1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3   ------------------------------------X
                                        :
4   JOSE BAUTA,                         :
                                        :   14-CV-03725 (RER)
5                    Plaintiff,         :
                                        :
6             v.                        :   225 Cadman Plaza
                                        :   Brooklyn, New York
7   GREYHOUND LINES, INC., *et al.*,    :
                                        :   May 21, 2019
8                    Defendants.        :
    ------------------------------------X
9
          TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
10           BEFORE THE HONORABLE RAMON E. REYES, JR.
                  UNITED STATES MAGISTRATE JUDGE
11

12  APPEARANCES:

    For the Plaintiff:        RAYMOND D. McELFISH, ESQ.
13                            McElfish & Associates, LLC
                              60 East 42nd Street
14                            Suite #2100
                              New York, New York 10168
15
    For Greyhound Lines,      BRADLEY JAMES BARMEN, ESQ.
16  Inc.; Sabrina            Lewis Brisbois Bisgaard &
    Anderson:                   Smith, LLP
17                            1375 East 9th Street
                              Suite #1600
18                            Cleveland, Ohio  44114

19                            STEVEN SAAL, ESQ.
                              Marshall Dennehey Warner
20                              Coleman & Goggin
                              800 Westchester Avenue
21                            Suite #C-700
                              Rye Brook, New York 10573
22
                              ROBERT ORTIZ, ESQ.
23                            JONATHAN SHAUB, ESQ.
                              Shaub, Ahmuty, Citrin & Spratt, LLP
24                            1983 Marcus Avenue
                              Lake Success, New York 11042
25

                              (Appearances continue on next page.)

    Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

1                                                                          2

2

3    APPEARANCES CONTINUED:

4

5    Court Transcriber:          SHARI RIEMER, CET-805
                                 TypeWrite Word Processing Service
6                                211 N. Milton Road
                                 Saratoga Springs, New York 12866
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1   (Proceedings began at 3:30 p.m.)

2   (Audio cuts in and out at times.)

3           THE OPERATOR:  There are seven participants on the

4   call including you.  You are joining your conference as the

5   host.  For many of available commands, press star pound.

6           THE COURT:  Good afternoon.  This is Magistrate

7   Judge Reyes.  We're holding a telephone conference in the case

8   of <u>Bauta v. Greyhound Lines, Inc.</u>, Docket No. 14-CV-3725.

9           Counsel for the plaintiff, please state your name

10  for the record.

11          MR. McELFISH:  Raymond McElfish for the plaintiff.

12  Good afternoon, Judge.

13          THE COURT:  Good afternoon.  Counsel for Greyhound.

14          MR. BARMEN:  Good afternoon, Your Honor.  Brad

15  Barmen for Greyhound Lines.

16          MR. SAAL:  Good afternoon, Your Honor.  It's Steven

17  Saal, Marshall, Dennehy for Greyhound Lines and Sabrina

18  Anderson.

19          MR. ORTIZ:  Good afternoon.  Rob Ortiz from Shaub,

20  Ahmuty, Citrin & Spratt also for Greyhound.

21          MR. SHAUB:  Jonathan Shaub from Shaub, Ahmuty,

22  Citrin & Spratt for defendants as well.

23          THE COURT:  Is there anyone else on the line?

24          MR. McELFISH:  Judge, you've got John Keefer for the

25  plaintiffs also.

4

1          THE COURT:  All right.  Okay.  We have a lot to talk

2     about.  Where should we start?

3          MR. BARMEN:  Your Honor, this is Brad Barmen.

4     Considering -- I agree, we do have a lot to talk about.  I

5     think one of the major issues is the disagreement we have

6     relative to the scope of causation in this trial because I

7     think that would -- talking about that first may help us with

8     some of the ancillary issues.

9          THE COURT:  Okay.  Well, what's the disagreement?

10         MR. BARMEN:  Well, very simply based on the filings

11    our discussions with Mr. McElfish.  Mr. McElfish is under the

12    [inaudible] that the first jury determined that Mr. Bauta's

13    lumbar injury was caused by the accident.  The defense

14    disagrees because the verdict's form that the jury actually

15    executed says do you find that the lumbar injury was caused or

16    exacerbated, exacerbated by the accident.  Based on that that

17    was what the jury found but they never were asked to

18    differentiate between whether they found that the injury was

19    actually caused by the accident or there was a pre-existing

20    condition that was aggravated by the accident.

21         So at this point we believe we're entitled to put on

22    evidence that -- similar to the first trial that he had a pre-

23    existing lumbar injury that was aggravated by the accident and

24    the extent of that is certainly relevant to any finding on

25    past and future pain and suffering for that injury.

1          THE COURT:  But aren't you the ones who raised the

2   request that the special verdict form be phrased that way?

3          MR. BARMEN:  Well, honestly I don't recall.

4          THE COURT:  I just checked it about five minutes ago

5   and that's what Mr. Saal put in in the proposed special

6   verdict form.

7          MR. BARMEN:  Okay.  Well, then that was the verdict

8   form that the jury executed.  So I disagree with plaintiff's

9   counsel representation that he's made multiple times in these

10  letters and replies that he's filed saying that the first jury

11  found that the injury was caused [inaudible - static] that's

12  not what they found.

13         THE COURT:  They found that it was caused or

14  exacerbated by.  So what --

15         MR. BARMEN:  Correct.

16         THE COURT:  How is that going to make a difference

17  in the -- in a trial for -- on pain and suffering alone?

18         MR. BARMEN:  Well, because certainly I believe it's

19  reasonable to expect if the jury finds that he already had a

20  problem that was just made worse by that could impact how they

21  see the severity of any damage number they want to fix.

22         THE COURT:  So we have to retry causation then?

23         MR. BARMEN:  No, no, no.  Well, to an extent but in

24  terms of it's the same experts that testified last time.  For

25  the defense it would be Drs. Casden, Rabin and Prolinzali

6

1   [Ph.] to explain the films, and one of the reasons I wanted to

2   start with this issue, Your Honor, because one of the things

3   plaintiff is trying to do is exclude those witnesses as being

4   irrelevant.  Obviously we disagree with that.

5          It doesn't -- it doesn't change the scope of what we

6   intended to get to.  Frankly we were surprised by plaintiff's

7   position that the first jury in his mind found that the injury

8   was caused by because that's not what the verdict said.  So we

9   were under the impression until the most recent filings that

10  that was the main issue in dispute for this trial.

11                    [Pause in proceedings.]

12          THE COURT:  Mr. McElfish, do you want to be heard on

13  this?

14          MR. McELFISH:  I do.  So Mr. Barmen I don't think

15  read my latest reply in which I said that causation

16  encompasses two potential possibilities.  One that the

17  accident caused the injury or two, that the accident

18  exacerbated the injury.  We agree it was one or the other as

19  the jury has found.  So I don't think they get to now try to

20  convince a new jury that the injury or the condition pre-

21  exists the accident because the first jury based on Mr. Saal's

22  verdict form has found that it was one or the other.

23          If the first jury had found that it was not caused

24  by the accident and not -- a prior condition was not

25  exacerbated by the accident we wouldn't be retrying the case.

1   So I don't -- I think Mr. Barmen misunderstands my position

2   and I think that it's pretty clear that that would eliminate

3   the need to try causation again.  I never said their expert

4   should be excluded.  What I said was given that was the main

5   purpose for using them I would like to request an offer of

6   proof from them as to what beyond that they would testify to

7   that would be within the scope of a non economic damages case

8   inside their deposition.

9           So I don't think they get to put on evidence as to

10  what caused the injury or what exacerbated the injury or even

11  found.

12          THE COURT:  But don't you think it makes a

13  difference -- don't you think it makes a difference on the

14  amount of pain and suffering whether the injury was caused by

15  the accident or whether the injury was exacerbated by the

16  accident?

17          MR. McELFISH:  Well, no.  This leads into a separate

18  issue to be discussed [inaudible] is that to what extent are

19  we going to tell the new jury anything about what the first

20  jury found.  Certainly I think the new jury needs to

21  understand --

22          THE COURT:  Don't -- no, no.  Don't go -- that's a

23  separate issue.

24          MR. McELFISH:  I'm going to --

25          THE COURT:  That's a separate issue.  Does it make a

8

1  difference on the amount of pain and suffering he's entitled

2  to whether it was -- whether his injury was caused by the

3  accident or whether it was exacerbated?

4          MR. McELFISH:  I don't believe it does, no.

5          THE COURT:  So in an exacerbation case you get the

6  same level of pain and suffering as you do in a -- in a case

7  where there's -- there is no exacerbation, there was no prior

8  injury and the defendant's caused whatever happened.

9          MR. McELFISH:  Correct.

10          MR. ORTIZ:  Your Honor, this is Rob Ortiz.  How are

11  you?  I just wanted to just chime in on that last point.  No,

12  it is actually different in terms of an exacerbation or

13  aggravation and there's a specific charge that's given that if

14  it's an exacerbation case you're only supposed to award for

15  the exacerbation, not for the underlying condition.

16          So the fact that the jury previously said either or,

17  we at this trial are still able to argue -- we're not saying

18  that -- I think that one of the confusions is that we're not

19  saying that he cannot recover.  There's no scenario where Mr.

20  Bauta doesn't recover pain and suffering where you're saying

21  causation means yes or no and it's either a zero or he gets

22  money.

23          That's not what we're saying.  What we're saying is

24  by virtue of the prior jury's verdict they determined that

25  either or occurred.  Either it was caused by, meaning he

1  didn't have a prior back injury and it came only from the bus

2  accident, or it was exacerbation.  We don't know which but

3  that was enough to recover but the difference is as you just

4  apply pointed or you posed the question, is there a

5  distinction and under New York law there is.  In fact, that's

6  one of the charges that you give in them making the award they

7  have to consider that.  I can give you the charge language if

8  you'd like.

9          THE COURT:  What did -- where did we charge -- I

10  don't have my jury charge right in front of me.  Do you know

11  what the -- where the charge is on the docket sheet that we

12  gave them?

13          MR. ORTIZ:  Are you asking me, Your Honor, or

14  someone else?

15          THE COURT:  Yes, I'm asking you, Mr. Ortiz.  Do you

16  know?

17          MR. ORTIZ:  I can pull it up if you give me one

18  second.  I apologize.

19          THE COURT:  The docket is only 765 entries long.

20                  [Pause in proceedings.]

21          MR. ORTIZ:  I don't have the number on it but I have

22  a copy of the hard -- the charge that you gave.

23          THE COURT:  Well, why don't you read what we did?

24          MR. ORTIZ:  I'm just going to that page if you bear

25  with me.

10

1            [Pause in proceedings.]

2            MR. ORTIZ:  So it's on Page 12 of your charge.  Do
3    you want me to read that?

4            THE COURT:  Yes.

5            MR. ORTIZ:  "So if you find that before this
6    accident the plaintiff had pre-existing -- "  Remember, that
7    was cervical lumbar at that time.  Now it would just be
8    lumbar.  "Lumbar spine dysfunction and/or degenerative changes
9    and further find that because of the accident one or more of
10   these conditions was aggravated so as to cause increase
11   suffering and disability then the plaintiff is entitled to
12   recover for any increased disability or pain resulting from
13   such aggravation.  However, he is not entitled to recover for
14   any physical ailment or disability which existed prior to the
15   accident or for any injuries from which he may now be
16   suffering which were not caused or attributed to by the
17   accident.  The plaintiff can only recover for damage caused by
18   aggravation of the pre-existing condition, not the condition
19   itself.  The plaintiff should be compensated only to the
20   extent that you find his condition was made worse by
21   defendant's actions."

22           So that's the charge you gave right before your
23   closing instructions in Part 3 of the charge.  That's based on
24   -- I don't know exactly.  There's a specific New York PJI
25   section as well that deals with that and that's what it is.

1   So that goes to the question that you asked before is there a

2   difference and with all due respect to Mr. McElfish, there is.

3   And if the jury here believes -- based on the evidence that's

4   going to be presented we present evidence saying look, it's

5   our position that it was pre-existing, that it only got worse

6   -- anything that happened it only got worse but the underlying

7   condition was there then the jury would award just for the

8   exacerbation.

9              If they conversely believe Mr. McElfish's proof that

10  he didn't have anything that was pre-existing and that it was

11  all caused by the accident well, then they don't pay the award

12  for the full value of it.

13             And then in your review, let's say there's an

14  excessive verdict just for an example and there's a review,

15  when we talk about what's sustainable under New York law then

16  we can say well, they found exacerbation or they found

17  causation but we can look at it and actually I would suggest

18  we actually have a question.  We can't say it didn't happen at

19  all and again I think that's part of what Ray's -- Mr.

20  McElfish's issue -- we're not saying it didn't happen at all

21  or he can't -- there's a way of us getting a zero here, okay,

22  but it's one or the other.

23             It's either it was caused by the accident or he had

24  the underlying condition and it was made worse by the

25  accident.  And it's important to know that because it's an aid

1   to the court in looking at excessiveness or inadequacy later

2   post verdict.  I try not to repeat myself but I think that

3   covered it.

4         THE COURT:  So where in essence -- what the

5   defendant proposed is in essence asking this jury to pick from

6   either caused by or exacerbation by.

7         MR. ORTIZ:  Right.  Without a possibility of saying

8   he gets zero which I think is what Mr. McElfish's concern was

9   or maybe.  I don't want to speak for him.

10        THE COURT:  I don't think you should ever try to

11  speak for Mr. McElfish.  He does a good enough for himself.

12        MR. ORTIZ:  Okay.

13        THE COURT:  But you see that -- all right.  Mr.

14  McElfish.

15        MR. McELFISH:  A couple of things.  That's why I was

16  getting ready to say that it goes to the charge.  I mean

17  basically the jury here should be instructed that the injury

18  was caused by or exacerbation by, and that's the language the

19  defendants asked for.  You were correct about that.  I believe

20  it was actually Mr. Ortiz and Mr. Saal together who asked for

21  that and to come to a reasonable amount of money for either

22  the causation or the exacerbation and --

23        THE COURT:  But how they can do that without having

24  evidence on caused by or exacerbation by?

25        MR. McELFISH:  That's an interesting question

1  because the defense expert previously -- let me just think

2  this through if you don't mind.  The defense experts

3  previously testified -- I mean their only real opinion for it

4  is that the injury did not or the accident did not exacerbate

5  things.  So it's going to be interesting --

6           MR. BARMEN:  Whoa, whoa.  Wait, wait.  That is

7  completely --

8           MR. McELFISH:  May I finish, please?

9           THE COURT:  Let him finish.  Let him finish.

10          MR. BARMEN:  Well, no.

11          THE COURT:  Yes, yes.  Let him finish.

12          MR. McELFISH:  So their opinions were -- and I have

13  Mr. -- Dr. Casden and Dr. Rabin and Dr. Prolinzali in mind

14  were basically this was a condition that pre-existed and was

15  not caused or exacerbated by the accident.  So I'm not sure

16  how now that discovery is closed they're going to change that

17  to say that it was exacerbated by the accident.  I just don't

18  see how they're going to now do that.  I mean it's already

19  been decided.  It was their language.

20          MR. BARMEN:  This is Brad Barmen.  May I now respond

21  to that?

22          THE COURT:  Yes.

23          MR. BARMEN:  Okay.  That is a complete

24  misrepresentation of what the R3 defense experts found.  They

25  all agree that Mr. Bauta had a pre-existing lumbar injury,

14

1   that there's no way the [inaudible] herniation was traumatic,

2   that the retro-spondylolisthesis was traumatic, that the nerve

3   root impingement was traumatic.  They all said at worst the

4   accident aggravated the condition that already existed and

5   they explain their findings for that.  Particularly Rabin and

6   Prolinzali using the films, Prolinzali being a neuro

7   radiologist.  So all to a man found that a) it wasn't caused

8   by the accident; and b) if anything it was an aggravation of a

9   pre-existing condition and it's clear in the record.

10          And to talk about -- Mr. McElfish brings up this

11  issue of a request for an offer of proof, we have been going

12  back and forth on this for weeks in the preparation of the

13  Rule 16 and meeting and conferring.  We are all in agreement

14  and have been in agreement that the playing field here are

15  witnesses who testified in the first trial and evidence that

16  was admitted in the first trial.  There's absolutely no reason

17  for an offer of proof because Mr. McElfish cross-examined all

18  three of these experts at trial.  He knows exactly what they

19  said then and he knows what they're going to say now.  The

20  testimony is going to be the same relative to the mechanism

21  [inaudible].

22          THE COURT:  All right.  Anything else, Mr. McElfish,

23  on this issue?

24          MR. McELFISH:  No.

25          THE COURT:  I'm going to let the doctors testify as

15

1   they see fit on the issue of caused by or exacerbated by.

2   They of course will not be able to argue that he doesn't have

3   an injury because the first jury found that he had an injury

4   and it was either caused or exacerbated by.  So look at their

5   depositions, look at their expert reports and we'll see what

6   they can and can't say.

7           MR. BARMEN:  Can I ask a follow up to that?  I

8   understand your ruling.  The long -- I think as long as the

9   jury receives a charge, it doesn't have to necessarily be --

10  they don't necessarily have to be told that this was the first

11  jury's finding I don't think but at least that they receive a

12  charge that there was already a finding of caused by or

13  exacerbated by.  That's why I kept talking about the charge

14  because I think the charge is [inaudible] with this so-called

15  proffer of evidence.

16          THE COURT:  We're going to work on a preliminary set

17  of jury instructions before we start the trial and a jury

18  charge for when the evidence is in.  In addition, a

19  description of the case for jury selection and we'll have all

20  of that prior to the start of the trial so you can see where

21  we're intending to go.

22          MR. BARMEN:  Okay.

23          THE COURT:  So that takes care of the defendant's

24  medical experts and what they can testify about.  What's next,

25  the next issue that you want to talk about?  I want to --

1          MR. BARMEN:  I guess next in line would be -- I

2  guess next in line would be whether they can get into --

3  whether or not the treatment was reasonable and necessary.  I

4  don't think they should be able to do that or past work

5  [inaudible].

6          THE COURT:  Where is that in the papers that you

7  submitted?

8          MR. BARMEN:  It's all over my briefs.  I know I went

9  through it again in my latest reply on Sunday.

10                      [Pause in proceedings.]

11          THE COURT:  That's the last thing.  Your last --

12  it's not all over.  There's one paragraph.

13          Are you intending to get into that?

14          MR. BARMEN:  Are you asking the defense or Mr.

15  McElfish?

16          THE COURT:  No, you, Mr. Barmen.

17          MR. BARMEN:  Well, certainly I don't think there's

18  any -- yes, to an extent because we believe he over treated to

19  inflate the damages.  Mr. McElfish wants the jury to know what

20  the first jury found in terms of awards and certainly if that

21  happens we should be able to put on evidence through our

22  experts again, the same medical experts, that the treatment he

23  received a lot of it was excessive, unnecessary, unreasonable

24  [inaudible].  For example, chiropractic manipulation under

25  anesthesia for someone claimed that traumatic [inaudible]

17

 1  herniation.  This is all testimony again that came in from the

 2  first trial.

 3          What Mr. McElfish wants to do is he wants to be able

 4  to put in everything that the --

 5          THE COURT:  We're not retrying the case.  We are not

 6  retrying the case.  I want everyone to be clear about that.

 7          MR. BARMEN:  We certainly don't intend to.

 8          THE COURT:  I want everyone to be clear about that.

 9  We are not retrying the whole case.  I know that's what you

10  want to do.  I know that's what you want to do but we're not

11  doing it.  Okay?

12          MR. BARMEN:  Your Honor, from the defense

13  perspective I can assure you that is not what we want to do or

14  intend to do but we need to be able to respond reasonably to

15  what Mr. McElfish does.

16          THE COURT:  Listen, the jury is not going to be told

17  that he received a cane and money for Percocet and -- they're

18  not going to be given a copy of the special verdict sheet and

19  we're not going to go through all that evidence over again.

20  This is about his pain and suffering and as everyone has done

21  from the beginning of this case you're making it into much,

22  much more than it is.

23          MR. BARMEN:  I understand that, Your Honor, but my

24  concern, the defense concern on this issue is Mr. McElfish

25  getting up and saying he's got hundreds and thousands of

18

1    dollars in medicals to try and bolster -- think that there's a

2    correlation between how much medical treatment and how much

3    the specials were in terms of pain and suffering.  The higher

4    the special number the correlation is the higher the pain and

5    suffering.  If he's going to -- we need to be able to respond

6    because we have evidence that demonstrates otherwise.  We have

7    experts to state otherwise.  We're not looking to go tit for

8    tat.  We're not looking [inaudible] certainly talk about

9    issues of $30 for this limitation or $30 for that limitation.

10           What we're talking about is -- one of the concerns -

11   - the back and forth we have had, Mr. McElfish and I,

12   [inaudible] going through this is what he thinks the jury

13   should be told.  Well, what he thinks the jury should be told

14   necessarily requires us to be able to respond assuming the

15   court is going to grant him to some extent what he's

16   requesting.

17           We have our hands tied.  We understand that.  We had

18   our hands tied in the first trial relative to liability both

19   for causation and punitive damages and we have our hands tied

20   even further in this case and I understand it because we now

21   own the back injury to some extent whether there was causation

22   or exacerbation but we still have to be able to put on a

23   defense to what he does.  We have to be able to try and

24   mitigate if permitted to have the opportunity to litigate with

25   the evidence that we have the number.  That's all we're

1   seeking to do.  We're just seeking an even playing field to

2   the extent it's possible under the circumstance.

3           THE COURT:  What do you propose to tell the jury

4   about, Mr. McElfish, about what the first jury awarded as far

5   as his medical expenses, medical care?

6           MR. McELFISH:  Nothing about medical expense

7   [inaudible] costs of care.

8           MR. BARMEN:  What about treatment?

9           MR. McELFISH:  I was waiting to see how the court

10  felt about that.  What my plan was was to put Dr. Mobin on and

11  perhaps Dr. Quartiali [Ph.] on just to walk through the

12  treatment without any necessarily any testimony about

13  reasonableness and necessary standards.

14          THE COURT:  Well, they -- they have to be limited --

15  they would have to be limited to what the jury found.

16          MR. McELFISH:  Right.  Exactly.  And just walk the

17  jury through the treatment that he had because that relates to

18  the pain and suffering that he endured during that and what it

19  would mean for the future without cost that the jury found,

20  the first jury found because that would relate to his future

21  pain and suffering but I don't think the defense gets to get

22  off -- if I don't get into reasonable and necessary medical

23  care the jury already found it was reasonable and necessary.

24  So I don't think the defense gets to get up and rebut that.

25          MR. BARMEN:  I agree with most of what Mr. McElfish

20

1  just said but if he's going to have Quartiali, the surgeon who

2  as far as we know is still actively treating his patient, Mr.

3  Bauta, and who testified in the first trial he never had any

4  intention of ever [inaudible] he -- Mr. McElfish wants to be

5  able to put that evidence on and prevent us from getting up

6  and saying [inaudible] it's too much, it's unnecessary when

7  that's what our expert witnesses to a man opined.

8          We're just asking for what's good for the goose --

9  if he's allowed to put in information in front of the jury we

10 should be allowed to rebut it with information that was

11 admitted in the first trial that's relevant to the issues for

12 the lumbar spine.  That's all.

13         MR. McELFISH:  I think to make it simple, Judge,

14 because it sounds like it's getting far afield, is the first

15 jury -- this is why in the last question I was trying to

16 figure out what you're going to tell the jury about the first

17 trial is if this jury is told that the medical bills were

18 found to be reasonable and necessary -- I'm not getting into

19 amounts obviously -- and that the future needs were found to

20 be reasonable and necessary I don't think anybody needs to

21 talk about costs.  Nobody has talked about reasonable and

22 necessary.  I think those matters have been decided and should

23 be eliminated.

24         MR. BARMEN:  But when you talk about reasonable and

25 necessary then does the first jury get told or does this jury

1  get told that based on all that the first jury awarded $36,000

2  in past, [inaudible] and future.

3          MR. McELFISH:  No.

4          MR. BARMEN:  But see that's my concern.  You want to

5  be able to put in what is good for you to try and raise an

6  inference in the jury's mind that the injury is such obviously

7  worse than we [inaudible] and prevent us from doing anything

8  to rebut that.

9          I understand it's a slippery slope, Your Honor, and

10 I guess the issue is how do we proceed with Mr. McElfish being

11 able to tell the jury what he wants to tell them and the

12 implications and the reason for that obvious and don't need to

13 be stated and yet at the same time expect us not to be able to

14 put in evidence in front of the jury that the first jury saw

15 [inaudible].

16         MR. McELFISH:  I think it's being overblown.

17         THE COURT:  Well, you're going to -- I'm going to --

18 you're going to see how we will phrase to the second jury what

19 the first jury found.  We have to figure that out ourselves

20 and then you will see it prior to trial.  No expert can

21 testify as to future pain and suffering beyond what the first

22 jury found as far as his future medical expenses.  In other

23 words, I'll --

24         MR. McELFISH:  Surgery is a good example.

25         THE COURT:  We can use the surgery as an example,

1   right.  They found that he is entitled to a lumbar fusion

2   surgery in the future.  I'm not going to tell them how much

3   the jury found but we will tell them something about that.  So

4   no expert can say well, a lumbar fusion is -- this is what it

5   is, this is the -- painful post surgical recuperation period,

6   whatever, but they can't go beyond that.  They can't say oh,

7   he's going to need another surgery or he's going to need a two

8   level fusion or he's going to need lumbar epidural injections

9   because the jury said no, he's not.

10          MR. McELFISH:  Right.  That was my point is that I

11  don't intend to go beyond what the first jury found but they

12  can't turn around and say well, it's not necessary and he

13  shouldn't have it.  That was my whole point with the

14  reasonable and necessary argument.

15          MR. BARMEN:  Wait a minute.  This is Barmen.  The

16  jury did award an amount of money for that future surgery.

17  But if you recall, Your Honor, what the testimony was on that,

18  and it was from Dr. Mobin was a study that he referenced

19  that's in the record that was all patients who had herniations

20  from degenerative disk disease, not trauma, and it was

21  something like 36 percent.

22          THE COURT:  Yes, we litigated that in the motion,

23  right, and that stands.

24          MR. BARMEN:  I don't under -- what I'm finding is

25  are we allowed to go back to Dr. Mobin and question that

23

1   study.

2           THE COURT:  No, because the first jury found -- the

3   first jury found he's entitled to a future surgery.  He's

4   proved that by a preponderance of the evidence.  They gave a

5   dollar amount for that surgery with the cost of the surgery

6   and you filed a post trial motion to set that aside and I

7   denied that motion.  So you can't now argue to the second jury

8   he's not -- he doesn't need the second surgery.  All you can

9   argue is the second surgery is -- equates to whatever level of

10  pain and suffering because the first jury screwed it up by not

11  giving him a dollar amount.

12          We're not relitigating -- Mr. McElfish is right.

13  We're not relitigating what's reasonable and necessary because

14  the first jury already determined that and it's been sustained

15  to a large degree on motion post trial.

16          MR. BARMEN:  I'm just trying to make sure I

17  understand what that means in terms of the scope of what we

18  can and cannot do because the first jury gave an amount of

19  money for the future surgery but was there a verdict -- and I

20  honestly don't recall.  I don't have it in front of me that

21  says if he's going to need that future surgery.  I don't know

22  if there was a finding.

23          THE COURT:  Yes, I think that's a fair -- I don't

24  even think if you call it an inference to be drawn from the

25  special verdict sheet and the charge.  I could only -- they

24

1  could only give him damages for things they find he proved by

2  a preponderance of the evidence he will need in the future as

3  a result of the injury being caused or exacerbated by

4  Greyhound's and Ms. Anderson's conduct.  The jury has said

5  that.  He's going to need a future surgery.  He is going to

6  need one year of home care.  He's going to need a straight

7  cane for 12 years, yada, yada, yada.

8          So that's what we'll do with that issue.  Everyone,

9  all expert witnesses are confined to what the first jury found

10 as far as what is going to be required in the future and they

11 have to say well, this is -- this is painful.  This is

12 whatever.  This is how it's done and the jury will then -- and

13 the other side will say well, no, that's not how it's done or

14 well, it's not that painful or whatever they're going to say

15 they're going to say and the jury will come up with an amount.

16         Next issue.

17         MR. McELFISH:  Criminal convictions.  They've argued

18 that they should have them on the back burner, that they might

19 need to use them.  As I said in the papers, they're itching to

20 get them in again and I just -- I'm trying to get clarity on

21 the ruling that it has really no place.  I only intend -- the

22 outer limits of what I intend to offer by way of evidence is

23 physical limitations that could affect him in all parts of

24 life.  I mean the ability to stand, ability to stand, ability

25 to lift weights, ability to run.  Those are the things that

1   result from infusion but that -- I just need to make sure that

2   they don't come in and create another mistrial or retrial by

3   putting -- trying to put -- even by inferring some of these

4   convictions.  That would be the next issue I think.

5          THE COURT:  Mr. Barmen, do you intend to get into

6   the convictions?

7          MR. BARMEN:  Only if, Your Honor, Mr. McElfish or

8   Mr. Bauta tell the jury that he's incapable of working because

9   of his injury, and I've had [inaudible] on multiple occasions

10  with Mr. McElfish and the issue is he wants to preclude it

11  whole claw.  We certainly understand that your rulings the

12  first trial, and that was really relative to the issues of his

13  anxiety and depression and because of his inability to support

14  his daughters.  And we argued and the judge agreed -- you

15  agreed, Your Honor, that okay well, there's reasons why other

16  things that could cause the anxiety [inaudible] to his

17  inability to work.

18         Now, I asked Ray, Mr. McElfish, tell me you're not

19  going to go there and then we don't have an issue and he

20  wouldn't commit to me.  Well, I don't intend to but I can't

21  promise what's going to be said on the stand.  Okay.

22         And in one of his recent filings, and I don't have

23  it in front of me, Steven.  Help me with the docket number.

24         MR. SAAL:  Yes, the docket number is 760.  It's Mr.

25  McElfish's letter of May 16th.

26

1          THE COURT:  Hold on.  Let me find it.  Let me just
2  find it.  Just a second.
3                    [Pause in proceedings.]
4          MR. BARMEN:  Second page, Your Honor, bottom
5  paragraph.  He specifically includes an inability to work in
6  his papers.  It's about eight lines from the bottom of the
7  page.
8                    [Pause in proceedings.]
9          THE COURT:  Well, certainly -- are you saying now,
10  Mr. McElfish, that you're not intending to get into that?
11          MR. McELFISH:  I guess the problem I have is is if
12  you have physical limitations it certainly seems to have an
13  affect on your ability to do physical things or to sit or to
14  do things that would be required to work.
15          If your ruling is that I can't say he's unable to
16  work but he has these physical limitations I'll abide by that
17  ruling to exclude these matters.  No problem.  I thought I
18  said something different on May 18th.  I thought about it
19  after talking to these fine gentlemen.  I had said on May 18th
20  that I only intended to get into the physical limitations.
21          THE COURT:  The issue of lost wages was not part of
22  the trial.
23          MR. McELFISH:  Correct.
24          MR. BARMEN:  Correct.  Remember, Your Honor, this
25  man was unemployed for the year prior to the accident.

1          THE COURT:  Yes.  But I'm just wondering how an

2     argument that well, his pain -- his limitations on bending,

3     stretching, sitting, whatever, is going to impact his ability

4     to work and therefore he gets pain and suffering damages where

5     the first jury didn't award him any lost wages, no emotional

6     or psychological damages whatsoever.  How does that -- how do

7     we get that in now?

8               MR. McELFISH:  I think there's --

9               THE COURT:  This is all about --

10              MR. McELFISH:  Let me just say this.  Prior to the

11    first trial I withdrew any formal economic claims for lost

12    earnings.  It wasn't ever presented.  The jury never had a

13    chance to reject it or to decide it.  So in this case I think

14    there's a huge difference between a psychological claim and

15    PTSD and emotional damages related to depression and anxiety

16    as opposed to the standard mental suffering that you get under

17    the jury instruction for standard pain and suffering, and I

18    think that's the dividing line is that he should be able to

19    say he's unable to work because he's physically unable and to

20    the extent he has mental suffering from the pain he's unable

21    and I think that's the dividing line.

22              MR. BARMEN:  Once again, Your Honor, Barmen again.

23    He's trying to handcuff us and he just said it again.  He

24    wants to be able to tell the jury that because of the pain,

25    the injury to the back this man could -- can't work, i.e. he

28

1   would be working but for the back injury from the accident

2   whether it was caused by it or exacerbated.

3           THE COURT:  I'll simplify it.  If you get into the

4   issue of work in whatever way in the future then that opens

5   the door for the convictions to come in.

6           MR. McELFISH:  That's all we were asking for, Your

7   Honor.

8           THE COURT:  So steer clear of it and the jury won't

9   hear about that.

10          MR. McELFISH:  But physical limitations do not open

11  the door by themselves?

12          THE COURT:  No, of course -- that's part of his pain

13  and suffering, his physical pain and suffering.

14          MR. BARMEN:  And the defense doesn't disagree with

15  that.

16          THE COURT:  Next issue.

17          MR. McELFISH:  Before you move on from that, a

18  related matter is I just want to be specific about this is --

19  because right now we're talking about the substantive issue of

20  I guess he would call it earning capacity and you ruled on

21  that.  Now I want to turn just for a second to impeachment.

22          Are they -- are you going to allow them for any

23  reason to get into the save a lot application which previously

24  -- I argued previously was not turned over in discovery,

25  contains a job application that contains a misstatement or a

1   lie depending on who you are about whether or not he had a

2   record.  I can't imagine how that would be allowed in but I

3   wanted to specifically discuss it on the record with you.

4           MR. BARMEN:  Your Honor, in response to that.  The

5   save a lot application did come in to the first trial and why

6   it's relevant is very simple.  It's the plaintiff lying and

7   his credibility is certainly at issue in a trial about non

8   economic damages.  Certainly the defense believes to a certain

9   extent that the claims are exaggerated.  I mean we have the

10  surveillance.  We have everything else.  I've never been

11  involved in a case that I'm aware of as a civil defense lawyer

12  where the plaintiff's own credibility wasn't an issue.

13          MR. McELFISH:  Well --

14          MR. BARMEN:  And he -- he submitted a false

15  application where he claims he had never been convicted of

16  something when in fact he knew he had.

17          MR. McELFISH:  Well, first of all -- that's why I

18  wanted to talk about impeachment, Judge.  That's Federal Rule

19  609.  And he's now trying to get in an application that I

20  believe is dated 2005 and it's a 13 year old conviction to

21  start with and both items are over 10 years and they haven't

22  shown a substantial need or substantial relevance to it under

23  the rule.  So I guess that needs to be looked at.

24          MR. BARMEN:  Again, my point is the relevance is

25  simple.  It bears directly on the plaintiff's credibility

1 which is always in play no matter what the limited issues in a

2 trial are.

3          MR. McELFISH:  It's not in play if it violates 609.

4          MR. BARMEN:  Going back to you -- it's in the Rule

5 16.  We all agree that evidence that was admitted in the first

6 trial it's relevant to [inaudible] this trial is fair game.

7          MR. McELFISH:  No, no, no, no.

8          MR. BARMEN:  It was admitted in the first trial and

9 it's relevant to your client's credibility.

10          MR. McELFISH:  The plaintiff would seek exclusion of

11 that, Judge, under 609.  First of all, I don't know what lie

12 they would be trying to impeach because it has to be something

13 related -- that was an employment application but here we go

14 again.  If I don't talk about employment how does that even

15 impeach anything but it also violates 609.

16          MR. BARMEN:  I don't want to keep going back and

17 forth on it.  I mean the 609 argument was made prior to it

18 being admitted in a trial a year ago.  Nothing has changed in

19 terms of the impact of 609 since it was admitted the first

20 time.

21          MR. McELFISH:  Well, a lot has changed.  I mean he's

22 not making employment claims.  He's not making financial

23 distress claims related to his children.  I mean a lot has

24 changed.  It's a very limited --

25          THE COURT:  Well, you're not going to be --

1          MR. BARMEN:  [Inaudible] the first time.

2          THE COURT:  This is a 2005 job application.

3          MR. BARMEN:  I don't remember the date on it but it

4     came after the conviction.  Steven, offhand is that right,

5     2005?

6          MR. SAAL:  I'm bringing it up right now.

7                    [Pause in proceedings.]

8          MR. SAAL:  Actually it was a 2010 job application,

9     Your Honor, and I also recall from the court's order on the

10    retrial -- on the motions for a new trial from January 4th the

11    court said that this wasn't a 609 application despite Mr.

12    McElfish's reliance on that section.  It was a 403 issue

13    because they --

14         THE COURT:  Evidence of --

15         MR. SAAL:  Evidence of impeachment based on the

16    convictions themselves.  It's evidence --

17         THE COURT:  Exactly.

18         MR. SAAL:  -- of the fact that he lied on a job

19    application.

20         THE COURT:  Exactly.  That's what I was going to say

21    is that it's -- 609 prevents evidence of the conviction where

22    the jury finds out what the conviction was about and all --

23    we're not going there.  It's simply -- if we're going to use

24    it for cross examining him on his credibility he lied on a job

25    application.  You said you never been convicted and in fact

1  you had been convicted of something; correct?

2          MR. BARMEN:  Precisely, Your Honor.

3          MR. McELFISH:  How is it relevant if he's not making

4  an employment claim or an inability capacity claim?

5          THE COURT:  Because if -- if you lie it's relevant.

6  If you lie about anything.  If you lie about something that's

7  not material it's relevant because a lie is a lie.  I

8  understand your point it's not a lie, it's a misstatement and

9  you can use that on redirect but I think the jury is entitled

10  to know that this guy who -- juries are always entitled to

11  know about someone's credibility.  It's the primary reason why

12  you have juries is to assess [inaudible].

13          MR. McELFISH:  How far into the conviction are you

14  going to allow this to go?

15          THE COURT:  Not far at all.  He has been convicted

16  of something.  No, he lied on a job application when he said

17  he wasn't convicted.

18          MR. McELFISH:  That's it?

19          THE COURT:  And when he was convicted of something.

20  Yes, that's it.

21          MR. McELFISH:  On something?

22          MR. BARMEN:  We never had -- we don't have any

23  intention to go farther than that, Your Honor.

24          THE COURT:  No searchable database.

25          MR. BARMEN:  No.

33

1          THE COURT:  None of that.

2          MR. McELFISH:  So what's the something, just

3     something?

4          THE COURT:  You had a conviction and you didn't

5     disclose it on your job application.  Not you didn't disclose

6     it.  You said you didn't have a conviction when you did.

7                    [Pause in proceedings.]

8          THE COURT:  Next issue.

9          MR. BARMEN:  Your Honor, Mr. McElfish wants to

10    preclude us from bringing in Kelly Peachy.  If you recall she

11    was the EMT on scene who initially was the first person to

12    assess Mr. Bauta.  She testified by a videotape in the first

13    trial.

14         THE COURT:  That he hurt his shin.  That's the only

15    thing.  Right?

16         MR. BARMEN:  Right.  That she specifically assessed

17    his head, neck and back, that he specifically denied back pain

18    at the scene, and that the only thing he complained of was the

19    shin pain.  We also think it's relevant that -- how he got out

20    of the bus and the fact that he was willingly assisting the

21    EMTs [inaudible].

22         THE COURT:  Mr. McElfish.

23         MR. McELFISH:  I don't see the relevance of that and

24    then it starts getting into areas of precluded material.

25         MR. BARMEN:  What precluded material?

34

1          MR. McELFISH:  That he was with Ms. Wang.

2          MR. BARMEN:  It has nothing to do with Ms. Wang.  He

3    wasn't with Ms. Wang when he was being assessed by Kelly

4    Peachy.  It was the other EMT that he was with Ms. Wang for.

5          MR. McELFISH:  Again, how is it relevant to his pain

6    and suffering?  I'm not following.

7          THE COURT:  If he wasn't in pain -- I guess the

8    defendant's argument if he wasn't in pain immediately after he

9    wasn't in pain.  There's no pain.  He wasn't suffering.

10         MR. McELFISH:  This is the delayed onset issue that

11   I raised.

12         MR. BARMEN:  And it's also relevant to the

13   aggravation and exacerbation issue as well but our experts,

14   Your Honor, if you recall say that if he had suffered an 11

15   millimeter herniation and all the damage that's shown in the

16   '15 MRI including the retro-spondylolisthesis that he would

17   have been in excruciating pain immediately.  But the plaintiff

18   wants to say the shin pain masked the pain from the 11

19   millimeter herniation.

20         And there was also testimony the first time around,

21   Your Honor, the first time Mr. Bauta claimed of back pain was

22   eight days after the accident after he had retained counsel

23   and we think that's all relevant.  Again, it certainly

24   reflects on credibility.

25         THE COURT:  Ms. Peachy can testify.

1          MR. BARMEN:  The next issue for the defense, Your

2  Honor, unless Ray, you want to go alternating.

3          THE COURT:  Yes, let's alternate.

4          MR. McELFISH:  Go ahead.  Whoever is next.

5          MR. BARMEN:  The surveillance, Your Honor.  The

6  surveillance -- we had surveillance that was played and

7  entered into evidence in the first trial.  Since the first

8  trial since your ruling came out that this was going to get

9  tried again we surveilled Mr. Bauta again.  We have additional

10  surveillance material on Mr. Bauta.  We disclosed that to Mr.

11  McElfish roughly two months ago.  You recall he petitioned you

12  to depose Mr. Bauta again the last time we had surveillance

13  before it was disclosed.  We didn't bother with that at this

14  time.  We just sent him what we had.  Mr. McElfish has taken

15  the position that because it was -- the surveillance was taken

16  subsequent to the first trial obviously it couldn't have been

17  used in the first trial so it should be precluded.  Again, it

18  goes to Mr. Bauta's credibility.

19          But by the same token while Mr. McElfish takes the

20  position we should not be able to use the new surveillance

21  that was timely disclosed to him Mr. Bauta has continued to

22  treat with New York Spine and Mr. McElfish asked for the

23  subsequent treating records that obviously couldn't have been

24  in the first trial because they didn't exist at the time just

25  like our surveillance to be in evidence.

1         So the surveillance is no different than -- they're

2    going to get up and say this guy continuing to treat because

3    he's still having [inaudible] and pain and this, that and the

4    other thing.  We have additional surveillance that flies in

5    the face of that.

6         So if the new records would be coming in, which we

7    don't object to and frankly I think it's fair game, the new

8    records.  So is the new surveillance for the same purpose it

9    was used the last time.

10        MR. McELFISH:  Let me correct a couple of things.

11   Mr. McElfish here.  The surveillance was disclosed on April

12   22, 2019.  I did not ask for the new records.  I was asked by

13   the defendants for an authorization.  They attempted to

14   subpoena the records from New York Spine and they couldn't get

15   them.  So they asked me for an authorization which I gave

16   them.  I think it all ought to be excluded.  I think that not

17   being able to take any discovery on the surveillance -- I mean

18   I've learned a lot the first time around and I had [inaudible]

19   their investigators because I found things in discovery that I

20   wanted to put on before the jury but here I'm precluded from

21   that and it's just another way to back door new information.

22   I don't think any of it should come in.

23        MR. BARMEN:  Just so we're clear on everything, yes,

24   we got the authorization, requested the authorization to see

25   if he had any more treatment since the last trial.  But Ray,

37

1  it was you that asked specifically in an email to Steven those

2  new records would be included in the joint exhibits.  So it

3  was your request included in the exhibit.

4          MR. McELFISH:  No, no, wait a minute.

5          MR. BARMEN:  It was.  And wait a minute.

6          MR. McELFISH:  Let me straighten -- let me

7  straighten this out.

8          MR. BARMEN:  I'm not done yet.  I'm not done

9  talking, Ray.

10          So in terms of any discovery, you didn't request any

11  since we disclosed the surveillance to you.  You didn't

12  request to depose the investigators again.  You didn't request

13  a deposition of your own client.  You were silent on it until

14  the Rule 16 where you objected to it.

15          THE COURT:  So, Mr. McElfish, I want to be clear.

16  The post trial treatment records you're saying you don't

17  intend to use them.

18          MR. McELFISH:  I just -- the answer is correct and

19  I'd like to answer what he says is that only a week ago as we

20  were putting trial exhibits together I asked Steven to include

21  them just because you might want to see them in making your

22  rulings but it was the defendants who were out seeking them

23  with subpoenas and authorizations.  I considered discovery

24  closed.  Since this day it's been closed prior to the first

25  trial.  So that's why I didn't seek discovery on the

1   surveillance.  That's why I didn't produce voluntarily any of

2   these medical records as if discovery was open.  So I don't

3   think it should be used.  I don't think any of it should be

4   used.  I didn't ask for any of it.

5            THE COURT:  Mr. Barmen, last point.

6            MR. BARMEN:  Your Honor, they're going to be talking

7   about future medicals which we've already discussed, what he's

8   going to need in the future.  The fact that he's still

9   treating with Quartiali.  So those records are relevant and

10  he's going to come in -- Mr. Bauta [inaudible] trial again

11  with his cane and tell the jury that it takes him two hours to

12  get out of bed and how much pain he's in every day yet we have

13  recent surveillance where he's strolling around Brooklyn like

14  you, me, Steven or anybody else, much like we saw the first

15  time.

16           So it's certainly relevant to his credibility when

17  he's going to come in and say I'm in this kind of pain and

18  it's constant to this day we should be able to show the jury

19  what he looks like on days when he's not -- when he doesn't

20  think he's being looked at.  And it's no different than the

21  first time around.

22           And of course discovery was closed prior to the

23  first trial but at the time we tried the case and everything

24  else we didn't know that we would be having another trial.  So

25  we made the decision at that time to do a few more days of

1  surveillance and we happened to get him on days when he was

2  out walking around.  Now, certainly like the last time he can

3  come in and say well, I was having a good day that day, I have

4  good days and bad days and you caught me on a good day.  They

5  can absolutely do that which is what I would expect them to

6  do.

7         But when he's going to come in and tell this jury

8  that he's still suffering we should be able to give a jury a

9  peak at how he appears when he's not in front of a jury.

10        MR. McELFISH:  Only discovery, Judge.  It's

11 inappropriate.

12        THE COURT:  I'm going to reserve decision on the

13 2019 surveillance.  But I have to think about it.  I will make

14 the same ruling with respect to the post trial medical

15 records.  Either both are coming in or both are going to be

16 excluded along with any testimony related to that.  And I'll

17 let you know when we start -- before we start.  Make a note of

18 that.

19        I want to take an issue next.  It's related.  It's

20 Christine Gautheir and Sean Lanigan.

21        MR. McELFISH:  Yes, Your Honor.

22        THE COURT:  You want to exclude them, Mr. Barmen;

23 correct?

24        MR. BARMEN:  Yes, Your Honor.  Those were --

25 remember, Mr. McElfish subpoenaed all four investigators.

40

1    Those were two investigators that went out to try and find Mr.

2    Bauta and never got it.  So Mr. McElfish wants to come in and

3    make an issue of the efforts we went to.  We can certainly do

4    that with Sean who's their boss which you did last time in

5    terms of how much money we spent on surveillance.  But there's

6    no need to parade in two unnecessary witnesses who are going

7    to say yeah, I went to find him and I never saw him.  You get

8    that information from the two that actually did see him or the

9    one that actually saw him and the one that was responsible for

10   the assignment.

11            THE COURT:  That would be Scott Whitlock and Chris

12   Viggiano.

13            MR. BARMEN:  Viggiano, yes, Your Honor.

14            THE COURT:  So you --

15            MR. BARMEN:  I said Sean.  I meant Scott.  I

16   apologize.

17            THE COURT:  So you have no problem with Mr. Whitlock

18   and Viggiano testifying, just not Gautheir and Lanigan?

19            MR. BARMEN:  It's cumulative.  It's unnecessary.

20   They add nothing.

21            THE COURT:  Why do you need them to testify, Mr.

22   McElfish?

23            MR. McELFISH:  As Mr. Barmen says, Judge, everything

24   from the first trial comes in the second trial.  They had

25   relevant testimony as to their effort.  Certainly, Gautheir

41

1   testified as to how her attempts to try to locate him.  And

2   Mr. Lanigan testified as to basically the overall operation

3   that they were running and the amount of money that it cost.

4   That was all admitted.

5           THE COURT:  You're going to be able to get all these

6   people in that you intend to get in in a week?

7           MR. McELFISH:  Sooner.  I put my case on quick.

8           THE COURT:  Just like last time, right?

9           MR. McELFISH:  I was pretty quick on compensatory

10  damages.

11          MR. BARMEN:  You said it, Your Honor.  Not me.

12          MR. McELFISH:  If you exclude causation, it would be

13  really quick.

14          THE COURT:  There's no way to exclude causation

15  other than telling the jury that there is causation.  They

16  have to decide which one.

17          MR. McELFISH:  Right.  Okay.

18          THE COURT:  All right.  I'll allow them to testify.

19          MR. BARMEN:  Your Honor, the next issue for the

20  defense is [indiscernible] put in numerous autographs that

21  were not part of the Rule 16.  And some of the ones that he

22  wants to now include despite his representation were not

23  admitted in the first trial.  We think the fact that they were

24  not included in the Rule 16 is enough to preclude them.

25          Mr. McElfish stated in his letter request for that

42

1   that he didn't have time to review the Rule 16 closely enough

2   because of his trial schedule.  There were five or six

3   versions, red line versions that went back and forth primarily

4   between Mr. Saal on our end and exclusively Ray, Mr. McElfish

5   on the other end.  In fact, we tried to move things along by

6   working either with Mr. Kieffer.  We requested that someone

7   else in Ray's office.  Ray insisted that it be him.  So for

8   him to say that he didn't have time to review it despite the

9   fact that we had emails back and forth with the five or six

10  different redline versions just doesn't make sense to me.

11          But more importantly, the law is pretty clear on

12  this.  Him being too busy even if that were the case, isn't an

13  excuse and he's waived the right because it wasn't in the Rule

14  16, it was agreed to by the parties and submitted, to now put

15  those in over our objection.  And that's just for the ones we

16  actually used in the first trial.

17          The photographs themselves don't add anything for

18  the purposes of pain and suffering.  You know, we own the

19  accident.  We own the BAP.  He's not bringing anyone in.  His

20  biomechanics engineer has not been identified in this trial,

21  John Smith.  So to try and have the jury to infer what the

22  forces could have done is inappropriate.  There's no one

23  that's going to come in to authenticate the photographs.  A

24  couple of them are after the vehicles were separated.

25  [Indiscernible] can't authenticate those.  He wasn't at the

43

1  scene after the vehicles were separated.  He's already been

2  transported.

3           So there's an authentication problem.  There's a

4  relevancy problem.  There's a prejudice problem, separate and

5  apart from the issue with the Rule 16.  Steven, am I missing

6  any?

7           THE COURT:  Are there any pictures that were in the

8  joint pretrial order?

9           MR. SAAL:  No, there were no photographs as to the

10  bus accident in the joint pretrial order, Your Honor.  The

11  only photographs listed in the joint pretrial order were the

12  photographs of plaintiffs' injuries.

13           MR. BARMEN:  Which we have no objection to, if I

14  recall, Steven.  Is that correct?

15           MR. SAAL:  No, no stated objections.

16           MR. BARMEN:  Right.

17           THE COURT:  Mr. McElfish?

18           MR. McELFISH:  Yeah.  As I put in my papers, the one

19  case that Mr. Saal cited was way off the mark involving Judge

20  Spatt and Judge Boyle where they found that a lawyer's

21  schedule wasn't sufficient because there was a history and

22  pattern.  I don't remember the name of the case.  It's in the

23  papers, where there was a history and pattern by the lawyer

24  trying to assert that he was too busy.  And Judge Spatt said,

25  no, I agree with Judge Boyle.  This pattern of conduct was

44

1  deliberate, and there was a whole history of it that was

2  cited.

3          So the law is not clear, as Mr. Barmen said, number

4  one.  Number two, I was being very honest with the Court.  I

5  was in the middle of a five-week trial.  I had -- it wasn't

6  anything to do with the Rule 16 or the redlining.  I simply

7  went through the exhibits and the damages and did not go

8  through the exhibits and the liability, and those were the

9  photos that were in that section.

10         And I'm simply saying, first of all, it was an error

11 on my part that Mr. Bauta should not be penalized for, number

12 one.  There's no prejudice to the defendants, and I think it

13 was a week after the Rule 16 was file where I was done with

14 this trial out here.  So there's no prejudice in the timing of

15 it.  Whether or not there's prejudice with them being in the

16 case is a different issue.  It is just to give -- and I'm

17 agreeable.  I said this in the papers.  I'm agreeable to one

18 or two or three photographs and give the jury an idea of what

19 the case is about and what the accident basically looked like

20 and what Mr. Bauta endured.  I don't intend to use them for

21 any other purpose.

22         So yeah.  That's my position.

23         THE COURT:  Well --

24         MR. BARMEN:  And if I may respond briefly, Your

25 Honor?

1        THE COURT:  Go ahead.

2        MR. BARMEN:  Those two or three, whatever he wants

3   to use, to try and demonstrate to the jury what Mr. Bauta

4   endured is one of the issues we have with this because there's

5   nobody going to come in this trial to explain to the jury what

6   Mr. Bauta endured.  They're going to see photographs of a very

7   bad accident.  They're not going to hear about how the forces

8   dissipate as you go back and where Mr. Bauta was sitting and

9   how the impact forces were different on the people in the

10  front of the bus versus the middle of the bus, like the back

11  of the bus, the things they heard the first time around.

12        All they're going to see is photographs of what was

13  a bad accident.  And it's for no other purpose than to

14  prejudice and inflame without anyone to authenticate it or put

15  it into the proper context as it relates to the impact to Mr.

16  Bauta.

17        MR. McELFISH:  For --

18        THE COURT:  He's not done yet.

19        MR. McELFISH:  Oh, I thought he was done.

20        MR. BARMEN:  You know, I am done.

21        THE COURT:  Okay.

22        MR. McELFISH:  Last word?

23        THE COURT:  Yes.

24        MR. McELFISH:  Mr. Bauta can authenticate.  He was

25  there.  He saw the vehicle.  He lived through this.  What Mr.

1   Barmen is explaining is a biomechanical analysis.  No one's

2   going to make any argument about forces or any of that.  It's

3   just any one, two, or three of the photographs that would be

4   allowed would simply be used to show the juror, to set the

5   scene and let them understand what they're actually providing.

6          MR. BARMEN:  And it's exactly that type of prejudice

7   we're trying to avoid because they're not going to get any

8   context other than that.  Mr. McElfish can tell the jury this

9   was a bad accident.  Nobody disputes that.  But the impact of

10  those pictures with no context and nothing else and no

11  explanation on the forces, if Mr. McElfish had identified John

12  Smith and John Smith was going to come in to discuss that, we

13  wouldn't be objecting to it other than the fact that they

14  weren't disclosed in the Rule 16 as they should have been.

15         And there's an issue with, you know, him wanting to

16  submit eight or ten of them and only four or five of them were

17  actually admitted in the first trial. But that's a different

18  issue -- they're going to -- the impact of seeing that bad

19  accident and then talking about pain and suffering with no

20  bridge between what it actually did to Mr. Bauta.

21         Now, a couple of those photographs, again, are after

22  the vehicle were separated.  Bauta wasn't there then.  He

23  certainly can't authenticate those.  And he can describe what

24  this accident was.  Mr. McElfish certainly is going to in open

25  and close and every other opportunity he has.  The photographs

47

1  themselves, the potential prejudicial value of them outweigh

2  any relevance to the limited issues in this trial, and that's

3  exactly their intent in trying to get it in front of the jury.

4          MR. BARMEN:  Now may I have the last word?

5          THE COURT:  All right.  Fine.

6          MR. BARMEN:  Real quick, Judge.  I'm not going to

7  call John Smith back in because for the -- not because I don't

8  want to put the pictures in but because the jury's already

9  decided causation.  So there was no need for him.

10         And I recall what you said about the pictures of Ms.

11  Wang when she was relevant to the first trial.  Just because a

12  picture is bad doesn't mean it's prejudicial.  Undue prejudice

13  is something different than inherent prejudice.  Just because

14  it was a bad accident and the jury gets a chance to see what

15  it is they're deciding and what it is it's about is not the

16  kind of prejudice that 403 was contemplating.

17         THE COURT:  Agree to one picture.  If you can't

18  agree, then you each some with the one picture you propose and

19  I'll pick it.  Jury needs some context.

20         Next issue.

21         MR. McELFISH:  I'll just jump in if Brad, you're

22  ready -- not ready?

23         MR. BARMEN:  No, go ahead.

24         MR. McELFISH:  Dr. Goldman, they're trying to get in

25  Dr. Goldman's notes about Mr. Bauta going on a bus ride.  I

1  think there's a way they can get that in without Dr. Goldman

2  or her notes.  She would need to be cross-examined on the

3  context of her notes.  Because one thing I remember her saying

4  was, Yeah. I wasn't looking at his back.  I mean I wasn't

5  interested in that.  I was interested in -- I mean it was a

6  therapy session.  I was interested in his flashbacks of PTSD.

7  So I think Goldman ought to be excluded and her notes as to

8  hearsay ought to be excluded.

9  　　　　　　MR. BARMEN:  And, Your Honor, Barmen again.  The

10  defense position on that is pretty simple.  Yeah, Dr. Goldman

11  was treating the emotional.  She's a psychologist, but in her

12  notes, as you would expect for someone -- a mental health

13  professional treating someone whose injuries mental and

14  physical allegedly stem from an accident, she would ask him

15  about his pain.  And that's in her notes.  And they discussed

16  it at times.

17  　　　　　　More importantly, it goes to Bauta's credibility

18  specifically.  He said, you know, his pain he can't sit for 20

19  minutes at a time, yet, a couple of weeks after this accident

20  he was on a bus, a Greyhound bus for eight hours one way to

21  Syracuse, stayed there for a day and rode it eight hours back.

22  Then a few months later, in July, he did it again, another 16-

23  hour round trip, when he claims he can't sit for any period of

24  time because of his back.

25  　　　　　　So that's why Dr. Goldman, it goes directly to Mr.

1  Bauta's credibility.  It goes to his suffering because he's

2  going to claim he can't do certain things, and we have

3  evidence in his own medical records that he was doing certain

4  things that he claims in deposition and at trial previously he

5  couldn't do.  That's why she's relevant.

6         THE COURT:  She can testify, and the records can

7  come in.

8         MR. McELFISH:  [Inaudible].

9         MR. BARMEN:  And my further defense, that's

10  everything on --

11         THE COURT:  Hold on.

12         MR. BARMEN:  I'm sorry.  Whoever that was broke up.

13  I didn't hear it.

14         MR. McELFISH:  I can cross-examine on the context of

15  the notes?

16         THE COURT:  Well, you want her notes to come in, Mr.

17  Barmen?

18         MR. BARMEN:  Well, we have a subpoena out on the

19  doctor, and certainly we would introduce the notes to her at

20  the time.  And if we're calling her in our case, we would be

21  directing her and I would certainly think that Ray would then

22  have the opportunity to cross-examine her.

23         THE COURT:  How do we not bring in TBI and PTSD

24  then?

25         MR. BARMEN:  Well, if we have to redact certain

1   things because if the notes that talk about the bus trips,

2   Your Honor, there's just two separate notes.  One was a couple

3   of weeks after the accident, and one was in I believe July of

4   the same year so that we're looking at -- well, the first trip

5   was still in '13, I believe, and the second trip was June or

6   July of '14.  So it would just be [indiscernible] redacted.

7           THE COURT:  Well, be careful they're not open --

8           MR. BARMEN:  Understood.

9           THE COURT:  Well, you're not going to open the door

10  because the first jury found that he doesn't have TBI or PTSD,

11  but still, this jury hearing about that will confuse them.

12  And I don't think you want them to be confused.

13          MR. BARMEN:  Understood.  Thank you.  And Steven,

14  unless I'm -- that's everything on my list.  Steven?  Rob?

15          MR. SAAL:  Tom?  Brad?  Do we --

16          MR. BARMEN:  Is there something in our list?

17          MR. SAAL:  Brad, did we want -- I apologize.

18          MR. McELFISH:  [Indiscernible].  I mean, Judge, why

19  can't we just consider a stipulation on that?  Do we need Dr.

20  Goldman to --

21          THE COURT:  Well, if you want to stipulate, if you

22  want to come up with factual stipulations, that's fine.

23  Anything that will make it less time-consuming is great.

24          MR. McELFISH:  All right.

25          THE COURT:  But if the defendants won't agree to a

1  stipulation, then they're entitled to call her.

2          MR. BARMEN:  Well, I'm not going to commit right

3  now, but I will say I'll talk to my team about it.  I'll let

4  Ray know.

5          UNIDENTIFIED SPEAKER:  Brad, do we want to discuss

6  Mr. Provder before we moved on?

7          MR. BARMEN:  Oh, yes.  Yes, thank you.  Your Honor,

8  Mr. McElfish has identified Edmond Provder as one of his

9  witnesses.  Mr. Provder was their life care planner.

10         THE COURT:  Uh-huh.

11         MR. BARMEN:  And he's the one that talked about he

12 needs X, Y, and Z in the future.  Well, the jury already

13 determined all that stuff.  I don't think Mr. Provder adds

14 anything new or is relevant [indiscernible].

15         THE COURT:  And this applies to Ms. Cummings, also?

16         MR. BARMEN:  Correct.  We only listed Ms. Cummings

17 on rebuttal if necessary to permit Mr. Provder to testify

18 which, frankly, we don't think he should because this is pain

19 and suffering.  He's a doctor, and he can't talk about any of

20 the medical stuff.  All he could testify to is what he's going

21 to need in the future.  That's already been determined.  But

22 if he's permitted to testify, then we would need Ms. Cummings.

23         THE COURT:  And why do you need Mr. Provder, Mr.

24 McElfish?

25         MR. McELFISH:  I just need to figure out -- because

52

1   you didn't want me to talk earlier about what this jury's

2   going to know about what the first jury did.  So I'm just

3   trying to line up ways that this jury can know what the first

4   jury did.  If you want to talk about what you're going to tell

5   the second jury, maybe we don't need Mr. Provder, but I need

6   to get it in some way if you don't tell them what the first

7   jury found.  And you told me I don't want to talk about that

8   right now, and I respect that.  But I'm trying to -- if I knew

9   what the first -- if I knew what the second jury was going to

10  be told about what the first jury did, I could cull down my

11  witness list pretty good probably.

12          THE COURT:  And what do you want to tell the second

13  jury about what the first jury did?

14          MR. McELFISH:  Just what the findings were in terms

15  of the medical care that's needed, not the amounts or

16  anything, just the past medical care and the future medical

17  care.  Then I don't need Provder to explain it.

18          MR. BARMEN:  And in prior papers, Mr. McElfish and

19  the Rule 16, Mr. McElfish wants to tell the jury, this new

20  jury the compensatory damage award and the punitive damage

21  award, which is highly improper for any number of reasons.  So

22  I'm all for paring things down if we can, but whether things

23  are pared down or not, to us there's absolutely no reason for

24  the life care people to testify when all that stuff's already

25  been determined.  It's not in dispute.

53

1          MR. McELFISH:  Judge, I don't think any amount

2     should be given to the jury.  I don't think any amount from

3     the first trial, whether it's good for me or bad for me,

4     should be given to the second jury.  But as to liability, they

5     should know that there's liability.  As to causation, they

6     should be told what the first jury found.  As to medical care,

7     they should be told what the first jury found.  And then let

8     them decide pain and suffering so they have context around

9     what they're deciding.  I don't think the amounts are needed.

10          MR. BARMEN:  Ray, are you now dropping your request

11    that this jury be told that the first jury found punitive?

12          MR. McELFISH:  I just said what I'm requesting.

13          MR. BARMEN:  Yeah, yeah.  But I want to make sure

14    we're clear because --

15          THE COURT:  Okay.  I will --

16          MR. BARMEN:  -- you say things and it's open to

17    interpretation.

18          THE COURT:  I will figure out what the first -- what

19    the second jury will be told.  And I am almost certain that

20    Mr. Provder and Ms. Cummings will be excluded because they

21    will not be necessary.

22          MR. McELFISH:  Right.  So what I was going to say is

23    once I know that, it doesn't have to be now, it can be

24    obviously the day before trial, if it's clear that the jury

25    knows that the treatment is awarded or what it was that he was

54

1   given, then clearly I don't need him to come in and say it.

2   And I can adjust at that moment.

3           THE COURT:  Okay.

4           MR. McELFISH:  I don't need to know now.

5           THE COURT:  All right.

6           MR. BARMEN:  Your Honor, and I appreciate that and I

7   think that's good for everybody, but on this issue of punitive

8   --

9           THE COURT:  I'm not going to tell --

10          MR. BARMEN:  -- if Mr. McElfish --

11          THE COURT:  I'm not going to tell the jury what the

12  punitive damage award was.

13          MR. BARMEN:  But is the jury going to be told that

14  we were liable for punitive?  I don't think that's in any way

15  appropriate or relevant to pain and suffering.  It has nothing

16  to do with the guy's physical injuries and the pain he

17  suffered.

18          THE COURT:  I'll have to think about that.  You'll

19  find out.  I'm looking at these -- all these papers and trying

20  to find -- there are other things that are mentioned that we

21  haven't discussed yet.

22          MR. McELFISH:  So the Brookdale Hospital records,

23  these so-called, and excuse me for this, and quote "a blown

24  condom" -- not, the "ruptured condom" event, I'm just trying

25  to the best of my ability remove the prejudice of this.  And

55

1   I'm okay if they cross him with you went to the hospital for

2   sex-related issue when you said you couldn't have sex.  But

3   blown condoms, STDs are not -- they're prejudicial.  They're

4   not relevant.

5           MR. BARMEN:  And, Your Honor, if you recall the

6   first time, the first trial, he redacted the specific stuff

7   relative to the STDs.

8           MR. McELFISH:  Right.  But they didn't redact "blown

9   condoms," though.

10          MR. BARMEN:  I don't know how that's prejudicial,

11  but, you know, it's not up to me.  The issue here is that

12  plaintiff's credibility.  He testified in deposition in no

13  uncertain terms he was unable to have sex post-accident

14  because of the pain.  Well, we know that's not true based on

15  the records.  So it's another instance of him lying this time

16  under oath because what he testified to is inconsistent with

17  what's in his medical records.

18          We would only use it for that purpose, and it would

19  be used exactly the same way in this trial as it was the first

20  trial with the STD stuff redacted.

21          MR. McELFISH:  I think they can ask him if he went

22  to the hospital for a sex-related issue at a time when he said

23  he couldn't have sex, and he can answer.  But to show the jury

24  about ruptured condoms, I'm not following --

25          THE COURT:  Well, that's not -- I don't think that's

56

1  the way they'll ask the question.

2              MR. BARMEN:  Right.  And here's --

3              MR. McELFISH:  That's the way they did it in the

4  first trial.  They showed the jury the document, and it was

5  too late.  It was already up.

6              THE COURT:  Yes, but this --

7              MR. McELFISH:  They showed the jury the ruptured

8  condom language.

9              THE COURT:  But this is the second trial, and

10 they're going to say --

11             MR. McELFISH:  Right.

12             THE COURT:  -- didn't you lie to the jury in the

13 first trial --

14             MR. McELFISH:  Right.

15             THE COURT:  -- by saying you couldn't have sex but

16 yet you were going to the hospital for a ruptured condom.

17             MR. BARMEN:  Right.  And there's a problem, Your

18 Honor, and Ray and I have discussed this previously in an

19 effort to try and resolve this amongst ourselves.  The problem

20 with doing it the way Mr. McElfish wants to do it is, you

21 know, without showing any of the records or have a proper

22 context of what happened here, understanding that it is for

23 credibility issues, if we don't have the records and they say,

24 well, you went to the hospital for sex-related issues, the

25 implication there or the way they come back on that is by

1    saying -- is putting in the jury's mind that it was because of

2    the pain that he couldn't function or ended up in the

3    hospital.

4            THE COURT:  Well --

5            MR. BARMEN:  The records are important because they

6    go directly to impeaching what he said or what he testified to

7    under oath.

8            THE COURT:  It all depends --

9            MR. McELFISH:  We never --

10           THE COURT:  To me, it all depends on how and what

11   question you ask and how he answers it because he may answer

12   it in a way based on the question you asked that is truthful

13   that you don't need to show him the records.

14           MR. BARMEN:  No, of course.  If he admits this time

15   that he lied last time, then we move on.

16           THE COURT:  So I'm not going to exclude them.  It

17   all depends on how it plays out as to the Brookdale Hospital

18   reports.

19           MR. BARMEN:  Understood.

20           THE COURT:  Then the next -- I guess the next thing

21   is Claxton-Hepburn records.        MR. McELFISH:  Yeah.  Most

22   of those records were related to headache that they tried into

23   wrap in to the head injury case which is out.  The issue I

24   wanted to focus in on is that the back pain that's related to

25   the pneumonia, I guess we could just explain like we did in

1    the last trial.  But I think that it's not a bona fide -- it's

2    not bona fide back pain.  In other words, it's clear that this

3    is only pain related to pneumonia.  That's what he was treated

4    for.

5            So I'm asking that that visit and those complaints

6    be excluded because it's not a bona fide lumbar injury.  If it

7    was, I would understand admitting it.

8            THE COURT:  These are records that pre-date the

9    accident, yes?

10           MR. McELFISH:  Correct.

11           MR. BARMEN:  Correct.

12           THE COURT:  So didn't the jury -- well, I was going

13   to say didn't the jury sort of they were not compelled by them

14   because they found that he had an injury that was either

15   caused or exacerbated by the accident.

16           MR. McELFISH:  Correct.

17           THE COURT:  But I guess, Mr. Barmen, you'd say,

18   well, no, they did because they found -- they gave him such a

19   low amount for pain and suffering.  It's because he had a

20   preexisting back injury.

21           MR. BARMEN:  That is right on point, Your Honor.

22   And with both Brookdale and Claxton as it relates to things

23   after the accident, there's relevant information in those

24   records as well because when he went in for, for example, the

25   sexual -- when he went in for there, they still work him up

59

1    for a full history.  And there's notes in there.

2              THE COURT:  They deny his back.

3              MR. BARMEN:  So right, denying back pain, denying

4    this, denying that.  Those things are relevant as well.

5              THE COURT:  Okay.  They can come in.  Lattuga's

6    report?

7              MR. BARMEN:  And this is -- Your Honor, can I speak

8    to that or do you want to --

9              THE COURT:  Go ahead.

10             MR. BARMEN:  -- Mr. McElfish first?  Lattuga's

11   report was admitted in evidence the first time.  Dr.

12   [indiscernible] relied heavily on Dr. Lattuga's report.  And

13   recall Dr. Lattuga issued or submitted a multiple-page report

14   saying I treated Bauta from so-and-so to so-and-so when it

15   turns out that --

16             THE COURT:  He did.

17             MR. BARMEN:  -- not only did he never treated him,

18   he'd never met him.  So their primary expert, Dr. Mobin relied

19   on a fraudulent report by Lattuga that was signed under

20   penalty of perjury.  And that's certainly relevant to any

21   number of things but certainly, Dr. Mobin's opinion.

22             MR. McELFISH:  Well -- are you done?

23             MR. BARMEN:  Well, no, actually, I have one more

24   thing.  I mean Mr. McElfish --

25             MR. McELFISH:  You don't need to think, Mr. Berman,

60

1  if I ask you if you're done.

2       MR. BARMEN:  No, no.  I had one more thing, Ray.  I

3  was just collecting my thoughts.  Mr. McElfish on this call

4  has indicated things that were admitted in the first trial as

5  exhibits are fair game in this trial.  Lattuga's report was an

6  exhibit in the first trial.  Now I'm done.

7       MR. McELFISH:  Well, it wasn't -- okay, if the only

8  purpose -- if the only -- by way of offer of proof, if the

9  only purpose of using this report is to establish that Mobin

10 relied upon a fraudulent report, that whole issue flamed out

11 big time in the first trial because Dr. Mobin said I have no

12 idea.  And then they threaten repeatedly to bring Dr. Lattuga

13 in and prove to the jury that their main surgeon was a fraud,

14 that never happened.

15      So in this case, this trial, I don't see how they

16 can go beyond what they asked Dr. Mobin who is going to say I

17 don't know.  I mean I have what I have,  I read what I read.

18 And anything beyond that is hearsay because Lattuga never

19 testified.  So I'm not sure where they're going to get all the

20 firepower from.

21      MR. BARMEN:  Well, then withdraw your objection if

22 it's no big deal and you can clean him up with Mobin just the

23 way you said.  Then what is the big deal?

24      MR. McELFISH:  I'm not going to withdraw --

25      MR. BARMEN:  We want to use -- we want to use it.

61

1  We believe it's relevant.  We believe it goes to the

2  credibility of your case and your expert.  It was admitted as

3  an exhibit in the first trial.  And if it's no big deal, then,

4  Ray, it's no big deal.

5  　　　　MR. McELFISH:  I don't think it was admitted into

6  evidence.

7  　　　　MR. BARMEN:  It was.

8  　　　　MR. McELFISH:  Oh,

9  　　　　MR. BARMEN:  It was.

10  　　　　MR. McELFISH:  It's 403 all the way.  I mean it

11  doesn't have -- if they brought Lattuga in in the first trial

12  and they proved up this fraud as they call it, then we'd be

13  talking a different story.  But because it's [indiscernible]

14  out in the first trial, they want another shot at it here.

15  They shouldn't get it for this limited scope.

16  　　　　THE COURT:  I guess the question becomes is Dr.

17  Lattuga's report relevant to whether Mr. Bauta has past or

18  future pain and suffering related to his lumbar spine.

19  　　　　MR. McELFISH:  Right.  The answer is it's not, and I

20  can explain why.

21  　　　　THE COURT:  Or if it is relevant, it is unduly

22  prejudicial.  So you're saying it's not relevant why.

23  　　　　MR. McELFISH:  Right.  So it's not relevant because

24  for a couple of reasons.  Number one, if you recall, Dr.

25  Lattuga was originally going to be an expert witness, and that

1  was a report written as an expert and a treating doctor.  He

2  was replaced by Dr. Mobin who does not rely upon Dr. Lattuga's

3  report as an expert.  Dr. Mobin relies upon the records of --

4  primarily the records of Dr. Cordial which are different than

5  Dr. Lattuga's report.

6          Dr. Lattuga only claims to have seen Mr. Bauta like

7  in the very initial stages of when he went New York Spine.

8  He's been there many, many times.  Dr. Mobin forms his opinion

9  based upon the -- you know, the time line of medical records

10  from the beginning to the end and his background training and

11  experience and the MRI.  So he doesn't in any way rely upon

12  the Lattuga report and neither does Dr. Cordial.  He's a

13  treating doctor and he can testify based upon his own records

14  and what he did to the man.

15          THE COURT:  Mr. Barmen, last word?

16          MR. BARMEN:  Thank you, Your Honor.  I'm shaking my

17  head at some of the things that were just said.  I mean the

18  record is so inconsistent with what was just said.  Mr. -- Dr.

19  Mobin and Dr. Lattuga were both initially identified as

20  experts for the plaintiff.  Dr. Mobin didn't replace Dr.

21  Lattuga.  Dr. Lattuga was designated as an expert when we

22  determined through deposition that his report was fraudulent,

23  that he never treated him, never met him.

24          Dr. Mobin did testify in deposition that he relied

25  on Dr. Lattuga's report.  It was only after Lattuga was

1   withdrawn and the issue with the report came to light that

2   Mobin had changed that on the stand at trial and downplayed

3   his reliance on Lattuga's report which is wholly inconsistent

4   with his deposition testimony which goes to his credibility

5   and the credibility of an expert is always at issue, always.

6          And, again, this was admitted the first trial.

7          THE COURT:  Yes, I [indiscernible].

8          MR. BARMEN:  And as Mr. McElfish pointed out early

9   on, prejudicial is not the standard.  Unduly prejudicial, the

10  risk of the probative value being substantially outweighed by

11  undue prejudice.  These were the people they relied on.  This

12  is a report that Mr. McElfish requested and paid for.  And it

13  wasn't until the lie was exposed that it was withdrawn, and it

14  wasn't until that was exposed that Mobil changed his position

15  on what he relied on in forming his opinion.

16         Everything Mr. McElfish just said, he can certainly

17  put on at trial when we go down this road with Mobin.  But the

18  testimony back and forth on it is relevant to his credibility,

19  the strength of his opinions which ultimately goes back to the

20  aggravation versus causation issue.  It's all fair game or it

21  should be.

22         THE COURT:  I'll allow it.  Okay.  Next issue,

23  Medicaid and Emblem Health records.  What do you need those

24  for, Mr. Barmen?

25         MR. BARMEN:  Steven, you want to take that one?

1    MR. SAAL:  Yes, Your Honor.  Mr. Saal here.  We

2 listed these as exhibits mainly in response to without knowing

3 what Mr. McElfish's case is going to be on the extend of

4 treatment that was provided to Mr. Bauta, reasonableness of

5 treatment, the extent of the treatment.  And these records

6 were just relevant to giving the context of the treatment that

7 Mr. Bauta had undergone as a result of his alleged injuries.

8    So it's basically something that we listed as we

9 will -- if we need to respond to Mr. McElfish at trial, but

10 basically it's something reserved for response at this point.

11    THE COURT:  They're likely to be excluded unless

12 they become relevant based on the plaintiff's case.  And I'd

13 serious doubt they will be because we're going to instruct the

14 jury, inform them of what the first jury found and that should

15 clear everything up.

16    MR. SAAL:  Yes.  Thank you, Your Honor.

17    THE COURT:  Delayed onset, I guess this is an issue

18 that deals with causation.

19    MR. McELFISH:  Yes.

20    THE COURT:  Again, I don't know how we can escape

21 this jury answering the question is it -- was it caused by or

22 was it exacerbated by?

23    MR. McELFISH:  Because -- I didn't hear any case

24 citations or anything specific from Mr. Ortiz.  Maybe I'm

25 missing something.  I'll admit it.  I don't know the

1  difference between caused by or exacerbated by in terms of

2  damages only.  I understand the difference causation-wise, but

3  the jury decided it was one or the other.  So I'm still not --

4  I mean you ruled.  So you ruled so what am I supposed to do?

5          THE COURT:  It's -- well --

6          MR. McELFISH:  But I don't see how you -- I mean

7  it's more of an apportionment issue, but they didn't -- you

8  know, they weren't asked to apportion.  That's the problem.

9          THE COURT:  So then what do we do with it?  If we

10  have a problem that we didn't collectively --

11          MR. McELFISH:  That's what I was trying to say in

12  the beginning and you didn't want me --

13          THE COURT:  No.

14          MR. McELFISH:  -- to go any further with it.

15          THE COURT:  No, that's not what -- no, that's not

16  what you tried to say in the beginning.  What you tried to say

17  in the beginning was about what we should tell the jury about

18  medical treatment that the first jury awarded.

19          MR. McELFISH:  No, you shut me down.  I'm sorry to

20  interrupt.  You shut me down when I tried to tell you what I

21  thought you should tell the jury about causation.  And that's

22  really --

23          THE COURT:  That's so not true.

24          MR. McELFISH:  -- if you don't mind me saying so --

25          THE COURT:  That is so not true.

66

1          MR. McELFISH:  -- what the jury should know --

2          THE COURT:  That's so not true.

3          MR. McELFISH:  -- is that the first jury found

4    either causation and/or exacerbation and --

5          THE COURT:  So what?  So what?  So what from that?

6    What flows from that, Mr. McElfish?

7          MR. McELFISH:  What flows from that is because the

8    first jury was not asked to apportion it, and this jury's only

9    being asked for pain and suffering damages, again, it doesn't

10   matter.  It was either one or the other.  Why did they have to

11   now apportion it?

12         UNIDENTIFIED SPEAKER:  Because they're going to --

13         THE COURT:  Oh my god.  It's like -- don't even

14   answer him.  I'll answer him.

15         UNIDENTIFIED SPEAKER:  Okay.

16         THE COURT:  It's very simple, very simple.  You have

17   someone with degenerative back who's in a lot of pain, right?

18   Daily pain, they can't sit for a long period of time.  They

19   can't stand for a long period of time.  They're hurting so

20   much.  They get into a car accident, and now they need

21   surgery.  So you're saying the person driving that other car

22   is responsible for all of the pain, the pain that pre-existed

23   and the pain, additional pain caused by the surgery and going

24   forward?

25         There's no difference, right?  Of course, there is.

1   There's a huge difference.  You're liable, but you're only

2   liable for the damage that you cause.  And if it's -- you

3   exacerbated it, you're liable for the exacerbation.  If you

4   caused all of it, you're liable for all of it.  You're

5   responsible for all of it.

6           And we made the mistake, and I'll take the blame for

7   this, of not asking the jury, we should have had two

8   questions.  Did the accident cause his injury, yes or no?  If

9   you answer no, go to the next one.  Did it exacerbate his

10  injury, yes or no?  If it exacerbated, then you get damages

11  for the exacerbation, not for all of it.  Or is the law that

12  -- I don't think it is, but is it that if you exacerbate,

13  you're responsible for everything?

14          MR. McELFISH:  But that's -- wait a second.  That's

15  exactly my point is that if this was their question, this was

16  their interrogatory -- and you can take the blame for it,

17  Judge, but they're the ones that submitted it.  And now they

18  want to apportion it.  They want to go back and do what they

19  should have done the first time.  That's exactly my point.

20          THE COURT:  Yes.

21          MR. McELFISH:  There may have been a difference had

22  they done it right.

23          THE COURT:  So --

24          MR. McELFISH:  -- but they didn't.

25          THE COURT:  Okay.  All right.  So they didn't do it

68

1  right the first time.

2          MR. McELFISH:  Now they want another bite, right.

3  And I'm saying no.

4          THE COURT:  And if it's still wrong, it's wrong.

5  And if it goes to the circuit, we have a second trial that we

6  don't apportion it, they'll figure it out.  It's still wrong.

7  And then it goes to the circuit because this case is going to

8  the circuit.  And no one's going to see a penny for another

9  couple of three years because you're going to have post-trial

10 motions after the second trial, right?  And then it's going to

11 go to the circuit and the circuit's going to say, hey, you

12 guys got it wrong.  Do it over again.  How does that work for

13 any of us?  I want --

14         MR. McELFISH:  That's the point, Your Honor.

15         THE COURT:  I want this done before I retire, and I

16 retire in 13 years.  At the rate we're going, we're probably

17 going to have Bauta 3, 4, and 5.  So let's get it right.

18 Look, we're going to look -- we're going to look at this

19 issue.

20         MR. McELFISH:  Okay.

21         THE COURT:  Let's look at this issue.  Under the

22 law, is it caused by or exacerbated by, is there a difference?

23 And if there is a difference, we're going to tell this jury --

24 if there is no difference, if Mr. McElfish is right, then the

25 jury doesn't need to hear any of this, just what are his

1    damages.

2            If it is a difference between cause or exacerbated,

3    we're going to make this -- have this jury figure that out,

4    and they have to pick one or the other because it's not a

5    question we ask the first jury.

6            MR. McELFISH:  Now, maybe I would suggest that we

7    can brief that.

8            MR. ORTIZ:  Your Honor, I don't even think you need

9    to.  I mean honestly -- it's Rob Ortiz -- if you look at your

10   own charge, if you look at the PJI, under 2:282 just for

11   reference --

12           THE COURT:  Hold on.  Hold on.  Hold on.

13           MR. ORTIZ:  Sure.

14                   [Pause in proceedings.]

15           THE COURT:  What was that, Mr. Ortiz, 2 what?

16           MR. ORTIZ:  2:282 which is damages, personal injury,

17   aggravation of pre-existing injury.

18           THE COURT:  Yeah.

19           MR. ORTIZ:  Okay.  And if you look at the comments,

20   it has all the case law there explaining -- it has the charge

21   which is, if I recall, this is what we asked for and what you

22   incorporated into the charge to the jury as well.  And, you

23   know, where it states wrongful act does not cause the

24   condition, injury, or illness but only aggravates and

25   increases the severity of a condition existing at the time of

1    the injury.  The plaintiffs may recover only for such

2    increased or augmented suffering or damage as are caused by

3    the defendant's act citing Ortiz -- no relation -- v.

4    Mendolia, 116 A.D.2nd, 707 (Second Dept. 1986).  And you have

5    a bunch of cases there.

6              I mean, you know, to the extent that we're talking

7    about the differentiated verdict sheet, I hazard to guess that

8    this verdict sheet was as differentiated as anyone's ever

9    seen.  We had line items for everything, and we had separate

10   line items for, you know, cervical versus lumbar versus TBI

11   and the other thing.  And I don't frankly think anyone was

12   going to go for separate items because the thing is the issue

13   was are you going to recover and he -- you know, if it was

14   caused or exacerbated, he's entitled to recover.  But you're

15   going to charge them that what they determine is going to

16   affect the amount that they award.  And that's why, in our

17   view, they awarded what they did, which is a very small

18   number, 36,5, and then zero.

19             So, you know, I think that it's important here to

20   know it.  I think that it's important to know why because it's

21   going to be a guide for Your Honor to look at this in terms of

22   CPLR 5501(c) for material deviation once this verdict is done.

23   And, you know, what we know is that the jury did not throw out

24   Mr. Bauta in connection with the lumbar injury.  They threw

25   him out on everything else.  They didn't throw him out on a

71

1    lumbar injury.

2              And we know that it either was, as we know,

3    [indiscernible] caused or exacerbated, but we know which.  It

4    wasn't an error.  I think that we are now at a new trial where

5    that's the only issue.  He is not getting nonsuited, and it's

6    informative to the Court and to the parties to know which one

7    they believe.  You've already allowed the proof in on it in

8    terms of, you know, what we're going to say is that it's an

9    exacerbation because it pre-existed.  And Ray's going to argue

10   -- Mr. McElfish is going to argue that it's not, that it's all

11   from the bus.  And they're going to believe it or not.

12             And based on what they do, if they say it's an

13   exacerbation and they give the guy $5 million, then we know

14   right away that that is excessive under the material deviate

15   standard under 5501(c) of the CPLR.  And that'll aid you in

16   your remittitur, in your decision of our remittitur

17   application, you know.  So that's where it is.  This is not

18   harming anyone.

19             And you're going to tell the jury, I believe, from

20   what I've heard on this call that there was a prior trial and

21   that it's already been determined that Mr. Bauta either

22   sustained the lumbar injury from the bus accident or it was

23   exacerbated.  They'll have to decide which one based on the

24   evidence that's presented by the parties, and their award is

25   going to be guided by that determination because, you know,

72

1  our position would be that you should charge them the way you

2  did in the prior trial with 2:282.

3           I mean I know you adapted the wording a little, but

4  that's basically what you charged them.  And that's the charge

5  that -- I apologize, I didn't have the docket number, but it's

6  what you did in the charge that you delivered to this jury,

7  the first jury.

8           MR. McELFISH:  Here's the problem, Judge, is whether

9  Mr. Ortiz is right or wrong, this was an issue that should

10 have been raised with the first jury and based on the case law

11 I'm looking at, generally speaking, if these things are not

12 raised, they're waived.  Then what happens is they don't

13 raised it in post-trial motion.  They lump it all together in

14 the first case.  Then they don't raise it in the post-trial

15 motion.  The Court rules that there's a retrial just on pain

16 and suffering damages only for compensatory.  And now for the

17 first time, they want to go back and basically retry causation

18 and sparse it out.

19          MR. ORTIZ:  That's not what we're saying, Your

20 Honor.  By any stretch of the imagination and not for nothing,

21 it was raised in the prior trial.  You charged the jury with

22 it.  You charged --

23          MR. McELFISH:  But not the apportionment.

24          MR. ORTIZ:  No one is apportioning -- right, no one

25 is apportioning a percentage to prior -- it's either/or.  It's

1  either/or.  And the jury found, you know, one way or the other

2  because that's what they needed to do here, what we're -- I

3  don't understand what you're saying we're -- we're not saying,

4  is it 50 percent or 40 percent.  It's one or the other.  And

5  what that does is it governs the amount of the award for

6  purposes of review.  But, you know, we're talking about --

7            MR. McELFISH:  I think this should be briefed.

8            MR. ORTIZ:  -- we're talking about many different

9  things, you know.  You're saying whether I'm right or wrong.

10 I'm not wrong.  I'm telling you what the law is in New York.

11 This is what I've given the Court the citation.

12           MR. McELFISH:  You've been wrong.

13           MR. ORTIZ:  I'm not wrong.

14           MR. McELFISH:  You've been wrong.

15           THE COURT:  Okay.  Okay.

16           MR. ORTIZ:  But I think it's --

17           THE COURT:  Okay.  Okay.

18           MR. ORTIZ:  -- [inaudible] in my life, sure.

19           THE COURT:  All right.

20           MR. ORTIZ:  I've been wrong in my life, Ray.  Not in

21 this case.

22           THE COURT:  Well, all right.  If you want to send in

23 a letter brief, Mr. Elfish, on this issue, that's fine.  And

24 if the defendants want to respond to it, that's okay as well.

25 I'm intending -- I mean I think there are a number of mistakes

74

1   that have been made in this case by all involved.  And I'm

2   trying my best to clean everything up so that you can move on

3   to the next level and have a meaningful and full discussion of

4   all these issues and resolution, which may result in a third

5   trial.

6           I hope it doesn't, but it may.  So delayed onset,

7   it's still part of the case.  What is not part of the case is

8   whether the injury that the first jury found Mr. Bauta to have

9   is either caused by or exacerbated by this accident.  He is

10  going to get money.  He is going to get more money than the

11  first jury gave him because they did not give him enough.

12          MR. ORTIZ:  I'm sorry, Your Honor,  I just didn't

13  understand.  Are you saying that we are not asking them if it

14  was caused or exacerbated and that you are not going to charge

15  them on that?

16          THE COURT:  No.  I -- that's not what I said.

17          MR. ORTIZ:  Okay, I apologize.  Sorry, I just

18  [indiscernible].

19          THE COURT:  I have to figure out how we're going to

20  do it, whether it's in the form of a special verdict sheet.

21          MR. ORTIZ:  Yeah.

22          THE COURT:  Or whether it's just encompassed in the

23  charge itself.

24          MR. ORTIZ:  In all honesty, I've already drafted a

25  draft, prepared a draft verdict sheet which actually asks the

1  question, you know, check a box, is it cause or was it

2  exacerbated by.  And then it goes to the next question and the

3  amount of damages.  And then --

4         THE COURT:  Well, you don't necessarily have to do

5  that.  You could -- or maybe -- there are different ways of

6  doing it, but I haven't figured it out.  If you want to submit

7  something, go ahead and submit it.

8         MR. ORTIZ:  Sure.

9         THE COURT:  Mr. McElfish, if you want to brief this

10  issue, go ahead and brief it.  That's fine.  You each can

11  respond to whatever the other side submits.  As long as I have

12  it sufficiently in advance of the trial, I don't care.  You

13  give it to me at least four days before the trial, that's

14  fine.  I think we have other issues though as far as the

15  evidence is concerned and what should or should not be

16  permitted.

17         I'm looking at Mr. McElfish's May 18th letter.  I

18  think all of those issues are dealt with, have been dealt

19  with.  You filed -- wait a second.  Provder and Cummings,

20  that's done.  Lanigan, Gautheir, that's done.  Photographs of

21  family, of plaintiff and the family, what is the relevance of

22  -- I know they were part of the first trial, right?

23         MR. McELFISH:  Yeah.

24         THE COURT:  I know they were marked.  They were

25  marked, but they weren't admitted.

76

1          MR. McELFISH:  I don't intend to offer it, Judge.  I

2  don't intent to offer it.

3          THE COURT:  Okay.  Those are out.  Greyhound's no-

4  fault records denying no-fault coverage?

5          MR. McELFISH:  I don't intend to offer it.  I said

6  that in a letter from me.

7          THE COURT:  Oh, okay.

8          MR. McELFISH:  I told them that, too.

9          THE COURT:  Harm to other passengers.

10         MR. McELFISH:  I don't intent to offer it.

11         THE COURT:  Okay.  Punitive damages, that's out.

12  What else is there, anything that I'm missing?

13         MR. BARMEN:  Everything that -- this is Barmen.

14  Everything on my list, Your Honor.  Steven, is there something

15  we forgot to cover or didn't cover?

16         MR. SAAL:  No, I believe that that completes our

17  issues.  Your Honor, you said that the punitive -- the whole

18  mention of punitive damages is out?  Is that what the Court

19  just said?  I didn't hear that.

20         THE COURT:  Yes, but -- yes.  One thing you could do

21  to avoid all of this is to let me decide the damages and see

22  if the circuit will buy that.

23         MR. SAAL:  Say that again.

24         THE COURT:  All right.  Remittitur is permitted,

25  correct?

1            UNIDENTIFIED SPEAKER:  Yeah.

2            THE COURT:  Additur is not?

3            MR. McELFISH:  That's the one thing federal judges

4  don't get and the states do.

5            THE COURT:  Well, I mean, to be fully honest, we

6  try.  We really thought about it long and hard.  Artis [Ph.]

7  who is the law clerk during the trial stayed and wrote and

8  helped me write the decision on the post-trial motions.  And

9  we really wanted to do that, but we didn't think it would pass

10 muster with the circuit.  But --

11           MR. BARMEN:  Yeah, we tried to give you the tools

12 for it, but we understand.

13           THE COURT:  Well, the reason why it doesn't work is

14 because it potentially impacts the plaintiff, right, and --

15           MR. McELFISH:  Well, it's a constitutional issue,

16 Seventh Amendment.

17           THE COURT:  Can't you -- you can waive that, can't

18 you?

19           MR. McELFISH:  Yeah, you can do -- we put this in

20 our papers.  You can do a conditional additur and then if we

21 choose to take it, we can waive it.  That would waive the

22 constitutional violation.  We can waive that by accepting a

23 conditional additur.  That's a Gasperini case of the U.S.

24 Supreme Court.

25           THE COURT:  But it's still unclear whether -- well,

1    if you accept it, then -- if you waive it, then how is the

2    circuit going to get it, right?  The circuit would never deal

3    with the issue.

4         MR. ORTIZ:  They would get it if we didn't agree

5    with your additur.

6         THE COURT:  Correct.

7         MR. ORTIZ:  And we appealed.

8         MR. McELFISH:  If either one of us don't agree with

9    your additur, the circuit would get it.

10        THE COURT:  Do you want to -- you want me to -- not

11   now, but would you within the next few days give you proposed

12   numbers and see if you agree with them?

13        MR. BARMEN:  Your Honor, this is Barmen.  We would

14   have to speak with Mr. Paticucci to see where he came down on.

15   I don't think that's -- frankly, for me, it's an interesting

16   idea, and it's actually something Ray and I discussed some

17   time ago.

18        MR. McELFISH:  It was actually something I proposed

19   some time ago.

20        MR. BARMEN:  Yeah.  Right.  And I told you at the

21   time I thought it was an interesting idea.  But that's not

22   something that I think on the defense side can commit to

23   without talking to the person who's responsible for writing

24   the check.

25        THE COURT:  Well, you wouldn't be writing the check

1  immediately, right?

2          MR. BARMEN:  No, but I mean even to say, Your Honor

3  -- I mean I guess if Your Honor wanted to in a couple of days

4  circulate numbers and say, here, here's what I think it's

5  worth, tell me what you think, that's one thing.  But I

6  certainly can't commit on behalf of Greyhound and the insurer

7  to just, you know, accept to walk down that road right now

8  without having approval to do so.

9          MR. McELFISH:  It would certainly temper post-trial

10  motions if there's a verdict.

11          MR. BARMEN:  Well, look as I said --

12          MR. McELFISH:  Because then we'll know where he's

13  at.

14          MR. BARMEN:  I said it's an interesting idea, and

15  I'm not against it personally.  But I need to get approval

16  before we could do all that and come on, Judge?

17  [Indiscernible] misses us and wants to come in for two weeks.

18          MR. McELFISH:  I can't believe it's been a year,

19  Judge.

20          THE COURT:  Yeah.

21          MR. BARMEN:  Rob, this is something we need to

22  discuss, but --

23          MR. ORTIZ:  Yeah.  And --

24          MR. BARMEN:  -- [inaudible].

25          MR. ORTIZ:  Yeah.

80

1          MR. McELFISH:  Judge, I have an issue before we get

2     off the phone once you're done with this.

3          THE COURT:  Okay.

4          MR. McELFISH:  So let me know when you're ready.

5          THE COURT:  Go ahead.

6          MR. McELFISH:  I'm a little embarrassed to bring

7     this up and maybe this is not something you want to deal with,

8     but I'm going to bring it up since we're on the phone, is I've

9     had, you know, what I do for a living out here is I try cases.

10    That's all I do.  And a lot of state court judges have granted

11    motions to continue based on the federal engagement order

12    which you were kind enough to sign.  But I do have one

13    remaining court that is not wanting to do that.  And he's

14    trying to engage me before this trial starts, and I don't know

15    what to do.  I'm losing sleep.  Orange County in California.

16         I'm going to go in on another motion Thursday and

17    ask him one more time.  Well, I can't be in two places at

18    once.

19         THE COURT:  When is he saying you have to be there?

20         MR. McELFISH:  I'm going to go in on Thursday for a

21    motion that he's saying that the trial needs to start on 5/28.

22    And the problem with all of this is that they had --- the

23    defendants in that case had prior lawyers that stipulated to

24    move to trial to late June or July, I can't remember.  And

25    then Murchison & Cumming is a big firm out here in L.A., came

81

1  in and said no, we don't agree to any of that.  We want to

2  start on May 28th.  And so far, the judge is holding my feet

3  to the fire.

4           THE COURT:  How long of a trial is it?

5           MR. McELFISH:  It'll go into this for sure.  It'll

6  go two or three weeks.  It's called [indiscernible], Naomi

7  [indiscernible].

8           THE COURT:  I don't know what to tell you, Mr.

9  McElfish.

10          MR. McELFISH:  I don't know either.  What happens if

11 he engages me and I'm not there?  I guess I'm not there.

12          THE COURT:  Well --

13          MR. BARMEN:  Mr. Kieffer can try it.  He's well --

14 he can try it with --

15          MR. McELFISH:  Yeah, yeah.  Brad, come on.

16          THE COURT:  You have to -- I mean what --

17                   [Pause in proceedings.]

18          MR. SAAL:  Are we still there?

19          THE COURT:  Yeah.

20          UNIDENTIFIED SPEAKER:  Yeah, I'm here.

21          MR. SAAL:  Sorry, I thought everyone -- my

22 apologies.

23                   [Pause in proceedings.]

24          THE COURT:  I wouldn't be able -- if we move our

25 trial --

82

1          MR. ORTIZ:  How long is our trial going to be?

2          THE COURT:  Two weeks.

3          MR. McELFISH:  Two weeks.

4          MR. ORTIZ:  Two weeks in total?

5          THE COURT:  Yes.  That's all I've given you.  Maybe,

6    maybe, maybe starting July 22nd.

7          MR. ORTIZ:  Your Honor, I mean for this to be

8    brought up at this late date, we've got experts lined up.  I

9    mean --

10         THE COURT:  Look, I understand that.  But, you know,

11   if another judge is being difficult, it's either Mr. McElfish

12   jettisons that case, gets another lawyer who has to handle it,

13   you know, on the fly or we move our case.  He can't be in two

14   places at once.

15         MR. ORTIZ:  And, look, I get that and I've been in a

16   situation and I'm certainly sensitive to it.  But now you're

17   considering talking about other dates without us knowing if

18   we're available, if our experts are available, if our other

19   witnesses are available.  Because everybody's got to travel.

20         THE COURT:  Yes, I understand.

21         MR. ORTIZ:  We're talking about the summer travel

22   season.

23         MR. McELFISH:  Judge, let me ask you a question, and

24   I don't know if this is an appropriate question.  You'll tell

25   me, I'm sure.  This gentleman, he's actually a nice guy, his

1   name is Judge Delaney.  I'm going to go in again on Thursday

2   with another motion.  Any chance you would speak to him?  And

3   maybe he thinks I'm kidding around or something.  I don't know

4   what it is.  I've never been put quite in this position in all

5   these years.  And maybe he'll grant it on Thursday, and the

6   issue's resolved.  But I didn't want to not bring it up

7   because I could be stuck,

8           THE COURT:  I would talk to him, for sure.  You

9   could --

10          MR. McELFISH:  Okay.

11          THE COURT:  You could tell him that and that I am

12  having a very difficult time finding another time for you to

13  try the case.

14          MR. McELFISH:  I mean --

15          THE COURT:  I just -- I set this -- how many -- how

16  long ago did we set this?

17          MR. McELFISH:  You set this actually the first and

18  second week in I think it was February.  So anyhow, I'll go in

19  Thursday.  That makes me feel a little better.  I'll try to do

20  it without bringing any of that up.  If he grants it, the

21  issue's over.  If he denies it, I'm just going to ask him to

22  speak to you.  And I'll provide the Court with the information

23  and that'll be that, whatever happens.

24          Again, I hate bringing it up.

25          THE COURT:  Yeah.

84

1          MR. McELFISH:  And I'm not asking for a continuance

2    of this case.  I want to do this case, Bauta.

3          THE COURT:  Do you --

4          MR. McELFISH:  I'm ready to go.

5          THE COURT:  In your post-trial motions, you included

6    cases on pain and suffering?

7          UNIDENTIFIED SPEAKER:  Yep.

8          MR. McELFISH:  Yes.

9          THE COURT:  All right.

10          MR. McELFISH:  I don't know if you remember this or

11    not, but under the Gasperini ruling, one of the things that

12    was discussed was both sides could actually have a Gasperini

13    hearing about the value and call experts as to what they

14    thought the value was.

15          MR. ORTIZ:  We actually --

16          MR. McELFISH:  Am I -- can I just -- let me just --

17    I'm sorry.  Let me just --

18          MR. ORTIZ:  Sure.  [Indiscernible]

19          MR. McELFISH:  And my suggestion was we agree on as

20    an expert in the value of the case, we agree on the mediator

21    that we used who was chief of the Second Circuit.  What was

22    his name?

23          THE COURT:  No.  He was the chief of the Second

24    Circuit --

25          MR. McELFISH:  I'm sorry.  The Second --

85

1          THE COURT:  -- Second Department.

2          MR. McELFISH:  -- Appellate Division.

3          THE COURT:  Second Appellate Division.

4          MR. McELFISH:  Second Appellate Division.

5          THE COURT:  Judge Berlin.

6          UNIDENTIFIED SPEAKER:  Yeah, Judge Berlin.

7          MR. ORTIZ:  Ariel Berlin.  Yeah, we actually opposed

8  that application in the post-trial motion and pointed out that

9  there's no history of any Gasperini hearings ever and that

10 it's the province of the court to determine material deviation

11 in general.  So just to let you know.  It's fully briefed in

12 our opposition to the post-trial motion from the plaintiffs or

13 we dealt with that.

14         THE COURT:  Okay.  You're going to talk to Mr.

15 Paticucci, Mr. Barmen?

16         MR. BARMEN:  Yes, Your Honor.  We will.

17         THE COURT:  All right.

18         MR. BARMEN:  Yes, Your Honor.  We will.

19         THE COURT:  Okay.

20         MR. BARMEN:  And how would you like us to -- just

21 call your chambers back or shoot you an email after we speak

22 to him?  You know, yay or nay, he's not making a decision or

23 no, it isn't or send you a letter?  How would you like us to

24 address that?

25         THE COURT:  Why don't you call chambers.  So Mr.

86

1 McElfish, I take it that you are amenable to at least --

2 you're amenable to this?

3 　　　　　MR. McELFISH:  I'm amenable to hearing the number,

4 sure.

5 　　　　　THE COURT:  Okay.

6 　　　　　MR. McELFISH:  And if it's a number we can accept,

7 we're amenable to take it.

8 　　　　　THE COURT:  All right.  So, Mr. Barmen, why don't

9 you call chambers back?  How soon could you do it, a couple of

10 days?

11 　　　　　MR. BARMEN:  The hope would be tomorrow, but

12 certainly.

13 　　　　　THE COURT:  All right.  Do it by Thursday, if you

14 can by Thursday at 4:00.

15 　　　　　MR. BARMEN:  Will do.

16 　　　　　THE COURT:  All right.  And if that's -- if you both

17 are amenable to that, we'll propose numbers for past and

18 future pain and suffering and we'll see if it works.  And then

19 you won't have to come deal with me for two weeks.

20 　　　　　MR. McELFISH:  I was looking forward to it.

21 　　　　　MR. BARMEN:  I was hoping we'd have a day-long

22 hearing on Valentino.

23 　　　　　THE COURT:  Oh, no.  And all right, we do have one

24 more issue, right, that this motion about the punitive damages

25 or there's a pre-motion.

87

1          MR. ORTIZ:  Yeah, we didn't know if that was

2    appropriate to raise now or not because it really has nothing

3    to do with what this trial is, Your Honor, but we're certainly

4    prepared to discuss it.

5          THE COURT:  I don't want to talk about it.

6          MR. SHAUB:  Jonathan Shaub, Your Honor, I was

7    looking forward to it.  I've been waiting for two hours to

8    discuss this issue with you.

9          THE COURT:  Yes.

10          UNIDENTIFIED SPEAKER:  He's all upset now.

11          THE COURT:   That's all right.  I'm sure he'll raise

12    it at every break during the trial.

13          MR. SHAUB:  Absolutely, Your Honor.  But, yes, if

14    you could, this was our premotion letter, nor out actual

15    motion on the issue.

16          THE COURT:  Yes.  Yes.  All right.  Well, why don't

17    we break then unless there's something else we need to talk

18    about.

19          MR. McELFISH:  I'll just say that if Judge Delaney

20    denied the motion, I'll make calls to your courtroom with the

21    phone number, name, and case number.

22          THE COURT:  Great.  Okay.  Thank you, gentlemen.

23    (Proceedings concluded at 5:36 p.m.)

24                          *  *  *  *  *  *

25

88

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                              _____

6                              Shari Riemer, CET-805

7

8  Dated:   May 31, 2019