1051

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - X
 3    JOSE BAUTA,                     :  14-CV-03725(FB)(RER)
                                      :
 4            Plaintiff,              :
                                      :
 5         -against-                  :  United States Courthouse
                                      :  Brooklyn, New York
 6                                    :
                                      :
 7                                    :  Monday, May 7, 2018
      GREYHOUND LINES, INC.,          :  9:00 a.m.
 8    SABRINA ANDERSON, AKOS          :
      GUBICA, KAROLY GUBICA, AND      :
 9    CAV ENTERPRISE, LLC,            :
                                      :
10            Defendants.             :
     - - - - - - - - - - - - - - - - X
11

12            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
                BEFORE THE HONORABLE RAMON E. REYES
13        UNITED STATES MAGISTRATE JUDGE, AND A JURY

14
                      A P P E A R A N C E S:
15
     For the Plaintiffs:    McElfish & Associates, LLC
16                          Attorneys for the Plaintiff -
                            Jose Bauta
17                               122 East 42nd Street
                                 Suite 2100
18                               New York, New York 10168
                            BY: RAYMOND D. McELFISH, ESQ.
19                               JAMIE DIAMOND, ESQ.

20
                            WAGSTAFF & CARTMELL, LLP
21                          Attorneys for the Plaintiff -
                            Jose Bauta
22                               3740 Grand Avenue
                                 Suite 300
23                               Kansas City, Missouri 64112
                            BY: JONATHAN P. KIEFFER, ESQ.
24

25
```

SN        OCR        RPR

1052

A P P E A R A N C E S: (Continued.)


For the Defendants:        LEWIS BRISBOIS BISGAARD & SMITH, LLP
                           Attorneys for the Defendants -
                           Greyhound Lines, Inc., Sabrina Anderson,
                           Akos Gubica, Karoly Gubica, and CAV
                           Enterprise, LLC
                              1375 East 9th Street
                              Suite 1600
                              Cleveland, Ohio 44114
                           BY: BRADLEY J. BARMEN, ESQ.
                              THOMAS P. MANNION, ESQ.


                           MARSHALL, DENNEHEY, WARNER, COLEMAN
                           & GOGGIN
                           Attorneys for the Defendants -
                           Greyhound Lines, Inc., Sabrina
                           Anderson, Akos Gubica, Karoly
                           Gubica, and CAV Enterprise, LLC
                              800 Westchester Avenue
                              Suite C-700
                              Rye Brook, New York 10573
                           BY: HAROLD L. MOROKNEK, ESQ.
                              STEVEN B. SAAL, ESQ.




Court Reporter:       SOPHIE NOLAN
                      225 Cadman Plaza East/Brooklyn, NY 11201
                      NolanEDNY@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription

Proceedings                                              1053

1              (In open court.)

2          (JUDGE RAMON E. REYES enters the courtroom.)

3      (The following occurs outside the presence of the jury.)

4          THE COURT:  Mr. McElfish, you had something you

5   needed to raise?

6          MR. McELFISH:  Yes, Your Honor, good morning.

7   Thursday -- I'm bringing it up this morning because I believe

8   I have an obligation to bring something like this to your

9   attention as quickly as I can.

10         The cross-examination of John Smith took place on

11  Thursday, but I did not have the transcript to be sure of what

12  I was going to do until after Friday, so today.  After there

13  was a sidebar about Mr. Barmen's cross-examination of John

14  Smith and other injuries on the bus responding to the same

15  forces biomechanical forces of shearing and otherwise, you

16  instructed him to get open the topic; that it would open the

17  door, quote unquote.  I have the pages and lines here.

18         After that, he proceeded to go into medical records

19  of other passengers, persisted with Colonel Smith on what

20  other injuries existed on the bus and did he review the

21  records and why wasn't he prepared to discuss that today

22  before the jury.  After Thursday I called Mr. Ostroff who in

23  Pennsylvania who represented 22 of those people.  After

24  hearing what I had to say about what went down, he immediately

25  left depositions in Pittsburgh and made arrangements to come

Proceedings                                    1054

1   here today and is here today, who has represented some of

2   these folks.  The application is to allow us to call at least

3   one bus passenger who was either equal or behind Mr. Bauta who

4   had much, much worse injuries to testify in rebuttal.  Now,

5   the reason why I'm bringing it up today is because I want to

6   avoid it age-old trap of failing to call in direct, because I

7   am notice of it now.  I'm certainly happy to call at least

8   Brandon Osborn, who was one of the plaintiffs, who flew over

9   four or five seats in the back of the bus and had his jaw

10  broken and his teeth knocked out, among other things.

11          I'm willing to call him before I rest my direct

12  case.  I'm also willing to call him as a rebuttal witness if

13  the court allows.  Mr. Ostroff is present.  He won't be here

14  for the trial, just for the out-of-the-presence portion to

15  discuss it with you if you wish.  Thank you.

16          MR. BARMEN:  This is the first time hearing of it,

17  Your Honor, but we did have a sidebar where Mr. McElfish

18  indicated I opened the door.  Your Honor stated that not only

19  had I not, that it wasn't going to happen, it didn't happen.

20  I would oppose any such motion for the reasons previously

21  stated.  This was addressed.  I didn't go down that road.

22  There was no door open.  And, frankly, I tried the

23  Pennsylvania case for Mr. Osborn.  Mr. McElfish didn't.

24          Mr. Osborn did not have a broken jaw, but that's

25  either here nor there.  The fact is the door wasn't open and

Proceedings                                    1055

1   it's a baseless motion and should be denied.

2              THE COURT:  Do you have the transcript?

3              MR. McELFISH:  May I respond?

4              THE COURT:  No.  Do you have the transcript?

5              MR. McELFISH:  Of who?

6              THE COURT:  Catherine Smith.

7              MR. McELFISH:  I have it electronically.

8              THE COURT:  Can you tell me the pages?

9              MR. McELFISH:  Yes, sir.  The admonition to

10  Mr. Barman occurred somewhere around 750.

11             MR. BARMEN:  Your Honor, when it is okay, there's

12  one more points on this.  It's important that I would like to

13  make.

14             MR. McELFISH:  I would like to respond to this,

15  first.

16             MR. BARMEN:  Can I come up here and see what you're

17  looking at?

18             MR. McELFISH:  Of course.

19             THE COURT:  742 is where the sidebar starts.

20             MR. McELFISH:  Correct.  And if you go to page 743,

21  the Court said, I'm going to grant the motion -- I'm sorry.

22             THE COURT:  I do not know that I said that.

23             MR. McELFISH:  It's right here.

24             THE COURT:  Well, that is what the transcript says.

25             MR. McELFISH:  The Court, I'm going to grant the

Proceedings                                          1056

1    motion because first of allel it opens the door.  Second of

2    all, are there are so many different factors that can go into

3    play, that are in play, with whether one person in the middle

4    of the bus is injured as opposed to another, for instance.

5              And I asked for a curative instruction and I asked

6    for the questions and answers to be stricken.  And then -- and

7    there's no problem with that part.  The problem with that

8    part.  Let's just assume you didn't say it.  It doesn't really

9    matter honestly.  We had the discussion.  You were aware of

10   the issue, of course.  It doesn't matter what you said in

11   response.  What happens after that is he starts grilling, at

12   page 756, he -- let me get there.

13             Beginning at line 6 or 7.  So 756 is after 742.  And

14   then he gets into that, so if you would read that Your Honor.

15   That's what I'm referring to about culling the medical records

16   of other passengers and why aren't you prepared with that

17   today and things of that nature, opens the door after he was

18   warned.

19             MR. BARMEN:  Where did I question him on him not

20   being prepared to do that?

21             MR. McELFISH:  When you said, we have to call the --

22             MR. BARMEN:  No, he said.  Where did I question him

23   on it?

24             MR. McELFISH:  Hold on a minute.

25             MR. BARMEN:  No you are making misrepresentations of

Proceedings                                    1057

1    the transcript and I want to make sure that we're accurate.

2              MR. McELFISH:  Hold on.  No problem.  You are asking

3    him who and --

4              MR. BARMEN:  In response to his --

5              MR. McELFISH:  Who else are you familiar with on the

6    bus that had a cervical or lumbar herniation.  I thought in

7    the Philadelphia case it came up that some of those people had

8    cervical and lumbar injuries.  Who?  I'm not prepared to

9    discuss that.

10             THE COURT:  So you start at page 742 with the

11   sidebar and you go through --

12             MR. McELFISH:  And jump up to 745.

13             THE COURT:  Where the sidebar concludes.

14             MR. McELFISH:  Correct.

15             THE COURT:  And then 756.

16             MR. McELFISH:  Correct.

17             THE COURT:  To what.

18             MR. McELFISH:  Yes, on down to page 757, line 13.

19             MR. BARMEN:  May I respond, Your Honor?

20             THE COURT:  Hold on.

21             MR. BARMEN:  First off, the motion Mr. McElfish

22   reference up around 742, was not a separate motion.  It was

23   referring back to the motion in limine that had been filed,

24   number one.  And that is clear on -- bear with me, I'm getting

25   there.

Proceedings                                      1058

1        Mr. McElfish starting reading below where that was

2   being discussed as if there were some new motion being

3   referenced which is simply not true.  You indicated that there

4   was not going to be a trial within a trial of the other people

5   on the bus and we agreed.  In any event, they want to bring in

6   Brendon Osborn.  There are a couple of things that are

7   important to that and Mr. McElfish who was also counsel of

8   record in Philadelphia and Mr. Ostroff who was lead counsel in

9   the case are certainly aware, there was no allegation, number

10  one, that Brandon Osborn had any type of back injury;

11  certainly no disc herniation.

12       Mr. Osborn also is comparing apples to oranges

13  because as they all well know, Mr. Ostroff (sic) was in the

14  very back seat of the bus in the middle in the aisle; because

15  in the back seat, Your Honor, it goes all the way across.

16  There's not just two on either side.  There's a bench that

17  goes all the way across.  He testified very clearly that he

18  was sitting in the middle of that bench.  So when the accident

19  happened, he flew forward in the aisle.  He didn't have a seat

20  in front of him like Mr. Bauta did.

21       So they want to bring him in to say that forces on

22  him in the back of the bus were the same or greater than those

23  on Mr. Bauta when Mr. Bauta didn't have the same situation

24  that -- I'm sorry, Mr. Osborn did not have the same situation

25  as Mr. Bauta did.  When Colonel Smith testified he said the

Proceedings                                    1059

1   seat in front of Mr. Bauta deflected.  I think he called it

2   plastic deformation.  And that lessened the forces on him.

3   You had the Delta V of 16 when the accident happened.

4   Mr. Bauta strikes the seat in front of him.  It deforms, it

5   absorbs energy and lessens the biomechanical forces on him.

6            Mr. Osborn didn't have that.  Mr. Osborn had a Delta

7   V of 16 and nothing in front of him to strike and absorb the

8   energy.  It's not surprising to me that Brandon Osborn would

9   be the one person they would pick to try and spring thi son us

10  now.

11           What's also interesting is I ran into Mr. Ostroff in

12  the bar at the hotel last night and we had a nice

13  conversation.  Mr. McElfish was there too.  They didn't raise

14  this issue then.  He didn't raise it to me Thursday or Friday

15  when he became aware of it as he indicates.  They raise it

16  when they come into court when you come onto the bench.  You

17  denied it at the time.  It should be denied again.  Thank you.

18           THE COURT:  Last word.

19           MR. McELFISH:  First of all, the motion that's being

20  referred to, the original motion in limine, was the

21  defendant's motion to exclude any reference to any injury of

22  any other passengers.  Our opposition was no, that -- well,

23  that's fine, except we have to get into evidence Ms. Wang and

24  you granted that motion.  It's their own motion to exclude any

25  other injuries of any other passengers and you did a cutout

Proceedings                                        1060

1   for Ms. Wang.  In opening statements, he told the jury the

2   people in the back of the bus don't feel the impact.  Most of

3   the serious injuries are in the front of the bus and then he

4   went on to cross examine at page 756, Colonel Smith, on

5   whether or not he compared or looked at the other injuries on

6   the bus to the other passengers to see if they were subjected

7   to the same force and grilled him, essentially, because he

8   didn't bring the medical records of those other folks with

9   him.  And that was after you told him; whether you said it

10  that way or a different way, I don't know.  I can only go by

11  what's in the record.

12          He was on notice it would open the door and then he

13  opened the door and now we're here to make our application.  I

14  think it's pretty clear.  He had neck injuries.  And may

15  Mr. Ostroff address the injury briefly?

16          THE COURT:  No.

17          MR. McELFISH:  Okay.  He had neck injuries.  He had

18  jaw injuries.  He had teeth knocked out.  He went several

19  aisles down.  How can you argue that -- certainly based on

20  what they've go so far they're going to argue to the jury well

21  Mr. Bauta couldn't have been injured because he wasn't in the

22  front of the bus.  I would like to --

23          THE COURT:  That is not what they said in their

24  opening.

25          MR. McELFISH:  Oh, it is.

Proceedings                                    1061

1        THE COURT:  No, it is not.

2        MR. McELFISH:  They said the more serious injuries

3  were in the front of the bus --

4        THE COURT:  They did not say that Mr. Bauta was not

5  injured.

6        MR. McELFISH:  They said the people in the middle

7  and the back got bumps and bruises.

8        THE COURT:  You just said they were going to say

9  that Mr. Bauta was not injured that would be inconsistent with

10  their opening.  They said Mr. Bauta was injured.  The only

11  question was the extent of his injuries.

12        MR. McELFISH:  Let me be clearer then.  What they

13  said and what they're going to say based on that evidence is

14  that the more serious injuries took place in the beginning of

15  the bus, like Mr. Soberay (ph) and that the people in the back

16  of bus were had more minor injuries.  You're right they said

17  he had more minor injuries and they used the phrase bumps and

18  bruises.  Okay, well, we have a passenger in the back of the

19  bus who didn't have bumps and bruises.  It is narrowly

20  tailored to rebut that evidence and I will keep it short.

21        THE COURT:  It is to say is a traumatic brain injury

22  more or less severe than a broken jaw --

23        MR. McELFISH:  Or knocked out teeth.

24        THE COURT:  -- which is more severe.

25        MR. McELFISH:  It goes to the force.

SN        OCR        RPR

Proceedings                                              1062

1    THE COURT:  It does not.  I will take it under
2    advisement.  We do not need to decide it now, but I am
3    inclined to deny it.
4        MR. McELFISH:  -- if you decide to change your mind
5    and grant it, I will keep it short.
6        THE COURT:  I will give you plenty of time to get
7    this guy up from wherever he is to testify.
8        MR. BARMEN:  Your Honor, since we're discussing
9    issues there is one relative to Dr. Thomas.  Would you like us
10   to address it now or wait until Dr. Thomas testifies.
11       THE COURT:  Doesn't Mr. Whitlock have to catch a bus
12   or a train?
13       MR. BARMEN:  Mr. Whitlock is here and is prepared to
14   go.
15       THE COURT:  What time is his train?
16       MR. BARMEN:  He just needs to be out of here by
17   lunch.  He is fine.
18       THE COURT:  Raise your voice.
19       MR. BARMEN:  I went back through, like Mr. McElfish,
20   the transcript of Dr. Thomas.  Dr. Thomas testified in his
21   direct on Thursday which is set to be complete this morning
22   that he believes that the PTSD suffered by the plaintiff in
23   this case was significant and the symptoms of that were the
24   fact that he's quiet and he has a startled response.  He then
25   went on to say at page 802 of the transcript, Your Honor,

Proceedings                                    1063

1    that:  "I don't know too much more about his symptoms so I

2    couldn't come to a real definitive conclusion about the PTSD."

3            We request that any reference to the PTSD or any

4    suggestion that Dr. Thomas diagnosed the plaintiff with PTSD

5    be stricken, because he did not.

6            THE COURT:  Do you want to respond, Mr. McElfish?

7            MR. KIEFFER:  I will respond.  Dr. Thomas' testimony

8    is not concluded.  As the Court knows, we had a sidebar about

9    issues related to this qEEG treatment and how evidence on that

10   will be permitted.  There may be additional questioning of

11   Dr. Thomas concerning PTSD.  Dr. Thomas' records, certain of

12   which I hadn't had an opportunity to get to yet, appear to

13   state quite clearly that he had -- he made a diagnosis of

14   PTSD.

15           For example, there is Exhibit P 364, page four.

16   There is a not in Dr. Thomas' chart that has been admitted

17   dated February 18, 2016 where it states PTSD is significant

18   for this man but is very quiet this and will not talk about

19   the PTSD even if asked.  And then goes on an elaborates

20   further on that topic and some others.  I think Mr. Barmen is

21   free to cross-examine him on it but his direct testimony

22   hasn't been concluded yet so I don't think it's proper to take

23   snippets of it and try to wall off certain topics.

24           MR. BARMEN:  Again, he's already testified

25   definitively at page 802 of the transcript:  "So I will not

Proceedings                                          1064

1    say he's diagnosed with it."  It's relative to the PTSD,

2    because he couldn't come to that conclusion.

3            MR. KIEFFER:  Well, he certainly came to that

4    conclusion in his chart that I hadn't yet had an opportunity

5    to ask him about.

6            THE COURT:  First of all, it is not a note in his

7    chart.  It's an e-mail he sent to Dr. Honor.  It's not quite a

8    note in his chart.  He threw everything into his chart.  His

9    testimony struck me that he did not diagnose him at the time

10   with PTSD.  He said I don't know.  I think those were his

11   exact words at trial.  So if he says that now, regardless of

12   what is in his notes, how can he, like a treating

13   neuropsychologist, be allowed to opine on PTSD?

14           MR. KIEFFER:  Your Honor, however you want to

15   characterize this and I'm putting the characterization of

16   whether it's an e-mail or a note.  It's his words.  It's his

17   narrative explanation addressing an issue.  And he was

18   specifically asked by Dr. Honor what his thoughts were on

19   PTSD.  He didn't say at the time when he was treating him, I

20   don't know, I cannot tell, I cannot make a diagnosis.

21           What he said was, yes, PTSD is significant for this

22   man and then he went on to elaborate on it.  His testimony of

23   Thursday is what it what is, but to me the import is was he

24   was not done.  We adjourned.  He is still on the stand and on

25   direct.  If there's a feeling when his direct and his cross

SN        OCR        RPR

Proceedings                                    1065

1   concludes that the testimony doesn't execute the cut the

2   mustard, I'm sure the Court will do as it sees fit, but I

3   don't think it's fair for the plaintiff to in effect penalize

4   the plaintiff's evidence from a treating physician just

5   because we had to adjourn his testimony in the middle.

6           MR. BARMEN:  Your Honor, the testimony regarding the

7   PTSD was long before the adjournment of the testimony for the

8   day on Thursday and when he said the PTSD was significant, he

9   gave two reasons; the man is quiet and he -- a startled

10  response.  Certainly that's not the diagnosis standard under

11  DSM-5 for definitive diagnosis of PTSD, he clearly said he

12  couldn't do it.  Simply sending a note or letter to Dr. Honor

13  saying it was significant does not get them to a standard to

14  allow a treating physician, who never formally diagnosed

15  somebody according the DSM-5 with PTSD to tell the jury he has

16  it.

17          THE COURT:  Other than this e-mail that he sent to

18  Dr. Honor, is there any evidence that Dr. Thomas diagnosed at

19  the time Mr. Bauta with PTSD?

20          MR. KIEFFER:  I believe that is the evidence, Your

21  Honor.

22          THE COURT:  I know that's not your application but

23  I'm going to strike that testimony because he did not make

24  that diagnosis.  An e-mail to another retained expert is not

25  enough especially if he follows up the significant PTSD with I

Proceedings                                    1066

1    don't push him on it.  He doesn't talk about it.

2          You know, that is not enough to qualify as a

3    diagnosis under the DSM-5 which it has to be.  If you can show

4    me references in Dr. Thomas' notes, I think there are five or

5    six, required elements in the DSM-5 for someone to be

6    diagnosed with PTSD and you can show me that, but you do not

7    need it.  You have Dr. Honor.  Dr. Honor's diagnosed him with

8    PTSD so what's the big deal?

9          MR. KIEFFER:  My position, Judge, would be to the

10   extent that Mr. Barmen wants to quibble about DSM-4 or DSM-5,

11   treating physicians all the time have records.  Some are scant

12   and some are verbose, and I don't know that just because he

13   wasn't verbose on that point him renders him ineligible to

14   testify about it as a treating physician.

15         MR. BARMEN:  I don't think raising the legal

16   standard in the state of New York is quibbling, number one.

17   You made your ruling, Your Honor, and I would ask consistent

18   with that, a curative instruction to the jury to disregard

19   Dr. Thomas' testimony relative to PTSD.  Thank you.

20         THE COURT:  Anything else?

21         MR. BARMEN:  Nothing from the defense.

22         MR. McELFISH:  Later I will have something.

23         THE COURT:  Is Mr. Whitlock in the hall?

24         MR. BARMEN:  Yes, Your Honor.

25         THE COURT:  Let's get the jury.  Everything is set

```
                        Proceedings                    1067
```

1    with the transcript for read back?

2              MR. McELFISH:  What?

3              THE COURT:  The transcript for read back later

4    today?

5              MR. McELFISH:  Yes, Lichy.

6              THE COURT:  No, because they sent us a

7    revision again that they made changes which Mr. Saal can

8    address.

9              We will do that later then.

10             (Jury enters.)

11             THE COURT:  You may call your next witness.

12             MR. McELFISH:  Thank you, Your Honor.  The

13   plaintiffs call Scott Whitlock.

14             THE COURT:  Mr. Whitlock, please raise your right

15   hand.

16             (Witness sworn/affirmed.)

17             THE COURT:  Please be seated.  Tell the court

18   reporter your name and please spell it.

19             THE WITNESS:  Scott, S-C-O-T-T, Whitlock,

20   W-H-I-T-L-O-C-K.

21             THE COURT:  You may inquire.

22   **SCOTT WHITLOCK**,

23             called by the Plaintiff, having been

24             first duly sworn, was examined and testified

25             as follows:

1  DIRECT EXAMINATION

2  BY MR. KIEFFER:

3  Q    By good morning, sir.

4  A    Good morning.

5  Q    Who are you employed, Mr. Whitlock?

6  A    Beau Dietl & Associates.

7  Q    And who is Beau Dietl & Associates?

8  A    It's an investigations company.

9  Q    What kind of investigations does Beau Dietl & Company --

10 & Associates do?

11 A    Insurance fraud investigations, matrimonial

12 investigations, Workers' Compensation.

13 Q    Okay.  How long have you worked for Beau Dietl &

14 Associates?

15 A    Five years.

16 Q    And what's your title?

17 A    Investigator.

18 Q    And you are not a licensed private investigator; correct?

19 A    No, I'm not.

20 Q    You are one of several folks at Beau Dietl & Associates

21 that undertook certain surveillance on the plaintiff in this

22 case, Mr. Bauta, are you not?

23 A    Yes.

24 Q    Okay.  You created certain records of your activities?

25 A    Yes, I did.

1  Q    Okay.  Your first assignment to or involvement with

2  Mr. Bauta was in July of 2016; correct?

3           MR. BARMEN:  Objection, Your Honor.  Leading.  It's

4  their witness.

5           THE COURT:  Sustained.

6  Q    When was your first involvement with Mr. Bauta, sir?

7  A    I don't recall off the top of my head but I believe it

8  was in 2016.  I don't have the exact date.

9  Q    If there are records and testimony in this case including

10 testimony from you that your first involvement was July 25th

11 of 2016 do you have any reason to dispute that?

12 A    That sounds like it.

13 Q    What was the assignment that you were given on that date

14 with respect to Mr. Bauta?

15 A    If I recall I believe that date we were assigned to start

16 at one of the claimant's doctor's offices.  I think it's a PTO

17 office that he was supposed to have physical therapy

18 treatments.

19 Q    All right.  And how was it that you knew who you were

20 looking for?

21 A    I was given the information from my boss.

22 Q    Were you given a photograph of Mr. Bauta?

23 A    Yes.

24 Q    All right.  Now, this physical therapy office that you

25 mentioned, what did you do, did you go to the office?

1    A    Yes.

2    Q    Did you go in a vehicle.  I believe I drove my car there.

3    And were you alone or were you with someone?

4    A    At that PTO office, I was with the second investigator.

5    Q    And on was that?

6    A    Chris Viggiano.

7    Q    How long were you on location on July 25, 2016?

8    A    I believe it was six to eight hours.

9    Q    Is your typical shift in the six to eight-hour range?

10   A    It varies.  Generally they're eight hours.

11   Q    You said generally they're eight hours?

12   A    Yeah, but it could go long other or shorter.

13   Q    Typically you don't go out just for an hour or two?

14   A    No.

15   Q    On that date, your first surveillance of Mr. Bauta, you

16   did not see him; correct?

17            MR. KIEFFER:  Objection.

18            MR. BARMEN:  Objection, leading.

19            THE COURT:  Sustained.

20   Q    Did you see Mr. Bauta on July 25th?

21   A    I don't remember.

22   Q    You don't recall at all?

23   A    I'm not sure.

24   Q    Do you recall giving a deposition in this case sir?

25   A    Yes.

1        MR. KIEFFER:  Your Honor, may I?

2        THE COURT:  447.

3        MR. BARMEN:  Page and line, please.

4        MR. KIEFFER:  I'm getting there.  On page 28, sir.

5        MR. BARMEN:  447.  Your Honor, if that's one of ours

6   it's 397-45.

7        THE COURT:  Never mind.  I have it.  I'm sorry.

8        MR. KIEFFER:  Let me withdraw that question and ask

9   a different question.

10  Q    Sir, if you had seen Mr. Bauta on that date, July 25,

11  would you have made some sort of recording of that?

12  A    Yes.

13  Q    And how would you have recorded your sighting of

14  Mr. Bauta, would you have done it via something like

15  videotape, would you have done it via a written report or

16  both?

17  A    Well, first I would use a videocamera.  It's like a

18  camcorder type of camera and after the surveillance is

19  complete I write a report based on what I saw.

20  Q    Let me ask you about this camera.  What kind of a camera

21  do you use?

22  A    It's -- the one I use currently is a Panasonic HD camera.

23  Q    This is a hand-held videocamera?

24  A    All of them are.

25  Q    You also use some kind of a covert camera?

Whitlock - direct - Kieffer                    1072

1    A    Yes.  It is more of, like, an Apple iTouch, if you want

2    to call it.  It has video capability and also date and

3    timestamp on it as well.

4    Q    This covert or Apple iTouch type of camera, is that

5    something you hold?

6    A    Yes.

7    Q    It's not something that goes in a buttonhole or something

8    on your person?

9    A    It's like a cell phone.

10   Q    Is it something that can be seen by a bystander, for

11   instance?

12   A    Sure.

13   Q    If the only video that has been produced to us in this

14   case from you dates from February 2, 2017 and April 21, 2017,

15   would that indicate those are the only dates that you actually

16   physically saw Mr. Bauta?

17   A    Yes.

18   Q    Otherwise you would have endeavored to make some kind of

19   a recording of that; correct?

20   A    If I had seen him, I would have tried to videotape him

21   but I didn't see him.

22   Q    You went out on a number of instances looking for

23   Mr. Bauta; correct?

24   A    Yes.

25   Q    Okay.  You went out on August 1st and 2nd and 5th and 6th

1  and 16th and 18th and 20th; correct?

2  A    Yes.

3  Q    All right.  And you did not see Mr. Bauta on any of those

4  seven dates, true?

5  A    No.

6  Q    So if you didn't see him, you didn't see him engaging in

7  any activities; right?

8  A    No.

9  Q    Were those shifts typically six to eight hour shifts like

10 your shift on July 25th?

11 A    I don't remember exactly but I don't believe so.

12 Q    Were you typically accompanied by another investigator on

13 those dates?

14 A    Not always.  I don't think I was.

15 Q    On none of them?

16 A    Well, it depends on where they were.  If it was in the

17 City most likely I would have had a second investigator with

18 me.

19 Q    And why is that?

20 A    Just the setup of the City.  Multiple means of egress for

21 the claimant to leave, to either walk or take a cab or take

22 the train, so typically you have two investigators in the City

23 surveillance.

24 Q    You went out in January, January 19th and January 30th

25 looking for Mr. Bauta; correct?

Whitlock - direct - Kieffer                 1074

1    A    I don't remember but if it's in the depo, then yes.

2    Q    If you testified that you went looking for Mr. Bauta on

3    January 19th and January 30th, you're not changing your

4    testimony today?

5    A    No.

6    Q    Those would also typically be six to eight-hour shifts?

7    A    I would think so.

8    Q    Do you know if you were accompanied by any other

9    investigator on those dates?

10   A    I don't recall.  It depends on what it was.

11   Q    You went looking for Mr. Bauta on February 1st, 2nd, 3rd

12   and 5th as well, true?

13            MR. KIEFFER:  Objection, leading.

14            THE COURT:  I will allow it.

15   A    Do you know what page that's on?

16   Q    Do you recall, sir?

17   A    If it's in the deposition, then yes.

18   Q    If you testified under oath that you went looking for

19   Mr. Bauta on February 1st, 2nd, 3rd and 5th, you're not giving

20   different testimony today?

21   A    No.

22   Q    Okay.  The only one of those days that you actually saw

23   Mr. Bauta was on February 2nd; correct?

24   A    Yes.

25   Q    Okay.  And what did you observe on February 2nd?

1           THE COURT:  Do you remember as you sit here today?

2           THE WITNESS:  Off the top of my head, I don't

3    recall.

4    A    Off the top of my head I don't recall.

5    Q    Do you recall starting surveillance about 9 a.m.?

6    A    I believe so.

7    Q    Do you recall you started that at the office of

8    Mr. Bauta's physical therapist?

9    A    Yes.

10   Q    You recall that later in the day your supervisor,

11   Mr. Lanigan, told you to change locations and go to the office

12   of a Dr. Thomas?

13   A    Yes.

14   Q    And you did that?

15   A    Yes.

16   Q    And that was approximately at 2 p.m.?

17   A    I believe so, yes.

18   Q    When you got to Dr. Thomas' office, did there come a time

19   when you observed Mr. Bauta exiting the office?

20   A    Yes, at approximately 5:07 p.m.

21   Q    And he proceeded walking toward Penn Station, did he not?

22   A    Yes.

23   Q    Did you follow him?

24   A    Yes, I did.

25   Q    Let me pause and ask a question, sir.  When you are

1    undertaking surveillance on a man like Mr. Bauta is it

2    typically your goal to be seen or not be seen?

3    A    Not be seen.

4    Q    Okay.  The goal, if you can achieve it, is to do it in

5    secret, covertly so that the person you're studying doesn't

6    know they're being watched; true?

7    A    That's my goal.

8    Q    So hopefully whatever you might observe or capture on

9    video is natural and uncensored, for lack of a better word;

10   true?

11   A    I guess.  I just prefer not to be seen with whomever I'm

12   following.

13   Q    As far as you were aware, when you began following

14   Mr. Bauta on this day, February 2, 2017 from his doctor's

15   office, he was not aware that you were following him?

16             MR. KIEFFER:  Objection.

17   A    I don't believe so.

18             THE COURT:  Overruled.  You can the question.

19   A    I don't believe so.

20   Q    When you first observed Mr. Bauta exiting Dr. Thomas'

21   office on February 2nd, he was carrying a cane, was he not?

22   A    Yes.

23

24             (Continued on the following page.)

25

SN        OCR        RPR

1    EXAMINATION CONTINUES

2    BY MR. KIEFFER:

3    Q    And he walked with that cane as you followed him to Penn

4    Station, true?

5    A    Yes.

6    Q    Okay.  Did you proceed to follow him on into Penn

7    Station?

8    A    Yes.

9    Q    Did he get on a train?

10   A    Yes, I believe so.

11   Q    Did you follow him onto the train?

12   A    Yes.

13   Q    And when you followed him through Penn Station and onto

14   the train, he was continuing to walk with a cane, was he not?

15   A    Yes.

16   Q    He exited -- did he take one train or two trains that

17   day?

18   A    I recall he might have taken two -- two downtown trains,

19   I believe.

20   Q    Towards Brooklyn?

21   A    Yes.

22   Q    All right.  And did you remain on -- did you follow him

23   onto both of those trains?

24   A    Yes.

25   Q    Attempting to tape him all the while?

1   A    Yes.

2   Q    And on both those trains, he continued to walk with his

3   cane, or stand with his cane if he was occupying a space on

4   the train?

5   A    As I recall, I think he was sitting.

6   Q    Do you recall Mr. Bauta exiting at New Lots Avenue?

7   A    Yes.

8   Q    And he walked several blocks, 10 or 11 blocks, to a

9   residence in Brooklyn, correct?

10  A    Yes.

11  Q    And that residence is one that you had gone to before, at

12  614 Bradford Street?

13  A    I don't recall if I've ever been there or not.

14  Q    Well, regardless of --

15  A    Off the top of my head, I don't remember.

16  Q    Pardon me?

17  A    Off the top of my head, I don't know if I ever went to

18  that residence or not.

19  Q    Well, regardless of whether you'd been to that residence

20  or not, you continued to follow Mr. Bauta this 10 or 11 blocks

21  to a residence in Brooklyn, correct?

22  A    Yes.

23  Q    And during that entire time, he continued to walk with

24  his cane?

25  A    Yes.

1  Q    And you don't recall him carrying anything else other

2  than his cane during this walk; true?

3  A    I am mixing up dates.  I thought he might have had an

4  umbrella, but that might have been a different day.

5  Q    All right.

6  A    I believe it was just his cane.

7  Q    Now, your surveillance continued into that evening,

8  correct?

9  A    Yes.

10 Q    All right.  And whenever you saw Mr. Bauta and you were

11 able to observe him, was it your goal to -- I am going to say

12 videotape, recognizing you are not -- I assume it's all

13 digital, right?

14 A    The video camera, you know, takes video.

15 Q    Video images?

16 A    Yeah.

17 Q    Okay.  And whenever you saw Mr. Bauta, was it your goal

18 to take video images of what you saw?

19 A    Yes.

20 Q    And at some point, you took those images that you

21 recorded and you uploaded them onto the system of your

22 employer, Bo Dietl & Associates?

23 A    Yes.  Well, I go home.  I upload it to my computer, and

24 then I e-mail it and/or upload it to a track ops program that

25 we have.

1  Q    And at some point you review it?

2  A    I just kind of plug it into the computer and make the

3  video and upload it.

4  Q    And make sure that it is actually -- that the file is

5  actually being transferred?

6  A    Not so much transferred, just make sure that it was made

7  correctly, no errors.

8  Q    And then, so far as you are aware, the video that you

9  took on February 2nd of 2017 of Mr. Bauta and uploaded onto Bo

10 Dietl & Associates's server, that was a complete copy of what

11 you recorded that day?

12 A    Yes.

13 Q    Did you delete any of it?

14 A    No.

15 Q    Did you edit any of it?

16 A    No.

17 Q    Okay.

18         MR. KIEFFER:  With the Court's permission, Your

19 Honor, I'd like to have this on the small screens and publish

20 it to the jury as well, and ask the witness some questions

21 about the video that he took.

22         MR. BARMEN:  No objection.

23         THE COURT:  And what exhibit is this?

24         MR. KIEFFER:  This is Exhibit 304.

25         THE COURT:  It's defendant's 304?

Whitlock - direct - Kieffer                1081

1        MR. KIEFFER:  It's Plaintiff's 304; I'm sorry.  My

2    apologies.  Plaintiff's 302, Judge.

3        THE COURT:  And what date is this?

4        MR. KIEFFER:  This particular video is February 2nd

5    of 2017, commencing just before the 12-minute mark, on the --

6    on the exhibit, because the videos are all put together in the

7    exhibit.

8        THE COURT:  So 304 is all of the videos?

9        MR. KIEFFER:  Correct.

10       MR. McELFISH:  302.

11       THE COURT:  Excuse me.

12       Thank you, Mr. McElfish.  302.

13       Do you have any objection to receiving this in

14   evidence?

15       MR. BARMEN:  No objection, Your Honor.

16       THE COURT:  All right, I will receive

17   Plaintiff's 302 in evidence.

18           (Plaintiff's Exhibit 302 was received in evidence.)

19       MR. BARMEN:  And so I'm clear, 302 is the entirety

20   of all the video we produced?

21       MR. KIEFFER:  Yes.

22       MR. BARMEN:  No objection.

23       THE COURT:  Podium laptop?

24       MR. KIEFFER:  Yes.

25       THE COURT:  It's on your laptop, right?

SAM     OCR     RMR     CRR     RPR

1      MR. KIEFFER:  Yes, iPad.  And if the Court would be

2  kind enough to dim the lights a bit.

3           (Exhibit published.)

4           (Video played.)

5  BY MR. KIEFFER:

6  Q    Sir, does this appear to be what you observed on

7  February 2nd when you were filming Mr. Bauta?

8  A    Yes, but I don't believe this is Mr. Bauta.

9  Q    I'm sorry?

10  A    I don't believe this is Mr. Bauta.

11  Q    You had a couple of false starts, true, where you filmed

12  an individual or two that you thought, perhaps, were Mr. Bauta

13  and then realized it wasn't?

14  A    Yes.  But this, I believe, is Mr. Bauta here.

15  Q    Mr. Bauta exiting the offices of Dr. Thomas?

16  A    Yes.

17  Q    And is this that portion of the walk to Penn Station?

18  A    That just played before, but now this is where he got off

19  the train at New Lots.

20           (Video continues playing.)

21           MR. BARMEN:  Your Honor, when counsel is done

22  playing this, can we have a brief sidebar before the next

23  question, please?

24           (Video continues playing.)

25  Q    Did you observe Mr. Bauta going into a grocery store?

1   A    Yes.

2   Q    Okay.

3          (Video continues playing.)

4   BY MR. KIEFFER:

5   Q    Did you see Mr. Bauta exit the grocery store?

6   A    Yes.

7   Q    Okay.  You recall witnessing this personally?

8   A    Yes.

9   Q    Okay.  Mr. Bauta appeared to be accompanied by several

10  females?

11  A    I think it was two or three.

12  Q    And did you know who they were?

13  A    No.

14  Q    Okay.  If these were family members who were assisting

15  him with his grocery shopping, did you do any investigation

16  that would have informed you of that?

17          MR. BARMEN:  Objection.

18          THE COURT:  Sustained.

19  Q    Did you make any inquiry, sir, as to who these people

20  were?

21  A    I don't believe so.

22  Q    Any inquiry as to what they were doing?

23  A    Well, it was obvious they were shopping, but no.

24  Q    And Mr. Bauta is carrying one bag there in his left hand?

25  A    Yes.

1    Q    And these ladies are pushing a cart with other items in

2    them, correct?

3    A    Yes.

4    Q    Where were you stationed, sir?  Were you in a vehicle or

5    on foot?

6    A    I think I was on foot, but I don't remember a hundred

7    percent.  I'm pretty sure I was on foot.

8    Q    This is the actual tape speed that you recorded, correct,

9    it hasn't been slowed down?

10   A    No, this is the actual speed.

11   Q    Okay.  So this would be an accurate representation of the

12   pace Mr. Bauta was walking at that evening?

13   A    Yes.

14           (Video continues playing.)

15   BY MR. KIEFFER:

16   Q    Did these individuals all go to one address?

17   A    Yes, I believe it was the Bradford Street address.

18   Q    And you understood that to be Mr. Bauta's residence?

19   A    I believed it was his residence at this time.

20   Q    Okay.  If you were to take an educated guess, sir, did it

21   appear to you that he had been out grocery shopping,

22   accompanied by certain females?

23   A    Yes.

24   Q    And did they help him, from what you could tell, transfer

25   those groceries into his home?

1          MR. BARMEN:  Objection.

2          THE COURT:  Sustained.

3   BY MR. KIEFFER:

4   Q    What did you believe was going on here, sir?

5   A    He went shopping and walked back home and went into his

6   residence.

7   Q    Okay.  With these ladies?

8   A    Yes.

9   Q    And the groceries?

10  A    Yes.

11  Q    Okay.  Did you remain on the outside of his residence for

12  some additional period of hours on February 3rd?  On

13  February 2nd; I'm sorry.

14  A    Yes, I believe so.

15  Q    Your surveillance continued until about 11:00 p.m. that

16  night, right?

17  A    That sounds about right.

18  Q    You didn't see Mr. Bauta come out again after that

19  grocery shopping trip --

20  A    No.

21  Q    -- on February 2nd, correct?

22  A    No.

23  Q    And just for clarity, sir, when we see the -- an image of

24  what appears to be a clock on an iPhone, you are taking a

25  video shot of that, correct?

1  A     Yes.

2  Q     And that's to document the fact that you are still on

3  scene doing surveillance and attempting to capture anything of

4  interest?

5  A     Yes.

6             (Video stopped.)

7  BY MR. KIEFFER:

8  Q     Sir, you also performed some surveillance on Mr. Bauta on

9  April 21st, did you not?

10  A     I believe so, yes.

11  Q     And that day, you began your work at 7:34 a.m., true?

12  A     If that's what it says in the depo, then yes.

13  Q     Okay.  Again, I am just trying to speed this along, sir.

14  If you testified previously to that, you are not changing your

15  testimony today, correct?

16  A     No, I'm not.

17  Q     You began your surveillance at Mr. Bauta's home on

18  Bradford Street in Brooklyn, correct?

19  A     Yes.

20  Q     And after you didn't see him for a while, you were

21  instructed to go to 275 Madison Avenue, because you were told

22  that Mr. Bauta would be giving a deposition there that day?

23  A     Yes.

24  Q     Okay.  And you waited for him to exit the building?

25  A     Yes.

Whitlock - direct - Kieffer                1087

1   Q    And he did exit the building at 12:52 p.m., true?

2   A    Yes.

3   Q    And he exited with an individual that you believed to be

4   his lawyer, Mr. McElfish?

5   A    I didn't know who he was, but I believed it was his

6   lawyer, yes.

7   Q    He was there to give a deposition, and the gentleman

8   accompanying him you believed at the time to be his lawyer?

9   A    Yes.

10  Q    And have you since learned that it was Mr. McElfish?

11  A    Yes.

12  Q    All right.  And then you proceeded to follow Mr. Bauta

13  and Mr. McElfish from the 275 Madison Avenue address?

14  A    Yes.  They left from 275.

15  Q    All right.  And you taped what you saw on that --

16  A    Yes.

17  Q    -- day, April 21st, as well, correct?

18  A    Yes.

19  Q    All right, let me show this to you.

20       (Video playing.)

21  BY MR. KIEFFER:

22  Q    Is this what you recognize as video that you took on

23  April 21st?

24  A    No, I think this is the February 2nd, I believe.

25  Q    Do you see Mr. McElfish up there on the left, in front of

1    him?

2              MR. BARMEN:  Objection.

3              THE COURT:  Sustained.

4    BY MR. KIEFFER:

5    Q    Is this a video you took, sir?

6    A    Yes.  I'm just trying to see the date on the bottom left

7    there.

8    Q    This is as it was produced to us, sir.

9    A    I believe this is the video from the doctor's office

10   going to Penn Station.

11   Q    You recognize this as video you took of Mr. Bauta?

12   A    Yes.

13   Q    Okay.  Walking with his cane?

14   A    Yes.

15             (Video continues playing.)

16   Q    When you were taking surveillance of Mr. Bauta and

17   Mr. McElfish insofar as --

18             MR. BARMEN:  Objection, Your Honor.  Sidebar,

19   please.  Sidebar, please.

20             THE COURT:  Sure.

21             MR. BARMEN:  Stop the video, please.

22             (Sidebar held outside the hearing of the jury.)

23

24             (Continued on the following page.)

25

SAM      OCR      RMR      CRR      RPR

```
                          Sidebar                      1089

 1           (The following sidebar took place outside the
 2     hearing of the jury.)
 3           MR. BARMEN:  The video he is showing clearly by the
 4     date stamp is still 2/2.  They showed the back half of 2/2
 5     first; this is the earlier half of 2/2.  Mr. McElfish is not
 6     there.  Yet he keeps saying it's April 21st and he's with his
 7     lawyer, which is, frankly, false.
 8           I would like a clarification to the jury that,
 9     consistent with the time stamp on the video, we are still
10     talking about February 2nd, and that they showed the second
11     half first, and this is the first half, where Mr. Whitlock
12     first picked Mr. Bauta up on 2/2 without Mr. McElfish.
13           MR. McELFISH:  It's your tape.  We're playing it the
14     way you produced it.
15           MR. BARMEN:  Fine, but it doesn't change the fact
16     that you keep saying it's 4/17 or 4/21 and it's not, and
17     Mr. McElfish is not there.
18           MR. KIEFFER:  He is there.
19           MR. McELFISH:  I actually was there.  I had the
20     thing over my shoulder.
21           MR. BARMEN:  No.
22           MR. KIEFFER:  If I can respond to this.
23           That is being played as it was produced.  There are
24     some places you can barely -- there are some images that say
25     2/2 down low and April 21st up high on the same screen.  I
```

SAM      OCR      RMR      CRR      RPR

1   don't have any idea --

2          THE COURT:  How can you say it's Mr. McElfish when

3   the witness says he does not know who it is?  So then do you

4   want to testify?

5          MR. McELFISH:  Swear me.

6          THE COURT:  Then you cannot represent him for the

7   rest of the trial.  You want to testify, you cannot represent

8   him for the rest of the case.

9          And you cannot say that's Mr. McElfish, because the

10  witness does not know who it is.

11         MR. KIEFFER:  It came up in his deposition and he

12  said, Yeah, I think it was you; but I'll move on.

13         MR. BARMEN:  Not on this tape.  That's my point,

14  there is tape where he's on it.

15         MR. KIEFFER:  On an earlier frame, he's standing

16  there with a bag over his shoulder.

17         THE COURT:  Yes, but the witness does not know who

18  it is.

19         MR. KIEFFER:  That's fine.  I'll move on.

20         THE COURT:  You cannot testify either.

21         MR. KIEFFER:  I'll move on.

22         THE COURT:  So if you say it one more time, you are

23  out of the case as a sanction.  Do you understand?

24         Stop the nonsense, guys.

25         MR. McELFISH:  Judge.

Sidebar                                              1091

1          THE COURT:  How long have you been practicing law?

2          MR. McELFISH:  Judge --

3          THE COURT:  How long have you been practicing law?

4          MR. KIEFFER:  22 years.

5          THE COURT:  You know how to do it, do it right.  You

6    have been practicing longer than that and you know how to do

7    it, do it right.  If he does not know who it is, do not keep

8    saying that's Mr. McElfish.  That's Mr. McElfish.  That's

9    Mr. McElfish.  If he said --

10         MR. KIEFFER:  He said it at his deposition --

11         THE COURT:  If he said it at his deposition --

12         MR. KIEFFER:  I am just trying to avoid pulling it

13   out.

14         THE COURT:  Then with a specific piece of video, if

15   you showed him the video at his deposition and he said, Yeah,

16   that's Mr. McElfish, that's different.

17         Where did he say that?

18         MR. KIEFFER:  I've got to go see that.

19         MR. McELFISH:  Get your notes.  Get your notes.

20         THE COURT:  With this particular video?

21         MR. KIEFFER:  I don't recall if it was with that

22   particular video; I didn't take the deposition.

23         THE COURT:  Then we have a problem.

24         MR. KIEFFER:  I'll move on.

25         MR. BARMEN:  I'd ask for a clarification for the

Sidebar                                    1092

1   jury, because it paints the wrong picture in their eyes when

2   it's the wrong video and they keep saying he's there.

3          THE COURT:  Wait a second.  What does it matter

4   whether Mr. McElfish is in the video or not?

5          MR. KIEFFER:  I think it matters that -- this

6   witness has testified that on April 21st -- regardless of

7   whether what they want to say about that particular frame,

8   this witness has testified that on April 21st, he went to 275

9   Madison Avenue because he knew Bauta was going to be giving a

10  deposition there, and he waited and Bauta exited the building,

11  and he followed Bauta, and Bauta was walking with someone who

12  he assumed to be his lawyer.  And I think it's relevant.

13  There are images on he- --

14         THE COURT:  What is that relevant to prove?

15         MR. KIEFFER:  I think it's --

16         THE COURT:  The fact that you cannot articulate it

17  right now in a second-and-a-half indicates that it is not

18  relevant.

19         MR. KIEFFER:  I think it's relevant.

20         THE COURT:  That you want to prejudice him.  Oh,

21  he's following him with his lawyer.

22         MR. KIEFFER:  When he's a few feet away, yeah, I

23  think the jury's entitled to know the circumstance of this

24  surveillance.

25         THE COURT:  Why?  Why?  What is the relevance of

```
                        Sidebar                       1093
```

1   that as to whether Mr. Bauta was injured or not --

2           MR. McELFISH:  I'll tell.

3           THE COURT:  -- or the extent of his injuries whether

4   he was with his lawyer at any point in time?

5           MR. McELFISH:  I'd be happy to tell you, if you want

6   to see, it inside a second-and-a-half.

7           What they did is, they noticed his deposition and

8   set up the surveillance and they couldn't find him.  And the

9   fact that he's with his lawyer is relevant to the fact that

10  they only found him because he was with his lawyer.

11          You're telling me that's not a good argument?

12          THE COURT:  So what?  How is that relevant --

13          MR. McELFISH:  I'm telling you.

14          THE COURT:  -- to whether he was injured or not?

15          MR. McELFISH:  It's relevant to the fact that they

16  couldn't get tape on him.  They couldn't find him.  And so the

17  only way they could get him is, they noticed a deposition to

18  set him up so they could follow him.  Okay.

19          THE COURT:  That's still not --

20          MR. McELFISH:  That's why it's relevant.

21          THE COURT:  That's still not relevant to whether he

22  was injured or not, and you know it.

23          MR. McELFISH:  It's a good argument.  You know it

24  is.

25          THE COURT:  Listen to me.  Stop making bullshit

```
                           Sidebar                      1094

 1    arguments, whether it's good or not.  You are trying to dirty

 2    them up.  That is not the point of a trial.  The point of the

 3    trial is was Mr. Bauta injured in this accident and what are

 4    the extent of his injuries.

 5             MR. McELFISH:  Excuse me, you let convictions in,

 6    and you're on my case because we're trying to impeach an

 7    investigator who followed him around?

 8             THE COURT:  The convictions are relevant to his

 9    emotional state.

10             MR. McELFISH:  Not yet, they're not.  I haven't

11    heard one piece of testimony yet.

12             THE COURT:  Unless you can link it up with proof

13    with this witness that that was Mr. McElfish, I am going to

14    instruct the jury to ignore that testimony.

15             MR. KIEFFER:  Okay.

16             THE COURT:  All right?  It's just not relevant.

17             Let's move on.

18             (Sidebar concluded.)

19

20             (Continued on the following page.)

21

22

23

24

25
```

1              (In open court - jurors present.)

2              MR. KIEFFER:  May I proceed, Your Honor?

3              THE COURT:  Yes.

4              MR. KIEFFER:  Thank you.

5              THE COURT:  Mr. Whitlock, how many days did you go

6      out to try to obtain video on Mr. Bauta?

7              THE WITNESS:  I don't know exactly, but I'm pretty

8      sure I worked it at least 10 days, if not more.

9              THE COURT:  At least 10 days, if not more.  And on

10     how many days did you observe Mr. Bauta?

11             THE WITNESS:  Two days.

12             THE COURT:  Two days?

13             THE WITNESS:  Yes.

14             THE COURT:  So 20 percent, at best?

15             THE WITNESS:  I think yes, two days' worth of

16     surveillance.

17             THE COURT:  Is that uncommon in your practice, to go

18     out a number of times and not be able to find someone, you

19     know, 8 out of 10 times?

20             THE WITNESS:  Depending on the case, you know,

21     some -- some plaintiffs are hard to find, and some, we have an

22     address for them and we know where to find them.  So you can't

23     really say is it common, because every case is different.  But

24     it is what it is, I guess.

25             THE COURT:  Did you know when you went out on

1    April -- whether it was April 21st, April 22nd --

2              THE WITNESS:  The second day that I saw him?

3              THE COURT:  Yes.

4              THE WITNESS:  Okay.

5              THE COURT:  That he would be coming to or from his

6    deposition?

7              THE WITNESS:  I was under the impression that he

8    would have been leaving for his deposition in the morning

9    and/or leaving -- leaving from his residence to go to the

10   deposition, and/or leave the deposition to go home.

11             THE COURT:  Okay.  So the chances are, you would

12   have been more likely to see him on that day than had you done

13   a random --

14             THE WITNESS:  Yes.

15             THE COURT:  -- stakeout, if you will?

16             THE WITNESS:  Yes.

17             THE COURT:  Were you similarly instructed on other

18   days that he would be going to physical therapy or to a

19   doctor's office, so that the chances were better that you

20   would find him?

21             THE WITNESS:  No, I don't believe so.  The other

22   days, I don't think we had -- we had any knowledge of the PT

23   appointments.  We were just kind of waiting to see if he

24   showed up.

25             THE COURT:  But you knew the address of the physical

1    therapist?

2                THE WITNESS:  Yes.

3                THE COURT:  And you knew the address of some of his

4    other doctors?

5                THE WITNESS:  Yes, I believe the one up in -- the

6    one other doctor that was the first day we actually saw him.

7                THE COURT:  Okay.  Who was it that instructed you

8    about the date of the deposition?

9                THE WITNESS:  My boss, Sean Lanigan.

10               THE COURT:  Sean Lanigan?

11               THE WITNESS:  Yes.

12               THE COURT:  Okay.

13               You can continue.

14               MR. KIEFFER:  Thank you.

15               May I resume the video, Your Honor?

16               THE COURT:  Sure.

17               (Video resumes.)

18               MR. BARMEN:  Counsel, it was running on the small

19   screen the whole time that was going on, if you want to back

20   it up.

21               MR. KIEFFER:  Yes.  Let me see if I can do that

22   here, let's see.  Hang on just one second.

23               (Video stopped.)

24               (Pause.)

25               THE COURT:  Ready for public display?

1          MR. KIEFFER:  Yes, Judge, thank you.

2          (Video playing.)

3   BY MR. KIEFFER:

4   Q    Sir, this is Mr. Bauta?

5   A    Yes.

6   Q    Okay.  Approximately how far behind him were you walking?

7   A    He and I were pretty close, maybe 10 feet away, maybe

8   closer.

9   Q    10 feet, if not closer?

10  A    Yeah -- yes.  This is the second as well, going to Penn

11  Station, I believe.

12          (Video continues playing.)

13  Q    Sir, while you had Mr. Bauta in view, did there ever come

14  a time when you shut the video off?

15  A    Yes, I think I did right there, just before.

16  Q    And why would you have done that?

17  A    Might have had to grab my MetroCard out of my pocket, so

18  I hit stop quick and started it back up.

19  Q    Other than doing something like getting your card out of

20  your pocket, was it your intent to videotape Mr. Bauta

21  whenever you had eyes on him?

22  A    Yes.

23          (Video continues playing.)

24  Q    Was Mr. Bauta's cane a particular focus of what you were

25  trying to document?

1   A    Not really.  It's just sometimes, it depends on the angle

2   of the camera how it comes out.  I try to get a full view.

3             (Video continues playing.)

4   BY MR. KIEFFER:

5   Q    What camera were you using for this particular episode of

6   video?

7   A    This would have been the covert iTouch camera.

8   Q    You are holding this in front of you?

9   A    Yeah.  Usually close to me.

10  Q    I am not meaning to argue with you, sir, but I am trying

11  to understand what's covert about something like an iTouch

12  that you can hold in front of you; is it just that it's small?

13  A    It's a term.  I just used the term covert camera.  It is

14  small.  It's the size of a cell phone, or a little bit

15  smaller.

16  Q    It's less obvious in your view to the subject that you're

17  taping than if you're holding a camcorder?

18  A    Yes.

19            MR. KIEFFER:  That's all for now, Your Honor.

20            Thank you.

21            (Video stopped.)

22  Q    Sir, the -- we established a moment ago, of all the

23  different dates that you went out looking for Mr. Bauta, the

24  only two dates that you actually observed him were

25  February 2nd and April 21st, correct?

Whitlock - direct - Kieffer                    1100

1    A    Yes.

2    Q    All right.  And whenever you had eyes on him, you

3    attempted to video document whatever you could about his

4    activities?

5    A    I tried to as much as I can.

6    Q    All right.  And on the occasions that you saw Mr. Bauta,

7    he had his cane, true?

8    A    Yes.

9    Q    And on one date, you testified he might have perhaps had

10   an umbrella as well?

11   A    Yes.

12   Q    Your shifts surveilling Mr. Bauta were typically six to

13   eight hours and sometimes longer.  For example, the one we

14   looked at from February 2nd, that went until 11 o'clock at

15   night?

16   A    Yes.

17   Q    Okay.  Sometimes you were accompanied by a colleague or

18   partner, and sometimes you went alone?

19   A    Yes.

20            MR. BARMEN:  Objection.

21   A    Yes.

22            THE COURT:  Overruled.

23   BY MR. KIEFFER:

24   Q    In your observations of Mr. Bauta you never saw him run,

25   true?

1   A    No, I don't think so.

2   Q    You never saw him playing any sports?

3   A    No.

4   Q    You never saw him lifting any heavy objects?

5   A    No.

6   Q    And you never saw him without his cane?

7   A    No, I never saw him without his cane.

8          MR. KIEFFER:  Okay.  Those are all the questions I

9   have at the moment, sir.  Thank you.

10  CROSS-EXAMINATION

11  BY MR. BARMEN:

12  Q    Mr. Whitlock, how are you today?

13  A    Very good, thank you.

14  Q    Good.  Good to see you again.

15          You are not here voluntarily today, are you?

16  A    No, I was asked to be here.

17  Q    You were actually subpoenaed to be here by the

18  plaintiffs, correct?

19  A    Yes.

20  Q    Okay.  You've been an investigator for how long in total?

21  A    Overall, about six years now, I believe.

22  Q    You had a job with another investigative company prior to

23  joining Bo Dietl, correct?

24  A    Yes.

25  Q    Okay.  And your job as an investigator for six years

1  primarily has been this type of investigation, is that true?

2  A    Yes.

3  Q    Okay.  You've seen lots of claimants over your six years,

4  haven't you?

5  A    Yes.

6  Q    You've seen other people with canes, other than

7  Mr. Bauta --

8  A    Yes.

9  Q    -- in that time?

10  A    Yes.

11         MR. BARMEN:  Can you roll the video of the subway,

12  please, that we just saw?  February 2nd.

13         (Video played.)

14         MR. BARMEN:  That will do.  That's the right one.

15  That's the one he's heading to the subway.  That's fine.  Just

16  run it, please.

17         (Video continues playing.)

18  BY MR. BARMEN:

19  Q    Do you notice anything about how Mr. Bauta as using his

20  cane on this day?

21         MR. KIEFFER:  Objection.

22         THE COURT:  Sustained.

23         MR. KIEFFER:  Sidebar, Your Honor.

24         (Video stopped.)

25         (Sidebar held outside the hearing of the jury.)

```
                        Sidebar                      1103
```

1      (The following sidebar took place outside the

2  hearing of the jury.)

3      MR. KIEFFER:  Look, if where he is going is trying

4  to elicit opinion from this witness about the manner and means

5  in which this man was walking with his cane, it's improper.

6  There's no foundation, no foundation can be laid.  This man

7  isn't a doctor, a physical therapist, an occupational

8  therapist.  There's been no testimony he had sensors or

9  devices that would enable him to form some informed judgment

10  about how Bauta was using his cane.

11      The video speaks for itself.  He's an investigator

12  who followed him with a camera, and I think it's patently

13  improper to get into all sorts of lay opinion about the manner

14  he was using his cane.  If he tossed his cane down -- sorry.

15      MR. BARMEN:  He can testify to what he's observed.

16  He said he's seen other people using his [sic] cane.  I can

17  lay more foundation by if he's seen people actually leaning on

18  or putting weight on it or whether or not that was consistent

19  with what he saw here.  These are his personal observations.

20  They brought him in here.

21      THE COURT:  He has no particular expertise to render

22  any opinion based on his personal observations of one person

23  over another.  I am not going to allow it.

24      MR. KIEFFER:  Thank you, Judge.

25      (Sidebar concluded.)

1              (In open court - jurors present.)

2              THE COURT:  Ladies and gentlemen, I hate to do this

3    to you, but we need to take a break.  Ten minutes, restroom

4    break for everybody.

5              (Jury exits.)

6              (Recess taken.)

7              (In open court - jury not present.)

8              THE COURT:  You may be seated.

9              (Jury enters.)

10             THE COURT:  Please be seated.

11             You may continue.

12             MR. BARMEN:  Thank you, Your Honor.

13   EXAMINATION CONTINUES

14   BY MR. BARMEN:

15   Q    Mr. Whitlock, when you are assigned an investigation, do

16   you have any interest in the outcome of the investigation?

17   A    No.

18   Q    Do you get paid any differently whether you find somebody

19   or you don't find somebody?

20   A    No.

21   Q    Do you get paid any differently if you find something

22   interesting versus something mundane?

23   A    No.

24   Q    You just go out and do your job?

25   A    Yes.

1  Q    Okay.

2         MR. BARMEN:  Can you go back to the video of the

3  subway, please?  Just keep running that.

4         (Video played.)

5  BY MR. BARMEN:

6  Q    When you are shooting this video, is there anything in

7  particular you're looking for?

8  A    Just trying to get an overall shot of the person that I'm

9  following.

10 Q    Okay.  Just an accurate representation of how they

11 appear?

12 A    Yes.

13 Q    Now, you testified --

14        MR. BARMEN:  And you can just let that run.

15 Q    You testified early on -- well, I guess on

16 cross-examination that you had had 10 or 12 opportunities or

17 assignments where you couldn't find Mr. Bauta.

18 A    Yes.

19 Q    And you actually only saw him twice?

20 A    Yes.

21 Q    Do you know if there was a mistake with the address that

22 you had the first times you were trying to locate Mr. Bauta?

23 A    I -- there was a different address that I believe I

24 started at in the beginning, and there was no sign of him

25 there.

1    Q    Okay.  Did you also come to learn during the course of

2    your being involved in the investigation that he didn't always

3    stay in the same place?

4    A    It appeared that way.

5    Q    Okay.  In situations like that, is it unusual, if you

6    find out he is going to be at a particular place at a

7    particular time, to set up shop there?

8    A    Yes.

9    Q    Is that standard operating procedure for someone in your

10   profession?

11   A    Yes.

12   Q    Okay.  You saw him on two days?

13   A    Yes.

14   Q    One, February 2nd, coming from -- I think you said a PT

15   appointment.

16   A    The first time was leaving a different kind of doctor's

17   appointment.

18

19              (Continued on the following page.)

20

21

22

23

24

25

1   CROSS EXAMINATION

2   BY MR. BARMEN:   (Continuing)

3   Q    Do you know if it was a doctor related to the treatment

4   he's alleging was necessary because of the accident at issue

5   in this case or does it matter to you?

6   A    I'm not sure.  That's where I was told to go.

7   Q    Okay.  And the second time was April 21st.  Do you know

8   whether or not he was actually coming from a deposition that

9   day?

10  A    I was under the impression he was leaving from the

11  deposition.

12  Q    Okay.  So both times you saw him he was in the city for

13  issues related to this case; fair?

14          MR. KIEFFER:  Objection.

15          THE COURT:  Sustained.

16  Q    Did you know the deposition that you think he was going

17  to was related to this case?  Did you know?

18          MR. KIEFFER:  Objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  I can answer it?

21          THE COURT:  Yes.

22  A    I believe anything related was regards to this case.

23  Q    Okay.  In your experience, is it unusual to see claimants

24  when they're going to case-related doctors' appointments using

25  something like a cane?

1          MR. KIEFFER:  Objection, Your Honor, prior ruling.

2          THE COURT:  Overruled.

3  A    Can you ask me that again.  I'm sorry.

4          MR. BARMEN:  I can try.  Can you read it back for

5  me, please.

6          THE COURT:  Yes.

7          (Record read.)

8          MR. KIEFFER:  Objection.

9          THE COURT:  Overruled.

10 A    It's not unusual.

11         MR. BARMEN:  I don't have any other questions for

12 you.  Thank you, sir.

13         MR. KIEFFER:  Your Honor, may we approach briefly,

14 sidebar?

15         THE COURT:  Yes.

16         (Sidebar held outside the hearing of the jury.)

17         (Continued on the following page.)

18

19

20

21

22

23

24

25

Sidebar                                    1109

1          (The following sidebar held outside of the hearing

2     of the jury.)

3               THE COURT:  I have to crank up the white noise.

4               MR. KIEFFER:  Your Honor, Mr. Barmen specifically

5     went into money-related things:  You don't have any interest

6     in the outcome, you don't get paid anything more on the

7     results.  He clearly opened the door to the payment.  This

8     company was paid a certain amount of money.  There was a prior

9     in limine ruling.  He weighed right in on money-related things

10    trying to cloak this witness.  His company was clearly paid

11    substantial money with some patina of, you know, unbiased

12    credibility as if he were law enforcement or something.  We

13    are entitled to present that evidence.

14              MR. BARMEN:  I simply asked him -- first off, he

15    doesn't get paid an exorbitant amount of money.  Remember the

16    motion in limine we filed, Your Honor, they want to say Beau

17    Dietl & Associates got paid tens of thousands of dollars to do

18    this investigation.  I'm establishing through him he has no

19    skin in the game what happens one way or the other.  He is not

20    management.  He is not Beau Dietl.  He is an investigator

21    going to do his job.  So any allegation that somehow the door

22    is open on the motion in limine to the total amount of money

23    paid for the surveillance is off base.

24              MR. KIEFFER:  There was no reason to get into

25    money-related issues with this witness.

MDL   RPR

Sidebar                                              1110

1        MR. BARMEN:  They clearly tried to paint him as bias

2   or somehow paint him with some sort of broad-brush taint that

3   bringing up this issue somehow he was doing something wrong.

4        THE COURT:  I will allow you to ask him how much he

5   gets paid and if he knows how much the company got paid.

6        MR. KIEFFER:  Okay.

7        THE COURT:  He probably doesn't, but if he does, he

8   does.

9        MR. BARMEN:  But do you know how much the company

10  got paid, rather than you know the company got paid X.

11       THE COURT:  Yes.  You have to lay the foundation for

12  it.

13       MR. McELFISH:  For future reference, in addition to

14  what Mr. Kieffer said, it opens the door not to just this

15  witness, because it is all the same investigation, it opens up

16  the door to how much the company was paid for witnesses who do

17  have foundation for that information.

18       MR. BARMEN:  I disagree, Your Honor, and I stand on

19  my argument.

20       THE COURT:  I will allow it, if they have knowledge.

21       MR. KIEFFER:  Okay.

22       (Sidebar concluded.)

23       (Continued on the following page.)

24

25

1          MR. KIEFFER:  May I proceed, Your Honor?

2          THE COURT:  Yes.

3          MR. KIEFFER:  Thank you.

4    REDIRECT EXAMINATION

5    BY MR. KIEFFER:

6    Q    Sir, Mr. Barmen asked you about the fact that you

7    received a subpoena to come here to court to testify today.

8    Do you recall that?

9    A    Yes.

10   Q    Okay.  You're not a stranger to the litigation process.

11   You have been required to testify under oath in other

12   circumstances in other cases, have you not?

13   A    Yes.

14   Q    You understand that when you're undertaking covert

15   surveillance on an individual that may end up being played in

16   court and you may be called upon to come testify under oath

17   about that; right?

18   A    Yes.

19   Q    All right.  In fact, sir, to the extent that this

20   subpoena was any inconvenience to you, you understand we

21   specifically scheduled your testimony today to accommodate

22   your own travel schedule?

23   A    Yes.

24   Q    All right.  Mr. Barmen asked you some questions about

25   money related to this investigation.  Do you know how much

Whitlock - redirect - Kieffer                    1112

1   your company, Beau Dietl & Associates, was paid for the

2   surveillance that you and others did on Mr. Bauta?

3              MR. BARMEN:  Objection.

4              THE COURT:  Overruled.

5   A    No.

6   Q    No information about that at all?

7              MR. BARMEN:  Objection.

8              THE COURT:  Overruled.

9   A    I'm not aware of what they billed to clients.

10  Q    Sir, Mr. Barmen asked you some questions about other

11  investigations you have been involved in and other people you

12  may have surveilled that had canes.  Do you recall those

13  questions?

14  A    Yes.

15  Q    Okay.  How long have you been in this investigation

16  business?

17  A    At least six years.

18  Q    I'm sorry?

19  A    At least six years.

20  Q    And in that six-year period of time, how many individuals

21  do you think you have done covert surveillance on?

22  A    I would have no idea --

23  Q    Hundreds?

24  A    -- of numbers.

25              Probably, yeah.

1  Q    Okay.  Have you encountered people who have said, for

2  example, they could not lift heavy objects and yet through

3  your surveillance you found them doing just that?

4  A    Yes.

5  Q    You didn't find that with respect to Mr. Bauta, did you?

6  A    No.

7  Q    Have you surveilled claimants that have said they

8  couldn't run or they couldn't engage in vigorous physical

9  activity and your surveillance showed them doing just that?

10  A    Yes.

11  Q    Okay.  You never saw Mr. Bauta engaging in vigorous

12  physical activity other than walking to and from doctors'

13  appointments and grocery stores and depositions; true?

14  A    Yes.

15  Q    Okay.  When you're given an assignment to secretly follow

16  somebody like Mr. Bauta, what information are you given about

17  the claims that they are making?

18  A    Every case is different, but the information I'm usually

19  provided with is an address.  Sometimes we have a picture.

20  Sometimes we don't and we might have information regarding an

21  injury and sometimes we don't.

22  Q    Okay.  And in this particular instance, when you

23  undertook this surveillance, you understood that Mr. Bauta was

24  claiming physical injury?

25  A    Yes.  Some type of injury.  I just wasn't sure what.

Proceedings                                                1114

1   Q    All right.  And -- strike that.

2              MR. KIEFFER:  Those are all of the questions that I

3   have, sir.  Thank you.

4              MR. BARMEN:  No questions.

5              THE COURT:  Thank you.  Mr. Whitlock, you're

6   excused.

7              THE WITNESS:  Okay.  Thank you for accommodating me.

8              (Witness steps down.)

9              THE COURT:  Dr. Thomas?

10             MR. KIEFFER:  Yes.  We recall Dr. James Thomas.

11             THE COURT:  Ladies and gentleman, we are going to

12  continue with Dr. Thomas' testimony, I forget which day he

13  started, but we will continue with his testimony.  I do want

14  to alert you to one thing, though.  You may have heard

15  testimony from Dr. Thomas about PTSD, post traumatic stress.

16  I have stricken that testimony from the record, so you're not

17  to pay it any mind going forward and certainly not in your

18  deliberations.  All right.

19             MR. BARMEN:  Your Honor, in light of the PTSD issue

20  and the instruction to the jury, I would request an admonition

21  with Dr. Thomas going toward so we don't have to revisit this.

22             THE COURT:  I don't think we need that.

23             MR. BARMEN:  Okay.

24             THE COURT:  As long as there are no questions about

25  it.

MDL   RPR

Thomas - direct - Kieffer                    1115

1          MR. McELFISH:  These instructions are as to Dr.

2     Thomas, not to Dr. Honor.

3          THE COURT:  Dr. Thomas, I will remind you that

4     you're still under oath.  I don't have to swear you in again.

5     If you could tell the court reporter your name again, because

6     I think this is a different court reporter.

7          THE WITNESS:  I am Dr. James Lawrence Thomas.

8          THE COURT:  You may inquire.

9          MR. KIEFFER:  Thank you.

10    **JAMES LAWRENCE THOMAS,**

11         having been previously duly sworn, was examined and

12         testified as follows:

13    DIRECT EXAMINATION

14    BY MR. KIEFFER:

15    Q    Good morning, Dr. Thomas.

16    A    Good morning.

17    Q    Sir, when we adjourned your testimony on Thursday, we

18    were talking about some issues related to qEEG testing that

19    you reviewed in relation to Mr. Bauta.  Do you recall that

20    general line of questioning?

21    A    Yes.

22    Q    My question at the moment is, sir, in Mr. Bauta's case,

23    were you able to look at the results of successive qEEG's to

24    determine if they showed improvement in Mr. Bauta's brain

25    functioning as a result of your treatment?

1  A     Yes.  They showed improvement.

2  Q     All right.  Would it be possible, sir, for you to

3  demonstrate for the jury with reference to certain information

4  in successive qEEG reports?

5  A     So I refer to those pages that you have in my record?  Is

6  that....

7         MR. KIEFFER:  Your Honor, can we have small screens

8  only?

9         THE COURT:  There we go.

10 Q     Doctor, can you see the exhibit that is in front of you?

11 It is Plaintiff's Exhibit 364, page 23.

12 A     No, nothing shows up here.  Oh, there it is.

13 Q     Sir, to orient us, that is a page from a qEEG report of

14 December 19, 2015; is that correct?

15 A     Correct.

16 Q     And I believe, according to your records, that is the

17 first qEEG report related to Mr. Bauta?

18 A     Correct.

19 Q     Can you describe for the Court and jury, sir, what about

20 the information on this exhibit, P-364-0023, is relevant to

21 you in trying to assess whether or not Mr. Bauta's brain

22 function is improving as a result of the treatment?

23         MR. BARMEN:  Objection, vague.

24         THE COURT:  Overruled.

25 A     This is the first one.  This doesn't show improvement.

Thomas - direct - Kieffer                    1117

1  Q    All right.  So let me ask this, sir, what is it about

2  Exhibit 364-0023 that gave you information to target your

3  treatment to see if you could improve Mr. Bauta's brain

4  function?

5  A    Is there a way that we can put it on the big screen so

6  that I could point out things for the jury?

7            MR. BARMEN:  Objection.

8            MR. KIEFFER:  Permission to publish, Your Honor.

9            THE WITNESS:  Because I don't think it could be

10  understood otherwise.

11            THE COURT:  Plaintiff's Exhibit 364, has it been

12  received in evidence?

13            MR. BARMEN:  I don't believe so, Your Honor, and we

14  discussed a couple of these pages the last time around.  I

15  don't think the foundation has been laid for this.  We've had

16  some other issues that we've discussed, including the ability

17  to change the colors and the parameters.

18            THE COURT:  Well, that doesn't go to admissibility.

19            MR. KIEFFER:  We discussed a redaction, Judge.

20            THE COURT:  I am going to receive Plaintiff's

21  Exhibit 364 in evidence subject to redaction of the pages that

22  we discussed previously and the pages we will discuss, I

23  believe, going forward.  The only thing I will permit you to

24  show to the jury at this point in time are the particular

25  pages of the qEEG test results that Dr. Thomas wants to

Thomas - direct - Kieffer                1118

1    explain to the jury how it showed improvement.

2              MR. KIEFFER:  Understood.

3              THE COURT:  So that includes page 23, and so I will

4    publish that to the jury over the defendant's objection.

5              (Plaintiff's Exhibit 364 received in evidence.)

6              MR. KIEFFER:  And, Your Honor, would the Court

7    kindly turn the lights down for the jury.

8              THE COURT:  Sure.

9              MR. KIEFFER:  Thank you.

10   BY MR. KIEFFER:

11   Q    Dr. Thomas, do you recall the question?

12   A    Okay.  So what you see here is a view of different

13   parameters of the person's brain functioning as viewed from

14   above.  So I'm going to use my gizmo here.

15              This is the front (indicating).   This is where the

16   nose is (indicating).  This is where the back is (indicating).

17   These are the ears (indicating), and there are different

18   variables that are assessed with this particular method.  You

19   can assess the power of the electrophysiology, which is in

20   microvolts, a very small amount of electricity, which we all

21   have.  And you see how does it deviate from the normal person.

22   So if somebody gets in an accident and bangs their head, they

23   might have different things that are out of whack or very

24   deviant.

25              Now, in this particular display, you have different

Thomas - direct - Kieffer                    1119

1    frequencies delta, beta.  These are slow waves.  Alpha, beta

2    and high beta.  In a typical brain-injured person, you will

3    have an excess of slow waves.  Particularly in the front

4    because no matter what kind of injury you have, you're going

5    to have frontal contusions.  You may also have -- so you see

6    the excess of the yellow and the orange.  And this is a scale.

7    So here is three standard deviations above the mean, the red,

8    and when you have blue, you have three standard deviations

9    below the --

10                  THE COURT:  Can we have a sidebar, please.

11                  (Sidebar held outside the hearing of the jury.)

12                  (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        1120

 1              (The following sidebar held outside of the hearing
 2    of the jury.)
 3              THE COURT:  He is getting perilously close to
 4    showing qEEG results that indicate that he has a TBI.  All
 5    right.  Don't ask questions that are going to elicit a long
 6    narrative from him.  Have him show the improvement, which is
 7    what you intended to do, between this and the next qEEG, and I
 8    think there are four of them in total; correct?
 9              MR. KIEFFER:  Yes.  There were only two I was going
10    to show him.
11              THE COURT:  Because he started talking about
12    standard deviation.
13              MR. KIEFFER:  I had the paralegal give him another
14    copy of your order on the motion in limine and I'm trying to
15    tow the line.
16              THE COURT:  Okay.
17              MR. KIEFFER:  You know, he testifies the way he
18    testifies, but I can ask him short --
19              THE COURT:  If he crosses that line, then he is
20    going to have a big problem.  You might have a lot of
21    testimony stricken.  Just ask him a question, say this is the
22    first one, I am going to show you the second one, can you show
23    the improvement to the jury.
24              MR. KIEFFER:  Okay.
25              THE COURT:  That's the point, right?
```

Sidebar                                              1121

1            MR. KIEFFER:  Okay.

2            THE COURT:  You want to show the neurofeedback is

3    helping him.

4            MR. KIEFFER:  Yes, the treatment, okay.

5            (Sidebar concluded.)

6            (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Thomas - direct - Kieffer                    1122

1          MR. KIEFFER:  May I proceed?

2          THE COURT:  Yes.

3    Q    Dr. Thomas, let me ask you a slightly different question

4    to follow up on the Court's instruction.  This particular page

5    that we are looking at is from the very first qEEG on Mr.

6    Bauta, just to make sure we are clear on time; correct?

7    A    Correct.

8    Q    And is this what sometimes might be referred to as a

9    baseline study?

10   A    Yeah.

11   Q    To get a sense of where Mr. Bauta was at about the time

12   he sought treatment from you?

13   A    Correct.

14   Q    All right.  If I may, Doctor, I'd like to direct you to

15   Exhibit P-364-0047.  I will pull it up here, give me just a

16   moment.

17          And for the record, Doctor, Exhibit P-364-0047 is a

18   similar page from a qEEG report of about 11 months later,

19   dated November 19, 2016, all right.

20          MR. KIEFFER:  Permission to publish that, Your

21   Honor.

22          THE COURT:  It should be up.  There we go.

23          MR. KIEFFER:  Okay.

24          MR. BARMEN:  Same objection, Your Honor.

25          THE COURT:  Same ruling.

Thomas - direct - Kieffer                    1123

1   Q    Dr. Thomas, can you explain to the jury how exhibit

2   364-0047 provides you with information about whether the

3   treatment that you had done for Mr. Bauta in those intervening

4   11 months was or was not improving his brain functioning?

5   A    It improved some parameters of his brain function.  You

6   might recall in your visual memory that there was a lot of red

7   lines in the fourth from the top panel.  There are a lot of

8   red lines.  That's the coherence variable.  There were red

9   lines in the front upper right quadrant and there were blue

10  lines in the lower left quadrant and those have been improved

11  so that they're not there.  Those are excesses either in --

12  excess energy of coherence or deficiency.  The blue is

13  deficient.  That's how he improved, with those variables.

14  Q    Okay.  And the improvement that you believe is shown as

15  between those two studies, is it your belief that's as a

16  result of your treatment?

17  A    That's my belief.

18       MR. KIEFFER:  Your Honor, I would move to admit

19  Plaintiff's Exhibit 364-0047.

20       THE COURT:  Again, we are going to deal with the

21  specific pages from Plaintiff's Exhibit 364 that will be

22  admitted into evidence later.

23       MR. KIEFFER:  Okay.  Thank you.

24  Q    Doctor, I have put back on the screen a page of your

25  records that were admitted last week.  This is, for the

Thomas - direct - Kieffer                     1124

1   record, P-364-0012, and this is the side-by-side comparison

2   results of the Halstead-Reitan Battery that you did in 2016

3   and in 2017.  You're with me?

4   A    Yes.

5   Q    And you testified last week that Mr. Bauta, between those

6   two Halstead-Reitan Batteries actually showed some improvement

7   in some of his scores?

8   A    Yes.

9   Q    Did you form a conclusion, Doctor, that if Mr. Bauta had

10  been malingering, whether it would have been likely that you

11  seen the type of improvement that you saw between those two

12  scores?

13              MR. BARMEN:  Objection.

14              THE COURT:  Overruled.

15  A    Well, malingering means that somebody is purposely trying

16  to appear impaired.  Well, if somebody wants to be impaired,

17  they would have a lot of low scores.  It would be logical to

18  find that.  If you test them a year later and they had been

19  under treatment and the scores improved, you would think they

20  weren't malingering, they were getting better.  If they were

21  malingering, they would try to have impaired scores.

22              And, actually, as an additional comment, he improved

23  in the areas exactly how brain-damage people improve in almost

24  every instance.  He still is brain-damaged and he's close to

25  the moderate range, but he has improved.

Thomas - direct - Kieffer                    1125

1    Q    Thank you.  And just to follow up on your last comment,

2    Doctor, what are those areas where you saw improvement in Mr.

3    Bauta in the areas where you would expect to see a

4    brain-damaged person improve?

5    A    One of the most sensitive test is called a Category Test.

6    It is a test of visual abstract reasoning and it is long and

7    it is difficult.  He went from a significant -- severe

8    impairment range to a moderate impairment range.  He -- I'm

9    trying to... he went from 83 errors to 62 errors, so that's

10   one major area.

11            You know, if you look in my report, my 2017

12   Halstead-Reitan Battery report, it is much more clearly laid

13   out.  Can we go to that page of scores?

14   Q    Well, bear with me.  I'll have find it.

15   A    I hope to help you.

16   Q    Do you have it there with you, Doctor?

17   A    Well, it is here, but I have this big book, you see.

18            That is P-164-102.

19            MR. KIEFFER:  Permission to publish P-164-102, Your

20   Honor.

21            MR. BARMEN:  Same objection.

22            THE COURT:  Overruled.  It is overruled.

23            THE WITNESS:  Touch there.  Well, it is a little

24   hard to see.

25   A    Okay.  I have been talking about the category test and

MDL   RPR

Thomas - direct - Kieffer                1126

1  this is -- okay, here's 2000 and -- let's see, 2016, the

2  scores of the Halstead-Reitan Battery, and here's 2017.

3         If you can -- do you have the little things in front

4  of you?  Okay.  All right.

5         So, Category Test improves.

6         Now, there's a scale of ranking each test.  Three is

7  severe impairment, two is moderate impairment, and one is mild

8  impairment, and zero is no impairment.  So if you go from

9  three to two, it's an improvement.  If you could from two to

10 zero, it's an improvement.

11        MR. McELFISH:  Your Honor, one moment, I want to

12 tell him he can mark on the screen.  You can mark on the

13 screen.

14        Sorry for the interruption.  Thank you.

15        THE WITNESS:  Wow.  Now that's a mess.

16        THE COURT:  Just tap the screen and then it goes

17 away.

18 A    So -- wait a minute.  These scores here, you can see

19 generally the scores went down.  One went up.  It was trail B,

20 went from two to three, like that.

21        Okay.  So you add up all these scores and have

22 various ratios and you get an overall index, general

23 neuropsychological deficit scale.  Anything over 50 is

24 moderate impairment.  Anything under 41 and above 25 is a mild

25 impairment, okay.

1       So here's is the moderate impairment in 2016.

2  Here's the overall mild impairment in 2017.

3       An additional thing to note is his IQ went up by

4  about -- let's see.  His IQ went up 14 points, overall.  But

5  his IQ went up in the performance area of functioning.  That's

6  visual and spatial and that kind of processing.  So you can

7  see that with -- with these tests (indicating), and then they

8  went up in percentiles with these tests (indicating).  I made

9  a mess again.  But anything that has an asterisk is a

10  significant improvement.  And those are the areas that people

11  who recover from brain injury intend to improve at.  So, I

12  mean, it fits all the literature in the neuropsychological

13  field.  There we go.

14  Q     Thank you, Doctor.

15       Does the fact that Mr. Bauta had shown improvement

16  between those two battery of tests, does that indicate that he

17  no longer needs treatment for his brain injury?

18  A     He still has brain damage.

19  Q     Okay.  As you have continued to treat him, Doctor, have

20  you reached an opinion or conclusion about whether Mr. Bauta

21  needs further care and therapy for his brain damage?

22       MR. BARMEN:  Objection.

23  A     I would -- I can't say?

24       THE COURT:  Overruled.

25  A     Well, I would strongly recommend continued treatment.

Thomas - direct - Kieffer                1128

1   Q     And what sort of continued treatment do you strongly

2   recommend?

3   A     I would continue to do what I've been doing.  I might

4   shift to more sophisticated neurotherapy methods.

5   Q     And what sorts of methods are those?

6   A     Well, there's some new techniques that I am being trained

7   in in the last year called NeuroField and it combines very

8   mild electrostimulation combined with neurotherapy to help

9   improve brain functioning.

10  Q     Have you reached a conclusion, Doctor, as to whether Mr.

11  Bauta needs continued therapy of the kinds that you have been

12  providing to him previously?

13  A     The kind of work that I have been doing with him to me

14  has shown improvement.  I have data that we have just

15  discussed that shows improvement.  It is likely to be helpful

16  for him to continue in this kind of work.  I don't know if he

17  will improve more or not.  I think it's worth doing because

18  we've had some progress so far.

19  Q     All right.  Thank you, Doctor.

20          MR. KIEFFER:  I would move to admit P-364-0102.

21          THE COURT:  Subject to redaction?

22          MR. KIEFFER:  Yes.

23          THE COURT:  I think I have already admitted it.

24          MR. BARMEN:  Note my objection on the record.

25          THE COURT:  Okay.  It is received subject to

1    redaction.

2              MR. KIEFFER:  Thank you.

3              (Plaintiff's Exhibit P-364-0102 received in

4    evidence.)

5    Q    Dr. Thomas, did you create certain bills for services

6    that you rendered to Mr. Bauta?

7    A    Yes.

8    Q    All right.  We have those, sir, as Exhibit 365.

9              MR. KIEFFER:  Your Honor, could I have small screens

10   at the moment.

11   Q    Dr. Thomas, Exhibit 365-0001 -- all right.  It should be

12   on the screen in front of you, 365-0001, is that the page of

13   your billing statements?

14   A    Yes.

15   Q    And your billing runs from 365-0001 through 365-0021; is

16   that correct?

17   A    That's what you have.  There's more since then, of,

18   course.

19   Q    All right.  This would be bills through the last date

20   that's shown here, January 30th of 2018; correct?

21   A    Correct.

22   Q    These are bills that you prepared yourself?

23   A    Yes.

24   Q    All right.  Are the services -- the bills for the

25   services that you generated, are they customary and reasonable

1  and were the service necessary for the treatment that you

2  provided to Mr. Bauta?

3  A    Well, I think they're reasonable given the situation that

4  I took on this case not knowing if I would with be paid or

5  not.  It is called a lien, and today I haven't been paid

6  anything.  It's been two and a half years.

7            Actually, the $400 per hour is not high in

8  Manhattan.  It might even be a little bit lower than most

9  attorneys.

10           MR. BARMEN:  Objection.

11           THE WITNESS:  Pardon me?

12           THE COURT:  Sustained.  I will strike that last bit.

13  A    What was the other part of the question?

14  Q    I think you answered that.

15           The question was, Doctor, were the bills that you

16  generated for the services that you provided to Mr. Bauta, in

17  your view, reasonable and customary in your field and do they

18  correspond to services that were necessary for Mr. Bauta's

19  treatment?

20  A    Yes.

21  Q    All right.  Sir, regardless of whether your bills get

22  paid or not, is it your intention to continue to treat Mr.

23  Bauta?

24  A    Yes.

25  Q    For as long as you believe the care that you're providing

Thomas - direct - Kieffer                    1131

1    to him results in improvement to him?

2    A    Yes.  Until he plateaus, yes.

3    Q    All right.  There are some visits where Mr. Bauta didn't

4    make an appointment.  Is that true?

5    A    No.  He made an appointment, but he didn't show up.

6    Q    Thanks.  Your answer is better than my question.

7              There were certain instances where there were

8    scheduled appointments for Mr. Bauta and he either called and

9    cancelled or in some instances did not show up?

10   A    Most of the time he called and cancelled the same day,

11   usually not before that.

12   Q    All right.

13   A    There are times where he didn't show up and I didn't get

14   a call.  Those were pretty few.  Later, when he explained to

15   me what happened is that -- you see, even though his pain

16   problems improved, every once in a while he gets hit with a

17   lot of pain and he can't do anything and he takes a pain pill

18   and it knocks him out for a day.  So those were some of the

19   times.

20             Other times he had necessary things to do with his

21   daughters.  He has two teenage daughters and, let's say --

22   they're good kids, but they need attention.

23   Q    All right.  And, Doctor, I don't want to take the jury's

24   time going through numerous visits, but your records that we

25   admitted into evidence last week, as it relates to

Thomas - direct - Kieffer                 1132

1  appointments that Mr. Bauta either cancelled or didn't show up

2  for, that's documented in your records; correct?

3  A    Correct.

4  Q    And to the extent that Mr. Bauta may have provided you

5  with an explanation on a particular occasion as to why he had

6  to cancel or why he didn't show up and the circumstances

7  related to that, that's written down in your records as well?

8  A    Correct.

9  Q    All right.  And for the many appointments that Mr. Bauta

10  did keep with you, you documented on a visit-by-visit basis

11  essentially what was done and what pertinent things he

12  reported to you that might relate to the treatment decisions

13  that you were making?

14  A    Usually what he related to me was things that was

15  happening in his family system, whether it was dealing with

16  his daughters or his -- the daughter's mother or his father or

17  something like that.  They didn't really have to do with the

18  treatment.  The treatment is pretty -- you know, you set up

19  somebody with biofeedback equipment and just run the equipment

20  and it is pretty simple.

21  Q    All right.  Thank you.

22          MR. KIEFFER:  Your Honor, I would move to admit

23  Exhibit P-365, which are Dr. Thomas's bills.

24          THE COURT:  Any objection?

25          MR. BARMEN:  No objection.

Thomas - direct - Kieffer                    1133

1          THE COURT:  Received.

2          (Plaintiff's Exhibit P-365 received in evidence.)

3          MR. KIEFFER:  Dr. Thomas, those are all of the

4    questions that I have for you at the moment.

5          THE WITNESS:  Okay.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Continuing.)

2              MR. BARMEN:  May I proceed, Your Honor.

3              THE COURT:  Yes.

4              MR. BARMEN:  Thank you.

5    CROSS-EXAMINATION

6    BY MR. BARMEN:

7    Q    Dr. Thomas, how are you this morning?

8    A    Okay.

9    Q    Bear with me, I'm going to jump around a little bit based

10   on really starting on Thursday and getting back to you today.

11   On Thursday you testified on direct examination that Mr. Bauta

12   at some point reported an auditory problem to you.

13              Do you remember that testimony?

14   A    Well, I knew it from talking with him.  It also came up

15   in the testing.

16   Q    You did auditory testing of him?

17   A    Yeah, that's part of the Halstead-Reitan battery.  You do

18   like this and they report if they hear you with both the

19   right, left and both ears.

20   Q    Did you ever discuss any auditory testing with Mr. Bauta

21   with Dr. Honor?

22   A    I don't think so, but he knows the battery.  He knows

23   that I would do that.

24   Q    In your treatment notes do you make any indication of any

25   auditory issue relative to Mr. Bauta?

1    A    Probably not.  I don't deal with it that much.

2    Q    Have you ever seen the report of an Edmund Provder who

3    did the life care plan for the plaintiff?

4    A    No, I hadn't.

5    Q    Can you pull up GL I 427-59.

6         MR. BARMEN:  Small screens only, please.

7         MR. KIEFFER:  Objection.  Lacks foundation for this

8    witness.

9         THE COURT:  Sustained.

10   Q    Do you know of any other indications in any medical

11   record anywhere for Mr. Bauta that indicates any type of

12   auditory problem?

13   A    No, I don't.

14   Q    And that's because you never reviewed his medical

15   records, did you?

16   A    That's true.  I didn't review his medical records.

17   Q    You didn't think they were relative to your care and

18   treatment of him?

19   A    Actually, no.  I was treating his pain and his focusing

20   and you, you know, just being able to pay attention and reduce

21   his pain and try to get him to a state where he could sleep.

22   Q    Right, because your two goals in treating this man was to

23   lessen his pain and two, to help him to sleep?

24   A    Correct.  And to reduce his depression.

25   Q    That's a third thing.  Who diagnosed him with depression,

Thomas - cross - Barmen                    1136

1    Doctor?

2    A    I think Dr. Honor did and I did.

3    Q    Dr. Honor retired -- is a retained expert and you a

4    treating physician on a lien.  Did anyone else ever diagnose

5    Mr. Bauta with depression?

6    A    I do not know that.

7    Q    Have you ever even heard it suggested?

8    A    I'm familiar with Dr. Honor's report and I see it myself.

9    Q    Okay.  You actually came to treat Mr. Bauta because of

10   Dr. Honor, true?

11   A    Correct.

12   Q    Dr. Honor posted on a Listserve for any neuropsychologist

13   willing to take on a brain injured patient on a lien; correct?

14   A    I don't know exactly what he said, whether he said brain

15   injured patient or just a patient.  The Listserve happens to

16   be a neuropsychology Listserve and pretty much everyone who is

17   on the Listserve probably would assume, if it weren't stated,

18   that it would be a brain injury patient.

19   Q    You doctor, do you remember we've take your deposition

20   three separate times in this case; correct?

21   A    Correct.

22   Q    One in February of 2017, again in April of 2017 and the

23   last one was in November of 2017, true?

24   A    Correct.

25   Q    When I took your deposition --

1          MR. BARMEN:  Well, before we do that, Page 17 on the

2   small screen, please.

3          May I proceed, Your Honor?

4          THE COURT:  You may.

5   BY MR. BARMEN:

6   Q    Page 17, February 2, 2017 deposition starting at line

7   eight.

8   A    Okay.  You want a response from me?

9   Q    I'm waiting for the judge to allow me to proceed.

10         THE COURT:  Go ahead.

11  Q    When I took your deposition, sir, back in February of '17

12  I asked you starting at line eight:  "Okay, how did Mr. Bauta

13  come under your care?"  Your response was, "On a Listserve

14  neuropsychologist Steve Honor, Dr. Honor, asked would anyone

15  like to take on a treatment case of a brain injured patient on

16  a lien."  That's what you testified to back in February of

17  last year; correct?

18  A    Okay.

19  Q    Dr. Honor did, in fact, post on that Listserve, Would

20  anyone like to take on a brain-injured person; isn't that

21  true?

22  A    It looks like it is.

23  Q    And in fact because of that, you believed Mr. Bauta was

24  brain injured before you ever met him; isn't that true?

25  A    I would have assumed that, sure.

1    Q    So you went in with the assumption before you ever met

2    him that he was brain injured, fair?

3    A    Fair.

4    Q    And, in fact, you were the only neuropsychologist on this

5    Listserve to respond to Dr. Honor and indicate your

6    willingness to take on this case on a lien are you aware of

7    that?

8    A    I wasn't aware of that until the last time I saw

9    Dr. Honor which was last week, May 2nd.  I wasn't aware that I

10   was the only one.

11   Q    But you have since discussed it with Dr. Honor since

12   Dr. Honor testified before this jury, right?

13   A    Well, he just told me I was the only one.  I don't know

14   if you'd call it a discussion but that's what he said.

15   Q    When did you last speak to Dr. Honor?

16   A    The day he was here.

17   Q    You didn't speak to him over the weekend?

18   A    Nope.

19   Q    Did you speak to anyone over the weekend about the

20   testimony that started on Thursday?

21   A    Nope.

22   Q    Isn't the reason you're the only one that responded to

23   that Listserve is because the American Academy of

24   Neuropsychology frowns upon doctors taking cases on liens?

25   A    Well, I had responded to you, what's the alternative; to

1  not treat him when I knew I could help him.  So your response

2  in the deposition was -- when I said what's the alternative,

3  you said don't treat him and I said, are you kidding?  This

4  guy needs help.

5  Q    So you believe despite the fact that the American Academy

6  of Neuropsychology believes it's unethical to take a patient

7  on a lien, it would have been more unethical for you not to

8  accept it?

9  A    I don't accept the construct at all.  I'm here to help

10 people get better.  You can twist it around into trying to

11 make me a bad guy because I took somebody on a lien where I

12 might not get paid at all.

13 Q    Did you know at the time that you responded to

14 Dr. Honor's post that he was under a state suspension for

15 professional misconduct?

16 A    Nope.

17 Q    Are you familiar with your ethical standard 6.04?

18 A    No, I don't memorize it.  What is it?

19 Q    Fees and financial arrangements of treating physicians.

20 A    Go ahead, tell me what it is.

21 Q    You're not supposed to take these things on liens.

22 A    Show me that.

23        MR. KIEFFER:  Objection.  He's characterizing a

24 document he hasn't shown to a witness.

25 A    I looked at my ethical standards quite recently and I

1    didn't see it.

2    Q    Did you look at 6.04?

3    A    You can show me what it is.  I don't memorize my ethical

4    standards as a psychologist.

5    Q    That's fine.  We'll move on.  Certainly as a treater you

6    agree you have to remain objective and unbiased, true?

7    A    Well, as a treater, yes.  As a neuropsychologist you

8    should be objective.

9    Q    Okay.  You spoke to Mr. McElfish before you ever met or

10   spoke to Mr. Bauta, true?

11   A    I don't recall.

12   Q    Can you pull up plaintiff 410-0559, please.  Go to 561,

13   please.  You signed this lien agreement with Mr. McElfish on

14   November -- you signed it on November 5th of 2015; correct?

15   A    November 5, 2015, yeah.

16   Q    Mr. McElfish signed it on November 11, 2015; correct?

17   A    That's what it says.

18   Q    Mr. Bauta signed it on December 3, 2015; correct?

19   A    Correct.

20   Q    And you first treated Mr. Bauta in December of 2015;

21   correct?

22   A    I think that's correct.

23   Q    So based on the timing, you had to have spoken to

24   Mr. McElfish before you ever met or treated Mr. Bauta, true?

25   A    Well, actually I had an attorney help me fix -- create

Thomas - cross - Barmen                    1141

1   the lien so I think there was discussions between my attorney

2   hand Mr. McElfish.

3   Q    Can you answer my question, please, sir?

4   A    I don't recall.

5           MR. BARMEN:  Can you pull up depo 1, please, page

6   21?

7           MR. McELFISH:  What's the date?

8           MR. BARMEN:  February 2nd of 2017.

9   Q    Starting at line 1 through line 11.  Do you have it up

10  there, Doctor?

11  A    Yes.

12  Q    I asked you on page 21 of your first --

13          MR. KIEFFER:  Objection, Your Honor.  It's not

14  impeaching.

15          THE COURT:  Overruled.

16  Q    The question was:  "Understanding you're not an expert in

17  this case, an expert witness, and you're a treating physician

18  when did you first start communicating with Mr. McElfish or

19  his office?"  Your answer was:  "Well, I don't know, but I

20  guess it was -- I think the first treatment day I had was

21  early December of 2015 and of course of must have talked with

22  him, Mr. McElfish, before then and that's pretty much what I

23  recall and that's about it."  Was that your testimony in

24  February of 2017?

25  A    Well, I guess so since you have it written in front of

1    me.

2    Q    You testified truthfully back in February of 2017; right?

3    A    Yes, but I'm just as unsure then as I am now.

4    Q    You weren't unsure then at all.  You said you must have

5    talked with him first.

6    A    First.  I think the first treatment day I have to -- and

7    of course I must have talked with him.  I'm kind of making a

8    conclusion about what I think happened.  I'm not absolutely

9    sure.  If you look at the grammar carefully before then and

10   that's pretty much what I recall and that's it.  Move on.

11            THE COURT:  Move on.

12   A    That isn't very conclusive.

13            THE COURT:  That is stricken.  Move on.

14   Q    Okay.  It was actually Dr. Honor that arranged for you to

15   talk to Mr. McElfish before even met Mr. Bauta; correct?

16   A    I don't know, I don't recall.

17   Q    Page 23 of the deposition, please.  Starting at line 16

18   page 23, going true line 1 on page 24.

19            MR. BARMEN:  May I proceed, Your Honor?

20            THE COURT:  Hold on.  Go to the top of the next

21   page, please.

22            MR. BARMEN:  Can you scroll down?

23            THE COURT:  Okay.

24   A    Okay.

25   Q    I asked you:  "After you responded to Dr. Honor on the

1   Listserve, you tell him you're willing to take a look at this

2   what does Dr. Honor tell you about Mr. Bauta?"  Your answer

3   was: "He said it was -- I can't remember.  I really can't

4   remember very much.  He said it was a big accident and he

5   might have said something about Greyhound and he said

6   Mr. McElfish's name and I don't remember specifically what

7   happened after that, but I guess he arranged for McElfish to

8   call me or me to call -- probably for McElfish to call me."

9           THE COURT:  Does that refresh your recollection as

10  to whether Dr. Honor suggested or arranged for a call between

11  Mr. McElfish and you prior to you meeting Mr. Bauta?

12          THE WITNESS:  I am no more than what I see in front

13  of you, in front of me and you.

14  Q    And that's fair.  And I know it was a while ago.  But

15  what you are clear of is because of the agreement you have

16  with Mr. McElfish, you have a financial interest in the

17  outcome of this lawsuit, do you not?

18  A    Yes.

19  Q    And when you talked to Mr. McElfish and you were

20  negotiating this lien agreement, he told you this case was a

21  sure thing, didn't he?

22  A    He might have said something like that.  But you're

23  asking me to believe an attorney, so maybe I would.  They can

24  say anything.  But we're here now, aren't we?

25  Q    We are.  We are?  Your real interest is helping Mr. Bauta

1  get better, true?

2  A    True.

3  Q    And certainly you would take all steps that you feel as

4  his treater that are in his best interest; correct?

5  A    As best as I can.

6  Q    Unless of course you're concerned about not getting paid,

7  fair?

8  A    No.

9  Q    Well, you did an initial neuropsychological battery on

10 him blind when he first came to treat with you, right?

11 A    Right.

12 Q    And then in one of the depositions I took of you, I

13 believe the second one, I asked you why you hadn't done

14 another?

15 A    Yeah.

16 Q    And I think you've already told this injury that the

17 second one you did you did at my suggestion?

18 A    I thought it was a good suggestion.  I thought well, I

19 thought about it for a while and I thought that's a pretty

20 good idea to do is to see his progress.  And the Halstead

21 Reitan battery is a good way to do it because it's

22 well-validated in the field and there tends not to be a

23 practice effect and I thought it was a good idea.

24 Q    The reason you didn't do it prior to me suggesting it is

25 because you usually charge $3,500 for them and you weren't

Thomas - cross - Barmen                    1145

1   getting paid; correct?

2   A    I disagree with your insinuation.

3   Q    I'm not insinuating anything.

4   A    Oh, you certainly are.

5   Q    Depo two, please.  I'm referring now, Doctor, to your

6   deposition from April of 2017, April 20th of 2017.  Starting

7   at page 62, line 23 and really going through the next several

8   pages we had a discussion about why you hadn't done the second

9   round of psychological testing.  So let's start at the bottom

10  of 62.

11  A    This was a deposition that I never got the transcript.  I

12  asked you in a third deposition why I hadn't gotten the

13  deposition to review and you said oh, yes, yeah.  By the way,

14  that's on record with the person who was, you know, using one

15  of these little funny machines.  And I never got a transcript

16  from the third deposition to review which I believe I'm

17  supposed to get.

18  Q    Did you ever ask the Court Reporter for one?

19  A    Who?

20  Q    The Court Reporter, sir?

21  A    I don't know who the Court Reporter is.

22            MR. BARMEN:  Sidebar, sidebar

23            (Sidebar held outside of the hearing of the jury.)

24            (Continued on next page.)

25

```
                          Sidebar                        1146
```

1           (The following sidebar took place outside the
2   hearing of the jury.)
3           THE COURT:  Did he request a copy of the deposition
4   transcript?
5           MR. BARMEN:  Well after the fact.  I don't represent
6   him.  He was advised and had the option to review and sign or
7   waive.  I don't represent him.  I didn't retain him.  He was
8   properly advised.  He certainly got the first one.
9           THE COURT:  When did he ask for the second
10  deposition transcript?
11          MR. BARMEN:  I believe he requested it during the
12  third deposition, if I'm not mistaken.  Maybe it was after.
13          THE COURT:  And he hasn't been given copy of the
14  second or third?
15          MR. BARMEN:  He could have gotten to the Court
16  Reporter any time he wanted to.
17          THE COURT:  Whose responsibility is it to provide a
18  deposition transcript once it is requested?  Is it the court
19  reporter or the party taking the deposition or the party who
20  proffered the expert?   The rule seems somewhat vague.
21          MR. BARMEN:  I don't think I have that
22  responsibility.  They used this man as an expert despite the
23  fact they call him a treater.
24          MR. McELFISH:  If he's an expert we can let
25  everything in.

Sidebar                                              1147

1      THE COURT:  Before the deposition is completed the

2   deponent must be allowed 30 days after being notified by the

3   officer that the transcript or recording is available in which

4   to review the transcript or recording; and if there are

5   changes to form or substance to sign a statement listing the

6   changes and the reasons for making them."

7      MR. BARMEN:  And that's precisely what my

8   understanding is, Your Honor.  He was advised on the option to

9   waive or read.  If he would have requested it, the Court

10  Reporter would have sent the transcript directly to him.

11     THE COURT:  Did he request it during the third

12  deposition --

13     MR. BARMEN:  I don't recall.

14     THE COURT:  -- before the deposition was completed?

15  Once, twice, three times -- the third is the completion,

16  right.

17     MR. BARMEN:  I instruct even people I don't

18  represent, I tell them I don't represent you but you have the

19  right to read or waive.  You can tell the Court Reporter what

20  you want to do, and if he choses to read it the Court Reporter

21  sends it to him, not me.  I don't represent this man.

22     THE COURT:  But you hired the Court reporter.  Can

23  you show me where the third deposition is, please.

24         (Continued on the following page.)

25

```
                        Sidebar                          1148
```

1    (Continuing)

2            (The following sidebar took place outside the

3    hearing of the jury.)

4            MR. BARMEN:  Your Honor, look, this is the last

5    deposition (indicating) and I tell him that in every

6    deposition.

7            THE COURT:  Did you ensure that she sent him a copy?

8    You hired her, you hired her to take the deposition.

9            MR. BARMEN:  I did hire her.

10           THE COURT:  He asked for it.

11           MR. BARMEN:  Judge, I did hire her.  I have no

12   reason to believe she didn't send him a copy.  He got the

13   first one.

14           THE COURT:  Well, he claims he did not get it.

15           MR. BARMEN:  And, respectfully, how is that my

16   issue?

17           THE COURT:  Because you hired the court reporter.

18   She acts on your behalf.  She is transcribing the deposition.

19   She is your agent.  He asked for it.  If she did not send it,

20   then that is on you.  But are you going to go down this road

21   and then you call her to say, yes, I sent it, here is proof?

22           MR. BARMEN:  If need be, because I have three

23   depositions of this witness.  I think you get a sense for the

24   rather difficult nature of this witness.  I am going to need

25   to refer to his deposition transcripts.

Sidebar                                              1149

1              MR. McELFISH:  He's pretty well-natured, I think.

2              MR. BARMEN:  I didn't say he wasn't.

3              THE COURT:  Why don't you continue to do it and --

4              MR. MOROKNEK:  Why not just ask him the question

5      classically?  In other words, Do you remember being asked a

6      series of questions and having given these particular answers?

7      And then read the question, here's the question, answer,

8      here's the answer.

9              THE COURT:  Not, Do you remember, were you asked

10     those questions and did you give those answers.  And then if

11     he says, I don't know, I didn't review my transcript, move on

12     to the next thing.

13             MR. McELFISH:  Not, I didn't review my transcript,

14     the defense never sent it to me.

15             MR. BARMEN:  It's not incumbent upon the defense to

16     send it to him.

17             MR. McELFISH:  I'm sure it is.

18             MR. BARMEN:  Thank you, Your Honor.

19             MR. McELFISH:  Judge, there's one more thing.

20             MS. DIAMOND:  Here's where he testified.  It's

21     Page 183 of his third deposition, which was November 2017.

22     Page 183.

23             MR. KIEFFER:  You can show it to the judge, if you

24     like.

25             THE COURT:  It does not really clarify.

SAM      OCR      RMR      CRR      RPR

```
                    Sidebar                          1150
```

1          MR. BARMEN:  No, it doesn't.

2          MR. MOROKNEK:  Our concern is, are we going to rely

3    on his memory?  It's not that he did not get it, he does not

4    remember getting it.

5          MR. BARMEN:  I'll proceed as indicated, Your Honor.

6          But I'm wondering, it's going on 12:30, is this an

7    appropriate time to take a break?

8          THE COURT:  How much --

9          MR. BARMEN:  I've got a while.

10         MR. McELFISH:  Just remember you're paying for

11   Cummings today.  So if she doesn't get on and off today, it's

12   not my dime.

13         MR. MANNION:  She'll be here.

14         MR. McELFISH:  No, but if we don't finish it --

15         THE COURT:  We've got the other witnesses.

16         MR. BARMEN:  I've got at least 90 minutes with him.

17         THE COURT:  Let's go to 1 o'clock.

18         (Sidebar concluded.)

19

20         (Continued on the following page.)

21

22

23

24

25

1              (In open court - jurors present.)

2    EXAMINATION CONTINUING

3    BY MR. BARMEN:

4    Q    Back to what we were talking about a few minutes ago,

5    Dr. Thomas.

6              When I took your deposition on April 20th of 2017,

7    do you remember me asking you this question, starting at

8    line 23, counsel:

9              If it would be beneficial to determine if this

10   person, Mr. Bauta, has improved --

11             MR. McELFISH:  Excuse us a second, it's not on the

12   screen.

13             MR. BARMEN:  No, it's not on the screen.

14             MR. McELFISH:  How do we --

15             MR. BARMEN:  You have the transcript.  I gave you

16   the page.  62.

17             MR. McELFISH:  Line.

18             MR. BARMEN:  Starting at line 23.

19             MR. McELFISH:  Go ahead.

20   BY MR. BARMEN:

21   Q    Question:  So if it would be beneficial to determine if

22   this person, Mr. Bauta, has improved, you wouldn't do it

23   yourself?

24             Now, to the top of 63.

25             Your answer was:  I don't know.

Thomas, PhD - cross - Barmen                1152

1          Question:  What would be the rationale to not do it

2   yourself?

3          Your answer:  Well, I'm putting in all this time

4   without getting paid.

5          Was that your testimony back in April of 2017?

6   A    I guess so, since you have it written down.

7   Q    Okay.  Now, on page 67 --

8   A    By the way, I did do it myself.

9   Q    I know.  On page 67, when I was talking to you about the

10  same issue, whether or not it makes sense to do a second

11  battery of neuropsychological testing, I asked you at page 67,

12  starting at line 9:

13         If it might be beneficial to the patient, isn't it

14  incumbent upon you to do it?

15         And your answer was:  I'm not sure.

16         MR. KIEFFER:  Objection, improper impeachment.

17         THE COURT:  Sustained.

18  BY MR. BARMEN:

19  Q    Doctor, did you always take appropriate steps in this

20  patient's best interest, regardless of whether or not you were

21  getting paid?

22  A    I think so.

23  Q    But, in fact --

24  A    By the way, this is not an example of that.  It really

25  doesn't matter who -- who would be doing the testing.

Thomas, PhD - cross - Barmen                    1153

1   Q    You didn't do it until I suggested it, because you

2   weren't getting paid for it, correct?

3   A    I disagree with that insinuation.

4   Q    Well, it is not an insinuation, it is in fact what --

5   A    Well, you're wrong.

6   Q    -- what you testified --

7   A    No.

8   Q    You need to let me finish my question, sir, and I'll give

9   you the same courtesy and let you finish your answer.

10          You, in fact, testified when I took your deposition

11  in April of '17 that you didn't do it because you weren't

12  getting paid.

13          You saw that testimony, right?

14          MR. KIEFFER:  Objection --

15          THE COURT:  Overruled.

16          MR. KIEFFER:  -- cumulative; asked and answered.

17          THE COURT:  Overruled.

18  BY MR. BARMEN:

19  Q    So are you changing your testimony now?

20  A    No, I'm not changing my testimony.  I just don't think

21  it's a big deal.

22  Q    It's not a big deal for a treating physician who stated

23  earlier it would have been a bigger ethical issue not to treat

24  this man, rather than to take him on a lien, for that same

25  physician to have testified they didn't do something they felt

SAM     OCR     RMR     CRR     RPR

1   was beneficial for the patient because they weren't getting

2   paid.

3             Is that your testimony?

4   A    I disagree with your assumptions.

5   Q    Okay.  It certainly benefits you to continue treating

6   Mr. Bauta on this arrangement with his lawyer, doesn't it?

7   A    It may not be useful.  We don't know how this case is

8   gonna come out.

9   Q    So, perhaps, it is beneficial for you, right?

10  A    It might be; it might not be.

11  Q    Because, in fact, you might get paid?

12  A    I might; I might not.

13  Q    Okay.  Have you made any other medical decisions relative

14  to Mr. Bauta, with the consideration as to whether or not you

15  are going to get paid, since we talked in April of 2017?

16  A    I don't believe so, but keep in mind, I'm not a medical

17  doctor.

18  Q    That's right.  You're not a medical doctor, true?

19  A    True.

20  Q    Going back to that, you said one of the things that you

21  are now starting to treat Mr. Bauta with -- let me make sure I

22  get this right -- is something called NeuroField?

23  A    Yes.

24  Q    And you agree NeuroField is not something that's accepted

25  in the neuropsychological community?

Thomas, PhD - cross - Barmen                1155

1    A    Well, wait a minute.  I have to back up.  I'm not

2    treating him with NeuroField now.  I haven't started doing

3    that yet.  I would plan to do it if I would continue.

4    Q    You were just recently trained in NeuroField?

5    A    Correct.

6    Q    So I misunderstood.  You haven't started it yet, but your

7    intention is to do so?

8    A    I would like to try it.  It might be helpful.

9    Q    Despite the fact that it is not accepted in the

10   neuropsychological community, true?

11   A    I don't know how it's accepted or not.

12   Q    Well, isn't it true that most things that you do are not

13   accepted in the neuropsychological community?

14   A    Neuro feedback is starting to be accepted, not only in

15   the neuropsychological field, but in the medical field.

16   Q    Can you answer my question, please, sir?

17   A    And -- rephrase the question.

18   Q    Most of the things you do, your treatments relative to

19   Mr. Bauta, are not accepted in the neuropsychological field,

20   is that true?

21        MR. KIEFFER:  Objection, asked and answered.

22   A    No.

23        THE COURT:  Overruled.

24        MR. BARMEN:  Deposition Number 3, please, Page 107.

25        107, please.  The deposition starts in the hundreds,

SAM      OCR      RMR      CRR      RPR

Thomas, PhD - cross - Barmen                    1156

1    so it's one of the first pages.

2           Just give me line 25 and the next page, please.

3    BY MR. BARMEN:

4    Q    Do you recall me asking you, when we were talking about

5    NeuroFields in November of 2017, whether that was something

6    that was accepted in the neuropsychological community?

7           Do you remember us having that discussion?

8    A    Well, I'm reading what you had written that I said.

9    Q    Take your time.  First of all, I didn't write it, sir.

10          The court reporter did.

11          MR. KIEFFER:  Objection, improper impeachment.

12          THE COURT:  Overruled.

13   Q    I asked you --

14   A    Okay, what's your question?

15   Q    I asked you, when you testified under oath in November --

16          THE COURT:  Just do it the classic way, please.

17          MR. BARMEN:  Okay.

18   Q    Did I ask you, sir, if NeuroFields was something accepted

19   in the neuropsychological field?

20          THE COURT:  Sustained.

21          At your deposition, were you asked this question and

22   did you give this answer:

23          This is something accepted in the neuropsychological

24   community?

25          Answer:  I'm sure it's not.  Most things I know are

SAM      OCR      RMR      CRR      RPR

1   not accepted in the neuropsychological field, but they are

2   accepted in neuroscience.  Neuropsychology is very limited in

3   its treatment methods, very limited.  95 percent of the

4   neuropsychologists only do testing.  That's kinda important to

5   know, but may be beyond the scope of this particular case.

6            Were you asked that question and did you give that

7   answer?

8            THE WITNESS:  Yes.

9            By the way, I'm not seeing that on the screen.

10  BY MR. BARMEN:

11  Q    Sometimes it goes black and you got to touch it.

12  A    It's not black, it's just the page is a different page.

13  Can I make it go -- well, I can't move the page.

14  Q    No, he does that from here (indicating).

15           Neuroscience -- the position of neuroscience on

16  taking positions on the lien is the same as the general

17  neuropsychological community; it's against it, correct?

18  A    I don't know that.  I don't even know what organization

19  you're talking about.

20  Q    The American Academy of Neuroscience.  What is their

21  position on taking patients on liens?

22           MR. KIEFFER:  Objection, it's cumulative.

23           THE COURT:  Overruled.

24  A    I've never heard of that organization, but when I did a

25  search on Google about neuroscience organizations, I got

1  3.6 million organizations, although in the United States,

2  there is only 975,000.  So you talk about an organization I

3  don't know about.  And besides, I decided to take the case on

4  a lien so that the person could get treatment.

5  Q    We discussed the American Academy of Neuroscience at your

6  last deposition.  You never told me at that time you didn't

7  know what it was, correct?

8  A    You didn't ask.

9  Q    Okay.  I asked you in your last deposition what the

10 American Academy of Neuroscience's position was on -- I'm

11 sorry, I asked you what the American Academy of Neuroscience

12 consensus was as to validity testing in the neuropsychological

13 realm.  Do you remember what you said to that?

14         MR. KIEFFER:  Objection, improper impeachment.

15         MR. BARMEN:  It's a different question.  It's not --

16         THE COURT:  Sustained.

17         MR. BARMEN:  Okay.

18 BY MR. BARMEN:

19 Q    In addition to never reviewing Mr. Bauta's medical

20 records, you didn't ask him what medications he was taking

21 until you had been treating him for two years, correct?

22 A    No, I asked him, I just didn't write it down.

23 Q    Do you remember having a discussion with me in one of

24 your depositions about the potential impact of medication on

25 qEEG results?

1    A    Yes.

2              MR. BARMEN:  Deposition Number 2, please.

3              THE COURT:  Sustained.

4    BY MR. BARMEN:

5    Q    Do you remember me asking you in your deposition whether

6    medication can impact the results of qEEG tests?

7              THE COURT:  Sustained.

8              MR. KIEFFER:  Objection.

9              THE COURT:  Can medication impact the results of

10   qEEG testing?

11             THE WITNESS:  Yes.  Mildly so, usually.

12             THE COURT:  Okay.

13   BY MR. BARMEN:

14   Q    And you never asked Mr. Bauta what medications he was on

15   until after you had done three of the four qEEG's over a

16   period of over a year-and-a-half, correct?

17   A    Oh, I knew he was on some medication which have he

18   tapered off, and now as I understand it, he's not on it except

19   in emergencies.  But Bob Thatcher has done studies showing the

20   qEEG's are still valid.  Besides, what I wanted to do is I

21   wanted to find out the relationships of the different

22   variables, so I know where to guide my treatment in Mr. Bauta.

23             I don't need to know if there is a slight difference

24   in magnitude in, you know, excess or deficient variables.  The

25   treatment would still be the same.

1   Q      Did I ask you on April 20th, 2017 why you waited until

2   February 2nd, 2017 to ask Mr. Bauta what medications he was

3   taking?

4          MR. KIEFFER:  Objection.

5   A      I don't recall you asking me that at all.

6          THE COURT:  Sustained.

7   A      I don't remember everything you said.

8          THE COURT:  Sustained.

9          MR. BARMEN:  All right.  Page 37 of deposition

10  Number 2, please.

11         MR. KIEFFER:  Objection, Your Honor.

12         THE COURT:  Let's see first.  What line?

13         MR. BARMEN:  Page 37, starting at line 14 down to

14  line 23.

15  A      Okay.  What's the question?

16         THE COURT:  Hold on, hold on.

17         All right.  Dr. Thomas, do you know when you first

18  either asked Mr. Bauta or found out what medications he was

19  on?

20         THE WITNESS:  I probably found out in the first

21  couple sessions.  I may not have written it down.  By the way,

22  it didn't make any difference as far as my treatment goes.

23         MR. BARMEN:  Can you pull up depo 1, page 37,

24  please?

25         MR. KIEFFER:  Objection.  It's improper impeachment.

1          MR. BARMEN:  Lines, Your Honor, 4 -- I'm sorry, 5

2    through 22 in depo 1.

3          Can you blow that up, please, 5 through 22?

4          THE COURT:  What is the date?  This is February 2nd?

5          MR. BARMEN:  This is February 2nd.  The first one we

6    looked at, Your Honor, was April 20th.  So it's in both of

7    them.

8          MR. KIEFFER:  Objection, Your Honor, it's not

9    impeaching if you read lines 10 and 11.

10          MR. BARMEN:  Keep going through 22, counsel.

11          THE COURT:  Okay.  You can ask these questions.

12          MR. BARMEN:  Thank you.

13   BY MR. BARMEN:

14   Q    When I took your deposition on February 2nd, 2017, I

15   asked you, starting at line 5, or did I ask you, starting on

16   line 5 -- do you have it there, Dr. Thomas?

17   A    Yes.

18   Q    I asked you:  If someone is on certain medications, can

19   that affect the test results?  Your answer was:  It can.  I

20   then asked you:  Do you know what kind of medications

21   Mr. Bauta is on daily?

22          Your response was:  Daily, I don't know.  He tries

23   to avoid them, but he has pain medication.

24          I then asked you:  Do you know if he's on any other

25   kind of medication other than pain medication?

Thomas, PhD - cross - Barmen                    1162

1              Your answer was no.

2              I then asked you:  You don't know, or no he's not?

3              Your answer was:  I don't know.

4              I then asked you:  Understanding that certain

5     medications can impact qEEG testing, wouldn't that be

6     something you should know?

7              Your response:  It might be, but ordinarily,

8     medications can be understood, and the EEG can be interpreted

9     correctly.

10             I then asked you:  Okay, but to interpret that,

11    wouldn't you need to correlate it with knowing what

12    medications a particular patient is taking?

13             Your response was:  Possibly.

14             Do you recall that?

15    A    Vaguely.

16    Q    And we had a similar exchange in April.

17             The point is, you did not ask Mr. Bauta what

18    medications he was taking until after the third qEEG, despite

19    admitting that medications can impact qEEG.

20             True or false?

21    A    I don't recall.

22    Q    Okay.  You did a total of four qEEG s on Mr. Bauta,

23    correct?

24    A    Correct.

25    Q    You agree you're not an expert in qEEG?

1    A    Correct.

2    Q    In fact, for the first three, you relied who a social

3    worker by the name of Mr. Smith to help you interpret the

4    results, fair?

5    A    I think so, yeah.

6    Q    Okay.  And for the fourth one, you relied on a Dr. Herd,

7    correct?

8    A    Correct.

9    Q    And Dr. Herd you believe is an expert in qEEG?

10   A    Correct.  Actually, I would like to clarify something.

11   Mark Smith is an expert in qEEG.  You say social worker as if

12   that's some kind of disqualification of his credentials.  He

13   happens to be one of the highest-ranking qEEG people in the

14   country.

15   Q    He is not a medical doctor, correct?

16   A    No.

17   Q    He can't diagnose anyone, correct?

18   A    He can diagnose.  Social workers can diagnose in this

19   state.

20   Q    Social workers can diagnose brain injury by looking at a

21   qEEG?

22   A    They can diagnose according to DSM V, and brain injury is

23   part of that.  Actually, they can.

24   Q    Okay.

25   A    That's my understanding.

Thomas, PhD - cross - Barmen                    1164

1   Q     You understand also that Mark Smith testified that you

2   cannot --

3               THE COURT:  Sustained.

4   BY MR. BARMEN:

5   Q     -- use qEEG --

6               THE COURT:  Sustained.

7   BY MR. BARMEN:

8   Q     By your own admission, three of the four qEEG tests you

9   did are invalid, correct?

10  A     No.

11  Q     The first test had a lot of artifact in it, didn't it?

12  A     I am not so sure about that.  I'm looking at the qEEG's,

13  you know, recently, and they looked pretty valid to me.

14  Q     When you testified back in February of --

15  A     By the way, you can still have accurate results and have

16  artifact.  There is an auto edit that can correct it.  So

17  you're trying to push things into a box, and it's

18  inappropriate.

19  Q     I am just going by what you previously testified to,

20  Doctor.

21  A     No, you're trying to put me in a box.

22  Q     When did you go back and review these test results again?

23  A     Why?

24  Q     When?

25  A     Last couple weeks.

SAM      OCR      RMR      CRR      RPR

1    Q    Why?

2    A    Because I was coming to visit you.

3    Q    Okay, that's fair.  Did you not tell me back in

4    February of 2017 that the first test had a lot of artifact,

5    which is why you did the second test?

6              MR. KIEFFER:  Objection, improper impeachment.

7              THE COURT:  Sustained.

8              THE WITNESS:  So I don't answer that?

9              THE COURT:  Correct.

10   BY MR. BARMEN:

11   Q    Let's look at page 46 of your first deposition.

12             MR. KIEFFER:  Objection.

13             MR. BARMEN:  Can I have a sidebar, please?

14

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Sidebar                                           1166

1          (The following sidebar held outside of the hearing

2     of the jury.)

3          THE COURT:  Why are you doing this?

4          MR. BARMEN:  Because if he is going to keep changing

5     his testimony, I have to continue to impeach him.  He is

6     changing his testimony.  He is.  I have to show the jury.

7          THE COURT:  What is the point of that?  You're

8     getting very close, and I will let you go, if you want to get

9     close to the point where you're starting to ask him questions

10    about qEEG, which you almost just did, about diagnosis, then,

11    then they are going to call him back on the stand and I am

12    going to let all of that in.

13         MR. BARMEN:  I am not going to diagnose --

14         THE COURT:  You almost just did with Mark Smith.

15         MR. BARMEN:  I am off Mark Smith.  I am talking now

16    about the specific tests that did he where he admits three of

17    them is invalid.

18         THE COURT:  If you can't see the ridiculousness, and

19    I'm looking at you as someone who doesn't have the history

20    that Mr. Barmen has with this person, he is so emotional and

21    personally involved with this that he will go to the ends of

22    the earth to prove Dr. Thomas wrong and he is going to jump

23    the line and boom.

24         MR. MANNION:  Can we take the break now for lunch?

25         THE COURT:  Yes, I think we should.

1        MR. MANNION:  Thank you.

2        (Sidebar concluded.)

3        (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    1168

1              THE COURT:  Lunch break, ladies and gentleman.  Be

2    back at quarter to 2:00.  Thank you.

3              THE WITNESS:  So I am not to talk to anybody about

4    this case?

5              THE COURT:  Exactly.

6              THE WITNESS:  Mum's the word.  How about the

7    attorneys?

8              THE COURT:  Don't talk with them.

9              THE WITNESS:  No?

10             THE COURT:  No.

11             THE WITNESS:  All right.

12             THE COURT:  See you folks at quarter to 2:00.

13

14             (Lunch recess.)

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2              (In open court; outside the presence of the jury.)

3         THE COURT:  Are we ready?

4         MR. BARMEN:  Yes, Your Honor.

5         THE COURT:  Dr. Thomas, you can come up.

6         MR. McELFISH:  Sorry, Judge, we are ready.

7              (Witness takes stand.)

8              (Jury enters the courtroom.)

9         THE COURT:  Please be seated.

10        You may continue, Mr. Barmen.

11        MR. BARMEN:  Thank you, Your Honor.

12   RECROSS EXAMINATION

13   BY MR. BARMEN:

14   Q    Dr. Thomas, would you agree with me that no matter what

15   kind of testing you're doing on someone to try and determine a

16   treatment plan, it is important that the tests be valid?

17   A    Yeah.

18   Q    Okay.  Prior to you treating or taking on Mr. Bauta, you

19   didn't have any information regarding his pre-injury cognitive

20   function, did you?

21   A    Actually, it's noted in Dr. Honor's report, he had school

22   records and it looks like he was average.

23   Q    What do you consider to be an average student?

24   A    Well, I don't have his tables in front of me, but they

25   were between the 25th and 84th percentile.

1    Q    25th?

2    A    And 84th percentile or 16th and 84th percentile, rather.

3    Q    Did you ever review the school records yourself for Mr.

4    Bauta?

5    A    No.

6    Q    There wasn't any neuropsychological testing done prior to

7    the bus accident for to you review to get an idea of his

8    baseline; correct?

9    A    Not that I know of.

10   Q    Let's talk a little bit about the neuropsychological

11   testing that was done.  Prior to you ever treating Mr. Bauta,

12   he had had a battery of neuropsychological tests from Dr.

13   Honor and Dr. Morgan, the defense neuropsych expert; correct?

14   A    I think Morgan was after I started treatment, but I'm not

15   sure.

16   Q    Okay.  And actually, I think timing-wise, you're probably

17   right, but Dr. Honor had already done his before you treated

18   him; fair?

19   A    Fair.

20   Q    And you'd agree with me that Mr. Bauta showed a lack of

21   full effort, let's say, with the testing done for Dr. Honor?

22   A    That would be a proper way of characterizing it.

23   Q    Okay.  And he also showed a similar lack of full effort

24   on the test done by Mr. Morgan; true?

25   A    Yeah, I think so.

Thomas - recross - Barmen                1171

1  Q    And I think you already testified on direct on the first

2  set of neurological testing you had done by another neuropsych

3  in your office by Dr. --

4  A    Hoffman.

5  Q    -- Dr. Hoffman, again, he showed a similar lack of full

6  effort, let's say, fair?

7  A    Yes.

8  Q    So three tests, the initial tests that were done, one by

9  you, one by Dr. Honor and one by Dr. Morgan, showed similar

10  results in terms of Mr. Bauta level of effort, fair?

11  A    Yes.

12  Q    And I know you attribute the effort issues to Mr. Bauta's

13  pain; true?

14  A    More than pain.

15  Q    What else?

16  A    His fatigue, probably some cognitive problems to some

17  extent, some brain fog, and he said that when he sat for a

18  long period of time he would get so uncomfortable it's -- it

19  gets in the way of his thinking.

20  Q    You agree that the results of Dr. Honor's tests were such

21  that you believe it crossed the line into malingering?

22  A    No.  I don't think at any time he scored in the

23  malingering range.

24         MR. BARMEN:  Pull up 140 of depo three, please.

25         MR. McELFISH:  I'm sorry, depo three?

1          MR. BARMEN:  Yes, the November --

2          MR. McELFISH:  Got it.  Page?

3          MR. BARMEN:  140, please.  1 through 17.

4          MR. McELFISH:  I'm sorry.

5    Q    In your November deposition, did I ask the question well --

6    A    I don't see anything by the way.

7    Q    Try and tap the screen.

8    A    Got it.

9    Q    In the November 2017 deposition, did I ask you the

10   question --

11         MR. KIEFFER:  Objection.  Improper impeachment.

12         THE COURT:  Can I see the next page, please?  The

13   rest of the answer.

14         Sustained.

15   Q    You didn't tell me in November that the results of Dr.

16   Honor's neuropsychological testing crossed the line of

17   malingering?

18         MR. KIEFFER:  Objection.

19         Improper impeachment.

20         THE COURT:  I'm having a hard time following this.

21   Can you show me which exhibit it is in the book so I can read

22   it?

23         MR. BARMEN:  It might be easier this way, Your

24   Honor.

25         MR. McELFISH:  Judge, do you want the reporter?

1          MR. BARMEN:  It might be easier this way, Your

2     Honor.  Dr. Honors.

3          THE COURT:  All right.  You can, yes.

4          MR. BARMEN:  Thank you, Your Honor.

5     Q    Sir, look at page 140 of the deposition from November of

6     2011, specifically 9 and 10.

7     A    November 2011?

8     Q    November of 2017.

9     A    Oh, okay.

10    Q    Right in front of you there, page 140.

11    A    Okay.

12    Q    At line 9 and 10?

13    A    Uh-huh.

14    Q    You told me then that the results of Dr. Honor's

15    neuropsych test crossed the line of malingering; correct?

16    A    Well, that's what it says.  Was this one of those

17    deposition transcripts that I never got?  Because I would have

18    challenged that.

19    Q    Okay.  And that's fine.  But the point is --

20    A    But I don't even know what it means actually.

21    Q    I --

22    A    You mean that something in Honor's evaluation indicated

23    Jose Mr. Bauta was malingering?  Is that what you mean?

24    Q    No, sir.  No.  What I'm suggesting, based upon your

25    testimony, was you reviewed the results of Dr. Honor's

1   neuropsychological test and we already agreed it demonstrated

2   poor effort; right?

3   A    Okay.

4   Q    And the results were such that it even could have crossed

5   the line into malingering.  That's what you testified back in

6   November; true?

7   A    I'm not sure I did testify to that.

8   Q    That's fine.  The point is Dr. Honor's neuropsychological

9   test results were not valid because of the poor effort; fair?

10  A    No, that's not true.

11  Q    Did you not testify in the same deposition in November

12  that those test results were not valid?

13            MR. McELFISH:  Objection, improper impeachment.

14            THE COURT:  Overruled.

15  A    Do I answer that one?

16  Q    Yes.

17            THE COURT:  Yes.

18  A    Repeat the question.

19  Q    Did you not testify in November of 2017 that the results

20  of Dr. Honor's neuropsychological testifying were not valid?

21  A    I doubt I said that.

22            MR. BARMEN:  Can we go to page 141?  Can you pull up

23  the top of 141 with this, please.

24            What I want is lines 1 through 6 of 141.

25  Q    Do you agree that when you have results that demonstrate

Thomas - recross - Barmen                      1175

1   this type of poor effort you're not going to get valid

2   testing?

3          MR. KIEFFER:  Objection.  It's improper impeachment.

4   A    I don't know what you're referring to.

5   Q    We are talking about Dr. Honor's --

6   A    I don't think you are.  I think I need the previous page

7   to see what you're talking about.

8          MR. BARMEN:  Go to 140, the top of the page.

9   Q    Look at lines 1 through 6, were we not talking about the

10  validity test in Dr. Honor's neuropsychological battery?

11  A    You might have been talking about that yeah.

12  Q    Is that what your deposition transcript indicates there,

13  sir?

14  A    That's what it indicates.

15  Q    Okay.  Do you agree that when you have the type of poor

16  effort demonstrated by these tests that you're not going to

17  have valid test results?  That's all I'm asking.

18  A    No.  You're wrong.  You can have valid test results.

19  Q    So the valid test results would demonstrate that Mr.

20  Bauta was malingering?

21  A    Boy, you're really twisting this around.  No again.

22  Q    Do you think Dr. Honor's neuropsychological battery that

23  demonstrated poor effort was valid, yes or no?

24  A    Yes.

25  Q    Do you think that Dr. Morgan neuropsychological battery

1    that demonstrated poor effort was valid, yes or no?

2    A     Probably not.

3    Q     Do you think that the first neuropsychological battery

4    that you did that demonstrated poor effort was valid, yes or

5    no?

6    A     Yes.

7    Q     So despite the fact that the three results were

8    essentially identical, yours is valid, Dr. Honor's is valid,

9    and Dr. Morgan is invalid?

10   A     Yes.  Ask me why.

11   Q     We will get there.  I just want to make sure that we're

12   all on the same page.  That the same test results --

13   A     You have the same test results, but they're not even the

14   same test.

15   Q     Okay.  When you retested Mr. Bauta as you indicated at my

16   suggestion, the second set of neurological tests that you did,

17   you didn't do a full battery, did you?

18   A     I did a full battery, Halstead-Reitan Battery.

19   Q     That was a four-hour test; right?

20   A     Yes.

21   Q     But the initial test that Dr. Honor did and the initial

22   test that Dr. Morgan did were eight-hour tests; true?

23   A     Probation.

24   Q     And you're critical of Dr. Morgan for not breaking the

25   test up into two days because of this fatigue issue that you

Thomas - recross - Barmen                1177

1   talked about; right?

2   A    Correct.

3   Q    Okay.  When you're treating someone like Mr. Bauta or

4   anybody else, you expect them to be honest and forthright with

5   you, don't you?

6   A    Yes.

7   Q    And you believe Mr. Bauta was?

8   A    Yes.

9   Q    Mr. Bauta didn't tell you that Dr. Morgan gave him the

10  option to do the test over two days, did he?

11  A    He didn't tell me -- he said that he was not offered two

12  days to do the testing.  And if he were offered two days to do

13  the testing, he would have taken it.

14  Q    Okay.  We will come back to that, but despite the fact

15  that Dr. Honor did it over two days and Dr. Morgan didn't,

16  both tests indicated poor effort, we have already establish

17  that; right?

18  A    Correct.

19  Q    Okay.

20       MR. BARMEN:  Can we pull up, please, that 1120-173

21  or is that 412-0173.

22       MR. McELFISH:  017?

23       MR. BARMEN:  Three.  Small screens only.

24  Q    This is the consent regarding neuropsychological

25  evaluation services that Dr. Morgan presented to Mr. Bauta

Thomas - recross - Barmen                1178

1    prior to the testing.  You have seen this before; correct?

2          It was marked as an exhibit in one of your

3    depositions.

4    A    Yeah, but I don't know if I've seen the whole thing,

5    though.

6          MR. BARMEN:  Can we go to 0174, please.

7    Q    You will see that Mr. Bauta signed this on February 2,

8    2016; correct?

9    A    That's what it says.

10   Q    Okay.  Are you suggesting that you didn't see both of

11   these pages in your deposition?

12   A    Well, point me to aspect that you want me to pay

13   attention to.

14   Q    Right now I want you to answer the question that I just

15   asked you, sir.  Is it your position that you didn't see both

16   pages of these in your deposition?

17   A    I suppose I saw them.  I don't recall.

18         MR. BARMEN:  Go back to the first page, please.

19   Thank you.  Can you blowup the bottom where it says risks and

20   likely benefits, assessment and evaluation.

21   Q    You agree that this document that Mr. Bauta signed says

22   at the bottom if you become so tired that you prefer to finish

23   on other day, let us know?

24   A    I see that.

25   Q    And Mr. Bauta did sign this document?

1  A    He did, but it was -- there's a part of this that has

2  been forgotten.  Jose Bauta can't read and he was not given

3  this to out loud, as far as I know.  I don't know what

4  happened.  But if you go back and look at Steve Honor's scores

5  on the reading comprehension, Jose Bauta scores at less than

6  the first percentile on all reading comprehension measures.

7  So unless this was read to him, he might have just signed it

8  to be cooperative.

9          I know that's not smart to do in legal situations,

10 but it is very likely that he did not understand what he was

11 signing and he's also a cooperative person that he just wants

12 to finish things and go along with what's required.  But he

13 told me that at the noon break he had to take a pain pill and

14 he was out of it for the rest of the day.  I would, therefore,

15 consider most of Joel Morgan's testing as not valid.

16 Q    You believe your second round of testing was valid;

17 right?

18 A    Yes.

19 Q    And he had to read that test to do it, didn't he?

20 A    What test?

21 Q    The second neuropsychological test that you gave him that

22 you believe is valid, he had to read it to be able to complete

23 it; correct?

24 A    There's almost no reading in it.

25 Q    Okay.  Have you read Dr. Morgan's deposition?

1   A     No.

2   Q     When Mr. Bauta was telling you that he had to take a pain

3   pill on the break, did he tell you that he was verbally told

4   that he could split the test over two days if he chose to?

5   A     He said he was not told.

6   Q     Okay.  Well, Dr. Honor did split the test.

7   A     Yeah, and so did I.

8   Q     And there was poor effort shown on both of those, your

9   initial test anyway?

10  A     Initial, and by the way, the second testing, all my

11  effort test measures were completely valid.  He almost scored

12  perfectly and he was still brain-damaged.

13  Q     Let's talk about that for a minute.  The second set of

14  tests you gave, the second neuropsychological battery that you

15  gave him was after he indicated to you that he had been

16  informed that we had him under surveillance; true?

17  A     I'm not sure when I heard that.  In fact, I don't even

18  know that was really true.  I think I recall hearing something

19  about it, but I don't know when he told me.

20                (Continued on next page.)

21

22

23

24

25

1   BY MR. BARMEN:   (Continuing.)

2   Q    Do you agree with the proposition generally, if someone

3   is accused of exerting poor effort and then they're given an

4   opportunity to do something again, they might expert more

5   effort the second time?

6   A    Well, it obviously didn't happen with the first three

7   neuropsychological evaluations so that would not be true.

8   Q    Unless of course they realized they had been under

9   surveillance?

10  A    Nobody was in my office but me.  What do you mean by

11  surveillance?

12  Q    I'm not suggesting he was under surveillance in your

13  office, sir.

14  A    Then I don't know what you're talking about.

15  Q    Okay.  That's fair.  Do you agree that for you to really

16  determine how much treatment Mr. Bauta needs going forward you

17  would need to do a full battery of neuropsychological testing?

18  A    That would be a very good idea, yeah.

19  Q    And despite the fact that it would be a good idea and

20  could benefit him, you haven't done it, true?

21  A    No, because he's done an awful lot of testing so far and

22  I wouldn't put him under that unless -- I don't know.  I would

23  do it if I really could see -- I would probably do it too

24  because I would treat him no matter what.

25  Q    When we talked about it in November of 2017 you agreed

1  with me that it could benefit him.

2  A    What could benefit him?

3  Q    A full battery of testing him.

4  A    I'm not sure that even came up with me doing a full

5  battery.  We have plenty of neuropsychological and achievement

6  measures already and it might be a whole different ball game

7  after this case.

8  Q    Could we look at page 172 of depo three, please, from

9  November?  11/8/17, page 172.

10           Sir, do you recall me asking you --

11           MR. BARMEN:  Can you blow it up starting at line 3,

12  please?  It's a little small for me to see it.

13  Q    We were talking about how much treatment you thought

14  Mr. Bauta was going to need going forward from November of '17

15  and I asked you this question or did I ask you this question:

16  "And then what did you -- and then what did you evaluate after

17  those next 100 visits at $400 a visit to determine?"

18           Was your answer: "What did you mean, what did I

19  evaluate?"  Did I then ask you:  "To determine whether or not

20  he needs to continue treating with you for another year

21  because you say two to three years."

22           Did you not then answer:  "I would do an evaluation

23  like you've seen me do before but probably more elaborate."

24  Did I not then ask:  "What evaluation would you do that's more

25  elaborate?"  Did you not answer:  "I would give him reading,

Thomas - cross - Barmen                    1183

1    math and memory tests which I didn't do in this evaluation of

2    the first one because it's already done by Dr. Honor."

3              Did I not then ask you:  "But you know now that he

4    didn't put forth full effort when he was tested by Dr. Morgan?

5    Leave Dr. Morgan out of it."  Did you not then answer:

6    "Okay," to which I asked you:  "You know he didn't put forth

7    full effort with Honor yet you don't think it's relevant to

8    see what he could do on those tests when he did put forth full

9    effort."  To which you answered:  "You have it in front of you

10   how he did when he did put forth full effort and he's still

11   measured as having a brain injury."  I then asked:  "I don't

12   have it in front of me.  When did the image" -- I'm sorry,

13   strike that.

14             "I don't have it in front of me when he did the

15   image or the reading you're talking about because you didn't

16   give it to him, right?"  Your answer:  "Correction, I didn't

17   do that."  I then asked you:  "Didn't I?  You didn't think it

18   would be a benefit both you and him -- you need to let me

19   finish, I don't think -- you don't think it would benefit both

20   you and he, your patient, to see how he would score if he put

21   forth full effort?"  Did you then answer:  "It might be

22   beneficial"?

23             MR. KIEFFER:  Objection, improper impeachment.

24             THE COURT:  Overruled.  Can you answer the question?

25   A    I'm trying to figure out what you're getting at here.

Thomas - cross - Barmen                          1184

1  Q    I can start over --

2  A    Given more testing would be beneficial.

3  Q    And you didn't have a reason for not having done it;

4  correct?

5  A    Well, the reason is effort.  I want him to be in much

6  better shape so he can -- we can have some accurate scores

7  about his achievement tests.

8  Q    Okay.  Well, then, on page 74, starting at line 7, did I

9  not ask you:  "Again, you agree with me that it's possible you

10 haven't done it.  I don't understand why.  Explain it to me."

11 Did you not answer:  "I have no explanation"?

12 A    Okay.  That's what I answered, I guess.

13 Q    That's what it says there; right?

14 A    Yeah.

15 Q    So you had something you testified could benefit him and

16 you had no explanation for why you hadn't done it, true?

17 A    Well, I can give an explanation now.

18 Q    Is what I just said true, yes or no?

19 A    I will agree that that's apparently what I said.

20 Q    Isn't it true that you believe that doing that testing

21 could actually demonstrate whether he was capable of ever

22 going back to work?

23 A    No, I don't think so.

24 Q    Pull up 173 again, please.  Still on 173 starting at line

25 22, after you agreed it might be beneficial did I not ask you:

SN        OCR        RPR

1    "So why haven't you done it?"

2              THE COURT:  I want to see the next page.

3              MR. BARMEN:  Will you please pull up lines 1 through

4    5 on the next page?

5              THE COURT:  Sustained.  Do not read it.

6    BY MR. BARMEN:

7    Q    After your last deposition, did you ever talk to

8    Mr. Bauta about whether or not it might be beneficial for him

9    to try to get back in the workforce?

10             MR. KIEFFER:  Objection.

11             THE COURT:  Sustained.

12   Q    Do you agree with me that for someone with a brain injury

13   and cognitive dysfunction doing something to exercise your

14   brain could be beneficial to his betterment?

15   A    Yes.

16   Q    Is it still true that you believe that one of Mr. Bauta's

17   biggest impediments going forward are his memory issues?

18   A    No.

19   Q    What changed between November --

20   A    By the way, the correct answer is I don't know.  I'm not

21   saying he has or has not memory issues.  I just don't know the

22   assessment of it at the current time.

23   Q    Have you done something to test his memory since you

24   testified in November of 2017?

25   A    No.

1  Q    Are you aware of any treating physicians of Mr. Bauta

2  other than you questioning his long or short-term memory?

3  A    No.

4  Q    Do you agree neuropsychologically that theres consensus

5  that TBI patients reach a plateau and medical maximum

6  improvement within two years of injury?

7  A    Obviously I don't agree because I have improved him quite

8  beyond that span.

9  Q    Okay.  And that's based on what you showed earlier on

10 direct partially?

11 A    Well, it's my experience with him every week.

12 Q    He's gotten better?

13 A    Yes.

14 Q    But you still believe he is brain injured?

15 A    Oh, yes.

16 Q    And part of that belief is based on what you showed

17 earlier, parts of these qEEGs that you say demonstrate he's

18 improved from the last first to the last; isn't that --

19 A    And my second evaluation and I'm seeing him twice a week,

20 very often every week, and he has become better in his mood

21 and better in his conversation.  He's still very slow in

22 walking and experiences a fair amount of pain, but he's

23 better.

24 Q    You agree pain is subjective?

25 A    Maybe by current measures, but some -- you know, there

Thomas - cross - Barmen                    1187

1  may be ways in the near future, which I don't know and none of

2  us know, where we can be mere objective about pain.

3  Q    So yes you agree, as of now at least, pain is subjective,

4  true?

5  A    I'm not going to be pushed into a corner about that.  I'm

6  just going to not give an answer.

7  Q    I would ask that you answer the question, Doctor.

8  A    I don't know.  That's the answer.

9  Q    Okay.  Mr. Bauta never once told you he experienced

10 radiating pain, did he?

11 A    He might have, I don't recall.  I would ask where the

12 pain was and he would say his back, but he may have recorded

13 radiating pain, I don't recall.

14        MR. BARMEN:  Pull up page 33 of depo one, please.

15        MR. McELFISH:  Page and line?

16        MR. BARMEN:   33, line 23 on to line one of page 34.

17 A    Okay, so that's your question.

18 Q    Well, wait for the Judge, please.

19        THE COURT:  Okay, fine.

20        MR. KIEFFER:  Objection.  It's outside the scope of

21 his treatment.

22        THE COURT:  Overruled.

23 Q    Sir, on page 33 of your first deposition did I not ask

24 you starting at line 23:  "Okay, has he ever told you that

25 he's got pain that radiates into his extremities, whether it

SN        OCR        RPR

Thomas - redirect - Kieffer                1188

1   be his arms or his legs?"  Did you not answer:  "He has not

2   said that to me"?

3   A    I see that.

4   Q    That was your testimony in February of 2017; correct?

5   A    Yeah, I guess so.

6   Q    Doctor, you're not aware of any objective evidence of

7   brain injury to Mr. Bauta in a single medical record of his;

8   correct?

9   A    I haven't reviewed the records, so I don't know.

10  Q    As someone who is treating him for a brain injury, don't

11  you think it would be important to do?

12  A    Actually, it doesn't matter.  I make my own conclusions

13  and do my own treatment.

14  Q    You really didn't make a conclusion.  You determined he

15  was brain injured before you even met him.  We've established

16  that; right?

17  A    That's what you think.  I think you're dead wrong.  I did

18  my own tests, for God's sakes, and they're detailed tests in

19  ten different realms and I made my own conclusions with my own

20  tests.

21          MR. BARMEN:  All right.  Doctor.  I appreciate your

22  time.  I don't have any other questions for you.

23  REDIRECT EXAMINATION

24  BY MR. KIEFFER:

25  Q    Mr. Barmen asked you a question a moment ago about

Thomas - redirect - Kieffer                    1189

1    whether you had a record of Mr. Bauta making complaints to you

2    of pain that radiated to his extremity.  Do you recall that

3    question?

4    A    Yes.

5    Q    All right.  Now when you first started seeing Mr. Bauta

6    he had already had spine surgery by that point in time, true?

7    A    Actually more than one, but yeah.

8    Q    And you knew that.  You recorded that in your records in

9    perhaps I think that first visit with him; correct?

10   A    Correct.

11   Q    So if Mr. Bauta had made complaints of pain radiating to

12   his extremity months before, prior to even having spine

13   surgery, that's not anything you would have been aware of,

14   true?

15            MR. BARMEN:  Objection.

16            THE COURT:  Overruled.

17            THE WITNESS:  So I don't answer?

18            THE COURT:  You can answer.

19   A    What was the question again?

20   Q    If Mr. Bauta had made complaints of pain radiating to his

21   extremities, lower extremities, months before he ever saw you

22   for the first time and before he ever had surgery on his

23   spine, that's not anything that you would necessarily be aware

24   of; correct?

25   A    Well, yeah -- correct.  I was -- I don't remember him

1   saying that and if I would have heard it, it would have

2   indicated a probable other kind of pathology.  So maybe more

3   of a pinched nerve in the column that would affect one side

4   more than another.  I don't -- I do not recall ever hearing

5   about radiating pain.  But also you'd have to know exactly

6   what he meant.

7   Q    Sure.

8   A    Would it mean one side, both sides, which is very

9   different than one side?  So --

10  Q    Fair enough.  When you would see Mr. Bauta I take it you

11  were interested in getting information from him about the

12  nature of his pain in the here and now, not necessarily

13  physical pain he had experienced months before?

14  A    Correct.  And that's exactly what you treat.  You treat

15  the here and now.  You don't need to know too much anything

16  else.

17  Q    You treat the patient that's in front of you?

18  A    Correct.

19  Q    You were giving some responses to Mr. Barman about effort

20  testing and I want to follow up on one of those issues.  Did

21  you say that Mr. Bauta scored well on the second set of tests,

22  the Halstead Reitan battery that you gave him, in terms of the

23  efforts measures?

24  A    The effort measure in any neuropsychological battery is

25  quite a separate test.  It's a test unto itself and there are

Thomas - redirect - Kieffer                    1191

1   a number of choices that you can have.  In fact, it's a bit of

2   a cottage industry.  There are six or seven common ones.  The

3   Halstead Reitan battery is distinct.  It doesn't have effort

4   testing per se except that if the pattern of the test scores

5   reflects a true TBI patient, traumatic brain injury patient,

6   on the second evaluation, the Victoria Symptom Validity Test,

7   VSVT, he scored on all three for the measures almost

8   perfectly.  And yet on the Halstead Reitan battery he still

9   scored as brain damaged.  So the effort was excellent.  He was

10  free of a lot more of the pain and fatigue and I would say

11  because of my treatment and so it looked like he improved and

12  he was -- he no longer had this label of imperfect effort or,

13  you know, less effort and, so, it looks like we have a real

14  picture.

15  Q    And this effort testing that you just referenced goes by

16  the acronym VSVT?

17  A    Yes.

18  Q    And the second set of those results was improved and you

19  attribute that to the benefit from the treatment that you

20  provided?

21  A    Yeah, but I'm sure there are other factors involved,

22  maybe an improved relationship with his daughters and getting

23  to be more active in his life and so on.

24  Q    Doctor, on this issue of a lien that many questions were

25  asked on, did you undertake treatment with Mr. Bauta because

1  in your opinion you were the only person who might be willing

2  to take him on as a patient without necessarily getting paid

3  and give him some benefit?

4  A    Well, that's true, but also I'm probably one of the few

5  neuropsychologist, in fact the only one I know in New York

6  City or even the boroughs, who does biofeedback and

7  biofeedback of the brain.  The vast majority of

8  neuropsychologists only do testing, probably 95 percent, maybe

9  more and for some reason they just don't look into treatment

10  models.  There is another discipline called Cognitive

11  Remediation, which I have not done with Mr. Bauta because I

12  want to get his pain down, I want to get him to sleep on a

13  regular basis and when that's kind of settled then I think we

14  can work on some cognitive exercises.  There are not that many

15  people who do that as well, but there might be 20 here in New

16  York City.

17  Q    You took his case on because you thought you might be

18  able to help him?

19  A    Correct.

20  Q    And in your opinion you have helped him?

21  A    Yes.

22  Q    And you took this case on because you believed you might

23  be able to help him, even though you might not get compensated

24  for your services?

25  A    Yes, and that's okay.  I'd be better about it if he feels

Cummings - direct - McElfish                1193

1  better.

2  Q    An you're willing to treat him, even if you don't end up

3  getting paid at least until such time in your professional

4  judgment he's reached a plateau in his recovery?

5  A    Correct.

6  Q    Thank you, doctor.  Nothing further.

7          MR. BARMEN:  No questions.

8          THE COURT:  Dr. Thomas, thank you very much.  Thank

9  you, you are excused.

10         (Witness excused.)

11         MR. McELFISH:  At this time, Your Honor, the

12  plaintiff calls life care planner Wendy Cummings.

13         THE COURT:  Please raise your right hand.

14         (Witness sworn/affirmed.)

15         THE COURT:  Please be seated.  Tell the Court

16  reporter your name and spell it please.

17         THE WITNESS:  My name is Wendy Cummings, W-E-N-D-Y

18  C-U-M-M-I-N-G-S.

19  **WENDY CUMMINGS**,

20          called by the Plaintiff, having been

21          first duly sworn, was examined and testified

22          as follows:

23  DIRECT EXAMINATION

24  BY MR. McELFISH:

25  Q    Good afternoon, Ms. Cummings.

Cummings - direct - McElfish                  1194

1    A    Yes.

2    Q    You are here by way of subpoena; correct?

3    A    Correct.

4    Q    My law firm for the plaintiff subpoenaed your appearance

5    today and you've complied and we thank you.

6    A    You're welcome.

7    Q    And you recall me, for better or worse, from your

8    deposition; right?

9    A    I do.

10   Q    Okay.  All right.  Now, my recollection of your

11   background is that you had primarily a psychology background;

12   is that correct?

13   A    Not primarily, but I have a psychology background and I'm

14   a certified life care planner.

15   Q    Understood and somewhere since 2001 or so I believe you

16   worked with a Ms. Madsen is it?

17             MR. BARMEN:  Objection, leading.

18             THE COURT:  I'll allow some leading overruled.

19   A    Would you repeat that, please.

20   Q    Somewhere around I guess 2000, early 2000s you worked

21   with a Ms. Madsen?

22   A    I was working with Jane Madsen at that time, yes.

23   Q    She's also a life care planner?

24   A    Yes.

25   Q    And what percentage of her work is for defense?

Cummings - direct - McElfish                1195

1  A    Her work, when I was working for her, was about 70/30

2  defense/plaintiff.

3  Q    And, so, for how many years did you work for Ms. Madsen

4  who did 70 percent defense work?

5  A    I worked for her from 1994 until 2016.

6  Q    And during that time, did you prepare life care plans for

7  her 70 percent to defense?

8  A    I'm not sure I understand that question.

9  Q    When you worked with her you prepared life care plans;

10  right?

11  A    Yes, I did.

12        THE COURT:  Of the life care plans that you

13  prepared, what percentage were for defendants, what percentage

14  were for plaintiffs?

15        THE WITNESS:  My percentage fluctuated and sometimes

16  it would be 60/40, sometimes it would be 70/30.

17        THE COURT:  In that range?

18        THE WITNESS:  In that range, yes.

19  BY MR. McELFISH:

20  Q    And when you say -- just to be clear when you say 70/30,

21  for example, you mean 70 percent in favor of defense, 30

22  percent for plaintiffs?

23  A    Could you rephrase that, please.

24  Q    Yeah, in other words, the 70 percent is attached to the

25  defense and the 30 percent goes to the plaintiff; correct?

Cummings - direct - McElfish                     1196

1    A    Yes.

2    Q    Okay.

3         MR. McELFISH:  Small screens, Your Honor.

4    Q    Okay.  Okay, Ms. Cummings, what I would like you to do is

5    direct your attention to the small screens in front of you

6    there.  That's a copy of your curriculum vitae, true?

7    A    Actually, there's nothing on it.  Oh, there it is.  Yes,

8    that is.

9    Q    That's a copy of the curriculum vitae that was attached

10   to your deposition; right?

11   A    Right.

12   Q    All right.  I'd like you just to go over and I --

13   withdrawn.  I went to the second page of that which for the

14   record is 432-0103.  I'd like to look at publications

15   withdrawn --

16         I'd like to look at Memberships and Professional

17   Associations, P 32-0303 for ID, okay?

18   A    Yes.

19

20         (Continued on the following page.)

21

22

23

24

25

Cummings - direct - McElfish                    1197

1    EXAMINATION CONTINUES

2    BY MR. McELFISH:

3    Q    All right.  Tell the jury the three professional

4    associations that you were involved in.

5    A    The three that are listed on my C.V. are the

6    International Academy of Rehabilitation Professionals, the

7    American Psychological Association, and the Connecticut

8    Psychological Association.

9    Q    All right.  And the publications are both for psychology,

10   right?

11   A    That is correct.

12   Q    So you did not present in the field of lifecare planning

13   or rehabilitation?

14   A    No.

15   Q    And the presentations that you've given relate to

16   psychology, correct?

17   A    Correct.

18   Q    You did not present as part of your formal education and

19   training in lifecare planning?

20   A    Is that something I already answered?  I don't know.  Is

21   that a new question?

22   Q    Let me make it a better question.

23         So in your presentations, you also gave psychology

24   presentations and not lifecare planning?

25   A    Correct.

Cummings - direct - McElfish                    1198

1   Q     Except there is one in November of '98 that you appear to

2   have given to the Medical Interinsurance Exchange in

3   Princeton, New Jersey, right?

4   A     I did that, correct.

5   Q     And that was for claims professionals?

6   A     That was for doctors and medical professionals, case

7   managers.

8   Q     For insurance companies, right?

9   A     Yes, I think so.

10  Q     Okay.

11  A     It was a while ago.

12  Q     Okay.  Now, in your current practice, you mostly do your

13  lifecare plans for defense, correct?

14  A     No, not -- not currently.

15  Q     At the time of your deposition, I believe it was 70/30.

16  A     It was, and it's now just about 50/50.

17  Q     Okay.  So what I would like to do is, let's take a look

18  at your report for a minute, and that appears right here

19  (indicating)?

20          MR. McELFISH:  432-0080 for ID is on the small

21  screens.

22  BY MR. McELFISH:

23  Q     Do you see it?

24  A     I see it.

25  Q     Is that your report?

SAM      OCR      RMR      CRR      RPR

Cummings - direct - McElfish                    1199

1    A    Yes, it.

2    Q    So you were retained by the defense law firm in this

3    case, Marshall, Dennehey, Warner, Coleman and Goggin, right?

4    A    Yes.

5    Q    And you authored a report dated October 13th of 2016 to

6    Mr. Harold Moroknek, right here (indicating)?

7    A    Yes.

8    Q    Had you worked for Mr. Moroknek before?

9    A    No.

10   Q    You had worked for Lewis Brisbois before, correct?

11   A    Yes.

12   Q    The other law firm representing the defendant in this

13   case?

14   A    Yes.

15   Q    How many times?

16   A    Twice.

17   Q    Okay.  Now, in your report, you -- and in doing the work

18   for the defense law firm in this case, you -- leading up to

19   your deposition, you basically went and take a look through

20   all the medical records, right?

21   A    Right.

22   Q    And to try to save some time, Ms. Cummings, you went

23   through all the hospital records and you went through all the

24   treating doctors' records, and even some of the experts'

25   reports; true?

1  A    Yes.

2  Q    All right.  You were provided by the defense attorneys in

3  this case the expert reports of a neurologist, Dr. Aaron

4  Rabin, right?

5  A    Yes.

6  Q    And a Dr. Andrew Casden?

7  A    Yes.

8  Q    He's an orthopedic spine specialist for the defense,

9  right?

10  A    Yes.

11  Q    Did you review the radiological opinions of James

12  Provenzale, the radiologist that the defense hired in the

13  case?

14  A    I did not.

15  Q    And I do believe you reviewed the opinions of a Dr. Joel

16  Morgan, who is a neuropsychologist for the defense in this

17  case?

18  A    Yes.

19  Q    And as a result of reviewing their expert -- withdrawn.

20          Do you know who Dr. Fardad Mobin is?

21  A    Yes.

22  Q    You did not review his deposition in this case, correct?

23  A    I've reviewed it, yes.

24  Q    Well, since your deposition, you may have reviewed it,

25  right?

1   A    Correct.

2   Q    You didn't review it back when you were deposed in -- a

3   year ago?

4   A    That's correct.

5   Q    And even at that time, you had not seen Dr. Mobin's

6   reports, true?

7   A    I had seen his reports.

8   Q    Now, were you compensated for your time here today?

9   A    Yes.

10  Q    And who paid you?

11  A    Well, I will be compensated; I'm sorry.

12  Q    Who is going to pay you?

13  A    Marshall Dennehey.

14  Q    And how much are they going to pay you?

15  A    For today?

16  Q    Uh-hum.

17  A    $3,500.

18  Q    Okay.  And since you have been retained in this case

19  prior to October of 2016, how much -- how much have you billed

20  them for your services?

21  A    Approximately 24,000.

22  Q    And that was for the review of the medical records and

23  the correspondence back and forth, as well as a meeting that

24  you had with Mr. Bauta, correct?

25  A    It was for review of records and evaluation of Mr. Bauta,

Cummings - direct - McElfish                     1202

1    yes.

2    Q    Now, you got a chance to meet with Mr. Bauta and sit down

3    with him and discuss this case with him, right?

4    A    To discuss his complaints, yes.

5    Q    Okay.  And I believe I'm correct, and you'll -- please

6    feel free to let me know if I'm not right, that you did that

7    after you reviewed all the medical records?

8    A    Not all of them.

9    Q    Are you able to say here, though, in front of the jury

10   which ones you had reviewed before seeing Mr. Bauta, and those

11   that you had not?

12   A    No.

13   Q    Okay.  Are you able to say whether or not prior to

14   sitting down with Mr. Bauta, you reviewed more than half the

15   records or less?

16   A    I can't really, you know, quantify it in that way.  I can

17   say that I knew what his complaints were from the records I

18   had reviewed.

19   Q    And where did you have a meeting with Mr. Bauta?

20   A    At Marshall Dennehey's office in lower Manhattan.

21   Q    Down on Pine Street?

22   A    Right.

23   Q    So were there any of the defense attorneys at the

24   meeting?

25   A    No.

1  Q     How long was the meeting you had with Mr. Bauta?

2  A     It was about an hour.

3  Q     One-on-one?

4  A     Yes.

5  Q     Did he arrive in a cane -- with a cane?

6  A     He had a cane with him, yes.

7  Q     Okay.  And what was the general nature of the discussion

8  between you and Mr. Bauta?

9  A     The discussion was about what his complaints are, what he

10 felt limited in doing due to those complaints.

11 Q     And what do you remember about it?

12 A     I remember that he said that he had back pain and

13 stiffness that made it difficult for him to walk, and that's

14 why he carried a cane with him.  And he had neck pain that

15 made it difficult for him to move his head up and down and

16 sideways.

17 Q     Now, according to my notes, and if there's something that

18 you need to refresh your recollection, we can pull it up;

19 there is no problem with that.

20        According to my notes, you had this meeting with

21 Mr. Bauta in January of 2016.  Does that sound right?

22 A     Yes.

23 Q     And to your understanding, was that about six or seven

24 months or so after he had had or undergone double-level back

25 fusion?

1  A    Yes.

2  Q    Okay.  So at the time that you were interviewing him, he

3  had already undergone the surgery, and so he was in a

4  post-surgical state, if you will?

5  A    Yes.

6  Q    What else, if anything, over that hour did you and

7  Mr. Bauta talk about?

8  A    We talked about a typical day for him.

9  Q    Let's stop there.  And if you don't mind, we'll go

10  through each one.

11        What did he tell you about a typical day?

12  A    He told me that on a typical day, he wakes up at 12:30

13  p.m., and then sits in bed for a couple of hours more because

14  he feels pain and stiffness in his low back.

15  Q    Now, as part of the $24,000 that you were paid to review

16  the medical records, Ms. Cummings, have you seen any evidence

17  to the contrary of how long it takes him to get ready?

18  A    I'm not sure I understand the question.

19  Q    I'm not sure I do.  I apologize.  Let me try that again.

20        In the medical records anywhere that you reviewed

21  and that you were paid for, did you see any evidence that

22  contradicted what he told you about how long it took him to

23  get dressed?

24  A    Well, the records spoke to his complaints, but they

25  didn't quantify or qualify his activities of daily living and

Cummings - direct - McElfish                    1205

1   the difficulty he reported with them.

2   Q    Okay.  You didn't see in Dr. Winn's records and in

3   Dr. Cordiale's records his restriction of motion and his

4   restrictions on daily living?

5            MR. BARMEN:  Objection.

6            THE COURT:  Overruled.

7   A    I saw that their records that talked about his diagnoses

8   that they had put forth and the complaints that he had of

9   stiffness and pain, but it didn't speak to the typical day

10  scenario, as I was speaking about.

11  Q    Okay, other than the length of time it would take him to

12  get dressed and get ready and things of that nature, what else

13  did you ask him about?

14  A    I asked him about what equipment he uses.  I asked him

15  about what medication he's on.  And I asked him to describe

16  for me his complaints, and how they affected his life at that

17  time.

18  Q    Okay, if you don't mind stopping there.

19           And it's a lot of information, so if you need your

20  report, I can put it up on the screen to refresh your

21  recollection.

22           What did he say about equipment?  What equipment was

23  he needing at that time?

24  A    He had a cane, and that was -- and he had a spinal cord

25  bone growth stimulator because he was post-surgery.

1    Q    And do you know for how long he had to use that?

2    A    He had used that for several months before I saw him.  I

3    don't know how long he used it for afterwards.

4    Q    You've evaluated other people with spine surgery,

5    Ms. Cummings?

6    A    Yes.

7    Q    Is a spinal stimulator something that's consistent with

8    what you've seen in other patients?

9    A    I -- I want to correct.  It wasn't a spinal stimulator,

10   like a spinal cord stimulator.  It was something to promote

11   bone growth for healing after the surgery.

12   Q    Let me then -- let me correct then the question, because

13   your answer -- you are correct, I need to ask a better

14   question.

15        Was the equipment -- a bone growth stimulator, in

16   your experience in the other patients you've seen, is

17   typically used for fusions, where the bone is fused?

18        MR. BARMEN:  Objection.

19        THE COURT:  Overruled.

20   A    I think that's a medical question.  No, I haven't --

21   Q    No problem, okay.  All right.

22        And on the medications, what was it he had let you

23   know he was taking?

24   A    He was taking Tizanidine, which is a muscle relaxant.

25   And at times, he was taking Ibuprofen.

Cummings - direct - McElfish                    1207

1   Q    Does Tizanidine, to your knowledge, if you know, make you

2   tired?

3   A    I don't know.

4   Q    Other than equipment and medication, there was one more

5   category you just testified to a minute ago that you inquired

6   on, and I didn't write it down.

7        Can you remind me?  There was something right after

8   medication?

9        Let me ask it this way:

10        Other than equipment and medication, what else did

11   you discuss with him at that visit?

12   A    The typical day, and how his subjective complaints play

13   out in his life.

14   Q    Were you able to get an understanding from him,

15   Ms. Cummings, at that time, as to where he was having pain?

16   A    Yes, he indicated in his low back area.

17   Q    Okay.  And I think you also mentioned that he mentioned

18   his neck?

19   A    And his neck.

20   Q    And did he discuss emotional issues with you --

21   particularly given that you're a psychologist, did he discuss

22   emotional issues with you from the accident?

23   A    Not in any depth.  He said that he felt that -- that was

24   part of his complaint, was that he felt that he was having a

25   difficult time adjusting to his limitations.

1  Q     And being that you have a psychology background, did you

2  inquire further as to cognitive issues and emotional issues?

3  A     I did not inquire further.  Cognitive is not my field.

4  Q     Fair.  Did you inquire into psychological issues and

5  emotional issues?

6  A     I inquired as to whether he was receiving treatment at

7  that time.

8  Q     And what was your understanding, Ms. Cummings, as to

9  whether he was or was not at that time?

10 A     He said that he was not receiving psychological treatment

11 at that time.

12 Q     And have you since reviewed the records of Dr. James

13 Thomas?

14 A     Yes.

15 Q     And to your understanding, he was treating at that time?

16         MR. BARMEN:  Objection.

17         THE COURT:  Overruled.  Do you know?

18 A     At what time are you referring to?

19 Q     In or around January of '16, when you were visiting with

20 him.

21 A     I'd have to look at Dr. Thomas's records again to confirm

22 that or not.

23 Q     Okay.  We have covered the equipment, medication,

24 difficulty in daily living.

25         Before we go on, with respect to the difficulty of

Cummings - direct - McElfish                    1209

1    daily living, did you get any more specific with him after he

2    began to discuss with you how long it takes to get dressed,

3    for instance?  Did you discuss other kinds of difficulties

4    with daily living?

5    A    Yes.

6    Q    Please tell the jury about it.

7    A    Yes.  He described that he had -- waking up at 12:30, the

8    staying in bed for two hours because of pain and stiffness in

9    the low back.  And he described that he would take a shower

10   after those two hours and then, perhaps -- or actually more

11   often than not go back to bed after the shower.

12   Q    And to your recollection, does he say why?

13   A    He said because of pain and stiffness in his low back.

14   Q    Anything else he described to you in that meeting about

15   his difficulties with daily living, that comes to mind?

16   A    Just give me a moment to think.

17        (Pause.)

18   A    He said that he was independent with activities of daily

19   living, and they took long -- a long time for him to do them.

20   Q    Anything else about difficulties with daily living?  I

21   want to make sure I cover what you covered with Mr. Bauta

22   before I move on.

23        Anything else?

24   A    I think that's it.

25   Q    Okay.  And other than activities with daily living,

1  equipment, medication and the other items we've discussed,

2  what else did you discuss with Mr. Bauta during that hour?

3  A    I think that covers it.

4  Q    All right.  And did you take notes during that meeting?

5  A    I did.

6  Q    And I would assume, and correct me if I'm wrong, you took

7  the notes and made them into your report for Mr. Moroknek?

8  A    Yes, I synthesized them into my report.

9  Q    And did you have any discussions with either Mr. Moroknek

10 or Mr. Saal or Mr. Barmen or any of the attorneys for the

11 defense in this case?

12 A    Pardon, yes.

13 Q    And what did you tell them?

14 A    I'm not clear on that question.

15 Q    Okay.  Did you have discussions with them, for instance,

16 about the meeting you had with Mr. Bauta in January of '16?

17 A    Yes.

18 Q    And what did you tell them?

19 A    I told them, basically, what I just told you.

20 Q    Okay.  Did you let them know that you were going to make

21 recommendations as to future lifecare for Mr. Bauta?

22 A    Well, I was asked to make a lifecare plan for him,

23 assuming that everything in the records and in my interview of

24 him was true, and do a worst-case scenario so they could have

25 an idea of what numbers they would be looking at going

1  forward.

2           MR. McELFISH:  Your Honor, may I have that answer

3  read back?

4           THE COURT:  Yes.

5           (Record read)

6  BY MR. McELFISH:

7  Q    Okay.  And how many of those conversations have you had

8  with the attorneys for the defense?  It doesn't matter to me

9  who you spoke to, which one of them.  How many of those

10 conversations did you have with them?

11          MR. BARMEN:  Objection.  What point in time?

12          THE COURT:  It is a good point.

13          MR. McELFISH:  All right.

14 BY MR. McELFISH:

15 Q    Let's focus it in on just, for instance, the meeting in

16 of January of 2016 or thereabouts, in that area.

17          How many conversations did you have with

18 Mr. Moroknek or the attorneys for the defense about your

19 opinions?

20 A    I had more than one, but I don't have a count of how many

21 times.

22 Q    And are you able to say for the jury what was discussed

23 in the conversations, other than what you've already said?

24 A    That is what was discussed.

25 Q    All right.  And ultimately -- withdrawn.

Cummings - direct - McElfish                    1212

1          What was the scope of your retention?  What were you
2     asked to do in the beginning, before you did anything?
3     A    I was asked to do a lifecare plan that was objective and
4     reasonable and assumed the worst-case scenario, and put
5     numbers to the future costs of items arising from that
6     worst-case scenario.
7     Q    Now, in your report -- you say nowhere in your report
8     that is a worst-case scenario, do you?
9     A    I don't say that in my report, no.
10    Q    So if it were a worst-case scenario and you meant that,
11    you would want to document that; would you not?
12               MR. BARMEN:  Objection.
13               THE COURT:  Overruled.
14               You can answer the question.
15    A    I would not document that.
16    Q    Okay.  Well, you didn't create any other lifecare plans
17    or any other reports for something less than a worst-case
18    scenario?
19    A    No, I did not.
20    Q    Did you verbally discuss your opinions with the attorneys
21    before you issued the report?
22    A    Yes.
23    Q    And did they ask you to change or alter your opinion in
24    any way based on that discussion?
25    A    No.

1           MR. McELFISH:  So here is what we are going to do

2    now, we will go -- for the Court, small screens -- counsel, we

3    will go to 432-96.

4           MR. BARMEN:  Could you give me a page number of the

5    report, counsel, because I am looking at a different Bates

6    number.

7           MR. McELFISH:  Sure.  It's 432-96 in the exhibits

8    and on the report, it's 17 of 21.

9           MR. BARMEN:  Thank you.

10          MR. McELFISH:  You're welcome.

11   BY MR. McELFISH:

12   Q    Now, before I get to this exhibit, Ms. Cummings, you read

13   all the records, except for Dr. Mobin's deposition?

14          MR. BARMEN:  Objection.

15   Q    And you met with Mr. Bauta --

16          THE COURT:  Overruled.

17   Q    You met with Mr. Bauta.  Did you do anything else within

18   the scope of your retention before you put pen to paper and

19   typed up your report?

20   A    I reviewed the records.  I evaluated Mr. Bauta.  And I

21   worked up the items that would be based on his subjective

22   complaints, and then put all that in my report.

23   Q    When you -- when you were formulating your opinion as to

24   what the lifecare needs were going to be, did you consider

25   such things in the reports of the treating doctors, such as

Cummings - direct - McElfish                          1214

1   objective testing?

2   A    I'm not sure what you mean.

3   Q    It's a little vague, but for instance, objective testing

4   by the chiropractors might be straight leg tests, or the

5   Braggard's test, or other kinds of tests that revealed various

6   medical issues --

7              MR. BARMEN:  Objection.

8   Q    -- Did you consider those?

9              THE COURT:  Sustained.

10  BY MR. McELFISH:

11  Q    Have you spoken to the attorneys for the defense in the

12  past week about your testimony?

13  A    Yes.

14  Q    Have they provided you with daily transcripts of the

15  witnesses that have appeared and testified here before the

16  jury, such as Dr. McGowan?

17  A    No.

18  Q    Dr. Winn?

19  A    No.

20  Q    Dr. Russo?

21  A    No.

22  Q    Dr. Goldman?

23  A    No.

24  Q    Did you ask for those daily transcripts?

25  A    No.

1   Q    I would make the assumption that prior to preparing your

2   report, you also did some research as to the pricing for the

3   items you are going to put into your lifecare plan?

4   A    Yes.

5   Q    And I believe you used some fee book; I don't -- is it

6   Optum, was it Optum that you used?

7   A    No.

8   Q    What did you use?

9   A    I didn't use a book, I used a program:  Physicians Fee

10  Reference.

11  Q    Is that a software program?

12  A    Yes.

13  Q    Have you heard of FairHealth.org?

14  A    Yes.

15  Q    Is that a reliable database, in your view?

16  A    Yes.

17  Q    Is there any reason why you chose to use the Physicians

18  Fee software as opposed to FairHealth.org?

19  A    I used the Physicians Fee Reference because

20  FairHealth.org was not available to me at that time.

21  Q    Because it requires a private license?

22  A    No, it just wasn't -- it wasn't spoken of within my

23  professional groups, and so I was actually not aware of it.

24  Q    But now you are aware that FairHealth.org is a national

25  database for billing, coding and pricing?

Cummings - direct - McElfish                    1216

1   A    Yes.

2   Q    And you also understand that FairHealth.org requires a

3   private license in order to be able to access the information?

4            MR. BARMEN:  Objection.

5            THE COURT:  Overruled.

6   A    I am really not clear on if it's a private license.  I do

7   know that I purchased the ability to use that program.

8   Q    You have purchased the ability to use FairHealth?

9   A    Yes.

10  Q    When did you do that?

11  A    I did that in -- I'm not sure when I did that, but it was

12  after I wrote this lifecare plan.

13  Q    Okay.  You said earlier that you had not reviewed

14  Dr. Mobin's deposition at the time of your report, but you

15  have since reviewed it before your trial testimony; is that

16  what you said, or did I mishear that?

17  A    That's what I said.

18  Q    Did you see in Dr. Mobin's deposition that the pricing he

19  used for the future care was based on FairHealth.org?

20  A    I saw that he uses that.  It seemed to me that he uses it

21  in his practice, because I don't think he put forth projected

22  numbers.

23  Q    But he indicated in his testimony that's the database he

24  relies upon?

25            MR. BARMEN:  Objection.

1        THE COURT:  Overruled.

2   A    For his office billing, yes.

3   Q    I'm sorry I missed the date, Ms. Cummings.  When did you

4   begin using FairHealth?

5   A    I didn't give you a date because I don't recall.

6   Q    I apologize.  Can you give us a ballpark?

7   A    Well, as I said, it was after I wrote this report,

8   somewhere between there and now.  I'd say I've been using it

9   over a year.

10  Q    Okay.  And since beginning to use FairHealth.org, did you

11  go back at any point and reassess the numbers that you have in

12  this case based on that database?

13  A    No.

14  Q    Do you still use this Physicians Fee software, or do you

15  exclusively use FairHealth.org now?

16  A    I use FairHealth.org now.

17  Q    Okay.  Let's go to 432-0096 for ID for Mr. Barmen, at 17

18  of 21.

19           It's on the small screens, Ms. Cummings.

20  A    I see it.

21  Q    You came up with a lifecare plan for Mr. Bauta, correct?

22  A    Correct.

23  Q    And you broke it down in a couple of different areas, the

24  first of which was what's referred to as one-time costs?

25  A    Yes.   (Continued on the following page.)

Cummings - direct - McElfish                    1218

1    DIRECT EXAMINATION

2    BY MR. McELFISH: (Continuing)

3    Q    Okay.  And then if we go to the next page, which is 0097

4    for ID, we have what's referred to as annual costs.

5    A    My page hadn't flipped, but, yes.

6    Q    Apologize.  How's that?

7    A    Yes.

8    Q    Explain the difference to the jury, please.

9    A    The one-time costs are costs that will be used over the

10   short term, within the first year or two, and they're not

11   going to be repeating year after year throughout the life

12   expectancy as are the annual costs.

13   Q    Okay.  So one is a one-time shot and the other repeats

14   over the years?

15   A    Yes.

16   Q    When you say over the years, you picked a life expectancy

17   over how many years it would occur; right?

18   A    I didn't pick one.  I just used the national statistics

19   to get that information.

20   Q    And what was the ballpark of the life expectancy over

21   which the annual cost would project?

22   A    38 years.

23   Q    Okay.  Now, before I get to the specifics of the exhibit,

24   I just want to go back and ask you, you told Mr. Barmen that

25   if you believed what you -- I'm sorry, not Mr. Barmen.  You

1    told Mr. Moroknek that if what you read in the report was true

2    and if what you heard from Mr. Bauta was true, you would rely

3    upon that information to prepare the life care plan?

4    A    To prepare a worst-case scenario life care plan assuming

5    everything was true.

6    Q    Assuming everything was true, okay.  And based on

7    assuming everything was true, that is what you prepared, these

8    two exhibits?

9    A    The annual costs and the one-time costs?

10   Q    Yes.

11   A    Yes.

12   Q    Now, with respect to the physical therapy, which

13   according to your report is a one-time cost, how many sessions

14   did you think he needed?

15   A    From the records, I understood that he had been having

16   treatment and I observed and I calculated how many he had

17   historically and I came up with a number of 50 sessions

18   because it -- over the years he had had more than 50 sessions

19   and he had not been -- let me just think about this.  And he

20   -- and I didn't know -- I didn't have up to date records from

21   PT Dr. Vasile to have his projections going forward, so I had

22   to use my best judgment based on what I learned from the

23   records.

24   Q    Okay.  But to be clear, Ms. Cummings, if you did not feel

25   as a life care planner based upon the records and meeting Mr.

Cummings - direct - McElfish                    1220

1  Bauta that he did not need any physical therapy, you would not

2  have prepared it in your plan or included it?

3  A    Well, I have to say I relied on the doctors and Mr.

4  Bauta's subjective complaints to the doctors and to me.  I

5  didn't, you know, decide on my own he needs physical therapy

6  because that's a medical question.

7  Q    Fair, but that would then presume there was no doctor

8  that said he needed none?

9              MR. BARMEN:  Objection.

10             MR. McELFISH:  Let me withdraw that.  It was a

11 little awkward.

12 Q    If you reviewed records, Ms. Cummings, that said that Mr.

13 Bauta did not need future therapy, you would not have put it

14 in your plan?

15             MR. BARMEN:  Objection.

16             THE COURT:  If you had seen records, medical records

17 that said he did not need physical therapy, would you have put

18 physical therapy in your plan?

19             THE WITNESS:  You're asking me?

20             THE COURT:  Yes.

21             THE WITNESS:  I would not -- I base my opinions on

22 the entirety of the record, and if there were one record that

23 said he didn't need physical therapy, I would not rely only on

24 that record and not give him physical therapy because my task

25 was to do a worst-case scenario based on his complaints --

Cummings - direct - McElfish                    1221

1   Q    Okay.

2        THE WITNESS:  -- assuming they're true.

3   Q    I mean, you had cases where the worst-case scenario was

4   zero, right?  No therapy, no future need?

5   A    That's kind of a broad question and I don't think I can

6   answer that sitting here.

7   Q    Let me try to rephrase it.  Have you had other cases

8   where you have been asked to do a life care plan, you have

9   attributed zero future care?

10  A    Zero future care?

11  Q    Yes.

12  A    In what context?

13  Q    In context of litigation where you have been hired by the

14  defendants to say this is what his future care needs are and

15  you found zero.

16  A    I'm really at a lose to understand that question, I'm

17  sorry.

18  Q    Okay.  Well, if you read records and you interviewed

19  somebody who you were on the other side of the litigation and

20  based upon the entirety of the records you didn't think they

21  needed, for example, future physical therapy, you would not

22  have included it?  Is that true?

23  A    I can't give a hypothetical because I've had so many

24  cases and there's not something I can say I typically do or

25  don't do.  I have to take each case as it's presented to me.

1  Q    Okay.  Anyway, based on the entirety of the records, 50

2  sessions of physical therapy going forward and how much money

3  did you attribute -- or what was the cost -- I should probably

4  say what was the cost of the physical therapy per session per

5  session?

6  A    Do you mind flipping back to the --

7  Q    No, I don't mind at all.

8  A    136 per session.

9  Q    What is the total amount of physical therapy that you

10  believe Mr. Bauta needs?

11  A    The cost for those 50 sessions is, it looks like $6,800.

12  Q    That's a little small.  I can make it bigger.

13  A    Bigger might help.

14  Q    The number again, please.

15        MR. BARMEN:  Objection, Your Honor, she is reading

16  the report.

17        THE COURT:  I will allow it.  Well, do you see the

18  report on the screen?

19        THE WITNESS:  I do.  I just have a little difficulty

20  because it's blurry.

21  Q    Let me ask it this way:  Ms. Cummings, you have authored

22  a report.  You have an opinion.  Have you memorized each

23  number?

24  A    No.

25  Q    So you're going to need the report to know what it is

1   that you recommended --

2   A    Yes.

3   Q    -- to at least accurately recall the number numbers?

4   A    To give you accurately the numbers, I will need to refer

5   to this.

6   Q    There were objections and different things going on, can

7   you please tell me the physical therapy number again?

8   A    The total number?

9   Q    Yes, ma'am.

10  A    $6,800.

11  Q    Okay.  And then moving down the list, and this is just on

12  the one-time costs category, you have an opinion as to whether

13  or not Mr. Bauta need psychotherapy?

14          MR. BARMEN:  Objection.

15          THE COURT:  Overruled.

16          MR. BARMEN:  Can we approach, Your Honor?

17          THE COURT:  Sure.

18          (Sidebar held outside the hearing of the jury.)

19          (Continued on the following page.)

20

21

22

23

24

25

```
                          Sidebar                    1224

 1          (The following sidebar held outside of the hearing
 2   of the jury.)
 3          MR. BARMEN:  He is asking a non-medical witness to
 4   give opinions based on medical needs.  She was here to review
 5   records and to do costs and he is asking her a medical
 6   opinion.  She has already said once, you know, that she can't
 7   give a medical opinion.  He could ask her what does X cost in
 8   your report.  He should not be permitted to ask is it your
 9   opinion that he needs X from a medical standpoint, which is
10   what he intends to do.
11          MR. McELFISH:  Well, that's a misunderstanding of
12   how a life care plan works.  What a life-care planner does is,
13   using their background and experience, as she just said, she --
14          THE COURT:  That's exactly wrong.  Your economist
15   didn't do that.  Your economist didn't say this line in Mr.
16   Provder's life care plan cost X.  Mr. Provder put the cost and
17   then she just extrapolated the cost out taking into account
18   inflation and present value.
19          MR. McELFISH:  I am confused.
20          THE COURT:  I can't help you with that.  That's your
21   confusion.
22          Your life-care planner --
23          MR. McELFISH:  You already heard her --
24          THE COURT:  Stop with the ridiculous arguments.
25   Okay.  You say things off the cuff that are demonstrably false
```

MDL   RPR

```
                    Sidebar                    1225
```

1   by your own doctors.  Your life-care planner Mr. Provder says

2   physical therapy is going to cost X, yes or no.

3           MR. McELFISH:  Well --

4           THE COURT:  Answer the question.  Yes or no, that's

5   what your life-care planner said?

6           MR. McELFISH:  Well, I don't remember.  I'm trying

7   to think of how to deal with this.

8           THE COURT:  Listen, you're objecting in part to your

9   own life care planner's --

10          MR. BARMEN:  No, no.

11          MR. MANNION:  Can I, Your Honor?  The way that he's

12  asking the question, he's asking if it's her opinion that he

13  needs all of these things.  That's a medical opinion.  What

14  she did is look through the records and say these doctors say

15  he needs those things and I will take the worst-case scenario,

16  here's the cost for those things.  It's not her opinion that

17  he needs them.  That's a medical opinion.  That's the

18  difference in the way he is asking.

19          THE COURT:  It is just the form of the question?

20          MR. MANNION:  Exactly.

21          He is asking her essentially for a medical opinion

22  as to what this gentleman needed.  That's not what she did.

23  She took the worst-case scenario medical opinions and said

24  okay, the doctor says he needs this, now let me put a cost to

25  it.

```
                         Sidebar                        1226

1         THE COURT:  Can you read back to me the question

2   that prompted this sidebar?

3         (Record read.)

4         THE COURT:  They are right.

5         MR. McELFISH:  What I am trying to ascertain is,

6   because I don't necessarily disagree, how they want it

7   phrased.  Because she did come to an opinion based on the

8   records about what the doctor said that he needed.  I'm okay

9   with... I'm okay with how we rephrase it.  I don't care about

10  that part.

11        MR. MANNION:  It's not her opinion on psychotherapy,

12  it's here the cost is if you believe that doctor.

13        MR. McELFISH:  She does have an opinion that he

14  needs psychotherapy.  See, Judge --

15        THE COURT:  I saw it on the screen.

16        MR. McELFISH:  How about this:  Do you have an

17  opinion based on the doctor's records or have you put together

18  some life care items based on the doctor's opinions as to

19  whether or not he will need psychotherapy?

20        MR. MANNION:  She can't -- that's the whole thing.

21        THE COURT:  Look, it --

22        MR. MANNION:  It's the cost.

23        THE COURT:  It is not only the cost.

24        MR. McELFISH:  Thank you.

25        THE COURT:  Mr. McElfish is right to a certain
```

Sidebar                                           1227

1   extent.  Are there medical records that say he needs 50

2   sessions of physical therapy?

3           MR. BARMEN:  No.  What she's done is she has gone

4   back and look at how much he has already had.

5           THE COURT:  Good point.  It is her, based on the

6   records, this is what he needs going forward.

7           MR. BARMEN:  No.  This is reasonable to give him

8   based on what he has already had and what you see in the

9   medical records, not that it is her opinion, but she's giving

10  him the benefit of the doubt.

11          MR. MANNION:  She can't prescribe physical therapy.

12  She's not qualified to say anything about physical therapy.

13          THE COURT:  What about psychotherapy?

14          MR. MANNION:  It's the same thing.

15          MR. BARMEN:  Also, I object to hearing this part

16  because he talks about psychotherapy and Dr. Thomas as if it's

17  one and the same and he conflates the issue with the jury and

18  he has done it again.

19          Dr. Thomas is not doing psychotherapy, but he asked

20  the question to her as if he is.

21          THE COURT:  Why don't you just ask her, you have

22  here psychotherapy 50 sessions, how did you conclude that.

23          MR. McELFISH:  She's going to say -- before we leave

24  sidebar so we don't have another sidebar, what she's going to

25  say is that I looked at all the records and that's what I came

```
                        Sidebar                      1228
```

1    up with based on the totality of all the records.

2          THE COURT:  That's fine.  And then what costs do you

3    associate with that.

4          MR. McELFISH:  I was just trying to cut to the

5    chase.  Sure.  No problem.

6          MR. MANNION:  Thank you.

7          (Sidebar concluded.)

8          (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cummings - direct - McElfish                    1229

1        MR. McELFISH:  Can I proceed?

2        THE COURT:  Yes.

3   DIRECT EXAMINATION

4   BY MR. McELFISH:

5   Q    Ms. Cummings, going back to 432-0096 for ID, do you see

6   there in the record it indicates the need for psychotherapy,

7   how did you come up with that?

8   A    I came up with that based on the records, the treatment

9   records and Mr. Bauta's complaints in the records of emotional

10  distress.

11  Q    Okay.  Now, did you yourself rely upon any of your own

12  experience, training, and background in order to decide what

13  it is he needs or did you just rely upon what the doctors and

14  the therapists had said?

15       MR. BARMEN:  Objection.

16       MR. McELFISH:  Foundation, Judge.

17       THE COURT:  Overruled.

18  A    Okay, so I relied on the history and the medical records

19  and what Mr. Bauta explained to me.  I wasn't asked to do a

20  psychological evaluation.

21  Q    That's fair.  And based on that, how many sessions of

22  psychotherapy do you believe Mr. Bauta needs going forward?

23       MR. BARMEN:  Objection.

24       THE COURT:  How many sessions did you include in

25  your life care plan?

1          THE WITNESS:  I included 50 sessions of

2   psychotherapy.

3   Q    And how much -- are those -- withdrawn.

4          Did you price out the sessions based on the

5   physician's fee software?

6   A    Yes.

7   Q    And how much total is the psychotherapy for the 50

8   sessions?

9   A    $8,600.

10  Q    Okay.  What is the next line down?

11  A    The next line down is --

12  Q    And let me help you out.  Let me help you out.  Let's do

13  this.

14  A    This is helpful.  Thank you.

15  Q    You're quite welcome.

16  A    It's allowance for diagnostic imaging, such as MRI and

17  X-rays.

18  Q    Now, what I want to do here is ask you, do you have any

19  type of a breakdown as to how many you included in your life

20  care plan and, for instance, you have in parenthesis MRIs,

21  X-rays.  How many MRIs?  How many X-rays?

22  A    I did not break it down that way.

23  Q    So where did you come up with the figure, the total cost

24  for that if you did not know the breakdown?

25  A    Well, I reviewed the records and saw his history of MRI

Cummings - direct - McElfish                    1231

1    and X-rays and I provided enough funding for X-rays several

2    times and MRI a time or two, but I didn't break it down.

3              THE COURT:  So you got those costs from the

4    physician's --

5              THE WITNESS:  Yes, the fee reference.

6              THE COURT:  -- fee reference?

7              THE WITNESS:  Yes.

8    Q    Tell the jury how much you have -- withdrawn.

9              What is your allowance for future diagnostic testing

10   for Mr. Bauta?

11   A    $15,000.

12   Q    So, in total, can you tell the jury how much the one-time

13   cost is that you believe he needs?

14   A    The one-time cost totals $30,400.

15   Q    Thank you.

16             Let's go on then to the annual costs, which, as

17   we've already discussed, will repeat annually.  Let's begin

18   with physical therapy.  Is this different than the one-time

19   cost physical therapy?

20   A    Yes, it is.  This is an annual cost that involves

21   monitoring of his home exercise program and his status as far

22   as his need for the home exercise program and making sure that

23   he is carrying it out in a way that's helpful to him.

24   Q    I see.  And how many times a year did you believe Mr.

25   Bauta needed based on the records that you reviewed -- let me

Cummings - direct - McElfish                    1232

1   withdraw it.

2          What did you include in your life care plan based on

3   the records that you reviewed in terms of evaluations?

4   A    Four times per year.

5   Q    And what is the cost per evaluation?

6   A    $174.

7   Q    And the total for the therapy?

8   A    Annual is $696.

9   Q    The next section is medical.  Can you explain?

10  A    Yes.  This is based on the medical records and I included

11  a physiatrist twice per year, $225 each; a spine specialist

12  five times per year, $225 each; and an orthopedist once per

13  year, $146 per year.

14  Q    Let me understand, physiatrist is sort of a pain

15  management-type doctor to your understanding?

16  A    He is a physical medicine and rehabilitation doctor.

17  Q    Thank you.  You believe, or you included, I should say,

18  physiatry visits twice a year for his life?

19  A    Yes.

20  Q    Who said he needed that?

21  A    Well, that would be adjunctive to physical therapy

22  evaluations every year.

23  Q    Okay.  Same question on spine specialist, you believe he

24  needs to see -- I'm sorry.  Let me withdraw that.  I have to

25  phrase it right.

Cummings - direct - McElfish                    1233

1          You included five visits to a spine specialist a

2   year for the next 38 years?

3   A    I did.

4   Q    And you also included an orthopedist, who is more of like

5   a bone doctor, could be spine doctor as well, once a year?

6   A    Yes.

7   Q    For the rest of his life?

8   A    Yes.

9   Q    Now, rather than wasting time going through the

10  individual numbers, if you could just tell us what the annual

11  medical costs associated with seeing the rehabilitation

12  doctor, the spine specialist, and the orthopedist are each

13  year?

14  A    The total is $1,721.

15  Q    And I take it those are generally, according to this fee

16  reference software, that would fall under some sort of an

17  office visit?

18  A    Yes.

19  Q    By the way, do you know who -- do you know who has

20  published or -- withdrawn.

21         Do you know where the data comes from or where the

22  data pool was collected from in the physician reference

23  software?

24  A    I don't know exactly at this point.

25  Q    At any time did you ever understand it was a collection

Cummings - direct - McElfish                1234

1  of data from an insurance company, health insurance company?

2  A    It was a collection of actual charges that were

3  historically -- were made historically.

4  Q    Was that United Healthcare, if you know?

5  A    No.

6  Q    All right.  Let's go on.  The next category is

7  medication.  Would you tell the jury what you included in your

8  life care plan for medication?

9  A    I included the two medications that Mr. Bauta informed me

10 that he was taking when I evaluated him in January of 2016 and

11 those are Tizanidine, which is a muscle relaxant, and

12 ibuprofen, which is a non-steroidal anti-inflammatory

13 medication, which would be more for pain.

14 Q    Do you know whether or not he has taken or takes any pain

15 medication, narcotic pain medication?

16 A    What's the timeframe on that?

17 Q    Any time after the surgery or during the time that he saw

18 you.

19 A    He was not taking narcotic pain medication when I saw

20 him.

21 Q    Do you know if he has been prescribed pain medications or

22 narcotic medications?

23 A    Yes.  During the acute postsurgery period.

24 Q    And how about before surgery?

25 A    I don't recall.

Cummings - direct - McElfish                    1235

1   Q     Fair.  Okay.  When you say medications on an annual

2   basis, are you able to say for the jury how much medication he

3   is going to have to take a year?

4               MR. BARMEN:  Objection.

5               THE COURT:  Are you asking me to give the dosage

6   that's listed here?

7   Q     I'm not asking you for the dosage.  I'm asking you for

8   the frequency.  How often would he have to take these

9   medications?

10  A     Well, the Tizanidine has been prescribed at once per day

11  and he has indicated to me that the ibuprofen was as needed or

12  intermittently.

13  Q     And did I ask you the amount?

14  A     The total annual amount is $296.

15  Q     Thank you.  Let's go to the next area.  Tell the jury

16  what equipment you believe Mr. Bauta will need for the rest of

17  his life.

18  A     I included a shower chair, a handheld shower, a back

19  brush, grab bars for the bathroom, a soft lumbosacral

20  orthosis, which is a back brace that's made of fabric, and a

21  cane.

22  Q     And how much are each of these items?

23  A     The shower chair is $125.  The handheld shower is $40.

24  The back brush is $15.  The grab bars for the bathroom would

25  be $100.  A soft lumbosacral orthosis would be $30, and the

1   cane would be $15.

2   Q    What's the total annual cost, because you don't get a new

3   cane every year, for example, so you sort of annualized it

4   out?

5   A    Well, I have a cane replaced every five years and, you

6   know, I have timeframes for each item.

7   Q    How much do you believe the cost is for the annualization

8   of the equipment per year?

9   A    The cost in my report is $79 per year.

10  Q    And that's for 38 years; right?

11  A    Correct.

12  Q    Now, before I go on, you and I had discussed Mr. Bauta's

13  cane in your deposition.  Did you review your deposition

14  before today?

15  A    Yes.

16  Q    And I asked you whether or not his cane was needed.

17  What's your answer to that?

18           MR. BARMEN:  Objection.

19           MR. McELFISH:  Let me withdraw it and ask it

20  correctly.

21  Q    Do you have an opinion, Ms. Cummings, as to whether or

22  not he needs this cane?

23           MR. BARMEN:  Objection.

24           THE COURT:  Overruled.

25           Do you?

1  A     I don't have an opinion on that.  I have the fact that he

2  carries a cane with him and has for several years and so I put

3  it into the projected annual costs.

4  Q     Okay.  Going to your deposition.

5          MR. McELFISH:  For counsel and the Court and the

6  witness, page 33, which is marked as 432-0034.  It is on the

7  small screens.

8  Q     You were deposed back in February 3, 2017; correct?

9  A     Correct.

10  Q     Okay.  Beginning at line 7, down to line 17.

11          MR. McELFISH:  And I will, Your Honor, bring it up.

12  Not like that.  Sorry.

13          THE COURT:  Okay.

14  Q     You were asked the following questions and you gave the

15  following answers:

16          "QUESTION:  And you don't have any opinion one way

17  or the other about whether or not he need the cane?

18          "ANSWER:  Well, I do have an opinion that he needs

19  the cane.  I have that in my life care plan.  That's one of

20  the needs that I was able to glean from my records.

21          "QUESTION:  So based upon the records and based upon

22  your personal observations of Mr. Bauta, it is your

23  professional opinion that Mr. Bauta does need the cane?

24          "ANSWER:  Yes."

25          Are those the questions and answers that you were

1    asked and the answers that you gave in your deposition?

2    A     Yes.

3    Q     Thank you.

4            MR. McELFISH:  Judge, have we had a break?  I don't

5    remember.  I just lost -- my iPad went down.  I can get it

6    back up in a second.

7            THE COURT:  Take a break or keep piling through?

8            THE JURORS:  Break.

9            THE COURT:  All right.  10-minute break.

10           (Jury exits the courtroom.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cummings - direct - McElfish                    1239

1    (In open court.)

2              (JUDGE RAMON E. REYES enters the courtroom.)

3              (The following occurs outside the presence of the

4    jury.)

5              MR. McELFISH:  Judge, is she getting the jury?

6              THE COURT:  Yes.  What's up?

7              MR. McELFISH:  I found in the transcript she uses

8    her own experience in respect do physical therapy and

9    physiatry and I'm going to impeach her with that or at least

10   ask about it.  It's contrary to what counsel said at the

11   sidebar.  She doesn't use any of her own experience to make

12   any of these recommendations but she specifically testified to

13   those two.

14             THE COURT:  So do it.

15             (Jury enters.)

16             THE COURT:  You may continue.

17   BY MR. McELFISH:

18   Q    I just want to go back and clear one thing up,

19   Ms. Cummings, with respect to the manner in which you formed

20   your opinions.  As a life care planner you rely on the records

21   of others for the most part; is that right?

22   A    Yes.

23   Q    Okay.  But I believe with respect to physical therapy,

24   you use your own training and experience to come up with the

25   physical therapy projections?

Cummings - direct - McElfish                    1240

1          MR. BARMEN:  Objection.

2          THE COURT:  Overruled.

3   A    I don't, no.  I use my judgment as far as understanding

4   the treatment that had been received.

5   Q    Page four -- Exhibit 432-0057, that's page 56 of the

6   deposition, lines 3 through 12.

7          THE COURT:  Hold on just one second.

8          MR. McELFISH:  I can pull it up.  It's on your

9   screen, Judge.  I made it bigger.

10         MR. BARMEN:  Improper impeachment.

11         THE COURT:  This is talking about something

12  different.  Would you come to sidebar, please.

13         (Sidebar held outside of the hearing of the jury.)

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

```
                           Sidebar                    1241
```

1              (The following sidebar took place outside the
2     hearing of the jury.)
3              THE COURT:  May I see the life care plan?
4              You have been questioning her about these things.
5              MR. McELFISH:  Correct.
6              THE COURT:  For impeachment what you were going to
7     do is annual costs which are not the one-time costs.
8              MR. McELFISH:  Right.
9              THE COURT:  A different thing.
10             MR. McELFISH:  I understand.  We're over here now.
11             THE COURT:  She testified that anything about this
12    was based on just a review of the records.
13             MR. McELFISH:  Yeah.  That's my recollection.  I'm
14    afraid to say it.
15             MR. BARMEN:  She said she uses her judgment based on
16    X, Y and Z in conjunction with the medical records.
17             MR. McELFISH:  The whole reason we were up here
18    before --
19             THE COURT:  That is not my recollection of what she
20    said when you asked her about the physical therapy because all
21    of this has to do with physical therapy, right?  They were in
22    relation to the one-time costs, how did you come up with the
23    $6,800 for physical therapy.
24             MR. McELFISH:  Initially, yes.
25             THE COURT:  I don't remember any questions on this

                      SN      OCR      RPR

```
                          Sidebar                        1242
```

1   unless I'm mistaken.  Am I mistaken?

2          MR. BARMEN:  I don't think so.

3          THE COURT:  That specific impeachment is this --

4          MR. BARMEN:  I did object to improper impeachment.

5   I did for that reason.

6          THE COURT:  I did not think it was this, but this

7   says --

8          MR. BARMEN:  Either way I think it's inconsistent

9   with respect to the rest of the annual costs that are not

10  one-time costs.

11         MR. McELFISH:  Yeah, these.

12         THE COURT:  Yes, but I don't think she gave how she

13  came up with this.

14         MR. McELFISH:  I'm not trying to beat her up.

15         THE COURT:  If she says that's based on what is in

16  the records, then this is impeachment.

17         MR. McELFISH:  I agree with you, I just thought --

18         MR. BARMEN:  But she already testified that based on

19  her judgment X, Y and Z she's answered the question to this

20  and then he proceeded to impeach on it.

21         MR. McELFISH:  She said I used my judgment but she

22  uses her experience with the discharge of actual patients.

23         MR. BARMEN:  She said my judgment in conjunction

24  with.

25         THE COURT:  Fine.  You can do it.  We're spending

Sidebar                                          1243

1     time on such ridiculously minor points, but go ahead.

2              (Sidebar ends.)

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN      OCR      RPR

Cummings - direct - McElfish                1244

1  BY MR. McELFISH:

2  Q    And in your deposition, Ms. Cummings, you were asked the

3  following questions and you gave the following answers, page

4  56, lines 3 through 12:

5          "Question:  Okay, now with respect to the" --

6          MR. BARMEN:  Objection, Your Honor.  Didn't we just

7  discuss this.

8          THE COURT:  Lay the foundation for it.

9  Q    With respect to the physical therapy evaluations that you

10  do once a year, where do you obtain that information from?

11  A    Well, as I explained earlier, it's four times per year

12  and it is for follow-up to ensure that he's carrying out his

13  home exercise program as he should be and he's getting the

14  benefits from it that are expected.

15  Q    Okay, but do you base that upon your own experience or

16  just what's in the records?

17  A    This I used my own judgment and it is based on the -- on

18  cases that I've seen that are discharged with a home exercise

19  program and follow-up is recommended.

20  Q    All right, thank you.  All right, let's go back to where

21  we were on 432-0097.  I believe we were at the assistance area

22  and let me make it bigger for you.  I think we completed

23  equipment; correct?

24  A    We did.

25  Q    Okay.  Thank you.  If we can just go to the assistance

SN      OCR      RPR

Cummings - direct - McElfish                    1245

1   area, can you explain what that is to the jury, please?

2   A    Yes.  The assistance -- I have funds for ten hours per

3   week of homemaker services and the purpose of that is based on

4   Mr. Bauta's subjective report that he takes longer to do his

5   activities of daily living and that he spends a good portion

6   of his day in bed more often than not.  So I gave him ten

7   hours of basically household assistance to do the items that

8   he didn't have time to do because he was in bed or he didn't

9   feel capable of doing.

10  Q    Okay.  I want to just be clear though on the homemaker.

11  It's ten hours a week at $15 an hour; right?

12  A    Right.

13  Q    And that's ten hours a week at $15 an hour for the rest

14  of his life?

15  A    Yes.

16  Q    If you would please tell the jury when you put it

17  together on an annual cost basis, what did it add up to as an

18  annual cost?

19  A    $10,592.

20  Q    Okay.  Going over to P-432-0098 for identification,

21  Ms. Cummings, you did a summary of costs based on the one-time

22  cost and the annual costs.  Which is the total cost; correct?

23  A    Correct.

24  Q    Okay.  And if you add the one-time cost -- actually,

25  let's do it this way.  The one-time cost you've already said

1  is 30,400?

2  A    Yes.

3  Q    And I apologize.  Let me make it bigger.  Thanks.  If you

4  take the annual cost of $10,592 that we just established, how

5  much is that if you just do a flat multiplication projection

6  out 38 years?

7  A    4,000 --

8  Q    I'm sorry?

9  A    $402,496.

10 Q    And if you take the annual cost and the one-time cost and

11 you add them together, what's the total cost for Mr. Bauta's

12 life care?

13 A    Based on my evaluation of him and the records I have in

14 my report $432,896 and that's if assuming that everything that

15 I was told and read was true, if those things aren't true then

16 I would remove the non-necessary items from my plan.

17 Q    Right, but since you were deposed -- withdrawn.  Since

18 you wrote this report a year and a half ago you haven't

19 removed anything, have you?

20 A    I haven't had new records to review.

21 Q    Okay.  So as of right now in front of the jury you

22 haven't removed anything?

23 A    I haven't removed anything because I didn't have new

24 information to base that on.

25 Q    Okay.  But Ms. Cummings, I mean there's law firms

Cummings - direct - McElfish                    1247

1  representing the defendant's there.  You're retained by them,

2  you've been speaking to them, you're in communication with

3  them.  You could call and ask them, right?

4           MR. BARMEN:  Objection.

5           THE COURT:  Sustained.

6  Q    You've worked with these law firms before.  If you have

7  an understanding that if they had new records to update you

8  with, they would have provided them to you?

9           MR. BARMEN:  Objection.

10          THE COURT:  Sustained.

11          Were you asked to update your report?

12          THE WITNESS:  No.

13 Q    Now, we can agree that Dr. Mobin in his expert report and

14 his deposition has opined that Mr. Bauta needs future lumbar

15 surgery.  Do you recall that?

16          MR. BARMEN:  Objection.

17          THE COURT:  Overruled.

18 A    Do I recall that Dr. Mobin says that he needs future -- I

19 actually don't have that in my mind right now.

20 Q    In fact, at your deposition I asked you if you had seen

21 Dr. Mobin's recommendation for future surgery and you said

22 along the lines, I would like to have seen that, I would like

23 to have known that.

24          MR. BARMEN:  Objection.

25          THE COURT:  Do you recall that?

SN        OCR        RPR

1          THE WITNESS:  I think it was referring to his

2   deposition testimony.

3   Q    Yes.

4   A    Yes.

5   Q    Okay.  Had you been provided with his deposition

6   testimony where he opines on future back surgery?

7   A    Yes.

8   Q    Okay.  So now that you had that in mind, do you believe

9   that you should add items to your life care plan that includes

10  surgical features?

11         MR. BARMEN:  Objection.

12         THE COURT:  Overruled.

13  A    That would require a medical opinion and I relied on

14  Mr. Bauta's self-report and the treating records.  And my

15  understanding is that Dr. Mobin did not see him so I don't

16  know how valid his opinions are because it's not for me to say

17  because I'm not a medical doctor.

18  Q    In your answer just now you said that you would need a

19  medical opinion in order to know whether or not he needs

20  future surgery.  So now you have Dr. Mobin's medical opinion.

21  Do you believe he needs future care with a surgical feature?

22         MR. BARMEN:  Objection.

23         THE COURT:  Overruled.

24  A    I mean, I would need more of a doctor's opinion, such as

25  treating physicians, physicians who have actually worked with

Cummings - direct - McElfish                1249

1   him.

2   Q    You know Dr. Mobin, he's a renowned neurosurgeon, he's

3   read all the records and he's read the treating doctors and he

4   has an opinion as to what Mr. Bauta needs for future care,

5   you're aware of that?

6             MR. BARMEN:  Objection.

7             THE COURT:  Sustained.

8             MR. BARMEN:  Strike.

9             THE COURT:  Sustained.

10  Q    So when you talk about the worst-case scenario that you

11  told the jury that's not in your report, that's primarily

12  based about defense expert reporting, right?

13            MR. BARMEN:  Objection.

14            THE COURT:  Overruled.

15  A    I didn't quite catch the end of that, can you say it

16  again, please.

17  Q    When you talk about the worst-case scenario that you've

18  prepared, you've only relied primarily on the defense expert

19  reporting in preparing that worst-case scenario, right?

20            MR. BARMEN:  Objection.

21            THE COURT:  Overruled.

22  A    No, if I were to rely on the defense expert reports there

23  would be nothing in my life care plan.

24  Q    But if you relied on Dr. Mobin, there would be a surgical

25  feature in there, right?

Cummings - direct - McElfish                    1250

1    MR. BARMEN:  Objection.

2    THE COURT:  Overruled.

3  A    Similarly, as I said, I would need more than the opinion

4  of a doctor who has not treated him and certainly who has not

5  seen him and I'm not a medical doctor to sort out the opinions

6  and come to a conclusion myself.  I would need treaters to

7  have concurred with that or recommended the same.

8  Q    Have you reviewed Dr. Cordiale's trial testimony through

9  daily transcripts?

10  A    No.

11  Q    He testified last Monday?

12  A    No.

13  Q    So you have no idea what he has to say about that?

14  A    Right.

15    MR. BARMEN:  Objection.

16    THE COURT:  Overruled.

17  Q    Now, on a cost-by-cost basis are you able to say whether

18  or not FairHealth.org numbers are higher than the Physician

19  Fee reference numbers on an apples-to-apples basis?

20    THE COURT:  At the time you did your report.

21  Q    Yes.

22  A    I rally can't stay that because I didn't have access to

23  FairHealth at the time and FairHealth is updated very

24  frequently so it's kind of not an apples-to-apples situation.

25  Q    Well, that's fair.  If you assume hypothetically that

SN        OCR        RPR

Cummings - direct - McElfish                    1251

1  plaintiff's medical expert Dr. Mobin has relied upon

2  FairHealth.org for his projections, that's the same database

3  you now use?

4  A    My understanding is that Dr. Mobin uses it for his office

5  billing and I can agree that it is a well-thought of and

6  frequently used program in my profession also.

7  Q    Okay.  So if he uses it in his office billing for his

8  practice it wouldn't be a large stretch if he used it to

9  project future care; correct?

10            MR. BARMEN:  Objection.

11            THE COURT:  Overruled.

12 A    Future care or future cost?

13 Q    The cost for the future care, my apologies.

14 A    It wasn't aware that he gave cost projections.

15 Q    Okay.  Now Mr. Provder, a word against him, you have

16 cases against him?

17 A    Yes.

18 Q    A lot of them?

19 A    Yes.

20 Q    Now Mr. Provder, you understand his methodology of

21 pricing is he actually calls a whole range of doctors and

22 facilities in the area.  Do you understand that?

23 A    I've been told that, yes.

24 Q    And you understand from his deposition and from your

25 experience with him that he literally makes a sheet, a check

SN       OCR       RPR

Cummings - direct - McElfish                    1252

1   sheet, and goes out and calls facilities and doctor's offices

2   and hospitals to find the pricing for each item, do you

3   understand that?

4   A    I've been told that.  I don't know that from my

5   experience with him hand I haven't seen such a -- pardon me --

6   a sheet from these phone calls.

7   Q    Do you have any reason to dispute it?

8   A    I don't have any reason to dispute it.

9   Q    Okay.

10  A    But it is not the most efficient and effective way to get

11  costs.

12  Q    It may not be the most efficient or effective, but

13  certainly if you make a phone call to a facility and they tell

14  you it's going to be $100, it's a pretty good chance it's

15  going to be $100?

16            MR. BARMEN:  Objection.

17            THE COURT:  Overruled.  You can answer.

18  A    I don't agree with that because with something like the

19  Physicians Fee Reference and FairHealth you are using CPT

20  codes which are the Common Procedural Terminology codes that

21  doctors base their billing on and other medical professionals

22  also and I think that the idea of calling up a place and

23  saying how much would you charge for what-have-you, would end

24  up in a very inexact number because there would be no codes

25  that were associated with it.  And when I first started as a

SN        OCR        RPR

Cummings - direct - McElfish                  1253

1  life care planner I made a few calls and it was very difficult

2  to get information that way because they needed codes and I

3  did not have a vehicle to provide me with those codes.

4  Q    Okay.  So is that a no, you do not dispute that

5  Mr. Provder actually does that, because that was the question?

6           MR. BARMEN:  Objection.

7           THE COURT:  Sustained.

8  Q    Let me reask it.  Withdrawn.  You have nothing to dispute

9  that that is his methodology in obtaining costs?

10 A    I understand that that's what he said, but, you know, the

11 voracity of that, I have no idea.

12 Q    Right, you have no idea and you were not provided with

13 his trial transcript from in front of this jury just last

14 Friday.

15           MR. BARMEN:  Objection.

16           THE COURT:  Sustained.

17           MR. BARMEN:  Your Honor, sidebar, please.

18           THE COURT:  No, we don't need it.  Sustained.

19           MR. McELFISH:  I have no further questions.

20           MR. BARMEN:  Can we get clarification of whether

21 there's separation of witnesses or not?

22           THE COURT:  No, no.

23 Q    One more thing.  Thank you, Ms. Cummings.  Appreciate it.

24 A    You are welcome.

25           (Continued on the following page.)

1    CROSS-EXAMINATION

2    BY MR. BARMEN:

3    Q     Ms. Cummings, how are you?

4    A     I'm fine, thanks.  How are you?

5    Q     Great.  Nice to see you again.

6    A     Thank you.

7    Q     You didn't get a chance to introduce yourself to the

8    jury.  Would you do that, please?

9    A     Certainly.  I'm Wendy Cummings.  I'm a certified lifecare

10   planner.

11   Q     And would you tell the jury a little bit about your

12   education, training and background, please?

13   A     Yes.  I obtained my Bachelor's degree in English from

14   Yale University in 1994.  And around the same time, I started

15   to work as an assistant to a certified lifecare planner.  And

16   after I got the Bachelor's degree, I moved into the field of

17   psychology and obtained a Master's Degree.  And the Master's

18   Degree in psychology, which is a health-related field, enabled

19   me to do the coursework and the testing that ended up in my

20   certification as a lifecare planner.

21   Q     And how long have you been certified as a lifecare

22   planner?

23   A     I've been certified since 2001, so 17 years.

24   Q     And in that 17 years, about how many lifecare plans have

25   you completed?

1   A    I have completed hundreds.  And --

2   Q    And -- I'm sorry.

3   A    -- I can't estimate better than that.

4   Q    Have you done them both for plaintiff and for defendant?

5   A    Yes.

6   Q    Do you typically take on cases for either side that calls

7   you?

8   A    Yes.

9   Q    And when you're going to do a lifecare plan, whether it

10  be for a plaintiff or a defendant, overall, what are you

11  trying to accomplish?

12  A    I am trying to -- pardon me.  I am trying to understand

13  what the treatment has been, what the current status is, and

14  based on that, the items that are reasonable to include going

15  forward.

16  Q    Okay.  Do you take into consideration in doing that plan

17  whether you're doing it for a plaintiff or defendant?  And by

18  that I mean, are you trying to make the most expensive plan

19  you can make or the least expensive plan you can make?

20  A    I am trying to make an objective plan that's based on the

21  facts, and I don't lean toward either side that the attorney

22  that hired me is on.

23  Q    Have you testified in courts regarding your lifecare

24  plans before?

25  A    Yes.

1   Q     Both state and federal court?

2   A     Not federal.

3   Q     This is your first time in federal court?

4   A     Yes.

5   Q     Okay.  Mr. McElfish already talked about your membership

6   in professional associations and your publications and your

7   presentations.

8             MR. BARMEN:  So in order to save time at this time,

9   the defense would tender Ms. Cummings as an expert in lifecare

10  planning.

11            MR. McELFISH:  No objection.

12            THE COURT:  Ms. Cummings is received as an expert in

13  lifecare planning.

14            MR. BARMEN:  Okay.

15            THE COURT:  Your first time in federal court.

16            THE WITNESS:  Thank you.

17            MR. BARMEN:  Everybody has got to have a first time.

18  BY MR. BARMEN:

19  Q     Okay.  Ms. Cummings, what were you asked to do in this

20  case?

21  A     I was asked to do an objective lifecare plan based on a

22  worst-case scenario, and by that I mean that everything that's

23  in the treating records is true, and what Mr. Bauta told me is

24  true, regardless of where his complaints came from.

25  Q     Okay.  Do you form opinions as to the necessity of

Cummings - cross - Barmen                    1257

1   certain medical procedures?

2   A    Independently?

3   Q    Yes.

4   A    No.

5   Q    And why is that?

6   A    Because it's outside the scope of my practice.

7   Q    Do you form an opinion on whether or not in this case

8   Mr. Bauta is being honest with you when he gives you a

9   subjective history?

10  A    No, I assumed that what he told me was true.

11  Q    I thought -- I took you to mean when you were answering

12  Mr. McElfish's questions, you tell me if I'm wrong, that you

13  typically don't put a lot of stock in either side's retained

14  experts.

15         Is that true?

16  A    I put less stock in those than in the treating records,

17  yes.

18  Q    And tell the jury why that is, please.

19  A    Well, the expert doctors have a different job from mine.

20  They are doing their evaluation, making diagnoses, and making

21  recommendations.  My task is to synthesize the information and

22  write an objective lifecare plan.  So for me to rely on any

23  particular witness, expert witness, or a set of them, would be

24  outside of the scope of my practice.

25  Q    Okay.

Cummings - cross - Barmen                    1258

1   A    I would be making a medical decision.

2   Q    Do you feel like you have a sufficient picture, in terms

3   of the medical records you reviewed, to prepare your plan?

4   A    Yes.  Including seeing Mr. Bauta; yes.

5   Q    Okay.  And in reviewing the records of Mr. Bauta's

6   treating physicians, did you notice any type of pattern, or

7   anything strike you as unusual?

8            MR. McELFISH:  Foundation, for not a doctor, not a

9   doctor.

10            THE COURT:  I'll sustain the objection.

11            MR. BARMEN:  I'll rephrase.

12  BY MR. BARMEN:

13  Q    And, again, I'm not talking in terms of the treatment,

14  but in reviewing the records, did you notice where his

15  treating doctors were primarily?

16            MR. McELFISH:  Objection, foundation and relevance,

17  and vague.

18            THE COURT:  Sustained.

19  BY MR. BARMEN:

20  Q    Are you familiar with a rehabilitation center at

21  110 West 34th Street?

22  A    Yes.

23  Q    Did you notice that many of Mr. Bauta's treatments came

24  from the same address?

25  A    Yes.

Q     Is that something you've typically seen in the past?

MR. McELFISH:  Foundation.

THE COURT:  Overruled.

A     No, no.  Typically, there are various treaters, and they're not in any way affiliated or in the same practice.

Q     And is that something you noticed in the course of reviewing records and preparing your plan?

A     Yes.

Q     Okay.  Despite that, though, you didn't put any more or less stock in the information contained in the records, did you?

A     Based -- despite the fact that they were all in the same building?

Q     Yes, ma'am.

A     No, I did not.

Q     Okay.  When you met with Mr. Bauta -- well, strike that.

In typical fashion when you meet with someone for whom you are preparing a plan, how much overall weight do you put in their subjective complaints?

A     I put a lot of weight on their subjective complaints, because that is what I am basing my future projections on.

After I review the medical records, the next step is to hear from the plaintiff what ongoing complaints remain, and that gives me a sense of what to put in my lifecare plan.

Q     Okay.  When you met Mr. Bauta, how did he present to you?

Cummings - cross - Barmen                                1260

1   A     He presented as -- well, he -- he had a cane with him.

2   He was already seated when I arrived, and he presented as

3   someone who was in a lot of pain and having a lot of

4   limitations of activities that he was able to do.

5   Q     Was Mr. Bauta alone when you met him?

6   A     Yes.

7   Q     Did he give you any specifics about what he could not do?

8   A     Well, he actually said that he can do his activities of

9   daily living and he can do his laundry, but it takes a long

10  time for him to do those.

11        And he said, as I've said a couple of times already,

12  that he spent -- he was spending most of his days in bed.

13  Q     Would you agree with me that the home care allowance you

14  have put into your plan is the biggest ticket item of all?

15  A     Yes.

16  Q     Is there anything other than Mr. Bauta's subjective

17  history to you that prompted you to include that in the plan?

18  A     The records that I reviewed had various iterations of

19  those complaints.  So I relied on the records, as well as his

20  self-description when I sat with him.

21  Q     And are you talking about, in terms of the medical

22  records, his history provided to those individual providers?

23  A     Yes.  His subjective report to the doctors.

24  Q     Okay.  So his history provided to the medical treaters,

25  and in addition to the history provided to you, form the basis

1   for including the home care in the plan?

2   A    Yes.

3   Q    Okay, we are going to come back to that.  You've

4   obviously seen Mr. Provder's plan?

5   A    Yes.

6   Q    And the jury has already heard that certainly, you don't

7   both agree on everything, correct?

8   A    Correct.

9   Q    How did plaintiff -- strike that.

10       What was the cost Mr. Provder included per hour for

11  home care in his plan?

12  A    If I remember correctly, it was $22 per hour.

13  Q    And do you know where that came from?

14  A    An agency.

15  Q    What type of agency?

16  A    Home health agency, like a nursing agency.

17  Q    Okay.  Your cost per hour in your plan is $15 an hour?

18  A    Yes.

19  Q    Where are you getting that from?

20  A    I'm getting that from the Bureau of Labor Statistics.  I

21  have a program that synthesizes that information and it gives

22  the mean hourly wage, and I use that for my projection.

23  Q    When you go to the Bureau of Labor Statistics, are you

24  looking for the mean hourly age of skilled nursing?

25  A    No, no, of a house -- a houseworker or someone who -- a

Cummings - cross - Barmen                          1262

1   cleaning person.

2   Q    Domestics as opposed to skilled nursing?

3   A    Oh, yeah.  Yeah, he doesn't need that.

4   Q    Any reason to include the cost of nursing care for this

5   man, assuming everything he says is true?

6   A    No.

7   Q    Other than the fact he had a cane with him and told you

8   he needed one, any other reason to include that in the plan,

9   your plan?

10  A    Well, again, it was throughout the records that he was

11  walking with a cane.

12  Q    Did Mr. Bauta tell you that he can't cook for himself?

13  A    No.

14  Q    Did he tell you he can do his own laundry?

15  A    Yes.

16  Q    Did he tell you he can clean his own house or apartment?

17  A    He has -- at the time that I saw him, he had a single

18  room, and, yes, he said that he was able to do those things,

19  but it took a long time.

20  Q    Okay.  And despite the fact that he could do it, because

21  it took him longer, you thought it appropriate to include

22  10 hours a week of home care in his plan?

23  A    Yes.

24  Q    Okay.  Have you since come -- well, strike that.  We'll

25  come back to that.

1           Let's talk about the PT and psychotherapy.

2           MR. BARMEN:  Can you pull up P-457-0017, please?

3           Small screens?

4           (Pause.)

5           MR. BARMEN:  That was my fault, I said the wrong

6    number.  0017, please.  Okay, thank you.

7    BY MR. BARMEN:

8    Q    You explained to Mr. McElfish how you came up with 50 PT

9    sessions and 50 psychotherapy sessions.  So I don't want to go

10   over that, I want to go a different direction.

11          You saw Mr. Bauta in 2016, fair?

12   A    Yes.

13   Q    You prepared your plan in the fall of 2016?

14   A    Yes.

15   Q    And you haven't seen any additional records since, is

16   that fair?

17   A    Yes.

18   Q    If Mr. Bauta has not been actively doing PT for the last

19   year, would you still include that in your plan?

20          MR. McELFISH:  Objection, incomplete hypothetical.

21          THE COURT:  Overruled.

22          You can answer.

23   A    I would -- I would not.

24   Q    Okay.  And why is that?

25   A    Because his not receiving physical therapy over the

1  past -- I don't know how long you said -- but over, you know,

2  a number of months or a year would suggest or indicate that he

3  doesn't need to treatment.

4  Q    The records you reviewed when he was doing physical

5  therapy, was he compliant?

6  A    He seemed to be compliant with physical therapy.

7  Q    The psychotherapy, same question:  If he hasn't been

8  treating with a psychotherapist in well over a year, would you

9  take that off the list?

10 A    Yes, I would remove it from my lifecare plan.

11 Q    Okay.  Based upon your experience and training in

12 lifecare planning and your background as a psychologist, is

13 cognitive therapy the same thing as psychotherapy?

14 A    No, it's not.

15 Q    Mr. McElfish asked you about Dr. Thomas.

16          Do you know what kind of therapy Dr. Thomas has been

17 providing to Mr. Bauta?

18 A    My understanding is that he has been providing some

19 supportive psychotherapy and cognitive therapy.

20 Q    And do you know the breakdown between the two?

21 A    I don't.

22          MR. BARMEN:  Okay.  Can you roll February 4th for

23 me?

24 BY MR. BARMEN:

25 Q    I want you to -- we are going to play some video, I want

1   you to watch it for me.

2           MR. McELFISH:  Objection, foundation, outside the

3   scope, relevance to this witness.

4           MR. BARMEN:  I am happy to lay some additional

5   foundation, Your Honor.

6           THE COURT:  Sure.  Go ahead.

7   BY MR. BARMEN:

8   Q    Have you recently come to be aware of a potential change

9   in circumstances relative to Mr. Bauta?

10  A    Yes.

11  Q    And what is that?

12          MR. McELFISH:  Objection, vague and ambiguous on

13  this point.

14          THE COURT:  Overruled.

15          You can answer.

16  A    Well, I saw a video footage that showed him doing things

17  that I would never have expected him to do based on my

18  evaluation of him and based on the medical records.

19          MR. McELFISH:  Objection, move to strike,

20  foundation, and it's beyond her deposition.  It wasn't asked,

21  shown; it wasn't in existence.

22          THE COURT:  When did you become aware of this video?

23          THE WITNESS:  Over the weekend.

24          THE COURT:  Okay.

25          MR. McELFISH:  Move to strike, curative instruction.

SAM      OCR      RMR      CRR      RPR

1          MR. BARMEN:  Your Honor, the video didn't exist when

2    she was deposed.

3          THE COURT:  I am going to sustain the objection.

4          This testimony is stricken, ladies and gentlemen.

5    Ignore it.

6          MR. McELFISH:  Thank you.

7    BY MR. BARMEN:

8    Q    As an expert, hypothetically, if he is much more capable

9    than he told you, would that affect the items in your plan?

10         MR. McELFISH:  Vague and ambiguous as to time.

11         THE COURT:  Overruled.

12   A    Yes, if he -- if he's more capable than I understood from

13   what he told me back in 2016, I would remove certain things

14   from the lifecare plan that are no longer necessary.

15   Q    Okay.  So if he wasn't bedridden the way he told you for

16   hours a day, would you take the home care out of your plan?

17         THE COURT:  Sustained.

18         MR. McELFISH:  Thank you.

19   BY MR. BARMEN:

20   Q    If he was able to function substantially better than he

21   let on, would he still need home care?

22         MR. McELFISH:  Same objection.

23         THE COURT:  Overruled.

24   A    I don't think he would.

25   Q    Okay.  And of the total $432,000 in your plan, almost

Cummings - cross - Barmen                    1267

1  300,000 of that is accounted for by home care, correct?

2  A    Yes.

3  Q    If he's not using and never used a shower chair, does he

4  need one?

5  A    No, that would indicate that he has no need for one.

6  Q    Okay.  The same thing with a back brush or grab bars, if

7  he's never been using it, does he need it?

8  A    No.

9  Q    If he's not been seeing a spine specialist, would you

10  take that off the list?

11  A    I would.

12  Q    And, again, you wouldn't know any of these things because

13  you haven't seen records since 2016, fair.

14  A    Yes.

15  Q    Based on your education, training and experience, is

16  using these types of programs you mentioned for CPT codes the

17  appropriate way to price out these costs?

18  A    Are we talking about the Physicians Fee Reference?

19  Q    Yes, ma'am.

20  A    Yes, that's an acceptable way of pricing out items in

21  lifecare plans.

22  Q    I think you mentioned, tell me if I'm wrong, that you

23  used to follow the method that Mr. Provder told the jury

24  about, making three to five phone calls to various providers?

25  A    I used to do that.

1  Q    When did you stop doing that?

2  A    I would estimate around 2000-2001.

3

4           (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. BARMEN:  (Continuing)

3    Q    So 17, 18 years ago.  Why did you stop doing it that way?

4    A    Well, as I was describing earlier, it was just an

5    inefficient way to go about getting the cost for medical

6    treatment services because it wasn't a code-based endeavor.

7    So a lot of times I would get answers that were different from

8    one person on the phone, send me to another and give me a

9    different answer, often I was asked what are the codes and

10   without them, they wouldn't speak to me in some instances.

11   Q    So is it fair to say that the method that you use is much

12   more effective and efficient?  Fair?

13   A    Yes.

14            MR. BARMEN:  Okay.  One moment.

15   Q    Ms. Cummings, in doing your life care plan review of the

16   records, you don't form any opinions as to how his alleged

17   injuries were caused, do you?

18   A    No, I don't.

19   Q    And you wouldn't have, likewise, any opinions on whether

20   things were preexisting, whether they be physical or emotional?

21   A    No.

22            MR. BARMEN:  Your Honor, before I finish with this

23   witness, can we approach briefly?

24            THE COURT:  Sure.

25            (Sidebar held outside the hearing of the jury.)

```
                          Sidebar                    1270

 1          (The following sidebar held outside of the hearing

 2    of the jury.)

 3          MR. BARMEN:  MR. BARMEN:  I understood your

 4    objection relative to the questions when I was going to play

 5    the video but I want to renew that request for the simple

 6    purpose of I'm not going to ask her any opinions, whether she

 7    would back anything out, I just want to play it and ask her if

 8    that is representative of the guy that presented to her for

 9    her evaluation.  I think it's relevant to her opinions.

10          THE COURT:  When was her meeting with him?

11          MR. BARMEN:  Fall of 2016.

12          MR. McELFISH:  No, that's not correct.  Her meeting

13    with him was in January of 2017.

14          MR. BARMEN:  Her report was 2016.

15          MR. McELFISH:  So her meeting was January of 2017.

16          MR. BARMEN:  2016.  The meeting had to be before the

17    report.

18          MR. McELFISH:  I'm sorry.  The meeting was before

19    the report.  You're correct.

20          MR. BARMEN:  So it was all in 2016.

21          THE COURT:  And so the video is from February of

22    2017?

23          MR. BARMEN:  Correct.

24          MR. KIEFFER:  Is it the same video that we played

25    earlier today or is it a different video?
```

```
                          Sidebar                    1271

 1              MR. BARMEN:  The same.  Well, not the one -- the one
 2     he's walking down the street without the cane.
 3              MR. KIEFFER:  Because there's no foundation.
 4              MR. BARMEN:  The one without the cane, the one that
 5     he was walking down the street.
 6              MR. McELFISH:  There's no foundation unless the
 7     investigators come.
 8              MR. BARMEN:  You put them all in evidence already.
 9     You did, not me.  They're already in evidence, Your Honor.
10              MR. McELFISH:  Judge, it's totally inappropriate.
11     She's being asked to have an opinion about what she sees on
12     the videotape.
13              MR. BARMEN:  No, no.  I simply -- I'm sorry.  Go
14     ahead.
15              MR. McELFISH:  They're trying to use it as a way to
16     get somebody to say something about the videotape.  That's
17     all.
18              MR. BARMEN:  Well, the investigators are going to
19     come in and they're going to say plenty about the videotape,
20     so it's not like it's not going to be seen.
21              MR. McELFISH:  I have no problem with that.
22              MR. BARMEN:  I'm not done.  Please.
23              MR. McELFISH:  That's not the right witness for
24     that.
25              MR. BARMEN:  Mr. Kieffer moved the entire video into
```

Sidebar                              1272

1    evidence with -- and that includes parts -- first off, what

2    they're talking about hasn't been seen, displayed in open.

3    The entire video is now in evidence because they moved it in.

4    It's certainly relevant if she sees and can say what's

5    depicted there is not the same person in terms of the

6    complaints presented to me, or even if he has now progressed

7    to that part, it would certainly impact what he needs going

8    forward in my opinion as a life-care planner.

9         MR. McELFISH:  Let me tell you why this is

10   objectionable.  Of course the video is in evidence.  We moved

11   it in.  That's not the issue.  The issue is that it's a

12   totally different setting.  She sees him in his office sitting

13   down.  She's able to talk with him and interact with him.

14   This is not the same time period.  It's a totally different

15   time period, totally different environment.  It lacks

16   foundation.  And how is she -- what is she supposed to say?

17   Oh, I see him walking up and down now.  That is totally

18   inappropriate.

19        MR. MANNION:  That should go to weight.

20        MR. McELFISH:  It is an undisclosed opinion on top

21   of everything else.

22        MR. MANNION:  We don't have to ask what was backed

23   out or what she would back out.  The mere fact that this isn't

24   the same gentleman who presented to her goes to the

25   credibility.

```
                          Sidebar                          1273

 1           MR. McELFISH:  You should have supplemented.

 2           Judge, this video has been in existence for a long

 3     time.  I would have taken her deposition on this.

 4           MR. MANNION:  We didn't call her.  We weren't

 5     calling her.

 6           MR. McELFISH:  We showed it to you this weekend.

 7     I'm sorry.  That doesn't help you.  If she's an expert in the

 8     case and she has a supplemental opinion, you have to disclose

 9     it, so I have a right to either move to strike it or --

10           MR. MANNION:  It's --

11           MR. McELFISH:  Can I finish?

12           THE COURT:  I'm not going to allow it.  Make your

13     arguments with the jury.  If you want to ask her -- no, I'm

14     just not going to allow it.

15           (Sidebar concluded.)

16           (Continued on the following page.)

17

18

19

20

21

22

23

24

25
```

Cummings - redirect - McElfish                1274

1          MR. McELFISH:  I don't know if he is done.

2          MR. BARMEN:  I don't have any other questions.

3    Thank you.

4    REDIRECT EXAMINATION

5    BY MR. McELFISH:

6    Q    Ms. Cummings, I think the last question that Mr. Barmen

7    asked you was whether or not you had any opinions as to

8    causation in this accident.  Do you remember that?

9    A    Yes.

10         MR. McELFISH:  Small screens, Judge.  432-36 for ID.

11         THE COURT:  I got them up.

12         MR. McELFISH:  Let me just find it for you.  It is

13   432-006 for identification, lines 19 through --

14         MR. BARMEN:  What page is that, please?

15         MR. McELFISH:  Page 35.  I am going to bring it out

16   for you there.  19 through 24.  I blew it up, Judge.  And

17   there is no objection in the deposition.

18         THE COURT:   I'm sustaining this.  She is not a

19   causation expert.

20   Q    Ms. Cummings, you had mentioned in your cross-examination

21   by Mr. Barmen that you put a lot of stock and a lot of faith

22   in what the treating doctors say?

23   A    Yes.

24   Q    Okay.  And you understand -- withdrawn.  Do you

25   understand whether or not Mr. Bauta is still currently

1  treating and under follow-up care with Dr. Cordiale?

2  A    I don't know.

3  Q    All right.  Mr. Barmen asked you on cross if he had not

4  seen a spine surgeon you'd take that out of your life care

5  plan.  So you don't know whether or not he just saw Dr.

6  Cordiale a couple weeks ago; correct?

7            MR. BARMEN:  Objection.

8            THE COURT:  Overruled.

9  A    As I said, I don't know that he -- whether or not he's

10  been seeing Dr. Cordiale.

11  Q    Let me pose it as a hypothetical.  I'm sorry.  I thought

12  you were done.  Let me pose that as a hypothetical.  If you

13  assume that Dr. Cordiale testified to this jury that Mr. Bauta

14  is still under his care, he has not been discharged and saw

15  him recently and intends to see him again, you would not take

16  it out of the life care plan; correct?

17  A    I would have to know what he means by intends to see him

18  again.  I mean, is it I'll see you as needed, I'll see you

19  back in six months, a year.  It's not enough information.

20  Q    Assume as needed.

21  A    Assume as needed, then I would, at the very least, reduce

22  the amount that I have in my plan, the amount of visits.

23  Q    Okay.  But you don't know because you weren't provided

24  that information?

25            MR. BARMEN:  Objection.

Cummings - redirect - McElfish                    1276

1          THE COURT:  Overruled.

2          You can answer.

3    A    I wasn't provided with that information.

4    Q    You were asked questions about the 110 West 34th Street

5    location.  You don't know anything else about that location

6    other than that some of the early doctors Mr. Bauta treated

7    with practice there?

8    A    No.  I don't know anything else about it, but I just

9    noticed that they were all from that location.

10   Q    Well, that's what I wanted to talk to you about and clear

11   up.  When you say they all were at that location, you're

12   talking about a couple of doctors who worked there, a couple

13   of the early doctors, and I will give you some examples, Dr.

14   Vasile, Dr. Winn, Dr. Capiola, a couple of doctors come in

15   there and use that office space, but have offices in other

16   locations, you understand that; right?

17         MR. BARMEN:  Objection.

18         THE COURT:  Overruled.

19   A    I don't know what the configuration of that address is

20   and the practices.

21   Q    So you don't specifically know, for instance, how often

22   or how long any one of Mr. Bauta's doctors, if they go to that

23   location, how long they actually practice there, or how many

24   days they practice there, those types of details?

25   A    No.  I was just struck by the fact that all these

MDL   RPR

1  different specialists were in that same building or complex

2  because usually it's, you know, similar doctors are in the

3  same office or the same building rather than kind of the whole

4  spectrum.

5  Q    Well, have you ever heard of a multi-disciplinary

6  practice where doctors have different kinds of doctors in

7  their practice?

8  A    Not by that term specifically, no.

9  Q    Never heard of that?

10 A    No.

11 Q    Okay.  All right.  And you understand those were some

12 doctors that Mr. Bauta treated with early in his treatment and

13 care, but not long after that he went out to see the New York

14 Spine Group?  You're aware of that; right?

15 A    Yes.

16 Q    You read those records?

17 A    Yes.

18 Q    He treated with Dr. Mikelis, Dr. Cordiale, and he treated

19 with others out there; true?

20 A    I understand that he treated with Dr. Cordiale and that

21 Dr. Lattuga provided some reports but didn't actually see him.

22         MR. McELFISH:  Objection.  Move to strike.

23         THE COURT:  Overruled.

24 Q    You understand that the treating surgeon in this case, as

25 well as Dr. Mikelis treated Mr. Bauta at the location on -- in

1   Lake Success, Long Island.  Do you understand that, first of

2   all?

3             MR. BARMEN:  Objection.

4             THE COURT:  Overruled.

5   A    Lake Success, Long Island?  I mean, I'm not aware of the

6   address.  I understand that those doctors practice together.

7   Q    Do you know where New York Spine is based, the practice?

8   A    No.

9   Q    If I told you it's out on Long Island, Lake Success, does

10  that ring a bell?

11  A    No.

12  Q    They are certainly not associated with 110 West 34th

13  Street, are they?

14            MR. BARMEN:  Objection.

15            THE COURT:  Overruled.

16  Q    Based on your view of the records?

17  A    No.

18  Q    He has treated there now for over two and a half years,

19  including the surgery; correct?

20  A    I can't say because I don't have updated records.

21  Q    Well, the records that you have, he began treating there

22  in late 2014, just a year -- about a year after the accident,

23  up until at least recently, when the records that you have

24  come to an end, right?  In '17?

25  A    I don't have records from 2017.  The last record that I

1  have is from mid 2016 or early 2016.

2  Q    And that has nothing to do with 110 West 34th Street;

3  right?

4  A    I don't understand the question.

5  Q    The treatment with Dr. Cordiale in Lake Success and New

6  York Spine has nothing to do with 110 West 34th Street?

7  A    It's certainly not in the same location.

8  Q    Ms. Cummings, do you know if they have anything to do

9  with each other?

10 A    I don't know.

11 Q    And you know he had surgery at North Shore Hospital or

12 Franklin Hospital out on Long Island, that certainly has

13 nothing to do with West 34th Street; correct?

14 A    It doesn't seem as if it would.

15 Q    But you don't know, do you?

16 A    I don't.

17 Q    Now, Mr. Barmen was asking you questions about the

18 difference between cognitive therapy and psychotherapy.  Do

19 you remember those questions?

20 A    Yes.

21 Q    And your answer was Dr. Thomas, according to the records

22 that you reviewed, in your understanding was giving him a

23 combination of both?

24 A    Yes.

25 Q    So based on the fact that at least part of Dr. Thomas'

1  treatment is psychotherapy, you would leave it in the plan?

2  Yes?

3  A    Let me think about that for a sec.  The way that is

4  worded, I can't quite grasp it.

5  Q    Let me make it simpler.  If he is treating and getting

6  some psychotherapy, you would leave it in the plan?

7  A    If he was continuing to treat at this state?

8  Q    Yes.

9  A    Yes, I would.

10  Q    Now, Dr. Thomas, he's a treating doctor.  You know he has

11  been deposed three times.  He's not an expert witness.  Did

12  you review his depositions?

13  A    Were we just talking about Dr. Thomas right before that?

14  Q    Yes.

15  A    No, I have not read his deposition testimony.

16  Q    So you are putting a life care plan together.  You told

17  the jury that you put all the stock in the treating doctors

18  and you haven't read the deposition or one of three

19  depositions or any of three of the main treating doctors for

20  his emotional problems?

21           MR. BARMEN:  Objection.

22           THE COURT:  Sustained.

23           MR. McELFISH:  Let me rephrase, please.

24  Q    You put stock in treating doctors, but you haven't read

25  Dr. Thomas' depositions?

1          MR. BARMEN:  Objection.

2          THE COURT:  Sustained.

3          Give me one minute, please.

4          MR. McELFISH:  Sorry.  I didn't hear what you said.

5          THE COURT:  Give me one minute, please.

6          Can you direct me to Dr. Thomas' first deposition,

7    please?

8          MR. BARMEN:  It is February 2, 2017.  That's the

9    first one, February 2, 2017.

10          THE COURT:  I will sustain the objection.

11   Q    When you were doing your report back in October of 2016,

12   did you have available to you, at least up until that point in

13   time, all of Dr. Thomas' treating records?

14   A    I believe I did.  I know I had his records.  I can't

15   speak to the completeness of them.

16   Q    Okay.  Do you give him more weight in your evaluation

17   than you do Dr. Morgan because you believe treating doctors

18   more than you believe experts?

19          MR. BARMEN:  Objection.

20          THE COURT:  Overruled.

21   A    I gave more weight to Dr. Thomas -- Dr. Thomas' records,

22   because he was a treating physician, yes.  Not a physician,

23   but psychologist.

24   Q    More weight than Dr. Morgan; right?

25   A    Yes.  Because if I rely on Dr. Morgan, as with Casden and

Cummings - redirect - McElfish                1282

1  Rabin, there wouldn't be much for me to have in the life care

2  plan.

3  Q    Okay.  And so, with respect to a choice, for instance,

4  between Dr. Cordiale and Dr. Casden, you gave Dr. Cordiale and

5  the other treating doctors more weight than the defense

6  medical expert Dr. Casden?

7            MR. BARMEN:  Objection.

8            THE COURT:  Sustained.

9  Q    Now, you mentioned that -- in some hypothetical Mr.

10  Barmen asked you about, I want you to assume Mr. Bauta doesn't

11  use shower chairs and grab bars, Mr. Bauta didn't tell you

12  that he had a shower chair or a grab bar back when you met

13  with him, did he?

14  A    No, he did not.

15  Q    Okay.  So if he didn't use one then and he didn't use one

16  now, it should stay in the plan because he didn't use one

17  then?

18  A    It should be out of the plan if he doesn't use one then

19  and he doesn't use one now.

20  Q    But you put it in your report, and when you met with him

21  you knew at that point in time, you spent an hour with him,

22  that he didn't use one then?

23  A    I knew that he didn't have one.

24  Q    So he still doesn't have one, therefore, he doesn't use

25  one; correct?

1   A     Not at that time.  I was basing it on his complaints of

2   pain and stiffness in his back and if -- the fact that he

3   didn't have them at that time didn't mean that he didn't need

4   them; however, if he has not used them from then until now,

5   it's clear to me that he doesn't need them.

6   Q     But, Ms. Cummings, you have nothing to base that on

7   because you haven't seen him again and you haven't spoken to

8   him again and you haven't gotten a chance to talk to him

9   again; isn't that true?

10              MR. BARMEN:  Objection.

11              THE COURT:  Sustained.

12              MR. McELFISH:  Let me break it down.

13  Q     When you came to the opinion that he needed one, you had

14  a chance to sit down and see him and talk to him; right?

15  A     Yes.

16  Q     You have not done that since?

17  A     Correct.

18  Q     So you don't know whether or not he still needs one?  You

19  haven't spoken to him about how he feels; true?

20  A     I haven't had the opportunity to speak with him other

21  than in earlier January of 2016 and I'm saying if he hasn't

22  used them, then I would take them out of the life care plan.

23  Q     So I just want to understand how it works.  If somebody

24  tells you in 2016 that -- withdrawn.

25              If you determine in 2016 somebody needs one, right,

1  and then a year later, and you don't know any other

2  information, if they haven't used it in a year, you don't give

3  it to them in your life care plan?

4          MR. BARMEN:  Objection.

5          THE COURT:  Overruled.

6  A    I think you might have misunderstood what I said.  What I

7  said was if I learned that he hasn't used them, I would take

8  them out.  I wouldn't take them out right now because I don't

9  have information to base such a decision on.

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cummings - recross - Barman                    1285

1   BY MR. McELFISH:   (Continuing.)

2   Q    You know what, you're right, I did misunderstand but you

3   haven't learned that he doesn't use one other than a

4   hypothetical question from Mr. Barman?

5   A    I have not.

6   Q    You mentioned the word complaint with respect to the

7   treatment and the physical therapy and it was your opinion

8   elicited by Mr. Barman that Mr. Bauta was complying with his

9   physical therapy; isn't that right?

10  A    Yes.

11  Q    And what does compliant mean?

12  A    It means that he attends the sessions as recommended by

13  the physical therapist.

14  Q    Again, Ms. Cummings, thank you.  I appreciate your time.

15  RECROSS-EXAMINATION

16  BY MR. BARMEN:

17  Q    Quickly, Ms. Cummings, I just want to clarify.  You

18  mentioned that if you relied on the defense expert there would

19  be nothing in your report.  What did you mean by that?

20  A    I mean that the defense experts basically said that he

21  has no future needs, that he has no permanent jury and that

22  would give me a reason to put nothing in the life care plan if

23  I relied strictly on those reports.

24  Q    And that includes both the defense experts relative to

25  the physical complaints as well as the emotional and

Cummings - redirect - McElfish                1286

1   neurological complaints?

2   A    Yes.

3   Q    And is that why you relied primarily on the treaters and

4   the subjective complaints of the subject himself?

5   A    Yes.

6   Q    And is the converse true that if you relied too heavily

7   on the plaintiff experts, you would have an artificially

8   inflated plan?

9   A    Yes.

10  Q    Potentially a plan $3 million more than your worse-case

11  scenario plan?

12          MR. McELFISH:  Objection argumentative.

13          THE COURT:  Overruled.

14  A    Yes.

15  Q    You've reviewed Mr. Provder's report?

16  A    I have.

17  Q    And he's $3 million above what your worst-case scenario

18  calls for?

19          MR. McELFISH:  Objection, argumentative.

20          THE COURT:  Overruled.

21  A    Correct.

22          MR. BARMEN:  Okay, thank you.

23  REDIRECT EXAMINATION

24  BY MR. McELFISH:

25  Q    Ms. Cummings, I thought I just heard you testify that if

Cummings - redirect - McElfish                    1287

1  you relied upon Dr. Morgan's report, you wouldn't be giving

2  any psychotherapy?

3          MR. BARMEN:  Objection.

4  Q    Is that what I heard?

5          THE COURT:  Sustained.

6  Q    Let me read from your deposition, ma'am.

7          MR. BARMEN:  Objection.

8          THE COURT:  Sustained.

9          MR. McELFISH:  Judge, this is important.  Sidebar,

10  please, if you're not going to let me.  Let me pull up the

11  transcript and you can take a look.  Let me get to -- if you

12  would, Judge, go to 432-0024 for ID beginning at line nine

13  going down to line 23.

14          MR. BARMEN:  Objection.

15          MR. McELFISH:  It's impeaching.

16          MR. BARMEN:  It's improper.

17          THE COURT:  I'll allow it.

18  Q    In your deposition, Ms. Cummings, you were asked the

19  following questions and you gave the following answers on page

20  23 of the deposition, page 24 is the exhibit, line nine

21  through 23:

22          "Question:  The guy either misspoke or I misheard,

23  probably the former.  Dr. Morgan is what I meant to say also

24  had the opinion that basically Mr. Bauta was making up his

25  complaints and did not need future care.

1          "Did you -- so what I'm trying do understand the

2     foundation for the question is what defense doctor did you

3     rely upon in coming to the conclusion that he did need care?"

4          Then there's an objection by Mr. Barmen, go ahead,

5     and then the witness answers, I apologize.  The answer is:

6          "Dr. Morgan's report doesn't say he doesn't need

7     care.  It says he has no permanent injury, but it says he

8     shows signs of distress which can be ameliorated by

9     psychotherapy."

10         Is that the questions that you were asked and the

11    answers you gave in your deposition under oath?

12    A    You are right.  I remembered that it was Dr. Morgan who

13    said that he had objective signs -- he showed signs of stress

14    which could be ameliorated by psychotherapy.

15    Q    Okay.  So if you're relying on Dr. Morgan's report, you

16    would still give care; correct?

17    A    What kind of care?

18    Q    Psychotherapy.

19    A    I did.

20    Q    Great.  That's it.  I have no further questions.

21         MR. BARMEN:  Nothing, Your Honor.

22         THE COURT:  Thank you, Ms. Cummings.  You are

23    excused.

24         (Witness excused.)

25         THE COURT:  Call your next witness.

Cummings - redirect - McElfish            1289

1          MR. KIEFFER:  Chris Viggiano.

2          MR. BARMEN:  Your Honor, these folks have informed

3     us that they need to be on a train by 5:30.  They've been here

4     all day.

5          THE COURT:  Are they coming back tomorrow?

6          MR. BARMEN:  Please confirm that.

7          MR. McELFISH:  I can't do tomorrow.  I have

8     Dr. Mobin tomorrow.

9          MR. BARMEN:  These witnesses should go quickly.

10         THE COURT:  Either they take a later train or they

11    come another day.

12         MR. McELFISH:  Is there any one of the three

13    witnesses.

14         (Pause in proceedings.)

15         THE COURT:  Raise your right hand.

16         (Witness sworn/affirmed.)

17         THE COURT:  Can you have a seat please and tell the

18    court reporter your name and please spell it also.

19         THE WITNESS:  Christine Gauthier C-H-R-I-S-T-I-N-E

20    G-A-U-T-H-I-E-R.

21         THE COURT:  You may inquire.

22    **CHRISTINE GAUTHIER**,

23              called by the Plaintiff, having been

24              first duly sworn, was examined and testified

25              as follows:

Gauthier - direct - Kieffer                1290

1    DIRECT EXAMINATION

2    BY MR. KIEFFER:

3    Q    Good afternoon, ma'am.

4    A    Good afternoon.

5    Q    Who do you work for?

6    A    Beau Dietl & Associates.

7    Q    What do you do?

8    A    Investigator.

9    Q    How long have you been an investigator?

10   A    15 years.

11   Q    You are not a licensed private investigator?

12   A    No I'm not.

13   Q    Did you do work on the Jose Bauta case?

14   A    Yes.

15   Q    What sort of work did you do?

16   A    I did surveillance.

17   Q    When did you do surveillance?

18   A    I don't have a copy of my report.  Could you supply a

19   copy?

20   Q    No, ma'am.  Your attorneys refused to give us a copy of

21   your report.

22            THE COURT:  Sustained, stricken.

23   Q    Do you recall giving a deposition in this case, ma'am?

24   A    Correct.

25   Q    And you had a copy of your report at your deposition,

Gauthier - direct - Kieffer                    1291

1    true?

2    A    Yes.

3    Q    All right.  And you were able to provide us at the time

4    of your deposition with the dates of your surveillance, were

5    you not?

6    A    Yes.

7    Q    Have you reviewed that deposition recently in preparation

8    for your testimony here today?

9    A    Yes.

10   Q    So you recall that the first date you did surveillance on

11   Mr. Bauta was January 14, 2017; correct?

12   A    No. It was 2016.

13   Q    In 2016?

14   A    Correct.

15   Q    What month?

16   A    I believe it's July.

17   Q    All right.  And what did you do on that date?

18   A    I went to the subject's home address and documented

19   anything that I saw, which I did not see him.

20   Q    How long were you there?

21   A    Eight hours.

22   Q    Okay.  You didn't see Mr. Bauta?

23   A    No.

24   Q    Okay.  Did you take any video?

25   A    Yes.

Gauthier - direct - Kieffer                    1292

1    Q    What video did you take?

2    A    Just hourly time shots.

3    Q    Okay.  You next did surveillance on Mr. Bauta on February

4    18th of 2017?

5    A    No, another day in 2016.

6    Q    What day?

7    A    I'm not sure.

8    Q    What did you do?

9    A    Went to his home address.

10   Q    And what did you do at his home address?

11   A    Just document anything I saw, which I did not see him.

12   Q    Another eight-hour shift?

13   A    Yes.

14   Q    Were you alone or with somebody?

15   A    Alone.

16   Q    Okay.  Mr. Bauta didn't come or go from that residence

17   during that day?

18   A    Correct.

19   Q    Okay.  So you just took hourly time shots?

20   A    Correct.

21   Q    Okay.  Did you go do surveillance on Mr. Bauta after that

22   date?

23   A    Yes.

24   Q    When?

25   A    In 2017.

SN        OCR        RPR

Gauthier - direct - Kieffer                 1293

1  Q    February of 2017?

2  A    I believe so.

3  Q    Okay.  February 18th?

4  A    I believe so.

5  Q    What did you do on February 18th?

6  A    We went to a provider doctor's address.

7  Q    And what was that address?

8  A    I'm not -- I don't remember it.

9  Q    Do you know who the doctor was?

10 A    I don't remember.  I would need my report.

11 Q    All right.  Well, I don't have your report, ma'am.

12        MR. BARMEN:  Objection, Your Honor.

13        THE COURT:  Sustained, stricken.

14 Q    Did you see Mr. Bauta on that date?

15 A    No, I don't.

16 Q    Okay another eight-hour shift?

17 A    Yes.

18 Q    Did you work alone or was there another investigator with

19 you?

20 A    Another investigator was with me.

21 Q    Who?

22 A    I believe Scott Whitlock.

23 Q    And did you do surveillance on Mr. Bauta in January of

24 2017?

25 A    I'm not sure of the dates.

1  Q    Okay.  When is the last time you did any surveillance on

2  Mr. Bauta?

3  A    I'm not sure.  I know I did four days but I would need --

4  Q    You're not sure of the four days, but you did review your

5  sworn deposition testimony in preparation for today?

6  A    Yes, but I wasn't allowed to bring my report so I didn't

7  bring it.

8  Q    You were specifically told not to bring your report?

9         MR. BARMEN:  Objection.

10 A    No, not at all.

11 Q    Who didn't allow you not to bring it?

12        MR. BARMEN:  Objection.

13        THE COURT:  Overruled.

14 A    We were just told that you would have the reports, that

15 we would be able to look at them.

16 Q    All right.  And you were told you didn't need to bring

17 your own reports?

18 A    Correct.

19 Q    And your reports would set forth the details of what you

20 did, when you did it, where you did it and for how long you

21 did it; correct?

22 A    Correct.

23 Q    All right.

24        THE COURT:  Would they be materially different than

25 what you testified to already today?

1           THE WITNESS:  No.

2           THE COURT:  Each time was an eight-hour shift either

3    at his home or a doctor's office?

4           THE WITNESS:  Correct.

5           THE COURT:  And if you saw something you would have

6    shot video on it?

7           THE WITNESS:  Correct.

8           THE COURT:  You did not see anything?

9           THE WITNESS:  No.

10          THE COURT:  And you took hourly time shots?

11          THE WITNESS:  Correct.

12          THE COURT:  Anything else?

13          THE WITNESS:  That's it.

14   Q     Four occasions total, ma'am?

15   A     Correct.

16          MR. KIEFFER:  Thank you.

17          MR. BARMEN:  Your Honor, I have no questions, but

18   I'd like a cure instruction relative to the implications

19   regarding the report.  They issued a --

20          THE COURT:  Nope.

21          You're excused.  Thank you very much.

22          (Witness excused.)

23          THE COURT:  Ladies and gentlemen, once again keep an

24   open mind, no research, don't talk to anyone about it and if

25   you see anyone in the halls just smile and pass them by.

Gauthier - direct - Kieffer                1296

1    Tomorrow morning 9 o'clock I will see you.

2              (Jury exits.)

3              (In open court.)

4              THE COURT:  You will be here at 9.  If you have

5    issues you want to raise, fine, we'll talk about them.  If

6    not, we'll probably get going, knowing a couple of jurors

7    straggle in about 9:30.  We've got Dr. Mobin and he is going

8    to be all day?

9              MR. McELFISH:  He could be all day.  Maybe we can

10   get to the investigators tomorrow.

11             MR. BARMEN:  Well, they did indicate they're

12   available tomorrow.  Thursday is bad for Sean, but tomorrow

13   and Friday will work.  Thursday doesn't work for Sean.

14             THE COURT:  Well, let's actually do it this way.  So

15   Thursday doesn't work for Sean.  What about Dr. Casden.  How

16   much time is he going to take?

17             MR. McELFISH:  Probably similar to Cummings.

18             THE COURT:  So not even half a day.  So we can do

19   them Wednesday, the investigators, and leave Mr. Bauta and

20   Ms. Bauta for Thursday, if necessary.

21             MR. McELFISH:  If necessary.

22             THE COURT:  Well, he is necessary.  So why don't we

23   do them Wednesday and have the Bautas here just in case.

24             MR. McELFISH:  Tomorrow we can also do the Lichy

25   read-in.

1           THE COURT:  I understand you have issues with that.

2           MR. McELFISH:  We'll resolve it.

3           THE COURT:  Resolve it by tomorrow morning and we

4   will talk about it tomorrow morning if it's not resolved and

5   then we will do the read in and then Dr. Mobin or vice versa.

6           MR. McELFISH:  Vice versa just in case he goes long.

7   When will we hear a ruling on the application to open on

8   Brandon Osborn, the bus passenger?

9           THE COURT:  Tomorrow morning.

10          MR. McELFISH:  All right.  Everybody have a good

11  night.

12          (Matter adjourned until 9:00 a.m., Tuesday, May 8,

13  2017.)

14

15

16

17

18

19

20

21

22

23

24

25

1298

1      <u>I N D E X</u>

2

3      <u>WITNESS</u>                                          <u>PAGE</u>

4

5      **SCOTT WHITLOCK**

6          DIRECT EXAMINATION BY MR. KIEFFER          1068

7          CROSS-EXAMINATION BY MR. BARMEN            1101

8          REDIRECT EXAMINATION BY MR. KIEFFER        1111

9      **JAMES LAWRENCE THOMAS**

10         DIRECT EXAMINATION BY MR. KIEFFER          1115

11         CROSS-EXAMINATION BY MR. BARMEN            1134

12         REDIRECT EXAMINATION BY MR. KIEFFER        1188

13     **WENDY CUMMINGS**

14         DIRECT EXAMINATION BY MR. McELFISH         1193

15         CROSS-EXAMINATION BY MR. BARMEN            1254

16         REDIRECT EXAMINATION BY MR. McELFISH       1274

17         RECROSS-EXAMINATION BY MR. BARMEN          1285

18         REDIRECT EXAMINATION BY MR. McELFISH       1286

19     **CHRISTINE GAUTHIER**

20         DIRECT EXAMINATION  BY MR. KIEFFER         1290

21

22

23

24

25

1299

1    **E X H I B I T S**

2

3

4    Plaintiff's Exhibit 302                          1081

5

6    Plaintiff's Exhibit 364                          1118

7

8    Plaintiff's Exhibit P-364-0102                   1129

9

10   Plaintiff's Exhibit P-365                        1133

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        RPR        OCR

Bauta v. Greyhound, et al                                                          1

## $

**$1,721** [1] - 1233:14
**$10,592** [2] - 1245:19, 1246:4
**$100** [3] - 1235:25, 1252:14, 1252:15
**$125** [1] - 1235:23
**$146** [1] - 1232:13
**$15** [5] - 1235:24, 1236:1, 1245:11, 1245:13, 1261:17
**$15,000** [1] - 1231:11
**$174** [1] - 1232:6
**$22** [1] - 1261:12
**$225** [2] - 1232:11, 1232:12
**$24,000** [1] - 1204:15
**$296** [1] - 1235:14
**$3,500** [2] - 1144:25, 1201:17
**$30** [1] - 1235:25
**$30,400** [1] - 1231:14
**$40** [1] - 1235:23
**$400** [2] - 1130:7, 1182:17
**$402,496** [1] - 1246:9
**$432,000** [1] - 1266:25
**$432,896** [1] - 1246:14
**$6,800** [3] - 1222:11, 1223:10, 1241:23
**$696** [1] - 1232:8
**$79** [1] - 1236:9
**$8,600** [1] - 1230:9

## '

**'16** [2] - 1208:19, 1210:16
**'17** [4] - 1137:11, 1153:11, 1182:14, 1278:24
**'98** [1] - 1198:1

## 0

**0017** [1] - 1263:6
**0097** [1] - 1218:3
**017** [1] - 1177:22
**0174** [1] - 1178:6

## 1

**1** [10] - 1141:5, 1141:9, 1142:18, 1150:17, 1160:23, 1161:2, 1172:3, 1174:24, 1175:9, 1185:3
**10** [12] - 1078:8, 1078:20, 1095:8, 1095:9, 1095:19, 1098:7, 1098:9, 1105:16, 1161:9, 1173:6, 1173:12, 1262:22
**10-minute** [1] - 1238:9
**100** [1] - 1182:17
**10168** [1] - 1051:18
**10573** [1] - 1052:13
**1068** [1] - 1298:6
**107** [2] - 1155:24, 1155:25
**1081** [1] - 1299:4
**11** [8] - 1078:8, 1078:20, 1100:14,

1122:18, 1123:4, 1140:16, 1141:9, 1161:9
**11/8/17** [1] - 1182:9
**110** [5] - 1258:21, 1276:4, 1278:12, 1279:2, 1279:6
**1101** [1] - 1298:7
**1111** [1] - 1298:8
**1115** [1] - 1298:10
**1118** [1] - 1299:6
**1120-173** [1] - 1177:20
**1201** [1] - 1052:17
**1129** [1] - 1299:8
**1133** [1] - 1299:10
**1134** [1] - 1298:11
**1188** [1] - 1298:12
**1193** [1] - 1298:14
**11:00** [1] - 1085:15
**12** [3] - 1105:16, 1240:6, 1244:4
**12-minute** [1] - 1081:5
**122** [1] - 1051:17
**1254** [1] - 1298:15
**1274** [1] - 1298:16
**1285** [1] - 1298:17
**1286** [1] - 1298:18
**1290** [1] - 1298:20
**12:30** [3] - 1150:6, 1204:12, 1209:7
**12:52** [1] - 1087:1
**13** [1] - 1057:18
**136** [1] - 1222:8
**1375** [1] - 1052:5
**13th** [1] - 1199:5
**14** [3] - 1127:4, 1160:13, 1291:11
**14-CV-03725(FB)(RER** [1] - 1051:3
**140** [5] - 1171:24, 1172:3, 1173:5, 1173:10, 1175:8
**141** [3] - 1174:22, 1174:23, 1174:24
**15** [1] - 1290:10
**16** [3] - 1059:3, 1059:7, 1142:17
**1600** [1] - 1052:6
**16th** [2] - 1073:1, 1170:2
**17** [9] - 1137:1, 1137:6, 1172:3, 1213:8, 1217:17, 1237:10, 1254:23, 1254:24, 1269:3
**172** [2] - 1182:8, 1182:9
**173** [2] - 1184:24
**18** [2] - 1063:17, 1269:3
**183** [2] - 1149:21, 1149:22
**18th** [4] - 1073:1, 1292:4, 1293:3, 1293:5
**19** [4] - 1116:14, 1122:19, 1274:13, 1274:16
**1994** [2] - 1195:5, 1254:14
**19th** [2] - 1073:24, 1074:3
**1st** [3] - 1072:25, 1074:11, 1074:19

## 2

**2** [9] - 1072:14, 1075:16, 1076:14, 1137:6, 1159:2, 1160:10, 1178:7,

1281:8, 1281:9
**2/2** [5] - 1089:4, 1089:5, 1089:12, 1089:25
**20** [2] - 1095:14, 1192:15
**2000** [2] - 1126:1, 1194:20
**2000-2001** [1] - 1268:2
**2000s** [1] - 1194:20
**2001** [2] - 1194:15, 1254:23
**2011** [2] - 1173:6, 1173:7
**2014** [1] - 1278:22
**2015** [7] - 1116:14, 1140:14, 1140:15, 1140:16, 1140:18, 1140:20, 1141:21
**2016** [33] - 1063:17, 1069:2, 1069:8, 1069:11, 1070:7, 1122:19, 1124:2, 1126:1, 1127:1, 1178:8, 1195:5, 1199:5, 1201:19, 1203:21, 1211:16, 1234:10, 1263:11, 1263:13, 1266:13, 1267:13, 1270:11, 1270:14, 1270:16, 1270:20, 1279:1, 1281:11, 1283:21, 1283:24, 1283:25, 1291:12, 1291:13, 1292:5
**2017** [46] - 1072:14, 1076:14, 1080:9, 1081:5, 1124:3, 1125:11, 1126:2, 1127:2, 1136:22, 1136:23, 1137:6, 1141:8, 1141:24, 1142:2, 1145:6, 1149:21, 1151:6, 1152:5, 1154:15, 1156:5, 1160:1, 1160:2, 1161:14, 1165:4, 1172:9, 1173:8, 1174:19, 1181:25, 1185:24, 1188:4, 1237:8, 1270:13, 1270:15, 1270:22, 1278:25, 1281:8, 1281:9, 1291:11, 1292:4, 1292:25, 1293:1, 1293:24, 1297:13
**2018** [2] - 1051:7, 1129:20
**20th** [5] - 1073:1, 1145:6, 1151:6, 1160:1, 1161:6
**21** [5] - 1072:14, 1141:6, 1141:12, 1213:8, 1217:18
**2100** [1] - 1051:17
**21st** [10] - 1086:9, 1087:17, 1087:23, 1089:6, 1089:25, 1092:6, 1092:8, 1096:1, 1099:25, 1107:7
**22** [6] - 1053:23, 1091:4, 1161:2, 1161:3, 1161:10, 1184:25
**225** [1] - 1052:17
**22nd** [1] - 1096:1
**23** [13] - 1116:11, 1118:3, 1142:17, 1142:18, 1145:7, 1151:8, 1151:18, 1160:14, 1187:16, 1187:24, 1287:13, 1287:20, 1287:21
**24** [3] - 1142:18, 1274:16, 1287:20
**24,000** [1] - 1201:21
**25** [4] - 1070:7, 1071:10, 1126:24, 1156:2
**25th** [5] - 1069:10, 1070:20, 1073:10, 1169:25, 1170:1
**275** [4] - 1086:21, 1087:13, 1087:14, 1092:8
**28** [1] - 1071:4
**2:00** [2] - 1168:2, 1168:12
**2nd** [23] - 1072:25, 1074:11, 1074:19,

1074:23, 1074:25, 1076:21, 1080:9, 1081:4, 1082:7, 1085:13, 1085:21, 1087:24, 1089:10, 1099:25, 1100:14, 1102:12, 1106:14, 1138:9, 1141:8, 1160:2, 1161:4, 1161:5, 1161:14

## 3

**3** [8] - 1140:18, 1155:24, 1182:11, 1237:8, 1240:6, 1244:4, 1286:10, 1286:17
**3.6** [1] - 1158:1
**30** [3] - 1147:2, 1195:21, 1195:25
**30,400** [1] - 1246:1
**300** [1] - 1051:22
**300,000** [1] - 1267:1
**302** [7] - 1081:2, 1081:10, 1081:12, 1081:17, 1081:18, 1081:19, 1299:4
**304** [4] - 1080:24, 1080:25, 1081:1, 1081:8
**30th** [1] - 1073:24, 1074:3, 1129:20
**32-0303** [1] - 1196:17
**33** [4] - 1187:14, 1187:16, 1187:23, 1237:6
**34** [1] - 1187:16
**34th** [6] - 1258:21, 1276:4, 1278:12, 1279:2, 1279:6, 1279:13
**35** [1] - 1274:15
**364** [7] - 1063:15, 1116:11, 1117:11, 1117:21, 1118:5, 1123:21, 1299:6
**364-0023** [1] - 1117:2
**364-0047** [2] - 1123:2, 1123:19
**365** [1] - 1129:8
**365-0001** [3] - 1129:11, 1129:12, 1129:15
**365-0021** [1] - 1129:15
**37** [3] - 1160:9, 1160:13, 1160:23
**3740** [1] - 1051:22
**38** [4] - 1218:22, 1233:2, 1236:10, 1246:6
**397-45** [1] - 1071:6
**3rd** [3] - 1074:11, 1074:19, 1085:12

## 4

**4** [1] - 1161:1
**4,000** [1] - 1246:7
**4/17** [1] - 1089:16
**4/21** [1] - 1089:16
**41** [1] - 1126:24
**410-0559** [1] - 1140:12
**412-0173** [1] - 1177:21
**427-59** [1] - 1135:5
**42nd** [1] - 1051:17
**432-0024** [1] - 1287:12
**432-0034** [1] - 1237:6
**432-0057** [1] - 1240:5
**432-006** [1] - 1274:13
**432-0080** [1] - 1198:20

**432-0096** [2] - 1217:17, 1229:5
**432-0097** [1] - 1244:21
**432-0103** [1] - 1196:14
**432-36** [1] - 1274:10
**432-96** [2] - 1213:3, 1213:7
**44114** [1] - 1052:6
**447** [2] - 1071:2, 1071:5
**46** [1] - 1165:11
**4th** [1] - 1264:22

## 5

**5** [6] - 1140:15, 1161:1, 1161:3, 1161:15, 1161:16, 1185:4
**50** [11] - 1126:23, 1219:17, 1219:18, 1222:1, 1222:11, 1227:1, 1227:22, 1230:1, 1230:7, 1263:8, 1263:9
**50/50** [1] - 1198:16
**56** [2] - 1240:5, 1244:4
**561** [1] - 1140:12
**5:07** [1] - 1075:20
**5:30** [1] - 1289:3
**5th** [4] - 1072:25, 1074:12, 1074:19, 1140:14

## 6

**6** [3] - 1056:13, 1174:24, 1175:9
**6.04** [2] - 1139:17, 1140:2
**60/40** [1] - 1195:16
**614** [1] - 1078:12
**62** [4] - 1125:9, 1145:7, 1145:10, 1151:16
**63** [1] - 1151:24
**64112** [1] - 1051:23
**67** [3] - 1152:7, 1152:9, 1152:11
**6th** [1] - 1072:25

## 7

**7** [4] - 1051:7, 1056:13, 1184:8, 1237:10
**70** [4] - 1195:4, 1195:7, 1195:21, 1195:24
**70/30** [4] - 1195:1, 1195:16, 1195:20, 1198:15
**74** [1] - 1184:8
**742** [4] - 1055:19, 1056:13, 1057:10, 1057:22
**743** [1] - 1055:20
**745** [1] - 1057:12
**750** [1] - 1055:10
**756** [4] - 1056:12, 1056:13, 1057:15, 1060:4
**757** [1] - 1057:18
**7:34** [1] - 1086:11

## 8

**8** [2] - 1095:19, 1297:12
**800** [1] - 1052:12
**802** [2] - 1062:25, 1063:25
**83** [1] - 1125:9
**84th** [3] - 1169:25, 1170:2

## 9

**9** [6] - 1075:5, 1152:12, 1173:6, 1173:12, 1296:1, 1296:4
**90** [1] - 1150:16
**95** [2] - 1157:3, 1192:8
**975,000** [1] - 1158:2
**9:00** [1] - 1051:7, 1297:12
**9:30** [1] - 1296:7
**9th** [1] - 1052:5

## A

**a.m** [4] - 1051:7, 1075:5, 1086:11, 1297:12
**Aaron** [1] - 1200:3
**ability** [3] - 1117:16, 1216:7, 1216:8
**able** [21] - 1079:11, 1095:18, 1115:23, 1135:20, 1179:22, 1192:18, 1192:23, 1202:9, 1202:13, 1207:14, 1211:22, 1216:3, 1235:2, 1237:20, 1250:17, 1260:4, 1262:18, 1266:20, 1272:13, 1291:3, 1294:15
**absolutely** [1] - 1142:8
**absorb** [1] - 1059:7
**absorbs** [1] - 1059:5
**abstract** [1] - 1125:6
**Academy** [7] - 1138:23, 1139:5, 1157:20, 1158:5, 1158:10, 1158:11, 1197:6
**accept** [2] - 1139:8, 1139:9
**acceptable** [1] - 1267:20
**accepted** [11] - 1154:24, 1155:9, 1155:11, 1155:13, 1155:14, 1155:19, 1156:6, 1156:18, 1156:23, 1157:1, 1157:2
**access** [2] - 1216:3, 1250:22
**accident** [10] - 1058:18, 1059:3, 1094:3, 1107:4, 1118:22, 1143:4, 1170:7, 1207:22, 1274:8, 1278:22
**accommodate** [1] - 1111:21
**accommodating** [1] - 1114:7
**accompanied** [5] - 1073:12, 1074:8, 1083:9, 1084:22, 1100:17
**accompanying** [1] - 1087:8
**accomplish** [1] - 1255:11
**according** [8] - 1065:15, 1116:16, 1163:22, 1203:17, 1203:20, 1219:13, 1233:15, 1279:21
**account** [1] - 1224:17
**accounted** [1] - 1267:1

**accurate** [5] - 1057:1, 1084:11, 1105:10, 1164:15, 1184:6

**accurately** [2] - 1223:3, 1223:4

**accused** [1] - 1181:3

**achieve** [1] - 1076:4

**achievement** [2] - 1182:5, 1184:7

**acronym** [1] - 1191:16

**active** [1] - 1191:23

**actively** [1] - 1263:18

**activities** [9] - 1068:24, 1073:7, 1100:4, 1204:25, 1209:18, 1209:25, 1245:5, 1260:4, 1260:8

**activity** [2] - 1113:9, 1113:12

**acts** [1] - 1148:18

**actual** [4] - 1084:8, 1084:10, 1234:2, 1242:22

**acute** [1] - 1234:23

**add** [5] - 1126:21, 1245:17, 1245:24, 1246:11, 1248:9

**addition** [3] - 1110:13, 1158:19, 1260:25

**additional** [6] - 1063:10, 1085:12, 1124:22, 1127:3, 1263:15, 1265:4

**address** [20] - 1060:15, 1062:10, 1067:8, 1084:16, 1084:17, 1087:13, 1095:22, 1096:25, 1097:3, 1105:21, 1105:23, 1113:19, 1258:24, 1276:19, 1278:6, 1291:18, 1292:9, 1292:10, 1293:6, 1293:7

**addressed** [1] - 1054:21

**addressing** [1] - 1064:17

**adjourn** [1] - 1065:5

**adjourned** [3] - 1064:24, 1115:17, 1297:12

**adjournment** [1] - 1065:7

**adjunctive** [1] - 1232:21

**adjusting** [1] - 1207:25

**admissibility** [1] - 1117:18

**admission** [1] - 1164:8

**admit** [3] - 1123:18, 1128:20, 1132:22

**admits** [1] - 1166:16

**admitted** [5] - 1063:16, 1123:22, 1123:25, 1128:23, 1131:25

**admitting** [1] - 1162:19

**admonition** [2] - 1055:9, 1114:20

**advised** [3] - 1146:6, 1146:8, 1147:8

**advisement** [1] - 1062:2

**affect** [3] - 1161:19, 1190:3, 1266:9

**affected** [1] - 1205:16

**affiliated** [1] - 1259:5

**afraid** [1] - 1241:14

**afternoon** [4] - 1169:1, 1193:25, 1290:3, 1290:4

**afterwards** [1] - 1206:3

**age** [2] - 1054:6, 1261:24

**age-old** [1] - 1054:6

**agency** [4] - 1261:14, 1261:15, 1261:16

**agent** [1] - 1148:19

**ago** [10] - 1099:22, 1143:14, 1151:4, 1188:25, 1198:11, 1201:3, 1207:5, 1246:18, 1269:3, 1275:6

**agree** [24] - 1140:6, 1154:24, 1162:25, 1169:14, 1170:20, 1171:20, 1174:25, 1175:15, 1178:21, 1181:2, 1181:15, 1184:9, 1184:19, 1185:12, 1186:4, 1186:7, 1186:24, 1187:3, 1242:17, 1247:13, 1251:5, 1252:18, 1260:13, 1261:7

**agreed** [4] - 1058:5, 1174:1, 1181:25, 1184:25

**agreement** [3] - 1140:13, 1143:15, 1143:20

**ahead** [7] - 1137:10, 1139:20, 1151:19, 1243:1, 1265:6, 1271:14, 1288:4

**Aided** [1] - 1052:19

**aisle** [2] - 1058:14, 1058:19

**aisles** [1] - 1060:19

**AKOS** [1] - 1051:8

**Akos** [2] - 1052:4, 1052:11

**alert** [1] - 1114:14

**allegation** [2] - 1058:9, 1109:21

**alleged** [1] - 1269:16

**alleging** [1] - 1107:4

**allel** [1] - 1056:1

**allow** [13] - 1054:2, 1065:14, 1074:14, 1103:23, 1110:4, 1110:20, 1137:9, 1194:18, 1222:17, 1273:12, 1273:14, 1287:17, 1294:11

**allowance** [3] - 1230:16, 1231:9, 1260:13

**allowed** [3] - 1064:13, 1147:2, 1294:6

**allows** [1] - 1054:13

**almost** [7] - 1124:23, 1166:10, 1166:14, 1179:24, 1180:11, 1191:7, 1266:25

**alone** [6] - 1070:3, 1100:18, 1260:5, 1292:14, 1292:15, 1293:18

**alpha** [1] - 1119:1

**alter** [1] - 1212:23

**alternative** [2] - 1138:25, 1139:2

**ambiguous** [2] - 1265:12, 1266:10

**ameliorated** [2] - 1288:8, 1288:14

**American** [7] - 1138:23, 1139:5, 1157:20, 1158:5, 1158:10, 1158:11, 1197:7

**amount** [10] - 1109:8, 1109:15, 1109:22, 1118:20, 1186:22, 1222:9, 1235:13, 1235:14, 1275:22

**AND** [2] - 1051:8, 1051:13

**Anderson** [2] - 1052:4, 1052:11

**ANDERSON** [1] - 1051:8

**Andrew** [1] - 1200:6

**angle** [1] - 1099:1

**annual** [12] - 1218:4, 1218:12, 1218:21, 1219:9, 1231:16, 1231:20, 1232:8, 1233:10, 1235:1, 1235:14, 1236:2, 1237:3, 1241:7, 1242:9, 1245:17, 1245:18, 1245:22, 1246:4,

**annualization** [1] - 1236:7

**annualized** [1] - 1236:3

**annually** [1] - 1231:17

**answer** [51] - 1107:20, 1131:6, 1141:3, 1141:19, 1143:2, 1149:7, 1149:8, 1151:25, 1152:3, 1152:15, 1153:9, 1155:16, 1156:22, 1156:25, 1157:7, 1161:19, 1162:1, 1162:3, 1165:8, 1172:13, 1174:15, 1178:14, 1182:18, 1182:22, 1182:25, 1183:5, 1183:16, 1183:21, 1183:24, 1184:11, 1185:20, 1187:6, 1187:7, 1187:8, 1188:1, 1189:17, 1189:18, 1206:13, 1211:2, 1212:14, 1221:6, 1225:4, 1236:17, 1248:18, 1252:17, 1263:22, 1265:15, 1269:9, 1276:2, 1279:21, 1288:5

**ANSWER** [2] - 1237:18, 1237:24

**answered** [7] - 1130:14, 1153:16, 1155:21, 1183:9, 1184:12, 1197:20, 1242:19

**answering** [1] - 1257:11

**answers** [11] - 1056:6, 1149:6, 1149:10, 1237:15, 1237:25, 1238:1, 1244:3, 1269:7, 1287:19, 1288:5, 1288:11

**anti** [1] - 1234:12

**anti-inflammatory** [1] - 1234:12

**anyway** [2] - 1180:9, 1222:1

**apartment** [1] - 1262:16

**apologies** [2] - 1081:2, 1251:13

**apologize** [5] - 1204:19, 1217:6, 1218:6, 1246:3, 1288:5

**appear** [6] - 1063:12, 1082:6, 1084:21, 1105:11, 1124:16, 1198:1

**appearance** [1] - 1194:4

**appeared** [3] - 1083:9, 1106:4, 1214:15

**Apple** [2] - 1072:1, 1072:4

**apples** [5] - 1058:12, 1250:19, 1250:24

**apples-to-apples** [2] - 1250:19, 1250:24

**application** [4] - 1054:2, 1060:13, 1065:22, 1297:7

**appointment** [4] - 1106:15, 1106:17, 1131:4, 1131:5

**appointments** [6] - 1096:23, 1107:24, 1113:13, 1131:8, 1132:1, 1132:9

**appreciate** [3] - 1188:21, 1253:23, 1285:14

**approach** [3] - 1108:13, 1223:16, 1269:23

**appropriate** [4] - 1150:7, 1152:19, 1262:21, 1267:17

**April** [23] - 1072:14, 1086:9, 1087:17, 1087:23, 1089:6, 1089:25, 1092:6, 1092:8, 1096:1, 1099:25, 1107:7, 1136:22, 1145:6, 1151:6, 1152:5, 1153:11, 1154:15, 1160:1, 1161:6, 1162:16

**area** [8] - 1125:10, 1127:5, 1207:16, 1211:16, 1235:15, 1244:21, 1245:1, 1251:22

**areas** [5] - 1124:23, 1125:2, 1125:3, 1127:10, 1217:23

**argue** [3] - 1060:19, 1060:20, 1099:10

**argument** [3] - 1093:11, 1093:23, 1110:19

**argumentative** [2] - 1286:12, 1286:19

**arguments** [3] - 1094:1, 1224:24, 1273:13

**arising** [1] - 1212:5

**arms** [1] - 1188:1

**arranged** [3] - 1142:14, 1143:7, 1143:10

**arrangement** [1] - 1154:6

**arrangements** [2] - 1053:25, 1139:19

**arrive** [1] - 1203:5

**arrived** [1] - 1260:2

**articulate** [1] - 1092:16

**artifact** [3] - 1164:11, 1164:16, 1165:4

**artificially** [1] - 1286:7

**ascertain** [1] - 1226:5

**aspect** [1] - 1178:12

**assess** [2] - 1116:21, 1118:19

**assessed** [1] - 1118:18

**assessment** [2] - 1178:20, 1185:22

**assigned** [2] - 1069:15, 1104:15

**assignment** [3] - 1069:1, 1069:13, 1113:15

**assignments** [1] - 1105:17

**assistance** [4] - 1244:21, 1244:25, 1245:2, 1245:7

**assistant** [1] - 1254:15

**assisting** [1] - 1083:14

**associate** [1] - 1228:3

**associated** [3] - 1233:11, 1252:25, 1278:12

**Associates** [10] - 1051:15, 1068:6, 1068:7, 1068:10, 1068:14, 1068:20, 1079:22, 1109:17, 1112:1, 1290:6

**Associates's** [1] - 1080:10

**Association** [2] - 1197:7, 1197:8

**Associations** [1] - 1196:17

**associations** [2] - 1197:4, 1256:6

**assume** [9] - 1056:8, 1079:12, 1136:17, 1210:6, 1250:25, 1275:13, 1275:20, 1275:21, 1282:10

**assumed** [4] - 1092:12, 1137:25, 1212:4, 1257:10

**assuming** [7] - 1210:23, 1219:4, 1219:6, 1219:7, 1221:2, 1246:14, 1262:5

**assumption** [2] - 1138:1, 1215:1

**assumptions** [1] - 1154:4

**asterisk** [1] - 1127:9

**attached** [2] - 1195:24, 1196:9

**attempted** [1] - 1100:3

**attempting** [2] - 1077:25, 1086:3

**attends** [1] - 1285:12

**attention** [5] - 1053:9, 1131:22, 1135:20, 1178:13, 1196:5

**attorney** [4] - 1140:25, 1141:1, 1143:23, 1255:21

**attorneys** [11] - 1051:21, 1130:9, 1168:7, 1200:2, 1202:23, 1210:10, 1211:8, 1211:18, 1212:20, 1214:11, 1290:20

**Attorneys** [3] - 1051:16, 1052:3, 1052:10

**attribute** [3] - 1171:12, 1191:19, 1222:3

**attributed** [1] - 1221:9

**auditory** [5] - 1134:12, 1134:16, 1134:20, 1134:25, 1135:12

**August** [1] - 1072:25

**authored** [2] - 1199:5, 1222:21

**auto** [1] - 1164:16

**available** [4] - 1147:3, 1215:20, 1281:12, 1296:12

**Avenue** [6] - 1051:22, 1052:12, 1078:6, 1086:21, 1087:13, 1092:9

**average** [2] - 1169:22, 1169:23

**avoid** [3] - 1054:6, 1091:12, 1161:23

**aware** [22] - 1056:9, 1058:9, 1059:15, 1076:13, 1076:15, 1080:8, 1112:9, 1138:6, 1138:8, 1138:9, 1186:1, 1188:6, 1189:13, 1189:23, 1215:23, 1215:24, 1249:5, 1251:14, 1265:8, 1265:22, 1277:14, 1278:5

**awful** [1] - 1181:21

**awkward** [1] - 1220:11

## B

**Bachelor's** [2] - 1254:13, 1254:16

**backed** [1] - 1272:22

**background** [8] - 1194:11, 1194:13, 1208:1, 1224:13, 1229:12, 1254:12, 1264:12

**bad** [2] - 1139:11, 1296:12

**bag** [2] - 1083:24, 1090:16

**ball** [1] - 1182:6

**ballpark** [2] - 1217:6, 1218:20

**bangs** [1] - 1118:22

**bar** [2] - 1059:12, 1282:12

**barely** [1] - 1089:24

**Barman** [4] - 1055:10, 1190:19, 1285:4, 1285:8

**BARMEN** [280] - 1052:7, 1054:16, 1055:11, 1055:16, 1056:19, 1056:22, 1056:25, 1057:4, 1057:19, 1057:21, 1062:8, 1062:13, 1062:16, 1062:19, 1063:24, 1065:6, 1066:15, 1066:21, 1066:24, 1069:3, 1070:18, 1071:3, 1071:5, 1080:22, 1081:15, 1081:19, 1081:22, 1082:21, 1083:17, 1085:1, 1088:2, 1088:18, 1088:21, 1089:3, 1089:15, 1089:21, 1090:13, 1091:25,

1097:18, 1100:20, 1101:11, 1102:11, 1102:14, 1102:18, 1103:15, 1104:12, 1104:14, 1105:2, 1105:5, 1105:14, 1107:2, 1108:4, 1108:11, 1109:14, 1110:1, 1110:9, 1110:18, 1112:3, 1112:7, 1114:4, 1114:19, 1114:23, 1116:23, 1117:7, 1117:13, 1122:24, 1124:13, 1125:21, 1127:22, 1128:24, 1130:10, 1132:25, 1134:2, 1134:4, 1134:6, 1135:6, 1137:1, 1137:5, 1141:5, 1141:8, 1142:19, 1142:22, 1145:22, 1146:5, 1146:11, 1146:15, 1146:21, 1147:7, 1147:13, 1147:17, 1148:4, 1148:9, 1148:11, 1148:15, 1148:22, 1149:2, 1149:15, 1149:18, 1150:1, 1150:5, 1150:9, 1150:16, 1151:3, 1151:13, 1151:15, 1151:18, 1151:20, 1152:18, 1153:18, 1155:24, 1156:3, 1156:17, 1157:10, 1158:15, 1158:17, 1158:18, 1159:2, 1159:4, 1159:13, 1160:9, 1160:13, 1160:23, 1161:1, 1161:5, 1161:10, 1161:12, 1161:13, 1164:4, 1164:7, 1165:10, 1165:13, 1166:4, 1166:13, 1166:15, 1169:4, 1169:11, 1169:13, 1171:24, 1172:1, 1172:3, 1172:23, 1173:1, 1173:4, 1174:22, 1175:8, 1177:20, 1177:23, 1178:6, 1178:18, 1181:1, 1182:11, 1185:3, 1185:6, 1187:14, 1187:16, 1188:21, 1189:15, 1193:7, 1194:17, 1205:5, 1206:18, 1208:16, 1211:11, 1212:12, 1213:4, 1213:9, 1213:14, 1214:7, 1216:4, 1216:25, 1220:9, 1220:15, 1222:15, 1223:14, 1223:16, 1224:3, 1225:10, 1227:3, 1227:7, 1227:15, 1229:15, 1229:23, 1235:4, 1236:18, 1236:23, 1240:1, 1240:10, 1241:15, 1242:2, 1242:4, 1242:8, 1242:18, 1242:23, 1244:6, 1247:4, 1247:9, 1247:16, 1247:24, 1248:11, 1248:22, 1249:6, 1249:8, 1249:13, 1249:20, 1250:1, 1250:15, 1251:10, 1252:16, 1253:6, 1253:15, 1253:17, 1253:20, 1254:2, 1256:8, 1256:14, 1256:17, 1256:18, 1258:11, 1258:12, 1258:19, 1263:2, 1263:5, 1263:7, 1264:22, 1264:24, 1265:4, 1265:7, 1266:1, 1266:7, 1266:19, 1269:2, 1269:14, 1269:22, 1270:3, 1270:11, 1270:14, 1270:16, 1270:20, 1270:23, 1271:1, 1271:4, 1271:8, 1271:13, 1271:18, 1271:22, 1271:25, 1274:2, 1274:14, 1275:7, 1275:25, 1276:17, 1278:3, 1278:14, 1280:21, 1281:1, 1281:8, 1281:19, 1282:7, 1283:10, 1284:4, 1285:16, 1286:22, 1287:3, 1287:7, 1287:14, 1287:16, 1288:21, 1289:2, 1289:6, 1289:9, 1293:12, 1294:9, 1294:12, 1295:17, 1296:11, 1298:7, 1298:11, 1298:15, 1298:17

**barmen** [3] - 1063:20, 1188:25, 1288:4
**Barmen** [16] - 1066:10, 1109:4, 1111:6, 1111:24, 1112:10, 1166:20, 1169:10, 1210:10, 1217:17, 1218:24, 1218:25, 1274:6, 1274:21, 1275:3, 1279:17, 1282:10
**Barmen's** [1] - 1053:13
**bars** [4] - 1235:19, 1235:24, 1267:6, 1282:11
**base** [7] - 1109:23, 1220:21, 1244:15, 1246:24, 1252:21, 1283:6, 1284:9
**based** [55] - 1060:19, 1061:13, 1071:19, 1103:22, 1134:9, 1140:23, 1173:24, 1186:9, 1186:16, 1212:24, 1213:21, 1216:19, 1217:12, 1219:6, 1219:22, 1219:25, 1220:25, 1221:20, 1222:1, 1224:4, 1226:7, 1226:17, 1226:18, 1227:5, 1227:8, 1228:1, 1229:8, 1229:21, 1230:4, 1231:25, 1232:2, 1232:10, 1237:21, 1241:12, 1241:15, 1242:14, 1242:18, 1244:17, 1245:3, 1245:21, 1246:13, 1249:12, 1255:14, 1255:20, 1256:21, 1259:12, 1264:11, 1265:17, 1265:18, 1267:15, 1269:6, 1278:7, 1278:16, 1279:25
**baseless** [1] - 1055:1
**baseline** [2] - 1122:9, 1170:8
**basing** [2] - 1259:21, 1283:1
**basis** [7] - 1132:10, 1192:13, 1235:2, 1245:17, 1250:17, 1250:19, 1260:25
**Bates** [1] - 1213:5
**bathroom** [2] - 1235:19, 1235:24
**Batteries** [1] - 1124:6
**battery** [21] - 1127:16, 1134:17, 1134:22, 1144:9, 1144:21, 1152:11, 1170:12, 1175:10, 1175:22, 1175:25, 1176:3, 1176:17, 1176:18, 1180:14, 1181:17, 1182:3, 1182:5, 1190:22, 1190:24, 1191:3, 1191:8
**Battery** [4] - 1124:2, 1125:12, 1126:2, 1176:18
**bauta** [5] - 1061:10, 1074:2, 1074:11, 1076:14, 1076:20
**BAUTA** [1] - 1051:3
**Bauta** [223] - 1051:16, 1051:21, 1054:3, 1058:20, 1058:23, 1058:25, 1059:1, 1059:4, 1060:21, 1061:4, 1061:9, 1065:19, 1068:22, 1069:2, 1069:6, 1069:14, 1069:22, 1070:15, 1070:20, 1071:10, 1071:14, 1072:16, 1072:23, 1073:3, 1073:25, 1074:19, 1074:23, 1075:19, 1076:1, 1078:6, 1078:20, 1079:10, 1079:17, 1080:9, 1082:7, 1082:8, 1082:10, 1082:12, 1082:14, 1082:15, 1082:25, 1083:5, 1083:9, 1083:24, 1084:12, 1085:18, 1086:8, 1086:22, 1087:12, 1088:11, 1088:16, 1089:12, 1092:9, 1092:10, 1092:11, 1093:1, 1094:3, 1095:6, 1095:10, 1098:4, 1098:13, 1098:20,

1099:23, 1100:6, 1100:12, 1100:24, 1102:7, 1102:19, 1103:10, 1105:17, 1105:22, 1112:2, 1113:5, 1113:11, 1113:16, 1113:23, 1115:19, 1116:17, 1122:6, 1122:11, 1123:3, 1124:5, 1124:9, 1125:3, 1127:15, 1127:20, 1128:11, 1129:6, 1130:2, 1130:16, 1130:23, 1131:3, 1131:8, 1132:1, 1132:4, 1132:9, 1134:11, 1134:20, 1134:25, 1135:11, 1136:5, 1136:9, 1137:12, 1137:23, 1140:10, 1140:18, 1140:20, 1140:24, 1142:15, 1143:2, 1143:11, 1143:25, 1151:10, 1151:22, 1154:6, 1154:14, 1154:21, 1155:19, 1159:14, 1159:22, 1160:2, 1160:18, 1161:21, 1162:17, 1162:22, 1169:18, 1170:4, 1170:11, 1170:20, 1171:10, 1173:23, 1175:20, 1176:15, 1177:3, 1177:7, 1177:9, 1177:25, 1178:7, 1178:21, 1178:25, 1179:2, 1179:5, 1180:2, 1181:16, 1182:14, 1185:8, 1186:1, 1187:9, 1188:7, 1189:1, 1189:5, 1189:11, 1189:20, 1190:10, 1190:21, 1191:25, 1192:11, 1201:24, 1201:25, 1202:2, 1202:10, 1202:14, 1202:19, 1203:1, 1203:8, 1203:21, 1204:7, 1209:21, 1210:2, 1210:16, 1210:21, 1213:15, 1213:17, 1213:20, 1217:21, 1219:2, 1220:1, 1220:13, 1222:10, 1223:13, 1229:19, 1229:22, 1231:10, 1231:25, 1234:9, 1235:16, 1237:22, 1237:23, 1247:14, 1249:4, 1256:23, 1257:8, 1258:4, 1259:16, 1259:25, 1260:5, 1262:12, 1263:11, 1263:18, 1264:17, 1265:9, 1274:25, 1275:13, 1276:6, 1277:12, 1277:25, 1282:10, 1282:11, 1285:8, 1287:24, 1290:13, 1291:11, 1291:22, 1292:3, 1292:16, 1292:21, 1293:14, 1293:23, 1294:2, 1296:19, 1296:20
**Bauta's** [22] - 1075:8, 1084:18, 1086:17, 1098:24, 1115:22, 1115:24, 1116:21, 1117:3, 1130:18, 1158:19, 1171:12, 1185:16, 1220:4, 1229:9, 1236:12, 1245:4, 1246:11, 1248:14, 1258:5, 1258:23, 1260:16, 1276:22
**Bautas** [1] - 1296:23
**bear** [3] - 1057:24, 1125:14, 1134:9
**beat** [1] - 1242:14
**Beau** [9] - 1068:6, 1068:7, 1068:9, 1068:13, 1068:20, 1109:16, 1109:20, 1112:1, 1290:6
**became** [1] - 1059:15
**become** [3] - 1178:22, 1186:20, 1265:22
**bed** [6] - 1204:13, 1209:8, 1209:11, 1245:6, 1245:8, 1260:12
**bedridden** [1] - 1266:15
**BEFORE** [1] - 1051:12
**began** [5] - 1076:13, 1086:11,

1086:17, 1209:2, 1278:21
**begin** [2] - 1217:4, 1231:17
**beginning** [7] - 1056:13, 1061:14, 1105:24, 1212:2, 1217:10, 1237:10, 1287:12
**behalf** [1] - 1148:18
**behind** [2] - 1054:3, 1098:6
**belief** [3] - 1123:15, 1123:17, 1186:16
**believes** [2] - 1062:22, 1139:6
**bell** [1] - 1278:10
**below** [2] - 1058:1, 1119:9
**bench** [3] - 1058:16, 1058:18, 1059:16
**beneficial** [10] - 1151:9, 1151:21, 1152:13, 1154:1, 1154:9, 1183:22, 1184:2, 1184:25, 1185:8, 1185:14
**benefit** [9] - 1181:20, 1182:1, 1182:2, 1183:18, 1183:19, 1184:15, 1191:19, 1192:3, 1227:10
**benefits** [3] - 1154:5, 1178:20, 1244:14
**best** [5] - 1095:14, 1144:4, 1144:5, 1152:20, 1219:22
**beta** [3] - 1119:1, 1119:2
**better** [18] - 1076:9, 1096:19, 1124:20, 1131:6, 1139:10, 1144:1, 1184:6, 1186:12, 1186:20, 1186:21, 1186:23, 1192:25, 1193:1, 1194:7, 1197:22, 1206:13, 1255:3, 1266:20
**betterment** [1] - 1185:14
**between** [14] - 1120:7, 1123:15, 1124:5, 1124:11, 1127:16, 1141:1, 1143:10, 1169:25, 1185:19, 1203:8, 1217:8, 1264:20, 1279:18, 1282:4
**beyond** [3] - 1157:5, 1186:8, 1265:20
**bias** [1] - 1110:1
**big** [7] - 1066:8, 1117:5, 1120:20, 1125:17, 1143:4, 1153:21, 1153:22
**bigger** [6] - 1153:23, 1222:12, 1222:13, 1240:9, 1244:22, 1246:3
**biggest** [2] - 1185:17, 1260:14
**billed** [2] - 1112:9, 1201:19
**billing** [7] - 1129:13, 1129:15, 1215:25, 1217:2, 1251:5, 1251:7, 1252:21
**bills** [7] - 1129:5, 1129:19, 1129:22, 1129:24, 1130:15, 1130:21, 1132:23
**biofeedback** [3] - 1132:19, 1192:6, 1192:7
**biomechanical** [2] - 1053:15, 1059:5
**BISGAARD** [1] - 1052:3
**bit** [8] - 1082:2, 1099:14, 1130:8, 1130:12, 1134:9, 1170:10, 1191:1, 1254:11
**black** [2] - 1157:11, 1157:12
**blew** [1] - 1274:16
**blind** [1] - 1144:10
**blocks** [3] - 1078:8, 1078:20
**blow** [2] - 1161:3, 1182:11
**blowup** [1] - 1178:19
**blue** [3] - 1119:8, 1123:9, 1123:12

**blurry** [1] - 1222:20
**Bo** [3] - 1079:22, 1080:9, 1101:23
**Bob** [1] - 1159:19
**bone** [5] - 1205:25, 1206:11, 1206:15, 1206:17, 1233:5
**book** [4] - 1125:17, 1172:21, 1215:5, 1215:9
**boom** [1] - 1166:23
**boroughs** [1] - 1192:6
**boss** [2] - 1069:21, 1097:9
**bottom** [4] - 1088:6, 1145:9, 1178:19, 1178:22
**box** [2] - 1164:17, 1164:21
**boy** [1] - 1175:21
**brace** [1] - 1235:20
**Bradford** [3] - 1078:12, 1084:17, 1086:18
**BRADLEY** [1] - 1052:7
**Braggard's** [1] - 1214:5
**brain** [37] - 1061:21, 1115:24, 1116:21, 1117:3, 1118:13, 1119:2, 1123:4, 1123:5, 1124:23, 1124:24, 1125:4, 1127:11, 1127:17, 1127:18, 1127:21, 1128:9, 1136:13, 1136:14, 1136:18, 1137:15, 1137:20, 1137:24, 1138:2, 1163:20, 1163:22, 1171:17, 1180:12, 1183:11, 1185:12, 1185:14, 1186:14, 1188:7, 1188:10, 1188:15, 1191:5, 1191:9, 1192:7
**brain-damage** [1] - 1124:23
**brain-damaged** [3] - 1124:24, 1125:4, 1180:12
**brain-injured** [2] - 1119:2, 1137:20
**Brandon** [4] - 1054:8, 1058:10, 1059:8, 1297:8
**break** [14] - 1104:3, 1104:4, 1150:7, 1166:24, 1168:1, 1179:13, 1180:3, 1230:22, 1231:2, 1238:4, 1238:7, 1238:8, 1238:9, 1283:12
**breakdown** [3] - 1230:19, 1230:24, 1264:20
**breaking** [1] - 1176:24
**Brendon** [1] - 1058:6
**brief** [1] - 1082:22
**briefly** [3] - 1060:15, 1108:13, 1269:23
**bring** [11] - 1053:8, 1058:5, 1058:21, 1060:8, 1237:11, 1274:15, 1294:6, 1294:7, 1294:8, 1294:11, 1294:16
**bringing** [3] - 1053:7, 1054:5, 1110:3
**BRISBOIS** [1] - 1052:3
**Brisbois** [1] - 1199:10
**broad** [2] - 1110:2, 1221:5
**broad-brush** [1] - 1110:2
**broke** [1] - 1217:23
**broken** [3] - 1054:10, 1054:24, 1061:22
**Brook** [1] - 1052:13
**Brooklyn** [5] - 1051:5, 1077:20, 1078:9, 1078:21, 1086:18
**brought** [1] - 1103:20

**bruises** [3] - 1061:7, 1061:18, 1061:19
**brush** [4] - 1110:2, 1235:19, 1235:24, 1267:6
**building** [6] - 1086:24, 1087:1, 1092:10, 1259:13, 1277:1, 1277:3
**bullshit** [1] - 1093:25
**bumps** [3] - 1061:7, 1061:17, 1061:19
**Bureau** [2] - 1261:20, 1261:23
**bus** [20] - 1053:14, 1053:20, 1054:3, 1054:9, 1056:4, 1057:6, 1058:5, 1058:14, 1058:22, 1060:2, 1060:3, 1060:6, 1060:22, 1061:3, 1061:15, 1061:16, 1061:19, 1062:11, 1170:7, 1297:8
**business** [1] - 1112:16
**buttonhole** [1] - 1072:7
**BY** [82] - 1051:18, 1051:23, 1052:7, 1052:13, 1068:2, 1077:2, 1082:5, 1083:4, 1084:15, 1085:3, 1086:7, 1087:21, 1088:4, 1098:3, 1099:4, 1100:23, 1101:11, 1102:18, 1104:14, 1105:5, 1107:2, 1111:5, 1115:14, 1118:10, 1134:6, 1137:5, 1151:3, 1151:20, 1152:18, 1153:18, 1156:3, 1157:10, 1158:18, 1159:4, 1159:13, 1161:13, 1164:4, 1164:7, 1165:10, 1169:13, 1181:1, 1185:6, 1188:24, 1193:24, 1195:19, 1197:2, 1198:22, 1211:6, 1211:14, 1213:11, 1214:10, 1218:2, 1229:4, 1239:17, 1244:1, 1254:2, 1256:18, 1258:12, 1258:19, 1263:7, 1264:24, 1265:7, 1266:7, 1266:19, 1269:2, 1274:5, 1285:1, 1285:16, 1286:24, 1290:2, 1298:6, 1298:7, 1298:8, 1298:10, 1298:11, 1298:12, 1298:14, 1298:15, 1298:16, 1298:17, 1298:18, 1298:20
**bystander** [1] - 1072:10

# C

**C-700** [1] - 1052:12
**C-U-M-M-I-N-G-S** [1] - 1193:18
**C.V** [1] - 1197:5
**cab** [1] - 1073:21
**Cadman** [1] - 1052:17
**calculated** [1] - 1219:16
**camcorder** [2] - 1071:18, 1099:17
**camera** [12] - 1071:18, 1071:20, 1071:22, 1071:25, 1072:4, 1079:14, 1099:2, 1099:5, 1099:7, 1099:13, 1103:12
**cancel** [1] - 1132:6
**cancelled** [3] - 1131:9, 1131:10, 1132:1
**cane** [41] - 1076:21, 1077:3, 1077:14, 1078:3, 1078:24, 1079:2, 1079:6, 1088:13, 1098:24, 1100:7, 1101:6, 1101:7, 1102:20, 1103:5, 1103:10, 1103:14, 1103:16, 1107:25, 1203:5,

1203:6, 1203:14, 1205:24, 1235:21, 1236:1, 1236:3, 1236:5, 1236:13, 1236:16, 1236:22, 1237:2, 1237:17, 1237:19, 1237:23, 1260:1, 1262:7, 1262:11, 1271:2, 1271:4
**canes** [2] - 1102:6, 1112:12
**cannot** [8] - 1064:20, 1090:6, 1090:7, 1090:9, 1090:20, 1092:16, 1164:2
**capability** [1] - 1072:2
**capable** [4] - 1184:21, 1245:9, 1266:8, 1266:12
**Capiola** [1] - 1276:14
**capture** [2] - 1076:8, 1086:3
**car** [1] - 1070:2
**card** [1] - 1098:19
**care** [69] - 1127:21, 1130:25, 1135:3, 1135:17, 1137:13, 1193:12, 1194:14, 1194:23, 1195:6, 1195:9, 1195:12, 1216:19, 1219:3, 1219:4, 1219:25, 1221:8, 1221:9, 1221:10, 1221:14, 1224:12, 1224:16, 1224:22, 1225:1, 1225:5, 1225:9, 1226:9, 1226:18, 1229:25, 1230:20, 1232:2, 1234:8, 1237:19, 1239:20, 1241:3, 1246:12, 1248:9, 1248:21, 1249:4, 1249:23, 1251:9, 1251:12, 1251:13, 1253:1, 1260:13, 1261:1, 1261:11, 1262:4, 1262:22, 1266:16, 1266:21, 1267:1, 1269:15, 1272:8, 1275:1, 1275:4, 1275:14, 1275:16, 1277:13, 1280:16, 1282:1, 1283:22, 1284:3, 1285:22, 1287:25, 1288:3, 1288:7, 1288:16, 1288:17
**carefully** [1] - 1142:9
**carried** [1] - 1203:14
**carries** [1] - 1237:2
**carrying** [5] - 1076:21, 1079:1, 1083:24, 1231:23, 1244:12
**cart** [1] - 1084:1
**CARTMELL** [1] - 1051:20
**Casden** [5] - 1200:6, 1281:25, 1282:4, 1282:6, 1296:15
**case** [72] - 1054:12, 1054:23, 1057:7, 1058:9, 1062:23, 1068:22, 1069:9, 1070:24, 1072:14, 1090:8, 1090:23, 1094:6, 1095:20, 1095:23, 1107:5, 1107:13, 1107:17, 1107:22, 1107:24, 1113:18, 1115:22, 1130:4, 1136:20, 1137:15, 1138:6, 1141:17, 1143:20, 1154:7, 1157:5, 1158:3, 1168:4, 1182:7, 1192:17, 1192:22, 1198:6, 1199:3, 1199:13, 1199:18, 1200:3, 1200:13, 1200:17, 1200:22, 1201:18, 1202:3, 1210:11, 1210:24, 1212:4, 1212:6, 1212:8, 1212:10, 1212:17, 1217:12, 1219:4, 1220:25, 1221:3, 1221:25, 1225:15, 1225:23, 1249:10, 1249:17, 1249:19, 1256:20, 1256:22, 1257:7, 1273:8, 1277:24, 1286:10, 1286:17, 1290:13, 1290:23, 1296:23,

1297:6
**case-related** [1] - 1107:24
**cases** [8] - 1111:12, 1138:24, 1221:3, 1221:7, 1221:24, 1244:18, 1251:16, 1255:6
**catch** [2] - 1062:11, 1249:15
**Category** [2] - 1125:5, 1126:5
**category** [4] - 1125:25, 1207:5, 1223:12, 1234:6
**catherine** [1] - 1055:6
**causation** [2] - 1274:8, 1274:19
**CAUSE** [1] - 1051:12
**caused** [1] - 1269:17
**CAV** [3] - 1051:9, 1052:4, 1052:11
**cell** [2] - 1072:9, 1099:14
**center** [1] - 1258:20
**certain** [14] - 1063:11, 1063:23, 1068:21, 1068:24, 1084:22, 1109:8, 1116:3, 1129:5, 1131:7, 1161:18, 1162:4, 1226:25, 1257:1, 1266:13
**certainly** [21] - 1054:7, 1058:9, 1058:11, 1060:19, 1064:3, 1065:10, 1114:17, 1140:5, 1144:3, 1145:4, 1146:8, 1154:5, 1250:4, 1252:13, 1254:9, 1261:6, 1272:4, 1272:7, 1278:12, 1279:7, 1279:12
**certification** [1] - 1254:20
**certified** [5] - 1194:14, 1254:9, 1254:15, 1254:21, 1254:23
**cervical** [2] - 1057:6, 1057:8
**chair** [4] - 1235:18, 1235:23, 1267:3, 1282:12
**chairs** [1] - 1282:11
**challenged** [1] - 1173:18
**chance** [5] - 1202:2, 1252:14, 1254:7, 1283:8, 1283:14
**chances** [2] - 1096:11, 1096:19
**change** [6] - 1062:4, 1075:11, 1089:15, 1117:17, 1212:23, 1265:8
**changed** [1] - 1185:19
**changes** [3] - 1067:7, 1147:5, 1147:6
**changing** [6] - 1074:3, 1086:14, 1153:19, 1153:20, 1166:4, 1166:6
**characterization** [1] - 1064:15
**characterize** [1] - 1064:15
**characterizing** [2] - 1139:23, 1170:22
**charge** [2] - 1144:25, 1252:23
**charges** [1] - 1234:2
**chart** [5] - 1063:16, 1064:4, 1064:7, 1064:8
**chase** [1] - 1228:5
**check** [1] - 1251:25
**chiropractors** [1] - 1214:4
**choice** [1] - 1282:3
**choices** [1] - 1191:1
**chose** [2] - 1180:4, 1215:17
**choses** [1] - 1147:20
**Chris** [2] - 1070:6, 1289:1
**Christine** [1] - 1289:19

**CHRISTINE** [3] - 1289:19, 1289:22, 1298:19
**circumstance** [1] - 1092:23
**circumstances** [3] - 1111:12, 1132:6, 1265:9
**city** [1] - 1107:12
**City** [6] - 1051:23, 1073:17, 1073:20, 1073:22, 1192:6, 1192:16
**CIVIL** [1] - 1051:12
**claimant** [1] - 1073:21
**claimant's** [1] - 1069:16
**claimants** [3] - 1102:3, 1107:23, 1113:7
**claiming** [1] - 1113:24
**claims** [3] - 1113:17, 1148:14, 1198:5
**clarification** [3] - 1089:8, 1091:25, 1253:20
**clarify** [3] - 1149:25, 1163:10, 1285:17
**clarity** [1] - 1085:23
**classic** [1] - 1156:16
**classically** [1] - 1149:5
**clean** [1] - 1262:16
**cleaning** [1] - 1262:1
**clear** [13] - 1057:24, 1060:14, 1081:19, 1122:6, 1143:15, 1195:20, 1210:14, 1216:6, 1219:24, 1239:18, 1245:10, 1276:10, 1283:5
**clearer** [1] - 1061:12
**clearly** [8] - 1058:17, 1063:13, 1065:11, 1089:3, 1109:7, 1109:10, 1110:1, 1125:12
**Cleveland** [1] - 1052:6
**clients** [1] - 1112:9
**cloak** [1] - 1109:10
**clock** [1] - 1085:24
**close** [6] - 1098:7, 1099:9, 1120:3, 1124:24, 1166:8, 1166:9
**closer** [2] - 1098:8, 1098:9
**code** [1] - 1269:6
**code-based** [1] - 1269:6
**codes** [7] - 1252:20, 1252:24, 1253:2, 1253:3, 1267:16, 1269:9
**coding** [1] - 1215:25
**Cognitive** [1] - 1192:10
**cognitive** [9] - 1169:19, 1171:16, 1185:13, 1192:14, 1208:2, 1208:3, 1264:13, 1264:19, 1279:18
**coherence** [2] - 1123:8, 1123:12
**COLEMAN** [1] - 1052:9
**Coleman** [1] - 1199:3
**colleague** [1] - 1100:17
**collected** [1] - 1233:22
**collection** [2] - 1233:25, 1234:2
**Colonel** [3] - 1053:19, 1058:25, 1060:4
**colors** [1] - 1117:17
**column** [1] - 1190:3
**combination** [1] - 1279:23
**combined** [1] - 1128:8
**combines** [1] - 1128:7

**coming** [6] - 1096:5, 1106:14, 1107:8, 1165:2, 1288:3, 1289:5
**commencing** [1] - 1081:5
**comment** [2] - 1124:22, 1125:1
**common** [2] - 1095:23, 1191:2
**Common** [1] - 1252:20
**communicating** [1] - 1141:18
**communication** [1] - 1247:2
**community** [6] - 1154:25, 1155:10, 1155:13, 1156:6, 1156:24, 1157:17
**companies** [1] - 1198:8
**company** [11] - 1068:8, 1101:22, 1109:8, 1109:10, 1110:5, 1110:9, 1110:10, 1110:16, 1112:1, 1234:1
**Company** [1] - 1068:9
**compared** [1] - 1060:5
**comparing** [1] - 1058:12
**comparison** [1] - 1124:1
**compensated** [3] - 1192:23, 1201:8, 1201:11
**Compensation** [1] - 1068:12
**complaint** [2] - 1207:24, 1285:6
**complaints** [26] - 1189:1, 1189:11, 1189:20, 1202:4, 1202:17, 1203:9, 1203:10, 1204:24, 1205:8, 1205:16, 1207:12, 1213:22, 1220:4, 1220:25, 1229:9, 1256:24, 1259:19, 1259:20, 1259:23, 1260:19, 1272:6, 1283:1, 1285:25, 1286:1, 1286:4, 1287:25
**complete** [4] - 1062:21, 1071:19, 1080:10, 1179:22
**completed** [5] - 1147:1, 1147:14, 1244:22, 1254:25, 1255:1
**completely** [1] - 1180:11
**completeness** [1] - 1281:15
**completion** [1] - 1147:15
**complex** [1] - 1277:1
**compliant** [3] - 1264:5, 1264:6, 1285:11
**complied** [1] - 1194:5
**complying** [1] - 1285:8
**comprehension** [2] - 1179:5, 1179:6
**computer** [2] - 1079:23, 1080:2
**Computer** [1] - 1052:19
**Computer-Aided** [1] - 1052:19
**concern** [1] - 1150:2
**concerned** [1] - 1144:6
**concerning** [1] - 1063:11
**conclude** [1] - 1227:22
**concluded** [10] - 1063:8, 1063:22, 1094:18, 1103:25, 1110:22, 1121:5, 1150:18, 1167:2, 1228:7, 1273:15
**concludes** [2] - 1057:13, 1065:1
**conclusion** [10] - 1063:2, 1064:2, 1064:4, 1124:9, 1127:20, 1128:10, 1142:8, 1188:14, 1250:6, 1288:3
**conclusions** [2] - 1188:12, 1188:19
**conclusive** [1] - 1142:12
**concurred** [1] - 1250:7

**configuration** [1] - 1276:19
**confirm** [2] - 1208:21, 1289:6
**conflates** [1] - 1227:17
**confused** [1] - 1224:19
**confusion** [1] - 1224:21
**conjunction** [2] - 1241:16, 1242:23
**Connecticut** [1] - 1197:7
**consensus** [2] - 1158:12, 1186:4
**consent** [1] - 1177:24
**consider** [4] - 1169:23, 1179:15, 1213:24, 1214:8
**consideration** [2] - 1154:14, 1255:16
**consistent** [4] - 1066:17, 1089:9, 1103:18, 1206:7
**construct** [1] - 1139:9
**contained** [1] - 1259:10
**context** [2] - 1221:12, 1221:13
**continue** [14] - 1097:13, 1104:11, 1114:12, 1114:13, 1128:3, 1128:16, 1130:22, 1149:3, 1154:5, 1155:3, 1166:5, 1169:10, 1182:20, 1239:16
**continued** [14] - 1078:2, 1078:20, 1078:23, 1079:7, 1085:15, 1106:19, 1127:19, 1127:25, 1128:1, 1128:11, 1165:15, 1196:20, 1217:25, 1268:4
**Continued** [21] - 1052:1, 1076:24, 1088:24, 1094:20, 1108:17, 1110:23, 1119:12, 1121:6, 1133:6, 1145:24, 1147:24, 1150:20, 1167:3, 1180:20, 1223:19, 1228:8, 1240:14, 1243:3, 1253:25, 1273:16, 1284:10
**continues** [9] - 1082:20, 1082:24, 1083:3, 1084:14, 1088:15, 1098:12, 1098:23, 1099:3, 1102:17
**CONTINUES** [3] - 1077:1, 1104:13, 1197:1
**Continuing** [2] - 1148:1, 1181:1
**continuing** [7] - 1077:14, 1107:2, 1134:1, 1218:2, 1269:2, 1280:7, 1285:1
**CONTINUING** [1] - 1151:2
**contradicted** [1] - 1204:22
**contrary** [2] - 1204:17, 1239:10
**contusions** [1] - 1119:5
**conversation** [2] - 1059:13, 1186:21
**conversations** [4] - 1211:7, 1211:10, 1211:17, 1211:23
**converse** [1] - 1286:6
**convictions** [2] - 1094:5, 1094:8
**cook** [1] - 1262:12
**cooperative** [2] - 1179:8, 1179:11
**copy** [12] - 1080:10, 1120:14, 1146:3, 1146:13, 1148:7, 1148:12, 1196:6, 1196:9, 1290:18, 1290:19, 1290:20, 1290:25
**cord** [2] - 1205:24, 1206:10
**Cordiale** [9] - 1275:1, 1275:6, 1275:10, 1275:13, 1277:18, 1277:20, 1279:5, 1282:4
**Cordiale's** [2] - 1205:3, 1250:8

**corner** [1] - 1187:5
**Correct** [5] - 1132:3, 1177:2, 1177:18, 1236:11, 1237:9
**correct** [142] - 1055:20, 1057:14, 1057:16, 1068:18, 1069:2, 1070:16, 1072:19, 1072:23, 1073:1, 1073:25, 1074:23, 1078:9, 1078:21, 1079:8, 1081:9, 1084:2, 1084:8, 1085:21, 1085:25, 1086:15, 1086:18, 1087:17, 1099:25, 1101:18, 1101:23, 1116:14, 1116:15, 1116:18, 1120:8, 1122:6, 1122:7, 1122:13, 1129:16, 1129:20, 1129:21, 1132:2, 1136:8, 1135:24, 1136:11, 1136:13, 1136:20, 1136:21, 1136:24, 1137:17, 1140:14, 1140:16, 1140:18, 1140:19, 1140:21, 1140:22, 1142:15, 1144:4, 1145:1, 1153:2, 1155:5, 1157:17, 1158:7, 1158:21, 1159:16, 1162:23, 1162:24, 1163:1, 1163:7, 1163:8, 1163:10, 1163:15, 1163:17, 1164:9, 1164:16, 1165:9, 1170:8, 1170:13, 1173:15, 1178:1, 1178:8, 1179:23, 1184:4, 1185:20, 1188:4, 1188:8, 1189:9, 1189:10, 1189:24, 1189:25, 1190:14, 1190:18, 1192:19, 1193:5, 1194:2, 1194:3, 1194:12, 1195:25, 1197:11, 1197:16, 1197:17, 1197:25, 1198:4, 1198:13, 1199:10, 1200:22, 1201:1, 1201:4, 1201:24, 1202:5, 1206:9, 1206:12, 1206:13, 1210:6, 1217:21, 1217:22, 1237:8, 1241:5, 1244:23, 1245:22, 1245:23, 1251:9, 1261:7, 1261:8, 1267:1, 1270:12, 1270:19, 1270:23, 1275:6, 1275:16, 1278:19, 1279:13, 1282:25, 1283:17, 1286:21, 1288:16, 1290:24, 1291:11, 1291:14, 1292:18, 1292:20, 1294:18, 1294:21, 1294:22, 1295:4, 1295:7, 1295:11, 1295:15
**Correction** [1] - 1183:16
**correctly** [4] - 1080:7, 1162:9, 1236:20, 1261:12
**correlate** [1] - 1162:11
**correspond** [1] - 1130:18
**correspondence** [1] - 1201:23
**cost** [43] - 1218:21, 1219:13, 1222:3, 1222:4, 1222:11, 1224:7, 1224:16, 1224:17, 1225:2, 1225:16, 1225:24, 1226:12, 1226:22, 1226:23, 1230:23, 1231:13, 1231:14, 1231:19, 1231:20, 1232:5, 1236:2, 1236:7, 1236:9, 1245:17, 1245:18, 1245:22, 1245:24, 1245:25, 1246:4, 1246:10, 1246:11, 1250:17, 1251:12, 1251:13, 1251:14, 1261:10, 1261:17, 1262:4, 1269:5
**cost-by-cost** [1] - 1250:17
**costs** [25] - 1212:5, 1217:24, 1218:4, 1218:9, 1218:12, 1219:9, 1223:12, 1224:5, 1228:2, 1231:3, 1231:16, 1233:11, 1237:3, 1241:7, 1241:22,

1242:9, 1242:10, 1245:21, 1245:22, 1252:11, 1253:9, 1267:17
**cottage** [1] - 1191:2
**counsel** [10] - 1058:7, 1058:8, 1082:21, 1097:18, 1151:8, 1161:10, 1213:2, 1213:5, 1237:5, 1239:10
**count** [1] - 1211:20
**country** [1] - 1163:14
**couple** [13] - 1058:6, 1082:11, 1117:14, 1160:21, 1164:25, 1204:13, 1217:23, 1260:11, 1275:6, 1276:12, 1276:14, 1296:6
**course** [10] - 1055:18, 1056:10, 1106:1, 1129:18, 1141:21, 1142:7, 1144:6, 1181:8, 1259:6, 1272:10
**coursework** [1] - 1254:19
**court** [22] - 1053:1, 1054:13, 1059:16, 1067:17, 1095:1, 1104:1, 1104:7, 1111:7, 1111:16, 1115:5, 1115:6, 1146:18, 1148:17, 1151:1, 1156:10, 1169:2, 1239:1, 1256:1, 1256:3, 1256:15, 1289:18, 1296:3
**COURT** [385] - 1051:1, 1053:4, 1055:2, 1055:4, 1055:6, 1055:8, 1055:19, 1055:22, 1055:24, 1057:10, 1057:13, 1057:15, 1057:17, 1057:20, 1059:18, 1060:16, 1060:23, 1061:1, 1061:4, 1061:8, 1061:21, 1061:24, 1062:1, 1062:6, 1062:11, 1062:15, 1062:18, 1063:6, 1064:6, 1065:17, 1065:22, 1066:20, 1066:23, 1066:25, 1067:3, 1067:6, 1067:11, 1067:14, 1067:17, 1067:21, 1069:5, 1070:19, 1071:2, 1071:7, 1074:14, 1075:1, 1076:18, 1080:23, 1080:25, 1081:3, 1081:8, 1081:11, 1081:16, 1081:23, 1081:25, 1083:18, 1085:2, 1088:3, 1088:20, 1090:2, 1090:6, 1090:17, 1090:20, 1090:22, 1091:1, 1091:3, 1091:5, 1091:11, 1091:14, 1091:20, 1091:23, 1092:3, 1092:14, 1092:16, 1092:20, 1092:25, 1093:3, 1093:12, 1093:14, 1093:19, 1093:21, 1093:25, 1094:8, 1094:12, 1094:16, 1095:3, 1095:5, 1095:9, 1095:12, 1095:14, 1095:17, 1095:25, 1096:3, 1096:5, 1096:11, 1096:15, 1096:17, 1096:25, 1097:3, 1097:7, 1097:10, 1097:12, 1097:16, 1097:25, 1100:22, 1102:22, 1103:21, 1104:2, 1104:8, 1104:10, 1107:15, 1107:19, 1107:21, 1108:2, 1108:6, 1108:9, 1108:15, 1109:3, 1110:4, 1110:7, 1110:11, 1110:20, 1111:2, 1112:4, 1112:8, 1114:5, 1114:9, 1114:11, 1114:22, 1114:24, 1115:3, 1115:8, 1116:9, 1116:24, 1117:11, 1117:18, 1117:20, 1118:3, 1118:8, 1119:10, 1120:3, 1120:11, 1120:16, 1120:19, 1120:25, 1121:2, 1122:2, 1122:22, 1122:25, 1123:20, 1124:14,

1125:22, 1126:16, 1127:24, 1128:21, 1128:23, 1128:25, 1130:12, 1132:24, 1133:1, 1134:3, 1135:9, 1137:4, 1137:10, 1141:15, 1142:11, 1142:13, 1142:20, 1142:23, 1143:9, 1146:3, 1146:9, 1146:13, 1146:17, 1147:1, 1147:11, 1147:14, 1147:22, 1148:7, 1148:10, 1148:14, 1148:17, 1149:3, 1149:9, 1149:25, 1150:8, 1150:15, 1150:17, 1152:17, 1153:15, 1153:17, 1155:23, 1156:12, 1156:16, 1156:20, 1157:23, 1158:16, 1159:3, 1159:7, 1159:9, 1159:12, 1160:6, 1160:8, 1160:12, 1160:16, 1161:4, 1161:11, 1164:3, 1164:6, 1165:7, 1165:9, 1166:3, 1166:7, 1166:14, 1166:18, 1166:25, 1168:1, 1168:5, 1168:8, 1168:10, 1168:12, 1169:3, 1169:5, 1169:9, 1172:12, 1172:20, 1173:3, 1174:14, 1174:17, 1183:24, 1185:2, 1185:5, 1185:11, 1187:19, 1187:22, 1189:16, 1189:18, 1193:8, 1193:13, 1193:15, 1194:18, 1195:12, 1195:17, 1205:6, 1206:19, 1208:17, 1211:4, 1211:12, 1212:13, 1213:16, 1214:9, 1216:5, 1217:1, 1220:16, 1220:20, 1222:17, 1223:15, 1223:17, 1224:14, 1224:20, 1224:24, 1225:4, 1225:8, 1225:19, 1226:1, 1226:4, 1226:15, 1226:21, 1226:23, 1226:25, 1227:5, 1227:13, 1227:21, 1228:2, 1229:2, 1229:17, 1229:24, 1231:3, 1231:6, 1235:5, 1236:24, 1237:13, 1238:7, 1238:9, 1239:6, 1239:14, 1239:16, 1240:2, 1240:7, 1240:11, 1241:3, 1241:6, 1241:9, 1241:11, 1241:19, 1241:25, 1242:3, 1242:6, 1242:12, 1242:15, 1242:25, 1244:8, 1247:5, 1247:10, 1247:17, 1247:25, 1248:12, 1248:23, 1249:7, 1249:9, 1249:14, 1249:21, 1250:2, 1250:16, 1250:20, 1251:11, 1252:17, 1253:7, 1253:16, 1253:18, 1253:22, 1256:12, 1256:15, 1258:10, 1258:18, 1259:3, 1263:21, 1265:6, 1265:14, 1265:22, 1265:24, 1266:3, 1266:11, 1266:17, 1266:23, 1269:24, 1270:10, 1270:21, 1273:12, 1274:11, 1274:18, 1275:8, 1276:1, 1276:18, 1277:23, 1278:4, 1278:15, 1280:22, 1281:2, 1281:5, 1281:10, 1281:20, 1282:8, 1283:11, 1284:5, 1286:13, 1286:20, 1287:5, 1287:8, 1287:17, 1288:22, 1288:25, 1289:5, 1289:10, 1289:15, 1289:17, 1289:21, 1290:22, 1293:13, 1294:13, 1294:24, 1295:2, 1295:5, 1295:8, 1295:10, 1295:12, 1295:20, 1295:23, 1296:4, 1296:14, 1296:18, 1296:22, 1297:1, 1297:3, 1297:9
**Court** [19] - 1052:17, 1055:21, 1055:25, 1063:8, 1065:2, 1082:1,

1116:19, 1118:6, 1145:18, 1145:20, 1145:21, 1146:15, 1147:9, 1147:19, 1147:20, 1147:22, 1193:15, 1213:2, 1237:5
**Court's** [2] - 1080:18, 1122:4
**courtesy** [1] - 1153:9
**Courthouse** [1] - 1051:5
**courtroom** [4] - 1053:2, 1169:8, 1238:10, 1239:2
**courts** [1] - 1255:23
**cover** [1] - 1209:21
**covered** [2] - 1208:23, 1209:21
**covers** [1] - 1210:3
**covert** [7] - 1071:25, 1072:4, 1099:7, 1099:11, 1099:13, 1111:14, 1112:21
**covertly** [1] - 1076:5
**CPT** [2] - 1252:19, 1267:16
**crank** [1] - 1109:3
**create** [3] - 1129:5, 1140:25, 1212:16
**created** [1] - 1068:24
**credentials** [1] - 1163:12
**credibility** [2] - 1109:12, 1272:25
**critical** [1] - 1176:24
**CROSS** [8] - 1101:10, 1107:1, 1134:5, 1254:1, 1269:1, 1298:7, 1298:11, 1298:15
**cross** [8] - 1053:10, 1053:13, 1060:4, 1063:21, 1064:25, 1105:16, 1274:20, 1275:3
**CROSS-EXAMINATION** [6] - 1101:10, 1134:5, 1254:1, 1298:7, 1298:11, 1298:15
**cross-examination** [4] - 1053:10, 1053:13, 1105:16, 1274:20
**cross-examine** [1] - 1063:21
**crossed** [4] - 1171:21, 1172:16, 1173:15, 1174:4
**crosses** [1] - 1120:19
**cuff** [1] - 1224:25
**culling** [1] - 1056:15
**Cummings** [38] - 1150:11, 1193:12, 1193:17, 1196:4, 1199:22, 1204:16, 1206:5, 1207:15, 1208:8, 1213:12, 1217:3, 1217:19, 1219:24, 1220:12, 1222:21, 1229:5, 1236:21, 1239:19, 1244:2, 1245:21, 1246:25, 1253:23, 1254:3, 1254:9, 1256:9, 1256:12, 1256:19, 1269:15, 1274:6, 1274:20, 1279:8, 1283:6, 1285:14, 1285:17, 1286:25, 1287:18, 1288:22, 1296:17
**CUMMINGS** [2] - 1193:19, 1298:13
**cummings** [1] - 1193:25
**cumulative** [2] - 1153:16, 1157:22
**curative** [3] - 1056:5, 1066:18, 1265:25
**cure** [1] - 1295:18
**current** [4] - 1185:22, 1186:25, 1198:12, 1255:13
**curriculum** [2] - 1196:6, 1196:9
**customary** [2] - 1129:25, 1130:17

**cut** [2] - 1065:1, 1228:4
**cutout** [1] - 1059:25

## D 

**daily** [16] - 1161:21, 1161:22, 1204:25, 1205:4, 1208:24, 1209:1, 1209:4, 1209:15, 1209:18, 1209:20, 1209:25, 1214:14, 1214:24, 1245:5, 1250:9, 1260:9
**damage** [3] - 1124:23, 1127:18, 1127:21
**damaged** [4] - 1124:24, 1125:4, 1180:12, 1191:9
**data** [4] - 1128:14, 1233:21, 1233:22, 1234:1
**database** [5] - 1215:15, 1215:25, 1216:23, 1217:12, 1251:2
**date** [21] - 1069:8, 1069:13, 1069:15, 1070:15, 1071:10, 1072:2, 1081:3, 1088:6, 1089:4, 1097:8, 1100:9, 1129:19, 1141:7, 1161:4, 1217:3, 1217:5, 1219:20, 1291:10, 1291:17, 1292:22, 1293:14
**dated** [3] - 1063:17, 1122:19, 1199:5
**dates** [10] - 1072:14, 1072:15, 1073:4, 1073:13, 1074:9, 1079:3, 1099:23, 1099:24, 1291:4, 1293:25
**daughter's** [1] - 1132:16
**daughters** [4] - 1131:21, 1132:16, 1191:22
**days** [21] - 1074:22, 1095:5, 1095:8, 1095:9, 1095:10, 1095:11, 1095:12, 1096:18, 1096:22, 1106:12, 1147:2, 1176:25, 1177:10, 1177:12, 1177:15, 1180:4, 1260:12, 1276:24, 1294:3, 1294:4
**days'** [1] - 1095:15
**dead** [1] - 1188:17
**deal** [6] - 1066:8, 1123:20, 1135:1, 1153:21, 1153:22, 1225:7
**dealing** [1] - 1132:15
**December** [4] - 1116:14, 1140:18, 1140:20, 1141:21
**decide** [4] - 1062:2, 1062:4, 1220:5, 1229:12
**decided** [1] - 1158:3
**decision** [2] - 1258:1, 1284:9
**decisions** [2] - 1132:12, 1154:13
**defendant** [4] - 1199:12, 1255:4, 1255:10, 1255:17
**defendant's** [4] - 1059:21, 1080:25, 1118:4, 1247:1
**defendants** [3] - 1051:10, 1195:13, 1221:14
**Defendants** [3] - 1052:3, 1052:3, 1052:10
**defense** [30] - 1066:21, 1149:14, 1149:15, 1170:13, 1194:25, 1195:4, 1195:7, 1195:21, 1195:25, 1198:13,

1199:2, 1199:18, 1200:2, 1200:8,
1200:12, 1200:16, 1202:23, 1210:11,
1211:8, 1211:18, 1214:11, 1249:12,
1249:18, 1249:22, 1256:9, 1282:5,
1285:18, 1285:20, 1285:24, 1288:2
**defense/plaintiff** [1] - 1195:2
**deficiency** [1] - 1123:12
**deficient** [2] - 1123:13, 1159:24
**deficit** [1] - 1126:23
**definitive** [2] - 1063:2, 1065:11
**definitively** [1] - 1063:25
**deflected** [1] - 1059:1
**deformation** [1] - 1059:2
**deforms** [1] - 1059:4
**degree** [2] - 1254:13, 1254:16
**Degree** [2] - 1254:17, 1254:18
**delete** [1] - 1080:13
**deliberations** [1] - 1114:18
**delta** [1] - 1119:1
**Delta** [1] - 1059:3, 1059:6
**demonstrably** [1] - 1224:25
**demonstrate** [5] - 1116:3, 1174:25,
1175:19, 1184:21, 1186:17
**demonstrated** [5] - 1174:1, 1175:16,
1175:23, 1176:1, 1176:4
**denied** [3] - 1055:1, 1059:17
**Dennehey** [2] - 1199:3, 1201:13
**DENNEHEY** [1] - 1052:9
**Dennehey's** [1] - 1202:20
**deny** [1] - 1062:3
**depicted** [1] - 1272:5
**depo** [10] - 1074:1, 1086:12, 1141:5,
1145:5, 1160:23, 1161:2, 1171:24,
1171:25, 1182:8, 1187:14
**deponent** [1] - 1147:2
**deposed** [5] - 1201:2, 1237:8,
1246:17, 1266:2, 1280:11
**deposition** [104] - 1070:24, 1074:17,
1086:22, 1087:7, 1090:11, 1091:10,
1091:11, 1091:15, 1091:22, 1092:10,
1093:7, 1093:17, 1096:6, 1096:8,
1096:10, 1097:8, 1107:8, 1107:11,
1107:16, 1136:19, 1136:25, 1137:6,
1137:11, 1139:2, 1142:17, 1145:6,
1145:11, 1145:12, 1145:13, 1145:16,
1146:3, 1146:10, 1146:12, 1146:18,
1146:19, 1147:1, 1147:12, 1147:14,
1147:23, 1148:5, 1148:6, 1148:8,
1148:18, 1148:25, 1149:21, 1151:6,
1153:10, 1155:24, 1155:25, 1156:21,
1158:6, 1158:9, 1159:2, 1159:5,
1160:9, 1161:14, 1165:11, 1172:5,
1172:9, 1173:5, 1173:17, 1174:11,
1175:12, 1178:11, 1178:16, 1179:25,
1185:7, 1187:23, 1194:8, 1196:10,
1198:15, 1199:19, 1200:22, 1200:24,
1213:13, 1216:14, 1216:18, 1236:13,
1237:4, 1238:1, 1240:6, 1244:2,
1247:14, 1247:20, 1248:2, 1248:5,
1251:24, 1265:20, 1273:3, 1274:17,

1280:15, 1280:18, 1281:6, 1287:6,
1287:18, 1287:20, 1288:11, 1290:23,
1290:25, 1291:4, 1291:7, 1294:5
**depositions** [9] - 1053:25, 1113:13,
1144:12, 1148:23, 1158:24, 1178:3,
1280:12, 1280:19, 1280:25
**depression** [3] - 1135:24, 1135:25,
1136:5
**depth** [1] - 1207:23
**describe** [2] - 1116:19, 1205:15
**described** [3] - 1209:7, 1209:9,
1209:14
**describing** [1] - 1269:4
**description** [1] - 1260:20
**despite** [10] - 1139:5, 1146:22, 1155:9,
1162:18, 1176:7, 1177:14, 1181:19,
1259:9, 1259:12, 1262:20
**detailed** [1] - 1188:18
**details** [2] - 1276:24, 1294:19
**determine** [8] - 1115:24, 1151:9,
1151:21, 1169:15, 1181:16, 1182:17,
1182:19, 1283:25
**determined** [1] - 1188:14
**deviant** [1] - 1118:24
**deviate** [1] - 1118:21
**deviation** [1] - 1120:12
**deviations** [2] - 1119:7, 1119:8
**devices** [1] - 1103:9
**diagnose** [8] - 1064:9, 1136:4,
1163:17, 1163:18, 1163:20, 1163:22,
1166:13
**diagnosed** [7] - 1063:4, 1064:1,
1065:14, 1065:18, 1066:6, 1066:7,
1135:25
**diagnoses** [2] - 1205:7, 1257:20
**diagnosis** [7] - 1063:13, 1064:20,
1065:10, 1065:11, 1065:24, 1066:3,
1166:10
**diagnostic** [1] - 1230:16, 1231:9
**DIAMOND** [2] - 1051:19, 1149:20
**Dietl** [12] - 1068:6, 1068:7, 1068:9,
1068:13, 1068:20, 1079:22, 1080:10,
1101:23, 1109:17, 1109:20, 1112:1,
1290:6
**difference** [5] - 1159:23, 1160:22,
1218:8, 1225:18, 1279:18
**different** [40] - 1056:2, 1060:10,
1071:9, 1074:20, 1079:4, 1091:16,
1095:23, 1099:23, 1105:23, 1106:16,
1113:18, 1115:6, 1118:12, 1118:17,
1118:23, 1118:25, 1122:3, 1157:12,
1158:15, 1159:21, 1182:6, 1188:19,
1190:9, 1213:5, 1217:23, 1223:6,
1231:18, 1240:12, 1241:9, 1257:19,
1263:10, 1269:7, 1269:9, 1270:25,
1272:12, 1272:14, 1272:15, 1277:1,
1277:6, 1294:24
**differently** [2] - 1104:18, 1104:21
**difficult** [6] - 1125:7, 1148:24,
1203:13, 1203:15, 1207:25, 1253:1

**difficulties** [3] - 1209:3, 1209:15,
1209:20
**difficulty** [4] - 1205:1, 1208:24,
1208:25, 1222:19
**digital** [1] - 1079:13
**dim** [1] - 1082:2
**dime** [1] - 1150:12
**direct** [13] - 1054:6, 1054:11, 1062:21,
1063:21, 1064:25, 1122:14, 1134:11,
1171:1, 1186:10, 1193:23, 1196:5,
1281:6
**DIRECT** [9] - 1068:1, 1115:13, 1218:1,
1229:3, 1290:1, 1298:6, 1298:10,
1298:14, 1298:20
**direction** [1] - 1263:10
**directly** [1] - 1147:10
**dirty** [1] - 1094:1
**disagree** [5] - 1110:18, 1145:2,
1153:3, 1154:4, 1226:6
**disc** [1] - 1058:11
**discharge** [1] - 1242:22
**discharged** [2] - 1244:18, 1275:14
**disciplinary** [1] - 1277:5
**discipline** [1] - 1192:10
**disclose** [1] - 1273:8
**discuss** [15] - 1053:21, 1054:15,
1057:9, 1117:22, 1134:20, 1202:3,
1202:4, 1207:11, 1207:20, 1207:21,
1209:2, 1209:3, 1210:2, 1212:20,
1244:7
**discussed** [13] - 1058:2, 1117:14,
1117:16, 1117:19, 1117:22, 1128:15,
1138:11, 1158:5, 1210:1, 1211:22,
1211:24, 1231:17, 1236:12
**discussing** [1] - 1062:8
**discussion** [8] - 1056:9, 1138:14,
1145:8, 1156:7, 1158:23, 1203:7,
1203:9, 1212:24
**discussions** [3] - 1141:1, 1210:9,
1210:15
**display** [2] - 1097:25, 1118:25
**displayed** [1] - 1272:2
**dispute** [5] - 1069:11, 1252:7, 1252:8,
1253:4, 1253:8
**disqualification** [1] - 1163:12
**disregard** [1] - 1066:18
**distinct** [1] - 1191:3
**distress** [2] - 1229:10, 1288:8
**DISTRICT** [2] - 1051:1, 1051:1
**doctor** [30] - 1097:6, 1103:7, 1107:3,
1116:10, 1136:19, 1152:19, 1154:17,
1154:18, 1163:15, 1188:6, 1188:21,
1191:24, 1193:6, 1220:7, 1225:24,
1226:8, 1226:12, 1232:15, 1232:16,
1233:5, 1233:12, 1248:17, 1250:4,
1250:5, 1258:8, 1258:9, 1280:10,
1288:2, 1293:9
**Doctor** [17] - 1122:14, 1122:17,
1123:24, 1124:9, 1125:2, 1125:16,
1127:14, 1127:19, 1128:10, 1128:19,

1130:15, 1131:23, 1136:1, 1141:10,
1145:5, 1164:20, 1187:7
**doctor's** [11] - 1069:16, 1076:14,
1088:9, 1096:19, 1106:16, 1226:17,
1226:18, 1248:24, 1252:1, 1293:6,
1295:3
**doctors** [31] - 1097:4, 1138:24,
1198:6, 1213:25, 1220:3, 1220:4,
1225:1, 1225:14, 1229:13, 1249:3,
1251:21, 1252:21, 1257:19, 1258:15,
1260:23, 1274:22, 1276:6, 1276:12,
1276:13, 1276:14, 1276:22, 1277:2,
1277:6, 1277:12, 1278:6, 1280:17,
1280:19, 1280:24, 1281:17, 1282:5
**doctors'** [3] - 1107:24, 1113:12,
1199:24
**document** [9] - 1086:2, 1098:25,
1100:3, 1139:24, 1178:21, 1178:25,
1212:11, 1212:15, 1292:11
**documented** [3] - 1132:2, 1132:10,
1291:18
**dollars** [1] - 1109:17
**domestics** [1] - 1262:2
**done** [36] - 1064:24, 1071:14, 1071:15,
1082:21, 1096:12, 1098:16, 1112:21,
1123:3, 1132:11, 1144:13, 1145:8,
1159:15, 1159:19, 1170:6, 1170:11,
1170:17, 1170:21, 1170:24, 1171:2,
1171:8, 1181:20, 1181:21, 1183:2,
1184:3, 1184:10, 1184:16, 1185:1,
1185:23, 1192:11, 1227:3, 1227:18,
1255:4, 1271:22, 1274:1, 1275:12,
1283:16
**door** [12] - 1053:17, 1054:18, 1054:22,
1054:25, 1056:1, 1056:17, 1060:12,
1060:13, 1109:7, 1109:21, 1110:14,
1110:16
**dosage** [2] - 1235:5, 1235:7
**double** [1] - 1203:24
**double-level** [1] - 1203:24
**doubt** [2] - 1174:21, 1227:10
**down** [38] - 1053:24, 1054:21,
1057:18, 1060:19, 1084:9, 1089:25,
1103:14, 1114:8, 1118:7, 1126:19,
1132:7, 1142:22, 1148:20, 1152:6,
1158:22, 1160:13, 1160:21, 1192:12,
1202:2, 1202:14, 1202:21, 1203:15,
1207:6, 1217:23, 1223:11, 1230:10,
1230:11, 1230:22, 1231:2, 1237:10,
1238:5, 1271:2, 1271:5, 1272:13,
1272:17, 1283:12, 1283:14, 1287:13
**downtown** [1] - 1077:18
**Dr** [170] - 1062:9, 1062:10, 1062:20,
1063:4, 1063:7, 1063:11, 1063:16,
1064:7, 1064:18, 1065:12, 1065:18,
1066:4, 1066:7, 1066:19, 1075:12,
1075:18, 1076:20, 1082:15, 1114:9,
1114:10, 1114:12, 1114:15, 1114:21,
1115:1, 1115:2, 1115:3, 1115:7,
1115:15, 1117:25, 1118:11, 1122:3,

1123:1, 1129:5, 1129:11, 1132:23,
1133:3, 1134:7, 1134:21, 1136:2,
1136:3, 1136:8, 1136:10, 1136:12,
1137:14, 1137:19, 1138:5, 1138:9,
1138:11, 1138:12, 1138:15, 1139:14,
1142:14, 1142:25, 1143:2, 1143:10,
1151:5, 1160:17, 1161:16, 1163:6,
1163:9, 1166:22, 1169:5, 1169:14,
1169:21, 1170:12, 1170:13, 1170:17,
1170:21, 1171:3, 1171:5, 1171:9,
1171:20, 1172:15, 1173:2, 1173:14,
1173:25, 1174:8, 1174:20, 1175:5,
1175:10, 1175:22, 1175:25, 1176:8,
1176:9, 1176:21, 1176:22, 1176:24,
1177:9, 1177:15, 1177:25, 1179:25,
1180:6, 1183:2, 1183:4, 1183:5,
1200:3, 1200:6, 1200:15, 1200:20,
1201:5, 1205:2, 1205:3, 1208:12,
1208:21, 1213:13, 1214:16, 1214:18,
1214:20, 1214:22, 1216:14, 1216:18,
1219:21, 1227:16, 1227:19, 1247:13,
1247:18, 1247:21, 1248:15, 1248:20,
1249:2, 1249:24, 1250:8, 1251:1,
1251:4, 1264:15, 1264:16, 1275:1,
1275:5, 1275:10, 1275:13, 1276:13,
1276:14, 1277:18, 1277:20, 1277:21,
1277:25, 1279:5, 1279:21, 1279:25,
1280:10, 1280:13, 1280:25, 1281:6,
1281:13, 1281:17, 1281:21, 1281:24,
1281:25, 1282:4, 1282:6, 1287:1,
1287:23, 1288:6, 1288:12, 1288:15,
1289:8, 1296:7, 1296:15, 1297:5
**dr** [1] - 1193:8
**dressed** [3] - 1204:23, 1205:12,
1209:2
**drove** [1] - 1070:2
**DSM** [1] - 1163:22
**DSM-4** [1] - 1066:10
**DSM-5** [5] - 1065:11, 1065:15, 1066:3,
1066:5, 1066:10
**due** [1] - 1203:10
**duly** [4] - 1067:24, 1115:11, 1193:21,
1289:24
**during** [11] - 1078:23, 1079:2, 1106:1,
1146:11, 1147:11, 1195:6, 1210:2,
1210:4, 1234:17, 1234:23, 1292:17
**dysfunction** [1] - 1185:13

---

# E

**e-mail** [5] - 1064:7, 1064:16, 1065:17,
1065:24, 1079:24
**early** [5] - 1105:15, 1141:21, 1194:20,
1276:6, 1276:13, 1277:12, 1279:1
**ears** [2] - 1118:17, 1134:19
**earth** [1] - 1166:22
**easier** [2] - 1172:23, 1173:1
**East** [2] - 1051:17, 1052:5
**East/Brooklyn** [1] - 1052:17
**EASTERN** [1] - 1051:1

**economist** [2] - 1224:14, 1224:15
**edit** [2] - 1080:15, 1164:16
**Edmund** [1] - 1135:2
**educated** [1] - 1084:20
**education** [3] - 1197:18, 1254:12,
1267:15
**EEG** [1] - 1162:8
**effect** [2] - 1065:3, 1144:23
**effective** [3] - 1252:10, 1252:12,
1269:12
**efficient** [3] - 1252:10, 1252:12,
1269:12
**effort** [30] - 1170:21, 1170:23, 1171:6,
1171:10, 1171:12, 1174:2, 1174:9,
1175:1, 1175:16, 1175:23, 1176:1,
1176:4, 1177:16, 1180:8, 1180:11,
1181:3, 1181:5, 1183:4, 1183:7,
1183:9, 1183:10, 1183:21, 1184:5,
1190:19, 1190:24, 1191:3, 1191:9,
1191:12, 1191:13, 1191:15
**efforts** [1] - 1190:23
**egress** [1] - 1073:20
**eight** [14] - 1070:8, 1070:9, 1070:10,
1070:11, 1073:9, 1074:6, 1100:13,
1137:7, 1137:12, 1176:22, 1291:21,
1292:12, 1293:16, 1295:2
**eight-hour** [6] - 1070:9, 1074:6,
1176:22, 1292:12, 1293:16, 1295:2
**either** [18] - 1054:3, 1054:25, 1058:16,
1073:21, 1090:20, 1123:11, 1131:8,
1132:1, 1160:18, 1210:9, 1242:8,
1255:6, 1255:21, 1257:13, 1273:9,
1287:22, 1289:10, 1295:2
**elaborate** [3] - 1064:22, 1182:23,
1182:25
**elaborates** [1] - 1063:19
**electricity** [1] - 1118:20
**electronically** [1] - 1055:7
**electrophysiology** [1] - 1118:19
**electrostimulation** [1] - 1128:8
**elements** [1] - 1066:5
**elicit** [2] - 1103:4, 1120:5
**elicited** [1] - 1285:8
**emergencies** [1] - 1159:19
**emotional** [10] - 1094:9, 1166:20,
1207:20, 1207:22, 1208:2, 1208:5,
1229:9, 1269:20, 1280:20, 1285:25
**employed** [1] - 1068:5
**employer** [1] - 1079:22
**enable** [1] - 1103:9
**enabled** [1] - 1254:18
**encountered** [1] - 1113:1
**end** [5] - 1111:15, 1193:2, 1249:15,
1252:23, 1278:24
**endeavor** [1] - 1269:6
**endeavored** [1] - 1072:18
**ended** [1] - 1254:19
**ends** [2] - 1166:21, 1243:2
**energy** [3] - 1059:5, 1059:8, 1123:12
**enforcement** [1] - 1109:12

Bauta v. Greyhound, et al                                    12

**engage** [1] - 1113:8
**engaging** [2] - 1073:6, 1113:11
**English** [1] - 1254:13
**ensure** [2] - 1148:7, 1244:12
**ENTERPRISE** [1] - 1051:9
**Enterprise** [2] - 1052:5, 1052:11
**enters** [6] - 1053:2, 1067:10, 1104:9, 1169:8, 1239:2, 1239:15
**entire** [3] - 1078:23, 1271:25, 1272:3
**entirety** [4] - 1081:19, 1220:22, 1221:20, 1222:1
**entitled** [2] - 1092:23, 1109:13
**environment** [1] - 1272:15
**episode** [1] - 1099:5
**equal** [1] - 1054:3
**equipment** [13] - 1132:19, 1205:14, 1205:22, 1206:15, 1207:4, 1207:10, 1208:23, 1210:1, 1235:16, 1236:8, 1244:23
**errors** [3] - 1080:7, 1125:9
**especially** [1] - 1065:25
**ESQ** [7] - 1051:18, 1051:19, 1051:23, 1052:7, 1052:7, 1052:13, 1052:14
**essentially** [4] - 1060:7, 1132:11, 1176:8, 1225:21
**establish** [1] - 1177:16
**established** [3] - 1099:22, 1188:15, 1246:4
**establishing** [1] - 1109:18
**estimate** [2] - 1255:3, 1268:2
**ethical** [4] - 1139:17, 1139:25, 1140:3, 1153:23
**evaluate** [2] - 1182:16, 1182:19
**evaluated** [3] - 1206:4, 1213:20, 1234:10
**evaluation** [16] - 1173:22, 1177:25, 1178:20, 1182:22, 1182:24, 1183:1, 1186:19, 1191:6, 1201:25, 1229:20, 1232:5, 1246:13, 1257:20, 1265:18, 1270:9, 1281:16
**evaluations** [4] - 1181:7, 1232:3, 1232:22, 1244:9
**evening** [2] - 1079:7, 1084:12
**event** [1] - 1058:5
**evidence** [26] - 1059:23, 1061:13, 1061:20, 1063:9, 1065:4, 1065:18, 1065:20, 1081:14, 1081:17, 1081:18, 1109:13, 1117:12, 1117:21, 1118:5, 1123:22, 1129:4, 1131:25, 1133:2, 1188:6, 1204:16, 1204:21, 1271:8, 1271:9, 1272:1, 1272:3, 1272:10
**exact** [2] - 1064:11, 1069:8
**exactly** [10] - 1073:11, 1095:7, 1124:23, 1136:14, 1168:5, 1190:5, 1190:14, 1224:14, 1225:20, 1233:24
**examination** [5] - 1053:10, 1053:13, 1105:16, 1134:11, 1274:20
**EXAMINATION** [33] - 1068:1, 1077:1, 1101:10, 1104:13, 1107:1, 1111:4, 1115:13, 1134:5, 1151:2, 1169:12,

1188:23, 1193:23, 1197:1, 1218:1, 1229:3, 1254:1, 1269:1, 1274:4, 1285:15, 1286:23, 1290:1, 1298:6, 1298:7, 1298:8, 1298:10, 1298:11, 1298:12, 1298:14, 1298:15, 1298:16, 1298:17, 1298:18, 1298:20
**examine** [2] - 1060:4, 1063:21
**examined** [4] - 1067:24, 1115:11, 1193:21, 1289:24
**example** [7] - 1063:15, 1100:13, 1113:2, 1152:24, 1195:21, 1221:21, 1236:3
**examples** [1] - 1276:13
**excellent** [1] - 1191:9
**except** [5] - 1059:23, 1159:18, 1191:4, 1198:1, 1213:13
**excess** [4] - 1119:3, 1119:6, 1123:12, 1159:24
**excesses** [1] - 1123:11
**Exchange** [1] - 1198:2
**exchange** [1] - 1162:16
**exclude** [2] - 1059:21, 1059:24
**exclusively** [1] - 1217:15
**excuse** [3] - 1081:11, 1094:5, 1151:11
**excused** [7] - 1114:6, 1193:9, 1193:10, 1288:23, 1288:24, 1295:21, 1295:22
**execute** [1] - 1065:1
**exercise** [5] - 1185:13, 1231:21, 1231:22, 1244:13, 1244:18
**exercises** [1] - 1192:14
**exerting** [1] - 1181:3
**exhibit** [11] - 1080:23, 1081:6, 1081:7, 1116:10, 1116:20, 1123:1, 1172:21, 1178:2, 1213:12, 1218:23, 1287:20
**Exhibit** [23] - 1063:15, 1080:24, 1081:18, 1082:3, 1116:11, 1117:2, 1117:11, 1117:21, 1118:5, 1122:15, 1122:17, 1123:19, 1123:21, 1129:3, 1129:8, 1129:11, 1132:23, 1133:2, 1240:5, 1299:4, 1299:6, 1299:8, 1299:10
**exhibits** [2] - 1213:7, 1219:8
**exist** [1] - 1266:1
**existed** [1] - 1053:20
**existence** [2] - 1265:21, 1273:2
**exit** [3] - 1083:5, 1086:24, 1087:1
**exited** [3] - 1077:16, 1087:3, 1092:10
**exiting** [4] - 1075:19, 1076:20, 1078:6, 1082:15
**exits** [3] - 1104:5, 1238:10, 1296:2
**exorbitant** [1] - 1109:15
**expect** [2] - 1125:3, 1177:4
**expectancy** [3] - 1218:12, 1218:16, 1218:20
**expected** [2] - 1244:14, 1265:17
**expensive** [2] - 1255:18, 1255:19
**experience** [14] - 1107:23, 1186:11, 1206:16, 1224:13, 1229:12, 1239:8, 1239:11, 1239:24, 1242:22, 1244:15, 1251:25, 1252:5, 1264:11, 1267:15

**experienced** [2] - 1187:9, 1190:13
**experiences** [1] - 1186:22
**expert** [29] - 1065:24, 1136:3, 1141:16, 1141:17, 1146:20, 1146:22, 1146:24, 1162:25, 1163:9, 1163:11, 1170:13, 1181:4, 1200:3, 1200:19, 1247:13, 1249:12, 1249:18, 1249:22, 1251:1, 1256:9, 1256:12, 1257:19, 1257:23, 1266:8, 1273:7, 1274:19, 1280:11, 1282:6, 1285:18
**expertise** [1] - 1103:21
**experts** [5] - 1257:14, 1281:18, 1285:20, 1285:24, 1286:7
**experts'** [1] - 1199:24
**explain** [6] - 1118:1, 1123:1, 1184:10, 1218:8, 1232:9, 1245:1
**explained** [4] - 1131:14, 1229:19, 1244:11, 1263:8
**explanation** [5] - 1064:17, 1132:5, 1184:11, 1184:16, 1184:17
**extent** [8] - 1061:11, 1066:10, 1093:3, 1094:4, 1111:19, 1132:4, 1171:17, 1227:1
**extrapolated** [1] - 1224:17
**extremities** [3] - 1187:25, 1189:21
**extremity** [2] - 1189:2, 1189:12
**eyes** [3] - 1092:1, 1098:21, 1100:2

### F

**fabric** [1] - 1235:20
**facilities** [2] - 1251:22, 1252:1
**facility** [1] - 1252:13
**fact** [38] - 1054:25, 1062:24, 1086:2, 1089:15, 1092:16, 1093:9, 1093:15, 1111:6, 1111:19, 1127:15, 1137:19, 1137:23, 1138:4, 1139:5, 1146:5, 1146:23, 1152:23, 1153:4, 1153:10, 1154:11, 1155:9, 1163:2, 1176:7, 1177:14, 1180:17, 1181:19, 1191:1, 1192:5, 1237:1, 1247:20, 1259:12, 1262:7, 1262:20, 1272:23, 1276:25, 1279:25, 1283:2
**factors** [2] - 1056:2, 1191:21
**facts** [1] - 1255:21
**failing** [1] - 1054:6
**fair** [26] - 1065:3, 1107:13, 1138:2, 1138:3, 1143:14, 1144:7, 1163:4, 1165:3, 1170:18, 1170:19, 1171:6, 1171:10, 1174:9, 1181:15, 1186:22, 1190:10, 1208:4, 1220:7, 1229:21, 1235:1, 1250:25, 1263:11, 1263:16, 1267:13, 1269:11, 1269:12
**FairHealth** [5] - 1216:8, 1217:4, 1250:23, 1252:19
**FairHealth.org** [11] - 1215:13, 1215:18, 1215:20, 1215:24, 1216:2, 1216:19, 1217:10, 1217:15, 1217:16, 1250:18, 1251:2
**faith** [1] - 1274:21

SN        OCR        RPR

**fall** [3] - 1233:16, 1263:13, 1270:11

**false** [4] - 1082:11, 1089:7, 1162:20, 1224:25

**familiar** [4] - 1057:5, 1136:8, 1139:17, 1258:20

**family** [2] - 1083:14, 1132:15

**far** [10] - 1060:20, 1076:13, 1080:8, 1098:6, 1128:18, 1160:22, 1179:3, 1181:21, 1231:21, 1240:3

**Fardad** [1] - 1200:20

**fashion** [1] - 1259:17

**father** [1] - 1132:16

**fatigue** [3] - 1171:16, 1176:25, 1191:10

**fault** [1] - 1263:5

**favor** [1] - 1195:21

**feature** [2] - 1248:21, 1249:25

**features** [1] - 1248:10

**February** [44] - 1063:17, 1072:14, 1074:11, 1074:19, 1074:23, 1074:25, 1076:14, 1076:21, 1080:9, 1081:4, 1082:7, 1085:12, 1085:13, 1085:21, 1087:24, 1089:10, 1099:25, 1100:14, 1102:12, 1106:14, 1136:22, 1137:6, 1137:11, 1137:16, 1141:8, 1141:24, 1142:2, 1160:2, 1161:4, 1161:5, 1161:14, 1164:14, 1165:4, 1178:7, 1188:4, 1237:8, 1264:22, 1270:21, 1281:8, 1281:9, 1292:3, 1293:1, 1293:3, 1293:5

**federal** [4] - 1256:1, 1256:2, 1256:3, 1256:15

**fee** [5] - 1215:5, 1230:5, 1231:5, 1231:6, 1233:15

**Fee** [7] - 1215:9, 1215:18, 1215:19, 1217:14, 1250:19, 1252:19, 1267:18

**feedback** [1] - 1155:14

**fees** [1] - 1139:19

**feet** [3] - 1092:22, 1098:7, 1098:9

**felt** [4] - 1153:25, 1203:10, 1207:23, 1207:24

**females** [2] - 1083:10, 1084:22

**few** [5] - 1092:22, 1131:14, 1151:4, 1192:4, 1253:1

**field** [12] - 1127:13, 1130:17, 1144:22, 1155:15, 1155:19, 1156:19, 1157:1, 1197:12, 1208:3, 1254:16, 1254:18

**figure** [2] - 1183:25, 1230:23

**file** [1] - 1080:4

**filed** [2] - 1057:23, 1109:16

**filmed** [1] - 1082:11

**filming** [1] - 1082:7

**financial** [2] - 1139:19, 1143:16

**fine** [13] - 1059:23, 1062:17, 1089:15, 1090:19, 1102:15, 1140:5, 1173:19, 1174:8, 1187:19, 1228:2, 1242:25, 1254:4, 1296:5

**finish** [8] - 1150:14, 1153:8, 1153:9, 1178:22, 1179:12, 1183:19, 1269:22, 1273:11

**firm** [4] - 1194:4, 1199:2, 1199:12, 1199:18

**firms** [2] - 1246:25, 1247:6

**first** [69] - 1054:16, 1055:15, 1056:1, 1057:21, 1059:19, 1064:6, 1067:24, 1069:1, 1069:6, 1069:10, 1070:15, 1071:17, 1076:20, 1089:5, 1089:11, 1089:12, 1097:6, 1105:22, 1106:16, 1109:14, 1116:17, 1116:25, 1120:22, 1122:5, 1140:20, 1141:12, 1141:18, 1141:20, 1142:5, 1142:6, 1144:10, 1146:8, 1148:13, 1156:1, 1156:9, 1160:12, 1160:17, 1160:20, 1161:5, 1163:2, 1164:11, 1165:4, 1165:11, 1171:1, 1176:3, 1178:18, 1179:6, 1181:6, 1183:2, 1186:18, 1187:23, 1189:5, 1189:9, 1189:22, 1193:21, 1217:24, 1218:10, 1252:25, 1256:3, 1256:15, 1256:17, 1272:1, 1278:1, 1281:6, 1281:9, 1289:24, 1291:10

**fit** [1] - 1065:2

**fits** [1] - 1127:12

**five** [7] - 1054:9, 1066:4, 1068:15, 1232:12, 1233:1, 1236:5, 1267:24

**fix** [1] - 1140:25

**flat** [1] - 1246:5

**flew** [2] - 1054:8, 1058:19

**flipped** [1] - 1218:5

**flipping** [1] - 1222:6

**fluctuated** [1] - 1195:15

**focus** [2] - 1098:24, 1211:15

**focusing** [1] - 1135:19

**fog** [1] - 1171:17

**folks** [5] - 1054:2, 1060:8, 1068:20, 1168:12, 1289:2

**follow** [15] - 1075:23, 1077:6, 1077:11, 1077:22, 1078:20, 1087:12, 1093:18, 1113:15, 1122:4, 1125:1, 1190:20, 1244:12, 1244:19, 1267:23, 1275:1

**follow-up** [3] - 1244:12, 1244:19, 1275:1

**followed** [5] - 1077:3, 1077:13, 1092:11, 1094:7, 1103:12

**following** [43] - 1053:3, 1076:12, 1076:13, 1076:15, 1076:24, 1088:24, 1089:1, 1092:21, 1094:20, 1103:1, 1105:9, 1106:19, 1108:17, 1109:1, 1110:23, 1119:12, 1120:1, 1121:6, 1146:1, 1147:24, 1148:2, 1150:20, 1165:15, 1166:1, 1167:3, 1172:20, 1196:20, 1217:25, 1223:19, 1224:1, 1228:8, 1237:14, 1237:15, 1239:3, 1241:1, 1244:3, 1253:25, 1268:4, 1270:1, 1273:16, 1287:19

**follows** [5] - 1065:25, 1067:25, 1115:12, 1193:22, 1289:25

**foot** [3] - 1084:5, 1084:6, 1084:7

**footage** [1] - 1265:16

**FOR** [1] - 1051:12

**force** [2] - 1060:7, 1061:25

**forces** [5] - 1053:15, 1058:21, 1059:2, 1059:5

**forget** [1] - 1114:12

**forgotten** [1] - 1179:2

**form** [8] - 1103:9, 1124:9, 1147:5, 1225:19, 1256:25, 1257:7, 1260:25, 1269:16

**formal** [1] - 1197:18

**formally** [1] - 1065:14

**formed** [1] - 1239:19

**former** [1] - 1287:23

**formulating** [1] - 1213:23

**forth** [9] - 1183:4, 1183:6, 1183:8, 1183:10, 1183:21, 1201:23, 1205:8, 1216:21, 1294:19

**forthright** [1] - 1177:4

**forward** [13] - 1058:19, 1114:17, 1117:23, 1181:16, 1182:14, 1185:17, 1211:1, 1219:21, 1222:2, 1227:6, 1229:22, 1255:15, 1272:8

**foundation** [16] - 1103:6, 1103:17, 1110:11, 1110:17, 1117:15, 1135:7, 1229:16, 1244:8, 1258:8, 1258:16, 1259:2, 1265:2, 1265:5, 1265:20, 1271:3, 1271:6, 1272:16, 1288:2

**four** [13] - 1054:9, 1063:15, 1120:8, 1159:15, 1162:22, 1164:8, 1176:19, 1232:4, 1240:5, 1244:11, 1294:3, 1294:4, 1295:14

**four-hour** [1] - 1176:19

**fourth** [2] - 1123:7, 1163:6

**frame** [2] - 1090:15, 1092:7

**Franklin** [1] - 1279:12

**frankly** [2] - 1054:22, 1089:7

**fraud** [1] - 1068:11

**free** [3] - 1063:21, 1191:10, 1202:6

**frequencies** [1] - 1119:1

**frequency** [1] - 1235:8

**frequently** [2] - 1250:24, 1251:6

**Friday** [4] - 1053:12, 1059:14, 1253:14, 1296:13

**front** [29] - 1058:20, 1059:1, 1059:4, 1059:7, 1060:3, 1060:22, 1061:3, 1087:25, 1099:8, 1099:12, 1116:10, 1118:15, 1119:3, 1123:9, 1126:3, 1129:12, 1141:25, 1143:12, 1143:13, 1169:24, 1173:10, 1183:9, 1183:12, 1183:14, 1190:17, 1196:5, 1202:9, 1246:21, 1253:13

**frontal** [1] - 1119:5

**frowns** [1] - 1138:24

**full** [14] - 1099:2, 1170:21, 1170:23, 1171:5, 1176:17, 1176:18, 1181:17, 1182:3, 1182:4, 1183:4, 1183:7, 1183:8, 1183:10, 1183:21

**function** [5] - 1116:22, 1117:4, 1123:5, 1169:20, 1266:20

**functioning** [5] - 1115:25, 1118:13, 1123:4, 1127:5, 1128:9

**funding** [1] - 1231:1

Bauta v. Greyhound, et al     14

funds [1] - 1245:2
funny [1] - 1145:15
fused [1] - 1206:17
fusion [1] - 1203:25
fusions [1] - 1206:17
future [26] - 1110:13, 1187:1, 1210:21, 1212:5, 1216:19, 1220:13, 1221:4, 1221:9, 1221:10, 1221:14, 1221:21, 1231:9, 1247:14, 1247:18, 1247:21, 1248:6, 1248:20, 1248:21, 1249:4, 1251:9, 1251:12, 1251:13, 1259:21, 1285:21, 1287:25

## G

G-A-U-T-H-I-E-R [1] - 1289:20
game [2] - 1109:19, 1182:6
Gauthier [1] - 1289:19
GAUTHIER [2] - 1289:22, 1298:19
general [4] - 1115:20, 1126:22, 1157:16, 1203:7
generally [5] - 1070:10, 1070:11, 1126:19, 1181:2, 1233:15
generated [2] - 1129:25, 1130:16
gentleman [5] - 1087:7, 1114:11, 1168:1, 1225:22, 1272:24
gentlemen [3] - 1104:2, 1266:4, 1295:23
given [14] - 1069:13, 1069:21, 1069:22, 1113:15, 1113:16, 1130:3, 1146:13, 1149:6, 1179:2, 1181:3, 1184:2, 1197:15, 1198:2, 1207:21
gizmo [1] - 1118:14
GL [1] - 1135:5
glean [1] - 1237:20
goal [5] - 1076:2, 1076:4, 1076:7, 1079:11, 1079:17
goals [1] - 1135:22
God's [1] - 1188:18
GOGGIN [1] - 1052:9
Goggin [1] - 1199:3
Goldman [1] - 1214:22
gonna [1] - 1154:8
Google [1] - 1157:25
grab [6] - 1098:17, 1235:19, 1235:24, 1267:6, 1282:11, 1282:12
grammar [1] - 1142:9
Grand [1] - 1051:22
grant [3] - 1055:21, 1055:25, 1062:5
granted [1] - 1059:24
grasp [1] - 1280:4
great [2] - 1254:5, 1288:20
greater [1] - 1058:22
GREYHOUND [1] - 1051:7
Greyhound [3] - 1052:4, 1052:10, 1143:5
grilled [1] - 1060:7
grilling [1] - 1056:11
groceries [2] - 1084:25, 1085:9

grocery [6] - 1082:25, 1083:5, 1083:15, 1084:21, 1085:19, 1113:13
Group [1] - 1277:14
groups [1] - 1215:23
growth [3] - 1205:25, 1206:11, 1206:15
GUBICA [2] - 1051:8
Gubica [5] - 1052:4, 1052:11, 1052:11
guess [11] - 1076:11, 1084:20, 1095:24, 1105:15, 1141:20, 1141:25, 1143:7, 1152:6, 1184:12, 1188:5, 1194:20
guide [1] - 1159:22
guy [5] - 1062:7, 1139:4, 1139:11, 1270:8, 1287:22
guys [1] - 1090:24

## H

half [12] - 1089:4, 1089:5, 1089:11, 1092:17, 1093:6, 1130:6, 1159:16, 1202:14, 1246:18, 1278:18, 1296:18
hall [1] - 1066:23
halls [1] - 1295:25
Halstead [10] - 1124:2, 1124:6, 1125:12, 1126:2, 1134:17, 1144:20, 1176:18, 1190:22, 1191:3, 1191:8
Halstead-Reitan [6] - 1124:2, 1124:6, 1125:12, 1126:2, 1134:17, 1176:18
hand [7] - 1067:15, 1071:23, 1083:24, 1141:2, 1193:13, 1252:5, 1289:15
hand-held [1] - 1071:23
handheld [2] - 1235:18, 1235:23
hang [1] - 1097:22
happy [3] - 1054:7, 1093:5, 1265:4
hard [3] - 1095:21, 1125:24, 1172:20
Harold [1] - 1199:6
HAROLD [1] - 1052:13
hate [1] - 1104:2
HD [1] - 1071:22
head [7] - 1069:7, 1075:2, 1075:4, 1078:15, 1078:17, 1118:22, 1203:15
heading [1] - 1102:15
healing [1] - 1206:11
health [3] - 1234:1, 1254:18, 1261:16
health-related [1] - 1254:18
Healthcare [1] - 1234:4
hear [4] - 1134:18, 1259:23, 1281:4, 1297:7
heard [14] - 1094:11, 1114:14, 1136:7, 1157:24, 1180:17, 1190:1, 1215:13, 1219:2, 1224:23, 1261:6, 1277:5, 1277:9, 1286:25, 1287:4
hearing [3] - 1053:24, 1054:16, 1088:22, 1089:2, 1102:25, 1103:2, 1108:16, 1109:1, 1119:10, 1145:23, 1146:2, 1148:3, 1166:1, 1180:18, 1190:4, 1223:18, 1224:1, 1227:15, 1240:13, 1241:2, 1269:25, 1270:1

heavily [1] - 1286:6
heavy [2] - 1101:4, 1113:2
held [14] - 1071:23, 1088:22, 1102:25, 1108:16, 1109:1, 1119:11, 1120:1, 1145:23, 1166:1, 1223:18, 1224:1, 1240:13, 1269:25, 1270:1
help [16] - 1084:24, 1125:15, 1128:8, 1135:23, 1139:1, 1139:4, 1139:9, 1140:25, 1163:3, 1192:18, 1192:23, 1222:13, 1224:20, 1230:12, 1273:7
helped [1] - 1192:20
helpful [4] - 1128:15, 1155:8, 1230:14, 1231:23
helping [1] - 1121:3, 1143:25
Herd [2] - 1163:6, 1163:9
herniation [1] - 1057:6, 1058:11
high [3] - 1089:25, 1119:2, 1130:7
higher [1] - 1250:18
highest [1] - 1163:13
highest-ranking [1] - 1163:13
himself [2] - 1262:12, 1286:4
hire [1] - 1148:9, 1148:11
hired [7] - 1147:22, 1148:8, 1148:17, 1200:12, 1221:13, 1255:22
historically [3] - 1219:17, 1234:3
history [8] - 1166:19, 1229:18, 1230:25, 1257:9, 1260:17, 1260:22, 1260:24, 1260:25
hit [2] - 1098:18, 1131:16
Hoffman [2] - 1171:4, 1171:5
hold [9] - 1056:24, 1057:2, 1057:20, 1072:5, 1099:12, 1142:20, 1160:16, 1240:7
holding [2] - 1099:8, 1099:17
home [21] - 1079:23, 1084:25, 1085:5, 1086:17, 1106:10, 1231:21, 1231:22, 1244:13, 1244:18, 1260:13, 1261:1, 1261:11, 1261:16, 1262:22, 1266:16, 1266:21, 1267:1, 1291:18, 1292:9, 1292:10, 1295:3
homemaker [2] - 1245:3, 1245:10
honest [2] - 1177:4, 1257:8
honestly [1] - 1056:9
honor [4] - 1115:2, 1170:13, 1170:17, 1170:21
Honor [107] - 1053:6, 1054:17, 1054:18, 1055:11, 1056:14, 1057:19, 1058:15, 1062:8, 1062:25, 1064:7, 1064:14, 1064:18, 1065:6, 1065:12, 1065:18, 1065:21, 1066:7, 1066:17, 1066:24, 1067:12, 1069:3, 1071:1, 1071:5, 1080:19, 1081:15, 1082:21, 1088:18, 1095:2, 1097:15, 1099:19, 1102:23, 1104:12, 1108:1, 1108:13, 1109:4, 1109:16, 1110:18, 1111:1, 1114:19, 1116:7, 1117:8, 1117:13, 1118:6, 1122:21, 1122:24, 1123:18, 1125:20, 1126:11, 1129:9, 1132:22, 1134:2, 1134:21, 1136:2, 1136:3, 1136:10, 1136:12, 1137:3, 1137:14,

Bauta v. Greyhound, et al                                                      15

1137:19, 1138:5, 1138:9, 1138:11,
1138:12, 1138:15, 1141:13, 1142:14,
1142:19, 1142:25, 1143:2, 1143:10,
1147:8, 1148:4, 1149:18, 1150:5,
1160:11, 1161:1, 1161:6, 1161:8,
1169:4, 1169:11, 1171:9, 1172:24,
1173:2, 1173:4, 1176:21, 1177:15,
1180:6, 1183:2, 1183:7, 1193:11,
1196:3, 1211:2, 1222:15, 1223:16,
1225:11, 1237:11, 1244:6, 1253:17,
1265:5, 1266:1, 1269:22, 1271:9,
1288:21, 1289:2, 1293:12, 1295:17

**Honor's** [16] - 1066:7, 1136:8,
1139:14, 1169:21, 1171:20, 1172:16,
1173:14, 1173:22, 1173:25, 1174:8,
1174:20, 1175:5, 1175:10, 1175:22,
1176:8, 1179:4

**HONORABLE** [1] - 1051:12
**honors** [1] - 1173:2
**hope** [1] - 1125:15
**hopefully** [1] - 1076:8
**hospital** [1] - 1199:23
**Hospital** [2] - 1279:11, 1279:12
**hospitals** [1] - 1252:2
**hotel** [1] - 1059:12
**hour** [20] - 1070:9, 1070:13, 1073:9,
1074:6, 1130:7, 1176:19, 1176:22,
1203:2, 1204:6, 1210:2, 1245:11,
1245:13, 1261:10, 1261:12, 1261:17,
1282:21, 1292:12, 1293:16, 1295:2
**hourly** [5] - 1261:22, 1261:24, 1292:2,
1292:19, 1295:10
**hours** [15] - 1070:8, 1070:10, 1070:11,
1085:12, 1100:13, 1204:13, 1209:8,
1209:10, 1245:2, 1245:7, 1245:11,
1245:13, 1262:22, 1266:16, 1291:21
**house** [2] - 1261:25, 1262:16
**household** [1] - 1245:7
**houseworker** [1] - 1261:25
**hum** [1] - 1201:16
**hundred** [1] - 1084:6
**hundreds** [3] - 1112:23, 1155:25,
1255:1
**hypothetical** [6] - 1221:23, 1263:20,
1275:11, 1275:12, 1282:9, 1285:4
**hypothetically** [2] - 1250:25, 1266:8

I

**Ibuprofen** [1] - 1206:25
**ibuprofen** [2] - 1234:12, 1235:11
**ID** [7] - 1196:17, 1198:20, 1217:17,
1218:4, 1229:5, 1274:10, 1287:12
**idea** [12] - 1090:1, 1112:22, 1144:20,
1144:23, 1170:7, 1181:18, 1181:19,
1210:25, 1250:13, 1252:22, 1253:11,
1253:12
**identical** [1] - 1176:8
**identification** [2] - 1245:20, 1274:13
**ignore** [2] - 1094:14, 1266:5

**image** [3] - 1085:23, 1183:12, 1183:15
**images** [5] - 1079:15, 1079:18,
1079:20, 1089:24, 1092:13
**imaging** [1] - 1230:16
**immediately** [1] - 1053:24
**impact** [7] - 1060:2, 1158:24, 1159:6,
1159:9, 1162:5, 1162:19, 1272:7
**impaired** [3] - 1124:16, 1124:21
**impairment** [10] - 1125:8, 1126:7,
1126:8, 1126:24, 1126:25, 1127:1,
1127:2
**impeach** [4] - 1094:6, 1166:5, 1239:9,
1242:20
**impeaching** [3] - 1141:14, 1161:9,
1287:15
**impeachment** [15] - 1152:16, 1156:11,
1158:14, 1160:25, 1165:6, 1172:11,
1172:19, 1174:14, 1175:3, 1183:23,
1240:10, 1241:6, 1242:3, 1242:4,
1242:16
**impediments** [1] - 1185:17
**imperfect** [1] - 1191:12
**implications** [1] - 1295:18
**import** [1] - 1064:23
**important** [6] - 1055:12, 1058:7,
1157:4, 1169:16, 1188:11, 1287:9
**impression** [2] - 1096:7, 1107:10
**improper** [5] - 1103:5, 1103:13,
1152:16, 1156:11, 1158:14, 1160:25,
1165:6, 1172:11, 1172:19, 1174:13,
1175:3, 1183:23, 1240:10, 1242:4,
1287:16
**improve** [6] - 1117:3, 1124:23, 1125:4,
1127:11, 1128:9, 1128:17
**improved** [14] - 1123:5, 1123:10,
1123:13, 1124:19, 1124:22, 1124:25,
1131:16, 1151:10, 1151:22, 1186:7,
1186:18, 1191:11, 1191:18, 1191:22
**improvement** [18] - 1115:24, 1116:1,
1116:25, 1118:1, 1120:6, 1120:23,
1123:14, 1124:6, 1124:11, 1125:2,
1126:9, 1126:10, 1127:10, 1127:15,
1128:14, 1128:15, 1131:1, 1186:6
**improves** [1] - 1126:5
**improving** [2] - 1116:22, 1123:4
**inappropriate** [3] - 1164:18, 1271:10,
1272:18
**Inc** [2] - 1052:4, 1052:10
**INC** [1] - 1051:7
**inclined** [1] - 1062:3
**include** [8] - 1229:24, 1232:2,
1255:14, 1260:17, 1262:4, 1262:8,
1262:21, 1263:19
**included** [12] - 1220:2, 1221:22,
1230:1, 1230:19, 1232:10, 1232:17,
1233:1, 1233:4, 1234:7, 1234:9,
1235:18, 1261:10
**includes** [4] - 1118:3, 1248:9, 1272:1,
1285:24
**including** [5] - 1069:9, 1117:16,

1258:4, 1261:1, 1278:19
**incomplete** [1] - 1263:20
**inconsistent** [2] - 1061:9, 1242:8
**inconvenience** [1] - 1111:20
**incumbent** [2] - 1149:15, 1152:14
**independent** [1] - 1209:18
**independently** [1] - 1257:2
**index** [1] - 1126:22
**indicate** [7] - 1072:15, 1120:4,
1127:16, 1138:5, 1264:2, 1267:5,
1296:11
**indicated** [11] - 1054:18, 1058:3,
1150:5, 1173:22, 1176:15, 1177:16,
1180:15, 1190:2, 1207:16, 1216:23,
1235:11
**indicates** [6] - 1059:15, 1092:17,
1135:11, 1175:12, 1175:14, 1229:6
**indicating** [5] - 1118:17, 1127:7,
1148:5, 1198:19, 1199:6
**indicating** [5] - 1118:15, 1118:16,
1127:8, 1157:14
**indication** [1] - 1134:24
**indications** [1] - 1135:10
**individual** [5] - 1082:12, 1087:3,
1111:15, 1233:10, 1260:22
**individuals** [2] - 1084:16, 1112:20
**industry** [1] - 1191:2
**inefficient** [1] - 1269:5
**ineligible** [1] - 1066:13
**inexact** [1] - 1252:24
**inflammatory** [1] - 1234:12
**inflated** [1] - 1286:8
**inflation** [1] - 1224:18
**information** [27] - 1069:21, 1110:17,
1112:6, 1113:16, 1113:18, 1113:20,
1116:3, 1116:20, 1117:2, 1123:2,
1169:19, 1190:11, 1205:19, 1216:3,
1218:19, 1219:3, 1244:10, 1246:24,
1253:2, 1257:21, 1259:10, 1261:21,
1275:19, 1275:24, 1276:3, 1284:2,
1284:9
**informed** [5] - 1083:16, 1103:9,
1180:16, 1234:9, 1289:2
**initial** [6] - 1144:9, 1171:8, 1176:21,
1180:9, 1180:10
**injured** [18] - 1056:4, 1060:21, 1061:5,
1061:9, 1061:10, 1093:1, 1093:14,
1093:22, 1094:3, 1119:2, 1136:13,
1136:15, 1137:15, 1137:20, 1137:24,
1138:2, 1186:14, 1188:15
**injuries** [18] - 1053:14, 1053:20,
1054:4, 1057:8, 1059:25, 1060:3,
1060:5, 1060:14, 1060:17, 1060:18,
1061:2, 1061:11, 1061:14, 1061:16,
1061:17, 1093:3, 1094:4, 1269:17
**injury** [22] - 1058:10, 1059:21,
1060:15, 1061:21, 1113:21, 1113:24,
1113:25, 1119:4, 1127:11, 1127:17,
1136:18, 1144:16, 1163:20, 1163:22,
1169:19, 1183:11, 1185:12, 1186:6,

1188:7, 1188:10, 1191:5, 1288:7
**inquire** [6] - 1067:21, 1115:8, 1208:2, 1208:3, 1208:4, 1289:21
**inquired** [2] - 1207:5, 1208:6
**inquiry** [2] - 1083:19, 1083:22
**inside** [1] - 1093:6
**insinuating** [1] - 1145:3
**insinuation** [3] - 1145:2, 1153:3, 1153:4
**insofar** [1] - 1088:17
**instance** [11] - 1056:4, 1072:11, 1113:22, 1124:24, 1209:3, 1210:15, 1211:15, 1214:3, 1230:20, 1276:21, 1282:3
**instances** [4] - 1072:22, 1131:7, 1131:9, 1269:10
**instruct** [2] - 1094:14, 1147:17
**instructed** [4] - 1053:16, 1086:21, 1096:17, 1097:7
**instruction** [6] - 1056:5, 1066:18, 1114:20, 1122:4, 1265:25, 1295:18
**instructions** [1] - 1115:1
**insurance** [4] - 1068:11, 1198:8, 1234:1
**intend** [1] - 1127:11
**intended** [1] - 1120:7
**intends** [3] - 1224:10, 1275:15, 1275:17
**intent** [1] - 1098:20
**intention** [2] - 1130:22, 1155:7
**interact** [1] - 1272:13
**interest** [7] - 1086:4, 1104:16, 1109:5, 1143:16, 1143:25, 1144:4, 1152:20
**interested** [1] - 1190:11
**interesting** [2] - 1059:11, 1104:22
**Interinsurance** [1] - 1198:2
**intermittently** [1] - 1235:12
**International** [1] - 1197:6
**interpret** [2] - 1162:10, 1163:3
**interpreted** [1] - 1162:8
**interruption** [1] - 1126:14
**intervening** [1] - 1123:3
**interview** [1] - 1210:23
**interviewed** [1] - 1221:18
**interviewing** [1] - 1204:2
**introduce** [1] - 1254:7
**invalid** [3] - 1164:9, 1166:17, 1176:9
**investigation** [9] - 1083:15, 1102:1, 1104:15, 1104:16, 1106:2, 1109:18, 1110:15, 1111:25, 1112:15
**investigations** [5] - 1068:8, 1068:9, 1068:11, 1068:12, 1112:11
**investigative** [1] - 1101:22
**investigator** [16] - 1068:17, 1068:18, 1070:4, 1073:12, 1073:17, 1074:9, 1094:7, 1101:20, 1101:25, 1103:11, 1109:20, 1290:8, 1290:9, 1290:11, 1293:18, 1293:20
**investigators** [5] - 1073:22, 1271:7, 1271:18, 1296:10, 1296:19

**involved** [5] - 1106:2, 1112:11, 1166:21, 1191:21, 1197:4
**involvement** [3] - 1069:1, 1069:6, 1069:10
**involves** [1] - 1231:20
**iPad** [2] - 1082:1, 1238:5
**iPhone** [1] - 1085:24
**IQ** [3] - 1127:3, 1127:4, 1127:5
**Island** [4] - 1278:1, 1278:5, 1278:9, 1279:12
**issue** [15] - 1056:10, 1059:14, 1064:17, 1107:4, 1110:3, 1114:19, 1134:25, 1148:16, 1152:10, 1153:23, 1176:25, 1191:24, 1227:17, 1272:11
**issued** [2] - 1212:21, 1295:19
**issues** [19] - 1062:9, 1063:9, 1107:13, 1109:25, 1115:18, 1117:16, 1171:12, 1185:17, 1185:21, 1190:20, 1207:20, 1207:22, 1208:2, 1208:4, 1208:5, 1214:6, 1296:5, 1297:1
**item** [3] - 1236:6, 1252:2, 1260:14
**items** [13] - 1084:1, 1210:1, 1212:5, 1213:21, 1215:3, 1226:18, 1235:22, 1245:7, 1246:16, 1248:9, 1255:14, 1266:9, 1267:20
**iterations** [1] - 1260:18
**iTouch** [4] - 1072:1, 1072:4, 1099:7, 1099:11
**itself** [2] - 1103:11, 1190:25

## J

**James** [4] - 1114:10, 1115:7, 1200:11, 1208:12
**JAMES** [2] - 1115:10, 1298:9
**JAMIE** [1] - 1051:19
**Jane** [1] - 1194:22
**January** [16] - 1073:24, 1074:3, 1129:20, 1203:21, 1208:19, 1210:16, 1211:16, 1234:10, 1270:13, 1270:15, 1283:21, 1291:11, 1293:23
**jaw** [4] - 1054:9, 1054:24, 1060:18, 1061:22
**Jersey** [1] - 1198:3
**job** [5] - 1101:22, 1101:25, 1104:24, 1109:21, 1257:19
**Joel** [2] - 1179:15, 1200:15
**John** [2] - 1053:10, 1053:13
**joining** [1] - 1101:23
**JONATHAN** [1] - 1051:23
**JOSE** [1] - 1051:3
**Jose** [6] - 1051:16, 1051:21, 1173:23, 1179:2, 1179:5, 1290:13
**judge** [9] - 1090:25, 1091:2, 1137:9, 1148:11, 1149:19, 1149:23, 1239:5, 1271:10, 1287:9
**Judge** [16] - 1066:9, 1081:2, 1098:1, 1103:24, 1117:19, 1169:6, 1172:25, 1187:18, 1226:14, 1229:16, 1238:4, 1240:9, 1273:2, 1274:10, 1274:16,

1287:12
**JUDGE** [3] - 1051:13, 1053:2, 1239:2
**judgment** [9] - 1103:9, 1193:4, 1219:22, 1240:3, 1241:15, 1242:19, 1242:21, 1242:23, 1244:17
**July** [7] - 1069:2, 1069:10, 1070:7, 1070:20, 1071:10, 1073:10, 1291:16
**jump** [2] - 1057:12, 1134:9, 1166:22
**JURORS** [1] - 1238:8
**jurors** [4] - 1095:1, 1104:1, 1151:1, 1296:6
**Jury** [5] - 1104:5, 1104:9, 1238:10, 1239:15, 1296:2
**JURY** [2] - 1051:12, 1051:13
**jury** [73] - 1053:3, 1053:22, 1060:1, 1060:20, 1065:15, 1066:18, 1066:25, 1067:10, 1080:20, 1088:22, 1089:2, 1089:8, 1092:1, 1094:14, 1102:25, 1103:2, 1104:7, 1108:16, 1109:2, 1114:20, 1116:3, 1116:19, 1117:6, 1117:24, 1118:1, 1118:4, 1118:7, 1119:11, 1120:2, 1120:23, 1123:1, 1138:12, 1145:23, 1146:2, 1148:3, 1166:2, 1166:6, 1169:2, 1169:8, 1197:3, 1202:9, 1209:6, 1211:22, 1214:16, 1218:8, 1223:18, 1224:2, 1227:17, 1231:8, 1231:12, 1234:7, 1235:2, 1235:15, 1239:4, 1239:5, 1240:13, 1241:2, 1245:1, 1245:16, 1246:21, 1249:11, 1253:13, 1254:8, 1254:11, 1257:18, 1261:6, 1267:23, 1269:25, 1270:2, 1273:13, 1275:13, 1280:17, 1285:21
**jury's** [2] - 1092:23, 1131:23

## K

**Kansas** [1] - 1051:23
**KAROLY** [1] - 1051:8
**Karoly** [2] - 1052:4, 1052:11
**keep** [12] - 1061:20, 1062:5, 1089:16, 1091:7, 1092:2, 1105:3, 1132:10, 1154:16, 1161:10, 1166:4, 1238:7, 1295:23
**keeps** [1] - 1089:6
**kidding** [1] - 1139:3
**kids** [1] - 1131:22
**kIEFFER** [1] - 1063:7
**Kieffer** [2] - 1110:14, 1271:25
**KIEFFER** [135] - 1051:23, 1064:3, 1064:14, 1065:20, 1066:9, 1068:2, 1070:17, 1071:1, 1071:4, 1071:8, 1074:13, 1076:16, 1077:2, 1080:18, 1080:24, 1081:1, 1081:4, 1081:9, 1081:21, 1081:24, 1082:1, 1082:5, 1083:4, 1084:15, 1085:3, 1086:7, 1087:21, 1088:4, 1089:18, 1089:22, 1090:11, 1090:15, 1090:19, 1090:21, 1091:4, 1091:10, 1091:12, 1091:18, 1091:21, 1091:24, 1092:5, 1092:15,

1092:19, 1092:22, 1094:15, 1095:2, 1095:4, 1097:14, 1097:21, 1098:1, 1098:3, 1099:4, 1099:19, 1100:23, 1101:8, 1102:21, 1102:23, 1103:3, 1103:24, 1107:14, 1107:18, 1108:1, 1108:8, 1108:13, 1109:4, 1109:24, 1110:6, 1110:21, 1111:1, 1111:3, 1111:5, 1114:2, 1114:10, 1115:9, 1115:14, 1116:7, 1117:8, 1117:19, 1118:2, 1118:6, 1118:9, 1118:10, 1120:9, 1120:13, 1120:17, 1120:24, 1121:1, 1121:4, 1122:1, 1122:20, 1122:23, 1123:18, 1123:23, 1125:19, 1128:20, 1128:22, 1129:2, 1129:9, 1132:22, 1133:3, 1135:7, 1139:23, 1141:13, 1149:23, 1152:16, 1153:14, 1153:16, 1155:21, 1156:11, 1157:22, 1158:14, 1159:8, 1160:4, 1160:11, 1160:25, 1161:8, 1165:6, 1165:12, 1172:11, 1172:18, 1175:3, 1183:23, 1185:10, 1187:20, 1188:24, 1270:24, 1271:3, 1289:1, 1290:2, 1295:16, 1298:6, 1298:8, 1298:10, 1298:12, 1298:20

**kind** [24] - 1068:9, 1071:20, 1071:25, 1072:18, 1080:2, 1082:2, 1096:23, 1106:16, 1119:4, 1127:6, 1128:13, 1128:16, 1142:7, 1161:20, 1161:25, 1163:12, 1169:15, 1190:2, 1192:13, 1221:5, 1250:24, 1264:16, 1277:3, 1288:17
**kinda** [1] - 1157:4
**kindly** [1] - 1118:7
**kinds** [4] - 1128:11, 1209:3, 1214:5, 1277:6
**knocked** [3] - 1054:10, 1060:18, 1061:23
**knocks** [1] - 1131:18
**knowing** [3] - 1130:4, 1162:11, 1296:6
**knowledge** [3] - 1096:22, 1110:20, 1207:1
**known** [1] - 1247:23
**knows** [4] - 1063:8, 1110:5, 1134:22

## L

**label** [1] - 1191:12
**Labor** [2] - 1261:20, 1261:23
**lack** [4] - 1076:9, 1170:20, 1170:23, 1171:5
**lacks** [2] - 1135:7, 1272:15
**ladies** [7] - 1084:1, 1085:7, 1104:2, 1114:11, 1168:1, 1266:4, 1295:23
**laid** [3] - 1103:6, 1117:15, 1125:12
**Lake** [3] - 1278:1, 1278:9, 1279:5
**lake** [1] - 1278:5
**Lanigan** [2] - 1097:9, 1097:10
**lanigan** [1] - 1075:11
**laptop** [2] - 1081:23, 1081:25
**large** [1] - 1251:8

**last** [28] - 1059:12, 1059:18, 1117:14, 1123:25, 1124:5, 1125:1, 1128:7, 1129:19, 1130:12, 1131:25, 1136:23, 1137:17, 1138:8, 1138:9, 1138:15, 1148:4, 1158:6, 1158:9, 1164:25, 1185:7, 1186:18, 1250:11, 1253:13, 1263:18, 1274:6, 1278:25, 1294:1
**late** [1] - 1278:22
**Lattuga** [1] - 1277:21
**laundry** [2] - 1260:9, 1262:14
**law** [9] - 1091:1, 1091:3, 1109:12, 1194:4, 1199:2, 1199:12, 1199:18, 1246:25, 1247:6
**Lawrence** [1] - 1115:7
**LAWRENCE** [2] - 1115:10, 1298:9
**lawsuit** [1] - 1143:17
**lawyer** [10] - 1087:4, 1087:6, 1087:8, 1089:7, 1092:12, 1092:21, 1093:4, 1093:9, 1093:10, 1154:6
**lay** [5] - 1103:13, 1103:17, 1110:11, 1244:8, 1265:4
**lead** [1] - 1058:8
**leading** [6] - 1069:3, 1070:18, 1074:13, 1194:17, 1194:18, 1199:18
**lean** [1] - 1255:21
**leaning** [1] - 1103:17
**learn** [1] - 1106:1
**learned** [4] - 1087:10, 1219:22, 1284:7, 1285:3
**least** [16] - 1054:2, 1054:7, 1095:8, 1095:9, 1112:17, 1112:19, 1150:16, 1187:3, 1193:3, 1223:3, 1239:9, 1255:19, 1275:21, 1278:23, 1279:25, 1281:12
**leave** [7] - 1073:21, 1096:10, 1183:5, 1227:23, 1280:1, 1280:6, 1296:19
**leaving** [5] - 1096:8, 1096:9, 1106:16, 1107:10
**left** [7] - 1053:25, 1083:24, 1087:14, 1087:25, 1088:6, 1123:10, 1134:19
**leg** [1] - 1214:4
**legal** [2] - 1066:15, 1179:9
**legs** [1] - 1188:1
**length** [1] - 1205:11
**less** [8] - 1061:22, 1099:16, 1179:5, 1191:13, 1202:15, 1212:17, 1257:16, 1259:10
**lessen** [1] - 1135:23
**lessened** [1] - 1059:2
**lessens** [1] - 1059:5
**letter** [1] - 1065:12
**level** [2] - 1171:10, 1203:24
**Lewis** [1] - 1199:10
**LEWIS** [1] - 1052:3
**license** [3] - 1215:21, 1216:3, 1216:6
**licensed** [2] - 1068:18, 1290:11
**Lichy** [2] - 1067:5, 1296:24
**lien** [14] - 1130:5, 1136:4, 1136:13, 1137:16, 1138:6, 1139:7, 1139:11, 1140:13, 1141:1, 1143:20, 1153:24,

1157:16, 1158:4, 1191:24
**liens** [3] - 1138:24, 1139:21, 1157:21
**life** [49] - 1135:3, 1191:23, 1193:12, 1194:14, 1194:23, 1195:6, 1195:9, 1195:12, 1205:16, 1207:13, 1218:11, 1218:16, 1218:20, 1219:3, 1219:4, 1219:25, 1221:8, 1224:12, 1224:16, 1224:22, 1225:1, 1225:5, 1225:9, 1226:18, 1229:25, 1230:19, 1232:2, 1232:18, 1233:7, 1234:8, 1235:17, 1237:19, 1239:20, 1241:3, 1245:14, 1246:12, 1248:9, 1249:23, 1253:1, 1269:15, 1272:8, 1275:4, 1275:16, 1280:16, 1282:1, 1283:22, 1284:3, 1285:22
**life-care** [5] - 1224:12, 1224:22, 1225:1, 1225:5, 1272:8
**lifecare** [28] - 1197:12, 1197:19, 1197:24, 1198:13, 1210:21, 1210:22, 1212:3, 1212:16, 1213:24, 1215:3, 1216:12, 1217:21, 1254:9, 1254:15, 1254:20, 1254:21, 1254:24, 1255:9, 1255:23, 1256:9, 1256:13, 1256:21, 1257:22, 1259:24, 1264:10, 1264:12, 1266:14, 1267:21
**lift** [1] - 1113:2
**lifting** [1] - 1101:4
**light** [1] - 1114:19
**lights** [2] - 1082:2, 1118:7
**likely** [6] - 1073:17, 1096:12, 1124:10, 1128:15, 1178:20, 1179:10
**likewise** [1] - 1269:19
**limine** [6] - 1057:23, 1059:20, 1109:9, 1109:16, 1109:22, 1120:14
**limitations** [2] - 1207:25, 1260:4
**limited** [3] - 1157:2, 1157:3, 1203:10
**line** [44] - 1056:13, 1057:18, 1071:3, 1115:20, 1120:15, 1120:19, 1137:6, 1137:12, 1141:9, 1142:17, 1142:18, 1145:7, 1151:8, 1151:17, 1151:18, 1152:12, 1156:2, 1160:12, 1160:13, 1160:14, 1161:15, 1161:16, 1166:23, 1171:21, 1172:16, 1173:12, 1173:15, 1174:5, 1182:11, 1184:8, 1184:24, 1187:15, 1187:16, 1187:24, 1224:15, 1230:10, 1230:11, 1237:10, 1287:12, 1287:13, 1287:20
**Lines** [2] - 1052:4, 1052:10
**lines** [14] - 1053:17, 1123:7, 1123:8, 1123:9, 1123:10, 1161:1, 1161:9, 1174:24, 1175:9, 1185:3, 1240:6, 1244:4, 1247:22, 1274:13
**LINES** [1] - 1051:7
**link** [1] - 1094:12
**list** [3] - 1223:11, 1264:9, 1267:10
**listed** [1] - 1197:5, 1235:6
**listen** [2] - 1093:25, 1225:8
**listing** [1] - 1147:5
**Listserve** [9] - 1136:12, 1136:15, 1136:16, 1136:17, 1137:13, 1137:19,

1138:5, 1138:23, 1143:1
**literally** [1] - 1251:25
**literature** [1] - 1127:12
**litigation** [3] - 1111:10, 1221:13, 1221:19
**living** [11] - 1204:25, 1205:4, 1208:24, 1209:1, 1209:4, 1209:15, 1209:19, 1209:20, 1209:25, 1245:5, 1260:9
**LLC** [4] - 1051:9, 1051:15, 1052:5, 1052:11
**LLP** [2] - 1051:20, 1052:3
**locate** [1] - 1105:22
**location** [8] - 1070:7, 1276:5, 1276:9, 1276:11, 1276:23, 1277:25, 1279:7
**locations** [2] - 1075:11, 1276:16
**logical** [1] - 1124:17
**look** [23] - 1103:3, 1115:23, 1125:11, 1140:2, 1142:9, 1143:1, 1148:4, 1165:11, 1173:5, 1175:9, 1179:4, 1182:8, 1192:9, 1196:14, 1196:16, 1198:17, 1199:19, 1208:21, 1225:14, 1226:21, 1227:4, 1287:11, 1294:15
**looked** [7] - 1060:5, 1100:14, 1139:25, 1161:6, 1164:13, 1191:11, 1227:25
**looking** [16] - 1055:17, 1069:20, 1072:22, 1073:25, 1074:2, 1074:11, 1074:18, 1099:23, 1105:7, 1122:5, 1163:20, 1164:12, 1166:19, 1210:25, 1213:5, 1261:24
**looks** [4] - 1137:22, 1169:22, 1191:13, 1222:11
**lose** [1] - 1221:16
**lost** [1] - 1238:5
**loud** [1] - 1179:3
**low** [6] - 1089:25, 1124:17, 1204:14, 1207:16, 1209:9, 1209:13
**lower** [4] - 1123:10, 1130:8, 1189:21, 1202:20
**lumbar** [3] - 1057:6, 1057:8, 1247:14
**lumbosacral** [2] - 1235:19, 1235:25
**Lunch** [1] - 1168:14
**lunch** [3] - 1062:17, 1166:24, 1168:1

## M

**ma'am** [9] - 1223:9, 1259:14, 1267:19, 1287:6, 1290:3, 1290:20, 1290:23, 1293:11, 1295:14
**machines** [1] - 1145:15
**Madison** [3] - 1086:21, 1087:13, 1092:9
**madsen** [3] - 1194:16, 1194:21, 1195:3
**Madsen** [1] - 1194:22
**MAGISTRATE** [1] - 1051:13
**magnitude** [1] - 1159:24
**mail** [5] - 1064:7, 1064:16, 1065:17, 1065:24, 1079:24
**main** [1] - 1280:19
**major** [1] - 1125:10

**majority** [1] - 1192:7
**malingering** [11] - 1124:10, 1124:15, 1124:20, 1124:21, 1171:21, 1171:23, 1172:17, 1173:15, 1173:23, 1174:5, 1175:20
**man** [11] - 1063:18, 1064:22, 1065:9, 1076:1, 1103:5, 1103:6, 1135:22, 1146:22, 1147:21, 1153:24, 1262:5
**management** [2] - 1109:20, 1232:15
**management-type** [1] - 1232:15
**managers** [1] - 1198:7
**Manhattan** [2] - 1130:8, 1202:20
**manner** [3] - 1103:4, 1103:13, 1239:19
**MANNION** [16] - 1052:7, 1150:13, 1166:24, 1167:1, 1225:11, 1225:20, 1226:11, 1226:20, 1226:22, 1227:11, 1227:14, 1228:6, 1272:19, 1272:22, 1273:4, 1273:10
**mark** [3] - 1081:5, 1126:12
**Mark** [4] - 1163:11, 1164:1, 1166:14, 1166:15
**marked** [2] - 1178:2, 1237:6
**Marshall** [3] - 1199:3, 1201:13, 1202:20
**MARSHALL** [1] - 1052:9
**Master's** [2] - 1254:17
**materially** [1] - 1294:24
**math** [1] - 1183:1
**matrimonial** [1] - 1068:11
**matter** [10] - 1056:9, 1056:10, 1092:3, 1107:5, 1119:4, 1152:25, 1169:14, 1181:24, 1188:12, 1211:8
**Matter** [1] - 1297:12
**matters** [1] - 1092:5
**maximum** [1] - 1186:5
**mcElfish** [2] - 1142:15, 1244:1
**McElfish** [217] - 1051:15, 1051:18, 1053:4, 1053:6, 1054:17, 1054:23, 1055:3, 1055:5, 1055:7, 1055:9, 1055:14, 1055:18, 1055:20, 1055:23, 1055:25, 1056:21, 1056:24, 1057:2, 1057:5, 1057:12, 1057:14, 1057:16, 1057:18, 1057:21, 1058:1, 1058:7, 1059:13, 1059:19, 1060:17, 1060:25, 1061:2, 1061:6, 1061:12, 1061:23, 1061:25, 1062:4, 1062:19, 1063:6, 1066:22, 1067:2, 1067:5, 1067:12, 1081:10, 1081:12, 1087:4, 1087:10, 1087:13, 1087:25, 1088:17, 1089:5, 1089:12, 1089:13, 1089:17, 1089:19, 1090:2, 1090:5, 1090:9, 1090:25, 1091:2, 1091:8, 1091:9, 1091:16, 1091:19, 1092:4, 1093:2, 1093:5, 1093:13, 1093:15, 1093:20, 1093:23, 1094:5, 1094:10, 1094:13, 1110:13, 1115:1, 1126:11, 1140:9, 1140:13, 1140:16, 1140:24, 1141:2, 1141:7, 1141:18, 1141:22, 1143:7, 1143:8, 1143:11, 1143:16, 1143:19, 1146:24, 1149:1, 1149:13, 1149:17, 1149:19,

1150:10, 1150:14, 1151:11, 1151:14, 1151:17, 1151:19, 1169:6, 1171:25, 1172:2, 1172:4, 1172:25, 1174:13, 1177:22, 1187:15, 1193:11, 1193:24, 1195:19, 1196:3, 1197:2, 1198:20, 1198:22, 1211:2, 1211:6, 1211:13, 1211:14, 1213:1, 1213:7, 1213:10, 1213:11, 1214:10, 1218:2, 1220:10, 1224:11, 1224:19, 1224:23, 1225:3, 1225:6, 1226:5, 1226:13, 1226:16, 1226:24, 1226:25, 1227:23, 1228:4, 1229:1, 1229:4, 1229:16, 1236:19, 1237:5, 1237:11, 1238:4, 1239:5, 1239:7, 1239:17, 1240:8, 1241:5, 1241:8, 1241:10, 1241:13, 1241:17, 1241:24, 1242:11, 1242:14, 1242:17, 1242:21, 1253:19, 1256:5, 1256:11, 1258:8, 1258:16, 1259:2, 1263:8, 1263:20, 1264:15, 1265:2, 1265:12, 1265:19, 1265:25, 1266:6, 1266:10, 1266:18, 1266:22, 1270:12, 1270:15, 1270:18, 1271:6, 1271:10, 1271:15, 1271:21, 1271:23, 1272:9, 1272:20, 1273:1, 1273:6, 1273:11, 1274:1, 1274:5, 1274:10, 1274:12, 1274:15, 1277:22, 1280:23, 1281:4, 1283:12, 1285:1, 1286:12, 1286:19, 1286:24, 1287:9, 1287:15, 1289:7, 1289:12, 1296:9, 1296:17, 1296:21, 1296:24, 1297:2, 1297:6, 1297:10, 1298:14, 1298:16, 1298:18
**McElfish's** [1] - 1257:12
**mcElfish's** [1] - 1143:6
**McGowan** [1] - 1214:16
**mean** [23] - 1119:7, 1127:12, 1173:22, 1173:23, 1181:10, 1182:18, 1190:8, 1195:21, 1214:2, 1221:3, 1246:25, 1248:24, 1255:18, 1256:22, 1257:11, 1261:22, 1261:24, 1275:18, 1278:5, 1283:3, 1285:11, 1285:19, 1285:20
**meaning** [1] - 1099:10
**means** [6] - 1073:20, 1103:4, 1124:15, 1173:20, 1275:17, 1285:12
**meant** [3] - 1190:6, 1212:10, 1287:23
**measure** [1] - 1190:24
**measured** [1] - 1183:11
**measures** [6] - 1179:6, 1180:11, 1182:6, 1186:25, 1190:23, 1191:7
**mechanical** [1] - 1052:18
**Medical** [1] - 1198:2
**medical** [56] - 1053:18, 1056:15, 1060:8, 1135:10, 1135:14, 1135:16, 1154:13, 1154:16, 1154:18, 1155:15, 1158:19, 1163:15, 1186:5, 1188:7, 1198:6, 1199:20, 1201:22, 1202:7, 1204:16, 1204:20, 1206:20, 1214:6, 1220:6, 1220:16, 1224:3, 1224:4, 1224:5, 1224:7, 1224:9, 1225:13, 1225:17, 1225:21, 1225:23, 1227:1, 1227:9, 1229:18, 1232:9, 1232:10,

1233:11, 1241:16, 1248:13, 1248:17,
1248:19, 1248:20, 1250:5, 1251:1,
1252:21, 1257:1, 1258:1, 1258:3,
1259:22, 1260:21, 1260:24, 1265:18,
1269:5, 1282:6
**medication** [20] - 1158:24, 1159:6,
1159:9, 1159:17, 1161:23, 1161:25,
1205:15, 1207:4, 1207:8, 1207:10,
1208:23, 1210:1, 1234:7, 1234:8,
1234:13, 1234:15, 1234:19, 1235:2
**medications** [17] - 1158:20, 1159:14,
1160:2, 1160:18, 1161:18, 1161:20,
1162:5, 1162:8, 1162:12, 1162:18,
1162:19, 1206:22, 1234:9, 1234:21,
1234:22, 1235:1, 1235:9
**medicine** [1] - 1232:16
**meet** [2] - 1202:2, 1259:17
**meeting** [16] - 1143:11, 1201:23,
1202:19, 1202:24, 1203:1, 1203:20,
1209:14, 1210:4, 1210:16, 1211:15,
1219:25, 1270:10, 1270:12, 1270:15,
1270:16, 1270:18
**members** [1] - 1083:14
**membership** [1] - 1256:5
**Memberships** [1] - 1196:16
**memorize** [2] - 1139:18, 1140:3
**memorized** [1] - 1222:22
**memory** [7] - 1123:6, 1150:3, 1183:1,
1185:17, 1185:21, 1185:23, 1186:2
**mentioned** [9] - 1069:25, 1207:17,
1267:16, 1267:22, 1274:20, 1282:9,
1285:6, 1285:18
**mere** [2] - 1187:2, 1272:23
**mess** [2] - 1126:15, 1127:9
**met** [13] - 1137:24, 1138:1, 1140:9,
1140:24, 1142:15, 1188:15, 1213:15,
1213:17, 1259:16, 1259:25, 1260:5,
1282:12, 1282:20
**method** [3] - 1118:18, 1267:23,
1269:11
**methodology** [2] - 1251:20, 1253:9
**methods** [3] - 1128:4, 1128:5, 1157:3
**MetroCard** [1] - 1098:17
**microvolts** [1] - 1118:20
**mid** [1] - 1279:1
**middle** [5] - 1056:3, 1058:14, 1058:18,
1061:6, 1065:5
**might** [43] - 1076:8, 1077:18, 1079:3,
1079:4, 1098:17, 1100:9, 1113:20,
1118:23, 1120:20, 1122:8, 1123:6,
1128:3, 1130:8, 1132:12, 1139:12,
1143:5, 1143:22, 1152:13, 1154:10,
1154:11, 1154:12, 1155:8, 1162:7,
1172:23, 1173:1, 1175:11, 1179:7,
1181:4, 1182:6, 1183:21, 1184:25,
1185:8, 1187:11, 1192:1, 1192:15,
1192:17, 1192:22, 1192:23, 1214:4,
1222:13, 1284:6
**Mikelis** [2] - 1277:18, 1277:25
**mild** [4] - 1126:7, 1126:24, 1127:2,

1128:8
**mildly** [1] - 1159:11
**million** [3] - 1158:1, 1286:10, 1286:17
**mind** [12] - 1062:4, 1071:7, 1114:17,
1154:16, 1204:9, 1205:18, 1209:15,
1222:6, 1222:7, 1247:19, 1248:8,
1295:24
**mine** [1] - 1257:19
**minor** [3] - 1061:16, 1061:17, 1243:1
**minute** [8] - 1056:24, 1126:18, 1155:1,
1180:13, 1198:18, 1207:5, 1281:3,
1281:5
**minutes** [3] - 1104:3, 1150:16, 1151:4
**misconduct** [1] - 1139:15
**mishear** [1] - 1216:16
**misheard** [1] - 1287:22
**misrepresentations** [1] - 1056:25
**missed** [1] - 1217:3
**Missouri** [1] - 1051:23
**misspoke** [1] - 1287:22
**mistake** [1] - 1105:21
**mistaken** [3] - 1146:12, 1242:1
**misunderstand** [1] - 1285:2
**misunderstanding** [1] - 1224:11
**misunderstood** [1] - 1155:6, 1284:6
**mixing** [1] - 1079:3
**Mobin** [11] - 1200:20, 1247:13,
1247:18, 1248:15, 1249:2, 1249:24,
1251:1, 1251:4, 1289:8, 1296:7,
1297:5
**Mobin's** [6] - 1201:5, 1213:13,
1216:14, 1216:18, 1247:21, 1248:20
**models** [1] - 1192:10
**moderate** [5] - 1124:25, 1125:8,
1126:7, 1126:24, 1127:1
**moment** [11] - 1099:22, 1101:9,
1115:22, 1122:16, 1126:11, 1129:10,
1133:4, 1188:25, 1209:16, 1269:14
**Monday** [2] - 1051:7, 1250:11
**money** [9] - 1109:5, 1109:8, 1109:9,
1109:11, 1109:15, 1109:22, 1109:25,
1111:25, 1222:2
**money-related** [3] - 1109:5, 1109:9,
1109:25
**monitoring** [1] - 1231:21
**month** [1] - 1291:15
**months** [9] - 1122:18, 1123:4,
1189:12, 1189:21, 1190:13, 1203:24,
1206:2, 1264:2, 1275:19
**mood** [1] - 1186:20
**Morgan** [18] - 1170:13, 1170:14,
1170:24, 1171:9, 1175:25, 1176:22,
1176:24, 1177:9, 1177:15, 1177:25,
1183:4, 1183:5, 1200:16, 1281:17,
1281:24, 1281:25, 1287:23, 1288:12
**morgan** [1] - 1176:9
**morgan's** [1] - 1288:6
**Morgan's** [4] - 1179:15, 1179:25,
1287:1, 1288:15
**morning** [13] - 1053:6, 1053:7,

1062:21, 1068:3, 1068:4, 1096:8,
1115:15, 1115:16, 1134:7, 1296:1,
1297:3, 1297:4, 1297:9
**MOROKNEK** [3] - 1052:13, 1149:4,
1150:2
**Moroknek** [6] - 1199:6, 1199:8,
1210:7, 1210:9, 1211:18, 1219:1
**most** [14] - 1060:2, 1073:17, 1125:5,
1130:8, 1131:10, 1155:12, 1155:18,
1156:25, 1179:15, 1239:21, 1252:10,
1252:12, 1255:18, 1260:12
**mostly** [1] - 1198:12
**mother** [1] - 1132:16
**motion** [17] - 1054:20, 1055:1,
1055:21, 1056:1, 1057:21, 1057:22,
1057:23, 1058:2, 1059:19, 1059:20,
1059:21, 1059:24, 1109:16, 1109:22,
1120:14, 1205:3
**move** [20] - 1090:12, 1090:19,
1090:21, 1091:24, 1094:17, 1123:18,
1128:20, 1132:22, 1140:5, 1142:10,
1142:11, 1142:13, 1149:11, 1157:13,
1203:15, 1209:22, 1265:19, 1265:25,
1273:9, 1277:22
**moved** [4] - 1254:16, 1271:25, 1272:3,
1272:10
**moving** [1] - 1223:11
**MR** [605] - 1053:6, 1054:16, 1055:3,
1055:5, 1055:7, 1055:9, 1055:11,
1055:14, 1055:16, 1055:18, 1055:20,
1055:23, 1055:25, 1056:19, 1056:21,
1056:22, 1056:24, 1056:25, 1057:2,
1057:4, 1057:5, 1057:12, 1057:14,
1057:16, 1057:18, 1057:19, 1057:21,
1059:19, 1060:17, 1060:25, 1061:2,
1061:6, 1061:12, 1061:23, 1061:25,
1062:4, 1062:8, 1062:13, 1062:16,
1062:19, 1063:7, 1063:24, 1064:3,
1064:14, 1065:6, 1065:20, 1066:9,
1066:15, 1066:21, 1066:22, 1066:24,
1067:2, 1067:5, 1067:12, 1068:2,
1069:3, 1070:17, 1070:18, 1071:1,
1071:3, 1071:4, 1071:5, 1071:8,
1074:13, 1076:16, 1077:2, 1080:18,
1080:22, 1080:24, 1081:1, 1081:4,
1081:9, 1081:10, 1081:15, 1081:19,
1081:21, 1081:22, 1081:24, 1082:1,
1082:5, 1082:21, 1083:4, 1083:17,
1084:15, 1085:1, 1085:3, 1086:7,
1087:21, 1088:2, 1088:4, 1088:18,
1088:21, 1089:3, 1089:13, 1089:15,
1089:18, 1089:19, 1089:21, 1089:22,
1090:5, 1090:11, 1090:13, 1090:15,
1090:19, 1090:21, 1090:25, 1091:2,
1091:4, 1091:10, 1091:12, 1091:18,
1091:19, 1091:21, 1091:24, 1091:25,
1092:5, 1092:15, 1092:19, 1092:22,
1093:2, 1093:5, 1093:13, 1093:15,
1093:20, 1093:23, 1094:5, 1094:10,
1094:15, 1095:2, 1095:4, 1097:14,

1097:18, 1097:21, 1098:1, 1098:3,
1099:4, 1099:19, 1100:20, 1100:23,
1101:8, 1101:11, 1102:11, 1102:14,
1102:18, 1102:21, 1102:23, 1103:3,
1103:15, 1103:24, 1104:12, 1104:14,
1105:2, 1105:5, 1105:14, 1107:2,
1107:14, 1107:18, 1108:1, 1108:4,
1108:8, 1108:11, 1108:13, 1109:4,
1109:14, 1109:24, 1110:1, 1110:6,
1110:9, 1110:13, 1110:18, 1110:21,
1111:1, 1111:3, 1111:5, 1112:3,
1112:7, 1114:2, 1114:4, 1114:10,
1114:19, 1114:23, 1115:1, 1115:9,
1115:14, 1116:7, 1116:23, 1117:7,
1117:8, 1117:13, 1117:19, 1118:2,
1118:6, 1118:9, 1118:10, 1120:9,
1120:13, 1120:17, 1120:24, 1121:1,
1121:4, 1122:1, 1122:20, 1122:23,
1122:24, 1123:18, 1123:23, 1124:13,
1125:19, 1125:21, 1126:11, 1127:22,
1128:20, 1128:22, 1128:24, 1129:2,
1129:9, 1130:10, 1132:22, 1132:25,
1133:3, 1134:2, 1134:4, 1134:6,
1135:6, 1135:7, 1137:1, 1137:5,
1139:23, 1141:5, 1141:7, 1141:8,
1141:13, 1142:19, 1142:22, 1145:22,
1146:5, 1146:11, 1146:15, 1146:21,
1146:24, 1147:7, 1147:13, 1147:17,
1148:4, 1148:9, 1148:11, 1148:15,
1148:22, 1149:1, 1149:2, 1149:4,
1149:13, 1149:15, 1149:17, 1149:18,
1149:19, 1149:23, 1150:1, 1150:2,
1150:5, 1150:9, 1150:10, 1150:13,
1150:14, 1150:16, 1151:3, 1151:11,
1151:13, 1151:14, 1151:15, 1151:17,
1151:18, 1151:19, 1151:20, 1152:16,
1152:18, 1153:14, 1153:16, 1153:18,
1155:21, 1155:24, 1156:3, 1156:11,
1156:17, 1157:10, 1157:22, 1158:14,
1158:15, 1158:17, 1158:18, 1159:2,
1159:4, 1159:8, 1159:13, 1160:4,
1160:9, 1160:11, 1160:13, 1160:23,
1160:25, 1161:1, 1161:5, 1161:8,
1161:10, 1161:12, 1161:13, 1164:4,
1164:7, 1165:6, 1165:10, 1165:12,
1165:13, 1166:4, 1166:13, 1166:15,
1166:24, 1167:1, 1169:4, 1169:6,
1169:11, 1169:13, 1171:24, 1171:25,
1172:1, 1172:2, 1172:3, 1172:4,
1172:11, 1172:18, 1172:23, 1172:25,
1173:1, 1173:4, 1174:13, 1174:22,
1175:3, 1175:8, 1177:20, 1177:22,
1177:23, 1178:6, 1178:18, 1181:1,
1182:11, 1183:23, 1185:3, 1185:6,
1185:10, 1187:14, 1187:15, 1187:16,
1187:20, 1188:21, 1188:24, 1189:15,
1193:7, 1193:11, 1193:24, 1194:17,
1195:19, 1196:3, 1197:2, 1198:20,
1198:22, 1205:5, 1206:18, 1208:16,
1211:2, 1211:6, 1211:11, 1211:13,
1211:14, 1212:12, 1213:1, 1213:4,

1213:7, 1213:9, 1213:10, 1213:11,
1213:14, 1214:7, 1214:10, 1216:4,
1216:25, 1218:2, 1220:9, 1220:10,
1220:15, 1222:15, 1223:14, 1223:16,
1224:3, 1224:11, 1224:19, 1224:23,
1225:3, 1225:6, 1225:10, 1225:11,
1225:20, 1226:5, 1226:11, 1226:13,
1226:16, 1226:20, 1226:22, 1226:24,
1227:3, 1227:7, 1227:11, 1227:14,
1227:15, 1227:23, 1228:4, 1228:6,
1229:1, 1229:4, 1229:15, 1229:16,
1229:23, 1235:4, 1236:18, 1236:19,
1236:23, 1237:5, 1237:11, 1238:4,
1239:5, 1239:7, 1239:17, 1240:1,
1240:8, 1240:10, 1241:5, 1241:8,
1241:10, 1241:13, 1241:15, 1241:17,
1241:24, 1242:2, 1242:4, 1242:8,
1242:11, 1242:14, 1242:17, 1242:18,
1242:21, 1242:23, 1244:1, 1244:6,
1247:4, 1247:9, 1247:16, 1247:24,
1248:11, 1248:22, 1249:6, 1249:8,
1249:13, 1249:20, 1250:1, 1250:15,
1251:10, 1252:16, 1253:6, 1253:15,
1253:17, 1253:19, 1253:20, 1254:2,
1256:8, 1256:11, 1256:14, 1256:17,
1256:18, 1258:8, 1258:11, 1258:12,
1258:16, 1258:19, 1259:2, 1263:2,
1263:5, 1263:7, 1263:20, 1264:22,
1264:24, 1265:2, 1265:4, 1265:7,
1265:12, 1265:19, 1265:25, 1266:1,
1266:6, 1266:7, 1266:10, 1266:18,
1266:19, 1266:22, 1269:2, 1269:14,
1269:22, 1270:3, 1270:11, 1270:12,
1270:14, 1270:15, 1270:16, 1270:18,
1270:20, 1270:23, 1270:24, 1271:1,
1271:3, 1271:4, 1271:6, 1271:8,
1271:10, 1271:13, 1271:15, 1271:18,
1271:21, 1271:22, 1271:23, 1271:25,
1272:9, 1272:19, 1272:20, 1272:22,
1273:1, 1273:4, 1273:6, 1273:10,
1273:11, 1274:1, 1274:2, 1274:5,
1274:10, 1274:12, 1274:14, 1274:15,
1275:7, 1275:25, 1276:17, 1277:22,
1278:3, 1278:14, 1280:21, 1280:23,
1281:1, 1281:4, 1281:8, 1281:19,
1282:7, 1283:10, 1283:12, 1284:4,
1285:1, 1285:16, 1286:12, 1286:19,
1286:22, 1286:24, 1287:3, 1287:7,
1287:9, 1287:14, 1287:15, 1287:16,
1288:21, 1289:1, 1289:2, 1289:6,
1289:7, 1289:9, 1289:12, 1290:2,
1293:12, 1294:9, 1294:12, 1295:16,
1295:17, 1296:9, 1296:11, 1296:17,
1296:21, 1296:24, 1297:2, 1297:6,
1297:10, 1298:6, 1298:7, 1298:8,
1298:10, 1298:11, 1298:12, 1298:14,
1298:15, 1298:16, 1298:17, 1298:18,
1298:20

**MRI** [3] - 1230:16, 1230:25, 1231:2
**MRIs** [2] - 1230:20, 1230:21
**MS** [1] - 1149:20

**multi** [1] - 1277:5
**multi-disciplinary** [1] - 1277:5
**multiple** [1] - 1073:20
**multiplication** [1] - 1246:5
**mum's** [1] - 1168:6
**mundane** [1] - 1104:22
**muscle** [2] - 1206:24, 1234:11
**must** [4] - 1141:21, 1142:4, 1142:7,
1147:2
**mustard** [1] - 1065:2

**N**

**name** [7] - 1067:18, 1115:5, 1143:6,
1163:3, 1193:16, 1193:17, 1289:18
**narcotic** [3] - 1234:15, 1234:19,
1234:22
**narrative** [2] - 1064:17, 1120:6
**narrowly** [1] - 1061:19
**national** [2] - 1215:24, 1218:18
**natural** [1] - 1076:9
**nature** [5] - 1056:17, 1148:24,
1190:12, 1203:7, 1205:12
**natured** [1] - 1149:1
**near** [1] - 1187:1
**necessarily** [4] - 1189:23, 1190:12,
1192:2, 1226:6
**necessary** [9] - 1107:4, 1130:1,
1130:18, 1131:20, 1246:16, 1266:14,
1296:20, 1296:21, 1296:22
**necessity** [1] - 1256:25
**neck** [5] - 1060:14, 1060:17, 1203:14,
1207:18, 1207:19
**need** [52] - 1062:2, 1066:7, 1104:3,
1114:22, 1131:22, 1148:22, 1148:24,
1153:8, 1159:23, 1162:11, 1175:6,
1181:17, 1182:14, 1183:18, 1190:15,
1203:18, 1205:19, 1206:13, 1220:1,
1220:13, 1220:17, 1220:23, 1221:4,
1222:25, 1223:4, 1223:13, 1226:19,
1229:6, 1231:22, 1235:16, 1237:17,
1237:23, 1248:18, 1248:24, 1250:3,
1250:6, 1253:18, 1262:3, 1264:3,
1266:21, 1267:4, 1267:5, 1267:7,
1283:3, 1283:5, 1287:25, 1288:3,
1288:6, 1289:3, 1293:10, 1294:3,
1294:16
**needed** [16] - 1053:5, 1219:14, 1220:8,
1221:21, 1225:22, 1226:8, 1231:25,
1232:20, 1235:11, 1236:16, 1253:2,
1262:8, 1275:18, 1275:20, 1275:21,
1283:13
**needing** [1] - 1205:23
**needs** [36] - 1062:16, 1127:17,
1127:21, 1128:11, 1139:4, 1181:16,
1182:20, 1213:24, 1220:5, 1221:14,
1222:10, 1224:4, 1224:9, 1225:13,
1225:15, 1225:17, 1225:24, 1226:14,
1227:1, 1227:6, 1229:13, 1229:22,
1231:13, 1232:24, 1236:22, 1237:18,

1237:20, 1247:14, 1247:18, 1248:19, 1248:21, 1249:4, 1272:7, 1283:18, 1283:25, 1285:21
**negotiating** [1] - 1143:20
**nerve** [1] - 1190:3
**neuro** [1] - 1155:14
**neurofeedback** [1] - 1121:2
**NeuroField** [5] - 1128:7, 1154:22, 1154:24, 1155:2, 1155:4
**NeuroFields** [2] - 1156:5, 1156:18
**neurological** [3] - 1171:2, 1176:16, 1286:1
**neurologist** [1] - 1200:3
**neuropsych** [3] - 1170:13, 1171:2, 1173:15
**neuropsychological** [33] - 1126:23, 1127:12, 1144:9, 1152:11, 1154:25, 1155:10, 1155:13, 1155:15, 1155:19, 1156:6, 1156:19, 1156:23, 1157:1, 1157:17, 1158:12, 1170:6, 1170:10, 1170:12, 1172:16, 1174:1, 1174:8, 1174:20, 1175:10, 1175:22, 1175:25, 1176:3, 1177:24, 1179:21, 1180:14, 1181:7, 1181:17, 1182:5, 1190:24
**neuropsychologically** [1] - 1186:4
**neuropsychologist** [7] - 1064:13, 1136:12, 1137:14, 1138:4, 1140:7, 1192:5, 1200:16
**neuropsychologists** [2] - 1157:4, 1192:8
**neuropsychology** [2] - 1136:16, 1157:2
**Neuropsychology** [2] - 1138:24, 1139:6
**neuroscience** [4] - 1157:2, 1157:15, 1157:25
**Neuroscience** [3] - 1157:20, 1158:5, 1158:11
**Neuroscience's** [1] - 1158:10
**neurosurgeon** [1] - 1249:2
**neurotherapy** [2] - 1128:4, 1128:8
**never** [22] - 1065:14, 1071:7, 1100:24, 1101:2, 1101:4, 1101:6, 1101:7, 1113:11, 1135:14, 1145:11, 1145:15, 1149:14, 1157:24, 1158:6, 1158:19, 1159:14, 1173:17, 1187:9, 1265:17, 1267:3, 1267:7, 1277:9
**new** [7] - 1058:2, 1128:6, 1197:21, 1236:2, 1246:20, 1246:23, 1247:7
**NEW** [1] - 1051:1
**New** [13] - 1051:5, 1051:18, 1052:13, 1066:16, 1078:6, 1082:19, 1192:5, 1192:15, 1198:3, 1277:13, 1278:7, 1279:5
**next** [27] - 1067:11, 1082:22, 1120:7, 1133:6, 1142:20, 1145:7, 1145:24, 1149:12, 1156:2, 1172:12, 1180:20, 1182:17, 1185:2, 1185:4, 1218:3, 1230:10, 1230:11, 1232:9, 1233:2, 1234:6, 1235:15, 1240:14, 1243:3,

1259:22, 1284:10, 1288:25, 1292:3
**nice** [2] - 1059:12, 1254:5
**night** [4] - 1059:12, 1085:16, 1100:15, 1297:11
**nine** [2] - 1287:12, 1287:20
**nobody** [1] - 1181:10
**noise** [1] - 1109:3
**NOLAN** [1] - 1052:17
**NolanEDNY@aol.com** [1] - 1052:18
**non** [4] - 1224:3, 1234:12, 1246:16
**non-medical** [1] - 1224:3
**non-necessary** [1] - 1246:16
**non-steroidal** [1] - 1234:12
**none** [3] - 1073:15, 1187:1, 1220:8
**nonsense** [1] - 1090:24
**noon** [1] - 1179:13
**normal** [1] - 1118:21
**North** [1] - 1279:11
**nose** [1] - 1118:16
**note** [6] - 1064:6, 1064:8, 1064:16, 1065:12, 1127:3, 1128:24
**noted** [1] - 1169:21
**notes** [9] - 1064:12, 1066:4, 1091:19, 1134:24, 1203:17, 1203:20, 1210:4, 1210:7
**nothing** [14] - 1059:7, 1066:21, 1116:12, 1193:6, 1196:7, 1249:23, 1253:8, 1279:2, 1279:6, 1279:13, 1283:6, 1285:19, 1285:22, 1288:21
**notice** [6] - 1054:7, 1060:12, 1102:19, 1258:6, 1258:14, 1258:23
**noticed** [4] - 1093:7, 1093:17, 1259:6, 1276:9
**notified** [1] - 1147:2
**November** [25] - 1122:19, 1136:23, 1140:14, 1140:15, 1140:16, 1149:21, 1156:5, 1156:15, 1172:1, 1172:5, 1172:9, 1172:13, 1173:5, 1173:7, 1173:8, 1174:6, 1174:11, 1174:19, 1181:25, 1182:9, 1182:14, 1185:19, 1185:24, 1198:1
**nowhere** [1] - 1212:7
**Number** [3] - 1155:24, 1159:2, 1160:10
**number** [17] - 1057:24, 1058:9, 1066:16, 1072:22, 1095:18, 1191:1, 1213:4, 1213:6, 1219:17, 1222:14, 1222:23, 1223:3, 1223:7, 1223:8, 1252:24, 1263:6, 1264:2
**numbers** [10] - 1112:24, 1210:25, 1212:5, 1216:22, 1217:11, 1223:3, 1223:4, 1233:10, 1250:18, 1250:19
**numerous** [1] - 1131:24
**nursing** [4] - 1261:16, 1261:24, 1262:2, 1262:4
**NY** [1] - 1052:17

## O

**o'clock** [3] - 1100:14, 1150:17, 1296:1

**oath** [6] - 1074:18, 1111:11, 1111:16, 1115:4, 1156:15, 1288:11
**object** [2] - 1227:15, 1242:4
**objecting** [1] - 1225:8
**objection** [99] - 1070:17, 1074:13, 1076:16, 1080:22, 1081:13, 1081:15, 1081:22, 1083:17, 1085:1, 1086:2, 1088:18, 1100:20, 1102:21, 1107:14, 1107:18, 1108:1, 1108:8, 1112:3, 1112:7, 1116:23, 1117:7, 1118:4, 1122:24, 1124:13, 1125:21, 1127:22, 1128:24, 1130:10, 1132:24, 1132:25, 1135:7, 1139:23, 1141:13, 1152:16, 1153:14, 1155:21, 1156:11, 1157:22, 1158:14, 1159:8, 1160:4, 1160:11, 1160:25, 1161:8, 1165:6, 1165:12, 1172:11, 1172:18, 1174:13, 1175:3, 1183:23, 1185:10, 1187:20, 1205:5, 1206:18, 1208:16, 1211:11, 1212:12, 1213:14, 1214:7, 1216:4, 1216:25, 1220:9, 1220:15, 1222:15, 1223:14, 1229:15, 1229:23, 1235:4, 1236:18, 1236:23, 1252:16, 1256:11, 1258:10, 1258:16, 1263:20, 1265:2, 1265:12, 1265:19, 1266:3, 1266:22, 1270:4, 1274:17, 1275:7, 1275:25, 1276:17, 1277:22, 1278:3, 1278:14, 1280:21, 1281:1, 1281:10, 1281:19, 1282:7, 1283:10, 1284:4, 1286:12, 1286:19, 1288:4
**Objection** [26] - 1069:3, 1070:18, 1189:15, 1194:17, 1240:1, 1244:6, 1247:4, 1247:9, 1247:16, 1247:24, 1248:11, 1248:22, 1249:6, 1249:13, 1249:20, 1250:1, 1250:15, 1251:10, 1253:6, 1253:15, 1287:3, 1287:7, 1287:14, 1293:12, 1294:9, 1294:12
**objectionable** [1] - 1272:10
**objections** [1] - 1223:6
**objective** [11] - 1140:6, 1140:8, 1187:2, 1188:6, 1212:3, 1214:1, 1214:3, 1255:20, 1256:21, 1257:22, 1288:13
**objects** [2] - 1101:4, 1113:2
**obligation** [1] - 1053:8
**observations** [4] - 1100:24, 1103:19, 1103:22, 1237:22
**observe** [5] - 1074:25, 1076:8, 1079:11, 1082:25, 1095:10
**observed** [6] - 1075:19, 1076:20, 1082:6, 1099:24, 1103:15, 1219:16
**obtain** [2] - 1095:6, 1244:10
**obtained** [2] - 1254:13, 1254:17
**obtaining** [1] - 1253:9
**obvious** [2] - 1083:23, 1099:16
**obviously** [3] - 1181:6, 1186:7, 1261:4
**occasion** [1] - 1132:5
**occasions** [2] - 1100:6, 1295:14
**occupational** [1] - 1103:7
**occupying** [1] - 1078:3

**occur** [1] - 1218:17
**occurred** [1] - 1055:10
**occurs** [2] - 1053:3, 1239:3
**October** [3] - 1199:5, 1201:19, 1281:11
**OF** [2] - 1051:1, 1051:12
**offered** [2] - 1177:11, 1177:12
**office** [25] - 1069:17, 1069:24, 1069:25, 1070:4, 1075:7, 1075:11, 1075:18, 1075:19, 1076:15, 1076:21, 1088:9, 1096:19, 1141:19, 1171:3, 1181:10, 1181:13, 1202:20, 1217:2, 1233:17, 1251:4, 1251:7, 1272:12, 1276:15, 1277:3, 1295:3
**officer** [1] - 1147:3
**offices** [4] - 1069:16, 1082:15, 1252:1, 1276:15
**often** [6] - 1186:20, 1209:11, 1235:8, 1245:6, 1269:9, 1276:21
**Ohio** [1] - 1052:6
**old** [1] - 1054:6
**once** [10] - 1131:16, 1146:18, 1147:15, 1187:9, 1224:6, 1232:12, 1233:5, 1235:10, 1244:10, 1295:23
**one** [135] - 1054:3, 1054:8, 1055:12, 1056:3, 1057:24, 1058:10, 1059:9, 1062:9, 1066:16, 1068:20, 1069:16, 1071:5, 1071:22, 1074:22, 1077:16, 1078:11, 1083:24, 1084:16, 1090:22, 1094:11, 1097:5, 1097:6, 1097:22, 1100:9, 1100:13, 1102:14, 1102:15, 1103:22, 1106:14, 1109:19, 1114:14, 1116:25, 1120:22, 1125:5, 1125:10, 1126:7, 1126:11, 1126:19, 1136:22, 1136:23, 1138:10, 1138:13, 1138:22, 1144:12, 1144:13, 1144:17, 1145:14, 1145:18, 1146:8, 1148:13, 1149:19, 1154:20, 1156:1, 1158:23, 1161:5, 1163:6, 1163:13, 1171:8, 1171:9, 1173:16, 1174:15, 1178:2, 1183:2, 1185:16, 1187:14, 1187:16, 1189:7, 1190:3, 1190:8, 1190:9, 1190:20, 1192:4, 1192:5, 1198:1, 1203:3, 1204:10, 1207:4, 1211:9, 1211:20, 1217:24, 1218:9, 1218:13, 1218:18, 1219:9, 1219:13, 1220:22, 1223:12, 1227:17, 1231:12, 1231:14, 1231:18, 1237:16, 1237:19, 1239:18, 1240:7, 1241:7, 1241:22, 1242:10, 1245:21, 1245:24, 1245:25, 1246:10, 1253:23, 1262:8, 1267:4, 1267:5, 1269:8, 1269:14, 1271:1, 1271:4, 1276:22, 1280:18, 1281:3, 1281:5, 1281:9, 1282:15, 1282:16, 1282:18, 1282:19, 1282:22, 1282:23, 1282:24, 1282:25, 1283:13, 1283:18, 1283:25, 1285:3, 1289:12
**one-on-one** [1] - 1203:3
**one-time** [16] - 1217:24, 1218:9, 1218:13, 1219:9, 1219:13, 1223:12,

1231:12, 1231:14, 1231:18, 1241:7, 1241:22, 1242:10, 1245:21, 1245:24, 1245:25, 1246:10
**ones** [2] - 1191:2, 1202:10
**ongoing** [1] - 1259:23
**open** [17] - 1053:1, 1053:16, 1054:22, 1054:25, 1060:12, 1095:1, 1104:1, 1104:7, 1109:22, 1151:1, 1169:2, 1239:1, 1272:2, 1295:24, 1296:3, 1297:7
**opened** [3] - 1054:18, 1060:13, 1109:7
**opening** [3] - 1060:1, 1060:24, 1061:10
**opens** [4] - 1056:1, 1056:17, 1110:14, 1110:15
**operating** [1] - 1106:9
**opine** [1] - 1064:13
**opined** [1] - 1247:14
**opines** [1] - 1248:6
**opinion** [42] - 1103:4, 1103:13, 1103:22, 1127:20, 1192:1, 1192:20, 1212:23, 1213:23, 1222:22, 1223:12, 1224:6, 1224:7, 1224:9, 1225:12, 1225:13, 1225:16, 1225:17, 1225:21, 1226:7, 1226:11, 1226:13, 1226:17, 1227:9, 1236:21, 1237:1, 1237:16, 1237:18, 1237:23, 1248:13, 1248:19, 1248:20, 1248:24, 1249:4, 1250:3, 1257:7, 1271:11, 1272:8, 1272:20, 1273:8, 1283:13, 1285:7, 1287:24
**opinions** [17] - 1200:11, 1200:15, 1211:19, 1212:20, 1220:21, 1224:4, 1225:23, 1226:18, 1239:20, 1248:16, 1250:5, 1256:25, 1269:16, 1269:19, 1270:6, 1270:9, 1274:7
**opportunities** [1] - 1105:16
**opportunity** [4] - 1063:12, 1064:4, 1181:4, 1283:20
**oppose** [1] - 1054:20
**opposed** [3] - 1056:4, 1215:18, 1262:2
**opposition** [1] - 1059:22
**ops** [1] - 1079:24
**option** [3] - 1146:6, 1147:8, 1177:10
**Optum** [1] - 1215:6
**orange** [1] - 1119:6
**oranges** [1] - 1058:12
**order** [5] - 1120:14, 1216:3, 1229:12, 1248:19, 1256:8
**ordinarily** [1] - 1162:7
**organization** [3] - 1157:18, 1157:24, 1158:2
**organizations** [2] - 1157:25, 1158:1
**orient** [1] - 1116:13
**original** [1] - 1059:20
**orthopedic** [1] - 1200:8
**orthopedist** [3] - 1232:12, 1233:4, 1233:12
**orthosis** [2] - 1235:20, 1235:25
**Osborn** [9] - 1054:8, 1054:23, 1058:6, 1058:10, 1058:12, 1059:6, 1059:8,

1297:8
**osborn** [2] - 1054:24, 1058:24
**Ostroff** [4] - 1053:22, 1054:13, 1058:13, 1059:11
**ostroff** [2] - 1058:8, 1060:15
**otherwise** [3] - 1053:15, 1072:18, 1117:10
**out-of-the-presence** [1] - 1054:14
**outcome** [3] - 1104:16, 1109:6, 1143:17
**outside** [26] - 1053:3, 1085:11, 1088:22, 1089:1, 1102:25, 1103:1, 1108:16, 1109:1, 1119:11, 1120:1, 1145:23, 1146:1, 1148:2, 1166:1, 1169:2, 1187:20, 1223:18, 1224:1, 1239:3, 1240:13, 1241:1, 1257:6, 1257:24, 1265:2, 1269:25, 1270:1
**overall** [7] - 1101:21, 1105:8, 1126:22, 1127:2, 1127:4, 1255:10, 1259:18
**overruled** [21] - 1076:18, 1125:22, 1141:15, 1153:17, 1183:24, 1187:22, 1189:16, 1194:18, 1240:2, 1247:17, 1248:12, 1248:23, 1249:14, 1249:21, 1250:2, 1250:16, 1251:11, 1252:17, 1286:13, 1286:20, 1294:13
**Overruled** [38] - 1100:22, 1107:19, 1108:2, 1108:9, 1112:4, 1112:8, 1116:24, 1124:14, 1125:22, 1127:24, 1153:15, 1155:23, 1156:12, 1157:23, 1174:14, 1205:6, 1206:19, 1208:17, 1212:13, 1213:16, 1216:5, 1217:1, 1223:15, 1229:17, 1236:24, 1259:3, 1263:21, 1265:14, 1266:11, 1266:23, 1275:8, 1276:1, 1276:18, 1277:23, 1278:4, 1278:15, 1281:20, 1284:5
**own** [20] - 1059:24, 1111:22, 1164:8, 1188:12, 1188:13, 1188:18, 1188:19, 1220:5, 1225:1, 1225:9, 1229:11, 1239:8, 1239:11, 1239:24, 1244:15, 1244:17, 1262:14, 1262:16, 1294:17

## P

**P-164-102** [2] - 1125:18, 1125:19
**P-364-0012** [1] - 1124:1
**P-364-0023** [1] - 1116:20
**P-364-0047** [2] - 1122:15, 1122:17
**P-364-0102** [3] - 1128:20, 1129:3, 1299:8
**P-365** [3] - 1132:23, 1133:2, 1299:10
**P-432-0098** [1] - 1245:20
**P-457-0017** [1] - 1263:2
**p.m** [5] - 1075:16, 1075:20, 1085:15, 1087:1, 1204:13
**pace** [1] - 1084:12
**PAGE** [1] - 1298:3
**page** [93] - 1055:20, 1056:12, 1057:10, 1057:18, 1060:4, 1062:25, 1063:15, 1063:25, 1071:3, 1071:4, 1074:15, 1076:24, 1088:24, 1094:20, 1106:19,

Bauta v. Greyhound, et al _____ 23

1108:17, 1110:23, 1116:11, 1116:13, 1118:3, 1119:12, 1121:6, 1122:4, 1122:18, 1123:24, 1125:13, 1129:12, 1133:6, 1137:1, 1137:6, 1141:5, 1141:12, 1142:17, 1142:18, 1142:21, 1145:7, 1145:24, 1147:24, 1150:20, 1151:16, 1152:7, 1152:9, 1152:11, 1156:2, 1157:12, 1157:13, 1160:23, 1165:11, 1165:15, 1167:3, 1172:2, 1172:12, 1173:5, 1173:10, 1174:22, 1175:6, 1175:8, 1176:12, 1178:18, 1180:20, 1182:8, 1182:9, 1184:8, 1185:2, 1185:4, 1187:14, 1187:15, 1187:16, 1187:23, 1196:13, 1196:20, 1213:4, 1217:25, 1218:3, 1218:5, 1223:19, 1228:8, 1237:6, 1240:5, 1240:14, 1243:3, 1244:3, 1253:25, 1268:4, 1273:16, 1274:14, 1274:15, 1284:10, 1287:19, 1287:20

**Page** [5] - 1149:21, 1149:22, 1155:24, 1160:9, 1160:13

**pages** [12] - 1053:17, 1055:8, 1116:5, 1117:14, 1117:21, 1117:22, 1117:25, 1123:21, 1145:8, 1156:1, 1178:11, 1178:16

**paid** [32] - 1104:18, 1104:21, 1109:6, 1109:8, 1109:10, 1109:15, 1109:17, 1109:23, 1110:5, 1110:10, 1110:16, 1112:1, 1130:4, 1130:5, 1130:22, 1139:12, 1144:6, 1145:1, 1152:4, 1152:21, 1153:2, 1153:12, 1154:2, 1154:11, 1154:15, 1192:2, 1193:3, 1201:10, 1204:15, 1204:21

**pain** [43] - 1131:15, 1131:17, 1135:19, 1135:21, 1135:23, 1161:23, 1161:25, 1171:13, 1171:14, 1179:13, 1180:2, 1186:22, 1186:24, 1187:2, 1187:3, 1187:10, 1187:12, 1187:18, 1187:25, 1189:2, 1189:11, 1189:20, 1190:5, 1190:12, 1190:13, 1191:10, 1192:12, 1203:12, 1203:14, 1204:14, 1205:9, 1207:15, 1209:8, 1209:13, 1232:14, 1234:13, 1234:14, 1234:15, 1234:19, 1234:21, 1260:3, 1283:2

**paint** [2] - 1110:1, 1110:2

**paints** [1] - 1092:1

**Panasonic** [1] - 1071:22

**panel** [1] - 1123:7

**paper** [1] - 1213:18

**paralegal** [1] - 1120:13

**parameters** [3] - 1117:17, 1118:13, 1123:5

**pardon** [5] - 1078:16, 1130:11, 1210:12, 1252:5, 1255:12

**parenthesis** [1] - 1230:20

**part** [16] - 1056:7, 1056:8, 1130:13, 1134:17, 1163:23, 1179:1, 1186:16, 1197:18, 1204:15, 1207:24, 1225:8, 1226:10, 1227:15, 1239:21, 1272:7, 1279:25

**partially** [1] - 1186:10

**particular** [20] - 1081:4, 1091:20, 1091:22, 1092:7, 1098:24, 1099:5, 1103:21, 1105:7, 1106:6, 1106:7, 1113:22, 1117:24, 1118:18, 1118:25, 1122:4, 1132:5, 1149:6, 1157:5, 1162:12, 1257:23

**particularly** [2] - 1119:3, 1207:21

**partner** [1] - 1100:18

**parts** [2] - 1186:17, 1272:1

**party** [2] - 1146:19

**pass** [1] - 1295:25

**passenger** [3] - 1054:3, 1061:18, 1297:8

**passengers** [5] - 1053:19, 1056:16, 1059:22, 1059:25, 1060:6

**past** [3] - 1214:12, 1259:1, 1264:1

**patently** [1] - 1103:12

**pathology** [1] - 1190:2

**patient** [14] - 1136:13, 1136:15, 1136:18, 1137:15, 1139:6, 1152:13, 1154:1, 1162:12, 1183:20, 1190:17, 1191:5, 1192:2

**patient's** [1] - 1152:20

**patients** [5] - 1157:21, 1186:5, 1206:8, 1206:16, 1242:22

**patina** [1] - 1109:11

**pattern** [2] - 1191:4, 1258:6

**pause** [5] - 1075:25, 1097:24, 1209:17, 1263:4, 1289:14

**pay** [5] - 1114:17, 1135:20, 1178:12, 1201:12, 1201:14

**paying** [1] - 1150:10

**payment** [1] - 1109:7

**pen** [1] - 1213:18

**penalize** [1] - 1065:3

**Penn** [7] - 1075:21, 1077:3, 1077:6, 1077:13, 1082:17, 1088:10, 1098:10

**Pennsylvania** [2] - 1053:23, 1054:23

**people** [19] - 1053:23, 1057:7, 1058:4, 1060:2, 1061:6, 1061:15, 1083:19, 1102:6, 1103:16, 1103:17, 1112:11, 1113:1, 1124:23, 1127:10, 1139:10, 1147:17, 1163:13, 1192:15, 1206:4

**per** [19] - 1130:7, 1191:4, 1222:4, 1222:8, 1232:4, 1232:5, 1232:11, 1232:12, 1232:13, 1235:10, 1236:8, 1236:9, 1244:11, 1245:2, 1261:10, 1261:12, 1261:17

**percent** [10] - 1084:7, 1095:14, 1157:3, 1192:8, 1195:4, 1195:7, 1195:21, 1195:22, 1195:24, 1195:25

**percentage** [4] - 1194:25, 1195:13, 1195:15

**percentile** [4] - 1169:25, 1170:2, 1179:6

**percentiles** [1] - 1127:8

**perfectly** [2] - 1180:12, 1191:8

**performance** [1] - 1127:5

**performed** [1] - 1086:8

**perhaps** [5] - 1082:12, 1100:9, 1154:9, 1189:9, 1209:10

**perilously** [1] - 1120:3

**period** [7] - 1085:12, 1112:20, 1159:16, 1171:18, 1234:23, 1272:14, 1272:15

**permanent** [2] - 1285:21, 1288:7

**permission** [4] - 1080:18, 1117:8, 1122:20, 1125:19

**permit** [1] - 1117:23

**permitted** [2] - 1063:10, 1224:8

**persisted** [1] - 1053:19

**person** [20] - 1056:3, 1059:9, 1072:8, 1076:5, 1103:22, 1105:8, 1118:21, 1119:2, 1125:4, 1137:20, 1145:14, 1151:10, 1151:22, 1158:4, 1166:20, 1179:11, 1192:1, 1262:1, 1269:8, 1272:5

**person's** [1] - 1118:13

**personal** [3] - 1103:19, 1103:22, 1237:22

**personally** [2] - 1083:7, 1166:21

**pertinent** [1] - 1132:11

**ph** [1] - 1061:15

**Philadelphia** [1] - 1057:7, 1058:8

**phone** [6] - 1072:9, 1099:14, 1252:6, 1252:13, 1267:24, 1269:8

**photograph** [1] - 1069:22

**phrase** [2] - 1061:17, 1232:25

**phrased** [1] - 1226:7

**physiatrist** [2] - 1232:11, 1232:14

**physiatry** [2] - 1232:18, 1239:9

**physical** [45] - 1069:17, 1069:24, 1075:8, 1096:18, 1096:25, 1103:7, 1113:8, 1113:12, 1113:24, 1190:13, 1219:12, 1220:1, 1220:5, 1220:17, 1220:18, 1220:23, 1220:24, 1221:21, 1222:2, 1222:4, 1222:9, 1223:7, 1225:2, 1227:2, 1227:11, 1227:12, 1231:18, 1231:19, 1232:16, 1232:21, 1239:8, 1239:23, 1239:25, 1241:20, 1241:21, 1241:23, 1244:9, 1263:25, 1264:4, 1264:6, 1269:20, 1285:7, 1285:9, 1285:13, 1285:25

**physically** [1] - 1072:16

**physician** [10] - 1065:4, 1065:14, 1066:14, 1136:4, 1141:17, 1153:22, 1153:25, 1233:22, 1281:22

**Physician** [1] - 1250:18

**physician's** [2] - 1230:5, 1231:4

**Physicians** [6] - 1215:9, 1215:17, 1215:19, 1217:14, 1252:19, 1267:18

**physicians** [6] - 1066:11, 1139:19, 1186:1, 1248:25, 1258:6

**pick** [2] - 1059:9, 1218:18

**picked** [2] - 1089:12, 1218:16

**picture** [4] - 1092:1, 1113:19, 1191:14, 1258:2

**piece** [2] - 1091:14, 1094:11

**piling** [1] - 1238:7

**pill** [3] - 1131:17, 1179:13, 1180:3
**pinched** [1] - 1190:3
**Pine** [1] - 1202:21
**Pittsburgh** [1] - 1053:25
**place** [10] - 1053:10, 1061:14, 1089:1, 1103:1, 1106:3, 1106:6, 1146:1, 1148:2, 1241:1, 1252:22
**places** [1] - 1089:24
**plaintiff** [15] - 1062:22, 1063:4, 1065:3, 1068:21, 1135:3, 1140:12, 1193:12, 1194:4, 1195:25, 1255:4, 1255:10, 1255:17, 1259:23, 1261:9, 1286:7
**Plaintiff** [6] - 1051:4, 1051:16, 1051:21, 1067:23, 1193:20, 1289:23
**plaintiff's** [2] - 1065:4, 1251:1
**Plaintiff's** [16] - 1081:1, 1081:2, 1081:17, 1081:18, 1116:11, 1117:11, 1117:20, 1118:5, 1123:19, 1123:21, 1129:3, 1133:2, 1299:4, 1299:6, 1299:8, 1299:10
**plaintiffs** [6] - 1054:8, 1067:13, 1095:21, 1101:18, 1195:14, 1195:22
**Plaintiffs** [1] - 1051:15
**plan** [68] - 1135:3, 1155:3, 1169:16, 1210:22, 1212:3, 1215:3, 1216:12, 1217:21, 1219:3, 1219:4, 1220:2, 1220:14, 1220:18, 1221:8, 1224:12, 1224:16, 1229:25, 1230:20, 1232:2, 1234:8, 1237:19, 1241:3, 1246:16, 1248:9, 1249:23, 1255:9, 1255:16, 1255:18, 1255:19, 1255:20, 1256:21, 1257:22, 1258:3, 1259:7, 1259:18, 1259:24, 1260:14, 1260:17, 1261:1, 1261:4, 1261:11, 1261:17, 1262:8, 1262:9, 1262:22, 1263:13, 1263:19, 1264:10, 1266:9, 1266:14, 1266:16, 1266:25, 1269:15, 1275:5, 1275:16, 1275:22, 1280:1, 1280:6, 1280:16, 1282:2, 1282:16, 1282:18, 1283:22, 1284:3, 1285:22, 1286:8, 1286:10, 1286:11
**planner** [15] - 1193:12, 1194:14, 1194:23, 1219:25, 1224:12, 1224:22, 1225:1, 1225:5, 1239:20, 1253:1, 1254:10, 1254:15, 1254:20, 1254:22, 1272:8
**planner's** [1] - 1225:9
**planning** [6] - 1197:12, 1197:19, 1197:24, 1256:10, 1256:13, 1264:12
**plans** [8] - 1195:6, 1195:9, 1195:12, 1198:13, 1212:16, 1254:24, 1255:24, 1267:21
**plastic** [1] - 1059:2
**plateau** [2] - 1186:5, 1193:4
**plateaus** [1] - 1131:2
**play** [6] - 1056:3, 1207:12, 1264:25, 1270:4, 1270:7
**played** [7] - 1082:4, 1082:18, 1089:23, 1102:13, 1105:4, 1111:15, 1270:24

**playing** [14] - 1082:20, 1082:22, 1082:24, 1083:3, 1084:14, 1087:20, 1088:15, 1089:13, 1098:2, 1098:12, 1098:23, 1099:3, 1101:2, 1102:17
**Plaza** [1] - 1052:17
**plenty** [3] - 1062:6, 1182:5, 1271:19
**plug** [1] - 1080:2
**pocket** [2] - 1098:17, 1098:20
**podium** [1] - 1081:23
**point** [26] - 1066:13, 1079:20, 1080:1, 1090:13, 1093:4, 1094:2, 1117:6, 1117:24, 1120:25, 1134:12, 1162:17, 1166:7, 1166:9, 1173:19, 1174:8, 1178:12, 1189:6, 1211:11, 1211:12, 1217:11, 1227:5, 1233:24, 1265:13, 1281:12, 1282:21
**points** [3] - 1055:12, 1127:4, 1243:1
**pool** [1] - 1233:22
**poor** [10] - 1174:2, 1174:9, 1175:1, 1175:15, 1175:23, 1176:1, 1176:4, 1177:16, 1180:8, 1181:3
**portion** [1] - 1054:14, 1082:17, 1245:5
**pose** [2] - 1275:11, 1275:13
**position** [5] - 1066:9, 1157:15, 1157:21, 1158:10, 1178:15
**positions** [1] - 1157:16
**possible** [2] - 1116:2, 1184:9
**possibly** [1] - 1162:13
**post** [5] - 1114:15, 1137:19, 1139:14, 1204:4, 1205:25
**post-surgery** [1] - 1205:25
**post-surgical** [1] - 1204:4
**posted** [1] - 1136:12
**postsurgery** [1] - 1234:23
**potential** [2] - 1158:24, 1265:8
**potentially** [1] - 1286:10
**power** [1] - 1118:19
**practice** [15] - 1095:17, 1144:23, 1198:12, 1216:21, 1251:8, 1257:6, 1257:24, 1259:5, 1276:7, 1276:23, 1276:24, 1277:6, 1277:7, 1278:6, 1278:7
**practices** [1] - 1276:20
**practicing** [3] - 1091:1, 1091:3, 1091:6
**pre** [1] - 1169:19
**pre-injury** [1] - 1169:19
**precisely** [1] - 1147:7
**preexisting** [1] - 1269:20
**prefer** [2] - 1076:11, 1178:22
**prejudice** [1] - 1092:20
**preparation** [2] - 1291:7, 1294:5
**prepare** [4] - 1195:6, 1219:3, 1219:4, 1258:3
**prepared** [12] - 1053:21, 1056:16, 1056:20, 1057:8, 1062:13, 1129:22, 1195:9, 1195:13, 1219:7, 1220:2, 1249:18, 1263:13
**preparing** [4] - 1215:1, 1249:19, 1259:7, 1259:18
**prescribe** [1] - 1227:11

**prescribed** [2] - 1234:21, 1235:10
**presence** [4] - 1053:3, 1054:14, 1169:2, 1239:3
**present** [10] - 1054:13, 1095:1, 1104:1, 1104:7, 1109:13, 1151:1, 1197:12, 1197:18, 1224:18, 1259:25
**presentations** [4] - 1197:15, 1197:23, 1197:24, 1256:7
**presented** [7] - 1177:25, 1221:25, 1260:1, 1260:2, 1270:8, 1272:6, 1272:24
**presume** [1] - 1220:7
**pretty** [14] - 1060:14, 1084:7, 1095:7, 1098:7, 1131:14, 1132:18, 1132:20, 1136:16, 1141:22, 1142:10, 1144:19, 1149:1, 1164:13, 1252:14
**previous** [1] - 1175:6
**previously** [6] - 1054:20, 1086:14, 1115:11, 1117:22, 1128:12, 1164:19
**price** [2] - 1230:4, 1267:17
**pricing** [6] - 1215:2, 1215:25, 1216:18, 1251:21, 1252:2, 1267:20
**primarily** [7] - 1102:1, 1194:11, 1194:13, 1249:11, 1249:18, 1258:15, 1286:3
**Princeton** [1] - 1198:3
**private** [5] - 1068:18, 1215:21, 1216:3, 1216:6, 1290:11
**probable** [1] - 1190:2
**probation** [1] - 1176:23
**problem** [7] - 1056:7, 1057:2, 1091:23, 1120:20, 1134:12, 1135:12, 1203:19, 1206:21, 1228:5, 1271:21
**problems** [7] - 1131:16, 1171:16, 1280:20
**Procedural** [1] - 1252:20
**procedure** [1] - 1106:9
**procedures** [1] - 1257:1
**proceed** [10] - 1077:6, 1095:2, 1111:1, 1122:1, 1134:2, 1137:3, 1137:9, 1142:19, 1150:5, 1229:1
**proceeded** [4] - 1053:18, 1075:21, 1087:12, 1242:20
**proceedings** [1] - 1289:14
**Proceedings** [1] - 1052:18
**process** [1] - 1111:10
**processing** [1] - 1127:6
**produced** [5] - 1052:19, 1072:13, 1081:20, 1088:8, 1089:14, 1089:23
**profession** [2] - 1106:10, 1251:6
**Professional** [1] - 1196:16
**professional** [6] - 1139:15, 1193:3, 1197:3, 1215:23, 1237:23, 1256:6
**professionals** [3] - 1198:5, 1198:6, 1252:21
**Professionals** [1] - 1197:6
**proffered** [1] - 1146:20
**program** [7] - 1079:24, 1215:9, 1215:11, 1216:7, 1231:21, 1231:22, 1244:13, 1244:19, 1251:6, 1261:21

**programs** [1] - 1267:16
**progress** [2] - 1128:18, 1144:20
**progressed** [1] - 1272:6
**project** [2] - 1218:21, 1251:9
**projected** [2] - 1216:21, 1237:3
**projection** [2] - 1246:5, 1261:22
**projections** [5] - 1219:21, 1239:25, 1251:2, 1251:14, 1259:21
**promote** [1] - 1206:10
**prompted** [2] - 1226:2, 1260:17
**proof** [2] - 1094:12, 1148:21
**proper** [2] - 1063:22, 1170:22
**properly** [1] - 1146:8
**proposition** [1] - 1181:2
**Provder** [8] - 1135:2, 1224:16, 1225:1, 1251:15, 1251:20, 1253:5, 1261:10, 1267:23
**Provder's** [2] - 1224:16, 1261:4
**provder's** [1] - 1286:15
**prove** [2] - 1092:14, 1166:22
**Provenzale** [1] - 1200:12
**provide** [3] - 1146:17, 1253:3, 1291:3
**provided** [17] - 1113:19, 1130:2, 1130:16, 1132:4, 1191:20, 1200:2, 1214:14, 1231:1, 1247:8, 1248:5, 1253:12, 1260:22, 1260:24, 1260:25, 1275:23, 1276:3, 1277:21
**provider** [1] - 1293:6
**providers** [2] - 1260:22, 1267:24
**provides** [1] - 1123:2
**providing** [4] - 1128:12, 1130:25, 1264:17, 1264:18
**Psychological** [2] - 1197:7, 1197:8
**psychological** [4] - 1145:9, 1208:4, 1208:10, 1229:20
**psychologist** [4] - 1140:4, 1207:21, 1264:12, 1281:23
**psychology** [8] - 1194:11, 1194:13, 1197:9, 1197:16, 1197:23, 1208:1, 1254:17, 1254:18
**psychotherapist** [1] - 1264:8
**psychotherapy** [24] - 1223:13, 1226:11, 1226:14, 1226:19, 1227:13, 1227:16, 1227:19, 1227:22, 1229:6, 1229:22, 1230:2, 1230:7, 1263:1, 1263:9, 1264:7, 1264:13, 1264:19, 1279:18, 1280:1, 1280:6, 1287:2, 1288:9, 1288:14, 1288:18
**PT** [6] - 1096:22, 1106:14, 1219:21, 1263:1, 1263:8, 1263:18
**PTO** [2] - 1069:16, 1070:4
**PTSD** [24] - 1062:22, 1063:2, 1063:3, 1063:4, 1063:11, 1063:14, 1063:17, 1063:19, 1064:1, 1064:10, 1064:13, 1064:19, 1064:21, 1065:7, 1065:8, 1065:11, 1065:15, 1065:25, 1066:6, 1066:8, 1066:19, 1114:15, 1114:19
**public** [1] - 1097:25
**publications** [3] - 1196:14, 1197:9,

1256:6
**publish** [5] - 1080:19, 1117:8, 1118:4, 1122:20, 1125:19
**published** [2] - 1082:3, 1233:20
**pull** [15] - 1122:15, 1135:5, 1140:12, 1141:5, 1160:23, 1171:24, 1174:22, 1177:20, 1184:24, 1185:3, 1187:14, 1203:18, 1240:8, 1263:2, 1287:10
**pulling** [1] - 1091:12
**purchased** [2] - 1216:7, 1216:8
**purpose** [2] - 1245:3, 1270:6
**purposely** [1] - 1124:15
**push** [2] - 1066:1, 1164:17
**pushed** [1] - 1187:5
**pushing** [1] - 1084:1
**put** [37] - 1081:6, 1117:5, 1123:24, 1164:21, 1181:22, 1183:4, 1183:6, 1183:8, 1183:10, 1183:20, 1205:8, 1205:20, 1212:4, 1213:18, 1213:22, 1215:3, 1216:21, 1220:13, 1220:17, 1224:16, 1225:24, 1226:17, 1237:2, 1245:16, 1257:13, 1257:16, 1259:9, 1259:19, 1259:20, 1259:24, 1260:14, 1271:8, 1274:21, 1280:17, 1280:24, 1282:20, 1285:22
**putting** [4] - 1064:15, 1103:18, 1152:3, 1280:16

## Q

**qEEG** [25] - 1063:9, 1115:18, 1116:4, 1116:13, 1116:17, 1117:25, 1120:4, 1120:7, 1122:5, 1122:18, 1158:25, 1159:6, 1159:10, 1162:5, 1162:18, 1162:19, 1162:22, 1162:25, 1163:9, 1163:11, 1163:13, 1163:21, 1164:5, 1164:8, 1166:10
**qEEG's** [4] - 1115:23, 1159:15, 1159:20, 1164:12
**qEEGs** [1] - 1186:17
**quadrant** [2] - 1213:9, 1123:10
**qualified** [1] - 1227:12
**qualify** [2] - 1066:2, 1204:25
**quantify** [2] - 1202:16, 1204:25
**quarter** [2] - 1168:2, 1168:12
**QUESTION** [2] - 1237:16, 1237:21
**questioning** [4] - 1063:10, 1115:20, 1186:2, 1241:4
**questions** [34] - 1056:6, 1080:20, 1101:8, 1108:11, 1111:24, 1112:10, 1112:13, 1114:2, 1114:4, 1114:24, 1120:5, 1133:4, 1149:6, 1149:10, 1161:11, 1166:9, 1188:22, 1191:24, 1193:7, 1237:14, 1237:25, 1241:25, 1244:3, 1253:19, 1257:12, 1270:4, 1274:2, 1276:4, 1277:19, 1287:19, 1288:10, 1288:20, 1295:17
**quibble** [1] - 1066:10
**quibbling** [1] - 1066:16
**quick** [1] - 1098:18

**quickly** [3] - 1053:9, 1285:17, 1289:9
**quiet** [3] - 1062:24, 1063:18, 1065:9
**quite** [8] - 1063:13, 1064:7, 1139:25, 1186:7, 1190:25, 1230:15, 1249:15, 1280:4
**quote** [1] - 1053:17

## R

**Rabin** [2] - 1200:4, 1282:1
**radiated** [1] - 1189:2
**radiates** [1] - 1187:25
**radiating** [5] - 1187:10, 1187:13, 1189:11, 1189:20, 1190:5
**radiological** [1] - 1200:11
**radiologist** [1] - 1296:5
**raise** [9] - 1053:5, 1059:13, 1059:14, 1059:15, 1062:18, 1067:14, 1193:13, 1289:15, 1296:5
**raising** [1] - 1066:15
**rally** [1] - 1250:22
**RAMON** [3] - 1051:12, 1053:2, 1239:2
**ran** [1] - 1059:11
**random** [1] - 1096:13
**range** [8] - 1070:9, 1124:25, 1125:8, 1171:23, 1195:17, 1195:18, 1251:21
**ranking** [2] - 1126:6, 1163:13
**rather** [6] - 1110:10, 1148:24, 1153:24, 1170:2, 1233:9, 1277:3
**rationale** [1] - 1152:1
**ratios** [1] - 1126:22
**RAYMOND** [1] - 1051:18
**rays** [5] - 1230:17, 1230:21, 1231:1
**reach** [1] - 1186:5
**reached** [3] - 1127:20, 1128:10, 1193:4
**read** [34] - 1056:14, 1067:1, 1067:3, 1108:4, 1108:7, 1147:9, 1147:19, 1147:20, 1149:7, 1161:9, 1172:21, 1179:2, 1179:7, 1179:19, 1179:22, 1179:25, 1185:5, 1211:3, 1211:5, 1213:12, 1219:1, 1221:18, 1226:1, 1226:3, 1246:15, 1249:3, 1277:16, 1280:15, 1280:18, 1280:24, 1287:6, 1296:25, 1297:5
**read-in** [1] - 1296:25
**reading** [8] - 1058:1, 1156:8, 1179:5, 1179:6, 1179:24, 1182:25, 1183:15, 1222:15
**ready** [5] - 1097:25, 1169:3, 1169:6, 1204:17, 1205:12
**real** [3] - 1063:2, 1143:25, 1191:13
**realized** [2] - 1082:13, 1181:8
**really** [17] - 1056:8, 1095:23, 1099:1, 1132:17, 1134:10, 1143:3, 1145:7, 1149:25, 1152:24, 1175:21, 1180:18, 1181:15, 1181:23, 1188:14, 1202:16, 1216:6, 1221:16
**realm** [1] - 1158:13
**realms** [1] - 1188:19

reask [1] - 1253:8
reason [17] - 1054:5, 1069:11, 1109:24, 1138:22, 1144:24, 1148:12, 1184:3, 1184:5, 1192:9, 1215:17, 1241:17, 1242:5, 1252:7, 1252:8, 1262:4, 1262:8, 1285:22
reasonable [6] - 1129:25, 1130:3, 1130:17, 1212:4, 1227:7, 1255:14
reasoning [1] - 1125:6
reasons [3] - 1054:20, 1065:9, 1147:6
reassess [1] - 1217:11
rebut [1] - 1061:20
rebuttal [2] - 1054:4, 1054:12
receive [2] - 1081:16, 1117:20
received [10] - 1081:18, 1111:7, 1117:12, 1118:5, 1128:25, 1129:3, 1133:1, 1133:2, 1240:4, 1256:12
receiving [4] - 1081:13, 1208:6, 1208:10, 1263:25
recently [7] - 1139:25, 1155:4, 1164:13, 1265:8, 1275:15, 1278:23, 1291:7
recess [2] - 1104:6, 1168:14
recognize [2] - 1087:22, 1088:11
recognizing [1] - 1079:12
recollection [7] - 1143:9, 1194:10, 1203:18, 1205:21, 1209:12, 1241:13, 1241:19
recommend [2] - 1127:25, 1128:2
recommendation [1] - 1247:21
recommendations [3] - 1210:21, 1239:12, 1257:21
recommended [4] - 1223:1, 1244:19, 1250:7, 1285:12
Record [2] - 1108:7, 1226:3
record [18] - 1058:8, 1060:11, 1114:16, 1116:5, 1122:17, 1124:1, 1128:24, 1135:11, 1145:14, 1188:7, 1189:1, 1196:14, 1211:5, 1220:22, 1220:24, 1229:6, 1278:25
recorded [7] - 1052:18, 1071:13, 1079:21, 1080:11, 1084:8, 1187:12, 1189:8
recording [4] - 1071:11, 1072:19, 1147:3, 1147:4
records [105] - 1053:18, 1053:21, 1056:15, 1060:8, 1063:11, 1066:11, 1068:24, 1069:9, 1116:16, 1123:25, 1131:24, 1132:2, 1132:7, 1135:15, 1135:16, 1158:20, 1169:22, 1170:3, 1188:9, 1189:8, 1199:20, 1199:23, 1199:24, 1201:22, 1201:25, 1202:7, 1202:15, 1202:17, 1204:16, 1204:20, 1204:24, 1205:2, 1205:3, 1205:7, 1208:12, 1208:21, 1210:23, 1213:13, 1213:20, 1219:15, 1219:20, 1219:23, 1219:25, 1220:12, 1220:16, 1221:18, 1221:20, 1222:1, 1224:5, 1225:14, 1226:8, 1226:17, 1227:1, 1227:6, 1227:9, 1227:25, 1228:1, 1229:8,

1229:9, 1229:18, 1230:25, 1231:25, 1232:3, 1232:10, 1237:20, 1237:21, 1239:20, 1241:12, 1241:16, 1242:16, 1244:16, 1246:13, 1246:20, 1247:7, 1248:14, 1249:3, 1256:23, 1257:16, 1258:3, 1258:5, 1258:14, 1259:7, 1259:10, 1259:22, 1260:18, 1260:19, 1260:22, 1262:10, 1263:15, 1264:4, 1265:18, 1267:13, 1269:16, 1277:16, 1278:16, 1278:20, 1278:21, 1278:23, 1278:25, 1279:21, 1281:13, 1281:14, 1281:21
recover [1] - 1127:11
recovery [1] - 1193:4
RECROSS [2] - 1169:12, 1298:17
rECROSS [1] - 1285:15
RECROSS-EXAMINATION [1] - 1298:17
rECROSS-EXAMINATION [1] - 1285:15
red [4] - 1119:7, 1123:6, 1123:8
redaction [4] - 1117:19, 1117:21, 1128:21, 1129:1
REDIRECT [8] - 1111:4, 1188:23, 1274:4, 1286:23, 1298:8, 1298:12, 1298:16, 1298:18
reduce [3] - 1135:20, 1135:24, 1275:21
refer [3] - 1116:5, 1148:25, 1223:4
reference [10] - 1057:22, 1059:21, 1063:3, 1110:13, 1116:3, 1231:5, 1231:6, 1233:16, 1233:22, 1250:19
Reference [4] - 1215:10, 1215:19, 1252:19, 1267:18
referenced [2] - 1058:3, 1191:15
references [1] - 1066:4
referred [4] - 1059:20, 1122:8, 1217:24, 1218:4
referring [1] - 1056:15, 1057:23, 1145:5, 1175:4, 1208:18, 1248:1
reflects [1] - 1191:5
refresh [3] - 1143:9, 1203:18, 1205:20
refused [1] - 1290:20
regarding [6] - 1065:6, 1113:20, 1169:19, 1177:24, 1255:23, 1295:19
regardless [7] - 1064:11, 1078:14, 1078:19, 1092:6, 1130:21, 1152:20, 1256:24
regards [1] - 1107:22
regular [1] - 1192:13
Rehabilitation [1] - 1197:6
rehabilitation [4] - 1197:13, 1232:16, 1233:11, 1258:20
Reitan [10] - 1124:2, 1124:6, 1125:12, 1126:2, 1134:17, 1144:21, 1176:18, 1190:22, 1191:3, 1191:8
relate [2] - 1132:12, 1197:15
related [15] - 1063:9, 1107:3, 1107:13, 1107:17, 1107:22, 1107:24, 1109:5, 1109:9, 1109:25, 1111:25, 1115:18,

1116:17, 1132:7, 1132:14, 1254:18
relates [1] - 1131:25
relation [2] - 1115:19, 1241:22
relationship [1] - 1191:22
relationships [1] - 1159:21
relative [11] - 1062:9, 1064:1, 1066:19, 1134:25, 1135:17, 1154:13, 1155:18, 1265:9, 1270:4, 1285:24, 1295:18
relaxant [2] - 1206:24, 1234:11
relevance [3] - 1092:25, 1258:16, 1265:3
relevant [15] - 1092:12, 1092:14, 1092:18, 1092:19, 1093:9, 1093:12, 1093:15, 1093:20, 1093:21, 1094:8, 1094:16, 1116:20, 1183:7, 1270:9, 1272:4
reliable [1] - 1215:15
relied [14] - 1163:2, 1163:6, 1220:3, 1229:18, 1248:13, 1249:18, 1249:24, 1251:1, 1260:19, 1285:18, 1285:23, 1286:3, 1286:6, 1287:1
relies [1] - 1216:24
rely [10] - 1150:2, 1219:2, 1220:23, 1229:11, 1229:13, 1239:20, 1249:22, 1257:22, 1281:25, 1288:3
relying [1] - 1288:15
remain [4] - 1077:22, 1085:11, 1140:6, 1259:23
Remediation [1] - 1192:11
remember [33] - 1070:21, 1073:11, 1074:1, 1075:1, 1078:15, 1084:6, 1109:15, 1134:13, 1136:19, 1143:3, 1143:4, 1143:6, 1149:5, 1149:9, 1150:4, 1150:10, 1151:7, 1156:7, 1158:13, 1158:23, 1159:5, 1160:7, 1189:25, 1203:11, 1203:12, 1225:6, 1238:5, 1241:25, 1261:12, 1274:8, 1279:19, 1293:8, 1293:10
remembered [1] - 1288:12
remind [2] - 1115:3, 1207:7
remove [3] - 1246:16, 1264:10, 1266:13
removed [3] - 1246:19, 1246:22, 1246:23
render [1] - 1103:21
rendered [1] - 1129:6
renders [1] - 1066:13
renew [1] - 1270:5
renowned [1] - 1249:2
repeat [3] - 1174:18, 1194:19, 1231:17
repeating [1] - 1218:11
repeats [1] - 1218:13
rephrase [6] - 1155:17, 1195:23, 1221:7, 1226:9, 1258:11, 1280:23
replaced [1] - 1236:5
report [64] - 1071:15, 1071:19, 1116:13, 1116:17, 1122:18, 1125:11, 1125:12, 1134:18, 1135:2, 1136:8, 1169:21, 1198:18, 1198:25, 1199:5, 1199:17, 1205:20, 1210:7, 1210:8,

Bauta v. Greyhound, et al ━━━━━━━━━━━━━ 27

1212:7, 1212:9, 1212:21, 1213:5,
1213:8, 1213:19, 1213:22, 1215:2,
1216:14, 1217:7, 1219:1, 1219:13,
1222:16, 1222:18, 1222:22, 1222:25,
1224:8, 1236:9, 1245:4, 1246:14,
1246:18, 1247:11, 1247:13, 1248:14,
1249:11, 1250:20, 1260:23, 1270:14,
1270:17, 1270:19, 1281:11, 1282:20,
1285:19, 1286:15, 1287:1, 1288:6,
1288:15, 1290:18, 1290:21, 1290:25,
1293:10, 1293:11, 1294:6, 1294:8,
1295:19
**reported** [3] - 1132:12, 1134:12,
1205:1
**reporter** [10] - 1067:18, 1115:5,
1115:6, 1146:19, 1147:22, 1148:17,
1156:10, 1172:25, 1193:16, 1289:18
**Reporter** [8] - 1052:17, 1145:18,
1145:20, 1145:21, 1146:16, 1147:10,
1147:19, 1147:20
**reporting** [2] - 1249:12, 1249:19
**reports** [13] - 1116:4, 1199:25, 1200:3,
1201:6, 1201:7, 1212:17, 1213:25,
1249:22, 1277:21, 1285:23, 1294:14,
1294:17, 1294:19
**represent** [7] - 1090:6, 1090:7, 1146:5,
1146:7, 1147:18, 1147:21
**representation** [2] - 1084:11, 1105:10
**representative** [1] - 1270:8
**represented** [2] - 1053:23, 1054:1
**representing** [2] - 1199:12, 1247:1
**request** [5] - 1063:3, 1114:20, 1146:3,
1147:11, 1270:5
**requested** [3] - 1146:11, 1146:18,
1147:9
**require** [1] - 1248:13
**required** [3] - 1066:5, 1111:11,
1179:12
**requires** [2] - 1215:21, 1216:2
**research** [2] - 1215:2, 1295:24
**residence** [11] - 1078:9, 1078:11,
1078:18, 1078:19, 1078:21, 1084:18,
1084:19, 1085:6, 1085:11, 1096:9,
1292:16
**resolve** [2] - 1297:2, 1297:3
**resolved** [1] - 1297:4
**respect** [12] - 1069:14, 1113:5,
1208:25, 1219:12, 1239:8, 1239:19,
1239:23, 1242:9, 1244:5, 1244:9,
1282:3, 1285:6
**respectfully** [1] - 1148:15
**respond** [7] - 1055:3, 1055:14,
1057:19, 1063:6, 1063:7, 1089:22,
1138:5
**responded** [4] - 1138:22, 1138:25,
1139:13, 1142:25
**responding** [1] - 1053:14
**response** [10] - 1056:11, 1057:4,
1062:24, 1065:10, 1137:8, 1137:13,
1139:1, 1161:22, 1162:7, 1162:13

**responses** [1] - 1190:19
**responsibility** [2] - 1146:17, 1146:22
**rest** [9] - 1054:11, 1090:7, 1090:8,
1172:13, 1179:14, 1233:7, 1235:16,
1242:9, 1245:13
**restriction** [1] - 1205:3
**restrictions** [1] - 1205:4
**restroom** [1] - 1104:3
**result** [4] - 1115:25, 1116:22, 1123:16,
1200:19
**results** [30] - 1109:7, 1115:23,
1117:25, 1120:4, 1124:2, 1131:1,
1158:25, 1159:6, 1159:9, 1161:19,
1163:4, 1164:15, 1164:22, 1171:10,
1171:20, 1172:15, 1173:14, 1173:25,
1174:4, 1174:9, 1174:12, 1174:19,
1174:25, 1175:17, 1175:18, 1175:19,
1176:7, 1176:12, 1176:13, 1191:18
**resume** [1] - 1097:15
**resumes** [1] - 1097:17
**retain** [1] - 1146:7
**retained** [6] - 1065:24, 1136:3, 1199:2,
1201:18, 1247:1, 1257:13
**retention** [2] - 1212:1, 1213:18
**retested** [1] - 1176:15
**retired** [1] - 1136:3
**revealed** [1] - 1214:5
**review** [26] - 1053:20, 1080:1,
1135:16, 1145:13, 1145:16, 1146:6,
1147:4, 1149:11, 1149:13, 1164:22,
1170:3, 1170:7, 1200:11, 1200:22,
1201:2, 1201:22, 1201:25, 1204:15,
1224:4, 1236:13, 1241:12, 1246:20,
1259:22, 1269:15, 1280:12, 1294:4
**reviewed** [27] - 1115:19, 1135:14,
1173:25, 1188:9, 1200:15, 1200:23,
1200:24, 1202:7, 1202:10, 1202:14,
1202:18, 1204:20, 1208:12, 1213:20,
1216:13, 1216:15, 1220:12, 1230:25,
1231:25, 1232:3, 1250:8, 1258:3,
1260:18, 1264:4, 1279:22, 1286:15,
1291:7
**reviewing** [5] - 1158:19, 1200:19,
1258:5, 1258:14, 1259:7
**revision** [1] - 1067:7
**revisit** [1] - 1114:21
**REYES** [3] - 1051:12, 1053:2, 1239:2
**ridiculous** [1] - 1224:24
**ridiculously** [1] - 1243:1
**ridiculousness** [1] - 1166:18
**ring** [1] - 1278:10
**risks** [1] - 1178:19
**road** [2] - 1054:21, 1148:20
**roll** [2] - 1102:11, 1264:22
**room** [1] - 1262:18
**round** [2] - 1145:9, 1179:16
**rule** [1] - 1146:20
**ruling** [5] - 1066:17, 1108:1, 1109:9,
1122:25, 1297:7
**run** [5] - 1100:24, 1102:16, 1105:14,

1113:8, 1132:19
**running** [2] - 1097:18, 1105:3
**runs** [1] - 1129:15
**Russo** [1] - 1214:20
**Rye** [1] - 1052:13

## S

**Saal** [2] - 1067:7, 1210:10
**SAAL** [1] - 1052:14
**SABRINA** [1] - 1051:8
**Sabrina** [2] - 1052:4, 1052:10
**sakes** [1] - 1188:18
**sanction** [1] - 1090:23
**sat** [2] - 1171:17, 1260:20
**save** [2] - 1199:22, 1256:8
**saw** [42] - 1071:19, 1072:16, 1074:22,
1079:10, 1079:17, 1079:18, 1087:15,
1096:2, 1097:6, 1100:6, 1100:24,
1101:2, 1101:4, 1101:6, 1101:7,
1102:12, 1103:19, 1105:19, 1106:12,
1107:12, 1113:11, 1124:11, 1125:2,
1138:8, 1153:13, 1178:17, 1189:21,
1205:7, 1206:2, 1216:20, 1226:15,
1230:25, 1234:17, 1234:19, 1262:17,
1263:11, 1265:16, 1275:5, 1275:14,
1291:19, 1292:11, 1295:5
**scale** [3] - 1119:6, 1126:6, 1126:23
**scant** [1] - 1066:11
**scenario** [18] - 1205:10, 1210:24,
1212:4, 1212:6, 1212:8, 1212:10,
1212:18, 1219:4, 1220:25, 1221:3,
1225:15, 1225:23, 1249:10, 1249:17,
1249:19, 1256:22, 1286:11, 1286:17
**scene** [1] - 1086:3
**schedule** [1] - 1111:22
**scheduled** [2] - 1111:21, 1131:8
**school** [2] - 1169:21, 1170:3
**scope** [7] - 1157:5, 1187:20, 1212:1,
1213:18, 1257:6, 1257:24, 1265:3
**score** [1] - 1183:20
**scored** [5] - 1171:22, 1180:11,
1190:21, 1191:7, 1191:9
**scores** [14] - 1124:7, 1124:12,
1124:17, 1124:19, 1124:21, 1125:13,
1126:2, 1126:18, 1126:19, 1126:21,
1179:4, 1179:5, 1184:6, 1191:4
**SCOTT** [2] - 1067:19, 1298:5
**Scott** [3] - 1067:13, 1067:19, 1293:22
**sCOTT** [1] - 1067:22
**screen** [17] - 1089:25, 1097:19,
1117:5, 1123:24, 1126:12, 1126:13,
1126:16, 1129:12, 1137:2, 1151:12,
1151:13, 1157:9, 1172:7, 1205:20,
1222:18, 1226:15, 1240:9
**screens** [13] - 1080:19, 1116:7,
1129:9, 1135:6, 1177:23, 1196:3,
1196:5, 1198:21, 1213:2, 1217:19,
1237:7, 1263:3, 1274:10
**scroll** [1] - 1142:22

**se** [1] - 1191:4
**Sean** [5] - 1097:9, 1097:10, 1296:12, 1296:13, 1296:15
**search** [1] - 1157:25
**seat** [6] - 1058:14, 1058:15, 1058:19, 1059:1, 1059:4, 1289:17
**seated** [6] - 1067:17, 1104:8, 1104:10, 1169:9, 1193:15, 1260:2
**seats** [1] - 1054:9
**sec** [1] - 1280:3
**second** [34] - 1056:1, 1070:4, 1073:17, 1089:10, 1092:3, 1092:17, 1093:6, 1096:2, 1097:22, 1098:10, 1107:7, 1120:22, 1144:13, 1144:17, 1145:8, 1146:9, 1146:14, 1151:11, 1152:10, 1165:5, 1176:16, 1179:16, 1179:21, 1180:10, 1180:13, 1180:14, 1181:5, 1186:19, 1190:21, 1191:6, 1191:18, 1196:13, 1238:6, 1240:7
**second-and-a-half** [2] - 1092:17, 1093:6
**secret** [1] - 1076:5
**secretly** [1] - 1113:15
**section** [1] - 1232:9
**see** [86] - 1055:16, 1060:6, 1070:16, 1070:20, 1072:21, 1073:3, 1073:6, 1083:5, 1085:18, 1085:23, 1086:20, 1087:25, 1088:6, 1091:18, 1093:6, 1096:12, 1096:23, 1097:21, 1097:22, 1101:14, 1107:23, 1116:10, 1117:3, 1118:12, 1118:21, 1119:5, 1125:3, 1125:17, 1125:24, 1126:1, 1126:18, 1127:4, 1127:7, 1131:15, 1136:8, 1140:1, 1143:12, 1144:20, 1160:12, 1166:18, 1168:12, 1172:6, 1172:12, 1175:7, 1178:7, 1178:10, 1178:15, 1178:24, 1181:23, 1182:12, 1183:8, 1183:20, 1185:2, 1188:3, 1190:10, 1198:23, 1198:24, 1204:21, 1205:2, 1216:18, 1217:20, 1222:17, 1226:14, 1227:8, 1229:5, 1231:24, 1232:24, 1241:3, 1248:15, 1254:5, 1272:17, 1275:15, 1275:17, 1275:18, 1277:13, 1277:21, 1283:14, 1291:19, 1291:22, 1292:11, 1293:14, 1295:8, 1295:25, 1296:1
**seeing** [8] - 1157:9, 1186:19, 1189:5, 1202:10, 1233:11, 1258:4, 1267:9, 1275:10
**seem** [1] - 1279:14
**sees** [4] - 1065:2, 1271:11, 1272:4, 1272:12
**self** [2] - 1248:14, 1260:20
**self-description** [1] - 1260:20
**self-report** [1] - 1248:14
**send** [4] - 1148:12, 1148:19, 1149:16, 1269:8
**sending** [1] - 1065:12
**sends** [1] - 1147:21
**sense** [4] - 1122:11, 1148:23, 1152:10,

1259:24
**sensitive** [1] - 1125:5
**sensors** [1] - 1103:8
**sent** [7] - 1064:7, 1065:17, 1067:6, 1147:10, 1148:7, 1148:21, 1149:14
**separate** [3] - 1057:22, 1136:20, 1190:25
**separation** [1] - 1253:21
**series** [1] - 1149:6
**serious** [3] - 1060:3, 1061:2, 1061:14
**server** [1] - 1080:10
**service** [1] - 1130:1
**services** [10] - 1129:5, 1129:24, 1129:25, 1130:16, 1130:18, 1177:25, 1192:24, 1201:20, 1245:3, 1269:6
**session** [3] - 1222:4, 1222:5, 1222:8
**SESSION** [1] - 1169:1
**sessions** [16] - 1160:21, 1219:13, 1219:17, 1219:18, 1222:2, 1222:11, 1227:2, 1227:22, 1229:21, 1229:24, 1230:1, 1230:4, 1230:8, 1263:9, 1285:12
**set** [13] - 1062:21, 1066:25, 1093:8, 1093:18, 1106:7, 1132:18, 1171:2, 1176:16, 1180:13, 1190:21, 1191:18, 1257:23, 1294:19
**setting** [1] - 1272:12
**settled** [1] - 1192:13
**setup** [1] - 1073:20
**seven** [3] - 1073:4, 1191:2, 1203:23
**several** [8] - 1060:18, 1068:20, 1078:8, 1083:9, 1145:7, 1206:2, 1231:1, 1237:2
**severe** [4] - 1061:22, 1061:24, 1125:7, 1126:7
**shape** [1] - 1184:6
**shearing** [1] - 1053:15
**sheet** [3] - 1251:25, 1252:1, 1252:6
**shift** [6] - 1070:9, 1073:10, 1128:4, 1292:12, 1293:16, 1295:2
**shifts** [4] - 1073:9, 1074:6, 1100:12
**shooting** [1] - 1105:6
**shop** [1] - 1106:7
**shopping** [5] - 1083:15, 1083:23, 1084:21, 1085:5, 1085:19
**Shore** [1] - 1279:11
**short** [5] - 1061:20, 1062:5, 1120:18, 1186:2, 1218:10
**short-term** [1] - 1186:2
**shorter** [1] - 1070:12
**shot** [4] - 1085:25, 1105:8, 1218:13, 1295:6
**shots** [3] - 1292:2, 1292:19, 1295:10
**shoulder** [2] - 1089:20, 1090:16
**show** [21] - 1066:3, 1066:6, 1087:19, 1116:25, 1117:24, 1120:6, 1120:10, 1120:22, 1121:2, 1131:5, 1131:9, 1131:13, 1132:1, 1132:6, 1139:22, 1140:3, 1147:23, 1149:23, 1166:6, 1172:21

**showed** [18] - 1089:4, 1089:10, 1091:15, 1096:24, 1113:9, 1115:24, 1116:1, 1118:1, 1124:6, 1170:20, 1170:23, 1171:5, 1171:9, 1186:9, 1186:16, 1265:16, 1273:6, 1288:13
**shower** [9] - 1209:9, 1209:11, 1235:18, 1235:23, 1267:3, 1282:11, 1282:12
**showing** [3] - 1089:3, 1120:4, 1159:19
**shown** [7] - 1123:14, 1127:15, 1128:14, 1129:20, 1139:24, 1180:8, 1265:21
**shows** [3] - 1116:12, 1128:15, 1288:8
**shut** [1] - 1098:14
**sic** [2] - 1058:13, 1103:16
**side** [9] - 1058:16, 1124:1, 1190:3, 1190:8, 1190:9, 1221:19, 1255:6, 1255:21
**side's** [1] - 1257:13
**side-by-side** [1] - 1124:1
**sidebar** [33] - 1053:13, 1054:17, 1055:19, 1057:11, 1057:13, 1063:8, 1082:22, 1088:18, 1088:19, 1089:1, 1102:23, 1103:1, 1108:14, 1109:1, 1119:10, 1120:1, 1121:5, 1145:22, 1146:1, 1148:2, 1165:13, 1166:1, 1224:1, 1226:2, 1227:24, 1239:11, 1240:12, 1241:1, 1253:17, 1270:1, 1287:9
**Sidebar** [16] - 1088:22, 1094:18, 1102:25, 1103:25, 1108:16, 1110:22, 1119:11, 1145:23, 1150:18, 1167:2, 1223:18, 1228:7, 1240:13, 1243:2, 1269:25, 1273:15
**sides** [1] - 1190:8
**sideways** [1] - 1203:16
**sighting** [1] - 1071:13
**sign** [4] - 1105:24, 1146:6, 1147:5, 1178:25
**signed** [7] - 1140:13, 1140:14, 1140:16, 1140:18, 1178:7, 1178:21, 1179:7
**significant** [8] - 1062:23, 1063:17, 1064:21, 1065:8, 1065:13, 1065:25, 1125:7, 1127:10
**signing** [1] - 1179:11
**signs** [3] - 1288:8, 1288:13
**similar** [7] - 1122:18, 1162:16, 1170:23, 1171:5, 1171:9, 1277:2, 1296:17
**similarly** [2] - 1096:17, 1250:3
**simple** [2] - 1132:20, 1270:5
**simpler** [1] - 1280:5
**simply** [4] - 1058:3, 1065:12, 1109:14, 1271:13
**single** [2] - 1188:7, 1262:17
**sit** [3] - 1075:1, 1202:2, 1283:14
**sits** [1] - 1204:13
**sitting** [5] - 1058:18, 1078:5, 1202:14, 1221:6, 1272:12

**situation** [4] - 1058:23, 1058:24, 1130:3, 1250:24

**situations** [2] - 1106:5, 1179:9

**six** [15] - 1066:5, 1070:8, 1070:9, 1073:9, 1074:6, 1100:12, 1101:21, 1101:25, 1102:3, 1112:17, 1112:19, 1112:20, 1191:2, 1203:23, 1275:19

**six-year** [1] - 1112:20

**size** [1] - 1099:14

**skilled** [2] - 1261:24, 1262:2

**skin** [1] - 1109:19

**sleep** [3] - 1135:21, 1135:23, 1192:12

**slight** [1] - 1159:23

**slightly** [1] - 1122:3

**slow** [3] - 1119:1, 1119:3, 1186:21

**slowed** [1] - 1084:9

**small** [20] - 1080:19, 1097:18, 1099:12, 1099:14, 1116:7, 1118:20, 1129:9, 1135:6, 1137:2, 1177:23, 1182:12, 1196:3, 1196:5, 1198:20, 1213:2, 1217:19, 1222:12, 1237:7, 1263:3, 1274:10

**smaller** [1] - 1099:15

**smart** [1] - 1179:9

**smile** [1] - 1295:25

**Smith** [11] - 1053:10, 1053:14, 1053:19, 1055:6, 1058:25, 1060:4, 1163:3, 1163:11, 1164:1, 1166:14, 1166:15

**SMITH** [1] - 1052:3

**snippets** [1] - 1063:23

**soberay** [1] - 1061:15

**social** [4] - 1163:2, 1163:11, 1163:18, 1163:20

**soft** [1] - 1235:19, 1235:25

**software** [6] - 1215:11, 1215:18, 1217:14, 1230:5, 1233:16, 1233:23

**someone** [5] - 1066:5, 1070:3, 1092:11, 1095:18, 1106:9, 1161:18, 1166:19, 1169:15, 1177:3, 1181:2, 1185:12, 1188:10, 1259:17, 1260:3, 1261:25

**sometimes** [11] - 1099:1, 1100:13, 1100:17, 1100:18, 1113:19, 1113:20, 1113:21, 1122:8, 1157:11, 1195:15, 1195:16

**somewhat** [1] - 1146:20

**somewhere** [4] - 1055:10, 1194:15, 1194:20, 1217:8

**son** [1] - 1059:9

**SOPHIE** [1] - 1052:17

**sophisticated** [1] - 1128:4

**sorry** [29] - 1055:21, 1058:24, 1071:7, 1081:1, 1082:9, 1085:13, 1103:14, 1108:3, 1112:18, 1126:14, 1158:11, 1161:1, 1169:6, 1171:25, 1172:4, 4183:12, 1201:11, 1217:3, 1218:25, 1221:17, 1232:24, 1237:12, 1246:8, 1255:2, 1270:18, 1271:13, 1273:7, 1275:11, 1281:4

**sort** [8] - 1071:11, 1110:2, 1128:1, 1232:14, 1233:16, 1236:3, 1250:5, 1290:15

**sorts** [2] - 1103:13, 1128:5

**sought** [1] - 1122:12

**sound** [1] - 1203:21

**sounds** [2] - 1069:12, 1085:17

**space** [2] - 1078:3, 1276:15

**span** [1] - 1186:8

**spatial** [1] - 1127:6

**speaking** [2] - 1205:10, 1247:2

**speaks** [1] - 1103:11

**specialist** [6] - 1200:8, 1232:11, 1232:23, 1233:1, 1233:12, 1267:9

**specialists** [1] - 1277:1

**specific** [5] - 1091:14, 1123:21, 1166:16, 1209:1, 1242:3

**specifically** [9] - 1064:18, 1109:4, 1111:21, 1143:6, 1173:6, 1239:12, 1276:21, 1277:8, 1294:8

**specifics** [2] - 1218:23, 1260:7

**spectrum** [1] - 1277:4

**speed** [3] - 1084:8, 1084:10, 1086:13

**spell** [3] - 1067:18, 1193:16, 1289:19

**spending** [2] - 1242:25, 1260:12

**spends** [1] - 1245:5

**spent** [2] - 1260:12, 1282:21

**spinal** [4] - 1205:24, 1206:7, 1206:9, 1206:10

**Spine** [3] - 1277:14, 1278:7, 1279:6

**spine** [12] - 1189:6, 1189:12, 1189:23, 1200:8, 1206:4, 1232:11, 1232:23, 1233:1, 1233:5, 1233:12, 1267:9, 1275:4

**split** [2] - 1180:4, 1180:6

**spoken** [5] - 1140:23, 1214:11, 1215:22, 1283:7, 1283:19

**sports** [1] - 1101:2

**spring** [1] - 1059:9

**stakeout** [1] - 1096:15

**stamp** [2] - 1089:4, 1089:9

**stand** [5] - 1064:24, 1078:3, 1110:18, 1166:11, 1169:7

**standard** [8] - 1065:10, 1065:13, 1066:16, 1106:9, 1119:7, 1119:8, 1120:12, 1139:17

**standards** [2] - 1139:25, 1140:4

**standing** [1] - 1090:15

**standpoint** [1] - 1224:9

**start** [5] - 1057:10, 1069:15, 1141:18, 1145:9, 1184:1

**started** [12] - 1075:7, 1098:18, 1105:24, 1114:13, 1120:11, 1138:20, 1155:2, 1155:6, 1170:14, 1189:5, 1252:25, 1254:14

**starting** [21] - 1058:1, 1075:5, 1134:10, 1137:6, 1137:12, 1141:9, 1142:17, 1145:6, 1151:7, 1151:18, 1152:12, 1154:21, 1155:14, 1160:13, 1161:15, 1166:9, 1182:11, 1184:8,

1184:24, 1187:24

**startled** [2] - 1062:24, 1065:9

**starts** [4] - 1055:19, 1056:11, 1082:11, 1155:25

**state** [9] - 1063:13, 1066:16, 1094:9, 1135:21, 1139:14, 1163:19, 1204:4, 1256:1, 1280:7

**statement** [1] - 1147:5

**statements** [2] - 1060:1, 1129:13

**STATES** [2] - 1051:1, 1051:13

**states** [1] - 1063:17

**States** [2] - 1051:5, 1158:1

**Station** [7] - 1075:21, 1077:4, 1077:7, 1077:13, 1082:17, 1088:10, 1098:11

**stationed** [1] - 1084:4

**statistics** [1] - 1218:18

**Statistics** [2] - 1261:20, 1261:23

**status** [2] - 1231:21, 1255:13

**stay** [3] - 1106:3, 1250:22, 1282:16

**staying** [1] - 1209:8

**stenography** [1] - 1052:18

**step** [1] - 1259:22

**steps** [3] - 1114:8, 1144:3, 1152:19

**steroidal** [1] - 1234:12

**Steve** [2] - 1137:14, 1179:4

**STEVEN** [1] - 1052:14

**stiffness** [7] - 1203:13, 1204:14, 1205:9, 1209:8, 1209:13, 1283:2

**still** [27] - 1064:24, 1086:2, 1089:4, 1089:9, 1093:19, 1093:21, 1115:4, 1124:24, 1127:18, 1159:20, 1159:25, 1164:15, 1180:12, 1183:10, 1184:24, 1185:16, 1186:14, 1186:21, 1191:8, 1217:14, 1263:19, 1266:21, 1274:25, 1275:14, 1282:24, 1283:18, 1288:16

**stimulator** [5] - 1205:25, 1206:7, 1206:9, 1206:10, 1206:15

**stock** [6] - 1257:13, 1257:16, 1259:10, 1274:21, 1280:17, 1280:24

**stop** [8] - 1088:21, 1090:24, 1093:25, 1098:18, 1204:9, 1224:24, 1268:1, 1269:3

**stopped** [4] - 1086:6, 1097:23, 1099:21, 1102:24

**stopping** [1] - 1205:18

**store** [2] - 1082:25, 1083:5

**stores** [1] - 1113:13

**straggle** [1] - 1296:7

**straight** [1] - 1214:4

**stranger** [1] - 1111:10

**street** [2] - 1271:2, 1271:5

**Street** [12] - 1051:17, 1052:5, 1078:12, 1084:17, 1086:18, 1202:21, 1258:21, 1276:4, 1278:13, 1279:2, 1279:6, 1279:13

**stress** [2] - 1114:15, 1288:13

**stretch** [1] - 1251:8

**stricken** [8] - 1056:6, 1063:5, 1114:16, 1120:21, 1142:13, 1266:4, 1290:22, 1293:13

strictly [1] - 1285:23
strike [14] - 1059:7, 1065:23, 1114:1, 1130:12, 1183:13, 1249:8, 1258:7, 1259:16, 1261:9, 1262:24, 1265:19, 1265:25, 1273:9, 1277:22
strikes [1] - 1059:4
strongly [2] - 1127:25, 1128:1
struck [2] - 1064:9, 1276:25
student [1] - 1169:23
studies [2] - 1123:15, 1159:19
study [1] - 1122:9
studying [1] - 1076:5
subject [5] - 1099:16, 1117:21, 1128:21, 1128:25, 1286:4
subject's [1] - 1291:18
subjected [1] - 1060:6
subjective [12] - 1186:24, 1187:3, 1207:12, 1213:21, 1220:4, 1245:4, 1257:9, 1259:19, 1259:20, 1260:16, 1260:23, 1286:4
subpoena [3] - 1111:7, 1111:20, 1194:2
subpoenaed [2] - 1101:17, 1194:4
substance [1] - 1147:5
substantial [1] - 1109:11
substantially [1] - 1266:20
subway [3] - 1102:11, 1102:15, 1105:3
Success [4] - 1278:1, 1278:5, 1278:9, 1279:5
successive [2] - 1115:23, 1116:4
suffered [1] - 1062:22
sufficient [1] - 1258:2
suggest [1] - 1264:2
suggested [3] - 1136:7, 1143:10, 1153:1
suggesting [4] - 1144:24, 1173:24, 1178:10, 1181:12
suggestion [4] - 1063:4, 1144:17, 1144:18, 1176:16
Suite [4] - 1051:17, 1051:22, 1052:6, 1052:12
summary [1] - 1245:21
supervisor [1] - 1075:10
supplemental [1] - 1273:8
supplemented [1] - 1273:1
supply [1] - 1290:18
supportive [1] - 1264:19
suppose [1] - 1178:17
supposed [4] - 1069:17, 1139:21, 1145:17, 1272:16
surgeon [2] - 1275:4, 1277:24
surgery [15] - 1189:6, 1189:13, 1189:22, 1204:3, 1205:25, 1206:4, 1206:11, 1234:17, 1234:24, 1247:15, 1247:21, 1248:6, 1248:20, 1278:19, 1279:11
surgical [4] - 1204:4, 1248:10, 1248:21, 1249:24
surprising [1] - 1059:8

surveillance [34] - 1068:21, 1070:15, 1071:18, 1073:23, 1075:5, 1076:1, 1079:7, 1085:15, 1086:3, 1086:8, 1086:17, 1088:16, 1092:24, 1093:8, 1095:16, 1109:23, 1111:15, 1112:2, 1112:21, 1113:3, 1113:9, 1113:23, 1180:16, 1181:9, 1181:11, 1181:12, 1290:16, 1290:17, 1291:4, 1291:10, 1292:3, 1292:21, 1293:23, 1294:1
surveilled [2] - 1112:12, 1113:7
surveilling [1] - 1100:12
suspension [1] - 1139:14
sustain [3] - 1258:10, 1266:3, 1281:10
Sustained [24] - 1083:18, 1085:2, 1088:3, 1102:22, 1107:15, 1130:12, 1152:17, 1156:20, 1158:16, 1159:3, 1159:7, 1160:6, 1160:8, 1164:3, 1164:6, 1165:7, 1172:14, 1214:9, 1258:18, 1266:17, 1280:22, 1281:2, 1282:8, 1283:11
sustained [16] - 1069:5, 1070:19, 1135:9, 1185:5, 1185:11, 1247:5, 1247:10, 1249:7, 1249:9, 1253:7, 1253:16, 1253:18, 1287:5, 1287:8, 1290:22, 1293:13
sustaining [1] - 1274:18
swear [1] - 1115:4
Swear [1] - 1090:5
sworn [5] - 1067:24, 1115:11, 1193:21, 1289:24, 1294:5
sworn/affirmed [3] - 1067:16, 1193:14, 1289:16
Symptom [1] - 1191:6
symptoms [2] - 1062:23, 1063:1
synthesize [1] - 1257:21
synthesized [1] - 1210:8
synthesizes [1] - 1261:21
system [2] - 1079:21, 1132:15

# T

tables [1] - 1169:24
tailored [1] - 1061:20
taint [1] - 1110:2
talks [1] - 1227:16
tap [2] - 1126:16, 1172:7
tape [6] - 1077:25, 1084:8, 1089:13, 1090:13, 1090:14, 1093:16
taped [1] - 1087:15
tapered [1] - 1159:18
taping [1] - 1099:17
target [1] - 1117:2
task [2] - 1220:24, 1257:21
TBI [3] - 1120:4, 1186:5, 1191:5
techniques [1] - 1128:6
teenage [1] - 1131:21
teeth [3] - 1054:10, 1060:18, 1061:23
Ten [1] - 1104:3
ten [5] - 1188:19, 1245:2, 1245:6, 1245:11, 1245:13

tender [1] - 1256:9
tends [1] - 1144:22
tens [1] - 1109:17
term [5] - 1099:13, 1186:2, 1218:10, 1277:8
Terminology [1] - 1252:20
terms [7] - 1171:10, 1190:22, 1232:3, 1258:2, 1258:13, 1260:21, 1272:5
Test [3] - 1125:5, 1126:5, 1191:6
test [40] - 1117:25, 1124:18, 1125:5, 1125:6, 1125:25, 1126:6, 1161:19, 1164:11, 1164:22, 1165:4, 1165:5, 1170:24, 1173:15, 1174:1, 1174:9, 1174:12, 1175:10, 1175:17, 1175:18, 1175:19, 1176:12, 1176:13, 1176:14, 1176:19, 1176:21, 1176:22, 1176:25, 1177:10, 1179:19, 1179:20, 1179:21, 1180:4, 1180:6, 1180:9, 1180:11, 1185:23, 1190:25, 1191:4, 1214:5
tested [1] - 1183:4
testified [42] - 1058:17, 1058:25, 1062:20, 1063:24, 1067:24, 1074:2, 1074:18, 1086:14, 1092:6, 1092:8, 1100:9, 1105:13, 1105:15, 1115:12, 1124:5, 1134:11, 1137:16, 1138:12, 1142:2, 1149:20, 1153:6, 1153:10, 1153:25, 1156:15, 1164:1, 1164:14, 1164:19, 1171:1, 1174:5, 1184:15, 1185:24, 1193:21, 1207:5, 1214:15, 1239:12, 1241:11, 1242:18, 1250:11, 1255:23, 1275:13, 1289:24, 1294:25
testifies [1] - 1062:10, 1120:17, 1120:18
testify [14] - 1054:4, 1062:7, 1066:14, 1090:4, 1090:7, 1090:20, 1103:15, 1111:7, 1111:11, 1111:16, 1174:7, 1174:11, 1174:19, 1286:25
testifying [1] - 1174:20
testimony [47] - 1063:7, 1063:21, 1064:9, 1064:22, 1065:1, 1065:5, 1065:6, 1065:7, 1065:23, 1066:19, 1069:9, 1069:10, 1074:4, 1074:20, 1086:15, 1094:11, 1094:14, 1103:8, 1111:21, 1114:12, 1114:13, 1114:15, 1114:16, 1115:17, 1120:21, 1134:13, 1138:20, 1141:23, 1152:5, 1153:13, 1153:19, 1153:20, 1154:3, 1166:5, 1166:6, 1173:25, 1188:4, 1214:12, 1216:15, 1216:23, 1248:2, 1248:6, 1250:8, 1266:4, 1280:15, 1291:8, 1294:5
testing [37] - 1115:18, 1134:15, 1134:16, 1134:24, 1145:9, 1152:11, 1152:25, 1157:4, 1158:12, 1159:10, 1162:5, 1169:15, 1170:6, 1170:11, 1170:21, 1171:2, 1172:16, 1175:2, 1177:12, 1177:13, 1178:1, 1179:15, 1179:16, 1180:10, 1181:17, 1181:21, 1182:3, 1184:2, 1184:20, 1190:20, 1191:4, 1191:15, 1192:8, 1214:1,

1214:3, 1231:9, 1254:19
**tests** [25] - 1127:7, 1127:8, 1127:16, 1159:6, 1164:8, 1166:16, 1169:16, 1170:12, 1171:8, 1171:20, 1175:16, 1176:16, 1176:22, 1177:16, 1180:14, 1183:1, 1183:8, 1184:7, 1188:18, 1188:20, 1190:21, 1214:4, 1214:5
**that...** [1] - 1116:6
**Thatcher** [1] - 1159:19
**THE** [441] - 1051:12, 1053:4, 1055:2, 1055:4, 1055:6, 1055:8, 1055:19, 1055:22, 1055:24, 1057:10, 1057:13, 1057:15, 1057:17, 1057:20, 1059:18, 1060:16, 1060:23, 1061:1, 1061:4, 1061:8, 1061:21, 1061:24, 1062:1, 1062:6, 1062:11, 1062:15, 1062:18, 1063:6, 1064:6, 1065:17, 1066:20, 1066:23, 1066:25, 1067:3, 1067:6, 1067:11, 1067:14, 1067:17, 1067:19, 1067:21, 1069:5, 1070:19, 1071:2, 1071:7, 1074:14, 1075:1, 1075:2, 1076:18, 1080:23, 1080:25, 1081:3, 1081:8, 1081:11, 1081:16, 1081:23, 1081:25, 1083:18, 1085:2, 1088:3, 1088:20, 1090:2, 1090:6, 1090:17, 1090:20, 1090:22, 1091:1, 1091:3, 1091:5, 1091:11, 1091:14, 1091:20, 1091:23, 1092:3, 1092:14, 1092:16, 1092:20, 1092:25, 1093:3, 1093:12, 1093:14, 1093:19, 1093:21, 1093:25, 1094:8, 1094:12, 1094:16, 1095:3, 1095:5, 1095:7, 1095:9, 1095:11, 1095:12, 1095:13, 1095:14, 1095:15, 1095:17, 1095:20, 1095:25, 1096:2, 1096:3, 1096:4, 1096:5, 1096:7, 1096:11, 1096:14, 1096:15, 1096:16, 1096:17, 1096:21, 1096:25, 1097:2, 1097:3, 1097:5, 1097:7, 1097:9, 1097:10, 1097:11, 1097:12, 1097:16, 1097:25, 1100:22, 1102:22, 1103:21, 1104:2, 1104:8, 1104:10, 1107:15, 1107:19, 1107:20, 1107:21, 1108:2, 1108:6, 1108:9, 1108:15, 1109:3, 1110:4, 1110:7, 1110:11, 1110:20, 1111:2, 1112:4, 1112:8, 1114:5, 1114:7, 1114:9, 1114:11, 1114:22, 1114:24, 1115:3, 1115:7, 1115:8, 1116:9, 1116:24, 1117:9, 1117:11, 1117:18, 1117:20, 1118:3, 1118:8, 1119:10, 1120:3, 1120:11, 1120:16, 1120:19, 1120:25, 1121:2, 1122:2, 1122:22, 1122:25, 1123:20, 1124:14, 1125:22, 1125:23, 1126:15, 1126:16, 1127:24, 1128:21, 1128:23, 1128:25, 1130:11, 1130:12, 1132:24, 1133:1, 1133:5, 1134:3, 1135:9, 1137:4, 1137:10, 1141:15, 1142:11, 1142:13, 1142:20, 1142:23, 1143:9, 1143:12, 1146:3, 1146:9, 1146:13, 1146:17, 1147:1, 1147:11, 1147:14, 1147:22, 1148:7, 1148:10, 1148:14, 1148:17,

1149:3, 1149:9, 1149:25, 1150:8, 1150:15, 1150:17, 1152:17, 1153:15, 1153:17, 1155:23, 1156:12, 1156:16, 1156:20, 1157:8, 1157:23, 1158:16, 1159:3, 1159:7, 1159:9, 1159:11, 1159:12, 1160:6, 1160:8, 1160:12, 1160:16, 1160:20, 1161:4, 1161:11, 1164:3, 1164:6, 1165:7, 1165:8, 1165:9, 1166:3, 1166:7, 1166:14, 1166:18, 1166:25, 1168:1, 1168:3, 1168:5, 1168:6, 1168:8, 1168:9, 1168:10, 1168:11, 1168:12, 1169:3, 1169:5, 1169:9, 1172:12, 1172:20, 1173:3, 1174:14, 1174:17, 1183:24, 1185:2, 1185:5, 1185:11, 1187:19, 1187:22, 1189:16, 1189:17, 1189:18, 1193:8, 1193:13, 1193:15, 1193:17, 1194:18, 1195:12, 1195:15, 1195:17, 1195:18, 1205:6, 1206:19, 1208:17, 1211:4, 1211:12, 1212:13, 1213:16, 1214:9, 1216:5, 1217:1, 1220:16, 1220:19, 1220:20, 1220:21, 1221:2, 1222:17, 1222:19, 1223:15, 1223:17, 1224:14, 1224:20, 1224:24, 1225:4, 1225:8, 1225:19, 1226:1, 1226:4, 1226:15, 1226:21, 1226:23, 1226:25, 1227:5, 1227:13, 1227:21, 1228:2, 1229:2, 1229:17, 1229:24, 1230:1, 1231:3, 1231:5, 1231:6, 1231:7, 1235:5, 1236:24, 1237:13, 1238:7, 1238:8, 1238:9, 1239:6, 1239:14, 1239:16, 1240:2, 1240:7, 1240:11, 1241:3, 1241:6, 1241:9, 1241:11, 1241:19, 1241:25, 1242:3, 1242:6, 1242:12, 1242:15, 1242:25, 1244:8, 1247:5, 1247:10, 1247:12, 1247:17, 1247:25, 1248:1, 1248:12, 1248:23, 1249:7, 1249:9, 1249:14, 1249:21, 1250:2, 1250:16, 1250:20, 1251:11, 1252:17, 1253:7, 1253:16, 1253:18, 1253:22, 1256:12, 1256:15, 1256:16, 1258:10, 1258:18, 1259:3, 1263:21, 1265:6, 1265:14, 1265:22, 1265:23, 1265:24, 1266:3, 1266:11, 1266:17, 1266:23, 1269:24, 1270:10, 1270:21, 1273:12, 1274:11, 1274:18, 1275:8, 1276:1, 1276:18, 1277:23, 1278:4, 1278:15, 1280:22, 1281:2, 1281:5, 1281:10, 1281:20, 1282:8, 1283:11, 1284:5, 1286:13, 1286:20, 1287:5, 1287:8, 1287:17, 1288:22, 1288:25, 1289:5, 1289:10, 1289:15, 1289:17, 1289:19, 1289:21, 1290:22, 1293:13, 1294:13, 1294:24, 1295:1, 1295:2, 1295:4, 1295:5, 1295:7, 1295:8, 1295:9, 1295:10, 1295:11, 1295:12, 1295:13, 1295:20, 1295:23, 1296:4, 1296:14, 1296:18, 1296:22, 1297:1, 1297:3, 1297:9
**therapist** [5] - 1075:8, 1097:1, 1103:7, 1103:8, 1285:13

**therapists** [1] - 1229:14
**therapy** [43] - 1069:17, 1069:24, 1096:18, 1127:21, 1128:11, 1219:12, 1220:1, 1220:5, 1220:13, 1220:17, 1220:18, 1220:23, 1220:24, 1221:4, 1221:21, 1222:2, 1222:4, 1222:9, 1223:7, 1225:2, 1227:2, 1227:11, 1227:12, 1231:18, 1231:19, 1232:7, 1232:21, 1239:8, 1239:23, 1239:25, 1241:20, 1241:21, 1241:23, 1244:9, 1263:25, 1264:5, 1264:6, 1264:13, 1264:16, 1264:19, 1279:18, 1285:7, 1285:9
**thereabouts** [1] - 1211:16
**therefore** [2] - 1179:14, 1282:24
**they've** [2] - 1060:20, 1289:3
**thi** [1] - 1059:9
**thinking** [1] - 1171:19
**third** [10] - 1135:25, 1145:12, 1145:16, 1146:12, 1146:14, 1147:11, 1147:15, 1147:23, 1149:21, 1162:18
**Thomas** [38] - 1062:9, 1062:10, 1063:4, 1063:11, 1065:18, 1075:12, 1082:15, 1114:9, 1114:10, 1114:15, 1114:21, 1115:2, 1115:3, 1115:7, 1115:15, 1117:25, 1118:11, 1122:3, 1123:1, 1129:5, 1129:11, 1133:3, 1134:7, 1151:5, 1160:17, 1161:16, 1166:22, 1169:5, 1169:14, 1208:13, 1227:16, 1227:19, 1264:15, 1264:16, 1279:21, 1280:10, 1280:13, 1281:21
**THOMAS** [3] - 1052:7, 1115:10, 1298:9
**thomas** [1] - 1062:20, 1193:8
**Thomas'** [13] - 1063:7, 1063:11, 1063:16, 1066:4, 1066:19, 1075:18, 1076:20, 1114:12, 1279:25, 1280:25, 1281:6, 1281:13, 1281:21
**Thomas's** [2] - 1132:23, 1208:21
**thoughts** [1] - 1064:18
**thousands** [1] - 1109:17
**three** [29] - 1083:11, 1119:7, 1119:8, 1126:6, 1126:9, 1126:20, 1136:20, 1147:15, 1148:22, 1159:15, 1163:2, 1164:8, 1166:16, 1171:8, 1171:24, 1171:25, 1176:7, 1177:23, 1181:6, 1182:8, 1182:21, 1191:7, 1197:3, 1197:5, 1267:24, 1280:11, 1280:18, 1280:19, 1289:12
**threw** [1] - 1064:8
**throughout** [2] - 1218:11, 1262:10
**Thursday** [15] - 1053:7, 1053:11, 1053:22, 1059:14, 1062:21, 1064:23, 1065:8, 1115:17, 1134:10, 1134:11, 1138:20, 1296:12, 1296:13, 1296:15, 1296:20
**ticket** [1] - 1260:14
**timeframe** [1] - 1234:16
**timeframes** [1] - 1236:6
**timestamp** [1] - 1072:3
**timing** [2] - 1140:23, 1170:16

**timing-wise** [1] - 1170:16
**tired** [2] - 1178:22, 1207:2
**title** [1] - 1068:16
**Tizanidine** [4] - 1206:24, 1207:1, 1234:11, 1235:10
**to..** [1] - 1125:9
**today** [27] - 1053:12, 1053:21, 1054:1, 1054:5, 1056:17, 1067:4, 1074:4, 1074:20, 1075:1, 1086:15, 1101:12, 1101:15, 1111:7, 1111:21, 1130:5, 1134:10, 1150:11, 1194:5, 1201:8, 1201:15, 1236:14, 1270:25, 1291:8, 1294:5, 1294:25
**together** [6] - 1081:6, 1226:17, 1245:17, 1246:11, 1278:6, 1280:16
**tomorrow** [11] - 1289:5, 1289:7, 1289:8, 1296:1, 1296:10, 1296:12, 1296:24, 1297:3, 1297:4, 1297:9
**took** [32] - 1053:10, 1061:14, 1079:20, 1080:9, 1080:21, 1087:22, 1088:5, 1088:11, 1089:1, 1103:1, 1130:4, 1136:25, 1137:11, 1139:11, 1144:12, 1146:1, 1148:2, 1151:6, 1153:10, 1161:14, 1192:17, 1192:22, 1204:22, 1209:19, 1210:6, 1225:23, 1241:1, 1257:11, 1262:19, 1262:21, 1292:19, 1295:10
**top** [11] - 1069:7, 1075:2, 1075:4, 1078:15, 1078:17, 1123:7, 1142:20, 1151:24, 1174:23, 1175:8, 1272:20
**topic** [2] - 1053:16, 1063:20
**topics** [1] - 1063:23
**tossed** [1] - 1103:14
**total** [17] - 1101:20, 1109:22, 1120:8, 1162:22, 1222:9, 1223:8, 1230:7, 1230:23, 1231:12, 1232:7, 1233:14, 1235:14, 1236:2, 1245:22, 1246:11, 1266:25, 1295:14
**totality** [1] - 1228:1
**totally** [5] - 1271:10, 1272:12, 1272:14, 1272:15, 1272:17
**totals** [1] - 1231:14
**touch** [2] - 1125:23, 1157:11
**tow** [1] - 1120:15
**toward** [3] - 1075:21, 1114:21, 1255:21
**towards** [1] - 1077:20
**track** [1] - 1079:24
**trail** [1] - 1126:19
**train** [11] - 1062:12, 1062:15, 1073:22, 1077:9, 1077:11, 1077:14, 1077:16, 1078:4, 1082:19, 1289:3, 1289:10
**trained** [2] - 1128:6, 1155:4
**training** [6] - 1197:19, 1229:12, 1239:24, 1254:12, 1264:11, 1267:15
**trains** [4] - 1077:16, 1077:18, 1077:23, 1078:2
**transcribing** [1] - 1148:18
**transcript** [26] - 1052:18, 1053:11, 1055:2, 1055:4, 1055:24, 1057:1,

1062:20, 1062:25, 1063:25, 1067:1, 1067:3, 1145:11, 1145:15, 1146:4, 1146:10, 1146:18, 1147:3, 1147:4, 1147:10, 1149:11, 1149:13, 1151:15, 1175:12, 1239:7, 1253:13, 1287:11
**TRANSCRIPT** [1] - 1051:12
**Transcription** [1] - 1052:19
**transcripts** [5] - 1148:25, 1173:17, 1214:14, 1214:24, 1250:9
**transfer** [1] - 1084:24
**transferred** [2] - 1080:5, 1080:6
**trap** [1] - 1054:6
**traumatic** [3] - 1061:21, 1114:15, 1191:5
**travel** [1] - 1111:22
**treat** [14] - 1127:19, 1130:22, 1136:9, 1139:1, 1139:3, 1144:10, 1153:23, 1154:21, 1181:24, 1190:14, 1190:17, 1193:2, 1280:7
**treated** [11] - 1140:20, 1140:24, 1170:17, 1250:4, 1276:6, 1277:12, 1277:18, 1277:20, 1277:25, 1278:18
**treater** [4] - 1140:5, 1140:7, 1144:4, 1146:23
**treaters** [4] - 1250:6, 1259:4, 1260:24, 1286:3
**treating** [45] - 1064:12, 1064:19, 1065:4, 1065:14, 1066:11, 1066:14, 1135:19, 1135:22, 1136:4, 1139:19, 1141:17, 1153:22, 1154:5, 1155:2, 1158:21, 1169:18, 1170:11, 1177:3, 1182:20, 1186:1, 1188:10, 1199:24, 1208:15, 1213:25, 1248:14, 1248:25, 1249:3, 1256:23, 1257:16, 1258:6, 1258:15, 1264:8, 1274:22, 1275:1, 1277:24, 1278:21, 1280:5, 1280:10, 1280:17, 1280:19, 1280:24, 1281:13, 1281:17, 1281:22, 1282:5
**treatment** [51] - 1063:9, 1107:3, 1115:25, 1116:22, 1117:3, 1121:4, 1122:12, 1123:3, 1123:16, 1124:19, 1127:17, 1127:25, 1128:1, 1130:1, 1130:19, 1132:12, 1132:18, 1134:24, 1135:18, 1137:15, 1141:20, 1142:6, 1157:3, 1158:4, 1159:22, 1159:25, 1160:22, 1169:16, 1170:14, 1181:16, 1182:13, 1187:21, 1188:13, 1191:11, 1191:19, 1191:25, 1192:9, 1208:6, 1208:10, 1219:16, 1229:8, 1240:4, 1255:13, 1258:13, 1264:3, 1269:6, 1277:12, 1279:5, 1280:1, 1285:7
**treatments** [3] - 1069:18, 1155:18, 1258:23
**TRIAL** [1] - 1051:12
**trial** [10] - 1054:14, 1058:4, 1064:11, 1090:7, 1094:2, 1094:3, 1216:15, 1250:8, 1253:13
**tried** [4] - 1054:22, 1072:20, 1100:5, 1110:1
**tries** [1] - 1161:22

**trip** [1] - 1085:19
**true** [73] - 1058:3, 1073:4, 1074:12, 1076:6, 1076:10, 1077:4, 1079:2, 1082:11, 1086:11, 1087:1, 1100:7, 1100:25, 1102:1, 1113:13, 1131:4, 1135:16, 1136:10, 1136:23, 1137:21, 1137:24, 1140:6, 1140:10, 1140:24, 1142:18, 1144:1, 1144:2, 1154:18, 1154:19, 1155:10, 1155:12, 1155:20, 1162:20, 1170:24, 1171:13, 1174:6, 1174:10, 1176:22, 1180:16, 1180:18, 1181:7, 1181:20, 1184:16, 1184:18, 1184:20, 1185:16, 1187:4, 1189:6, 1189:14, 1191:5, 1192:4, 1196:6, 1199:25, 1201:6, 1210:24, 1219:1, 1219:2, 1219:5, 1219:6, 1219:7, 1221:2, 1221:22, 1246:15, 1256:23, 1256:24, 1257:10, 1257:15, 1262:5, 1277:19, 1283:9, 1283:19, 1286:6, 1291:1
**truthfully** [1] - 1142:2
**try** [14] - 1059:9, 1063:23, 1095:6, 1099:2, 1108:4, 1124:21, 1135:21, 1155:8, 1169:15, 1172:7, 1185:9, 1199:22, 1204:19, 1221:7
**trying** [30] - 1086:13, 1088:6, 1091:12, 1094:1, 1094:6, 1098:25, 1099:10, 1103:3, 1105:8, 1105:22, 1109:10, 1116:21, 1120:14, 1124:15, 1125:9, 1139:10, 1164:17, 1164:21, 1183:25, 1225:6, 1226:5, 1228:4, 1242:14, 1255:11, 1255:12, 1255:18, 1255:20, 1271:15, 1288:1
**Tuesday** [1] - 1297:12
**turn** [1] - 1118:7
**twice** [6] - 1105:19, 1147:15, 1186:19, 1199:16, 1232:11, 1232:18
**twist** [1] - 1139:10
**twisting** [1] - 1175:21
**two** [46] - 1058:16, 1065:9, 1070:13, 1073:22, 1077:16, 1077:18, 1082:12, 1083:11, 1095:11, 1095:12, 1095:15, 1099:24, 1106:12, 1120:9, 1123:15, 1124:6, 1124:11, 1126:7, 1126:9, 1126:20, 1127:16, 1130:6, 1131:21, 1135:22, 1135:23, 1145:5, 1158:21, 1176:25, 1177:10, 1177:11, 1177:12, 1177:15, 1180:4, 1182:21, 1186:6, 1209:8, 1209:10, 1218:10, 1219:8, 1231:2, 1234:9, 1239:13, 1264:20, 1278:18
**type** [13] - 1058:10, 1071:18, 1072:4, 1102:1, 1113:25, 1124:11, 1135:11, 1175:1, 1175:15, 1230:19, 1232:15, 1236:6, 1261:15
**typed** [1] - 1213:19
**types** [2] - 1267:16, 1276:24
**typical** [8] - 1070:9, 1119:2, 1204:8, 1204:11, 1204:12, 1205:9, 1207:12, 1259:17

**typically** [13] - 1070:13, 1073:9, 1073:12, 1073:22, 1074:6, 1076:2, 1100:12, 1206:17, 1221:24, 1255:6, 1257:13, 1259:1, 1259:4

## U

**uh-hum** [1] - 1201:16
**ultimately** [1] - 1211:25
**umbrella** [2] - 1079:4, 1100:10
**unbiased** [2] - 1109:11, 1140:6
**uncensored** [1] - 1076:9
**uncomfortable** [1] - 1171:18
**uncommon** [1] - 1095:17
**under** [22] - 1062:1, 1065:10, 1066:3, 1074:18, 1096:7, 1107:10, 1111:7, 1111:16, 1115:4, 1124:19, 1126:24, 1137:13, 1139:14, 1156:15, 1180:16, 1181:8, 1181:12, 1181:22, 1233:16, 1275:1, 1275:14, 1288:11
**undergone** [2] - 1203:24, 1204:3
**understood** [9] - 1084:18, 1113:23, 1117:10, 1118:2, 1162:8, 1194:15, 1219:15, 1266:12, 1270:3
**undertake** [1] - 1191:25
**undertaking** [2] - 1076:1, 1111:14
**undertook** [2] - 1068:21, 1113:23
**undisclosed** [1] - 1272:20
**unethical** [2] - 1139:6, 1139:7
**UNITED** [2] - 1051:1, 1051:13
**United** [3] - 1051:5, 1156:1, 1234:4
**University** [1] - 1254:14
**unless** [7] - 1094:12, 1144:6, 1179:7, 1181:8, 1181:22, 1242:1, 1271:6
**unquote** [1] - 1053:17
**unsure** [2] - 1142:3, 1142:4
**unto** [1] - 1190:25
**unusual** [4] - 1106:5, 1107:23, 1108:10, 1258:7
**up** [105] - 1053:7, 1054:5, 1055:16, 1057:7, 1057:12, 1057:22, 1062:7, 1065:25, 1079:3, 1087:25, 1089:12, 1089:25, 1090:11, 1093:8, 1093:18, 1094:2, 1094:12, 1096:24, 1097:5, 1097:20, 1098:18, 1106:7, 1109:3, 1110:3, 1110:15, 1111:15, 1116:12, 1122:4, 1122:15, 1122:22, 1125:1, 1126:19, 1126:21, 1127:3, 1127:4, 1127:5, 1127:8, 1131:5, 1131:9, 1131:13, 1132:1, 1132:6, 1132:18, 1134:14, 1135:5, 1140:12, 1141:5, 1141:9, 1155:1, 1160:23, 1161:3, 1169:5, 1171:24, 1174:22, 1176:25, 1177:20, 1182:4, 1182:11, 1184:24, 1185:3, 1187:14, 1190:20, 1193:2, 1199:18, 1203:15, 1203:18, 1204:12, 1205:20, 1209:7, 1213:19, 1213:21, 1217:21, 1219:17, 1219:20, 1228:1, 1229:7, 1229:8, 1230:23, 1237:11, 1238:6, 1239:6, 1239:18, 1239:24,

1240:8, 1241:17, 1241:22, 1242:13, 1242:14, 1244:12, 1244:19, 1245:17, 1252:22, 1252:24, 1254:19, 1263:2, 1263:8, 1272:17, 1274:11, 1274:16, 1275:1, 1276:11, 1278:23, 1281:12, 1287:10, 1287:24
**update** [2] - 1247:7, 1247:11
**updated** [2] - 1250:23, 1278:20
**upload** [3] - 1079:23, 1079:24, 1080:3
**uploaded** [2] - 1079:21, 1080:9
**upper** [1] - 1123:9
**useful** [1] - 1154:7
**uses** [8] - 1205:14, 1216:20, 1239:7, 1241:15, 1242:22, 1251:4, 1251:7

## V

**vague** [6] - 1116:23, 1146:20, 1214:3, 1258:17, 1265:12, 1266:10
**vaguely** [1] - 1162:15
**valid** [20] - 1159:20, 1164:13, 1169:16, 1174:9, 1174:12, 1174:20, 1175:1, 1175:17, 1175:18, 1175:19, 1175:23, 1176:1, 1176:4, 1176:8, 1179:15, 1179:16, 1179:22, 1180:11, 1248:16
**validated** [1] - 1144:22
**validity** [2] - 1158:12, 1175:10
**Validity** [1] - 1191:6
**value** [1] - 1224:18
**variable** [1] - 1123:8
**variables** [4] - 1118:18, 1123:13, 1159:22, 1159:24
**varies** [1] - 1070:10
**various** [5] - 1126:22, 1214:5, 1259:4, 1260:18, 1267:24
**Vasile** [2] - 1219:21, 1276:14
**vast** [1] - 1192:7
**vehicle** [3] - 1070:2, 1084:4, 1253:3
**verbally** [2] - 1180:3, 1212:20
**verbose** [2] - 1066:12, 1066:13
**versa** [2] - 1297:5, 1297:6
**versus** [1] - 1104:22
**via** [2] - 1071:14, 1071:15
**vice** [2] - 1297:5, 1297:6
**Victoria** [1] - 1191:6
**video** [67] - 1072:2, 1072:13, 1076:9, 1079:14, 1079:15, 1079:18, 1080:3, 1080:8, 1080:21, 1081:4, 1081:20, 1082:4, 1082:20, 1082:24, 1083:3, 1084:14, 1085:25, 1087:20, 1087:22, 1088:5, 1088:9, 1088:11, 1088:15, 1088:21, 1089:3, 1089:9, 1091:14, 1091:15, 1091:20, 1091:22, 1092:2, 1092:4, 1095:6, 1097:15, 1097:17, 1097:23, 1098:2, 1098:12, 1098:14, 1098:23, 1099:3, 1099:6, 1099:21, 1100:3, 1102:11, 1102:13, 1102:17, 1103:11, 1105:2, 1105:4, 1105:6, 1264:25, 1265:16, 1265:22, 1266:1, 1270:5, 1270:21, 1270:24, 1270:25,

1271:25, 1272:3, 1272:10, 1273:2, 1291:24, 1292:1, 1295:6
**Video** [2] - 1086:6, 1102:24
**videocamera** [2] - 1071:17, 1071:23
**videos** [2] - 1081:6, 1081:8
**videotape** [7] - 1071:15, 1072:20, 1079:12, 1098:20, 1271:12, 1271:16, 1271:19
**view** [7] - 1098:13, 1099:2, 1099:16, 1118:12, 1130:17, 1215:15, 1278:16
**viewed** [1] - 1118:13
**Viggiano** [2] - 1070:6, 1289:1
**vigorous** [2] - 1113:8, 1113:11
**visit** [7] - 1132:10, 1165:2, 1182:17, 1189:9, 1207:11, 1233:17
**visit-by-visit** [1] - 1132:10
**visiting** [1] - 1208:19
**visits** [6] - 1131:3, 1131:24, 1182:17, 1232:18, 1233:1, 1275:22
**visual** [3] - 1123:6, 1125:6, 1127:6
**vitae** [2] - 1196:6, 1196:9
**voice** [1] - 1062:18
**voluntarily** [1] - 1101:15
**voracity** [1] - 1253:11
**VSVT** [2] - 1191:7, 1191:16

## W

**W-H-I-T-L-O-C-K** [1] - 1067:20
**wage** [1] - 1261:22
**WAGSTAFF** [4] - 1051:20
**wait** [5] - 1062:10, 1092:3, 1126:18, 1155:1, 1187:18
**waited** [3] - 1086:24, 1092:10, 1160:1
**waiting** [1] - 1096:23, 1137:9
**waive** [3] - 1146:7, 1147:9, 1147:19
**wakes** [1] - 1204:12
**waking** [1] - 1209:7
**walk** [7] - 1073:21, 1077:14, 1078:2, 1078:23, 1079:2, 1082:17, 1203:13
**walked** [3] - 1077:3, 1078:8, 1085:5
**walking** [12] - 1075:21, 1084:12, 1088:13, 1092:11, 1098:6, 1103:5, 1113:12, 1186:22, 1262:11, 1271:2, 1271:5, 1272:17
**wall** [1] - 1063:23
**Wang** [2] - 1059:23, 1060:1
**wants** [4] - 1066:10, 1117:25, 1124:16, 1179:11
**warned** [1] - 1056:18
**Warner** [1] - 1199:3
**WARNER** [1] - 1052:9
**wasting** [1] - 1233:9
**watch** [1] - 1265:1
**watched** [1] - 1076:6
**waves** [2] - 1119:1, 1119:3
**ways** [1] - 1187:1
**Wednesday** [2] - 1296:19, 1296:23
**week** [12] - 1123:25, 1124:5, 1131:25,

1138:9, 1186:11, 1186:19, 1186:20, 1214:12, 1245:3, 1245:11, 1245:13, 1262:22

**weekend** [4] - 1138:17, 1138:19, 1265:23, 1273:6

**weeks** [2] - 1164:25, 1275:6

**weighed** [1] - 1109:9

**weight** [8] - 1103:18, 1259:18, 1259:20, 1272:19, 1281:16, 1281:21, 1281:24, 1282:5

**welcome** [4] - 1194:6, 1213:10, 1230:15, 1253:24

**well-natured** [1] - 1149:1

**well-thought** [1] - 1251:5

**well-validated** [1] - 1144:22

**Wendy** [3] - 1193:12, 1193:17, 1254:9

**WENDY** [3] - 1193:17, 1193:19, 1298:13

**West** [6] - 1258:21, 1276:4, 1278:12, 1279:2, 1279:6, 1279:13

**Westchester** [1] - 1052:12

**whack** [1] - 1118:23

**what-have-you** [1] - 1252:23

**white** [1] - 1109:3

**WHITLOCK** [2] - 1067:22, 1298:5

**Whitlock** [10] - 1062:11, 1067:13, 1067:19, 1068:5, 1089:11, 1095:5, 1101:12, 1104:15, 1114:5, 1293:22

**whitlock** [3] - 1062:13, 1066:23, 1067:14

**whole** [7] - 1097:19, 1178:4, 1182:6, 1226:20, 1241:17, 1251:21, 1277:3

**willing** [6] - 1054:11, 1054:12, 1136:13, 1143:1, 1192:1, 1193:2

**willingness** [1] - 1138:6

**Winn** [2] - 1214:18, 1276:14

**Winn's** [1] - 1205:2

**wise** [1] - 1170:16

**wish** [1] - 1054:15

**with..** [1] - 1226:9

**withdraw** [5] - 1071:8, 1220:10, 1232:1, 1232:24, 1236:19

**withdrawn** [11] - 1196:13, 1196:15, 1200:19, 1211:25, 1230:3, 1231:8, 1233:20, 1246:17, 1253:8, 1274:24, 1283:24

**Witness** [5] - 1114:8, 1193:10, 1193:14, 1288:24, 1295:22

**WITNESS** [57] - 1067:19, 1075:2, 1095:7, 1095:11, 1095:13, 1095:15, 1095:20, 1096:2, 1096:4, 1096:7, 1096:14, 1096:16, 1096:21, 1097:2, 1097:5, 1097:9, 1097:11, 1107:20, 1114:7, 1115:7, 1117:9, 1125:23, 1126:15, 1130:11, 1133:5, 1143:12, 1157:8, 1159:11, 1160:20, 1165:8, 1168:3, 1168:6, 1168:9, 1168:11, 1189:17, 1193:17, 1195:15, 1195:18, 1220:19, 1220:21, 1221:2, 1222:19, 1230:1, 1231:5, 1231:7, 1247:12,

1248:1, 1256:16, 1265:23, 1289:19, 1295:1, 1295:4, 1295:7, 1295:9, 1295:11, 1295:13, 1298:3

**witness** [32] - 1054:12, 1067:11, 1067:16, 1069:4, 1080:20, 1090:3, 1090:10, 1090:17, 1092:6, 1092:8, 1094:13, 1103:4, 1109:10, 1109:25, 1110:15, 1135:8, 1139:24, 1141:17, 1148:23, 1148:24, 1169:7, 1224:3, 1237:6, 1257:23, 1265:3, 1269:23, 1271:23, 1280:11, 1288:5, 1288:25, 1289:16

**witnesses** [6] - 1110:16, 1150:15, 1214:15, 1253:21, 1289:9, 1289:13

**witnessing** [1] - 1083:7

**wondering** [1] - 1150:6

**word** [5] - 1059:18, 1076:9, 1168:6, 1251:15, 1285:6

**worded** [1] - 1280:4

**words** [4] - 1064:11, 1064:16, 1149:5, 1195:24

**worker** [2] - 1163:3, 1163:11

**workers** [2] - 1163:18, 1163:20

**Workers'** [1] - 1068:12

**workforce** [1] - 1185:9

**works** [2] - 1224:12, 1283:23

**worse** [3] - 1054:4, 1194:7, 1286:10

**worse-case** [1] - 1286:10

**worst** [16] - 1210:24, 1212:4, 1212:6, 1212:8, 1212:10, 1212:17, 1219:4, 1220:25, 1221:3, 1225:15, 1225:23, 1249:10, 1249:17, 1249:19, 1256:22, 1286:17

**worst-case** [16] - 1210:24, 1212:4, 1212:6, 1212:8, 1212:10, 1212:17, 1219:4, 1220:25, 1221:3, 1225:15, 1225:23, 1249:10, 1249:17, 1249:19, 1256:22, 1286:17

**worth** [2] - 1095:15, 1128:17

**wow** [1] - 1126:15

**write** [5] - 1071:19, 1156:9, 1158:22, 1207:6, 1257:22

**written** [6] - 1071:15, 1132:7, 1141:25, 1152:6, 1156:8, 1160:21

**wrote** [3] - 1216:12, 1217:7, 1246:18

## X

**X-rays** [5] - 1230:17, 1230:21, 1231:1

## Y

**Yale** [1] - 1254:14

**year** [37] - 1112:20, 1124:18, 1128:7, 1137:17, 1159:16, 1182:20, 1201:3, 1217:9, 1218:10, 1218:11, 1231:24, 1232:4, 1232:11, 1232:12, 1232:13, 1232:18, 1232:22, 1233:2, 1233:5, 1233:13, 1235:3, 1236:3, 1236:8, 1236:9, 1244:10, 1244:11, 1246:18,

1263:19, 1264:2, 1264:8, 1275:19, 1278:22, 1284:1, 1284:2

**year-and-a-half** [1] - 1159:16

**years** [27] - 1068:15, 1091:4, 1101:21, 1101:25, 1102:3, 1112:17, 1112:19, 1130:6, 1158:21, 1182:21, 1186:6, 1195:3, 1218:14, 1218:16, 1218:17, 1218:22, 1219:18, 1233:2, 1236:5, 1236:10, 1237:2, 1246:6, 1254:23, 1254:24, 1269:3, 1278:18, 1290:10

**yellow** [1] - 1119:6

**YORK** [1] - 1051:1

**York** [10] - 1051:5, 1051:18, 1052:13, 1066:16, 1192:5, 1192:16, 1277:13, 1278:7, 1279:6

**yourself** [5] - 1129:22, 1151:23, 1152:2, 1170:3, 1229:11, 1254:7

## Z

**zero** [6] - 1126:8, 1126:10, 1221:4, 1221:9, 1221:10, 1221:15