1300

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - - X
3    JOSE BAUTA,                    :   14-CV-03725(FB)(RER)
                                    :
4          Plaintiff,              :
                                    :
5      -against-                   :   United States Courthouse
                                    :   Brooklyn, New York
6                                   :
                                    :
7                                   :   Tuesday, May 8, 2018
     GREYHOUND LINES, INC.,         :   9:00 a.m.
8    SABRINA ANDERSON, AKOS         :
     GUBICA, KAROLY GUBICA, AND     :
9    CAV ENTERPRISE, LLC,           :
                                    :
10         Defendants.             :
- - - - - - - - - - - - - - - - X
11

12          TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
             BEFORE THE HONORABLE RAMON E. REYES
13        UNITED STATES MAGISTRATE JUDGE, AND A JURY

14
              A P P E A R A N C E S:
15
   For the Plaintiffs:    MCELFISH LAW FIRM
16                        Attorneys for the Plaintiff -
                          Jose Bauta
17                           122 East 42nd Street
                             Suite 2100
18                           New York, New York 10168
                          BY: RAYMOND D. McELFISH, ESQ.
19                             JAMIE DIAMOND, ESQ.

20
                          WAGSTAFF & CARTMELL, LLP
21                        Attorneys for the Plaintiff -
                          Jose Bauta
22                           3740 Grand Avenue
                             Suite 300
23                           Kansas City, Missouri 64112
                          BY: JONATHAN P. KIEFFER, ESQ.
24

25

Proceedings                                          1301

1              A P P E A R A N C E S: (Continued.)

2

3   For the Defendants:       LEWIS BRISBOIS BISGAARD & SMITH, LLP
                              Attorneys for the Defendants -
4                             Greyhound Lines, Inc., Sabrina Anderson,
                              Akos Gubica, Karoly Gubica, and CAV
5                             Enterprise, LLC
                                  1375 East 9th Street
6                                 Suite 1600
                                  Cleveland, Ohio 44114
7                             BY: BRADLEY J. BARMEN, ESQ.
                                  THOMAS P. MANNION, ESQ.
8

9                             MARSHALL, DENNEHEY, WARNER, COLEMAN
                              & GOGGIN
10                            Attorneys for the Defendants -
                              Greyhound Lines, Inc., Sabrina
11                            Anderson, Akos Gubica, Karoly
                              Gubica, and CAV Enterprise, LLC
12                                800 Westchester Avenue
                                  Suite C-700
13                                Rye Brook, New York 10573
                              BY: HAROLD L. MOROKNEK, ESQ.
14                                STEVEN B. SAAL, ESQ.

15

16

17  Court Reporter:       SOPHIE NOLAN
                          225 Cadman Plaza East/Brooklyn, NY 11201
18                        NolanEDNY@aol.com
    Proceedings recorded by mechanical stenography, transcript
19  produced by Computer-Aided Transcription

20

21

22

23

24

25

                       SN      OCR     RPR

Proceedings                          1302

1         (In open court - jury not present.)

2         (The Honorable Ramon E. Reyes, Jr. Presiding.)

3         THE COURT:  I want to cover two issues.  Number one,

4    I have reviewed Colonel Smith's testimony, and originally,

5    when the issue was raised, Mr. McElfish asked to have the

6    testimony stricken.  I denied that request.  I am going to

7    reverse myself.  I am going to grant the request.

8         So pages 740, line 9 to 744, line 13, that testimony

9    is stricken from the record.

10        MR. BARMEN:  I'm sorry, Your Honor, the page and

11   line one more time?

12        THE COURT:  740, line 9 to 744, line 13.  I am going

13   to double check that to make sure I am right.  Well, it is

14   really -- the testimony is through page 741, line 20.  And

15   then if you continue on to 744, line 13, that is our sidebar.

16   So that does not need to be stricken, but I am going to strike

17   that testimony, and I will tell the jury to disregard any

18   testimony from Colonel Smith on cross-examination about how

19   many people were injured, what were the other injuries,

20   because it is violative of the motion in limine ruling, and we

21   do not, therefore, need to hear testimony from Mr. --

22        MR. McELFISH:  Osborn.

23        THE COURT:  -- Osborn or any other person that was

24   injured on the bus.

25        MR. McELFISH:  On that point, Judge, can there be an

Proceedings                                    1303

1   order precluding argument on that in closing?

2           In other words, testimony stricken, Osborn doesn't

3   come in, they get up and go, Well, people in the back of the

4   bus weren't hurt.  So we are asking for an order to exclude

5   that.

6           MR. BARMEN:  If it's not in, I can't argue it.

7           THE COURT:  There you go.

8           MR. McELFISH:  Thank you.

9           THE COURT:  The second thing, and I think you

10  already know about this, but I hear through the grapevine that

11  it has been resolved.  I would like to know how it has been

12  resolved.  We received -- just let me finish.  We received a

13  letter from Mr. Ehrenberg, who represents the witnesses

14  Vasile, Vargas, Ramirez, Rampersaud and Rambirch, expressing

15  the difficulty in having them all come on one day, asking that

16  they come on two days.  And -- well, asking that they either

17  be compensated or come on two days.  I was going to grant

18  this, what I consider to be a motion to modify a subpoena,

19  have them come on two days, but I would like to know what

20  arrangements you have made.

21          MR. BARMEN:  Thank you, Your Honor.  Mr. Saal has

22  been in frequent communication with Mr. Ehrenberg.  There is

23  an agreement to split it up over two days.  I believe it will

24  be Thursday, Friday of this coming week, but Mr. Saal can

25  speak to the specifics.  The bottom line is, I believe the

Proceedings                                    1304

1   issue that he has raised has been resolved by agreement.

2            THE COURT:  Great.

3            MR. McELFISH:  On that issue, two things.  One, we

4   received communication from -- I don't know who it was from,

5   Ms. Diamond has it, but it basically was to the point where I

6   believe it was Ms. Rambirch that is unable to appear at all

7   due to some medical issue.  She is one of the people

8   referenced in Mr. Ehrenberg's letter.  So I have been told by

9   the defense they are going to give me some designations to the

10  effect of that.

11           The other thing I would ask for on the remaining

12  three witnesses is some proffer as to what they are calling

13  them for, because based on their depositions, as I said in the

14  motions in limine, it doesn't seem relevant to me, and the

15  concern and the request for the proffer is, I don't want them

16  getting into insurance issues and Emblem.  When I try to talk

17  to them about what the proffer is, I'm told shenanigans,

18  Emblem, Medicaid.  That's out, that's post-trial.

19           So I just kind of want to get an idea where it's

20  going, and if it's relevant and it's not violative of the

21  motion in limine, it is what it is.

22           THE COURT:  I think that's fair, to give him some

23  idea what these witnesses are being called for.

24           MR. BARMEN:  But it is in the oppositions that we

25  filed.  It's relevant to -- because, as Your Honor is

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1305

1   certainly aware, one of the things we're arguing is, the bills

2   are highly inflated because this place, particularly West --

3   34 West 110th is a mill, and all these people that

4   Dr. Ehrenberg, or Mr. Ehrenberg sent the letter on represents

5   these people.  Now, they've all testified that they're all

6   separate entities, but just the fact that they sent a

7   letter -- that if the receptionist has to come and the biller

8   has to come, that the whole office would potentially shut

9   down, supports our belief that they're not separate entities.

10            And how they bill, how they refer patients back and

11   forth, how they keep records, the way they track patients when

12   they come in is certainly all relevant to our argument and our

13   belief --

14            THE COURT:  That the bills are inflated?

15            MR. BARMEN:  That the bills are severely inflated.

16   That the treatment was way over the top in terms of what was

17   reasonable and necessary, for the purpose of inflating the

18   bills.

19            Mr. McElfish has been aware of this for the last

20   18 months, when we've been doing these depositions, as to what

21   our theories are and what the proof, we believe, shows.

22            THE COURT:  And are you going to get into issues of

23   Emblem and Medicaid?

24            MR. BARMEN:  No.  Of course not.

25            MR. McELFISH:  Here is the problem.

SAM      OCR      RMR      CRR      RPR

Proceedings                      1306

1        MR. BARMEN:  They didn't bill through -- he had --

2   part of the issue is, he had medical coverage during part of

3   this time he was treating.  They didn't submit it there.

4        THE COURT:  And so because this was not submitted

5   and because Mr. Bauta did not pay them for it, yet they have a

6   lien on this case?

7        MR. BARMEN:  Yes, Your Honor.

8        MR. McELFISH:  Here is the problem:  The requirement

9   on proof for what you call inflated bills is actually called

10  reasonable and customary.

11       In every state in every court, you have to have --

12  even federal -- you have to have some competent proof

13  testimony qualified by a witness with foundation as to what

14  the reasonable cost of the services are.  You heard a little

15  bit in terms of future care yesterday from Ms. Cummings.  And

16  she goes, for instance -- and she admits this freely, she goes

17  to a referral guide for this case, but now she goes to

18  FairHealth.org.  That's how courts and juries receive the

19  reasonable and customary costs of care.

20       Now, on that point, the defense hired three medical

21  experts, Judge, all of which could have opined on the

22  reasonableness and customary cost of the care.  One for

23  orthopedics, two for neurology, and three for neuropsychology,

24  to opine on the three main areas of treatment and care, and

25  not one of these experts had an opinion that -- at all.  They

SAM      OCR      RMR      CRR      RPR

Proceedings                                      1307

1   didn't have any opinion.  They weren't given the bills to

2   evaluate.  They were told that that was not the scope of

3   their --

4            THE COURT:  It is not their burden of proof.

5            MR. McELFISH:  I'm sorry?

6            THE COURT:  It's not their burden of proof, it's

7   your burden of proof.

8            MR. McELFISH:  No, and I can meet that.  By my point

9   is, for them to counter with any standard of proof at all,

10  they can't just go in and say, well, your bills were high.

11  That doesn't make any sense.

12           THE COURT:  Why not?  If --

13           MR. McELFISH:  There is no foundation.  In other

14  words, if this medical facility --

15           THE COURT:  If this medical facility, the day he

16  checks in for whatever treatment --

17           MR. McELFISH:  Right.

18           THE COURT:  -- bills every single doctor that is in

19  their umbrella group, whether or not he has seen that doctor

20  or not --

21           MR. McELFISH:  That is a different issue, but --

22           THE COURT:  -- but --

23           MR. McELFISH:  That is a different issue.

24           THE COURT:  -- is that part of what you are getting

25  at?

Proceedings                              1308

1          MR. BARMEN:  The way they track their medical care

2    and bill it is, there's a sign-in sheet at the front:  I am

3    going to see so and so doctor today, I'm signing in.  And then

4    they come back and write what the treatments were on those

5    sign-in sheets, and they bill it that way.  I mean, it makes

6    absolutely no sense from a reasonability standpoint how this

7    place operates.  The jury has already been told that Mr. Bauta

8    was sent to this facility by attorney Colbert a week after the

9    accident.  There is a reason the lawyer sent him there.

10         We certainly have the right to argue that once he

11   was sent there, he was sent there for a reason, to be sent

12   around the mill to treat with chiropractic, and the

13   psychiatric and orthopedic, everything under this one roof.

14   They sent him from here to here to here to here to here.

15         THE COURT:  And Dr. Mobin is going to testify that

16   it's all reasonable and customary, all right?

17         MR. McELFISH:  I don't feel comfortable sitting when

18   I'm talking to you.  I apologize.

19         THE COURT:  It's all right.

20         MR. McELFISH:  But here's the point --

21         THE COURT:  Dr. Mobin is going to testify that this

22   whole list that you have just given me, it is all reasonable

23   and customary?

24         MR. McELFISH:  Yes, but I want to make a different

25   point.  What he's arguing is no problem from a proof point of

Proceedings                                1309

1  view, where he can say, well, the billing is not accurate.
2  The way they track patients is weird, whatever.  That's a
3  different issue than saying -- because he started out by
4  telling you in his proffer the bills are inflated, they're not
5  reasonable and customary.  That's a different legal issue that
6  goes to the jury.  It's just like, is the medical care
7  reasonable and necessary.  You have to have expert opinion
8  with foundation to establish that.
9        So whether or not -- how they track the people has
10  nothing to do with whether or not the pricing for each
11  service, for instance, matches the databases in FairHealth.org
12  or United Healthcare or these other -- there's several
13  different ones.  Optum is another one.  He is going to try and
14  argue that the bills are inflated and too much money.  That
15  lacks foundation.  That is my objection.
16        If he wants to beat up on the receptionist because
17  she wrote down that he went to see Dr. Gutstein or whatever,
18  that is a different issue.  I am talking about the actual
19  pricing per service, just like you heard Ms. Cummings talk
20  about.
21        THE COURT:  So then you do not have a problem with
22  him calling these witnesses.
23        MR. McELFISH:  Not on those issues, but if he is
24  going to try to say, for instance, Oh, they saw Dr. Gutstein
25  and that was $300, that is an inflated number, isn't it?

Proceedings                                    1310

1   There is no foundation for that.  That is my point.  If they

2   want to beat the witnesses up because of how they run the

3   office, I think that's 403, but that is a different issue.

4           You have to have an expert.

5           THE COURT:  I will allow the witnesses to testify.

6           MR. BARMEN:  Thank you, Your Honor.

7           MR. McELFISH:  Subject to?

8           THE COURT:  I will allow the witnesses to testify,

9   and we will work out the objections on the fly.

10          All right.  Miriam said that there are other issues

11  you want to discuss?

12          MR. McELFISH:  Well, I handed up -- what we did last

13  night.  I've been trying to meet and confer on this for

14  months, it feels like.  We have what's in the exhibit list as

15  305 for ID, and it is a 25-page accumulation summary of all

16  the bills.  They were provided to Dr. Mobin when he testified,

17  excluding, of course, Dr. Thomas, because Dr. Thomas is a --

18  there is some fine line about whether or not neuropsychology

19  is outside the scope of a neurosurgeon, because he does do a

20  lot of brain work and brain injury work.  But excluding

21  Dr. Thomas, for instance, and his treatment and care, the 305

22  summary basically has been in the exhibits for months.

23          So last night, what I did was, I went through and I

24  made it a one-page document, which we can now mark as 305A,

25  which I've handed up.  I intend to just basically ask

Proceedings                                    1311

1   Dr. Mobin whether or not these bills have been reviewed and

2   whether they're reasonable and necessary, and I am trying to

3   avoid objections.  So I am raising it now.

4           THE COURT:  So you are going to show Dr. Mobin all

5   of these exhibits, ask him if he has reviewed those bills, and

6   whether they are reasonable and customary?

7           MR. McELFISH:  I can do that if required, sure.

8           THE COURT:  Well, there has to be -- if this is a

9   summary --

10          MR. McELFISH:  Yes.

11          THE COURT:  -- there has to be an evidentiary basis

12  for it.

13          MR. McELFISH:  Sure.

14          THE COURT:  So you can't -- unless there is a

15  stipulation that --

16          MR. McELFISH:  Well, I can't imagine --

17          THE COURT:  -- all of these bills, that they have

18  been reviewed by Dr. Mobin and they are reasonable and -- and

19  all the charges are reasonable and customary.  Unless they

20  agree to that, you are going to have to fight it out over each

21  bill.

22          MR. McELFISH:  No problem.  Now, here is what

23  happened.  This is really more of an out of the presence

24  issue, is that during Dr. Mobin's first deposition in

25  October of 2016, he was provided with all these bills and

Proceedings                                              1312

1   thousands of pages of documents.  Mr. Barmen came to

2   California, took his deposition, did not ask him in the

3   deposition about the bills.  I asked him about the bills.  I

4   went through a couple of the bigger ticket items so that it

5   was in the record.  And then I just, so we weren't there for

6   two days, I said, Have you reviewed the rest of the bills?  He

7   said, I reviewed everything.  They're all reasonable and

8   necessary.

9         Here is my point:  He provided a CD-ROM to the court

10  reporter and/or Mr. Barmen -- I don't want to say that it was

11  given to Mr. Barmen, but it was given to the court reporter,

12  and it was not produced as a exhibit that's marked here, but

13  it is clearly in the record that the CD of all the bills was

14  given.  So I am just trying to avoid objections and games and

15  whatnot during the -- in front of the jury -- to try and iron

16  out if there is any objections to foundation and things of

17  that nature, whether or not it was produced and those types of

18  things.  In terms of just putting it in, it is going to take

19  all day, as I said, but no problem.

20        THE COURT:  I don't know why it would take all day.

21        You have 20, 25 bills.

22        MR. McELFISH:  Well, it can take all day because

23  what happens is, with each bill, you have to lay foundation as

24  to what he reviewed, what his background is on it, how he sees

25  it as reasonable and customary, where it is in the database.

SAM      OCR      RMR      CRR      RPR

Proceedings                    1313

1          It takes time, but no problem.

2          It won't take all day, but when you add it to

3     everything else, it does take time.

4          MR. SAAL:  Your Honor, our entire issue with this

5     summary is that, one, it's not accurate.  I went through the

6     numbers myself, and I am adding it up.  It did not come out to

7     the 720,000 that the summary says it comes out to.  I came out

8     to about 680,000.

9          There are also matters that we dispute on that.

10    There is inaccuracies.  There's duplication.  There is

11    statements regarding this doctor billing X amount that is not

12    reflected in any of the bills.  So our position has always

13    been, we have medical bills.  This can be laid through the

14    medical bills and the jury can total them up.  The summary is

15    unnecessary.  It doesn't add anything.  It's, at best,

16    cumulative, and it doesn't give anything evidentiary that

17    isn't already there in the medical bills, if the medical bills

18    are substantiated.

19         We had this issue before with a summary that was

20    provided in --

21         THE COURT:  So you are saying that, in part, the

22    total of all of these bills does not equal $721,268.33?

23         MR. SAAL:  My apologies, Your Honor.  If that is the

24    document that Mr. McElfish e-mailed this morning, I actually

25    have not had a chance to look at it.  I was looking at the one

Proceedings                    1314

1   that was marked.

2            MS. DIAMOND:  The total is the same, Your Honor.

3            MR. SAAL:  Okay.  I just don't know how you

4   condensed it.  If someone has a copy of that for me.

5            MS. DIAMOND:  I condensed it by provider, but the

6   total is the same.

7            MR. SAAL:  Thank you.

8            THE COURT:  Did the numbers --

9            MR. SAAL:  Some, yes.

10           THE COURT:  -- the internal numbers change?  I am

11   actually addressing to this Ms. Diamond.

12           MS. DIAMOND:  No, Your Honor.  All I did was,

13   Exhibit 305 is broken down by date of service, and so there's

14   multiple -- for instance, for Dr. Vasile, there's multiple

15   entries for him for each date of service and what he charged

16   on that date.

17           THE COURT:  There is no Exhibit 305 on this.

18           MS. DIAMOND:  I'm sorry, what?

19           THE COURT:  Is this Exhibit 305?

20           MR. McELFISH:  That's going to be marked -- 305 is

21   in the electronic and the paper versions; you should have it.

22   But it's the 25-page summary of all these bills, broken down.

23           THE COURT:  What is this that you gave me?

24           MR. McELFISH:  So we took the 25 pages, and to make

25   it simple, we've collapsed it into one page.  So you are not

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1315

1    looking at 25 pages of service bills.

2          MR. SAAL:  And, Your Honor, this summary is quite

3    confusing.  It doesn't have full names of physicians and

4    facilities.  It breaks out bills from facilities into multiple

5    physicians, when the bills are done by the facility.  So you

6    have Winn, you have Chen, you have Alladin, except they're all

7    on one bill.  Either there's Irfan Alladin, P.C., there's

8    Accelerated Surgical Center, and Barnard Surgical Center.  And

9    those are the three main facilities that were billing out of

10   this pain management practice that Dr. Alladin owns.  And it

11   is broken up between these doctors, but that's not how it's

12   broken up on the bills, which just creates more confusion.

13         There is something here along the lines for North

14   American Partners Anesthesia.  That was paid for and billed in

15   the Franklin Hospital billing records for Mr. Bauta's surgery.

16   There is no bill that reflects 171,000, which is for

17   Dr. Cordiale for his surgical bill, which is in the summary,

18   and is reflected in this $213,000 number.

19         There is no bill that says that.

20         MS. DIAMOND:  Actually, Your Honor, I am going

21   through their list of objections right now, and if you add up

22   Dr. Cordiale's bill, which is exhibit, I believe, 373 --

23   that's just off the top of my head -- if you add up the date

24   of service for 5/25/15, if you add up every charge, it does

25   equal 171,000.

SAM        OCR        RMR        CRR        RPR

Proceedings                                1316

1        MR. SAAL:  No, it comes out to about 43,000.  There
2    is a little bit over 5,000 in charges.  I can provide the
3    exhibit right now from New York Spine Specialists.  There is a
4    few broken-up charges for the subsequent surgery.
5        THE COURT:  See, this is the problem that I have had
6    with this case from the very beginning.
7        MR. SAAL:  Our position is simple.  Let's just do
8    the bills --
9        THE COURT:  No, no, no, no, let me finish.
10       You say yes, you say no.  You say yes, you say no.
11   Well, the simple thing is, what is the total of his bills?
12       Are you saying it is 43,000 for Dr. Cordiale, and
13   you are saying it is 170-something thousand?
14       MR. BARMEN:  Yes.
15       MR. SAAL:  I can print the invoice right now, Your
16   Honor, that shows about 44,000.  I think it may say 44,750.
17   I'd have to go look at it to see the exact.
18       THE COURT:  I want to use Dr. Cordiale as an
19   example.  Okay?  You each need to show me -- all right, you
20   want to give a summary to the jury that Dr. Cordiale's bills
21   total $213,650.
22       MR. McELFISH:  I want to give --
23       THE COURT:  Show me where that is in the actual
24   backup now, right now.
25       MR. McELFISH:  Judge --

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1317

1           THE COURT:  No.

2           MR. McELFISH:  -- while they're looking --

3           THE COURT:  Show it to me right now.

4           MR. McELFISH:  This is important.

5           THE COURT:  If this total is wrong based on the

6    backup, because you are saying Exhibit 359 substantiates a

7    total of $213,650; if that is wrong, this is not coming in.

8           MR. McELFISH:  I want to explain.  Please, let me

9    explain.  305 is what we have determined are what we can

10   locate for bills.  I have been telling them for months, Tell

11   me how it's not accurate, let's get a stipulation.  That's

12   all.  I'm not saying it's 100 percent accurate, I am saying --

13          THE COURT:  That is your job.  That is not their

14   job.  It is your job to make it a hundred percent accurate so

15   when they don't stipulate, you can come to me and say, Judge,

16   it's a hundred percent accurate.  Here is the proof, I want to

17   get my summary in.  That is -- you know the plaintiff always

18   bears the burden of proof.

19          MR. McELFISH:  Mr. Saal, do you have a number that

20   you think is accurate?

21          MR. SAAL:  Based on my review of the billing records

22   and what was provided, what I came to is that your total added

23   up to about 680, and I came up with about $201,000 that was

24   duplicated.

25          THE COURT:  Listen, we are not going to total/total,

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1318

1   because the devil is in the details, right?

2            MR. SAAL:  Thank you, Your Honor.

3            THE COURT:  We are using Dr. Cordiale.  You get

4   Dr. Cordiale's bills, what you say is the total for

5   Dr. Cordiale with the backup; you do the same.  We are going

6   to hash that out.  If it is not what is in this summary, the

7   summary is not coming in at all.

8            MR. McELFISH:  No, I intended to make a new one once

9   it's hashed out, so that the jury has something simple.

10           THE COURT:  And you better be prepared with

11  Dr. Mobin to go through each individual exhibit that has the

12  bills.  I have reviewed them.  I am a super expert, big

13  Beverly Hills guy --

14           MR. McELFISH:  305.

15           THE COURT:  No, 305 is not coming in.

16           MR. McELFISH:  No, no, not to come in, Your Honor.

17           THE COURT:  I have reviewed Exhibit 307 from William

18  Cameron Engine Company.

19           MR. McELFISH:  Right.

20           THE COURT:  That is customary and reasonable.

21           MR. McELFISH:  Right, no problem.

22           THE COURT:  Because they are not going to stipulate

23  to this.

24           MR. BARMEN:  This is why we couldn't stipulate to

25  it, Your Honor.

Proceedings                                          1319

1          MS. DIAMOND:  I think the problem may be, Your

2    Honor, we may have different billing records.  That may be the

3    possibility.

4          THE COURT:  How can that be?  How can that be?

5          MS. DIAMOND:  I don't know.

6          THE COURT:  We are four years into the case and you

7    have different records, different documents?

8               That is unacceptable.

9          MS. DIAMOND:  If Mr. Saal wants to sit down with me

10   and go over what I have for Dr. Cordiale and what he has for

11   Dr. Cordiale, then that could be worked out.

12         MR. SAAL:  Frankly, Your Honor, I think it's

13   unnecessary.

14         MR. BARMEN:  I think we should do what the judge

15   said.  I think we should all give him our bills for Cordiale.

16         THE COURT:  No, you are not going to give them to

17   me, you are going to walk me through it.  I am not going to do

18   your work.

19         MR. SAAL:  This is Greyhound Exhibit 431.  Going

20   through --

21         THE COURT:  I have to apologize.  You folks have

22   been -- but it is your fault.  You guys have been working me

23   up so much.  I am getting so frustrated.  So, please, I know

24   you are all working hard, just chill out a little bit.  It

25   will help me chill out even more and we will be okay.  Okay?

SAM      OCR      RMR      CRR      RPR

Proceedings                              1320

1        So Plaintiff's Exhibit 431 or defense?

2            MR. SAAL:  No, Defendant's Exhibit 431, Your Honor.

3            THE COURT:  Defendant's Exhibit 431, I have it in

4    front of me.

5            MR. SAAL:  And if we go to page, I believe, 8 of

6    that exhibit, it's GLI Bates Number 42403, indicating the

7    total due from insurance.  And it actually indicates that

8    number actually on each of the next two pages.

9        Now, Bates Number 42403 also lists out four

10   different charges amounting to the 38,000 that Dr. Cordiale

11   had billed regarding the second surgery.

12           THE COURT:  Hold on, hold on.

13       So this -- I am just looking at GLI 042403 through

14   405.  I see total due from insurance on each page as $44,750.

15   Now, this clearly is a statement of account of three pages.

16   It says page 1 of 3, 2 of 3 and 3 of 3.  So I assume that the

17   total from the three pages is 44,750.  And is what you are

18   saying to me that in the plaintiff's summary, that they have

19   triple dipped $44,750?

20           MR. SAAL:  What I believe they did is they added a

21   $171,000 surgical bill for Dr. Cordiale, which used to be

22   represented as an Emblem Health charge in the summary that was

23   turned over in discovery, and it's just not reflected -- it

24   was never reflected in any Emblem Health record we were

25   provided in discovery, and it is not reflected in the New York

Proceedings                                      1321

1   Spine records also.

2           And just so the Court is aware, the first four pages

3   of the exhibit, which is a separate billing record for 15,000,

4   was something that was paid by a legal funding check that is

5   actually also in the exhibit.  So there are two separate

6   billing statements.  One for that 15,000 that had been paid to

7   that office, and then the remaining 44,750 that they are still

8   due.

9           THE COURT:  To address your second point, the fact

10  that he may have paid a bill from some source doesn't mean he

11  can't recover the bill.

12          MR. SAAL:  Yes.  That $15,000, that can be

13  submitted, but it certainly doesn't represent the 213,000 that

14  exists in this summary.

15          THE COURT:  So this Exhibit 431.  This again is

16  Defendant's Exhibit 431?

17          MR. SAAL:  Yes, Your Honor.

18          THE COURT:  This is your understanding of what the

19  entirety of the bills are for Dr. Cordiale?

20          MR. SAAL:  It's for his office for New York Spine

21  Specialists.  It was produced at the deposition of one of

22  their employees by their counsel.

23          THE COURT:  As New York Spine Specialists' bills,

24  which is Dr. Cordiale's bills?

25          MR. SAAL:  Correct.

SAM      OCR      RMR      CRR      RPR

Proceedings                    1322

1           THE COURT:  So it consists of the 15,000 and the
2   44,750.
3           MR. SAAL:  Yes.
4           THE COURT:  All right.  So, therefore, your
5   understanding is, Dr. Cordiale's bill is $59,750?
6           MR. SAAL:  Yes, Your Honor, including --
7           THE COURT:  But what about, he testified about other
8   treatment, post-surgical treatment, right?
9           MR. SAAL:  Those additional visits, Your Honor, I
10  believe those are reflected -- if we go back to page GLI
11  42403, there are additional post-surgical visits beginning on
12  that page from June of 2015, and then on the next two pages,
13  continuing through April of 2017.
14          MR. McELFISH:  Can I see what you're looking at?
15          THE COURT:  Didn't Dr. Cordiale -- there was another
16  exhibit when he testified.
17          MS. DIAMOND:  Your Honor, it's Plaintiff's
18  Exhibit 359.
19          THE COURT:  359.
20          MR. McELFISH:  Yes.  Look at 0006, Judge, 359.
21          (Pause.)
22          THE COURT:  Okay, other than Plaintiff's
23  Exhibit 359, where are Dr. Cordiale's bills as far as the
24  plaintiff is concerned?
25          MR. McELFISH:  As far as the plaintiff is concerned,

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1323

1    what we added into our summary is 359-0006.  You can see the

2    amount billed at the bottom.  That's it that we have for him.

3    It says $216,000.  That is the amount billed, and then if

4    there's offsets through deductions post-trial or -- you know,

5    if there's an insurance payment or that nature -- do you see

6    that, Judge, the amount billed total?

7              THE COURT:  In 359?

8              MR. McELFISH:  Yes.  0006.  That's why I wanted to

9    come up and show you that.

10             MR. SAAL:  What plaintiff is referring to is matters

11   that were adjusted by the facility before there was any

12   billing to the insurance or to the plaintiff because this

13   billing was done through Franklin Hospital.  That's why

14   Franklin Hospital's billing was upwards of $200,000, because

15   that was the surgical bill.  The surgical bill wasn't fully

16   funneled through New York Spine Specialists, and plaintiff is

17   basically trying to double up.

18             MR. BARMEN:  It's not just the surgical bill, it's

19   the hospital bill, it's the facilities bill.

20             MR. SAAL:  The anesthesia.

21             MR. BARMEN:  It's all of that.  That's Franklin

22   Hospital, and they are trying to double dip it into New York

23   Spine.

24             THE COURT:  Where is Franklin Hospital on this

25   chart?

Proceedings                                    1324

1          MR. BARMEN:  Franklin Hospital's bill was

2    100 percent paid by Emblem Health, which is another part of

3    the double dipping issue that we have been trying to explain

4    to Mr. McElfish.

5          THE COURT:  Where is Franklin Hospital on this

6    chart?

7          MR. SAAL:  Franklin is at 363, Your Honor.  It's

8    about six, seven lines up from the bottom.

9          THE COURT:  I see.

10          (Pause.)

11          THE COURT:  Can you explain that again to me?

12          MR. McELFISH:  I can explain when ready.

13          THE COURT:  No, no, I want to hear it again from

14    Mr. Saal.

15          MR. McELFISH:  Sure.

16          MR. SAAL:  Yes, Your Honor.  So New York Spine has

17    that list of bills for the date of the surgery that were

18    immediately adjusted, never billed out to insurance, never

19    billed directly to Mr. Bauta, which the rest of the invoice is

20    billed out directly to him.  The Franklin Hospital records,

21    which is Defendant's 433, shows the $193,000 and change that

22    was billed out for the double level fusion procedure, and

23    which was then satisfied by Emblem Health.

24          So it is very simple that this bill for this

25    surgery.  It lists --

SAM       OCR       RMR       CRR       RPR

Proceedings                                    1325

1          THE COURT:  But where in the Franklin Hospital bill
2    are Dr. Cordiale's charges for doing that surgery?
3          Because the hospital certainly has a facilities fee
4    and all these other things that you mentioned, but so does the
5    surgeon.  The surgeon has a fee.
6          Can you show me in the Franklin Hospital bill, I see
7    lab, chemistry, immunology, hematology, et cetera, et cetera.
8    Room and board, coronary care, pharmacy, supply, implants,
9    laboratories, more, pathology.
10          MR. SAAL:  Yes, Your Honor.  I believe we go to
11   GLI 42464 --
12          THE COURT:  Hold on, you're looking at?
13          MR. SAAL:  I was looking at defendant's, I
14   apologize.
15          THE COURT:  Defendant's what?
16          MR. SAAL:  Defendant's 433.  It's in the same binder
17   as 431, just a couple pages later.
18          THE COURT:  Oh, I see.  So this is different than
19   the plaintiff's.  See, the plaintiff's is an Emblem Health
20   bill, it is not a Franklin Hospital bill.
21          All right.  And this is also an Emblem Health.  So
22   there are two different bills I am looking at.  All right.  So
23   show me in yours where Dr. Cordiale's fee for the surgery is
24   included in.
25          MR. SAAL:  Yes, Your Honor, under 42464 --

SAM      OCR      RMR      CRR      RPR

Proceedings                                1326

1    THE COURT:  42464.

2    MR. SAAL:  -- it has bill -- it has --

3    THE COURT:  Okay.

4    MR. SAAL:  -- it has a $23,000 bill for time spent,

5  implants, infused bone graft.  These are Dr. Cordiale's

6  actions during surgery.  That is not a -- infused bone graph,

7  that is one of Dr. Cordiale's procedures during surgery.  That

8  is not a facility charge.  And there is no foundation that

9  that number in the New York Spine records was ever given to

10 either an insurance company or to Mr. Bauta himself saying

11 that they have a responsibility to pay it.  That is part of

12 the foundation for these bills that somebody has the

13 responsibility to pay them.

14    THE COURT:  Mr. McElfish.

15    MR. McELFISH:  Yes, sir.

16    THE COURT:  You were going to say something?

17    MR. McELFISH:  Yes, sir.  So Mr. Saal is looking

18 at -- GLI 042464 is an insurance bill, which is a completely

19 unrelated to what we're talking about.

20    So if I could clear this up, plaintiff's --

21    THE COURT:  Why do you say it's an insurance bill?

22    MR. McELFISH:  Because it says Emblem at the top of

23 it.

24    THE COURT:  So does Plaintiff's 363.

25    MR. McELFISH:  All right.  359 -- to make it really

SAM     OCR     RMR     CRR     RPR

Proceedings                1327

1   simple.  It's becoming conflated.  359 is the Cordiale bills.

2           THE COURT:  Plaintiff's 359?

3           MR. McELFISH:  Yes, sir.  359 is the Cordiale bills,

4   and the way that you know that is they've itemized everything

5   that he did in all of 359.

6           I think you have it out, Judge.  Don't you?

7           THE COURT:  Yes.

8           MR. McELFISH:  So in other words, 359 itemizes what

9   New York Spine did and the dates they did it, and it is what

10  is referred to by experts as the professional charges, if you

11  will.  It's the doctors' fees.

12          363 is the hospital facility charge, which is

13  totally separate.  And Dr. Cordiale did two surgeries, and

14  he's seen him for a couple of years.  It does add up to 216 on

15  the professional charges.

16          The facility charges that Mr. Saal -- that are in

17  363, that's for the hospital.  Remember, he was in the

18  hospital, according to Dr. Cordiale, from 5/27 until 6/5.  I

19  mean, it is not a stretch to say that the hospital bill is 200

20  grand, separate from the surgical fees.  You know what

21  overnight hospital stays cost.  So what is that, a week,

22  10 days?

23          MR. BARMEN:  It is a stretch, because we don't have

24  documentation to support it.  That's been our problem for

25  months.

SAM     OCR     RMR     CRR     RPR

1          MR. McELFISH:  You had subpoenas.  We've all

2    subpoenaed these records and they've been turned over for

3    months.  So that is the confusion, is between the professional

4    charges and the facility charges, or the hospital bills.

5          MR. SAAL:  And there is no evidence there is

6    actually a charge for these professional charges that

7    Mr. McElfish is saying exist.  Why are they -- they're zeroed

8    out.  They're saying they're services due from insurance

9    because Emblem Health paid them, and that's why the balance is

10   zero.

11         MR. McELFISH:  That is a different balance.  359 is

12   the itemized --

13         MR. SAAL:  That's what we're going back and forth on

14   between the New York Spine records and the Franklin records

15   with the payment for Emblem Health.

16         That's why the numbers are matching up.

17         MR. McELFISH:  What we can do is I can just put the

18   bills in through Dr. Mobin on the fly, we'll do it, they can

19   cross-examine.  We can have a post-trial motion, post-trial

20   hearing on it and we can move on.  I'm fine with that.

21         MR. BARMEN:  We're not fine with that.

22         MR. McELFISH:  Because there is a difference

23   between --

24         MR. SAAL:  Putting a bill in evidence that increases

25   his bills by 40 percent with no foundation is a significant

Proceedings                                      1329

1  inflation, and there is no evidence for it.  Dr. Mobin can't

2  speak to how New York Spine does their billing, if this is a

3  bill that someone has responsibility for, as Mr. McElfish is

4  claiming it is.

5          THE COURT:  Well, didn't Dr. Cordiale testify that

6  these are his bills?

7          MR. SAAL:  I think Dr. Cordiale testified he didn't

8  know anything about billing, that he doesn't know how billing

9  is done and he doesn't deal with billing.  That was

10 Dr. Cordiale's testimony.

11         MR. BARMEN:  That was Dr. Cordiale's testimony.

12         MR. McELFISH:  Either way, Dr. Mobin testified in

13 his deposition as to the New York Spine bills, including the

14 professional charges or the surgical charges, and Mr. Barmen

15 didn't ask him any questions.  I mean, it is laid out item by

16 item in 359 as to what he's billing for --

17         MR. SAAL:  Dr. Mobin's bill --

18         MR. McELFISH:  Excuse me for a second.

19         Dr. Mobin is a neurosurgeon who does these

20 operations daily.  He can absolutely speak to every service

21 that is billed for and marked and turned over for months.  If

22 they have cross-examination on it, have at it.

23         MR. SAAL:  Dr. Mobin's ability to go to a software

24 program, put in a zip code and say, what is generally charged

25 in this region does not lay the foundation for what is

Proceedings                                          1330

1   actually in the New York Spine Specialists' bills.  Those are

2   two entirely different issues.

3             If the bill actually is what it says it is, if

4   Dr. Mobin can -- we'll have testimony regarding what this

5   website, what the software is telling him is reasonable,

6   that's one issue.  But if this was not actually a bill

7   provided to any insurance company to plaintiff, and this

8   money, as we are saying, was satisfied through Emblem, through

9   the billing through Franklin Hospital, then for plaintiff to

10  be able to put it on twice is basically just him dipping his

11  hand -- dipping -- putting his hands in the cookie jar two

12  times.  There is no reason for that.

13            THE COURT:  All right, let me ask one final

14  question.

15            MR. McELFISH:  Okay.

16            THE COURT:  I guess this is Plaintiff's 361.

17            MR. McELFISH:  Okay.

18            THE COURT:  That's Dr. Cordiale's bills.  The

19  balance says 59,750.

20            MR. McELFISH:  Yes.

21            THE COURT:  Yet on the summary, it says 213,650.

22            MR. McELFISH:  Right.

23            THE COURT:  Why is that different?

24            MR. McELFISH:  Because the way the law under 4545

25  works is that you put the amount billed in, and whether or not

SAM      OCR      RMR      CRR      RPR

Proceedings                                     1331

1    the billing is a reasonable and customary charge for the

2    service, that's how -- that's that expert issue I was talking

3    about earlier.  And then -- and we did this in pretrial

4    motions.

5               If there is any offset or reduction or payment, that

6    comes into an evidentiary hearing post-trial.  That's a

7    post-trial collateral source reduction.

8

9               (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                          1332

1          (Continuing.)

2          THE COURT:  This amount, $213,650 is not what is

3     listed on Dr. Cordiale's -- even if you use the billed amount.

4          MR. McELFISH:  It's close.  It's like 3 grand off.

5     I recognize that.

6          THE COURT:  So now we are horseshoes and hand

7     grenades?  It's close?  Come on.  The summary is out.

8          MR. McELFISH:  For now.

9          THE COURT:  No, the summary is out.

10          MR. McELFISH:  Okay.

11          THE COURT:  At the end of the day if you get

12    Dr. Mobin to testify as you want, you are going to have to

13    create a new summary.

14          MR. McELFISH:  No problem.

15          THE COURT:  And then I want law that says it's the

16    billed amount as opposed to the balance amount.

17          MR. McELFISH:  You already ruled on this.  We gave

18    you the law.  We cited all the cases.

19          THE COURT:  So then you are saying at the end of the

20    day when we have our hearing, I can say well, they billed X,

21    they adjusted Y, so all you get is the balance.

22          MR. McELFISH:  Yes.  You prevent the double dipping

23    in the post-trial hearing.  That's the conflation.

24          THE COURT:  I am not talking about double dipping.

25    I'm talking about looking at Dr. Cordiale's bills alone.  All

Proceedings                                    1333

1   this bill says is that the balance is $59,750.  They have

2   already received $50,287.76 cents even though they billed

3   $216,037.70 because they adjusted $141,000 and change.

4          MR. McELFISH:  Whatever they accept you can deal

5   with that in part of the evidentiary hearing, yes, I expect

6   that, of course, and you ruled -- we filed extensive briefing

7   on this citing New York law under 45, and you ruled on it, and

8   I fully expect there's either a facility adjustment or an

9   insurance payment or anything that reduces the amount owed

10  that is certainly a collateral source offset.  That's the way

11  it's been since the beginning.

12         MR. SAAL:  Mr. McElfish is missing one important

13  step here.  We have no evidence of a Medicaid lien.  We don't

14  have an Emblem Health summary.  We have the Emblem Health

15  summary, Long Island Jewish Medical Center, Franklin Hospital

16  showing what was billed out to Franklin Hospital for insurance

17  and what Emblem Health paid.  Why doesn't that exist for New

18  York Spine Specialists?  Was this anything that they billed

19  out for?  If Medicaid did not pay it and no one is ever going

20  to be responsible for it and we have no evidence of a Medicaid

21  lien proving that someone did pay for it and was responsible

22  for it, how is he going to put it into evidence before us.

23         MR. McELFISH:  Because it was billed for and the

24  liens that were signed showed the responsibility for it.  You

25  then, Your Honor, respectfully can take into consideration --

Proceedings                                          1334

1   hold on.  This is arguments as to what liens there are and

2   what reductions there were and what payments there were post

3   trial out of the presence of the jury, not now.

4               MR. SAAL:  We have not been shown anything from New

5   York Spine Specialists.

6               THE COURT:  That is for another day.  That is for

7   the post-trial hearing.  You are going to go with Dr. Mobin.

8   He has each and every bill.  Lay the foundation.  He will

9   testify and I will clean it up -- not after it is over, but

10  after the jury renders its verdict.

11              MR. SAAL:  Thank you, Your Honor.

12              THE COURT:  And if there's no lien?

13              MR. SAAL:  If there's no lien and there's no

14  balance, then there's no responsibility to pay and the bill is

15  essentially fictitious.

16              THE COURT:  Then he doesn't get it.

17              MR. McELFISH:  I think that's all I had this

18  morning.  I didn't mean to take that much time.

19              MR. McELFISH:  I guess there's a scheduling issue

20  when you're ready.  It's not an issue necessarily.

21              THE COURT:  Are we ready for the jury?

22              MR. McELFISH:  Yes, sir.

23              (Jury enters.)

24              THE COURT:  You may be seated.  Mr. McElfish, your

25  next witness.

Mobin - direct - McElfish                    1335

1          MR. McELFISH:  Good morning, Your Honor.

2    Plaintiff's next witness is Fardad Mobin, neurosurgeon.

3          THE COURT:  Dr. Mobin, raise your right hand.

4          (Witness sworn/affirmed.)

5          THE COURT:  Please be seated.  Can you tell the

6    court reporter your name and spelling it please.

7          THE WITNESS:  Sure.  Fardad Mobin, F-A-R-D-A-D

8    M-O-B-I-N.

9          MR. McELFISH:  May I inquire?

10          THE COURT:  Yes.

11   **FARDAD MOBIN**,

12          called by the Plaintiff, having been

13          first duly sworn, was examined and testified

14          as follows:

15   DIRECT EXAMINATION

16   BY MR. McELFISH:

17   Q    Good morning, Doctor.  Would you introduce yourself to

18   the jury and explain what kind of expert you are.

19   A    Good morning.  My name is Fardad Mobin.  I'm a

20   neurosurgeon and I'm asked to be here to render opinions in

21   terms of expert opinions regarding Mr. Bauta's care.

22   Q    Okay.  And if you would please, sir, would you give the

23   jury an idea of your background training and experience since

24   medical school?

25   A    Sure.  I actually went to undergrad here in New York, RPI

SN        OCR        RPR

1    Upstate.  So I'm back to my old ground here.  For medical

2    school I went to the University of California at Davis for my

3    medical training.  I completed my education in 1995 with Alpha

4    Omega Alpha, which is a medical honors society.  I stayed at

5    UC Davis for my general surgery training and went on to do my

6    neurosurgery training at UC Davis which finished in 2001.  And

7    then I went to UCLA for my fellowship training.  That was in

8    microsurgery and cerebral vascular surgery.

9    Q    And can you tell the jury what a neurosurgeon does?

10   A    Sure.  So the best way to understand our jobs is

11   basically knowing that we are surgeons first and foremost.  We

12   are not neurologists.  We get confused with neurologists a

13   lot.  We are actually surgeons and we do a very extensive

14   training in surgical discipline.  We do conduct neurological

15   exams.  We diagnosis patients with neurological problems and

16   if they need surgery then we can offer them surgical

17   intervention.

18          The other part of our training which is an extensive

19   part of our training is radiology.  We actually order our own

20   radiological studies, interpret them and depend on them to

21   treat patients.

22   Q    And why is that important?

23   A    So neurosurgery as a discipline is very image-oriented.

24   We need to know the structures of the brain and spine.  We

25   need to know the relationship of lesions such as tumors or

Mobin - direct - McElfish                1337

1  disc herniations relative to the brain itself.  We need to see

2  the image itself to design our surgical approaches and come up

3  with the proper diagnosis of the problem and also advise and

4  consult with our patients.

5  Q    What is reconstructive and micro spinal surgery?

6  A    That is a field within the spine that uses a microscopic

7  technique so we can do smaller incisions for doing the

8  procedures.  The reconstructive part is when we put screws and

9  rods to reconstruct the spine and bring it back into its

10 normal form.

11 Q    Where did you do your fellowship and residency?

12 A    It was at UC Davis and the fellowship was at UCLA.

13 Q    And since medical school what did you do next?

14 A    Since I finished my training, I started practicing at a

15 hospital called Daniel Freeman Memorial Hospital.  I was the

16 chief of service for three years and then I went on to join a

17 multidisciplinary group with other orthopedic surgeons,

18 neurosurgeons, pain management specialists, chiropractors,

19 physical therapists and I was with that group until 2013 and

20 then I started my own practice in Beverly Hills since 2013 and

21 that's where I practice now.

22 Q    Where is Daniel Freeman Hospital?

23 A    That's in Englewood.

24 Q    Englewood, California?

25 A    Yes.

Mobin - direct - McElfish                1338

1    Q    Okay.  And you mentioned a multiple-disciplinary

2    practice.  Where was that located?

3    A    That is still in Marina Delray.

4    Q    What is that called?

5    A    DISC.

6    Q    And you mentioned the term multidisciplinary practice.

7    Is that a special term in your field?

8    A    It just tends to explain the explain the fact that it's a

9    practice that has multiple disciplines in the same group under

10   the same roof so patients can get surgical/non-surgical

11   opinions and get different types of treatments in one setting.

12   Q    Is that generally accepted in the field?

13   A    Yes.

14   Q    Can you explain why?

15   A    Number one, it's market driven meaning that patients want

16   to go to one practice and get everything they need as opposed

17   to driving around and going to different places.  In other

18   words, in our practice when I was at DISC, we also had imaging

19   facilities on site, X-ray, CT scans and MRI's, therapists,

20   physical therapists, psychiatrists, pain management

21   specialists, orthopedic joint surgeons, hand surgeons and

22   neurosurgeons so it could come together and treat patients

23   under the same roof.

24   Q    And how many spine surgeons were in that practice, for

25   example?

1    A    I think there were four to six surgeons at some point.

2    Q    And that was all conducted in this DISC facility?

3    A    Yes.

4    Q    And after you practiced at DISC where did you go after

5    that?

6    A    Then I started my own practice in Beverly Hills which is

7    called Mobin Neurosurgery.

8    Q    And that's where you currently are?

9    A    Yes.

10   Q    And in your current practice, Dr. Mobin, would you give

11   the jury an idea of what kind of work you are currently doing

12   and if you don't mind splitting it up?

13   A    The majority of my work is treating patients with spine

14   problems and I would say 90 percent plus of my practice is

15   individuals with spinal injuries and taking care of them with

16   either surgical or non-surgical techniques.  And the other --

17   and that's the majority of my practice, 90 percent.  10

18   percent is medical/legal, giving depositions or coming to

19   court for testimony.

20   Q    And if you -- is that referred to as forensic practice?

21   A    Yes.

22   Q    And in your forensic practice what percentage of your

23   overall practice is forensic versus clinical?

24   A    The forensic part is less than 10 percent of my practice.

25   Q    And inside that 10 percent what percentage of it is for

SN        OCR        RPR

1   plaintiffs or patients like Mr. Bauta?  What is the percentage

2   for defendants like Greyhound in this case?

3   A    The majority of it is for plaintiffs and since I'm a

4   practicing surgeon, if there's a patient of mine that has a

5   medical, legal or forensic issue, then the attorneys ask me

6   for opinion, I'm comfortable with it and I will say yes.

7   Q    And Dr. Mobin one step further in cases where you are an

8   expert witness but you not testifying on behalf of your

9   patient what percentage of those cases exist?

10  A    So it's -- if it's just a case that I'm reviewing records

11  similar to this case, it's 70 percent for plaintiff and 30

12  percent for defense.

13  Q    This in this case you're an expert witness but Mr. Bauta

14  was not your patient for instance?

15  A    That is correct.

16  Q    And if you would, please, give the jury an idea at Mobin

17  spine what a typical week is like in terms of how many

18  patients you see and how many surgeries you do?

19  A    I typically see anywhere between, I would say, 40 to 60

20  patients a week and I operate on patients twice a week and it

21  varies.  It could be on average three cases a week.  Some

22  weeks are busier, some are not as busy.

23  Q    Are those patients that you do operate on, are they

24  operated on in hospitals or ambulatory surgery centers or

25  something else?

Mobin - direct - McElfish                1341

1   A    A combination of both.  The complicated cases are done in
2   the hospital.  Patients that are eligible for outpatient we'll
3   do it at an ambulatory surgery center.
4   Q    Do you have an interest in ambulatory surgery center?
5   A    Yes.
6   Q    Which one do you have an ownership interest in?
7   A    I'm part owner in Bay City Surgery Center.
8   Q    Where is that based?
9   A    In Torrance.
10  Q    Doctor, in your practice do you have an occasion to
11  interact and refer patients do pain management doctors?
12  A    Yes.
13  Q    And can you give the jury and idea of your background,
14  training and experience with respect to page management and
15  anesthesiologist?
16  A    So as part of my in-residency training I did a sub
17  fellowship during that training which was pain management,
18  injections for the spine such as facet blocks, radio frequency
19  ablation and also looking and supervising other residents and
20  fellows.
21        So as far as the practice of spine, what happens is
22  spine surgeons either do the pain management themselves or
23  refer to another physician who is either a physiatrist or a
24  pain management specialist and they perform the injections.
25  Q    In your custom and practice, Dr. Mobin, in seeing a

1   patient do you have occasion to refer patients out to pain

2   management before surgical options are explored?

3   A    Yes.

4   Q    Why do you do that?

5   A    So the concept is if there is an occasion to use a less

6   invasive treatment such as injection, that's what I like to

7   do.

8   Q    Are you currently affiliated with any other hospitals?

9   A    Yes.

10  Q    Can you give the jury an idea of what hospital and what's

11  your affiliation?

12  A    Active staff neurosurgeon at several hospitals; Marina

13  Hospital Cedars, St. Vincent's Medical Center in Los Angeles,

14  Marina Hospital in Marina Delray and Olympia Medical Center

15  and also St. John's, if I didn't say that.

16  Q    And for how long have you held those positions?

17  A    Between the ten or fifteen years for each location.

18  Q    Do you have any background or training and experience in

19  emergency medicine or emergency room work?

20  A    Yes.

21  Q    Can you give the jury an understanding of what that is,

22  please?

23  A    My particular training was at a county hospital and as

24  part of that training we are embedded in a sense within the

25  hospital for many, many years.  We take call every other night

1    or every third night in-house and we're a direct consultant to

2    the emergency room.  We see patients in the emergency room, or

3    I did, directly interact with the emergency room doctors,

4    nurses and other services who were consulting in trauma cases.

5    Q     Am I to understand that emergency rooms have

6    neurosurgeons who have consultants who work in emergency

7    rooms?

8    A     Emergency rooms have neurosurgeons who are affiliated or

9    on call.

10   Q     I take it based on that experience you worked in county

11   hospital emergency rooms?

12   A     That's correct.

13   Q     For how long did you do that?

14   A     From 1996 to 2001, so that's six years.

15   Q     Have you received any awards and certificates, please?

16   A     Yes.

17   Q     Can you explain?

18   A     During my medical school training, I received the Alpha

19   Omega Alpha which is our medical honor society award and

20   during residency I was selected as outstanding senior

21   resident.  I became the chief resident of the service and I

22   also received two awards at St. Vincent's the Guardian Angel

23   award twice.

24   Q     What professional societies are you involved in?

25   A     Presently at Congress of Neurological Surgeons.

Mobin - direct - McElfish                    1344

1   Q    And have you published in the field -- have you had

2   peer-reviewed publications in the field of neurosurgery?

3   A    Yes.

4   Q    Can you give the jury a short explanation of that?

5   A    The publications are primarily for brain tumors and

6   treatment of tumors and aneurysms.

7            MR. McELFISH:  At this point, Your Honor, the

8   plaintiff will offer Dr. Fardad Mobin as an expert in

9   neurosurgery.

10           MR. MANNION:  No objection, Your Honor.

11           THE COURT:  Dr. Mobin will be received as an expert

12   in neurosurgery.

13   Q    Now, Doctor, you and I -- we're both in California.  You

14   and I have worked together before?

15   A    Yes.

16   Q    All right.  And can you give the jury some idea of how

17   many times?

18   A    Probably over the last three or four years I've had

19   occasion probably I would say two to three times.

20   Q    And was there ever an occasion where we had a case

21   against one another?

22   A    Yes.

23   Q    And when was that?

24   A    Probably five years ago, I would say.

25   Q    And can you tell us when you were retained as an expert

1  witness in neurosurgery in this case?

2  A    I believe it was in 2016, mid-2016 I don't remember the

3  exact date.

4  Q    All right.  And what was the scope of your retention?

5  What did myself and the lawyers at my firm ask you to do?

6  A    The scope was to review a volume of records in records to

7  Mr. Bauta's condition, his treatment that he had received from

8  multiple doctors also pre-incident records that were sent to

9  me.  In addition to that, I was asked to review several

10  imaging studies, X-rays, MRIs and CAT scans, review defense

11  expert records and reports, provide reasonableness of medical

12  care, reasonableness of cost, causation and also future care

13  and reasonableness of future costs.

14  Q    Okay.  And can you -- have you memorized the list of

15  doctors and medical records that you reviewed and relied upon

16  in forming your opinion?

17  A    I don't have it fully memorized because it's just a

18  tremendous number, but I have a sheet that I prepared in front

19  of me if I can refer to it.

20  Q    Sure.  Can you see give the jury an idea, a quick list,

21  of the doctors' reports, records and bills that you've

22  identified?

23  A    Certainly.  I've reviewed records from New York

24  specialists which include Dr. Cordiale, Dr. Lattuga, and

25  Dr. McGowan who were in that group.  I've reviewed records

1    from physical therapist Mr. Vasile.

2    Q    I think it's actually Vasile.

3    A    Sorry.  I've reviewed records from pain management

4    specialists, Dr. Winn, Dr. Chen and Dr. Alladin.  I reviewed

5    records from Dr. Honor, Dr. Gutstein and also reviewed records

6    from Dr. Liebowitz, and radiology reports from Dr. Kolb and

7    his partner Dr. Lichy.

8    Q    And, Dr. Kolb and Dr. Lichy, they were radiologists at a

9    location called Precision Radiology?

10   A    That's correct.

11   Q    And there were also surgical records from Franklin

12   Hospital.  Did you review those?

13   A    As far as facilities I reviewed, I reviewed records from

14   the Franklin facility, Franklin Hospital, the Brookdale

15   Hospital records and Braxton records.

16   Q    In terms of facilities -- withdrawn.  With respect to

17   Franklin Hospital, is it your understanding Dr. Mobin -- is

18   Franklin a hospital or is an ambulatory surgical center?

19   A    I believe it's a hospital.

20   Q    All right.  The same thing with Brookdale Hospital?

21   A    That's correct.

22   Q    And did you review the records of any ambulatory surgery

23   centers where in this case pain management procedures were

24   done?

25   A    Correct.  So in conjunction with the records for Dr. Winn

Mobin - direct - McElfish                    1347

1    and Dr. Alladin, I believe there were two facilities

2    Accelerated Surgery Center and Braxton -- Barnert, I'm sorry,

3    Surgery Center.  Those are the two outpatient facilities that

4    I've seen records from.

5    Q    So it's Accelerated and Barnert Surgical Center?

6    A    Correct.

7    Q    Okay.  And did you notice in reviewing those records they

8    were voluminous?

9    A    Yes.

10   Q    And in reviewing the records for Dr. Lebowitz, did you

11   notice that Dr. Capiola's records were included in that?

12   A    That is correct.

13   Q    And did you notice in Dr. Winn's records and Dr. Chen's

14   records that Dr. Rosenberg's records were included?

15   A    I don't remember that.

16   Q    Okay.  Did you notice that in the Franklin Hospital

17   records the American Partners Records, anesthesia records were

18   included?

19   A    Yes.

20   Q    And in reviewing Dr. Lebowitz and Dr. Capiola's records,

21   did you notice that Greater New York Radiology and Midtown

22   Diagnostics were included?

23   A    That might be the case.  I don't have an exact

24   recollection of it.

25   Q    And MedicSurg, did you happen to notice whether those

1  records were included in any of the hospital records you

2  reviewed?

3  A    I believe they were in the Franklin Hospital records.

4  Q    And Dr. Soto, her name -- his name, excuse me, appeared

5  in Dr. Winn's records, did you notice that?

6  A    I believe so, yes.

7  Q    And did you have an opportunity to review the Brookdale

8  Hospital records in the emergency room?

9  A    Yes.

10  Q    And, to be specific, in your report you reviewed 87 pages

11  of Brookdale Hospital records?

12  A    I wouldn't disagree with my report but that sounds

13  correct.

14  Q    And those 87 records or 89 records whichever, I can't

15  remember what it was, those included not only the dates of

16  service for the emergency room but some records for visits

17  beyond the accident?

18  A    That is correct.

19  Q    And did you have an opportunity to review the first

20  emergency room records where Mr. Bauta was taken Evangelical

21  in Pennsylvania?

22  A    Yes.

23  Q    And generally speaking -- I'll come back to it, but

24  generally speaking have you reviewed the billing for all of

25  these facilities and doctors and hospitals?

1    A    I have, yes.

2    Q    And have you formed opinions on whether or not the --

3    generally the billing has -- the billing for those entities,

4    individuals and hospitals was reasonable and customary in the

5    community?

6    A    I have and my response is basically my report.  If you

7    look at the bills across, for example, the emergency room

8    visits, the visits to physical therapists, visits to the

9    doctors.  They're all within customary and reasonable values.

10   Bills for the injections and the ambulatory surgery bills are

11   different between the two facilities because they had

12   different charges and I opined on the reasonableness of those

13   values in my report as well.

14   Q    We can come back later.  I want to get to the medical

15   care first but we can do the bills later, but you have formed

16   those opinions?

17   A    I have.

18   Q    All right.  Now, the Franklin Hospital records, just to

19   sort of nail this down, Doctor, also included all the surgical

20   records and the hospital stay for Mr. Bauta?

21   A    That's correct.  Those included dates of service of May

22   27, 2015 through June 5, 2015, I believe.

23   Q    And have you reviewed these records in a chronological

24   way in which you could understand Mr. Bauta's treatment and

25   care?

1  A    I have a chronology out of it.  They're a soup of records

2  but to the best of my ability they're overlapping treatments

3  so it's hard to do one line of a timeline, but I've done my

4  best to try to organize them chronologically.

5  Q    As an expert witness in neurosurgery, Dr. Mobin, is it

6  important for you to understand the nature of the treatment

7  and care that Mr. Bauta received?

8  A    Yes.

9  Q    Would you walk the jury through the treatment and care

10  you considered in forming your opinions as to whether or not

11  it was reasonable and necessary?

12  A    Sure.  Just to take the jurors through this mentally so I

13  can understand it and you can understand it.  The date of

14  injury is October 9, 2013.  That's when the accident occurred.

15  And then Mr. Bauta, to my understanding, was transported by

16  ambulance EMT to Evangelical Hospital emergency room.  He had

17  treatments regarding his facial laceration, lower leg

18  contusion and head injury.

19       The next day he goes to Brookdale Medical Center and

20  he complains of total body ache.  He has contusions, soft

21  tissue contusions, abrasions of the scalp and he gets treated

22  for those conditions.  Then he sees a number of providers

23  including chiropractors and neurologists, Dr. McGowan,

24  Dr. Russo are chiropractors that see Mr. Bauta shortly

25  thereafter and Dr. Constantine who's the neurologist that sees

1    him.

2    Q    Go ahead.

3    A    So that's really the initial first part of the treatment,

4    I would say the acute phase of the treatment which is the

5    doctors are trying to figure out what's happened to Mr. Bauta,

6    what kind of injuries he sustained and we see a set of -- we

7    call it differential diagnosis populating the records meaning

8    what could be going on with this gentleman.

9         Some of the early records indicate that he has back

10   pain and leg pain and there are records within the week or ten

11   days of the incident that are clearly demonstrating

12   radiculopathy or sciatica.  That's another term we use.  He

13   goes on to get treatment, extensive physical therapy with

14   Dr. Vasile and he goes on to see multiple doctors including

15   orthopedic surgeons, neurologists and ultimately spine

16   specialists, who all have a very similar type of recording of

17   Mr. Bauta's problems.  They all document back pain,

18   radiculopathy and within the first eight months from the

19   incident they start to report weakness in the right lower

20   extremity in particular.

21        One of the very early providers of care, a

22   chiropractor, refers Mr. Bauta to an MRI facility, Precision

23   MRI, with a condition of disc herniation as part of the

24   differential and, in fact, they do document and see an

25   objective MRI finding.  There's a large disc herniation in the

1    lower back accounting for some of the problems that Mr. Bauta

2    presented with which was back pain and radiculopathy.

3    Q    To be a little more specific, Dr. Mobin, these early

4    doctors, did they, what was the basis for their suspicions

5    that there was a disc herniation?  Was it just Mr. Bauta's

6    complaints, his subjective complaints as its been referred to,

7    or was their objective testing?

8    A    I would say both.  The subjective complaints are what

9    alarmed the doctors that there's something just beyond the

10   soft tissue injury, just beyond the abrasions and swollen

11   joints.  Mr. Bauta is complaining, look, my back is hurting

12   now and I have radiating pain down my leg.  Those are red

13   flags for sciatica and the doctors, rightly so, performed

14   orthopedic tests and other maneuvers which demonstrates that

15   yes, there is in fact room for suspicion for sciatica and then

16   they go back to the early MRIs, early on as early as November

17   of 2013, which is within the first four to six weeks of the

18   incident.

19   Q    What is a straight-leg test?

20   A    So the straight-leg-raise test is done with the patient.

21   Usually I have the patient sit at the edge of the table.

22   Their legs are at 90 degrees, very much so the way you're

23   sitting on the chair and then I will raise the leg to make --

24   to extend the knee.  The way we're doing this now is we're

25   putting pressure or stress on the nerves that are exiting from

1  the spine.  And if in you look at the spine model there's --

2  the skeleton in the back, and what it shows is that there are

3  orifices on the side of the spine called the neuro-foramina or

4  the exit zones of the nerve.

5          MR. McELFISH:  Should we bring him around if the

6  Court allows.

7          THE COURT:  Continue this way.

8  A    So what happens is the last three nerves, which are the

9  L4, L5 and S1 nerve roots, as they exit the spine they come to

10 an area in the pelvis called the lumbar plexus and then the

11 lumbar plexus goes on to a very large nerve, the sciatic nerve

12 and that nerve runs right from the back of the buttock area

13 into the back of the leg into the lower leg.

14         As we're stressing that large, long cable if there's

15 impingement or a narrowing at the exit of the nerve root, the

16 patient would say don't do that, it's hurting or I'm getting a

17 tingling sensation or tingling or numbness down the leg.  So

18 that's one of the maneuvers that we do with the patient.

19 Q    What is Braggard's test?

20 A    So, other versions of the same concept, other ways of

21 testing the nerve is that let's say the pain, the test is too

22 painful and you really can't raise the leg, what we have is

23 the patients leg straighten out so we take the tension of the

24 back of the leg and then we bring the foot up towards them.

25 And what you're doing there, if you know the anatomy, is that

1  the nerve goes all the way and supplies the foot too, so when

2  you bring the foot in you're stressing the nerve another way

3  and then they say, Doc, I'm feeling the tingling, numbness or

4  pain going down the leg.

5  Q    Would it help to show -- we're going to go to dermatomes

6  next.  Would it help to show these ideas on the model?

7  A    I think so, yes.

8           THE COURT:  All right.  Bring the model up.

9           MR. McELFISH:  Permission for the witness to step

10  down.

11           THE COURT:  You may.

12           MR. MANNION:  Excuse me, Your Honor, permission to

13  reposition if I need to.

14           THE COURT:  Yes.

15  A    So what we're doing or talking about is the lumbar spine

16  in particular.  I'm going to take you back to grade school.

17  The cervical spine is designated with the letter C.  It goes

18  from C1 through C7.  The thoracic spine starts with T and goes

19  from T1 to T12 and the lumbar spine which is from L1 through

20  L5 and I'm sure you've heard of disc herniation of the L4/5

21  and L5/S1, that's the address for the disc.  So the disc for

22  the cushion on that sits between the two vertebrae is referred

23  to by the vertebrae above it and the vertebrae below it.  So

24  if I say L4/5 disc, that's the cushion between the L4 and the

25  L5 vertebrae.  And then the last vertebrae that interfaces

1    with the top of the sacrum is the L5 and the top of the sacrum

2    is S-1.  So we talk about the last cushion in the spine,

3    that's the L5/S1 disc.  That's going to be talked about also.

4         So to demonstrate what we're talking about here in

5    terms of the straight leg raises, if you look at the yellow

6    lines that are coming out, these are the nerves that are

7    exiting the spine and what the part of the model doesn't show

8    is that these are very long nerves that come together and they

9    actually continue down the leg.

10        So what we're doing in the straight-leg raise is we

11   have the leg basically flex at the hip and bring it up.  This

12   model doesn't allow me to do it.  What happens is the leg

13   comes in front and stresses the nerve that comes behind the

14   leg and that's the basis of the test.

15   Q    And were those tests completed -- don't leave yet.  I

16   want to ask you about dermatomes?  Were those tests completed

17   early on in the treatment of care by the doctors.

18   A    Right, so, there are a lot of records even from within

19   the first week to ten days from the incident that document

20   that Mr. Bauta has problems with the radiculopathy going down

21   the leg or the psychiatrist contact.  The test is very painful

22   for him and that's why the doctors do have different types of

23   testing to show the psychiatrist contact exists.

24        (Continued on the following page.)

25

Mobin - direct - McElfish                    1356

1    DIRECT EXAMINATION

2    BY MR. McELFISH: (Continuing)

3    Q    While we are talking about testing, can you tell the

4    jury, please, what the heel and the toe walk are?

5    A    So heel walk is basically when we have the patients walk

6    on the heels, and the tiptoe walk is when we have them walk on

7    their tiptoes.

8              With the heel walk, what we're doing is -- again,

9    it's kind of similar to the test that we just talked about

10   when we have the patient's foot come towards them.  With the

11   heel walk what they'll usually do is -- first of all, they

12   can't do it most of the times.  Second of all, they say when I

13   do that there's a pain shooting down my leg because it, in

14   many ways, recreates the tension on the nerves.

15   Q    And based on the records that you have been provided and

16   that you reviewed as an expert in this case, was Mr. Bauta

17   able to do that test early on?

18   A    He had difficulty doing it.

19   Q    All right.  Now, I want to just talk for a minute about

20   dermatomes.  First of all, what is a dermatome?

21   A    So dermatome, the best way to explain that is that our

22   skin is not just one piece of cloth that is placed on our

23   body.  It's actually multiple areas of patches of skin that

24   come together.  So the term chimera is used.  Usually there's

25   one piece of skin here and one piece of skin here and then

1   they interdigitate to a certain extent.  And each one of these

2   nerves supplies a particular patch.  So why is that important

3   because that's how we can go back and figure out what nerve is

4   being affected.

5           So a dermatome is just a particular patch of the

6   skin that's being served with a particular nerve.  So as these

7   nerves exit the spine, think of it as exits of a freeway or

8   highway, you call it here, and these exits will determine

9   where the nerve goes.  So there is a particular destination

10  for each nerve.  Each nerve is responsible for a particular

11  patch of skin.  Each nerve is responsible for a particular

12  muscle.

13          So the L5 nerve root will have your big toe come up.

14  The L4 nerve root is responsible to bring the foot up.  Then

15  there's some overlap.  And then the S1 nerve allows the foot

16  to push up, are you able to walk on your toes?

17          So that's how we can go back and this is how

18  neurology was done before the advances of the MRI imaging, the

19  neurologist would say hey, we have a patient here who can't

20  bring their foot up, we have a partial foot drop, and they

21  will tell the surgeon where to operate.  That's 200 years ago.

22  Now we have the MRIs.

23          That's the importance of dermatomes and myotomes.

24  Dermatomes are the patches of the skin that allows us to trace

25  back to the level of the spine and myotomes are the muscles

Mobin - direct - McElfish                    1358

1    that are weak and then we can trace those muscles back to

2    where the origin is in the spine and try and figure out where

3    the problem is.

4    Q    Got it.  Okay.  So would you then be specific for the

5    jury on what the dermatomes are for the S1 nerve?

6    A    Sure.  So the S1 nerve typically runs -- it runs in the

7    back of the leg.  It affects the back of the calf, the lateral

8    aspect of the calf muscle.  That's typically where the S1

9    nerve root resides.

10   Q    And what about the L5?

11   A    The L5 nerve is more lateral.  It goes into the front of

12   the shin, or the side of the shin, and then the top of the

13   foot, and it involves part of the bottom of the foot too.

14   Q    And L4?

15   A    And L4, again, runs down the leg.  It goes from the side

16   of the thigh to the front of the foot and it usually ends

17   about the ankle or just short of the top of the foot.

18   Q    So five is more lateral and four is more frontal?

19   A    Yes.

20   Q    Got it.  L3.

21   A    L3 ends up being more frontal in the thigh area.

22   Q    All right.  And did you see, Dr. Mobin, any indication of

23   the dermatomes in the early records for Mr. Bauta?

24   A    Yes.

25   Q    Tell the jury what you saw.

1  A    So both of the chiropractors had documented that there

2  was numbness or areas of deficit in the sensation which

3  corresponded to the L4 and L5 dermatomes.

4  Q    Are you referring to Dr. Russo and Dr. McGowan?

5  A    Yes.

6  Q    Before you leave the model, I want to ask you about -- I

7  want to get into a little bit about the difference between the

8  central canal and the lateral nerve roots.

9  A    Sure.

10 Q    Can you explain, first of all, the difference between the

11 central canal and the lateral nerve, the foramina, for

12 instance?  We have heard the term neural foramen.  Can you

13 explain that?

14 A    Okay.  So the best way to understand that is imagine or

15 think of the spinal canal as an oval-shaped canal.  It has a

16 central thorough-way that all of the nerves are going through

17 and then it has side exits for the nerves to come out.  So you

18 have these, you know, several multitude of nerves going right

19 in the middle of this tunnel, and then as they want to come

20 out of the foramina or the exit zones they don't immediately

21 exit.  They actually take a little bit of a right-hand or

22 left-hand turn and then they go out.

23         So the central canal refers to where the majority of

24 the nerves are.  The lateral recess or that side channel where

25 the nerves take a little bit of time before going out of the

1    spine is the lateral portion of the canal.

2    Q    Got it.  So we have central versus lateral?

3    A    Yes.

4    Q    In the lateral portion, what is a neural foramen?

5    A    So the lateral portion refers to the beginning of the

6    foramen, the beginning of that exit zone.  And the best way to

7    explain or the best way to understand that is that the foramen

8    isn't just a parallel opening in the spine.  It's actually

9    more of an ice cream cone, so it has a narrow end and then it

10   opens up wider.  So the nerve comes out of the spine through

11   this tinier channel and then it goes to this wider channel

12   outside.  It's a conical structure.

13   Q    What is stenosis?

14   A    So stenosis is narrowing.  It's a simple term that we use

15   that tells us that there is narrowing of these exits.  It

16   could be a stenosis in the central part of the canal where the

17   major thorough-way, or it could be stenosis in the lateral

18   recess where the nerves are just taking a right- or a

19   left-hand turn to go out, or there's stenosis in the foramen,

20   where the nerve is actually trying to exit the spine itself.

21   Q    I want to you explain what a nerve root is.

22   A    Nerve root are these structures that we referred to early

23   year.  These are structures emanating from the spine and have

24   particular destinations.  The nerve root has two major

25   functions:  One is a sensory function, which means that it

1  gives us information about our surroundings through the skin,

2  we touch, we feel, we get information that sensation goes

3  through the nerves.  It goes back into the spinal canal.  It

4  goes into the spinal cord, and it goes to the brain stem and

5  brain and then we understand what we're touching.

6           The other part is the reverse pathways, is where we

7  think of raising our arm.  There's a signal in the brain that

8  generated and it goes through the brain, through the brain

9  stem, through the spinal cord and it comes out of the nerve,

10 and we're able to raise our arm when we're thinking about

11 doing that.

12 Q    Okay.  What is lateral compression or nerve root

13 compression?

14 A    So nerve root compression is where we have an area that

15 we just talked about being compressed, either a central part

16 of the spine is compressed or the lateral recess is compressed

17 or the foramen is compressed.  So those are the three

18 different usual areas where the nerve is being compressed.

19 Q    Based upon the records, in your opinion, Dr. Mobin, what

20 of those did Mr. Bauta have?

21 A    So Mr. Bauta has a combination of all of those.  He has

22 central compression from his large disc herniation at the

23 L5-S1.  He has bilateral lateral recess narrowing where the

24 nerves are trying to come out.  There is compression there,

25 and he also has foraminal compression.

1    Q    And what are the symptoms of those three different areas?

2    A    So the symptoms can range from what we call axial back

3    pain, mechanical back pain, meaning that moving, twisting,

4    bending can cause pain.  It can cause nerve impingement

5    directly, which means that patients will come in with sciatica

6    symptoms.  Sciatica symptoms evolve over time.  They become

7    numbness, tingling and weakness.

8              So, initially, they complain of pain.  They say,

9    doc, I have a lot of pain, shooting, stabbing, and then it

10   becomes dull pain, then it becomes tingling, numbness, and

11   then all of a sudden they try to walk and then their leg gives

12   out because the signal is not going through, and that's the

13   weakness that they experience.

14   Q    Are we through with the model?

15   A    I am.

16             MR. McELFISH:  You may take it away.  Thank you,

17   sir.

18   Q    I want to talk a little bit about -- well, in follow up

19   to your last answer, what did you see in the records as an

20   expert that told you Mr. Bauta had those three areas?

21   A    So Mr. Bauta's was complaining of back pain, radiating

22   pain, numbness, tingling, and ultimately weakness in the

23   anterior tibialis, which is the muscle that brings the foot

24   up.  Extensor hallucis longus, which is the muscle that brings

25   the toe up, and they also -- the doctors also document

1  quadricepts weakness, which is the major muscle for
2  individuals to extend the leg.
3  Q    All right.  And were you able to say which side of the
4  body he had the most symptoms on consistently from the
5  accident?
6  A    Most consistently was on the right side.
7  Q    I heard you say earlier in just a general explanation to
8  the jury that he had bilateral compression.  Did you see
9  records indicating symptoms for bilateral compression?
10  A    Yes.  So the New York Spine records in particular, they
11  have documented the majority of the time right-sided,
12  occasional left-sided symptoms in the leg.
13  Q    Now, we're going to come to the neck later, Dr. Mobin.
14  But generally, with respect to the anatomy lesson, is the neck
15  similar to the back in the way that discs and nerve roots
16  operate?
17          I don't know if I said that right.  Let me withdraw
18  that.
19          The anatomy of the neck, is it similar to the
20  anatomy in the back in the way that you explained it to the
21  jury?
22  A    In the majority of the ways, yes, the only major
23  difference between the neck and the lower back is that the
24  neck has the spinal cord continuously going through it.  In
25  the lower back, the spinal cord ends at about L1 level.  So

Mobin - direct - McElfish                    1364

1    beyond the L1 level, we're dealing with nerves.  It's the

2    bundle of nerves that go through as opposed to the spinal cord

3    and the cervical spine.

4    Q    But all the other principles apply, such as compression

5    creates weakness into the extremity or the arm, things of that

6    nature?

7    A    That is correct.

8    Q    Okay.  Now, focusing on the medical records of, for

9    instance, Dr. McGowan and Dr. Russo and the early

10   chiropractors, Dr. Mobin, do you have an opinion as to whether

11   or not their treatment and care for what you've seen in the

12   records and what they did for Mr. Bauta was reasonable and

13   necessary?

14   A    Yes, they were reasonable and necessary.

15   Q    Can you explain why?

16   A    So that is part and parcel of what we do in spine care

17   for patients.  Patients get treatments from spine providers,

18   like chiropractors and physical therapists as the first

19   providers in the majority of instances where there is soft

20   tissue injury.  So we try to get patients better with less

21   invasive maneuvers.  That's one of the principles we have,

22   start from less invasive treatments, see how patients do.  If

23   they don't do well, then we escalate the care.  We go to

24   medical therapy, medications, pain management.  If those fail,

25   then we will get a surgical consultation.

Mobin - direct - McElfish                    1365

1   Q     Just backing up for a minute, Dr. Mobin.  You had

2   testified in your review of materials that you reviewed the

3   records from both Evangelical Hospital in Pennsylvania and

4   Brookdale Hospital here in Brooklyn, the emergency room care

5   that is contained in those records, do you have an opinion as

6   to whether or not it was reasonable and necessary for Mr.

7   Bauta as a result of this accident?

8   A     My opinion is that they were reasonable and necessary and

9   related to the accident.

10  Q     Why?

11  A     Because he did not have any of those complaints

12  immediately prior to the accident.

13  Q     Now, there were some physical therapy records that you

14  had reviewed from either doctor or PT Vincent Vasile.

15            THE COURT:  I'd like to have a sidebar for a second.

16            MR. McELFISH:  Sure.

17            (Sidebar held outside the hearing of the jury.)

18            (Continued on next page.)

19

20

21

22

23

24

25

MDL   RPR

Sidebar                                          1366

1          (The following sidebar held outside of the hearing

2    of the jury.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                         1367

1            THE COURT:  At some point in time are you going to

2    show him the bills?

3            MR. McELFISH:  Yes, I'm going to show him on the

4    small screens later, but I want to get through the medical

5    care first.   It is always wise to do bills after the medical

6    care.

7            THE COURT:  So you're now saying whether the medical

8    care was reasonable or not?

9            MR. McELFISH:  Yes.

10           MR. MANNION:  And that's how I took it too.

11           MR. McELFISH:  I'm just trying to walk through the

12   categories of medical care as to whether or not it was

13   reasonable and necessary.

14           THE COURT:  All right.

15           MR. McELFISH:  We have chiropractic.  We have

16   emergency.

17           THE COURT:  Fine.

18           MR. MANNION: I have gone an hour without an

19   objection.

20           MR. McELFISH:  That's because you're here.

21           THE COURT:  We will talk at a break about another

22   issue.

23           MR. McELFISH:  Related to this witness?

24           THE COURT:  Yes.

25           MR. McELFISH:  Should I know now?
```

```
                           Sidebar                      1368
```

1        THE COURT:  And the special verdict sheet.  If we

2   are going to have a post-trial hearing where we parse out what

3   is billed, what is -- what's the term?

4        MR. McELFISH:  Charged.  There's bill paid and

5   adjusted.

6        THE COURT:  Adjusted, paid, and charged.

7        MR. McELFISH:  Yes.

8        THE COURT:  Shouldn't we have it in a special

9   verdict sheet rather than an overall category of past medical

10  care?  Shouldn't we have it broken out by each provider?

11  Otherwise, if I have a total that the jury finds, I will have

12  no way to link that to individual charges.

13        MR. MANNION:  I think we have to.

14        MR. McELFISH:  My initial reaction to that is no.  I

15  mean, maybe.  The reason why is once the jury awards past

16  medical, and let's assume it is a number that doesn't match

17  what we think it is, you still, independent of what they heard

18  and they decide, you then look at the bills in the post-trial

19  proceeding and the payments and the adjustments are

20  independent of what they decide.  So let's say they decide

21  400,000, for instance, then you figure out in post-trial

22  hearings that there's a total reduction of the payments and

23  offsets 200,000.

24        THE COURT:  What happens if it's more than what they

25  award?

```
                          Sidebar                        1369
```

1          MR. McELFISH:  What happens if what's more than they
2     award?
3          THE COURT:  If the payments and adjustments are more
4     than what they award.
5          MR. McELFISH:  Zero.
6          THE COURT:  Then he gets zero.
7          MR. McELFISH:  Yes, I think so, because that's the
8     nature of the collateral source offset.
9          MR. MANNION:  I'll talk to our appellate guy at the
10    break.  Your Honor, our initial proposed verdict forms that we
11    submitted had it broken out.
12         THE COURT:  But did you break it out by provider?
13         MR. BARMEN:  We broke it out by type.
14         THE COURT:  But even with that --
15         MR. BARMEN:  I think you're right.  I think it has
16    to be by provider for purposes --
17         MR. McELFISH:  Well, I understand for this witness'
18    purpose just to walk through the bills by provider and ask for
19    the totals on each of the providers, and then I don't think it
20    affects him necessarily.  But if it does, you'll let me know.
21         THE COURT:  Not necessarily but tangentially.  We
22    need to figure it out because we can get ourselves in a bind
23    at the end of the day.
24         (Sidebar concluded.)
25    BY MR. McELFISH: (Continuing)

Mobin - direct - McElfish                    1370

1   Q    Let me begin with -- let's do it this way.

2          MR. McELFISH:  Judge, small screens.  We will go 308

3   for ID.  I think this is a better way to go.

4          THE COURT:  This is Plaintiff's Exhibit 308?

5          MR. McELFISH:  Yes, Your Honor.  Ready?

6          THE COURT:  Yes.  It's on my screen.  Is it on your

7   screen?

8          THE WITNESS:  Yes, Your Honor.

9   Q    Okay.  Dr. Mobin, if you would, please I have 308-001

10  through 0017 on the small screens, the only question I want to

11  ask you about this, is this, to your recollection, the

12  Evangelical emergency room records that you reviewed in your

13  medical review?

14  A    I only see 001 on this.

15  Q    Good point.

16         THE WITNESS:  Thank you.

17         THE COURT:  He has got it.  He has a hard copy in

18  front of him.  Wait.  307?

19         MR. McELFISH:  308.

20         THE COURT:  308, okay.  He has 308 in front of him.

21         MR. McELFISH:  You gave him your copy?

22         THE COURT:  Yes.

23         MR. McELFISH:  Because I want to go through them all

24  and I will get him a separate book so you can have your copy.

25         It might be several binders ultimately, but we will

MDL   RPR

Mobin - direct - McElfish                    1371

1    start with those.   Okay.   I think we are ready.

2    Q    Dr. Mobin, if you would, please, I have presented you

3    with the hard copy of 308, Plaintiff's Exhibit 308 for

4    identification.   Is this a record that you reviewed in forming

5    your opinion?

6    A    I believe so, yes.

7    Q    I'm sorry?

8    A    Yes.

9    Q    Okay.   And is this -- let's do it this way:   Is this

10   emergency room care and treatment that Mr. Bauta received on

11   that day reasonable and necessary for the injuries he received

12   in this accident?

13   A    It was, yes.

14   Q    If you could, please, let's go to the next page, 309 for

15   ID only.   Is this -- what is this?

16   A    This is an itemized bill for Evangelical Community

17   Hospital services, which included the ER evaluation, the

18   immunization, the three set of CAT scans that were performed

19   and the medication that was dispensed and prescribed.   The

20   total bill is listed here.

21   Q    Okay.   And in your opinion, Dr. Mobin, for emergency room

22   care, based on your training and experience, is this bill

23   reasonable and customary for the services that were performed?

24   A    Yes, the bill is reasonable and customary.

25              MR. MANNION:   Excuse me, can we put these up on the

Mobin - direct - McElfish                    1372

1    small screen so I can see them.  What number was that, 309?

2           MR. McELFISH:  We are to 309 now, yes.

3           MR. MANNION:  Or if you have one, that would be

4    great.

5           MR. McELFISH:  Yes.

6           MR. MANNION:  Thank you very much.  I appreciate it.

7    Q    And, Dr. Mobin, since it is your opinion that the charges

8    are reasonable and customary in the community, can you tell

9    the jury how much that bill is?

10   A    Sure.

11          THE COURT:  Before you do that, what do you do to

12   determine what is reasonable and customary?

13          THE WITNESS:  Sure.  So what I do is, as part of my

14   forensic medicine part of it, I look at hundreds of bills,

15   maybe thousands of bills in my career across different

16   facilities, hospital, doctors, and, this case, through states.

17   The other thing I do is I look at a national database.  It's

18   called Fair Health.  Fair Health is the most recognized

19   database that we have.  It's not the only thing that I rely

20   on, but it is a database that we use to determine the fair and

21   reasonable rates for care and treatment provided by hospital,

22   doctors and facilities.

23   Q    Did you consult the database and, of course, check in on

24   your own experience and training in arriving at that opinion?

25   A    Right.  So I've done that in particular for the surgical

Mobin - direct - McElfish                1373

1   cases and the codes that were provided for the two surgeries.

2          In particular for the emergency room costs, I'm well

3   familiar with the cost for CAT scans.  So the costs -- the

4   numbers are variable.  There's a wide range.  What I am

5   opining on is what's the reasonable number.  So we have a

6   hospital in my neighborhood called Cedar Sinai that I have

7   seen bills for $10,000 for a CAT scan.  And do I say that's a

8   reason number?  No, because that's a number that they use

9   because of their costs, whatever they have.

10         The bills that I see as an outpatient facility for

11  an MRI or a CAT scan is about $2,000, so this number that I

12  see for 1,100 or 1,096 is actually within that range of

13  reasonableness.  That's what I'm opining about.

14  Q    Just for now, to make sure there is enough foundation,

15  you also have an opinion and the immunity vaccine, the

16  ibuprofen, the Tylenol and everything that's broken down

17  there?

18  A    Right.  So those are reasonable values and numbers for

19  the services rendered.  The ER Class 4 visit that they bill

20  for 595 is what I have seen from emergency rooms.

21         Vaccinations and all of that, I'm less experienced

22  with, but I believe it is a reasonable number for $71 for a

23  vaccination, which is tetanus vaccine which is part of the

24  emergency room treatment for operations and suspicion of

25  infection with tetanus.

Mobin - direct - McElfish                    1374

1  Q    If you would, please, tell the jury what the total

2  emergency room bill was.

3  A    Total bill is $4,808.60.

4         MR. McELFISH:  At this point, plaintiff moves to

5  admit 309-001, and sorry, withdrawn.  At this point, plaintiff

6  moves to admit 309-0001 to 309-0002.

7         THE COURT:  In other words, Plaintiff's Exhibit 309.

8         MR. MANNION:  Yes.  Your Honor, no objection.  There

9  may be a redaction on there that we can talk about later, if

10 you can all see that.

11        THE COURT:  Is it on a particular line?

12        MR. MANNION:  Yes.  Right here.  We have agreed on

13 the redaction.

14        THE COURT:  We are not going to publish it to the

15 jury, are we?

16        MR. McELFISH:  No.

17        THE COURT:  I will receive 309 in evidence subject

18 to redaction.

19        (Plaintiff's Exhibit 309 was received in evidence.)

20 Q    Now, Dr. Mobin, to perhaps speed up a little bit, if you

21 would go to 310 for ID in the book.

22 A    Yes.

23 Q    So can you identify the exhibit?

24 A    This is a continuation of the Brookdale Medical Center

25 records that includes patient demographics and I believe these

Mobin - direct - McElfish                    1375

1   are EMR records from the hospital, which includes different

2   dates of encounters all the way from the 10/10/2013, which is

3   the next day after the incident through, I believe, October of

4   2015.

5   Q    All right.  And based upon, and I want to carefully frame

6   this question, based upon your review of these records, was

7   the emergency room visit of 10/10/13 related to the accident

8   reasonable and necessary for his treatment and care in this

9   case?

10  A    Yes.

11  Q    And if you would please --

12       MR. McELFISH:  By the way, Your Honor, I want to go

13  back and move into evidence 308, which is the emergency room

14  records at Evangelical.

15       THE COURT:  Any objection?

16       MR. MANNION:  One moment real quickly.  I want to

17  make sure I see what's in there.

18       THE COURT:  Sure.

19       MR. MANNION:  No objection.

20       THE COURT:  We will receive 308 in evidence.

21       (Plaintiff's Exhibit 308 was received in evidence.)

22  Q    Now, back to where I was at 310, Dr. Mobin, if you go to

23  pages 310-001 through 310-0015 for ID, are those the records

24  that were related to the 10/10 visit right after this

25  accident?

MDL   RPR

Mobin - direct - McElfish                    1376

1   A    That is correct, yes.

2   Q    Was that treatment reasonable and necessary for the

3   injuries that he received in this accident?

4   A    They were.

5        MR. McELFISH:  I move to admit those pages, 310-001

6   through 310-0015.

7        MR. MANNION:  No objection, if there are similar

8   issues with the redaction, if we can address that.

9        MR. McELFISH:  No problem.

10       THE COURT:  It is received 310 subject to redaction.

11       (Plaintiff's Exhibit 310 was received in evidence.)

12       MR. MANNION:  One moment, Your Honor.  Okay.  Go

13  ahead.

14  Q    If you would turn now, Dr. Mobin to 311 for

15  identification.  That exhibit is only one page.  Can you

16  identify it for the jury, please?

17  A    Sure.  These are the itemized charges, including the

18  emergency room and the pharmacy charges that were in

19  conjunction to the 10/10/2013 visit.

20       MR. MANNION:  May we approach, Your Honor?

21       THE COURT:  Yes.

22       MR. McELFISH:  I think I can handle what the sidebar

23  is going to be.  Can I ask the next question?

24       MR. MANNION:  That's fine.

25  Q    Dr. Mobin, in looking at the exhibit, please, first of

1   all, can you tell us whether or not the bill for the services

2   provided on just the 10/10 date after the accident are

3   reasonable and customary?

4   A    They are, yes.

5   Q    If you would, please, because of what Mr. Mannion is

6   thinking about, would you look at the total charge line in the

7   middle of the page?

8           MR. MANNION:  What page again?

9           MR. McELFISH:  311-001.  I'm sorry, I shouldn't say

10  that.  311.  It's only a one-page exhibit.

11  A    Yes.

12  Q    You have emergency room, pharmacy, and then total

13  charges.  Do you see that?

14  A    Yes.

15  Q    Can you tell the jury that number?

16  A    Yes, it's $1,023.61.

17          MR. McELFISH:  Plaintiff moves to admit 311.

18          MR. MANNION:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 311 received in evidence.)

21          MR. MANNION:  May we approach now?

22          THE COURT:  Yes.

23          (Sidebar held outside the hearing of the jury.)

24          (Continued on next page.)

25

```
                         Sidebar                    1378

1           (The following sidebar held outside of the hearing
2    of the jury.)
3           MR. MANNION:  Maybe this was just their copy, I
4    thought these were the medical records that were provided from
5    subpoena, because at the beginning of it it has a subpoena,
6    but look what we have in here, there is bolding and
7    underlining and highlighting parts of those medical records.
8           MR. McELFISH:  Let me see.
9           MR. MANNION:  Yes.
10          MR. McELFISH:  I don't think we did that.  If you
11   have something different, I'll agree to your copy.
12          MR. MANNION:  Okay.
13          MR. McELFISH:  How am I supposed to underline an
14   emergency room record?  Yours has it too, doesn't it?
15          MR. MANNION:  No, it doesn't.
16          MR. McELFISH:  Let me see.
17          MR. MANNION:  Here is the original, Your Honor, and
18   here's what they have.  It goes on throughout there.
19          MR. McELFISH:  Guys, first of all, Tom, I could care
20   less about that.  I didn't do it.
21          MR. MANNION:  As long as it is replaced with the
22   correct one.
23          MR. McELFISH:  It will be replaced.  We will work
24   that out.
25          THE COURT:  Okay.
```

```
                        Sidebar                        1379
```

1          MR. MANNION:  Thank you.

2          MR. McELFISH:  I think the clerk in the emergency

3    room is a plaintiff --

4          MR. MANNION:  Come on.

5          THE COURT:  We'll work it out.

6          (Sidebar concluded.)

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mobin - direct - McElfish                    1380

1    MR. McELFISH:  Where were we?

2    THE COURT:  I think we have 310 and 311 have been

3    received in evidence.

4    MR. McELFISH:  309, 310, and 311 so far.

5    THE COURT:  Yes.

6    MR. McELFISH:  Subject to redaction and subject to

7    discussion.

8    THE COURT:  Yes.

9  Q    Dr. Mobin, please go to 312 for identification.  I'll

10  represent to you that 312, the parts that matter are already

11  in evidence.

12    MR. McELFISH:  It starts with McGowan's records,

13  Your Honor.

14    THE COURT:  Yes.

15    MR. McELFISH:  So I think we can move past that.

16  Q    But while we are on it, 312 in evidence, Dr. Mobin, can

17  you identify it?

18  A    These are records, treatment reports from chiropractor

19  Dr. McGowan.

20  Q    And she's one of the first providers to see Mr. Bauta

21  within a few days of the accident or within a week after the

22  accident?

23  A    I believe within a week after the accident.

24  Q    Have you reviewed these records to determine whether or

25  not her treatment was reasonable and necessary related to the

Mobin - direct - McElfish                    1381

1    injuries?

2    A    Yes.

3    Q    And what's your opinion on that?

4    A    They were reasonable and related to the October 9, 2013

5    accident.

6              MR. McELFISH:  To the extent these records are not

7    admitted, Your Honor, I move to admit them.  I believe some of

8    them are in.  We can work that out later, Mr. Mannion.

9              MR. MANNION:  I have no objection, Your Honor, as

10   long as we can compare these to the certified copy and there

11   are no issues as we discussed at the sidebar.

12             MR. McELFISH:  We also can compare them to what has

13   already been admitted because you were not here that day.

14   Part of this was admitted.  That's all.

15             Moving on?

16             THE COURT:  Just a second.  We will have further

17   colloquy on this.  I'll receive it to the extent it is

18   consistent with what has already been received and when Dr.

19   McGowan testifies and  we will follow up afterwards.

20             MR. McELFISH:  Thank you.  A similar issue on 313

21   and really, frankly, just to make sure.

22             (Continued on next page.)

23

24

25

Mobin, MD - direct - McElfish                    1382

1    EXAMINATION CONTINUES

2    BY MR. McELFISH:

3    Q    Dr. Mobin, can you please turn to 313 and identify this

4    record for ID, please?

5    A    Yes.  It's a itemized charge for date of service

6    October 17th, 2013 by Geraldine McGowan, DO.

7    Q    Okay.  And have you reviewed her bill to see if it's

8    reasonable and necessary -- I'm sorry, reasonable and

9    customary?

10   A    Yes, it's reasonable and customary.

11   Q    And can you tell the jury how much it is?

12   A    It was for $104.07.

13           MR. McELFISH:  We move to admit 313, Your Honor, on

14   the same basis that it's probably in, but just to be sure.

15           MR. MANNION:  No objection.

16           THE COURT:  I'll receive it.

17           (Plaintiff's Exhibit 313 was received in evidence.)

18   Q    Let's go to 314, Dr. Mobin.

19   A    Yes.

20   Q    And can you identify this set of records, please?

21   A    So these are records from Vincent Vasile, the certified

22   physical therapist.  And it includes his records, and also

23   records from New York Spine, who referred the patient for

24   physical therapy.

25   Q    Okay.  And can you just give the jury an idea of what

SAM     OCR     RMR     CRR     RPR

Mobin, MD - direct - McElfish          1383

1   kind of treatment Mr. Bauta received by Doctor or Physical

2   Therapist Vasile, please?

3   A    Sure.  Mr. Vasile has documented multiple entries for the

4   physical therapy that was rendered.  It includes range of

5   motion modalities and manual traction modalities that were

6   provided and administered to Mr. Bauta.  And the dates are

7   within the records, which start from, roughly,

8   November of 2013 and go all the way through the second

9   surgery, which was done in 2016, all the way -- the last date

10  of entry of January 3, 2017.

11  Q    And in an effort to save time, Dr. Mobin, was the

12  treatment and care, the physical therapy, the modalities that

13  were provided by Dr. Vasile or -- I keep saying that, Physical

14  Therapist Vasile -- in your opinion reasonable and necessary

15  for the injuries he received in this accident?

16  A    They were, yes.  They were reasonable and necessary.

17            MR. McELFISH:  And for the Court, counsel and the

18  record, that exhibit is 314 dash, and I will try to go slow,

19  0001 through 314-0028.

20            Plaintiff moves to admit, subject to any redaction

21  that Mr. Mannion and I discuss.

22            MR. MANNION:  Can we just approach briefly?

23            THE COURT:  Yes.

24            (Sidebar held outside the hearing of the jury.)

25            (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

Sidebar                                    1384

1            (The following sidebar took place outside the

2       hearing of the jury.)

3            MR. MANNION:  Okay, a couple issues.

4            I don't want to, obviously, make you bring every

5       single provider in to say it's their records, so I am not

6       going to object on this basis as long as I am not going to get

7       any problems when I try to use medical records and you tell me

8       I have to bring the provider in.  I don't think --

9            MR. McELFISH:  If it's in, it's in.

10           MR. MANNION:  Well, but that's not what I'm saying.

11      You may not put all the records in.

12           MR. McELFISH:  I just did.  I am saying in that

13      particular exhibit -- I don't know what else you're talking

14      about, but in that exhibit, I put everything in.

15           MR. MANNION:  What I'm saying, in the medical

16      records that are in here, subject to any admissibility

17      arguments, you are not going to give us any problems with

18      authenticity or bringing providers in?

19           MR. McELFISH:  Listen, you are making me do all

20      this, so I am not going to say that I'm not.  I mean, if you

21      agree to these records and you agree to these bills, then we

22      have a deal.  That's what I've been trying to get at.

23           MR. MANNION:  That's what I said.  If I agree to let

24      these in, you are not going to give me a problem.

25           MR. McELFISH:  I don't know what you're talking

SAM      OCR      RMR      CRR      RPR

1   about.

2          MR. MANNION:  I mean, technically, I don't think

3   this gentleman can --

4          THE COURT:  All he can testify to is these are the

5   records that you sent me and that I reviewed.

6          MR. MANNION:  Right.

7          THE COURT:  He cannot testify as to whether they are

8   the actual records from this physical therapist.

9          He does not know.

10         MR. McELFISH:  There is a waiver of authenticity and

11  foundation.  We've already covered this.  A, you agreed to

12  it --

13         THE COURT:  That is true, they have waived

14  authenticity.

15         MR. McELFISH:  No, the other way around.  They

16  agreed to authenticity and waived foundation.

17         THE COURT:  Do you agree to the foundation?

18         MR. SAAL:  No, we never agreed to the foundation.

19         MR. McELFISH:  No, Judge, the other way around, I'm

20  sorry.  Let me explain.  No, let me explain.

21         THE COURT:  That is what I said.

22         MR. McELFISH:  Please, for a second.  I can make

23  this simple.

24         They agreed in several e-mails that they agreed to

25  authenticity.  They waived foundation in the Rule 16 because

Sidebar                                              1386

1  it's not objected to, and we've already had this discussion.

2          THE COURT:  You did not object to foundation in the

3  Joint Pretrial Order?

4          MR. McELFISH:  To some things, he did.

5          MR. SAAL:  He still has to lay foundation for the

6  exhibit.

7          MR. MANNION:  I am just trying to make this easy.

8          THE COURT:  If he turns it on you, don't worry about

9  it.  It is a two-way street.

10         MR. MANNION:  Okay.

11         THE COURT:  No one is bringing in every single

12  provider to lay a foundation --

13         MR. MANNION:  Right, exactly.

14         THE COURT:  -- for all these records.  If we are

15  going to get them in, we are going to let them in.

16         MR. McELFISH:  I would never turn on anybody.  All

17  I'm saying is, if he's asking me to agree to something, I've

18  been pre-agreeable, so whatever it is, I'll try to agree.

19         MR. MANNION:  The second issue is, as you see in

20  here again, we have highlights.  There are several places in

21  here where there are highlights.

22         THE COURT:  I do not see that on my copy.

23         MR. MANNION:  We agree.

24         MR. McELFISH:  That's because we were kind enough to

25  give you our book which we were marking on, and now you're

SAM      OCR      RMR      CRR      RPR

```
                        Sidebar                      1387
```

1   making objections on it.

2           THE COURT:  Come on.

3           MR. McELFISH:  We can deal with this stuff, guys.

4           THE COURT:  I do not see any in the copy that I

5   have, and what is going to the jury there will be no

6   highlights, no edits.

7           MR. MANNION:  Okay, we will clear that up.  So all

8   my objections are with that caveat.

9           THE COURT:  Okay.

10          MR. McELFISH:  And I will say, Judge, I don't know

11  what's in their copies.  That's something we gave them as a

12  courtesy.  I don't want highlights and underlining going to

13  the jury.  I could care less.

14          MR. MANNION:  I just want to make sure the record is

15  clear.

16          THE COURT:  We can clear up the highlights and

17  underlining and handwritten notes later, but you are going to

18  have to do that quickly, because when I give them that charge,

19  they are going back to render their decision, and if they want

20  to see exhibits, they have got to be ready.

21          MR. MANNION:  Thank you, Your Honor.

22          (Sidebar concluded.)

23

24          (Continued on the following page.)

25

```
        SAM      OCR      RMR      CRR      RPR
```

```
                   Mobin, MD - direct - McElfish            1388

 1              (In open court - jurors present.)

 2              MR. McELFISH:  Proceed?

 3              THE COURT:  314, subject to redactions.

 4              (Plaintiff's Exhibit 314 was received in evidence.)

 5   EXAMINATION CONTINUES

 6   BY MR. McELFISH:

 7   Q    Now, going over to 315, I have a couple of questions

 8   about that, Dr. Mobin.

 9              As an expert, in your review of these records, were

10   you able to determine the length of time or the span of

11   treatment by Physical Therapist Vasile in his office?

12   A    Yes.

13   Q    Can you tell the jury what it was, please?

14   A    So the physical therapy started with Mr. Vasile on

15   October 16th, 2013, and then it continued through dates of

16   service of 2017.

17   Q    And if you would, please, turn to -- if you would turn to

18   315-0014, can you tell the jury, at least according to this

19   document, when the last physical therapy visit was?

20   A    That was May 8th, 2017.

21   Q    So on and off intermittently, Mr. Bauta received physical

22   therapy for three-and-a-half years?

23   A    Yes.

24   Q    No, no, I'm sorry.  Two-and-a-half years?

25   A    Well, 2013 through 2017.
```

SAM      OCR      RMR      CRR      RPR

Mobin, MD - direct - McElfish                    1389

Q    Oh, sorry.  Three-and-a-half years?

A    Three-and-a-half years.

Q    Okay.  And you've reviewed the charges on each of these
visits?

A    I have, yes.

Q    Are they reasonable and customary in the field?

A    They are, yes.

Q    And they are backed up by the Fair Health database?

A    They are within the ranges that I've seen multiple times
from physical therapists and facilities that provide that.

Q    And if you would, please, did you review the balance of
the bills added up on 315-0014?

A    Yes.

Q    And is that a number that's customary and reasonable, in
your opinion?

A    For this duration and length of therapy, yes.

Q    Okay.  Can you tell the jury how much it is?

A    It is for $8,528.41.

     MR. McELFISH:  Plaintiff moves to admit 315-0001
through 315-0014.

     MR. MANNION:  No objection, Your Honor.

     THE COURT:  Received.

     (Plaintiff's Exhibit 315-0001 through 315-0014 was
received in evidence.)

BY MR. McELFISH:

1    Q    Now, going over to 318 for identification, please.

2    A    Yes.

3    Q    Can you identify these records?

4    A    Sure.  So these are the New York Medical Rehabilitation

5    Center records, which include records from Dr. Liebowitz;

6    Dr. Capiola.  Those are the two physicians I've seen records

7    from.

8    Q    Okay.  And can you give the jury an idea of the kind of

9    work that these gentlemen did for Mr. Bauta in the treatment

10   that you have reviewed?

11   A    So Dr. Capiola and Dr. Liebowitz, both orthopedic

12   surgeons, have generated reports documenting the encounters

13   with Mr. Bauta, and they've also rendered opinions regarding

14   treatments, and directed some of the physical therapy that he

15   received with Physical Therapist Vasile.

16   Q    What kind of doctor, to your knowledge, is Dr. Capiola?

17   A    He is an orthopedic surgeon.

18   Q    And if you would, please, did you consider his diagnosis

19   in forming your opinion about Mr. Bauta?

20   A    Yes.

21   Q    And if you would, go to 318-0027 for ID.

22        What was his diagnosis?

23   A    The report is dated December 22nd, 2014.  Diagnoses are

24   under that page that you mentioned, which included

25   post-traumatic right knee, internal derangement, which means

1  damage to the knee, itself.  Post-traumatic right leg, focal

2  subcutaneous soft tissue, meaning that there's swelling in the

3  ankle area and then the right leg.  Post-traumatic left elbow

4  sprain, pretty self-explanatory.  And then post-traumatic disk

5  herniations at the C4/5, C5/6, C6/7 dash or slash disk bulges

6  at C2/3 and C3/4.  And last, but not least, post-traumatic

7  bulging L2/3, L3/4, L4/5, intervertebral disks, large disk

8  herniation L5/S1.

9  Q    So he is yet another surgeon that has reviewed Mr. Bauta?

10 A    That is correct.

11 Q    And that, I believe you said, was in December of '13?

12 A    '14, this particular report, but they've seen Mr. Bauta

13 earlier.  October of 2013 -- October 30th, 2013, the first

14 report, and then December 22nd, 2014, which we just discussed

15 the diagnoses.

16 Q    I just want to go back for a minute.  Go back to 318-0002

17 for ID.

18 A    Yes.

19         THE COURT:  002 or 22?

20         MR. McELFISH:  2.

21         THE WITNESS:  Oh, I'm sorry.  Okay.

22 BY MR. McELFISH:

23 Q    What is the date of this record?

24 A    October 30th, 2013.

25 Q    And with respect to the low back and the right leg, what

Mobin, MD - direct - McElfish                    1392

1   was Dr. Capiola -- what were his findings at that time?

2   A     So this is the template form and they have written,

3   handwritten, lower back pain/right knee, shin.  Right knee and

4   shin.

5   Q     And he was seen again by Dr. Capiola a number of times?

6   A     That is correct.

7   Q     And I just wanted to -- was there testing with respect to

8   the low back pain done by these doctors?

9   A     (No response.)

10  Q     And I can maybe direct you to 318-0026.

11  A     Yes.

12  Q     What testing was done?

13  A     So, under the objective testing, they have views of the

14  X-rays and MRIs.

15  Q     Okay.  And if you go to 318-0026 for ID, let's first link

16  this document up to a date.  What is the date of that report?

17  And if you could go back to page 24, it has the date.

18  A     The date is December 22nd, 2014.

19  Q     And what -- going back to page 26, what was the course of

20  treatment that these spine surgeons recommended for Mr. Bauta?

21  A     They had recommended physiotherapy, which was what was

22  carried out, and pain management, including epidural steroid

23  injection for his spine.  And the referral was done by Dr. --

24  to Dr. Terrance Winn, who actually performed the test on

25  March 17th, '14.

SAM      OCR      RMR      CRR      RPR

Mobin, MD - direct - McElfish                1393

1    Q    Now, I believe in my qualifications of you, Doctor, I
2    neglected to ask you, are you board certified?
3    A    Yes.
4    Q    And in what field are you board certified in?
5    A    Neurological surgery.
6    Q    Okay.  And to the extent that Dr. Capiola had treatment
7    and care for Mr. Bauta identified in Exhibit 318, do you have
8    an opinion as to whether or not that treatment and care was
9    reasonable and necessary for the injuries in this accident?
10   A    I do.  I believe that the care and treatment were both
11   necessary and reasonable, and related to the accident.
12   Q    If you could go to 319, page 1, please.
13   A    319?
14   Q    Yes.
15   A    Okay.
16   Q    Can you identify this record?
17   A    Yes.  This is the itemized bill regarding the encounters
18   with Orthopedic Specialists starting on October 30th, 2013
19   through March 16th, 2015.
20   Q    Are you able to say, Dr. Mobin, whether or not the bills
21   that are charged for those services on those individual dates
22   are reasonable and customary in the community?
23   A    They are in the lower range of the reasonable and
24   customary rate.  They are reasonable, yes.
25   Q    And can you tell us what the total is at the bottom,

Mobin, MD - direct - McElfish                1394

1  under amount due?

2  A    $1,042.85.

3          MR. McELFISH:  Plaintiff moves to admit just

4  319-001.

5          MR. MANNION:  No objection to 001.

6          THE COURT:  Received.

7          (Plaintiff's Exhibit 319-001 was received in

8  evidence.)

9  BY MR. McELFISH:

10  Q    Okay, now, going over to 320 for ID, can you --

11  Dr. Mobin, can you please describe for the jury what this

12  record is?

13  A    This is a MRI report addressed to Geraldine McGowan, DC,

14  who is the doctor addressed in the letter as the referring

15  source for the MRI of the lumbar spine.  And it gives a

16  description of the lumbar MRI, with its detailed description

17  and impression, by Dr. Jacob Lichy, M.D.

18  Q    We are going to get into the films later and talk about

19  what's on the films later, but for purposes of these series of

20  questions, is this reasonable and necessary having these MRIs

21  done for the injuries Mr. Bauta sustained in the accident?

22  A    Yes, they are.

23  Q    And can you be specific as to -- not getting into what

24  the films reveal at this time, but can you give the jury an

25  idea of how many films were done and what they were done for?

Mobin, MD - direct - McElfish                    1395

1   A    So, Mr. Bauta had multiple imaging studies, including

2   X-ray of the spine and knee.  And MRIs of the cervical spine,

3   which is the neck, and the lumbar spine, which is the lower

4   back, along with CAT scans of the cervical spine, which were

5   done -- I believe he had a CAT scan of his head also at some

6   point.

7              MR. McELFISH:  Plaintiff moves to admit 320-1

8   through 24.

9              MR. MANNION:  I'm sorry?

10             THE COURT:  320 --

11             MR. MANNION:  I got confused on that one.

12             MR. McELFISH:  Sorry, I am trying to leave some

13  zeros out.  320-0001.

14             THE COURT:  So Plaintiff's Exhibit 320?

15             MR. MANNION:  Yes, no objection.

16             I thought it was 320 to 324.

17             THE COURT:  Exactly.  Received.

18             MR. McELFISH:  Judge, I do that just in case there's

19  a dispute about how many pages.  That's all.

20             (Plaintiff's Exhibit 320 was received in evidence.)

21             MR. McELFISH:  So it is four pages, basically.

22  BY MR. McELFISH:

23  Q    All right.  Now going to 321 for identification --

24  A    Yes.

25  Q    -- can you tell the jury what this document is, or

Mobin, MD - direct - McElfish                1396

1   exhibit is?

2   A    This is a bill generated by Precision Imaging of New

3   York.  It includes the study dates of November 7, 2013;

4   November 18, 2013; February 11th, 2015; which correspond to

5   the dates of service for four different MRIs.

6   Q    Now, Dr. Mobin, as to the first three images that were

7   taken, can you give the jury an idea of what the dates were?

8   A    So the first two sets of MRIs are from the neck and the

9   lower back, and they are within the first month of the

10  incident, which is November 7th, 2013.

11  Q    Okay.  And what about the last one?

12  A    The last one is an MRI of the lumbar spine, which was

13  performed on February 11th, 2015.

14  Q    And to your understanding, in reviewing these records as

15  an expert witness, Dr. Mobin, is that the MRI that

16  Dr. Cordiale requested prior to surgery?

17  A    I was going to continue with that, yes.

18  Q    Oh, sorry.

19  A    That is the preoperative MRI ordered by New York Spine

20  Specialists, and the lead surgeon was Dr. Cordiale.

21  Q    And can you give the jury the individual charges for the

22  films, please?

23  A    Yes.  The individual charges are 1,800 each.

24  Q    And what is the total for the bill for the MRI center?

25  A    The total bill is 7,200.

SAM      OCR      RMR      CRR      RPR

Mobin, MD - direct - McElfish                1397

1    Q    And that is a one-page exhibit, 321.

2              MR. McELFISH:  Plaintiff moves to admit.

3              MR. MANNION:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 321 was received in evidence.)

6              MR. McELFISH:  One moment, Your Honor.

7              THE COURT:  Anyone need a break?

8              Okay, let's keep going.

9    BY MR. McELFISH:

10   Q    Let's go to 324 for identification.

11   A    Okay.

12   Q    Can you describe for the jury what this document is?

13   A    This is a MRI report from Precision Radiology addressed

14   to Andrew Cordiale, DO, who is the surgeon requesting the

15   study.  It includes a detailed description of the study, with

16   its impressions.

17   Q    And can you tell the jury the date of this MRI, please?

18   A    The date of service is October 29th, 2017.

19   Q    All right.  And briefly, what would be the purpose, as an

20   expert neurosurgeon, for a postoperative MRI like this?

21   A    So the neck MRI is being ordered in conjunction with

22   Mr. Bauta's continued complaints of neck pain.

23              And then there is a almost contemporaneous study,

24   which is October 31st, '17, which is the postoperative MRI

25   ordered by Dr. Cordiale for the same reason, continued

SAM     OCR     RMR     CRR     RPR

Mobin, MD - direct - McElfish                    1398

1    postoperative pain in lower back region.

2    Q    And in your opinion, Dr. Mobin, why were these ordered?

3    A    Continued pain.  Still having symptoms since the surgery.

4    Q    Okay.  And if we can, please, I want to go to 326-6, or

5    0006 for ID.

6         Can you identify this?

7    A    I'm sorry.  What's the number again?

8    Q    324-006.

9    A    Yes, okay.  These are the two view X-rays of the neck and

10   the lower back from December 26th of '13, read by Dr. Jacob

11   Lichy, M.D.

12   Q    Okay.  Let's go over to -- whoops, sorry.

13             MR. McELFISH:  324 then, plaintiff moves to admit.

14             MR. MANNION:  No objection.

15             THE COURT:  The entirety of it?

16             MR. McELFISH:  There is one duplicative page, but

17   otherwise, yes.

18             THE COURT:  Since there is no objection, we'll

19   receive it.

20             (Plaintiff's Exhibit 324 was received in evidence.)

21             MR. McELFISH:  And for the record, it is 324-0001

22   through 324-0006.

23   BY MR. McELFISH:

24   Q    Going over to 325 for identification , can you identify

25   this record for the jury, please?

SAM     OCR     RMR     CRR     RPR

1  A    Right.  So these are the Precision Radiology itemized
2  billing for the October 19th, 2017 service date for the MRI of
3  the neck and lower back.
4  Q    And the pricing for the MRIs in 2017, are they not the
5  same price as they were in '13?
6  A    They are identical, yes.
7  Q    Okay.  And how much were they each?
8  A    1,800.
9  Q    And what is the total bill for the two?
10  A    3,600.
11  Q    Is that reasonable and customary in the community?
12  A    It is, yes.
13          MR. McELFISH:  Plaintiff moves to admit 324-0001
14  only.
15          MR. MANNION:  No objection.
16          THE COURT:  Received.
17          (Plaintiff's Exhibit 324-0001 was received in
18  evidence.)
19  BY MR. McELFISH:
20  Q    Okay, let's go to 326 for identification.
21          Can you, Dr. Mobin, identify this set of records,
22  which spans 326-0001 to 326-0154?
23  A    Yes.  So this is a set of records that include treatments
24  of Mr. Bauta at the Accelerated Surgical Center, and also
25  includes treatment from other providers, chiropractors that

1  were taking care of Mr. Bauta.  And pain management specialist

2  Dr. Alladin and other physicians who performed the procedures,

3  such as Dr. Winn.

4  Q    Now, before we get to the reasonableness and necessity of

5  the treatment that is in these records, sir, I want to just

6  ask you briefly about facet blocks and epidurals, okay?

7  A    Right.

8  Q    As a neurosurgeon, sir, what is the medical benefit, in

9  your view, of having a facet block like Mr. Bauta had in this

10 case?

11 A    So, the primary purpose for the facet block, as the name

12 implies, it's to block the nerve that goes to the joint.  The

13 physicians are concerned about the joint, mechanical stress

14 being departed upon the joint causing pain.  So they go in and

15 they block the nerve that goes to the joint, trying to

16 decrease the -- what we call the mechanical -- the pain that's

17 produced by movement of the spine away.

18 Q    And when a facet block is done on a particular nerve, is

19 that something that's done to, A, diagnose the problem; and,

20 B, treat the problem, or both?

21 A    So it's actually both.  I have kind of a skewed view

22 because I see the patients that fail this procedure, but

23 generally what we do is we try to get the patients treated

24 with the facet blocks.  But it also has a diagnostic value for

25 the surgeon, in particular, because if somebody comes in and

1   says, Doc, after the facet block, I was able to run again, I

2   was able to lift my kids again and my backhand was a lot

3   better, that tells me the particular problem is with the facet

4   joint more so than it is with the disk.  But if the patient

5   comes back and says, No, the facet block helped me for about

6   50 percent, maybe for 30 percent, then I would ascribe some of

7   that problem to the disk.

8           So this is what we do daily in the clinic is to try

9   to figure out what elements of the spine are causing pain.  Is

10  it the joints or is it the disk?  And in order to figure out

11  which one is causing it, the best or the easiest area to

12  approach or have access to is the facet joint.  So we try to

13  take that out of the equation and figure out, is the disk the

14  primary cause of pain of the pain or not.

15          So it has a diagnostic value.

16

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1    BY MR. McELFISH:   (Continuing.)

2    Q    And so that's the facet block, what -- how does an

3    epidural differ and -- from your point of view as a

4    neurosurgeon?

5    A    So epidurals are in a sense given -- the medicine is

6    provided to a different space than the facet.  The facets are

7    sitting more outside of the spine.  As the records indicate,

8    the doctors went in with particular needles and they put the

9    needles on the X-ray guidance to the center of the joint to

10   block the nerve endings in the joint.  Generally facet blocks

11   are done to, again, block a nerve to the point.  Epidurals I'm

12   sure most of the jurors have heard for a pregnant lady.  You

13   put a needle through the spine to block the nerve from the

14   belly down so the pregnant woman can deliver a baby without

15   too much pain.  Instead of general anesthesia, they can do

16   spinal anesthesia.  The individual can be completely insensate

17   from a particular level of anesthesia to lower levels so they

18   have no pain.  You could put pins in their legs and they don't

19   feel anything.

20        So the concept of the epidural is very similar to

21   that.  We're putting a needle into the potential space, which

22   is called the epidural space.  The dural being the covering of

23   the nerves, remember that tunnel we talked about.  All of

24   those nerves are going through the dura and the dura is the

25   covering around the nerves in the tunnel.  So imagine going

1    through the Holland Tunnel and there's a little tent within

2    the tunnel, that tent is the dura.  If somebody comes from the

3    top of the tunnel, there's an air vent and they're putting a

4    needle through that air vent without piercing the tent, that's

5    what they have to go through.  If you pierce the tent, there's

6    water in that tent.  That's spinal fluid it can leak out and

7    cause spinal headaches.  It's done through that area into that

8    epidural space through into the epidural space right over the

9    10th and the doctors give steroids and numbing medicine to

10   take away the shooting pain down the leg and also help with

11   the back pain.

12   Q    Okay.  And are the epidurals also done both

13   diagnostically and for treatment?

14   A    Yes.

15   Q    The same reason?

16   A    So the epidurals, this is what I tell my patients is that

17   we try to get you through this without surgery.  We're going

18   to do the epidurals to help you with your leg pain.  Your pain

19   can get better, but your weakness may not get better.

20   Q    And why is that?

21   A    Because you have to remember what an epidural is.

22   Epidural is just giving medication to take inflammation away

23   from the nerve.  It's a biological process.  It doesn't take

24   away large disc herniations off of the nerve.  So there are

25   two problems at play.  The disc itself has a mass that's

1   putting pressure on the nerve.  It's having your hand in the

2   door and somebody knocking the door on your hand and someone

3   giving you morphine.  Eventually your pain goes away, but in

4   the meantime your hand is getting swollen.  We need to open

5   the door and get the hand out.  That's the surgery part.  What

6   I tell my patient is there is a reason that you have pain

7   because your body is telling you something is wrong.  We're

8   going to take that pain away from you and you're going to say,

9   Doc, my pain is better, I am cured.

10            All of a sudden they walk and their leg gives out

11   because the leg is still under pressure.  That's the

12   mechanical part of the problem.  They are both therapeutic and

13   diagnostic.

14   Q    And just quickly rhizotomies and ablations?

15   A    So rhizotomy or ablation is basically saying the same

16   thing.  In the instance where we have a patient that comes

17   back and says, Doc, that nerve block is the best thing I had

18   since this pain started.  It only lasted a few times.  So we

19   do one more time to make sure it works.  The third time what

20   we can do is instead of just giving a numbing medicine like a

21   nerve block or a steroid for a short-term relief, they

22   actually put a special needle called a radio frequency needle.

23   It's very similar to the spinal needle that they put in, it

24   has the same caliber and the same size, but the tip is a

25   special tip.  It has a radio frequency probe which is

1   connected to a sophisticated machine that can produce radio

2   frequency like microwave and it burns the nerve.  It cooks the

3   nerve in a vary focal location because you don't want to cook

4   the entire nerve because if that happens then they can't use

5   their leg.  That's not a good outcome.

6           This is a very sophisticated machine that allows us

7   to do a pinpoint ablation, pinpoint destruction of the nerve

8   that usually causes pain and that's what a rhizotomy is.

9   Q    And are all of these procedures, facet block, epidurals,

10  rhizotomies, ablations are they done in either a hospital or

11  an ambulatory surgery center?

12  A    They're usually done at either of those facilities, yes,

13  hospital or surgery centers.

14  Q    Can you do them in an office?

15  A    You can if the office is well-equipped and they have

16  certifications to do so.

17  Q    Okay.  And does the patient -- when a patient undergoes

18  any of these procedures that we just discussed, is anesthesia

19  used?

20  A    So for the rhizotomy, I would highly recommend anesthesia

21  because the ablation of the nerve is very painful.  There's

22  some individuals that are absolutely averse to anesthesia, so

23  they get sedation, but generally most of these procedures can

24  be done under sedation or general anesthesia.

25  Q    How many of these procedures did Jose Bauta have?

1  A    So, I have a list of procedures to answer these "how

2  many" questions for you.  I counted six different procedures

3  for Mr. Bauta including epidurals, facet blocks and facet

4  blocks rhizotomies, maybe seven.

5  Q    In each of those six times did Mr. Bauta undergo

6  anesthesia or sedation and if you could explain?

7  A    As part of the procedure, there's a surgeon involved

8  which actually does the procedure itself and there's

9  anesthesiologists that monitors the patient.  You have to

10 remember, the patients are usually done face down.  They're

11 flat on their stomach and they can lose their airway.  Joan

12 Rivers is one of the victims of this.  She lost her airways

13 and she died.

14          MR. MANNION:  Objection, move to strike.

15          THE COURT:  Overruled.

16 A    This is an important point that we need to have an

17 individual anesthesiologist that will maintain the airway for

18 the patient.  We're sedating an individual and that means

19 you're going to sleep and if you are going to sleep like this

20 you can close down your airway.  The carbon dioxide goes up,

21 you get hypercapnic and they go into cardiac arrest.  So that

22 is a very important part of the procedure to make sure that

23 patients' airways are well-controlled.

24 Q    Now, do you generally have the span -- we heard from

25 Dr. Winn, but do you have the span of treatment for this care

1    that Dr. Winn provided?

2    A    The dates of service are, I believe, from March 17, 2014

3    through May 16, 2015 is what I have.

4    Q    And when you see a patient undergo all of the pain

5    management procedures that we've discussed, do you refer to

6    that or consider that what's called conservative care?

7    A    So I would consider that less-invasive care.  It's not

8    necessarily -- it's past conservative care.  So conservative

9    care in my mind is physical therapy, chiropractic therapy and

10   medications.  When you start putting needles in people's

11   spines you're getting more into invasive territory because

12   they're not without risk if you hit the wrong nerve or wrong

13   blood vessel or, God forbid, inside the spinal cord or the

14   nerve root itself you can cause paralysis.  So there are

15   less-invasive options than this one.

16   Q    You understand from Exhibit 326 for identification that

17   plaintiff many times saw Dr. Winn, he saw Dr. Soto and

18   Dr. Chen for these pain management procedures and/or office

19   visits?

20   A    Yes.

21   Q    And with respect to Exhibit 326-0001 through 326-0154, do

22   you consider this treatment and care from Mr. Bauta as an

23   expert witness to be reasonable and necessary for the injuries

24   he received in this accident?

25   A    I do.  I believe that they were reasonable and necessary.

Mobin - direct - McElfish                    1408

1          MR. McELFISH:  Subject to any redaction or

2     duplication which may be discovered by counsel in their

3     review, plaintiff moves to admit 326.

4          THE COURT:  What pages again?

5          MR. McELFISH:  0001 through 0154.

6          MR. MANNION:  Are these already in through Dr. Winn?

7          THE COURT:  No, no, no.

8          MR. McELFISH:  They may be in.

9          THE COURT:  No.

10          MR. MANNION:  No objection, Your Honor.

11          MR. McELFISH:  If it please the Court, how long do

12     you want me to go?

13          THE COURT:  We're going to go to 12:30.

14          MR. McELFISH:  May I approach?

15          THE COURT:  Yes.

16          MR. McELFISH:  May I proceed?

17          THE COURT:  No, not yet.

18          Mr. McElfish and Mr. Mannion, can you come up for a

19     second?

20          (Sidebar held outside of the hearing of the jury.)

21          (Continued on next page.)

22

23

24

25

                        SN      OCR      RPR

```
                          Sidebar                        1409
```

1             (The following sidebar took place outside the

2    hearing of the jury.)

3             THE COURT:  419, right?  Dr. Winn's records came in

4    in Exhibit 419.  We went through them very carefully and we

5    took out anesthesiologist and the nurse records and kept in

6    the consent forms and his reports and the fluoroscopy

7    pictures.  This is the entirety of what's -- Accelerated

8    Surgical, the entirety of their records, but we get back to

9    the same thing that we were talking about the last time.  Do

10   you see what I'm saying.

11            MR. MANNION:  Yeah.

12            THE COURT:  So do you really have an objection here?

13            MR. MANNION:  No, Your Honor.  I said that I had no

14   objection.

15            THE COURT:  I'm sorry, I'll receive it.

16            MR. MANNION:  I'm sorry.

17            MR. McELFISH:  The next exhibit is 327 which you

18   don't have the book yet, but what it is is the records for

19   that center, I admit up front that I didn't double check the

20   327 exhibit what was previously admitted under 419.  If you

21   recall, 419 had the records up front and there was a big fight

22   whether they were coming in through Dr. Winn.  I'm going to

23   move to admit them and then like everything else Mr. Mannion

24   and I can take duplications out.  There's no problem with

25   that.  We don't want duplications going to the jury.

```
                          Sidebar                        1410
```

 1          THE COURT:  Duplications of what?

 2          MR. McELFISH:  Of the billing.

 3          THE COURT:  Within the exhibit itself?

 4          MR. McELFISH:  We moved in the Accelerated Surgery

 5   Center for Dr. Winn.  You overruled objections for that.  Now

 6   we have a set of bills from the same center.  I'm not sure,

 7   and it's my fault if they are duplicative, but I want to move

 8   to admit them now.  Mr. Mannion and I can sit down and make

 9   sure they don't duplicate before we go to closing arguments on

10   it.

11          THE COURT:  Well --

12          MR. McELFISH:  The reason is if for some reason

13   there's something in 327 that was not previously admitted, I

14   don't want to miss my chance.  That's all.

15          THE COURT:  I just don't want the jury to hear a

16   number that is duplicative because they're writing down all of

17   these numbers.

18          MR. MANNION:  I'm going to tell them they shouldn't.

19          THE COURT:  I thought it was up front.

20          MR. McELFISH:  They've been writing numbers down

21   like crazy all week.

22          THE COURT:  It's different.  This is --

23          MR. MANNION:  I'd have to compare the two.

24          THE COURT:  It's a different date.

25          MR. MANNION:  Maybe now is the time for the break.

```
                    SN      OCR      RPR
```

Sidebar                                          1411

1          MR. McELFISH:  Or do it later.

2          THE COURT:  Do it later.  All right.

3          (Sidebar ends.)

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

1        MR. McELFISH:  Proceed?

2        THE COURT:  Yes.  And we will receive Exhibit 326 in

3   evidence.

4        (Plaintiff's Exhibit 326 received in evidence.)

5   BY MR. McELFISH:

6   Q    Moving on to 327 for identification, Dr. Mobin --

7   A    Yes.

8   Q    -- can you identify the record, please?

9   A    Yeah, so these are itemized billing for the injections

10  that are performed on March 28, 2014 through May 30, 2015 with

11  professional fees, doctor fees and also the facility fees.

12  Q    Okay.  And can you tell the jury what the bill is for

13  that exhibit?

14  A    So page three of that exhibit I'm looking at the balance

15  due which I haven't done the math here I haven't really

16  counted them up, but the total bill is $62,750.

17       MR. McELFISH:  Plaintiff moves to admit these three

18  pages, 327-0001, 0002 and 0003.

19       MR. MANNION:  Your Honor, subject to any redactions

20  for duplicates for the issues we talked about with the other

21  exhibits, no objection.

22       THE COURT:  Received.

23       (Plaintiff's Exhibit 327-0001, 327-0002 and 327-0003

24  received in evidence.)

25  Q    Going on now to 329 for identification, Dr. Mobin.

Mobin - direct - McElfish                1413

1   A    Yes.

2   Q    If you could look please through these.  This exhibit

3   appears there is two bills here?

4   A    Correct.

5   Q    Also Ifran Alladin?

6   A    Right.  These are two dates of visits by the pain

7   management M.D., Dr. Alladin.  Dates of service are January 3,

8   2017 and it appears to be September 18, 2015.

9   Q    And are the bills that you see in this exhibit reasonable

10  and customary?

11  A    They are, yes.

12  Q    And can you give the jury the amounts of the bills?

13            MR. MANNION:  Objection.

14  Q    And I think it shows up at 329-0012.

15  A    Right, so the rest of those intervening pages also

16  include different dates of service with Dr. Alladin which are

17  reasonable, necessary and related to the accident.  The bills

18  also include the professional treatments by Dr. Alladin, his

19  injection, professional fees and the total bill is -- it's on

20  page 329-0012 the total 43,197.92.

21            MR. MANNION:  Your Honor, I'm going to object.  I

22  think Dr. Winn's bills are in here as bell.  These are not

23  just Dr. Alladin's.

24            THE COURT:  Where is this again?  329?

25            MR. MANNION:  It's mostly Dr. Winn's which I think

SN      OCR      RPR

1    have been admitted.

2              THE COURT:  Is this 329?

3              MR. McELFISH:  Yes.

4              THE COURT:  Ladies and gentlemen, we're going to

5    take our lunch break right now.  Been back at 1:20, please.

6              (Jury exits.)

7              (In open court.)

8              THE COURT:  Okay.  Let's off the record.

9              (Discussion off the record.)

10             (Luncheon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           AFTERNOON SESSION

2           (In open court.)

3           (Jury enters.)

4           THE COURT:  You may continue.

5           MR. McELFISH:  Thank you.

6    FARDAD MOBIN,

7        called as a witness, having been previously duly

8        sworn, was examined and testified as follows:

9    DIRECT EXAMINATION

10   BY MR. McELFISH: (Continuing.)

11   Q    I believe where we left off at Exhibit 329 for

12   identification.  Plaintiff had moved it into evidence.  There

13   was a sidebar.  The Court ruled at the sidebar.

14           THE COURT:  Yes, received.

15           (Plaintiff's Exhibit 329 received in evidence.)

16           THE COURT:  Did we deal with 328?

17           MR. McELFISH:  I did not for other reasons.

18           THE COURT:  Okay.

19   Q    Dr. Mobin, I believe you testified already that 329 going

20   to -- specifically to 329-0012 the amount was 43,197?

21   A    Correct.

22   Q    All right.  Moving on to Plaintiff's 330 for

23   identification, can you identify this set of documents?

24   A    These are a set of documents from the chiropractor,

25   Dr. Glen Rosenberg.

Mobin - direct - McElfish                    1416

1   Q    Okay.  And can you say what he did for Mr. Bauta?

2   A    Sure.  These are records reflecting care and treatment

3   from Dr. Rosenberg starting in April of 2014 and continuing

4   on, I believe, through -- last state of surface is June 2,

5   2016.

6   Q    And to your general understanding, Dr. Mobin, do these

7   records indicate treatment for Mr. Bauta's neck and back?

8   A    They do, yes.

9   Q    And to your understanding as an expert witness in this

10  field, sir, are the treatments reflected in this exhibit

11  reasonable and necessary for the injuries that Mr. Bauta

12  received in the bus accident of October 2013?

13  A    They are reasonable and necessary, yes.

14       MR. McELFISH:  Plaintiff moves -- withdrawn.

15  Q    331, for ID.  Now, can you identify this document,

16  please?

17  A    These are the itemized bills for the treatment that was

18  rendered to Mr. Bauta.

19  Q    And this is for Dr. Rosenberg?

20  A    Yes it's for Dr. Rosenberg, yes.

21  Q    And in terms of reviewing his care and then if you look

22  through Exhibit 330 which for the court, the witness and the

23  record is 331-0001 through 331-0008 -- I'm sorry, 9, you see

24  billing codes in there?

25  A    Yes.

Mobin - direct - McElfish                    1417

1   Q    And based on those billing codes and the treatment and

2   care you're aware of, is this bill reasonable and customary in

3   the community?

4   A    Correct, yes, they are reasonable and customary.

5   Q    Can you tell the jury the total amount billed?

6   A    The total bill is $5,889.58 and that's for the care and

7   treatment from April 15, 2014 through August 2, 2016.

8             MR. McELFISH:  Plaintiff moves to admit 331-1

9   through 9.

10            MR. MANNION:  No objection consistent with the prior

11  discussions.

12            THE COURT:  Received.

13            (Plaintiff's Exhibit 331-0001 through 331-0009

14  received in evidence.)

15  Q    Now going to 332 for ID, can you identify these records?

16  A    Right, so these are records of Dr. Chen who is one of the

17  pain management specialists involved with the care of

18  Mr. Bauta.

19  Q    And Dr. Chen performed some of the these transforaminal

20  injections and facet blocks; correct?

21  A    He performed lumbar steroid injections, yes.

22  Q    And is that reasonable and necessary as you've already

23  explained to the jury?

24  A    Yes.

25            MR. McELFISH:  And plaintiff moved moves to admit

SN      OCR      RPR

Mobin - direct - McElfish                    1418

1    332-1 through 7.

2              MR. MANNION:  No objection.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 332-0001 through 332-0007

5    received in evidence.)

6    Q    Moving on to 333, there's a chance this is duplicative

7    but for purposes of foundation, Dr. Mobin, to the extent this

8    bill at 333 is just reasonable and customary, do you have an

9    opinion on that?

10   A    Yeah, this is -- I believe the same bill we talked about

11   a few minutes ago on the pain management which is billed under

12   Dr. Alladin and it also includes bills from Dr. Winn and the

13   amounts on the bill is reflecting a reasonable and necessary

14   set of treatments that were rendered to Mr. Bauta as related

15   to the accident.

16             MR. McELFISH:  And per my agreement with counsel,

17   we're going to move this document in subject to duplication,

18   redaction and other adjustments.

19             THE COURT:  333?

20             MR. MANNION:  No objection consistent with that,

21   Your Honor.

22             THE COURT:  Received.

23             (Plaintiff's Exhibit 333 received in evidence.)

24   Q    334, for identification I believe may be -- can you just

25   say, Dr. Mobin, if 334 is duplicative of the other records

1    you've seen for Accelerated?

2    A    Yes and it also includes Barnert Surgical Center's

3    records.

4    Q    Okay.  And to the extent that it is not duplicative, is

5    it reasonable and necessary care in your opinion so we can

6    move along?

7    A    Yes, it is.

8              MR. McELFISH:  I will move, subject to our agreement

9    Mr. Mannion I will move 334 in, to the extent it's not

10   duplicative.

11             MR. MANNION:  No objection with the same agreement.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 334 received in evidence.)

14             MR. McELFISH:  Mr. Mannion, before I approach the

15   witness on this, Exhibits 335, 336, 337, 338 -- I'm sorry,

16   withdrawn.  335, 336, 337, are all exhibits that we can move

17   in subject to the same objection without going through

18   foundation.  If they're duplicative, they're duplicative.

19             MR. MANNION:  Agreed, Your Honor.

20             THE COURT:  335, 336 and 337?

21             MR. McELFISH:  Yes, sir.

22             THE COURT:  Received.

23             (Plaintiff's Exhibits 335, 336 and 337 received in

24   evidence.)

25             (Continued on the following page.)

SN      OCR      RPR

1          MR. McELFISH:  And, now, 338, I believe, Mr.

2     Mannion, can I have the same understanding on that?  It may be

3     duplicative, as long as it is agreed it is reasonable and

4     necessary.

5          MR. MANNION:  Agreed, Your Honor.

6          MR. McELFISH:  Thank you, sir.

7     DIRECT EXAMINATION

8     BY MR. McELFISH: (Continuing)

9     Q    Now, I want to go to 339 for ID, which is a compilation

10    bill.  And, Dr. Mobin, if we can take a minute and try to

11    shorten this, you've already testified on 339 for

12    identification as to the bill of Stanley Liebowitz; is that

13    correct?

14    A    I believe so, yes.

15    Q    You have already testified as to the bills for Vincent

16    Vasile?

17    A    Yes.

18    Q    And you did not review the psychological services;

19    correct?

20    A    I didn't.

21    Q    You just testified as to the bill for Dr. Glenn

22    Rosenberg?

23    A    Yes.

24    Q    Dr. Gutstein is a neurologist that saw Mr. Bauta a time

25    or two after the accident?

Mobin - direct - McElfish                    1421

1    A     That's correct.

2    Q     I will separately ask you, to the extent that you have

3    seen his records and reports, is his bill reasonable and

4    customary?

5    A     Yes.

6          MR. McELFISH:  And I seek to move to admit just this

7    portion of the exhibit.  Well, withdrawn.  Let me move on.

8    Q     What is the bill for Dr. Gutstein?

9    A     So, he -- Dr. Gutstein did an examination of Mr. Bauta

10   and he also performed the diagnostic test, which was the upper

11   extremity nerve conduction and electromyography.

12   Q     Okay.  What is the bill for the services he provided?

13   Well, withdrawn.

14         Are the bills for the services he provided

15   reasonable and customary?

16   A     Right.  So his neurological reports and patient

17   encounters are reasonable and customary and the bill for the

18   electrodiagnostic studies are also reasonable and customary

19   value.

20   Q     How much was the bill for Dr. Gutstein?

21   A     So his encounter bill is $1,179.42 and the bill for the

22   diabetic was $1,894.50.

23   Q     And last but not least on that sheet, there is an invoice

24   for an X-ray from Greater New York Radiology.  Have you

25   reviewed that?

Mobin - direct - McElfish                    1422

1   A    I don't know the dates.  I can't tell you, but I believe

2   I have.

3   Q    Let me ask you this:  Is the amount indicated reasonable

4   for a set of X-rays?

5   A    Yes.  So usually for four to six views of cervical lumbar

6   X-rays, that's a reasonable rate.

7   Q    And how much is that amount?

8   A    $580.68.

9         MR. McELFISH:  I move to admit 339 subject to

10  redaction just for the amounts just discussed and that

11  specifically, Your Honor, because of duplication on the next

12  page, 339-001.

13        MR. MANNION:  No objection with that caveat.

14        THE COURT:  Received.

15        (Plaintiff's Exhibit 339-001 was received in

16  evidence.)

17        MR. McELFISH:  For the Court, Counsel, 342 are the

18  records of Dr. Russo.  I believe they are already in.  I will

19  skip those.

20        Moving on to a new book.  Let's go to 343 for ID.

21  Mr. Mannion, do you have one?

22        MR. MANNION:  No, I do not.

23        MR. McELFISH:  Going to 343 for identification, I

24  believe that's also in.

25  Q    Now, Dr. Mobin, look at 343 for ID, please.

Mobin - direct - McElfish                    1423

1    A    Yes.

2    Q    These are the records for Dr. Gutstein you just testified

3    about?

4    A    That's correct.

5             MR. McELFISH:  Plaintiff moves to admit.

6             MR. MANNION:  No objection.

7             THE COURT:  343?

8             MR. MANNION:  344?

9             MR. McELFISH:  344.

10            THE COURT:  Received.

11            (Plaintiff's Exhibit 344 was received in evidence.)

12   Q    And 345 is the bill for Dr. Gutstein that we just

13   discussed as part of the other exhibit; correct?

14   A    That is correct.  This is the itemized bill for Dr.

15   Gutstein's visits.

16            MR. McELFISH:  Subject to redaction and duplication,

17   plaintiff moves to admit Plaintiff's Exhibit 345-001 for ID.

18            MR. MANNION:  No objection.

19            THE COURT:  Received.

20            (Plaintiff's Exhibit 345-001 was received in

21   evidence.)

22   Q    Let's go to Exhibit 351 for ID.  Can you identify this

23   document, please?

24   A    Yes.  This is the North American Partners Anesthesia.

25   This is the anesthesia itemized billing for the surgery date

Mobin - direct - McElfish                    1424

1    of service May 27, 2015.

2    Q    In fact, Dr. Mobin, if you look on the left side for date

3    of service, it actually lists the two surgeries that Mr. Bauta

4    had?

5    A    Correct.  So May 27th and then subsequent to that, the

6    date of service is June 1, 2015.

7    Q    And if you go to the next page, 351-002 for

8    identification, can you give the jury the amount for the

9    anesthesia?

10   A    So total bill is $14,563.50 for those two days of

11   services.

12            MR. McELFISH:  Plaintiff moves to admit 351.

13            MR. MANNION:  Same objection as before, but with

14   that caveat, we're okay with it.

15            THE COURT:  Received.

16            (Plaintiff's Exhibit 351 was received in evidence.)

17            MR. McELFISH:  Same agreement, Mr. Mannion, as to

18   352, 353 on the Barnert Surgery Center, admit and we figure

19   out if it's duplicative.

20            MR. MANNION:  Give me the numbers again, please.

21            THE COURT:  352 and 353.

22            MR. MANNION:  Agreed.

23            THE COURT:  352 and 353 received.

24            (Plaintiff's Exhibits 352 and 353 received in

25   evidence.)

Mobin - direct - McElfish                    1425

1   Q     Now, at some point did -- withdrawn.

2               We have talked about Dr. Liebowitz and Dr. Capiola.

3   These are doctors that Mr. Bauta saw earlier on in his

4   treatment and care; correct?

5   A     Yes.

6   Q     At some point did Mr. Bauta go see a group of spine

7   surgeons at New York Spine?

8   A     Yes, he did.

9   Q     And do you know who the doctors are at New York Spine?

10  A     So Dr. Lattuga, Dr. Cordiale and there is a physiatrist,

11  a Dr. Mikelis.

12  Q     Okay.  And can you tell the jury, please, as an expert

13  witness, what did these doctors at this facility do for him?

14  A     So --

15  Q     Using the date span.

16  A     Sure.  So let me refer to my timeline here.  What I have

17  is that the New York Spine Specialists, starting with Dr.

18  Mikelis and Lattuga evaluated Mr. Bauta initially in 2013 and

19  followed up care with Dr. Cordiale, which then summed up in

20  two spine surgeries in May of 2014 and June of 2014 through

21  postoperative care and treatment in 2017.

22  Q     Now, to your knowledge, did Dr. Lattuga treat Mr. Bauta?

23  A     I don't know.

24  Q     Can you explain to the jury more specifically from a

25  neurosurgeon's point of view what Dr. Cordiale did for Mr.

1   Bauta from the time he first began to treat there in late 2014

2   until the surgeries, six or eight months later?

3   A     Sure.  From the very start of evaluation of Mr. Bauta

4   with the New York Spine Specialists, the complaints of back

5   pain and radiculopathy and neck pain are documented, and then

6   the referral is done through Dr. Mikelis, and the spine

7   specialist in the group, Dr. Cordiale, who goes through his

8   evaluation of Mr. Bauta saying look, you know, you have back

9   pain, radiculopathy, you have MRI findings that show objective

10  nerve impingement, and you also have weakness in your leg on

11  those nerves that we talked about, in the dermatomes that we

12  talked about, which means that you're a good surgical

13  candidate; however, let's try some interventions first.

14        So he prescribed lumbar corset, lumbar brace in

15  particular, and LSO brace.  He prescribed medications,

16  including muscles relaxants and narcotics, and he referred Mr.

17  Bauta to pain management and brought Mr. Bauta back.  Mr.

18  Bauta circled back to Dr. Cordiale because the other

19  treatments have not helped to give him relief in terms of his

20  back pain and leg symptoms.

21        Then Dr. Cordiale goes on through a very detailed

22  report of foundation for need for surgery and he lists a

23  number of reasons why Mr. Bauta is a surgical candidate.  One

24  of them being that Mr. Bauta has failed the less invasive and

25  conservative treatment:  Physical therapy, multiple injections

Mobin - direct - McElfish                    1427

1   facet blocks and epidurals.  He has failed medical therapy and

2   medications that he was prescribed.  He has failed bracing.

3           And he has objective findings on the MRI that

4   explain his clinical symptoms, meaning his MRI, what you see

5   on the films correlate with what clinically the physicians are

6   detecting, weakness in the anterior tibialis, which is the

7   muscle responsible for bringing the foot up, numbness in the

8   patches of dermatomes that correspond to the nerve roots that

9   are being compressed.  And he also cites other reasons.  He

10  goes on and says, look, if you'd like to have surgery, you're

11  a surgical candidate now.

12          And, ultimately, Mr. Bauta signs on to have the

13  surgery done.  And the surgery was performed in May of 2014,

14  May 27th, I'm sorry, May 27, 2015, which included lumbar

15  laminectomy at the L4, 5 and L5-S1 with pedicle screw

16  fixation.  Those are special screws that span from the back of

17  the spine through the front and there are rods that

18  interconnect the screws together to hold the spine stable and

19  fused.  And he also used a particular material called BMP and

20  bone graft to mend those levels together.

21  Q    And, Dr. Mobin, have you routinely done the same or

22  similar surgery with those screws?

23  A    I have, yes.

24  Q    And did you bring an example of those screws with you

25  today?

Mobin - direct - McElfish                1428

1    A    Yes.

2            MR. McELFISH:  Is there any objection?

3            MR. MANNION:  I apologize, can I see them?

4            MR. McELFISH:  You may.

5            MR. MANNION:  Can we hit the side real quick.  I

6    haven't seen them beforehand.

7            (Sidebar held with the Court and counsel only.)

8    BY MR. McELFISH:

9    Q    Dr. Mobin, can you explain to the jury what you have in

10   your hands, please?

11   A    So I'm holding in my hand a sample of a pedicle screw rod

12   construct that we use.  This is actually the type of material

13   that I use in surgery.  I borrowed this from one of my reps

14   and the way it is done, you can see it's a very stiff

15   construct.  It's very strong.  Normally we were able to move

16   the screws around.

17           MR. McELFISH:  Excuse me, doctor.

18           Your Honor, may he step down closer?

19           THE COURT:  Sure.

20           THE WITNESS:  I will try to speak loud.

21   A    (Continuing) so this is a particular screw that has

22   the -- you know, this is color-coded.  Not all of them are

23   this color.  This is what's called a multi-axial pedicle

24   screw, meaning that the stem of the pedicle screw can move in

25   different directions.  The reason for that is because the

1  spine has a curvature and we don't want to operate like this,

2  bent forward, so we can actually adjust the angle of the

3  screws.

4          In this particular model, because the rod has

5  already been set, the screw is fixed.  And if you notice,

6  there's a curve here which tries to reconstruct the curve of

7  the spine.  And these are the screws that we place into the

8  spine.  And they come in different lengths, sizes and pitches

9  of the screw.

10          THE COURT:  Let the record indicate that Dr. Mobin

11  is using the skeleton and the screws in a demonstrative way.

12  A    So just to demonstrate to you where we put these screws,

13  on the model itself, if you will notice, there are bridges

14  that connect the back of the spine to the front of the spine.

15  These bridges are called the pedicles.  So the screws have to

16  be placed very precisely because the diameter of the screw is

17  usually about 50 to 75 percent of the diameter of this bridge.

18  So you can misfire.  If you misfire, you can hit the nerve and

19  you can also hit the spinal canal itself.  You can pierce that

20  tent that we talked about that's over the nerves in the

21  tunnel.

22          The way we do the screw placement, we use anatomic

23  markers that tell us, because we can't really see the side of

24  the spinal surgery, this is the view we have in the operating

25  room.  So we have to find the anatomic locations for the entry

1  point of the screw.  And then as Dr. Cordiale did in the

2  operation, we use a machine called a fluoroscope.  It's a

3  sophisticated X-ray machine that allows us to look at the

4  spine in different angles.

5          What I do in surgery, for example, I make the

6  incision, I know where the facet joints are.  And the way we

7  teach this to the students, medical students and the residents

8  is that the lower vertebra is doing a high five and the upper

9  vertebra is doing a low five, so there are two hands coming

10 together.  The thumb is where we need to go for the screw

11 placement.  That's the entry point.  So if you go too

12 medially, you're going to breach medial and hit the nerve.  If

13 you go too laterally, you're getting it air ball, like in

14 basketball.  You're not getting in to the right trajectory.

15 So it's a very precise location.  It's within really

16 millimeters of difference that allows to us go in and place

17 these screws where they need to be.

18         And then we do what he is called an AP, which is

19 frontal X-ray and a lateral X-ray, to make sure that the screw

20 is not too deep to hit the aorta or the blood vessels in the

21 front or pierce the valve.  Also we look in the frontal view

22 to make sure it's not too medial or not going into the canal.

23 So it is a pretty delicate way of doing this.  This is the

24 gold standard.  These are the best instruments we have to

25 stabilize the spine, because it gives us very rigid fixation

1    and allows the spine, number one, to let the bone grow.

2    Because if there's micromovement or movement of the spine, the

3    bone grafts don't heal.  And that's why we need to have a

4    stiff construct.  And it also allows to us reconstruct the

5    spine.  So if somebody is bent forward or they have scoliosis,

6    we can actually make them straight because these are very

7    strong elements that we use.

8    Q    How long are those, Dr. Mobin?

9    A    So the length of the screw can vary depending on the

10   anatomy of the patient.  We have a preoperative usually MRI or

11   CAT scan that we can measure the length that we need before

12   the operation.  So when we go to the operation, the reps bring

13   the differing lengths of the screws.  And then we go anywhere

14   from, for example, 30 millimeter, 3 centimeters depth all the

15   way to 60.  So we have to choose the right length.

16         And then, similarly, the width of the screw can vary

17   anywhere from four-and-a-half millimeter all the way to eight

18   millimeter, which is -- it doesn't sound much, but those are

19   smaller screws to very large screws, it looks like a bolt that

20   we put in.

21   Q    How heavy are they?

22   A    They're very light.

23   Q    Okay.  Now, how many of those did Mr. Bauta have in his

24   spine?

25   A    Initially, he had three on each side, a total of six.  On

1    then on the revision, they had to take the left L5 pedicle out

2    because the screw was close to the nerve.  So he ended up

3    having five screws.

4    Q    Is there a metal plate that goes over the top of those

5    screws?

6    A    It's actually a rod and there are two rods that hold the

7    screw heads together.  So this construct has two screws but,

8    in fact, at one side Mr. Bauta has three and on the other side

9    he has two.  He's missing the middle one.

10         MR. McELFISH:  Your Honor, at this time, plaintiff

11   moves to admit the screws as an exhibit of Dr. Mobin's

12   pre-marked exhibits of 403 for ID, we can make it 403-A.

13         MR. MANNION:  Objection, Your Honor.

14         THE COURT:  Sustained.

15   Q    Now, Dr. Mobin, thank you.  You have seen the animation

16   of the surgery that was done --

17         MR. McELFISH:  And for the Court, counsel, and for

18   the record, 377 in evidence.

19   Q    -- of the surgery that Dr. Cordiale performed?

20   A    Yes.

21   Q    And do you have an opinion whether or not that animation

22   appropriately represents how this particular surgery was done?

23         MR. MANNION:  Objection, Your Honor.  Outside the

24   scope of disclosures.

25         THE COURT:  Can I have the question read back,

1    please.  Actually, there are two.

2           MR. McELFISH:  I don't intend to show it.  I just

3    want to get an answer from the witness to understand that he

4    agrees with it and that he has reviewed it.

5           THE COURT:  Can I have the question read back.

6           (Record read.)

7           THE COURT:  I will overrule the objection.  You can

8    answer.

9    A    Yes.

10   Q    And to your understanding, did Mr. Bauta continue to

11   treat with Dr. Cordiale following these two surgeries?

12   A    He did, yes.

13   Q    Okay.  And do you have an understanding as to whether or

14   not he's still treating with Dr. Cordiale?

15   A    As of 2017, he still was.  In fact, there were two new

16   set of MRIs that were ordered by Dr. Cordiale in follow up.

17   Q    I believe that was October of 2017?

18   A    I believe so.  That's correct.

19   Q    All right.  And the EXHIBIT which comprises 354 for

20   identification, specifically 354-0001 through 354-0092

21   reflects your understanding of Dr. Cordiale and Dr. Mikelis'

22   treatment and care of Mr. Bauta?

23   A    That is correct.

24   Q    Do you have an opinion, sir, as an expert witness and as

25   a neurosurgeon as to whether or not that treatment and care is

Mobin - direct - McElfish                1434

1   reasonable and necessary for the injuries Mr. Bauta received

2   in the bus accident?

3   A    Yes.  My opinion is that the care was reasonable,

4   necessary and related to the bus accident.

5              MR. McELFISH:  I believe 354 has been admitted

6   already.  Your Honor, certain sections, just out of caution, I

7   move to admit the set, subject to agreement by counsel, we

8   make sure there's no duplication.

9              THE COURT:  Subject to the --

10             MR. MANNION:  May we have one second, Your Honor.

11             THE COURT:  Sure.

12             (Pause.)

13             MR. MANNION:  No objection with the same caveat.

14             THE COURT:  To the extent that it needs to be

15  readmitted, we will receive it in evidence.

16             MR. McELFISH:  Thank you.

17             (Plaintiff's Exhibit 354 was received in evidence.)

18  Q    Now, going to 355 for identification, Dr. Mobin, can you

19  generally state what these exhibits are?

20  A    So, 355 are the bills generated from New York Spine

21  Specialists and it spans the timeline starting November 17,

22  2014 through the last date in 2017, which appears to be April

23  12th.

24  Q    Okay.  Now, before we go any further, I want you to

25  assume that Dr. Cordiale testified to this, and I believe it

MDL   RPR

Mobin - direct - McElfish                     1435

1    is in the records that you have reviewed, that Mr. Bauta was

2    hospitalized from May 27th until June 5th.  Do you have that

3    understanding in mind?

4    A    Yes.

5    Q    I'd like you to explain, before I finish with 355, I

6    would like you to explain to the jury the difference between

7    billing charge for a professional service and for a facility

8    charge?

9    A    Sure.  The facility charge is as its name applies.  It is

10   the bill related to the hospital or the facility that the

11   procedure is performed at.  So the professional bill is what

12   the doctors bill on their own behalf in terms of the services

13   that they provide to the patient.

14   Q    Now, going to 355, the first page for identification,

15   does this page contain the dates of service for work that

16   doctors at New York Spine did for Mr. Bauta?

17   A    Yes.

18   Q    And as an example, for the X-rays and for the follow-ups,

19   at least, for instance, prior to May 27th of 2015, are those

20   charges reasonable and necessary?

21   A    Yes, they are.

22              THE COURT:  What page are you looking at?

23              MR. McELFISH:  355-001.

24              THE COURT:  Could I have the question read back,

25   please.

1    MR. McELFISH:  Let me withdraw the question, Judge.

2   I will try to clear it up.

3    THE COURT:  Thanks.

4   Q    So, Dr. Mobin, with respect to the service dates for

5   November 14th, I believe that's March of '15, but there's a

6   hole in it, and then some more March of '14 visits for

7   follow-ups, the first three in line there, are those doctor

8   visits?

9   A    Right.  So the November 17, 2014 and then March of 2015,

10  March 10th, I believe, those are follow-up visits and

11  evaluations.

12  Q    And for the amount billed for those particular individual

13  services, is that in your view reasonable and customary?

14  A    Yes.

15  Q    The next one down, also with a March 10, 2015 date, does

16  that appear to be an X-ray?

17  A    It is, yes.

18  Q    Is the amount associated with that reasonable and

19  necessary?

20  A    It is.

21  Q    If you would, please, for the initial consult and the two

22  follow-up visits, can you give the jury the amount of those

23  services?

24  A    Sure.  The amounts are $500 and then the two follow-ups

25  for 700, and then the X-ray is $250, the additional follow up

1    is $350.

2    Q    Okay.  That occurred in May prior to surgery; correct?

3    A    That is correct.

4          THE COURT:  Just to be clear, the two follow-ups are

5    not 700 each?

6          THE WITNESS:  No.  Combined.

7          THE COURT:  They are 350 each, total of 700?

8          THE WITNESS:  That is correct.

9          THE COURT:  Thank you.

10   Q    Now, the charges next down for 5/27/2015, do you

11   understand those to be charges for professional services

12   related to the surgery?

13   A    Yes.

14   Q    And before we get to the amount, can you explain to the

15   jury your understanding of what arthrodesis posterior service

16   would mean?

17   A    So that's the actual placement of bone graft on the --

18   what we call the fusion surface.  The doctor has to take a

19   drill and take away the top surface of the bone to make what

20   we call a bleeding bed for the grafts to be placed upon to get

21   healed.  So that's the process of what we call decortication,

22   which means we take the superficial layer of bone off and the

23   process of putting bone graft on that surface is called

24   arthrodesis.

25   Q    Okay.  And the amount for that service is how much?

1    A    The amount billed here, it is $20,000.

2    Q    And assuming we get to the end of this and we can talk

3    about the total, each of these are added up; correct?

4    A    All these subsequent codes are added together to come up

5    with a global fee.

6              (Continued on following page.)

Mobin, MD - direct - McElfish                    1439

1  EXAMINATION CONTINUES

2  BY MR. McELFISH:

3  Q    So if you go to the next one, it also appears to be a

4  charge for professional services during the surgery.

5         Can you explain to the jury what it is?

6  A    Right.  So the next charge is for the additional level of

7  arthrodesis.  So the arthrodesis code goes by level.  If you

8  do the L4/5, which was done in this case, it's one code; and

9  then when you go to the L5/S1 it will be the subsequent level,

10  so it's the second code, and that's what that code is.  First

11  one is 22612, and the subsequent code is 22614.

12  Q    Okay, and that is a point I want to go back to.

13         The arthrodesis posterior has a specific billing

14  code, correct?

15  A    Yes.

16  Q    And that is the first $20,000 charge you mentioned,

17  correct?

18  A    Yes.

19  Q    And those billing codes are called CBTs?

20  A    Right.

21  Q    Okay.  And they correspond to particular procedures in

22  the industry.

23  A    They do.

24  Q    And there is a different billing code used for the

25  additional segment that you just testified about?

SAM     OCR     RMR     CRR     RPR

1  A    That is correct.

2  Q    So it has a separate CBT code for the work done by the

3  surgeon?

4  A    That is correct.

5  Q    All right.  So going to the next one on the same surgical

6  date, can you describe what the next one is?

7  A    So the next one is the placement of the pedicle screw,

8  which is the 22842 code.

9  Q    And again, under the billing code guidelines, that has a

10  separate number?

11  A    That is correct.

12  Q    And I think I missed something, but the three things

13  we've talked about so far, the arthrodesis, the additional

14  segment and the instrumentation, can you give the jury the

15  amounts that were billed for those three services?

16  A    Right.  For the arthrodesis, as I had mentioned earlier,

17  was $20,000.  Billing the additional level was 20,000 as well.

18  And the billed amount for the instrumentation was $20,000.

19  Q    All separate $20,000 charges?

20  A    Yes.

21  Q    Going to the next page, which is 355, and I will -- I

22  apologize, I will try to slow down with numbers.

23        355-0002, also on the first surgical date, can you

24  go to the next one?

25  A    The next code under the same surgical date is 63047,

Mobin, MD - direct - McElfish                    1441

1  which is the laminectomy code.

2  Q    And the jury heard that's the bone removal during

3  Dr. Cordiale's testimony?

4  A    Yes.

5  Q    And what is the amount that's billed under the code for

6  that?

7  A    The amount billed is 20,000.

8  Q    Okay.  And go to the next item, please, and that date of

9  service?

10 A    Next item is 63048, which is the additional level of

11 laminectomy.  They did an laminectomy at one level, which is

12 the L4 laminate, and then the laminectomize on the L5

13 laminate -- and the additional code is 63048.

14 Q    And what is the reasonable and customary amount under the

15 coding for that service?

16 A    So the range is -- again, we see in these bills, they

17 represent the higher ends of normal.  I would opine for the

18 arthrodesis bill, $15,000, additional level is 7,500,

19 instrumentation code is 15,000.  The laminectomy code, it's

20 10,000.  The additional laminectomy code should be 5,000.

21 Q    Okay.  And so if you don't mind doing that again.  And I

22 apologize for the confusion.

23         The arthrodesis posterior that was originally the

24 first item you talked about that was $20,000, you think should

25 be?

SAM      OCR      RMR      CRR      RPR

1    A    15,000.

2    Q    15,000?  Okay.

3         And the additional segment bill for $20,000, you

4    think should be how much?

5    A    It should be 7,500.

6    Q    Instead of 20,000?

7    A    Correct.

8    Q    And the instrumentation, which is the implement of the

9    items, was $20,000.  What do you think you it should be?

10   A    It should be about 15,000.

11   Q    Going to the next page, the laminectomy, the first part

12   laminectomy billed at 20,000, what do you think is the

13   reasonable and customary amount?

14   A    The laminectomy should be about 10,000 for the initial

15   level and then 5,000 for the subsequent level.

16   Q    When you talk -- when we're talking about the subsequent

17   level, you mean the $30,000 bill for the laminectomy?

18   A    Right.

19   Q    So instead of $30,000, it should be 5?

20   A    Correct.

21   Q    And going on down to the lumbar plexus, what is that,

22   please?

23   A    So the surgeons, when they go in, in order to insert the

24   instrumentation or decompress the canal, they sometimes

25   encounter adhesions or scars within the canal, itself.  The

Mobin, MD - direct - McElfish                    1443

1    process of removing the scar and safely moving the nerve over

2    so you don't pierce the nerve in the instrumentation course,

3    or doing the discectomy part of the procedure is called

4    internal neurolysis.  And the reasonable charge is anywhere

5    between 7- to 10,000.  7,500 is a reasonable rate for that.

6    Q    And internal neurolysis, can you describe that?

7    A    The internal neurolysis, again, it's where the segment --

8    additional segment for -- and then the charge of 4,500 is

9    reasonable.

10   Q    And the next one down, the autograft, can you explain

11   what that is?

12   A    So autograft is the process of taking bone away from the

13   lamina or from other parts of the spine or sacrum and putting

14   it over the sides of the spine.  And the charge is $10,000 for

15   the autograft removal.  The reasonable rates are about

16   anywhere from 7- to 8,000, so I would say 7,500 would be a

17   more reasonable number.

18   Q    Okay, and the fluoros -- there is an autograft and then

19   there is an allograft.  What is the difference?

20   A    So allograft is a graft that is obtained from outside

21   sources.  Usually, it's a cadaveric bone or what we call

22   biomaterial that we use in the surgery, itself.  The process

23   of handling that tissue and preparing it and applying it to

24   the bed of bone for fusion, it's called allograft or

25   allografting.  And a reasonable rate for that is about 3- to

SAM      OCR      RMR      CRR      RPR

Mobin, MD - direct - McElfish                    1444

1    5,000.  So I would say 4,000 is a more reasonable number for

2    that.

3    Q    And the next one is a fluoroscopy, which is the

4    intrasurgical X-rays.

5    A    Right.  So the fluoroscopy is what we just talked about.

6    It is the process of obtaining X-ray throughout the procedure

7    to ensure placement of the screws and proper decompression,

8    making sure the alignment of the spine is properly

9    reconstructed.  And the code here is for more than one hour of

10   fluoroscopy, and the reasonable rate is about 1,500.  Their

11   rate is about 3,000.

12   Q    The repair wound complex?

13   A    Right.  So this is a repair for lumbar wound or closure

14   of a complex lumbar wound.  2,500, the charge is reasonable.

15   Q    That is reasonable?

16   A    Yes.

17   Q    The next page, and I have to plead I don't know what this

18   is.  This is another charge under another billing code for

19   arthrodesis posterior?

20   A    Yes.

21   Q    Is that duplicative or is that an additional charge?

22   A    That is duplicative.

23   Q    And would that be true of everything on this page, since

24   we just covered some of these things?

25   A    Yes.

Mobin, MD - direct - McElfish                    1445

1    Q    And let's go over to the next page.  I think everything

2    would be duplicative down to the bottom half of the page where

3    it begins with June 1st?

4    A    That is correct.

5    Q    Okay.  So on June 1st what was billed first?

6    A    So the June 1st operation included the re-exploration of

7    the spine.  The code for that is the 63042, for re-exploration

8    and laminotomy.

9             So what was the question?

10   Q    The question is, you're looking at the laminotomy for

11   June 1st, which is the second surgery; is that amount billed

12   reasonable and customary?

13   A    So the reasonable amount for that would be about 20,000,

14   for a redo exploration case, because it is more complicated

15   than the 63047 code.

16   Q    And by the way, is the second surgery as you understand

17   it, the removal of the pedicle screw and the hematoma, is that

18   reasonably necessary and related to the injuries received from

19   the accident?

20   A    It is a sequelae of the initial surgery, which was

21   related to the subject accident.  So it's indirectly related

22   to the bus accident.

23   Q    Indirectly, but nonetheless related?

24   A    Correct.

25   Q    Okay.  So the 30,000 on that page, 355-0004, becomes

SAM     OCR     RMR     CRR     RPR

1   20,000.  The next item is deeper complicated incision.

2          What is that?

3   A    So that's the code for irrigation and debridement, and

4   $3,000 is a reasonable number for that.

5   Q    Let's go to the next one, removal of the instrumentation.

6   A    Correct.  So this is actually 2,500, which is the low end

7   of normal, but that's a reasonable number.

8   Q    And the next one is repair wound complex, 2,500.  Is that

9   reasonable and customary?

10  A    So this is a repair of a -- closure of a complex wound.

11  And let me just make sure -- and that is a reasonable number

12  for that, yes.

13  Q    Then the last one is finishing out X-ray spine for $250

14  reasonable?

15  A    Yes.

16  Q    Last page on this, we have some follow-up visits.  And if

17  you could say -- if you could just take a look at them from

18  July of 2015 up until January of 2017, can you say whether or

19  not they are reasonable and customary in terms of just office

20  visits and X-rays?

21  A    Right.  So the rates at $350 for the follow-ups are

22  reasonable and necessary.  And X-rays also at $250 are a

23  reasonable and necessary part of the follow-up.

24  Q    And what about other charges like med recs and NARR,

25  N-A-R-R?

1   A    I am not familiar with NARR.  I don't know what that is.

2   Q    Okay.  Other than NARR on that page, is everything else

3   reasonable and necessary, or is there something else that you

4   don't recognize or agree with?

5   A    So the med rec charges, those are charges for duplication

6   or recreation of the records, and those are reasonable.

7   Q    So the $52 charge is unrelated to the treatment?

8   A    No, they're for the recreation of the records.  So

9   printing of the records, I would say.

10  Q    And the NARR, we don't know what it is, we'll take that

11  out.

12           Everything else is reasonable and customary?

13  A    Yes.

14  Q    Okay, on the last page, it also appears to be, I guess,

15  what you would call litigation charges or nontreatment

16  charges?

17  A    That is correct.

18  Q    So those would not be related, reasonably related to the

19  treatment and care, correct?

20  A    That is correct.

21  Q    Okay.

22           MR. McELFISH:  Now, at some point we'll be adding

23  those up, but for now, what I would like to do is, given the

24  testimony of Dr. Mobin, we would like to move into evidence

25  355 for identification, subject to redaction and whatever we

1    need to do to make sure that the records reflect the

2    testimony.

3              MR. MANNION:  I object to this particular exhibit

4    based on the testimony, Your Honor.

5              THE COURT:  Overruled.  We will receive it in

6    evidence.

7              (Plaintiff's Exhibit 355 was received in evidence.)

8    BY MR. McELFISH:

9    Q    I want to just go to 357-0006, which appears to be a more

10   updated version of the bill.  So my apologies on that.

11             Looking at the last page, looking at that page of

12   the bill for these additional charges, those are not related

13   or reasonably related to treatment and care, correct?

14   A    Correct.

15   Q    Let's go on over to the next book.

16             MR. McELFISH:  Mr. Barmen, do you have the next

17   book?

18             (Pause.)

19             MR. McELFISH:  May I proceed?

20             THE COURT:  Yes.

21   Q    Now, Dr. Mobin --

22             MR. McELFISH:  What's the matter?

23             THE COURT:  Nothing is the matter.  Go ahead.

24             MR. McELFISH:  Sorry.

25   Q    With respect to the hospital records and the surgery at

Mobin, MD - direct - McElfish                    1449

1  Franklin Hospital, or otherwise known as North Shore Hospital,
2  did you get a chance to review those records?
3  A    I have, yes.
4  Q    Okay, and would you agree with me that those records are
5  almost a thousand pages or more?
6  A    I know they're at least more than 700 pages.
7  Q    Okay.
8          MR. McELFISH:  Well, for purposes of brevity, Your
9  Honor, those exhibits were submitted to counsel and to the
10 Court electronically because they are almost a thousand pages.
11 BY MR. McELFISH:
12 Q    Do you recall the exhibit, Dr. Mobin?
13         THE WITNESS:  Yes.
14         MR. McELFISH:  We move to admit the hospital
15 records, Your Honor.
16         THE COURT:  What exhibit number is it?
17         MR. McELFISH:  They are 362.  They are not in the
18 book because of their size.  I do not intend to go through
19 them, just admit them as the hospital records.
20         MR. MANNION:  No objection, with the same caveat as
21 before, other than there may be individual portions of that
22 large, so we may need to talk about individual entries
23 throughout.
24         MR. McELFISH:  So agreed.
25         THE COURT:  All right.  Received, 362.

Mobin, MD - direct - McElfish                    1450

1            (Plaintiff's Exhibit 362 was received in evidence.)
2   BY MR. McELFISH:
3   Q    And as I said before, do you have an understanding that
4   Mr. Bauta was in the hospital for almost 10 days?
5   A    That is correct.
6   Q    Okay.  And if you turn now to 363 for ID, can you tell
7   the jury what this is?
8   A    Yes.  So 363 is the itemized bill from Franklin Hospital
9   regarding the dates of service of May 27th, 2015 through
10  June 5th, 2015.
11  Q    And based on the individual breakdown of the services
12  provided and your general understanding as a neurosurgeon, are
13  the charges for the hospitalization for those 10 days
14  reasonable and customary?
15  A    Yes.
16  Q    And can you tell the jury how much the hospitalization
17  was?
18  A    Total bill was $193,480.02.
19          MR. McELFISH:  And subject to redaction and other
20  duplicative agreements and things we've discussed, plaintiff
21  requests to move into evidence 363 for identification.
22          MR. MANNION:  With that caveat, Your Honor, no
23  objection.
24          THE COURT:  Received.
25          (Plaintiff's Exhibit 363 was received in evidence.)

Mobin, MD - direct - McElfish                1451

BY MR. McELFISH:

Q    And just a housekeeping matter.  If you go to 373-0001,
previously, we had requested, Dr. Mobin, that you opine on the
X-ray charges for Midtown Diagnostics and the number that you
put into evidence was 1894.  373-1 is the backup for that
charge.

        Do you see that?

A    Right, yes.

        MR. McELFISH:  Plaintiff moves to admit 373-1 only.

        THE WITNESS:  Just to be clear, the Midtown
Diagnostic charge here, this pertains to services of the
doctors that evaluated Mr. Bauta, and these are the specific
tests they did and the particular charges for those tests.
It's not X-ray charges, in other words.  It's separate from
the X-ray charges.

        MR. McELFISH:  Okay.

BY MR. McELFISH:

Q    And I believe on this issue, thankfully, last, but not
least, we can go to 376 for identification.

        THE COURT:  363, is there any objection?

        MR. MANNION:  Just the first page of that,
Mr. McElfish, 373?

        MR. McELFISH:  Yes, just for 373, page 1.

        THE COURT:  Yes.

        MR. MANNION:  No objection.

Mobin, MD - direct - McElfish                    1452

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 373 was received in evidence.)

3    BY MR. McELFISH:

4    Q    Now, 376 has four pages in it.  What is Medicsurg?

5    A    So the first page of Exhibit 376 is the itemized charge

6    for anesthesia which was provided by Dr. Razudian (phonetic).

7          MR. MANNION:  May we approach, Your Honor?

8          THE COURT:  376?

9          MR. McELFISH:  Yes.  It's tucked in the back of the

10   book.

11         MR. MANNION:  Can we approach briefly, Your Honor?

12         THE COURT:  Sure.

13         (Sidebar held outside the hearing of the jury.)

14

15         (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

Mobin, MD - direct - McElfish                    1453

 1            (The following sidebar took place outside the

 2     hearing of the jury.)

 3            MR. MANNION:  I've been told by Steven that this

 4     particular 376 was not produced in discovery and not disclosed

 5     to us.  I have to admit I don't know one way or another on

 6     that issue.

 7            MR. SAAL:  We've never seen anything from Medicsurg.

 8     Nothing in any disclosure.  We never had an authorization for

 9     it.  The first we saw it was when it was listed in the

10     pretrial order and we preserved the objection that it was not

11     previously disclosed in the Rule 16 order.

12            MR. McELFISH:  The service was provided adjacent to

13     the Accelerated bills, the service that is indicated is

14     included in the subpoenas that they have issued to both

15     Barnard and Accelerated.  Once they see those records, they

16     see the service.  It's in there.  You see if you look over

17     here (indicating), that's where the service was performed at.

18            MR. MANNION:  The issue is not the service --

19            MR. SAAL:  But if those records were in the

20     Accelerated records, we would have seen that.  The same way

21     when we requested everything from Irfan Alladin's office, we

22     received everything for Accelerated Surgical we received

23     everything for Barnard.  We never saw this provider.

24            THE COURT:  What was the service that was provided?

25            MR. SAAL:  I believe Mr. McElfish said anesthesia.

Mobin, MD - direct - McElfish                    1454

1   Is that correct?

2          MR. McELFISH:  I believe it's anesthesia supplies.

3   It's a vendor, yes.

4          MR. MANNION:  Looks like the charge is by the minute

5   because down here we have 19 minutes and the next one for

6   15 minutes is a little bit less, and the next one for 33 is

7   more.

8          MR. McELFISH:  I can ask the doctor.

9          MR. MANNION:  I mean --

10         MR. McELFISH:  If he doesn't know, he doesn't know.

11  If he knows, he knows.

12         THE COURT:  Does this have dates of service also?

13         MR. McELFISH:  Yes, because this was for each of the

14  different pain management procedures, I would assume.

15         MR. MANNION:  He could not have seen these before

16  any of his depositions because we've never had them, but --

17         MR. McELFISH:  Guys, I gotta get him off the stand

18  at 4 o'clock.

19         MR. MANNION:  I know.

20         THE COURT:  Okay, I am not going to allow it if you

21  didn't produce it in discovery.

22         MR. McELFISH:  I don't know that that's true, but I

23  don't have it right here.  Just because he says it, I don't --

24         MR. MANNION:  I would be willing to do this, Your

25  Honor, if you're okay with this, I mean without saying the

SAM      OCR      RMR      CRR      RPR

1   numbers, but if you ask if these are reasonable and necessary

2   and we find out they were produced in discovery, we can

3   talk --

4           THE COURT:  Give it to the jury?

5           MR. MANNION:  Or give them the number.  And if

6   they're not, then we don't.

7           THE COURT:  That's fine.

8           MR. McELFISH:  Sure.

9           (Sidebar concluded.)

10

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mobin, MD - direct - McElfish                    1456

1          (In open court - jurors present.)

2               MR. McELFISH:  Proceed?

3               THE COURT:  Yes.

4    BY MR. McELFISH:

5    Q    Now, looking at 376 for identification, Dr. Mobin, are

6    you able to tell what the service was that was provided?

7    A    Yes.

8    Q    Can you tell the jury what it was?

9    A    These are the bills regarding the anesthesia services for

10   Mr. Bauta's injections that were performed at Accelerated

11   Surgical Center on four different dates of service.

12   Q    And typically, in your experience, is this a service by a

13   vendor that's different than the facility charge?

14   A    That is correct.

15   Q    Okay.  And if you just would answer this question,

16   please.

17          The services that are indicated in these four

18   documents and the charges that are associated with it, are

19   they reasonable and customary?

20   A    They are, yes.

21   Q    And the service itself reasonable and necessary for the

22   injuries received by Mr. Bauta in this bus accident?

23   A    They are, yes.

24               MR. McELFISH:  And we reserve on the number.

25               THE COURT:  All right, received, subject to proof as

SAM     OCR     RMR     CRR     RPR

Mobin, MD - direct - McElfish                    1457

1   discussed at the sidebar.

2           (Plaintiff's Exhibit 376 was received in evidence.)

3   BY MR. McELFISH:

4   Q    Now, Dr. Mobin, just switching gears for a second.

5           With respect to every medical treating record you

6   have seen in this case, do you have an opinion for this jury

7   as to whether or not all of the treatment and care Mr. Bauta

8   has received as a result of this bus accident was reasonable

9   and necessary for the injuries he received?

10  A    My opinion is that they were reasonable and necessary and

11  related to the injuries that Mr. Bauta sustained in the bus

12  accident.

13  Q    Okay.  And --

14          MR. MANNION:  I am going to object.  Excuse me, that

15  was non-psychological?

16          MR. McELFISH:  Yes.  Let me rephrase.

17          MR. MANNION:  I just wanted to make sure.

18  Q    Other than the psychological and neuropsychological care

19  that Mr. Bauta received, do you have an opinion as to whether

20  or not all of the other treatment and care that Mr. Bauta

21  received from all of the doctors we've covered this morning,

22  all the facilities, all the hospitals, were reasonable and

23  necessary for the injuries he received in the bus accident?

24  A    Yes.  Minus the psychological testing, the medical

25  treatment rendered by the chiropractors, physical therapists,

Mobin, MD - direct - McElfish                1458

1  the orthopedic surgeons, neurologists and the spine surgeons

2  were all reasonable, necessary and related to the subject

3  accident.

4  Q    And with respect to the bills, although we do not have a

5  total figure right now for the jury -- we have to get together

6  to get that -- the individual bills that you've seen and

7  opined on before this jury, do you have an opinion as to

8  whether or not those charges all taken together were

9  reasonable and customary as you've seen them in the community?

10 A    They were.  And, you know, we've gone through, I think,

11 every single one line by line this afternoon and I've opined

12 regarding the ones that I thought were reasonable and I've

13 opined regarding the ones I thought they were a little bit on

14 the higher end.

15 Q    Dr. Mobin, have you seen Mr. Bauta personally?

16 A    I have not.

17 Q    And can you explain to the jury whether or not you needed

18 to do that?

19 A    Sure.

20 Q    I will move out of the way.

21 A    So my role here is really trying to explain from a

22 neurosurgical expert's perspective the care, treatment,

23 causation, and give you opinions on the radiology tests that

24 they were done, and also provide you with rebuttal opinions.

25      I am not here as a treating physician.  I don't --

SAM      OCR      RMR      CRR      RPR

1    there are no discussions or disputes regarding Mr. Bauta's

2    condition.  At least ten doctors have seen him and across the

3    board, every single physician or the chiropractors opined

4    regarding the spinal injuries.  So I did not feel that I need

5    to see Mr. Bauta and re-establish clinical diagnoses for him.

6    So there was no need for me to see him as a physician.

7            As an expert, I had all the data that was provided

8    to the doctors that were involved with the care of Mr. Bauta,

9    like Dr. Cordiale.  I had the imaging studies.  I had the

10   actual records of the hospitals.  I had the actual information

11   regarding the outcome of those treatments.

12           So I am here today to put those, hopefully,

13   together, from a neurosurgical expert's perspective and give

14   you my best opinion.

15

16           (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Mobin - direct - McElfish                1460

1    BY MR. McELFISH:  (Continuing.)

2    Q    Now you've had an opportunity to review the MRI films in

3    forming your expert opinion?

4    A    I have, yes.

5              MR. McELFISH:  At this point in time, we have an

6    agreement at this point with the defense that we can admit and

7    publish the MRI films.

8              MR. MANNION:  To publish?

9              MR. McELFISH:  Well, then, let me back up and do it

10   over.

11   BY MR. McELFISH:

12   Q    Dr. Mobin, have you seen the MRI films for the cervical

13   and lumbar spine taken of Mr. Bauta in November of 2013?

14             MR. MANNION:  We do, it's fine.

15             MR. McELFISH:  Do what?

16             MR. MANNION:  Agree admission of the publication.

17             THE COURT:  Can I have the exhibit numbers please?

18             MR. McELFISH:  Let me do it this way, Judge.  The

19   exhibits were marked generally in the pretrial order as 320.

20   They have not been individually marked, but I intend to do

21   that now.  I can do it as we go through and give them a

22   number.  They may have a number, but I don't know that they

23   do.  We listed it as 320.

24             THE COURT:  Okay.  We'll take them one by one then.

25   We didn't admit them.  Are there only five of them?

Mobin - direct - McElfish                    1461

1    MR. McELFISH:  We have an agreement to admit.  Yes

2    only five.

3    THE COURT:  I think you referred to them before as

4    320-001 through 005 and we will stick with those numbers and

5    they'll be received in evidence.

6    (Plaintiff's Exhibit 320-001 through 320-005

7    received in evidence.)

8    MR. McELFISH:  If we can lower the lights, I'll try

9    to move through them.  Is there any way to go any lower on the

10   lights?

11   THE COURT:  No.

12   (Exhibit published.)

13   Q    The first MRI, can you identify this for the record,

14   Dr. Mobin?

15   A    Sure, that is the MRI of the lumbar spine of Mr. Bauta

16   and the date is November 7, 2013.

17   Q    And this is shortly after the accident; correct?

18   A    Yes.

19   Q    Okay.  Now, which one of these views do you want to look

20   at?

21   A    So if you go to the upper right-hand corner, blow that

22   up.  That will be very helpful.

23   Q    And you can draw on your screen and then clear it on the

24   right side.

25   A    Okay.  So what we're looking at is the side-view of the

1    spine of Mr. Bauta.  This area here is what we call the

2    subcutaneous fat which is bright.  This particular sequence

3    also shows us the spinal fluid which is -- I'm drawing an

4    arrow here, if I can see if this works.  It doesn't.  That's

5    an arrow supposedly.  Okay, so the arrow that I'm trying to

6    draw the line to there's a white stripe of fluid that you can

7    see, that's basically spinal fluid and it's water and it's

8    bright on this particular sequence.

9            So, fluid is bright and then what we're looking at

10   is the center part of the discs which are bright.  That is

11   normally what we like to see in every single level except for

12   L5/S1 which is the last cushion between the last lumbar

13   vertebrae and the top of the sacrum which is right here.  At

14   the top of the sacrum, this structure looks like the ice cream

15   cone.  This is the top of the ice cream cone and that's where

16   the disc is having problems.

17           If you focus on this particular area here, that

18   reveals some interesting findings.  Can you focus on that?  Is

19   it possible to blow that up or no?

20   Q    Let me see.

21   A    Perfect.  So now what we're looking at is the disc or the

22   cushion between the two vertebrae, in particularly this area

23   is now displaced.  It's pushed into the spinal canal and it is

24   so much so that if you look at this dark line here, that is

25   the posterior longitudinal ligament.  It's a ligament that's

Mobin - direct - McElfish                    1463

1   behind the vertebrae and it's being lifted by this structure

2   which is the herniated disc.  So the herniation right here is

3   lifting this band of tissue which is the PLL and you can see

4   the PLL here being in close proximity to the other discs and

5   the other vertebrae there; so all of these.

6           And the other thing we see is if you look at the

7   disc above at L4/5, it has retained some of the water content.

8   It's bright on this sequence and if you look here, you can see

9   a -- just a hint of the white signal within the disc.  And if

10  you go to the prior image which was the upper left-hand side,

11  you can actually trace the -- you can actually trace the white

12  signal through the disc.  I'm trying to draw but the arrows

13  are not coming out nicely.  This particular arrow shows there

14  is still -- you can actually see the nucleus or the center

15  part of the disc herniated through the posterior aspects or

16  the back of the discs which is the increased signal within

17  that portion of the disc and that's a sign of a recent

18  herniation within weeks and months of this image.

19  Q    Okay.  This is called the sagittal view?

20  A    That's the side or sagittal view.  That's correct.

21  Q    What would you like to look at next on this MRI?

22  A    So this particular MRI has another page.  If you go to

23  the next page, then we can look at the axial images of the

24  L5/S1.

25  Q    Is it this page, bottom left?

1    A    No, it's another page.

2             THE COURT:  This is 320-001.

3             MR. McELFISH:  I don't see another page for this.

4    A    Does it move up?

5    Q    Yes, sorry.

6    A    The right upper hand side if you can blow up from here to

7    here, that would be great.  Fantastic.  So this is the axial

8    or the bird's eye view of the spine and the structure here

9    that we see is not supposed to be here.  That is part of the

10   nucleus that is now secluded.  It's inside of the spinal canal

11   and it's touching the nerves as they try to exit.  This is the

12   thecal sack, or the tent within the tunnel, and those dots are

13   the nerves going through the canal.  The disc is compressing

14   and effacing the covering of the nerves.  And if you go to the

15   prior image, which was the upper left-hand corner image and

16   blow up this area here.

17   Q    Too much?

18   A    Yes, a little bit higher up.  That's fine.  So now what

19   we can see is that the nerve exits.  This is the area that the

20   nerve has to go out from to go down into the spine.  This area

21   is completely shut off.  This area is completely shut off and

22   this is the area of the disc that's herniated into the canal.

23   We have the extruded discs which is central stenosis or

24   central narrowing and then we have narrowing on both sides of

25   the canal where the nerves have to exit the canal in order to

1    get to the legs.

2    Q    Now briefly, Dr. Mobin, while this image is up and in

3    brief rebuttal form, Dr. Casden for the defense, orthopedic

4    spine has indicated he agrees there is lateral compression in

5    those areas; correct?

6    A    Yes.

7             MR. MANNION:  Objection.

8             THE COURT:  Overruled.

9    A    That's correct.

10   Q    And also the defense radiologist, Dr. Provenzale, has

11   also indicated that the areas you have circled are tight but

12   he denies compression.

13            THE COURT:  You reviewed their reports?

14            THE WITNESS:  I did.

15            THE COURT:  Okay.

16   Q    Do you recall?

17   A    I did, yes.  And I do recall, yes.

18   Q    Okay.  So are they compressed or are they just tight?

19   A    Well, we can answer that by looking at a normal level --

20   let me see if I have an example of that.

21   Q    Do you have a comparative level?

22   A    If you go back to the first page and if you blow up this

23   particular image.

24   Q    The bottom left?

25   A    Yes.  Okay, so this is the L4/5 level which is less

1    problematic but does show compression as well.  Here what we

2    see is that there is still at least a sliver of opening for

3    the nerves to go out.  The nerves have to exit through what we

4    call the subarticular space.  This is the articular region or

5    the facets.  There's some opening here and some opening there.

6              But if you go back to the L5/S1 we see it's

7    completely compressed.  That's where the nerve has to exit in

8    order to go to the target area and the other level there's

9    really no room left.  So, I mean, you can see it -- you don't

10   have to be a radiologist.  You can clearly see that there's

11   this material in this area.  This area, this area, this air,

12   this area, that are not supposed to be there and it's

13   compressing on the pathway for the nerve because the nerves

14   have to clearly go out and come down from these the areas into

15   the legs and they seem compressed.  So I don't think there's

16   an debate on the image.

17   Q    Let me ask you this, going back just to the first page,

18   and let's use this as an example, we had some discussion with

19   Dr. Cordiale briefly about disc height and disc height

20   hydration.  Can you explain that?

21   A    So if you look at the spine and the lumbar region, these

22   are inner vertebral discs that I'm circling and they have

23   normal hydration and normal height.  The L5/S1 has more of a

24   triangular shape so it shows normal disc height in the front

25   and decreased disc height in the back because part of the disc

1   is ruptured and it's going into the canal.  There's a

2   mechanical disadvantage.  The vertebrae is actually slipped

3   backwards and the spondylolisthesis is one of the findings

4   that we have.

5            So if you were to draw a line in the front of the

6   spine you -- so if you were to draw a line in the front of the

7   spine, they all line up.  If you were to draw a line in the

8   back of the spine there's a little slippage there.  I'm sorry

9   the line is a little squiggly but what I can tell you is

10  that -- I can't erase this now, but the vertebrae.  This

11  particular vertebrae is slipped back relative to this

12  vertebrae which is in its normal position.  And that's because

13  there's a mechanical disadvantage.  Part of the disc is

14  herniated.  It's inside of the canal and the disc -- the

15  vertebrae slips backwards.

16  Q    And what does it tell you about all the levels above L4

17  that are hydrated with normal disc height?

18  A    So what it tells me is what I've said in my supplemental

19  report as a rebuttal to the other experts.  They're saying

20  that the spine is riddled with degenerative conditions,

21  spondylosis is the term they used.  It's not the case.  The

22  discs are of normal height and hydration in the remainder of

23  the spine, but there are problems in terms of actual disc

24  herniation and protrusion at the L5/S1 and L4/5 to a lesser

25  extent.  But I wouldn't say it's a spine that's completely

Mobin - direct - McElfish                    1468

1    riddled with degenerative changes.

2    Q     If you can take the colors off for a second.

3    A     I can't.

4          THE COURT:  Why don't we take a quick break and I'm

5    going to reboot the system.

6          (Jury exits.)

7          (Recess taken.)

8          (Jury enters.)

9          MR. McELFISH:  May I have the lights all the way

10   down?

11   BY MR. McELFISH:

12   Q     NOW, where we were, Dr. Mobin.  This is a blowup of the

13   L5/S1 for the lumbar spine from October of 2013 and what I

14   wanted to ask you before the break was can you tell the jury

15   why this disc level here is different than the other disc

16   levels.

17   A     Sure, so what we see on this blow up is the L4/5 disc at

18   the very top which is right up here and that's a cuboidal

19   shaped disc.  The L5/S1 has more of a triangular shape, a

20   wedge shape.  And what's happened is there's a portion of the

21   disc that's herniated in the back and the vertebral level

22   loses it's height, particularly in the back and the vertebrae,

23   the L5 vertebrae is slipping relative to the S1 vertebrae.

24          If I draw a line in the back of the spine here and

25   draw a line in the back of the spine there, there is a

SN        OCR        RPR

Mobin - direct - McElfish                    1469

1  two-to-three millimeter slippage of the vertebrae which is due

2  to this traumatic disc herniation.

3  Q    I was going --

4  A    Go ahead.

5  Q    I was going to ask you, do you have an opinion as to

6  whether or not this particular levels herniated as a result of

7  trauma or something else?

8  A    So, based on the history that's relevant or evident in

9  all the records, based on all the care and treatment that

10 Mr. Bauta has received in the post-accident events that's

11 taken place and also the MRI findings.  Again, I direct your

12 attention to this particular area, which is -- the part of the

13 disc that shows increased signal and that's the very important

14 finding in terms of recent trauma, recent herniated disc.

15      If this was a longstanding herniated disc it would

16 be calcified and dark in appearance but it is more likely that

17 the herniation occurred, as I said, within weeks or two months

18 of this MRI.

19      THE COURT:  Is this a different MRI than you were

20 showing to Dr. Mobin previously?

21      MR. McELFISH:  No, this is November of 2013.

22      THE COURT:  Okay.

23      MR. McELFISH:  Lumbar spine.

24      THE COURT:  So it's the first one.

25 Q    And to be clear, Dr. Mobin, you are talking about these

Mobin - direct - McElfish                    1470

1   white signals right here; right?

2   A    Right, so -- well, that's the pre-signal which is if you

3   compare this level to the L5/S1, there's loss of signal.  If

4   you blow that up -- so you can actually trace one of the lines

5   here that goes into the disc which tells us that the nucleus

6   is going into the disc but there's actually a portion of the

7   disc which I'm drawing to draw or circle for you right there

8   that shows increased signal and that's consistent with a

9   herniated disc.  So you can actually see a wedge of disc

10  material right there and I'm trying to see if I can draw it

11  better.  It's hanging off of the disc and there's also an

12  increased signal within the portion that's herniated.

13        Those are relatively important signs to determine or

14  age the herniation as far as the just pure imaging is

15  concerned.  If you listen to the patient, if you look at the

16  records.  It's very evident that his pain started within a

17  week of the collision in terms of both back and leg pain which

18  is consistent with the MRI finding.

19        MR. McELFISH:  Now, Your Honor, moving forward to

20  the next image it's going to be the February 2015 MRI just

21  before surgery.  We can mark that as 322.

22  Q    Which image, Dr. Mobin?

23  A    We can look at the sagittal image there, if you want to

24  blow that up on the left upper hand side, yeah.  So the disc

25  herniation on this particular image, what it shows it that we

1    still see a herniated disc at the L5/S1 level.  It's not as

2    large as the one we saw prior in the 2013 image and this

3    particular image is down to 5 millimeters from the prior image

4    which was 10 to 12 millimeters and that shows regression or

5    decrease in size of the herniation in the two-year interval.

6    Q    What does the medical word "resorption" mean?

7    A    Resorption is the medical terminology we use to indicate

8    that the disc herniated material that is starting to absorb or

9    the body is trying to break down, that part of the disc which

10   is displaced is in the canal.

11   Q    And does that explain the reduction in size?

12   A    Yes.

13   Q    And how large was the herniation in October of --

14   withdrawn.  How large was the herniation at that level in

15   November of 2013 by measurement?

16   A    It was about 10 to 12 millimeters.

17   Q    And in the scheme of things, is that a herniation you see

18   on a regular basis or is that unusual?

19   A    That's a large herniation.  It's not usually seen

20   randomly on MRIs?

21   Q    Is there any other image relative to the February 15

22   images?

23   A    So the axial images -- if you blow up this particular

24   image, you can see the nerve compression both in the center

25   part of the spine and also in the lateral part of the spine.

1   The white arrows that are placed on this image are to describe

2   or bring your attention to the nature of the disc herniation.

3   This is the material that's coming into the canal and it's

4   compressing the nerves and is still present on the 2015 study

5   after the interval time has passed.  So although the disc has

6   decreased in size in the center portion, the areas of the

7   nerve exits are still present which makes sense why Mr. Bauta

8   is still having pain at this point.

9   Q    Going to the next image which will be the -- let's do the

10  5/31/15, post-April scan?

11                THE COURT:  320-3?

12                MR. McELFISH:  Yes, 320-3.

13  A    So there should be another page to that image.  If you go

14  to the next page it's perfect.

15  Q    Which one?

16  A    Exit.  This image.  The upper left-hand one, yeah.  So

17  these are the postoperative images, CAT scan images of

18  Mr. Bauta's back after the surgery.  The image, there are

19  studies performed on May 31, 2015.  What it shows is that lack

20  of what we're supposed to see.  There's no more bone in this

21  area.  This is the laminectomy that was performed by

22  Dr. Cordiale at the L5 level and partial S1 level and partial

23  L4 level.  So from the bottom of the L4 to the top of the S1

24  is missing.  That's where the laminectomy was performed and if

25  you go back to the other sagittal image, you will see the

1  screw placement.  These are the actual screw material that we

2  show or we saw earlier in my deposition -- in my testimony.

3  We saw the material.

4         This is exactly the construct that is displayed

5  here.  These screws are going through those bony channels we

6  talked about earlier.  Those are the pedicles and this is the

7  back.  This is the front of the screw which is traversing the

8  spine from back to front.

9

10         (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mobin - direct - McElfish                    1474

1    DIRECT EXAMINATION

2    BY MR. McELFISH: (Continuing)

3    Q    Briefly, let's go to the next one, which is 6115, it is

4    an operative X-ray.  I'm sorry, 324.

5    A    If you will look at this particular image --

6    Q    Which one?

7    A    The left upper-hand.  So this particular image is after

8    the June 1, 2015 surgery where they removed the L5 pedicle on

9    the left-hand side.  We know this is on the back because this

10   is L for left.  This is the right-sided construct, which shows

11   the L4 and L5 and S1 screws in place.  It shows a correct

12   alignment of the spine and it looks fine.

13           And then if you go to the side view or the sagittal

14   view, which is this image --

15   Q    On the right?

16   A    Right upper-hand side, yes.

17           So this is the radiographic X-ray of the lumbar

18   spine of Mr. Bauta on June 1, 2015, and we can see the upper

19   pedicle screws, the L5 pedicle screws, and then the S1 pedicle

20   screws in place.  And these are the rods that hold the spine

21   and has the correct lumbar lordosis or lumbar curvature THAT

22   we like to recreate when we put instruments in.

23   Q    Last but not least, let's go to the early MRI of the

24   cervical spine or of the neck, that will be 320-5 in evidence.

25   This is from November 13th, Dr. Mobin, which view would you

MDL   RPR

1   like to discuss?

2   A    If you go to the left upper-hand corner, the sagittal,

3   side view of the neck.  What we are seeing here is that there

4   are some bulges at C5-6 in particular, and C6-7 levels, show

5   minor bulges but no definitive spinal cord compression.

6          And if you go to the axial views or the topdown

7   views, this is the C3-4 level, we're looking at the top to

8   bottom, again, those are the areas that the nerves have to

9   exit from and we can see the opening.  It is mildly stenotic

10  or narrowed on the left-hand side.

11         And if you go to the C5-6 level, which I believe is

12  on the next page.

13  Q    Which one?

14  A    The left upper-hand.  And this particular study shows

15  that there's more narrowing on the left-hand side compared to

16  the right-hand side, which is consistent with the radiologist

17  who read the report from the Precision Imaging.  But, again,

18  the spinal cord itself is normal.  There's no abnormal signal.

19  We can see the spinal fluid around the spinal cord, which is

20  good in terms of what it shows.

21         Mr. Bauta does have a disc protrusion at the C6-7

22  level, which is mostly central.  And that's the next image on

23  the right upper-hand side.

24         And just for comparison of internal control, this is

25  what normally we like to see.  This is the opening for the

Mobin - direct - McElfish                    1476

1    nerve.  The nerve has to exit and go to the arm and that's

2    normal as opposed to the other side, which is narrowed.  But

3    generally this protrusion in the center or bulge in the center

4    does not comprise the spinal cord and it appears to be okay.

5             MR. McELFISH:  Okay, I believe that's it.  Your

6    Honor, can we have the lights, please?  Thank you.

7    Q    Now, Dr. Mobin, in the time that I have remaining, I have

8    some additional questions to ask you, do you believe based on

9    the records and the films that we have seen that this bus

10   accident traumatically caused a herniated disc in Mr. Bauta's

11   low back?

12   A    That's my opinion, that to a reasonable degree of medical

13   probability with all of the records that I have seen, all of

14   the imaging studies and the history provided by Mr. Bauta to

15   all of the physicians involved, the bus accident is the most

16   likely event that caused the traumatic disc herniation.

17   Q    I know we haven't talked a lot of about the neck injuries

18   and the neck treatment, but did he have a neck injury and did

19   he treat?

20   A    He did.  I believe he had a sprain and strain and also

21   what we call cervical whiplash where the facet joints in the

22   neck get injured and he was properly treated for that.  He

23   also had herniations in his neck, but they were not as severe

24   as the lower back.

25   Q    I see.  Were those injuries to Mr. Bauta's cervical spine

Mobin - direct - McElfish                1477

1    in your opinion as an expert neurosurgeon causally related to

2    the bus accident on October 9, 2013?

3    A    They are, yes.

4    Q    And you believe that to a reasonable degree of medical

5    certainty?

6    A    That's correct.

7    Q    Have you been provided with any records of Mr. Bauta's

8    history before the accident?

9    A    I was.  I reviewed several records from Claxton Hospital.

10   Q    Can you tell the jury in summary fashion what the sum and

11   substance of Mr. Bauta's medical history was prior to this

12   collision?

13   A    So the sum and substance of that is that there are not

14   that many prior histories in terms of back pain or

15   radiculopathy.  There are sporadic entries, meaning that there

16   are few entries regarding back pain in the Claxton records.

17   One of them is mostly related to a bout of pneumonia Mr. Bauta

18   had.  He was treated for pneumonia.  They actually obtained a

19   chest X-ray from him.  They do X-rays of his spine.

20   Q    What was he treated for on that visit?

21   A    He was treated for pneumonia.

22   Q    And that was inn I believe in March of 2009?

23   A    That is correct.

24   Q    Have you seen, Dr. Mobin, any other indication anywhere,

25   in any of the records that Mr. Bauta ever had a back complaint

Mobin - direct - McElfish                    1478

1   or a back injury or back treatment prior to this accident in

2   October of 2013?

3   A    Not besides what I just said.

4   Q    And the lack --  withdrawn.

5        Just to make sure it is covered, have you ever heard

6   or seen where Mr. Bauta ever treated for any kind of back or

7   neck problem of any kind, but particularly with pain

8   management, physical therapy, chiropractors, surgeons, MRIs

9   prior to this accident?

10  A    No, I have not.  No.

11  Q    Did you have an opinion, sir, as to whether or not Mr.

12  Bauta is going to need future medical care?

13  A    I do.  I believe he will require medical care in the

14  future.

15  Q    And in connection with future medical care, have you

16  reviewed a life care plan by Mr. Provder?

17  A    I have.

18  Q    Do you agree, to the extent that the services contained

19  in the report are within the scope of your qualifications,

20  that the items he indicated would be reasonably needed?

21        MR. MANNION:  Objection.

22  A    Yes.

23        THE COURT:  Overruled.

24  A    The objects that Mr. Provder has indicated in his report

25  as far as the musculoskeletal and spine is concerned is within

1  my scope and I agree with him.

2  Q    Now, can you tell the jury that from a neurosurgery point

3  of view and a spinal surgery point of view exactly what

4  medical care you believe Mr. Bauta will need in the future

5  over his life expectancy?

6  A    Sure.  Just to set the stage where we are with Mr. Bauta

7  is that he has five screws and two rods in his back and we

8  tell our patients that after fusion you're not going to be the

9  same, you're hopefully going to be better than what you're now

10 in terms of your pain, but you're going to have rods and

11 screws and metal in your back.  In terms of future treatment

12 for Mr. Bauta is several fold, number one, he continues to

13 have pain.  He's not somebody who is completely cured from his

14 pain; hence, he needs to have access to spinal specialists

15 like Dr. Cordiale for follow-up visits to make sure that the

16 screws don't have problems, like there is screw breakage that

17 can occur.

18           More importantly, when we fuse the spine, again, the

19 purpose of the spine is to move.  That's how we get

20 information about our surroundings.  If we were to stick, we

21 would be eaten by tigers back in the evolutionary times, so we

22 need to be able to get information from our surroundings.

23 Once we mend or fuse two or three vertebral levels together,

24 what happens is the force is now transmitted to the level

25 above.  Generally, the level above and level below the fusion

1  will experience what we call increased pressure.  There's a

2  term called intradiscal pressure.  If you look at the disc and

3  you actually measure the pressure, if you fuse the spine, the

4  pressure in the level above rises.  It's a phenomenon called

5  stress riser.  And what does that do?  What it does is it

6  causes earlier breakdown of the disc.  In other words, it is

7  an accelerated degeneration, and the term for that we use is

8  the adjacent segment disease.

9       So there's entity that we discuss at our conferences

10  to try to avoid because the surgery has a side effect and

11  that's adjacent segment disease.  So he needs to have access

12  to spinal specialists, spine surgeons, pain management

13  specialists in particular, because what happens is the level

14  above the fusion, the facet joints are the first to go.  They

15  are going to be inflamed first because they are more delicate

16  and have more pressure on them, and he needs to have physical

17  therapy for that, medical therapy for that, facet injections

18  and rhizotomy, similar to what he had prior to the surgery, to

19  try to delay another surgery for him as long as possible.

20       Ultimately, because of his young age, he has 40, 50

21  years to go, there is to a reasonable degree of medical

22  certainty that the adjacent segment disease will occur in him.

23  And of the subsets of patients that get adjacent segment

24  disease, there are a preponderance of literature that tell us

25  they will require surgery for it.  So the coded rate is

Mobin - direct - McElfish                    1481

1    anywhere from three to six percent per year that the adjacent

2    segment disease will occur.  And at 10 years, the papers show

3    us it is about 36 percent of patients requiring surgery.  So

4    if you extend that out to 20 to 30 years, I can tell you to a

5    reasonable medical certainty it would require another surgery

6    in the future.

7    Q    And you're referring to the lumbar spine?

8    A    That is correct.

9         MR. McELFISH:  Okay.  Now, small screens, Judge,

10   please, just in case it is still stuck on public.

11   Q    Going to, for identification, 403-0110, can you tell the

12   jury, please, Dr. Mobin, what specific items you believe Mr.

13   Bauta will need and what you believe the costs are --

14        THE COURT:  Check your thing, please.

15        MR. McELFISH:  It's me.  I'm sorry, I don't publish

16   until you're ready.

17   A    Sure.  So the follow-up care with spine specialists at

18   least once a year for his lifetime.  I've written here $700

19   per visit, which includes the follow-up visit and also review

20   imaging studies.

21        Pain medications, narcotics, muscle relaxants and

22   anti-inflammatories, cost $2,000 per year.  Costs for other

23   classes of medication, in particular, Naproxen, Celebrex, and

24   antiinflammatory medications at $2,000 a year.  Physical

25   therapy, which is 20 sessions annually.  That's $3,000 a year

Mobin - direct - McElfish                    1482

1   cost.  Pain management follow-ups are 650, which will include

2   review of imaging studies.

3           And then we talked about facet blocks, facet and

4   rhizotomy, similar to what he has had before.  And the cost

5   for the facet blocks is 18,000.  That's inclusive of the

6   facility, anesthesiologist, and the surgeon who performs the

7   procedure, and that's for two sets.

8           And the rhizotomy, it's $15,000 for one set of the

9   cervical and lumbar, meaning $15,000 for each anatomic

10  location.

11          And imaging studies of MRI, I have here $2,000 per

12  study.  And ultimately, lumbar fusion for the level above,

13  extending that, which will occur probably in the next tend to

14  20 years, and that's 180,000.

15  Q    And you have checked Mr. Provder's report to make sure

16  those items are included?

17  A    Yes, I did.  They are included.

18  Q    All right.  Do you believe in your expert opinion that

19  Mr. Bauta, A, needs a cane now and, B, will need one going

20  forward?

21  A    So the cane will help him, yes.  I believe that he needs

22  one.  The reason for that is at this point his strength is

23  better, but he still has lower back pain, so it helps him with

24  taking pressure off his lower back, so one should be provided

25  to him.

Mobin - direct - McElfish                    1483

1  Q    To be clear, is he using that as a medical device or is

2  he using it in another way?

3            MR. MANNION:  Objection.

4            MR. McELFISH:  I don't know if I asked that right.

5            THE COURT:  Sustained.

6            MR. McELFISH:  Let me withdraw it.

7  Q    Dr. Mobin, what is the exact manner you believe or what

8  is the exact need you believe Mr. Bauta has with the cane?

9  A    So that the cane is a device that will allow him to

10 relieve the pressure on his lower back.  If he is using it

11 properly to offset the pressure in his lower back, then it

12 will provide an assistive device for ambulation.  It's not

13 necessarily for weakness in his leg.  It's to keep him more

14 comfortable.

15 Q    Now, my staff has added up generally the medical bills

16 that we discussed --

17            MR. MANNION:  Objection, Your Honor.

18            THE COURT:  Sustained.

19 Q    And do you believe that Mr. Bauta is going to need this

20 future care and future surgery to a reasonable degree of

21 medical certainty?

22 A    I do, yes.

23 Q    Now, my last area Dr. Mobin is, you had mentioned earlier

24 in your testimony you had worked in emergency rooms and had

25 been consultants to emergency rooms.

Mobin - direct - McElfish                    1484

1    A    I have been a consultant to an emergency room.  I haven't

2    worked in an emergency room, but I have been a consultant to

3    the emergency room.

4    Q    Thank you.  And you're familiar with the procedures that

5    county hospitals and emergency rooms use?

6    A    For neurosurgical issues, yes.

7    Q    And you have read the Brookdale Hospital records that

8    were for Mr. Bauta's visits after he was there the first time

9    in October of 2013?

10   A    Yes.

11   Q    And do you have an opinion, sir, as to whether or not --

12   as to what kind of examination was being done by the doctors

13   for the reasons he presented?

14              MR. MANNION:  Objection.

15              THE COURT:  Read that back to me, please.

16              (Record read.)

17              THE COURT:  I will allow it.  You can answer.

18   A    Sure.  So the question in the emergency room when a

19   patient comes in is this patient going to die in front of me

20   or not.  It's called triage.  So we do a certain test

21   immediately to make sure that the patient is not in dire

22   straight or in a situation where they are going to perish.  It

23   is airway control, breathing control, circulation, the ABC's

24   of triage.

25              Now, in the same token, if a patient comes into the

MDL   RPR

1    emergency room and complains of a sore throat, I don't

2    anticipate the emergency room physician to do a detailed

3    neurological examination to try to figure out if there is a

4    brain tumor, for example.  They're going to do a culture of

5    the throat, more than likely, perhaps a chest X-ray, and

6    prescribe medications and have the patient on their way.  It's

7    a very system directed examination and that's what we do in

8    the clinic.  The majority of patients that come in as a

9    follow-up, I don't go through the entirety of their exam again

10   unless there is a need for it.  So it is a system directed

11   examination.  That's what's done in emergency rooms and urgent

12   care centers routinely.  They don't necessarily do a detailed

13   neurological examination, hand, muscular skeletal examination

14   for an unrelated issue.

15   Q    Dr. Mobin, last question, all of the opinions -- all the

16   testimony and the opinions that you have given to this jury

17   today you hold to a reasonable degree of medical certainty as

18   a neurosurgeon?

19   A    I do, yes.

20         MR. McELFISH:  At this time, Your Honor, I have no

21   further questions of Dr. Mobin on direct.

22         MR. MANNION:  May I, Your Honor?

23         THE COURT:  Yes.

24         MR. MANNION:  Thank you.

25   CROSS EXAMINATION

Mobin - cross - Mannion                    1486

1   BY MR. MANNION:

2   Q    Good afternoon, Doctor.

3   A    Good afternoon.

4   Q    Good afternoon.  My name is Tom Mannion and I am one of

5   the lawyers that represents the defendants in this case.  I

6   have a few questions for you.

7              Starting with the bills, I just -- the jury heard a

8   lot of different numbers.  I want to make sure I understand

9   this correctly.  You haven't gone through all these bills to

10  see where the duplicates are and where they are not, have you?

11  A    I've seen every single line item bill, but as -- I

12  haven't gone through to see if there is a duplicate or not.

13  In fact, I know a couple of records are duplicative.

14  Q    We might have 21,000 in one set of invoices and 30,000 in

15  another, but some of them overlap?

16  A    They are overlapping bills, yes.

17  Q    And you haven't put pen to paper to figure out what the

18  true number is, have you?

19  A    No, I have not done that.

20  Q    Likewise, you don't know the amount that Mr. Bauta was

21  actually billed, do you, the exact amount that he was billed?

22  A    For all of the services, no, I don't have that total

23  number.

24  Q    Okay.  Now, as you mentioned on direct, you did not treat

25  Mr. Bauta; fair?

1   A    That is correct.

2   Q    And some of our experts obviously didn't treat him

3   either, that's how it goes with experts; true?

4   A    Sometimes, yes.

5   Q    Sometimes you actually as an expert though, get to see

6   the patient and examine and evaluate him; correct?

7   A    That is correct.

8   Q    Did you ask for that opportunity in this case?

9   A    No.

10  Q    You haven't met Mr. Bauta?

11  A    I haven't.

12  Q    You have not examined him?

13  A    That is correct.

14  Q    You have not talked to him on the phone?

15  A    That is correct.

16  Q    In fact, the only one you talked to about this case was

17  Mr. McElfish; true?

18  A    That's correct.

19  Q    And Mr. McElfish hired you to review the records in this

20  case and render opinions from a neurosurgeon's point of view;

21  correct?

22  A    That is correct.

23  Q    And we have seen volumes of records and I think some of

24  them even were on a disc because there were too many to

25  printout?

Mobin - cross - Mannion                    1488

1    A     Yes.

2    Q     And you had all of those records?

3    A     Yes.

4    Q     And what you were asked to do was to review those records

5    and render some opinions; fair?

6    A     Yes.

7    Q     And you spent approximately eight to ten hours reviewing

8    those records before issuing your report?

9    A     Before issuing the first report, that's correct.

10   Q     In your practice as opposed to being an expert, usually

11   patients are referred to you from another treating physician;

12   fair?

13   A     Yes.

14   Q     By the time they get to you, there's already a lot of

15   times a consideration that surgery is required, or should be

16   considered; fair?

17   A     Not always.  But I see patients in different situations.

18   Sometimes I see them as a first-contact point; sometimes I

19   have seen them as they have gone through other modalities of

20   care:  Physical therapists, chiropractors, or pain management

21   specialists have had a chance to treat them.

22   Q     They have tried conservative treatment and now it might

23   be time for surgery in those parents?

24   A     Yes.

25   Q     And sometimes that's simply because the patient's disc

1    has degenerated on its own without any type of trauma; fair?

2    A    That can happen.

3    Q    And sometimes it from a trauma, and by that I think what

4    we are all referring to here is an accident, or something of

5    that nature; fair?

6    A    Yes.

7    Q    It could be a car accident?

8    A    Yes.

9    Q    It might be a slip and fall on eyes?

10   A    That's true.

11   Q    In fact, is there any truth to the -- I have always heard

12   that people can sneeze and get a herniated disc.  Can that

13   happen?

14   A    Anything can happen.  But it is more likely that there's

15   a more traumatic event.

16   Q    Right.  So usually there's some type of significant event

17   that would cause a herniation?

18   A    Generally, yes.

19   Q    And sometimes you see a combination of both, partly

20   degenerative, their bones in their spine was already having

21   some problems and it is combined with the trauma; fair?

22   A    Trauma can be superimposed on a back injury and

23   degenerative disease, correct.

24   Q    In this case you would agree Mr. Bauta did have a number

25   of preexisting conditions in his spine that had nothing to do

1   with this accident; fair?

2   A    He had a number, which is not a lot of them, but he did

3   have age-related degenerative changes, which we would expect

4   to see in somebody in their 30's or early 40's.

5   Q    As we age, most peoples discs degenerate to a certain

6   extent?

7   A    Yes.

8   Q    The fluids in the disc tend to dry out and they can

9   become more brittle?

10   A    That is correct.

11   Q    You have genetic type of situations that cause you to

12   degenerate faster?

13   A    That's possible, yes.

14   Q    And in Mr. Bauta, Mr. Bauta was fine before this

15   accident.  And if we say degenerative, can we agree that would

16   mean before this accident?

17   A    Sure.

18   Q    He had osteophyte formations; correct?

19   A    In the front of the spine, not in the back of the spine.

20   I would say, in the cervical spine, in the neck, not in the

21   lower back.

22   Q    Well, and I'm just asking in general.  There were a

23   number of different conditions that Mr. Bauta had in his spine

24   that had nothing to do with this accident; fair?

25   A    Sure.  Yes.

Mobin - cross - Mannion                          1491

1   Q    Did you show us any of those on the film?

2   A    As I said, lumbar spine has very few findings.  The

3   osteophytes that you're referring to, and I went over during

4   my deposition with your colleague, were at the front of the

5   spine in the cervical region, so I didn't have a chance or

6   opportunity to show that on the lumbar.

7   Q    And osteophytes are evidence of a longstanding issue;

8   true?

9   A    Generally, they take months to years, yes.

10  Q    They don't just pop up overnight?

11  A    Correct.

12  Q    There was a calcified anterior longitudinal ligament at

13  C6-7 on the left side.  What's that?

14  A    That's the neck, at C6-7 in the front and the ALL, or the

15  anterior longitudinal ligament is the ligament that's in front

16  of the spine.

17  Q    And calcified would be something occurred over time?

18  A    Yes.

19  Q    Likewise, the November 2013 MRI shows a disc

20  protrusion -- excuse me.  Let me strike that.

21       You talked about a couple bulges.  Are you saying

22  the bulges were caused in this accident?

23  A    In the cervical spine he probably had some preexisting

24  bulges.

25       In the lumbar spine, he has frank extruded disc

Mobin - cross - Mannion                    1492

1  herniation, which is, if you look at the spectrum, and we are

2  using a lot of terms here, just to take one moment to explain

3  that to the jury, because it's an important point.  A bulge is

4  generally -- imagine me eating a lot of food and my belly

5  pushing forward.  That's a bulge.  Rupture is when actually

6  your guts rupture out.  That's an extrusion.

7          So there is a spectrum.  So if my belly is pushing

8  against the belt, that's a bulge.  But herniation is when

9  there is a crack between the muscles and the guts is coming

10 through it.  And extrusion is the guts are all the way there

11 (indicating).

12          Mr. Bauta has that, has the last kind, which is the

13 worst kind.  He has actually part of the nucleus of the disc

14 is extruded from the center part of the spine into the spinal

15 canal.

16 Q    Are you done?

17 A    Yes.

18 Q    Let's go back to my question.  I wasn't asking about a

19 herniation.  I was asking about the bulges that you identified

20 on the film.

21 A    Yes.

22 Q    You're not saying those were caused by the accident, are

23 you?

24 A    Not the bulges, no.

25 Q    Okay.  And certainly evidence of degeneration in one area

MDL   RPR

Mobin - cross - Mannion                    1493

1   of the spine certainly tells you you might get degeneration in

2   another area of the spine; true?

3   A    It can, but they could be mutually independent.

4   Q    There was a protrusion, you said, at C6-7?

5   A    Yes.

6   Q    You're not saying that was caused by the accident, are

7   you?

8   A    I don't know.  I don't have an MRI prior to the accident

9   to compare it to the MRI after the accident.

10          It does not cause nerve impingement or spinal cord

11  compression to the point where I would say Mr. Bauta needs to

12  have surgery for it.

13  Q    But you're not telling this surgery to a reasonable

14  degree of medical certainty that that protrusion at C6-7 was

15  caused in this accident; true?

16  A    That is true, yes.

17  Q    As you say, one of the reasons is you don't have film

18  from before the accident?

19  A    That's correct.

20  Q    In fact, nobody does here; correct?

21  A    There was no need for it from my understanding, that's

22  correct.

23  Q    And you were asked some questions about our experts, Dr.

24  Provenzale and Dr. Casden, a Dr. Rabin.  You have read their

25  reports?

1   A    I did, yes.

2   Q    And you understand that, in essence, the dispute between

3   you and them is how much of Mr. Bauta's current condition

4   preexisted the bus accident and how much was caused by the

5   accident; fair?

6   A    I think that's a generalization, but that's true, yes.

7   Q    That's the major difference; fair?

8   A    Yes.

9   Q    And you agree there is some preexisting degenerative

10  changes, you just don't agree that it's to the extent that our

11  experts say; fair?

12  A    That is true, yes.

13  Q    And one of the things that none of us can do is go back

14  and look at, of course, a prior film to compare from before

15  accident to after?

16  A    Right.  There are no pre-accident films to my knowledge.

17  Q    And we do know that with the condition that Mr. Bauta had

18  there at the scene and even at the ER on the 9th and the next

19  day at Brookdale, in your opinion he had this 11 millimeter

20  herniation at that time; fair?

21  A    Not necessarily.

22  Q    Okay.

23  A    So what can happen is, first of all, symptoms of disc

24  herniation can occur in a delayed fashion.  It doesn't --

25  Q    I'm not talking symptoms.  I'm just talking about whether

1   it's there.

2   A    Yes.  And there's no way to tell that because we don't

3   have an MRI on the day that he went to the ER at Brookdale or

4   Evangelical Hospital, Evangelical Community Hospital.  What I

5   can tell you to a reasonable degree of medical certainty is

6   that when Dr. McGowan, the chiropractor, examined Mr. Bauta,

7   he has symptomatology that is in line with extruded disc or

8   disc herniation.  In fact, she says, wait a minute, let's get

9   an MRI.  And the MRI that is done within a month to six weeks

10  from the incident shows a ruptured disc.  So to a reasonable

11  degree of medical certainty, I can tell you that there was

12  disc injury at the L5-S1 that either caused the extrusion at

13  the time of the incident, at the time of the bus collision, or

14  within the first week after the collision.

15  Q    And I know you have some opinions based on the film, but

16  what you have just told me was based on the symptoms; true?

17  A    It's both symptoms and films, yes.

18  Q    Agree.  But what you were just talking about there is the

19  fact that he had symptoms, complained of them and then get an

20  MRI, and that's one of the things that led you to the opinion

21  that this was traumatic?

22  A    Yes.

23            (Continued on following page.)

24

25

1   EXAMINATION CONTINUES

2   BY MR. MANNION:

3   Q    And what was the date of the first complaint of back

4   pain?

5   A    So the first complaint of pain in general is the 10th,

6   which is total body ache.  The first day of back pain

7   complaint is, I believe, the first visit with Dr. McGowan, and

8   shortly thereafter with the physician at the time.  If you let

9   me, I'll tell you the dates.

10  Q    October 17th?

11  A    October 17th, that's correct.

12  Q    So about eight days after the accident?

13  A    Correct.

14  Q    So are you saying that there was no herniation,

15  protrusion or extrusion at all at that level before this

16  accident?

17  A    No, what I'm saying is that there was no extrusion.

18  There could have been a herniated disk.  It could have been

19  disk desiccation, either drying up of the disk or brittle

20  disk, at the L5/S1.

21       In other words, if you had an MRI of Mr. Bauta's

22  back, let's say, a month before the accident, it could have

23  shown a disk that had lost its desiccation, perhaps some

24  height loss, but no extrusion like the one we see on the

25  November 2013 MRI.

Mobin, MD - cross - Mannion                1497

1  Q    What is your opinion to a reasonable degree of medical

2  certainty as to the extent, if any, of any herniation at the

3  level where he had the 11-millimeter herniation later, prior

4  to this accident?

5  A    So to a reasonable degree of medical certainty, what I

6  can tell you is that there are no records within the four

7  years from the time that he goes to Claxton in 2009 'til this

8  accident of 2013 that shows any type of back pain,

9  radiculopathy, sciatica or a need for chiropractic or even

10  physical therapy.

11         So I can tell you that if he had a disk bulge or

12  herniation, it was asymptomatic, and I can tell you that there

13  was a very high likelihood that he did not have an extruded

14  disk prior to this accident.

15  Q    Okay.  That's extrusion, but I am coming back.

16         Do you have an opinion as to how much, if at all, he

17  was herniated at the that L5/S1 level?

18  A    No, I can't, and nobody can, because there is no image to

19  tell you.  You are asking me how much or what's the

20  quantification of the herniation, you have to have an image to

21  do that.

22  Q    Do you believe in your opinion that there would be a

23  difference in how much pain he experienced if there was an

24  immediate 11-millimeter herniation and extrusion versus if,

25  let's say, it went from 7 to 11?

SAM      OCR      RMR      CRR      RPR

1  A     There is no way to tell, because individual experiences

2  are different.  Some individuals have higher pain thresholds,

3  some don't.  And also the circumstances of the herniation.

4          So if there is a major accident, a accident that

5  there is fatalities at the scene, or there is an issue that

6  you want to save your own life, that's a flight-and-fight

7  response.  It's a physiological response to preserve yourself.

8  So even if you have a large disk herniation, you will get

9  yourself out of that scene from -- you know, preserving

10  yourself.

11          So there are a lot of circumstances that will

12  dictate an individual response to a traumatic event.

13  Q     So generally speaking, you would agree a disk herniation

14  of this size will cause excruciating pain typically?

15  A     I just explained it.  It really depends on the

16  circumstances.

17          Typically, what I have heard, and I've seen patients

18  with massive herniations, and some of them say, You know, Doc,

19  I just had a pop in my back.

20          I treated a Air Force pilot that had a 22-millimeter

21  disk herniation, and the only thing he complained about was he

22  said, Doc, I had a pop in my back.  So it really -- the size

23  of the herniation and the amount of pain an individual relates

24  to you may not be proportional.

25  Q     I know there are exceptions to all the general rules.

Mobin, MD - cross - Mannion                    1499

1     I am asking, generally speaking, would you agree if

2  a traumatic event occurs that causes an 11-millimeter

3  herniation, that person is going to know it?

4  A    As I said, not necessarily.  It depends on the --

5  Q    That is not what I'm asking.

6  A    It depends on the circumstances.

7  Q    Generally speaking, more likely than not, sir, they're

8  going to feel some serious pain with an 11-millimeter disk

9  herniation, true?

10 A    Not instantaneously.  They can have -- as I said, they

11 can be in a shock situation.  They can have distracting

12 injuries, and they can have these symptoms in a delayed

13 fashion.  And this is what ER physicians tell their patients

14 that get into car accidents, You're gonna be fine right now,

15 but tomorrow, you won't be able to move.

16 Q    Well, that's soft tissue injury mostly?

17 A    Well, part of the soft tissue injury is what takes over

18 the disk herniation and pain.

19 Q    Maybe I'll say it again one more time.

20     More likely than not in a traumatic accident, absent

21 something masking the symptoms that you're talking about, that

22 person is going to feel some serious pain at that time or

23 within a day or two, fair?

24 A    They will feel the soft tissue pain.  That is fair, yes.

25 And then the inflammation sets in from the disk.  Those are

Mobin, MD - cross - Mannion                    1500

1   the stages of the problem that a disk causes.  So as the disk

2   herniates, it causes an inflammatory response.  That takes 24

3   to 48 hours to set in.  That's why we give

4   anti-inflammatories.  Then they complain of stinging down the

5   legs.  That's why we prescribe epidurals.  And if those help,

6   great, but if the pain goes away and the leg starts to get

7   weak, that's the later stages of the disk herniation, which is

8   the mechanical compression of the nerve.  That's where we get

9   involved as surgeons to go and take the pressure off of the

10  nerve.

11          So there are stages to herniation, and patients can

12  either have a lot of pain or no pain, or have pain the next

13  day or within a week or within a month even, depending on what

14  medications they take, what circumstances they're under, and

15  what other issues can mask the pain.

16  Q    Pain by definition is subjective, fair?

17  A    That's fair.

18  Q    But you have to rely on what the patient is saying about

19  the pain level?

20  A    Yes.

21  Q    We do know, and we'll talk about this more later, but we

22  have at least seven days or so where there are no complaints

23  of pain, upper back, middle back or lower back, fair?

24  A    I don't know that.  He might have had pain and didn't go

25  to the hospital or to the chiropractor.

SAM      OCR      RMR      CRR      RPR

1  Q    Okay.

2  A    There is no --

3  Q    Let me ask it again.

4  A    Yeah.

5  Q    Do you have any evidence anywhere in the records,

6  depositions, anywhere, that in the first seven days after this

7  accident, Mr. Bauta said, My low back hurts?

8  A    Not specifically his low back.

9  Q    My middle back hurts?

10 A    Well, total body ache would involve the neck, middle back

11 and low back.

12 Q    And if they said they had a total body ache and then

13 somebody palpates the back and it's not tender and they deny

14 back pain --

15 A    That's the physical exam finding.

16 Q    Okay.

17 A    It's not the subjective complaint.

18 Q    Let me ask it again.

19       Do you have any evidence anywhere your that

20 Mr. Bauta told any healthcare provider, or anybody else for

21 that matter, in the first seven days that his back,

22 specifically his back, hurt?

23 A    Not in records, no.

24 Q    Well, not in anywhere, is it?

25 A    Well, records is only thing I have to go by.

1   Q    Okay.  So what you've done then is you've looked at the

2   records, talked to Mr. McElfish, looked at the film and you've

3   come up with opinion.  And in your opinion, which we've heard

4   for the last few hours, this occurred in the bus accident, the

5   herniation.  You were also asked, though, about our experts,

6   Dr. Provenzale.

7            Do you know what his specialty is?

8   A    So there are a lot of questions in that one question.

9            Let me just step back a little bit.

10           THE COURT:  Why don't you break it out?

11           MR. MANNION:  Sure.  We'll just strike that.

12  BY MR. MANNION:

13  Q    You were asked about Dr. Provenzale and about whether you

14  agree with him?

15  A    That is correct.

16  Q    And Dr. Provenzale is a board certified neuroradiologist,

17  correct?

18  A    He's a board certified radiologist.  There is no such

19  thing as board certified neuroradiologist.

20  Q    But he is a neuroradiologist, that is what his specialty

21  is, true?

22  A    True.

23  Q    That's not your specialty?

24  A    It's part of my training, but not my specialty.

25  Q    It's what he does on an everyday basis, fair?

1    A    I don't know that, that's his specialty.

2    Q    And the film -- two of the primary issues on the film, I

3    think you said, that lead you to the conclusion this was

4    traumatic is the increased signal --

5    A    Yes.

6    Q    -- and then also the resorption?

7    A    That is correct.

8    Q    And by resorption we mean the herniation got a little bit

9    smaller?

10   A    It got about half the size, yes.

11   Q    Well, it got about 2 millimeters smaller, didn't it?

12   A    Well, I have measurements of 12 millimeters on sagittal

13   images, and it goes down to about 5 millimeters on the

14   subsequent 2015 image.

15   Q    With respect to the signal, you understand that

16   Dr. Casden, Dr. Provenzale and Dr. Rabin, a neurologist, all

17   say that that happens whether it's traumatic or whether it's

18   chronic and degenerative.  True?

19   A    I don't remember exactly what they said, but I can tell

20   you the T2 signal is commonly seen in an acute herniated disk

21   setting.

22   Q    And it's also commonly seen in a degenerative setting,

23   isn't it?

24   A    No.  In a degenerative setting, the disk appears to be

25   degenerated in its entirety, meaning that the entire disk has

1  low signal or appears dark.  It shouldn't have one bright part

2  and one dark part.

3  Q    And you understand that those three experts disagree with

4  you, fair?

5  A    If that's what they said, then they disagree.

6  Q    And I think what you said regarding the difference in the

7  size of the herniation is that if, in fact, the herniation did

8  not get smaller, did not resorb, then you would agree with

9  Dr. Provenzale.

10        Do you recall that?

11  A    Again, what I said, if the disk is already a degenerated

12  disk and has calcifications in it, for example, because what

13  happens is the cartilage can become calcified.  It can become

14  like bone over time, then it won't change its size on

15  subsequent images.  If that's the case, then I would agree

16  with that.

17  Q    I want to go to that spot in your deposition, and see if

18  that refreshes your recollection on that issue.

19        One second, sir.

20        (Pause.)

21        THE COURT:  Can I have the prior question read back,

22  please?

23        (Record read back as requested.)

24  BY MR. MANNION:

25  Q    Just so we're clear then, if this was a static calcified

Mobin, MD - cross - Mannion                    1505

1    disk, you would agree with Dr. Provenzale?

2    A    Correct.

3    Q    And what you told us in your deposition was that there

4    was a 2-millimeter difference, true?

5    A    It's possible on that image that we were talking

6    specifically that was the difference, but if you look at the

7    sagittal images -- and that's what the radiologist, Dr. Lichy,

8    also measured it to be -- large herniation about 12

9    millimeters.  So I have the same measurement on the 2013 MRI.

10   And if you go to the 2015 MRI, on the sagittal or side view

11   images, it goes to about 5 millimeters.

12   Q    And you raised a good point, the angle that you look at

13   this level of a disk could impact how large the herniation

14   looks, true?

15   A    So on the axial image, meaning if you're looking from top

16   to bottom, the measurement is about 5 millimeters across in

17   some of the images.  And then if that changes to

18   3 millimeters, which is what I think we were looking at at the

19   time of the deposition, for that particular specific image,

20   yes, the difference would be 2 millimeters.

21   Q    So now let's take a look at the medical records, because

22   the medical records are where you would have determined issues

23   with respect to symptomatology, correct?

24   A    Yes.

25   Q    If we could first talk about the EMS.  I have not used

SAM     OCR     RMR     CRR     RPR

Mobin, MD - cross - Mannion                     1506

1    this yet.  Let me make sure I have the right buttons to push

2    here.  Oh, is it on the small screen?  I got you.

3              MR. MANNION:  Any objection to publishing this?

4              THE COURT:  What is it?

5              MR. MANNION:  EMS records, Your Honor.

6              THE COURT:  Exhibit number?

7              MR. MANNION:  It is GLI 040193.

8              MR. BARMEN:  It is Exhibit 402.  What he gave you

9    was the Bates stamp, Your Honor.

10             THE COURT:  Any objection, Mr. McElfish?

11             MR. McELFISH:  No.

12             THE COURT:  All right.  Has this been -- all right,

13   I'll publish it to the jury.

14             (Exhibit published.)

15             MR. MANNION:  If you could pull with the Bates

16   number GLI 040193, the same exhibit number we just discussed.

17   BY MR. MANNION:

18   Q    Now, sir, two EMTs treated Mr. Bauta at the scene, true,

19   or evaluated him?

20   A    I can't see this record to tell you that.

21   Q    Hold on.

22             THE COURT:  Are you pulling it up over there?

23             MR. MANNION:  Yes.

24             THE COURT:  No objection?

25   Q    And you've seen the EMS record, correct?

1    A    Yes.

2    Q    You don't dispute that Kelly Peachey and Thomas Latosek,

3    EMTs, saw Mr. Bauta that day?

4    A    I believe that's true.

5    Q    And, in fact, they did -- certainly not as thorough as a

6    neurologist would or, perhaps, an emergency room, but they did

7    their own evaluation of Mr. Bauta, correct?

8    A    Yes.

9    Q    They inquired into his medical history, and it says none;

10   fair?

11   A    Again, I can't see that part.

12         MR. MANNION:  If we can put the whole, at the

13   bottom.

14         THE WITNESS:  Okay.

15   BY MR. MANNION:

16   Q    They inquired into his medical history, his medications,

17   allergies, things of that nature?

18   A    Yes.

19   Q    They took his blood pressure several times over 15 or

20   20 minutes; fair?

21   A    That's correct.

22   Q    They examined him physically and documented their

23   physical findings, true?

24   A    They have a very brief paragraph that summarizes that.

25   Q    In fact, if you could highlight the history of present

1    illness, is that the paragraph you're talking about?

2    A    Right.

3    Q    The history of present illness?

4    A    Yes.

5    Q    If we could look at that, we can see on here, Patient's

6    only complaint was left lower leg pain, correct?

7    A    That was the chief complaint, yes.

8    Q    It says, Plaintiff's only complaint was left lower leg

9    pain, correct?

10   A    Yes.

11   Q    And that was the left shin that had a brush burn and was

12   swollen; fair?

13   A    Yes.

14   Q    Mr. Bauta denied blurred vision, true?

15   A    Yes, correct.

16   Q    He denied a headache, true?

17   A    That's what it says.

18   Q    He denied hitting his head to the EMT, fair?

19   A    That's what it reported, yes.

20   Q    He denied back pain?

21   A    Correct.

22   Q    He denied neck pain?

23   A    Correct.

24   Q    And by denying back pain, that means they asked him about

25   that issue, true?

1              MR. McELFISH:  Foundation.

2              THE COURT:  Overruled.

3              You can answer the question.

4    A    I can only say what the report says here.  I'm not sure

5    if this is a template they have.  Is it the actual -- if they

6    actually asked the patient.  So you have to ask the EMTs.  But

7    the report, or the record, what it says is that he denied

8    blurred vision, headache, hitting his head, back pain.

9    Q    That is not a template, that is a narrative that they

10   typed out, true?

11   A    I don't know that.  You'd have to ask them.

12   Q    Well, you are rendering opinions based upon reviews of

13   medical records, fair?

14              MR. McELFISH:  Objection, argumentative, foundation.

15              THE COURT:  Overruled.

16   BY MR. MANNION:

17   Q    True, sir?

18   A    Yes.

19   Q    And you're not sure whether what they wrote under history

20   and present illness is a narrative or some type of template?

21   A    Right.  So I look at the records and I opine on them.

22   Q    That wasn't my question.

23   A    Well, I have --

24              THE COURT:  Let him answer the question.

25              MR. McELFISH:  Objection.

Mobin, MD - cross - Mannion                    1510

1      THE COURT:  Let him answer the question.

2  A    I basically review the records and I -- and I review them

3  at their face value as what they are.  I don't have any

4  knowledge of how they're obtained.  If they are used as part

5  of the electronic medical record template, as part of the

6  EMTs' templates or whatnot.  This is a record that I reviewed

7  and I relied upon.  That's it.  I don't know how it was

8  obtained.

9  BY MR. MANNION:

10 Q    Well, it's important for you to know whether their

11 information was obtained directly from the patient, true?

12 A    True, but there is no way for me to verify that.

13 Q    How did you verify all of the other information in all of

14 the other records with respect to Mr. Bauta's complaints?

15 A    It's what the records say.

16 Q    Okay.  So you accept it as true?

17 A    I do, yes.

18 Q    Well, will you accept this as true?

19 A    I do.  If it's a subpoenaed record and it's authenticated

20 record, then yes, I accept it as a true record.

21 Q    You never raised any question about this record from the

22 time of your deposition in 2016 until now, have you?

23 A    No, I'm just simply trying to answer your question, as --

24 you know, was this received from Dr. -- from Mr. Bauta or not.

25 And I simply tell you, I don't know how it was created.

1   Q    They also did a neurological exam; fair?

2   A    I don't know that, sir.

3   Q    Okay.

4         MR. MANNION:  You can pull that up at the bottom

5   there.

6   A    So that is not something I would call a neurological

7   exam.  They are indicating patient is alert.

8   Q    Okay.  Well, they actually -- the Glasgow Coma Scale,

9   they did some evaluations to come up with a value for the

10  Glasgow Coma Scale score, didn't they, sir?

11  A    I don't see a number for that.

12  Q    Okay, let's look at the next page then.  Same exhibit

13  number, but Bates stamped 040194 at the top right.

14        MR. McELFISH:  Judge, I would just ask, if he's

15  going to cross-examine Dr. Mobin, he at least give him the

16  record.  In this case, he asked a question and he had a

17  different record in front of him as if -- so now he finally

18  changed the page, is what my point is.

19        THE COURT:  All right.

20        MR. MANNION:  Your Honor, he reviewed the record.

21        THE COURT:  Fair enough.  It is a carryover to the

22  next page.

23        MR. MANNION:  Yes, it is on the second page.

24  BY MR. MANNION:

25  Q    So there was a value of 15, correct?

SAM     OCR     RMR     CRR     RPR

1    A    Right.

2    Q    That's the highest you can get on that, true?

3    A    Yeah.  The patient is awake and alert and is able to

4    communicate.

5    Q    Well, there is a P, an M and a V that you look at for

6    that test, true?

7    A    There is an E, a V, and an M.

8    Q    It's E-V-M, true?

9    A    Yes.

10              THE COURT:  What does that mean; that test?

11              THE WITNESS:  E is for eye, V is for verbal, and M

12   is for motor.  And there are different numbers under each

13   category, and they add up from lowest 3 to highest 15, and it

14   is a scale to determine if the patient is in coma or not.

15   BY MR. MANNION:

16   Q    Well, it's more than just a coma.  We knew he wasn't in a

17   coma, fair?

18   A    That's my point, yes.  This is not a neurological exam,

19   this is just a scale that's done at the scene to communicate

20   to the ER that, hey, we have a patient here that is not in

21   coma, is actually alert, able to follow command, verbalize,

22   and his eyes open.

23   Q    What number would you have to be to be in a coma?

24   A    Less than 8.

25   Q    Okay.  Then if it's over 8, why even keep going?

1  A     Because if there is a traumatic brain injury, then the

2  Glasgow Coma Scale becomes an important number in terms of

3  prognostication to the Emergency Room.

4  Q     Exactly.  So let's look here.  Under the motor

5  evaluation, they looked at the LA, RA, LL and RL.  That would

6  be the left and right arms and the left and right legs?

7  A     Correct.

8  Q     All normal, true?

9  A     Right.

10 Q     Same with the sensory for those, true?

11 A     Yes, that's correct.

12 Q     And by the verbal -- means they would talk to him, and

13 that was normal?

14 A     Yes.

15 Q     Pupils and eyes were normal there?

16 A     Correct.

17 Q     They checked the airway and the respirations; fair?

18 A     Yes.

19 Q     And they went down and actually did physical findings.

20 If we could highlight the center part of that exhibit there

21 that says initial physical findings.  And if you go down, and

22 you see where it says neck findings, sir?

23 A     Yes.

24 Q     No documentation of neck pain; fair?

25 A     Yeah, this is the physical finding.  So it won't be

1    subjective like pain.

2    Q    But there was no mention of tenderness.  This is where

3    you would mention tenderness if you found it, true?

4    A    Yes.  If they found tenderness, I think this is where

5    they would record it.

6    Q    And by tenderness, that means they actually touched that

7    portion of the patient's body to see if it elicits a pain

8    sponsor if the patient says it hurts?

9    A    If that was done, that's correct.

10   Q    And down at the fact findings, we see it says normal, and

11   then it says negative bruising or abnormality.  So they

12   actually observed the back, fair?

13   A    Fair.

14   Q    And so to neither one of those EMTs were there any

15   questions relating to -- excuse me, were there any complaints

16   at all with respect to neck or back, fair?

17   A    On the physical finding, that's correct.

18   Q    Well, in any of those of those two pages, fair?

19   A    Fair.

20   Q    And you had mentioned something in your direct about

21   there's five items you were looking at:  Back pain, radiating

22   pain, numbness, tingling and quadricep pain.

23         Do you recall talking about those symptoms you saw

24   that helped lead to you your opinion?

25   A    Yeah.  Those were in conjunction with symptoms that would

Mobin, MD - cross - Mannion                    1515

1    be elicited in terms of nerve compression.

2    Q    None of those five were present at the scene of this

3    accident, fair?

4    A    Not that the EMTs have discovered, but that is a very

5    different question.

6    Q    Okay.  Well, you have no documentation anywhere that any

7    of those are present at the scene, fair?

8    A    Yeah, but you are assuming that they did a thorough

9    neurological examination to determine that, which I don't

10   believe happened.

11   Q    Well, they touched his neck and back and there was no

12   back pain, fair?

13   A    Yes.

14   Q    There were no complaints of radiating pain, fair?

15   A    Not that's been reported, correct.

16   Q    And he had no complaints of numbness, tingling or

17   quadricep pain, fair?

18   A    Correct.

19   Q    Now, let's go to the Evangelical Community Hospital

20   records, the ER that he went to later that day, and he was

21   there for about five hours, true?

22              THE COURT:  Do you want to offer 401, at least those

23   two pages, into evidence?

24              MR. MANNION:  Thank you.

25              Your Honor, at this time, we would move to admit

SAM      OCR      RMR      CRR      RPR

Mobin, MD - cross - Mannion                    1516

1    Exhibit 402.

2              THE COURT:  401, I think it is, right?

3              No, it's 402.  402, you are right, my bad.

4              Objection, Mr. McElfish?

5              MR. McELFISH:  No.

6              THE COURT:  Received, Defendant's Exhibit 402.

7              (Defendant's Exhibit 402 was received in evidence.)

8              MR. MANNION:  Thank you.

9    BY MR. MANNION:

10   Q    Now I'll move on to Exhibit 403, the Evangelical

11   Community Hospital records.

12             He was there for about five hours, would you agree?

13   A    I don't know the exact number of hours.

14   Q    Whatever is in the record, you wouldn't dispute that?

15   A    Correct.

16   Q    Likewise, would you agree that he was observed by five,

17   six, seven different healthcare providers during that five

18   hours?

19   A    If that's what the records say, I don't dispute that.

20   Q    And if the records show that Nurse Eppley and Nurse Erb,

21   a Dr. Gessner, a Nurse Kelley, a Nurse Mull, and several

22   others were involved in the evaluation and treatment and

23   discussions with him; you would not dispute that, fair?

24   A    That's fair.

25   Q    He was physically examined in the ER, right?

SAM      OCR      RMR      CRR      RPR

1    A     Yes.

2    Q     He had CTs performed?

3    A     That is correct.

4    Q     Can you tell the jury how many complaints Mr. Bauta made

5    to any of those six or seven people concerning his back?

6    A     So I am having a little hard time reading this, but what

7    it says is the -- thanks.  The passenger was involved in the

8    accident on the interstate.

9    Q     Excuse me, sir.

10            MR. McELFISH:  Objection.

11            MR. MANNION:  Your Honor, this is nonresponsive.

12            MR. McELFISH:  Well, we don't know that because we

13   haven't heard the answer yet.  He keeps interrupting the

14   witness.

15            MR. MANNION:  I don't keep interrupting him.

16            THE COURT:  Stop.

17   BY MR. MANNION:

18   Q     The question is, how many complaints of back pain did

19   Mr. Bauta make in that ED?

20   A     Not back pain, but he did make other complaints.

21   Q     In fact, he made no complaints of back pain to the nurses

22   or the physician, true?

23   A     Looking at this one page of the report -- of the

24   Evangelical Community -- that's what it says.

25            MR. MANNION:  If we can go to, same exhibit, Bates

1  stamped 040197 at the top.

2  BY MR. MANNION:

3  Q    And at the top at 3:39 a.m., and that's before any pain

4  medication was provided, true?

5  A    I'd have to look at the records for timing of that.  I

6  don't know.

7  Q    So whatever the time says in the records, you won't

8  dispute that on the pain meds?

9  A    That's fine, correct.

10 Q    And it specifically says denies back pain; fair?

11 A    That's fine.  Yeah, that's fair.

12       MR. MANNION:  And down under the exam at the bottom,

13 if you could highlight where it says back at the bottom, and

14 highlight that.

15 Q    Could you read that for us and tell us what it says about

16 the physical exam of the back?

17 A    So under back, it says tenderness is absent.

18 Q    You are not saying that this Emergency Room physician

19 doesn't know how to check for tenderness in the back, are you?

20 A    No.

21 Q    Okay.  I mean, how did he have to check for tenderness in

22 the back?

23 A    It's palpation of the lower back and the mid-back.

24 Q    And by palpation, you mean what?

25 A    Feeling it.

Mobin, MD - cross - Mannion                    1519

1   Q    And so you are trying to say there is an 11-millimeter

2   herniation from this accident that an Emergency Room doctor

3   tries to elicit pain and it doesn't hurt him?

4   A    No, that's not what I said.  The earlier testimony is --

5   I can repeat it for you -- is this:  That he either had a

6   large herniation at the scene of the accident or had a

7   substantial tear in the back of the annulus, where the disk

8   resides.  And then over the next seven to 10 days, by the time

9   he gets to Dr. McGowan's office is where he's complaining of

10  neck pain and radiating pain.  That's where this rupture

11  actually occurred.  So it can happen in delayed fashion.

12

13              (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1   BY MR. MANNION:   (Continuing.)

2   Q    Would you agree that today is the first time you told

3   anyone that the rupture occurred after this accident?

4   A    No, it's what I said; that the disc was a traumatically

5   used disc in my deposition in my reports.  And the specifics

6   that you're trying to elicit in the timelines is what I'm

7   going to tell you; he either had the herniation at the scene

8   of the accident, he became symptomatic in a delayed fashion,

9   which is in my report.  If you're going to get more specific

10  on that, then I can give you a more-specific answer.

11  Q    You would agree though that if Toradol had not been

12  provided yet and the emergency room physician palpated his

13  back, you would expect significant pain in that area, wouldn't

14  you, sir?

15  A    It depends on other injuries.  On thing that you failed

16  to mention is that he had complaints of other areas of pain.

17  He was complaining of pain, for example, in the anterior

18  aspect of both legs, right worse than left.  He's also

19  complaining of neck stiffness.  He has other areas of pain.

20  So there are other circumstances that are at play.

21  Q    But I was talking about the back pain.

22  A    That's what I'm talking about too.

23  Q    So you're trying to say whatever is going on with his

24  legs and the stiffness in his neck would mask the herniation,

25  whatever size it was?

1    A    It depends on whatever amount of pain that was in his

2    legs.  It can, yes.

3    Q    There was also film done there and you'd agree that that

4    film showed, in part, dense calcifications, true?

5    A    Films for what area?

6    Q    Do you recall seeing the film reports from the CT?

7    A    He had a CT scan of his knee, I believe, and cervical and

8    lumbar spine in the emergency room.

9    Q    He had a CT of the brain which showed no acute

10   intercranial injury, is that fair?

11           MR. McELFISH:  Objection.  Outside the scope of this

12   witness' testimony?

13           THE COURT:  Overruled.

14   Q    There was no bleed, true?

15   A    That's correct.

16   Q    There was a dense calcification on the CT of the brain.

17   That would not be caused by the accident; correct?

18   A    That's correct.

19   Q    There was no disruption of the gray/white matter on that

20   film, true?

21   A    That's what I remember, that's correct.

22   Q    And the CT of the cervical spine showed no fracture,

23   true?

24   A    That's correct.

25   Q    It did show mild degenerative changes manifested by mild

Mobin - cross - Mannion                    1522

1    anterior osteolytic spurring, true?

2    A    Yes.

3    Q    All preexisting this accident, fair?

4    A    That's what I said already, yes.  He had calcification in

5    the front of the cervical spine.

6    Q    So, in addition to the two EMTs we have five or six

7    healthcare providers at the ER and you agree that he did not

8    complain to any of them of back pain, fair?

9    A    That's correct.

10   Q    He did not complain that pain was radiating from his back

11   to somewhere else?

12   A    That's correct.

13   Q    Or numbness, fair?

14   A    Correct.

15   Q    Or tingling?

16   A    That is correct.

17   Q    Or quadricept pain?

18   A    That's correct.

19   Q    From there, Mr. Bauta, the next day went to Brookdale

20   Hospital, yes?

21            MR. MANNION:  Excuse me, Your Honor.  I move 403

22   into evidence.

23            THE COURT:  Objection?

24            MR. McELFISH:  No.

25            THE COURT:  Received.  Defendant 403.

1          (Defendants' Exhibit 403 received in evidence.)

2    Q    Referring to Exhibit 404, the Brookdale records, do you

3    recall, sir, that he was seen by several nurses and a doctor

4    Susan Jacobowitz at Brookdale?

5    A    If that's what the records say, I don't dispute it.

6    Q    And he was at that hospital for several hours as well,

7    true?

8    A    Yes.

9    Q    They did a history, a physical exam and came up with an

10   assessment and a plan?

11   A    They did, yes.

12   Q    Would you agree he denied blurred vision, nausea and

13   vomiting?

14   A    I believe so.

15   Q    He denied a headache?

16   A    If that's what -- if he did not complain of at that point

17   I would not dispute it.

18   Q    I would go through more of the records if I had more time

19   here.  He denied extremity weakness, fair?

20   A    Fair.

21   Q    And by that I would mean all four, upper and lower, true?

22   A    It can, yes.

23   Q    Well, he denies extremity weakness would be both arms and

24   both legs, fair?

25   A    Yes.

Mobin - cross - Mannion                          1524

1    Q    And he denied difficulty walking, true?

2    A    Let me see the particular report you're pulling up right

3    now.

4    Q    On the same exhibit if we can go to 216, please in

5    addition to the history and the subjective complaints, they

6    did their own exam, true?

7    A    At Brookdale, yes.

8    Q    And that's what we would call objective.  It's not coming

9    from the patient.  It's the physician's assessment, true?

10   A    It's called objective but the physician relies on the

11   patient to get answers from the different maneuvers that the

12   physician is performing.  So it's part of subjective and part

13   objective.

14   Q    If we look under the exam objective under the neck, do

15   you see it says "NT," true?

16   A    Yes.

17   Q    And that means non-tender, doesn't it?

18   A    Yes.

19   Q    In other words, they palpated his neck and there was no

20   tenderness or pain, fair?

21   A    Fair.

22   Q    It says, Full range of motion of the neck, ROM, true?

23   A    Yes.

24   Q    And no JVD, true?

25   A    Yes.

SN        OCR        RPR

Mobin - cross - Mannion                          1525

1    Q     And that would be jugular vein distention?

2    A     Yes.

3    Q     That particular finding has nothing to do with this case,

4    I assume?

5    A     Yeah.

6    Q     But their physical exam of his neck showed no tenderness

7    and full range of motion, fair?

8    A     That's what they found, yes.

9    Q     If we then go to the extremities we see that there was

10   some calf pain.  It says subjective pain but there nothing

11   else listed in here regarding the back as being anything that

12   had an increased range of motion or pain.  Only the calf under

13   this exam objective, fair?

14   A     So this is an extremity exam.  They won't mention the

15   back under that treatment.

16   Q     I meant in the whole objective standpoint under the

17   neuro, the treatment, the entire set here, there's no mention

18   of back pain, fair?

19   A     Right, there's no mention -- well, back pain will not be

20   mentioned under objective.  It will be under subjective

21   history.

22   Q     There's no mention of tenderness to the back, fair?

23   A     Fair, that's correct.

24   Q     So, we have again he essentially treated, received some

25   Motrin and Flexeril when he left and was discharged, fair?

1          MR. McELFISH:  Can you show me the assessment and

2    plan.

3          MR. MANNION:  It's the same page at the bottom.

4          MR. McELFISH:  You've got to move it up so the

5    witness can see it before you ask the question of the doctor.

6    Please.  I mean --

7    Q    You've reviewed all of these records, true, sir?

8    A    I have, yes, part of the thousands of pages that I've

9    seen.

10   Q    So you'd agree that there's nothing in this entire record

11   from Brookdale where it uses the word "back" and associates it

12   somehow with pain, tenderness or decreased range of motion,

13   agreed?

14   A    That's correct.

15   Q    And the neurological exam says "gait normal," so he was

16   walking fine, true?

17   A    Which is not consistent, but that's true.

18   Q    And not consistent with what?

19   A    With calf pain on the right side, swollen calf and they

20   say gait normal, which is not consistent.

21   Q    Well, he walked in there and they observed him and they

22   said his gait was normal, fair?

23   A    I'm just pointing it out there's inconsistency, but

24   that's what they're reporting.  I don't have a dispute about

25   it.

Mobin - cross - Mannion                              1527

1   Q     In addition to the two EMT and at Evangelical we have

2   three more healthcare providers where there were no complaints

3   of back pain, true?

4   A     True.

5   Q     No complaints of radiation, true?

6   A     Yes.

7   Q     No complaints of numbness, tingling or quadricept pain

8   either, true?

9   A     That's correct.

10  Q     Then, we have no treatment for the next five days, the

11  11th, the 12th, the 13th, the 14th, the 15th.  I think he

12  finally sees a physical therapist on the 16th.

13  A     I believe that's correct.

14  Q     And do you recall, sir, I won't put it up now, but do you

15  recall that the physical therapist had a spot for low back

16  pain and it was completely blank?

17  A     I'd have to look at the report.

18  Q     If that's what's in there, you don't dispute that?

19  A     If it's in there, no.

20  Q     The first complaint then of back pain would be on October

21  17, 2013 with Dr. Hal Gutstein over at 110 West 34th Street?

22  A     Yes.

23  Q     And what we know is that in those five days Mr. Bauta

24  retained a lawyer, fair?

25              MR. McELFISH:  Objection, foundation.

SN        OCR        RPR

1          THE COURT:  Do you know when Mr. Bauta retained an
2     attorney?
3          THE WITNESS:  No, sir.
4          MR. MANNION:  040495 -- 413, Your Honor, Bates
5     stamped 040945.
6          THE COURT:  Before you move on, are you offering --
7          MR. MANNION:  Yes, I am Your Honor.
8          THE COURT:  Objection?
9          MR. McELFISH:  I don't have it.
10         MR. MANNION:  It's the Brookdale records from the
11    ED.
12         MR. McELFISH:  No objection to that okay.
13         THE COURT:  Received Defendant's 404.
14         (Defendants' Exhibit 404 received in evidence.)
15    Q    413 is New York Medical Rehab Center, Grand Concourse
16    Chiropractic PC, 110 West 34th Street.  You've seen these
17    records, true, sir?
18    A    I believe so, yes.
19         MR. MANNION:  Small screens only, Your Honor,
20    please.
21         THE COURT:  These are Dr. Russo's records; is that
22    correct?
23         MR. MANNION:  Yes, sir.
24    Q    You'll see on here this is from October 16, 2013;
25    correct?

1   A    That first exhibit, yes.

2   Q    And on here it indicates Attorney Colbert, 50 East 42nd

3   Street.

4   A    Yes.

5   Q    And it has all of his information and to the left of that

6   it says, "Left message for info"?

7   A    Yes.

8   Q    So fair to say that Mr. Bauta was represented before he

9   went to see the doctor on the 17th?

10  A    That's what it appears to be.

11  Q    And were you aware that actually the attorney referred

12  him to that physician?

13         MR. McELFISH:  Objection, foundation.

14         THE COURT:  Do you know one way or the other how he

15  came to be there?

16         THE WITNESS:  I don't know that.

17  Q    Would that make a difference to you?

18  A    It doesn't.

19         MR. McELFISH:  Argumentative.

20  Q    Would that make a difference to your review of the

21  records and the credibility of the records?

22         MR. McELFISH:  Objection.

23  A    It doesn't, no.

24  Q    Okay.  You would agree, though, that the credibility of

25  both the patient and the patient's treating physicians is

1  important to you as an expert reviewing these records?

2  A    Yes.

3  Q    In fact the history provided by a patient is, I think in

4  your own words, one of the most important parts of an exam,

5  fair?

6  A    That is fair.

7  Q    And of course by saying that what you mean is the

8  credibility of the patient and what they're reporting is

9  crucially important, fair?

10  A    What I'm saying is you need to get an honest history from

11  the patient in order to be able to treat them.

12  Q    And to the extent the history you're getting is not

13  accurate for whatever reason, that would cast some doubt on

14  the information in the records, fair?

15  A    It can, yes.

16  Q    Likewise, you want your physicians that you're relying on

17  and their records to be credible, do you agree?

18  A    Yes.

19  Q    And, I mean, you didn't know anything about Mr. Bauta's

20  background when you reviewed this other than what you saw in

21  the medical reports, true?

22  A    That's correct.

23  Q    And, again, you only talked about Mr. McElfish, none of

24  the treaters there?

25  A    That's correct.

Mobin - cross - Mannion                    1531

1   Q    And didn't see Mr. Bauta?

2   A    Correct.

3   Q    You testified as an expert for Mr. McElfish before, fair?

4   A    I have.

5   Q    Just recently out in L.A., was it?

6   A    It was in Los Angeles, but I'm not sure how recent it

7   was.

8   Q    Several times you worked for Mr. McElfish before, true?

9   A    Probably two or three times before.

10  Q    And some of our experts have worked with us before, but

11  you two knew each other from that, fair?

12  A    Yes.

13  Q    And you've testified dozens and dozens in trial, fair?

14  A    I have.

15  Q    You've given over 200 depositions?

16  A    I have.

17  Q    When you were reviewing this case, even up until today,

18  you were under the opinion that Dr. Lattuga was one of the

19  treating physicians, fair?

20  A    That's what the records indicated, so, yes.

21  Q    The records that you relied on for their truth said that

22  he was a treating physician, fair?

23  A    Well, he evaluated Mr. Bauta and I went through this in

24  the deposition to a certain extent.  He didn't treat Mr. Bauta

25  in the sense of operating on him or performing procedures on

SN        OCR        RPR

1    him, but he evaluated him.

2    Q    You understood, though, and you believed at the time you

3    were giving your deposition that he had actually treated

4    Mr. Bauta.  He was one of the treaters, true?

5    A    It's a play with words, but yes.  He was one of the

6    doctors that evaluated Mr. Bauta.

7    Q    You thought he was one of the doctors that evaluated him

8    meaning he laid his eyes and his hands-on him, true?

9    A    Yes.

10   Q    And to this day do you know what Dr. Lattuga's true

11   involvement was with the plaintiff?

12   A    I don't know.

13   Q    Okay.  One of the -- before we go on I want to mention

14   briefly that as expert you obviously are getting paid for your

15   time, true?

16   A    Yes.

17   Q    Just like our experts.  What was it, 15,000 to come and

18   testify at trial?

19   A    It's for a full day, yes.

20   Q    And how much had you spent or charged before that,

21   25,000?

22   A    I don't know it's that high, but it will be the record

23   reviews and the preparation of reports.  So I believe our

24   office provided you with a breakdown but I don't believe it's

25   that high.

1    Q    And, in fact, I think that as of June 2017 you were over

2    $21,000 that you had billed on this?

3    A    If that's what the records say, yes.

4    Q    Let's talk about the report from Dr. Lattuga that you

5    relied on.  If we can get to that report -- the Bates stamp

6    number that I'd like to go to is 42835.  454 is the exhibit

7    number.

8             THE COURT:  428 what?

9             MR. MANNION:  845.  It's Exhibit 454.

10   Q    And, sir, you reviewed Dr. Lattuga's 14-page report?

11   A    Yes, I did.

12   Q    Okay.  By the way, part of those charges, we're talking

13   about credibility, did you realize that part of the charges

14   that you talked about had a $1,250 charge for this report?

15   A    If that's what the records indicate.  I don't dispute it.

16   Q    And if Dr. Lattuga never saw this patient, never talked

17   to him, never evaluated him, never treated him, would you take

18   that $1,250 off?

19   A    If it was intended for treatment, yes, but if it was a

20   report that was created with the review of records then

21   there's a charge for that.

22   Q    And the providers, one of the providers you talked about

23   charged $30,000 for a procedure that you said $5,000 was the

24   reasonableness expense.  Do you recall that?

25   A    Yes.

Mobin - cross - Mannion                          1534

1    Q    600 percent higher than it should be?

2    A    It's -- the reason for that is when you do a procedure,

3    the second code is a percentage of the charge.  In other

4    words, if that code was done by itself then, yes, it would

5    have been the full amount, but since it's in conjunction with

6    other codes, then it would be reduced and that's what I said

7    in my testimony.  I'm not trying to give you the highest

8    number or the lowest number.  I'm trying to give you the

9    number that I've seen as a fair and reasonable number.

10   Q    I'm not criticizing you.  What I'm saying is that treater

11   was charging $30,000 when they should have charged 5?

12   A    They might have, yes.

13   Q    If we look at this exhibit here on 835?

14           MR. McELFISH:  Your Honor, we move to admit

15   Dr. Lattuga's report and publish this to the jury.

16           THE COURT:  Objection?

17           MR. McELFISH:  No objection.

18           THE COURT:  This is exhibit Defendant's 454.  What

19   pages?

20           MR. McELFISH:  It would be pages 042833 through

21   042846, 14 pages.

22           THE COURT:  So received.

23           (Defendant's Exhibit 454 received in evidence.)

24   Q    Sir, if you look, it says follow-up visit on January 22,

25   2015.  Do you see that?

1   A     Yes.

2   Q     And when you reviewed this, you thought this was

3   Dr. Lattuga's follow-up visit with this patient, fair?

4   A     Yes.

5   Q     If we go to 42386 on the next page under motor exam,

6   Dr. Lattuga has information in here that would lead you to

7   believe that he performed a motor exam, both the cervical and

8   lumbar neurological exam, true?

9   A     That's correct.

10  Q     If we then go to 42837 at the top, another follow-up

11  visit on March 10, 2015 that you believed Dr. Lattuga had with

12  the patient, fair?

13  A     Yes.

14  Q     These are all things that if he didn't see the patient,

15  he wouldn't know this firsthand, true?

16  A     Right.  I'm relying on the records.

17  Q     Okay.  And we can continue to go through here, but let me

18  skip some.  If we can go to 42845 and if you can highlight the

19  fifth paragraph down starting, I have treated, this is

20  Dr. Lattuga's report saying "I," meaning Dr. Lattuga, true?

21  A     If that's the signature line, yes.

22  Q     "Have treated Jose Bauta from November 17, 2014 through

23  the present."  Did I read that portion correctly?

24  A     Yes.

25  Q     If we then go to the next page 042846 and highlight that

Mobin - cross - Mannion                    1536

1   last paragraph, can you read the last paragraph for us,

2   Doctor?  I will read it and tell me if I did so correctly.

3   "I, Sebastian Lattuga, M.D. being duly licensed to practice in

4   the State of New York affirm the foregoing under penalties of

5   perjury to CPLR 2106 and that the foregoing is true and

6   accurate to the best of my knowledge and information."  Did I

7   read that correctly?

8   A   Yes.

9   Q   And he signs it Sebastian Lattuga, true?

10  A   Yes.

11  Q   And by confirming that he was telling you or whoever read

12  the records that he saw the patient, he examined the patient,

13  he performed tests on the patient, he personally treated the

14  patient; isn't that what he's saying?

15          MR. McELFISH:  Objection, foundation.

16          THE COURT:  Overruled.

17  A   That's what he says.

18  Q   And none of that is true, is it?

19  A   I don't know.

20  Q   I want you to assume that Dr. Lattuga never met the

21  patient, never talked to him on the phone, never evaluated

22  him, never treated him.  With that assumption, those

23  statements aren't true, are they?

24  A   If he has not seen the patient but had a physician

25  assistant or another physician in the group that did and he

Mobin - cross - Mannion                    1537

1    relied on that, he should have indicated that, but if he

2    hasn't then that's not correct.

3    Q    When you read this you took it as Dr. Lattuga personally

4    treating this patient, fair?

5    A    I review records and I look at the signatory of the

6    reports to see who has done it, yes.

7    Q    When he says, "I have treated Jose Bauta from November

8    17, 2014 to the present," you took him at his word, fair?

9    A    I guess so, yes.

10            THE COURT:  Let's move on.

11            MR. MANNION:  One last question on this, Your Honor.

12            THE COURT:  Go ahead.

13   Q    And if that is not true, wouldn't that raise some

14   questions in your mind about your ability to rely on

15   Dr. Lattuga?

16   A    It would, but it does not detract from the other

17   physicians that have seen and actually treated Mr. Bauta's

18   condition.

19   Q    Although that's not what I was asking.  As it relates to

20   Dr. Lattuga, that would certainly raise some questions in your

21   mind as to whether you should be relying on him, true?

22            MR. MANNION:  Objection.

23            THE COURT:  Sustained.

24   Q    And likewise, sir, if he was not, then now with the same

25   assumption that he never saw or treated him would you agree

1    that that narrative report should be taken off the bills?

2    A    If he has not treated the patient, yes.

3    Q    If we can pull up -- I'll get an exhibit number in a

4    second.  Bates 040236.  404 is part of the Brookdale records.

5    Did you see some records from Brookdale where in February of

6    2014, several months after this accident Mr. Bauta slipped and

7    fell on some ice?

8    A    I believe those are the February 2014 records.

9    Q    Okay.  And at that time do you recall that he

10   specifically denied back pain?

11   A    That's what I remember, yes.

12   Q    And the only tenderness found was to his left knee, fair?

13   A    I believe so, yes.

14   Q    He was diagnosed with a bruise to the left knee and that

15   was it, fair?

16   A    That's correct.

17   Q    Do you also recall a record from April 15th of 2014 where

18   it talks about Mr. Bauta having a fall a week before that?

19   A    In the Brookdale records, I don't remember that.

20   Q    We're not in the Brookdale.  Do you recall any other

21   falls that Mr. Bauta had?

22   A    Not by remembering right now.

23   Q    And you're not here to tell this jury that we caused

24   Mr. Bauta to slip and fall on the ice to a reasonable degree

25   of medical probability?

Mobin - cross - Mannion                    1539

1   A    I don't know.

2   Q    You're not saying that; right?

3   A    That you made him fall?

4   Q    No, that it was as a result of his injuries that he

5   slipped and fell on ice; you're not saying that, you don't

6   know one way or the other?

7   A    I don't know one way or the other, but he did have

8   weakness in his right leg.

9   Q    But you don't know that that's what caused him to fall on

10  ice, do you?

11           MR. McELFISH:  Objection, argumentative and asked

12  and answered.

13           THE COURT:  Sustained.

14  Q    And there's nothing in the records that indicates he

15  complained of any type of weakness in his legs as the reason

16  for the fall, fair?

17  A    Not those exact words, that's correct.

18  Q    And back on the credibility of the patient and what they

19  say, were you aware of the validity testing that was done in

20  this case by various other providers?

21           MR. McELFISH:  Outside the scope.

22           THE COURT:  Sustained.

23  Q    If a patient is specifically asked whether they can do a

24  specific activity and they tell you they can't and you find

25  out objectively that they can actually do that activity, how

Mobin - cross - Mannion                    1540

1  does that impact your review of the records in a case like

2  this?

3          MR. McELFISH:  Objection, lack foundation.  Overly

4  broad.

5          THE COURT:  Overruled.

6  A    It really depends what you're specifically asking and if

7  they're asking -- if they're saying I can't do skiing and they

8  go skiing, that will impact my opinion.  If they say I can

9  walk with a cane, I usually use a cane and then sometimes they

10 don't use a cane, it really depends on their comfort level at

11 that particular time or other circumstances.

12 Q    Well, if a patient specifically tells you that they have

13 not and cannot do a certain activity, but you find out they

14 have been doing a physical activity, would that raise a

15 question in your mind as to credibility?

16         MR. McELFISH:  Objection.

17         THE COURT:  Overruled.

18 A    You need to be more specific.  I can't answer that

19 question in that general of a term.

20 Q    You haven't looked at the records for that type of

21 information or you have?

22 A    I'm not sure what you're asking, sir.

23 Q    Okay.  Would you agree today that at least as of April of

24 2017 when Mr. Bauta was last deposed, that he was able to do

25 his own shopping, do his own laundry?

1           MR. McELFISH:  Outside of scope.

2           THE COURT:  Overruled.

3    A    I'm not aware of that, no.

4

5           (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS EXAMINATION

2   BY MR. MANNION:   (Continuing)

3   Q    And did you read his deposition from April 2017?

4   A    I have not.

5   Q    That's the most recent deposition of Mr. Bauta talking

6   about what he can and can't do from a physical standpoint.

7   You haven't read that?

8   A    I don't believe so.

9   Q    And when was your last deposition?  Was it June of 2017?

10  A    No, I can tell you.  Last deposition --

11  Q    Or was it February of 2017?  It might be February.

12  A    I believe so, yes.

13  Q    So from February 2017 until today, you hadn't had any

14  information provided to you as to what Mr. Bauta can and can't

15  do?

16  A    I don't have that, no.

17  Q    Okay.  Would it help you to know that he, in fact, is in

18  good enough physical condition to help take care of his dad

19  and do some of his dad's chores?

20       MR. McELFISH:  Foundation.

21       THE COURT:  Overruled.

22  A    Well, that means that he has improved since the surgery,

23  but it doesn't mean that he does not have pain still, which is

24  what the records indicate.

25  Q    I apologize.  I guess it was in June.  Was it June 2017

1    your second deposition?

2    A    So I was just looking at that.  The second deposition was

3    June 8, 2017, that's correct.

4    Q    So two months after this deposition in April?

5    A    I guess so, yes.

6    Q    So you weren't aware that he was able to bend and touch

7    his knees?

8    A    Not at that point, no.

9    Q    That he had some caretaking responsibilities for his dad?

10   A    No.

11   Q    That he did his own cleaning and cooking and his dad's

12   cleaning and cooking at times?

13   A    No.

14   Q    That he did his dad's laundry?

15   A    No.

16   Q    That he shopped for his dad?

17            MR. McELFISH:  Facts not in evidence.

18            THE COURT:  Overruled.

19   A    So the list that you're reading, if that's the

20   deposition, I did not review his deposition.

21   Q    Were you aware that Mr. Bauta testified he did not have

22   to use his cane regularly back in April of 2017?

23   A    I believe so.  I'm thinking of a different record, but he

24   had a cane after the surgery, as I said.  And to a certain

25   extent, he's using it to take pressure off of his back.  It's

Mobin - cross - Mannion                    1544

1   not for weakness in his legs since the surgery.  So he can use

2   it as needed.

3   Q    You haven't seen the video of Mr. Bauta?

4           MR. McELFISH:  Objection.  Foundation.

5           MR. MANNION:  I was asking.

6           THE COURT:  Overruled.  You haven't seen it.

7   A    I have not.

8   Q    Would it help you to see video of Mr. Bauta as to how he

9   walks both with and without his cane?

10  A    So that is only a one snippet of time.  It doesn't tell

11  me the entirety of his back condition.

12          More importantly, I have actual MRI and CAT scan

13  images of his spine and records that span at least three years

14  of time.  So looking at a video in one particular capsule of

15  time may not necessarily tell me the whole story of his back,

16  gait, or what his condition is.

17  Q    To be fair -- that's fair, sir, but I didn't ask whether

18  it told you the whole story.  Would it be helpful to you to

19  have video to see how Mr. Bauta walks both with and without a

20  cane in 2017?

21          MR. McELFISH:  Foundation.

22          THE COURT:  Overruled.

23  A    It doesn't really change the opinions that I have.  But

24  if it's a piece of evidence that I need to see, I'll see it.

25  It doesn't alter the medical facts of the case.

Mobin - cross - Mannion                 1545

1    Q     You weren't provided that information; true?

2    A     I don't believe so.

3          THE COURT:  You have 15 minutes before we have to

4    break for the day.

5          MR. MANNION:  I know.  Your Honor, I'm looking.

6    Give me one quick minute.  I cut out a bunch here trying to

7    get this done.

8          MR. McELFISH:  I stopped early so I could have a

9    little bit, even with the IT problem.

10         THE COURT:  I appreciate that.

11         MR. MANNION:  One quick moment, Your Honor.

12         THE COURT:  Yes.

13   Q     Sir, you talked about some of those studies relating to

14   adjacent segment degeneration?

15   A     Yes.

16   Q     And you talked about the percentages?

17   A     Correct.

18   Q     Now, you'd agree that in the articles that you cited in

19   your report none of them state that future surgery is more

20   likely than not, do they?

21   A     They provide us with an extrapolation during the time of

22   the studies.

23         One thing you got to remember is medical studies

24   don't go the lifetime of an individual.  Again, they are

25   capsules of time.  They are short time-wise.  They're

1  anywhere from two, five to ten years.

2          The study that I have or several studies that I

3  provided in my deposition and in my reports, one of them

4  particularly indicates that over a 10-year span of time they

5  have 36 percent of the patients that develop enough adjacent

6  segment disease that were surgical candidates for redo surgery

7  and they actually were undergoing surgery.  So that gives you

8  about 3.6 percent in that 10-year cohort.

9  Q    The L5-S1 is the level that what we're talking about

10 here; correct?

11 A    No, the L3-4 would be the level that would be the

12 adjacent segment.

13 Q    Okay.  None of these articles, and I have looked at them,

14 none of these articles anywhere mention a greater than 50

15 percent chance of future surgery, do they?

16 A    They can't.  They're not -- as I said, they're not

17 long-span studies.  They're studies that are usually five,

18 almost -- maximally 10 years in span, so they can't provide

19 you with a number of more than 36 or 40 percent.

20 Q    And there is controversy regarding the subsequent

21 degeneration of adjacent segments in the field, isn't there?

22 A    There's always controversy in the field.  There are no

23 one or two surgeons that are standing in a room that agree on

24 everything.  But one thing that is not in dispute is adjacent

25 segment; in other words, the ongoing thought about spine

Mobin - cross - Mannion                    1547

1  surgery and fusion is that fusion will cause accelerated
2  degeneration of adjacent segment, hence, the term adjacent
3  segment disease.  And that's why we do all these new different
4  technologies, like disc replacement, doing arthroplasty,
5  putting devices that allow the spine to keep moving.  So I
6  think the majority of spine surgeons, if not the entire
7  community of spine surgeons do agree on adjacent segment
8  disease.
9  Q    Doctor, tell me if you agree with this, in one of your
10 articles, at the very first paragraph, "There is controversy
11 regarding the subsequent degeneration of adjacent segments,
12 and we are aware of no long-term studies that have analyzed
13 both cephalad and caudad degeneration following posterior
14 arthrodesis.  I may have mispronounced some, but do you recall
15 reading that?
16 A    Which article are you referring to?
17 Q    *Adjacent Segment Degeneration in the Lumbar Spine*.
18 A    Right.  So I think that's the preamble of the article and
19 they go in and explain what the findings are.
20 Q    And these patients were actually patients who had
21 degeneration and that's why they had their original surgery;
22 true?
23 A    Those were patients that generally have degeneration have
24 surgery, that's correct.
25 Q    So you would expect that their spine would continue to

MDL   RPR

1  degenerate; fair?

2  A    So that's exactly the point of the article.  The question

3  is this:  If you look at an individual who has a degenerated

4  disc and you follow that patient in time, does that individual

5  defer or change from another individual.  Let's say you have

6  two twin.  Let's do a twin study.  You have one twin with a

7  degenerative disc at L3-4.  You have another twin with a

8  degenerative disc L3-4.  Twin one goes on with his life.  Twin

9  B gets a fusion from L4 to S1.  What is going to happen to

10  these in terms of the crossover or the timeline?  Are they

11  going to go in parallel or one of them is going to degenerate

12  faster than the other.  That's the controversy.

13        And what our studies are telling us over the last

14  two-and-a-half decades, this is a question since the 1990s, is

15  that individual that gets fusion will have accelerated

16  degeneration.  They will experience adjacent segment disease

17  more so than individuals that don't have a fusion below that

18  level.

19  Q    Okay.  So you would agree, though, that the patients in

20  these studies had degenerative disease that led to their

21  initial surgery; fair?

22  A    Yes.

23  Q    And in this case, you believe it was trauma that caused

24  it, not degeneration?

25  A    In this case, what I've written in my reports and

1  testified all day today is that Mr. Bauta has some underlying

2  degenerative condition, but he had a traumatic disc on the

3  background of the landscape of degeneration.

4  Q    And that underlying degeneration would have continued

5  from age 37 or 38 at the time of this accident moving forward;

6  fair?

7  A    Yes.

8  Q    And --

9            THE COURT:  Last question.

10           MR. MANNION:  Okay.

11  Q    Sir, you'd agree in one of these studies, it literally

12  indicates only 11.6 percent or 14.5 percent or 16.3 percent of

13  patients need future surgery due to adjacent segment

14  degeneration; fair?

15  A    That's a four-year study, correct.

16           MR. MANNION:  Your Honor, I would just proffer I

17  would have more, but because of the time.

18           THE COURT:  We have to move on.

19           MR. MANNION:  Yes.

20  REDIRECT EXAMINATION

21  BY MR. McELFISH:

22  Q    Dr. Mobin, when you say that there is a landscape -- I'm

23  sorry, a degenerative landscape of the spine, are you

24  referring to the cervical or the lumbar with respect to the

25  particular films that you saw of Mr. Bauta?

Mobin - redirect - McElfish                    1550

1  A    Both, actually.  But in particular, the lumbar MRI show

2  us that there is desiccated disc at the L5-S1, even on the

3  first MRI, which is in November of 2013.  So what I mean is

4  that the desiccation probably, more than likely preexisted the

5  incident.  He had a susceptible disc at the L5-S1 and then he

6  was subjected to a significant accident with significant

7  forces then caused the rupture either acutely or in a delayed

8  fashion.

9  Q    And, Doctor, given that there was never a complaint or a

10 record prior to this accident, do you attribute the pain and

11 all the treatment and all the care and all the surgeries that

12 he has had to the accident, not the degeneration?

13 A    I do, yes.

14 Q    Okay.  So has anything that Mr. Mannion asked you changed

15 your opinions that you elicited on direct?

16 A    It doesn't.  The other counsel is implying or saying that

17 Dr. Lattuga, for example, did not see the patient.  And my

18 opinion is if that's the case, the charges and all of that

19 should be stricken.

20        However, the other doctors in his group, the other

21 two partners have seen and treated, and one of them did

22 operate on Mr. Bauta, and they have clearly and accurately

23 documented his MRI findings and have documented physical

24 findings, which are consistent with at least five, if not six,

25 other providers of Mr. Bauta's care.

MDL   RPR

Mobin - redirect - McElfish                1551

Q    On that point, Dr. Mobin, I want you to make the
assumption, as Mr. Mannion asked you about assumptions, I want
you to assume that Dr. Lattuga has testified in his
depositions that when he prepared the report he made an error
saying I --

          MR. MANNION:  Objection, Your Honor.

          THE COURT:  Overruled.

Q    Instead of saying I treated, the practice treated, his
practice, meaning Dr. Cordiale and Dr. Mikelis, and that it
was simply a minor error in his expert report, with that
assumption in mind --

          THE COURT:  Sustained.  He is not an expert in this
case.

          MR. McELFISH:  Let me start again with that.

Q    With the assumption in mind that Dr. Lattuga testified
that he made an error in his report, that he meant to say the
practice treated, my practice treated instead of I did, would
that change your opinions in this case?

A    As I said, that's what I said at my deposition and
earlier the questions that were put to me regarding Dr.
Lattuga's report, I said, you know, in my practice I have pain
specialists, in my prior practice, we had 22 doctors
associated with our practice, and we had records back and
forth.  So I would typically and customarily incorporate some
of the findings of my other colleagues in my reports, although

1    I saw the patient.  So it doesn't change my opinion as long as

2    the substance of the data was actually obtained from the

3    patient.

4    Q    And is that what happened in this case, Dr. Lattuga

5    incorporated the treating records from Dr. Cordiale and Dr.

6    Mikelis into his report?

7                MR. MANNION:  Objection, leading and --

8                THE COURT:  Sustained.

9                You saw Dr. Cordiale's records; right?

10               THE WITNESS:  Yes.

11               THE COURT:  Underlying records?

12               THE WITNESS:  Yes.

13               THE COURT:  And the other doctors from Lattuga's

14   practice have treated Mr. Bauta?

15               THE WITNESS:  Yes.

16               THE COURT:  And you relied on those?

17               THE WITNESS:  I did, yes.

18   Q    Let me ask it this way:  If Dr. Lattuga never issued a

19   report in this case, would it have any affect on your opinion?

20   A    No, it wouldn't.

21   Q    Now, Mr. Mannion was asking you a lot of questions about

22   the EMT report.  I will do this briefly.  Can you just give

23   the jury an idea of how a person can have an injury like Mr.

24   Bauta has and have an exam like he had with the EMT?

25   A    Yes, it's very similar to what I have discussed and

Mobin - redirect - McElfish                    1553

1    testified earlier in an emergency room setting.  In the

2    emergency room setting we try to triage patients.  The

3    emergency room physician in charge triages the patients in the

4    sense of who's going to die now, who's going to die later,

5    who's stable to go out.  EMT's have the same kind of mindset.

6    They come to the scene, to the bedside, to wherever the injury

7    is, they try to determine is the patient in coma or not, is

8    there a life-threatening issue at hand or not.  They're not

9    going to sit down and do a straight leg raise test and a

10   neurological exam in terms of doing every single dermatome

11   with a pinprick.  They don't have time.  There are fatalities

12   at the scene and they need to tend to other injured parties.

13          It is not unusual to see these types of records that

14   says able to walk at the scene, no tenderness, this patient is

15   okay to leave and go to some other provider.

16   Q    Dr. Mobin, with respect to the really early records, the

17   EMT records and the Evangelical Hospital records and even to

18   some degree the Brookdale Hospital records, you offered two

19   explanations, one was delayed onset, one was a tear in the

20   annulus, just real brief, on the tear in the annulus, how can

21   that have a delayed symptomatology?

22          MR. MANNION:  Objection.  Outside the scope.

23          THE COURT:  Overruled.

24   A    Again, very briefly, if you imagine the disc, the cushion

25   that sits between the vertebra of the jelly doughnut -- I will

1    give you a milder example as opposed to the belly.

2         The jelly doughnut, as we age, gets more brittle,

3    and if you imagine the jelly getting dryer.  Now, if there is

4    a traumatic event that causes a crack in the outer part of the

5    shell of the jelly doughnut, even under normal conditions,

6    sitting, standing, you can push that jelly, the dry jelly out

7    in a delayed fashion; in other words, you either smash the

8    doughnut and the jelly extrudes, or over time, because there

9    is a large crack now because of the trauma, a twisting type of

10   a trauma, a flexion- or extension-type trauma, then over the

11   next day or week or month the jelly gets extruded in a delayed

12   fashion and all of a sudden they have pain down the leg and

13   have onset of lower back pain.

14   Q    I want you to assume that Mr. Bauta's sister, Selenia

15   Bauta, appeared here and testified before the jury that just a

16   couple days after the accident he had pain in his back and his

17   right leg, would that then support your opinions?

18             MR. MANNION:  Objection, Your Honor.

19             THE COURT:  Overruled.

20   A    That would be an independent observation, the individual

21   saying look, I'm having back and leg pain shortly thereafter,

22   after the accident.

23   Q    The same question, his brother-in-law, I want you to

24   assume testified to the same thing.

25   A    That would also be supportive testimony.

Mobin - redirect - McElfish                    1555

1    Q    And the fact that he may have had a lawyer to help him

2    within a couple days after the accident, does that in any way

3    impact your opinion as an expert witness in this case?

4    A    It does not, no.

5    Q    Earlier in your direct testimony when we spent all that

6    time going through the bills, you actually identified the -- I

7    think it was an NARR charge for 1,250 and you actually

8    testified that that was not a charge that would be related and

9    you removed it; right?

10   A    That is correct.

11   Q    So Mr. Mannion was asking you about a charge that you

12   already agreed --

13            MR. MANNION:  Objection, Your Honor.  Argumentative

14   and leading.

15            THE COURT:  Sustained.

16   Q    And you had mentioned a medical condition of distracting

17   injury.  Can you explain briefly, real brief?

18   A    So this is what we deal with, in terms of neurosurgical

19   consultant to the emergency room, when the patient comes in

20   and, let's say, has a broken leg, they may not complain of the

21   neck pain, they may actually have a neck fracture and not know

22   about it.  That's why a lateral C-spine X-ray is done

23   routinely on multi-trauma individuals, in what is called

24   rollovers, and orthopedic injuries, and multiple extremity

25   injuries, because the pain in one location, if it's severe

Mobin - redirect - McElfish                    1556

1    enough, can distract from the pain in other locations.

2            MR. McELFISH:  Judge, three quick questions and I

3    will be done.

4            THE COURT:  Yes, as long as they don't take 20

5    minutes.

6    Q    Number one, is the other reason that you gave in your

7    direct testimony about the explanation for the findings by the

8    EMT and the hospital, he did complain in the hospital of leg

9    pain and body pain; right?

10           MR. MANNION:  Objection.  Leading.

11           THE COURT:  Overruled.

12   A    Yes.  He did.  The Brookdale records in particular, he

13   was complaining about total body ache and leg pain.

14           (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MR. McELFISH:

3   Q    Okay, and the other reason that you gave, which is a

4   medical explanation, is that of delayed onset.

5            Can you just, real brief?

6   A    That's -- the delayed onset is, as I said, it is the

7   timing of this inflammatory response.  In other words, the

8   disk, there is a reason it's embedded in a very strong cover.

9   It's called the annulus.  Because the nuclear material, the

10  center part of the disk, is highly inflammatory.  So as it

11  comes out and it comes in close proximity to nerves, it can

12  set off an inflammatory response, irritation and causing

13  burning sensation, tingling and whatnot down the leg.  Hence,

14  use of the anti-inflammatories.

15  Q    Is this, as a neurosurgeon, a progression of an injury

16  that you commonly see?

17  A    I've seen it multiple times, yes.

18  Q    All right, and you were asked about the $30,000 charge

19  for the supplemental work that was done in the operating room.

20           You mentioned that if it's done on its own it would

21  be billed at 30,000, but if it's billed supplementally it

22  would be billed at $5,000.

23           Have you seen that as a common billing error?

24           MR. MANNION:  Objection.

25           THE COURT:  Sustained.

Mobin, MD - redirect - McElfish                1558

1  BY MR. McELFISH:

2  Q    Is it easy to misbill --

3            THE COURT:  It's irrelevant.

4            MR. McELFISH:  Okay.

5  BY MR. McELFISH:

6  Q    Last question is on the ASD.

7            Has anything Mr. Mannion asked you changed your

8  opinion about whether or not Mr. Bauta, A, will develop ASD

9  and, B, will have a need for surgery, more probable than not?

10 A    It did not, no.

11 Q    Sorry, that was supposed to be the last question, this is

12 the last question.

13           In the studies that Mr. Mannion was asking you

14 about, those studies did not involve patients that were

15 involved in trauma, correct?

16 A    I don't believe so, that's correct.

17 Q    So your opinion is based not only on the science, but

18 your many years of treatment and care for people in your

19 practice?

20 A    That is correct.

21           MR. McELFISH:  Thank you, I have no further

22 questions.

23           THE COURT:  Quickly.

24           MR. MANNION:  Thank you, Your Honor.

25                          ///

SAM      OCR      RMR      CRR      RPR

Mobin, MD - recross - Mannion                1559

1  RECROSS-EXAMINATION

2  BY MR. MANNION:

3  Q    Doctor, you don't have a single study that says that

4  patients who had to have surgery because of trauma are likely

5  to have surgery because of ASD in the future, do you?

6  A    No.  So the traumatic patients generally have a worse

7  impact on the spine more than the degenerative spine.  So the

8  ASD studies in more ways than not are more conservative

9  numbers than it is for traumatic patients.

10 Q    Does it say that anywhere in those studies or do you have

11 any study to show that?

12 A    The study is right in front of you, 20 years of

13 neurosurgery.

14 Q    Okay.  But you don't have something to say that these

15 studies that apply to people who had surgery from degeneration

16 apply to trauma; fair?

17 A    As I said, the degenerative studies are conservative

18 estimates.

19 Q    That's not what I asked.

20 A    That's my answer to you.  This is the best way I can

21 explain it to you.  The degenerative patients have a less

22 trauma by definition to their spine; hence, have a less chance

23 of developing adjacent segment disease as opposed to an

24 individual who was involved in trauma who has more than one

25 area of spine injured.

SAM      OCR      RMR      CRR      RPR

Mobin, MD - recross - Mannion                    1560

1    Q    You were asked a question about Mr. Bauta's sister and

2    about complaints of pain that he may have made to her

3    following the accident.

4          You certainly don't -- you're not saying that his

5    sister is a better historian than EMS and ED, emergency

6    department personnel, are you?

7              MR. McELFISH:  Argumentative.

8              THE COURT:  Sustained.

9    BY MR. MANNION:

10   Q    Sir, part of what you have to determine is credibility of

11   the records you're looking at, fair?

12   A    Yes.

13   Q    Okay.  So are you going to give more credence to a sister

14   who said, He told me he had pain in his back, than trained

15   medical professionals who documented no back pain?

16             MR. McELFISH:  Argumentative.

17             THE COURT:  Overruled.

18   A    I am not really giving credence more to one individual

19   than another.  The circumstances of the EMT individuals, their

20   examination explains; the circumstances of a sister giving a

21   testimony under oath is another thing.  They're just another

22   timeline piece of data that supports the fact that he

23   developed leg pain shortly after the accident.

24   Q    Well, let me ask you this:  If one of Mr. Bauta's sisters

25   testified under oath that she had never talked to Mr. McElfish

1  and we find out she actually had for hours, would that impact

2  whether -- how you give weight to her testimony relating to

3  back pain?

4          MR. McELFISH:  Argumentative, lacks foundation.

5          THE COURT:  Overruled.

6  A    It depends what the content was and it also brings a

7  legal issue, which I'm not here to speak of.

8  Q    Okay.  Now, at the scene, I mean he didn't have a broken

9  leg; fair?

10  A    That's correct.

11  Q    He climbed out of the window?

12  A    Yes.

13  Q    And you said fatalities, but I mean that was a mistake,

14  right, there was a fatality in this case, right, one?

15  A    That's my understanding.

16  Q    Okay.  And they actually asked Mr. Bauta to help them

17  with that, correct?

18          MR. McELFISH:  Objection.

19          THE COURT:  Sustained.

20          MR. MANNION:  Okay.

21          THE COURT:  Beyond the scope.

22          MR. McELFISH:  Thank you.

23          MR. MANNION:  He specifically talked about the EMTs.

24  BY MR. MANNION:

25  Q    And there was no life-threatening situation to mask his

1  symptoms of back pain once he was out of that buzz, was there?

2          MR. McELFISH:  Foundation, beyond the scope.

3  Foundation.

4          THE COURT:  Overruled.

5  A    Well, if there was a significant accident with fatality

6  at the scene, I don't know what went through Mr. Bauta's head.

7  So he might have been trying to preserve himself from an

8  explosion or some other psychological issue that he had

9  experienced.

10          So there are a lot of circumstances that come into

11  play that will make an individual climb out of a window, for

12  example, to preserve their life.

13  Q    He had to climb out of the window because that was the

14  easiest way to get out, or do you not know that?

15          MR. McELFISH:  Objection, foundation.

16          THE COURT:  Sustained.

17  BY MR. MANNION:

18  Q    Sir, he felt his shin pain; fair?

19  A    Yes.

20  Q    And regarding the delayed response, are you aware that

21  according to Dr. Casden somebody with this type of herniation

22  it would be virtually impossible not to feel excruciating pain

23  at the time?

24  A    That's Dr. Casden's opinion.  That's not what my opinion

25  is.

1          MR. MANNION:  Okay, that's all.

2          THE COURT:  Thank you, ladies and gentlemen.  We are

3    done for the day.  The same admonitions and I will see you

4    tomorrow at 9 o'clock.  Have a wonderful evening and night.

5          (Jury exits.)

6          THE COURT:  You are excused, thank you very much.

7          THE WITNESS:  Thank you.

8          (Witness excused.)

9

10     (Matter adjourned to Wednesday, May 9, 2018 at 9:00 a.m. )

11

12

13

14                          ooo0ooo

15

16

17

18

19

20

21

22

23

24

25

1564

1    <u>I N D E X</u>

2

3    <u>WITNESS</u>                                          <u>PAGE</u>

4      <u>FARDAD MOBIN</u>

5          DIRECT EXAMINATION BY MR. McELFISH        1335

6          CROSS EXAMINATION BY MR. MANNION          1485

7          REDIRECT EXAMINATION BY MR. McELFISH      1549

8          RECROSS-EXAMINATION BY MR. MANNION        1559

9

10              <u>E X H I B I T S</u>

11

12     **Plaintiff's Exhibit 309**                    **1374**

13

14     **Plaintiff's Exhibit 308**                    **1375**

15

16     **Plaintiff's Exhibit 310**                    **1376**

17

18     **Plaintiff's Exhibit 311**                    **1377**

19

20     **Plaintiff's Exhibit 313**                    **1382**

21

22     **Plaintiff's Exhibit 314**                    **1388**

23

24     **Plaintiff's Exhibit 315-0001 through**

25     **315-0014**                                    **1389**

1565

```
 1
 2     Plaintiff's Exhibit 319-001                    1394
 3
 4     Plaintiff's Exhibit 320                        1395
 5
 6     Plaintiff's Exhibit 321                        1397
 7
 8     Plaintiff's Exhibit 324                        1398
 9
10     Plaintiff's Exhibit 324-0001                   1399
11
12     Plaintiff's Exhibit 326                        1412
13
14     Plaintiff's Exhibit 327-0001, 327-0002 and
15     327-0003                                       1412
16
17     Plaintiff's Exhibit 329                        1415
18
19     Plaintiff's Exhibit 331-0001 through
20     331-0009                                       1417
21
22     Plaintiff's Exhibit 332-0001 through
23     332-0007                                       1418
24
25     Plaintiff's Exhibit 333                        1418
```

1566

1

2    Plaintiff's Exhibit 334                          1419

3

4    Plaintiff's Exhibits 335, 336 and 337           1419

5

6    Plaintiff's Exhibit 339-001                      1422

7

8    Plaintiff's Exhibit 344                          1423

9

10   Plaintiff's Exhibit 345-001                      1423

11

12   Plaintiff's Exhibit 351                          1424

13

14   Plaintiff's Exhibits                             1424

15

16   Plaintiff's Exhibit 354                          1434

17

18   Plaintiff's Exhibit 355                          1448

19

20   Plaintiff's Exhibit 362                          1450

21

22   Plaintiff's Exhibit 363                          1450

23

24   Plaintiff's Exhibit 373                          1452

25

1567

```
 1
 2      Plaintiff's Exhibit 376                         1457
 3
 4      Plaintiff's Exhibit 320-001 through 320-005     1461
 5
 6      Defendant's Exhibit 402                         1516
 7
 8      Defendants' Exhibit 403                         1523
 9
10      Defendants' Exhibit 404                         1528
11
12      Defendant's Exhibit 454                         1534
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SN        OCR        RPR

Bauta v. Greyhound Lines, et al — 1

## $

**$1,023.61** [1] - 1377:16
**$1,042.85** [1] - 1394:2
**$1,179.42** [1] - 1421:21
**$1,250** [2] - 1533:14, 1533:18
**$1,894.50** [1] - 1421:22
**$10,000** [2] - 1373:7, 1443:14
**$104.07** [1] - 1382:12
**$14,563.50** [1] - 1424:10
**$141,000** [1] - 1333:3
**$15,000** [4] - 1321:12, 1441:18, 1482:8, 1482:9
**$171,000** [1] - 1320:21
**$193,000** [1] - 1324:21
**$193,480.02** [1] - 1450:18
**$2,000** [4] - 1373:11, 1481:22, 1481:24, 1482:11
**$20,000** [8] - 1438:1, 1439:16, 1440:17, 1440:18, 1440:19, 1441:24, 1442:3, 1442:9
**$200,000** [1] - 1323:14
**$201,000** [1] - 1317:23
**$21,000** [1] - 1533:2
**$213,000** [1] - 1315:18
**$213,650** [3] - 1316:21, 1317:7, 1332:2
**$216,000** [1] - 1323:3
**$216,037.70** [1] - 1333:3
**$23,000** [1] - 1326:4
**$250** [3] - 1436:25, 1446:13, 1446:22
**$3,000** [2] - 1446:4, 1481:25
**$30,000** [5] - 1442:17, 1442:19, 1533:23, 1534:11, 1557:18
**$300** [1] - 1309:25
**$350** [2] - 1437:1, 1446:21
**$4,808.60** [1] - 1374:3
**$44,750** [2] - 1320:14, 1320:19
**$5,000** [2] - 1533:23, 1557:22
**$5,889.58** [1] - 1417:6
**$50,287.76** [1] - 1333:2
**$500** [1] - 1436:24
**$52** [1] - 1447:7
**$580.68** [1] - 1422:8
**$59,750** [2] - 1322:5, 1333:1
**$62,750** [1] - 1412:16
**$700** [1] - 1481:18
**$71** [1] - 1373:22
**$721,268.33** [1] - 1313:22
**$8,528.41** [1] - 1389:18

## '

**'13** [3] - 1391:11, 1398:10, 1399:5
**'14** [1] - 1391:12, 1392:25, 1436:6
**'15** [1] - 1436:5
**'17** [1] - 1397:24

## 0

**0001** [2] - 1383:19, 1408:5
**0002** [1] - 1412:18
**0003** [1] - 1412:18
**0006** [3] - 1322:20, 1323:8, 1398:5
**001** [2] - 1370:14, 1394:5
**0017** [1] - 1370:10
**002** [1] - 1391:19
**005** [1] - 1461:4
**0154** [1] - 1408:5
**040193** [1] - 1506:7
**040194** [1] - 1511:13
**040197** [1] - 1518:1
**040236** [1] - 1538:4
**040495** [1] - 1528:4
**040945** [1] - 1528:5
**042403** [1] - 1320:13
**042464** [1] - 1326:18
**042833** [1] - 1534:20
**042846** [2] - 1534:21, 1535:25

## 1

**1** [6] - 1320:16, 1393:12, 1424:6, 1451:23, 1474:8, 1474:18
**1,096** [1] - 1373:12
**1,100** [1] - 1373:12
**1,250** [1] - 1555:7
**1,500** [1] - 1444:10
**1,800** [2] - 1396:23, 1399:8
**10** [13] - 1327:22, 1339:17, 1339:24, 1339:25, 1436:15, 1450:4, 1450:13, 1471:4, 1471:16, 1481:2, 1519:8, 1535:11, 1546:18
**10,000** [3] - 1441:20, 1442:14, 1443:5
**10-year** [1] - 1546:4, 1546:8
**10/10** [2] - 1375:24, 1377:2
**10/10/13** [1] - 1375:7
**10/10/2013** [2] - 1375:2, 1376:19
**100** [2] - 1317:12, 1324:2
**10168** [1] - 1300:18
**10573** [1] - 1301:13
**10th** [3] - 1403:9, 1436:10, 1496:5
**11** [2] - 1494:19, 1497:25
**11-millimeter** [5] - 1497:3, 1497:24, 1499:2, 1499:8, 1519:1
**11.6** [1] - 1549:12
**110** [2] - 1527:21, 1528:16
**110th** [1] - 1305:3
**11201** [1] - 1301:17
**11th** [3] - 1396:4, 1396:13, 1527:11
**12** [4] - 1471:4, 1471:16, 1503:12, 1505:8
**122** [1] - 1300:17
**12:30** [1] - 1408:13
**12th** [2] - 1434:23, 1527:11
**13** [3] - 1302:8, 1302:12, 1302:15
**1335** [1] - 1564:5

**1374** [1] - 1564:12
**1375** [2] - 1301:5, 1564:14
**1376** [1] - 1564:16
**1377** [1] - 1564:18
**1382** [1] - 1564:20
**1388** [1] - 1564:22
**1389** [1] - 1564:25
**1394** [1] - 1565:2
**1395** [1] - 1565:4
**1397** [1] - 1565:6
**1398** [1] - 1565:8
**1399** [1] - 1565:10
**13th** [2] - 1474:25, 1527:11
**14** [1] - 1534:21
**14-CV-03725(FB)(RER** [1] - 1300:3
**14-page** [1] - 1533:10
**14.5** [1] - 1549:12
**1412** [2] - 1565:12, 1565:15
**1415** [1] - 1565:17
**1417** [1] - 1565:20
**1418** [2] - 1565:23, 1565:25
**1419** [2] - 1566:2, 1566:4
**1422** [1] - 1566:6
**1423** [2] - 1566:8, 1566:10
**1424** [2] - 1566:12, 1566:14
**1434** [1] - 1566:16
**1448** [1] - 1566:18
**1450** [2] - 1566:20, 1566:22
**1452** [1] - 1566:24
**1457** [1] - 1567:2
**1461** [1] - 1567:4
**1485** [1] - 1564:6
**14th** [2] - 1436:5, 1527:11
**15** [7] - 1417:7, 1454:6, 1471:21, 1507:19, 1511:25, 1512:13, 1545:3
**15,000** [8] - 1321:3, 1321:6, 1322:1, 1441:19, 1442:1, 1442:2, 1442:10, 1532:17
**1516** [1] - 1567:6
**1523** [1] - 1567:8
**1528** [1] - 1567:10
**1534** [1] - 1567:12
**1549** [1] - 1564:7
**1559** [1] - 1564:8
**15th** [1] - 1527:11, 1538:17
**16** [4] - 1385:25, 1407:3, 1453:11, 1528:24
**16.3** [1] - 1549:12
**1600** [1] - 1301:6
**16th** [3] - 1388:15, 1393:19, 1527:12
**17** [6] - 1407:2, 1434:21, 1436:9, 1527:21, 1535:22, 1537:8
**170-something** [1] - 1316:13
**171,000** [2] - 1315:16, 1315:25
**17th** [5] - 1382:6, 1392:25, 1496:10, 1496:11, 1529:9
**18** [3] - 1305:20, 1396:4, 1413:8
**18,000** [1] - 1482:5
**180,000** [1] - 1482:14

**1894** [1] - 1451:5
**19** [1] - 1454:5
**1990s** [1] - 1548:14
**1995** [1] - 1336:3
**1996** [1] - 1343:14
**19th** [1] - 1399:2
**1:20** [1] - 1414:5
**1st** [4] - 1445:3, 1445:5, 1445:6, 1445:11

## 2

**2** [6] - 1320:16, 1391:20, 1416:4, 1417:7, 1503:11, 1505:20
**2,500** [3] - 1444:14, 1446:6, 1446:8
**2-millimeter** [1] - 1505:4
**20** [8] - 1302:14, 1312:21, 1481:4, 1481:25, 1482:14, 1507:20, 1556:4, 1559:12
**20,000** [6] - 1440:17, 1441:7, 1442:6, 1442:12, 1445:13, 1446:1
**200** [3] - 1327:19, 1357:21, 1531:15
**200,000** [1] - 1368:23
**2001** [2] - 1336:6, 1343:14
**2009** [2] - 1477:22, 1497:7
**2013** [34] - 1337:19, 1337:20, 1350:14, 1352:17, 1381:4, 1382:6, 1383:8, 1388:15, 1388:25, 1391:13, 1391:24, 1393:18, 1396:3, 1396:4, 1396:10, 1416:12, 1425:18, 1460:13, 1461:16, 1468:13, 1469:21, 1471:2, 1471:15, 1477:2, 1478:2, 1484:9, 1491:19, 1496:25, 1497:8, 1505:9, 1527:21, 1528:24, 1550:3
**2014** [18] - 1390:23, 1391:14, 1392:18, 1407:2, 1412:10, 1416:3, 1417:7, 1425:20, 1426:1, 1427:13, 1434:22, 1436:9, 1535:22, 1537:8, 1538:6, 1538:8, 1538:17
**2015** [28] - 1322:12, 1349:22, 1375:4, 1393:19, 1396:4, 1396:13, 1407:3, 1412:10, 1413:8, 1424:1, 1424:6, 1427:14, 1435:19, 1436:9, 1436:15, 1446:18, 1450:9, 1450:10, 1470:20, 1472:4, 1472:19, 1474:8, 1474:18, 1503:14, 1505:10, 1534:25, 1535:11
**2016** [6] - 1311:25, 1345:2, 1383:9, 1416:5, 1417:7, 1510:22
**2017** [24] - 1322:13, 1383:10, 1388:16, 1388:20, 1388:25, 1397:18, 1399:2, 1399:4, 1413:8, 1425:21, 1433:15, 1433:17, 1434:22, 1446:18, 1533:1, 1540:24, 1542:3, 1542:9, 1542:11, 1542:13, 1542:25, 1543:3, 1543:22, 1544:20
**2018** [2] - 1300:7, 1563:10
**21,000** [1] - 1486:14
**2100** [1] - 1300:17
**2106** [1] - 1536:5
**213,000** [1] - 1321:13

**213,650** [1] - 1330:21
**216** [2] - 1327:14, 1524:4
**22** [3] - 1391:19, 1534:24, 1551:22
**22-millimeter** [1] - 1498:20
**225** [1] - 1301:17
**22612** [1] - 1439:11
**22614** [1] - 1439:11
**22842** [1] - 1440:8
**22nd** [3] - 1390:23, 1391:14, 1392:18
**24** [3] - 1392:17, 1395:8, 1500:2
**25** [3] - 1312:21, 1314:24, 1315:1
**25,000** [1] - 1532:21
**25-page** [2] - 1310:15, 1314:22
**26** [1] - 1392:19
**26th** [1] - 1398:10
**27** [3] - 1349:22, 1424:1, 1427:14
**27th** [5] - 1424:5, 1427:14, 1435:2, 1435:19, 1450:9
**28** [1] - 1412:10
**29th** [1] - 1397:18

## 3

**3** [11] - 1320:16, 1332:4, 1383:10, 1413:7, 1431:14, 1443:25, 1505:18, 1512:13
**3,000** [1] - 1444:11
**3,600** [1] - 1399:10
**3.6** [1] - 1546:8
**30** [5] - 1340:11, 1401:6, 1412:10, 1431:14, 1481:4
**30's** [1] - 1490:4
**30,000** [3] - 1445:25, 1486:14, 1557:21
**300** [1] - 1300:22
**305** [9] - 1310:15, 1310:21, 1314:13, 1314:17, 1314:19, 1314:20, 1317:9, 1318:14, 1318:15
**305A** [1] - 1310:24
**307** [2] - 1318:17, 1370:18
**308** [11] - 1370:2, 1370:4, 1370:19, 1370:20, 1371:3, 1375:13, 1375:20, 1375:21, 1564:14
**308-001** [1] - 1370:9
**309** [8] - 1371:14, 1372:1, 1372:2, 1374:7, 1374:17, 1374:19, 1380:4, 1564:12
**309-0001** [1] - 1374:6
**309-0002** [1] - 1374:6
**309-001** [1] - 1374:5
**30th** [3] - 1391:13, 1391:24, 1393:18
**31** [1] - 1472:19
**310** [7] - 1374:21, 1375:22, 1376:10, 1376:11, 1380:2, 1380:4, 1564:16
**310-001** [2] - 1375:23, 1376:5
**310-0015** [2] - 1375:23, 1376:6
**311** [7] - 1376:14, 1377:10, 1377:17, 1377:20, 1380:2, 1380:4, 1564:18
**311-001** [1] - 1377:9
**312** [3] - 1380:9, 1380:10, 1380:16

**313** [5] - 1381:20, 1382:3, 1382:13, 1382:17, 1564:20
**314** [5] - 1382:18, 1383:18, 1388:3, 1388:4, 1564:22
**314-0028** [1] - 1383:19
**315** [1] - 1388:7
**315-0001** [3] - 1389:19, 1389:23, 1564:24
**315-0014** [5] - 1388:18, 1389:12, 1389:20, 1389:23, 1564:25
**318** [2] - 1390:1, 1393:7
**318-0002** [1] - 1391:16
**318-0026** [2] - 1392:10, 1392:15
**318-0027** [1] - 1390:21
**319** [2] - 1393:12, 1393:13
**319-001** [3] - 1394:4, 1394:7, 1565:2
**31st** [1] - 1397:24
**320** [8] - 1394:10, 1395:10, 1395:14, 1395:16, 1395:20, 1460:19, 1460:23, 1565:4
**320-0001** [1] - 1395:13
**320-001** [4] - 1461:4, 1461:6, 1464:2, 1567:4
**320-005** [2] - 1461:6, 1567:4
**320-1** [1] - 1395:7
**320-3** [2] - 1472:11, 1472:12
**320-5** [1] - 1474:24
**321** [4] - 1395:23, 1397:1, 1397:5, 1565:6
**322** [1] - 1470:21
**324** [6] - 1395:16, 1397:10, 1398:13, 1398:20, 1474:4, 1565:8
**324-0001** [4] - 1398:21, 1399:13, 1399:17, 1565:10
**324-0006** [1] - 1398:22
**324-006** [1] - 1398:8
**325** [1] - 1398:24
**326** [6] - 1399:20, 1407:16, 1408:3, 1412:2, 1412:4, 1565:12
**326-0001** [1] - 1399:22, 1407:21
**326-0154** [2] - 1399:22, 1407:21
**326-6** [1] - 1398:4
**327** [4] - 1409:17, 1409:20, 1410:13, 1412:6
**327-0001** [3] - 1412:18, 1412:23, 1565:14
**327-0002** [2] - 1412:23, 1565:14
**327-0003** [2] - 1412:23, 1565:15
**328** [1] - 1415:16
**329** [7] - 1412:25, 1413:24, 1414:2, 1415:11, 1415:15, 1415:19, 1565:17
**329-0012** [3] - 1413:14, 1413:20, 1415:20
**33** [1] - 1454:6
**330** [2] - 1415:22, 1416:22
**331** [1] - 1416:15
**331-0001** [3] - 1416:23, 1417:13, 1565:19
**331-0008** [1] - 1416:23

Bauta v. Greyhound Lines, et al                    3

**331-0009** [2] - 1417:13, 1565:20
**331-1** [1] - 1417:8
**332** [1] - 1417:15
**332-0001** [2] - 1418:4, 1565:22
**332-0007** [2] - 1418:4, 1565:23
**332-1** [1] - 1418:1
**333** [5] - 1418:6, 1418:8, 1418:19, 1418:23, 1565:25
**334** [5] - 1418:24, 1418:25, 1419:9, 1419:13, 1566:2
**335** [5] - 1419:15, 1419:16, 1419:20, 1419:23, 1566:4
**336** [5] - 1419:15, 1419:16, 1419:20, 1419:23, 1566:4
**337** [5] - 1419:15, 1419:16, 1419:20, 1419:23, 1566:4
**338** [2] - 1419:15, 1420:1
**339** [3] - 1420:9, 1420:11, 1422:9
**339-001** [3] - 1422:12, 1422:15, 1566:6
**34** [1] - 1305:3
**342** [1] - 1422:17
**343** [4] - 1422:20, 1422:23, 1422:25, 1423:7
**344** [4] - 1423:8, 1423:9, 1423:11, 1566:8
**345** [1] - 1423:12
**345-001** [3] - 1423:17, 1423:20, 1566:10
**34th** [2] - 1527:21, 1528:16
**350** [1] - 1437:7
**351** [4] - 1423:22, 1424:12, 1424:16, 1566:12
**351-002** [1] - 1424:7
**352** [4] - 1424:18, 1424:21, 1424:23, 1424:24
**353** [4] - 1424:18, 1424:21, 1424:23, 1424:24
**354** [4] - 1433:19, 1434:5, 1434:17, 1566:16
**354-0001** [1] - 1433:20
**354-0092** [1] - 1433:20
**355** [8] - 1434:18, 1434:20, 1435:5, 1435:14, 1440:21, 1447:25, 1448:7, 1566:18
**355-0002** [1] - 1440:23
**355-0004** [1] - 1445:25
**355-001** [1] - 1435:23
**357-0006** [1] - 1448:9
**359** [14] - 1317:6, 1322:18, 1322:19, 1322:20, 1322:23, 1323:7, 1326:25, 1327:1, 1327:2, 1327:3, 1327:5, 1327:8, 1328:11, 1329:16
**359-0006** [1] - 1323:1
**36** [3] - 1481:3, 1546:5, 1546:19
**361** [1] - 1330:16
**362** [4] - 1449:17, 1449:25, 1450:1, 1566:20
**363** [10] - 1324:7, 1326:24, 1327:12, 1327:17, 1450:6, 1450:8, 1450:21, 1450:25, 1451:20, 1566:22

**37** [1] - 1549:5
**373** [5] - 1315:22, 1451:22, 1451:23, 1452:2, 1566:24
**373-0001** [1] - 1451:2
**373-1** [2] - 1451:5, 1451:9
**3740** [1] - 1300:22
**376** [8] - 1451:19, 1452:4, 1452:5, 1452:8, 1453:4, 1456:5, 1457:2, 1567:2
**377** [1] - 1432:18
**38** [1] - 1549:5
**38,000** [1] - 1320:10
**3:39** [1] - 1518:3

## 4

**4** [2] - 1373:19, 1454:18
**4,000** [1] - 1444:1
**4,500** [1] - 1443:8
**40** [4] - 1328:25, 1340:19, 1480:20, 1546:19
**40's** [1] - 1490:4
**400,000** [1] - 1368:21
**401** [2] - 1515:22, 1516:2
**402** [7] - 1506:8, 1516:1, 1516:3, 1516:6, 1516:7, 1567:6
**403** [7] - 1310:3, 1432:12, 1516:10, 1522:21, 1522:25, 1523:1, 1567:8
**403-0110** [1] - 1481:11
**403-A** [1] - 1432:12
**404** [5] - 1523:2, 1528:13, 1528:14, 1538:4, 1567:10
**405** [1] - 1320:14
**413** [2] - 1528:4, 1528:15
**419** [4] - 1409:3, 1409:4, 1409:20, 1409:21
**42386** [1] - 1535:5
**42403** [3] - 1320:6, 1320:9, 1322:11
**42464** [3] - 1325:11, 1325:25, 1326:1
**428** [1] - 1533:8
**42835** [1] - 1533:6
**42837** [1] - 1535:10
**42845** [1] - 1535:18
**42nd** [2] - 1300:17, 1529:2
**43,000** [2] - 1316:1, 1316:12
**43,197** [1] - 1415:20
**43,197.92** [1] - 1413:20
**431** [7] - 1319:19, 1320:1, 1320:2, 1320:3, 1321:15, 1321:16, 1325:17
**433** [2] - 1324:21, 1325:16
**44,000** [1] - 1316:16
**44,750** [4] - 1316:16, 1320:17, 1321:7, 1322:2
**44114** [1] - 1301:6
**45** [1] - 1333:7
**454** [5] - 1533:6, 1533:9, 1534:18, 1534:23, 1567:12
**4545** [1] - 1330:24
**48** [1] - 1500:3

## 5

**5** [8] - 1349:22, 1427:15, 1442:19, 1471:3, 1503:13, 1505:11, 1505:16, 1534:11
**5,000** [4] - 1316:2, 1441:20, 1442:15, 1444:1
**5/25/15** [1] - 1315:24
**5/27** [1] - 1327:18
**5/27/2015** [1] - 1437:10
**5/31/15** [1] - 1472:10
**50** [5] - 1401:6, 1429:17, 1480:20, 1529:2, 1546:14
**59,750** [1] - 1330:19
**595** [1] - 1373:20
**5th** [2] - 1435:2, 1450:10

## 6

**6/5** [1] - 1327:18
**60** [2] - 1340:19, 1431:15
**600** [1] - 1534:1
**6115** [1] - 1474:3
**63042** [1] - 1445:7
**63047** [2] - 1440:25, 1445:15
**63048** [2] - 1441:10, 1441:13
**64112** [1] - 1300:23
**650** [1] - 1482:1
**680** [1] - 1317:23
**680,000** [1] - 1313:8

## 7

**7** [6] - 1396:3, 1418:1, 1443:5, 1443:16, 1461:16, 1497:25
**7,200** [1] - 1396:25
**7,500** [4] - 1441:18, 1442:5, 1443:5, 1443:16
**70** [1] - 1340:11
**700** [4] - 1436:25, 1437:5, 1437:7, 1449:6
**720,000** [1] - 1313:7
**740** [2] - 1302:8, 1302:12
**741** [1] - 1302:14
**744** [3] - 1302:8, 1302:12, 1302:15
**75** [1] - 1429:17
**7th** [1] - 1396:10

## 8

**8** [5] - 1300:7, 1320:5, 1512:24, 1512:25, 1543:3
**8,000** [1] - 1443:16
**800** [1] - 1301:12
**835** [1] - 1534:13
**845** [1] - 1533:9
**87** [2] - 1348:10, 1348:14
**89** [1] - 1348:14
**8th** [1] - 1388:20

VB        OCR        CRR

## 9

**9** [9] - 1302:8, 1302:12, 1350:14, 1381:4, 1416:23, 1417:9, 1477:2, 1563:4, 1563:10
**90** [3] - 1339:14, 1339:17, 1352:22
**9:00** [2] - 1300:7, 1563:10
**9th** [2] - 1301:5, 1494:18

## A

**a.m** [3] - 1300:7, 1518:3, 1563:10
**ABC's** [1] - 1484:23
**ability** [3] - 1329:23, 1350:2, 1537:14
**ablation** [4] - 1341:19, 1404:15, 1405:7, 1405:21
**ablations** [2] - 1404:14, 1405:10
**able** [19] - 1330:10, 1356:17, 1357:16, 1361:10, 1363:3, 1388:10, 1393:20, 1401:1, 1401:2, 1428:15, 1456:6, 1479:22, 1499:15, 1512:3, 1512:21, 1530:11, 1540:24, 1543:6, 1553:14
**abnormal** [1] - 1475:18
**abnormality** [1] - 1514:11
**abrasions** [2] - 1350:21, 1352:10
**absent** [2] - 1499:20, 1518:17
**absolutely** [3] - 1308:6, 1329:20, 1405:22
**absorb** [1] - 1471:8
**Accelerated** [12] - 1315:8, 1347:2, 1347:5, 1399:24, 1409:7, 1410:4, 1419:1, 1453:13, 1453:15, 1453:20, 1453:22, 1456:10
**accelerated** [3] - 1480:7, 1547:1, 1548:15
**accept** [4] - 1333:4, 1510:16, 1510:18, 1510:20
**accepted** [1] - 1338:12
**access** [3] - 1401:12, 1479:14, 1480:11
**accident** [90] - 1308:9, 1348:17, 1350:14, 1363:5, 1365:7, 1365:9, 1365:12, 1371:12, 1375:7, 1375:25, 1376:3, 1377:2, 1380:21, 1380:22, 1380:23, 1381:5, 1383:15, 1393:9, 1393:11, 1394:21, 1407:24, 1413:17, 1416:12, 1418:15, 1420:25, 1434:2, 1434:4, 1445:19, 1445:21, 1445:22, 1456:22, 1457:8, 1457:12, 1457:23, 1458:3, 1461:17, 1469:10, 1476:10, 1476:15, 1477:2, 1477:8, 1478:1, 1478:9, 1489:4, 1489:7, 1490:1, 1490:15, 1490:16, 1490:24, 1491:22, 1492:22, 1493:6, 1493:8, 1493:9, 1493:15, 1493:18, 1494:4, 1494:5, 1494:15, 1494:16, 1496:12, 1496:16, 1496:22, 1497:4, 1497:8, 1497:14, 1498:4, 1499:20, 1501:7, 1502:4, 1515:3, 1517:8, 1519:2, 1519:6, 1520:3, 1520:8, 1521:17, 1522:3,

1538:6, 1549:5, 1550:6, 1550:10, 1550:12, 1554:16, 1554:22, 1555:2, 1560:3, 1560:23, 1562:5
**accidents** [1] - 1499:14
**according** [3] - 1327:18, 1388:18, 1562:21
**account** [1] - 1320:15
**accounting** [1] - 1352:1
**accumulation** [1] - 1310:15
**accurate** [9] - 1309:1, 1313:5, 1317:11, 1317:12, 1317:14, 1317:16, 1317:20, 1530:13, 1536:6
**accurately** [1] - 1550:22
**ache** [5] - 1350:20, 1496:6, 1501:10, 1501:12, 1556:13
**actions** [1] - 1326:6
**active** [1] - 1342:12
**activity** [4] - 1539:24, 1539:25, 1540:13, 1540:14
**actual** [10] - 1309:18, 1316:23, 1385:8, 1437:17, 1459:10, 1467:23, 1473:1, 1509:5, 1544:12
**acute** [3] - 1351:4, 1503:20, 1521:9
**acutely** [1] - 1550:7
**add** [7] - 1313:2, 1313:15, 1315:21, 1315:23, 1315:24, 1327:14, 1512:13
**added** [7] - 1317:22, 1320:20, 1323:1, 1389:12, 1438:3, 1438:4, 1483:15
**adding** [2] - 1313:6, 1447:22
**addition** [4] - 1345:9, 1522:6, 1524:5, 1527:1
**additional** [16] - 1322:9, 1322:11, 1436:25, 1439:6, 1439:25, 1440:13, 1440:17, 1441:10, 1441:13, 1441:18, 1441:20, 1442:3, 1443:8, 1444:21, 1448:12, 1476:8
**address** [3] - 1321:9, 1354:21, 1376:8
**addressed** [3] - 1394:13, 1394:14, 1397:13
**addressing** [1] - 1314:11
**adhesions** [1] - 1442:25
**adjacent** [18] - 1453:12, 1480:8, 1480:11, 1480:22, 1480:23, 1481:1, 1545:14, 1546:5, 1546:12, 1546:21, 1546:24, 1547:2, 1547:7, 1547:11, 1548:16, 1549:13, 1559:23
**Adjacent** [1] - 1547:17
**adjourned** [1] - 1563:10
**adjust** [1] - 1429:2
**adjusted** [6] - 1323:11, 1324:18, 1332:21, 1333:3, 1368:5, 1368:6
**adjustment** [1] - 1333:8
**adjustments** [3] - 1368:19, 1369:3, 1418:18
**administered** [1] - 1383:6
**admissibility** [1] - 1384:16
**admission** [1] - 1460:16
**admit** [37] - 1374:5, 1374:6, 1376:5, 1377:17, 1381:7, 1382:13, 1383:20, 1389:19, 1394:3, 1395:7, 1397:2,

1398:13, 1399:13, 1408:3, 1409:19, 1409:23, 1410:8, 1412:17, 1417:8, 1417:25, 1421:6, 1422:9, 1423:5, 1423:17, 1424:12, 1424:18, 1432:11, 1434:7, 1449:14, 1449:19, 1451:9, 1453:5, 1460:6, 1460:25, 1461:1, 1515:25, 1534:14
**admits** [1] - 1306:16
**admitted** [7] - 1381:7, 1381:13, 1381:14, 1409:20, 1410:13, 1414:1, 1434:5
**admonitions** [1] - 1563:3
**advances** [1] - 1357:18
**advise** [1] - 1337:3
**affect** [1] - 1552:19
**affected** [1] - 1357:4
**affects** [2] - 1358:7, 1369:20
**affiliated** [2] - 1342:8, 1343:8
**affiliation** [1] - 1342:11
**affirm** [1] - 1536:4
**afternoon** [5] - 1415:1, 1458:11, 1486:2, 1486:3, 1486:4
**afterwards** [1] - 1381:19
**age** [6] - 1470:14, 1480:20, 1490:3, 1490:5, 1549:5, 1554:2
**age-related** [1] - 1490:3
**ago** [3] - 1344:24, 1357:21, 1418:11
**agree** [43] - 1311:20, 1378:11, 1384:21, 1384:23, 1385:17, 1386:17, 1386:18, 1386:23, 1447:4, 1449:4, 1460:16, 1478:18, 1479:1, 1489:24, 1490:15, 1494:9, 1494:10, 1495:18, 1498:13, 1499:1, 1502:14, 1504:8, 1504:15, 1505:1, 1516:12, 1516:16, 1520:2, 1520:11, 1521:3, 1522:7, 1523:12, 1526:10, 1529:24, 1530:17, 1537:25, 1540:23, 1545:18, 1546:23, 1547:7, 1547:9, 1548:19, 1549:11
**agreeable** [1] - 1386:18
**agreed** [13] - 1374:12, 1385:11, 1385:16, 1385:18, 1385:24, 1419:19, 1420:3, 1420:5, 1424:22, 1449:24, 1526:13, 1555:12
**agreement** [9] - 1303:23, 1304:1, 1418:16, 1419:8, 1419:11, 1424:17, 1434:7, 1460:6, 1461:1
**agreements** [1] - 1450:20
**agrees** [2] - 1433:4, 1465:4
**ahead** [5] - 1351:2, 1376:13, 1448:23, 1469:4, 1537:12
**Aided** [1] - 1301:19
**Air** [1] - 1498:20
**air** [4] - 1403:3, 1403:4, 1430:13, 1466:11
**airway** [5] - 1406:11, 1406:17, 1406:20, 1484:23, 1513:17
**airways** [2] - 1406:12, 1406:23
**AKOS** [1] - 1300:8
**Akos** [2] - 1301:4, 1301:11
**alarmed** [1] - 1352:9

**alert** [3] - 1511:7, 1512:3, 1512:21
**alignment** [2] - 1444:8, 1474:12
**ALL** [1] - 1491:14
**Alladin** [11] - 1315:6, 1315:7, 1315:10, 1346:4, 1347:1, 1400:2, 1413:5, 1413:7, 1413:16, 1413:18, 1418:12
**Alladin's** [2] - 1413:23, 1453:21
**allergies** [1] - 1507:17
**allograft** [3] - 1443:19, 1443:20, 1443:24
**allografting** [1] - 1443:25
**allow** [7] - 1310:5, 1310:8, 1355:12, 1454:20, 1483:9, 1484:17, 1547:5
**allows** [8] - 1353:6, 1357:15, 1357:24, 1405:6, 1430:3, 1430:16, 1431:1, 1431:4
**almost** [5] - 1397:23, 1449:5, 1449:10, 1450:4, 1546:18
**alone** [1] - 1332:25
**Alpha** [4] - 1336:3, 1336:4, 1343:18, 1343:19
**alter** [1] - 1544:25
**ambulance** [1] - 1350:16
**ambulation** [1] - 1483:12
**ambulatory** [7] - 1340:24, 1341:3, 1341:4, 1346:18, 1346:22, 1349:10, 1405:11
**American** [3] - 1315:14, 1347:17, 1423:24
**amount** [34] - 1313:11, 1323:2, 1323:3, 1323:6, 1330:25, 1332:2, 1332:3, 1332:16, 1333:9, 1394:1, 1415:20, 1417:5, 1422:3, 1422:7, 1424:8, 1436:12, 1436:18, 1436:22, 1437:14, 1437:25, 1438:1, 1440:18, 1441:5, 1441:7, 1441:14, 1442:13, 1445:11, 1445:13, 1486:20, 1486:21, 1498:23, 1521:1, 1534:5
**amounting** [1] - 1320:10
**amounts** [5] - 1413:12, 1418:13, 1422:10, 1436:24, 1440:15
**analyzed** [1] - 1547:12
**anatomic** [3] - 1429:22, 1429:25, 1482:9
**anatomy** [5] - 1353:25, 1363:14, 1363:19, 1363:20, 1431:10
**AND** [2] - 1300:8, 1300:13
**Anderson** [2] - 1301:4, 1301:11
**ANDERSON** [1] - 1300:8
**Andrew** [1] - 1397:14
**anesthesia** [16] - 1323:20, 1347:17, 1402:15, 1402:16, 1402:17, 1405:18, 1405:20, 1405:22, 1405:24, 1406:6, 1423:25, 1424:9, 1452:6, 1453:25, 1454:2, 1456:9
**Anesthesia** [2] - 1315:14, 1423:24
**anesthesiologist** [4] - 1341:15, 1406:17, 1409:5, 1482:6
**anesthesiologists** [1] - 1406:9
**aneurysms** [1] - 1344:6

**Angel** [1] - 1343:22
**Angeles** [2] - 1342:13, 1531:6
**angle** [2] - 1429:2, 1505:12
**angles** [1] - 1430:4
**animation** [2] - 1432:15, 1432:21
**ankle** [2] - 1358:17, 1391:3
**annually** [1] - 1481:25
**annulus** [4] - 1519:7, 1553:20, 1557:9
**answer** [15] - 1362:19, 1406:1, 1433:3, 1433:8, 1456:15, 1465:19, 1484:17, 1509:3, 1509:24, 1510:1, 1510:23, 1517:13, 1520:10, 1540:18, 1559:20
**answered** [1] - 1539:12
**answers** [1] - 1524:11
**anterior** [6] - 1362:23, 1427:6, 1491:12, 1491:15, 1520:17, 1522:1
**anti** [3] - 1481:22, 1500:4, 1557:14
**anti-inflammatories** [3] - 1481:22, 1500:4, 1557:14
**anticipate** [1] - 1485:2
**antiinflammatory** [1] - 1481:24
**aorta** [1] - 1430:20
**AP** [1] - 1430:18
**apologies** [2] - 1313:23, 1448:10
**apologize** [7] - 1308:18, 1319:21, 1325:14, 1428:3, 1440:22, 1441:22, 1542:25
**appear** [2] - 1304:6, 1436:16
**appearance** [1] - 1469:16
**appeared** [2] - 1348:4, 1554:15
**appellate** [1] - 1369:9
**applies** [1] - 1435:9
**apply** [3] - 1364:4, 1559:15, 1559:16
**applying** [1] - 1443:23
**appreciate** [2] - 1372:6, 1545:10
**approach** [8] - 1376:20, 1377:21, 1383:22, 1401:12, 1408:14, 1419:14, 1452:7, 1452:11
**approaches** [1] - 1337:2
**appropriately** [1] - 1432:22
**April** [10] - 1322:13, 1416:3, 1417:7, 1434:22, 1472:10, 1538:17, 1540:23, 1542:3, 1543:4, 1543:22
**area** [28] - 1353:10, 1353:12, 1358:21, 1361:14, 1391:3, 1401:11, 1403:7, 1462:1, 1462:17, 1462:22, 1464:16, 1464:19, 1464:20, 1464:21, 1464:22, 1466:8, 1466:11, 1466:12, 1469:12, 1472:21, 1483:23, 1492:25, 1493:2, 1520:13, 1521:5, 1559:25
**areas** [13] - 1306:24, 1356:23, 1359:2, 1361:18, 1362:1, 1362:20, 1465:5, 1465:11, 1466:14, 1472:6, 1475:8, 1520:16, 1520:19
**argue** [3] - 1303:6, 1308:10, 1309:14
**arguing** [2] - 1305:1, 1308:25
**argument** [2] - 1303:1, 1305:12
**argumentative** [7] - 1509:14, 1529:19, 1539:11, 1555:13, 1560:7, 1560:16, 1561:4

**arguments** [3] - 1334:1, 1384:17, 1410:9
**arm** [4] - 1361:7, 1361:10, 1364:5, 1476:1
**arms** [2] - 1513:6, 1523:23
**arrangements** [1] - 1303:20
**arrest** [1] - 1406:21
**arriving** [1] - 1372:24
**arrow** [4] - 1462:4, 1462:5, 1463:13
**arrows** [2] - 1463:12, 1472:1
**arthrodesis** [11] - 1437:15, 1437:24, 1439:7, 1439:13, 1440:13, 1440:16, 1441:18, 1441:23, 1444:19, 1547:14
**arthroplasty** [1] - 1547:4
**article** [3] - 1547:16, 1547:18, 1548:2
**articles** [4] - 1545:18, 1546:13, 1546:14, 1547:10
**articular** [1] - 1466:4
**ascribe** [1] - 1401:6
**ASD** [4] - 1558:6, 1558:8, 1559:5, 1559:8
**aspect** [3] - 1358:8, 1520:18
**aspects** [1] - 1463:15
**assessment** [3] - 1523:10, 1524:9, 1526:1
**assistant** [1] - 1536:25
**assistive** [1] - 1483:12
**associated** [3] - 1436:18, 1456:18, 1551:23
**associates** [1] - 1526:11
**assume** [9] - 1320:16, 1368:16, 1434:25, 1454:14, 1525:4, 1536:20, 1551:3, 1554:14, 1554:24
**assuming** [2] - 1438:2, 1515:8
**assumption** [5] - 1536:22, 1537:25, 1551:2, 1551:11, 1551:15
**assumptions** [1] - 1551:2
**asymptomatic** [1] - 1497:12
**attention** [2] - 1469:12, 1472:2
**attorney** [3] - 1308:8, 1528:2, 1529:11
**Attorney** [1] - 1529:2
**attorneys** [2] - 1300:21, 1340:5
**Attorneys** [3] - 1300:16, 1301:3, 1301:10
**attribute** [1] - 1550:10
**August** [1] - 1417:7
**authenticated** [1] - 1510:19
**authenticity** [5] - 1384:18, 1385:10, 1385:14, 1385:16, 1385:25
**authorization** [1] - 1453:8
**autograft** [4] - 1443:10, 1443:12, 1443:15, 1443:18
**Avenue** [2] - 1300:22, 1301:12
**average** [1] - 1340:21
**averse** [1] - 1405:22
**avoid** [3] - 1311:3, 1312:14, 1480:10
**awake** [1] - 1512:3
**award** [5] - 1343:19, 1343:23, 1368:25, 1369:2, 1369:4

VB          OCR          CRR

**awards** [3] - 1343:15, 1343:22, 1368:15
**aware** [11] - 1305:1, 1305:19, 1321:2, 1417:2, 1529:11, 1539:19, 1541:3, 1543:6, 1543:21, 1547:12, 1562:20
**axial** [7] - 1362:2, 1428:23, 1463:23, 1464:7, 1471:23, 1475:6, 1505:15

# B

**baby** [1] - 1402:14
**backed** [1] - 1389:8
**background** [6] - 1312:24, 1335:23, 1341:13, 1342:18, 1530:20, 1549:3
**backhand** [1] - 1401:2
**backing** [1] - 1365:1
**backup** [4] - 1316:24, 1317:6, 1318:5, 1451:5
**backwards** [2] - 1467:3, 1467:15
**bad** [1] - 1516:3
**balance** [8] - 1328:9, 1328:11, 1330:19, 1332:16, 1332:21, 1333:1, 1334:14, 1389:11, 1412:14
**ball** [1] - 1430:13
**band** [1] - 1463:3
**BARMEN** [23] - 1301:7, 1302:10, 1303:6, 1303:21, 1304:24, 1305:15, 1305:24, 1306:1, 1306:7, 1308:1, 1310:6, 1316:14, 1318:24, 1319:14, 1323:18, 1323:21, 1324:1, 1327:23, 1328:21, 1329:11, 1369:13, 1369:15, 1506:8
**Barmen** [5] - 1312:1, 1312:10, 1312:11, 1329:14, 1448:16
**Barnard** [3] - 1315:8, 1453:15, 1453:23
**Barnert** [4] - 1347:2, 1347:5, 1419:2, 1424:18
**based** [20] - 1304:13, 1317:5, 1317:21, 1341:8, 1343:10, 1356:15, 1361:19, 1371:22, 1375:5, 1375:6, 1417:1, 1448:4, 1450:11, 1469:8, 1469:9, 1476:8, 1495:15, 1495:16, 1509:12, 1558:17
**basis** [7] - 1311:11, 1352:4, 1355:14, 1382:14, 1384:6, 1471:18, 1502:25
**basketball** [1] - 1430:14
**Bates** [9] - 1320:6, 1320:9, 1506:9, 1506:15, 1511:13, 1517:25, 1528:4, 1533:5, 1538:4
**BAUTA** [1] - 1300:3
**Bauta** [153] - 1300:16, 1300:21, 1306:5, 1308:7, 1324:19, 1326:10, 1340:1, 1340:13, 1348:20, 1349:20, 1350:7, 1350:15, 1350:24, 1351:5, 1351:22, 1352:1, 1352:11, 1355:20, 1356:16, 1358:23, 1361:20, 1361:21, 1362:20, 1364:12, 1365:7, 1371:10, 1380:20, 1383:1, 1383:6, 1388:21, 1390:9, 1390:13, 1390:19, 1391:9,

1391:12, 1392:20, 1393:7, 1394:21, 1395:1, 1399:24, 1400:1, 1400:9, 1405:25, 1406:3, 1406:5, 1407:22, 1416:1, 1416:11, 1416:18, 1417:18, 1418:14, 1420:24, 1421:9, 1424:3, 1425:3, 1425:6, 1425:25, 1426:22, 1426:1, 1426:3, 1426:8, 1426:17, 1426:18, 1426:23, 1426:24, 1427:12, 1431:23, 1432:8, 1433:10, 1433:22, 1434:1, 1435:1, 1435:16, 1450:4, 1451:12, 1456:22, 1457:7, 1457:11, 1457:19, 1457:20, 1458:15, 1459:5, 1459:8, 1460:13, 1461:15, 1462:1, 1469:10, 1472:7, 1474:18, 1475:21, 1476:14, 1477:17, 1477:25, 1478:6, 1478:12, 1479:4, 1479:6, 1479:12, 1481:13, 1482:19, 1483:8, 1483:19, 1486:20, 1486:25, 1487:10, 1489:24, 1490:14, 1490:23, 1492:12, 1493:11, 1494:17, 1495:6, 1501:7, 1501:20, 1506:18, 1507:3, 1507:7, 1508:14, 1510:24, 1517:4, 1517:19, 1522:19, 1527:23, 1528:1, 1529:8, 1531:1, 1531:23, 1531:24, 1532:4, 1532:6, 1535:22, 1537:7, 1538:6, 1538:18, 1538:21, 1538:24, 1540:24, 1542:5, 1542:14, 1543:21, 1544:3, 1544:8, 1544:19, 1549:1, 1549:25, 1550:22, 1552:14, 1552:24, 1554:15, 1558:8, 1561:16
**bauta's** [2] - 1351:17, 1352:5
**Bauta's** [25] - 1315:15, 1335:21, 1345:7, 1349:24, 1362:21, 1397:22, 1416:7, 1456:10, 1459:1, 1472:18, 1476:10, 1476:25, 1477:7, 1477:11, 1484:8, 1494:3, 1496:21, 1510:14, 1530:19, 1537:17, 1550:25, 1554:14, 1560:1, 1560:24, 1562:6
**Bay** [1] - 1341:7
**bears** [1] - 1317:18
**beat** [2] - 1309:16, 1310:2
**became** [1] - 1343:21, 1520:8
**become** [4] - 1362:6, 1490:9, 1504:13
**becomes** [4] - 1362:10, 1445:25, 1513:2
**becoming** [1] - 1327:1
**bed** [2] - 1437:20, 1443:24
**bedside** [1] - 1553:6
**BEFORE** [1] - 1300:12
**beforehand** [1] - 1428:6
**began** [1] - 1426:1
**begin** [1] - 1370:1
**beginning** [6] - 1316:6, 1322:11, 1333:11, 1360:5, 1360:6, 1378:5
**begins** [1] - 1445:3
**behalf** [2] - 1340:8, 1435:12
**behind** [2] - 1355:13, 1463:1
**belief** [2] - 1305:9, 1305:13
**bell** [1] - 1413:22
**belly** [4] - 1402:14, 1492:4, 1492:7,

1554:1
**below** [3] - 1354:23, 1479:25, 1548:17
**belt** [1] - 1492:8
**bend** [1] - 1543:6
**bending** [1] - 1362:4
**benefit** [1] - 1400:8
**bent** [2] - 1429:2, 1431:5
**best** [14] - 1313:15, 1336:10, 1350:2, 1350:4, 1356:21, 1359:14, 1360:6, 1360:7, 1401:11, 1404:17, 1430:24, 1459:14, 1536:6, 1559:20
**better** [11] - 1318:10, 1364:20, 1370:3, 1401:3, 1403:19, 1404:9, 1470:11, 1479:9, 1482:23, 1560:5
**between** [19] - 1315:11, 1328:3, 1328:14, 1328:23, 1340:19, 1342:17, 1349:11, 1354:22, 1354:24, 1359:7, 1359:10, 1363:23, 1436:5, 1443:5, 1462:12, 1462:22, 1492:9, 1494:2, 1553:25
**Beverly** [3] - 1318:13, 1337:20, 1339:6
**beyond** [6] - 1348:17, 1352:9, 1352:10, 1364:1, 1561:21, 1562:2
**big** [3] - 1318:12, 1357:13, 1409:21
**bigger** [1] - 1312:4
**bilateral** [3] - 1361:23, 1363:8, 1363:9
**bill** [87] - 1305:10, 1306:1, 1308:2, 1308:5, 1311:21, 1312:23, 1315:7, 1315:16, 1315:17, 1315:19, 1315:22, 1320:21, 1321:10, 1321:11, 1322:5, 1323:15, 1323:18, 1323:19, 1324:1, 1324:24, 1325:1, 1325:6, 1325:20, 1326:2, 1326:4, 1326:18, 1326:21, 1327:19, 1328:24, 1329:3, 1329:17, 1330:3, 1330:6, 1333:1, 1334:8, 1334:14, 1368:4, 1371:16, 1371:20, 1371:22, 1371:24, 1372:9, 1373:19, 1374:2, 1374:3, 1377:1, 1382:7, 1393:17, 1396:2, 1396:24, 1396:25, 1399:9, 1412:12, 1412:16, 1413:19, 1417:2, 1417:6, 1418:8, 1418:10, 1418:13, 1420:10, 1420:12, 1420:21, 1421:3, 1421:8, 1421:12, 1421:17, 1421:20, 1421:21, 1423:12, 1423:14, 1424:10, 1435:10, 1435:11, 1435:12, 1441:18, 1442:3, 1442:17, 1448:10, 1448:12, 1450:8, 1450:18, 1486:11
**billed** [36] - 1315:14, 1320:11, 1323:2, 1323:3, 1323:6, 1324:18, 1324:19, 1324:20, 1324:22, 1329:21, 1330:25, 1332:3, 1332:16, 1332:20, 1333:2, 1333:16, 1333:18, 1333:23, 1368:3, 1417:5, 1418:11, 1436:12, 1438:1, 1440:15, 1440:18, 1441:5, 1441:7, 1442:12, 1444:5, 1445:11, 1486:21, 1533:2, 1557:21, 1557:22
**biller** [1] - 1305:7
**billing** [35] - 1309:1, 1313:11, 1315:9, 1315:15, 1317:21, 1319:2, 1321:3, 1321:6, 1323:12, 1323:13, 1323:14,

1329:2, 1329:8, 1329:9, 1329:16, 1330:9, 1331:1, 1348:24, 1349:3, 1399:2, 1410:2, 1412:9, 1416:24, 1417:1, 1423:25, 1435:7, 1439:13, 1439:19, 1439:24, 1440:9, 1440:17, 1444:18, 1557:23

**bills** [93] - 1305:1, 1305:14, 1305:15, 1305:18, 1306:9, 1307:1, 1307:10, 1307:18, 1309:4, 1309:14, 1310:16, 1311:1, 1311:5, 1311:17, 1311:25, 1312:3, 1312:6, 1312:13, 1312:21, 1313:12, 1313:13, 1313:14, 1313:17, 1313:22, 1314:22, 1315:1, 1315:4, 1315:5, 1315:12, 1316:8, 1316:11, 1316:20, 1317:10, 1318:4, 1318:12, 1319:15, 1321:19, 1321:23, 1321:24, 1322:23, 1324:17, 1325:22, 1326:12, 1327:1, 1327:3, 1328:4, 1328:18, 1328:25, 1329:6, 1329:13, 1330:1, 1330:18, 1332:25, 1345:21, 1349:7, 1349:10, 1349:15, 1367:2, 1367:5, 1368:18, 1369:18, 1372:14, 1372:15, 1373:7, 1373:10, 1384:21, 1389:12, 1393:20, 1410:6, 1413:3, 1413:9, 1413:12, 1413:17, 1413:22, 1416:17, 1418:12, 1420:15, 1421:14, 1434:20, 1441:16, 1453:13, 1456:9, 1458:4, 1458:6, 1483:15, 1486:7, 1486:9, 1486:16, 1538:1, 1555:6

**bind** [1] - 1369:22
**binder** [1] - 1325:16
**binders** [1] - 1370:25
**biological** [1] - 1403:23
**biomaterial** [1] - 1443:22
**bird's** [1] - 1464:8
**BISGAARD** [1] - 1301:3
**bit** [14] - 1306:15, 1316:2, 1319:24, 1359:7, 1359:21, 1359:25, 1362:18, 1374:20, 1454:6, 1458:13, 1464:18, 1502:9, 1503:8, 1545:9
**blank** [1] - 1527:16
**bleed** [1] - 1521:14
**bleeding** [1] - 1437:20
**block** [14] - 1400:9, 1400:11, 1400:12, 1400:15, 1400:18, 1401:1, 1401:5, 1402:2, 1402:10, 1402:11, 1402:13, 1404:17, 1404:21, 1405:9
**blocks** [10] - 1341:18, 1400:6, 1400:24, 1402:10, 1406:3, 1406:4, 1417:20, 1427:1, 1482:3, 1482:5
**blood** [3] - 1407:13, 1430:20, 1507:19
**blow** [9] - 1461:21, 1462:19, 1464:6, 1464:16, 1465:22, 1468:17, 1470:4, 1470:24, 1471:23
**blowup** [1] - 1468:12
**blurred** [3] - 1508:14, 1509:8, 1523:12
**BMP** [1] - 1427:19
**board** [7] - 1325:8, 1393:2, 1393:4, 1459:3, 1502:16, 1502:18, 1502:19
**body** [11] - 1350:20, 1356:23, 1363:4,

1404:7, 1471:9, 1496:6, 1501:10, 1501:12, 1514:7, 1556:9, 1556:13
**bolding** [1] - 1378:6
**bolt** [1] - 1431:19
**bone** [15] - 1326:5, 1326:6, 1427:20, 1431:1, 1431:3, 1437:17, 1437:19, 1437:22, 1437:23, 1441:2, 1443:12, 1443:21, 1443:24, 1472:20, 1504:14
**bones** [1] - 1489:20
**bony** [1] - 1473:5
**book** [9] - 1370:24, 1374:21, 1386:25, 1409:18, 1422:20, 1448:15, 1448:17, 1449:18, 1452:10
**borrowed** [1] - 1428:13
**bottom** [16] - 1303:25, 1323:2, 1324:8, 1358:13, 1393:25, 1445:2, 1463:25, 1465:24, 1472:23, 1475:8, 1505:16, 1507:13, 1511:4, 1518:12, 1518:13, 1526:3
**bout** [1] - 1477:17
**brace** [2] - 1426:14, 1426:15
**bracing** [1] - 1427:2
**BRADLEY** [1] - 1301:7
**Braggard's** [1] - 1353:19
**brain** [14] - 1310:20, 1336:24, 1337:1, 1344:5, 1361:4, 1361:5, 1361:7, 1361:8, 1485:4, 1513:1, 1521:9, 1521:16
**Braxton** [2] - 1346:15, 1347:2
**breach** [1] - 1430:12
**break** [11] - 1367:21, 1369:10, 1369:12, 1397:7, 1410:25, 1414:5, 1468:4, 1468:14, 1471:9, 1502:10, 1545:4
**breakage** [1] - 1479:16
**breakdown** [3] - 1450:11, 1480:6, 1532:24
**breaks** [1] - 1315:4
**breathing** [1] - 1484:23
**brevity** [1] - 1449:8
**bridge** [1] - 1429:17
**bridges** [2] - 1429:13, 1429:15
**brief** [5] - 1465:3, 1507:24, 1553:20, 1555:17, 1557:5
**briefing** [1] - 1333:6
**briefly** [11] - 1383:22, 1397:19, 1400:6, 1452:11, 1465:2, 1466:19, 1474:3, 1532:14, 1552:22, 1553:24, 1555:17
**bright** [6] - 1462:2, 1462:8, 1462:9, 1462:10, 1463:8, 1504:1
**bring** [13] - 1337:9, 1353:5, 1353:24, 1354:2, 1354:8, 1355:11, 1357:14, 1357:20, 1384:4, 1384:8, 1427:24, 1431:12, 1472:2
**bringing** [3] - 1384:18, 1386:11, 1427:7
**brings** [3] - 1362:23, 1362:24, 1561:6
**BRISBOIS** [1] - 1301:3
**brittle** [3] - 1490:9, 1496:19, 1554:2
**broad** [1] - 1540:4

**broke** [1] - 1369:13
**broken** [10] - 1314:13, 1314:22, 1315:11, 1315:12, 1316:4, 1368:10, 1369:11, 1373:16, 1555:20, 1561:8
**broken-up** [1] - 1316:4
**Brook** [1] - 1301:13
**Brookdale** [22] - 1346:14, 1346:20, 1348:7, 1348:11, 1350:19, 1365:4, 1374:24, 1484:7, 1494:19, 1495:3, 1522:19, 1523:2, 1523:4, 1524:7, 1526:11, 1528:10, 1538:4, 1538:5, 1538:19, 1538:20, 1553:18, 1556:12
**Brooklyn** [2] - 1300:5, 1365:4
**brother** [1] - 1554:23
**brother-in-law** [1] - 1554:23
**brought** [1] - 1426:17
**bruise** [1] - 1538:14
**bruising** [1] - 1514:11
**brush** [1] - 1508:11
**bulge** [5] - 1476:3, 1492:3, 1492:5, 1492:8, 1497:11
**bulges** [8] - 1391:5, 1475:4, 1475:5, 1491:21, 1491:22, 1491:24, 1492:19, 1492:24
**bulging** [1] - 1391:7
**bunch** [1] - 1545:6
**bundle** [1] - 1364:2
**burden** [4] - 1307:4, 1307:6, 1307:7, 1317:18
**burn** [1] - 1508:11
**burning** [1] - 1557:13
**burns** [1] - 1405:2
**bus** [16] - 1302:24, 1303:4, 1416:12, 1434:2, 1434:4, 1445:22, 1456:22, 1457:8, 1457:11, 1457:23, 1476:9, 1476:15, 1477:2, 1494:4, 1495:13, 1502:4
**busier** [1] - 1340:22
**busy** [1] - 1340:22
**buttock** [1] - 1353:12
**buttons** [1] - 1506:1
**buzz** [1] - 1562:1
**BY** [61] - 1300:18, 1300:23, 1301:7, 1301:13, 1335:16, 1356:2, 1369:25, 1382:2, 1388:6, 1389:25, 1391:22, 1394:9, 1395:22, 1397:9, 1398:23, 1399:19, 1402:1, 1412:5, 1415:10, 1420:8, 1428:8, 1439:2, 1448:8, 1449:11, 1450:2, 1451:1, 1451:17, 1452:3, 1456:4, 1457:3, 1460:1, 1460:11, 1468:11, 1474:2, 1486:1, 1496:2, 1502:12, 1504:24, 1506:17, 1507:15, 1509:16, 1510:9, 1511:24, 1512:15, 1516:9, 1517:17, 1518:2, 1520:1, 1542:2, 1549:21, 1557:2, 1558:1, 1558:5, 1559:2, 1560:9, 1561:24, 1562:17, 1564:5, 1564:6, 1564:7, 1564:8

# C

**C-700** [1] - 1301:12
**C-spine** [1] - 1555:22
**C1** [1] - 1354:18
**C2/3** [1] - 1391:6
**C3-4** [1] - 1475:7
**C3/4** [1] - 1391:6
**C4/5** [1] - 1391:5
**C5-6** [2] - 1475:4, 1475:11
**C5/6** [1] - 1391:5
**C6-7** [6] - 1475:4, 1475:21, 1491:13, 1491:14, 1493:4, 1493:14
**C6/7** [1] - 1391:5
**C7** [1] - 1354:18
**cable** [1] - 1353:14
**cadaveric** [1] - 1443:21
**Cadman** [1] - 1301:17
**calcification** [2] - 1521:16, 1522:4
**calcifications** [2] - 1504:12, 1521:4
**calcified** [5] - 1469:16, 1491:12, 1491:17, 1504:13, 1504:25
**calf** [6] - 1358:7, 1358:8, 1525:10, 1525:12, 1526:19
**caliber** [1] - 1404:24
**California** [4] - 1312:2, 1336:2, 1337:24, 1344:13
**Cameron** [1] - 1318:18
**canal** [23] - 1359:8, 1359:11, 1359:15, 1359:23, 1360:1, 1360:16, 1361:3, 1429:19, 1430:22, 1442:24, 1442:25, 1462:23, 1464:10, 1464:13, 1464:22, 1464:25, 1467:1, 1467:14, 1471:10, 1472:3, 1492:15
**candidate** [3] - 1426:13, 1426:23, 1427:11
**candidates** [1] - 1546:6
**cane** [11] - 1482:19, 1482:21, 1483:8, 1483:9, 1540:9, 1540:10, 1543:22, 1543:24, 1544:9, 1544:20
**cannot** [2] - 1385:7, 1540:13
**Capiola** [7] - 1390:6, 1390:11, 1390:16, 1392:1, 1392:5, 1393:6, 1425:2
**Capiola's** [2] - 1347:11, 1347:20
**capsule** [1] - 1544:14
**capsules** [1] - 1545:25
**car** [2] - 1489:7, 1499:14
**carbon** [1] - 1406:20
**cardiac** [1] - 1406:21
**care** [77] - 1306:15, 1306:19, 1306:22, 1306:24, 1308:1, 1309:6, 1310:21, 1325:8, 1335:21, 1339:15, 1345:12, 1349:15, 1349:25, 1350:7, 1350:9, 1351:21, 1355:17, 1364:11, 1364:16, 1364:23, 1365:4, 1367:5, 1367:6, 1367:8, 1367:12, 1368:10, 1371:10, 1371:22, 1372:21, 1375:8, 1378:19, 1383:12, 1387:13, 1393:7, 1393:8,

1393:10, 1400:1, 1406:25, 1407:6, 1407:7, 1407:8, 1407:9, 1407:22, 1416:2, 1416:21, 1417:2, 1417:6, 1417:17, 1419:5, 1425:4, 1425:19, 1425:21, 1433:22, 1433:25, 1434:3, 1447:19, 1448:13, 1457:7, 1457:18, 1457:20, 1458:22, 1459:8, 1469:9, 1478:12, 1478:13, 1478:15, 1478:16, 1479:4, 1481:17, 1483:20, 1485:12, 1488:20, 1542:18, 1550:11, 1550:25, 1558:18
**career** [1] - 1372:15
**carefully** [2] - 1375:5, 1409:4
**caretaking** [1] - 1543:9
**carried** [1] - 1392:22
**carryover** [1] - 1511:21
**cartilage** [1] - 1504:13
**CARTMELL** [1] - 1300:20
**Casden** [4] - 1465:3, 1493:24, 1503:16, 1562:21
**Casden's** [1] - 1562:24
**case** [43] - 1306:6, 1306:17, 1316:6, 1319:6, 1340:2, 1340:10, 1340:11, 1340:13, 1344:20, 1345:1, 1346:23, 1347:23, 1356:16, 1372:16, 1375:9, 1395:18, 1400:10, 1439:8, 1445:14, 1457:6, 1467:21, 1481:10, 1486:5, 1487:8, 1487:16, 1487:20, 1489:24, 1504:15, 1511:16, 1525:3, 1531:17, 1539:20, 1540:1, 1544:25, 1548:23, 1548:25, 1550:18, 1551:13, 1551:18, 1552:4, 1552:19, 1555:3, 1561:14
**cases** [7] - 1332:18, 1340:7, 1340:9, 1340:21, 1341:1, 1343:4, 1373:1
**cast** [1] - 1530:13
**CAT** [10] - 1340:10, 1371:18, 1373:3, 1373:7, 1373:11, 1395:4, 1395:5, 1431:11, 1472:17, 1544:12
**categories** [1] - 1367:12
**category** [2] - 1368:9, 1512:13
**caudad** [1] - 1547:13
**causally** [1] - 1477:1
**causation** [2] - 1345:12, 1458:23
**CAUSE** [1] - 1300:12
**caused** [13] - 1476:10, 1476:16, 1491:22, 1492:22, 1493:6, 1493:15, 1494:4, 1495:12, 1521:17, 1538:23, 1539:9, 1548:23, 1550:7
**causes** [6] - 1405:8, 1480:6, 1499:2, 1500:1, 1500:2, 1554:4
**causing** [4] - 1400:14, 1401:9, 1401:11, 1557:12
**caution** [1] - 1434:6
**CAV** [3] - 1300:9, 1301:4, 1301:11
**caveat** [6] - 1387:8, 1422:13, 1424:14, 1434:13, 1449:20, 1450:22
**CBT** [1] - 1440:2
**CBTs** [1] - 1439:19
**CD** [2] - 1312:9, 1312:13
**CD-ROM** [1] - 1312:9

**Cedar** [1] - 1373:6
**Cedars** [1] - 1342:13
**Celebrex** [1] - 1481:23
**Center** [17] - 1315:8, 1333:15, 1341:7, 1342:13, 1342:14, 1347:2, 1347:3, 1347:5, 1350:19, 1374:24, 1390:5, 1399:24, 1410:5, 1424:18, 1456:11, 1528:15
**center** [17] - 1341:3, 1341:4, 1346:18, 1396:24, 1402:9, 1405:11, 1409:19, 1410:6, 1462:10, 1463:14, 1471:24, 1472:6, 1476:3, 1492:14, 1513:20, 1557:10
**Center's** [1] - 1419:2
**centers** [4] - 1340:24, 1346:23, 1405:13, 1485:12
**centimeters** [1] - 1431:14
**central** [11] - 1359:8, 1359:11, 1359:16, 1359:23, 1360:2, 1360:16, 1361:15, 1361:22, 1464:23, 1464:24, 1475:22
**cents** [1] - 1333:2
**cephalad** [1] - 1547:13
**cerebral** [1] - 1336:8
**certain** [7] - 1357:1, 1434:6, 1484:20, 1490:5, 1531:24, 1540:13, 1543:24
**certainly** [12] - 1305:1, 1305:12, 1308:10, 1321:13, 1325:3, 1333:10, 1345:23, 1492:25, 1493:1, 1507:5, 1537:20, 1560:4
**certainty** [10] - 1477:5, 1480:22, 1481:5, 1483:21, 1485:17, 1493:14, 1495:5, 1495:11, 1497:2, 1497:5
**certificates** [1] - 1343:15
**certifications** [1] - 1405:16
**certified** [7] - 1381:10, 1382:21, 1393:2, 1393:4, 1502:16, 1502:18, 1502:19
**cervical** [18] - 1354:17, 1364:3, 1395:2, 1395:4, 1422:5, 1460:12, 1474:24, 1476:21, 1476:25, 1482:9, 1490:20, 1491:5, 1491:23, 1521:7, 1521:22, 1522:5, 1535:7, 1549:24
**cetera** [2] - 1325:7
**chair** [1] - 1352:23
**chance** [8] - 1313:25, 1410:14, 1418:6, 1449:2, 1488:21, 1491:5, 1546:15, 1559:22
**change** [8] - 1314:10, 1324:21, 1333:3, 1504:14, 1544:23, 1548:5, 1551:18, 1552:1
**changed** [3] - 1511:18, 1550:14, 1558:7
**changes** [5] - 1468:1, 1490:3, 1494:10, 1505:17, 1521:25
**channel** [1] - 1359:24, 1360:11
**channels** [1] - 1473:5
**charge** [35] - 1315:24, 1320:22, 1326:8, 1327:12, 1328:6, 1331:1, 1377:6, 1382:5, 1387:18, 1435:7,

1435:8, 1435:9, 1439:4, 1439:6, 1439:16, 1443:4, 1443:8, 1443:14, 1444:14, 1444:18, 1444:21, 1447:7, 1451:6, 1451:11, 1452:5, 1454:4, 1456:13, 1533:14, 1533:21, 1534:3, 1553:3, 1555:7, 1555:8, 1555:11, 1557:18

**charged** [8] - 1314:15, 1329:24, 1368:4, 1368:6, 1393:21, 1532:20, 1533:23, 1534:11

**charges** [42] - 1311:19, 1316:2, 1316:4, 1320:10, 1325:2, 1327:10, 1327:15, 1327:16, 1328:4, 1328:6, 1329:14, 1349:12, 1368:12, 1372:7, 1376:17, 1376:18, 1377:13, 1389:3, 1396:21, 1396:23, 1435:20, 1437:10, 1437:11, 1440:19, 1446:24, 1447:5, 1447:15, 1447:16, 1448:12, 1450:13, 1451:4, 1451:13, 1451:14, 1451:15, 1456:18, 1458:8, 1533:12, 1533:13, 1550:18

**charging** [1] - 1534:11

**chart** [2] - 1323:25, 1324:6

**check** [7] - 1302:13, 1321:4, 1372:23, 1409:19, 1481:14, 1518:19, 1518:21

**checked** [2] - 1482:15, 1513:17

**checks** [1] - 1307:16

**chemistry** [1] - 1325:7

**Chen** [5] - 1315:6, 1346:4, 1407:18, 1417:16, 1417:19

**Chen's** [1] - 1347:13

**chest** [2] - 1477:19, 1485:5

**chief** [3] - 1337:16, 1343:21, 1508:7

**chill** [2] - 1319:24, 1319:25

**chimera** [1] - 1356:24

**chiropractic** [4] - 1308:12, 1367:15, 1407:9, 1497:9

**Chiropractic** [1] - 1528:16

**chiropractor** [5] - 1351:22, 1380:18, 1415:24, 1495:6, 1500:25

**chiropractors** [11] - 1337:18, 1350:23, 1350:24, 1359:1, 1364:10, 1364:18, 1399:25, 1457:25, 1459:3, 1478:8, 1488:20

**choose** [1] - 1431:15

**chores** [1] - 1542:19

**chronic** [1] - 1503:18

**chronological** [1] - 1349:23

**chronologically** [1] - 1350:4

**chronology** [1] - 1350:1

**circle** [1] - 1470:7

**circled** [2] - 1426:18, 1465:11

**circling** [1] - 1466:22

**circulation** [1] - 1484:23

**circumstances** [10] - 1498:3, 1498:11, 1498:16, 1499:6, 1500:14, 1520:20, 1540:11, 1560:19, 1560:20, 1562:10

**cited** [2] - 1332:18, 1545:18

**cites** [1] - 1427:9

**citing** [1] - 1333:7

**City** [2] - 1300:23, 1341:7

**CIVIL** [1] - 1300:12

**claiming** [1] - 1329:4

**Class** [1] - 1373:19

**classes** [1] - 1481:23

**Claxton** [3] - 1457:9, 1477:16, 1497:7

**clean** [1] - 1334:9

**cleaning** [2] - 1543:11, 1543:12

**clear** [11] - 1326:20, 1387:7, 1387:15, 1387:16, 1436:2, 1437:4, 1451:10, 1461:23, 1469:25, 1483:1, 1504:25

**clearly** [6] - 1312:13, 1320:15, 1351:11, 1466:10, 1466:14, 1550:22

**clerk** [1] - 1379:2

**Cleveland** [1] - 1301:6

**climb** [2] - 1562:11, 1562:13

**climbed** [1] - 1561:11

**clinic** [2] - 1401:8, 1485:8

**clinical** [3] - 1339:23, 1427:4, 1459:5

**clinically** [1] - 1427:5

**close** [6] - 1332:4, 1332:7, 1406:20, 1432:2, 1463:4, 1557:11

**closer** [1] - 1428:18

**closing** [2] - 1303:1, 1410:9

**closure** [2] - 1444:13, 1446:10

**cloth** [1] - 1356:22

**code** [25] - 1329:24, 1439:7, 1439:8, 1439:10, 1439:11, 1439:14, 1439:24, 1440:2, 1440:8, 1440:9, 1440:25, 1441:1, 1441:5, 1441:13, 1441:19, 1441:20, 1444:9, 1444:18, 1445:7, 1445:15, 1446:3, 1534:3, 1534:4

**coded** [2] - 1428:22, 1480:25

**codes** [6] - 1373:1, 1416:24, 1417:1, 1438:4, 1439:19, 1534:6

**coding** [1] - 1441:15

**cohort** [1] - 1546:8

**Colbert** [2] - 1308:8, 1529:2

**COLEMAN** [1] - 1301:9

**collapsed** [1] - 1314:25

**collateral** [3] - 1331:7, 1333:10, 1369:8

**colleague** [1] - 1491:4

**colleagues** [1] - 1551:25

**collision** [4] - 1470:17, 1477:12, 1495:13, 1495:14

**colloquy** [1] - 1381:17

**Colonel** [2] - 1302:4, 1302:18

**color** [2] - 1428:22, 1428:23

**color-coded** [1] - 1428:22

**colors** [1] - 1468:2

**Coma** [3] - 1511:8, 1511:10, 1513:2

**coma** [6] - 1512:14, 1512:16, 1512:17, 1512:21, 1512:23, 1553:7

**combination** [3] - 1341:1, 1361:21, 1489:19

**combined** [2] - 1437:6, 1489:21

**comfort** [1] - 1540:10

**comfortable** [3] - 1308:17, 1340:6,

1483:14

**coming** [13] - 1303:24, 1317:7, 1318:7, 1318:15, 1339:18, 1355:6, 1409:22, 1430:9, 1463:13, 1472:3, 1492:9, 1497:15, 1524:8

**command** [1] - 1512:21

**common** [1] - 1557:23

**commonly** [3] - 1503:20, 1503:22, 1557:16

**communicate** [2] - 1512:4, 1512:19

**communication** [2] - 1303:22, 1304:4

**community** [7] - 1349:5, 1372:8, 1393:22, 1399:11, 1417:3, 1458:9, 1547:7

**Community** [5] - 1371:16, 1495:4, 1515:19, 1516:11, 1517:24

**Company** [1] - 1318:18

**company** [2] - 1326:10, 1330:7

**comparative** [1] - 1465:21

**compare** [6] - 1381:10, 1381:12, 1410:23, 1470:3, 1493:9, 1494:14

**compared** [1] - 1475:15

**comparison** [1] - 1475:24

**compensated** [1] - 1303:17

**competent** [1] - 1306:12

**compilation** [1] - 1420:9

**complain** [7] - 1362:8, 1500:4, 1522:8, 1522:10, 1523:16, 1555:20, 1556:8

**complained** [3] - 1495:19, 1498:21, 1539:15

**complaining** [6] - 1352:11, 1362:21, 1519:9, 1520:17, 1520:19, 1556:13

**complains** [2] - 1350:20, 1485:1

**complaint** [10] - 1477:25, 1496:3, 1496:5, 1496:7, 1501:17, 1508:6, 1508:7, 1508:8, 1527:20, 1550:9

**complaints** [21] - 1352:6, 1352:8, 1365:11, 1397:22, 1426:4, 1500:22, 1510:14, 1514:15, 1515:14, 1515:16, 1517:4, 1517:18, 1517:20, 1517:21, 1520:16, 1524:5, 1527:2, 1527:5, 1527:7, 1560:2

**completed** [3] - 1336:3, 1355:15, 1355:16

**completely** [8] - 1326:18, 1402:16, 1464:21, 1466:7, 1467:25, 1479:13, 1527:16

**complex** [4] - 1444:12, 1444:14, 1446:8, 1446:10

**complicated** [3] - 1341:1, 1445:14, 1446:1

**compressed** [9] - 1361:15, 1361:16, 1361:17, 1361:18, 1427:9, 1465:18, 1466:7, 1466:15

**compressing** [3] - 1464:13, 1466:13, 1472:4

**compression** [17] - 1361:12, 1361:13, 1361:14, 1361:22, 1361:24, 1361:25, 1363:8, 1363:9, 1364:4, 1465:4, 1465:12, 1466:1, 1471:24, 1475:5,

1493:11, 1500:8, 1515:1
**comprise** [1] - 1476:4
**comprises** [1] - 1433:19
**Computer** [1] - 1301:19
**Computer-Aided** [1] - 1301:19
**concept** [3] - 1342:5, 1353:20, 1402:20
**concern** [1] - 1304:15
**concerned** [5] - 1322:24, 1322:25, 1400:13, 1470:15, 1478:25
**concerning** [1] - 1517:5
**concluded** [4] - 1369:24, 1379:6, 1387:22, 1455:9
**conclusion** [1] - 1503:3
**Concourse** [1] - 1528:15
**condensed** [2] - 1314:4, 1314:5
**condition** [11] - 1345:7, 1351:23, 1459:2, 1494:3, 1494:17, 1537:18, 1542:18, 1544:11, 1544:16, 1549:2, 1555:16
**conditions** [5] - 1350:22, 1467:20, 1489:25, 1490:23, 1554:5
**conduct** [1] - 1336:14
**conducted** [1] - 1339:2
**conduction** [1] - 1421:11
**cone** [3] - 1360:9, 1462:15
**confer** [1] - 1310:13
**conferences** [1] - 1480:9
**confirming** [1] - 1536:11
**conflated** [1] - 1327:1
**conflation** [1] - 1332:23
**confused** [2] - 1336:12, 1395:11
**confusing** [1] - 1315:3
**confusion** [3] - 1315:12, 1328:3, 1441:22
**Congress** [1] - 1343:25
**conical** [1] - 1360:12
**conjunction** [5] - 1346:25, 1376:19, 1397:21, 1514:25, 1534:5
**connect** [1] - 1429:14
**connected** [1] - 1405:1
**connection** [1] - 1478:15
**consent** [1] - 1409:6
**conservative** [7] - 1407:6, 1407:8, 1426:25, 1488:22, 1559:8, 1559:17
**consider** [5] - 1303:18, 1390:18, 1407:6, 1407:7, 1407:22
**consideration** [2] - 1333:25, 1488:15
**considered** [2] - 1350:10, 1488:16
**consistent** [10] - 1381:18, 1417:10, 1418:20, 1470:8, 1470:18, 1475:16, 1526:17, 1526:18, 1526:20, 1550:24
**consistently** [2] - 1363:4, 1363:6
**consists** [1] - 1322:1
**Constantine** [1] - 1350:25
**construct** [6] - 1422:18, 1428:15, 1431:4, 1432:7, 1473:4, 1474:10
**consult** [3] - 1337:4, 1372:23, 1436:21
**consultant** [4] - 1343:1, 1484:1,

1484:2, 1555:19
**consultants** [2] - 1343:6, 1483:25
**consultation** [1] - 1364:25
**consulting** [1] - 1343:4
**contact** [3] - 1355:21, 1355:23, 1488:18
**contain** [1] - 1435:15
**contained** [2] - 1365:5, 1478:18
**contemporaneous** [1] - 1397:23
**content** [2] - 1463:7, 1561:6
**continuation** [1] - 1374:24
**continue** [8] - 1302:15, 1353:7, 1355:9, 1396:17, 1415:4, 1433:10, 1535:17, 1547:25
**continued** [17] - 1331:9, 1365:18, 1377:24, 1388:15, 1397:22, 1397:25, 1398:3, 1401:17, 1419:25, 1438:6, 1459:16, 1473:10, 1495:23, 1519:13, 1541:5, 1549:4, 1556:14
**Continued** [10] - 1301:1, 1355:24, 1379:7, 1381:22, 1383:25, 1387:24, 1408:21, 1411:4, 1452:15, 1455:11
**continues** [1] - 1479:12
**CONTINUES** [5] - 1382:1, 1388:5, 1439:1, 1496:1, 1557:1
**Continuing** [3] - 1402:1, 1420:8, 1520:1
**continuing** [10] - 1322:13, 1332:1, 1356:2, 1369:25, 1415:10, 1416:3, 1428:21, 1460:1, 1474:2, 1542:2
**continuously** [1] - 1363:24
**control** [2] - 1475:24, 1484:23
**controlled** [1] - 1406:23
**controversy** [4] - 1546:20, 1546:22, 1547:10, 1548:12
**contusion** [1] - 1350:18
**contusions** [2] - 1350:20, 1350:21
**cook** [1] - 1405:3
**cookie** [1] - 1330:11
**cooking** [2] - 1543:11, 1543:12
**cooks** [1] - 1405:2
**copies** [1] - 1387:11
**copy** [10] - 1314:4, 1370:17, 1370:21, 1370:24, 1371:3, 1378:3, 1378:11, 1381:10, 1386:22, 1387:4
**cord** [11] - 1361:4, 1361:9, 1363:24, 1363:25, 1364:2, 1407:13, 1475:5, 1475:18, 1475:19, 1476:4, 1493:10
**Cordiale** [42] - 1315:17, 1316:12, 1316:18, 1318:3, 1318:5, 1319:10, 1319:11, 1319:15, 1320:10, 1320:21, 1321:19, 1322:15, 1327:1, 1327:3, 1327:13, 1327:18, 1329:5, 1329:7, 1345:24, 1396:16, 1396:20, 1397:14, 1397:25, 1425:10, 1425:19, 1425:25, 1426:7, 1426:16, 1426:21, 1430:1, 1432:19, 1433:11, 1433:14, 1433:16, 1433:21, 1434:25, 1459:9, 1466:19, 1472:22, 1479:15, 1551:9, 1552:5
**Cordiale's** [17] - 1315:22, 1316:20,

1318:4, 1321:24, 1322:5, 1322:23, 1325:2, 1325:23, 1326:5, 1326:7, 1329:10, 1329:11, 1330:18, 1332:3, 1332:25, 1441:3, 1552:9
**corner** [3] - 1461:21, 1464:15, 1475:2
**coronary** [1] - 1325:8
**correct** [137] - 1321:25, 1340:15, 1343:12, 1346:10, 1346:21, 1346:25, 1347:6, 1347:12, 1348:13, 1348:18, 1349:21, 1364:7, 1376:1, 1378:22, 1391:10, 1392:6, 1413:4, 1415:21, 1417:4, 1417:20, 1420:13, 1420:19, 1421:1, 1423:4, 1423:13, 1423:14, 1424:5, 1425:4, 1433:18, 1433:23, 1437:2, 1437:3, 1437:8, 1438:3, 1439:14, 1439:17, 1440:1, 1440:4, 1440:11, 1442:7, 1442:20, 1445:4, 1445:24, 1446:6, 1447:17, 1447:19, 1447:20, 1448:13, 1448:14, 1450:5, 1454:1, 1456:14, 1461:17, 1463:20, 1465:5, 1465:9, 1474:11, 1474:21, 1477:6, 1477:23, 1481:8, 1487:1, 1487:6, 1487:7, 1487:13, 1487:15, 1487:18, 1487:21, 1487:22, 1488:9, 1489:23, 1490:10, 1490:18, 1491:11, 1493:19, 1493:20, 1493:22, 1496:11, 1496:13, 1502:15, 1502:17, 1503:7, 1505:2, 1505:23, 1506:25, 1507:7, 1507:21, 1508:6, 1508:9, 1508:15, 1508:21, 1508:23, 1511:25, 1513:7, 1513:11, 1513:16, 1514:9, 1514:17, 1515:15, 1515:18, 1516:15, 1517:3, 1518:9, 1521:15, 1521:17, 1521:18, 1521:21, 1521:24, 1522:9, 1522:12, 1522:14, 1522:16, 1522:18, 1525:23, 1526:14, 1527:9, 1527:13, 1528:22, 1528:25, 1530:22, 1530:25, 1531:2, 1535:9, 1537:2, 1538:16, 1539:17, 1543:3, 1545:17, 1546:10, 1547:24, 1549:15, 1555:10, 1558:15, 1558:16, 1558:20, 1561:10, 1561:17
**correctly** [4] - 1486:9, 1535:23, 1536:2, 1536:7
**correlate** [1] - 1427:5
**correspond** [3] - 1396:4, 1427:8, 1439:21
**corresponded** [1] - 1359:3
**corset** [1] - 1426:14
**cost** [8] - 1306:14, 1306:22, 1327:21, 1345:12, 1373:3, 1481:22, 1482:1, 1482:4
**costs** [7] - 1306:19, 1345:13, 1373:2, 1373:3, 1373:9, 1481:13, 1481:22
**counsel** [9] - 1321:22, 1383:17, 1408:2, 1418:16, 1428:7, 1432:17, 1434:7, 1449:9, 1550:16
**Counsel** [1] - 1422:17
**counted** [2] - 1406:2, 1412:16
**counter** [1] - 1307:9
**county** [3] - 1342:23, 1343:10, 1484:5

**couple** [9] - 1312:4, 1325:17, 1327:14, 1384:3, 1388:7, 1486:13, 1491:21, 1554:16, 1555:2
**course** [8] - 1305:24, 1310:17, 1333:6, 1372:23, 1392:19, 1443:2, 1494:14, 1530:7
**court** [11] - 1302:1, 1306:11, 1312:9, 1312:11, 1335:6, 1339:19, 1388:1, 1414:7, 1415:2, 1416:22, 1456:1
**COURT** [347] - 1300:1, 1302:3, 1302:12, 1302:23, 1303:7, 1303:9, 1304:2, 1304:22, 1305:14, 1305:22, 1306:4, 1307:4, 1307:6, 1307:12, 1307:15, 1307:18, 1307:22, 1307:24, 1308:15, 1308:19, 1308:21, 1309:21, 1310:5, 1310:8, 1311:4, 1311:8, 1311:11, 1311:14, 1311:17, 1312:20, 1313:21, 1314:8, 1314:10, 1314:17, 1314:19, 1314:23, 1316:5, 1316:9, 1316:18, 1316:23, 1317:1, 1317:3, 1317:5, 1317:13, 1317:25, 1318:3, 1318:10, 1318:15, 1318:17, 1318:20, 1318:22, 1319:4, 1319:6, 1319:16, 1319:21, 1320:3, 1320:12, 1321:9, 1321:15, 1321:18, 1321:23, 1322:1, 1322:4, 1322:7, 1322:15, 1322:19, 1322:22, 1323:7, 1323:24, 1324:5, 1324:9, 1324:11, 1324:13, 1325:1, 1325:12, 1325:15, 1325:18, 1326:1, 1326:3, 1326:14, 1326:16, 1326:21, 1326:24, 1327:2, 1327:7, 1329:5, 1330:13, 1330:16, 1330:18, 1330:21, 1330:23, 1332:2, 1332:6, 1332:9, 1332:11, 1332:15, 1332:19, 1332:24, 1334:6, 1334:12, 1334:16, 1334:21, 1334:24, 1335:3, 1335:5, 1335:10, 1344:11, 1353:7, 1354:8, 1354:11, 1354:14, 1365:15, 1367:1, 1367:7, 1367:14, 1367:17, 1367:21, 1367:24, 1368:1, 1368:6, 1368:8, 1368:24, 1369:3, 1369:6, 1369:12, 1369:14, 1369:21, 1370:4, 1370:6, 1370:17, 1370:20, 1370:22, 1372:11, 1374:7, 1374:11, 1374:14, 1374:17, 1375:15, 1375:18, 1375:20, 1376:10, 1376:21, 1377:19, 1377:22, 1378:25, 1379:5, 1380:2, 1380:5, 1380:8, 1380:14, 1381:16, 1382:16, 1383:23, 1385:4, 1385:7, 1385:13, 1385:17, 1385:21, 1386:2, 1386:8, 1386:11, 1386:14, 1386:22, 1387:2, 1387:4, 1387:9, 1387:16, 1388:3, 1389:22, 1391:19, 1394:6, 1395:10, 1395:14, 1395:17, 1397:4, 1397:7, 1398:15, 1398:18, 1399:16, 1406:15, 1408:4, 1408:7, 1408:9, 1408:13, 1408:15, 1408:17, 1409:3, 1409:12, 1409:15, 1410:1, 1410:3, 1410:11, 1410:15, 1410:19, 1410:22, 1410:24, 1411:2, 1412:2, 1412:22, 1413:24, 1414:2, 1414:4, 1414:8, 1415:4, 1415:14, 1415:16,

1415:18, 1417:12, 1418:3, 1418:19, 1418:22, 1419:12, 1419:20, 1419:22, 1422:14, 1423:7, 1423:10, 1423:19, 1424:15, 1424:21, 1424:23, 1428:19, 1429:10, 1432:14, 1432:25, 1433:5, 1433:7, 1434:9, 1434:11, 1434:14, 1435:22, 1435:24, 1436:3, 1437:4, 1437:7, 1437:9, 1448:5, 1448:20, 1448:23, 1449:16, 1449:25, 1450:24, 1451:20, 1451:24, 1452:1, 1452:8, 1452:12, 1453:24, 1454:12, 1454:20, 1455:4, 1455:7, 1456:3, 1456:25, 1460:17, 1460:24, 1461:3, 1461:11, 1464:2, 1465:8, 1465:13, 1465:15, 1468:4, 1469:19, 1469:22, 1469:24, 1472:11, 1478:23, 1481:14, 1483:5, 1483:18, 1484:15, 1484:17, 1485:23, 1502:10, 1504:21, 1506:4, 1506:6, 1506:10, 1506:12, 1506:22, 1506:24, 1509:2, 1509:15, 1509:24, 1510:1, 1511:19, 1511:21, 1512:10, 1515:22, 1516:2, 1516:6, 1517:16, 1521:13, 1522:23, 1522:25, 1528:1, 1528:6, 1528:8, 1528:13, 1528:21, 1529:14, 1533:8, 1534:16, 1534:18, 1534:22, 1536:16, 1537:10, 1537:12, 1537:23, 1539:13, 1539:22, 1540:5, 1540:17, 1541:2, 1542:21, 1543:18, 1544:6, 1544:22, 1545:3, 1545:10, 1545:12, 1549:9, 1549:18, 1551:7, 1551:12, 1552:8, 1552:11, 1552:13, 1552:16, 1553:23, 1554:19, 1555:15, 1556:4, 1556:11, 1557:25, 1558:3, 1558:23, 1560:8, 1560:17, 1561:5, 1561:19, 1561:21, 1562:4, 1562:16, 1563:2, 1563:6
**Court** [10] - 1301:17, 1321:2, 1353:6, 1383:17, 1408:11, 1415:13, 1422:17, 1428:7, 1432:17, 1449:10
**courtesy** [1] - 1387:12
**Courthouse** [1] - 1300:5
**courts** [1] - 1306:18
**cover** [2] - 1302:3, 1557:8
**coverage** [1] - 1306:2
**covered** [4] - 1385:11, 1444:24, 1457:21, 1478:5
**covering** [3] - 1402:22, 1402:25, 1464:14
**CPLR** [1] - 1536:5
**crack** [3] - 1492:9, 1554:4, 1554:9
**crazy** [1] - 1410:21
**cream** [3] - 1360:9, 1462:14, 1462:15
**create** [1] - 1332:13
**created** [2] - 1510:25, 1533:20
**creates** [2] - 1315:12, 1364:5
**credence** [2] - 1560:13, 1560:18
**credibility** [7] - 1529:21, 1529:24, 1530:8, 1533:13, 1539:18, 1540:15, 1560:10
**credible** [1] - 1530:17

**criticizing** [1] - 1534:10
**cross** [4] - 1302:18, 1328:19, 1329:22, 1511:15
**CROSS** [3] - 1485:25, 1542:1, 1564:6
**cross-examination** [2] - 1302:18, 1329:22
**cross-examine** [2] - 1328:19, 1511:15
**crossover** [1] - 1548:10
**crucially** [1] - 1530:9
**CT** [6] - 1338:19, 1521:6, 1521:7, 1521:9, 1521:16, 1521:22
**CTs** [1] - 1517:2
**cuboidal** [1] - 1468:18
**culture** [1] - 1485:4
**Cummings** [2] - 1306:15, 1309:19
**cumulative** [1] - 1313:16
**cured** [2] - 1404:9, 1479:13
**current** [2] - 1339:10, 1494:3
**curvature** [2] - 1429:1, 1474:21
**curve** [2] - 1429:6
**cushion** [6] - 1354:22, 1354:24, 1355:2, 1462:12, 1462:22, 1553:24
**custom** [1] - 1341:25
**customarily** [1] - 1551:24
**customary** [43] - 1306:10, 1306:19, 1306:22, 1308:16, 1308:23, 1309:5, 1311:6, 1311:19, 1312:25, 1318:20, 1331:1, 1349:4, 1349:9, 1371:23, 1371:24, 1372:8, 1372:12, 1377:3, 1382:9, 1382:10, 1389:6, 1389:14, 1393:22, 1393:24, 1399:11, 1413:10, 1417:2, 1417:4, 1418:8, 1421:4, 1421:15, 1421:17, 1421:18, 1436:13, 1441:14, 1442:13, 1445:12, 1446:9, 1446:19, 1447:12, 1450:14, 1456:19, 1458:9
**cut** [1] - 1545:6

# D

**dad** [3] - 1542:18, 1543:9, 1543:16
**dad's** [3] - 1542:19, 1543:11, 1543:14
**daily** [2] - 1329:20, 1401:8
**damage** [1] - 1391:1
**Daniel** [2] - 1337:15, 1337:22
**dark** [4] - 1462:24, 1469:16, 1504:1, 1504:2
**dash** [2] - 1383:18, 1391:5
**data** [3] - 1459:7, 1552:2, 1560:22
**database** [6] - 1312:25, 1372:17, 1372:19, 1372:20, 1372:23, 1389:8
**databases** [1] - 1309:11
**date** [31] - 1314:13, 1314:15, 1314:16, 1315:23, 1324:17, 1345:3, 1350:13, 1377:2, 1382:5, 1383:9, 1391:23, 1392:16, 1392:17, 1392:18, 1397:17, 1397:18, 1399:2, 1410:24, 1423:25, 1424:2, 1424:6, 1425:15, 1434:22, 1436:15, 1440:6, 1440:23, 1440:25, 1441:8, 1461:16, 1496:3

dated [1] - 1390:23
dates [21] - 1327:9, 1348:15, 1349:21, 1375:2, 1383:6, 1388:15, 1393:21, 1396:3, 1396:5, 1396:7, 1407:2, 1413:6, 1413:7, 1413:16, 1422:1, 1435:15, 1436:4, 1450:9, 1454:12, 1456:11, 1496:9
Davis [4] - 1336:2, 1336:5, 1336:6, 1337:12
days [21] - 1303:16, 1303:17, 1303:19, 1303:23, 1312:6, 1327:22, 1351:11, 1355:19, 1380:21, 1424:10, 1450:4, 1450:13, 1496:12, 1500:22, 1501:6, 1501:21, 1519:8, 1527:10, 1527:23, 1554:16, 1555:2
DC [1] - 1394:13
deal [6] - 1329:9, 1333:4, 1384:22, 1387:3, 1415:16, 1555:18
dealing [1] - 1364:1
debate [1] - 1466:16
debridement [1] - 1446:3
decades [1] - 1548:14
December [5] - 1390:23, 1391:11, 1391:14, 1392:18, 1398:10
decide [3] - 1368:18, 1368:20
decision [1] - 1387:19
decompress [1] - 1442:24
decompression [1] - 1444:7
decortication [1] - 1437:21
decrease [2] - 1400:16, 1471:5
decreased [3] - 1466:25, 1472:6, 1526:12
deductions [1] - 1323:4
deep [1] - 1430:20
deeper [1] - 1446:1
defendant [1] - 1522:25
Defendant's [11] - 1320:2, 1321:16, 1324:21, 1325:16, 1516:6, 1516:7, 1528:13, 1534:18, 1534:23, 1567:6, 1567:12
defendant's [3] - 1320:3, 1325:13, 1325:15
defendants [3] - 1300:10, 1340:2, 1486:5
Defendants [3] - 1301:3, 1301:3, 1301:10
Defendants' [4] - 1523:1, 1528:14, 1567:8, 1567:10
defense [8] - 1304:9, 1306:20, 1320:1, 1340:12, 1345:10, 1460:6, 1465:3, 1465:10
defer [1] - 1548:5
deficit [1] - 1359:2
definition [2] - 1500:16, 1559:22
definitive [1] - 1475:5
degenerate [4] - 1490:5, 1490:12, 1548:1, 1548:11
degenerated [4] - 1489:1, 1503:25, 1504:11, 1548:3
degeneration [17] - 1480:7, 1492:25,

1493:1, 1545:14, 1546:21, 1547:2, 1547:11, 1547:13, 1547:21, 1547:23, 1548:16, 1548:24, 1549:3, 1549:4, 1549:14, 1550:12, 1559:15
Degeneration [1] - 1547:17
degenerative [19] - 1467:20, 1468:1, 1489:20, 1489:23, 1490:3, 1490:15, 1494:9, 1503:18, 1503:22, 1503:24, 1521:25, 1548:7, 1548:8, 1548:20, 1549:2, 1549:23, 1559:7, 1559:17, 1559:21
degree [12] - 1476:12, 1477:4, 1480:21, 1483:20, 1485:17, 1493:14, 1495:5, 1495:11, 1497:1, 1497:5, 1538:24, 1553:18
degrees [1] - 1352:22
delay [1] - 1480:19
delayed [12] - 1494:24, 1499:12, 1519:11, 1520:8, 1550:7, 1553:19, 1553:21, 1554:7, 1554:11, 1557:4, 1557:6, 1562:20
delicate [2] - 1430:23, 1480:15
deliver [1] - 1402:14
Delray [2] - 1338:3, 1342:14
demographics [1] - 1374:25
demonstrate [2] - 1355:4, 1429:12
demonstrates [1] - 1352:14
demonstrating [1] - 1351:11
demonstrative [1] - 1429:11
denied [12] - 1302:6, 1508:14, 1508:16, 1508:18, 1508:20, 1508:22, 1509:7, 1523:12, 1523:15, 1523:19, 1524:1, 1538:10
denies [3] - 1465:12, 1518:10, 1523:23
DENNEHEY [1] - 1301:9
dense [2] - 1521:4, 1521:16
deny [1] - 1501:13
denying [1] - 1508:24
departed [1] - 1400:14
department [1] - 1560:6
deposed [1] - 1540:24
deposition [25] - 1311:24, 1312:2, 1312:3, 1321:21, 1329:13, 1473:2, 1491:4, 1504:17, 1505:3, 1505:19, 1510:22, 1520:5, 1531:24, 1532:3, 1542:3, 1542:5, 1542:9, 1542:10, 1543:1, 1543:2, 1543:4, 1543:20, 1546:3, 1551:19
depositions [7] - 1304:13, 1305:20, 1339:18, 1454:16, 1501:6, 1531:15, 1551:4
depth [1] - 1431:14
derangement [1] - 1390:25
dermatome [4] - 1356:20, 1356:21, 1357:5, 1553:10
dermatomes [10] - 1354:5, 1355:16, 1356:20, 1357:23, 1357:24, 1358:5, 1358:23, 1359:3, 1426:11, 1427:8
describe [5] - 1394:11, 1397:12, 1440:6, 1443:6, 1472:1

description [3] - 1394:16, 1397:15
desiccated [1] - 1550:2
desiccation [3] - 1496:19, 1496:23, 1550:4
design [1] - 1337:2
designated [1] - 1354:17
designations [1] - 1304:9
destination [1] - 1357:9
destinations [1] - 1360:24
destruction [1] - 1405:7
detailed [5] - 1394:16, 1397:15, 1426:21, 1485:2, 1485:12
details [1] - 1318:1
detecting [1] - 1427:6
determine [10] - 1357:8, 1372:12, 1372:20, 1380:24, 1388:10, 1470:13, 1512:14, 1515:9, 1553:7, 1560:10
determined [2] - 1317:9, 1505:22
detract [1] - 1537:16
develop [2] - 1546:5, 1558:8
developed [1] - 1560:23
developing [1] - 1559:23
device [3] - 1483:1, 1483:9, 1483:12
devices [1] - 1547:5
devil [1] - 1318:1
diabetic [1] - 1421:22
diagnose [1] - 1400:19
diagnosed [1] - 1538:14
diagnoses [3] - 1390:23, 1391:15, 1459:5
diagnosis [5] - 1336:15, 1337:3, 1351:7, 1390:18, 1390:22
Diagnostic [1] - 1451:11
diagnostic [4] - 1400:24, 1401:15, 1404:13, 1421:10
diagnostically [1] - 1403:13
Diagnostics [2] - 1347:22, 1451:4
diameter [2] - 1429:16, 1429:17
DIAMOND [10] - 1300:19, 1314:2, 1314:5, 1314:12, 1314:18, 1315:20, 1319:1, 1319:5, 1319:9, 1322:17
Diamond [2] - 1304:5, 1314:11
dictate [1] - 1498:12
die [3] - 1484:19, 1553:4
died [1] - 1406:13
differ [1] - 1402:3
difference [16] - 1328:22, 1359:7, 1359:10, 1363:23, 1430:16, 1435:6, 1443:19, 1494:7, 1497:23, 1504:6, 1505:4, 1505:6, 1505:20, 1529:17, 1529:20
different [53] - 1307:21, 1307:23, 1308:24, 1309:3, 1309:5, 1309:13, 1309:18, 1310:3, 1319:2, 1319:7, 1320:10, 1325:18, 1325:22, 1328:11, 1330:2, 1330:23, 1338:11, 1338:17, 1349:11, 1349:12, 1355:22, 1361:18, 1362:1, 1372:15, 1375:1, 1378:11, 1396:5, 1402:6, 1406:2, 1410:22, 1410:24, 1413:16, 1428:25, 1429:8,

1430:4, 1439:24, 1454:14, 1456:11, 1456:13, 1468:15, 1469:19, 1486:8, 1488:17, 1490:23, 1498:2, 1511:17, 1512:12, 1515:5, 1516:17, 1524:11, 1543:23, 1547:3

**differential** [2] - 1351:7, 1351:24

**differing** [1] - 1431:13

**difficulty** [3] - 1303:15, 1356:18, 1524:1

**dioxide** [1] - 1406:20

**dip** [1] - 1323:22

**dipped** [1] - 1320:19

**dipping** [5] - 1324:3, 1330:10, 1330:11, 1332:22, 1332:24

**dire** [1] - 1484:21

**DIRECT** [6] - 1335:15, 1356:1, 1415:9, 1420:7, 1474:1, 1564:5

**direct** [9] - 1343:1, 1392:10, 1469:11, 1485:21, 1486:24, 1514:20, 1550:15, 1555:5, 1556:7

**directed** [3] - 1390:14, 1485:7, 1485:10

**directions** [1] - 1428:25

**directly** [5] - 1324:19, 1324:20, 1343:3, 1362:5, 1510:11

**disadvantage** [2] - 1467:2, 1467:13

**disagree** [3] - 1348:12, 1504:3, 1504:5

**DISC** [4] - 1338:5, 1338:18, 1339:2, 1339:4

**disc** [79] - 1337:1, 1351:23, 1351:25, 1352:5, 1354:20, 1354:21, 1354:24, 1355:3, 1361:22, 1403:24, 1403:25, 1462:16, 1462:21, 1463:2, 1463:7, 1463:9, 1463:12, 1463:15, 1463:17, 1464:13, 1464:22, 1466:19, 1466:24, 1466:25, 1467:13, 1467:14, 1467:17, 1467:23, 1468:15, 1468:17, 1468:19, 1468:21, 1469:2, 1469:13, 1469:14, 1469:15, 1470:5, 1470:6, 1470:7, 1470:9, 1470:11, 1470:24, 1471:1, 1471:8, 1471:9, 1472:2, 1472:5, 1475:21, 1476:10, 1476:16, 1480:2, 1480:6, 1487:24, 1488:25, 1489:12, 1490:8, 1491:19, 1491:25, 1492:13, 1494:23, 1495:7, 1495:8, 1495:10, 1495:12, 1520:4, 1520:5, 1547:4, 1548:4, 1548:7, 1548:8, 1549:2, 1550:2, 1550:5, 1553:24

**discectomy** [1] - 1443:3

**discharged** [1] - 1525:25

**disciplinary** [1] - 1338:1

**discipline** [2] - 1336:14, 1336:23

**disciplines** [1] - 1338:9

**disclosed** [2] - 1453:4, 1453:11

**disclosure** [1] - 1453:8

**disclosures** [1] - 1432:24

**discovered** [2] - 1408:2, 1515:4

**discovery** [5] - 1320:23, 1320:25, 1453:4, 1454:21, 1455:2

**discs** [8] - 1363:15, 1462:10, 1463:4,

1463:16, 1464:23, 1466:22, 1467:22, 1490:5

**discuss** [4] - 1310:11, 1383:21, 1475:1, 1480:9

**discussed** [11] - 1381:11, 1391:14, 1405:18, 1407:5, 1422:10, 1423:13, 1450:20, 1457:1, 1483:16, 1506:16, 1552:25

**Discussion** [1] - 1414:9

**discussion** [3] - 1380:7, 1386:1, 1466:18

**discussions** [3] - 1417:11, 1459:1, 1516:23

**disease** [12] - 1480:8, 1480:11, 1480:22, 1480:24, 1481:2, 1489:23, 1546:6, 1547:3, 1547:8, 1548:16, 1548:20, 1559:23

**disk** [33] - 1391:4, 1391:5, 1391:7, 1401:4, 1401:7, 1401:10, 1401:13, 1496:18, 1496:19, 1496:20, 1496:23, 1497:11, 1497:14, 1498:8, 1498:13, 1498:21, 1499:8, 1499:18, 1499:25, 1500:1, 1500:7, 1503:20, 1503:24, 1503:25, 1504:11, 1504:12, 1505:1, 1505:13, 1519:7, 1557:8, 1557:10

**disks** [1] - 1391:7

**dispensed** [1] - 1371:19

**displaced** [2] - 1462:23, 1471:10

**displayed** [1] - 1473:4

**dispute** [14] - 1313:9, 1395:19, 1494:2, 1507:2, 1516:14, 1516:19, 1516:23, 1518:8, 1523:5, 1523:17, 1526:24, 1527:18, 1533:15, 1546:24

**disputes** [1] - 1459:1

**disregard** [1] - 1302:17

**disruption** [1] - 1521:19

**distention** [1] - 1525:1

**distract** [1] - 1556:1

**distracting** [2] - 1499:11, 1555:16

**DISTRICT** [2] - 1300:1, 1300:1

**DO** [2] - 1382:6, 1397:14

**Doc** [6] - 1354:3, 1401:1, 1404:9, 1404:17, 1498:18, 1498:22

**doc** [1] - 1362:9

**doctor** [18] - 1307:18, 1307:19, 1308:3, 1313:11, 1341:10, 1365:14, 1390:16, 1394:14, 1412:11, 1428:17, 1436:7, 1437:18, 1454:8, 1519:2, 1523:3, 1526:5, 1529:9, 1559:3

**Doctor** [9] - 1335:17, 1344:13, 1349:19, 1383:1, 1393:1, 1486:2, 1536:2, 1547:9, 1550:9

**doctors** [35] - 1315:11, 1341:11, 1343:3, 1345:8, 1345:15, 1348:25, 1349:9, 1351:5, 1351:14, 1352:4, 1352:9, 1352:13, 1355:17, 1355:22, 1362:25, 1372:16, 1372:22, 1392:8, 1402:8, 1403:9, 1425:3, 1425:9, 1425:13, 1435:12, 1435:16, 1451:12, 1457:21, 1459:2, 1459:8, 1484:12,

1532:6, 1532:7, 1550:20, 1551:22, 1552:13

**doctors'** [2] - 1327:11, 1345:21

**document** [13] - 1310:24, 1313:24, 1351:17, 1351:24, 1355:19, 1362:25, 1388:19, 1392:16, 1395:25, 1397:12, 1416:15, 1418:17, 1423:23

**documentation** [3] - 1327:24, 1513:24, 1515:6

**documented** [8] - 1359:1, 1363:11, 1383:3, 1426:5, 1507:22, 1550:23, 1560:15

**documenting** [1] - 1390:12

**documents** [5] - 1312:1, 1319:7, 1415:23, 1415:24, 1456:18

**done** [54] - 1315:5, 1323:13, 1329:9, 1341:1, 1346:24, 1350:3, 1352:20, 1357:18, 1372:25, 1383:9, 1392:8, 1392:12, 1392:23, 1394:21, 1394:25, 1395:5, 1400:18, 1400:19, 1402:11, 1403:7, 1403:12, 1405:10, 1405:12, 1405:24, 1406:10, 1412:15, 1426:6, 1427:13, 1427:21, 1428:16, 1432:16, 1432:22, 1439:8, 1440:2, 1458:24, 1484:12, 1485:11, 1486:19, 1492:16, 1495:9, 1502:1, 1512:19, 1514:9, 1521:3, 1534:4, 1537:6, 1539:19, 1545:7, 1555:22, 1556:3, 1557:19, 1557:20, 1563:3

**door** [3] - 1404:2, 1404:5

**dots** [1] - 1464:12

**double** [8] - 1302:13, 1323:17, 1323:22, 1324:3, 1324:22, 1332:22, 1332:24, 1409:19

**doubt** [1] - 1530:13

**doughnut** [2] - 1553:25, 1554:2, 1554:5, 1554:8

**down** [45] - 1305:9, 1309:17, 1314:13, 1314:22, 1319:9, 1349:19, 1352:12, 1353:17, 1354:4, 1354:10, 1355:9, 1355:20, 1356:13, 1358:15, 1373:16, 1402:14, 1403:10, 1406:10, 1406:20, 1410:8, 1410:16, 1410:20, 1428:18, 1436:15, 1437:10, 1440:22, 1442:21, 1443:10, 1445:2, 1454:5, 1464:20, 1466:14, 1468:10, 1471:3, 1471:9, 1500:4, 1503:13, 1513:19, 1513:21, 1514:10, 1518:12, 1535:19, 1553:9, 1554:12, 1557:13

**dozens** [2] - 1531:13

**dr** [1] - 1329:17

**Dr** [291] - 1305:4, 1308:15, 1308:21, 1309:17, 1309:24, 1310:16, 1310:17, 1310:21, 1311:1, 1311:4, 1311:18, 1311:24, 1314:14, 1315:10, 1315:17, 1315:22, 1316:12, 1316:18, 1316:20, 1318:3, 1318:4, 1318:5, 1318:11, 1319:10, 1319:11, 1320:10, 1320:21, 1321:19, 1321:24, 1322:5, 1322:15, 1322:23, 1325:2, 1325:23, 1326:5,

Bauta v. Greyhound Lines, et al _____14

1326:7, 1327:13, 1327:18, 1328:18,
1329:1, 1329:5, 1329:7, 1329:10,
1329:11, 1329:12, 1329:19, 1329:23,
1330:4, 1330:18, 1332:3, 1332:12,
1332:25, 1334:7, 1335:3, 1339:10,
1340:7, 1341:25, 1344:8, 1344:11,
1345:24, 1345:25, 1346:4, 1346:5,
1346:6, 1346:7, 1346:8, 1346:17,
1346:25, 1347:1, 1347:10, 1347:11,
1347:13, 1347:14, 1347:20, 1348:4,
1348:5, 1350:5, 1350:23, 1350:24,
1350:25, 1351:14, 1352:3, 1358:22,
1359:4, 1361:19, 1363:13, 1364:9,
1364:10, 1365:1, 1370:9, 1371:2,
1371:21, 1372:7, 1374:20, 1375:22,
1376:14, 1376:25, 1380:9, 1380:16,
1380:19, 1381:18, 1382:3, 1382:18,
1383:11, 1383:13, 1388:8, 1390:5,
1390:6, 1390:11, 1390:16, 1392:1,
1392:5, 1392:23, 1392:24, 1393:6,
1393:20, 1394:11, 1394:17, 1396:6,
1396:15, 1396:16, 1396:20, 1397:25,
1398:2, 1398:10, 1399:21, 1400:2,
1400:3, 1406:25, 1407:1, 1407:17,
1407:18, 1408:6, 1409:3, 1409:22,
1410:5, 1412:6, 1412:25, 1413:7,
1413:16, 1413:18, 1413:22, 1413:23,
1413:25, 1415:19, 1415:25, 1416:3,
1416:6, 1416:19, 1416:20, 1417:16,
1417:19, 1418:7, 1418:12, 1418:25,
1420:10, 1420:21, 1420:24, 1421:8,
1421:9, 1421:20, 1422:18, 1422:25,
1423:2, 1423:12, 1423:14, 1424:2,
1425:2, 1425:10, 1425:11, 1425:17,
1425:19, 1425:22, 1425:25, 1426:6,
1426:7, 1426:18, 1426:21, 1427:21,
1428:9, 1429:10, 1430:1, 1431:8,
1432:11, 1432:15, 1432:19, 1433:11,
1433:14, 1433:16, 1433:21, 1434:18,
1434:25, 1436:4, 1441:3, 1447:24,
1448:21, 1449:12, 1451:3, 1452:6,
1456:5, 1457:4, 1458:15, 1459:9,
1460:12, 1461:14, 1465:2, 1465:3,
1465:10, 1466:19, 1468:12, 1469:20,
1469:25, 1470:22, 1472:22, 1474:25,
1476:7, 1477:24, 1479:15, 1481:12,
1483:7, 1483:23, 1485:15, 1485:21,
1493:23, 1493:24, 1495:6, 1496:7,
1502:6, 1502:13, 1502:16, 1503:16,
1504:9, 1505:1, 1505:7, 1510:24,
1511:15, 1516:21, 1519:9, 1527:21,
1528:21, 1531:18, 1532:10, 1533:4,
1533:10, 1533:16, 1534:15, 1535:3,
1535:6, 1535:11, 1535:20, 1536:20,
1537:3, 1537:15, 1537:20, 1549:22,
1550:17, 1551:1, 1551:3, 1551:9,
1551:15, 1552:10, 1552:4, 1552:5,
1552:9, 1552:18, 1553:16, 1562:21,
1562:24
**draw** [10] - 1461:23, 1462:6, 1463:12,
1467:5, 1467:6, 1467:7, 1468:24,

1468:25, 1470:7, 1470:10
**drawing** [2] - 1462:3, 1470:7
**drill** [1] - 1437:19
**driven** [1] - 1338:15
**driving** [1] - 1338:17
**drop** [1] - 1357:20
**dry** [2] - 1490:8, 1554:6
**dryer** [1] - 1554:3
**drying** [1] - 1496:19
**due** [9] - 1304:7, 1320:7, 1320:14,
1321:8, 1328:8, 1394:1, 1412:15,
1469:1, 1549:13
**dull** [1] - 1362:10
**duly** [3] - 1335:13, 1415:7, 1536:3
**duplicate** [2] - 1410:9, 1486:12
**duplicated** [1] - 1317:24
**duplicates** [2] - 1412:20, 1486:10
**duplication** [7] - 1313:10, 1408:2,
1418:17, 1422:11, 1423:16, 1434:8,
1447:5
**duplications** [3] - 1409:24, 1409:25,
1410:1
**duplicative** [16] - 1398:16, 1410:7,
1410:16, 1418:6, 1418:25, 1419:4,
1419:10, 1419:18, 1420:3, 1424:19,
1444:21, 1444:22, 1445:2, 1450:20,
1486:13
**dura** [3] - 1402:24, 1403:2
**dural** [1] - 1402:22
**duration** [1] - 1389:16
**during** [13] - 1306:2, 1311:24,
1312:15, 1326:6, 1326:7, 1341:17,
1343:18, 1343:20, 1439:4, 1441:2,
1491:3, 1516:17, 1545:21

## E

**e-mailed** [1] - 1313:24
**e-mails** [1] - 1385:24
**early** [15] - 1351:9, 1351:21, 1352:3,
1352:16, 1355:17, 1356:17, 1358:23,
1360:22, 1364:9, 1474:23, 1490:4,
1545:8, 1553:16
**easiest** [2] - 1401:11, 1562:14
**East** [3] - 1300:17, 1301:5, 1529:2
**East/Brooklyn** [1] - 1301:17
**EASTERN** [1] - 1300:1
**easy** [2] - 1386:7, 1558:2
**eaten** [1] - 1479:21
**eating** [1] - 1492:4
**ED** [3] - 1517:19, 1528:11, 1560:5
**edge** [1] - 1352:21
**edits** [1] - 1387:6
**education** [1] - 1336:3
**effacing** [1] - 1464:14
**effect** [2] - 1304:10, 1480:10
**effort** [1] - 1383:11
**Ehrenberg** [4] - 1303:13, 1303:22,
1305:4

**Ehrenberg's** [1] - 1304:8
**eight** [5] - 1351:18, 1426:2, 1431:17,
1488:7, 1496:12
**Either** [1] - 1315:7
**either** [20] - 1303:16, 1326:10,
1329:12, 1333:8, 1339:16, 1341:22,
1341:23, 1361:15, 1365:14, 1405:10,
1405:12, 1487:3, 1495:12, 1496:19,
1500:12, 1519:5, 1520:7, 1527:8,
1550:7, 1554:7
**elbow** [1] - 1391:3
**electrodiagnostic** [1] - 1421:18
**electromyography** [1] - 1421:11
**electronic** [2] - 1314:21, 1510:5
**electronically** [1] - 1449:10
**elements** [2] - 1401:9, 1431:7
**elicit** [2] - 1519:3, 1520:6
**elicited** [2] - 1515:1, 1550:15
**elicits** [1] - 1514:7
**eligible** [1] - 1341:2
**emanating** [1] - 1360:23
**embedded** [2] - 1342:24, 1557:8
**Emblem** [16] - 1304:16, 1304:18,
1305:23, 1320:22, 1320:24, 1324:2,
1324:23, 1325:19, 1325:21, 1326:22,
1328:9, 1328:15, 1330:8, 1333:14,
1333:17
**Emergency** [3] - 1513:3, 1518:18,
1519:2
**emergency** [47] - 1342:19, 1343:2,
1343:3, 1343:5, 1343:6, 1343:8,
1343:11, 1348:8, 1348:16, 1348:20,
1349:7, 1350:16, 1365:4, 1367:16,
1370:12, 1371:10, 1371:21, 1373:2,
1373:20, 1373:24, 1374:2, 1375:7,
1375:13, 1376:18, 1377:12, 1378:14,
1379:2, 1483:24, 1483:25, 1484:1,
1484:2, 1484:3, 1484:5, 1484:18,
1485:1, 1485:2, 1485:11, 1507:6,
1520:12, 1521:8, 1553:1, 1553:2,
1553:3, 1555:19, 1560:5
**employees** [1] - 1321:22
**EMR** [1] - 1375:1
**EMS** [4] - 1505:25, 1506:5, 1506:25,
1560:5
**EMT** [8] - 1350:16, 1508:18, 1527:1,
1552:22, 1552:24, 1553:17, 1556:8,
1560:19
**EMT's** [1] - 1553:5
**EMTs** [7] - 1506:18, 1507:3, 1509:6,
1514:14, 1515:4, 1522:6, 1561:23
**EMTs'** [1] - 1510:6
**encounter** [2] - 1421:21, 1442:25
**encounters** [4] - 1375:2, 1390:12,
1393:17, 1421:17
**end** [7] - 1332:11, 1332:19, 1360:9,
1369:23, 1438:2, 1446:6, 1458:14
**ended** [1] - 1432:2
**endings** [1] - 1402:10
**ends** [5] - 1358:16, 1358:21, 1363:25,

1411:3, 1441:17
**Engine** [1] - 1318:18
**Englewood** [1] - 1337:23
**englewood** [1] - 1337:24
**ensure** [1] - 1444:7
**Enterprise** [2] - 1301:5, 1301:11
**ENTERPRISE** [1] - 1300:9
**enters** [3] - 1334:23, 1415:3, 1468:8
**entire** [6] - 1313:4, 1405:4, 1503:25, 1525:17, 1526:10, 1547:6
**entirely** [1] - 1330:2
**entirety** [7] - 1321:19, 1398:15, 1409:7, 1409:8, 1485:9, 1503:25, 1544:11
**entities** [3] - 1305:6, 1305:9, 1349:3
**entity** [1] - 1480:9
**entries** [5] - 1314:15, 1383:3, 1449:22, 1477:15, 1477:16
**entry** [3] - 1383:10, 1429:25, 1430:11
**epidural** [8] - 1392:22, 1402:3, 1402:20, 1402:22, 1403:8, 1403:21, 1403:22
**epidurals** [10] - 1400:6, 1402:5, 1402:11, 1403:12, 1403:16, 1403:18, 1405:9, 1406:3, 1427:1, 1500:5
**Eppley** [1] - 1516:20
**equal** [2] - 1313:22, 1315:25
**equation** [1] - 1401:13
**equipped** [1] - 1405:15
**ER** [9] - 1371:17, 1373:19, 1494:18, 1495:3, 1499:13, 1512:20, 1515:20, 1516:25, 1522:7
**erase** [1] - 1467:10
**Erb** [1] - 1516:20
**error** [4] - 1551:4, 1551:10, 1551:16, 1557:23
**escalate** [1] - 1364:23
**ESQ** [7] - 1300:18, 1300:19, 1300:23, 1301:7, 1301:7, 1301:13, 1301:14
**essence** [1] - 1494:2
**essentially** [2] - 1334:15, 1525:24
**establish** [2] - 1309:8, 1459:5
**estimates** [1] - 1559:18
**et** [2] - 1325:7
**evaluate** [2] - 1307:2, 1487:6
**evaluated** [9] - 1425:18, 1451:12, 1506:19, 1531:23, 1532:1, 1532:6, 1532:7, 1533:17, 1536:21
**evaluation** [6] - 1371:17, 1426:3, 1426:8, 1507:7, 1513:5, 1516:22
**evaluations** [2] - 1436:11, 1511:9
**Evangelical** [13] - 1348:20, 1350:16, 1365:3, 1370:12, 1371:16, 1375:14, 1495:4, 1515:19, 1516:10, 1517:24, 1527:1, 1553:17
**evening** [1] - 1563:4
**event** [6] - 1476:16, 1489:15, 1489:16, 1498:12, 1499:2, 1554:4
**events** [1] - 1469:10
**eventually** [1] - 1404:3

**everyday** [1] - 1502:25
**evidence** [66] - 1328:5, 1328:24, 1329:1, 1333:13, 1333:20, 1333:22, 1374:17, 1374:19, 1375:13, 1375:20, 1375:21, 1376:11, 1377:20, 1380:3, 1380:11, 1380:16, 1382:17, 1388:4, 1389:24, 1394:8, 1395:20, 1397:5, 1398:20, 1399:18, 1412:3, 1412:4, 1412:24, 1415:12, 1415:15, 1417:14, 1418:5, 1418:23, 1419:13, 1419:24, 1422:16, 1423:11, 1423:21, 1424:16, 1424:25, 1432:18, 1434:15, 1434:17, 1447:24, 1448:6, 1448:7, 1450:1, 1450:21, 1450:25, 1451:5, 1452:2, 1457:2, 1461:5, 1461:7, 1474:24, 1491:7, 1492:25, 1501:5, 1501:19, 1515:23, 1516:7, 1522:22, 1523:1, 1528:14, 1534:23, 1543:17, 1544:24
**evident** [2] - 1469:8, 1470:16
**evidentiary** [4] - 1311:11, 1313:16, 1331:6, 1333:5
**EVM** [1] - 1512:8
**evolutionary** [1] - 1479:21
**evolve** [1] - 1362:6
**exact** [8] - 1316:17, 1345:3, 1347:23, 1483:7, 1483:8, 1486:21, 1516:13, 1539:17
**exactly** [6] - 1386:13, 1395:17, 1473:4, 1479:3, 1503:19, 1548:2
**Exactly** [1] - 1513:4
**exam** [20] - 1485:9, 1501:15, 1511:1, 1511:7, 1512:18, 1518:12, 1518:16, 1523:9, 1524:6, 1524:14, 1525:6, 1525:13, 1525:14, 1526:15, 1530:4, 1535:5, 1535:7, 1535:8, 1552:24, 1553:10
**EXAMINATION** [18] - 1335:15, 1356:1, 1382:1, 1388:5, 1415:9, 1420:7, 1439:1, 1474:1, 1485:25, 1496:1, 1542:1, 1549:20, 1557:1, 1559:1, 1564:5, 1564:6, 1564:7, 1564:8
**examination** [11] - 1302:18, 1329:22, 1421:9, 1484:12, 1485:3, 1485:7, 1485:11, 1485:13, 1515:9, 1560:20
**examine** [3] - 1328:19, 1487:6, 1511:15
**examined** [7] - 1335:13, 1415:8, 1487:12, 1495:6, 1507:22, 1516:25, 1536:12
**example** [15] - 1316:19, 1338:25, 1349:7, 1427:24, 1430:5, 1431:14, 1435:18, 1465:20, 1466:18, 1485:4, 1504:12, 1520:17, 1550:17, 1554:1, 1562:12
**exams** [1] - 1336:15
**except** [2] - 1315:6, 1462:11
**exceptions** [1] - 1498:25
**exclude** [1] - 1303:4
**excluding** [2] - 1310:17, 1310:20
**excruciating** [2] - 1498:14, 1562:22

**excuse** [10] - 1329:18, 1348:4, 1354:12, 1371:25, 1428:17, 1457:14, 1491:20, 1514:15, 1517:9, 1522:21
**excused** [2] - 1563:6, 1563:8
**EXHIBIT** [1] - 1433:19
**exhibit** [46] - 1310:14, 1312:12, 1315:22, 1316:3, 1318:11, 1320:6, 1321:3, 1321:5, 1322:16, 1374:23, 1376:15, 1376:25, 1377:10, 1383:18, 1384:13, 1384:14, 1386:6, 1396:1, 1397:1, 1409:17, 1409:20, 1410:3, 1412:13, 1412:14, 1413:2, 1413:9, 1416:10, 1421:7, 1423:13, 1432:11, 1448:3, 1449:12, 1449:16, 1460:17, 1461:12, 1506:6, 1506:16, 1511:12, 1513:20, 1517:25, 1524:4, 1529:1, 1533:6, 1534:13, 1534:18, 1538:3
**Exhibit** [102] - 1314:13, 1314:17, 1314:19, 1317:6, 1318:17, 1319:19, 1320:1, 1320:2, 1320:3, 1321:15, 1321:16, 1322:18, 1322:23, 1370:4, 1371:3, 1374:7, 1374:19, 1375:21, 1376:11, 1377:20, 1382:17, 1388:4, 1389:23, 1393:7, 1394:7, 1395:14, 1395:20, 1397:5, 1398:20, 1399:17, 1407:16, 1407:21, 1409:4, 1412:2, 1412:4, 1412:23, 1415:11, 1415:15, 1416:22, 1417:13, 1418:4, 1418:23, 1419:13, 1422:15, 1423:11, 1423:17, 1423:20, 1423:22, 1424:16, 1434:17, 1448:7, 1450:1, 1450:25, 1452:2, 1452:5, 1457:2, 1461:6, 1506:8, 1506:14, 1516:1, 1516:6, 1516:7, 1516:10, 1523:1, 1523:2, 1528:14, 1533:9, 1534:23, 1564:12, 1564:16, 1564:20, 1564:22, 1564:24, 1565:2, 1565:4, 1565:6, 1565:8, 1565:10, 1565:12, 1565:14, 1565:17, 1565:19, 1565:22, 1565:25, 1566:2, 1566:6, 1566:8, 1566:10, 1566:12, 1566:16, 1566:18, 1566:20, 1566:22, 1566:24, 1567:2, 1567:4, 1567:6, 1567:8, 1567:10, 1567:12
**exhibits** [9] - 1310:22, 1311:5, 1387:20, 1412:21, 1419:16, 1432:12, 1434:19, 1449:9, 1460:19
**Exhibits** [5] - 1419:15, 1419:23, 1424:24, 1566:4, 1566:14
**exist** [3] - 1328:7, 1333:17, 1340:9
**exists** [2] - 1321:14, 1355:23
**exit** [15] - 1353:4, 1353:9, 1353:15, 1357:7, 1359:20, 1359:21, 1360:6, 1360:20, 1464:11, 1464:25, 1466:3, 1466:7, 1472:16, 1475:9, 1476:1
**exiting** [2] - 1352:25, 1355:7
**exits** [9] - 1357:7, 1357:8, 1359:17, 1360:15, 1414:6, 1464:19, 1468:6, 1472:7, 1563:5
**expect** [5] - 1333:5, 1333:8, 1490:3, 1520:13, 1547:25

**expectancy** [1] - 1479:5
**expense** [1] - 1533:24
**experience** [10] - 1335:23, 1341:14, 1342:18, 1343:10, 1362:13, 1371:22, 1372:24, 1456:12, 1480:1, 1548:16
**experienced** [3] - 1373:21, 1497:23, 1562:9
**experiences** [1] - 1498:1
**expert** [34] - 1309:7, 1310:4, 1318:12, 1331:2, 1335:18, 1335:21, 1340:8, 1340:13, 1344:8, 1344:11, 1344:25, 1345:11, 1350:5, 1356:16, 1362:20, 1388:9, 1396:15, 1397:20, 1407:23, 1416:9, 1425:12, 1433:24, 1459:7, 1460:3, 1477:1, 1482:18, 1487:5, 1488:10, 1530:1, 1531:3, 1532:14, 1551:10, 1551:12, 1555:3
**expert's** [2] - 1458:22, 1459:13
**experts** [12] - 1306:21, 1306:25, 1327:10, 1467:19, 1487:2, 1487:3, 1493:23, 1494:11, 1502:5, 1504:3, 1531:10, 1532:17
**explain** [35] - 1317:8, 1317:9, 1324:3, 1324:11, 1324:12, 1335:18, 1338:8, 1338:14, 1343:17, 1356:21, 1359:10, 1359:13, 1360:7, 1360:21, 1364:15, 1385:20, 1406:6, 1425:24, 1427:4, 1428:9, 1435:5, 1435:6, 1437:14, 1439:5, 1443:10, 1458:17, 1458:21, 1466:20, 1471:11, 1492:2, 1547:19, 1555:17, 1559:21
**explained** [3] - 1363:20, 1417:23, 1498:15
**explains** [1] - 1560:20
**explanation** [4] - 1344:4, 1363:7, 1556:7, 1557:4
**explanations** [1] - 1553:19
**explanatory** [1] - 1391:4
**exploration** [3] - 1445:6, 1445:7, 1445:14
**explored** [1] - 1342:2
**explosion** [1] - 1562:8
**expressing** [1] - 1303:14
**extend** [3] - 1352:24, 1363:2, 1481:4
**extending** [1] - 1482:13
**extension** [1] - 1554:10
**extension-type** [1] - 1554:10
**extensive** [4] - 1333:6, 1336:13, 1336:18, 1351:13
**extensor** [1] - 1362:24
**extent** [17] - 1357:1, 1381:6, 1381:17, 1393:6, 1418:7, 1419:4, 1419:9, 1421:2, 1434:14, 1467:25, 1478:18, 1490:6, 1494:10, 1497:2, 1530:12, 1531:24, 1543:25
**extrapolation** [1] - 1545:21
**extremities** [1] - 1525:9
**extremity** [7] - 1351:20, 1364:5, 1421:11, 1523:19, 1523:23, 1525:14, 1555:24

**extruded** [6] - 1464:23, 1491:25, 1492:14, 1495:7, 1497:13, 1554:11
**extrudes** [1] - 1554:8
**extrusion** [8] - 1492:6, 1492:10, 1495:12, 1496:15, 1496:17, 1496:24, 1497:15, 1497:24
**eye** [2] - 1464:8, 1512:11
**eyes** [4] - 1489:9, 1512:22, 1513:12, 1532:8

# F

**face** [2] - 1406:10, 1510:3
**facet** [25] - 1341:18, 1400:6, 1400:9, 1400:11, 1400:18, 1400:24, 1401:1, 1401:3, 1401:5, 1401:12, 1402:2, 1402:6, 1402:10, 1405:9, 1406:3, 1417:20, 1427:1, 1430:6, 1476:21, 1480:14, 1480:17, 1482:3, 1482:5
**facets** [2] - 1402:6, 1466:5
**facial** [1] - 1350:17
**facilities** [17] - 1315:4, 1315:9, 1323:19, 1325:3, 1338:19, 1346:13, 1346:16, 1347:1, 1347:3, 1348:25, 1349:11, 1372:16, 1372:22, 1389:10, 1405:12, 1457:22
**facility** [21] - 1307:14, 1307:15, 1308:8, 1315:5, 1323:11, 1326:8, 1327:12, 1327:16, 1328:4, 1333:8, 1339:2, 1346:14, 1351:22, 1373:10, 1412:11, 1425:13, 1435:7, 1435:9, 1435:10, 1456:13, 1482:6
**fact** [24] - 1305:6, 1321:9, 1338:8, 1351:24, 1352:15, 1424:2, 1432:8, 1433:15, 1486:13, 1487:16, 1489:11, 1493:20, 1495:8, 1495:19, 1504:7, 1507:5, 1507:25, 1514:10, 1517:21, 1530:3, 1533:1, 1542:17, 1555:1, 1560:22
**facts** [2] - 1543:17, 1544:25
**fail** [2] - 1364:24, 1400:22
**failed** [4] - 1426:24, 1427:1, 1427:2, 1520:15
**Fair** [1] - 1372:18, 1389:8
**fair** [91] - 1304:22, 1372:20, 1486:25, 1488:5, 1488:12, 1488:16, 1489:1, 1489:5, 1489:21, 1490:1, 1490:24, 1494:5, 1494:7, 1494:11, 1494:20, 1499:23, 1499:24, 1500:16, 1500:17, 1500:23, 1502:25, 1504:4, 1507:10, 1507:20, 1508:12, 1508:18, 1509:13, 1511:1, 1511:21, 1512:17, 1513:17, 1513:24, 1514:12, 1514:13, 1514:16, 1514:18, 1514:19, 1515:3, 1515:7, 1515:12, 1515:14, 1515:17, 1516:23, 1516:24, 1518:10, 1518:11, 1521:10, 1522:3, 1522:8, 1522:13, 1523:19, 1523:20, 1523:24, 1524:20, 1524:21, 1525:7, 1525:13, 1525:18, 1525:22, 1525:23, 1525:25, 1526:22, 1527:24,

1529:8, 1530:5, 1530:6, 1530:9, 1530:14, 1531:3, 1531:11, 1531:13, 1531:19, 1531:22, 1534:9, 1535:3, 1535:12, 1537:4, 1537:8, 1538:12, 1538:15, 1539:16, 1544:17, 1548:1, 1548:21, 1549:6, 1549:14, 1559:16, 1560:11, 1561:9, 1562:18
**FairHealth.org** [2] - 1306:18, 1309:11
**fall** [6] - 1489:9, 1538:18, 1538:24, 1539:3, 1539:9, 1539:16
**falls** [1] - 1538:21
**familiar** [3] - 1373:3, 1447:1, 1484:4
**fantastic** [1] - 1464:7
**far** [8] - 1322:23, 1322:25, 1341:21, 1346:13, 1380:4, 1440:13, 1470:14, 1478:25
**Fardad** [4] - 1335:2, 1335:7, 1335:19, 1344:8
**FARDAD** [4] - 1335:7, 1335:11, 1415:6, 1564:4
**fashion** [8] - 1477:10, 1494:24, 1499:13, 1519:11, 1520:8, 1550:8, 1554:7, 1554:12
**faster** [2] - 1490:12, 1548:12
**fat** [1] - 1462:2
**fatalities** [3] - 1498:5, 1553:11, 1561:13
**fatality** [2] - 1561:14, 1562:5
**fault** [2] - 1319:22, 1410:7
**February** [9] - 1396:4, 1396:13, 1470:20, 1471:21, 1538:5, 1538:8, 1542:11, 1542:13
**federal** [1] - 1306:12
**fee** [4] - 1325:3, 1325:5, 1325:23, 1438:5
**fees** [6] - 1327:11, 1327:20, 1412:11, 1413:19
**fell** [2] - 1538:7, 1539:5
**fellows** [1] - 1341:20
**fellowship** [4] - 1336:7, 1337:11, 1337:12, 1341:17
**felt** [1] - 1562:18
**few** [9] - 1316:4, 1380:21, 1404:18, 1418:11, 1477:16, 1486:6, 1491:2, 1502:4
**fictitious** [1] - 1334:15
**field** [10] - 1337:6, 1338:7, 1338:12, 1344:1, 1344:2, 1389:6, 1393:4, 1416:10, 1546:21, 1546:22
**fifteen** [1] - 1342:17
**fifth** [1] - 1535:19
**fight** [3] - 1311:20, 1409:21, 1498:6
**figure** [12] - 1351:5, 1357:3, 1358:2, 1368:21, 1369:22, 1401:9, 1401:10, 1401:13, 1424:18, 1458:5, 1485:3, 1486:17
**filed** [2] - 1304:25, 1333:6
**film** [12] - 1491:1, 1492:20, 1493:17, 1494:14, 1495:15, 1502:2, 1503:2, 1521:3, 1521:4, 1521:6, 1521:20

films [14] - 1394:18, 1394:19, 1394:24, 1394:25, 1396:22, 1427:5, 1460:2, 1460:7, 1460:12, 1476:9, 1494:16, 1495:17, 1521:5, 1549:25
final [1] - 1330:13
finally [2] - 1511:17, 1527:12
findings [17] - 1392:1, 1426:9, 1427:3, 1462:18, 1467:3, 1469:11, 1491:2, 1507:23, 1513:19, 1513:21, 1513:22, 1514:10, 1547:19, 1550:23, 1550:24, 1551:25, 1556:7
fine [14] - 1310:18, 1328:20, 1328:21, 1367:17, 1376:24, 1455:7, 1460:14, 1464:18, 1474:12, 1490:14, 1499:14, 1518:9, 1518:11, 1526:16
finish [3] - 1303:12, 1316:9, 1435:5
finished [2] - 1336:6, 1337:14
finishing [1] - 1446:13
firm [1] - 1345:5
FIRM [1] - 1300:15
first [58] - 1311:24, 1321:2, 1335:13, 1336:11, 1348:19, 1349:15, 1351:3, 1351:18, 1352:17, 1355:19, 1356:11, 1359:10, 1364:18, 1367:5, 1376:25, 1378:19, 1380:20, 1391:13, 1392:15, 1396:6, 1396:8, 1396:9, 1426:1, 1426:13, 1435:14, 1436:7, 1439:10, 1439:16, 1440:23, 1441:24, 1442:11, 1445:5, 1451:21, 1452:5, 1453:9, 1461:13, 1465:22, 1466:17, 1469:24, 1480:14, 1480:15, 1484:8, 1488:9, 1488:18, 1494:23, 1495:14, 1496:3, 1496:5, 1496:6, 1496:7, 1501:6, 1501:21, 1505:25, 1520:2, 1527:20, 1529:1, 1547:10, 1550:3
First [1] - 1356:20
first-contact [1] - 1488:18
firsthand [1] - 1535:15
five [20] - 1344:24, 1358:18, 1430:8, 1430:9, 1432:3, 1460:25, 1461:2, 1479:7, 1514:21, 1515:2, 1515:21, 1516:12, 1516:16, 1516:17, 1522:6, 1527:10, 1527:23, 1546:1, 1546:17, 1550:24
fixation [2] - 1427:16, 1430:25
fixed [1] - 1429:5
flags [1] - 1352:13
flat [1] - 1406:11
flex [1] - 1355:11
Flexeril [1] - 1525:25
flexion [1] - 1554:10
flight [1] - 1498:6
flight-and-fight [1] - 1498:6
fluid [6] - 1403:6, 1462:3, 1462:6, 1462:7, 1462:9, 1475:19
fluids [1] - 1490:8
fluoros [1] - 1443:18
fluoroscope [1] - 1430:2
fluoroscopy [4] - 1409:6, 1444:3, 1444:5, 1444:10

fly [2] - 1310:9, 1328:18
focal [2] - 1391:1, 1405:3
focus [2] - 1462:17, 1462:18
focusing [1] - 1364:8
fold [1] - 1479:12
folks [1] - 1319:21
follow [23] - 1362:18, 1381:19, 1433:16, 1435:18, 1436:7, 1436:10, 1436:22, 1436:24, 1436:25, 1437:4, 1446:16, 1446:21, 1446:23, 1479:15, 1481:17, 1481:19, 1482:1, 1485:9, 1512:21, 1534:24, 1535:3, 1535:10, 1548:4
follow-up [11] - 1436:10, 1436:22, 1446:16, 1446:23, 1479:15, 1481:17, 1481:19, 1485:9, 1534:24, 1535:3, 1535:10
follow-ups [6] - 1435:18, 1436:7, 1436:24, 1437:4, 1446:21, 1482:1
followed [1] - 1425:19
following [24] - 1331:9, 1355:24, 1366:1, 1378:1, 1379:7, 1383:25, 1384:1, 1387:24, 1401:17, 1409:1, 1419:25, 1433:11, 1438:6, 1452:15, 1453:1, 1455:11, 1459:16, 1473:10, 1495:23, 1519:13, 1541:5, 1547:13, 1556:14, 1560:3
follows [2] - 1335:14, 1415:8
food [1] - 1492:4
foot [14] - 1353:24, 1354:1, 1354:2, 1356:10, 1357:14, 1357:15, 1357:20, 1358:13, 1358:16, 1358:17, 1362:23, 1427:7
FOR [1] - 1300:12
foramen [6] - 1359:12, 1360:4, 1360:6, 1360:7, 1360:19, 1361:17
foramina [1] - 1353:3, 1359:11, 1359:20
foraminal [1] - 1361:25
forbid [1] - 1407:13
force [1] - 1479:24
Force [1] - 1498:20
forces [1] - 1550:7
foregoing [2] - 1536:4, 1536:5
foremost [1] - 1336:11
forensic [6] - 1339:20, 1339:22, 1339:23, 1339:24, 1340:5, 1372:14
form [1] - 1337:10, 1392:2, 1465:3
formations [1] - 1490:18
formed [2] - 1349:2, 1349:15
forming [5] - 1345:16, 1350:10, 1371:4, 1390:19, 1460:3
forms [2] - 1369:10, 1409:6
forth [3] - 1305:11, 1328:13, 1551:24
forward [6] - 1429:2, 1431:5, 1470:19, 1482:20, 1492:5, 1549:5
foundation [35] - 1306:13, 1307:13, 1309:8, 1309:15, 1310:1, 1312:16, 1312:23, 1326:8, 1326:12, 1328:25, 1329:25, 1334:8, 1373:14, 1385:11,

1385:16, 1385:17, 1385:18, 1385:25, 1386:2, 1386:5, 1386:12, 1418:7, 1419:18, 1426:22, 1509:1, 1509:14, 1527:25, 1529:13, 1536:15, 1540:3, 1542:20, 1544:21, 1561:4, 1562:2, 1562:15
Foundation [2] - 1544:4, 1562:3
four [17] - 1319:6, 1320:9, 1321:2, 1339:1, 1344:18, 1352:17, 1358:18, 1395:21, 1396:5, 1422:5, 1431:17, 1452:4, 1456:11, 1456:17, 1497:6, 1523:21, 1549:15
four-and-a-half [1] - 1431:17
four-year [1] - 1549:15
fracture [2] - 1521:22, 1555:21
frame [1] - 1375:5
frank [1] - 1491:25
Franklin [6] - 1315:15, 1323:13, 1323:14, 1323:21, 1323:24, 1324:1, 1324:5, 1324:7, 1324:20, 1325:1, 1325:6, 1325:20, 1328:14, 1330:9, 1333:15, 1333:16, 1346:11, 1346:14, 1346:17, 1346:18, 1347:16, 1348:3, 1349:18, 1449:1, 1450:8
frankly [2] - 1319:12, 1381:21
freely [1] - 1306:16
Freeman [2] - 1337:15, 1337:22
freeway [1] - 1357:7
frequency [2] - 1341:18, 1404:22, 1404:25, 1405:2
frequent [1] - 1303:22
Friday [1] - 1303:24
front [28] - 1308:2, 1312:15, 1320:4, 1345:18, 1355:13, 1358:11, 1358:16, 1370:18, 1370:20, 1409:19, 1409:21, 1410:19, 1427:17, 1429:14, 1430:21, 1466:24, 1467:5, 1467:6, 1473:7, 1473:8, 1484:19, 1490:19, 1491:4, 1491:14, 1491:15, 1511:17, 1522:5, 1559:12
frontal [4] - 1358:18, 1358:21, 1430:19, 1430:21
frustrated [1] - 1319:23
full [4] - 1315:3, 1525:7, 1532:19, 1534:5
Full [1] - 1524:22
fully [3] - 1323:15, 1333:8, 1345:17
function [1] - 1360:25
functions [1] - 1360:25
funding [1] - 1321:4
funneled [1] - 1323:16
fuse [3] - 1479:18, 1479:23, 1480:3
fused [1] - 1427:19
fusion [12] - 1324:22, 1437:18, 1443:24, 1479:8, 1479:25, 1480:14, 1482:12, 1547:1, 1548:9, 1548:15, 1548:17
future [15] - 1306:15, 1345:12, 1345:13, 1478:12, 1478:14, 1478:15, 1479:4, 1479:11, 1481:6, 1483:20,

1545:19, 1546:15, 1549:13, 1559:5

# G

**gait** [4] - 1526:15, 1526:20, 1526:22, 1544:16
**games** [1] - 1312:14
**gears** [1] - 1457:4
**general** [10] - 1336:5, 1363:7, 1402:15, 1405:24, 1416:6, 1450:12, 1490:22, 1496:5, 1498:25, 1540:19
**generalization** [1] - 1494:6
**generally** [23] - 1329:24, 1338:12, 1348:23, 1348:24, 1349:3, 1363:14, 1400:23, 1402:10, 1405:23, 1406:24, 1434:19, 1460:19, 1476:3, 1479:25, 1483:15, 1489:18, 1491:9, 1492:4, 1498:13, 1499:1, 1499:7, 1547:23, 1559:6
**generated** [4] - 1361:8, 1390:12, 1396:2, 1434:20
**genetic** [1] - 1490:11
**gentleman** [1] - 1351:8, 1385:3
**gentlemen** [3] - 1390:9, 1414:4, 1563:2
**Geraldine** [2] - 1382:6, 1394:13
**Gessner** [1] - 1516:21
**given** [11] - 1307:1, 1308:22, 1312:11, 1312:14, 1326:9, 1402:5, 1447:23, 1485:16, 1531:15, 1550:9
**Glasgow** [3] - 1511:8, 1511:10, 1513:2
**Glen** [1] - 1415:25
**Glenn** [1] - 1420:21
**GLI** [7] - 1320:6, 1320:13, 1322:10, 1325:11, 1326:18, 1506:7, 1506:16
**global** [1] - 1438:5
**God** [1] - 1407:13
**GOGGIN** [1] - 1301:9
**gold** [1] - 1430:24
**gonna** [1] - 1499:14
**gotta** [1] - 1454:17
**grade** [1] - 1354:16
**graft** [5] - 1326:5, 1427:20, 1437:17, 1437:23, 1443:20
**grafts** [2] - 1431:3, 1437:20
**grand** [2] - 1327:20, 1332:4
**Grand** [2] - 1300:22, 1528:15
**grant** [2] - 1302:7, 1303:17
**grapevine** [1] - 1303:10
**graph** [1] - 1326:6
**gray/white** [1] - 1521:19
**great** [4] - 1304:2, 1372:4, 1464:7, 1500:6
**greater** [1] - 1546:14
**Greater** [2] - 1347:21, 1421:24
**grenades** [1] - 1332:7
**Greyhound** [4] - 1301:4, 1301:10, 1319:19, 1340:2
**GREYHOUND** [1] - 1300:7

**ground** [1] - 1336:1
**group** [9] - 1307:19, 1337:17, 1337:19, 1338:9, 1345:25, 1425:6, 1426:7, 1536:25, 1550:20
**grow** [1] - 1431:1
**Guardian** [1] - 1343:22
**Gubica** [4] - 1301:4, 1301:11, 1301:11
**GUBICA** [2] - 1300:8
**guess** [6] - 1330:16, 1334:19, 1447:14, 1537:9, 1542:25, 1543:5
**guidance** [1] - 1402:9
**guide** [1] - 1306:17
**guidelines** [1] - 1440:9
**guts** [3] - 1492:6, 1492:9, 1492:10
**Gutstein** [10] - 1309:17, 1309:24, 1346:5, 1420:24, 1421:8, 1421:9, 1421:20, 1423:2, 1423:12, 1527:21
**Gutstein's** [1] - 1423:15
**guy** [2] - 1318:13, 1369:9
**guys** [4] - 1319:22, 1378:19, 1387:3, 1454:17

# H

**Hal** [1] - 1527:21
**half** [8] - 1388:22, 1388:24, 1389:1, 1389:2, 1431:17, 1445:2, 1503:10, 1548:14
**hallucis** [1] - 1362:24
**hand** [29] - 1330:11, 1332:6, 1335:3, 1338:21, 1359:21, 1359:22, 1360:19, 1404:1, 1404:2, 1404:4, 1404:5, 1428:11, 1461:21, 1463:10, 1464:6, 1464:15, 1470:24, 1472:16, 1474:7, 1474:9, 1474:16, 1475:2, 1475:10, 1475:14, 1475:15, 1475:16, 1475:23, 1485:13, 1553:8
**handed** [2] - 1310:12, 1310:25
**handle** [1] - 1376:22
**handling** [1] - 1443:23
**hands** [4] - 1330:11, 1428:10, 1430:9, 1532:8
**hands-on** [1] - 1532:8
**handwritten** [1] - 1387:17, 1392:3
**hanging** [1] - 1470:11
**hard** [5] - 1319:24, 1350:3, 1370:17, 1371:3, 1517:6
**HAROLD** [1] - 1301:13
**hash** [1] - 1318:6
**hashed** [1] - 1318:9
**head** [6] - 1315:23, 1350:18, 1395:5, 1508:18, 1509:8, 1562:6
**headache** [3] - 1508:16, 1509:8, 1523:15
**headaches** [1] - 1403:7
**heads** [1] - 1432:7
**heal** [1] - 1431:3
**healed** [1] - 1437:21
**Health** [14] - 1320:22, 1320:24, 1324:2,

1324:23, 1325:19, 1325:21, 1328:9, 1328:15, 1333:14, 1333:17, 1372:16, 1389:8
**Healthcare** [1] - 1309:12
**healthcare** [4] - 1501:20, 1516:17, 1522:7, 1527:2
**hear** [4] - 1302:21, 1303:10, 1324:13, 1410:15
**heard** [15] - 1306:14, 1309:19, 1354:20, 1359:12, 1363:7, 1368:17, 1402:12, 1406:24, 1441:2, 1478:5, 1486:7, 1489:11, 1498:17, 1502:3, 1517:13
**hearing** [17] - 1328:20, 1331:6, 1332:20, 1332:23, 1333:5, 1334:7, 1365:17, 1366:1, 1368:2, 1377:23, 1378:1, 1383:24, 1384:2, 1408:20, 1409:2, 1452:13, 1453:2
**hearings** [1] - 1368:22
**heavy** [1] - 1431:21
**heel** [4] - 1356:4, 1356:5, 1356:8, 1356:11
**heels** [1] - 1356:6
**height** [9] - 1466:19, 1466:23, 1466:24, 1466:25, 1467:17, 1467:22, 1468:22, 1496:24
**held** [9] - 1342:16, 1365:17, 1366:1, 1377:23, 1378:1, 1383:24, 1408:20, 1428:7, 1452:13
**help** [12] - 1319:25, 1354:5, 1354:6, 1403:10, 1403:18, 1482:21, 1500:5, 1542:17, 1542:18, 1544:8, 1555:1, 1561:16
**helped** [3] - 1401:5, 1426:19, 1514:24
**helpful** [2] - 1461:22, 1544:18
**helps** [1] - 1482:23
**hematology** [1] - 1325:7
**hematoma** [1] - 1445:17
**hence** [4] - 1479:14, 1547:2, 1557:13, 1559:22
**herniated** [17] - 1463:2, 1463:15, 1464:22, 1467:14, 1468:21, 1469:6, 1469:14, 1469:15, 1470:9, 1470:12, 1471:1, 1471:8, 1476:10, 1489:12, 1496:18, 1497:17, 1503:20
**herniates** [1] - 1500:2
**herniation** [54] - 1351:23, 1351:25, 1352:5, 1354:20, 1361:22, 1391:8, 1463:2, 1463:18, 1467:24, 1469:2, 1469:17, 1470:14, 1470:25, 1471:5, 1471:13, 1471:14, 1471:17, 1471:19, 1472:2, 1476:16, 1489:17, 1492:1, 1492:8, 1492:19, 1494:20, 1494:24, 1495:8, 1496:14, 1497:2, 1497:3, 1497:12, 1497:20, 1497:24, 1498:3, 1498:8, 1498:13, 1498:21, 1498:23, 1499:3, 1499:9, 1499:18, 1500:7, 1500:11, 1502:5, 1503:8, 1504:7, 1505:8, 1505:13, 1519:2, 1519:6, 1520:7, 1520:24, 1562:21

**herniations** [5] - 1337:1, 1391:5, 1403:24, 1476:23, 1498:18

**high** [5] - 1307:10, 1430:8, 1497:13, 1532:22, 1532:25

**higher** [5] - 1441:17, 1458:14, 1464:18, 1498:2, 1534:1

**highest** [3] - 1512:2, 1512:13, 1534:7

**highlight** [6] - 1507:25, 1513:20, 1518:13, 1518:14, 1535:18, 1535:25

**highlighting** [1] - 1378:7

**highlights** [5] - 1386:20, 1386:21, 1387:6, 1387:12, 1387:16

**highly** [3] - 1305:2, 1405:20, 1557:10

**highway** [1] - 1357:8

**Hills** [3] - 1318:13, 1337:20, 1339:6

**himself** [2] - 1326:10, 1562:7

**hint** [1] - 1463:9

**hip** [1] - 1355:11

**hired** [2] - 1306:20, 1487:19

**historian** [1] - 1560:5

**histories** [1] - 1477:14

**history** [15] - 1469:8, 1476:14, 1477:8, 1477:11, 1507:9, 1507:16, 1507:25, 1508:3, 1509:19, 1523:9, 1524:5, 1525:21, 1530:3, 1530:10, 1530:12

**hit** [6] - 1407:12, 1428:5, 1429:18, 1429:19, 1430:12, 1430:20

**hitting** [2] - 1508:18, 1509:8

**hold** [9] - 1320:12, 1325:12, 1334:1, 1427:18, 1432:6, 1474:20, 1485:17, 1506:21

**holding** [1] - 1428:11

**hole** [1] - 1436:6

**Holland** [1] - 1403:1

**honest** [1] - 1530:10

**Honor** [92] - 1302:10, 1303:21, 1304:25, 1306:7, 1310:6, 1313:4, 1313:23, 1314:2, 1314:12, 1315:2, 1315:20, 1316:16, 1318:2, 1318:16, 1318:25, 1319:2, 1319:12, 1320:2, 1321:17, 1322:6, 1322:9, 1322:17, 1324:7, 1324:16, 1325:10, 1325:25, 1333:25, 1334:11, 1335:1, 1344:7, 1344:10, 1346:5, 1354:12, 1369:10, 1370:5, 1370:8, 1374:8, 1375:12, 1376:12, 1376:20, 1378:17, 1380:13, 1381:7, 1381:9, 1382:13, 1387:21, 1389:21, 1397:6, 1408:10, 1409:13, 1412:19, 1413:21, 1418:21, 1419:19, 1420:5, 1422:11, 1428:18, 1432:10, 1432:13, 1432:23, 1434:6, 1434:10, 1448:4, 1449:9, 1449:15, 1450:22, 1452:7, 1452:11, 1454:25, 1470:19, 1476:6, 1483:17, 1485:20, 1485:22, 1506:5, 1506:9, 1511:20, 1515:25, 1517:11, 1522:21, 1528:4, 1528:7, 1528:19, 1534:14, 1537:11, 1545:5, 1545:11, 1549:16, 1551:6, 1554:18, 1555:13, 1558:24

**honor** [1] - 1343:19

**HONORABLE** [1] - 1300:12

**Honorable** [1] - 1302:2

**honors** [1] - 1336:4

**hopefully** [2] - 1459:12, 1479:9

**horseshoes** [1] - 1332:6

**Hospital** [42] - 1315:15, 1323:13, 1323:22, 1323:24, 1324:5, 1324:20, 1325:1, 1325:6, 1325:20, 1330:9, 1333:15, 1333:16, 1337:15, 1337:22, 1342:13, 1342:14, 1346:12, 1346:14, 1346:15, 1346:17, 1346:20, 1347:16, 1348:3, 1348:8, 1348:11, 1349:18, 1350:16, 1365:3, 1365:4, 1371:17, 1449:1, 1450:8, 1477:9, 1484:7, 1495:4, 1515:19, 1516:11, 1522:20, 1553:17, 1553:18

**hospital** [33] - 1323:19, 1325:3, 1327:12, 1327:17, 1327:18, 1327:19, 1327:21, 1328:4, 1337:15, 1341:2, 1342:10, 1342:23, 1342:25, 1343:11, 1346:18, 1346:19, 1348:1, 1349:20, 1372:16, 1372:21, 1373:6, 1375:1, 1405:10, 1405:13, 1435:10, 1448:25, 1449:14, 1449:19, 1450:4, 1500:25, 1523:6, 1556:8

**Hospital's** [2] - 1323:14, 1324:1

**hospitalization** [2] - 1450:13, 1450:16

**hospitalized** [1] - 1435:2

**hospitals** [8] - 1340:24, 1342:8, 1342:12, 1348:25, 1349:4, 1457:22, 1459:10, 1484:5

**hour** [2] - 1367:18, 1444:9

**hours** [9] - 1488:7, 1500:3, 1502:4, 1515:21, 1516:12, 1516:13, 1516:18, 1523:6, 1561:1

**house** [1] - 1343:1

**housekeeping** [1] - 1451:2

**hundred** [2] - 1317:14, 1317:16

**hundreds** [1] - 1372:14

**hurt** [3] - 1303:4, 1501:22, 1519:3

**hurting** [2] - 1352:11, 1353:16

**hurts** [3] - 1501:7, 1501:9, 1514:8

**hydrated** [1] - 1467:17

**hydration** [3] - 1466:20, 1466:23, 1467:22

**hypercapnic** [1] - 1406:21

## I

**ibuprofen** [1] - 1373:16

**ice** [7] - 1360:9, 1462:14, 1462:15, 1538:7, 1538:24, 1539:5, 1539:10

**ID** [20] - 1310:15, 1370:3, 1371:15, 1374:21, 1375:23, 1382:4, 1390:21, 1391:17, 1392:15, 1394:10, 1398:5, 1416:15, 1417:15, 1420:9, 1422:20, 1422:25, 1423:17, 1423:22, 1432:12, 1450:6

**idea** [14] - 1304:19, 1304:23, 1335:23, 1339:11, 1340:16, 1341:13, 1342:10,

1344:16, 1345:20, 1382:25, 1390:8, 1394:25, 1396:7, 1552:23

**ideas** [1] - 1354:6

**identical** [1] - 1399:6

**identification** [25] - 1371:4, 1376:15, 1380:9, 1390:1, 1395:23, 1397:10, 1398:24, 1399:20, 1407:16, 1412:6, 1412:25, 1415:12, 1415:23, 1418:24, 1420:12, 1422:23, 1424:8, 1433:20, 1434:18, 1435:14, 1447:25, 1450:21, 1451:19, 1456:5, 1481:11

**identified** [4] - 1345:22, 1393:7, 1492:19, 1555:6

**identify** [6] - 1374:23, 1376:16, 1380:17, 1382:3, 1382:20, 1390:3, 1393:16, 1398:6, 1398:24, 1399:21, 1412:8, 1415:23, 1416:15, 1417:15, 1423:22, 1461:13

**Ifran** [1] - 1413:5

**illness** [3] - 1508:1, 1508:3, 1509:20

**image** [34] - 1336:23, 1337:2, 1463:10, 1463:18, 1464:15, 1465:2, 1465:23, 1466:16, 1470:20, 1470:22, 1470:23, 1470:25, 1471:2, 1471:3, 1471:21, 1471:24, 1472:1, 1472:9, 1472:13, 1472:16, 1472:18, 1472:25, 1474:5, 1474:7, 1474:14, 1475:22, 1497:18, 1497:20, 1503:14, 1505:5, 1505:15, 1505:19

**image-oriented** [1] - 1336:23

**images** [12] - 1396:6, 1463:23, 1471:22, 1471:23, 1472:17, 1503:13, 1504:15, 1505:7, 1505:11, 1505:17, 1544:13

**imagine** [5] - 1311:16, 1359:14, 1402:25, 1492:4, 1553:24, 1554:3

**imaging** [10] - 1338:18, 1345:10, 1357:18, 1395:1, 1459:9, 1470:14, 1476:14, 1481:20, 1482:2, 1482:11

**Imaging** [2] - 1396:2, 1475:17

**immediate** [1] - 1497:24

**immediately** [4] - 1324:18, 1359:20, 1365:12, 1484:21

**immunity** [1] - 1373:15

**immunization** [1] - 1371:18

**immunology** [1] - 1325:7

**impact** [6] - 1505:13, 1540:1, 1540:8, 1555:3, 1559:7, 1561:1

**impingement** [1] - 1353:15, 1362:4, 1426:10

**impingment** [1] - 1493:10

**implants** [2] - 1325:8, 1326:5

**implement** [1] - 1442:8

**implies** [1] - 1400:12

**implying** [1] - 1550:16

**importance** [1] - 1357:23

**important** [15] - 1317:4, 1333:12, 1336:22, 1350:6, 1357:2, 1406:16, 1406:22, 1469:13, 1470:13, 1492:3, 1510:10, 1513:2, 1530:1, 1530:4,

1530:9

**importantly** [2] - 1479:18, 1544:12

**impossible** [1] - 1562:22

**impression** [1] - 1394:17

**impressions** [1] - 1397:16

**improved** [1] - 1542:22

**in-house** [1] - 1343:1

**in-residency** [1] - 1341:16

**inaccuracies** [1] - 1313:10

**Inc** [2] - 1301:4, 1301:10

**INC** [1] - 1300:7

**incident** [10] - 1345:8, 1351:11, 1351:19, 1352:18, 1355:19, 1375:3, 1396:10, 1495:10, 1495:13, 1550:5

**incision** [2] - 1430:6, 1446:1

**incisions** [1] - 1337:7

**include** [6] - 1345:24, 1390:5, 1399:23, 1413:16, 1413:18, 1482:1

**included** [16] - 1325:24, 1347:11, 1347:14, 1347:18, 1347:22, 1348:1, 1348:15, 1349:19, 1349:21, 1371:17, 1390:24, 1427:14, 1445:6, 1453:14, 1482:16, 1482:17

**includes** [10] - 1374:25, 1375:1, 1382:22, 1383:4, 1396:3, 1397:15, 1399:25, 1418:12, 1419:2, 1481:19

**including** [9] - 1322:6, 1329:13, 1350:23, 1351:14, 1376:17, 1392:22, 1395:1, 1406:3, 1426:16

**inclusive** [1] - 1482:5

**inconsistency** [1] - 1526:23

**incorporate** [1] - 1551:24

**incorporated** [1] - 1552:5

**increased** [7] - 1463:16, 1469:13, 1470:8, 1470:12, 1480:1, 1503:4, 1525:12

**increases** [1] - 1328:24

**independent** [4] - 1368:17, 1368:20, 1493:3, 1554:20

**indicate** [7] - 1351:9, 1402:7, 1416:7, 1429:10, 1471:7, 1533:15, 1542:24

**indicated** [9] - 1422:3, 1453:13, 1456:17, 1465:4, 1465:11, 1478:20, 1478:24, 1531:20, 1537:1

**indicates** [5] - 1320:7, 1529:2, 1539:14, 1546:4, 1549:12

**indicating** [4] - 1320:6, 1363:9, 1453:17, 1511:7

**indicating)** [1] - 1492:11

**indication** [2] - 1358:22, 1477:24

**indirectly** [2] - 1445:21, 1445:23

**individual** [25] - 1318:11, 1368:12, 1393:21, 1396:21, 1396:23, 1402:16, 1406:17, 1406:18, 1436:12, 1449:21, 1449:22, 1450:11, 1458:6, 1498:1, 1498:12, 1498:24, 1545:24, 1548:3, 1548:4, 1548:5, 1548:15, 1554:20, 1559:24, 1560:18, 1562:11

**individually** [1] - 1460:20

**individuals** [8] - 1339:15, 1349:4,

1363:2, 1405:22, 1498:2, 1548:17, 1555:23, 1560:19

**industry** [1] - 1439:22

**infection** [1] - 1373:25

**inflamed** [1] - 1480:15

**inflammation** [2] - 1403:22, 1499:25

**inflammatories** [3] - 1481:22, 1500:4, 1557:14

**inflammatory** [4] - 1500:2, 1557:7, 1557:10, 1557:12

**inflated** [5] - 1305:2, 1305:14, 1305:15, 1306:9, 1309:4, 1309:14, 1309:25

**inflating** [1] - 1305:17

**inflation** [1] - 1329:1

**info** [1] - 1529:6

**information** [14] - 1361:1, 1361:2, 1459:10, 1479:20, 1479:22, 1510:11, 1510:13, 1529:5, 1530:14, 1535:6, 1536:6, 1540:21, 1542:14, 1545:1

**infused** [2] - 1326:5, 1326:6

**initial** [8] - 1351:3, 1368:14, 1369:10, 1436:21, 1442:14, 1445:20, 1513:21, 1548:21

**injection** [3] - 1342:6, 1392:23, 1413:19

**injections** [9] - 1341:18, 1341:24, 1349:10, 1412:9, 1417:20, 1417:21, 1426:25, 1456:10, 1480:17

**injured** [5] - 1302:19, 1302:24, 1476:22, 1553:12, 1559:25

**injuries** [25] - 1302:19, 1339:15, 1351:6, 1371:11, 1376:3, 1381:1, 1383:15, 1393:9, 1394:21, 1407:23, 1416:11, 1434:1, 1445:18, 1456:22, 1457:9, 1457:11, 1457:23, 1459:4, 1476:17, 1476:25, 1499:12, 1520:15, 1539:4, 1555:24, 1555:25

**injury** [17] - 1310:20, 1350:14, 1350:18, 1352:10, 1364:20, 1476:18, 1478:1, 1489:22, 1495:12, 1499:16, 1499:17, 1513:1, 1521:10, 1552:23, 1553:6, 1555:17, 1557:15

**inn** [1] - 1477:22

**inner** [1] - 1466:22

**inquire** [1] - 1335:9

**inquired** [2] - 1507:9, 1507:16

**insensate** [1] - 1402:16

**insert** [1] - 1442:23

**inside** [4] - 1339:25, 1407:13, 1464:10, 1467:14

**instance** [11] - 1306:16, 1309:11, 1309:24, 1310:21, 1314:14, 1340:14, 1359:12, 1364:9, 1368:21, 1404:16, 1435:19

**instances** [1] - 1364:19

**instantaneously** [1] - 1499:10

**instead** [6] - 1402:15, 1404:20, 1442:6, 1442:19, 1551:8, 1551:17

**instrumentation** [7] - 1440:14,

1440:18, 1441:19, 1442:8, 1442:24, 1443:2, 1446:5

**instruments** [2] - 1430:24, 1474:22

**insurance** [13] - 1304:16, 1320:7, 1320:14, 1323:5, 1323:12, 1324:18, 1326:10, 1326:18, 1326:21, 1328:8, 1330:7, 1333:9, 1333:16

**intend** [4] - 1310:25, 1433:2, 1449:18, 1460:20

**intended** [2] - 1318:8, 1533:19

**interact** [2] - 1341:11, 1343:3

**interconnect** [1] - 1427:18

**intercranial** [1] - 1521:10

**interdigitate** [1] - 1357:1

**interest** [2] - 1341:4, 1341:6

**interesting** [1] - 1462:18

**interfaces** [1] - 1354:25

**intermittently** [1] - 1388:21

**internal** [6] - 1314:10, 1390:25, 1443:4, 1443:6, 1443:7, 1475:24

**interpret** [1] - 1336:20

**interrupting** [2] - 1517:13, 1517:15

**interstate** [1] - 1517:8

**interval** [2] - 1471:5, 1472:5

**intervening** [1] - 1413:15

**intervention** [1] - 1336:17

**interventions** [1] - 1426:13

**intervertebral** [1] - 1391:7

**intradiscal** [1] - 1480:2

**intrasurgical** [1] - 1444:4

**introduce** [1] - 1335:17

**invasive** [7] - 1342:6, 1364:21, 1364:22, 1407:7, 1407:11, 1407:15, 1426:24

**invoice** [3] - 1316:15, 1324:19, 1421:23

**invoices** [1] - 1486:14

**involve** [2] - 1501:10, 1558:14

**involved** [10] - 1343:24, 1406:7, 1417:17, 1459:8, 1476:15, 1500:9, 1516:22, 1517:7, 1558:15, 1559:24

**involvement** [1] - 1532:11

**involves** [1] - 1358:13

**Irfan** [2] - 1315:7, 1453:21

**iron** [1] - 1312:15

**irrelevant** [1] - 1558:3

**irrigation** [1] - 1446:3

**irritation** [1] - 1557:12

**Island** [1] - 1333:15

**issue** [34] - 1302:5, 1304:1, 1304:3, 1304:7, 1306:2, 1307:21, 1307:23, 1309:3, 1309:5, 1309:18, 1310:3, 1311:24, 1313:4, 1313:19, 1324:3, 1330:6, 1331:2, 1334:19, 1334:20, 1340:5, 1367:22, 1381:20, 1386:19, 1451:18, 1453:6, 1453:18, 1485:14, 1491:7, 1498:5, 1504:18, 1508:25, 1553:8, 1561:7, 1562:8

**issued** [2] - 1453:14, 1552:18

**issues** [14] - 1302:3, 1304:16,

1305:22, 1309:23, 1310:10, 1330:2, 1376:8, 1381:11, 1384:3, 1412:20, 1484:6, 1500:15, 1503:2, 1505:22
**issuing** [2] - 1488:8, 1488:9
**IT** [1] - 1545:9
**item** [7] - 1329:15, 1329:16, 1441:8, 1441:10, 1441:24, 1446:1, 1486:11
**itemized** [13] - 1327:4, 1328:12, 1371:16, 1376:17, 1382:5, 1393:17, 1399:1, 1412:9, 1416:17, 1423:14, 1423:25, 1450:8, 1452:5
**itemizes** [1] - 1327:8
**items** [6] - 1312:4, 1442:9, 1478:20, 1481:12, 1482:16, 1514:21
**itself** [15] - 1337:1, 1337:2, 1360:20, 1391:1, 1403:25, 1406:8, 1407:14, 1410:3, 1429:13, 1429:19, 1442:25, 1443:22, 1456:21, 1475:18, 1534:4

## J

**Jacob** [2] - 1394:17, 1398:10
**Jacobowitz** [1] - 1523:4
**JAMIE** [1] - 1300:19
**January** [4] - 1383:10, 1413:7, 1446:18, 1534:24
**jar** [1] - 1330:11
**jelly** [8] - 1553:25, 1554:2, 1554:3, 1554:5, 1554:6, 1554:8, 1554:11
**Jewish** [1] - 1333:15
**Joan** [1] - 1406:11
**job** [3] - 1317:13, 1317:14
**jobs** [1] - 1336:10
**John's** [1] - 1342:15
**join** [1] - 1337:16
**joint** [9] - 1338:21, 1400:12, 1400:13, 1400:14, 1400:15, 1401:4, 1401:12, 1402:9, 1402:10
**Joint** [1] - 1386:3
**joints** [5] - 1352:11, 1401:10, 1430:6, 1476:21, 1480:14
**JONATHAN** [1] - 1300:23
**JOSE** [1] - 1300:3
**Jose** [5] - 1300:16, 1300:21, 1405:25, 1535:22, 1537:7
**Jr** [1] - 1302:2
**judge** [5] - 1316:25, 1319:14, 1395:18, 1511:14, 1556:2
**JUDGE** [1] - 1300:13
**Judge** [12] - 1302:25, 1306:21, 1317:15, 1322:20, 1323:6, 1327:6, 1370:2, 1385:19, 1387:10, 1436:1, 1460:18, 1481:9
**jugular** [1] - 1525:1
**July** [1] - 1446:18
**June** [18] - 1322:12, 1349:22, 1416:4, 1424:6, 1425:20, 1435:2, 1445:3, 1445:5, 1445:6, 1445:11, 1450:10, 1474:8, 1474:18, 1533:1, 1542:9, 1542:25, 1543:3

**juries** [1] - 1306:18
**jurors** [4] - 1350:12, 1388:1, 1402:12, 1456:1
**Jury** [6] - 1334:23, 1414:6, 1415:3, 1468:6, 1468:8, 1563:5
**jury** [98] - 1302:1, 1302:17, 1308:7, 1309:6, 1312:15, 1313:14, 1316:20, 1318:9, 1334:3, 1334:10, 1334:21, 1335:18, 1335:23, 1336:9, 1339:11, 1340:16, 1341:13, 1342:10, 1342:21, 1344:4, 1344:16, 1345:20, 1350:9, 1356:4, 1358:5, 1358:25, 1363:8, 1363:21, 1365:17, 1366:2, 1368:11, 1368:15, 1372:9, 1374:1, 1374:15, 1376:16, 1377:15, 1377:23, 1378:2, 1382:11, 1382:25, 1383:24, 1384:2, 1387:5, 1387:13, 1388:13, 1388:18, 1389:17, 1390:8, 1394:11, 1394:24, 1395:25, 1396:7, 1396:21, 1397:12, 1397:17, 1398:25, 1408:20, 1409:2, 1409:25, 1410:15, 1412:12, 1413:12, 1417:5, 1417:23, 1424:8, 1425:12, 1425:24, 1428:9, 1435:6, 1436:22, 1437:15, 1439:5, 1440:14, 1441:2, 1450:7, 1450:16, 1452:13, 1453:2, 1455:4, 1456:8, 1457:6, 1458:5, 1458:7, 1458:17, 1468:14, 1477:10, 1479:2, 1481:12, 1485:16, 1486:7, 1492:3, 1506:13, 1517:4, 1534:15, 1538:23, 1552:23, 1554:15
**JURY** [2] - 1300:12, 1300:13
**JVD** [1] - 1524:24

## K

**Kansas** [1] - 1300:23
**KAROLY** [1] - 1300:8
**Karoly** [2] - 1301:4, 1301:11
**keep** [7] - 1305:11, 1383:13, 1397:8, 1483:13, 1512:25, 1517:15, 1547:5
**keeps** [1] - 1517:13
**Kelley** [1] - 1516:21
**Kelly** [1] - 1507:2
**kept** [1] - 1409:5
**kids** [1] - 1401:2
**KIEFFER** [1] - 1300:23
**kind** [16] - 1304:19, 1335:18, 1339:11, 1351:6, 1356:9, 1383:1, 1386:24, 1390:8, 1390:16, 1400:21, 1478:6, 1478:7, 1484:12, 1492:12, 1492:13, 1553:5
**knee** [9] - 1352:24, 1390:25, 1391:1, 1392:3, 1395:2, 1521:7, 1538:12, 1538:14
**knees** [1] - 1543:7
**knocking** [1] - 1404:2
**knowing** [1] - 1336:11
**knowledge** [5] - 1390:16, 1425:22, 1494:16, 1510:4, 1536:6
**known** [1] - 1449:1

**knows** [2] - 1454:11
**Kolb** [2] - 1346:6, 1346:8

## L

**L.A** [1] - 1531:5
**L1** [3] - 1354:19, 1363:25, 1364:1
**L2/3** [1] - 1391:7
**L3** [2] - 1358:20, 1358:21
**L3-4** [3] - 1546:11, 1548:7, 1548:8
**L3/4** [1] - 1391:7
**L4** [13] - 1353:9, 1354:24, 1357:14, 1358:14, 1358:15, 1359:3, 1427:15, 1441:12, 1467:16, 1472:23, 1474:11, 1548:9
**L4/5** [8] - 1354:20, 1354:24, 1391:7, 1439:8, 1463:7, 1465:25, 1467:24, 1468:17
**L5** [15] - 1353:9, 1354:20, 1354:25, 1355:1, 1357:13, 1358:10, 1358:11, 1359:3, 1432:1, 1441:12, 1468:23, 1472:22, 1474:8, 1474:11, 1474:19
**L5-S1** [6] - 1361:23, 1427:15, 1495:12, 1546:9, 1550:2, 1550:5
**L5/S1** [15] - 1354:21, 1355:3, 1391:8, 1439:9, 1462:12, 1463:24, 1466:6, 1466:23, 1467:24, 1468:13, 1468:19, 1470:3, 1471:1, 1496:20, 1497:17
**LA** [1] - 1513:5
**lab** [1] - 1325:7
**laboratories** [1] - 1325:9
**laceration** [1] - 1350:17
**lack** [3] - 1472:19, 1478:4, 1540:3
**lacks** [2] - 1309:15, 1561:4
**ladies** [2] - 1414:4, 1563:2
**lady** [1] - 1402:12
**laid** [3] - 1313:13, 1329:15, 1532:8
**lamina** [1] - 1443:13
**laminate** [2] - 1441:12, 1441:13
**laminectomize** [1] - 1441:12
**laminectomy** [12] - 1427:15, 1441:1, 1441:11, 1441:19, 1441:20, 1442:11, 1442:12, 1442:14, 1442:17, 1472:21, 1472:24
**laminotomy** [1] - 1445:8, 1445:10
**landscape** [3] - 1549:3, 1549:22, 1549:23
**large** [17] - 1351:25, 1353:11, 1353:14, 1361:22, 1391:7, 1403:24, 1431:19, 1449:22, 1471:2, 1471:13, 1471:14, 1471:19, 1498:8, 1505:8, 1505:13, 1519:6, 1554:9
**last** [39] - 1305:19, 1310:12, 1310:23, 1344:18, 1353:8, 1354:25, 1355:2, 1362:19, 1383:9, 1388:19, 1391:6, 1396:11, 1396:12, 1409:9, 1416:4, 1421:23, 1434:22, 1446:13, 1446:16, 1447:14, 1448:11, 1451:18, 1462:12, 1483:23, 1485:15, 1492:12, 1502:4, 1536:1, 1537:11, 1540:24, 1542:9,

1542:10, 1548:13, 1549:9, 1558:6, 1558:11, 1558:12
**Last** [1] - 1474:23
**lasted** [1] - 1404:18
**late** [1] - 1426:1
**lateral** [18] - 1358:7, 1358:11, 1358:18, 1359:8, 1359:11, 1359:24, 1360:1, 1360:2, 1360:4, 1360:5, 1360:17, 1361:12, 1361:16, 1361:23, 1430:19, 1465:4, 1471:25, 1555:22
**laterally** [1] - 1430:13
**Latosek** [1] - 1507:2
**Lattuga** [21] - 1345:24, 1425:10, 1425:18, 1425:22, 1531:18, 1533:4, 1533:16, 1535:6, 1535:11, 1535:20, 1536:3, 1536:9, 1536:20, 1537:3, 1537:15, 1537:20, 1550:17, 1551:3, 1551:15, 1552:4, 1552:18
**Lattuga's** [7] - 1532:10, 1533:10, 1534:15, 1535:3, 1535:20, 1551:21, 1552:13
**laundry** [2] - 1540:25, 1543:14
**law** [5] - 1330:24, 1332:15, 1332:18, 1333:7, 1554:23
**LAW** [1] - 1300:15
**lawyer** [3] - 1308:9, 1527:24, 1555:1
**lawyers** [2] - 1345:5, 1486:5
**lay** [5] - 1312:23, 1329:25, 1334:8, 1386:5, 1386:12
**layer** [1] - 1437:22
**lead** [4] - 1396:20, 1503:3, 1514:24, 1535:6
**leading** [3] - 1552:7, 1555:14, 1556:10
**leak** [1] - 1403:6
**least** [16] - 1388:18, 1391:6, 1421:23, 1435:19, 1449:6, 1451:19, 1459:2, 1466:2, 1474:23, 1481:18, 1500:22, 1511:15, 1515:22, 1540:23, 1544:13, 1550:24
**leave** [4] - 1355:15, 1359:6, 1395:12, 1553:15
**Lebowitz** [2] - 1347:10, 1347:20
**led** [2] - 1495:20, 1548:20
**left** [32] - 1359:22, 1360:19, 1363:12, 1391:3, 1415:11, 1424:2, 1432:1, 1463:10, 1463:25, 1464:15, 1465:24, 1466:9, 1470:24, 1472:16, 1474:7, 1474:9, 1474:10, 1475:2, 1475:10, 1475:14, 1475:15, 1491:13, 1508:6, 1508:8, 1508:11, 1513:6, 1520:18, 1525:25, 1529:5, 1538:12, 1538:14
**Left** [1] - 1529:6
**left-hand** [8] - 1359:22, 1360:19, 1463:10, 1464:15, 1472:16, 1474:9, 1475:10, 1475:15
**left-sided** [1] - 1363:12
**leg** [52] - 1350:17, 1351:10, 1352:12, 1352:19, 1352:20, 1352:23, 1353:13, 1353:17, 1353:22, 1353:23, 1353:24, 1354:4, 1355:5, 1355:9, 1355:10,

1355:11, 1355:12, 1355:14, 1355:21, 1356:13, 1358:7, 1358:15, 1362:11, 1363:2, 1363:12, 1391:1, 1391:3, 1391:25, 1403:10, 1403:18, 1404:10, 1404:11, 1405:5, 1426:10, 1426:20, 1470:17, 1483:13, 1500:6, 1508:6, 1508:8, 1539:8, 1553:9, 1554:12, 1554:17, 1554:21, 1555:20, 1556:8, 1556:13, 1557:13, 1560:23, 1561:9
**legal** [4] - 1309:5, 1321:4, 1340:5, 1561:7
**legs** [12] - 1352:22, 1402:18, 1465:1, 1466:15, 1500:5, 1513:6, 1520:18, 1520:24, 1521:2, 1523:24, 1539:15, 1544:1
**length** [5] - 1388:10, 1389:16, 1431:9, 1431:11, 1431:15
**lengths** [2] - 1429:8, 1431:13
**lesions** [1] - 1336:25
**less** [15] - 1339:24, 1342:5, 1364:20, 1364:22, 1373:21, 1378:20, 1387:13, 1407:7, 1407:15, 1426:24, 1454:6, 1465:25, 1512:24, 1559:21, 1559:22
**less-invasive** [2] - 1407:7, 1407:15
**lesser** [1] - 1467:24
**lesson** [1] - 1363:14
**letter** [6] - 1303:13, 1304:8, 1305:4, 1305:7, 1354:17, 1394:14
**level** [46] - 1324:22, 1357:25, 1363:25, 1364:1, 1402:17, 1439:6, 1439:7, 1439:9, 1440:17, 1441:10, 1441:11, 1441:18, 1442:15, 1442:17, 1462:11, 1465:19, 1465:21, 1465:25, 1466:8, 1468:15, 1468:21, 1470:3, 1471:1, 1471:14, 1472:22, 1472:23, 1475:7, 1475:11, 1475:22, 1479:24, 1479:25, 1480:4, 1480:13, 1482:12, 1496:15, 1497:3, 1497:17, 1500:19, 1505:13, 1540:10, 1546:9, 1546:11, 1548:18
**levels** [7] - 1402:17, 1427:20, 1467:16, 1468:16, 1469:6, 1475:4, 1479:23
**LEWIS** [1] - 1301:3
**licensed** [1] - 1536:3
**Lichy** [4] - 1346:7, 1394:17, 1398:11, 1505:7
**lichy** [1] - 1346:8
**Liebowitz** [5] - 1346:6, 1390:5, 1390:11, 1420:12, 1425:2
**lien** [5] - 1306:6, 1333:13, 1333:21, 1334:12, 1334:13
**liens** [2] - 1333:24, 1334:1
**life** [7] - 1478:16, 1479:5, 1498:6, 1548:8, 1553:8, 1561:25, 1562:12
**life-threatening** [2] - 1553:8, 1561:25
**lifetime** [2] - 1481:18, 1545:24
**lift** [1] - 1401:2
**lifted** [1] - 1463:1
**lifting** [1] - 1463:3
**ligament** [5] - 1462:25, 1491:12, 1491:15

**light** [1] - 1431:22
**lights** [4] - 1461:8, 1461:10, 1468:9, 1476:6
**likelihood** [1] - 1497:13
**likely** [9] - 1469:16, 1476:16, 1485:5, 1489:14, 1499:7, 1499:20, 1545:20, 1550:4, 1559:4
**likewise** [5] - 1486:20, 1491:19, 1516:16, 1530:16, 1537:24
**limine** [3] - 1302:20, 1304:14, 1304:21
**line** [27] - 1302:8, 1302:11, 1302:12, 1302:14, 1302:15, 1303:25, 1310:18, 1350:3, 1374:11, 1377:6, 1436:7, 1458:11, 1462:6, 1462:24, 1467:5, 1467:6, 1467:7, 1467:9, 1468:24, 1468:25, 1486:11, 1495:7, 1535:21
**Lines** [1] - 1301:4, 1301:10
**LINES** [1] - 1300:7
**lines** [4] - 1315:13, 1324:8, 1355:6, 1470:4
**link** [2] - 1368:12, 1392:15
**list** [8] - 1308:22, 1310:14, 1315:21, 1324:17, 1345:14, 1345:20, 1406:1, 1543:19
**listed** [5] - 1332:3, 1371:20, 1453:9, 1460:23, 1525:11
**listen** [2] - 1317:25, 1470:15
**Listen** [1] - 1384:19
**lists** [4] - 1320:9, 1324:25, 1424:3, 1426:22
**literally** [1] - 1549:11
**literature** [1] - 1480:24
**litigation** [1] - 1447:15
**LL** [1] - 1513:5
**LLC** [3] - 1300:9, 1301:5, 1301:11
**LLP** [2] - 1300:20, 1301:3
**locate** [1] - 1317:10
**located** [1] - 1338:2
**location** [6] - 1342:17, 1346:9, 1405:3, 1430:15, 1482:10, 1555:25
**locations** [2] - 1429:25, 1556:1
**long-span** [1] - 1546:17
**long-term** [1] - 1547:12
**longitudinal** [3] - 1462:25, 1491:12, 1491:15
**longstanding** [2] - 1469:15, 1491:7
**longus** [1] - 1362:24
**look** [51] - 1313:25, 1316:17, 1322:20, 1349:7, 1352:11, 1353:1, 1355:5, 1368:18, 1372:14, 1372:17, 1377:6, 1378:6, 1413:2, 1416:21, 1422:25, 1424:2, 1426:8, 1427:10, 1430:3, 1430:21, 1446:17, 1453:16, 1461:19, 1462:24, 1463:6, 1463:8, 1463:21, 1463:23, 1466:21, 1470:15, 1470:23, 1474:5, 1480:2, 1492:1, 1494:14, 1505:6, 1505:12, 1505:21, 1508:5, 1509:21, 1511:12, 1512:5, 1513:4, 1518:5, 1524:14, 1527:17, 1534:13, 1534:24, 1537:5, 1548:3, 1554:21

**looked** [5] - 1502:1, 1502:2, 1513:5, 1540:20, 1546:13
**looking** [31] - 1313:25, 1315:1, 1317:2, 1320:13, 1322:14, 1325:12, 1325:13, 1325:22, 1326:17, 1332:25, 1341:19, 1376:25, 1412:14, 1435:22, 1445:10, 1448:11, 1456:5, 1461:25, 1462:9, 1462:21, 1465:19, 1475:7, 1505:15, 1505:18, 1514:21, 1517:23, 1543:2, 1544:14, 1545:5, 1560:11
**looks** [5] - 1431:19, 1454:4, 1462:14, 1474:12, 1505:14
**lordosis** [1] - 1474:21
**Los** [2] - 1342:13, 1531:6
**lose** [1] - 1406:11
**loses** [1] - 1468:22
**loss** [2] - 1470:3, 1496:24
**lost** [2] - 1406:12, 1496:23
**loud** [1] - 1428:20
**low** [10] - 1391:25, 1392:8, 1430:9, 1446:6, 1476:11, 1501:7, 1501:8, 1501:11, 1504:1, 1527:15
**lower** [29] - 1350:17, 1351:19, 1352:1, 1353:13, 1363:23, 1363:25, 1392:3, 1393:23, 1395:3, 1396:9, 1398:1, 1398:10, 1399:3, 1402:17, 1430:8, 1461:8, 1461:9, 1476:24, 1482:23, 1482:24, 1483:10, 1483:11, 1490:21, 1500:23, 1508:6, 1508:8, 1518:23, 1523:21, 1554:13
**lowest** [2] - 1512:13, 1534:8
**LSO** [1] - 1426:15
**lumbar** [35] - 1353:10, 1353:11, 1354:15, 1354:19, 1394:15, 1394:16, 1395:3, 1396:12, 1417:21, 1422:5, 1426:14, 1427:14, 1442:21, 1444:13, 1444:14, 1460:13, 1461:15, 1462:12, 1466:21, 1468:13, 1469:23, 1474:17, 1474:21, 1481:7, 1482:9, 1482:12, 1491:2, 1491:6, 1491:25, 1521:8, 1535:8, 1549:24, 1550:1
**Lumbar** [1] - 1547:17
**lunch** [1] - 1414:5
**Luncheon** [1] - 1414:10

# M

**M-O-B-I-N** [1] - 1335:8
**M.D** [4] - 1394:17, 1398:11, 1413:7, 1536:3
**machine** [4] - 1405:1, 1405:6, 1430:2, 1430:3
**MAGISTRATE** [1] - 1300:13
**mailed** [1] - 1313:24
**mails** [1] - 1385:24
**main** [2] - 1306:24, 1315:9
**maintain** [1] - 1406:17
**major** [6] - 1360:17, 1360:24, 1363:1, 1363:22, 1494:7, 1498:4
**majority** [9] - 1339:13, 1339:17,

1340:3, 1359:23, 1363:11, 1363:22, 1364:19, 1485:8, 1547:6
**management** [25] - 1315:10, 1337:18, 1338:20, 1341:11, 1341:14, 1341:17, 1341:22, 1341:24, 1342:2, 1346:3, 1346:23, 1364:24, 1392:22, 1400:1, 1407:5, 1407:18, 1413:7, 1417:17, 1418:11, 1426:17, 1454:14, 1478:8, 1480:12, 1482:1, 1488:20
**maneuvers** [4] - 1352:14, 1353:18, 1364:21, 1524:11
**manifested** [1] - 1521:25
**manner** [1] - 1483:7
**Mannion** [18] - 1377:5, 1381:8, 1383:21, 1408:18, 1409:23, 1410:8, 1419:9, 1419:14, 1420:2, 1422:21, 1424:17, 1486:4, 1550:14, 1551:2, 1552:21, 1555:11, 1558:7, 1558:13
**MANNION** [178] - 1301:7, 1344:10, 1354:12, 1367:10, 1367:18, 1368:13, 1369:9, 1371:25, 1372:3, 1372:6, 1374:8, 1374:12, 1375:16, 1375:19, 1376:7, 1376:12, 1376:20, 1376:24, 1377:8, 1377:18, 1377:21, 1378:3, 1378:9, 1378:12, 1378:15, 1378:17, 1378:21, 1379:1, 1379:4, 1381:9, 1382:15, 1383:22, 1384:3, 1384:10, 1384:15, 1384:23, 1385:2, 1385:6, 1386:7, 1386:10, 1386:13, 1386:19, 1386:23, 1387:7, 1387:14, 1387:21, 1389:21, 1394:5, 1395:9, 1395:11, 1395:15, 1397:3, 1398:14, 1399:15, 1406:14, 1408:6, 1408:10, 1409:11, 1409:13, 1409:16, 1410:18, 1410:23, 1410:25, 1412:19, 1413:13, 1413:21, 1413:25, 1417:10, 1418:2, 1418:20, 1419:11, 1419:19, 1420:5, 1422:13, 1422:22, 1423:8, 1423:18, 1424:13, 1424:20, 1424:22, 1428:3, 1428:5, 1432:13, 1432:23, 1434:10, 1434:13, 1448:3, 1449:20, 1450:22, 1451:21, 1451:25, 1452:7, 1452:11, 1453:3, 1453:18, 1454:4, 1454:9, 1454:15, 1454:19, 1454:24, 1455:5, 1457:14, 1457:17, 1460:8, 1460:14, 1460:16, 1465:7, 1478:21, 1483:3, 1483:17, 1484:14, 1485:22, 1485:24, 1486:1, 1496:2, 1502:11, 1502:12, 1504:24, 1506:3, 1506:5, 1506:7, 1506:15, 1506:17, 1506:23, 1507:12, 1507:15, 1509:16, 1510:9, 1511:4, 1511:20, 1511:23, 1511:24, 1512:15, 1515:24, 1516:8, 1516:9, 1517:11, 1517:15, 1517:17, 1517:25, 1518:2, 1518:12, 1520:1, 1522:21, 1526:3, 1528:4, 1528:7, 1528:10, 1528:19, 1528:23, 1533:9, 1537:11, 1537:22, 1542:2, 1544:5, 1545:5, 1545:11, 1549:10, 1549:16, 1549:19, 1551:6, 1552:7, 1553:22, 1554:18, 1555:13,

1556:10, 1557:24, 1558:24, 1559:2, 1560:9, 1561:20, 1561:23, 1561:24, 1562:17, 1563:1, 1564:6, 1564:8
**manual** [1] - 1383:5
**March** [11] - 1392:25, 1393:19, 1407:2, 1412:10, 1436:5, 1436:6, 1436:9, 1436:10, 1436:15, 1477:22, 1535:11
**Marina** [4] - 1338:3, 1342:12, 1342:14
**mark** [2] - 1310:24, 1470:21
**marked** [7] - 1312:12, 1314:1, 1314:20, 1329:21, 1432:12, 1460:19, 1460:20
**markers** [1] - 1429:23
**market** [1] - 1338:15
**marking** [1] - 1386:25
**MARSHALL** [1] - 1301:9
**mask** [3] - 1500:15, 1520:24, 1561:25
**masking** [1] - 1499:21
**mass** [1] - 1403:25
**massive** [1] - 1498:18
**match** [1] - 1368:16
**matches** [1] - 1309:11
**matching** [1] - 1328:16
**material** [9] - 1427:19, 1428:12, 1466:11, 1470:10, 1471:8, 1472:3, 1473:1, 1473:3, 1557:9
**materials** [1] - 1365:2
**math** [1] - 1412:15
**matter** [7] - 1380:10, 1448:22, 1448:23, 1451:2, 1501:21, 1521:19, 1563:10
**matters** [2] - 1313:9, 1323:10
**maximally** [1] - 1546:18
**MCELFISH** [1] - 1300:15
**McElfish** [340] - 1300:18, 1302:5, 1302:22, 1302:25, 1303:8, 1304:3, 1305:19, 1305:25, 1306:8, 1307:5, 1307:8, 1307:13, 1307:17, 1307:21, 1307:23, 1308:17, 1308:20, 1308:24, 1309:23, 1310:7, 1310:12, 1311:7, 1311:10, 1311:13, 1311:16, 1311:22, 1312:22, 1313:24, 1314:20, 1314:24, 1316:22, 1316:25, 1317:2, 1317:4, 1317:8, 1317:19, 1318:8, 1318:14, 1318:16, 1318:19, 1318:21, 1322:14, 1322:20, 1322:25, 1323:8, 1324:4, 1324:12, 1324:15, 1326:14, 1326:15, 1326:17, 1326:22, 1326:25, 1327:3, 1327:8, 1328:1, 1328:7, 1328:11, 1328:17, 1328:22, 1329:3, 1329:12, 1329:18, 1330:15, 1330:17, 1330:20, 1330:22, 1330:24, 1332:4, 1332:8, 1332:10, 1332:14, 1332:17, 1332:22, 1333:4, 1333:12, 1333:23, 1334:17, 1334:19, 1334:22, 1334:24, 1335:1, 1335:9, 1335:16, 1344:7, 1353:5, 1354:9, 1356:2, 1362:16, 1365:16, 1367:3, 1367:9, 1367:11, 1367:15, 1367:20, 1367:23, 1367:25, 1368:4, 1368:7, 1368:14, 1369:1, 1369:5,

1369:7, 1369:17, 1369:25, 1370:2, 1370:5, 1370:19, 1370:21, 1370:23, 1372:2, 1372:5, 1374:4, 1374:16, 1375:12, 1376:5, 1376:9, 1376:22, 1377:9, 1377:17, 1378:8, 1378:10, 1378:13, 1378:16, 1378:19, 1378:23, 1379:2, 1380:1, 1380:4, 1380:6, 1380:12, 1380:15, 1381:6, 1381:12, 1381:20, 1382:2, 1382:13, 1383:17, 1384:9, 1384:12, 1384:19, 1384:25, 1385:10, 1385:15, 1385:19, 1385:22, 1386:4, 1386:16, 1386:24, 1387:3, 1387:10, 1388:2, 1388:6, 1389:19, 1389:25, 1391:20, 1391:22, 1394:3, 1394:9, 1395:7, 1395:12, 1395:18, 1395:21, 1395:22, 1397:2, 1397:6, 1397:9, 1398:13, 1398:16, 1398:21, 1398:23, 1399:13, 1399:19, 1402:1, 1408:1, 1408:5, 1408:8, 1408:11, 1408:14, 1408:16, 1408:18, 1409:17, 1410:2, 1410:4, 1410:12, 1410:20, 1411:1, 1412:1, 1412:5, 1412:17, 1414:3, 1415:5, 1415:10, 1415:17, 1416:14, 1417:8, 1417:25, 1418:16, 1419:8, 1419:14, 1419:21, 1420:1, 1420:6, 1420:8, 1421:6, 1422:9, 1422:17, 1422:23, 1423:5, 1423:9, 1423:16, 1424:12, 1424:17, 1428:2, 1428:4, 1428:8, 1428:17, 1432:10, 1432:17, 1433:2, 1434:5, 1434:16, 1435:23, 1436:1, 1439:2, 1447:22, 1448:8, 1448:16, 1448:19, 1448:22, 1448:24, 1449:8, 1449:11, 1449:14, 1449:17, 1449:24, 1450:2, 1450:19, 1451:1, 1451:9, 1451:16, 1451:17, 1451:22, 1451:23, 1452:3, 1452:9, 1453:12, 1453:25, 1454:2, 1454:8, 1454:10, 1454:13, 1454:17, 1454:22, 1455:8, 1456:2, 1456:4, 1456:24, 1457:3, 1457:16, 1460:1, 1460:5, 1460:9, 1460:11, 1460:15, 1460:18, 1461:1, 1461:8, 1468:9, 1468:11, 1469:21, 1469:23, 1470:19, 1472:12, 1474:2, 1476:5, 1481:9, 1481:15, 1483:4, 1483:6, 1485:20, 1487:17, 1487:19, 1502:2, 1506:10, 1506:11, 1509:1, 1509:14, 1509:25, 1511:14, 1516:4, 1516:5, 1517:10, 1517:12, 1521:11, 1522:24, 1526:1, 1526:4, 1527:25, 1528:9, 1528:12, 1529:13, 1529:19, 1529:22, 1530:23, 1531:3, 1531:8, 1534:14, 1534:17, 1534:20, 1536:15, 1539:11, 1539:21, 1540:3, 1540:16, 1541:1, 1542:20, 1543:17, 1544:4, 1544:21, 1545:8, 1549:21, 1551:14, 1556:2, 1557:2, 1558:1, 1558:4, 1558:5, 1558:21, 1560:7, 1560:16, 1560:25, 1561:4, 1561:18, 1561:22, 1562:2, 1562:15, 1564:5, 1564:7
**mcGowan** [1] - 1345:25

**McGowan** [9] - 1350:23, 1359:4, 1364:9, 1380:19, 1381:19, 1382:6, 1394:13, 1495:6, 1496:7
**McGowan's** [2] - 1380:12, 1519:9
**mean** [27] - 1308:5, 1321:10, 1327:19, 1329:15, 1334:18, 1368:15, 1384:20, 1385:2, 1437:16, 1442:17, 1454:9, 1454:25, 1466:9, 1471:6, 1490:16, 1503:8, 1512:10, 1518:21, 1518:24, 1523:21, 1526:6, 1530:7, 1530:19, 1542:23, 1550:3, 1561:8, 1561:13
**meaning** [13] - 1338:15, 1351:7, 1362:3, 1391:2, 1427:4, 1428:24, 1477:15, 1482:9, 1503:25, 1505:15, 1532:8, 1535:20, 1551:9
**means** [11] - 1360:25, 1362:5, 1390:25, 1406:18, 1426:12, 1437:22, 1508:24, 1513:12, 1514:6, 1524:17, 1542:22
**meant** [2] - 1525:16, 1551:16
**meantime** [1] - 1404:4
**measure** [2] - 1431:11, 1480:3
**measured** [1] - 1505:8
**measurement** [3] - 1471:15, 1505:9, 1505:16
**measurements** [1] - 1503:12
**mechanical** [8] - 1301:18, 1362:3, 1400:13, 1400:16, 1404:12, 1467:2, 1467:13, 1500:8
**med** [2] - 1446:24, 1447:5
**medial** [2] - 1430:12, 1430:22
**medially** [1] - 1430:12
**Medicaid** [5] - 1304:18, 1305:23, 1333:13, 1333:19, 1333:20
**Medical** [7] - 1333:15, 1342:13, 1342:14, 1350:19, 1374:24, 1390:4, 1528:15
**medical** [74] - 1304:7, 1306:2, 1306:20, 1307:14, 1307:15, 1308:1, 1309:6, 1313:13, 1313:14, 1313:17, 1335:24, 1336:1, 1336:3, 1336:4, 1337:13, 1340:5, 1343:18, 1343:19, 1345:11, 1345:15, 1349:14, 1364:8, 1364:24, 1367:4, 1367:5, 1367:7, 1367:12, 1368:9, 1368:16, 1370:13, 1378:4, 1378:7, 1384:7, 1384:15, 1400:8, 1427:1, 1430:7, 1457:5, 1457:24, 1471:6, 1471:7, 1476:12, 1477:4, 1477:11, 1478:12, 1478:13, 1478:15, 1479:4, 1480:17, 1480:21, 1481:5, 1483:1, 1483:15, 1483:21, 1485:17, 1493:14, 1495:5, 1495:11, 1497:1, 1497:5, 1505:21, 1505:22, 1507:9, 1507:16, 1509:13, 1510:5, 1530:21, 1538:25, 1544:25, 1545:23, 1555:16, 1557:4, 1560:15
**medical/legal** [1] - 1339:18
**medication** [4] - 1371:19, 1403:22, 1481:23, 1518:4
**medications** [9] - 1364:24, 1407:10,

1426:15, 1427:2, 1481:21, 1481:24, 1485:6, 1500:14, 1507:16
**medicine** [5] - 1342:19, 1372:14, 1402:5, 1403:9, 1404:20
**Medicsurg** [3] - 1347:25, 1452:4, 1453:7
**meds** [1] - 1518:8
**meet** [2] - 1307:8, 1310:13
**Memorial** [1] - 1337:15
**memorized** [2] - 1345:14, 1345:17
**mend** [2] - 1427:20, 1479:23
**mentally** [1] - 1350:12
**mention** [9] - 1514:2, 1514:3, 1520:16, 1525:14, 1525:17, 1525:19, 1525:22, 1532:13, 1546:14
**mentioned** [12] - 1325:4, 1338:1, 1338:6, 1390:24, 1439:16, 1440:16, 1483:23, 1486:24, 1514:20, 1520:20, 1555:16, 1557:20
**message** [1] - 1529:6
**met** [2] - 1487:10, 1536:20
**metal** [2] - 1432:4, 1479:11
**micro** [1] - 1337:5
**micromovement** [1] - 1431:2
**microscopic** [1] - 1337:6
**microsurgery** [1] - 1336:8
**microwave** [1] - 1405:2
**mid** [1] - 1518:23
**mid-2016** [1] - 1345:2
**mid-back** [1] - 1518:23
**middle** [6] - 1359:19, 1377:7, 1432:9, 1500:23, 1501:9, 1501:10
**Midtown** [3] - 1347:21, 1451:4, 1451:10
**might** [10] - 1347:23, 1370:25, 1486:14, 1488:22, 1489:9, 1493:1, 1500:24, 1534:12, 1542:11, 1562:7
**Mikelis** [5] - 1425:11, 1425:18, 1426:6, 1551:9, 1552:6
**Mikelis'** [1] - 1433:21
**mild** [2] - 1521:25
**milder** [1] - 1554:1
**mildly** [1] - 1475:9
**mill** [2] - 1305:3, 1308:12
**millimeter** [5] - 1431:14, 1431:17, 1431:18, 1469:1, 1494:19
**millimeters** [12] - 1430:16, 1471:3, 1471:4, 1471:16, 1503:11, 1503:12, 1503:13, 1505:9, 1505:11, 1505:16, 1505:18, 1505:20
**mind** [9] - 1339:12, 1407:9, 1435:3, 1441:21, 1537:14, 1537:21, 1540:15, 1551:11, 1551:15
**mindset** [1] - 1553:5
**mine** [1] - 1340:4
**minor** [2] - 1475:5, 1551:10
**minus** [1] - 1457:24
**minute** [7] - 1356:19, 1365:1, 1391:16, 1420:10, 1454:4, 1495:8, 1545:6
**minutes** [6] - 1418:11, 1454:5, 1454:6,

1507:20, 1545:3, 1556:5
**Miriam** [1] - 1310:10
**misbill** [1] - 1558:2
**misfire** [2] - 1429:18
**mispronounced** [1] - 1547:14
**miss** [1] - 1410:14
**missed** [1] - 1440:12
**missing** [3] - 1333:12, 1432:9, 1472:24
**Missouri** [1] - 1300:23
**mistake** [1] - 1561:13
**Mobin** [94] - 1308:15, 1308:21, 1310:16, 1311:1, 1311:4, 1311:18, 1318:11, 1328:18, 1329:1, 1329:12, 1329:19, 1330:4, 1332:12, 1334:7, 1335:2, 1335:3, 1335:7, 1335:19, 1339:7, 1339:10, 1340:7, 1340:16, 1341:25, 1344:8, 1344:11, 1346:17, 1350:5, 1352:3, 1358:22, 1361:19, 1363:13, 1364:10, 1365:1, 1370:9, 1371:2, 1371:21, 1372:7, 1374:20, 1375:22, 1376:14, 1376:25, 1380:9, 1380:16, 1382:3, 1382:18, 1383:11, 1388:8, 1393:20, 1394:11, 1396:6, 1396:15, 1398:2, 1399:21, 1412:6, 1412:25, 1415:19, 1418:7, 1418:25, 1420:10, 1422:25, 1424:2, 1427:21, 1428:9, 1429:10, 1431:8, 1432:15, 1434:18, 1436:4, 1447:24, 1448:21, 1449:12, 1451:3, 1456:5, 1457:4, 1458:15, 1460:12, 1461:14, 1465:2, 1468:12, 1469:20, 1469:25, 1470:22, 1474:25, 1476:7, 1477:24, 1481:12, 1483:7, 1483:23, 1485:15, 1485:21, 1511:15, 1549:22, 1551:1, 1553:16
**mobin** [1] - 1416:6
**MOBIN** [3] - 1335:11, 1415:6, 1564:4
**Mobin's** [4] - 1311:24, 1329:17, 1329:23, 1432:11
**modalities** [4] - 1383:5, 1383:12, 1488:19
**model** [9] - 1353:1, 1354:6, 1354:8, 1355:7, 1355:12, 1359:6, 1362:14, 1429:4, 1429:13
**modify** [1] - 1303:18
**moment** [5] - 1375:16, 1376:12, 1397:6, 1492:2, 1545:11
**money** [2] - 1309:14, 1330:8
**monitors** [1] - 1406:9
**month** [5] - 1396:9, 1495:9, 1496:22, 1500:13, 1554:11
**months** [14] - 1305:20, 1310:14, 1310:22, 1317:10, 1327:25, 1328:3, 1329:21, 1351:18, 1426:2, 1463:18, 1469:17, 1491:9, 1538:6, 1543:4
**more-specific** [1] - 1520:10
**morning** [6] - 1313:24, 1334:18, 1335:1, 1335:17, 1335:19, 1457:21
**MOROKNEK** [1] - 1301:13
**morphine** [1] - 1404:3

**most** [10] - 1356:12, 1363:4, 1363:6, 1372:18, 1402:12, 1405:23, 1476:15, 1490:5, 1530:4, 1542:5
**mostly** [4] - 1413:25, 1475:22, 1477:17, 1499:16
**motion** [9] - 1302:20, 1303:18, 1304:21, 1328:19, 1383:5, 1524:22, 1525:7, 1525:12, 1526:12
**motions** [2] - 1304:14, 1331:4
**motor** [4] - 1512:12, 1513:4, 1535:5, 1535:7
**Motrin** [1] - 1525:25
**move** [36] - 1328:20, 1375:13, 1376:5, 1380:15, 1381:7, 1382:13, 1406:14, 1409:23, 1410:7, 1418:17, 1419:6, 1419:8, 1419:9, 1419:16, 1421:6, 1421:7, 1422:9, 1428:15, 1428:24, 1434:7, 1447:24, 1449:14, 1450:21, 1458:20, 1461:9, 1464:4, 1479:19, 1499:15, 1515:25, 1516:10, 1522:21, 1526:4, 1528:6, 1534:14, 1537:10, 1549:18
**moved** [3] - 1410:4, 1415:12, 1417:25
**movement** [2] - 1400:17, 1431:2
**moves** [20] - 1374:4, 1374:6, 1377:17, 1383:20, 1389:19, 1394:3, 1395:7, 1397:2, 1398:13, 1399:13, 1408:3, 1412:17, 1416:14, 1417:8, 1417:25, 1423:5, 1423:17, 1424:12, 1432:11, 1451:9
**moving** [10] - 1362:3, 1381:15, 1412:6, 1415:22, 1418:6, 1422:20, 1443:1, 1470:19, 1547:5, 1549:5
**MR** [565] - 1302:10, 1302:22, 1302:25, 1303:6, 1303:8, 1303:21, 1304:3, 1304:24, 1305:15, 1305:24, 1305:25, 1306:1, 1306:7, 1306:8, 1307:5, 1307:8, 1307:13, 1307:17, 1307:21, 1307:23, 1308:1, 1308:17, 1308:20, 1308:24, 1309:23, 1310:6, 1310:7, 1310:12, 1311:7, 1311:10, 1311:13, 1311:16, 1311:22, 1312:22, 1313:4, 1313:23, 1314:3, 1314:7, 1314:9, 1314:20, 1314:24, 1315:2, 1316:1, 1316:7, 1316:14, 1316:15, 1316:22, 1316:25, 1317:2, 1317:4, 1317:8, 1317:19, 1317:21, 1318:2, 1318:8, 1318:14, 1318:16, 1318:19, 1318:21, 1318:24, 1319:12, 1319:14, 1319:19, 1320:2, 1320:5, 1320:20, 1321:12, 1321:17, 1321:20, 1321:25, 1322:3, 1322:6, 1322:9, 1322:14, 1322:20, 1322:25, 1323:8, 1323:10, 1323:18, 1323:20, 1323:21, 1324:1, 1324:7, 1324:12, 1324:15, 1324:16, 1325:10, 1325:13, 1325:16, 1325:25, 1326:2, 1326:4, 1326:15, 1326:17, 1326:22, 1326:25, 1327:3, 1327:8, 1327:23, 1328:1, 1328:5, 1328:11, 1328:13, 1328:17, 1328:21, 1328:22, 1328:24,

1329:7, 1329:11, 1329:12, 1329:17, 1329:18, 1329:23, 1330:15, 1330:17, 1330:20, 1330:22, 1330:24, 1332:4, 1332:8, 1332:10, 1332:14, 1332:17, 1332:22, 1333:4, 1333:12, 1333:23, 1334:4, 1334:11, 1334:13, 1334:17, 1334:19, 1334:22, 1335:1, 1335:9, 1335:16, 1344:7, 1344:10, 1353:5, 1354:9, 1354:12, 1356:2, 1362:16, 1365:16, 1367:3, 1367:9, 1367:10, 1367:11, 1367:15, 1367:18, 1367:20, 1367:23, 1367:25, 1368:4, 1368:7, 1368:13, 1368:14, 1369:1, 1369:5, 1369:7, 1369:9, 1369:13, 1369:15, 1369:17, 1369:25, 1370:2, 1370:5, 1370:19, 1370:21, 1370:23, 1371:25, 1372:2, 1372:3, 1372:5, 1372:6, 1374:4, 1374:8, 1374:12, 1374:16, 1375:12, 1375:16, 1375:19, 1376:5, 1376:7, 1376:9, 1376:12, 1376:20, 1376:22, 1376:24, 1377:8, 1377:9, 1377:17, 1377:18, 1377:21, 1378:3, 1378:8, 1378:9, 1378:10, 1378:12, 1378:13, 1378:15, 1378:16, 1378:17, 1378:19, 1378:21, 1378:23, 1379:1, 1379:2, 1379:4, 1380:1, 1380:4, 1380:6, 1380:12, 1380:15, 1381:6, 1381:9, 1381:12, 1381:20, 1382:2, 1382:13, 1382:15, 1383:17, 1383:22, 1384:3, 1384:9, 1384:10, 1384:12, 1384:15, 1384:19, 1384:23, 1384:25, 1385:2, 1385:6, 1385:10, 1385:15, 1385:18, 1385:19, 1385:22, 1386:4, 1386:5, 1386:7, 1386:10, 1386:13, 1386:16, 1386:19, 1386:23, 1386:24, 1387:3, 1387:7, 1387:10, 1387:14, 1387:21, 1388:2, 1388:6, 1389:19, 1389:21, 1389:25, 1391:20, 1391:22, 1394:3, 1394:5, 1394:9, 1395:7, 1395:9, 1395:11, 1395:12, 1395:15, 1395:18, 1395:21, 1395:22, 1397:2, 1397:3, 1397:6, 1397:9, 1398:13, 1398:14, 1398:16, 1398:21, 1398:23, 1399:13, 1399:15, 1399:19, 1402:1, 1406:14, 1408:1, 1408:5, 1408:6, 1408:8, 1408:10, 1408:11, 1408:14, 1408:16, 1409:11, 1409:13, 1409:16, 1409:17, 1410:2, 1410:4, 1410:12, 1410:18, 1410:20, 1410:23, 1410:25, 1411:1, 1412:1, 1412:5, 1412:17, 1412:19, 1413:13, 1413:21, 1413:25, 1414:3, 1415:5, 1415:10, 1415:17, 1416:14, 1417:8, 1417:10, 1417:25, 1418:2, 1418:16, 1418:20, 1419:8, 1419:11, 1419:14, 1419:19, 1419:21, 1420:1, 1420:5, 1420:6, 1420:8, 1421:6, 1422:9, 1422:13, 1422:17, 1422:22, 1422:23, 1423:5, 1423:6, 1423:8, 1423:9, 1423:16, 1423:18, 1424:12, 1424:13, 1424:17, 1424:20, 1424:22, 1428:2, 1428:3, 1428:4,

1428:5, 1428:8, 1428:17, 1432:10,
1432:13, 1432:17, 1432:23, 1433:2,
1434:5, 1434:10, 1434:13, 1434:16,
1435:23, 1436:1, 1439:2, 1447:22,
1448:3, 1448:8, 1448:16, 1448:19,
1448:22, 1448:24, 1449:8, 1449:11,
1449:14, 1449:17, 1449:20, 1449:24,
1450:2, 1450:19, 1450:22, 1451:1,
1451:9, 1451:16, 1451:17, 1451:21,
1451:23, 1451:25, 1452:3, 1452:7,
1452:9, 1452:11, 1453:3, 1453:7,
1453:12, 1453:18, 1453:19, 1453:25,
1454:2, 1454:4, 1454:8, 1454:9,
1454:10, 1454:13, 1454:15, 1454:17,
1454:19, 1454:22, 1454:24, 1455:5,
1455:8, 1456:2, 1456:4, 1456:24,
1457:3, 1457:14, 1457:16, 1457:17,
1460:1, 1460:5, 1460:8, 1460:9,
1460:11, 1460:14, 1460:15, 1460:16,
1460:18, 1461:1, 1461:8, 1464:3,
1465:7, 1468:9, 1468:11, 1469:21,
1469:23, 1470:19, 1472:12, 1474:2,
1476:5, 1478:21, 1481:9, 1481:15,
1483:3, 1483:4, 1483:6, 1483:17,
1484:14, 1485:20, 1485:22, 1485:24,
1486:1, 1496:2, 1502:11, 1502:12,
1504:24, 1506:3, 1506:5, 1506:7,
1506:8, 1506:11, 1506:15, 1506:17,
1506:23, 1507:12, 1507:15, 1509:1,
1509:14, 1509:16, 1509:25, 1510:9,
1511:4, 1511:14, 1511:20, 1511:23,
1511:24, 1512:15, 1515:24, 1516:5,
1516:8, 1516:9, 1517:10, 1517:11,
1517:12, 1517:15, 1517:17, 1517:25,
1518:2, 1518:12, 1520:1, 1521:11,
1522:21, 1522:24, 1526:1, 1526:3,
1526:4, 1527:25, 1528:4, 1528:7,
1528:9, 1528:10, 1528:12, 1528:19,
1528:23, 1529:13, 1529:19, 1529:22,
1533:9, 1534:14, 1534:17, 1534:20,
1536:15, 1537:11, 1537:22, 1539:11,
1539:21, 1540:3, 1540:16, 1541:1,
1542:2, 1542:20, 1543:17, 1544:4,
1544:5, 1544:21, 1545:5, 1545:8,
1545:11, 1549:10, 1549:16, 1549:19,
1549:21, 1551:6, 1551:14, 1552:7,
1553:22, 1554:18, 1555:13, 1556:2,
1556:10, 1557:2, 1557:24, 1558:1,
1558:4, 1558:5, 1558:21, 1558:24,
1559:2, 1560:7, 1560:9, 1560:16,
1561:4, 1561:18, 1561:20, 1561:22,
1561:23, 1561:24, 1562:2, 1562:15,
1562:17, 1563:1, 1564:5, 1564:6,
1564:7, 1564:8

**MRI** [51] - 1351:22, 1351:23, 1351:25,
1357:18, 1373:11, 1394:13, 1394:15,
1394:16, 1396:12, 1396:15, 1396:19,
1396:24, 1397:13, 1397:17, 1397:20,
1397:21, 1397:24, 1399:2, 1426:9,
1427:3, 1427:4, 1431:10, 1460:2,
1460:7, 1460:12, 1461:13, 1461:15,

1463:21, 1463:22, 1469:11, 1469:18,
1469:19, 1470:18, 1470:20, 1474:23,
1482:11, 1491:19, 1493:8, 1493:9,
1495:3, 1495:9, 1495:20, 1496:21,
1496:25, 1505:9, 1505:10, 1544:12,
1550:1, 1550:3, 1550:23

**MRI's** [1] - 1338:19

**MRIs** [12] - 1345:10, 1352:16, 1357:22,
1392:14, 1394:20, 1395:2, 1396:5,
1396:8, 1399:4, 1433:16, 1471:20,
1478:8

**MS** [9] - 1314:2, 1314:5, 1314:12,
1314:18, 1315:20, 1319:1, 1319:5,
1319:9, 1322:17

**Mull** [1] - 1516:21

**multi** [2] - 1428:23, 1555:23

**multi-axial** [1] - 1428:23

**multi-trauma** [1] - 1555:23

**multidisciplinary** [2] - 1337:17,
1338:6

**multiple** [14] - 1314:14, 1315:4,
1338:1, 1338:9, 1345:8, 1351:14,
1356:23, 1383:3, 1389:9, 1395:1,
1426:25, 1555:24, 1557:17

**multiple-disciplinary** [1] - 1338:1

**multitude** [1] - 1359:18

**muscle** [7] - 1357:12, 1358:8, 1362:23,
1362:24, 1363:1, 1427:7, 1481:21

**muscles** [4] - 1357:25, 1358:1,
1426:16, 1492:9

**muscular** [1] - 1485:13

**musculoskeletal** [1] - 1478:25

**mutually** [1] - 1493:3

**myotomes** [2] - 1357:23, 1357:25

## N

**nail** [1] - 1349:19

**name** [7] - 1335:6, 1335:19, 1348:4,
1400:11, 1435:9, 1486:4

**names** [1] - 1315:3

**Naproxen** [1] - 1481:23

**narcotics** [2] - 1426:16, 1481:21

**NARR** [6] - 1446:24, 1446:25, 1447:1,
1447:2, 1447:10, 1555:7

**narrative** [3] - 1509:9, 1509:20, 1538:1

**narrow** [1] - 1360:9

**narrowed** [2] - 1475:10, 1476:2

**narrowing** [7] - 1353:15, 1360:14,
1360:15, 1361:23, 1464:24, 1475:15

**national** [1] - 1372:17

**nature** [8] - 1312:17, 1323:5, 1350:6,
1364:6, 1369:8, 1472:2, 1489:5,
1507:17

**nausea** [1] - 1523:12

**necessarily** [9] - 1334:20, 1369:20,
1369:21, 1407:8, 1483:13, 1485:12,
1494:21, 1499:4, 1544:15

**necessary** [43] - 1305:17, 1309:7,
1311:2, 1312:8, 1350:11, 1364:13,

1364:14, 1365:6, 1365:8, 1367:13,
1371:11, 1375:8, 1376:2, 1380:25,
1382:8, 1383:14, 1383:16, 1393:9,
1393:11, 1394:20, 1407:23, 1407:25,
1413:17, 1416:11, 1416:13, 1417:22,
1418:13, 1419:5, 1420:4, 1434:1,
1434:4, 1435:20, 1436:19, 1445:18,
1446:22, 1446:23, 1447:3, 1455:1,
1456:21, 1457:9, 1457:10, 1457:23,
1458:2

**necessity** [1] - 1400:4

**neck** [38] - 1363:13, 1363:14, 1363:19,
1363:23, 1363:24, 1395:3, 1396:8,
1397:21, 1397:22, 1398:9, 1399:3,
1416:7, 1426:5, 1474:24, 1475:3,
1476:17, 1476:18, 1476:22, 1476:23,
1478:7, 1490:20, 1491:14, 1501:10,
1508:22, 1513:22, 1513:24, 1514:16,
1515:11, 1519:10, 1520:19, 1520:24,
1524:14, 1524:19, 1524:22, 1525:6,
1555:21

**need** [38] - 1302:16, 1302:21, 1316:19,
1336:16, 1336:24, 1336:25, 1337:1,
1338:16, 1354:13, 1369:22, 1397:7,
1404:4, 1406:16, 1426:22, 1430:10,
1430:17, 1431:3, 1431:11, 1448:1,
1449:22, 1459:4, 1459:6, 1478:12,
1479:4, 1479:22, 1481:13, 1482:19,
1483:8, 1483:19, 1485:10, 1493:21,
1497:9, 1530:10, 1540:18, 1544:24,
1549:13, 1553:12, 1558:9

**needed** [3] - 1458:17, 1478:20, 1544:2

**needle** [6] - 1402:13, 1402:21, 1403:4,
1404:22, 1404:23

**needles** [3] - 1402:8, 1402:9, 1407:10

**needs** [7] - 1434:14, 1479:14, 1480:11,
1480:16, 1482:19, 1482:21, 1493:11

**negative** [1] - 1514:11

**neglected** [1] - 1393:2

**neighborhood** [1] - 1373:6

**nerve** [74] - 1353:4, 1353:9, 1353:11,
1353:12, 1353:15, 1353:21, 1354:1,
1354:2, 1355:13, 1357:3, 1357:6,
1357:9, 1357:10, 1357:11, 1357:13,
1357:14, 1357:15, 1358:5, 1358:6,
1358:9, 1358:11, 1359:8, 1359:11,
1360:10, 1360:20, 1360:21, 1360:22,
1360:24, 1361:9, 1361:12, 1361:14,
1361:18, 1362:4, 1363:15, 1400:12,
1400:15, 1400:18, 1402:10, 1402:11,
1402:13, 1403:23, 1403:24, 1404:1,
1404:17, 1404:21, 1405:2, 1405:3,
1405:4, 1405:7, 1405:21, 1407:12,
1407:14, 1421:11, 1426:10, 1427:8,
1429:18, 1430:12, 1432:2, 1443:1,
1443:2, 1464:19, 1464:20, 1466:7,
1466:13, 1471:24, 1472:7, 1476:1,
1493:10, 1500:8, 1500:10, 1515:1

**nerves** [32] - 1352:25, 1353:8, 1355:6,
1355:8, 1356:14, 1357:2, 1357:7,

1359:16, 1359:17, 1359:18, 1359:24, 1359:25, 1360:18, 1361:3, 1361:24, 1364:1, 1364:2, 1402:23, 1402:24, 1402:25, 1426:11, 1429:20, 1464:11, 1464:13, 1464:14, 1464:25, 1466:3, 1466:13, 1472:4, 1475:8, 1557:11

**neural** [2] - 1359:12, 1360:4

**neuro** [2] - 1353:3, 1525:17

**neuro-foramina** [1] - 1353:3

**Neurological** [1] - 1343:25

**neurological** [13] - 1336:14, 1336:15, 1393:5, 1421:16, 1485:3, 1485:13, 1511:1, 1511:6, 1512:18, 1515:9, 1526:15, 1535:8, 1553:10

**neurologist** [5] - 1350:25, 1357:19, 1420:24, 1503:16, 1507:6

**neurologists** [5] - 1336:12, 1350:23, 1351:15, 1458:1

**neurology** [2] - 1306:23, 1357:18

**neurolysis** [3] - 1443:4, 1443:6, 1443:7

**neuropsychological** [1] - 1457:18

**neuropsychology** [2] - 1306:23, 1310:18

**neuroradiologist** [3] - 1502:16, 1502:19, 1502:20

**neurosurgeon** [14] - 1310:19, 1329:19, 1335:2, 1335:20, 1336:9, 1342:12, 1397:20, 1400:8, 1402:4, 1433:25, 1450:12, 1477:1, 1485:18, 1557:15

**neurosurgeon's** [2] - 1425:25, 1487:20

**neurosurgeons** [4] - 1337:18, 1338:22, 1343:6, 1343:8

**Neurosurgery** [1] - 1339:7

**neurosurgery** [9] - 1336:6, 1336:23, 1344:2, 1344:9, 1344:12, 1345:1, 1350:5, 1479:2, 1559:13

**neurosurgical** [4] - 1458:22, 1459:13, 1484:6, 1555:18

**never** [22] - 1320:24, 1324:18, 1385:18, 1386:16, 1453:7, 1453:8, 1453:23, 1454:16, 1510:21, 1533:16, 1533:17, 1536:20, 1536:21, 1536:22, 1537:25, 1550:9, 1552:18, 1560:25

**new** [5] - 1318:8, 1332:13, 1422:20, 1433:15, 1547:3

**NEW** [1] - 1300:1

**New** [37] - 1300:5, 1300:18, 1301:13, 1316:3, 1320:25, 1321:20, 1321:23, 1323:16, 1323:22, 1324:16, 1326:9, 1327:9, 1328:14, 1329:2, 1329:13, 1330:1, 1333:7, 1333:17, 1334:4, 1335:25, 1345:23, 1347:21, 1363:10, 1382:23, 1390:4, 1396:2, 1396:19, 1421:24, 1425:7, 1425:9, 1425:17, 1426:4, 1434:20, 1435:16, 1528:15, 1536:4

**next** [61] - 1320:8, 1322:12, 1334:25,

1335:2, 1337:13, 1350:19, 1354:6, 1365:18, 1371:14, 1375:3, 1376:23, 1377:24, 1381:22, 1408:21, 1409:17, 1411:4, 1422:11, 1424:7, 1436:15, 1437:10, 1439:3, 1439:6, 1440:5, 1440:6, 1440:7, 1440:21, 1440:24, 1440:25, 1441:8, 1441:10, 1442:11, 1443:10, 1444:3, 1444:17, 1445:1, 1446:1, 1446:5, 1446:8, 1448:15, 1448:16, 1454:5, 1454:6, 1463:21, 1463:23, 1470:20, 1472:9, 1472:14, 1474:3, 1475:12, 1475:22, 1482:13, 1494:18, 1502:12, 1511:12, 1511:22, 1519:8, 1522:19, 1527:10, 1535:5, 1535:25, 1554:11

**nicely** [1] - 1463:13

**night** [5] - 1310:13, 1310:23, 1342:25, 1343:1, 1563:4

**nobody** [1] - 1493:20, 1497:18

**NOLAN** [1] - 1301:17

**NolanEDNY@aol.com** [1] - 1301:18

**non** [2] - 1339:16, 1457:15, 1524:17

**non-psychological** [1] - 1457:15

**non-surgical** [1] - 1339:16

**non-tender** [1] - 1524:17

**none** [8] - 1494:13, 1507:9, 1515:2, 1530:23, 1536:18, 1545:19, 1546:13, 1546:14

**nonetheless** [1] - 1445:23

**nonresponsive** [1] - 1517:11

**nontreatment** [1] - 1447:15

**normal** [20] - 1337:10, 1441:17, 1446:7, 1465:19, 1466:23, 1466:24, 1467:12, 1467:17, 1467:22, 1475:18, 1476:2, 1513:8, 1513:13, 1513:15, 1514:10, 1526:15, 1526:20, 1526:22, 1554:5

**normally** [3] - 1428:15, 1462:11, 1475:25

**North** [3] - 1315:13, 1423:24, 1449:1

**notes** [1] - 1387:17

**nothing** [9] - 1309:10, 1448:23, 1453:8, 1489:25, 1490:24, 1525:3, 1525:10, 1526:10, 1539:14

**notice** [9] - 1347:7, 1347:11, 1347:13, 1347:16, 1347:24, 1347:25, 1348:5, 1429:5, 1429:13

**November** [18] - 1352:16, 1383:8, 1396:3, 1396:4, 1396:10, 1434:21, 1436:5, 1436:9, 1460:13, 1461:16, 1469:21, 1471:15, 1474:25, 1491:19, 1496:25, 1535:22, 1537:7, 1550:3

**NOW** [1] - 1468:12

**NT** [1] - 1524:15

**nuclear** [1] - 1557:9

**nucleus** [4] - 1463:14, 1464:10, 1470:5, 1492:13

**Number** [2] - 1320:6, 1320:9

**number** [58] - 1302:3, 1309:25, 1315:18, 1317:19, 1320:8, 1326:9,

1338:15, 1345:18, 1350:22, 1368:16, 1372:1, 1373:5, 1373:8, 1373:11, 1373:22, 1377:15, 1389:14, 1392:5, 1398:7, 1410:16, 1426:23, 1431:1, 1440:10, 1443:17, 1444:1, 1446:4, 1446:7, 1446:11, 1449:16, 1451:4, 1455:5, 1456:24, 1460:22, 1479:12, 1486:18, 1486:23, 1489:24, 1490:2, 1490:23, 1506:6, 1506:16, 1511:11, 1511:13, 1512:23, 1513:2, 1516:13, 1533:6, 1533:7, 1534:8, 1534:9, 1538:3, 1546:19, 1556:6

**numbers** [16] - 1313:6, 1314:8, 1314:10, 1328:16, 1373:4, 1373:18, 1410:17, 1410:20, 1424:20, 1440:22, 1455:1, 1460:17, 1461:4, 1486:8, 1512:12, 1559:9

**numbing** [2] - 1403:9, 1404:20

**numbness** [11] - 1353:17, 1354:3, 1359:2, 1362:7, 1362:10, 1362:22, 1427:7, 1514:22, 1515:16, 1522:13, 1527:7

**nurse** [1] - 1409:5

**Nurse** [4] - 1516:20, 1516:21

**nurses** [3] - 1343:4, 1517:21, 1523:3

**NY** [1] - 1301:17

# O

**o'clock** [2] - 1454:18, 1563:4

**O40193** [1] - 1506:16

**oath** [2] - 1560:21, 1560:25

**object** [5] - 1384:6, 1386:2, 1413:21, 1448:3, 1457:14

**objected** [1] - 1386:1

**Objection** [2] - 1406:14, 1413:13, 1465:7, 1537:22

**objection** [74] - 1309:15, 1344:10, 1367:19, 1374:8, 1375:15, 1375:19, 1376:7, 1377:18, 1381:9, 1382:15, 1389:21, 1394:5, 1395:15, 1397:3, 1398:14, 1398:18, 1399:15, 1408:10, 1409:12, 1409:14, 1412:21, 1417:10, 1418:2, 1418:20, 1419:11, 1419:17, 1422:13, 1423:6, 1423:18, 1424:13, 1428:2, 1432:13, 1432:23, 1433:7, 1434:13, 1449:20, 1450:23, 1451:20, 1451:25, 1453:10, 1478:21, 1483:3, 1483:17, 1484:14, 1506:3, 1506:10, 1506:24, 1509:14, 1509:25, 1516:4, 1517:10, 1521:11, 1522:23, 1527:25, 1528:8, 1528:12, 1529:13, 1529:22, 1534:16, 1534:17, 1536:15, 1539:11, 1540:3, 1540:16, 1544:4, 1551:6, 1552:7, 1553:22, 1554:18, 1555:13, 1556:10, 1557:24, 1561:18, 1562:15

**objections** [8] - 1310:9, 1311:3, 1312:14, 1312:16, 1315:21, 1387:1, 1387:8, 1410:5

**objective** [12] - 1351:25, 1352:7,

1392:13, 1426:9, 1427:3, 1524:8, 1524:10, 1524:13, 1524:14, 1525:13, 1525:16, 1525:20
**objectively** [1] - 1539:25
**objects** [1] - 1478:24
**observation** [1] - 1554:20
**observed** [3] - 1514:12, 1516:16, 1526:21
**obtained** [6] - 1443:20, 1477:18, 1510:4, 1510:8, 1510:11, 1552:2
**obtaining** [1] - 1444:6
**obviously** [3] - 1384:4, 1487:2, 1532:14
**occasion** [5] - 1341:10, 1342:1, 1342:5, 1344:19, 1344:20
**occasional** [1] - 1363:12
**occur** [5] - 1479:17, 1480:22, 1481:2, 1482:13, 1494:24
**occurred** [7] - 1350:14, 1437:2, 1469:17, 1491:17, 1502:4, 1519:11, 1520:3
**occurs** [1] - 1499:2
**October** [24] - 1311:25, 1350:14, 1375:3, 1381:4, 1382:6, 1388:15, 1391:13, 1391:24, 1393:18, 1397:18, 1397:24, 1399:2, 1416:12, 1433:17, 1468:13, 1471:13, 1477:2, 1478:2, 1484:9, 1496:10, 1496:11, 1527:20, 1528:24
**OF** [2] - 1300:1, 1300:12
**offer** [3] - 1336:16, 1344:8, 1515:22
**offered** [1] - 1553:18
**offering** [1] - 1528:6
**office** [12] - 1305:8, 1310:3, 1321:7, 1321:20, 1388:11, 1405:14, 1405:15, 1407:18, 1446:19, 1453:21, 1519:9, 1532:24
**offset** [4] - 1331:5, 1333:10, 1369:8, 1483:11
**offsets** [2] - 1323:4, 1368:23
**Ohio** [1] - 1301:6
**old** [1] - 1336:1
**Olympia** [1] - 1342:14
**Omega** [2] - 1336:4, 1343:19
**once** [7] - 1308:10, 1318:8, 1368:15, 1453:15, 1479:23, 1481:18, 1562:1
**one** [150] - 1302:3, 1302:11, 1303:15, 1304:3, 1304:7, 1305:1, 1306:22, 1306:25, 1308:13, 1309:13, 1310:24, 1313:5, 1313:25, 1314:25, 1315:7, 1318:8, 1321:6, 1321:21, 1326:7, 1330:6, 1330:13, 1333:12, 1333:19, 1338:11, 1338:15, 1338:16, 1340:7, 1341:6, 1344:21, 1350:3, 1351:21, 1353:18, 1356:22, 1356:25, 1357:1, 1360:25, 1364:21, 1372:3, 1375:16, 1376:12, 1376:15, 1377:10, 1378:22, 1380:20, 1386:11, 1395:11, 1396:11, 1396:12, 1397:1, 1397:6, 1398:16, 1401:11, 1404:19, 1406:12, 1407:15,

1417:16, 1422:21, 1426:23, 1428:13, 1431:1, 1432:8, 1432:9, 1434:10, 1436:15, 1439:3, 1439:8, 1439:11, 1440:5, 1440:6, 1440:7, 1440:24, 1441:11, 1443:10, 1444:3, 1444:9, 1446:5, 1446:8, 1446:13, 1453:5, 1454:5, 1454:6, 1458:11, 1460:24, 1461:19, 1467:3, 1469:24, 1470:4, 1471:2, 1472:15, 1472:16, 1474:3, 1474:6, 1475:13, 1477:17, 1479:12, 1482:8, 1482:19, 1482:22, 1482:24, 1486:4, 1486:14, 1487:16, 1492:2, 1492:25, 1493:17, 1494:13, 1495:20, 1496:24, 1499:19, 1502:8, 1504:1, 1504:2, 1504:19, 1514:14, 1517:23, 1529:14, 1530:4, 1531:18, 1532:4, 1532:5, 1532:7, 1532:13, 1533:22, 1537:11, 1539:6, 1539:7, 1544:10, 1544:14, 1545:6, 1545:11, 1545:23, 1546:3, 1546:23, 1546:24, 1547:9, 1548:6, 1548:8, 1548:11, 1549:11, 1550:21, 1553:19, 1555:25, 1556:6, 1559:24, 1560:18, 1560:24, 1561:14
**one-page** [3] - 1310:24, 1377:10, 1397:1
**ones** [3] - 1309:13, 1458:12, 1458:13
**ongoing** [1] - 1546:25
**onset** [4] - 1553:19, 1554:13, 1557:4, 1557:6
**ooo0ooo** [1] - 1563:14
**open** [7] - 1302:1, 1388:1, 1404:4, 1414:7, 1415:2, 1456:1, 1512:22
**opening** [6] - 1360:8, 1466:2, 1466:5, 1475:9, 1475:25
**opens** [1] - 1360:10
**operate** [6] - 1340:20, 1340:23, 1357:21, 1363:16, 1429:1, 1550:22
**operated** [1] - 1340:24
**operates** [1] - 1308:7
**operating** [3] - 1429:24, 1531:25, 1557:19
**operation** [4] - 1430:2, 1431:12, 1445:6
**operations** [2] - 1329:20, 1373:24
**operative** [1] - 1474:4
**opine** [4] - 1306:24, 1441:17, 1451:3, 1509:21
**opined** [6] - 1306:21, 1349:12, 1458:7, 1458:11, 1458:13, 1459:3
**opining** [2] - 1373:5, 1373:13
**opinion** [55] - 1306:25, 1307:1, 1309:7, 1340:6, 1345:16, 1361:19, 1364:10, 1365:5, 1365:8, 1371:5, 1371:21, 1372:7, 1372:24, 1373:15, 1381:3, 1383:14, 1389:15, 1390:19, 1393:8, 1398:2, 1418:9, 1419:5, 1432:21, 1433:24, 1434:3, 1457:6, 1457:10, 1457:19, 1458:7, 1459:14, 1460:3, 1469:5, 1476:12, 1477:1, 1478:11, 1482:18, 1484:11, 1494:19,

1495:20, 1497:1, 1497:16, 1497:22, 1502:3, 1514:24, 1531:18, 1540:8, 1550:18, 1552:1, 1552:19, 1555:3, 1558:8, 1558:17, 1562:24
**opinions** [19] - 1335:20, 1335:21, 1338:11, 1349:2, 1349:16, 1350:10, 1390:13, 1458:23, 1458:24, 1485:15, 1485:16, 1487:20, 1488:5, 1495:15, 1509:12, 1544:23, 1550:15, 1551:18, 1554:17
**opportunity** [5] - 1348:7, 1348:19, 1460:2, 1487:8, 1491:6
**opposed** [7] - 1332:16, 1338:16, 1364:2, 1476:2, 1488:10, 1554:1, 1559:23
**oppositions** [1] - 1304:24
**options** [2] - 1342:2, 1407:15
**Optum** [1] - 1309:13
**order** [11] - 1303:1, 1303:4, 1336:19, 1401:10, 1442:23, 1453:10, 1453:11, 1460:19, 1464:25, 1466:8, 1530:11
**Order** [1] - 1386:3
**ordered** [5] - 1396:19, 1397:21, 1397:25, 1398:2, 1433:16
**organize** [1] - 1350:4
**oriented** [1] - 1336:23
**orifices** [1] - 1353:3
**origin** [1] - 1358:2
**original** [2] - 1378:17, 1547:21
**originally** [2] - 1302:4, 1441:23
**Orthopedic** [1] - 1393:18
**orthopedic** [10] - 1308:13, 1337:17, 1338:21, 1351:15, 1352:14, 1390:11, 1390:17, 1458:1, 1465:3, 1555:24
**orthopedics** [1] - 1306:23
**Osborn** [3] - 1302:22, 1302:23, 1303:2
**osteolytic** [1] - 1522:1
**osteophyte** [1] - 1490:18
**osteophytes** [2] - 1491:3, 1491:7
**otherwise** [3] - 1368:11, 1398:17, 1449:1
**ourselves** [1] - 1369:22
**outcome** [2] - 1405:5, 1459:11
**outer** [1] - 1554:4
**outpatient** [3] - 1341:2, 1347:3, 1373:10
**outside** [19] - 1310:19, 1360:12, 1365:17, 1366:1, 1377:23, 1378:1, 1383:24, 1384:1, 1402:7, 1408:20, 1409:1, 1432:23, 1443:20, 1452:13, 1453:1, 1521:11, 1539:21, 1541:1, 1553:22
**outstanding** [1] - 1343:20
**oval** [1] - 1359:15
**oval-shaped** [1] - 1359:15
**overall** [2] - 1339:23, 1368:9
**overlap** [1] - 1357:15, 1486:15
**overlapping** [1] - 1350:2, 1486:16
**overly** [1] - 1540:3
**overnight** [2] - 1327:21, 1491:10

**overrule** [1] - 1433:7
**overruled** [8] - 1406:15, 1410:5, 1465:8, 1521:13, 1536:16, 1540:5, 1540:17, 1541:2
**Overruled** [15] - 1448:5, 1478:23, 1509:2, 1509:15, 1542:21, 1543:18, 1544:6, 1544:22, 1551:7, 1553:23, 1554:19, 1556:11, 1560:17, 1561:5, 1562:4
**owed** [1] - 1333:9
**own** [14] - 1336:19, 1337:20, 1339:6, 1372:24, 1435:12, 1489:1, 1498:6, 1507:7, 1524:6, 1530:4, 1540:25, 1543:11, 1557:20
**owner** [1] - 1341:7
**ownership** [1] - 1341:6
**owns** [1] - 1315:10

## P

**P.C** [1] - 1315:7
**PAGE** [1] - 1564:3
**page** [82] - 1302:10, 1302:14, 1310:24, 1314:25, 1320:5, 1320:14, 1320:16, 1322:10, 1322:12, 1331:9, 1341:14, 1355:24, 1365:18, 1371:14, 1376:15, 1377:7, 1377:8, 1377:10, 1377:24, 1379:7, 1381:22, 1383:25, 1387:24, 1390:24, 1392:17, 1392:19, 1393:12, 1397:1, 1398:16, 1401:17, 1408:21, 1411:4, 1412:14, 1413:20, 1419:25, 1422:12, 1424:7, 1435:14, 1435:15, 1435:22, 1438:6, 1440:21, 1442:11, 1444:17, 1444:23, 1445:1, 1445:2, 1448:11, 1451:21, 1451:23, 1452:5, 1452:15, 1455:11, 1459:16, 1463:22, 1463:23, 1463:25, 1464:1, 1464:3, 1465:22, 1466:17, 1472:13, 1472:14, 1473:10, 1475:12, 1495:23, 1511:12, 1511:18, 1511:22, 1511:23, 1517:23, 1519:13, 1526:3, 1535:5, 1535:25, 1541:5, 1556:14
**pages** [28] - 1302:8, 1312:1, 1314:24, 1315:1, 1320:8, 1320:15, 1320:17, 1321:2, 1322:12, 1325:17, 1348:10, 1375:23, 1376:5, 1395:19, 1395:21, 1408:4, 1412:18, 1413:15, 1449:5, 1449:6, 1449:10, 1452:4, 1514:18, 1515:23, 1526:8, 1534:19, 1534:20, 1534:21
**paid** [10] - 1315:14, 1321:4, 1321:6, 1321:10, 1324:2, 1328:9, 1333:17, 1368:4, 1368:6, 1532:14
**pain** [164] - 1315:10, 1337:18, 1338:20, 1341:11, 1341:17, 1341:22, 1341:24, 1342:1, 1346:3, 1346:23, 1351:10, 1351:17, 1352:2, 1352:12, 1353:21, 1354:4, 1356:13, 1362:3, 1362:4, 1362:8, 1362:9, 1362:10, 1362:21,

1362:22, 1364:24, 1392:8, 1392:22, 1397:22, 1398:1, 1398:3, 1400:1, 1400:14, 1400:16, 1401:9, 1401:14, 1402:15, 1402:18, 1403:10, 1403:11, 1403:18, 1404:3, 1404:6, 1404:8, 1404:9, 1404:18, 1405:8, 1407:4, 1407:18, 1413:6, 1417:17, 1418:11, 1426:5, 1426:9, 1426:17, 1426:20, 1454:14, 1470:16, 1470:17, 1472:8, 1477:14, 1477:16, 1478:7, 1479:10, 1479:13, 1479:14, 1480:12, 1481:21, 1482:1, 1482:23, 1488:20, 1496:4, 1496:5, 1496:6, 1497:8, 1497:23, 1498:2, 1498:14, 1498:23, 1499:8, 1499:18, 1499:22, 1499:24, 1500:6, 1500:12, 1500:15, 1500:16, 1500:19, 1500:23, 1500:24, 1501:14, 1508:6, 1508:9, 1508:20, 1508:22, 1508:24, 1509:8, 1513:24, 1514:1, 1514:7, 1514:21, 1514:22, 1515:12, 1515:14, 1515:17, 1517:18, 1517:20, 1517:21, 1518:3, 1518:8, 1518:10, 1519:3, 1519:10, 1520:13, 1520:16, 1520:17, 1520:19, 1520:21, 1521:1, 1522:8, 1522:10, 1522:17, 1524:20, 1525:10, 1525:12, 1525:18, 1525:19, 1526:12, 1526:19, 1527:3, 1527:7, 1527:16, 1527:20, 1538:10, 1542:23, 1550:10, 1551:21, 1554:12, 1554:13, 1554:16, 1554:21, 1555:21, 1555:25, 1556:1, 1556:9, 1556:13, 1560:2, 1560:14, 1560:15, 1560:23, 1561:3, 1562:1, 1562:18, 1562:22
**pain/right** [1] - 1392:3
**painful** [3] - 1353:22, 1355:21, 1405:21
**palpated** [2] - 1520:12, 1524:19
**palpates** [1] - 1501:13
**palpation** [2] - 1518:23, 1518:24
**paper** [2] - 1314:21, 1486:17
**papers** [1] - 1481:2
**paragraph** [6] - 1507:24, 1508:1, 1535:19, 1536:1, 1547:10
**parallel** [2] - 1360:8, 1548:11
**paralysis** [1] - 1407:14
**parcel** [1] - 1364:16
**parents** [1] - 1488:23
**parse** [1] - 1368:2
**part** [63] - 1306:2, 1307:24, 1313:21, 1324:2, 1326:11, 1333:5, 1336:18, 1336:19, 1337:8, 1339:24, 1341:7, 1341:16, 1342:24, 1351:3, 1351:23, 1355:7, 1358:13, 1360:16, 1361:6, 1361:15, 1364:16, 1372:13, 1372:14, 1373:23, 1381:14, 1404:5, 1404:12, 1406:7, 1406:22, 1423:13, 1442:11, 1443:3, 1446:23, 1462:10, 1463:15, 1464:9, 1466:25, 1467:13, 1469:12, 1471:9, 1471:25, 1492:13, 1492:14, 1499:17, 1502:24, 1504:1, 1504:2,

1507:11, 1510:4, 1510:5, 1513:20, 1521:4, 1524:12, 1526:8, 1533:12, 1533:13, 1538:4, 1554:4, 1557:10, 1560:10
**partial** [3] - 1357:20, 1472:22
**particular** [57] - 1342:23, 1351:20, 1354:16, 1357:2, 1357:5, 1357:6, 1357:9, 1357:10, 1357:11, 1360:24, 1363:10, 1372:25, 1373:2, 1374:11, 1384:13, 1391:12, 1400:18, 1400:25, 1401:3, 1402:8, 1402:17, 1426:15, 1427:19, 1428:21, 1429:4, 1432:22, 1436:12, 1439:21, 1448:3, 1451:13, 1453:4, 1462:2, 1462:8, 1462:17, 1463:13, 1463:22, 1465:23, 1467:11, 1469:6, 1469:12, 1470:25, 1471:3, 1471:23, 1474:5, 1474:7, 1475:4, 1475:14, 1480:13, 1481:23, 1505:19, 1524:2, 1525:3, 1540:11, 1544:14, 1549:25, 1550:1, 1556:12
**particularly** [5] - 1305:2, 1462:22, 1468:22, 1478:7, 1546:4
**parties** [1] - 1553:12
**partly** [1] - 1489:19
**partner** [1] - 1346:7
**Partners** [3] - 1315:14, 1347:17, 1423:24
**partners** [1] - 1550:21
**parts** [4] - 1378:7, 1380:10, 1443:13, 1530:4
**passed** [1] - 1472:5
**passenger** [1] - 1517:7
**past** [4] - 1368:9, 1368:15, 1380:15, 1407:8
**patch** [3] - 1357:2, 1357:5, 1357:11
**patches** [2] - 1356:23, 1357:24, 1427:8
**pathology** [1] - 1325:9
**pathway** [1] - 1466:13
**pathways** [1] - 1361:6
**patient** [65] - 1340:4, 1340:9, 1340:14, 1342:1, 1352:20, 1352:21, 1353:16, 1353:18, 1357:19, 1374:25, 1382:23, 1401:4, 1404:6, 1404:16, 1405:17, 1406:9, 1406:18, 1407:4, 1421:16, 1431:10, 1435:13, 1470:15, 1484:19, 1484:21, 1484:25, 1485:6, 1487:6, 1500:18, 1509:6, 1510:11, 1511:7, 1512:3, 1512:14, 1512:20, 1514:8, 1524:9, 1524:11, 1529:25, 1530:3, 1530:8, 1530:11, 1533:16, 1535:3, 1535:12, 1535:14, 1536:12, 1536:13, 1536:14, 1536:21, 1536:24, 1537:4, 1538:2, 1539:18, 1539:23, 1540:12, 1548:4, 1550:17, 1552:1, 1552:3, 1553:7, 1553:14, 1555:19
**patient's** [4] - 1356:10, 1488:25, 1514:7, 1529:25
**Patient's** [1] - 1508:5
**patients** [52] - 1305:10, 1305:11,

1309:2, 1336:15, 1336:21, 1337:4, 1338:10, 1338:15, 1338:22, 1339:13, 1340:1, 1340:18, 1340:20, 1340:23, 1341:2, 1341:11, 1342:1, 1343:2, 1353:23, 1356:5, 1362:5, 1364:17, 1364:20, 1364:22, 1400:22, 1400:23, 1403:16, 1406:10, 1479:8, 1480:23, 1481:3, 1485:8, 1488:11, 1488:17, 1498:17, 1499:13, 1500:11, 1546:5, 1547:20, 1547:23, 1548:19, 1549:13, 1553:2, 1553:3, 1558:14, 1559:4, 1559:6, 1559:9, 1559:21
**patients'** [1] - 1406:23
**Pause** [1] - 1434:12
**pause** [4] - 1322:21, 1324:10, 1448:18, 1504:20
**pay** [6] - 1306:5, 1326:11, 1326:13, 1333:19, 1333:21, 1334:14
**payment** [4] - 1323:5, 1328:15, 1331:5, 1333:9
**payments** [4] - 1334:2, 1368:19, 1368:22, 1369:3
**PC** [1] - 1528:16
**Peachey** [1] - 1507:2
**pedicle** [11] - 1427:15, 1428:11, 1428:23, 1428:24, 1432:1, 1440:7, 1445:17, 1474:8, 1474:19
**pedicles** [2] - 1429:15, 1473:6
**peer** [1] - 1344:2
**peer-reviewed** [1] - 1344:2
**pelvis** [1] - 1353:10
**pen** [1] - 1486:17
**penalties** [1] - 1536:4
**Pennsylvania** [2] - 1348:21, 1365:3
**people** [10] - 1302:19, 1303:3, 1304:7, 1305:3, 1305:5, 1309:9, 1489:12, 1517:5, 1558:18, 1559:15
**people's** [1] - 1407:10
**peoples** [1] - 1490:5
**per** [6] - 1309:19, 1418:16, 1481:1, 1481:19, 1481:22, 1482:11
**percent** [25] - 1317:12, 1317:14, 1317:16, 1324:2, 1328:25, 1339:14, 1339:17, 1339:18, 1339:24, 1339:25, 1340:11, 1340:12, 1401:6, 1429:17, 1481:1, 1481:3, 1534:1, 1546:5, 1546:8, 1546:15, 1546:19, 1549:12
**percentage** [5] - 1339:22, 1339:25, 1340:1, 1340:9, 1534:3
**percentages** [1] - 1545:16
**perfect** [2] - 1462:21, 1472:14
**perform** [1] - 1341:24
**performed** [21] - 1352:13, 1371:18, 1371:23, 1392:24, 1396:13, 1400:2, 1412:10, 1417:19, 1417:21, 1421:10, 1427:13, 1432:19, 1435:11, 1453:17, 1456:10, 1472:19, 1472:21, 1472:24, 1517:2, 1535:7, 1536:13
**performing** [2] - 1524:12, 1531:25
**performs** [1] - 1482:6

**perhaps** [4] - 1374:20, 1485:5, 1496:23, 1507:6
**perish** [1] - 1484:22
**perjury** [1] - 1536:5
**permission** [2] - 1354:9, 1354:12
**person** [4] - 1302:23, 1499:3, 1499:22, 1552:23
**personally** [3] - 1458:15, 1536:13, 1537:3
**personnel** [1] - 1560:6
**perspective** [2] - 1458:22, 1459:13
**pertains** [1] - 1451:11
**pharmacy** [3] - 1325:8, 1376:18, 1377:12
**phase** [1] - 1351:4
**phenomenon** [1] - 1480:4
**phone** [2] - 1487:14, 1536:21
**phonetic** [1] - 1452:6
**physiatrist** [2] - 1341:23, 1425:10
**Physical** [3] - 1383:1, 1383:13, 1388:11, 1390:15
**physical** [40] - 1337:19, 1338:20, 1346:1, 1349:8, 1351:13, 1364:18, 1365:13, 1382:22, 1382:24, 1383:4, 1383:12, 1385:8, 1388:14, 1388:19, 1388:21, 1389:10, 1390:14, 1407:9, 1426:25, 1457:25, 1478:8, 1480:16, 1481:24, 1488:20, 1497:10, 1501:15, 1507:23, 1513:19, 1513:21, 1513:25, 1514:17, 1518:16, 1523:9, 1525:6, 1527:12, 1527:15, 1540:14, 1542:6, 1542:18, 1550:23
**physically** [2] - 1507:22, 1516:25
**physician** [17] - 1341:23, 1458:25, 1459:3, 1459:6, 1485:2, 1488:11, 1496:8, 1517:22, 1518:18, 1520:12, 1524:10, 1524:12, 1529:12, 1531:22, 1536:24, 1536:25, 1553:3
**physician's** [1] - 1524:9
**physicians** [12] - 1315:3, 1315:5, 1390:6, 1400:2, 1400:13, 1427:5, 1476:15, 1499:13, 1529:25, 1530:16, 1531:19, 1537:17
**physiological** [1] - 1498:7
**physiotherapy** [1] - 1392:21
**pictures** [1] - 1409:7
**piece** [5] - 1356:22, 1356:25, 1544:24, 1560:22
**pierce** [4] - 1403:5, 1429:19, 1430:21, 1443:2
**piercing** [1] - 1403:4
**pilot** [1] - 1498:20
**pinpoint** [2] - 1405:7
**pinprick** [1] - 1553:11
**pins** [1] - 1402:18
**pitches** [1] - 1429:8
**place** [10] - 1305:2, 1308:7, 1384:1, 1409:1, 1429:7, 1430:16, 1453:1, 1469:11, 1474:11, 1474:20
**placed** [4] - 1356:22, 1429:16,

1437:20, 1472:1
**placement** [6] - 1429:22, 1430:11, 1437:17, 1440:7, 1444:7, 1473:1
**places** [2] - 1338:17, 1386:20
**plaintiff** [35] - 1317:17, 1322:24, 1322:25, 1323:10, 1323:12, 1323:16, 1330:7, 1330:9, 1340:11, 1344:8, 1374:4, 1374:5, 1377:17, 1379:3, 1383:20, 1389:19, 1394:3, 1395:7, 1397:2, 1398:13, 1399:13, 1407:17, 1408:3, 1412:17, 1415:12, 1416:14, 1417:8, 1417:25, 1423:5, 1423:17, 1424:12, 1432:10, 1450:20, 1451:9, 1532:11
**Plaintiff** [4] - 1300:4, 1300:16, 1300:21, 1335:12
**Plaintiff's** [70] - 1320:1, 1322:17, 1322:22, 1326:24, 1327:2, 1330:16, 1335:2, 1370:4, 1371:3, 1374:7, 1374:19, 1375:21, 1376:11, 1377:20, 1382:17, 1388:4, 1389:23, 1394:7, 1395:14, 1395:20, 1397:5, 1398:20, 1399:17, 1412:4, 1415:15, 1415:22, 1419:13, 1419:23, 1422:15, 1423:11, 1423:17, 1423:20, 1424:16, 1424:24, 1434:17, 1448:7, 1450:1, 1450:25, 1452:2, 1457:2, 1461:6, 1508:8, 1564:12, 1564:14, 1564:16, 1564:18, 1564:20, 1564:22, 1564:24, 1565:2, 1565:4, 1565:6, 1565:8, 1565:10, 1565:12, 1565:17, 1566:2, 1566:4, 1566:6, 1566:8, 1566:10, 1566:12, 1566:14, 1566:16, 1566:18, 1566:20, 1566:22, 1566:24, 1567:2, 1567:4
**plaintiff's** [12] - 1320:18, 1325:19, 1326:20, 1412:23, 1417:13, 1418:4, 1418:23, 1565:14, 1565:19, 1565:22, 1565:25
**plaintiffs** [2] - 1340:1, 1340:3
**Plaintiffs** [1] - 1300:15
**plan** [3] - 1478:16, 1523:10, 1526:2
**plate** [1] - 1432:4
**play** [4] - 1403:25, 1520:20, 1532:5, 1562:11
**Plaza** [1] - 1301:17
**plead** [1] - 1444:17
**plexus** [3] - 1353:10, 1353:11, 1442:21
**PLL** [2] - 1463:3, 1463:4
**plus** [1] - 1339:14
**pneumonia** [3] - 1477:17, 1477:18, 1477:21
**point** [44] - 1302:25, 1304:5, 1306:20, 1307:8, 1308:20, 1308:25, 1310:1, 1312:9, 1321:9, 1339:1, 1344:7, 1367:1, 1370:15, 1374:4, 1374:5, 1395:6, 1402:3, 1402:11, 1406:16, 1425:1, 1425:6, 1425:25, 1430:1, 1430:11, 1439:12, 1447:22, 1460:5, 1460:6, 1472:8, 1479:2, 1479:3, 1482:22, 1487:20, 1488:18, 1492:3,

1493:11, 1505:12, 1511:18, 1512:18, 1523:16, 1543:8, 1548:2, 1551:1
**pointing** [1] - 1526:23
**pop** [3] - 1491:10, 1498:19, 1498:22
**populating** [1] - 1351:7
**portion** [11] - 1360:1, 1360:4, 1360:5, 1421:7, 1463:17, 1468:20, 1470:6, 1470:12, 1472:6, 1514:7, 1535:23
**portions** [1] - 1449:21
**position** [3] - 1313:12, 1316:7, 1467:12
**positions** [1] - 1342:16
**possibility** [1] - 1319:3
**possible** [4] - 1462:19, 1480:19, 1490:13, 1505:5
**post** [21] - 1304:18, 1322:8, 1322:11, 1323:4, 1328:19, 1331:6, 1331:7, 1332:23, 1334:2, 1334:7, 1368:2, 1368:18, 1368:21, 1390:25, 1391:1, 1391:3, 1391:4, 1391:6, 1469:10, 1472:10
**post-accident** [1] - 1469:10
**post-April** [1] - 1472:10
**post-surgical** [2] - 1322:8, 1322:11
**post-traumatic** [5] - 1390:25, 1391:1, 1391:3, 1391:4, 1391:6
**post-trial** [11] - 1304:18, 1323:4, 1328:19, 1331:6, 1331:7, 1332:23, 1334:7, 1368:2, 1368:18, 1368:21
**posterior** [7] - 1437:15, 1439:13, 1441:23, 1444:19, 1462:25, 1463:15, 1547:13
**postoperative** [5] - 1397:20, 1397:24, 1398:1, 1425:21, 1472:17
**potential** [1] - 1402:21
**potentially** [1] - 1305:8
**practice** [31] - 1315:10, 1337:20, 1337:21, 1338:2, 1338:6, 1338:9, 1338:16, 1338:18, 1338:24, 1339:6, 1339:10, 1339:14, 1339:17, 1339:20, 1339:22, 1339:23, 1339:24, 1341:10, 1341:21, 1341:25, 1488:10, 1536:3, 1551:8, 1551:9, 1551:17, 1551:21, 1551:22, 1551:23, 1552:14, 1558:19
**practiced** [1] - 1339:4
**practicing** [2] - 1337:14, 1340:4
**pre** [5] - 1345:8, 1386:18, 1432:12, 1470:2, 1494:16
**pre-accident** [1] - 1494:16
**pre-agreeable** [1] - 1386:18
**pre-incident** [1] - 1345:8
**pre-marked** [1] - 1432:12
**pre-signal** [1] - 1470:2
**preamble** [1] - 1547:18
**precise** [1] - 1430:15
**precisely** [1] - 1429:16
**Precision** [6] - 1346:9, 1351:22, 1396:2, 1397:13, 1399:1, 1475:17
**precluding** [1] - 1303:1
**preexisted** [2] - 1494:4, 1550:4

**preexisting** [4] - 1489:25, 1491:23, 1494:9, 1522:3
**pregnant** [2] - 1402:12, 1402:14
**preoperative** [2] - 1396:19, 1431:10
**preparation** [1] - 1532:23
**prepared** [3] - 1318:10, 1345:18, 1551:4
**preparing** [1] - 1443:23
**preponderance** [1] - 1480:24
**prescribe** [2] - 1485:6, 1500:5
**prescribed** [4] - 1371:19, 1426:14, 1426:15, 1427:2
**presence** [2] - 1311:23, 1334:3
**present** [12] - 1302:1, 1388:1, 1456:1, 1472:4, 1472:7, 1507:25, 1508:3, 1509:20, 1515:2, 1515:7, 1535:23, 1537:8
**presented** [3] - 1352:2, 1371:2, 1484:13
**presently** [1] - 1343:25
**preserve** [3] - 1498:7, 1562:7, 1562:12
**preserved** [1] - 1453:10
**preserving** [1] - 1498:9
**presiding** [1] - 1302:2
**pressure** [14] - 1352:25, 1404:1, 1404:11, 1480:1, 1480:2, 1480:3, 1480:4, 1480:16, 1482:24, 1483:10, 1483:11, 1500:9, 1507:19, 1543:25
**pretrial** [3] - 1331:3, 1453:10, 1460:19
**Pretrial** [1] - 1386:3
**pretty** [2] - 1391:4, 1430:23
**prevent** [1] - 1332:22
**previously** [6] - 1409:20, 1410:13, 1415:7, 1451:3, 1453:11, 1469:20
**price** [1] - 1399:5
**pricing** [3] - 1309:10, 1309:19, 1399:4
**primarily** [1] - 1344:5
**primary** [3] - 1400:11, 1401:14, 1503:2
**principles** [2] - 1364:4, 1364:21
**print** [1] - 1316:15
**printing** [1] - 1447:9
**printout** [1] - 1487:25
**probability** [2] - 1476:13, 1538:25
**probable** [1] - 1558:9
**probe** [1] - 1404:25
**problem** [25] - 1305:25, 1306:8, 1308:25, 1309:21, 1311:22, 1312:19, 1313:1, 1316:5, 1318:21, 1319:1, 1327:24, 1332:14, 1337:3, 1358:3, 1376:9, 1384:24, 1400:19, 1400:20, 1401:3, 1401:7, 1404:12, 1409:24, 1478:7, 1500:1, 1545:9
**problematic** [1] - 1466:1
**problems** [12] - 1336:15, 1339:14, 1351:17, 1352:1, 1355:20, 1384:7, 1384:17, 1403:25, 1462:16, 1467:23, 1479:16, 1489:21
**procedure** [11] - 1324:22, 1400:22, 1406:7, 1406:8, 1406:22, 1435:11, 1443:3, 1444:6, 1482:7, 1533:23,

1534:2
**procedures** [16] - 1326:7, 1337:8, 1346:23, 1400:2, 1405:9, 1405:18, 1405:23, 1405:25, 1406:1, 1406:2, 1407:5, 1407:18, 1439:21, 1454:14, 1484:4, 1531:25
**proceed** [5] - 1388:2, 1408:16, 1412:1, 1448:19, 1456:2
**proceeding** [1] - 1368:19
**Proceedings** [1] - 1301:18
**process** [7] - 1403:23, 1437:21, 1437:23, 1443:1, 1443:12, 1443:22, 1444:6
**produce** [2] - 1405:1, 1454:21
**produced** [7] - 1301:19, 1312:12, 1312:17, 1321:21, 1400:17, 1453:4, 1455:2
**professional** [13] - 1327:10, 1327:15, 1328:3, 1328:6, 1329:14, 1343:24, 1412:11, 1413:18, 1413:19, 1435:7, 1435:11, 1437:11, 1439:4
**professionals** [1] - 1560:15
**proffer** [5] - 1304:12, 1304:15, 1304:17, 1309:4, 1549:16
**prognostication** [1] - 1513:3
**program** [1] - 1329:24
**progression** [1] - 1557:15
**proof** [11] - 1305:21, 1306:9, 1306:12, 1307:4, 1307:6, 1307:7, 1307:9, 1308:25, 1317:16, 1317:18, 1456:25
**proper** [2] - 1337:3, 1444:7
**properly** [3] - 1444:8, 1476:22, 1483:11
**proportional** [1] - 1498:24
**proposed** [1] - 1369:10
**protrusion** [7] - 1467:24, 1475:21, 1476:3, 1491:20, 1493:4, 1493:14, 1496:15
**Provder** [2] - 1478:16, 1478:24
**Provder's** [1] - 1482:15
**Provenzale** [5] - 1465:10, 1493:24, 1502:6, 1502:13, 1502:16, 1503:16, 1504:9, 1505:1
**provide** [8] - 1316:2, 1345:11, 1389:10, 1435:13, 1458:24, 1483:12, 1545:21, 1546:18
**provided** [34] - 1310:16, 1311:25, 1312:9, 1313:20, 1317:22, 1320:25, 1330:7, 1356:15, 1372:21, 1373:1, 1377:2, 1378:4, 1383:6, 1383:13, 1402:6, 1407:1, 1421:12, 1421:14, 1450:12, 1452:6, 1453:12, 1453:24, 1456:6, 1459:7, 1476:14, 1477:7, 1482:24, 1518:4, 1520:12, 1530:3, 1532:24, 1542:14, 1545:1, 1546:3
**provider** [11] - 1314:5, 1368:10, 1369:12, 1369:16, 1369:18, 1384:5, 1384:8, 1386:12, 1453:23, 1501:20, 1553:15
**providers** [15] - 1350:22, 1351:21,

1364:17, 1364:19, 1369:19, 1380:20,
1384:18, 1399:25, 1516:17, 1522:7,
1527:2, 1533:22, 1539:20, 1550:25
**proving** [1] - 1333:21
**proximity** [2] - 1463:4, 1557:11
**psychiatric** [1] - 1308:13
**psychiatrist** [2] - 1355:21, 1355:23
**psychiatrists** [1] - 1338:20
**psychological** [5] - 1420:18, 1457:15,
1457:18, 1457:24, 1562:8
**PT** [1] - 1365:14
**public** [1] - 1481:10
**publication** [1] - 1460:16
**publications** [2] - 1344:2, 1344:5
**publish** [6] - 1374:14, 1460:7, 1460:8,
1481:15, 1506:13, 1534:15
**published** [3] - 1344:1, 1461:12,
1506:14
**publishing** [1] - 1506:3
**pull** [3] - 1506:15, 1511:4, 1538:3
**pulling** [2] - 1506:22, 1524:2
**pupils** [1] - 1513:15
**pure** [1] - 1470:14
**purpose** [5] - 1305:17, 1369:18,
1397:19, 1400:11, 1479:19
**purposes** [4] - 1369:16, 1394:19,
1418:7, 1449:8
**push** [3] - 1357:16, 1506:1, 1554:6
**pushed** [1] - 1462:23
**pushing** [2] - 1492:5, 1492:7
**put** [23] - 1328:17, 1329:24, 1330:10,
1330:25, 1333:22, 1337:8, 1371:25,
1384:11, 1384:14, 1402:8, 1402:13,
1402:18, 1404:22, 1404:23, 1429:12,
1431:20, 1451:5, 1459:12, 1474:22,
1486:17, 1507:12, 1527:14, 1551:20
**putting** [11] - 1312:18, 1328:24,
1330:11, 1352:25, 1402:21, 1403:3,
1404:1, 1407:10, 1437:23, 1443:13,
1547:5

## Q

**quadricep** [2] - 1514:22, 1515:17
**quadricept** [2] - 1522:17, 1527:7
**quadricepts** [1] - 1363:1
**qualifications** [2] - 1393:1, 1478:19
**qualified** [1] - 1306:13
**quantification** [1] - 1497:20
**questions** [16] - 1329:15, 1388:7,
1394:20, 1406:2, 1476:8, 1485:21,
1486:6, 1493:23, 1502:8, 1514:15,
1537:14, 1537:20, 1551:20, 1552:21,
1556:2, 1558:22
**quick** [6] - 1345:20, 1428:5, 1468:4,
1545:6, 1545:11, 1556:2
**quickly** [4] - 1375:16, 1387:18,
1404:14, 1558:23
**quite** [1] - 1315:2

## R

**RA** [1] - 1513:5
**Rabin** [2] - 1493:24, 1503:16
**radiating** [6] - 1352:12, 1362:21,
1514:21, 1515:14, 1519:10, 1522:10
**radiation** [1] - 1527:5
**radiculopathy** [8] - 1351:12, 1351:18,
1352:2, 1355:20, 1426:5, 1426:9,
1477:15, 1497:9
**radio** [4] - 1341:18, 1404:22, 1404:25,
1405:1
**radiographic** [1] - 1474:17
**radiological** [1] - 1336:20
**radiologist** [5] - 1465:10, 1466:10,
1475:16, 1502:18, 1505:7
**radiologists** [1] - 1346:8
**radiology** [3] - 1336:19, 1346:6,
1458:23
**Radiology** [5] - 1346:9, 1347:21,
1397:13, 1399:1, 1421:24
**raise** [10] - 1335:3, 1352:20, 1352:23,
1353:22, 1355:10, 1361:10, 1537:13,
1537:20, 1540:14, 1553:9
**raised** [4] - 1302:5, 1304:1, 1505:12,
1510:21
**raises** [1] - 1355:5
**raising** [2] - 1311:3, 1361:7
**Rambirch** [2] - 1303:14, 1304:6
**Ramirez** [1] - 1303:14
**RAMON** [1] - 1300:12
**Ramon** [1] - 1302:2
**Rampersaud** [1] - 1303:14
**randomly** [1] - 1471:20
**range** [10] - 1362:2, 1373:4, 1373:12,
1383:4, 1393:23, 1441:16, 1524:22,
1525:7, 1525:12, 1526:12
**ranges** [1] - 1389:9
**rate** [7] - 1393:24, 1422:6, 1443:5,
1443:25, 1444:10, 1444:11, 1480:25
**rates** [3] - 1372:21, 1443:15, 1446:21
**rather** [1] - 1368:9
**ray** [19] - 1338:19, 1395:2, 1402:9,
1421:24, 1430:3, 1430:19, 1436:16,
1436:25, 1444:6, 1446:13, 1451:4,
1451:14, 1451:15, 1474:4, 1474:17,
1477:19, 1485:5, 1555:22
**RAYMOND** [1] - 1300:18
**rays** [10] - 1345:10, 1392:14, 1398:9,
1422:4, 1422:6, 1435:18, 1444:4,
1446:20, 1446:22, 1477:19
**Razudian** [1] - 1452:6
**re** [3] - 1445:6, 1445:7, 1459:5
**re-establish** [1] - 1459:5
**re-exploration** [2] - 1445:6, 1445:7
**reaction** [1] - 1368:14
**read** [21] - 1398:10, 1432:25, 1433:5,
1433:6, 1435:24, 1475:17, 1484:7,
1484:15, 1484:16, 1493:24, 1504:21,

1504:23, 1518:15, 1535:23, 1536:1,
1536:2, 1536:7, 1536:11, 1537:3,
1542:3, 1542:7
**reading** [3] - 1517:6, 1543:19, 1547:15
**readmitted** [1] - 1434:15
**ready** [7] - 1324:12, 1334:20, 1334:21,
1370:5, 1371:1, 1387:20, 1481:16
**real** [5] - 1375:16, 1428:5, 1553:20,
1555:17, 1557:5
**realize** [1] - 1533:13
**really** [19] - 1302:14, 1311:23,
1326:25, 1351:3, 1353:22, 1381:21,
1409:12, 1412:15, 1429:23, 1430:15,
1458:21, 1466:9, 1498:15, 1498:22,
1540:6, 1540:10, 1544:23, 1553:16,
1560:18
**reason** [18] - 1308:9, 1308:11,
1330:12, 1368:15, 1373:8, 1397:25,
1403:15, 1404:6, 1410:12, 1428:25,
1482:22, 1530:13, 1534:2, 1539:15,
1556:6, 1557:3, 1557:8
**reasonability** [1] - 1308:6
**reasonable** [126] - 1305:17, 1306:10,
1306:14, 1306:19, 1308:16, 1308:22,
1309:5, 1309:7, 1311:2, 1311:6,
1311:18, 1311:19, 1312:7, 1312:25,
1318:20, 1330:5, 1331:1, 1349:4,
1349:9, 1350:11, 1364:12, 1364:14,
1365:6, 1365:8, 1367:8, 1367:13,
1371:11, 1371:23, 1371:24, 1372:8,
1372:12, 1372:21, 1373:5, 1373:18,
1373:22, 1375:8, 1376:2, 1377:3,
1380:25, 1381:4, 1382:8, 1382:10,
1383:14, 1383:16, 1389:6, 1389:14,
1393:9, 1393:11, 1393:22, 1393:23,
1393:24, 1394:20, 1399:11, 1407:23,
1407:25, 1413:9, 1413:17, 1416:11,
1416:13, 1417:2, 1417:4, 1417:22,
1418:8, 1418:13, 1419:5, 1420:3,
1421:3, 1421:15, 1421:17, 1421:18,
1422:3, 1422:6, 1434:1, 1434:3,
1435:20, 1436:13, 1436:18, 1441:14,
1442:13, 1443:4, 1443:5, 1443:9,
1443:15, 1443:17, 1443:25, 1444:1,
1444:10, 1444:14, 1444:15, 1445:12,
1445:13, 1446:4, 1446:7, 1446:9,
1446:11, 1446:14, 1446:19, 1446:22,
1446:23, 1447:3, 1447:6, 1447:12,
1450:14, 1455:1, 1456:19, 1456:21,
1457:8, 1457:10, 1457:22, 1458:2,
1458:9, 1458:12, 1476:12, 1477:4,
1480:21, 1481:5, 1483:20, 1485:17,
1493:13, 1495:5, 1495:10, 1497:1,
1497:5, 1534:9, 1538:24
**reasonableness** [8] - 1306:22,
1345:11, 1345:12, 1345:13, 1349:12,
1373:13, 1400:4, 1533:24
**reasonably** [4] - 1445:18, 1447:18,
1448:13, 1478:20
**reasons** [5] - 1415:17, 1426:23,

1427:9, 1484:13, 1493:17
**reboot** [1] - 1468:5
**rebuttal** [3] - 1458:24, 1465:3, 1467:19
**rec** [1] - 1447:5
**receive** [10] - 1306:18, 1374:17, 1375:20, 1381:17, 1382:16, 1398:19, 1409:15, 1412:2, 1434:15, 1448:5
**Received** [1] - 1389:22
**received** [97] - 1303:12, 1304:4, 1333:2, 1343:15, 1343:18, 1343:22, 1344:11, 1345:7, 1350:7, 1371:10, 1371:11, 1374:19, 1375:21, 1376:3, 1376:10, 1376:11, 1377:19, 1377:20, 1380:3, 1381:18, 1382:17, 1383:1, 1383:15, 1388:4, 1388:21, 1389:24, 1390:15, 1394:6, 1394:7, 1395:17, 1395:20, 1397:4, 1397:5, 1398:20, 1399:16, 1399:17, 1407:24, 1412:4, 1412:22, 1412:24, 1415:14, 1415:15, 1416:12, 1417:12, 1417:14, 1418:3, 1418:5, 1418:22, 1418:23, 1419:12, 1419:13, 1419:22, 1419:23, 1422:14, 1422:15, 1423:10, 1423:11, 1423:19, 1423:20, 1424:15, 1424:16, 1424:23, 1424:24, 1434:1, 1434:17, 1445:18, 1448:7, 1449:25, 1450:1, 1450:24, 1450:25, 1452:1, 1452:2, 1453:22, 1456:22, 1456:25, 1457:2, 1457:8, 1457:9, 1457:19, 1457:21, 1457:23, 1461:5, 1461:7, 1469:10, 1510:24, 1516:6, 1516:7, 1522:25, 1523:1, 1525:24, 1528:13, 1528:14, 1534:22, 1534:23
**recent** [5] - 1463:17, 1469:14, 1531:6, 1542:5
**recently** [1] - 1531:5
**receptionist** [2] - 1305:7, 1309:16
**recess** [5] - 1359:24, 1360:18, 1361:16, 1361:23, 1414:10
**Recess** [1] - 1468:7
**recognize** [2] - 1332:5, 1447:4
**recognized** [1] - 1372:18
**recollection** [3] - 1347:24, 1370:11, 1504:18
**recommend** [1] - 1405:20
**recommended** [2] - 1392:20, 1392:21
**reconstruct** [3] - 1337:9, 1429:6, 1431:4
**reconstructed** [1] - 1444:9
**reconstructive** [2] - 1337:5, 1337:8
**Record** [2] - 1484:16, 1504:23
**record** [43] - 1302:9, 1312:5, 1312:13, 1320:24, 1321:3, 1371:4, 1378:14, 1382:4, 1383:18, 1387:14, 1391:23, 1393:16, 1394:12, 1398:21, 1398:25, 1412:8, 1414:8, 1414:9, 1416:23, 1429:10, 1432:18, 1433:6, 1457:5, 1461:13, 1506:20, 1506:25, 1509:7, 1510:5, 1510:6, 1510:19, 1510:20, 1510:21, 1511:16, 1511:17, 1511:20,

1514:5, 1516:14, 1526:10, 1532:22, 1538:17, 1543:23, 1550:10
**recorded** [1] - 1301:18
**recording** [1] - 1351:16
**Records** [1] - 1347:17
**records** [205] - 1305:11, 1315:15, 1317:21, 1319:2, 1319:7, 1321:1, 1324:20, 1326:9, 1328:2, 1328:14, 1340:10, 1345:6, 1345:8, 1345:11, 1345:15, 1345:21, 1345:23, 1345:25, 1346:3, 1346:5, 1346:11, 1346:13, 1346:15, 1346:22, 1346:25, 1347:4, 1347:7, 1347:10, 1347:11, 1347:13, 1347:14, 1347:17, 1347:20, 1348:1, 1348:3, 1348:5, 1348:8, 1348:11, 1348:14, 1348:16, 1348:20, 1349:18, 1349:20, 1349:23, 1350:1, 1351:7, 1351:9, 1351:10, 1355:18, 1356:15, 1358:23, 1361:19, 1362:19, 1363:9, 1363:10, 1364:8, 1364:12, 1365:3, 1365:5, 1365:13, 1370:12, 1374:25, 1375:1, 1375:6, 1375:14, 1375:23, 1378:4, 1378:7, 1380:12, 1380:18, 1380:24, 1381:6, 1382:20, 1382:21, 1382:22, 1382:23, 1383:7, 1384:5, 1384:7, 1384:11, 1384:16, 1384:21, 1385:5, 1385:8, 1386:14, 1388:9, 1390:3, 1390:5, 1390:6, 1396:14, 1399:21, 1399:23, 1400:5, 1402:7, 1409:3, 1409:5, 1409:8, 1409:18, 1409:21, 1416:2, 1416:7, 1417:15, 1417:16, 1418:25, 1419:3, 1421:3, 1422:18, 1422:3, 1435:1, 1447:6, 1447:8, 1447:9, 1448:1, 1448:25, 1449:2, 1449:4, 1449:15, 1449:19, 1453:15, 1453:19, 1453:20, 1459:10, 1469:9, 1470:16, 1476:9, 1476:13, 1477:7, 1477:9, 1477:16, 1477:25, 1484:7, 1486:13, 1487:19, 1487:23, 1488:2, 1488:4, 1488:8, 1497:6, 1501:5, 1501:23, 1501:25, 1502:2, 1505:21, 1505:22, 1506:5, 1509:13, 1509:21, 1510:2, 1510:14, 1510:15, 1515:20, 1516:11, 1516:19, 1516:20, 1518:5, 1518:7, 1523:2, 1523:5, 1523:18, 1526:7, 1528:10, 1528:17, 1528:21, 1529:21, 1530:1, 1530:14, 1530:17, 1531:20, 1531:21, 1533:3, 1533:15, 1533:20, 1535:16, 1536:12, 1537:5, 1538:4, 1538:5, 1538:8, 1538:19, 1539:14, 1540:1, 1540:20, 1542:24, 1544:13, 1551:23, 1552:5, 1552:9, 1552:11, 1553:13, 1553:16, 1553:17, 1553:18, 1556:12, 1560:11
**recover** [1] - 1321:11
**recreate** [1] - 1474:22
**recreates** [1] - 1336:14
**recreation** [2] - 1447:6, 1447:8
**RECROSS** [2] - 1559:1, 1564:8
**RECROSS-EXAMINATION** [2] -

1559:1, 1564:8
**recs** [1] - 1446:24
**red** [1] - 1352:12
**redaction** [13] - 1374:9, 1374:13, 1374:18, 1376:8, 1376:10, 1380:6, 1383:20, 1408:1, 1418:18, 1422:10, 1423:16, 1447:25, 1450:19
**redactions** [2] - 1388:3, 1412:19
**REDIRECT** [2] - 1549:20, 1564:7
**redo** [2] - 1445:14, 1546:6
**reduced** [1] - 1534:6
**reduces** [1] - 1333:9
**reduction** [4] - 1331:5, 1331:7, 1368:22, 1471:11
**reductions** [1] - 1334:2
**refer** [7] - 1305:10, 1341:11, 1341:23, 1342:1, 1345:19, 1407:5, 1425:16
**referenced** [1] - 1304:8
**referral** [3] - 1306:17, 1392:23, 1426:6
**referred** [10] - 1327:10, 1339:20, 1352:6, 1354:22, 1360:22, 1382:23, 1426:16, 1461:3, 1488:11, 1529:11
**referring** [9] - 1323:10, 1359:4, 1394:14, 1481:7, 1489:4, 1491:3, 1523:2, 1547:16, 1549:24
**refers** [3] - 1351:22, 1359:23, 1360:5
**reflect** [1] - 1448:1
**reflected** [7] - 1313:12, 1315:18, 1320:23, 1320:24, 1320:25, 1322:10, 1416:10
**reflecting** [2] - 1416:2, 1418:13
**reflects** [2] - 1315:16, 1433:21
**refreshes** [1] - 1504:18
**regarding** [21] - 1313:11, 1320:11, 1330:4, 1335:21, 1350:17, 1390:13, 1393:17, 1450:9, 1456:9, 1458:12, 1458:13, 1459:1, 1459:4, 1459:11, 1477:16, 1504:6, 1525:11, 1546:20, 1547:11, 1551:20, 1562:20
**region** [5] - 1329:25, 1398:1, 1466:4, 1466:21, 1491:5
**regression** [1] - 1471:4
**regular** [1] - 1471:18
**regularly** [1] - 1543:22
**Rehab** [1] - 1528:15
**Rehabilitation** [1] - 1390:4
**related** [26] - 1365:9, 1367:23, 1375:7, 1375:24, 1380:25, 1381:4, 1393:11, 1413:17, 1418:14, 1434:4, 1435:10, 1437:12, 1445:18, 1445:21, 1445:23, 1447:18, 1448:12, 1448:13, 1457:11, 1458:2, 1477:1, 1477:17, 1490:3, 1555:8
**relates** [2] - 1498:23, 1537:19
**relating** [3] - 1514:15, 1545:13, 1561:2
**relationship** [1] - 1336:25
**relative** [4] - 1337:1, 1467:11, 1468:23, 1471:21
**relatively** [1] - 1470:13
**relaxants** [2] - 1426:16, 1481:21

Bauta v. Greyhound Lines, et al _____ 34

**relevant** [5] - 1304:14, 1304:20, 1304:25, 1305:12, 1469:8
**relied** [6] - 1345:15, 1510:7, 1531:21, 1533:5, 1537:1, 1552:16
**relief** [2] - 1404:21, 1426:19
**relies** [1] - 1524:10
**relieve** [1] - 1483:10
**rely** [3] - 1372:19, 1500:18, 1537:14
**relying** [3] - 1530:16, 1535:16, 1537:21
**remainder** [1] - 1467:22
**remaining** [3] - 1304:11, 1321:7, 1476:7
**remember** [12] - 1327:17, 1345:2, 1347:15, 1348:15, 1402:23, 1403:21, 1406:10, 1503:19, 1521:21, 1538:11, 1538:19, 1545:23
**remembering** [1] - 1538:22
**removal** [4] - 1441:2, 1443:15, 1445:17, 1446:5
**removed** [2] - 1474:8, 1555:9
**removing** [1] - 1443:1
**render** [4] - 1335:20, 1387:19, 1487:20, 1488:5
**rendered** [6] - 1373:19, 1383:4, 1390:13, 1416:18, 1418:14, 1457:25
**rendering** [1] - 1509:12
**renders** [1] - 1334:10
**repair** [4] - 1444:12, 1444:13, 1446:8, 1446:10
**repeat** [1] - 1519:5
**rephrase** [1] - 1457:16
**replaced** [2] - 1378:21, 1378:23
**replacement** [1] - 1547:4
**report** [41] - 1348:10, 1348:12, 1349:6, 1349:13, 1351:19, 1380:23, 1391:12, 1391:14, 1392:16, 1394:13, 1397:13, 1426:22, 1467:19, 1475:17, 1478:19, 1478:24, 1482:15, 1488:8, 1488:9, 1509:4, 1509:7, 1517:23, 1520:9, 1524:2, 1527:17, 1533:4, 1533:5, 1533:10, 1533:14, 1533:20, 1534:15, 1535:20, 1538:1, 1546:19, 1551:4, 1551:10, 1551:16, 1551:21, 1552:6, 1552:19, 1552:22
**reported** [2] - 1508:19, 1515:15
**Reporter** [1] - 1301:17
**reporter** [2] - 1312:10, 1312:11, 1335:6
**reporting** [2] - 1526:24, 1530:8
**reports** [18] - 1345:11, 1345:21, 1346:6, 1380:18, 1390:12, 1409:6, 1421:3, 1421:16, 1465:13, 1493:25, 1520:5, 1521:6, 1530:21, 1532:23, 1537:6, 1546:3, 1548:25, 1551:25
**reposition** [1] - 1354:13
**represent** [3] - 1321:13, 1380:10, 1441:17
**represented** [2] - 1320:22, 1529:8
**represents** [4] - 1303:13, 1305:4,

1432:22, 1486:5
**reps** [2] - 1428:13, 1431:12
**request** [3] - 1302:6, 1302:7, 1304:15
**requested** [4] - 1396:16, 1451:3, 1453:21, 1504:23
**requesting** [1] - 1397:14
**requests** [1] - 1450:21
**require** [3] - 1478:13, 1480:25, 1481:5
**required** [2] - 1311:7, 1488:15
**requirement** [1] - 1306:8
**requiring** [1] - 1481:3
**reserve** [1] - 1456:24
**residency** [3] - 1337:11, 1341:16, 1343:20
**resident** [2] - 1343:21
**residents** [2] - 1341:19, 1430:7
**resides** [2] - 1358:9, 1519:8
**resolved** [3] - 1303:11, 1303:12, 1304:1
**resorb** [1] - 1504:8
**resorption** [4] - 1471:6, 1471:7, 1503:6, 1503:8
**respect** [16] - 1341:14, 1346:16, 1363:14, 1391:25, 1392:7, 1407:21, 1436:4, 1448:25, 1457:5, 1458:4, 1503:15, 1505:23, 1510:14, 1514:16, 1549:24, 1553:16
**respectfully** [1] - 1333:25
**respirations** [1] - 1513:17
**response** [9] - 1349:6, 1392:9, 1498:7, 1498:12, 1500:2, 1557:7, 1557:12, 1562:20
**responsibilities** [1] - 1543:9
**responsibility** [5] - 1326:11, 1326:13, 1329:3, 1333:24, 1334:14
**responsible** [6] - 1333:20, 1333:21, 1357:10, 1357:11, 1357:14, 1427:7
**rest** [3] - 1312:6, 1324:19, 1413:15
**result** [4] - 1365:7, 1457:8, 1469:6, 1539:4
**retained** [4] - 1344:25, 1463:7, 1527:24, 1528:1
**retention** [1] - 1345:4
**reveal** [1] - 1394:24
**reveals** [1] - 1462:18
**reverse** [2] - 1302:7, 1361:6
**review** [28] - 1317:21, 1345:6, 1345:9, 1345:10, 1346:12, 1346:22, 1348:7, 1348:19, 1365:2, 1370:13, 1375:6, 1388:9, 1389:11, 1408:3, 1420:18, 1449:2, 1460:2, 1481:19, 1482:2, 1487:19, 1488:4, 1510:2, 1529:20, 1533:20, 1537:5, 1540:1, 1543:20
**reviewed** [45] - 1302:4, 1311:1, 1311:5, 1311:18, 1312:6, 1312:7, 1312:24, 1318:12, 1344:2, 1345:15, 1345:23, 1345:25, 1346:3, 1346:4, 1346:5, 1346:13, 1348:2, 1348:10, 1348:24, 1349:23, 1356:16, 1365:2, 1365:14, 1370:12, 1371:4,

1380:24, 1382:7, 1385:5, 1389:3, 1390:10, 1391:9, 1421:25, 1433:4, 1435:1, 1465:13, 1477:9, 1478:16, 1510:6, 1511:20, 1526:7, 1530:20, 1533:10, 1535:2
**reviewing** [4] - 1340:10, 1347:7, 1347:10, 1347:20, 1396:14, 1416:21, 1488:7, 1530:1, 1531:17
**reviews** [2] - 1509:12, 1532:23
**revision** [1] - 1432:1
**REYES** [1] - 1300:12
**Reyes** [1] - 1302:2
**rhizotomies** [3] - 1404:14, 1405:10, 1406:4
**rhizotomy** [6] - 1404:15, 1405:8, 1405:20, 1480:18, 1482:4, 1482:8
**riddled** [2] - 1467:20, 1468:1
**right-hand** [3] - 1359:21, 1461:21, 1475:16
**right-sided** [2] - 1363:11, 1474:10
**rightly** [1] - 1352:13
**rigid** [1] - 1430:25
**riser** [1] - 1480:5
**rises** [1] - 1480:4
**risk** [1] - 1407:12
**Rivers** [1] - 1406:12
**RL** [1] - 1513:5
**rod** [3] - 1428:11, 1429:4, 1432:6
**rods** [6] - 1337:9, 1427:17, 1432:6, 1474:20, 1479:7, 1479:10
**role** [1] - 1458:21
**rollovers** [1] - 1555:24
**ROM** [2] - 1312:9, 1524:22
**roof** [3] - 1308:13, 1338:10, 1338:23
**Room** [3] - 1513:3, 1518:18, 1519:2
**room** [41] - 1325:8, 1342:19, 1343:2, 1343:3, 1348:8, 1348:16, 1348:20, 1349:7, 1350:16, 1352:15, 1365:4, 1370:12, 1371:10, 1371:21, 1373:2, 1373:24, 1374:2, 1375:7, 1375:13, 1376:18, 1377:12, 1378:14, 1379:3, 1429:25, 1466:9, 1484:1, 1484:2, 1484:3, 1484:18, 1485:1, 1485:2, 1507:6, 1520:12, 1521:8, 1546:23, 1553:1, 1553:2, 1553:3, 1555:19, 1557:19
**rooms** [9] - 1343:5, 1343:7, 1343:8, 1343:11, 1373:20, 1483:24, 1483:25, 1484:5, 1485:11
**root** [10] - 1353:15, 1357:13, 1357:14, 1358:9, 1360:21, 1360:22, 1360:24, 1361:12, 1361:14, 1407:14
**roots** [4] - 1353:9, 1359:8, 1363:15, 1427:8
**Rosenberg** [5] - 1415:25, 1416:3, 1416:19, 1416:20, 1420:22
**Rosenberg's** [1] - 1347:14
**roughly** [1] - 1383:7
**routinely** [3] - 1427:21, 1485:12, 1555:23

**RPI** [1] - 1335:25
**Rule** [2] - 1385:25, 1453:11
**ruled** [4] - 1332:17, 1333:6, 1333:7, 1415:13
**rules** [1] - 1498:25
**ruling** [1] - 1302:20
**run** [2] - 1310:2, 1401:1
**runs** [4] - 1353:12, 1358:6, 1358:15
**rupture** [5] - 1492:5, 1492:6, 1519:10, 1520:3, 1550:7
**ruptured** [2] - 1467:1, 1495:10
**Russo** [4] - 1350:24, 1359:4, 1364:9, 1422:18
**Russo's** [1] - 1528:21
**Rye** [1] - 1301:13

## S

**S-1** [1] - 1355:2
**S1** [11] - 1353:9, 1357:15, 1358:5, 1358:6, 1358:8, 1468:23, 1472:22, 1472:23, 1474:11, 1474:19, 1548:9
**Saal** [7] - 1303:21, 1303:24, 1317:19, 1319:9, 1324:14, 1326:17, 1327:16
**SAAL** [49] - 1301:14, 1313:4, 1313:23, 1314:3, 1314:7, 1314:9, 1315:2, 1316:1, 1316:7, 1316:15, 1317:21, 1318:2, 1319:12, 1319:19, 1320:2, 1320:5, 1320:20, 1321:12, 1321:17, 1321:20, 1321:25, 1322:3, 1322:6, 1322:9, 1323:10, 1323:20, 1324:7, 1324:16, 1325:10, 1325:13, 1325:16, 1325:25, 1326:2, 1326:4, 1328:5, 1328:13, 1328:24, 1329:7, 1329:17, 1329:23, 1333:12, 1334:4, 1334:11, 1334:13, 1385:18, 1386:5, 1453:7, 1453:19, 1453:25
**SABRINA** [1] - 1300:8
**Sabrina** [2] - 1301:4, 1301:10
**sack** [1] - 1464:12
**sacrum** [5] - 1355:1, 1443:13, 1462:13, 1462:14
**safely** [1] - 1443:1
**sagittal** [9] - 1463:19, 1463:20, 1470:23, 1472:25, 1474:13, 1475:2, 1503:12, 1505:7, 1505:10
**sample** [1] - 1428:11
**satisfied** [2] - 1324:23, 1330:8
**save** [2] - 1383:11, 1498:6
**saw** [20] - 1309:24, 1358:25, 1407:17, 1420:24, 1425:3, 1453:9, 1453:23, 1471:2, 1473:2, 1473:3, 1507:3, 1514:23, 1530:20, 1533:16, 1536:12, 1537:25, 1549:25, 1552:1, 1552:9
**Scale** [3] - 1511:8, 1511:10, 1513:2
**scale** [2] - 1512:14, 1512:19
**scalp** [1] - 1350:21
**scan** [8] - 1373:7, 1373:11, 1395:5, 1431:11, 1472:10, 1472:17, 1521:7, 1544:12

**scans** [5] - 1338:19, 1345:10, 1371:18, 1373:3, 1395:4
**scar** [1] - 1443:1
**scars** [1] - 1442:25
**scene** [14] - 1494:18, 1498:5, 1498:9, 1506:18, 1512:19, 1515:2, 1515:7, 1519:6, 1520:7, 1553:6, 1553:12, 1553:14, 1561:8, 1562:6
**scheduling** [1] - 1334:19
**scheme** [1] - 1471:17
**school** [5] - 1335:24, 1336:2, 1337:13, 1343:18, 1354:16
**sciatic** [1] - 1353:11
**sciatica** [6] - 1351:12, 1352:13, 1352:15, 1362:5, 1362:6, 1497:9
**science** [1] - 1558:17
**scoliosis** [1] - 1431:5
**scope** [13] - 1307:2, 1310:19, 1345:4, 1345:6, 1432:24, 1478:19, 1479:1, 1521:11, 1539:21, 1541:1, 1553:22, 1561:21, 1562:2
**score** [1] - 1511:10
**screen** [5] - 1370:6, 1370:7, 1372:1, 1461:23, 1506:2
**screens** [5] - 1367:4, 1370:2, 1370:10, 1481:9, 1528:19
**screw** [22] - 1427:15, 1428:11, 1428:21, 1428:24, 1429:5, 1429:9, 1429:16, 1429:22, 1430:1, 1430:10, 1430:19, 1431:9, 1431:16, 1432:2, 1432:7, 1440:7, 1445:17, 1473:1, 1473:7, 1479:16
**screws** [28] - 1337:8, 1427:16, 1427:18, 1427:22, 1427:24, 1428:16, 1429:3, 1429:7, 1429:11, 1429:12, 1429:15, 1430:17, 1431:13, 1431:19, 1432:3, 1432:5, 1432:7, 1432:11, 1444:7, 1473:5, 1474:11, 1474:19, 1474:20, 1479:7, 1479:11, 1479:16
**seated** [2] - 1334:24, 1335:5
**Sebastian** [2] - 1536:3, 1536:9
**secluded** [1] - 1464:10
**second** [23] - 1303:9, 1320:11, 1321:9, 1329:18, 1356:12, 1365:15, 1381:16, 1383:8, 1385:22, 1386:19, 1408:19, 1434:10, 1439:10, 1445:11, 1445:16, 1457:4, 1468:2, 1504:19, 1511:23, 1534:3, 1538:4, 1543:1, 1543:2
**sections** [1] - 1434:6
**sedating** [1] - 1406:18
**sedation** [3] - 1405:23, 1405:24, 1406:6
**see** [120] - 1308:3, 1309:17, 1316:17, 1320:14, 1322:14, 1323:1, 1323:5, 1324:9, 1325:6, 1325:18, 1325:19, 1337:1, 1340:18, 1340:19, 1343:2, 1345:20, 1350:24, 1351:6, 1351:14, 1351:24, 1358:22, 1362:19, 1363:8, 1364:22, 1370:14, 1372:1, 1373:10, 1373:12, 1374:10, 1375:17, 1377:13,

1378:8, 1378:16, 1380:20, 1382:7, 1386:19, 1386:22, 1387:4, 1387:20, 1400:22, 1407:4, 1409:10, 1413:9, 1416:23, 1425:6, 1427:4, 1428:3, 1428:14, 1429:23, 1441:16, 1451:7, 1453:15, 1453:16, 1459:5, 1459:6, 1462:4, 1462:7, 1462:11, 1462:20, 1463:3, 1463:6, 1463:8, 1463:14, 1464:3, 1464:9, 1464:19, 1465:20, 1466:2, 1466:6, 1466:9, 1466:10, 1468:17, 1470:9, 1470:10, 1471:1, 1471:17, 1471:24, 1472:20, 1472:25, 1474:18, 1475:9, 1475:19, 1475:25, 1476:25, 1486:10, 1486:12, 1487:5, 1488:17, 1488:18, 1489:19, 1490:4, 1496:24, 1504:17, 1506:20, 1507:11, 1508:5, 1511:11, 1513:22, 1514:7, 1514:10, 1524:2, 1524:15, 1525:9, 1526:5, 1528:24, 1529:9, 1531:1, 1534:25, 1535:14, 1537:6, 1538:5, 1544:8, 1544:19, 1544:24, 1550:17, 1553:13, 1557:16, 1563:3
**See** - 1316:5
**seeing** [3] - 1341:25, 1475:3, 1521:6
**seek** [1] - 1421:6
**seem** [2] - 1304:14, 1466:15
**sees** [4] - 1312:24, 1350:22, 1350:25, 1527:12
**segment** [20] - 1439:25, 1440:14, 1442:3, 1443:7, 1443:8, 1480:8, 1480:11, 1480:22, 1480:23, 1481:2, 1545:14, 1546:6, 1546:12, 1546:25, 1547:2, 1547:3, 1547:7, 1548:16, 1549:13, 1559:23
**Segment** [1] - 1547:17
**segments** [2] - 1546:21, 1547:11
**selected** [1] - 1343:20
**Selenia** [1] - 1554:14
**self** [1] - 1391:4
**self-explanatory** [1] - 1391:4
**senior** [1] - 1343:20
**sensation** [4] - 1353:17, 1359:2, 1361:2, 1557:13
**sense** [7] - 1307:11, 1308:6, 1342:24, 1402:5, 1472:7, 1531:25, 1553:4
**sensory** [2] - 1360:25, 1513:10
**sent** [10] - 1305:4, 1305:6, 1308:8, 1308:9, 1308:11, 1308:14, 1345:8, 1385:5
**separate** [11] - 1305:6, 1305:9, 1321:3, 1321:5, 1327:13, 1327:20, 1370:24, 1440:2, 1440:10, 1440:19, 1451:14
**separately** [1] - 1421:2
**September** [1] - 1413:8
**sequelae** [1] - 1445:20
**sequence** [3] - 1462:2, 1462:8, 1463:8
**series** [1] - 1394:19
**serious** [2] - 1499:8, 1499:22
**served** [1] - 1357:6
**service** [42] - 1309:11, 1309:19,

1314:13, 1314:15, 1315:1, 1315:24, 1329:20, 1331:2, 1337:16, 1343:21, 1348:16, 1349:21, 1382:5, 1388:16, 1396:5, 1397:18, 1399:2, 1407:2, 1413:7, 1413:16, 1424:1, 1424:3, 1424:6, 1435:7, 1435:15, 1436:4, 1437:15, 1437:25, 1441:9, 1441:15, 1450:9, 1453:12, 1453:13, 1453:16, 1453:17, 1453:18, 1453:24, 1454:12, 1456:6, 1456:11, 1456:12, 1456:21

**services** [24] - 1306:14, 1328:8, 1343:4, 1371:17, 1371:23, 1373:19, 1377:1, 1393:21, 1420:18, 1421:12, 1421:14, 1424:11, 1435:12, 1436:13, 1436:23, 1437:11, 1439:4, 1440:15, 1450:11, 1451:11, 1456:9, 1456:17, 1478:18, 1486:22

**SESSION** [1] - 1415:1

**sessions** [1] - 1481:25

**set** [19] - 1351:6, 1371:18, 1382:20, 1399:21, 1399:23, 1410:6, 1415:23, 1415:24, 1418:14, 1422:4, 1429:5, 1433:16, 1434:7, 1479:6, 1482:8, 1486:14, 1500:3, 1525:17, 1557:12

**sets** [3] - 1396:8, 1482:7, 1499:25

**setting** [6] - 1338:11, 1503:21, 1503:22, 1503:24, 1553:1, 1553:2

**seven** [8] - 1324:8, 1406:4, 1500:22, 1501:6, 1501:21, 1516:17, 1517:5, 1519:8

**several** [16] - 1309:12, 1342:12, 1345:9, 1359:18, 1370:25, 1385:24, 1386:20, 1477:9, 1479:12, 1507:19, 1516:21, 1523:3, 1523:6, 1531:8, 1538:6, 1546:2

**severe** [2] - 1476:23, 1555:25

**severely** [1] - 1305:15

**shape** [3] - 1466:24, 1468:19, 1468:20

**shaped** [2] - 1359:15, 1468:19

**sheet** [5] - 1308:2, 1345:18, 1368:1, 1368:9, 1421:23

**sheets** [1] - 1308:5

**shell** [1] - 1554:5

**shenanigans** [1] - 1304:17

**shin** [6] - 1358:12, 1392:3, 1392:4, 1508:11, 1562:18

**shock** [1] - 1499:11

**shooting** [3] - 1356:13, 1362:9, 1403:10

**shopped** [1] - 1543:16

**shopping** [1] - 1540:25

**Shore** [1] - 1449:1

**short** [4] - 1344:4, 1358:17, 1404:21, 1545:25

**short-term** [1] - 1404:21

**shorten** [1] - 1420:11

**shortly** [5] - 1350:24, 1461:17, 1496:8, 1554:21, 1560:23

**show** [26] - 1311:4, 1316:19, 1316:23, 1317:3, 1323:9, 1325:6, 1325:23,

1354:5, 1354:6, 1355:7, 1355:23, 1367:2, 1367:3, 1426:9, 1433:2, 1466:1, 1473:2, 1475:4, 1481:2, 1491:1, 1491:6, 1516:20, 1521:25, 1526:1, 1550:1, 1559:11

**showed** [5] - 1333:24, 1521:4, 1521:9, 1521:22, 1525:6

**showing** [2] - 1333:16, 1469:20

**shown** [2] - 1334:4, 1496:23

**shows** [20] - 1305:21, 1316:16, 1324:21, 1353:2, 1413:14, 1462:3, 1463:13, 1466:24, 1469:13, 1470:8, 1470:25, 1471:4, 1472:19, 1474:10, 1474:11, 1475:14, 1475:20, 1491:19, 1495:10, 1497:8

**shut** [3] - 1305:8, 1464:21

**side** [32] - 1353:3, 1358:12, 1358:15, 1359:17, 1359:24, 1363:3, 1363:6, 1424:2, 1428:5, 1429:23, 1431:25, 1432:8, 1461:24, 1461:25, 1463:10, 1463:20, 1464:6, 1470:24, 1474:9, 1474:13, 1474:16, 1475:3, 1475:10, 1475:15, 1475:16, 1475:23, 1476:2, 1480:10, 1491:13, 1505:10, 1526:19

**side-view** [1] - 1461:25

**Sidebar** [9] - 1369:24, 1379:6, 1383:24, 1387:22, 1408:20, 1411:3, 1428:7, 1452:13, 1455:9

**sidebar** [14] - 1302:15, 1365:15, 1365:17, 1366:1, 1376:22, 1377:23, 1378:1, 1381:11, 1384:1, 1409:1, 1415:13, 1453:1, 1457:1

**sided** [3] - 1363:11, 1363:12, 1474:10

**sides** [2] - 1443:14, 1464:24

**sign** [3] - 1308:2, 1308:5, 1463:17

**sign-in** [2] - 1308:2, 1308:5

**signal** [15] - 1361:7, 1362:12, 1463:9, 1463:12, 1463:16, 1469:13, 1470:2, 1470:3, 1470:8, 1470:12, 1475:18, 1503:4, 1503:15, 1503:20, 1504:1

**signals** [1] - 1470:1

**signatory** [1] - 1537:5

**signature** [1] - 1535:21

**signed** [1] - 1333:24

**significant** [6] - 1328:25, 1489:16, 1520:13, 1550:6, 1562:5

**signing** [1] - 1308:3

**signs** [3] - 1427:12, 1470:13, 1536:9

**similar** [13] - 1340:11, 1351:16, 1356:9, 1363:15, 1363:19, 1376:7, 1381:20, 1402:20, 1404:23, 1427:22, 1480:18, 1482:4, 1552:25

**similarly** [1] - 1431:16

**simple** [8] - 1314:25, 1316:7, 1316:11, 1318:9, 1324:24, 1327:1, 1360:14, 1385:23

**simply** [4] - 1488:25, 1510:23, 1510:25, 1551:10

**Sinai** [1] - 1373:6

**single** [9] - 1307:18, 1384:5, 1386:11,

1458:11, 1459:3, 1462:11, 1486:11, 1553:10, 1559:3

**sister** [5] - 1554:14, 1560:1, 1560:5, 1560:13, 1560:20

**sisters** [1] - 1560:24

**sit** [4] - 1319:9, 1352:21, 1410:8, 1553:9

**site** [1] - 1338:19

**sits** [2] - 1354:22, 1553:25

**sitting** [4] - 1308:17, 1352:23, 1402:7, 1554:6

**situation** [3] - 1484:22, 1499:11, 1561:25

**situations** [2] - 1488:17, 1490:11

**six** [15] - 1324:8, 1339:1, 1343:14, 1352:17, 1406:2, 1406:5, 1422:5, 1426:2, 1431:25, 1481:1, 1495:9, 1516:17, 1517:5, 1522:6, 1550:24

**size** [11] - 1404:24, 1449:18, 1471:5, 1471:11, 1472:6, 1498:14, 1498:22, 1503:10, 1504:7, 1504:14, 1520:25

**sizes** [1] - 1429:8

**skeletal** [1] - 1485:13

**skeleton** [2] - 1353:2, 1429:11

**skewed** [1] - 1400:21

**skiing** [2] - 1540:7, 1540:8

**skin** [8] - 1356:22, 1356:23, 1356:25, 1357:6, 1357:11, 1357:24, 1361:1

**skip** [1] - 1422:19, 1535:18

**slash** [1] - 1391:5

**sleep** [2] - 1406:19

**slip** [2] - 1489:9, 1538:24

**slippage** [2] - 1467:8, 1469:1

**slipped** [4] - 1467:2, 1467:11, 1538:6, 1539:5

**slipping** [1] - 1468:23

**slips** [1] - 1467:15

**sliver** [1] - 1466:2

**slow** [2] - 1383:18, 1440:22

**small** [7] - 1367:4, 1370:2, 1370:10, 1372:1, 1481:9, 1506:2, 1528:19

**smaller** [5] - 1337:7, 1431:19, 1503:9, 1503:11, 1504:8

**smash** [1] - 1554:7

**SMITH** [1] - 1301:3

**Smith** [1] - 1302:18

**Smith's** [1] - 1302:4

**sneeze** [1] - 1489:12

**snippet** [1] - 1544:10

**societies** [1] - 1343:24

**society** [2] - 1336:4, 1343:19

**soft** [7] - 1350:20, 1352:10, 1364:19, 1391:2, 1499:16, 1499:17, 1499:24

**software** [2] - 1329:23, 1330:5

**someone** [4] - 1314:4, 1329:3, 1333:21, 1404:2

**sometimes** [4] - 1442:24, 1487:4, 1487:5, 1488:18, 1488:25, 1489:3, 1489:19, 1540:9

somewhere [1] - 1522:11
SOPHIE [1] - 1301:17
sophisticated [3] - 1405:1, 1405:6, 1430:3
sore [1] - 1485:1
sorry [30] - 1302:10, 1307:5, 1314:18, 1346:3, 1347:2, 1371:7, 1374:5, 1377:9, 1382:8, 1385:20, 1388:24, 1389:1, 1391:21, 1395:9, 1395:12, 1396:18, 1398:7, 1398:12, 1409:15, 1409:16, 1416:23, 1419:15, 1427:14, 1448:24, 1464:5, 1467:8, 1474:4, 1481:15, 1549:23, 1558:11
sort [1] - 1349:19
Soto [2] - 1348:4, 1407:17
sound [1] - 1431:18
sounds [1] - 1348:12
soup [1] - 1350:1
source [5] - 1321:10, 1331:7, 1333:10, 1369:8, 1394:15
sources [1] - 1443:21
space [6] - 1402:6, 1402:21, 1402:22, 1403:8, 1466:4
span [9] - 1388:10, 1406:24, 1406:25, 1425:15, 1427:16, 1544:13, 1546:4, 1546:17, 1546:18
spans [2] - 1399:22, 1434:21
speaking [5] - 1348:23, 1348:24, 1498:13, 1499:1, 1499:7
special [6] - 1338:7, 1368:1, 1368:8, 1404:22, 1404:25, 1427:16
specialist [3] - 1341:24, 1400:1, 1426:7
specialists [12] - 1337:18, 1338:21, 1345:24, 1346:4, 1351:16, 1417:17, 1479:14, 1480:12, 1480:13, 1481:17, 1488:21, 1551:22
Specialists [10] - 1316:3, 1321:21, 1323:16, 1333:18, 1334:5, 1393:18, 1396:20, 1425:17, 1426:4, 1434:21
Specialists' [2] - 1321:23, 1330:1
specialty [5] - 1502:7, 1502:20, 1502:23, 1502:24, 1503:1
specific [12] - 1348:10, 1352:3, 1358:4, 1394:23, 1439:13, 1451:12, 1481:12, 1505:19, 1520:9, 1520:10, 1539:24, 1540:18
specifically [13] - 1415:20, 1422:11, 1425:24, 1433:20, 1501:8, 1501:22, 1505:6, 1518:10, 1538:10, 1539:23, 1540:6, 1540:12, 1561:23
specifics [2] - 1303:25, 1520:5
spectrum [2] - 1492:1, 1492:7
speed [1] - 1374:20
spelling [1] - 1335:6
spent [4] - 1326:4, 1488:7, 1532:20, 1555:5
spinal [31] - 1337:5, 1339:15, 1359:15, 1361:3, 1361:4, 1361:9, 1363:24, 1363:25, 1364:2, 1402:16, 1403:6,

1403:7, 1404:23, 1407:13, 1429:19, 1429:24, 1459:4, 1462:3, 1462:7, 1462:23, 1464:10, 1475:5, 1475:18, 1475:19, 1476:4, 1479:3, 1479:14, 1480:12, 1492:14, 1493:10
Spine [25] - 1316:3, 1321:1, 1321:20, 1321:23, 1323:16, 1323:23, 1324:16, 1326:9, 1327:9, 1328:14, 1329:2, 1329:13, 1330:1, 1333:18, 1334:5, 1363:10, 1382:23, 1396:19, 1425:7, 1425:9, 1425:17, 1426:4, 1434:20, 1435:16, 1547:17
spine [128] - 1336:24, 1337:6, 1337:9, 1338:24, 1339:13, 1340:17, 1341:18, 1341:21, 1341:22, 1351:15, 1353:1, 1353:3, 1353:9, 1354:15, 1354:17, 1354:18, 1354:19, 1355:2, 1355:7, 1357:7, 1357:25, 1358:2, 1360:1, 1360:8, 1360:10, 1360:20, 1360:23, 1361:16, 1364:3, 1364:16, 1364:17, 1392:20, 1392:23, 1394:15, 1395:2, 1395:3, 1395:4, 1396:12, 1400:17, 1401:9, 1402:7, 1402:13, 1425:6, 1425:20, 1426:6, 1427:17, 1427:18, 1429:1, 1429:7, 1429:8, 1429:14, 1430:4, 1430:25, 1431:1, 1431:2, 1431:5, 1431:24, 1443:13, 1443:14, 1444:8, 1445:7, 1446:13, 1458:1, 1460:13, 1461:15, 1462:1, 1464:8, 1464:20, 1465:4, 1466:21, 1467:6, 1467:7, 1467:8, 1467:20, 1467:23, 1467:25, 1468:13, 1468:24, 1468:25, 1469:23, 1471:25, 1473:8, 1474:12, 1474:18, 1474:20, 1474:24, 1476:25, 1477:19, 1478:25, 1479:18, 1479:19, 1480:3, 1480:12, 1481:7, 1481:17, 1489:20, 1489:25, 1490:19, 1490:20, 1490:23, 1491:2, 1491:5, 1491:16, 1491:23, 1491:25, 1492:14, 1493:1, 1493:2, 1521:8, 1521:22, 1522:5, 1544:13, 1546:25, 1547:5, 1547:6, 1547:7, 1547:25, 1549:23, 1555:22, 1559:7, 1559:22, 1559:25
spines [1] - 1407:11
split [1] - 1303:23
splitting [1] - 1339:12
spondylolisthesis [1] - 1467:3
spondylosis [1] - 1467:21
sponsor [1] - 1514:8
sporadic [1] - 1477:15
spot [2] - 1504:17, 1527:15
sprain [2] - 1391:4, 1476:20
spurring [1] - 1522:1
squiggly [1] - 1467:9
St [3] - 1342:13, 1342:15, 1343:22
stabbing [1] - 1362:9
stabilize [1] - 1430:25
stable [2] - 1427:18, 1553:5
staff [2] - 1342:12, 1483:15
stage [1] - 1479:6

stages [3] - 1500:1, 1500:7, 1500:11
stamp [2] - 1506:9, 1533:5
stamped [3] - 1511:13, 1518:1, 1528:5
stand [1] - 1454:17
standard [2] - 1307:9, 1430:24
standing [2] - 1546:23, 1554:6
standpoint [3] - 1308:6, 1525:16, 1542:6
Stanley [1] - 1420:12
start [7] - 1351:19, 1364:22, 1371:1, 1383:7, 1407:10, 1426:3, 1551:14
started [7] - 1309:3, 1337:14, 1337:20, 1339:6, 1388:14, 1404:18, 1470:16
starting [7] - 1393:18, 1416:3, 1425:17, 1434:21, 1471:8, 1486:7, 1535:19
starts [3] - 1354:18, 1380:12, 1500:6
state [4] - 1306:11, 1416:4, 1434:19, 1545:19
State [1] - 1536:4
statement [1] - 1320:15
statements [3] - 1313:11, 1321:6, 1536:23
states [1] - 1372:16
STATES [2] - 1300:1, 1300:13
States [1] - 1300:5
static [1] - 1504:25
stay [1] - 1349:20
stayed [1] - 1336:4
stays [1] - 1327:21
stem [3] - 1361:4, 1361:9, 1428:24
stenography [1] - 1301:18
stenosis [6] - 1360:13, 1360:14, 1360:16, 1360:17, 1360:19, 1464:23
stenotic [1] - 1475:9
step [5] - 1333:13, 1340:7, 1354:9, 1428:18, 1502:9
steroid [3] - 1392:22, 1404:21, 1417:21
steroids [1] - 1403:9
STEVEN [1] - 1301:14
Steven [1] - 1453:3
stick [2] - 1461:4, 1479:20
stiff [2] - 1428:14, 1431:4
stiffness [2] - 1520:19, 1520:24
still [17] - 1321:7, 1338:3, 1368:17, 1386:5, 1398:3, 1404:11, 1433:14, 1433:15, 1463:14, 1466:2, 1471:1, 1472:4, 1472:7, 1472:8, 1481:10, 1482:23, 1542:23
stinging [1] - 1500:4
stipulate [3] - 1317:15, 1318:22, 1318:24
stipulation [2] - 1311:15, 1317:11
stomach [1] - 1406:11
stop [1] - 1517:16
stopped [1] - 1545:8
story [2] - 1544:15, 1544:18
straight [7] - 1352:19, 1352:20,

1355:5, 1355:10, 1431:6, 1484:22, 1553:9

**straight-leg** [2] - 1352:19, 1355:10
**straight-leg-raise** [1] - 1352:20
**straighten** [1] - 1353:23
**strain** [1] - 1476:20
**street** [1] - 1386:9
**Street** [5] - 1300:17, 1301:5, 1527:21, 1528:16, 1529:3
**strength** [1] - 1482:22
**stress** [3] - 1352:25, 1400:13, 1480:5
**stresses** [1] - 1355:13
**stressing** [2] - 1353:14, 1354:2
**stretch** [2] - 1327:19, 1327:23
**stricken** [5] - 1302:6, 1302:9, 1302:16, 1303:2, 1550:19
**strike** [4] - 1302:16, 1406:14, 1491:20, 1502:11
**stripe** [1] - 1462:6
**strong** [3] - 1428:15, 1431:7, 1557:8
**structure** [4] - 1360:12, 1462:14, 1463:1, 1464:8
**structures** [3] - 1336:24, 1360:22, 1360:23
**stuck** [1] - 1481:10
**students** [2] - 1430:7
**studies** [26] - 1336:20, 1345:10, 1395:1, 1421:18, 1459:9, 1472:19, 1476:14, 1481:20, 1482:2, 1482:11, 1545:13, 1545:22, 1545:23, 1546:2, 1546:17, 1547:12, 1548:13, 1548:20, 1549:11, 1558:13, 1558:14, 1559:8, 1559:10, 1559:15, 1559:17
**study** [13] - 1396:3, 1397:15, 1397:23, 1472:4, 1475:14, 1482:12, 1546:2, 1548:6, 1549:15, 1559:3, 1559:11, 1559:12
**stuff** [1] - 1387:3
**sub** [1] - 1341:16
**subarticular** [1] - 1466:4
**subcutaneous** [2] - 1391:2, 1462:2
**Subject** [1] - 1310:7
**subject** [21] - 1374:17, 1376:10, 1380:6, 1383:20, 1384:16, 1388:3, 1408:1, 1412:19, 1418:17, 1419:8, 1419:17, 1422:9, 1423:16, 1434:7, 1434:9, 1445:21, 1447:25, 1450:19, 1456:25, 1458:2
**subjected** [1] - 1550:6
**subjective** [9] - 1352:6, 1352:8, 1500:16, 1501:17, 1514:1, 1524:5, 1524:12, 1525:10, 1525:20
**submit** [1] - 1306:3
**submitted** [4] - 1306:4, 1321:13, 1369:11, 1449:9
**subpoena** [3] - 1303:18, 1378:5
**subpoenaed** [2] - 1328:2, 1510:19
**subpoenas** [2] - 1328:1, 1453:14
**subsequent** [11] - 1316:4, 1424:5, 1438:4, 1439:9, 1439:11, 1442:15,

1442:16, 1503:14, 1504:15, 1546:20, 1547:11
**subsets** [1] - 1480:23
**substance** [3] - 1477:11, 1477:13, 1552:2
**substantial** [1] - 1519:7
**substantiated** [1] - 1313:18
**substantiates** [1] - 1317:6
**sudden** [3] - 1362:11, 1404:10, 1554:12
**Suite** [4] - 1300:17, 1300:22, 1301:6, 1301:12
**sum** [2] - 1477:10, 1477:13
**summarizes** [1] - 1507:24
**summary** [25] - 1310:15, 1310:22, 1311:9, 1313:5, 1313:7, 1313:14, 1313:19, 1314:22, 1315:2, 1315:17, 1316:20, 1317:17, 1318:6, 1318:7, 1320:18, 1320:22, 1321:14, 1323:1, 1330:21, 1332:7, 1332:9, 1332:13, 1333:14, 1333:15, 1477:10
**summed** [1] - 1425:19
**super** [1] - 1318:12
**superficial** [1] - 1437:22
**superimposed** [1] - 1489:22
**supervising** [1] - 1341:19
**supplemental** [2] - 1467:18, 1557:19
**supplementally** [1] - 1557:21
**supplies** [3] - 1354:1, 1357:2, 1454:2
**supply** [1] - 1325:8
**support** [2] - 1327:24, 1554:17
**supportive** [1] - 1554:25
**supports** [2] - 1305:9, 1560:22
**supposed** [5] - 1378:13, 1464:9, 1466:12, 1472:20, 1558:11
**supposedly** [1] - 1462:5
**surface** [4] - 1416:4, 1437:18, 1437:19, 1437:23
**surgeon** [12] - 1325:5, 1340:4, 1357:21, 1390:17, 1391:9, 1396:20, 1397:14, 1400:25, 1406:7, 1440:3, 1482:6
**Surgeons** [1] - 1343:25
**surgeons** [21] - 1336:11, 1336:13, 1337:17, 1338:21, 1338:24, 1339:1, 1341:22, 1351:15, 1390:12, 1392:20, 1425:7, 1442:23, 1458:1, 1478:8, 1480:12, 1500:9, 1546:23, 1547:6, 1547:7
**surgeries** [8] - 1327:13, 1340:18, 1373:1, 1424:3, 1425:20, 1426:2, 1433:11, 1550:11
**surgery** [77] - 1315:15, 1316:4, 1320:11, 1324:17, 1324:25, 1325:2, 1325:23, 1326:6, 1326:7, 1336:5, 1336:8, 1336:16, 1337:5, 1340:24, 1341:3, 1341:4, 1346:22, 1349:10, 1383:9, 1393:5, 1396:16, 1398:3, 1403:17, 1404:5, 1405:11, 1405:13, 1423:25, 1426:22, 1427:10, 1427:13,

1427:22, 1428:13, 1429:24, 1430:5, 1432:16, 1432:19, 1432:22, 1437:2, 1437:12, 1439:4, 1443:22, 1445:11, 1445:16, 1445:20, 1448:25, 1470:21, 1472:18, 1474:8, 1479:3, 1480:10, 1480:18, 1480:19, 1480:25, 1481:3, 1481:5, 1483:20, 1488:15, 1488:23, 1493:12, 1493:13, 1542:22, 1543:24, 1544:1, 1545:19, 1546:6, 1546:7, 1546:15, 1547:1, 1547:21, 1547:24, 1548:21, 1549:13, 1558:9, 1559:4, 1559:5, 1559:15
**Surgery** [5] - 1341:7, 1347:2, 1347:3, 1410:4, 1424:18
**Surgical** [8] - 1315:8, 1347:5, 1399:24, 1409:8, 1419:2, 1453:22, 1456:11
**surgical** [28] - 1315:17, 1320:21, 1322:8, 1322:11, 1323:15, 1323:18, 1327:20, 1329:14, 1336:14, 1336:16, 1337:2, 1338:10, 1339:16, 1342:2, 1346:11, 1346:18, 1349:19, 1364:25, 1372:25, 1426:12, 1426:23, 1427:11, 1440:5, 1440:23, 1440:25, 1546:6
**surgical/non** [1] - 1338:10
**surgical/non-surgical** [1] - 1338:10
**surroundings** [3] - 1361:1, 1479:20, 1479:22
**Susan** [1] - 1523:4
**susceptible** [1] - 1550:5
**suspicion** [2] - 1352:15, 1373:24
**suspicions** [1] - 1352:4
**Sustained** [10] - 1432:14, 1483:5, 1483:18, 1551:12, 1552:8, 1555:15, 1557:25, 1560:8, 1561:19, 1562:16
**sustained** [6] - 1351:6, 1394:21, 1457:11, 1537:23, 1539:13, 1539:22
**swelling** [1] - 1391:2
**switching** [1] - 1457:4
**swollen** [4] - 1352:10, 1404:4, 1508:12, 1526:19
**sworn** [2] - 1335:13, 1415:8
**sworn/affirmed** [1] - 1335:4
**symptomatic** [1] - 1520:8
**symptomatology** [3] - 1495:7, 1505:23, 1553:21
**symptoms** [20] - 1362:1, 1362:2, 1362:6, 1363:4, 1363:9, 1363:12, 1398:3, 1426:20, 1427:4, 1494:23, 1494:25, 1495:16, 1495:17, 1495:19, 1499:12, 1499:21, 1514:23, 1514:25, 1562:1
**system** [3] - 1468:5, 1485:7, 1485:10

## T

**T1** [1] - 1354:19
**T12** [1] - 1354:19
**T2** [1] - 1503:20
**table** [1] - 1352:21
**talks** [1] - 1538:18

tangentially [1] - 1369:21
target [1] - 1466:8
teach [1] - 1430:7
tear [3] - 1519:7, 1553:19, 1553:20
technically [1] - 1385:2
technique [1] - 1337:7
techniques [1] - 1339:16
technologies [1] - 1547:4
template [5] - 1392:2, 1509:5, 1509:9, 1509:20, 1510:5
templates [1] - 1510:6
ten [6] - 1342:17, 1351:10, 1355:19, 1459:2, 1488:7, 1546:1
tend [3] - 1482:13, 1490:8, 1553:12
tender [2] - 1501:13, 1524:17
tenderness [13] - 1514:2, 1514:3, 1514:4, 1514:6, 1518:17, 1518:19, 1518:21, 1524:20, 1525:6, 1525:22, 1526:12, 1538:12, 1553:14
tends [1] - 1338:8
tension [2] - 1353:23, 1356:14
tent [7] - 1403:1, 1403:2, 1403:4, 1403:5, 1403:6, 1429:20, 1464:12
term [14] - 1338:6, 1338:7, 1351:12, 1356:24, 1359:12, 1360:14, 1368:3, 1404:21, 1467:21, 1480:2, 1480:7, 1540:19, 1547:2, 1547:12
terminology [1] - 1471:7
terms [24] - 1305:16, 1306:15, 1312:18, 1335:21, 1340:17, 1346:16, 1355:5, 1416:21, 1426:19, 1435:12, 1446:19, 1467:23, 1469:14, 1470:17, 1475:20, 1477:14, 1479:10, 1479:11, 1492:2, 1513:2, 1515:1, 1548:10, 1553:10, 1555:18
Terrance [1] - 1392:24
territory [1] - 1407:11
test [14] - 1352:19, 1352:20, 1353:19, 1353:21, 1355:14, 1355:21, 1356:9, 1356:17, 1392:24, 1421:10, 1484:20, 1512:6, 1512:10, 1553:9
testified [27] - 1305:5, 1310:16, 1322:7, 1322:16, 1329:7, 1329:12, 1335:13, 1365:2, 1415:8, 1415:19, 1420:11, 1420:15, 1420:21, 1423:2, 1434:25, 1439:25, 1531:3, 1531:13, 1543:21, 1549:1, 1551:3, 1551:15, 1553:1, 1554:15, 1554:24, 1555:8, 1560:25
testifies [1] - 1381:19
testify [10] - 1308:15, 1308:21, 1310:5, 1310:8, 1329:5, 1332:12, 1334:9, 1385:4, 1385:7, 1532:18
testifying [1] - 1340:8
testimony [28] - 1302:4, 1302:6, 1302:8, 1302:14, 1302:17, 1302:18, 1302:21, 1303:2, 1306:13, 1329:10, 1329:11, 1330:4, 1339:19, 1441:3, 1447:24, 1448:2, 1448:4, 1473:2, 1483:24, 1485:16, 1519:4, 1521:12,

1534:7, 1554:25, 1555:5, 1556:7, 1560:21, 1561:2
testing [9] - 1352:7, 1353:21, 1355:23, 1356:3, 1392:7, 1392:12, 1392:13, 1457:24, 1539:19
tests [7] - 1352:14, 1355:15, 1355:16, 1451:13, 1458:23, 1536:13
tetanus [2] - 1373:23, 1373:25
thankfully [1] - 1451:18
THAT [1] - 1474:21
THE [367] - 1300:12, 1302:3, 1302:12, 1302:23, 1303:7, 1303:9, 1304:2, 1304:22, 1305:14, 1305:22, 1306:4, 1307:4, 1307:6, 1307:12, 1307:15, 1307:18, 1307:22, 1307:24, 1308:15, 1308:19, 1308:21, 1309:21, 1310:5, 1310:8, 1311:4, 1311:8, 1311:11, 1311:14, 1311:17, 1312:20, 1313:21, 1314:8, 1314:10, 1314:17, 1314:19, 1314:23, 1316:5, 1316:9, 1316:18, 1316:23, 1317:1, 1317:3, 1317:5, 1317:13, 1317:25, 1318:3, 1318:10, 1318:15, 1318:17, 1318:20, 1318:22, 1319:4, 1319:6, 1319:16, 1319:21, 1320:3, 1320:12, 1321:9, 1321:15, 1321:18, 1321:23, 1322:1, 1322:4, 1322:7, 1322:15, 1322:19, 1322:22, 1323:7, 1323:24, 1324:5, 1324:9, 1324:11, 1324:13, 1325:1, 1325:12, 1325:15, 1325:18, 1326:3, 1326:3, 1326:14, 1326:16, 1326:21, 1326:24, 1327:2, 1327:7, 1329:5, 1330:13, 1330:16, 1330:18, 1330:21, 1330:23, 1332:2, 1332:6, 1332:9, 1332:11, 1332:15, 1332:19, 1332:24, 1334:6, 1334:12, 1334:16, 1334:21, 1334:24, 1335:3, 1335:5, 1335:7, 1335:10, 1344:11, 1353:7, 1354:8, 1354:11, 1354:14, 1365:15, 1367:1, 1367:7, 1367:14, 1367:17, 1367:21, 1367:24, 1368:1, 1368:6, 1368:8, 1368:24, 1369:3, 1369:6, 1369:12, 1369:14, 1369:21, 1370:4, 1370:6, 1370:8, 1370:16, 1370:17, 1370:20, 1370:22, 1372:11, 1372:13, 1374:7, 1374:11, 1374:14, 1374:17, 1375:15, 1375:18, 1375:20, 1376:10, 1376:21, 1377:19, 1377:22, 1378:25, 1379:5, 1380:2, 1380:5, 1380:8, 1380:14, 1381:16, 1382:16, 1383:23, 1385:4, 1385:7, 1385:13, 1385:17, 1385:21, 1386:2, 1386:8, 1386:11, 1386:14, 1386:22, 1387:2, 1387:4, 1387:9, 1387:16, 1388:3, 1389:22, 1391:19, 1391:21, 1394:6, 1395:10, 1395:14, 1395:17, 1397:4, 1397:7, 1398:15, 1398:18, 1399:16, 1406:15, 1408:4, 1408:7, 1408:9, 1408:13, 1408:15, 1408:17, 1409:3, 1409:12, 1409:15, 1410:1, 1410:3, 1410:11, 1410:15, 1410:19,

1410:22, 1410:24, 1411:2, 1412:2, 1412:22, 1413:24, 1414:2, 1414:4, 1414:8, 1415:4, 1415:14, 1415:16, 1415:18, 1417:12, 1418:3, 1418:19, 1418:22, 1419:12, 1419:20, 1419:22, 1422:14, 1423:7, 1423:10, 1423:19, 1424:15, 1424:21, 1424:23, 1428:19, 1428:20, 1429:10, 1432:14, 1432:25, 1433:5, 1433:7, 1434:9, 1434:11, 1434:14, 1435:22, 1435:24, 1436:3, 1437:4, 1437:6, 1437:7, 1437:8, 1437:9, 1448:5, 1448:20, 1448:23, 1449:13, 1449:16, 1449:25, 1450:24, 1451:10, 1451:20, 1451:24, 1452:1, 1452:8, 1452:12, 1453:24, 1454:12, 1454:20, 1455:4, 1455:7, 1456:3, 1456:25, 1460:17, 1460:24, 1461:3, 1461:11, 1464:2, 1465:8, 1465:13, 1465:14, 1465:15, 1468:4, 1469:19, 1469:22, 1469:24, 1472:11, 1478:23, 1481:14, 1483:5, 1483:18, 1484:15, 1484:17, 1485:23, 1502:10, 1504:21, 1506:4, 1506:6, 1506:10, 1506:12, 1506:22, 1506:24, 1507:14, 1509:2, 1509:15, 1509:24, 1510:1, 1511:19, 1511:21, 1512:10, 1512:11, 1515:22, 1516:2, 1516:6, 1517:16, 1521:13, 1522:23, 1522:25, 1528:1, 1528:3, 1528:6, 1528:8, 1528:13, 1528:21, 1529:14, 1529:16, 1533:8, 1534:16, 1534:18, 1534:22, 1536:16, 1537:10, 1537:12, 1537:23, 1539:13, 1539:22, 1540:5, 1540:17, 1541:2, 1542:21, 1543:18, 1544:6, 1544:22, 1545:3, 1545:10, 1545:12, 1549:9, 1549:18, 1551:7, 1551:12, 1552:8, 1552:10, 1552:11, 1552:12, 1552:13, 1552:15, 1552:16, 1552:17, 1553:23, 1554:19, 1555:15, 1556:4, 1556:11, 1557:25, 1558:3, 1558:23, 1560:8, 1560:17, 1561:5, 1561:19, 1561:21, 1562:4, 1562:16, 1563:2, 1563:6, 1563:7
thecal [1] - 1464:12
themselves [1] - 1341:22
theories [1] - 1305:21
therapeutic [1] - 1404:12
therapist [5] - 1346:1, 1382:22, 1385:8, 1527:12, 1527:15
Therapist [4] - 1383:2, 1383:14, 1388:11, 1390:15
therapists [8] - 1337:19, 1338:19, 1338:20, 1349:8, 1364:18, 1389:10, 1457:25, 1488:20
therapy [20] - 1351:13, 1364:24, 1365:13, 1382:24, 1383:4, 1383:12, 1388:14, 1388:19, 1388:22, 1389:16, 1390:14, 1407:9, 1426:25, 1427:1, 1478:8, 1480:17, 1481:25, 1497:10
thereafter [3] - 1350:25, 1496:8, 1554:21

Bauta v. Greyhound Lines, et al _____ 40

**therefore** [2] - 1302:21, 1322:4
**they've** [6] - 1305:5, 1327:4, 1328:2, 1390:13, 1391:12, 1410:20
**thigh** [2] - 1358:16, 1358:21
**thinking** [3] - 1361:10, 1377:6, 1543:23
**third** [2] - 1343:1, 1404:19
**THOMAS** [1] - 1301:7
**Thomas** [4] - 1310:17, 1310:21, 1507:2
**thoracic** [1] - 1354:18
**thorough** [4] - 1359:16, 1360:17, 1507:5, 1515:8
**thorough-way** [2] - 1359:16, 1360:17
**thousand** [3] - 1316:13, 1449:5, 1449:10
**thousands** [3] - 1312:1, 1372:15, 1526:8
**threatening** [2] - 1553:8, 1561:25
**three** [35] - 1304:12, 1306:20, 1306:23, 1306:24, 1315:9, 1320:15, 1320:17, 1337:16, 1340:21, 1344:18, 1344:19, 1353:8, 1361:17, 1362:1, 1362:20, 1371:18, 1388:22, 1389:1, 1389:2, 1396:6, 1412:14, 1412:17, 1431:25, 1432:8, 1436:7, 1440:12, 1440:15, 1469:1, 1479:23, 1481:1, 1504:3, 1527:2, 1531:9, 1544:13, 1556:2
**three-and-a-half** [3] - 1388:22, 1389:1, 1389:2
**thresholds** [1] - 1498:2
**throat** [2] - 1485:1, 1485:5
**throughout** [3] - 1378:18, 1444:6, 1449:23
**thumb** [1] - 1430:10
**Thursday** [1] - 1303:24
**tibialis** [2] - 1362:23, 1427:6
**ticket** [1] - 1312:4
**tigers** [1] - 1479:21
**tight** [2] - 1465:11, 1465:18
**time-wise** [1] - 1545:25
**timeline** [5] - 1350:3, 1425:16, 1434:21, 1548:10, 1560:22
**timelines** [1] - 1520:6
**timing** [2] - 1518:5, 1557:7
**tingling** [11] - 1353:17, 1354:3, 1362:7, 1362:10, 1362:22, 1514:22, 1515:16, 1522:15, 1527:7, 1557:13
**tinier** [1] - 1360:11
**tip** [2] - 1404:24, 1404:25
**tiptoe** [1] - 1356:6
**tiptoes** [1] - 1356:7
**tissue** [9] - 1350:21, 1352:10, 1364:20, 1391:2, 1443:23, 1463:3, 1499:16, 1499:17, 1499:24
**today** [9] - 1308:3, 1427:25, 1459:12, 1485:17, 1520:2, 1531:17, 1540:23, 1542:13, 1549:1
**toe** [3] - 1356:4, 1357:13, 1362:25
**toes** [1] - 1357:16

**together** [13] - 1338:22, 1344:14, 1355:8, 1356:24, 1427:18, 1427:20, 1430:10, 1432:7, 1438:4, 1458:5, 1458:8, 1459:13, 1479:23
**token** [1] - 1484:25
**Tom** [2] - 1378:19, 1486:4
**tomorrow** [2] - 1499:15, 1563:4
**took** [10] - 1312:2, 1314:24, 1367:10, 1384:1, 1409:1, 1409:5, 1453:1, 1507:19, 1537:3, 1537:8
**top** [21] - 1305:16, 1315:23, 1326:22, 1355:1, 1358:12, 1358:17, 1403:3, 1432:4, 1437:19, 1462:13, 1462:14, 1462:15, 1468:18, 1472:23, 1475:7, 1505:15, 1511:13, 1518:1, 1518:3, 1535:10
**topdown** [1] - 1475:6
**Toradol** [1] - 1520:11
**Torrance** [1] - 1341:9
**total** [42] - 1313:14, 1313:22, 1314:2, 1314:6, 1316:11, 1316:21, 1317:5, 1317:7, 1317:22, 1318:4, 1320:7, 1320:14, 1320:17, 1323:6, 1350:20, 1368:11, 1368:22, 1371:20, 1374:1, 1374:3, 1377:6, 1377:12, 1393:25, 1396:24, 1396:25, 1399:9, 1412:16, 1413:19, 1413:20, 1417:5, 1417:6, 1424:10, 1431:25, 1437:7, 1438:3, 1450:18, 1458:5, 1486:22, 1496:6, 1501:10, 1501:12, 1556:13
**total/total** [1] - 1317:25
**totally** [1] - 1327:13
**totals** [1] - 1369:19
**touch** [2] - 1361:2, 1543:6
**touched** [2] - 1514:6, 1515:11
**touching** [2] - 1361:5, 1464:11
**towards** [2] - 1353:24, 1356:10
**trace** [5] - 1357:24, 1358:1, 1463:11, 1470:4
**track** [4] - 1305:11, 1308:1, 1309:2, 1309:9
**traction** [1] - 1383:5
**trained** [1] - 1383:5
**training** [19] - 1335:23, 1336:3, 1336:5, 1336:6, 1336:7, 1336:14, 1336:18, 1336:19, 1337:14, 1341:14, 1341:16, 1341:17, 1342:18, 1342:23, 1342:24, 1343:18, 1371:22, 1372:24, 1502:24
**trajectory** [1] - 1430:14
**TRANSCRIPT** [1] - 1300:12
**transcript** [1] - 1301:18
**Transcription** [1] - 1301:19
**transforaminal** [1] - 1417:19
**transmitted** [1] - 1479:24
**transported** [1] - 1350:15
**trauma** [17] - 1343:4, 1469:7, 1469:14, 1489:1, 1489:3, 1489:21, 1489:22, 1548:23, 1554:9, 1554:10, 1555:23, 1558:15, 1559:4, 1559:16, 1559:22,

1559:24
**traumatic** [19] - 1390:25, 1391:1, 1391:3, 1391:4, 1391:6, 1469:2, 1476:16, 1489:15, 1495:21, 1498:12, 1499:2, 1499:20, 1503:4, 1503:17, 1513:1, 1549:2, 1554:4, 1559:6, 1559:9
**traumatically** [2] - 1476:10, 1520:4
**traversing** [1] - 1473:7
**treat** [13] - 1308:12, 1336:21, 1338:22, 1400:20, 1425:2, 1426:1, 1433:11, 1476:19, 1486:24, 1487:2, 1488:21, 1530:11, 1531:24
**treated** [26] - 1350:21, 1400:23, 1476:22, 1477:18, 1477:20, 1477:21, 1478:6, 1498:20, 1506:18, 1525:24, 1532:3, 1533:17, 1535:19, 1535:22, 1536:13, 1536:22, 1537:7, 1537:17, 1537:25, 1538:2, 1550:21, 1551:8, 1551:17, 1552:14
**treater** [1] - 1534:10
**treaters** [2] - 1530:24, 1532:4
**treating** [11] - 1306:3, 1339:13, 1433:14, 1457:5, 1458:25, 1488:11, 1529:25, 1531:19, 1531:22, 1537:4, 1552:5
**treatment** [66] - 1305:16, 1306:24, 1307:16, 1310:21, 1322:8, 1342:6, 1344:6, 1345:7, 1349:24, 1350:6, 1350:9, 1351:3, 1351:4, 1351:13, 1355:17, 1364:11, 1371:10, 1372:21, 1373:24, 1375:8, 1376:2, 1380:18, 1380:25, 1383:1, 1383:12, 1388:11, 1390:9, 1392:20, 1393:6, 1393:8, 1393:10, 1399:25, 1400:5, 1403:13, 1406:25, 1407:22, 1416:2, 1416:7, 1416:17, 1417:1, 1417:7, 1425:4, 1425:21, 1426:25, 1433:22, 1433:25, 1447:7, 1447:19, 1448:13, 1457:7, 1457:20, 1457:25, 1458:22, 1469:9, 1476:18, 1478:1, 1479:11, 1488:22, 1516:22, 1525:15, 1525:17, 1527:10, 1533:19, 1550:11, 1558:18
**treatments** [13] - 1308:4, 1338:11, 1350:2, 1350:17, 1364:17, 1364:22, 1390:14, 1399:23, 1413:18, 1416:10, 1418:14, 1426:19, 1459:11
**tremendous** [1] - 1345:18
**triage** [3] - 1484:20, 1484:24, 1553:2
**triages** [1] - 1553:3
**TRIAL** [1] - 1300:12
**trial** [14] - 1304:18, 1323:4, 1328:19, 1331:6, 1331:7, 1332:23, 1334:3, 1334:7, 1368:2, 1368:18, 1368:21, 1531:13, 1532:18
**triangular** [2] - 1466:24, 1468:19
**tried** [1] - 1488:22
**tries** [2] - 1429:6, 1519:3
**triple** [1] - 1320:19
**true** [80] - 1385:13, 1444:23, 1454:22,

VB        OCR        CRR

1486:18, 1487:3, 1487:17, 1489:10, 1491:8, 1493:2, 1493:15, 1493:16, 1494:6, 1494:12, 1495:16, 1499:9, 1502:21, 1502:22, 1503:18, 1505:4, 1505:14, 1506:18, 1507:4, 1507:23, 1508:14, 1508:16, 1508:25, 1509:10, 1509:17, 1510:11, 1510:12, 1510:16, 1510:18, 1510:20, 1512:2, 1512:6, 1512:8, 1513:8, 1513:10, 1514:3, 1515:21, 1517:22, 1518:4, 1521:4, 1521:14, 1521:20, 1521:23, 1522:1, 1523:7, 1523:21, 1524:1, 1524:6, 1524:9, 1524:15, 1524:22, 1524:24, 1526:7, 1526:16, 1526:17, 1527:3, 1527:4, 1527:5, 1527:8, 1528:17, 1530:21, 1531:8, 1532:4, 1532:8, 1532:10, 1532:15, 1535:8, 1535:15, 1535:20, 1536:5, 1536:9, 1536:18, 1536:23, 1537:13, 1537:21, 1545:1, 1547:22

**truth** [2] - 1489:11, 1531:21

**try** [27] - 1304:16, 1309:13, 1309:24, 1312:15, 1350:4, 1358:2, 1362:11, 1364:20, 1383:18, 1384:7, 1386:18, 1400:23, 1401:8, 1401:12, 1403:17, 1420:10, 1426:13, 1428:20, 1436:2, 1440:22, 1461:8, 1464:11, 1480:10, 1480:19, 1485:3, 1553:2, 1553:7

**trying** [27] - 1310:13, 1311:2, 1312:14, 1323:17, 1323:22, 1324:3, 1351:5, 1360:20, 1361:24, 1367:11, 1384:22, 1386:7, 1395:12, 1400:15, 1458:21, 1462:5, 1463:12, 1470:10, 1471:9, 1510:23, 1519:1, 1520:6, 1520:23, 1534:7, 1534:8, 1545:6, 1562:7

**tucked** [1] - 1452:9

**Tuesday** [1] - 1300:7

**tumor** [1] - 1485:4

**tumors** [3] - 1336:25, 1344:5, 1344:6

**tunnel** [7] - 1359:19, 1402:23, 1402:25, 1403:2, 1403:3, 1429:21, 1464:12

**Tunnel** [1] - 1403:1

**turn** [8] - 1359:22, 1360:19, 1376:14, 1382:3, 1386:16, 1388:17, 1450:6

**turned** [3] - 1320:23, 1328:2, 1329:21

**turns** [1] - 1386:8

**twice** [3] - 1330:10, 1340:20, 1343:23

**twin** [6] - 1548:6, 1548:7, 1548:8

**twisting** [2] - 1362:3, 1554:9

**two** [70] - 1302:3, 1303:16, 1303:17, 1303:19, 1303:23, 1304:3, 1306:23, 1312:6, 1320:8, 1321:5, 1322:12, 1325:22, 1327:13, 1330:2, 1330:11, 1343:22, 1344:19, 1347:1, 1347:3, 1349:11, 1354:22, 1360:24, 1373:1, 1386:9, 1388:24, 1390:6, 1396:8, 1398:9, 1399:9, 1403:25, 1410:23, 1413:3, 1413:6, 1420:25, 1424:3, 1424:10, 1425:20, 1430:9, 1432:6,

1432:7, 1432:9, 1433:1, 1433:11, 1433:15, 1436:21, 1436:24, 1437:4, 1462:22, 1469:1, 1469:17, 1471:5, 1479:7, 1479:23, 1482:7, 1499:23, 1503:2, 1506:18, 1514:18, 1515:23, 1522:6, 1527:1, 1531:9, 1531:11, 1543:4, 1546:1, 1546:23, 1548:6, 1548:14, 1550:21, 1553:18

**two-and-a-half** [2] - 1388:24, 1548:14

**two-to-three** [1] - 1469:1

**two-way** [1] - 1386:9

**two-year** [1] - 1471:5

**Tylenol** [1] - 1373:16

**type** [13] - 1351:16, 1369:13, 1428:12, 1489:1, 1489:16, 1490:11, 1497:8, 1509:20, 1539:15, 1540:20, 1554:9, 1554:10, 1562:21

**typed** [1] - 1509:10

**types** [4] - 1312:17, 1338:11, 1355:22, 1553:13

**typical** [1] - 1340:17

**typically** [7] - 1340:19, 1358:6, 1358:8, 1456:12, 1498:14, 1498:17, 1551:24

# U

**UC** [3] - 1336:5, 1336:6, 1337:12

**UCLA** [2] - 1336:7, 1337:12

**ultimately** [6] - 1351:15, 1362:22, 1370:25, 1427:12, 1480:20, 1482:12

**umbrella** [1] - 1307:19

**unable** [1] - 1304:6

**unacceptable** [1] - 1319:8

**under** [37] - 1308:13, 1325:25, 1330:24, 1333:7, 1338:9, 1338:23, 1390:24, 1392:13, 1394:1, 1404:11, 1405:24, 1409:20, 1418:11, 1440:9, 1440:25, 1444:5, 1441:14, 1444:18, 1500:14, 1509:19, 1512:12, 1513:4, 1518:12, 1518:17, 1524:14, 1525:12, 1525:15, 1525:16, 1525:20, 1531:18, 1535:5, 1536:4, 1554:5, 1560:21, 1560:25

**undergo** [2] - 1406:5, 1407:4

**undergoes** [1] - 1405:17

**undergoing** [1] - 1546:7

**undergrad** [1] - 1335:25

**underline** [1] - 1378:13

**underlining** [3] - 1378:7, 1387:12, 1387:17

**underlying** [3] - 1549:1, 1549:4, 1552:11

**understood** [1] - 1532:2

**UNITED** [2] - 1300:1, 1300:13

**United** [2] - 1300:5, 1309:12

**University** [1] - 1336:2

**unless** [3] - 1311:14, 1311:19, 1485:10

**unnecessary** [2] - 1313:15, 1319:13

**unrelated** [3] - 1326:19, 1447:7, 1485:14

**unusual** [2] - 1471:18, 1553:13

**up** [105] - 1303:3, 1303:23, 1309:16, 1310:2, 1310:12, 1310:25, 1313:6, 1313:14, 1315:11, 1315:12, 1315:21, 1315:23, 1315:24, 1316:4, 1317:23, 1319:23, 1323:9, 1323:17, 1324:8, 1326:20, 1327:14, 1328:16, 1334:9, 1337:2, 1339:12, 1353:24, 1354:8, 1355:11, 1357:13, 1357:14, 1357:16, 1357:20, 1358:21, 1360:10, 1362:18, 1362:24, 1362:25, 1365:1, 1371:25, 1374:20, 1381:19, 1387:7, 1387:16, 1389:8, 1389:12, 1392:16, 1406:20, 1408:18, 1409:19, 1409:21, 1410:19, 1412:16, 1413:14, 1425:19, 1427:7, 1432:2, 1433:16, 1436:2, 1436:10, 1436:22, 1436:25, 1438:3, 1438:4, 1446:16, 1446:18, 1446:23, 1447:23, 1460:9, 1461:22, 1462:19, 1464:4, 1464:6, 1464:16, 1464:18, 1465:2, 1465:22, 1467:7, 1468:17, 1468:18, 1470:4, 1470:24, 1471:23, 1479:15, 1481:17, 1481:19, 1483:15, 1485:9, 1491:10, 1496:19, 1502:3, 1506:22, 1511:4, 1511:9, 1512:13, 1523:9, 1524:2, 1526:4, 1527:14, 1531:17, 1534:24, 1535:3, 1535:10, 1538:3

**updated** [1] - 1448:10

**upper** [16] - 1421:10, 1430:8, 1461:21, 1463:10, 1464:6, 1464:15, 1470:24, 1472:16, 1474:7, 1474:16, 1474:18, 1475:2, 1475:14, 1475:23, 1500:23, 1523:21

**upper-hand** [5] - 1474:7, 1474:16, 1475:2, 1475:14, 1475:23

**ups** [6] - 1435:18, 1436:7, 1436:24, 1437:4, 1446:21, 1482:1

**Upstate** [1] - 1336:1

**upwards** [1] - 1323:14

**urgent** [1] - 1485:11

**uses** [2] - 1337:6, 1526:11

**usual** [1] - 1361:18

# V

**vaccination** [1] - 1373:23

**vaccinations** [1] - 1373:21

**vaccine** [2] - 1373:15, 1373:23

**validity** [1] - 1539:19

**value** [6] - 1400:24, 1401:15, 1421:19, 1510:3, 1511:9, 1511:25

**values** [3] - 1349:9, 1349:13, 1373:18

**valve** [1] - 1430:21

**Vargas** [1] - 1303:14

**variable** [1] - 1373:4

**varies** [1] - 1340:21

**various** [1] - 1539:20

**vary** [3] - 1405:3, 1431:9, 1431:16

**vascular** [1] - 1336:8

**vasile** [1] - 1351:14

**Vasile** [14] - 1303:14, 1314:14, 1346:1, 1346:2, 1365:14, 1382:21, 1383:2, 1383:3, 1383:13, 1383:14, 1388:11, 1388:14, 1390:15, 1420:16
**vein** [1] - 1525:1
**vendor** [2] - 1454:3, 1456:13
**vent** [2] - 1403:3, 1403:4
**verbal** [2] - 1512:11, 1513:12
**verbalize** [1] - 1512:21
**verdict** [4] - 1334:10, 1368:1, 1368:9, 1369:10
**verify** [2] - 1510:12, 1510:13
**version** [1] - 1448:10
**versions** [2] - 1314:21, 1353:20
**versus** [3] - 1339:23, 1360:2, 1497:24
**vertebra** [3] - 1430:8, 1430:9, 1553:25
**vertebrae** [18] - 1354:22, 1354:23, 1354:25, 1462:13, 1462:22, 1463:1, 1463:5, 1467:2, 1467:10, 1467:11, 1467:12, 1467:15, 1468:22, 1468:23, 1469:1
**vertebral** [3] - 1466:22, 1468:21, 1479:23
**vessel** [1] - 1407:13
**vessels** [1] - 1430:20
**victims** [1] - 1406:12
**video** [4] - 1544:3, 1544:8, 1544:14, 1544:19
**view** [21] - 1309:1, 1398:9, 1400:9, 1400:21, 1402:3, 1425:25, 1429:24, 1430:21, 1436:13, 1461:25, 1463:19, 1463:20, 1464:8, 1474:13, 1474:14, 1474:25, 1475:3, 1479:3, 1487:20, 1505:10
**views** [5] - 1392:13, 1422:5, 1461:19, 1475:6, 1475:7
**Vincent** [3] - 1365:14, 1382:21, 1420:15
**Vincent's** [2] - 1342:13, 1343:22
**violative** [2] - 1302:20, 1304:20
**virtually** [1] - 1562:22
**vision** [3] - 1508:14, 1509:8, 1523:12
**visit** [12] - 1373:19, 1375:7, 1375:24, 1376:19, 1388:19, 1477:20, 1481:19, 1496:7, 1534:24, 1535:3, 1535:11
**visits** [18] - 1322:9, 1322:11, 1348:16, 1349:8, 1389:4, 1407:19, 1413:6, 1423:15, 1436:6, 1436:8, 1436:10, 1436:22, 1446:16, 1446:20, 1479:15, 1484:8
**volume** [1] - 1345:6
**volumes** [1] - 1487:23
**voluminous** [1] - 1347:8
**vomiting** [1] - 1523:13

## W

**WAGSTAFF** [1] - 1300:20
**wait** [2] - 1370:18, 1495:8
**waived** [3] - 1385:13, 1385:16,

1385:25
**waiver** [1] - 1385:10
**walk** [16] - 1319:17, 1350:9, 1356:4, 1356:5, 1356:6, 1356:8, 1356:11, 1357:16, 1362:11, 1367:11, 1369:18, 1404:10, 1540:9, 1553:14
**walked** [1] - 1526:21
**walking** [2] - 1524:1, 1526:16
**walks** [2] - 1544:9, 1544:19
**wants** [2] - 1309:16, 1319:9
**WARNER** [1] - 1301:9
**water** [3] - 1403:6, 1462:7, 1463:7
**ways** [4] - 1353:20, 1356:14, 1363:22, 1559:8
**weak** [2] - 1358:1, 1500:7
**weakness** [15] - 1351:19, 1362:7, 1362:13, 1362:22, 1363:1, 1364:5, 1403:19, 1426:10, 1427:6, 1483:13, 1523:19, 1523:23, 1539:8, 1539:15, 1544:1
**website** [1] - 1330:5
**wedge** [2] - 1468:20, 1470:9
**Wednesday** [1] - 1563:10
**week** [17] - 1303:24, 1308:8, 1327:21, 1340:17, 1340:20, 1340:21, 1351:10, 1355:19, 1380:21, 1380:23, 1410:21, 1470:17, 1495:14, 1500:13, 1538:18, 1554:11
**weeks** [5] - 1340:22, 1352:17, 1463:18, 1469:17, 1495:9
**weight** [1] - 1561:2
**weird** [1] - 1309:2
**well-controlled** [1] - 1406:23
**well-equipped** [1] - 1405:15
**West** [4] - 1305:2, 1305:3, 1527:21, 1528:16
**Westchester** [1] - 1301:12
**whatnot** [3] - 1312:15, 1510:6, 1557:13
**whichever** [1] - 1348:14
**whiplash** [1] - 1476:21
**white** [5] - 1462:6, 1463:9, 1463:11, 1470:1, 1472:1
**whole** [6] - 1305:8, 1308:22, 1507:12, 1525:16, 1544:15, 1544:18
**whoops** [1] - 1398:12
**wide** [1] - 1373:4
**wider** [2] - 1360:10, 1360:11
**width** [1] - 1431:16
**William** [1] - 1318:17
**willing** [1] - 1454:24
**window** [3] - 1561:11, 1562:11, 1562:13
**Winn** [12] - 1315:6, 1346:4, 1346:25, 1392:24, 1400:3, 1406:25, 1407:1, 1407:17, 1408:6, 1409:22, 1410:5, 1418:12
**winn's** [2] - 1413:22, 1413:25
**Winn's** [3] - 1347:13, 1348:5, 1409:3
**wise** [2] - 1367:5, 1545:25

**withdraw** [3] - 1363:17, 1436:1, 1483:6
**withdrawn** [9] - 1346:16, 1374:5, 1416:14, 1419:16, 1421:7, 1421:13, 1425:1, 1471:14, 1478:4
**Witness** [1] - 1335:4
**witness** [22] - 1306:13, 1334:25, 1335:2, 1340:8, 1340:13, 1345:1, 1350:5, 1354:9, 1367:23, 1396:15, 1407:23, 1415:7, 1416:9, 1416:22, 1419:15, 1425:5, 1433:3, 1433:24, 1517:14, 1526:5, 1555:3, 1563:8
**WITNESS** [21] - 1335:7, 1370:8, 1370:16, 1372:13, 1391:21, 1428:20, 1437:6, 1437:8, 1449:13, 1451:10, 1465:14, 1507:14, 1512:11, 1528:3, 1529:16, 1552:10, 1552:12, 1552:15, 1552:17, 1563:7, 1564:3
**witness'** [2] - 1369:17, 1521:12
**witnesses** [7] - 1303:13, 1304:12, 1304:23, 1309:22, 1310:2, 1310:5, 1310:8
**woman** [1] - 1402:14
**wonderful** [1] - 1563:4
**word** [3] - 1471:6, 1526:11, 1537:8
**words** [16] - 1303:2, 1307:14, 1327:8, 1338:18, 1374:7, 1451:14, 1480:6, 1496:21, 1524:19, 1530:4, 1532:5, 1534:4, 1539:17, 1546:25, 1554:7, 1557:7
**works** [3] - 1330:25, 1404:19, 1462:4
**worry** [1] - 1386:8
**worse** [2] - 1520:18, 1559:6
**worst** [1] - 1492:13
**wound** [5] - 1444:12, 1444:13, 1444:14, 1446:8, 1446:10
**write** [1] - 1308:4
**writing** [2] - 1410:16, 1410:20
**written** [3] - 1392:2, 1481:18, 1548:25
**wrote** [2] - 1309:17, 1509:19

## X

**X-ray** [19] - 1338:19, 1395:2, 1402:9, 1421:24, 1430:3, 1430:19, 1436:16, 1436:25, 1444:6, 1446:13, 1451:4, 1451:14, 1451:15, 1474:4, 1474:17, 1477:19, 1485:5, 1555:22
**X-rays** [10] - 1345:10, 1392:14, 1398:9, 1422:4, 1422:6, 1435:18, 1444:4, 1446:20, 1446:22, 1477:19

## Y

**year** [8] - 1360:23, 1471:5, 1481:1, 1481:18, 1481:22, 1481:24, 1481:25, 1549:15
**years** [24] - 1319:6, 1327:14, 1337:16, 1342:17, 1342:25, 1343:14, 1344:18, 1344:24, 1357:21, 1388:22, 1388:24,

1389:1, 1389:2, 1480:21, 1481:2, 1481:4, 1482:14, 1491:9, 1497:7, 1544:13, 1546:1, 1546:18, 1558:18, 1559:12

**yellow** [1] - 1355:5
**yesterday** [1] - 1306:15
**YORK** [1] - 1300:1
**York** [37] - 1300:5, 1300:18, 1301:13, 1316:3, 1320:25, 1321:20, 1321:23, 1323:16, 1323:22, 1324:16, 1326:9, 1327:9, 1328:14, 1329:2, 1329:13, 1330:1, 1333:7, 1333:18, 1334:5, 1335:25, 1345:23, 1347:21, 1363:10, 1382:23, 1390:4, 1396:3, 1396:19, 1421:24, 1425:7, 1425:9, 1425:17, 1426:4, 1434:20, 1435:16, 1528:15, 1536:4
**young** [1] - 1480:20
**yourself** [4] - 1335:17, 1498:7, 1498:9, 1498:10

## Z

**zero** [3] - 1328:10, 1369:5, 1369:6
**zeroed** [1] - 1328:7
**zeros** [1] - 1395:13
**zip** [1] - 1329:24
**zone** [1] - 1360:6
**zones** [2] - 1353:4, 1359:20