2006

1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF New York
2
   - - - - - - - - - - - - - - - - X
3   JOSE BAUTA,                       :    14-CV-03725(FB)(RER)
                                      :
4          Plaintiff,                 :
                                      :
5      -against-                      :    United States Courthouse
                                      :    Brooklyn, New York
6                                     :
                                      :
7                                     :    Friday, May 11, 2018
   GREYHOUND LINES, INC.,             :    9:00 a.m.
8   SABRINA ANDERSON, AKOS            :
   GUBICA, KAROLY GUBICA, AND         :
9   CAV ENTERPRISE, LLC,              :
                                      :
10         Defendants.                :
   - - - - - - - - - - - - - - - - X
11

12              TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
                  BEFORE THE HONORABLE RAMON E. REYES
13            UNITED STATES MAGISTRATE JUDGE, AND A JURY

14
                       A P P E A R A N C E S:
15
   For the Plaintiffs:     McELFISH LAW FIRM
16                         Attorneys for the Plaintiff -
                           Jose Bauta
17                             122 East 42nd Street
                               Suite 2100
18                             New York, New York 10168
                           BY: RAYMOND D. McELFISH, ESQ.
19                             JAMIE DIAMOND, ESQ.

20
                           WAGSTAFF & CARTMELL, LLP
21                         Attorneys for the Plaintiff -
                           Jose Bauta
22                             3740 Grand Avenue
                               Suite 300
23                             Kansas City, Missouri 64112
                           BY: JONATHAN P. KIEFFER, ESQ.
24

25

                       SN      OCR      RPR

Proceedings                          2007

1              A P P E A R A N C E S: (Continued.)

2

3    For the Defendants:      LEWIS BRISBOIS BISGAARD & SMITH, LLP
                              Attorneys for the Defendants -
4                             Greyhound Lines, Inc., Sabrina Anderson,
                              Akos Gubica, Karoly Gubica, and CAV
5                             Enterprise, LLC
                                   1375 East 9th Street
6                                  Suite 1600
                                   Cleveland, Ohio 44114
7                             BY: BRADLEY J. BARMEN, ESQ.
                                   THOMAS P. MANNION, ESQ.
8

9                             MARSHALL, DENNEHEY, WARNER, COLEMAN
                              & GOGGIN
10                            Attorneys for the Defendants -
                              Greyhound Lines, Inc., Sabrina
11                            Anderson, Akos Gubica, Karoly
                              Gubica, and CAV Enterprise, LLC
12                                 800 Westchester Avenue
                                   Suite C-700
13                                 Rye Brook, New York 10573
                              BY:   STEVEN B. SAAL, ESQ.
14

15                            SHAUB AHMUTY CITRIN & SPRATT LLP
                              Attorneys for defendants - Greyhound
16                            Lines, Inc. Annd Sabrina Anderson
                                   1983 Marcus Avenue
17                                 Lake Success, New York 11042
                              BY:   ROBERT M. ORTIZ, ESQ.
18

19

20
     Court Reporter:     SOPHIE NOLAN
21                       225 Cadman Plaza East/Brooklyn, NY 11201
                         NolanEDNY@aol.com
22   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Aided Transcription
23

24

25

Proceedings                                    2008

1              (In open court.)

2          (JUDGE RAMON E. REYES enters the courtroom.)

3          (The following occurs outside the presence of the

4    jury.)

5          THE COURT:  Okay.  I am not sure if all the jurors

6    are here, but when they are we will continue.  But before we

7    call them back in I wanted to hear the motions since the

8    plaintiff will be resting.

9          MR. McELFISH:  I have a short application to make

10   and I have to go upstairs to the EMT deposition.  Can I go

11   first in case I have to duct out?

12         THE COURT:  Sure.

13         MR. McELFISH:  And whether it's to change your mind

14   or to make a record, either way, I want to bring this to the

15   court's attention.  Yesterday after the Sav-a-Lot document was

16   admitted, I went back and checked my files again.  I didn't

17   see that it was exchanged.  I would never in this position

18   guarantee the Court that it was not exchanged, but under the

19   Rule 16 I believe it was the first time I said in the case

20   that something was not exchanged.  I do think that's true.

21         I have asked the defense to show me where it was

22   exchanged and I got two answers.  One was it was in the first

23   deposition of Dr. Morgan in January of 2017 and the second was

24   that it was served on me directly.  I went back and looked at

25   Dr. Morgan's deposition and he had an orange folder at the

Proceedings                                                    2009

1   deposition.  We were taking the deposition via Skype and it

2   indicated in the deposition that there was an exhibit that was

3   an orange folder that was his file.

4          So I called the Court Reporter for the exhibits

5   because we didn't have them and she said we don't have them

6   and if you look at the transcript it says Dr. Morgan retained

7   his exhibits.  So Mr. Mannion was nice enough -- he's not here

8   now, but he was nice enough to bring the orange folder to me

9   last night at the bar downstairs and copied the orange folder

10  for me and the Sav-a-Lot is not in the orange folder.

11  Furthermore, furthermore, we were not able to produce the

12  Morgan exhibits in our pretrial binders because we didn't have

13  it.

14         I went through Greyhound's pretrial binders and they

15  don't have it.  They don't have their own expert's file

16  although they have every other expert's file.  I also looked

17  at the authorizations we gave them and we not only gave them

18  two or three or four Sav-a-Lot authorizations, we gave them

19  the Barclays Center which I guess is the basketball center

20  here in Brooklyn and maybe another one and we also served our

21  authorizations on Sav-a-Lot and we got two responses from two

22  different Sav-a-Lot offices saying no employment applications,

23  no information on this gentleman.  I have all of that if

24  you're interested.

25         At the end of the day, I think the burden is on them

Proceedings                                    2010

1   to show me that they disclosed it.  I told them in e-mails and

2   in person, and I apologize to them if they did and I didn't

3   see it or have it, and I would apologize to you as well if

4   that were true, but because of its prejudicial nature I do

5   want to see if they can show me that it's been produced.

6           They're going to tell you, well, it was in

7   Dr. Morgan's transcript or in his exhibits.  We don't have

8   those.  We just have the orange folder now and that's just his

9   test data.  On the Rule 16 order, it was listed and I put

10  right below their exhibits, objection to any exhibit not

11  exchanged in Pennsylvania or in New York in disclosure.  So

12  there's an objection in there for anything not exchanged.  I

13  think if they can't show that it was produced, either in

14  deposition transcripts exhibits or by directly or in discovery

15  response or even in cover letter, I think it should be struck.

16  I think they have the burden to show it was exchanged and if

17  they went through the work of finding that it was exchanged,

18  in advance you have my apologies.

19          THE COURT:  All right.  Mr. Saal, come up, please.

20          MR. SAAL:  Just to clarify some of the points that

21  were made, it wasn't represented that the Sav-a-Lot

22  application was in Dr. Morgan's deposition or in the exhibits.

23  We said it was referenced in the report which the initial --

24  the disclosure of the expert reports were provided in the

25  summer of 2016.  Additionally what Mr. McElfish is referencing

Proceedings                                    2011

1   regarding his attempt to get the Sav-a-Lot information, it

2   specifically said no payroll records.  Nothing that he said he

3   ever produced showed that there weren't any application

4   records.  We were able to obtain the application.  We don't

5   know why Mr. McElfish's attempts to obtain the records himself

6   yielded no results.  Additionally, this issue was addressed

7   yesterday.  We had the initial objection to the application.

8   Then Mr. McElfish opened the door on redirect by going through

9   the other job applications that were referenced with Sunoco

10  and Pizza Hut and Walgreen's.  And then this issue was raised

11  again and based on Mr. McElfish opening the door on his

12  redirect, that's when the Sav-a-Lot application was received

13  into evidence.

14          So at that point this matter was really considered a

15  closed issue.  We did not need to address the discovery issue

16  any further until Mr. McElfish raised it again late last

17  night, which doesn't allow me the opportunity to go back to my

18  office and go through my entire paper file in order to go

19  through this.  It's going to be our standard practice.  We get

20  something like this in discovery, we're going to turn it over,

21  but after this issue was addressed in court when first Your

22  Honor made the ruling that it was not going to come in,

23  Mr. McElfish opened the door and then it was received into

24  evidence and at that point we considered the issue to be

25  closed and we were not -- we did not think there was an issue

Proceedings                    2012

1   regarding whether it was disclosed, whether that was going to

2   be something that was going to be re-raised.  Now it was

3   re-raised late last night when there's nobody in my office and

4   I don't have the ability now at this point to go back to

5   Ryebrook and go through my paper file to confirm it was sent

6   because when we receive something pursuant to an

7   authorization, it's going to be provided, but to now be raised

8   again after it was settled yesterday doesn't give me the

9   opportunity to respond to what was said.

10          THE COURT:  Do you have that excellent paralegal who

11  worked on the case?  Is she back in the case?

12          MR. SAAL:  I believe she's in the office.  I have to

13  call.

14          THE COURT:  Can't she look for it?

15          MR. SAAL:  I would ask her to look for it.  This was

16  still something that was -- that Mr. McElfish opened the door

17  on his redirect.

18          THE COURT:  We'll do it this way.  Why don't you get

19  that paralegal on it.  Have her find where it was produced

20  during discovery after the authorization was sent out,

21  information was received from -- what is it called again --

22  Sav-a-Lot, and you sending it on to Mr. McElfish and his team.

23  If you cannot find that information then we will revisit the

24  issue.  We have got the defendant's case to get through.  If I

25  am going to grant Mr. McElfish's application, it can be done

Proceedings                                                    2013

1  at some subsequent point.  All it is is an instruction to the

2  jury that they disregard the testimony concerning the

3  application.

4           MR. McELFISH:  It would be withdrawn from evidence

5  as well, so.

6           THE COURT:  Yes.  All right.  So we will take it one

7  step at a time.

8           MR. SAAL:  Thank you, Your Honor.

9           MR. McELFISH:  A noncontroversial issue; I have

10 before I rest some photographs of Mr. Bauta's graduation that

11 we need to admit.  It's been agreed by Mr. Barmen to admit

12 them.  The ladies that work for me are at Kinko's getting good

13 copies instead of copying them on our hotel printer.  It is

14 Exhibit -- if you can just make a note, Your Honor, and we can

15 mark them later, but it's 302 on the Rule 16.  It's

16 entitled -- no, I'm sorry, hold on.  301 on the Rule 16.  It's

17 entitled Photos of Plaintiff and Family.  I think there are

18 six of them, but when they get here with the copies I will

19 submark them.

20          THE COURT:  You have no objection?

21          MR. BARMEN:  No, Your Honor they were on the Rule

22 16.  I just want to make sure I see them when they get here

23 but no objection.

24          MR. McELFISH:  In fact, I served a discovery

25 response with them attached from July of '13 -- '15.

Proceedings                                    2014

1          THE COURT:  And that is it and then plaintiff will

2   rest?

3          MR. McELFISH:  Yes.  And I also am informed that the

4   day is shortening very fast; that we only have two witnesses

5   today.

6          MR. BARMEN:  Three with Peachey.

7          MR. McELFISH:  Are you going to put her on by video?

8          MR. BARMEN:  I don't -- if we have time we certainly

9   can, but the judge would have to go through any objections and

10  deal with that before we can put her on and I don't know that

11  we're going to have a transcript immediately after the

12  deposition.

13         THE COURT:  Who do you have scheduled --

14         MR. BARMEN:  Our first witness, Your Honor, will be

15  Dr. Joel Morgan and then we have Dr. Robert Nobolini.  Morgan

16  is neuropsych and Nobolini is biomechanics.  We have decided

17  to cut out all of those West 34th Street witnesses and

18  Dr. Alladin.  I don't think we need him at this point and we

19  didn't think the Court would mind a cutting out a bunch of

20  witnesses.

21         THE COURT:  No Vargas, Rampersaud, Ramirez, Rambrich

22  or Dr. Alladin?

23         MR. BARMEN:  Correct, Your Honor.  We've decided to

24  cut those out.

25         THE COURT:  So it's just Nobolini and Morgan today

SN      OCR      RPR

Proceedings                                    2015

1   and perhaps Ms. Peachey by videotape?

2              MR. BARMEN:  Yes, Your Honor.  And then Monday we

3   have Dr. Provenzale in the morning.  He's our neuroradiologist

4   and then we evened our case with Dr. Rabin, our neurologist.

5              THE COURT:  So we're still thinking about Tuesday

6   for closings and charge.

7              MR. BARMEN:  Yes, Your Honor.  Well, obviously,

8   subject to the charge conference that we have to have.

9              THE COURT:  We will have that Monday evening, late

10  after afternoon, evening, depending upon --

11             MR. McELFISH:  I don't think those witnesses will be

12  very long.  Provenzale is a radiologist so we won't be very

13  long.

14             MR. BARMEN:  Neuroradiologist.

15             MR. McELFISH:  A little longer.

16             THE COURT:  Okay, so that's great.  So I will hear

17  the motions.

18             MR. ORTIZ:  Good morning.  May it please the court,

19  my name is Robert Ortiz.  I'm appearing on behalf of the

20  defendants, Greyhound and Sabrina Anderson.  On behalf of

21  defendants we move for judgment as a matter of law, pursuant

22  to Federal Rule of Civil Procedure 50(a) as to a number of

23  claims that I will detail further.  As the Court is aware, and

24  as explained by the Second Circuit, Rule 50 allows the

25  District Court to grant a motion for judgment as a matter of

Proceedings                                    2016

1   law in favor of the defendant if at the close of plaintiff's

2   case a reasonable jury would not have a legally sufficient

3   basis to find for a plaintiff on an issue essential to the

4   claim.  And such a motion may be granted if there exists a

5   complete absence of evidence supporting the verdict that the

6   jury's findings could only be the result of sheer surmise and

7   conjecture.

8          Here the defendants seek judgment as a matter of law

9   and dismissal of numerous of the plaintiff's claims for future

10  medical expenses, as well as can the claims for traumatic

11  brain injury and post-traumatic stress disorder because the

12  evidence submitted at the trial on the plaintiff's case is

13  insufficient as a matter of law.  The law, and the facts

14  entitling Greyhound and Ms. Anderson to judgment as a matter

15  of law are as follows:  The first thing I would like to

16  address, Your Honor, deals with the numerous items in the life

17  care plan by Mr. Provder that lack a reasonable basis and have

18  not been established with reasonable certainty.

19         In New York, it is well-settled that future economic

20  injuries, including medical expenses, must be proven with a

21  reasonable degree of certainty.  And, for that, we cite

22  Schultz versus Harrison Radiator.  I spoke to the Court

23  Reporter and I'm giving her a list of the case citations, but

24  I will state it quickly, 90 NY 2d 311.  It's the New York

25  Court of Appeals 1997.

Proceedings                                    2017

1           Federal courts reviewing damages awards have

2     consistently applied this New York standard.  For that we cite

3     Adebiyi against Yankee Fiber Control Inc., 705 F. Supp. 2d

4     287, Southern District of New York 2010.  An award for future

5     medical expenses must thus be supported by competent medical

6     proof and may not rest on supposition or speculation.  For

7     that we cite Quijiano against American Transit Company, 155

8     A.D. 3d, 981, 2d department, 2017.

9           THE COURT:  I think it's Quijiano.

10          MR. ORTIZ:  I think it's Quihano too, Your Honor.

11    We also cite Hyatt v Metro N Commuter RR and that is 16 A.D.

12    3d 218, 1st department, 2005 for an award for future medical

13    expenses was set aside where the plaintiff was not attending

14    physical therapy before trial and the treating physician only

15    testified that he imagined plaintiff would need physical

16    therapy in the future.  Importantly, these awards for future

17    medical expenses are to compensate a plaintiff for

18    out-of-pocket medical expenses; that's as to the past and

19    future.

20          If you cannot demonstrate, you being the plaintiff,

21    with reasonable certainty that an expense will be incurred, or

22    the associated cost, then an award for that item of damage

23    should not be made or permitted.  An award for damages for

24    past and future medical expenses must be supported by

25    competent evidence establishing the need for the item, the

Proceedings                                              2018

1    cost of the medical care, the frequency and the duration.  And

2    for that proposition we cite <u>Pilgrim versus Wilson Flat, Inc.</u>,

3    110 A.D. 3d 973, the jump cite is 974, 2d department, 2013.

4         A plaintiff can recover damages for the costs of --

5    cannot recover, excuse me, for future medical treatments where

6    he has not previously received a treatment, has terminated

7    such treatment or has failed to offer testimony that he

8    intended to seek such treatment and, for that, we again cite

9    the <u>Hyatt</u> case, which is 16 A.D. 3d and the jump cite is at

10   219.  In that case, future medical expenses were deemed not to

11   be recoverable where there was no indication that the

12   plaintiff received the treatment in the year preceding the

13   trial.  Another case that is important is <u>Jackson versus</u>

14   <u>Chetrum</u>, 300 A.D. 2d, 446, 2d department, 2002; where it

15   precluded an element of medical expenses where there was no

16   testimony.  The plaintiff intended to undertake the treatment.

17        There is a very important case for the purposes of

18   our discussion today as we go through the life care plan, is

19   <u>Corn versus Levit</u>.  That is 231 ad 2nd 606 2nd department 1996

20   case.  In that case, the second department found that any

21   award for future expenses associated with treatment by a

22   psychologist is speculative because there was no indication

23   that the plaintiff was seeing a psychologist at the time of

24   trial.  Therefore, that was not a permissible award.

25        Here, Edmund Provder is not a medical doctor and he

Proceedings                                                    2019

1    admitted he cannot make any type of diagnosis.  That's at the

2    transcript, 929.  Incidentally, we would renew our motion in

3    limine that was made -- I think it was motion in limine 13 to

4    preclude Dr. Provder's testimony with regard to -- on three

5    bases that were raised in the motion.  Just for preservation

6    purposes I wanted to renew that, which is that his report

7    exclusively relied on Dr. Lattuga's findings to determine the

8    need for future medical care when Dr. Lattuga never actually

9    examined the plaintiff and we know the whole situation with

10   Dr. Lattuga's report.

11          Two, Mr. Provder's report predates the expert report

12   of Dr. Mobin who's in essence -- who also was not a treating

13   physician but just a litigation-retained expert and you cannot

14   post hoc -- post facto appropriate and approve that plan.

15   Third, Mr. Prover's testimony that he spoke to Dr. Mobin after

16   Provder was not a proper foundation.  We just wanted to renew

17   that for purposes of preservation.

18          Again, as I said, Mr. Provder is not a medical

19   doctor so he cannot be the foundation for any of these items

20   in terms of his life care plan.  He has to base his expert

21   opinions on diagnoses and recommendations of medical

22   physicians that are recommending this treatment as to the

23   particular plaintiff.  He can't just say he needs this because

24   I'm Mr. Provder.  It just doesn't work that way.  He cannot

25   lay a proper foundation.

Proceedings                                   2020

1          Now, I understand that during the sidebar when the

2    life care plan came up, Your Honor indicated that you would

3    instruct the jury at the end of the case that -- and this is a

4    quote:  If there's no corroborating evidence of these

5    procedures, any of these recommended items, then there's no

6    foundation for it and the jury can disregard the testimony.

7          That was at 907 of the transcript.  And I understand

8    what you said there.  However, with the greatest respect, our

9    position is that the jury can't do that with regard to items

10   that lack a legal foundation.  So if there's no foundation as

11   a matter of law, it's not for them to decide there's a

12   foundation or not.  That's an issue of law for the court.

13   It's different to say, you know, if, for example, we had

14   competing experts and our expert said he needs physical

15   therapy once a week for three years and their expert said he

16   needs it for life for this, then they can -- then they have a

17   factual determination which -- it's a battle of the experts,

18   it's a question of fact, who do you believe.

19         That's not what we have here.  And, so, when we deal

20   with the charge conference later, one of the things we're

21   going to ask for deals with itemization of the verdict and not

22   just by category but by specifics.  And there's a reason for

23   that and we'll explain it in the charge conference.

24         But just briefly, for example, you can't say

25   surgeries in this case.  Why can't you say that?  Well,

Proceedings                                    2021

1    there's been some testimony, even though the split screens are

2    on and it's someone withdrawn about the cervical fusion, and

3    there's some testimony about a lumbar fusion.  If they just

4    say surgeries on a verdict sheet, you don't know what they've

5    awarded it for.  Maybe you can do the math backwards or maybe

6    it was a 180, that he said for the lumbar.

7            The proper way to do it would be itemization as to

8    each of those particular items and the reason for that --

9    there's a case called Davis versus Caldwell which I don't have

10   a cite with me at the moment.  It said we have requested a

11   differentiated verdict, but the Court over objection has

12   refused it and there's no itemization, then you can't for the

13   purposes of Appellate review and your review in any post-trial

14   motion, you don't know what the jury did.  And that's why

15   we're going to ask for a specific itemization.

16           Turning to the issue at hand, now --

17           THE COURT:  Get to the specific evidence that is

18   lacking to support Mr. Provder's life care plan.

19           MR. ORTIZ:  Yes, I'm going to go through the items.

20   Unfortunately because of the nature of federal court and

21   having to lay bear all of our arguments, I have to go through

22   it item by item for preservation purposes.

23           What I'm saying is it's not enough for Dr. Mobin to

24   say, yeah, I looked at the life care plan.  It's okay.  He's a

25   neurosurgeon.  He dealt with this and he specifically

Proceedings                                    2022

1  testified as to items of future care that he believes are

2  necessary.  What you need is support from medical, preferably

3  a medical treater, saying I am treating this individual, this

4  is what he needs, this is how long he needs it, this is what

5  it costs.

6              THE COURT:  An expert witness can't do that.

7              MR. ORTIZ:  Our position is that it's not enough for

8  an expert to do it.  There has to be a foundation in the

9  record for that opinion.  So I will go through those opinions

10  and you can direct each one.

11

12              (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Proceedings                                          2023

1   (Continuing)

2          THE COURT:  So ordinarily, a treating physician does

3   not do that projecting out someone's life.  They are treating

4   an injury, and they treat it and they say whatever it is

5   they're going to say.  They don't say, Oh, and you are going

6   to need home care.

7          MR. ORTIZ:  Well, I mean --

8          THE COURT:  Oh, and in 10 years, you are going to

9   need a shower chair, or you are going to need this or you are

10  going to need that.  They are like, Right now, I am going to

11  prescribe X, Y, and Z.

12         MR. ORTIZ:  But based on a treating physician's

13  expertise, treatment of the patient, they are absolutely able

14  to project -- in their experience, they are able to project

15  what this person may or may not need going forward, because

16  they are familiar with that injury.  You can't just say -- you

17  need a medical foundation for it, because why do you need

18  these things?  What is the underlying basis for you to need

19  home therapy?  And we are definitely going to address that in

20  terms of why it shouldn't come in and should not be before the

21  jury.

22         THE COURT:  Get to the evidence.

23         MR. ORTIZ:  Okay.

24         So one other thing before I just get to it:  We are

25  going to have a long verdict sheet as it is with regard to --

Proceedings                                2024

1   based on what you were discussing the other day, in terms of

2   the past medicals by provider.

3              Do you remember you mentioned that?

4              And what -- this is an effort also eliminating a lot

5   of the itemization because of these items that don't --

6   clearly don't belong in front of the jury.  So that is part of

7   it as well, it is going to help the jury as well.

8              So with regard to Dr. Provder's trial testimony, at

9   874, he discussed a rehabilitation plan and development.  And

10  3,500 every five years.  There is no testimony from anyone in

11  this record that that is required.

12             MR. McELFISH:  I'm sorry, Rob, I missed that.

13             What was it.

14             MR. ORTIZ:  Sure.  That was rehabilitation plan at

15  874.

16             MR. McELFISH:  Rehabilitation plan?

17             MR. ORTIZ:  Yes.

18             MR. McELFISH:  Yes.

19             MR. ORTIZ:  And when I say 874, I'm talking about

20  the trial transcript.

21             MR. McELFISH:  874?

22             MR. ORTIZ:  Yes.

23             So our position is that that should be dismissed,

24  and it is not supported by legally sufficient evidence.  There

25  is no foundation for it.

```
 1          PT evaluation is at 875 to 76 of the transcript.
 2   And he has the cost there.  I could tell you what the costs
 3   are, but they're in the record.  It's 145 to 350 each.
 4          MR. McELFISH:  So will -- the second one was
 5   physical therapy?
 6          MR. ORTIZ:  Yes, sir, 875 to 876.  So not even
 7   Dr. Mobin testified as to a need for that.  That should be
 8   dismissed, lacking any foundation.
 9          The next item, neuropsychological --
10          THE COURT:  But wait.
11          MR. ORTIZ:  Yes.
12          THE COURT:  So I forget which case you cited for --
13          MR. ORTIZ:  If you're not getting it now, you're
14   don't get it?
15          THE COURT:  If you are not previously received, not
16   sought, nor will seek.
17          MR. ORTIZ:  Right.  That was, I will tell you right
18   now, Hyatt.
19          THE COURT:  Okay.  So if Mr. Bauta had received
20   physical therapy --
21          MR. ORTIZ:  Well, that would be past.  That's in the
22   past.  This is, are you -- do you need this in the future?
23          THE COURT:  So you have to have, according to the
24   defendants, you have to have a treating physician at the time
25   they are treating the plaintiff saying, You are going to need
```

Proceedings                                2026

1    physical therapy for X years at three times a day at this,

2    when --

3            MR. ORTIZ:  Well, that is reasonable certainty.  You

4    have to come in and establish; you can't speculate.  You have

5    to say, this gentleman worked -- because of his medical

6    condition, he requires physical therapy.  Well, how often?  He

7    is going to need it for this long.  I mean, it's more likely

8    than not.  It's not certainty, absolutely certainty, but it's

9    more likely than not that he will need this, because

10   otherwise, it's pure speculation.  That is the position.

11           So for the neuropsych evaluation, and the other

12   thing I have -- actually, this is just the PT evaluation.  I

13   have PT separately, which I'll address.  One of the things is

14   he, already testified yesterday that he stopped it, so I'll

15   get to that also.

16           So for the neuropsych evaluation, I believe

17   Mr. Provder testified that he needs two:  One at the beginning

18   and one at the end.  Well, he already had one at the

19   beginning, because he had it with Dr. Thomas.  So obviously,

20   that shouldn't go on the verdict sheet.  And as to the

21   forward, future, no one said -- not even Dr. Thomas said he

22   needs it in the future, not at this trial.  And that's their

23   burden, they have to show that.

24           So otherwise, if you put a line item that says

25   neuropsych testing and the jury assigns a number, it is only

Proceedings                                           2027

1  based on Mr. Provder, who is not a medical doctor and can't

2  give that opinion.  That's -- that's where we are.

3          Rehab counselor.

4          THE COURT:  What page is the neuropsych eval at?

5          MR. ORTIZ:  The neuropsych eval is at 878-9, and

6  also 884 of the trial transcript.

7          THE COURT:  Okay.

8          MR. ORTIZ:  The rehab counselor is at 881.  That's

9  the testimony of Mr. Provder.  No physician testified that he

10 requires that.  Okay?

11         On physical therapy -- now we're at physical

12 therapy.  So physical therapy is at page 881 to 882.  So

13 Mr. Provder had three times a week, 48 weeks, two years.

14 Dr. Mobin says 20 times a year, $3,000 per year, but what's

15 the problem with that?  Well, again, Mr. Provder is not the

16 medical doctor, so even if we go to Dr. Mobin, his testimony

17 said 20 times a year -- this is at 1481 -- 1481 -- 20 times a

18 year, $3,000 per year.  How long?  Is it for life?  He didn't

19 say that.  His testimony was not he needs this for life.  So

20 there is no duration given.  And plaintiff testified yesterday

21 that he's not having physical therapy, which is exactly Korn

22 versus Levick, where you don't get it, right, and that -- I

23 will quote that case for Your Honor, and it dealt with --

24         THE COURT:  What is the cite for Korn versus Levick?

25         MR. ORTIZ:  Sure.  It is 231 AD 2d 606 (Second

Proceedings                                           2028

1   Department 1996).

2        It says -- it is further -- I quote this:  It is

3   further noted that any award for damages for future expenses

4   associated with treatment by a psychologist is speculative, as

5   there is no indication -- I'm sorry -- as there was no

6   indication that the plaintiff was seeing a psychologist at the

7   time of trial.  And it has jump cites and citations there.

8   Okay?

9        In <u>Jackson versus Chetrum</u>, which is 300 AD 2d 446,

10  (Second Department 2002), there was no justification for an

11  award of future medical expenses in the absence of any

12  testimony that such a program was available to the infant

13  plaintiff, and she intended to enroll in such a program.  That

14  dealt with some private schools, but it's along -- you know,

15  future; it's not just future medicals.  It's any kind of

16  future economics have to be established with reasonable

17  certainty.  So that's it on the physical therapy; no duration

18  given.  It's <u>Korn versus Levick</u>.

19       Psychological therapy is exactly -- is exactly <u>Korn</u>

20  <u>versus Levick</u>.  You have -- he is not receiving it,

21  psychological therapy.  That's at -- 887 was Provder's

22  testimony.  I know Ms. Cummings testified he was not receiving

23  it in January 2016.  That's at 1208.  That should be dismissed

24  as legally insufficient foundation.  Dr. Thomas didn't opine

25  that he needed few future psychological.  And he's not having

Proceedings                          2029

1  it at the time of trial.  That's <u>Korn versus Levick</u>, directly

2  on point.  That's why psychological is out.

3           Next is cognitive therapy, and that's 887-8.  You

4  know, with cognitive therapy, our position is, it also be

5  dismissed as legally insufficient foundation.  Dr. Mobin,

6  obviously, did not testify as to any psychological.  He was

7  just, you know, the spine, and that was -- that was a preface

8  to his testimony, actually.  And Dr. Thomas testified that he

9  would give him his therapy until plaintiff plateaus.  When?

10  No duration.  That's at 1130 to 1131.  That's Dr. Thomas's

11  testimony.  And our position is that that is not reasonably

12  certain, it is speculative, and that's why the cognitive

13  therapy should also be dismissed.

14           Your Honor, with regard to physiatrist, that's at

15  888-9.  This also should be dismissed as lacking a legally

16  sufficient foundation.  No plaintiff physician or expert

17  opined.  No one said that he requires a physiatrist.  This is

18  an absence of proof in the record.  No testimony from

19  Dr. Mobin.  No testimony from anyone.

20           Internal medicine, I think Your Honor asked the

21  question about, Well, so like everyone else, he'll go to the

22  doctor every year?  And the answer was, Yeah.  No one said

23  that he has to go to an internist as a result of this accident

24  or, you know, how it's related.

25           THE COURT:  What page was that?

Proceedings                                    2030

1          MR. ORTIZ:  The internal medicine was at page 889

2    from Dr. Provder -- sorry, not doctor, Mr. Provder.  I keep

3    elevating this gentleman.  And in terms of where was it in the

4    transcript as to anyone else?  Nowhere.  I don't recall where

5    exactly -- actually, I think your comment is right around

6    there, where internal medicine came up that you asked that

7    question.  So that should also be dismissed, lacking a legally

8    sufficient foundation.

9          Neurosurgeon, 890.  No one testified that he needs

10   to see a neurosurgeon, not even Dr. Mobin.  Also should be

11   dismissed, and that's 12 times a year, up to $9,000.  If you

12   add all these items, these are a lot of -- you know, they add

13   up, and there is no foundation for that.

14         Orthopedist, let me give you -- let me give you an

15   example where -- everything I've said so far doesn't have a

16   legal foundation.  Orthopedist, you know, it's -- it's an

17   example of where you did it -- where at least there's a proper

18   evidentiary foundation for the jury to consider it, and this

19   is why:  So the orthopedist, you know, was in there, and

20   there's testimony about $700 a visit.  To the extent that he's

21   a litigation-retained expert and not a treater, we'll put that

22   aside for a second, but at least there's testimony that it's

23   $700 a visit for a spine specialist; that's 1481.  How often?

24   At least once a year.  You know, I mean, I would argue that

25   it's still not sufficient, but at least there's something

Proceedings                                    2031

1    there that the jury could say, All right, how long?  What does

2    it cost?  And you have a doctor saying he needs it.  I still

3    don't have a doctor saying he needs it; although Dr. Cordiale

4    did indicate he hasn't discharged him for it.  So that's

5    potentially something that may be considered.

6         Pain management doctor, eight-ninety -- and I'm

7    sorry, orthopedist was 890 to 891 as far as Provder's

8    testimony.  As far as the testimony about the specificity for

9    it, that was at 1481, that was Dr. Mobin.  So, you know,

10   that's something else.

11        Pain management physician is at 891.  That's

12   Provder's testimony.  So what do we have?  We have Dr. Mobin,

13   again, retained expert, indicating pain management follow-ups

14   are 650, and that includes review of the imaging studies,

15   1482.  That's it.  That is the entirety of the testimony.

16        What does that mean?  How does a jury put a

17   number -- how does a jury extrapolate 650 from that testimony

18   and give an award?  How often?  How long?  He didn't say.

19   There is no testimony as to frequency, duration.  Any award

20   would be speculative.  They have no idea what to do.

21        THE COURT:  What is the case for where you have to

22   have the need, cost, frequency and duration?

23        MR. ORTIZ:  Yes.  Pilgrim versus Wilson Flat.

24   Awards of damages for past and future medical expenses must be

25   supported by competent evidence which establishes the need for

SAM     OCR     RMR     CRR     RPR

Proceedings                                    2032

1    and the cost of the medical care.  Now, obviously, the need

2    for and cost, if you don't know how long it's going to be, you

3    can't get that final figure.

4            THE COURT:  So frequency and duration, that's not in

5    the case, itself?

6            MR. ORTIZ:  The words, those words are not.

7            THE COURT:  Okay.

8            MR. ORTIZ:  But, Your Honor, how do you get to the

9    number?

10           THE COURT:  What's the <u>Pilgrim</u> cite?

11           MR. McELFISH:  I was going to ask.

12           MR. ORTIZ:  It's 110 AD 3d 973, (Second Department

13   2013).

14           MR. McELFISH:  973?

15           MR. ORTIZ:  Yes, sir.

16           MR. McELFISH:  Okay.

17           MR. ORTIZ:  I believe we just finished with the pain

18   management physician.

19           So, MRIs.  Mr. Provder referenced them at 891 of the

20   transcript.  Dr. Mobin says 2,000 per study at 1482.  How many

21   studies?  MRIs of what?  Lumbar?  Cervical?  I don't know.

22   When is it gonna happen?  For life?  For three years?  Provder

23   says once every three years.  I don't know.  You know, he's

24   not the medical doctor.  It's not enough to say that.  So,

25   again, that should be dismissed as legally insufficient

Proceedings                                              2033

1   evidence, foundation, no testimony as to frequency or

2   duration.

3            X-rays, same thing.  X-rays' testimony is at 891 to

4   '2.  There is no testimony about it from any physician in this

5   record as to when they're needed, how much they cost,

6   anything.  Again, lacks a legal sufficient foundation and

7   should be dismissed.

8            All of these items I say should be lack of legal

9   sufficient foundation and should be dismissed.

10           The EMG study, that is at 892 of the record.  The

11  same thing.  Other than Provder, there is no medical testimony

12  to support it.  It lacks a legal sufficient foundation for

13  submission to the jury.  It would just invite speculation.

14           Lumbar -- I'm sorry, the EMGs are at 892, Your

15  Honor.

16           Lumbar epidural injections are at 899.  Same thing

17  with cervical.  These are epidural, as opposed to the facet

18  blocks, injections.  No medical testimony by anyone saying

19  that he needs these modalities at all.  Dismiss both, lacking

20  a legal sufficient foundation.

21           Facet joint injections, this is interesting.  This

22  is at 899.  So why should this be completely gone?  Very easy.

23  Now, this is 4,500 to $15,000.  Provder said at 937 he would

24  take them off the list.

25           THE COURT:  At 8 --

Proceedings                                  2034

1          MR. ORTIZ:  I'm sorry, 937.  That was Provder's

2    testimony, he would take them off the list, because Dr. Winn,

3    who was the pain management physician, did not testify about

4    the need for these.

5          Dr. Mobin at 1482 referenced them and says that he

6    needs facet blocks, and he would give two sets.  That's at

7    1482.  You can see the testimony on that.  So our position on

8    that is what?  Treating pain management physician Dr. Winn did

9    not come in and say he needs these things.  Their

10   litigation-retained expert guy says, Oh, yeah, he needs these

11   things.  He, in part, is based on -- he was trying to say, Oh,

12   yeah, what Provder said, that's okay; but Provder, himself,

13   withdrew from -- withdrew those modalities from his plan.

14         So whatever he was going to rely on isn't even in

15   the record because it was withdrawn.  So our position, again,

16   is that that also lacks a legal foundation and cannot go to

17   the jury, because there is nothing to say he would get these

18   facet blocks.

19         THE COURT:  So let us say there was no lifecare

20   planner and we just have a retained medical expert;

21   neurosurgeon, orthopedic surgeon, whomever, who opines that

22   even if no treating physician has said he is going to need X,

23   Y and Z and the expert says, Well, based on the medical

24   records, my exam of the plaintiff, and I understand Dr. Mobin

25   didn't examine him --

Proceedings                                              2035

1          MR. ORTIZ:  Did not.

2          THE COURT:  -- but I do not know that that is

3    necessarily a requirement.  So based on my evaluation of this

4    case, he needs X, Y and Z.

5          Is it the defendant's position that that's not

6    enough?

7          MR. ORTIZ:  We think that's extremely weak for that

8    to be allowable, in terms of -- you know, I can't point to

9    you -- in candor to the Court, I can't point you to a case

10   that says it has to be the treater versus an expert, but you

11   have to look at the totality.  And the totality here is

12   Dr. Mobin, as you said, did not treat this -- did not treat

13   this patient, did not physically examine this patient.  And

14   where you have -- the reason we're doing it item by item is

15   because it's not just -- you can't, like, just lump it

16   together and say, Oh, yeah, well, he said what -- Provder said

17   is okay.  You have to look at these things and you see

18   testimony in the actual record where you have a treating

19   physician who did the pain management and didn't say this, but

20   the only person coming in is some litigation-retained expert.

21         I think that's a big problem to foundation.

22         Radio frequency ablations at 899, Your Honor.

23   Provder testified, I would take it off the list, at 937.

24

25         (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Proceedings                                      2036

1    (Continuing)

2         MR. ORTIZ:  We argue that there should also be

3    dismissed lacking a legally sufficient foundation because we

4    had Dr. Winn testify, who was the pain management physician.

5    He did not testify that this was needed and that's -- so it's

6    along the same theme that we've been discussing.

7         Branch block injections are at page 900.  Same

8    basis.  No medical -- zero medical testimony as to the need,

9    frequency or duration.  That should be dismissed as a matter

10   of law as well.  Should not go to the jury.  Should not be a

11   line item.

12        Now, the next items I am going to categorize or

13   collate together, which is the medications.  So the

14   medications in Mr. Provder's life care plan that was testified

15   to at pages 900 to basically 901, dealt with Percocet,

16   tizanidine, Zanaflex and Motrin.  Mr. Provder said he would

17   remove anything that plaintiff was not taking from the list;

18   that's at 941.

19        Dr. Mobin had just a list of categories; narcotics,

20   muscle relaxants, anti-inflammatories, $2,000 a year.  That's

21   at 1481.  But not only did no treating physician say that the

22   plaintiff needs that stuff, the plaintiff yesterday testified

23   at 1889 of the transcript that he's not taking anything other

24   than over-the-counter muscle relaxer.

25        So, you know, our position on this is that none of

Proceedings                                      2037

1   these itemized -- if you're going to do a line item for

2   medications, then it should say over-the-counter muscle

3   relaxers; but I don't even see that anyone gave a cost as to

4   what that is.  So, frankly, that would be speculative also.

5   It's certainly not $2,000 a year as Dr. Mobin testified to.

6          And then we get to these other adaptive equipment,

7   which is a shower chair.  This is 901 to 902.  The hand-held

8   shower; grab bars.  Let's leave it at those three items quick.

9   He's not using any of those things.  And no one said that he

10  needs them in the future, other than Provder.

11         Now, again, I don't -- he's not a medical doctor.

12  He's not someone that can give that foundation, so we would

13  submit that that should be all dismissed.

14         The TENS machine is at 902 and Provder testified

15  himself that it could be removed.  That's at -- his removal

16  testimony is at 940 to 941.  So, again, we would argue that

17  that should be dismissed, as not supported by legally

18  sufficient evidence.

19         I'm not going to oppose the cane.  People said that

20  he needs a cane.  It's in the evidence.  I mean, there was

21  video showing him using it sometimes, not using it other

22  times.  We won't oppose that.

23         Orthotic, elastic low back support.  Actually, I

24  know he testified yesterday that he used some sort of back

25  support.  So I will not oppose that.

Proceedings                                    2038

1           Okay.  Now big-ticket items are as follows:  The

2    lumbar fusion is a big-ticket item here.  It's 916 of the

3    transcript.

4           Actually, let me do the cervical fusion first.

5    Sorry, Your Honor.  Let's do 915.  It's a lot quicker.

6           No physician said he needs a cervical fusion.  In

7    fact, Provder said he would remove it, at 940 to 941 of the

8    transcript, because Dr. Cordiale did not say it was needed.

9    And at page 161 of the transcript, Dr. Cordiale said he's not

10   recommending a cervical fusion.  There's zero basis for a

11   cervical fusion line item to be on the verdict sheet.

12          So this kind of brings me back to where we started

13   at the beginning where we said, you know, let the jury find

14   out if there's a foundation.

15          THE COURT:  Well, it is a little different.

16          MR. ORTIZ:  Okay.

17          THE COURT:  Right?  Because Dr. Mobin, even

18   Dr. Mobin, said no cervical fusion.

19          MR. ORTIZ:  Right.  So that clearly --

20          THE COURT:  So here you have no medical provider or

21   expert saying that there is a need for cervical fusion.

22          MR. ORTIZ:  So you would agree with me that that

23   clearly should not be on the verdict sheet and should be

24   dismissed?

25          THE COURT:  Well, I am going to hear from

Proceedings                                             2039

1   Mr. McElfish first before I make a decision.

2              MR. ORTIZ:  Okay.  Don't want to jump the gun.

3              THE COURT:  But I will grant you the cervical fusion

4   is in a different category than anything else because there is

5   some testimony about something, even if the frequency and

6   duration is lacking and all that.  There is some provider that

7   says -- whether it's a treating provider or a retained

8   expert -- saying yes, he needs something like that.

9              MR. ORTIZ:  Yeah, I mean, Your Honor, when you

10  brought up the thing about well, the case age -- the treatment

11  and the frequency and the duration.  I think just to address

12  that, you know, just from a logical perspective, when you just

13  have he needs this and this is what it costs.  And that's it.

14  You're still asking them to speculate as to how long this

15  person -- they're not doctors -- how long does this person

16  need it?  How long, you know, how frequent?  Because that will

17  -- obviously, it's a multiplier on the cost of the one-time

18  cost, whatever it is.  It's a multiplier.  That's how they get

19  to the number.  And that's why it's improper because it would

20  be speculative for them to come up with that number.  I

21  actually have a case that I'll talk about in a second.

22              But let's go to the lumbar fusion.  That's 916.

23              All right.  So why do we want this dismissed as a

24  matter of law?  Again, Mobin; expert, not treater.  You've got

25  that.  You've gotten that point.

Proceedings                                    2040

1          Dr. Cordiale operated on the plaintiff's back and
2    lumbar spine.  He's his surgeon; okay?  He didn't come in and
3    say, and by the way, he needs future surgery or he's going to
4    have ASD, the adjacent segment disease.  That's who you would
5    think would testify to that.  And as a matter of fact, I mean,
6    there's a basis for -- it's going to sound strange to you -- a
7    missing witness charge.  Even though he was here, he didn't --
8    he wasn't asked, hey, do you think he needs future lumbar
9    surgery?  That's the person you would ask.  Do you need lumbar
10   surgery?  The guy that opened his back and did the two-level
11   fusion, not some litigation-retained expert from Beverly
12   Hills, that's here to grossly inflate the claim.  That's the
13   basis that you need.
14          Dr. Cordiale testified as to a potential that he may
15   need more stuff.  Maybe more surgery, he says; page 157.  That
16   is not reasonable certainty.  All he said is I don't feel
17   comfortable discharging plaintiff from my care yet.  But he
18   never mentioned a need for future lumbar surgery.  And you can
19   see Dr. Cordiale's testimony at both 157 and 170 to 171 of the
20   record.
21          And the other thing is, you know, one of the issues
22   with Dr. Mobin's testimony, he basically said 36 percent of
23   the people after ten years will need this.  I mean, our
24   position is that's not really more probable than not, under
25   all the facts here.  It doesn't provide a sufficient basis for

Proceedings                                    2041

1    the need for future lumbar surgery to be established with

2    reasonable certainty for the jury to say, okay, he needs it.

3    I think the key there, though, is the surgeon was here.  He

4    didn't say it.  And that's very, very important.

5            Home care is the last item on the plan and that's

6    at, you know what?  I apologize, I think it's at 917, but I'm

7    not sure on that one.

8            So this is obviously a big-ticket item.  And why

9    should this be dismissed for legally insufficient evidence?

10   Well, not one treating physician recommended it.  Not one.

11   Not even Dr. Mobin.  Plaintiff told Provder that he cooks; he

12   cleans; he takes care of himself without home care.  It just

13   takes him a little longer to do things.  That's at transcript

14   944.

15           Provder admitted that plaintiff has not received any

16   home care since the accident; 945.  He can't recall, Provder,

17   could not recall whether plaintiff ever indicated he would

18   want home care; same page.  No doctor has indicated, he

19   admitted, that no doctor has indicated the plaintiff will

20   require home care in the future.  That's also at 945.  That's

21   Provder.  Mobin says nothing about it.

22           So you have no treating physician, not even the

23   expert saying it.  You have just some guy who's a counselor;

24   okay.  He doesn't have it now.  Maria Bauta, his sister,

25   testified yesterday that he's able to take care of himself

Proceedings                                          2042

1    with a little support and help from his family.  That's at

2    1777; okay?

3            There is absolutely no foundation in this record for

4    this individual to have $35,000 a year in home care and any

5    award by the jury with regard to that would be complete

6    speculation and lacking in foundation.  And that's why it

7    should be dismissed as a matter of law.

8            That's it on the life plan.  I have two other items.

9    One is the dismissal of the claim for traumatic brain injury.

10           The traumatic brain injury should be dismissed as a

11   matter of law.  I understand Dr. Honor testified, again, a

12   non-treating litigation retained expert, that plaintiff

13   suffered a TBI caused by the accident.  But he admitted,

14   plaintiff performed very poorly on the overwhelming number of

15   tests designed for effort.  That's at 428, 438, 440.

16           He also admitted that there are neuropsychologists

17   that would look at this test data, look at the numbers and say

18   this man is malingering or faking.  That's at 428 of the

19   record.

20           THE COURT:  Give me those pages again.

21           MR. ORTIZ:  Sure.  428.  The original one was 425 to

22   426.  That was where he said causation.  Where he did poorly

23   on the overwhelming number of tests was at 428 and 438 to 440.

24   And he says that there are neuropsychologists that would take

25   the test data, look at the numbers and say this man is

Proceedings                                        2043

1   malingering or faking, was at 428.  Okay.

2          His only argument against the test results, the lack

3   of validity to the test results, is that he had information

4   from other sources which happen to be the plaintiff's sisters

5   and brother-in-law, which is 428 to 429, when he had

6   specifically asked for non-family members of plaintiff's

7   counsel, but he was sent family members to talk about it.

8   That's where he got this correlation.

9          And he also testified that the plaintiff presented

10  with factors that are typical and accompany malingering,

11  including secondary gain, familial difficulties and impulse

12  control.  That's at 466 to '7; 475.

13         And as to malingering, Dr. Thomas even testified

14  that the validity testing, plaintiff was not putting full

15  effort; that's at 805.  And interestingly, Dr. Thomas says he

16  can't read at a first grade level.  Meanwhile, plaintiff

17  yesterday says I can read, you know.  He refuted plaintiff's

18  own testimony that he has a TBI.  He says, I can read.

19         Dr. Thomas testified he has a TBI, but he didn't

20  causally relate it to the accident.  It's not there.  If you

21  look at the entirety of Dr. Thomas's testimony, that's at --

22  the TBI is at 787.  No questions are ask, do you causally

23  relate it?  It seems like a forethought.

24         THE COURT:  This is Dr. Thomas?

25         MR. ORTIZ:  Dr. Thomas.  He's the treating.  He

Proceedings                                    2044

1    never said it.  It was never adduced.  You want to assume it,

2    you know, but that's -- you still have to meet your burden,

3    you know, and you have to elicit that testimony from the

4    expert, was that causally related?  From the treater.  And he

5    didn't.

6              Dr. Honor conceded that not one person that

7    treated --

8              THE COURT:  Treaters generally do not testify as to

9    causation.

10             MR. ORTIZ:  Well, he wasn't even asked.

11             THE COURT:  I do not think it was relevant to his

12   treatment.  He did not care.  Did not need to know.  He knows

13   the guy has symptoms and he is treating the symptoms.  I do

14   not think he was asked to opine as to causation.  So.

15             MR. ORTIZ:  Dr. Honor conceded not one person who

16   treated, as opposed to evaluated the plaintiff for purpose of

17   litigation, ever diagnosed him with a TBI.  That's at 450 to

18   '52.

19             THE COURT:  To be fair, it was also in his --

20   although the jury is not going to know this -- it was in his

21   bills to Dr. Mikelis to Dr. Thomas.

22             MR. ORTIZ:  Right.

23             THE COURT:  About the diagnosis.

24             MR. ORTIZ:  Right.  It's being redacted; right?

25   Because it was stricken.

Proceedings                              2045

1          THE COURT:  Yes, but that -- you cannot -- I am

2     going to strike it.  You cannot say there is no testimony

3     there.

4          MR. ORTIZ:  But why was it stricken?  It was

5     properly stricken.

6          I'm almost done, Your Honor.

7          THE COURT:  Okay.

8          MR. ORTIZ:  The other thing I would note is that

9     plaintiff, who was so traumatically brain injured, actually

10    schedules medical appointments for his father.  That's at

11    1929.

12         So based on these things, the defendants move to

13    dismiss the TBI claim as speculative.  Not established with

14    reasonable medical certainly to exist.  That's A.  Or to be

15    reeled to the accident, which that's B.

16         Lastly, we move on to -- lastly from my part,

17    because there's one other issue that Mr. Saal is going to

18    address, but claim of PTSD must be dismissed as a matter of

19    law.  And I think, just to color the argument, it's

20    interesting how Mr. Bauta was so traumatized by this bus

21    accident -- and look, it was a tough accident.  We understand

22    that.  But the claim is that he had PTSD and he was so

23    traumatized that he's on a bus, a Greyhound bus twice, two

24    trips on Greyhound busses, post-accident; one being eight

25    hours each way, within two weeks.  That's at transcript 1916.

Proceedings                                    2046

1   That was yesterday.

2           Dr. Goldman did not relate the PTSD to the accident;

3   that's 307 to 308.  Did not know he was a convicted felon; 335

4   to 338.  Didn't ask if he had sleeping issues; 345.  Did not

5   explore any of his family issues; that's 348.  No validity

6   testing performed; 352 to 353.  Not one of these physicians

7   ever referenced the DSM V criteria for PTSD.  There's a whole

8   laundry list of items that you have to have.  No one said that

9   he met that criteria.

10          So the defendants move to dismiss the Post-Traumatic

11  Stress Disorder claim at speculative, and not proven with a

12  reasonable degree of medical certainly to exist or to be

13  causally-related to the accident.

14          Lastly, before turning it over to Mr. Saal for the

15  motion as to liability issues.  We also move to dismiss the

16  bill for New York Spine, which plaintiff's testimony was that

17  it was not sent to him; 1941.  And it was addressed, To Whom

18  It May Concern.  So there's no evidence that that bill was

19  paid; that it's due and owing, such as to establish that

20  expense with reasonable certainty.

21          And Mr. Saal.

22          THE COURT:  I want to --

23          MR. ORTIZ:  I just wanted to alert the Court that

24  there is an issue that he wanted to raise with regard to some

25  liability issue.

```
                         Proceedings                        2047

1             THE COURT:  I want to go -- not yet.

2             MR. SAAL:  Okay.  All right.  There is something

3    also.

4             MR. ORTIZ:  May I have one moment, sir?

5             THE COURT:  Yes.

6             (Pause in the proceedings.)

7             MR. ORTIZ:  In addition to the New York Spine, there

8    was also no bill issued to the plaintiff for West 34th Street.

9    So if he was never billed for the service, and that's at 1941

10   of the transcript, then it's not -- I mean, there's no proof

11   that he incurred the expense, or is the expense is due and

12   owing and that shouldn't go to the jury either.

13            Thank you, Your Honor.  Appreciate the time.

14            THE COURT:  Okay.

15            MR. McELFISH:  I don't have a 40-minute argument.

16            THE COURT:  Good.

17            MR. McELFISH:  I'm not sure what you want me to

18   address.

19            THE COURT:  Address what you want to address.  It is

20   up to you.

21            MR. McELFISH:  Okay.

22            With respect to well let's start with, I guess,

23   Dr. Mobin.  Actually, let's start with this.  I thought I

24   heard him say -- what is your name again?  Last name.

25            MR. ORTIZ:  Ortiz.
```

Proceedings                                    2048

1              MR. McELFISH:  Ortiz.

2              I thought I heard Mr. Ortiz say that if a treating

3      doctor didn't testify that it was needed, that it wouldn't

4      survive the test for future care.

5              Now, my recollection -- and particularly I heard the

6      argument about Dr. Cordiale and how he didn't really have an

7      opinion with reasonable certainty as to the future.  I think

8      that argument is problematic here, because I think Your Honor

9      sustained objections to questions about what treating doctors

10     thought about future care, if my recollection is serving me

11     correctly.

12             THE COURT:  Assume that I disagree with defendant's

13     argument that it must be a treating physician that has to

14     render an opinion as to future care.

15             MR. McELFISH:  Okay.

16             THE COURT:  That an expert, a retained expert,

17     whether -- a retained medical expert can opine on the need for

18     future care, provided there is a proper factual basis for that

19     expert to do that.

20             MR. McELFISH:  Right.  That takes care of a lot of

21     arguments, because a lot of the arguments about the various

22     issues in the life care plan were mostly rooted in the

23     treating physician didn't require it.

24             Also, there's the issue -- and I will get to that.

25     But there is the issue of whether or not he's currently doing

Proceedings                                                2049

1    it, or needing it, or using it, or whatever.  And there's so

2    many items that Mr. Ortiz mentioned that, in fact, he is using

3    it and needing it.

4            For instance, just off the top of my head.  This

5    wasn't briefed so this is the first time I'm hearing the page

6    citations and things of that nature.  If the Court has a

7    concern about a particular item, if we can have time for

8    Ms. Diamond to check the transcript, we can certainly address

9    that.

10

11           (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    2050

1          (Continuing.)

2          MR. McELFISH:  But, like, medications.  He testified

3     and I don't think I was hearing things.  I think he said he

4     was taking muscle relaxers.  I don't think you get those

5     over-the-counter.

6          THE COURT:  That struck me too as something that is

7     peculiar.

8          MR. McELFISH:  I don't go to CVS.  I know that he's

9     seeing Dr. Cordiale and most likely that's where it's being

10    prescribed.  I know that Dr. Cordiale testified he was

11    prescribing medication for him.  So he had taken muscle

12    relaxants.  We know it's prescription medications.

13    Dr. Cordiale has scripts in his records that were admitted;

14    back brace -- all of those items, he uses them.  He's got

15    them.

16          He testified yesterday, Mr. Bauta, that he just

17    stopped doing physical therapy a couple of months ago but he

18    continues to do home exercises.  It was put in a different

19    light on cross-examination, but he does say he does the squats

20    and the wall pushups to help with the back and the spasms

21    which were prescribed by physical therapy.  I think it was

22    Dr. Rosenrerg.  So he is doing and and he under the care of

23    Dr. Cordiale still.

24          So, going to the experts I could be up here for

25    hours talking about each of the items, theoretically, but

Proceedings                                    2051

1   that's not going to happen.  Generally the way I see, and in

2   this trial it's the same; the breakdown between the experts,

3   their qualifications and foundation between doctors and life

4   care planners , for instance, is a doctor can prescribe

5   anything that's medical, physical therapy, pain management,

6   chiropractic if need be, future surgery.

7            I walked through Dr. Mobin's report when he was on

8   the stand, I think without objection, and it's found at 403.

9   That's his report, 403-110.  I don't have the transcript

10  pages, but he talked about spine specialists -- and spine

11  specialists are neurosrgeons.  I don't know why it was said

12  that a neurosurgeon wasn't mentioned, but when a neurosurgeon

13  says spine specialist he means neurosurgery.

14            THE COURT:  When a neurosurgeon says it, but when an

15  orthopedic surbeon says it, they mean an orthopedic surgeon.

16            MR. McELFISH:  Probably, but that doesn't help them,

17  but you're right.  Pain medications tizanidine is listed.  We

18  went through all of this.  Anti inflammatories, physical

19  therapy, pain management.  Dr. Mobin talked about the need for

20  future pain management in terms of cephalexin and epidurals

21  and injections.  We're back to Dr. Winn didn't need to do that

22  and Dr. Mobin actually talked about the pain management for

23  both the lumbar and the cervical, so he was able to cover both

24  of those.

25            He did talk about facet medial branch raisotomies

Proceedings                                    2052

1   and blocks and he talked about MRI studies and he talked about

2   lumbar fusions for the adjacent segment disease.

3          Now, on the issue of frequency and duration, he

4   testified to that.  He had -- he put down 20 sessions a year

5   physical therapy for the rest of his life.  That's what he

6   said.  Spine specialist once a year for his lifetime.  I don't

7   believe that's the standard that you have to have the exact

8   frequency and duration.  Anyhow, it is in the regard.  So

9   anything that's medical, certainly Dr. Mobin is capable of

10  covering that.  Most of the issues in the life care plan found

11  at 406-123.  That's the cover page, the summary page I tried

12  to get in.

13         The projected evaluations came from two places; one,

14  Dr. Mobin and Dr. Honor; for spine for neuropsychology.

15  That's only $1,234 a year.  Therapeutic modalities came from

16  all the treating records as well as Dr. Mobin.  The issue

17  about -- we're back to the Lattuga issue.  Lattuga and Mobin

18  are almost identical and Dr. Provder testified to that except

19  for the need for cervical fusion and you mentioned your issue

20  with the cervical fusion.  But the projected medical care, the

21  modalities, the pain management, the medication needs.  That

22  was all developed by Dr. Mobin.  It's in the record.

23         Now, you got down to aids for independent living,

24  orthotic needs, positioning needs, home care needs.  I mean,

25  Doctor -- I'm sorry Mr. Provder has plenty of qualifications,

Proceedings                                    2053

1   lots of things he can testify to from his own experience of

2   treating people that are disabled; home care, aids for

3   independent living, all of those items that are in the plan,

4   certainly he has foundation without a medical doctor for that.

5   I think I heard Mr. Ortiz say that if Dr. Mobine did not say

6   he needed it, he can't opine on it.

7            Also, interestingly, even though there was a

8   disagreement on the amount and the duration, Wendy Cummings

9   put in a lot of home care.  In fact, she is at -- let me see

10  what she put in.  She was at 475-0018.  She put in physical

11  therapy.  She had different designations.  She put in medical.

12  She put in physiatrist so that's in the record.  Spine

13  specialist, orthopedist once per year.  It may not be his

14  fault.  Maybe Mr. Ortiz wasn't here that day, but she

15  basically covered a number of the things that Dr. Mobin didn't

16  cover exactly the way it's supposed to be covered, she covered

17  it.  Orthopedics sticks out in my mind because Mr. Ortiz said

18  there's nothing in the record about an orthopedist.  It's

19  actually Wendy Cummings' opinion.

20           Then we went to the medications.  She also agrees on

21  the muscle relaxants.  Then we get to the equipment.  She

22  agrees with shower chair, handheld shower, back brush, grab

23  bars, lumbar orthosis.

24           THE COURT:  Back brace.

25           MR. McELFISH:  Back brace.

Proceedings                                    2054

1          THE COURT:  And a cane.  So if you take the treating

2    doctors out of the equation, you've got Dr. Mobin for all the

3    spine stuff, covered it all.  You've got Dr. Provder for all

4    the aids for independent living and the thing --

5    rehabilitation counseling, case management for the non-medical

6    parts and then you've got the defense experts filling in the

7    holes if there were any or just firming up twice what it is he

8    needs in some of these other areas and then moving on to the

9    neuropsychological issues.  Do you have any issues or

10   questions about the medical stuff?

11         THE COURT:  Yes.  Cervical fusions.

12         MR. McELFISH:  I'll come to that.  The reason why I

13   want to break it in two is because Ms. Peachey is waiting in a

14   firehouse or in a conference room somewhere and I'm going to

15   run upstairs and take her deposition.

16         THE COURT:  Move to the cervical fusions.

17         MR. McELFISH:  Yes.  And then Mr. Kieffer is going

18   to cover the neuropsychological stuff because he handled those

19   witnesses.

20         THE COURT:  Okay, sure.

21         MR. McELFISH:  The cervical fusions.  You know how

22   I'm going to handle this is, it's not in the record --

23         THE COURT:  Very carefully.

24         MR. McELFISH:  No.  Actually, very clumsily.  It's

25   not in the record.

                    SN        OCR       RPR

Proceedings                                          2055

1          THE COURT:  So it should come out.

2          MR. McELFISH:  All right.

3          THE COURT:  Agreement that the cervical fusion is

4     out.

5          MS. PINERA-VAZQUEZ:  Accepted.

6          THE COURT:  The motion is granted to that extent.

7          MR. McELFISH:  It was going to be granted anyway.

8          THE COURT:  I wanted to hear what you had to say.  I

9     was keeping an open mind.

10         MR. McELFISH:  I don't think it flies, but the only

11    argument to make is that Provder testified that he relied upon

12    the Lattuga report and he needs it for that reason, but I

13    don't think because Lattuga came in and actually expressed

14    that opinion that he's able to rely upon it for the jury to

15    consider.  He had foundation for his opinion but I don't think

16    there's enough foundation in the record --

17         THE COURT:  Fair enough.

18         MR. McELFISH:  -- in total to get it to the jury.

19         THE COURT:  Fair enough.

20         MR. McELFISH:  Are there any other questions or

21    issues on the medical stuff?

22         THE COURT:  No.

23         MR. McELFISH:  What I'd like to do is turn the TBI

24    arguments and the PTSD arguments over to Mr. Kieffer.  Before

25    I do, Ms. Diamond has indicated to me in a note there is

Proceedings                              2056

1   substantial case law that life care planners need not --

2   strike that.  There is substantial case law that life care

3   planners need not be a medical doctor, but can rely on medical

4   records as well; not just medical doctors or experts but the

5   records.  The Pilgrim case does not discuss the nature,

6   frequency or duration and is actually -- and is actually quite

7   short stating only the jurors award of future care is reduced

8   because that's what the evidence established not because it

9   lacked foundation.

10          THE COURT:  I'd love to hear from Mr. Kieffer on the

11  TBI and PTSD.  I know you have to go.  My initial reaction to

12  the motion is that I don't necessarily disagree with the

13  ultimate that thrust of it that there is insufficient evidence

14  for the jury to -- that the jury is not going to come back

15  with amounts for all of these different things or for a lot of

16  these different things but the standard in the rule is that a

17  reasonable jury would not have a legally sufficient

18  evidentiary basis to find for a party on a particular issue.

19          I think there is enough evidence for them to at

20  least consider it.  I don't think, I'll be frank, that there

21  is a preponderance of the evidence for a lot of these things

22  so they're not going to come back with it but I'm inclined to

23  deny the motion but I do want to hear about TBI and PTSD from

24  Mr. Kieffer because those are I think particularly troublesome

25  areas.

Proceedings                                    2057

1          MR. McELFISH:  You got it.  Thank you.

2          THE COURT:  I want to add that you need to address

3     this in the jury charge.  You cited a lot of cases.  I want to

4     see those cases.  If you want to each do competing versions of

5     a jury charge on future medical care, we'll consider that.

6          MR. ORTIZ:  For what?

7          THE COURT:  For future medical care and for other

8     future care.

9          MR. KIEFFER:  Are you ready --

10          THE COURT:  If you want to talk to Mr. McElfish,

11     that's fine.

12          MR. McELFISH:  No, go.

13          MR. KIEFFER:  As to the issue of a TBI Your Honor,

14     Dr. Honor testified quite clearly at page -- this would be the

15     transcript of May 2 at page 436 lines 8 through 17 based upon

16     all of his analysis which I can come to in a moment to a

17     reasonable degree of professional certainty Mr. Bauta had a

18     traumatic brain injury.  It was caused -- it appeared to be

19     caused by this bus accident and there was nothing in any of

20     the material that he reviewed suggesting that it was

21     attributable to any sort of preexisting cause.  Dr. Honor's

22     methodology was based upon well-accepted and time-tested

23     neuropsychological methods.  I can go through every category

24     but including a very exhaustive review of a lot of what's

25     called collateral information.  So first medical records, a

Proceedings                                              2058

1    number of medical records, collateral information including

2    school records, employment records, deposition transcripts,

3    interviews with family members.  I'm probably leaving a couple

4    of things out there.  Extensive neuropsychological testing

5    that he performed over, I think, a period of five separate

6    dates and then he interpreted all of that.

7              I know the defense has critiques much more focused

8    on his results and his conclusions and his methods.  I think

9    it's notable, although Dr. Morgan hasn't testified yet, used

10   many, most and perhaps all of the same methods that Dr. Honor

11   used and that Dr. Thomas used in terms of this Halstead Reitan

12   battery and whatnot.  He reaches different conclusions and

13   discounts some of the other factors that Dr. Honor considered.

14   For example, Dr. Honor for context purposes said I think

15   Mr. Bauta is a complex patient in this setting.  He's

16   obviously got some degree of chronic pain, some degree of

17   fatigue, some degree of emotional distress a lot of -- my

18   words, not his, but a lot of static overlay.  Things that make

19   the diagnosis a challenge but nevertheless he reached that

20   diagnosis to a reasonable degree of professional certainty.

21             I think he is undisputedly qualified.  I don't think

22   there's a bona fide challenge to his methods and, so, I think

23   as to the TBI claim, Dr. Honor more than clears the bar alone

24   on that.  I would then shift for a moment to Dr. Thomas.

25   Dr. Thomas made it clear that he was asked and this is the

Proceedings                                     2059

1   transcript from May 3 at page 783, lines 14 through 785, line

2   3.   There has been suggestion in the case that because

3   Dr. Honor posted this message on a Listserve, would anybody be

4   willing to take on a brain injured client on a lien and

5   Dr. Thomas responded and there was suggestion and

6   cross-examination from the defense that perhaps Dr. Thomas

7   just took it on face value from Dr. Honor that this this man

8   is brain injued and the portion of the transcript that I just

9   referencned, I asked Dr. Thomas, Did  you just take

10  Dr. Honor's word for it?  He said no, I didn't, I had to

11  perform my own assessment and he gave a fairly lengthy answer,

12  perhaps more lengthy than what I was looking for, but he

13  explained what he did and the results of his testing which was

14  the Halstead Reitan batter and some other things in that first

15  round of testing led him to a diagnosis of a moderate

16  traumatic brain injury.

17          And if the Court will recall, he did some retesting

18  about a year later extensively at Mr. Barmen's suggestion.

19  The same battery.  I think it was a bit more of an abbreviated

20  version and in his interpretation of the results saw some

21  improvement.  I think he categorized it at that point as a

22  mild or borderline mild/moderate.  I think he was trying to be

23  honest.  He said I think the score I have to say is -- the

24  point being, I think he was more borderline mild/moderate but

25  a stiff reading of the score in 2017 would have put him at

Proceedings                                            2060

1    mild.  I think that's further support and evidence for

2    traumatic brain injury.  The last thing I will say and

3    hopefully I can say it in a way that makes sense.  There is

4    the issue with the qEEG.  There was discussion about that and

5    the court ruled.  The court ruled that there couldn't be any

6    evidence or testimony about qEEG being diagnostic for a TBI.

7    But there could be evidence in testimony as to qEEG

8    demonstrating, I'll say, efficacy of treatment, that

9    Dr. Thomas was making progress.

10           And I think the Court kept a tight leash on all of

11   us because it relates to abiding by that and I think we did

12   it.  But I think the evidence from Dr. Thomas is, based on the

13   qEEG results, he was able to tell that the treatment he was

14   giving Mr. Bauta for his brain injury, the traumatic brain

15   injury was improving the injury or the sypmtomatology.  So

16   even though there was no testimony that he could point to

17   parts of that qEEG and say, I diagnosis him with a TBI based

18   on it I think as a matter of simple logic, Dr. Thomas did

19   say -- these are my characterizations.  These may not be his

20   exact terms, but there signature patterns in these normalized

21   databases.

22           He talked about one for Alzheimer's and ADHD and

23   there's -- and these normalized databases had a signature

24   pattern for a TBI.  And so implicit in that testimony is if

25   the qEEG objective data is showing improvement in a traumatic

Proceedings                                    2061

1   brain injury then, as a matter of simple logic, he had one.

2   Now, the question then is what if any --

3           THE COURT:  All right, let's say I agree with you

4   that there is enough evidence in the record to pass it on to

5   the jury for their consideration.  Tell me about PTSD and I

6   will tell you I have a serious problem with this because the

7   defendants are right, there is no discussion at all from

8   anyone about the SN-5 and whether he meets the criteria for

9   that.

10          THE COURT:  And in order to diagnose someone with

11  PTSD they have to meet -- the psychological, psychiatric

12  community all agree that if you don't satisfy the criteria in

13  the DSM-5 for whatever condition, you don't have it, and I

14  didn't didn't hear one bit from anyone about that.

15

16          (Continued on the following page.)

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Proceedings                                    2062

1    (Continuing)

2         MR. KIEFFER:  Well, you're correct, Your Honor.

3    There wasn't testimony from the DSM V about PTSD, simply put.

4    I would say, Dr. Honor did exhaustive evaluation testing of

5    this man.  He was asked about it, and he did render an opinion

6    that I believe is a legally sufficient opinion.  It did not

7    incorporate reference to DSM, is, I guess, the most I can tell

8    you on that.  He didn't.  But there was -- you know,

9    Dr. Goldman's initial record indicated some of Mr. Bauta's

10   presentation, and indicated a rule out post traumatic stress

11   disorder.  She pretty clearly, I don't think, ever ruled it

12   out or ruled it in.

13        Dr. Honor did evaluate him on multiple occasions and

14   did form a professional opinion that I believe he is legally

15   qualified to make, that to a reasonable degree of professional

16   certainty, Mr. Bauta had post traumatic stress disorder.  He

17   did not couch it in DSM terminology.

18        So the only other thing --

19        THE COURT:  That is where I am having the problem,

20   because if you look at the three categories of injuries that

21   Mr. Bauta claims he suffered from:  Back injury, the brain

22   injury and PTSD, for the back injury, we have doctors going

23   through MRIs, animations of surgeries, all these things from

24   which a jury can reasonably draw the conclusion that this

25   injury exists from a medical perspective.  It got that for the

SAM      OCR      RMR      CRR      RPR

Proceedings                              2063

1   TBI, although it is, perhaps, weak.  The jury does not know

2   anything about PTSD, other than Dr. Honor saying he has got

3   PTSD.  That is as if Dr. Mobin or Dr. Cordiale would come in

4   and say, He had a herniated disk, so I did the surgery.  Well,

5   show me, and there is absolutely nothing.

6            MR. KIEFFER:  May I respond?

7            THE COURT:  Yes.

8            MR. KIEFFER:  Okay.

9            Two things.  One, before -- let me back up a step.

10  I heard the Court say or reference Mr. Bauta's categories of

11  claimed injuries, and you mentioned back injury, brain injury,

12  TBI, and then you went to PTSD.  If we're drawing them in

13  categories, I believe --

14           THE COURT:  No, I said back injury, TBI and PTSD.

15           MR. KIEFFER:  Okay, thank you.

16           MR. McELFISH:  You said brain.

17           THE COURT:  I said brain, but that is what I meant,

18  PTSD.

19           MR. KIEFFER:  Fair enough.  I think there's a

20  category that's being left out there, and that a generalized

21  emotional distress claim.

22           THE COURT:  Emotional distress.

23           MR. KIEFFER:  Certainly, one can have a generalized

24  emotional distress claim that may or may not fit within the

25  neat box of PTSD.

SAM      OCR      RMR      CRR      RPR

Proceedings                                    2064

1           As to PTSD --

2           THE COURT:  Well, sure.  I mean, yes, you can have

3    garden variety emotional distress based on just about anything

4    without a formal diagnosis, right?  So I mean, that is fine.

5    But, yes, so tell me about the --

6           MR. KIEFFER:  The next thing I was going to say --

7    Ms. Diamond reminded me -- the DSM $\underline{V}$ criteria for PTSD

8    requires a direct exposure -- either direct exposure or

9    witnessing a trauma, and -- under criterion A, and one of

10   those is required.  Here, we would say, I think the evidence

11   is clear, Mr. Bauta experienced both.  He was a direct

12   participant in the exposure, he was in the vehicle.  He was

13   thrown around.  He witnessed all the, I'll call it, mayhem,

14   including, but certainly not limited to Mrs. Hoang.

15           And so whether or not either Dr. Honor or Dr. Thomas

16   recited the DSM as a source, I think it's clear -- I think

17   it's clear from the testimony that the criteria are satisfied.

18           THE COURT:  No, no, that's one criteria.  I could

19   have Ardis go get the DSM $\underline{V}$ that's on her desk.  You have to

20   have exposure to the traumatic event; and then you have to

21   have, there are four or five other categories of things where

22   you have to have either one or two.  And all of them are

23   escaping me, but it is nightmares, witness the event, this

24   that and the other thing.  And the problem is, even if there

25   was testimony from Mr. Bauta or someone else that these things

Proceedings                                2065

1    exist, the jury does not know how that equates to PTSD.  None

2    of the experts, Dr. Honor -- well, it is Dr. Honor because

3    Dr. Thomas did not diagnose him with PTSD.  Dr. Honor did not

4    say that.  So it is a leap for the jury to say by a

5    preponderance of the evidence, he has got PTSD just because

6    Dr. Honor or says it.

7              MR. KIEFFER:  Well, respectfully, Judge, I would say

8    it's not just because Dr. Honor says it.  I think the

9    testimony makes it clear that the predicate conditions are

10   satisfied, which I believe the evidence shows.  I mean, he had

11   nightmares.  He had flashbacks.  That was in the testimony of

12   multiple witnesses, including Honor, including Thomas.  And

13   Honor is well qualified to offer the opinion, did an

14   exhaustive evaluation of all available evidence, including

15   Mr. Bauta, and stated the opinion.  I don't believe it is a

16   leap at that point.

17             I don't think the law requires -- and I don't mean

18   to trivialize the issue that the Court is articulating, but I

19   don't think the law requires that kind of a slavish recitation

20   of specific verbiage tied to DSM.

21             THE COURT:  Okay, I will give you an example.  Let's

22   say Dr. Honor and Dr. Thomas came in, did not talk about any

23   of their testing and said, He's got a TBI.

24             Would that be enough?

25             MR. KIEFFER:  I don't think it would be.

SAM      OCR      RMR      CRR      RPR

Proceedings                                      2066

1          THE COURT:  All right.  The PTSD is very close to

2     that.  Dr. Honor is saying he's got PTSD, and he did not tell

3     the jury why.  Now, there may be other evidence in the record,

4     but the jury has no way of linking that up.  Right?

5          The jury can say on TBI, all right, Dr. Honor did

6     all of these tests that he told us about, and here are the

7     results that are below the norm, and he is saying when someone

8     is like that, they've got TBI.  Dr. Thomas, the same thing.

9          You have not given the jury enough on PTSD to make

10    that determination.

11         MR. KIEFFER:  And I would disagree.  I don't think

12    this is a situation like what you just described where, in

13    your hypothetical, Dr. Honor is coming in and saying he's got

14    a TBI, trust me, and packing up his things and going home.

15    There was substantial evidence from Dr. Honor about all of

16    Mr. Bauta's symptoms based upon records, conversations with

17    others, testimony, and his -- his multiple interviews with

18    Mr. Bauta that covers the DSM criteria.  And then he,

19    ultimately, stated his opinion as to PTSD.  Whether he put

20    those on a -- on a checklist, so to speak, and said, Here's

21    the DSM criteria for PTSD and they are met, we don't think

22    it's necessary.

23         THE COURT:  Can you go get the DSM V, please, Ardis?

24         THE LAW CLERK:  Yes.

25         MR. ORTIZ:  I actually have the criteria.

Proceedings                                          2067

1            MS. DIAMOND:  I do, too.

2            THE COURT:  I would like to look at the book rather

3    than a printout from Westlaw or somewhere else.

4            MR. ORTIZ:  Question?

5            THE COURT:  Yes.

6            MR. ORTIZ:  Can I have a moment to respond to that

7    when he's done, just this particular point?

8            THE COURT:  Sure.

9            MR. ORTIZ:  I just wanted to know; I wasn't sure.

10           THE COURT:  Sure.  Off the record.

11           (Discussion off the record.)

12           THE COURT:  Okay.  For the record, I have in my

13   hands the DSM <u>V</u>.  I am turning to the page -- in my book, it

14   is 271, Post Traumatic Stress Disorder.  Note the following

15   criteria apply to adults, adolescents and children older than

16   six:

17           PTSD requires -- that is not a quote -- exposure to

18   actual or threatened death, serious injury or sexual violence

19   in one or more of the following ways:

20           Directly experiencing the traumatic event,

21   witnessing in-person the event as it occurs to others.

22           I think we can all agree there is evidence in the

23   record that Mr. Bauta -- from which the jury if they were to

24   know of the DSM <u>V</u>, were to conclude that he directly

25   experienced a traumatic event.

SAM      OCR      RMR      CRR      RPR

Proceedings                          2068

1          Presence of one or more of the following intrusion

2    symptoms associated with the traumatic event, beginning after

3    the traumatic event occurred:

4          1.   Recurrent and voluntary and intrusive

5    distressing memories of the traumatic events.

6          2.   Recurring distressing dreams in which the

7    content and/or affect of the dream are related to the

8    traumatic events.

9          3.   Disassociative reactions, e.g., flashbacks in

10   which the individual feels or acts as if the traumatic event

11   were recurring.

12         4.   Intense or prolonged psychological distress at

13   exposure to internal or external clues that symbolize or

14   resemble an aspect of the traumatic event.

15         5.   Marked physiological reactions to internal or

16   external clues that symbolize or resemble an aspect of the

17   traumatic event.

18         Well, at some point in the past, arguably,

19   Mr. Bauta, based on the testimony that I heard, and the

20   defendants can correct me if I'm wrong, had recurrent,

21   involuntary and intrusive distressing memories of the

22   traumatic event.  Whether that continues today, I am not so

23   sure.

24         The third requirement:  Persistent avoidance of

25   stimuli associated with the traumatic event beginning after

Proceedings                                            2069

1   the traumatic event occurred, as evidenced by one or both of

2   the following:

3          Avoidance of or efforts to avoid distressing

4   memories, thoughts or feelings about or closely associated

5   with the traumatic event.

6          Avoidance of or efforts to avoid external reminders:

7   People, places, conversations, activities, objects, situations

8   that arouse distressing memories, thoughts or feelings about

9   or closely associated with the traumatic event.

10          I do not remember any testimony about that.

11          Fourth:  Negative alterations in cognitions and mood

12   associated with the traumatic event beginning or worsening

13   after the traumatic event occurred, as evidenced by two or

14   more of the following:

15          Inability to remember an important aspect of the

16   traumatic event.

17          Persistent and exaggerated negative beliefs or

18   expectations about one's self, others or the world.

19          Persistent distorted cognitions about the cause or

20   consequences of the traumatic events that leave the individual

21   to blame himself/herself or others.

22          Persistent negative emotional state, for example:

23   Fear, horror, anger, guilt or shame.

24          Markedly diminished interests or participation in

25   significant activities.

Proceedings                                    2070

1        Feelings of detachment or estrangement from others.

2        Persistent inability to experience positive

3   emotions; inability to experience happiness, satisfaction or

4   loving feelings.

5        I am not sure there is sufficient evidence in the

6   record from which you could find that he suffers from two of

7   those.  So I mean, this is the problem.

8        MR. KIEFFER:  May I respond?

9        THE COURT:  And those are only four.  There are one,

10  two, three, four more requirements.

11       MR. KIEFFER:  I'd like to respond when the Court is

12  ready.

13       THE COURT:  Yes.

14       MR. KIEFFER:  Okay.  It seems to me there's two

15  issues.  I believe there is sufficient evidence in the record

16  to support all of these.  And I understand the Court went

17  through some, not all of the categories here.  I think, for

18  example, Dr. Goldman's records and testimony and Mr. Bauta's

19  testimony satisfy many of these things, but there is evidence

20  and testimony beyond that.

21       So if the -- let me back up.

22       If the Court believes that an expert failing to

23  couch the PTSD diagnosis and opinion in DSM V terms is the

24  dispositive issue, then I have to be honest with the record

25  and say they didn't do that.  I don't think that's necessary.

SAM      OCR      RMR      CRR      RPR

Proceedings                              2071

1    I think it is akin to, for example, a medical malpractice

2    case, where an otherwise qualified expert opines that a

3    patient had a heart attack without calling it a myocardial

4    infarction, and without going through the American College of

5    Cardiology's guidelines for diagnosing a --

6              THE COURT:  That is not my point.

7              MR. KIEFFER:  Okay.  So I will move on from there.

8              If the Court believes that if there is sufficient

9    evidence in the record of these things, and an otherwise

10   qualified expert who reviewed the record stated an otherwise

11   legally sufficient expert opinion, absent DSM language, then I

12   believe we get there.  And I guess my request would be, if the

13   Court's willing, let us brief it.  Let us go through the

14   testimony and the DSM criteria.  And it seems to me two things

15   are true.  If I'm right, I think we will be able to show that

16   there is sufficient evidence in the record.  That's number

17   one.

18             Number two, it seems to me it's also a matter for

19   instruction.  If the jury, you know, believes the evidence

20   shows da da da da da, you know, as a predicate to a finding of

21   PTSD, you know, we are not going to, other than -- you know,

22   we don't have any further witnesses to call on this issue.  We

23   are not going to be arguing the case until next week.  So if

24   you would permit us a bit of time to go through the testimony

25   and kind of brief it under the DSM categories, I think it

Proceedings                                      2072

1   would be helpful.  And I think we'd probably want to do that

2   in any event.

3              THE COURT:  Do you have anything else you want to

4   raise?

5              MR. KIEFFER:  On this?

6              THE COURT:  On this or anything else?

7              MR. KIEFFER:  I don't believe so.  I don't know what

8   Mr. McElfish may have.

9              THE COURT:  Real quick.

10             MR. ORTIZ:  Your Honor, just briefly on this.

11             I think you hit it on the head.  This opinion about

12  PTSD is his ipse dixit.  It's just there because he said it.

13  And there is nothing in -- maybe there is a couple of things

14  about having a nightmare here or there, but it doesn't meet

15  those criteria, and there is nothing in the record that -- I

16  mean, they right now want to brief where in this 1800 pages of

17  the transcript are things that could fall under each category

18  that we can do what?  Then you are supposed to instruct the

19  jury, Well, the DSM V says that this is what you need to show

20  PTSD.  That's their job.  They should have done that with

21  their witness.  They didn't do it.  It's a failure of proof.

22  They can't fix it now, and it's not for the Court to say this

23  is the medical criteria for a diagnosis of PTSD.

24

25             (Continued on the following page.)

SAM       OCR       RMR       CRR       RPR

Proceedings                                    2073

1   (Continuing)

2        MR. ORTIZ:  The evidence is lacking.  All we have is

3   an opinion from an expert that says he has it.  And you don't

4   have the criteria met.  That's why -- I think you hit it on

5   the head with regard to that.

6        How are they going to relate it?  They have no

7   context.

8        THE COURT:  Yes.  Look, I agree with you.  I think

9   this is -- it is as if an expert were to come in, or a

10  treating physician and say simply, for example, a product

11  liability case, he has cancer because he used this drug.  And

12  not show why.

13       MR. ORTIZ:  Right.

14       THE COURT:  Nevertheless.  That is just one example.

15  I can come up with a number.

16       Nevertheless, I am going to allow it to go to the

17  jury.  I think there is insufficient evidence for the jury to

18  come back.  There is not a preponderance of the evidence for

19  the jury to come back with a PTSD finding.  If they do, I will

20  allow you to renew your motion at the end and we will brief

21  it.

22       MR. ORTIZ:  Okay.

23       Your Honor, obviously, we except to that.

24       One thing, before I sit down, there is one thing I

25  do want to notice; I want to mention this.  I think there was

Proceedings                                                2074

1   a comment right now about an additional category of damages

2   for emotional distress.  And I don't have the case with me,

3   but we'll deal with it with the charge conference, and I know

4   your line items had a line item for that, but I believe we

5   have a Second Circuit case that specifically says that your

6   emotional distress here is part and partial of your pain and

7   suffering.  There should not be a separate line item for

8   emotional distress here.  So I don't want it to be said in the

9   court, before you and us be silent on that and construed there

10  as any waiver.

11              THE COURT:  You are going to have to show me that

12  case.

13              MR. ORTIZ:  I will.

14              THE COURT:  I have, in other cases, have had it as a

15  separate line item.

16              MR. ORTIZ:  If it was a separate category,

17  specifically, if there is a, for example, a zone of danger

18  claim where there's no physical injury to a plaintiff, and the

19  only claim is that I was there -- for example, let's say he

20  was on the bus --

21              THE COURT:  Just let me.  You can, as a personal

22  injury plaintiff, you can have damages for pain and suffering

23  from your physical injury; right?

24              MR. ORTIZ:  Absolutely.

25              THE COURT:  And unless you have a physical injury,

Proceedings                                              2075

1  you cannot have emotional damages, unless you are in zone of

2  danger; right?

3          MR. ORTIZ:  Correct.  That's Bovsun versus Sanperi,

4  I believe.

5          THE COURT:  So if he had physical injury.  He had

6  pain and suffering.  He wasn't in the zone of danger.

7          MR. ORTIZ:  Yeah, but you don't get that.

8          You don't get -- the Bovsun/Sanperi, and I will have

9  to give you the -- I'm sorry.  I don't -- and I am probably

10  saying it wrong.  That zone of danger construct was created to

11  compensate people that aren't hurt themselves.  But they

12  observed a family member.

13          THE COURT:  So are you saying you cannot have

14  damages for emotional injury if you have a physical injury?

15          MR. ORTIZ:  No, no.  I am not saying that.

16          I am not saying that Mr. Bauta cannot recover for

17  the stress and the emotional, you know, whatever, the shock

18  and, that's part and -- what I'm saying is -- it is part and

19  parcel, under New York law, of the compensatory damages.  It's

20  not a separate line item that he gets, this is much for the

21  physical.  This is much for the emotional.

22          THE COURT:  So it has to be under one line?  There

23  is a case that says that?

24          MR. ORTIZ:  Yes, I believe.

25          MR. BARMEN:  Yeah.  There's no separate claim here

Proceedings                                    2076

1   for negligent infliction of emotional distress or intentional

2   infliction of emotional distress where that comes into play.

3           THE COURT:  No, but that is not the point.  You have

4   different types of damage.

5           MR. ORTIZ:  I know.  I believe I have --

6           THE COURT:  Look, if you cannot find a case that

7   says all of it has to be in one line item, then I am going to

8   break it out, because otherwise --

9           MR. ORTIZ:  I will provide you the case that says

10  it.

11          THE COURT:  All right.

12          MR. ORTIZ:  Okay.  Your Honor, thank you.

13          MS. DIAMOND:  Could you provide us with the case law

14  as well?

15          THE COURT:  Yes.  Any case law that he gives to me,

16  he has to give to you.

17          MS. DIAMOND:  Thank you.

18          THE COURT:  He has to give you the cite.  He does

19  not necessarily have to give you the case.

20          MS. DIAMOND:  Of course, just the cite.

21          THE COURT:  All right.

22          Yes, you were going to say something?

23          MR. SAAL:  Yes, Your Honor.

24          We just, at this time, the defense wants to take the

25  opportunity just to renew the prior arguments in opposition to

Proceedings                                    2077

1    the collateral estoppel ruling granting liability in the case

2    for the record, renewing our arguments that the soundness of

3    the verdict out of Philadelphia had significant issues due to

4    fundamental fairness; issues regarding the failure bifurcate

5    the case, which resulted in testimony in Philadelphia as to

6    Greyhound's self-insured retention, resulted in evidence as to

7    punitive damages poisoning the jury's consideration of

8    liability issues and resulting in un-Constitutionally

9    sustainable verdicts as to compensatory versus punitives.

10   Creating part and parcel this issue where the fact of the case

11   was not bifurcated, the jurors were not able to properly

12   separate the issue of punitive damages versus liability.

13           Additionally, there were key evidentiary issues in

14   that case, including the exclusion of one of the defense

15   accident reconstruction experts, and a situation where

16   Corporal Schmidt, the Pennsylvania State ACTAR

17   reconstructionist, was precluded from offering his causation

18   and conclusory opinions from his report, without basis;

19   wherein the plaintiff's accident reconstructionist, Colonel

20   Smith, who testified here in this court on biomechanics, was

21   able to testify as to his final conclusions, created a

22   significant issue of just fundamental fairness which really

23   denied the defendants their full and fair opportunity to

24   litigate, that being one of the major issues where their

25   accident reconstruction expert was able to give his

Proceedings                                           2078

1    conclusions and our ACTAR reconstructionist was not, and then

2    the Court precluded our privately-retained accident

3    reconstruction expert from testifying in any regard.

4            So those are just previous arguments we made in

5    opposition to the collateral estoppel ruling on liability and

6    we're renewing those objections and this motion at the close

7    of plaintiff's case.

8            THE COURT:  All right.

9            Denied.

10           MR. SAAL:  Okay.

11           THE COURT:  All right.

12           Dr. Morgan; right?

13           MR. BARMEN:  Yes, sir.

14           THE COURT:  Let's go.

15           Take five minutes, yes.

16           ALL:  Thank you, Your Honor.

17           (Recess taken.)     (In open court.)

18           (Judge RAMON E. REYES enters the courtroom.)

19           THE COURT:  Are we ready?

20           MR. BARMEN:  Yes, Your Honor.

21           THE COURT:  Okay.

22           (Jury enters.)

23           THE COURT:  You may be seated.

24           Mr. Kieffer, I understand that the plaintiff has no

25    further witnesses; is that correct?

```
                        Proceedings                    2079
```

1           MR. KIEFFER:  That's correct, Your Honor.

2           THE COURT:  So the plaintiff rests?

3           MR. KIEFFER:  Yes, subject to admitting Exhibit 301

4    that we talked about before.

5           THE COURT:  Oh, that is right.

6           Okay.  So plaintiff offers Exhibit 301 into

7    evidence?

8           MR. KIEFFER:  Correct.

9           THE COURT:  And there is no objection; is that

10   correct?

11          MR. BARMEN:  No objection, Your Honor.

12          THE COURT:  So Exhibit 301, Plaintiff's Exhibit 301

13   is received in evidence.

14          (Plaintiff's Exhibit 301 received in evidence.)

15          MR. KIEFFER:  Thank you, Your Honor.

16          MS. DIAMOND:  Thank you, Your Honor.

17          THE COURT:  Mr. Barmen, call your first witness.

18          MR. MANNION:  Your Honor, the defense calls Dr. Joel

19   Morgan.

20          (Witness enters and takes stand.)

21          THE COURT:  Dr. Morgan, please raise your right

22   hand.

23          (Continued on following page.)

24

25

Morgan - direct - Mannion                    2080

1    **JOEL  E.  MORGAN**,

2               called as a witness having been

3               first duly sworn, was examined and testified

4               as follows:

5               THE COURT:  Please be seated.

6               Introduce yourself to the jury and spell your name

7    for the court reporter.

8               THE WITNESS:  Hi.  Dr. Joel E. Morgan.  That's

9    spelled -- M-O-R-G-A-N.

10              MR. MANNION:  Can you move that down a little, the

11   mic?  Thank you.

12              May I proceed?

13              THE COURT:  Yes.

14              MR. MANNION:  Thank you, Your Honor.

15   DIRECT EXAMINATION

16   BY MR. MANNION:

17   Q    Dr. Morgan, tell us a little bit about yourself?

18   A    Sure.  I'm a neuropsychologist in private practice in

19   Morristown, New Jersey.  I've been practicing for a little

20   over 30 years.  I'm married.  I have a 27-year old daughter

21   who works in New York and lives in Brooklyn.  I maintain a

22   practice that is we call life span neuropsychology.  I see

23   children and adults.

24   Q    Okay.  And I understand you are here today because you

25   performed a number of neuropsychological testing on Mr. Bauta?

Morgan - direct - Mannion                    2081

1   A    Yes.  I examined Mr. Bauta and performed a

2   neuropsychological evaluation.

3   Q    And I know you have reached a number of opinions, but

4   before we talk about those, let's talk about your education,

5   training and experience.

6           And I understand that you are one of the two

7   neuropsychologists for one of the local sports teams?

8   A    Yes.  I'm a neuropsychologist, one of two, for the New

9   York Jets, National Football League.  I was formerly the

10  neuropsychologist for the New Jersey Devils.

11  Q    So what do you do for the Jets and what did you do for

12  the Devils?

13  A    So professional sports teams are concerned about

14  concussions, head injuries.  So we work in a concussion

15  program.  Professional athletes, particularly football players

16  and hockey players, are subject to concussions very often.

17          So what we do, the way the program works, we do a

18  preseason assessment of all the players and get what we call

19  baseline data on their mental skills and abilities.  Then when

20  they're concussed during the season, we see them again and we

21  compare the results on the post-concussion testing to their

22  baseline to see how badly it has affected their cognition.

23  Q    Well, as much as I would like to ask you about some of

24  those test results, I don't think I can.  But let's take a

25  step back and talk about your education.

VB        OCR        CRR

Morgan - direct - Mannion                    2082

1          When did you start college and where?

2    A    So I started college after high school.  I started

3    college at Temple University in Philadelphia.  My dad died

4    during the summer after my freshman year and so -- died late

5    in the summer.  I really couldn't go back, so I took a leave

6    of absence and that was during the Vietnam war and the draft

7    was after me.  So I enlisted in the Air Force and served in

8    the United States Air Force.

9    Q    Were you active outside of the United States?

10   A    Yes.  I was in Thailand and Vietnam for a year.

11   Q    When did you get out of the service?

12   A    1970.

13   Q    And what did you do from there?

14   A    So I went back to college.  I went to Rider University in

15   Lawrenceville, New Jersey.  I got my bachelors degree there.

16   Then I got a masters at Fairleigh Dickinson in New Jersey and

17   my Ph.D. at the New School for Social Research across the

18   river in New York.

19   Q    And what was your Ph.D. in?

20   A    Clinical psychology.

21   Q    Are you board certified in any areas?

22   A    Yes.  I'm board certified in clinical neuropsychology and

23   pediatric neuropsychology.

24   Q    What is neuropsychology?

25   A    Oh, so, neuropsychology is a subspecialty of clinical

1  psychology.  It deals with brain behavior relationships.

2  Neuropsychologists measure cognitive abilities and we also, of

3  course, are concerned with regular psychology; emotional,

4  personality and adjustment issues, also.

5  Q    And I know the jury has heard the term cognitive several

6  times, but can you give us sort of a layperson's definition of

7  what you mean by cognitive ability.

8  A    So, cognitive is really just a sort of a fancy term for

9  mental skills.  A mental skills such as concentration,

10  attention, short and long-term memory, visual processing,

11  auditory reprocessing, fine motor skills.  That's cognition.

12  Q    Okay.  Have you had any university teaching appointments

13  throughout the years?

14  A    Yes.  I used to teach at Seton Hall University in Jersey

15  and did clinical teaching at Rutgers University, New Jersey's

16  medical school.

17  Q    Any hospitals you've been affiliated with through the

18  years?

19  A    Yes.  VA in New Jersey.  UMDNJ University Hospital, now

20  Rutgers Hospital.  Somerset Medical Center, Somerset,

21  New Jersey.  Summit -- Fair Oaks Medical Center.  I think

22  that's about it.

23  Q    What are the primary neuropsychological associations in

24  your field?

25  A    So there are about three of them.  The National Academy

1  of Neuropsychology, The American Academy of Clinical

2  Neuropsychology, The International Neuropsychological

3  Association, Neuropsychological Society.  I'm a member of

4  them.

5  Q    Do you have any positions within them or have you in the

6  past?

7  A    I have in the past.  I used to be on the board of

8  directors for The American Board of Clinical Neuropsychology

9  and The American Academy of Clinical Neuropsychology.

10 Q    How do you go about getting a board certification?

11 A    So board certification in neuropsychology comes under the

12 umbrella organization called The American Board of

13 Professional Psychology; abbreviated ABPP.  And under ABPP

14 there are 13 different specialties.  One of them is clinical

15 neuropsychology.

16         And so to become board certified, a candidate has to

17 have their credentials reviewed.  He or she has to submit to a

18 written examination.  After they pass the examination, they

19 have to submit what are called work samples, which are two

20 cases that they have diagnosed, that they've worked -- two

21 patients they've worked with.  Those cases are reviewed by

22 three board certified neuropsychologists who have to pass the

23 case, the work sample.

24         Then after the work sample is finally passed, the

25 candidate has to sit for an oral examination, which always

Morgan - direct - Mannion                    2085

1   takes place in Chicago, sort of the middle of the country.

2   And the oral examination is by three board certified

3   neuropsychologists, an hour exam each.

4   Q    How does the Association determine who gives the oral

5   exams?

6   A    So that's selected by the board of directors and senior

7   members of the profession and the Academy.

8   Q    Have you ever been selected to give the board exam?

9   A    Yes.  I've done that for -- I did that for ten years

10  between 2004 and 2014.

11  Q    So you were one of the neuropsychologists who was

12  actually giving the exams to new folks who wanted to become

13  board certified?

14  A    To the candidates, yes.  I examined the candidates.

15  Q    I saw in your CV that you were representative to the

16  Council for the American Psychological Association, Division

17  40.

18         What is that and how did you get that?

19  A    Okay.  So The American Psychological Association is the

20  largest membership organization for professional psychologists

21  in America, and there are international members also.  And so

22  they have what's called the council of representatives.

23         Now the council of representatives is about 250

24  members.  Each council representative comes from one of the

25  divisions within The American Psychological Association, such

VB        OCR        CRR

Morgan - direct - Mannion                    2086

1   as, for example, the division of school psychology, the

2   division of clinical psychology, the division of group

3   psychology.  And one of the divisions is neuropsychology.  And

4   I was the representative to council for a number of years.

5   Q    How did you become representative?

6   A    That's an elected position.

7   Q    Okay.  How long did you do that?

8   A    About six years.

9   Q    Let's move now to publications or literature.

10           Are you published in your field?

11  A    Yes, I am.

12  Q    Tell us briefly about that.

13  A    So I've written a number of chapters that appear in

14  books.  I've edited a number of books in the profession.  I

15  have a number of journal articles in the profession and I've

16  presented orally, in person, to national and international

17  meetings.

18           MR. MANNION:  Your Honor, at this juncture, I would

19  offer Dr. Morgan as an expert in psychology and

20  neuropsychology.

21           MR. KIEFFER:  No objection.

22           THE COURT:  Dr. Morgan is received as an expert in

23  psychology and neuropsychology.

24           MR. MANNION:  Thank you, Your Honor.

25  Q    Doctor, eventually, as this examination goes forward, I'm

1  going to ask you a number of opinions.

2           Would you agree to only give those opinions that you

3  hold to a reasonable degree of scientific certainty?

4  A    Of course.

5  Q    And only those opinions that are based on your education,

6  training, experience, your examination of Mr. Bauta and all

7  the materials you reviewed?

8  A    Yes, of course.

9  Q    With that being said, before we get into everything you

10  reviewed, can you give us a brief summary of what your

11  opinions are.

12  A    Yes.  My opinions in this case are that Mr. Bauta, on my

13  examination, had some of the lowest scores that I have ever

14  seen on tests that he was given; that Mr. Bauta's test results

15  are not really credible in the sense that they represent his

16  real functions and so that Mr. Bauta appears to be faking his

17  impairment.

18  Q    Do you have any opinions with respect to whether or not

19  Mr. Bauta sustained a concussion in this accident?

20  A    I don't believe he did.

21  Q    And any opinions with respect to Post-Traumatic Stress

22  Disorder?

23  A    I don't believe he has PTSD.

24  Q    Now, we will get more into your first opinion, but

25  doctor, that's a very strong statement.

1          Did I hear you say your opinion, after you looked at

2    everything, was that Mr. Bauta was faking the test results?

3    A    Yes.  I'm afraid that's my opinion.

4    Q    How sure of that are you?

5    A    Oh, I am absolutely sure.

6    Q    Explain.

7    A    So Mr. Bauta scored on all of my tests at a level that

8    is, essentially, incomprehensible.  He scored at or below the

9    first percentile on literally all of my tests, almost all of

10   my tests.  If those scores were real, and really represented

11   the status of his functions, he would be having advanced

12   Alzheimer's disease and require 24/7 supervision, say, in a

13   facility like a nursing home.  So they can't really be real

14   and, unfortunately, that's the status we have.

15

16              (Continued on following page.)

17

18

19

20

21

22

23

24

25

1   BY MR. MANNION:   (Continuing. )

2   Q    Couldn't those results evidence the fact that perhaps he

3   had some problem with his cognition or his brain?

4   A    Not really, because in order to get those scores, for

5   many of the tests Mr. Bauta actually scored below chance.  So,

6   in other words, if you think about closing your eyes to a

7   visual test.  Just by chance alone, eyes you'd get about half

8   right.  If there were a visual test of, say, 100 questions and

9   you closed your eyes, just by chance alone, sort of like the

10  flip of a coin, you'd get about half.  Maybe not 50, but 47,

11  48, 53.  It would be close to half just by virtue of nature.

12           So in order to score below chance on so many of the

13  tests that I gave him, you have to purposefully choose the

14  wrong answer, which means that you really know the right

15  answer.

16  Q    Couldn't this just have happened by chance?

17  A    It's not possible to happen by chance on so many tests.

18  Even one test, even one test would be about one out of 100

19  that it could happen by chance.

20  Q    What about when you combine all the tests?

21  A    It would be literally impossible.  It would be

22  millions -- one chance out of millions that somebody would do

23  that.

24  Q    You would have a better chance of winning the Powerball?

25  A    No doubt.

Morgan - direct - Mannion                2090

1          THE COURT:  Sustained.  Stricken.

2   Q    The odds of this being by chance would be one in many,

3   many, many millions?

4   A    Infinitesimal incalculable.

5   Q    How many tests of this type have you given in your

6   career?

7   A    Many thousands.

8   Q    Four or five thousand?

9   A    Probably, maybe more.  I've tested literally thousands of

10  patients over a 30-year career.

11  Q    Absent an Alzheimer's patient, have you ever seen test

12  results like this?

13  A    I never have -- I've never seen anything quite like this.

14  Q    Let's take a step back then now.  How did you get

15  involved in this case?

16  A    So my office was contacted by the Marshal Dennehey law

17  firm.

18  Q    Had you ever worked for either attorney Moroknek,

19  Attorney Saal or any of the attorneys at that firm before?

20  A    No, this would be the first time.

21  Q    Had you ever worked with me or Mr. Barman or anyone from

22  our firm before?

23  A    No.

24  Q    Obviously you're paid for your professional time, I take

25  it?

SN        OCR        RPR

Morgan - direct - Mannion                    2091

1   A     I am.

2   Q     How much are you paid per hour?

3   A     $400 an hour.

4   Q     How many hours do you think you've spent on this case

5   from beginning to now?

6   A     Oh, my, probably close to 100.

7   Q     Do you also have somebody assisting you?  Yes, I have an

8   assistant who helps with the testing and also manages the

9   office.

10  A     Yes.

11  Q     What's her name?

12  A     Denise Krausless (ph).

13  Q     What are her qualifications?

14  A     She has a Bachelor's degree in psychology and she is

15  board certified in what we call physiometry, in other words to

16  give and score psychological tests.  She was trained by me and

17  one of my former students and she does testing under my

18  supervision in the office.

19  Q     How many hours does she spend on this, do you know?

20  A     Probably 30, 40.  I'm not sure, maybe more.

21  Q     Do you charge separately for her?

22  A     No, she's a salaried employee.  There's no extra billing

23  for her.

24  Q     Okay.  Your first report in this case was issued in

25  October 2016?

Morgan - direct - Mannion                    2092

1    A    Yes.

2    Q    Before issuing that report what records and materials did

3    you review?

4    A    There were voluminous records.  I would have to actually

5    look in my report to name all of them but there were

6    voluminous medical records from various providers, several

7    hospitals, there were many legal records.  They're all listed

8    in my report.

9    Q    Did you subsequently issue a supplemental report in July

10   of 2017?

11   A    I did.

12   Q    Did you review a number of materials before you issued

13   that report?

14   A    Yes.

15   Q    Would you give me the same answer, you'd have to look at

16   that report to really give a good accurate description of what

17   all of those were?

18   A    I would.

19        MR. MANNION:  Your Honor, may I approach to hand

20   Defendant's Exhibits 476 and 477, his reports, just to refresh

21   his recollection as to the materials he reviewed?

22        THE COURT:  Yes.

23        (Counsel approaches.)

24   Q    If you could, briefly and, you know, somewhat quickly,

25   give us a rundown of the materials you reviewed before you

1   issued your first report.

2   A    So there are records from Dr. Gutstein, records from the

3   Evangelical Hospital.  That was the hospital he was taken to

4   right after the accident.  Various doctors, providers, medical

5   bills, orthopedic surgery, radiology reports, reports from New

6   York Spine Specialists, Dr. Lattuga; various physician notes,

7   records from the Brookdale hospital with various dates of

8   treatment.  EMT report of lower leg pain.  Records from

9   Dr. Goldman, a psychologist, physical therapy records, records

10  from Claxton Hepburn hospital in Ogdensburg that go back prior

11  to the accident, medical records, many of them.  Deposition

12  transcript of a plaintiff, records from Dr. Liebowitz,

13  orthopedic surgeon, a report and raw data from Dr. Steven

14  honor the neuropsychologist, records from Dr. Thomas

15  neuropsychologist and various other reports.

16  Q    And before you issued your second report what additional

17  materials did you review?

18  A    I reviewed some of the same ones that I had had earlier,

19  as well as photos of the injuries of the plaintiff, the

20  deposition of Dr. Honor, photos from the scene of the

21  accident, records -- additional records from Dr. Thomas

22  including qEEG, Dr. Thomas' deposition, the deposition of the

23  plaintiffs sister, Selenia Rivera, the deposition of his

24  brother-in-law Martin Rivera.  A job application from

25  Sav-a-Lot, payroll records from Lettuce Feed You, a deposition

1    transcript from Mr. Spitzer, who was one of the first

2    responders on the scene -- at the scene of the accident,

3    additional records or the same records from Dr. Goldman, the

4    police report of the accident, from the fire company that was

5    the first responder, additional records from Dr. Thomas,

6    school records and GED certificate from the plaintiff.

7    Records from employer McDonald's, deposition transcripts from

8    Mr. Bauta, deposition transcripts from his other sister,

9    Maria.  Deposition -- my own deposition.  That's it, I think.

10   Q    Have you also had an opportunity to review trial

11   testimony from Dr. Thomas and Dr. Honor?

12   A    I have.

13   Q    And prior to issuing your records, did you have an

14   opportunity to talk with and examine Mr. Bauta?

15   A    I did.

16   Q    When was that?

17   A    That was February of 2016.

18   Q    Okay.  We're going to get into some of these issues, but

19   let me ask you when you do a neuropsychological assessment,

20   give us an overview of what you're doing?

21   A    Oh, sure.  So, I mean, the first thing we do when the

22   patient comes, I would greet the patient, introduce the

23   patient to the office.  Talk about what we're going to be

24   doing.  I'd explain I've been retained by the other side.  We

25   try to make the patient comfortable tell the patient that

Morgan - direct - Mannion                    2095

1   we're going to be doing an examination on his abilities and

2   his mood, personality and so forth.  We're asking questions.

3   We're going to ask the patient to read and sign a consent form

4   and I say I'll be glad to, you know, tell you about this, have

5   you read through it, ask any questions you may have about it.

6   Once the patient reads through the consent form and if he or

7   she has any questions, we'll answer the questions.

8              I would explain that we try to make you as

9   comfortable as possible, can we get you coffee, tea, we have a

10  machine in back.  If you brought your lunch, we have a fridge.

11  We really try to make the patient as comfortable as possible.

12  We treat each patient with respect and dignity.  We treat all

13  patients the same and give sort of the same introduction to

14  every patient whether they're a litigating patient whether

15  they're a patient patient, a non-litigation patient.

16  Q    Let me take this case with Mr. Bauta, did you explain to

17  him what was in the consent form?

18  A    Yes.

19  Q    Give us an example of what you explained to him.

20  A    Sure.  We explained that this is for legal purposes.

21  Again, that I'm working for the other side.  That we will be

22  asking you -- giving you tests that assess your mental

23  abilities, that consists of tests of memory, attention,

24  concentration, verbal process and visual processing and motor

25  speed and so forth, and also tests of mood and personality for

Morgan - direct - Mannion                    2096

1   adjustment and if you don't want to answer any questions,

2   that's fine, just let us know, we try to make it comfortable.

3   If you need to take a break at any time, please let us know.

4   If you feel you can't continue because you got too tired or

5   you don't feel well, please let us know, we will reschedule

6   you.

7              In other words we really try to make the patient as

8   comfortable as possible.  The form also states and we tell

9   them I'm not -- I'm treating you as if I'm your doctor.  We're

10  really doing this for legal purposes, so I won't be giving you

11  any feedback about how you've done.  I issue a report which

12  will go to the attorneys and you will be able to get it

13  through your lawyer and I ask if there's any further questions

14  and if not, we proceed to the interview section.

15  Q    Okay.  And before we get to the interview session, did

16  you also provide Mr. Bauta a consent form?

17  A    Yes.

18             MR. MANNION:  If we can please put up Exhibit 412,

19  Plaintiff's 412, page 173 to start with, this has already been

20  admitted, Your Honor.

21  Q    And if you don't see it come up on your screen, tap it.

22  Do you see it up there, Doctor?

23  A    Yes.

24  Q    Did Mr. Bauta by the way sign this form by the way,

25  Doctor?

1    A    Yes, he did.

2    Q    Was there any question in your mind about whether he

3    could read?

4    A    No, none at all.

5    Q    Let's look at the What to Expect.  In looking at the

6    first sentence there, "A neuropsychological evaluation

7    includes a diagnostic interview, review of collateral records,

8    school, medical, et cetera, and tests of brain-related

9    function such as attention, concentration, memory, spatial

10   processing and verbal and visual thinking."  Did I read that

11   correctly?

12   A    Yes.

13   Q    So you would have talked to Mr. Bauta about this and

14   provided this written consent?

15   A    Yes.  I always do it both ways.

16   Q    The next sentence, "It may also include measures of

17   academic achievement, personality, style and the presence of

18   emotional disorders, for example anxiety and depression."  Did

19   I read that correctly?

20   A    Yes.

21   Q    And that was explained as well?

22   A    Yes.

23   Q    The second paragraph, "You will be taking tests that also

24   measure cooperation, effort and truthfulness of responding.

25   Did I read that correctly?

Morgan - direct - Mannion                    2098

1    A    You did.

2    Q    What's the purpose of telling Mr. Bauta that?  First, did

3    you tell him that?

4    A    Yes, of course.

5    Q    Verbally and in writing?

6    A    Absolutely.

7    Q    What's the purpose of that?

8    A    We're going to be giving tests that assess effort and his

9    cooperation and his honesty and I think that patients need to

10   know that they're going to be assessed for those things and to

11   do their best and be has honest as possible.

12   Q    The next sentence, "Please answer all questions as

13   completely and honestly as possible, put forth good effort on

14   everything and do not exaggerate your symptoms or

15   difficulties."  Was that explained to him?

16   A    Yes.

17   Q    And why?

18   A    Again, for the same reason we stated.  We're going to be

19   doing these tests, the tests were very sensitive in assessing

20   effort and we want every patient to put forth the best effort

21   they can, that way I can be assured that the formal

22   neuropsychological tests are accurate, reliable and valid.

23   Q    If we look at the bottom of this form if you could please

24   highlight the last few sentences, the bottom of the first

25   page, "We will also make our best effort to help you be as

SN        OCR        RPR

1  comfortable as possible with the evaluation process.  If

2  problems arise, please bring them to our attention.  If you

3  become so tired that you prefer to finish on another day, let

4  us know."  Did I read that correctly?

5  A    You did.

6  Q    Did you also explain that verbally to him?

7  A    Absolutely.  Several times throughout the day we say

8  that.

9  Q    What do you mean by that?

10  A    So, in other words, how are you doing after a test, do

11  you need to take a break, feel free to take a break.  Do you

12  feel okay to continue and so forth.  We constantly are

13  observing and assessing the patient.

14  Q    Just in an abundance of caution because I don't have the

15  record in front of me.  In the event that these two pages are

16  not admitted, 412-173 and 174 --

17          THE COURT:  They've been admitted already.

18  Q    Okay.  If we can go to the next page, please, and

19  highlight Voluntary Nature of Evaluation.  This is Plaintiff's

20  412-174.  "Your participation in this evaluation is voluntary

21  and you are free to discontinue the evaluation at any time.

22  If you are involved in a legal case, however, you may wish to

23  talk with your attorney before you discontinue the exam."

24          Did I read that correctly?

25  A    Yes.

Morgan - direct - Mannion                    2100

1    Q    Was this explained to Mr. Bauta?

2    A    Of course.

3    Q    Now, I went over this into detail, probably extremely

4    boring at some point, but I did it for a reason, Doctor.  We

5    have been told that Mr. Bauta really didn't understand the

6    consent form.  That it wasn't really explained to him and he

7    was too tired and in too much pain to take these tests.

8              MR. McELFISH:  Objection, leading and compound.

9              THE COURT:  Overruled.

10   Q    Is that consistent with your memory of what happened that

11   day and your observation of Mr. Bauta?

12   A    No, he didn't bring any difficulties to our attention.

13   He proceeded with all of the tests as usual, as anyone does.

14   We had no sense of discomfort or pain.  All he had to do was

15   say I need to stop, I don't feel well.  Okay, please, go home,

16   give us a call and we'll reschedule you for some other

17   appointment.

18   Q    Did you ask him throughout the day about those issues?

19   A    We always do.

20   Q    What would you have done if you noticed him "falling

21   asleep"?

22   A    I would have stopped the exam right there.  I would have

23   said, Please wake up for a second, we have to stop the exam.

24   You obviously can't do this today.  Go home, feel better,

25   please call and we'll make another appointment to continue.

Morgan - direct - Mannion                    2101

1   Q    In addition to our own observations about that, Denise

2   was there as well?

3   A    Yes, we're always there together.

4   Q    Is it your practice to have her say the same thing to him

5   throughout the day?

6   A    Absolutely.  We reiterate this throughout the testing

7   day.

8   Q    Did Denise ever bring any issues to your attention?

9   A    No.

10  Q    In addition to your observation and hers what do the

11  actual test results tell you about whether Mr. Bauta was

12  physically and mentally able to take those tests that day?

13  A    Mr. Bauta was very engaged in the testing.  He -- as I

14  said, he scored in such a way on many, if not all, of the

15  tests to indicate that he purposefully chose the wrong answer.

16  In order to do this, you have to really know the right answer

17  to avoid it.  And, so, the only way someone can do that is to

18  have the mental ability and the memory to know the right

19  answer and choose the wrong answer.

20  Q    Was this true from the beginning of the day through the

21  end?

22  A    Yes, on almost all of the tests.

23  Q    Approximately how many hours was the day?

24  A    About six.  Five and a half to six with breaks.

25  Q    Okay.  And was there lunch breaks, restroom breaks, all

Morgan - direct - Mannion                    2102

1    of that?

2    A    All of that.

3    Q    So after the consent form is signed and you get into the

4    interview, what's the purpose of the interview other than just

5    a obtaining background information?

6    A    So, you know, every opportunity that we have to observe

7    the patient, everything is sort of a clinical analysis, a

8    clinical exam.  So I'm observing the patient's behavior and

9    speech and demeanor and that is also part of the interview as

10   well as getting information about social history, education,

11   work history, medical history.  And, you know, doing the

12   interview portion of the events of the accident.

13   Q    Were you able to observe Mr. Bauta interact with your

14   assistant Denise as well?

15   A    Yes.

16   Q    What did you observe?

17   A    It seemed to be a normal patient and examiner

18   relationship.

19   Q    Any question in your mind about his ability to take those

20   tests that day?

21   A    No.

22   Q    Did you ask Mr. Bauta where he lived?

23   A    Yes, he gave me his complete address.

24   Q    Any pause or anything that caused you any alarm there?

25   A    No.

Morgan - direct - Mannion                    2103

1    Q    I want you to assume that yesterday plaintiff's counsel

2    asked Mr. Bauta his address and immediately he gave us his

3    address as well.  Was that consistent with your observation of

4    him?

5    A    Yes.

6    Q    Was that consistent with his test results?

7    A    No.  One of the questions on one of the tests asks do you

8    have trouble remembering your address.  He said yes, true, to

9    that question.

10   Q    What did your interview process tell you about

11   Mr. Bauta's ability to communicate?

12   A    It seemed to be a perfectly normal.  He was verbal and

13   explained about the accident.  He remembered a lot of portions

14   of the accident.  He told me about that before we talked about

15   the accident he talked with ease, about his background and

16   education and other aspects of his life.

17   Q    Did he tell you anything about his long-term memory?

18   A    Well his long-term memory appeared to be intact.  He told

19   me about how he -- where he grew up and his family and his

20   siblings.  He told me about his education, about his medical

21   history.  Long-term memory issues, he didn't have.

22   Q    The jury has heard from a Dr. Goldman who testified that

23   Mr. Bauta's long-term and short-term memory were unimpaired.

24   Do you agree or disagree with her?

25   A    I agree with that.

Morgan - direct - Mannion                    2104

1   Q    Did Mr. Bauta tell you anything or did you ask anything

2   about medications?

3   A    Yes.

4   Q    And what did he tell you?

5   A    He told me that he was on a muscle relaxant.  He either

6   showed me the bottle or he told me about it.  I'm not sure.

7   Q    Tizanidine?

8   A    Tizanidine was it, yes.

9   Q    And what did you ask him about that?

10  A    Did he take it today?  Is he okay to have the testing,

11  does it affect him in any way that might interfere with the

12  testing?  Had he taken it that morning?  That's about it.

13  Q    Did that raise your vigilance in watching him throughout

14  the day to make sure that he was able to take the test?

15  A    Of course.

16  Q    Now if Mr. Bauta was in pain, would that impact these

17  results?

18  A    It could.

19  Q    Okay, explain.

20  A    It could.  So, if someone is in pain and if the pain is

21  very, very severe they might have some trouble engaging in the

22  test consistently throughout the day, but when that happens

23  patients usually tell me, you know, Dr. Morgan, I'm really not

24  feeling very well.  We need to break this up, can I come back

25  tomorrow and finish?  They usually tell me.

Morgan - direct - Mannion                    2105

1  Q    If they don't tell you and they're in pain, how would it

2  impact the results, to what degree?

3  A    To a minor extent most patients in pain can do these

4  tests and have maybe only a loss of a few points here or

5  there.

6  Q    You even have chronic pain patients that take these?

7  A    Oh, yes, we have a lot of research with chronic pain

8  patients in the neuropsychological literature.  Chronic pain

9  patients take these tests and do very well on them.

10 Q    Could pain account for the results that you saw?

11 A    Absolutely not.

12 Q    What do you mean?

13 A    There's no way that pain alone would give scores that are

14 so far below chance and so low on all of these tests.  As I

15 said, one would really need to know the right answers and

16 purposefully not give the right answers.

17 Q    Once you get done with the interview and that initial

18 session, what happens then?

19 A    Then we start the formal test.

20 Q    What do you start with?

21 A    We always start with the Victoria Symptom Validity Test.

22 Q    Why?

23 A    It's just a standard of our practice.  It's an easy test

24 to do.  It is not the sort of test that appears very

25 demanding.  Patients like it.  It's on the computer so we

Morgan - direct - Mannion                    2106

1    usually start with that.  It's not a threatening kind of test.

2    Q    Is that a recognized test in the neuropsychological

3    field?

4    A    Oh, yes, it is widely used in this profession.

5    Q    And was it used by either Dr. Thomas or Dr. Honor?

6    A    I believe Dr. Thomas also gave it.

7    Q    What -- explain for us how that test is, what it is and

8    what you tell the patient?

9    A    Oh, sure.  So the way the test works it's on a computer.

10   So we have a laptop and what I say to the patient is, when we

11   start this test you're going to see a five-digit number come

12   on the screen.  Now, I want you to memorize that number and

13   you have a few seconds to memorize it and then it goes away

14   and then you will see two different five-digit numbers on

15   either side of the screen, one of them is the one you just saw

16   and with the mouse just click the one you saw.

17          So there's a little practice.  So a number comes up,

18   a five-digit number like 12345, not 12345, but a five-digit

19   number and I would say memorize that and then a moment later,

20   two different five-digit numbers come up and the patient is

21   instructed to click the one that they just saw.

22   Q    You're not asking them to remember it and write it down.

23   They just need to recognize it on the same slide?

24   A    Yes, it's recognition memory.

25   Q    Explain if this is easy, difficult.  Explain.

Morgan - direct - Mannion                    2107

1  A    Recognition memory is very easy.  The test sounds like
2  it's a lot harder than it is, but recognition memory tests are
3  very easy.  People pass them with great ease.  There are two
4  parts to the test.  The easy -- what they call the easy items
5  and what they call the difficult items.  The easy items, when
6  they gave you the choice the numbers are very different.
7  Let's just assume that the number to be remembered is 52827.
8  So the two choices you get would be that that number, 52827,
9  and then one who's very different 14629.  So that's the easy
10 one.  They're very different.
11 Q    Many people get 100 percent on that?
12 A    Absolutely.
13 Q    Do you even give that to children?
14 A    Yes, five year olds pass this with ease.
15 Q    And how did Mr. Bauta do?
16 A    Well, there's a hard part.  I didn't mention that.  The
17 hard ones are not really hard, but the numbers are closer
18 together so you might have 52817 and then that would be one of
19 the choices, that's the real number, and the other one would
20 be 52718.  It's similar, but different.  If you've memorized
21 that number, you can easily tell the difference.  Five-year
22 old children can pass this test very easily.
23 Q    And how did Mr. Bauta do on the tests combined?
24 A    He got 16 right out of the 48 stimuli.  That's right on
25 the easy items and only 6 right on the difficult items.

SN        OCR        RPR

1   Q    And absen5 patients with dementia or significantly --

2   well, let me just ask you this, what did those test results

3   tell you?

4   A    Those test results indicate that, first of all, the

5   scores are very low.  Some of the lowest I've probably ever

6   seen.  In order to get that score by chance alone, like

7   flipping a coin we talked about before, it would be one out of

8   100.  So 99 times out of 100 you couldn't do it by chance so

9   what does that mean?

10          The only logical explanation is that he purposefully

11  chose the wrong answer on the more difficult items.  The easy

12  items, 10 out of 24, that could be by chance, but the more

13  difficult items he clearly chose the wrong answer.

14

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

SN        OCR      RPR

1  EXAMINATION CONTINUES

2  BY MR. MANNION:

3  Q    And are there some neuropsychologists who, that would

4  have been enough, they would have been done for the day?

5  A    Yes.  Some of my -- some of my professional colleagues

6  would stop the exam right there thinking that that's all they

7  need.

8  Q    Because it shows that he is not going to perform those

9  tests?

10 A    Not cooperating, he's probably not going to give you any

11 valid results during the rest of the examination.

12 Q    Now, were there test results from Mr. Bauta on this

13 Victoria test that were given by the plaintiffs?

14 A    Dr. Thomas gave that test in his second examination of

15 Mr. Bauta in 2017, and the results of which, according to

16 Dr. Thomas, was that he passed it.

17 Q    Okay.  So Mr. Bauta was capable of doing it with

18 Dr. Thomas?

19 A    Yes.

20 Q    How does that impact your interpretation of the results

21 with you?

22 A    Well, it reenforces my interpretation that, clearly, he

23 didn't cooperate on the test.  In fact, selectively chose

24 wrong answers.

25 Q    Would you come in here and essentially call Mr. Bauta a

Morgan, MD - direct - Mannion                    2110

1    faker, based on just that test?

2    A    You know, I continued -- I continued the examination.

3    Q    Okay.

4    A    Sometimes, you know, you never know.  Maybe -- maybe he

5    would rise to the occasion.  Maybe I'd get, you know, more

6    credible results on other tests.  So I continue the

7    examination, unlike some other colleagues.

8    Q    Okay.  Let's go now to one of the other tests.  It's

9    called the TOMM test, but it's T-O-M-M.  What is that test?

10   A    That's the Test of Memory and Malingering.

11   Q    And by the way, as we're talking about these tests, the

12   jury heard from Dr. Honor and Dr. Thomas about validity tests,

13   some being, quote, embedded and some being standalone.

14          What are those?

15   A    Yeah.  So there are two ways that these tests are done.

16   These are all called performance validity tests, because we're

17   testing the cognitive performance of the examinee.

18          So some tests are free-standing tests or standalone

19   tests.  The Victoria, the one I mentioned before on the

20   computer, is a free-standing or standalone test.  The TOMM is

21   a standalone test.  Dr. Honor gave a test called the Word

22   Memory Test.  That is a standalone test.  And then we gave

23   some tests that are actually part of a formal cognitive test,

24   and those are called embedded tests, embedded measures.

25   Q    Because there is a validity test within a bigger test?

1    A    Right, exactly.

2    Q    Is all of that standard in the neuropsychological

3    industry?

4    A    Oh, absolutely.  It's used by the vast majority of the

5    profession.

6    Q    Explain the TOMM test, and what you would have explained

7    to Mr. Bauta and what would have occurred.

8    A    Okay.  So the TOMM test is a test of visual recognition

9    memory.  So the patient is going to see pictures that are in a

10   spiral-bound book, one at a time.  So what I would say to the

11   patient is, I am going to show you some pictures of just

12   everyday objects.  I want you to remember the picture.

13   Memorize the picture.  You don't even have to know what it's

14   called, just memorize the picture.  And then there is an

15   example.

16        So you flip the book and there may be a picture of a

17   mouse.  I want you to remember that.  Okay, and you flip the

18   book.  Now, I want you to remember that, maybe it's a chair.

19   Okay, so he's seen the mouse and the chair.  Then you turn it

20   and then there are two pictures, one is the mouse and then

21   some -- what we call a foil, something he didn't see.  And we

22   say, Now, which did you see, A or B?  Well, I saw A, I saw the

23   mouse.  Okay, that's the way --

24   Q    Is this a difficult test?

25   A    Very easy test, five-year-olds pass the test.

Morgan, MD - direct - Mannion                    2112

1   Q    Now, is this Dr. Morgan saying that that test somehow

2   measures something, or is there some science behind it?

3   A    Oh, this is -- these tests are used by members of the --

4   almost all members of the profession use these tests, trust

5   these tests as examples of the patient's cooperativeness,

6   engagement in the testing process.  They're used throughout

7   by -- by the vast majority of members of the profession.

8   Q    How many of these pictures do you show, did you show

9   Mr. Bauta, and then how many did he get right?

10  A    So there are 50 pictures to the test that are shown one

11  at a time.  And then after the patient has seen all of the

12  pictures, then he gets -- he or she gets choices, as I said.

13          Choose A or B, which one did you see?

14  Q    How did Mr. Bauta perform on this test?

15  A    So, Mr. Bauta on -- you do it twice.  There are -- there

16  are two trials.  We call it two trials.  The same pictures

17  both times.  And then there is an optional recognition --

18  retention trial, we call it.

19          On the first trial with me, Mr. Bauta got 18 of the

20  50 right, below chance.

21          On the second trial with me, he did even worse, he

22  got 16 out of 50.

23  Q    Explain those results in relation to, for example,

24  patients with significant deficits in a nursing home, or

25  children.

SAM      OCR      RMR      CRR      RPR

Morgan, MD - direct - Mannion                2113

1   A     So these are really easy tests.  The whole idea of

2   performance validity tests is that they are easy tests that

3   even mildly demented patients will pass.  They look harder

4   than they are.  So that's the sort of the methodology.  And we

5   know that children as young as five will pass these tests

6   easily.

7           The patient has to get 45 right on each trial to

8   pass the test.  And most patients get at least 45 or more, 47,

9   49, even on the first trial.  That's how easy it is to

10  remember these pictures.

11          So, you know, as I said, mildly demented patients in

12  a nursing home will pass these tests.

13  Q     And what percentage -- for Mr. Bauta's results, where did

14  he lie in the percentage?

15  A     So, as I said, 18 of 50 for the first trial; 16 of 50 for

16  the second trial.  So it's about the first percentile.

17  Q     What do you mean by first percentile?  What does that

18  mean?

19  A     Percentile is a measurement that compares a patient's

20  performance on a test to other people who took the test.  So

21  if somebody scores at the 50th percentile on a test, what that

22  means is that half the people who took the test did worse than

23  that patient -- because he's at the 50th percentile -- the

24  other half did better.

25  Q     And what does 1 percent mean?

Morgan, MD - direct - Mannion                    2114

1   A    First percentile means that 99 percent of the people who

2   took the test in the same age group did better than he did.

3   Q    What is -- could this have just happened by chance with

4   Mr. Bauta; he just didn't get lucky?

5   A    No, it's far below chance.  By chance, you'd get about

6   half.

7   Q    Okay.  So in this case, what is the percentage chance

8   that this could have been some anomaly or chance?

9   A    Oh, it's -- it's about one out of a hundred.

10  Q    So he had one out of a hundred on the first, and one out

11  of the hundred on the second?

12  A    Yes.

13  Q    How do you combine those two in your analysis?

14  A    So, you know, I mean, it's -- it's pretty stark to think

15  about scoring that way on two tests by chance, that there

16  would be essentially no way for that to happen by chance

17  alone.

18  Q    One in a hundred times one in a hundred would be what,

19  one in a thousand?

20  A    Yeah, I guess, or some multiple of it.

21  Q    Let's now go to the California Verbal Learning Test.

22           What is this test?

23  A    That's a test of verbal memory, where a patient hears a

24  list of words to be remembered, and then they have to say the

25  words back after each time they hear it.  So the test has five

Morgan, MD - direct - Mannion                    2115

1  trials.  They hear the same list of words five times.  And

2  after they hear it each time, they are instructed to say back

3  as many of the words as they can remember, in any order.

4           Within the test, there is a validity test.  And the

5  validity portion of the test comes at the end of the test.

6  And that's one of the embedded validity indicators.

7  Q    Okay.  Now, how many words do you read off?

8  A    16.

9  Q    And don't read off 16 words, but give me an example.

10          Let's say, read off five words.

11  A    So, house, tree -- these aren't really -- I am not really

12  giving the words on the list.  House, tree, car, camera,

13  banana.  Something like that.

14  Q    Okay.  Well, let me ask you specifically:  Truck, lump,

15  cow, desk, cabbage.

16  A    Those are the words on the list, yeah.

17  Q    Those are some of the words.

18          And after you've read 16 words to him -- you told

19  him what you were doing, true?

20  A    Yes, of course.

21  Q    You read them slowly?

22  A    Yes.

23  Q    Okay.  And how many did he remember?

24  A    One.

25  Q    In addition to the one he remembered, were there any

Morgan, MD - direct - Mannion                    2116

1  additional words given?

2  A    Yes.  They're called intrusion errors, so they're sort of

3  made up by the patient.  You know, water is one of the ones he

4  made up.  It wasn't on the list.

5  Q    So you read 16 words, he got only one right, but he said

6  water as well?

7  A    Yes, yes.

8  Q    And some other words?

9  A    Yes.

10 Q    After that, what happened after that first trial?

11 A    So we say, okay, so I am going to read the same list of

12 words to you again and just as before, say back as many as you

13 can remember in any order, including the ones you said the

14 first time.  In other words, say back everything.

15         So we go through, I read the whole list of words

16 again, and the patient supposedly says back as many as they

17 can remember.

18 Q    And that time, he got three the second time?

19 A    Yes.

20 Q    And he also said water?

21 A    Water.

22 Q    Did you ever say that word to him, water?

23 A    No.  Water is not on the list.

24 Q    Now, you did a third time trial, correct?

25 A    Yes.  We actually did it five times.

Morgan, MD - direct - Mannion                    2117

1    Q     And he got three right the second time -- or the third

2    time, I mean?

3    A     The third time.

4    Q     And also said water?

5    A     Yes.

6    Q     And the fourth time, it looks like there were two right?

7    A     I believe so.  I don't have the data right in front of

8    me.

9    Q     And he also said water?

10   A     Yes.

11   Q     And the fifth time, I see one right.  He got cabbage, and

12   also said --

13   A     Water.

14   Q     Have you ever seen anybody on the fifth time reading

15   these only get one word right?

16   A     I have never seen that.  Even -- even in patients with

17   moderate Alzheimer's disease, they usually get three or four

18   by that point.

19   Q     And there is something called intrusions?

20   A     Yes.

21   Q     What are those?

22   A     Those were the words that were made up, like water.

23   Q     And there were six intrusions the first time, three the

24   second, three the third, three the fourth, and four on the

25   fifth.

Morgan, MD - direct - Mannion                    2118

1              What do intrusions tell you as neuropsychologist?

2    A    That he made up -- he made up the words.  He made up the

3    words that weren't on the list.

4    Q    But what does that tell you?

5    A    He's not -- he's not really trying.  He's not really

6    doing his best on the test.

7    Q    And then you go through a number of other different tests

8    on this that have to do with memory?

9    A    Yes.

10   Q    Okay.  As a result of all of those tests that were

11   performed by your office on the California Verbal Learning,

12   what was your conclusion?

13   A    Well, he scored -- he scored, you know, at or below the

14   first percentile on all of the measures on the California

15   Verbal Learning Test.

16             On the embedded validity test, which is a

17   recognition test, what we do is -- was this or that -- we say

18   the two words, was -- in other words, was truck or camera on

19   the list?  Now, the person has just heard the list five times,

20   and so they are instructed to say which word was on the list,

21   truck or camera.  Well, most people would say truck.  So most

22   people would -- there are 16, because there were 16 words on

23   the list, and most people get somewhere between 14 and 16

24   right.  Mr. Bauta got five right.

25   Q    And was this one of those other ones that maybe one out

SAM      OCR      RMR      CRR      RPR

1    of a hundred chance that this could be a, quote, by chance?

2    A    I've never seen anything that low.  I've never seen

3    anything --

4    Q    Never?

5    A    Never.

6    Q    Out of 5,000?

7    A    I've never seen anybody get 5 right out of 16.

8    Q    Five-year-olds?

9    A    Five-year-olds usually nail it, actually.  15 or 16.

10   Q    Mildly demented?

11   A    They usually get 14, 15 or 16.

12   Q    So one out of a hundred, one out of a hundred, one out of

13   a hundred, now we're out of one out of 10,000 that this is

14   some chance finding?

15   A    Yes.  Some very large number.

16   Q    What is the Digit Span Test?

17   A    So in the Digit Span Test, which is another embedded

18   measure, the examiner reads -- what we say to the patient is:

19   I am going to say some numbers, and I'd like you to repeat

20   them after me.  We start out with two numbers, like 2-7.  So

21   just repeat after me 2-7; 2-7.  6-4, 6-4.  And so then it goes

22   to three numbers, to four numbers, to five numbers and so

23   forth, until they get two wrong.

24            Then we say:  Now, I'm going to say some more

25   numbers.  This time, I'd like you to say them in reverse; say

Morgan, MD - direct - Mannion                    2120

1    them backwards.  So, for example, if I say 2-7, you would say

2    7-2.  Understand?  Yes.  Okay.  So then we go through that.

3    Q    Okay.  By the way, are you taking breaks --

4    A    Oh, of course.

5    Q    -- dUring these tests?

6    A    Absolutely.

7    Q    And without going through everything on that test, what

8    were the results of that test?

9    A    So, with me, he's reliable -- it's called the Reliable

10   Digit Span.  That's the validity test portion of it.  With me,

11   he got 4, which is below the cut-off of 7.  With Dr. Honor, he

12   got 6.  So he did better with Dr. Honor than he did with me.

13            So it's a very low Reliable Digit Span.

14   Q    And, again, was that another one out of a hundred?

15   A    Well, it's so rare that probably, yes.

16   Q    Okay.  So now we're up to one out of a hundred, one out

17   of a hundred, one out of a hundred, one out of a hundred,

18   we're at one out of what, a hundred-thousand?

19            MR. KIEFFER:  Objection, Your Honor, counsel is

20   testifying.

21            THE COURT:  Sustained.

22            MR. MANNION:  Okay.

23   BY MR. MANNION:

24   Q    So when you add those four tests together, what does that

25   tell you about the probability that this is by chance?

1   A    Oh, I think it's impossible at this point.

2   Q    Now, what is the MMPI?  And we'll start going through

3   these a little quicker.

4   A    Minnesota Multiphasic Personality Inventory, Second

5   Edition.

6   Q    Okay.  A lot of people may have heard of the MMPI.  It's

7   a personality test?

8   A    Yes.

9   Q    Are there any embedded validity tests?

10  A    There are -- there are validity scales on it that are

11  embedded, yes.

12  Q    Okay.  And how did Mr. Bauta perform on that?

13  A    He had an elevation on a couple of the validity scales

14  that -- where he reported exaggerated complaints of memory

15  loss and cognitive problems.

16  Q    Okay.  The verbal fluency test?

17  A    That's not a validity test.  That's just a test of the

18  ability to rapidly retrieve words from your memory.

19  Q    And how did he perform on that?

20  A    I believe he scored about or below the first percentile

21  also.

22  Q    Let's go now to the SIMS Test.  What is that?

23  A    SIMS stands for Structured Inventory of Malingered

24  Symptomatolgy -- Symptoms.

25  Q    Wow.  What does that mean?

Morgan, MD - direct - Mannion                    2122

1   A    It's a true/false test of psychiatric symptoms or --

2   Q    Is this it?

3   A    That's it.

4   Q    And they just fill out true or false?

5   A    Yes.

6   Q    What's the purpose of this test?

7   A    So it's a psychiatric symptom validity test, and the

8   purpose of it is similar to the performance validity tests

9   that assess cognitive performance.  This assesses symptoms

10  reported by the patient.  So for these items, there are items

11  in here that are very extreme representations of serious

12  psychopathology that even hospitalized schizophrenic patients

13  don't have.

14           So the cut-off for malingering on that test is 23.

15  If you answer 23 of these in this scored direction, that's

16  evidence of malingering.

17  Q    What's malingering?

18  A    Malingering is exaggerating impairment or symptoms to a

19  point of feigning, faking.

20  Q    Okay.  And what is a typical score?

21  A    On this?

22  Q    Yes.

23  A    About three or four, in a -- even in a patient who has

24  psychiatric problems.

25  Q    And what was Mr. Bauta's score?

1   A    42.

2   Q    23 is the cut-off and he had 42?

3   A    Yes.

4   Q    So how do you interpret that?

5   A    Clearly malingering psychopathology.

6   Q    I assume you don't have his answers memorized to all of

7   these?

8   A    Oh, absolutely not.

9   Q    But did you review this in preparation for today and look

10  at some of the specific questions and answers?

11  A    Yes.  And I think I put some of it in one of my reports

12  also.

13  Q    Okay.  So, for example, United States has 55 states.

14  Mr. Bauta responded?

15  A    True.

16  Q    There are only six days in a week.  Mr. Bauta responded?

17  A    True.

18  Q    People can read my thoughts.  Mr. Bauta responded?

19  A    True.

20  Q    If you try hard enough, you could read the thoughts of

21  somebody else; Mr. Bauta responded?

22  A    True.

23  Q    Were there a number of things like that that he said true

24  to?

25  A    Yeah, these are -- these are absurd symptoms that even

Morgan, MD - direct - Mannion                    2124

1   the most chronic psychiatric patients don't agree with.

2   Q    So what's your evaluation of the symptoms test?

3   A    So, it clearly was representative of malingered

4   psychopathology.

5   Q    Let's go through the others even quicker.

6            The WMS-IV, what's that?

7   A    The Wechsler Memory Scale, Fourth Edition.  That is not

8   a performance validity test.  It is a test of memory

9   functioning for verbal and visual material.

10  Q    And how did he do on that?

11  A    First percentile.

12  Q    I'm sorry?

13  A    The first percentile.

14  Q    What's your evaluation of that?

15  A    Again, it's just extremely low.  He -- he didn't put any

16  effort into it.  He's feigning memory impairment.

17  Q    And you had explained to him, again, that you were doing

18  this to evaluate all of these issues for purposes of

19  litigation?

20  A    We do this throughout the day.

21  Q    The WMS-IV that has some pencil drawings in it, what's

22  that?

23  A    That's the visual memory part.

24  Q    How did he do on that?

25  A    Again, first percentile.

SAM      OCR      RMR      CRR      RPR

Morgan, MD - direct - Mannion                    2125

1   Q     The WAS-II?

2   A     The Wechsler Abbreviated Scale of Intelligence.

3   Q     And what did you find on that?

4   A     He had an IQ of 64.

5   Q     Okay.  And the CVLT-II --

6   A     That's --

7   Q     Oh, by the way, let's say that that was a valid -- that

8   that really was his IQ, okay?  Assume that for a second.

9          Would that explain any of these results?

10  A     No, it wouldn't.

11  Q     Why?

12  A     Well, that would be equivalent to mild mental

13  retardation, which is now called development intellectual

14  disability.  Even patients with -- who are mildly

15  intellectually disabled can have a very normal memory.  They

16  don't -- they don't go together.  Impaired -- impaired

17  intellect and impaired memory, they don't go together.

18  Q     You are not asking him to solve the area of a cube or

19  anything of that nature?

20  A     No.

21  Q     Okay.  The CVLT-II?

22  A     That's the California Verbal Learning Test, the second

23  edition.  That's the one we talked about with 16 words.

24  Q     Okay, I'm just looking at a different portion of it.

25          The Rey-Osterrieth complex finger test?

1   A    Yes.  That's a test of the ability to draw.  Drawing is

2   actually a pretty complex function, because you have to see

3   something, it has to transfer from one area of your brain to

4   another to be able to draw it.  And so it involves what we

5   call a developmental motor coordination.  It's a fancy term

6   for the ability to see something and translate it into

7   psychomotor activity.

8   Q    Do they get to look at the thing that they're drawing the

9   entire time?

10  A    Yeah.  There's two portions to it.  There's a copy

11  portion where you just copy the figure.  And then that's taken

12  away at some point, and then you say, Now I'd like you to draw

13  that thing from your memory.

14  Q    You're not asking them to draw a portrait of somebody or

15  something difficult like that?

16  A    No.  It's just a geometric figure.

17  Q    Do you give this to children and other folks?

18  A    As young as 5 years old.

19  Q    How did Mr. Bauta do?

20  A    He actually passed that.  That's the only pass he test --

21  the only test he passed.

22  Q    Trailmaking Part A and Part B, what's that?

23  A    These are tests of executive functions, psychomotor

24  tests.  Trailmaking A is connect the numbers, just like sort

25  of a kids' thing.  You know, they have to find the number and

1    connect it, 1, 2, 3, 4 as quickly as you can.

2           Trailmaking B is similar, except you alternate

3    numbers and letters.  He scored at the first percentile on

4    this.

5    Q    And what did that tell you?

6    A    Didn't really try.

7    Q    Okay.

8    A    Attempting to exaggerate his impairment.

9    Q    Throughout the day, did you hear any complaints from

10   Mr. Bauta of pain?

11   A    No.

12   Q    Did you observe any signs of him limping around or

13   complaining, or anything of that nature?

14   A    No.  Not that we observed.  No.

15   Q    Okay.  And did you see him getting tired or falling

16   asleep or anything of that nature?

17   A    No.  If -- if -- if we had seen that, we would have

18   stopped the exam right away.

19   Q    And I'd like you to sort of explain, if you can for us,

20   that -- the extent to which you saw intentionally wrong

21   answers, how does that impact your opinion as to whether he

22   has good cognitive abilities and was able to take that test?

23   A    So as I think I've said, in order to consistently choose

24   the wrong answer on so many tests, that requires someone to

25   actually know the right answer and avoid it.  And so that

Morgan, MD - direct - Mannion                    2128

1  really indicates that his cognitive functioning is normal.
2  There would be no other way to do that.  You can't do it by
3  chance.
4  Q    Based upon your education, training and experience and
5  his results on these tests, and your observations of him, do
6  you have an opinion to a reasonable degree of scientific as to
7  whether Mr. Bauta has any cognitive deficits?
8  A    Yes.  He has no cognitive impairment.
9  Q    Okay.  By the way, did you document a cane in your notes?
10 A    Not that I -- no, I did not.
11 Q    Is that something you would typically document?
12 A    We would document had he used a cane.
13 Q    We heard some question -- some testimony about a
14 concussion.
15         And do you have opportunity in your profession to
16 have knowledge about concussions?
17 A    Oh, I've seen many hundreds of concussed patients, maybe
18 more.
19 Q    Okay, not only with the Jets and the hockey team, but in
20 your practice as well?
21 A    Yes, of course.
22 Q    Do you have an opinion to a reasonable degree of
23 scientific certainty as to whether Mr. Bauta sustained a
24 concussion in this accident?
25 A    I doubt it.

1   Q     Okay.

2   A     I doubt it.

3   Q     Okay.  Why do you say that?

4   A     Concussion is -- the effects of a concussion are

5   immediate, as soon as the impact occurs.  The effects are sort

6   of a change in your mental status.  That's the definition of a

7   concussion.  Concussions, you don't feel fine right afterwards

8   for a few minutes or a while and then you get worse.  Right

9   away, you can't think, you can't really talk.  You may

10  stagger, you feel dizzy, you feel out of it.  Lights are

11  flashing.  You have a ringing in your ears.  It happens

12  immediately.

13          Mr. Bauta said that, you know, at the scene of the

14  accident, he assisted the first responders.  He helped the

15  first responders with some translation.  I -- I don't see how

16  anybody who is concussed, particularly severely concussed,

17  could possibly do that, could possibly have the mental ability

18  to do that.

19

20          (Continued on the following page.)

21

22

23

24

25

1    (Continuing)

2    Q    And I don't know that you've seen that Mr. Bauta said he

3    helped with translation.

4            Is that something that we talked about?

5    A    Yes.

6    Q    Okay.  I want you to assume that the jury's going to hear

7    from an EMT that Mr. Bauta, at the scene, actually helped

8    translate for the EMT with the Spanish speaking, and the EMT

9    who didn't speak Spanish.

10           What does that tell you about his cognition at the

11   scene and whether he had a concussion?

12   A    Well, I cannot possibly see how somebody who is concussed

13   could possibly do that.  The athletes I've seen who are

14   concussed at the scene, they can barely speak, let alone do

15   that.  You just feel awful with a severe enough concussion

16   that I think being able to translate would be an

17   impossibility.

18   Q    Okay.  Dr. Honor talked about delayed onset concussion.

19           What is that?

20   A    Well, I've never heard that.  I don't -- I don't -- that

21   is not a generally accepted idea in terms of concussion.  As I

22   said, the effects of a concussion are immediate, right at the

23   point of impact.  You don't feel fine after an impact and then

24   lousy, you know, later.  It's right at that point.

25   Q    How do you check for concussion?

Morgan - direct - Mannion                    2131

1  A    Well, you can visibly see the patient is in distress.  If

2  they've been knocked down, often when they try to stand up

3  they stagger and fall back down.  They have no balance.  If

4  you ask them how they're doing, they don't speak right away.

5  Assuming that they are aware and alert, you really don't get

6  much of a response from them.  Their head is buzzing.  They

7  feel horrible.

8  Q    What's the GCS?

9  A    The Glasgow Coma Scale.

10  Q    What is that?

11  A    That measures level of awareness, alertness, awake.

12  There are three components to it having to do with the

13  patient's ability to respond to verbal stimuli, to respond to

14  touch and motor ability.  It measures level of awareness.

15  Q    Now one of the experts told us that that's just to see if

16  somebody's in a coma.

17        Do you agree?

18  A    Well, no.  You can observe if somebody's in a coma.  It

19  really measures their level of awareness.  And a total lack of

20  awareness would be equivalent to a coma, so I wouldn't put it

21  that way.

22  Q    Okay.  The EMTs, did you review those records?

23  A    I did.

24  Q    Did you see anything about the Glasgow Coma Scale on

25  there?

Morgan - direct - Mannion                    2132

1  A     He had normal GCS.

2  Q     Explain.

3  A     15 out of 15 correct.

4  Q     What does that mean?

5  A     It means he was able to respond appropriately to verbal

6  stimuli, to motor stimuli.  He was able to move appropriately

7  to command and responded appropriately.  It's a perfect score.

8  It doesn't show any level of unawareness.  With a very serious

9  impact, the Glasgow Coma Scale is often very low; 3, 4, 5 out

10 of 15.

11 Q     Any impairment with his eyes noted by any of the

12 treaters?

13 A     No.

14 Q     Did you review the emergency department, Evangelical

15 records?

16 A     I did.

17 Q     Any indication of a concussion?

18 A     No.

19 Q     And was a CT done at that time?

20 A     Yes.  He had a normal CAT scan, CT scan, that showed no,

21 no acute pathology.

22 Q     Okay.  Emergency department at Brookdale; any indication

23 of concussion?

24 A     No, he had pain there.  He reported pain.

25 Q     Okay.  And if, in fact, Mr. Bauta told any of the ER

1  personnel that he hit his head, would you expect them to

2  evaluate him for a concussion?

3  A    Absolutely.

4  Q    Is that perhaps why the CT was ordered?

5  A    Yes, it's standard procedure.

6  Q    Okay.  And before a referral by Mr. McElfish of Mr. Bauta

7  to Dr. Honor, did you see any of the treaters anywhere,

8  whether 110 West 34th or Lattuga's office or the ER or the

9  EMT; anyone diagnose him with a concussion?

10 A    No.

11 Q    Okay.  Any question in your mind as to whether he had a

12 concussion or not?

13 A    I don't believe he did.

14 Q    Okay.  Is it even a close call in your mind?

15 A    No.

16 Q    Okay.  Let's now talk about Post-Traumatic Stress

17 Disorder.

18            THE COURT:  How much more do you have?

19            MR. MANNION:  I could probably be done in five, ten

20 minutes.

21            THE COURT:  All right.  Five, ten minutes.

22            MR. MANNION:  Okay.

23 Q    Post-Traumatic Stress Disorder.

24            Do you have an opinion as to whether Mr. Bauta

25 sustained Post-Traumatic Stress Disorder?

Morgan - direct - Mannion                    2134

1    A    No, I don't believe he did.

2    Q    Now, he's told us that he gets anxious riding a bus.

3         Doesn't that show you that he's stressed out from

4    this; that he has PTSD?

5    A    Well, it requires more than that.  I think anyone

6    experiencing this kind of a crash would feel anxious getting

7    on a bus, but that's not PTSD.

8    Q    Well, how do you have experience with PTSD?

9    A    So I was trained in the VA Hospital.  I did a two-year

10   internship post-doc in the VA Hospital and then was a staff

11   member in the VA for 16 years.  And I have seen very many

12   patients with Post-Traumatic Stress Disorder.  And I've seen

13   them in my private practice also.

14   Q    Explain why you believe Mr. Bauta did not have PTSD.

15   A    So Mr. Bauta doesn't have the symptoms of PTSD.  PTSD

16   requires experiencing a traumatic event.  That part he has.

17   And it requires other types of symptoms that he doesn't have;

18   including reexperiencing, avoidance, startle response.  I

19   didn't see -- excuse me.

20        We evaluated him for PTSD and didn't see these kinds

21   of symptoms.

22   Q    Well, Mr. Bauta said he took a bus ride several weeks

23   after, a pretty lengthy one, and it made him anxious.

24   A    So anxiety, although it is sometimes seen in PTSD, is not

25   sufficient to diagnose PTSD.  Getting anxious after what he

Morgan - direct - Mannion                    2135

1  went through would not be unusual and would be expected.  But

2  that's not PTSD.

3  Q    Would you expect a PTSD, if he had it, to have been able

4  to take that bus strip?

5  A    Oh, I doubt it very much.  He would have avoided that at

6  all costs.

7  Q    Got off at the first stop?

8  A    Absolutely.

9  Q    Okay.

10          MR. MANNION:  Actually, Your Honor, I do have

11  another area that might take a little more time than I

12  thought.

13          THE COURT:  Okay.

14          Let's take our lunch break now, ladies and

15  gentlemen.  Come back at 1:45 p.m., please.

16          THE COURTROOM DEPUTY:  All rise.

17          (Jury exits. )

18          (In open court; outside the presence of the jury.)

19          THE COURT:  Please, Dr. Morgan, do not discuss your

20  testimony with your attorney.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  All right.  1:45 p.m.

23

24          (Continued on following page with AFTERNOON

25  SESSION.)

Proceedings                                    2136

1                 AFTERNOON SESSION:

2           (In open court.)

3           (Judge RAMON E. REYES enters the courtroom.)

4           (The following occurs outside the presence of the

5    jury.)

6           THE COURT:  You may be seated.

7           THE COURTROOM DEPUTY:  Judge, we are ready.

8           THE COURT:  You can go get them.

9           (Witness resumes stand.)

10          MR. McELFISH:  There is an issue on the next

11   witness, Nobilini, that I want to raise.  I do not have to do

12   it now.

13          THE COURT:  Is he ready to go right after this?

14          What is the issue?

15          MR. McELFISH:  Dr. Nobilini's defense's

16   biomechanical expert, and he's only being offered in rebuttal

17   to Mr. Smith.  He doesn't have any direct opinions; didn't do

18   a biomechanical analysis.

19          One of his opinions is, is that the occupants

20   further back in the bus receive less force and less injury

21   exposure, if you want to put it scientifically.

22          We had raised the issue of other passengers'

23   injuries and the Court excluded that, either did -- already

24   gave a curative instruction on that; that they are to

25   disregard any other passengers' injuries.  But this is the

Proceedings                           2137

1   same basic argument; that if somebody's in the back of the

2   bus, they're going to have less injury exposure, and if that's

3   the case, we can bring people to show it's not true.

4              THE COURT:  No.  It is not the argument.

5              Your expert testified to the force in the back of

6   the bus.  Their expert is going to testify to the lack of

7   forces in the back of the bus.

8              MR. BARMEN:  It's a physical principle, Your Honor.

9   It has to do with crush and crumple zones.  There's a reason

10  they're included.  As the wave travels back, as the crush goes

11  back, the force is lessened.  He's not going to talk about any

12  other passengers.  He's not going to talk about injuries to

13  other passengers.  He just talks about well-established

14  physical principles.

15             In terms of him not having an opinion, he was

16  brought in, in rebuttal.

17             THE COURT:  Did he write a report?

18             MR. BARMEN:  Of course, he did.  And it is in his

19  report and he articulated his opinions, Smith was wrong and

20  why.

21             THE COURT:  If you open the door to force equals

22  injury, they are less likely to be injured in the back of the

23  bus, then we might have a problem.

24             MR. BARMEN:  He is not going to talk about injuries.

25  He's not going to talk about other people.  There is a

1   physical principle.  The forces lessen as you go back -- front

2   to back.  It's a well-established physical principle and he'll

3   explain it.  It has nothing to do with other people.

4            THE COURT:  We will see how it comes in and if there

5   is a problem, we will deal with it.

6            All right.  Bring them in.

7            (Jury enters.)

8            THE COURT:  You may be seated.

9            You may continue, Mr. Mannion.

10            MR. MANNION:  Thank you, Your Honor.

11   DIRECT EXAMINATION (Continuing)

12   BY MR. MANNION:

13   Q    Dr. Morgan, you've already told us it would have been

14   natural for Mr. Bauta to experience some anxiety as a result

15   of an accident like this?

16   A    Yes.

17   Q    Okay.  Do you think it would have been appropriate at the

18   time after the accident or reasonable for him to seek some

19   therapy or counseling for that?

20   A    It would have been reasonable, sure.

21   Q    Okay.  And did you put that in your report early on?

22   A    I did.

23   Q    Okay.  Back in 2016 when you issued your report?

24   A    Yes.

25   Q    Okay.  What type of duration or anything of that nature

Morgan - direct - Mannion                    2139

1    were you talking?

2    A    Oh, I didn't necessarily think of it in terms of

3    duration, but some short-term counseling or supportive

4    psychotherapy would have been helpful to alleviate, you know,

5    symptoms.

6    Q    Okay.  The first deposition that -- you gave two

7    depositions in this case?

8    A    Yes.

9    Q    Okay.  By the time of your first report and first

10   deposition, had you had an opportunity to review the

11   depositions of the various family members the first time

12   around?

13   A    Yes.

14   Q    The first -- I know you didn't --

15   A    No, second time.

16   Q    Right.  So you reviewed those before your second

17   deposition and second report?

18   A    Yes.

19   Q    Okay.  You had a chance to evaluate that and take those

20   into consideration?

21   A    I did.

22   Q    Okay.  Do those alter your opinions?

23   A    Not at all.

24   Q    Okay.  And you had a mention in your report, I wanted to

25   ask you about, chronic migraine headaches before this

1  accident.

2  A    Yes.

3  Q    Okay.  Where did you see that?

4  A    I think it was the Brookdale Hospital records, that the

5  plaintiff had told hospital that he had headaches.  That was

6  about 2005.

7  Q    Migraines?

8  A    Yes.

9  Q    Okay.  And let me see now.  In addition to evaluating the

10 families, did you have an opportunity to evaluate Dr. Honor's

11 test results and testimony, and Dr. Thomas's test results and

12 testimony and consider those?

13 A    I did.

14 Q    Let's talk about Dr. Honor first.

15        One of the things, we talked a little bit about

16 concussion and the delayed onset.  But I wanted to ask you,

17 are you saying that the symptoms can't get worst over the

18 first 24 or 48 hours?

19 A    Symptoms can get worse, yes, but what I'm saying is that

20 there are immediate symptoms that are fairly prominent; fairly

21 profound.  It's not uncommon that the next day the concussed

22 person has more pain, increase of symptoms.

23 Q    Okay.

24 A    And particularly pain in the neck and headache are very

25 common.

Morgan - direct - Mannion                    2141

1    Q     In -- okay.

2          And by the time of the Brookdale treatment on the

3    10th, now in the 24 to 48-hour range, did you see any

4    indication of any diagnosis of concussion?

5    A     I didn't.

6    Q     Okay.  And did you see any of it in the months

7    afterwards?

8    A     I did not.

9    Q     Okay.  Could it have come about after those first

10   48 hours and shown up?

11   A     Well, no.  As I said, concussion occurs immediately.  At

12   the very moment of impact, there is an alteration of mental

13   status.  And that really defines -- it's definitional for

14   concussion.

15   Q     I want you to assume that in addition to helping

16   translate at the scene, Mr. Bauta helped translate at the

17   emergency room as well.

18          How does that impact your opinion regarding whether

19   or not he had a concussion?

20   A     Well, I think it reinforces my opinion.  I think that had

21   he been even moderately concussed, he would have had

22   tremendous difficulty, been unable to do that.

23   Q     Did you review the test results from Dr. Honor on the

24   wide range assessment of memory and learning too?

25   A     Yes.

VB        OCR        CRR

1    Q     Okay.  What were those results?

2    A     Well, many scores were very low, first percentile or

3    below the first percentile.  Some scores were a little bit

4    higher.  I don't remember the exact data.

5    Q     Okay.  What type of brain injury -- you've already told

6    us about Alzheimer's or dementia.  But what type of brain

7    injury, other than those, would you need to have to have those

8    types of scores?

9    A     In other words, if the scores were really valid?

10   Q     If they were valid.

11   A     So you would have to have brain damage in the left

12   hemisphere for a right-handed person.  So the left hemisphere,

13   particularly in the area by the temple, is the seat of new

14   learning and memory.  So the temporal lobes and the frontal

15   lobes would have to be severely damaged in some type of either

16   trauma or we see it with strokes of the middle cerebral artery

17   in the left hemisphere.  Or we see it with brain tumors,

18   whether they're primary or metastatic.  We see this pattern a

19   lot, but we -- we'd have a corroborating medical evidence.

20   Q     Would this be a subtle finding?

21   A     It would be profound.

22   Q     For example, would it be seen on film?

23   A     Yes.  The pathology would be seen on film to cause such a

24   huge -- low scores on memory tests.

25   Q     Massive bleeding, things of that nature?

Morgan - direct - Mannion                    2143

1  A    Absolutely.  It would be massive injury.

2  Q    Okay.  Did you see any evidence of that?

3  A    Oh, no.

4  Q    Okay.  In addition to that test, did you see the auditory

5  test results that Dr. Honor did?

6  A    Are you talking about the dichotic listening test?

7  Q    Yes.

8  A    There were a number of auditory tests.

9  Q    The one that he had not seen in 40 years?

10 A    Yes.  That's the dichotic listening test.

11 Q    Okay.  How does that impact your opinions?

12 A    So there were very unusual findings on the dichotic

13 listening test, which is a test that starts out with hearing

14 in one ear, hearing in another ear, a beep or a sound.  It's a

15 discrimination thing and the patient has to say which ear they

16 heard it from.

17          So my understanding is that Mr. Bauta responded

18 incorrectly to which ear the sound was in, which is a very

19 unusual finding.

20 Q    And Dr. Honor had not seen those type of results in his

21 entire 40 years?

22 A    I believe that's what he said.

23 Q    Okay.  What does that tell you about the validity of

24 Mr. Bauta's responses?

25 A    I think they were invalid.

Morgan - direct - Mannion                    2144

1   Q    Okay.  Did you ever see anybody actually refer him for

2   any type of hearing treatment?

3   A    I don't think so.

4   Q    Okay.  Do you have an opinion to a reasonable degree of

5   neuropsychological certainty as to whether Mr. Bauta's test

6   results on Dr. Honor's tests were valid?

7   A    I believe they were invalid.

8   Q    Why?

9   A    Because he failed performance validity tests and he had

10  scores that were so low that were not credible in light of the

11  fact patterns and medical history of the case.

12  Q    Did you see anything where Dr. Honor, from a

13  neuropsychological or psychological standpoint, was able it

14  rule out malingering?

15  A    He did not rule out malingering, but he could have on the

16  basis of the performance validity tests and the discrepant low

17  scores.

18  Q    Okay.  And so based on those scores, do you believe those

19  scores showed malingering?

20  A    I do.

21  Q    And was Dr. Honor able to rule out that finding?

22  A    He seemed to dismiss it.

23  Q    Why?

24  A    I can't say why he did it.  I -- I -- either incompetence

25  or -- I don't want to accuse anybody of anything, but.

Morgan - direct - Mannion                    2145

1   Q    Do you see any valid psychological or neuropsychological

2   basis to rule out malingering based on that test result of one

3   percent or less?

4   A    No.

5   Q    You also saw Dr. Thomas's test results?

6   A    Yes.

7   Q    Okay.  Did you see how Dr. Thomas got involved in the

8   case?

9   A    It's my thinking that he was referred by Dr. Honor.

10  Q    Okay.  And if I tell you that Dr. Thomas -- assume that

11  Dr. Thomas admitted on this stand to this jury that he has a

12  financial stake in this litigation.  How does that impact your

13  evaluation of his testimony and results?

14       THE COURT:  Sustained.

15       MR. MANNION:  Okay.

16  Q    Do you have a financial interest in this litigation, sir?

17  A    Not at all.

18  Q    And are there rules in the neuropsychological field that

19  control that issue?

20  A    Well, forensic psychologists, including forensic

21  neuropsychologists aren't supposed to take cases on lien or

22  contingency.

23  Q    Okay.  And that's what it's called when you're in court

24  testifying, forensic; correct.

25  A    Yes.

1   Q    And what's the purpose of that role?

2   A    So if you take a case on contingency or lien, it means

3   you haven't been paid.  You expect to be paid.  So it creates

4   a conflict of interest in that you now have a stake in the

5   ultimate outcome or verdict or decision of the case to be

6   favorable to your side so that you'll get paid.

7   Q    So you have an interest in finding neuropsychological

8   problems with the patient.

9   A    Yes.

10  Q    And that is one of the ethical rules?

11  A    Yes, it is.

12  Q    Do you have an opinion to a reasonable degree of

13  psychological or neuropsychological certainty as to whether

14  qEEG is accepted treatment for patients?

15  A    It's very controversial.  My view is that it is not.

16  It's not accepted by the broader neurological community or the

17  broader neuropsychological community.

18  Q    Is this a close call, like 51 percent to 49 percent?

19  A    Not at all.

20  Q    Okay.  Describe it.

21  A    So it's considered to be very controversial in the field.

22  It is not a technique that is used for treatment in -- by

23  neuropsychologists.

24  Q    And let me ask you, is there any scientific basis, in

25  your opinion and in the opinion of the neuropsychological

Morgan - direct - Mannion                    2147

1   field, by the vast majority, of whether that's valid treatment

2   modality?

3   A    It is not considered to be valid.

4   Q    Okay.  Last set of questions, doctor.

5        Based upon everything you reviewed and your exam of

6   Mr. Bauta, your education, training and experience, do you

7   have an opinion to a reasonable degree of psychological,

8   neuropsychological certainty as to whether Mr. Bauta met the

9   criteria, whether from the DSM or any other criteria, for

10  post-traumatic stress disorder?

11  A    I do not believe he did.

12  Q    Okay.  Any real question in your mind about that?

13  A    No.

14  Q    Based on all the same things, do you have an opinion to a

15  reasonable degree of certainty at to whether Mr. Bauta

16  sustained any neurocognitive dysfunction as a result of this

17  accident?

18  A    I don't believe he did.

19  Q    Any objective scientific evidence of cognitive impairment

20  or brain injury as it relates to this accident?

21  A    No.

22  Q    And you hold all the opinions you gave us today to a

23  reasonable degree of psychological and neuropsychological

24  certainty?

25  A    I do.

Morgan - cross - Kieffer                    2148

1          MR. MANNION:  One quick moment, Your Honor.

2          (Pause in the proceedings.)

3          MR. MANNION:  I just saw one thing.

4   Q    In your report, in your supplemental report, you talked

5   about a couple examples from the testing; the TDL T2 verbal

6   memory.  Do you recall Mr. Bauta claiming to remember none of

7   the words on the list; zero, after having heard a list five

8   times?

9   A    Yes, that was the last and fifth trial of the CVLT.

10  Q    Did he remember one or zero?

11  A    I think it was one.

12  Q    Okay.  I just wanted to clear that up.

13          And what does that tell you again?

14  A    That he put no effort into it; that he feigned

15  impairment.

16  Q    And he did the same thing on the Wechsler memory scale?

17  A    Yes.

18  Q    Same conclusion?

19  A    Yes.

20          MR. MANNION:  That's all, Your Honor.

21          THE COURT:  Mr. Kieffer?

22          MR. KIEFFER:  Thank you, Your Honor.

23  CROSS-EXAMINATION

24  BY MR. KIEFFER:

25  Q    Good afternoon, Doctor.

Morgan - cross - Kieffer                          2149

1    A    Good afternoon.

2    Q    I've got some questions and follow-up to Mr. Mannion, and

3    let me begin by asking about your fees in this case.

4              You testified on direct examination that prior to

5    coming to court today you had been paid or billed $40,000 or

6    perhaps a bit more?

7    A    It's about 36,000 all together.

8    Q    All right.  And is that money that has been both billed

9    and paid, or are there bills you have not yet sent?

10   A    There are no outstanding bills.

11   Q    And then you charge an additional fee for your testimony

12   here in court today.

13   A    Yes.

14   Q    And what is that?

15   A    $3,500; flat fee.

16   Q    So when all it said and done, you will have been paid

17   approximately $40,000 for your work on this case?

18   A    About that.

19   Q    Okay.  You used the word forensic a couple of times;

20   correct?

21   A    Yes.

22   Q    Okay.  Forensic refers to court proceedings, legal

23   proceedings, litigation; the kind of things that brings us

24   here today?

25   A    Yes, consulting to the legal profession.

Morgan - cross - Kieffer                    2150

1   Q    Okay.  And about 60 percent of your practice is devoted

2   to forensic work in neuropsychology; true?

3   A    That's approximate.

4   Q    All right.  And so as a matter of simple mathematics, a

5   majority of your professional practice is devoted to

6   consulting work in connection with litigated cases like this

7   one.

8   A    Yes.

9   Q    All right.  And of that majority of your practice that

10  focuses on litigated cases, a substantial majority of that is

11  work done on behalf of defendants such as who hired you in

12  this case; 70 to 75 percent of your work; true?

13  A    Well, I would like to clarify, if I may.

14  Q    Sure.

15  A    The forensic work is not all litigating cases.  In fact,

16  litigating cases accounts for the smaller part of the forensic

17  work I do.  The majority of the forensic work I do would be

18  for disability evaluations for insurance carriers.  So that

19  accounts for the bulk of the forensic work I do.

20  Q    Okay.  So I appreciate that clarification because I want

21  to be precise.  So of the majority of your practice that

22  focuses on forensic work, a majority of that has to do with

23  disability evaluations done on behalf of insurance carriers?

24  A    Yes.

25                (Continued on following page.)

Morgan - cross - Kieffer                    2151

1  BY MR. KIEFFER:  (Continuing.)

2  Q    And in those instances you were retained by the insurance

3  carriers?

4  A    Or sometimes there's a middleman in the organization.

5  Q    But as opposed to the claimant?

6  A    Yes.

7  Q    All right.  And you were performing a neuropsychological

8  evaluation to determine whether or not the claimant should be

9  paid the benefits that they are seeking?

10 A    Not actually.  I never asked that.  What I'm asking is

11 whether or not the claimant is cognitively or psychologically

12 impaired.

13 Q    Fair enough, but you recognize there's actually a

14 connection between those two things?

15 A    Yes.

16 Q    All right.  Now, of the work that you do in litigated

17 cases such as this one, a substantial majority of that work,

18 70 to 75 percent is done on behalf of defendants such as the

19 defendants here; correct?

20 A    Yes.

21 Q    All right.  Now, Mr. -- I'm going to take these topics.

22 I wrote down your several opinions in the order that you gave

23 them.  I'm going to take them a little out of order, not for

24 any particular reason but I'm going to start with the topic of

25 post-traumatic stress disorder or PTSD.

Morgan - cross - Kieffer                    2152

1   A    Sure.

2   Q    And in Mr. Mannion's questions a few moments ago he asked

3   you or you responded by saying that you didn't believe that

4   Mr. Bauta fit the criteria for PTSD; correct?

5   A    Correct.

6   Q    And the criteria you're referring to comes from a manual,

7   actually, called the DSM-5, does it not?

8   A    Yes.

9   Q    And that stands for the Diagnostic and Statistical Manual

10  of Psychiatric Disorders?

11  A    Yes.

12  Q    Fifth edition?

13  A    Yes.

14  Q    And in that manual various different disorders are

15  described and features are set forth and sometimes diagnostic

16  criteria; correct?

17  A    Yes.

18  Q    And so when you refer to DSM criteria, that's what you're

19  referring to; correct?

20  A    Yes.

21  Q    And now, Mr. Mannion didn't ask you about those criteria.

22  I'd like to, for a moment, make sure that we are crystal clear

23  on what it is you are referring to.  I take it you are

24  well-versed and well-familiar with this criteria because you

25  use them in your practice on a regular basis?

1  A     I think so.

2  Q     So the DSM criteria as it relates to post-traumatic

3  stress disorder, which I'll call PTSD has several categories,

4  criteria A, criteria B, criteria C.  Do you know what I'm

5  referring to?

6  A     I think so.

7  Q     And in some of those categories one particular variable

8  may be required and in some categories, more than one, true?

9  A     Yes.

10 Q     Let me ask you if this is your understanding of the

11 criteria that you've referenced to make sure that our record

12 is clear.  Criteria A says that the person was exposed to

13 death, threatened death, actual or threatened serious injury

14 or actual or threatened sexual violence in the following ways:

15 Either direct exposure, witnessing the trauma, learning that a

16 relative or a close friend was exposed to a trauma or indirect

17 exposure to adverse details of the trauma such as in the

18 course of professional duties like a first responder.  Is that

19 what you're familiar with as the criteria A component?

20 A     Yes.

21 Q     All right.  Criteria B and one of those is required for a

22 diagnosis of PTSD is that the traumatic event is persistently

23 reexperienced in the following ways:  Either by unwanted

24 upsetting memories, nightmares, flashbacks, emotional distress

25 after exposure to traumatic reminders, or physical reactivity

Morgan - cross - Kieffer                    2154

1   after exposure to traumatic reminders.  Is that what you're

2   familiar with as the criteria B for PTSD?

3   A     Yes.

4   Q     Criteria C, and one is required here as well, is

5   avoidance of trauma-related stimuli after the trauma in the

6   following ways:  Trauma-related thoughts or feelings,

7   trauma-related reminders, inability to recall key features of

8   the trauma, overtly negative thoughts and assumptions about

9   one's self or the world.  Exaggerated blame of self or others

10  for causing the trauma.

11             MR. MANNION:  I'm going to object and move to

12  strike.

13             THE COURT:  Sustained.  Sidebar.

14             (Sidebar held outside of the hearing of the jury.)

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                          2155

 1              (The following sidebar took place outside the

 2      hearing of the jury. )

 3              THE COURT:  You went from -- you skipped over C.

 4              MR. KIEFFER:  I believe I had the current one.

 5              MR. MANNION:  You can you take a picture of that.

 6              THE COURT:  Do you want the book?

 7              MR. MANNION:  I would object to the entire line of

 8      questioning.

 9              MR. KIEFFER:  He opened it up.  Which one did I

10      skip?

11              THE COURT:  You went this is A, the event

12      persistence, persistent avoidance of stimuli consistent with

13      the traumatic events.  I think you jumped to the D factors.

14              MR. MANNION:  You did C and this one.

15

16              (Sidebar ends.)

17              (Continued on next page.)

18

19

20

21

22

23

24

25
```

1  BY MR. KIEFFER:  (Continuing.)

2  Q    Doctor, with the courtesy of the Court, we have the

3  official version of the DSM-5 instead of my printout.  So

4  we're going to pick up where we left off, okay?

5  A    Sure.

6  Q    So criteria D as you understand it under the DSM five for

7  PTSD is, "Negative alterations in cognition and mood

8  associated with the traumatic events beginning or worsening

9  after the traumatic events occurred as evidenced by two or

10 more of the following:  One, inability to remember an

11 important aspect of the traumatic events typically due to

12 dissociative amnesia and not to other factors such as head

13 injury, alcohol or drugs; two, persistent and exaggerated

14 negative beliefs or expectations about one's self or others or

15 the world.  E.g. I am bad, no one can be trusted, the world is

16 completely dangerous, my whole nervous system is permanently

17 ruined; three, persistent distorted cognitions about the cause

18 or consequences of the traumatic events that lead the

19 individual to blame himself or herself or others; four,

20 persistent negative emotional state, e.g. fear, horror, anger,

21 guilt or shame; five, markedly diminished interest or

22 participation in significant activities; six, feelings of

23 detachment or estrangement from others; seven, persistent

24 inability to experience positive emotions, e.g. inability to

25 experience happiness, satisfaction or loving feelings."  Is

Morgan - cross - Kieffer                    2157

1    that what your familiar with as it relates to criterion D of

2    the DSM-5?

3    A    Yes.

4    Q    And, again, some of these are a little verbose, but to be

5    clear the DSM does not require that each and every one of

6    those subcategories be satisfied for each criteria.  Each

7    criteria specifies how many have to be satisfied, is that

8    correct?

9    A    That's right.

10   Q    Category E is, marked alterations in arousal and

11   reactivity associated with the traumatic event beginning or

12   worsening after the traumatic events occurred as evidenced by

13   two or more of the following:  One, irritable behavior and

14   angry outbursts with little or no provocation typically

15   expressed as verbal or physical aggression towards people or

16   objects; two, reckless or self-destructive behavior; three,

17   hypervigilance; 4, exaggerated startle response; five,

18   problems with concentration; six, sleep disturbances, e.g.

19   difficulty falling or staying asleep or restless sleep.  Is

20   that what you are familiar with, Doctor, as Category E of the

21   DSM are criteria?

22   A    Yes.

23   Q    Category F. Duration of the disturbance as set forth --

24   as described in criteria B, C, D and E is more than one month.

25   You're familiar with that?

Morgan - cross - Kieffer                    2158

1    A    Yes.

2    Q    Criteria G, the disturbance causes clinically significant

3    distress or impairment in social, occupational or other

4    important areas of functioning and; eight, the disturbance is

5    not attributable to the physiological affects of a substance,

6    e.g. medication, alcohol or another medical condition.  Are

7    you familiar with that as.

8              Category H as well?

9    A    Yes.

10   Q    Doctor, insofar as your professional experience and

11   training are concerned do you believe those are you all of the

12   diagnostic criteria for PTSD under DSM-5?

13   A    Yes.

14   Q    You testified in response to Mr. Mannion's questions that

15   you have reviewed, I take it, trial testimony of this trial

16   from Dr. Honor and Dr. Thomas?

17   A    Yes.

18   Q    All right.  Did you review trial testimony of other

19   witnesses?

20   A    No, I did not.

21   Q    Okay, so for example the testimony that the jury has

22   heard from Mr. Bauta, Maria Bauta, Selenia Bauta, Martin

23   Rivera.  Mr. Stitzer, one of the first responders,

24   Dr. Goldman, you did not review any of that testimonial

25   evidence; correct?

1  A    No, I haven't.

2  Q    To the extent that that testimony bears on any of the

3  DSM-5 criteria that we just went through, you don't know what

4  it is and how it might bear on that; is that fair?

5  A    That's right.

6  Q    All right.  Doctor, you shared with the jury some

7  opinions on the topic of concussion; correct?

8  A    Yes.

9  Q    Let me ask you a few follow-ups on that topic if I may.

10 You're familiar with the term executive functioning?

11 A    Of course.

12 Q    Executive functioning refers to higher cortical functions

13 in the brain such as organization, planning, multitasking,

14 processing speed and attention?

15 A    Among others, yes.

16 Q    Okay.  When you first issued your first report in this

17 case -- well, strike that.  You issued two reports in this

18 case; correct?

19 A    Yes.

20 Q    Is it fair to say that the opinions in those two reports

21 really didn't change?

22 A    That's right.

23 Q    The main difference between the first and the second

24 report was you had reviewed additional material by the time of

25 your second report, true?

Morgan - cross - Kieffer                    2160

1    A    Yes.

2    Q    Substantial additional material?

3    A    Yes.

4    Q    Substantial additional material that was pointed out to

5    you at your first deposition that you had not reviewed or

6    considers considered, true?

7              MR. MANNION:  Objection.

8              THE COURT:  Overruled.

9    A    Yes.

10   Q    Okay.  At the time you issued your first report basically

11   saying that Mr. Bauta is a faker, because that's the bottom

12   line of your opinion here today, I mean let's be direct about

13   it, okay?

14   A    Okay.

15   Q    At the time you issued your first report opining among

16   other things that Mr. Bauta was a faker, you didn't even know

17   if he had hit his head on anything in this accident; correct?

18   A    At the time I issued my first report?

19   Q    You didn't know he had struck his head in this accident;

20   correct?

21   A    I'm not certain I recall.

22   Q    You didn't know the mechanism of injury in the accident

23   whether to his head, to his back or any other part of his

24   body; right?

25   A    Okay.

1   Q    True?

2   A    Yes.

3   Q    Okay.  You didn't know what kind of a vehicle.  You knew

4   he was in a bus, but you didn't know the bus rear-ended a semi

5   truck at 67 miles an hour; correct?

6   A    Okay.

7   Q    True?

8   A    I knew it had rear-ended a vehicle.

9   Q    But you didn't know what kind of vehicle or how or at

10  what speed, true?

11  A    Okay.

12  Q    Correct?

13  A    Yes.

14  Q    All right.  Now, executive functioning and executive

15  functioning injuries or deficits typically come from some kind

16  of an injury to the frontal lobe of the brain, true?

17  A    That's one way.  There are other ways.

18  Q    Fair enough.  Now, the frontal lobe goes back pretty far,

19  does it not?

20  A    About here.

21  Q    Did you demonstrate for the jury the range of the frontal

22  lobe?

23  A    The frontal lobe is the largest lobe of the brain.

24  Q    For example, for lay people like me if I was wearing a

25  baseball cap backwards that would pretty well demarcate the

Morgan - cross - Kieffer                    2162

1    area of the frontal lobe?

2    A    Except for the area of your forehead above your eye

3    orbits.  This is frontal lobe too.

4    Q    Right above the eyebrows?

5    A    It actually starts about the middle of your nose.

6    Q    Fair enough.  Now, you did later learn that Mr. Bauta

7    struck his head in the accident?

8    A    Yes.

9    Q    You learned he had a laceration to the head that was

10   documented in medical records contemporaneously?

11   A    Yes.

12   Q    And that area where Mr. Bauta struck his head, that is in

13   the frontal lobe, true?

14   A    Yes.

15   Q    And that wasn't information that you knew anything about

16   at the time you issued your first report in this case;

17   correct?

18   A    I believe.

19   Q    Sorry?

20   A    I believe so.

21   Q    And you didn't specifically ask Mr. Bauta for any of

22   those sorts of details when you sat down and interviewed him

23   on the day of your examination, did you?

24   A    I actually don't recall.

25   Q    Okay.  Now the majority of people with concussions tend

Morgan - cross - Kieffer                    2163

1   to get better, do they not?

2   A     They do.

3   Q     And there's subset that don't get better?

4   A     They say it's 16 percent.

5   Q     Thank you.  And even those folks with concussions who get

6   better, when they get better they don't always return to

7   baseline, do they?

8   A     They will return to baseline.  The majority of them that

9   get better return to baseline.  There are some who have what

10  are considered to be mild lingering systems.

11  Q     All right.  There are some people who get concussions who

12  have mild lingering symptoms and that is recognized in the

13  field, true?

14  A     It is.

15  Q     Maybe the minority of patients but it is a widely

16  recognized truism in your field?

17  A     Yes.

18  Q     For folks with concussions who may not get better, they

19  can have what is sometimes referred to as a chronic

20  post-concussion syndrome?

21  A     That's a term that's used for that, yes.

22  Q     And that syndrome can consist of things like reports of

23  headache, sensitivity to light, dizziness, fatigue,

24  concentration problems, those sorts of things?

25  A     Yes.

Morgan - cross - Kieffer                    2164

1  Q    And you noted some of those complaints in Mr. Bauta's

2  medical file from October 2013 up until the present time;

3  correct?

4  A    Yes.

5  Q    He complained of a number of those?

6  A    He did.

7  Q    Including forgetfulness?

8  A    Yes.

9  Q    And you would agree that his reports of these things were

10 pretty consistent from October 2013 to the present; correct?

11 A    I think so.

12 Q    Okay.  Now, I'm skipping around, sir, so I apologize to

13 you in advance?

14 A    Sure.

15 Q    I'm just trying to not lose track of any of my piles of

16 papers here.

17 A    Sure.

18 Q    In response to Mr. Mannion's questions just before he sat

19 down, he was asking about some of Dr. Honor's results.  Do you

20 recall that?

21 A    Yes.

22 Q    To boil it down if we can Mr. Bauta had scores on some

23 tests and in some categories on Dr. Honor's testing that were

24 higher than yours; correct?

25 A    Yes.

Morgan - cross - Kieffer                    2165

1    Q    And the same is true of testing done in Dr. Thomas'

2    office, true?

3    A    Absolutely.

4    Q    And there was improvement in some of Mr. Bauta's scores

5    in retesting that was done in 2017 apparently at Mr. Barmen's

6    suggestion.  You saw that as well?

7    A    I did.

8    Q    So the scores -- it would be fair to say that the scores

9    that you recorded for Mr. Bauta back in 2016 on the whole were

10   the lowest of any of the neuropsychological test scores that

11   were done on Mr. Bauta; correct?

12   A    That's true.

13   Q    Okay.  One would tend to think that if a person was a

14   deliberate malingerer they wouldn't be trying to get their

15   scores up over time, wouldn't one?

16   A    Not necessarily.

17   Q    Okay.  On this topic of retesting, did any of the lawyers

18   that retained you suggest that you retest Mr. Bauta to see

19   whether his scores were the same or perhaps showed

20   improvement?

21            THE COURT:  Sustained.

22            MR. MANNION:  Objection.

23            THE COURT:  You don't have to answer.

24   Q    Let me ask it differently.  You performed only one test

25   series on Mr. Bauta and that's in 2016?

SN        OCR        RPR

1   A    Yes.

2   Q    And there was no further testing whether in total or

3   partially after that date by you?

4   A    Right.

5   Q    So in terms of neuropsychological test data, that is what

6   you have to go by, in terms of -- forgive me, withdrawn.

7            In terms of neuropsychological test data on testing

8   performed by you or at your direction, what you have to go on

9   is the one series of tests that you did in 2016; correct?

10  A    Yes.

11  Q    I want to ask you about one of these last tests that

12  Mr. Mannion mentioned did you call that the CVLT?

13  A    That's the California Verbal Learning Test.

14  Q    And there are several trials in that test you said;

15  correct?

16  A    Five.

17  Q    And I think you told Mr. Mannion that Mr. Bauta did the

18  worst on the fifth one?

19  A    That was, I think, the same as the first one.  He got one

20  right.

21  Q    You don't record when in the course a day different tests

22  are done; correct?

23  A    Only the first test and the last test.

24  Q    In terms of timing?

25  A    Yes.

Morgan - cross - Kieffer                    2167

1   Q    Okay.

2   A    You always give a certain test to begin the day and a

3   certain test to end the day.

4   Q    And then nothing else in the middle is recorded in terms

5   of the timing when the test is given, correct?

6   A    Right.

7   Q    You are -- in terms of the administration of this test,

8   you testified that you had an assistant work with you?

9   A    Yes.

10  Q    Did she administer all of these tests to Mr. Bauta or did

11  you administer part of them?

12  A    We shared the testing.  She administered some tests and I

13  administered some tests.

14  Q    Okay.  But regardless of what she administers, you are

15  the one who designs, for lack of a better word, the test

16  protocol?

17  A    Yes.

18  Q    You determine what tests will be given and in what order?

19  A    Not so much what order, but what tests will be given.

20  Q    All right.  Now, there was quite a bit of discussion

21  earlier in your testimony about your format, your consent

22  form, things like that.  I want to at least briefly touch on

23  that topic.  You are aware, I assume at least as of now, that

24  both Dr. Honor and Dr. Thomas broke their testing up across

25  multiple days?

Morgan - cross - Kieffer                    2168

1    A    Yes.

2    Q    All right.  I think the record -- I think Dr. Honor's

3    testimony and his records have been produced in this case

4    reflect that his testing was split up over five separate days.

5    You're aware of that?

6    A    I think so.

7    Q    And Dr. Thomas also tested on multiple days as well;

8    correct?

9    A    Yes.

10   Q    And you have seen that both of those gentlemen offered

11   some, at least, brief opinion or commentary about why they

12   believed that was perhaps the prudent approach.  You saw that?

13   A    I did.

14   Q    Okay.  As the person who designed this test protocol, if

15   you had wanted as a matter of your professional practice to

16   conduct this testing of Mr. Bauta over a several day period of

17   time, you could have done that?

18   A    Yes.

19   Q    It wouldn't have necessarily done anyone any harm had you

20   done that?

21   A    That's true.

22   Q    And you may or may not have gotten the same results that

23   you got, true?

24   A    Who knows.

25   Q    There was a break for lunch in this testing; correct?

Morgan - cross - Kieffer                          2169

1   A    Oh, sure.

2   Q    That's standard?

3   A    Always.

4   Q    Okay.  And, Mr. Bauta, do you know whether he left your

5   office or went out for lunch?

6   A    I really don't know.

7   Q    Okay.  Were you aware that he has testified that he was

8   in so much pain and discomfort that he did have to take some

9   medication over the lunch hour?

10  A    Yes.

11  Q    Okay.  And what is the source of your awareness of that?

12  A    Some of his testimony from this proceeding.

13  Q    Okay.  The trial testimony or deposition testimony?

14  A    Trial testimony.

15  Q    So you've reviewed Mr. Bauta's trial testimony?

16  A    Only with regard to that.

17  Q    Okay, all right.  I just want to be clear:  In the -- and

18  I read the form that -- the consent form Mr. Mannion put up

19  for us so I'm familiar with what that says and your testimony

20  about that.  My question on that topic is you did not

21  specifically inquire of Mr. Bauta as to his physical pain or

22  discomfort on that day; in other words, are you in pain?

23  A    Well, it's not phrased that way, but how are you doing,

24  are you okay, can we continue, do you need a break.  Those are

25  questions that we ask you throughout the day.

Morgan - cross - Kieffer                    2170

1  Q    All right.  But as to the issue of pain, you did not ever

2  ask him specifically are you in pain and you didn't ask him if

3  he was to rate his pain?

4  A    No.

5  Q    All right.  Do you ever do that?

6  A    When I evaluate patients for pain, that's part of the

7  protocol.

8  Q    I'm sorry.  Am I interrupting you?

9  A    I said I do something like that when we evaluate patients

10 for pain.

11 Q    Okay.  And what are some of the circumstances that would

12 cause you to evaluate a patient for pain?

13 A    So, it would be in conjunction with neuropsychological

14 assessment.  So some of the patients complain that pain is

15 related to their cognitive difficulties and so there are

16 requests from the referral source to evaluate the patient not

17 only for neuropsychological functions, but also their reported

18 pain.

19 Q    All right.  And when you make these evaluations for

20 reported pain, are you evaluating the results of your, I'll

21 calling it pain testing, independent of the results of your

22 neuropsychological testing or are you sometimes evaluating the

23 two in light of each other?

24 A    Well, it's all part of the same evaluation, so we give

25 pain inventories which are answered by the patient, and we

Morgan - cross - Kieffer                    2171

1    inquire about their level of pain.  The results of that are

2    considered within the overall evaluation assessment.

3    Q    Okay.  And it sounds from what you're saying as if

4    evaluating a -- I keep saying "patient," perhaps that's the

5    wrong word.  How would you refer to Mr. Bauta?

6    A    Well, he's a patient.

7    Q    We'll call him a patient.  It sounds from your testimony

8    as though evaluating a patient neuropsychologically along with

9    evaluating a patient for pain is not uncommon in your

10   practice.

11   A    I would agree with that.

12   Q    Okay.  But regardless of the fact that it's not uncommon,

13   you didn't do that here?

14   A    No.

15   Q    And you said typically when you would do a pain

16   evaluation in conjunction with a neuropsychological

17   evaluation, you would be asked to do that by the referral

18   source who directed the patient to you?

19   A    That's right.

20   Q    And in this case the referral source were the defense

21   lawyers?

22   A    Yes.

23   Q    And they did not ask you to do any sort of pain

24   evaluation on Mr. Bauta in connection with the

25   neuropsychological evaluation?

Morgan - cross - Kieffer                    2172

1  A    I should say that these requests typically come from

2  insurance companies rather than attorneys.  I don't believe --

3  I don't believe I've ever had a referral question from an

4  attorney to do a pain evaluation along with a cognitive

5  evaluation.  The ones I've had have all come from disability

6  insurance contexts.

7  Q    Fair enough.  But regardless of the source, regardless of

8  the reason, three things are true:  One, it's not uncommon in

9  your practice to do a pain evaluation with a

10 neuropsychological evaluation; correct?

11 A    Yes.

12 Q    Two, you only do both of those if requested by the

13 referral source?

14 A    Yes.

15 Q    And, three, that request was not made of you in

16 Mr. Bauta's case?

17 A    Yes.

18 Q    All right.  You were aware, I take it, by the time that

19 you sat down and met with and interviewed Mr. Bauta that he

20 was making some reports of ongoing and chronic pain and

21 discomfort?

22 A    Yes.

23

24           (Continued on the following page.)

25

Morgan, MD - cross - Kieffer                    2173

1   EXAMINATION CONTINUES

2   BY MR. KIEFFER:

3   Q    And did you know by this point in time -- what did you

4   know about the condition of his back and the surgery that he

5   had?

6   A    He had surgeries to correct.  I think two areas of

7   derangement, it was called.  He had, I believe, cervical and

8   lumbar surgeries, with the placement of, I guess, rods,

9   surgical -- surgical rods to adjust -- to adjust the

10  derangement.

11  Q    Okay.  And were you aware that he actually had to have

12  two surgeries because of a complication that developed

13  postoperatively after the first surgery?

14  A    Yes, I think so.

15  Q    Okay.  And I don't want to drag you into spine medicine,

16  but you knew he had multiple screws and multiple rods in his

17  back because of a two-level derangement issue?

18  A    Yes.

19  Q    And you knew when you met with him that he was

20  complaining that pain was an issue for him?

21  A    Yes.

22  Q    All right.  Did you give any consideration at that point,

23  perhaps, to on your own doing a pain assessment, to consider

24  that in your overall evaluation, along with the

25  neuropsychological evaluation?

W. Name - direct/cross - Atty                    2174

1   A    No, I didn't.

2   Q    It's just not the way you would go about it?

3   A    It's not the way I did it, yeah.

4   Q    Okay.

5         You testified on direct examination, and I don't

6   have those notes right here in front of me, so I am going to

7   paraphrase what I think you said, but I want you to correct me

8   if you think I misstate it.  All right?

9   A    Sure.

10  Q    You were asked by Mr. Mannion whether, if someone is

11  experiencing pain, whether that can affect the results of

12  neuropsychological testing.  And your response was something

13  along the lines of it can, but it depends.

14  A    I think that's generally correct.

15  Q    All right.

16        If a patient came for a neuropsychological

17  evaluation, hypothetically, and they were having -- their pain

18  was ranked on a scale of 2 out of 10, that patient might

19  perform somewhat differently on your testing than others with

20  pain ranked on a scale of 5 or 8 out of 10; is that a fair

21  generalization?

22  A    It's possible, but what we know from the pain literature

23  and neuropsychology is that most patients with chronic pain

24  actually do very well on these tests.

25  Q    But it's possible, nonetheless, correct?

W. Name - direct/cross - Atty                    2175

1    A     Theoretically possible, yeah.

2    Q     All right.  Were you aware at the time you evaluated

3    Mr. Bauta that he was complaining of sleep disturbances, and

4    sometimes not being able to fall asleep until 4 or 4:30 in the

5    morning?

6    A     He told me that, and I think I reported it in -- in one

7    of my reports.

8    Q     All right.  Can chronic sleeplessness and fatigue

9    sometimes affect how individuals might perform on

10   neuropsychological testing?

11   A     Sure.

12   Q     Might be akin to pulling late nights or all-nighters when

13   in school, right?

14   A     In graduate school?

15   Q     Tougher to take a test the next day?

16   A     Okay.

17   Q     You agree?

18   A     I do.

19   Q     Your evaluation -- and I don't mean to be redundant, but

20   before I close this door and move on -- your evaluation of

21   Mr. Bauta was limited to evaluation of a neuropsychological

22   nature, you did not undertake, either by a formal methodology

23   or even indirectly, to assess him for pain?

24   A     It was neuropsychological and psychological also.

25   Q     Okay.  Whatever testimony that you have given to this

W. Name - direct/cross - Atty                    2176

1   jury on topics of malingering or whatnot, that relates to his

2   cognitive and neuropsychological complaints, not his physical

3   complaints related to his back, correct?

4   A    That's correct.

5   Q    All right.  You are not saying he's faking any of that,

6   in other words.

7            MR. MANNION:  Objection.

8            THE COURT:  Overruled.

9   A    I'm not.

10  Q    You agree, sir, that if someone was a poor student in

11  school, they may do more poorly on neuropsychological tests,

12  true?

13  A    Depends on the tests that you're asking about.

14  Q    Okay.  But that can be true depending on the test?

15  A    It can be.

16  Q    And if someone has a low IQ, that can affect their

17  scoring on certain neuropsychological testing as well, right?

18  A    Again, it would depend on which tests you're -- you're

19  talking about.

20  Q    I understand, but it can?

21  A    It can.

22  Q    There is articles and scientific data in your field that

23  make certain criticisms of validity testing, such as the ones

24  that you did on Mr. Bauta?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

W. Name - direct/cross - Atty                2177

1   Q     Okay.  And the gist of those criticisms are that there
2   are some forms of brain injury that can cause poor performance
3   on validity tests?
4   A     Well, that's -- that's the criticism, but the data
5   supporting that criticism is virtually non-existent.
6   Q     All right.  But you understand that there are
7   publications in the field that take issue with some of these
8   validity tests, in that they may not sufficiently take into
9   account things like brain injury, and the impact of brain
10  injury on the scores?
11  A     That's their criticism, yes.
12  Q     All right.  Sir, what is collateral data?
13  A     Collateral data refers to other individuals, other
14  reports, not necessarily associated with the accident or the
15  event in question.
16  Q     All right.  So reports of family members, co-workers,
17  things like that?
18  A     Sure.
19  Q     Employment records, school records, things of that
20  nature?
21  A     Yes.
22  Q     All right.  At the -- at the time you issued your first
23  report -- I want to be clear, because you did go through a
24  list that sounded very complete to me early in your testimony,
25  but I want to make sure it's clear -- the information you got

1   after you first issued your opinions in this case.

2          All right?

3   A    Sure.

4   Q    Okay.  So at the time you issued your first report

5   setting forth your opinions, and thereafter gave a deposition,

6   you did not have photos showing Mr. Bauta's head injury,

7   right?

8   A    Right.

9   Q    You did not have any photos of the accident scene

10  documenting what the scene looked like and what Mr. Bauta

11  might have seen?

12  A    Right.

13  Q    Including photographs of the deceased passenger?

14  A    That's correct.

15  Q    Did you ever receive those?

16  A    I don't think I saw pictures of the deceased person.

17  Q    Okay.  But you understood Mr. Bauta reported that?

18  A    Sure.

19  Q    Okay.  Medical records and treatment records from

20  Dr. Thomas.  You didn't have any of those either?

21  A    I don't think so.

22  Q    Dr. Thomas's deposition setting forth additional

23  particulars of his care, you didn't have that?

24  A    That came later.

25  Q    Okay.  The depositions of Selenia Bauta, Martin Rivera,

W. Name - direct/cross - Atty                    2179

1   you didn't have those?

2   A    That came later.

3   Q    All right.  The testimony of Mr. Stitzer, the first

4   responder who addressed the deceased passenger and described

5   that scene, you didn't have that either?

6   A    It came later.

7   Q    Police report, you didn't have that?

8   A    It came later.

9   Q    And Mr. Bauta's records of his lengthy employment with

10  McDonald's, setting out things like performance reviews and

11  how he worked with others, you didn't have that either,

12  correct?

13  A    Right.

14  Q    All of that information can certainly be pertinent in

15  arriving at a complete neuropsychological opinion, correct?

16  A    Sometimes.

17          MR. KIEFFER:  Bear with me, sir, I'm skipping some

18  notes here.

19          THE WITNESS:  Sure.

20          MR. KIEFFER:  The silence is a good thing.

21          THE WITNESS:  Sure.

22          (Pause.)

23  BY MR. KIEFFER:

24  Q    Now, after you issued your first report and after you

25  gave a deposition, the attorneys who retained you sent you all

SAM     OCR     RMR     CRR     RPR

1   of that additional material that you hadn't received

2   previously, correct?

3   A    Yes.

4   Q    And you thereafter issued another report?

5   A    I did.

6   Q    And you gave another deposition?

7   A    I did.

8   Q    And the gist of your opinions and testimony were, None of

9   that made any difference, my opinions remained the same?

10  A    Well, I wouldn't put it that way, but yes.

11  Q    Okay.  Certain medications can affect the variability of

12  test results?

13  A    Depends on the medications.

14  Q    Okay.  Medications that can cause drowsiness might?

15  A    Perhaps.

16  Q    You've had cases, either as an expert or as a treating

17  neuropsychologist, where people have had valid injuries, but

18  they've nonetheless had invalid test scores; true?

19  A    Yes.

20  Q    More than a few times?

21  A    It's not infrequent, sure.

22  Q    I want to ask you about this subject of validity testing.

23  A    Sure.

24  Q    And I want to make sure that I'm using the right

25  terminology.

W. Name - direct/cross - Atty                2181

1           As a general term, validity testing is pretty much

2   the same thing as effort testing, as malingering testing;

3   true?

4   A   Well, it depends on what kind of validity testing you're

5   referring to.  So there are two broad types.

6           Do you want me to say this?

7   Q   Sure.

8   A   One type has to do with what we call performance

9   validity.  And those tests refer to cognitive testing,

10  cognitive functioning.  Mental abilities, in other words.

11          Another type of validity assessment is what we call

12  symptom validity assessment.  And those types of tests refer

13  to psychiatric and psychological symptoms.

14          So there are two broad types.

15  Q   Okay, thank you.

16          Let me focus on at least one in particular that you

17  mentioned earlier in your testimony.

18          It goes by the acronym T-O-M-M?

19  A   Yes.  The TOMM.

20  Q   I'm sorry?

21  A   TOMM.

22  Q   And is that the Test of Memory Malingering?

23  A   Yes.

24  Q   All right.  That is an important test in your field,

25  correct?

W. Name - direct/cross - Atty                    2182

1   A    Yes.  It's well-known, well-used.

2   Q    All right.  Well-known, well-used, and that -- you call

3   it TOMM?

4   A    The acronym, yeah, TOMM.

5   Q    That TOMM test is typically one of the first, if not the

6   first, test that you always give in your practice when you

7   want to assess validity; true?

8   A    When you say one of the first, I don't give it -- I

9   usually don't give it early in the examination.  It's usually

10  given later.

11  Q    Yes.  I think we are on the same page, but I think my

12  question wasn't as precise as your answer, so let me ask it

13  again.

14          When you start to give validity tests in the course

15  of the test day, is the TOMM test one of the first ones you

16  typically give?

17  A    It's one of the ones we use --

18  Q    Okay.

19  A    -- yes.

20  Q    And it is one of the most important, is it not?

21  A    Well, it's not more important than any of the others.

22  Q    But it's significant?

23  A    Sure.

24  Q    All right.

25          Now, you agree that Spanish-speaking people and

W. Name - direct/cross - Atty                2183

1  people with low IQs quite typically fail the TOMM test, and

2  you have so testified in the past, have you not?

3  A    It's not an uncommon thing.

4  Q    Okay.  It's not uncommon at all for individuals who,

5  Spanish is their first language and they have a lower IQ, to

6  fail the TOMM test, correct?

7  A    We're -- we're talking about people with IQs in the

8  mentally retarded range.  That's low.

9  Q    IQ scores in the 60s or the low 70s, high 60s or low 70s?

10  A    That would be right.

11  Q    And Mr. Bauta's IQ score scored in the 60s in your

12  testing, did it not?

13  A    I don't think that's a valid representation.

14  Q    Yes.  But that's not my question.

15        That is the score that came back in response to the

16  testing that you did.

17        MR. MANNION:  Objection, asked and answered, Your

18  Honor.

19        THE COURT:  Sustained.

20  BY MR. KIEFFER:

21  Q    What was Mr. Bauta's IQ score on your testing, sir?

22  A    64.

23  Q    Did you know that Mr. Bauta's first language was Spanish,

24  and that that was what was predominantly spoken in his home

25  when he was a child?

W. Name - direct/cross - Atty                    2184

1    A    He indicated that English was his first language.

2    Q    Did you specifically ask him that?

3    A    He said that -- well, I believe so.  And I think that

4    Dr. Honor wrote that in his report, that English was his

5    preferred language.

6    Q    Did you know his preferred language; is that what you

7    said?

8    A    I think that's the term he used.

9    Q    Okay.  Yes, that wasn't my question.  My question wasn't

10   what was his preferred language, my question was his first

11   language.

12          Did you know that Spanish was his first language,

13   and the language that was predominantly spoken in his home

14   when he was a child?

15   A    No, I did not.

16   Q    Okay.  Did you know that his father does not speak

17   English --

18          THE COURT:  Sustained.

19          MR. MANNION:  Thank you.

20   Q    Sir, you have had -- you have done neuropsychological

21   testing on individuals who Spanish was their first language,

22   and they had IQ scores in the range of Mr. Bauta, and they

23   have failed your validity testing, and you have nonetheless

24   testified that their overall results were still valid?

25   A    Perhaps.  I don't specifically remember cases, but yes,

W. Name - direct/cross - Atty                    2185

1   perhaps.

2   Q    Okay.  You remember the Godinez case?

3   A    Yes.

4   Q    All right.  That was a case in New Jersey?

5   A    Yes.

6   Q    That was a criminal case, correct?

7   A    Absolutely.

8   Q    All right.  And when you do neuropsychological work, you

9   don't just do it in a civil lawsuit like this, but sometimes

10  you do it in a criminal context?

11  A    Yes.

12  Q    Okay.  And in the Godinez case, you were hired by the

13  attorneys who were defending Mr. Godinez to do an evaluation

14  on him and render an opinion, correct?

15  A    I think so.

16  Q    All right.  Do you recall the specifics of Mr. Godinez

17  and his testing?

18  A    No, it's been a while.

19           THE COURT:  Sidebar.

20           (Sidebar held outside the hearing of the jury.)

21

22           (Continued on the following page.)

23

24

25

SAM      OCR      RMR      CRR      RPR

```
                          Sidebar                        2186

 1              (The following sidebar took place outside the
 2     hearing of the jury.)
 3              THE COURT:  What is the relevance of this?
 4              MR. KIEFFER:  It's impeaching, Your Honor.
 5              THE COURT:  About what?
 6              MR. KIEFFER:  Well, it's the testimony where he
 7     reached an opinion that is directly opposite to what he is
 8     testifying to in this case.
 9              THE COURT:  Did Godinez score the same level as
10     Bauta on all the tests?
11              MR. KIEFFER:  Generally the same level.
12              THE COURT:  What does that mean, generally the same
13     level?  The same?
14              MR. KIEFFER:  One percentile.  He grew up -- he --
15     he moved here from South America when he was five years old.
16     He --
17              THE COURT:  And Bauta was born here.
18              MR. KIEFFER:  I know that, but let me finish, if I
19     may.  All right?
20              Spanish was his first language, but he was
21     nonetheless proficient in English.  He read English at a
22     second grade level.  He scored very poorly on the TOMM
23     testing.  He failed one of the TOMM tests below chance, and
24     Dr. Morgan --
25              THE COURT:  One of the TOMM tests?
```

SAM      OCR      RMR      CRR      RPR

```
                    Sidebar                      2187
```

 1          MR. KIEFFER:  Yes.

 2          THE COURT:  What about all of the other validity

 3  testing?

 4          MR. KIEFFER:  The only one I'm asking about is the

 5  TOMM testing.

 6          MR. MANNION:  This is crazy.

 7          MR. KIEFFER:  He testified in court --

 8          THE COURT:  No.

 9          MR. KIEFFER:  -- to the exact opposite opinions --

10          THE COURT:  No.

11          MR. KIEFFER:  -- to what he's testifying to here.

12          THE COURT:  Did it talk about any of the other tests

13  that you did on Godinez?

14          MR. KIEFFER:  Just the TOMM testing.

15          THE COURT:  That's all this talks about?

16          MR. KIEFFER:  As far as I know.  That was all I was

17  going to ask him about.

18          MR. MANNION:  That's not what he said.

19          MR. KIEFFER:  Let me talk to the Judge, Tom.

20          MR. MANNION:  I want to know, as well.

21          THE COURT:  Then you cross-examine him on all the

22  other tests he did on Godinez, whether they were actually the

23  same.

24          MR. MANNION:  I am going to have to ask for a break

25  to see those, if I can.

Sidebar                                    2188

1          THE COURT:  Sure, sure.

2          (Sidebar concluded.)

3

4          (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court - jurors present.)

2           THE COURT:  Okay, go ahead.

3    EXAMINATION CONTINUING

4    BY MR. KIEFFER:

5    Q    Sir, in the Godinez case, you evaluated Mr. Godinez,

6    correct?

7    A    Yes.

8           MR. MANNION:  Objection, Your Honor.

9           THE COURT:  Overruled.

10   Q    And Spanish was his first language as well, correct?

11   A    He spoke virtually no English, as I remember.

12   Q    He read English at, at least, a second grade level, did

13   he not?

14   A    I really don't remember the details of the case.

15   Q    Okay.  Do you recall -- do you recall him failing one of

16   the TOMM tests?

17   A    No.

18   Q    You don't recall that at all?

19   A    I don't recall the details of the case.  It's been a

20   while.

21   Q    Okay.  Let me back up and ask a threshold question before

22   we get back to Godinez.

23           You don't recall asking Mr. Bauta in your interview

24   of him whether English was his first language or not, correct?

25   A    I don't recall.

SAM      OCR      RMR      CRR      RPR

1  Q    Whether you did or whether you didn't?

2  A    Right.

3  Q    All right.  But you did testify a moment ago -- strike

4  that.  Withdrawn.

5         Were you aware after meeting Mr. Bauta that he is of

6  Puerto Rican descent?

7  A    Yes.

8  Q    And you testified a moment ago that it is not uncommon

9  for individuals for whom Spanish is their first language to

10 fail the TOMM testing?

11 A    Well, that's true, but I believed that Mr. Godinez was

12 very fluent in English.

13         THE COURT:  Godinez?

14         THE WITNESS:  I'm sorry.

15 A    That Mr. Bauta was very fluent in English.  He had a high

16 school diploma from an American school.  Went to

17 English-speaking classes.  So I --

18         THE COURT:  Do you know he was born in Brooklyn?

19         THE WITNESS:  Yes.

20 A    From New York.

21 Q    And Mr. Godinez went through public schools in Newark,

22 New Jersey, did he not?

23 A    I actually don't recall.

24         MR. KIEFFER:  May I approach, Your Honor?

25         THE COURT:  Uh-hum.

1          MR. MANNION:  Objection, Your Honor.

2          THE COURT:  Overruled.

3   BY MR. KIEFFER:

4   Q    Sir, this is a copy of your trial testimony in the

5   Godinez matter.

6          THE COURT:  He is going to give you a copy.

7          MR. KIEFFER:  Yes.

8   Q    Sir, intelligence tests are very heavily weighted as far

9   as verbal skills go, are they not?

10  A    They are.

11  Q    And you so testified in the Godinez matter, didn't you?

12         MR. MANNION:  Objection.

13  A    As I said, I don't actually recall my testimony or --

14  Q    All right.

15  A    -- very much about it.

16         MR. MANNION:  Improper impeachment, Your Honor.

17         THE COURT:  Sustained.

18         You said that they are heavily weighted towards

19  verbal, right?

20         THE WITNESS:  Yes.

21  Q    In terms of fluency and proficiency in English, Doctor,

22  you recall that Mr. Godinez attended schools in Newark,

23  New Jersey?

24  A    As I said, I didn't recall that exactly.

25  Q    All right.  Let me direct you to page 58 of your

1    transcript, sir.

2            MR. MANNION:  If I may, Your Honor, I just would

3    like to clarify.

4            This is not all of his testimony, there's other

5    people in here, or not?

6            MR. KIEFFER:  Yes, I think it is for that segment of

7    the session, the morning session.

8            MR. MANNION:  I just wanted to clarify, okay.

9            MR. KIEFFER:  Yes.  I am not going to ask him about

10   other witnesses' testimony.

11   BY MR. KIEFFER:

12   Q    Page 58, sir.

13   A    Yes.

14   Q    All right.  Beginning at line 10, were you asked these

15   questions and did you provide these answers:

16           MR. MANNION:  Objection, improper impeachment.

17           THE COURT:  I don't have it.

18           (Sidebar held outside the hearing of the jury.)

19

20           (Continued on the following page.)

21

22

23

24

25

```
                        Sidebar                      2193

 1            (The following sidebar took place outside the
 2    hearing of the jury.)
 3            THE COURT:  Was Bauta in Special Education?
 4            MR. KIEFFER:  No, he wasn't.
 5            THE COURT:  Then you had better ask him all of this
 6    stuff.  You are comparing apples and oranges.
 7            (Sidebar concluded.)
 8
 9            (Continued on the following page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          (In open court - jurors present.)

2          THE COURT:  Do it the traditional way:  You were

3    asked this question and you gave this answer.

4    EXAMINATION CONTINUING

5    BY MR. KIEFFER:

6    Q    Sir, were you asked this question and did you give this

7    answer beginning at page 10 -- I'm sorry, page 58, line 10:

8          Question:  And did you take a brief history from

9    Mr. Godinez?

10         Answer:  I did.

11         Question:  Could you just, please, relate to us what

12   that history was?

13         Answer:  Mr. Godinez indicated that he was born in

14   Nicaragua and came to the United States as a child.  I think

15   he was about 5 years old.  He came with a grandparent.  His

16   mother was already here, he said.  He grew up in the Newark

17   area.  He attended school.  He was in special education

18   classes throughout school.  He was characterized as being a

19   slow learner.  He was characterized as having difficulty with

20   acquiring reading and verbal skills.  He stated that in his

21   home, Spanish was spoken, not English, so he didn't get a lot

22   of time to practice English.  He attended Eastside High

23   School.  He quit in the tenth grade.  He reported that all his

24   classes were taught in English, and so he stated he had a

25   tough time with that.

Morgan, MD - cross - Kieffer                    2195

1          He was diagnosed by the school system as being

2    perceptually impaired.  Teacher reports indicated he failed to

3    achieve standard education goals.  As far as employment, he

4    said he had worked in landscaping and in roofing for a few

5    years, before dropping out of school.

6          Do you recall being asked those questions and giving

7    those answers?

8    A    Yes.

9          MR. MANNION:  Wait.  You didn't read it all.

10         MR. KIEFFER:  Sorry.

11   BY MR. KIEFFER:

12   Q    Picking up at line 12:

13         As far as his use of alcohol and drugs -- excuse

14   me -- he reported daily use of alcohol, probably two or more

15   40-ounce bottles of alcohol per day.  That's high, probably.

16   He was an alcoholic.  He used cocaine on weekends.  As far as

17   medical history goes, the only thing he reported was a history

18   of asthma, and required what's called an inhaler.

19         Were you asked those questions and did you give

20   those answers?

21   A    Sure.

22   Q    And you recall, does this refresh your memory that in

23   that case, Mr. Godinez failed your TOMM testing?

24   A    Again, I don't specifically remember the scores or the

25   data, but if it's in here, obviously, that's the case.

Morgan, MD - cross - Kieffer                    2196

1    Q    Okay.  Did you -- do you recall what Mr. Godinez's skills

2    were in terms of ability to read the English language?

3    A    I don't.  I mean, the case is about eight or nine years

4    old, so I don't really remember the details.

5    Q    It's true that malingering is a very hard diagnosis to

6    make, is it not?

7    A    Yes.  It requires understanding the entire data set.

8    Q    And Mr. Godinez scored in a very low IQ percentile under

9    your testing?

10   A    Again, I don't remember specifically, but if it's in

11   here, that's -- then it's so.

12   Q    Mr. Godinez had not been in an accident, had not had

13   surgery?

14           MR. MANNION:  Objection.

15           THE COURT:  Overruled.

16   A    I really don't remember the details of his history.

17   Q    Have there been other instances, Doctor, where you have

18   performed neuropsychological testing on patients and they have

19   failed your TOMM testing, and you have nevertheless offered

20   the opinion that your results were otherwise valid?

21           MR. MANNION:  Objection.

22           THE COURT:  Overruled.

23   A    I am not certain.  Perhaps.

24   Q    Okay.  You recall a case you were asked about at your

25   deposition involving a lady by the name of Mrs. Rezireksyon?

1    A    Rezireksyon.

2    Q    Rezireksyon?

3    A    Yeah.

4    Q    R-E-Z-I-R-E-K-S-Y-O-N, for the record?

5    A    I think so.

6    Q    All right.  Do you recall that case?

7    A    Yes.

8    Q    Mrs. Rezireksyon tested with an IQ, under your testing,

9    in the high 60s, correct?

10   A    I think so.

11   Q    And Mrs. Rezireksyon failed at least one portion of your

12   TOMM testing, correct?

13   A    She actually passed TOMM on the second trial, so she

14   passed the TOMM.

15   Q    But she failed it on the first?

16   A    I think so.

17   Q    And Mrs. Rezireksyon was -- this was a criminal case,

18   where she was charged with a serious crime?

19   A    Absolutely.

20   Q    All right.  And you -- you recognize that individuals who

21   are facing the prospect of criminal penalties, whether

22   incarceration or worse, they may have motivations to try to

23   artificially alter the results of neuropsychological testing?

24        MR. MANNION:  Objection.

25        THE COURT:  Overruled.

Morgan, MD - cross - Kieffer                    2198

1   A    Sure.

2   Q    You had stated as much in your report in this case,

3   right?

4   A    Sure.

5   Q    And Mrs. Rezireksyon was facing significant potential

6   consequences in the criminal system at the time you evaluated

7   her?

8   A    Yes.

9   Q    All right.  Without getting into the details, it involved

10  charges connected with the death of a child, her child?

11          THE COURT:  Sustained.

12          MR. KIEFFER:  Okay.

13  Q    You asked --

14          MR. MANNION:  Move to strike, Your Honor.

15          THE COURT:  Stricken.

16  BY MR. KIEFFER:

17  Q    You asked Mrs. Rezireksyon for her explanation of why she

18  thought, perhaps, she failed your TOMM testing.

19          Do you recall that?

20  A    No, I don't.

21

22          (Continued on the following page.)

23

24

25

Side-Bar                              2199

1   (Continuing)

2           MR. KIEFFER:  May I approach, Your Honor?

3           THE COURT:  Come to side-bar, first.

4           (Side-bar conference held on the record out of the

5   hearing of the jury.)

6

7           (Side-bar.)

8           THE COURT:  Why is Ms. Rezireksyon's explanation for

9   why she failed the TOMM test relevant to anything in this

10  case?

11          MR. KIEFFER:  Because it goes directly to the

12  credibility of his opinions.  She came back on his testing

13  with an IQ score very close to Mr. Bauta.  She failed this

14  TOMM test.  He went and he asked her for an explanation.  Her

15  explanation was I had visions in my head of my children.  He

16  accepted that; said all of the other test results were valid

17  and had not considered vast amounts of collateral data, such

18  as police reports, witness reports, things like that.

19          THE COURT:  Was it his opinion rejected by any of

20  these courts?

21          MR. KIEFFER:  You mean like on a Daubert basis?

22          THE COURT:  On any basis.

23          MR. KIEFFER:  Not that I'm aware of.

24          THE COURT:  What is -- it has nothing to do with

25  anything.  I will give you an "A" for effort, but come on.

Side-Bar                                          2200

1          MR. KIEFFER:  I think it's directly relevant to the

2     credibility of the opinion he's offering here.  Some of these

3     folks had scores on this testing very close to Bauta and he

4     said it was fine.  He said it was fine here when a lady said I

5     had a vision of my child.

6          THE COURT:  You are isolating one single test that

7     he did; right?

8          MR. KIEFFER:  I am.

9          THE COURT:  One single test and -- no.  No.  No.

10         MR. KIEFFER:  A test that he testified to is the

11    first one he gives in here and a gold standard --

12         THE COURT:  It is not here, though.  No.

13         MR. McELFISH:  Tack on a validity test.  Here is Mr.

14    Bauta's validity test.

15         THE COURT:  One validity test out of many.

16         MR. McELFISH:  TOMM is an important one.

17         THE COURT:  Because you say so?

18         MR. McELFISH:  That's the start.

19         THE COURT:  He said it is not as important as any of

20    the others; right?

21         MR. KIEFFER:  That's not what he said in here.

22         THE COURT:  Then that is valid cross-examination.

23    But not what did Ms. Rezireksyon say.  And this is somewhat

24    sandbagging, but I get it.  It is cross-examination.

25              You are not giving a full picture of all these

Side-Bar                          2201

1    people.  You tried to skirt Godinez, the fact that he was in

2    special ed; that he was a coke head; that he was a drunk; that

3    he was perceptually impaired; right?  Maybe that is a reason

4    for why he did so poorly.  And not that he was trying to fake

5    it.

6              MR. KIEFFER:  I'm not trying to skirt anything, Your

7    Honor.  But look, if he comes back and says Bauta got an IQ

8    score in the 60s, so he's a total faker.

9              THE COURT:  He did not say that.  That is not what

10   he said.

11             MR. KIEFFER:  That's one of the things he said.

12             MR. BARMEN:  No, he didn't.

13             MR. MANNION:  No, he didn't.

14             MR. BARMEN:  He never mentioned IQ.

15             MR. KIEFFER:  I believe it is, Judge.

16             THE COURT:  You are going to look so incredibly

17   silly in front of this jury if you keep this up.  They are not

18   buying it.

19             Are you watching them?

20             MR. McELFISH:  I disagree with you, again.

21             THE COURT:  Okay.  All right.

22             MR. KIEFFER:  I will move on.

23             MR. MANNION:  Okay.

24             THE COURT:  If you want to go this way, go ahead.  I

25   am going to let him go ahead.

```
                         Side-Bar                      2202
```

1           MR. MANNION:  Just note my objection for the record,
2    please.
3           THE COURT:  Noted.  Give him all the transcripts
4    right now for every single one you are going to pull out so he
5    can search them.
6           MR. MANNION:  Can we take a break when he is done?
7           THE COURT:  We are going to.
8           (Side-bar end.)
9
10          (Continued on following page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Morgan - cross - Kieffer                    2203

1              (In open court.)

2    BY MR. KIEFFER:

3    Q    Sir, you agree that people with an IQ below 85 are

4    impaired; correct?

5    A    No.  People with IQs from 85 to about 70 are considered

6    borderline.  Impaired begins at 70 on down.

7              MR. KIEFFER:  May I approach, Judge.

8              THE COURT:  Yes.

9              MR. MANNION:  Page and line?

10             MR. KIEFFER:  Just one second.

11   Q    Doctor, if you would, turn with me to page 162 in that

12   transcript.

13             And that is the transcript of your testimony in the

14   Rezireksyon -- State of New Jersey versus Krisla Rezireksyon

15   case.  Page 162, line 21.

16   A    Okay.

17             MR. MANNION:  I apologize, what line number again?

18             MR. KIEFFER:  162, line 21.

19   Q    Doctor, picking up at line 21, were you asked these

20   questions and did you give these answers.

21             MR. MANNION:  Objection.  Improper impeachment.

22             THE COURT:  Can I see that, Doctor.

23             MR. MANNION:  Your Honor, he has to --

24             THE COURT:  Stop.  Stop.

25             MR. KIEFFER:  I was going to --

1           THE COURT:  Stop.

2           (Pause in the proceedings.)

3           THE COURT:  Can you read the last question and

4    answer back, please.

5           The last two, if you will, Victoria.

6           (The requested portion of the record was read back

7    by the Official Court Reporter.)

8           THE COURT:  Okay.  You can read it.

9           MR. KIEFFER:  Thank you, Judge.

10   BY MR. KIEFFER:

11   Q    Doctor, picking up at line 21 on page 162, were you asked

12   these questions and did you give these answers.

13          QUESTION:  You indicated in your report that her IQ,

14   the 67 number, is possibly, quite possibly, a slight estimate

15   of her abilities.

16          ANSWER:  A slight underestimate.

17          QUESTION:  Right.  Underestimate of her abilities;

18   yes?

19          ANSWER:  Yes.

20          QUESTION:  You also said what?  There was also a

21   ceiling; correct?

22          ANSWER:  I'm sure there was a ceiling and I guess I

23   should have underscored the fact that people with IQs below 85

24   are impaired.  They're impaired.

25   Q    Were you asked those questions and did you give those

Morgan - cross - Kieffer                2205

1    answers?

2    A    Yes.  If it's here, I suppose I did.

3    Q    Okay.  And an IQ of 67 is in the first percentile;

4    thereabouts?

5    A    Yes.

6    Q    And at least under your testing, that was the same

7    percentile that Mr. Bauta scored?

8    A    Yes.  But again, it's not valid.

9    Q    I understand that's your opinion.

10         In the Rezireksyon case, your opinion was that this

11   lady's scores on other dimensions of your test were valid,

12   notwithstanding the IQ result and notwithstanding any TOMM

13   testing result.

14         MR. MANNION:  Objection.

15         THE COURT:  Overruled.

16   A    Well, she did pass the TOMM ultimately.  So yes.  Yes.

17   Q    She failed one of them.

18   A    Failing the first trial -- I'd like to clarify that.

19         Failing the first trial of the TOMM and then passing

20   the second trial of the TOMM is a pass for that test.

21   Q    All right.  And was the testimony that you gave in the

22   Rezireksyon case, as it relates to that portion that we just

23   read, was it true when you gave it?

24   A    Well, if I -- apparently, I said that the IQ of 85 on

25   down is impaired, I misspoke.  It is not impaired.  The IQ of

Morgan - redirect - Mannion                    2206

1   85 to 80 is in the low average range, and the IQ from 80 to or

2   79 to 70, is in the borderline range; borderline impaired.

3   Q    All right.  And just to be clear, that was Rezireksyon's

4   testimony under oath in a courtroom?

5   A    Yes.

6   Q    Okay.  And your testimony before this jury is you

7   misspoke as to an IQ of 85 being the threshold for impairment.

8   A    Apparently I did.

9           MR. KIEFFER:  All right.  Thank you, doctor.  That's

10  all I have.

11          THE COURT:  Do you need a break?

12          MR. MANNION:  I can go.

13          THE COURT:  Go ahead.  And then we will take our

14  mid-afternoon break.

15          MR. MANNION:  Sure.

16          THE COURT:  It feels like night.

17  REDIRECT EXAMINATION

18  BY MR. MANNION:

19  Q    With respect to the deposition you were just looking at,

20  doctor --

21          THE COURT:  Trial testimony.

22  Q    Trial testimony you just looked at, doctor, on page 163,

23  Mr. Kieffer stopped after the word impaired.

24          Can you look a little further down on that page at

25  line 15.

Morgan - redirect - Mannion                    2207

1   A     I'm sorry.  What page are we on?

2   Q     163, line 15.  Just a few lines down from where

3   Mr. Kieffer stopped.

4           QUESTION:  Okay.  Let's talk about an IQ of 75.

5           ANSWER:  Okay.

6           QUESTION:  How would you describe that person?

7           ANSWER:  It's in the borderline; mentally retarded

8   range.  It's borderline IQ.

9           And people with IQ of 75 can learn real basic

10  skills.  They can learn all of the things that they are

11  certificate indicated she learned about --

12          It's a long answer.  If you want me to read it.

13          THE COURT:  Read it.

14          MR. MANNION:  Okay.

15          ANSWER:  No ancillary medical technology like blood

16  pressure, drawing blood, phlebotomy, because they were basic

17  motor skills.  They can learn to hold a job, work in storage,

18  you know.  They are successful at jobs, detective work.

19          Wait one second.  Okay.

20          That don't require a judgment or significant levels

21  of comprehension or abstract reasoning.

22          Was that the question and answer at that time?

23  A     Yes, sir.

24  Q     And is that exactly what you said earlier, that it's

25  borderline?

VB        OCR        CRR

1    A    Yes.

2    Q    Okay.  Does that make you feel better about the misspeak?

3    A    It does.

4    Q    Okay.  You actually said that in court that it was

5    borderline; correct?

6    A    Yes.

7    Q    Okay.

8              MR. MANNION:  One quick second, Your Honor.

9              (Pause in the proceedings.)

10   BY MR. MANNION:

11   Q    Now, you were also asked a question about whether that

12   particular individual had a secondary reason for giving

13   incorrect answers.

14   A    Yes.

15   Q    Okay.  Now, just because somebody has a motivation to

16   give an incorrect answer, does that mean they always do?

17   A    Of course not.

18   Q    Okay.  How do you test for that?

19   A    So you mean on tests?  Scores on tests?

20   Q    Is that the purpose of the validity tests?

21   A    Yes, of course.

22   Q    Okay.  You weren't asked here about any of the other

23   issues that had to do with that particular patient, were you?

24   A    No.

25   Q    Okay.  Do you recall that case?

1   A    Ms. Rezireksyon?

2   Q    Yes.

3   A    Yes, I do.  I recall that case, the history and so forth,

4   pretty, pretty well.  Not so much the scores on tests.

5   Q    And would you tell us if there's any comparison between

6   that particular case and Mr. Bauta in the scores, the testing

7   and how you evaluated them?

8   A    Well, no.  I mean, Ms. Rezireksyon had a psychotic

9   delusional disorder, schizophrenia, and she heard voices, God

10  instructing her, according to her, not to feed her children.

11  And she had delusional false beliefs of God's intervening.

12         So it's an entirely different set of circumstances;

13  entirely different case.

14  Q    Would you ever use just an IQ score or just a score on

15  one test to have gone into court and testified in this manner?

16  A    Of course not.

17  Q    Okay.  Did you do that in this case?

18  A    Of course not.

19  Q    And on the TOMM score in this case, was it trial one and

20  trial two?

21  A    He went down on trial two.  You're supposed to go up on

22  trial two.

23  Q    Now, let's talk about Mr. Godinez.  You were an expert on

24  his behalf?

25  A    Yes.

1   Q    All right.  We heard a lot about English speaking versus

2   Spanish speaking.

3           Was Mr. Godinez somebody who helped EMTs at a scene

4   translate?

5   A    Not to my knowledge.

6   Q    And is he somebody who helped translate between Spanish

7   and English in the emergency room?

8   A    Not to my knowledge.

9   Q    Was his preferred language English?

10  A    No.

11  Q    Okay.  Let me ask you this.  Was Mr. Bauta, to your

12  knowledge, in special education classes throughout his life

13  and born in Nicaragua?

14  A    Told me he was in regular education classes.

15  Q    Okay.  Now, Mr. Godinez said he did not get a lot of time

16  to practice English.

17           Does that sound like Mr. Bauta?

18  A    No.

19  Q    Does it sound like someone who translates from Spanish to

20  English, that they don't get a lot of time to talk English?

21  A    Certainly not.

22  Q    Mr. Godinez dropped out and Mr. Bauta had a GED.

23           Difference?

24  A    Absolutely.

25  Q    Mr. Godinez was diagnosed as being perceptually impaired.

Morgan - redirect - Mannion                    2211

1    A    Yes.

2    Q    Was there a diagnosis of that of Mr. Bauta?

3    A    No.

4    Q    Okay.  Did Mr. Bauta drink two, 40-ounce bottles of

5    alcohol per day?

6    A    He told me he didn't drink.

7    Q    Was he an alcoholic?

8    A    No.

9    Q    Did he do cocaine?

10   A    Not to my knowledge.

11   Q    Is there any comparison between these two?

12   A    Very different.

13   Q    Is this insulting to Mr. Bauta?

14        THE COURT:  Sustained.

15   Q    In addition to a motivation as was alleged here to give

16   incorrect results, do you also see that in a situation where

17   patients have a chance to have secondary financial gain if the

18   test results are worse?

19   A    Of course.

20   Q    Okay.  And do you believe that's what occurred in this

21   case?

22   A    I do.

23   Q    Let's now go back and ask a couple -- or hit a couple of

24   the other issues here.  And let's talk about the poor student

25   question because you were asked about IQ and poor student.

1          What do you mean that the IQ test was not valid for

2   Mr. Bauta?

3   A    Well, it's clear that, based on the performance validity

4   tests, the TOMM, the Victoria, the Reliable Digit Span, the

5   California Forced Choice Validity trial -- it's clear that

6   Mr. Bauta put forth not normal effort and scored on many of

7   those validity tests at a level that was below chance.  Had he

8   scored around chance, that would mean he's not paying

9   attention, just guessing, not taking it seriously, not really

10  engaged; just whatever.  But he scored significantly below

11  chance and so --

12  Q    And what's that show?

13  A    Pardon?

14  Q    What did that show, that it was significantly below?

15  A    That he purposely chose wrong answers.

16  Q    Okay.  Any question in your mind about that?

17  A    No.

18  Q    What level of certainty are you?

19  A    I'm absolutely certain.

20  Q    Near a hundred percent?

21  A    Yes, of course.

22          So that invalidates the IQ test.

23  Q    Now, have you given -- what was that test called where

24  you listed off words and Mr. Bauta kept saying water?

25  A    That's the California Verbal Learning Test.  The one

Morgan - redirect - Mannion                    2213

1   we're talking about.

2   Q    Have you given that to folks with a 60, 65 IQ?

3   A    Oh, all the time.

4   Q    Do they say water to all five of those?

5   A    I've never seen that response.

6   Q    Okay.  Have you seen them only remember 1 out of 16 after

7   saying it five times?

8   A    No.  In fact, many people with IQs in the 60s have normal

9   memory.

10  Q    Okay.  IQ and memory are two different things?

11  A    Yes.  They don't correlate that highly.

12  Q    Okay.  So let me ask you.  Do you remember those tests

13  from grade school where like math tests there's a hundred of

14  them and you get a certain amount of time and you get as many

15  as you can down?

16  A    Yes, it's called speed arithmetic.

17  Q    Okay.  Now, these aren't -- the tests you give aren't

18  school tests where you're asking them to perform, you know,

19  areas and integrals and things of that nature; true?

20  A    No.

21  Q    Okay.  But taking the test of a math test like that, can

22  you describe for me the results that Mr. Bauta had versus one

23  of those tests -- okay.

24         Give us analogy.  It would be similar to answering

25  what on a test like that?

Morgan - redirect - Mannion                    2214

1    A    So, Mr. Bauta, I mean, if we're making a direct
2    comparison?
3    Q    Yes.
4    A    So he wouldn't have solved the problem.  He would have
5    just written the same thing down for all the questions.
6    Q    Four, four, four, four, four, four?
7    A    Yeah, something like that.
8    Q    Maybe even put a letter instead of a number?
9    A    Possibly.
10   Q    Was it that bad?
11   A    It was.
12   Q    Okay.  So you have been retained as an expert by
13   plaintiff's attorneys and claimant's attorneys?
14   A    Yes.
15   Q    Many times?
16   A    Yes.
17   Q    As far as testimony, by the way, how many total times
18   have you been -- given a deposition?
19   A    I don't keep numbers, but it's probably 15, 20, somewhere
20   around there; over a dozen.
21   Q    In your entire career?
22   A    Yes.
23   Q    And how many times have you been at trial?
24   A    Probably around a dozen.
25   Q    Okay.  Not over 200?

Morgan - redirect - Mannion                    2215

1    A    Oh, certainly not.

2    Q    Okay.  Now, when you are an expert on behalf of an

3    injured party, are you willing to ignore low validity scores?

4    A    Never.

5    Q    Do you think that that's perhaps a reason why you don't

6    get retained more on behalf the plaintiffs?

7    A    I imagine.

8    Q    With respect to PTSD, you were asked some questions about

9    the DSM and I just want to clarify some of those things.

10          Can you give us an example -- one of the criteria

11   was, for example, startled reaction.  Okay.

12          What type of startled reaction are we talking about

13   that would be required to be valid under that, whatever number

14   that was?

15   A    Well, I can tell you what I've seen in patients who had

16   PTSD.

17   Q    Yeah.

18   A    I can tell you what I've seen a lot at the VA Hospital.

19   I mean, I can even demonstrate it.

20   Q    Please.

21   A    It's a physical response.

22   Q    Let's see.

23   A    So, I mean, I'm giving counseling to a veteran with PTSD

24   in my office and I say another colleague opens the door, they.

25   Like that, I mean, it's a physical -- it's a physical

1   response.  It's an automatic, nonvoluntary physical response

2   to a noise or a sound or some stimulus that disturbs them.  So

3   you can actually see it.

4   Q    And did you see any documentation of that in the medical

5   records anywhere?

6   A    No.

7   Q    You were asked a question about whether you knew

8   Mr. Bauta hit his head or not initially.

9            Now, what I'd like to do is -- do you still have

10  those reports in front of you, your reports?

11  A    No, I don't.

12  Q    Do you recall, though, that the first time before your

13  first report you reviewed both the Evangelical records and the

14  Brookdale records?

15  A    Yes.

16  Q    Okay.  So if those indicated he hit his head, you would

17  have known that?

18  A    Yes.  More than likely.

19  Q    Okay.  You talked about 16 percent don't get better from

20  a concussion.

21           Explain that.

22  A    So there's been a tremendous amount of research in the

23  neurology, neuroscience, neuropsychology, literature about

24  concussions and now it's really a hot topic with what's been

25  going on in the NFL, with dementia and so forth.

Morgan - redirect - Mannion                    2217

1          So there's a lot of research about it.  And

2   research, all of this, the bulk of the studies indicate that

3   about -- around 84 to 85 percent of concussed patients get

4   either completely better or almost completely better.  The

5   16 percent they call -- they call them the miserable minority.

6   I mean that's not --

7   Q    And of those mostly severely concussed patients?

8   A    They are severely concussed patients and the literature

9   indicates that the majority of them had a previous history of

10  psychiatric problems.  And so that confounds really what's

11  going on; whether it's head injury, concussion, or whether

12  it's mostly psychiatric.

13         So the literature indicates that there may be

14  multiple factors that lead to the expression of the 16 percent

15  miserable minority.

16  Q    Okay.  Is the comparison of that literature to this case

17  valid?

18  A    Not at all.

19  Q    Okay.  Why?

20  A    He -- I don't believe that Mr. Bauta was concussed and

21  his scores are so low on these tests that we never see that in

22  the literature.  The scores were more consistent with just

23  gross exaggeration malingering, not actual post-concussion

24  syndrome.

25  Q    Did he have a prior psychiatric history that you know of

1    that that literature talked about?

2    A    No.  He told me there was no previous psychiatric

3    history.

4    Q    And we talked about the first 24 to 48 hours, but let's

5    go a little further out from that.

6              Defendant's Exhibit 404, Bate's stamped 40-310.

7              THE COURT:  Is this received already?

8              MR. SAAL:  Yes.

9              MR. MANNION:  Yes, Your Honor.

10             (Exhibit published to jury.)

11   BY MR. MANNION:

12   Q    And you had the Brookdale records from various dates,

13   including this date; correct, sir?

14   A    Yes.

15   Q    If we could go to the middle, to the adult GCS.

16             Now we're talking five days post-accident, are we?

17   A    The 9th, yes.  9th to the 14th.

18   Q    Okay.  And Mr. Bauta at this time went to the ER, I

19   believe, for hypertension.  But at that time there was also a

20   Glasgow Coma Scale done; correct?

21   A    Yes.

22   Q    And what was the score?

23   A    15 out of the 15 correct.

24   Q    Perfect score?

25   A    Yes.

Morgan - redirect - Mannion                    2219

Q    15 at the scene; 15, 5 days later and not a single
diagnosis of concussion in between?

A    Yes.

        MR. McELFISH:  Can we have your exhibit number
there, Mr. Mannion, for that one?

        MR. MANNION:  Oh, wait a minute.  I completely
apologize.

        MR. SAAL:  Defendant's 404.

        MR. MANNION:  I completely apologize.

        THE WITNESS:  That's two years later.

Q    That's two years.

        But what does that tell you about whether it was
permanent?

A    Well --

        MR. KIEFFER:  Objection.

        THE COURT:  Sustained.

Q    Well, there was a question asked of you of whether the
damage was lingering or that 16 percent don't get better.

        What would that tell you?

A    Well, two years later he was fine.

        MR. MANNION:  And I apologize.  I thought when this
was handed to me, I thought -- I looked at the date and the
month.

Q    So --

        THE COURT:  Do me a favor, doctor.  You are saying

Morgan - redirect - Mannion                     2220

1    he did not have a concussion to begin with.

2              THE WITNESS:  Yes.

3              MR. MANNION:  Right.

4              THE COURT:  So let's move on.

5              MR. MANNION:  Okay.

6    BY MR. MANNION:

7    Q    Now, speaking about whether the testing was valid or not,

8    there was also a question to you about the type of brain

9    injury.  Certain types of brain injury can affect validity

10   testing.

11             What types of brain injury are we talking?

12   A    Very severe brain injuries.

13   Q    Okay.  First of all, you don't think he had any brain

14   injury at all; fair?

15   A    Right.

16   Q    Certainly not a severe brain injury.

17   A    That's right.

18   Q    Okay.  Is there any possible reasonable use of that

19   literature to this case?

20   A    No.

21   Q    And by the way, didn't you say that Dr. Honor and Thomas

22   performed the same type of validity tests as you?

23   A    I -- yes.

24   Q    Does the literature support use of validity tests?

25   A    Oh, absolutely.    (Continued on following page.)

VB        OCR        CRR

1    BY MR. MANNION:   (Continuing.)

2    Q    When these validity tests are done, is there -- once you

3    have the score, the raw score, if you looked at the raw data

4    from Dr. Honor, for example, would you be able to look at the

5    raw data and come up with a conclusion?

6    A    Yes.

7    Q    And, likewise, they can look at yours and come up with a

8    conclusion?

9    A    Yes, that's what science does.

10   Q    It's objective?

11   A    Yes.  It's science.

12   Q    You are not subjectively interpreting that data?

13   A    Of course not.

14   Q    And there was questions about whether or not it should

15   have been broken up.  Were his test scores consistent

16   throughout the day?

17   A    Absolutely.

18   Q    And if we just look at the initial testing at the

19   beginning, before lunch even, were those all consistently at

20   .01?

21   A    Yes.

22   Q    Although you may not have said, Are you in pain, what did

23   you ask Mr. Bauta and what did you do to assess whether it was

24   appropriate to continue with testing?

25   A    Well, you know, the patient is observed all day long.

Morgan - redirect - Mannion                    2222

1  We're in interaction with the patient, asked if he needs a

2  break, asked if he feels okay to continue.  I mean, we -- we

3  check on all patients, all patients; whether they're referred

4  by attorneys or just regular patients.  We want, hope to and

5  really desire to get the best results from everyone we test in

6  this way.  When we get scores that are low and all validity

7  tests are passed and the scores make sense along with the

8  medical record, then we can be more assured that the data

9  we're getting are reliable and valid.

10 Q     Did you ask him if he was comfortable enough to proceed?

11 A     Of course.

12 Q     And did you -- did he give you any reason to doubt that

13 it was okay to proceed?

14 A     No.

15 Q     You were also asked about whether we inquired for you to

16 do a pain assessment and you said that is really in the

17 disability aspect.  When you're retained by plaintiffs'

18 attorneys for injured people, they're not asking to you do a

19 pain assessment either; correct?

20 A     I've never been asked to do a pain assessment in that

21 context.

22 Q     You're not here to talk about the spine, fair?

23 A     No, I'm not a spinal doctor.

24 Q     Okay.  So your validity tests tell you that Mr. Bauta was

25 intentionally giving wrong answers on your tests, and you

1    refer to that as malingering; correct?

2    A    Yes.

3    Q    And that is potentially for secondary gain?

4    A    Yes.

5    Q    That's what malingering is?

6    A    Absolutely.

7    Q    Whether he's doing that for the bodily injuries you're

8    not testifying to?

9    A    I have no idea.

10   Q    But you do know that that's what he's doing, at least

11   with respect to the neuropsychological injuries?

12   A    I do.

13              THE COURT:  Let's wrap it up, please.

14              MR. MANNION:  One second, Your Honor.

15              Could I have the ELMO, please, Your Honor?

16              MR. KIEFFER:  Objection.

17              THE COURT:  Sustained.

18              MR. MANNION:  Okay.

19   BY MR. MANNION:

20   Q    There was some questions about validity testing and you

21   talked about the chance levels versus not-chance levels and

22   about the 1 percent.  Do you recall that?

23              MR. KIEFFER:  Objection, cumulative.

24              MR. MANNION:  It was opened, the door, on recross.

25              THE COURT:  I will allow it.

SN       OCR       RPR

Morgan - redirect - Mannion                    2224

1    Q    Do you recall that?

2    A    Yes.

3    Q    I want to be sure I understand the correct way to do this

4    that supports your opinions after the questions you were

5    asked.  When you do the tests in the morning you're

6    essentially saying there was a .01 percent chance, at best,

7    that this was a fluke?

8    A    Yes, one out of 100.

9             THE COURT:  So that's a one-percent chance.

10   A    In decimals, but not .01 percent.

11            THE COURT:  .01 is 1 percent.

12   Q    Agreed.  .01 or 1 percent is the probability that it was

13   just some fluke, fair?

14   A    Yes, we often phrase it one out of 100.

15   Q    99 percent chance he was giving an intentionally wrong

16   answer?

17   A    Exactly.

18   Q    And then you give another test and you get the same

19   result, fair?

20   A    Yes.

21   Q    And when you combine those two, the way you do that as a

22   neuropsychologist is .01 times .01?

23   A    Correct.

24            MR. KIEFFER:  Objection.  There's nothing in the

25   disclosure about doing that.

1           MR. MANNION:  Sure it is.

2           THE COURT:  Sustained.

3    BY MR. MANNION:

4    Q    How, Doctor, do you use these tests cumulatively?

5    A    Well, I think you just eyeball it without doing any math,

6    just eyeball it and recognize the chances of getting so many

7    tests at this level is ridiculous.

8    Q    Astronomical?

9    A    Astronomical is the word.  That's right.  It's

10   impossible.  It's impossible to get them on chance, all of

11   them on chance.

12   Q    And if you did it mathematically?

13          MR. KIEFFER:  Objection.

14          THE COURT:  Sustained.  Move on.

15   Q    Doctor, you've seen the photograph of the laceration on

16   his head?

17   A    I have.

18   Q    Does that change your opinions in any way?

19   A    No.

20   Q    Why?

21          MR. KIEFFER:  Objection, foundation.

22          THE COURT:  You opened the door.  Go ahead.

23   A    Striking one's head, a head injury, is not the same thing

24   as a concussion.  If everybody who hit their head in their

25   lifetime had a concussion or a serious brain injury, everybody

1   would be brain damaged.

2   Q    You were also asked a question about this accident being

3   67 miles per hour, but Mr. Kieffer didn't ask you about the

4   fact that the actual change in velocity that his expert talked

5   about was only 16 miles per hour --

6            MR. KIEFFER:  Objection.

7            THE COURT:  Sustained.

8   Q    Do you know what the speed of the other vehicle was?

9   A    I don't.

10           MR. KIEFFER:  Objection.

11           THE COURT:  Sustained.

12  Q    And you're not here to do a biomechanical analysis, fair?

13  A    Absolutely not.

14  Q    Okay.  And does the speed you were asked about, the

15  speed, does that change your opinion in any way?

16  A    No.

17           MR. MANNION:  Okay.  One minute, Your Honor.

18           (Pause in proceedings.)

19  Q    You were asked some questions about the post-traumatic

20  stress disorder and one of the criteria on there talks about

21  avoidance that was talked about.  Assuming that Mr. Bauta

22  spent eight hours on a bus approximately 13 -- let me see, 13

23  days or so after this accident and again in July of '14, what

24  does that tell you?

25           MR. KIEFFER:  Objection, incomplete hypothetical.

Morgan - redirect - Mannion                    2227

1       THE COURT:  Overruled.

2  A     Well, he certainly didn't avoid the bus and I think that

3  with PTSD one would avoid the bus.

4  Q     And you wouldn't spend eight hours on it?

5  A     Absolutely not.

6       MR. MANNION:  Just one moment.

7  Q     More likely than not, Doctor, if given the effort that

8  was given and your opinion that the answers by Mr. Bauta were

9  intentional, do you believe to a reasonable degree of

10 certainty that the test results would have been substantially

11 different if broken up?

12       MR. KIEFFER:  Objection.

13       THE COURT:  Overruled.

14 A     Not at all.

15 Q     Why not?

16 A     I think intention would have carried through on all the

17 testing with me.

18 Q     Does pain cause somebody to intentionally deceive?

19 A     Of course not.

20 Q     Does being tired cause somebody to intentionally pick

21 wrong answers?

22 A     No, of course not.

23 Q     And in the four or five thousand of these that you have

24 done, have you ever seen somebody so consistently

25 intentionally pick the wrong answers?

Morgan - recross - Kieffer                     2228

1   A    That is probably the only time.

2   Q    Thank you.

3        MR. KIEFFER:  Two quick recross.  I can do it from

4   here with the Court's permission.

5   RECROSS-EXAMINATION

6   BY MR. KIEFFER:

7   Q    Doctor, Mr. Mannion just asked you a question on the

8   topic of concussion and you answer was something along the

9   lines of striking or bumping your head then everybody would

10  have a concussion, true?

11  A    Yes.

12  Q    Point in fact you don't know anything about the forces

13  that Mr. Bauta's body or head were exposed to in that

14  accident?

15       MR. MANNION:  Objection.

16  Q    You have no information on that, do you?

17       MR. MANNION:  Objection.

18       THE COURT:  Overruled.

19  A    True.

20  Q    To the extent there's been biomechanical opinion

21  testimony and things of that nature, that was not shared with

22  you and that is not a part of your analysis of this case, your

23  opinions or any of your testimony to the jury, true?

24  A    I wouldn't understand it anyway.

25  Q    Thank you?

1   REDIRECT EXAMINATION

2   BY MR. MANNION:

3   Q    Were you asked any questions about whether this was

4   equivalent to a 16 mile per hour accident as opposed to a 67?

5   A    No.

6   Q    Nothing further.

7            THE COURT:  Thank you, Doctor.

8            (Witness excused.)

9            THE COURT:  We're going to take our not quite

10  mid-afternoon break.  Come back at 4:15 or we will come get

11  you at 4:15.

12           (Jury exits.)

13           (In open court.)

14           THE COURT:  We have Dr. Nobilini, next?

15           MR. BARMEN:  Yes, Your Honor.

16           THE COURT:  How long is he going to be?

17           MR. BARMEN:  Not that long.  I anticipate my direct

18  of him being 30 minutes, maybe 40 tops.  Are you looking at me

19  or the clock.

20           THE COURT:  At the clock.  That leaves half an hour

21  for the cross.  We will stay as late as we need to to get him

22  done.  So between 5:30 and 6.

23           (Recess taken.)

24           (Jury enters.)

25           (In open court.)

1           THE COURT:  Call your next witness.

2           MR. BARMEN:  The defendants call Dr. Nobilini.

3           THE COURT:  Dr Nobilini, please raise your right

4    hand.

5           (Witness sworn/affirmed.)

6           THE COURT:  Please introduce yourself to the jury

7    and spell your name for the court reporter.

8           THE WITNESS:  My name is Dr. Robert Nobilini,

9    N-O-B-I-L-I-N-I.

10   **ROBERT NOBILINI**, called by the Defense, having been

11           first duly sworn, was examined and testified

12           as follows:

13   DIRECT EXAMINATION

14   BY MR. BARMAN:

15   Q    Good afternoon, Dr.Nobilini.

16   A    Good afternoon.

17   Q    I appreciate your patience today.

18   A    Sure.

19   Q    Will you tell the jury a little bit about who you are?

20   A    I'm a consultant in the field of mechanical engineering

21   and biomechanics.  I do work in cases like this where I offer

22   opinions regarding issues related to my areas of expertise.

23   Q    And would you tell the jury -- first off, who do you work

24   for?

25   A    I work for -- I own my own company.  It's 4N6 Consulting

1    LLC.

2    Q     And how long have you been self-employed?

3    A     Since 2008.

4    Q     Would you tell the jury just a little bit about your

5    education, training and background, please?

6    A     Sure.  I have a Bachelor's of Science and a Master's of

7    Science as well as a Ph.D.  All three degrees are in

8    mechanical engineering from Drexel University.  My graduate

9    studies during my master's as well as my Ph.D. were all

10   concentrated in the field of biomechanics.

11   Q     And how long have you been doing biomechanical consulting

12   work?

13   A     Since 2000.

14   Q     Okay.  And do you have any type of medical background?

15   A     I worked at a hospital for a period of from '92 to 2000,

16   so a period of eight years.  During that time I worked closely

17   with clinicians on issues related to biomechanical research.

18   I worked with departments such as the orthopedics departments.

19   I worked with the physical therapy departments as well as with

20   general surgery, neurology.

21           During that time I was exposed to a lot of

22   medical -- not formal training but training in a medical

23   context where I was, you know, allowed to sit in on surgeries

24   and saw things occurring.  The research that I did at that

25   time involved working not only with volunteers but also

1   sometimes clinically with patients as well and in addition

2   with cadavers so a lot of the testing that I did involved

3   dissecting cadavers and using portions of the anatomy to do

4   the testing that I was -- that I'm doing.

5           So that I have a lot of training and experience

6   working with the human body and with the anatomy.

7   Q    You're not a medical doctor, are you?

8   A    I am not a medical doctor.

9   Q    You are Dr. Nobilini because of the engineering Ph.D.

10  A    That's correct.

11  Q    You cannot make diagnoses?

12  A    I cannot diagnose.

13  Q    But has working with that type of medical background and

14  the training you had been beneficial to you in your

15  biomechanical career?

16  A    Absolutely.

17  Q    How so?

18  A    Well, obviously exposed to working with the human anatomy

19  you have a better feel for how the structures behave from a

20  biomechanical point of view.  My interest is looking at

21  structures from the standpoint of how do they move, how do

22  they behave when forces are applied to them.  That's basically

23  what mechanical engineering is all about.

24          In biomechanics, the structures that we're looking

25  at are living structures.  They're unique.  They're different

1    than engineering materials like, for instance a material like

2    aluminum or steel might have a forced displacement

3    relationship that's linear.  In other words, you take a beam

4    made out of steel and you apply pounds, it might displace a

5    quarter of an inch.  You apply two pounds, it might displace

6    half an inch or twice as much.  When you look at human tissue,

7    it's not linear.  It's what we call viscoelastic.  So the

8    human body, the tissue in the human body, has unique

9    properties.  Another unique property is bone.  Bone actually

10   can change its shape based upon the loads that you're applying

11   to the bone.  That's when bone -- during every day experiences

12   bones are -- are loaded in various ways and the loads that are

13   applied to the bones cause the bones to shape themselves in a

14   particular manner according to a law caused Wolff's Law.

15           If you stress a bone in a certain direction, the

16   bone will actually lay down bone cells in that direction to

17   resist that force.  If you don't load the bone in a certain

18   direction, the bone cells will resorb.  So essentially what

19   happens is based on the loading throughout the day or

20   throughout your life, it actually remodels and actually takes

21   on an optimal shape to resist the loads -- to resist.  So the

22   uniqueness of the human body and the tissue that's involved in

23   the field of biomechanics is what makes biomechanics unique

24   from mechanical engineering.

25   Q    Have you testified in court as an expert in mechanical

Nobilini - direct - Barmen                    2234

1   engineering in the past?

2   A    Yes.

3   Q    Have you testified as an expert in biomechanical

4   engineering in the past?

5   A    Yes.

6        MR. BARMEN:  Your Honor, at this time the defense

7   would tender Dr. Nobilini as an expert in mechanical and

8   biomechanical engineering.

9        MR. McELFISH:  No objection.

10        THE COURT:  Dr. Nobilini is received as an expert in

11   mechanical engineering and you biomechanical engineering.

12        MR. BARMEN:  Thank you and I'm going to try to move

13   this along for you.

14   BY MR. BARMEN:

15   Q    When were you retained in this case, ballpark?

16   A    Good question.  Can I look in my report?

17        MR. BARMEN:  Your Honor, may he.

18        THE COURT:  Yes.

19   A    The report was in October of '16 so I'm guessing it was

20   sometime during the summer of 2016.

21   Q    And you understand that there were a few other cases

22   relative to this accident and you were previously retained on

23   those; is that true?

24   A    I have been, yes.

25   Q    Specifically in this case what were you retained to do?

Nobilini - direct - Barmen                    2235

1    A     What I was asked to do was to look at Colonel Smith's

2    report, his analysis, and to basically make a determination

3    whether his opinions had a valid scientific basis.

4    Q     Did you render opinions in this case?

5    A     I did.

6    Q     We're going to talk about those, but can we agree before

7    we do that any opinion you give, you will only give those

8    opinions that you hold to a reasonable degree of mechanical

9    and/or biomechanical engineering?

10   A     Yes.

11   Q     Okay.  Let's talk about what your opinions are relative

12   to Colonel Smith and then we'll talk about how you came to

13   those opinions.

14   A     Sure.  The three opinions that I was able to come to

15   after reviewing Colonel Smith's report were that, one, Colonel

16   Smith failed to accurately identify the mechanics that

17   occurred in this accident with regards to both the movement as

18   well as the forces that Mr. Bauta incurred during this

19   accident.  The second was that Colonel Smith failed to

20   calculate the loads, the level of load that Mr. Bauta

21   experienced during this accident and, as a result, he's not

22   able to make an opinion to a reasonable degree of engineering

23   certainty that those forces were consistent with the injuries

24   that Mr. Bauta incurred.

25              And, lastly, the last opinion, kind of a catchall,

1   to basically say that he basically provided no scientific

2   evidence to support his opinion that the subject accident

3   which he claims occurred at 16 miles per hour, basically

4   imparted sufficient forces to make the injuries that Mr. Bauta

5   is claiming related to this incident.

6   Q    Okay.  And I appreciate that.  Let's start with the issue

7   of Colonel Smith failing to calculate the forces in this

8   accident.  Is that something that you did?

9   A    I did not.

10  Q    Why?

11  A    First, it wasn't what I was asked to do, but secondly

12  there were many variables with regard to this accident that

13  pretty much made it impossible to calculate those forces as

14  far as the magnitudes are concerned.

15  Q    You weren't asked to do it, but could it have been done

16  in this case?

17  A    I don't believe it could have been.

18  Q    Could you explain to the jury why?

19  A    Sure.  During the incident the motor carriage experienced

20  a Delta V miles per hour.  Delta V itself, if you consider

21  driving down the road in a car at 16 miles an hour, you apply

22  your brakes, you bring your car to a stop.  You've now

23  incurred a Delta V at 16 miles per hour but you weren't thrown

24  forward into your seatbelt.

25          If you're doing 16 miles an hour in your car and you

Nobilini - direct - Barmen                      2237

1    strike an immovable wall, what's going to happen is your body

2    is going to move forward in the vehicle into your seatbelt and

3    you'll be restrained by your seatbelt.

4          In both cases you have a Delta V of 16 miles per

5    hour.  The is that in one case you had a higher rate of

6    acceleration than in the other case.  And the higher rate of

7    acceleration comes into play in the fact that during the

8    striking of the immovable object, the vehicle is going through

9    that changing velocity of 16 miles per hour over a much

10   shorter period of time, acceleration is basically the change

11   in velocity divided by the change in time over which that

12   change occurred.

13         So, the shorter the time the greater the

14   acceleration and as we know from Newton's Law force is equal

15   to mass on an acceleration.  So it's the time and the forces

16   on the body.  In this instance, the motor coach struck the

17   back of the truck.  In doing so, the front of the bus, as I'm

18   sure you've seen, was crushed significantly.  That crush

19   damage basically absorbed damage during the accident which

20   essentially reduced the amount of acceleration incurred by the

21   occupants of the vehicle.  Had this crush not occurred, the

22   Delta V would have been -- the Delta V would have occurred in

23   a shorter period of time, and the forces would have been

24   greater on the occupants.

25         With respect to Mr. Bauta, he was positioned,

1    according to him, somewhere in the middle to the back of the

2    bus on the driver's side of the bus.  The damage that occurs

3    to the bus forward of his position including the frontal

4    damage as well as damage to the body of the bus as well as

5    bends in the frame of the bus that occurred underneath, all of

6    that damage worked to absorb energy.

7              That absorption of energy is energy that Mr. Bauta

8    was not exposed to as a result.  So the concept basically is

9    the same as what we see in the design of automobiles where in

10   an automobile you have what's called crumple zones.  That was

11   concept that was patented by Mercedes back in the 1950s.  The

12   idea is to put areas in the vehicle that are intentionally

13   crushed during an accident, the purpose being to absorb

14   energy.  By absorbing energy, what happens is the vehicle

15   changes velocity over a greater distance or a greater amount

16   of time to reduce the acceleration and protect the occupants

17   of the vehicle.

18             In this case, Mr. Bauta was in the middle or back of

19   the bus area, so he had a good portion of the bus in front of

20   him.  That damage absorbed energy and basically his Delta V or

21   acceleration was reduced as a result of that.  Without knowing

22   the actual stiffness coefficients of the bus itself, it's not

23   possible to determine what his -- what his acceleration would

24   be as a result of the of the bus striking the truck.

25             In addition to that, his movement forward within the

1    vehicle into the seat that was in front of him would have

2    resulted in him incurring forces as the seat itself was

3    moving -- was moving slower than he was, right?  The vehicle

4    slows down, his body is going to move forward within the

5    vehicle until it contacts the seat.  Once it contacts the

6    seat, the seat is going to want to decelerate his body so that

7    his body is now reduced in speed to the same speed as the

8    seat.  That deceleration occurs over a period of time

9    depending on the stiffness of the seat.  The seats in the bus

10   are designed to --

11              MR. McELFISH:  Objection.  This is outside the

12   scope, the design of the seat, of his report.

13              THE COURT:  Overruled.

14   A    The seats on the bus are designed to absorb energy and

15   the absorption of energy means that the deceleration of

16   Mr. Bauta's body occurred over a greater period of time

17   because as the seat flexed forward, that whole period of time

18   is what it took for his body to decelerate; as opposed to if

19   the seat was stiff, the deceleration would have been

20   instantaneous.  You can think of it as you're at a baseball

21   game and a foul ball comes in your direction.  You put your

22   hand out.  If you were to stiff-arm it and catch the ball the

23   impact would be tremendous.  You'd have a lot of pain.  If you

24   were to take the ball and draw you're the hand back as the

25   ball comes into your hands, you extend the time over which the

Nobilini - direct - Barmen                    2240

1  ball decelerated and you reduce the acceleration and reduce

2  the impact force to your hand.

3          The same thing is true here.  When the seat deforms,

4  it extends the time over which that deceleration occurs which

5  reduces the force on Mr. Bauta's body.  In this instance,

6  there's a couple of things we don't know.  We do not know the

7  speed, the relative speed of Mr. Bauta compared to the speed

8  of the seat.  You would need to know that in order to be able

9  to calculate the forces on his body.  The second thing you

10  would need to know is what the stiffness characteristics of

11  the seat are.  We do not know that.

12          The amount the seat is deformed would also be

13  helpful.  We don't know where he was seated exactly.  We don't

14  know which seat was deformed and how much it deformed.  So

15  it's really not possible to calculate the external forces on

16  Mr. Bauta's body.

17  Q    Okay.  Now, am I to understand, though, that the longer

18  the total deceleration when you factor in the crush of the bus

19  and the deformation of the seat, the lower the forces will be

20  on that individual?

21  A    That's correct.

22  Q    Okay.  But because of those variables, we don't have the

23  precise forces that Mr. Bauta felt on that day, cannot be

24  determined?

25  A    That's right.

1  Q    Let's talk about Colonel Smith's failure to describe the

2  mechanism of injury.  And I think he talked about kinetics in

3  that regard.  Can you explain that to the jury?

4  A    Sure.  The difference between -- it's kinematics.

5  Q    For kinematics.  Thank you.

6  A    In the field of dynamics we're looking at the

7  relationship between force and displacement.  Looking at

8  forces is basically kinetics.  Motion is described as

9  kinematics.  So we'll just use force and displacement.

10 Obviously there's a relationship between the two.  Motion

11 doesn't happen without forces.  So, I think Colonel Smith in

12 this case said that he relied primarily upon kinematics.  He

13 didn't rely upon the forces and, rightfully so, he wasn't able

14 to calculate them because it wasn't possible.  So, therefore,

15 he had nothing to rely upon other than kinematics.  In

16 analyzing the kinematics in his report, what Colonel Smith

17 says is that with regards to the movement of the body in the

18 vehicle that Mr. Bauta's lumbar spine was exposed to, in his

19 words, a flexion distraction type injury.  Distraction means

20 pulling apart and flexion means moving forward with your body.

21        He basically stated that this mechanism occurred

22 because his pelvis was restrained by the lap belt of his

23 seatbelt.  As you probably know by now, there was no lap belt

24 or seatbelt present in the vehicle.  So that mechanism or that

25 loading or external loading that he claims occurred to the

1  body, didn't occur.  In fact, there were no forces that would

2  have created a distraction loading of the lumbar spine.

3         He furthermore talked about the cervical spine and

4  in the cervical spine he also blamed it on a flexion-type

5  mechanism.  Again, I think he was probably thinking that the

6  shoulder belt was present because in a forward impact the

7  shoulder belt will restrain your torso as you move forward and

8  your head would flex forward over the shoulder belt.

9         Again, the belt wasn't present and there was no

10 mechanism to create a flexion-type injury to the cervical

11 spine.  Furthermore, Mr. Bauta testified that prior to the

12 impact he actually looked up and saw the incident occurring.

13 He saw the truck and the bus colliding and, in addition, he

14 testified that he struck his face on the seat which means his

15 face was in an upward position.  It wasn't flexed up and down.

16 There was no flexion mechanism as Colonel Smith stated in his

17 reports.

18        So, therefore, the external kinematics and the

19 external loads that occurred to Mr. Bauta were incorrectly

20 described and incorrectly analyzed by Colonel Smith.  In order

21 to determine what happens within the body, in order to

22 determine the mechanism of injury and the loads that are being

23 applied to the internal structure of the body, you have to

24 know what the external forces are.  And, you know, forces are

25 actually made up two components.  A force consists of both a

1    magnitude and a direction.  You can change either one, but

2    change the force.  In this case, Colonel Smith, one, had the

3    directions of the forces wrong.  And, number two, he wasn't

4    able to calculate the magnitude so he knows nothing about what

5    the forces were on Mr. Bauta's body.  Yet he's somehow

6    offering an opinion to a reasonable degree of sniggering

7    certainty that the forces were consistent with the injuries.

8    That's simply not possible.

9    Q    Under the science of biomechanics, can anybody in this

10   situation offer an opinion as to a reasonable degree what the

11   forces Mr. Bauta experienced were?

12            MR. BARMEN:  Objection.

13            THE COURT:  Overruled.

14   A    In my opinion there was not enough evidence to determine

15   what those forces were.

16   Q    And do you believe that because Colonel Smith never

17   actually calculated the forces, that's why?

18            MR. McELFISH:  That's leading.

19            THE COURT:  Sustained.

20   Q    I'll move on.  I want to touch on this issue of seatbelts

21   and we'll go to the next opinion.  Did you ever inspect the

22   interior of the bus?

23   A    I did.

24   Q    And you know from reading Colonel Smith's deposition

25   transcript and seeing his report that he claims he did as

1 | well?

2 | A    Yes.

3

4 |           (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUING

2   BY MR. BARMEN:

3   Q     Would anybody inspecting this bus know if it had

4   seatbelts?

5   A     Absolutely, especially if you were performing a

6   biomechanical analysis of the motion of the occupants, you

7   would be looking for it.

8   Q     Why would seatbelts be something you would be

9   specifically looking for when you inspect the interior of the

10  bus?

11  A     Because the seatbelt will affect your movement within the

12  vehicle under the crash conditions.

13  Q     Now, you are aware in this case that Colonel Smith

14  ultimately offered a supplemental report after it was pointed

15  out to him by you that he was wrong about the seatbelts and

16  the flexion and extension?

17  A     Yes, I am.

18  Q     Did he correct that issue in the supplemental report?

19  A     Nope.

20  Q     Did he offer any explanation for the invalid opinion?

21  A     Nope.

22  Q     Did he come up with an alternative opinion?

23  A     He did not.

24  Q     Is that sound science?

25  A     No.

Nobellini, PhD - direct - Barmen                2246

1   Q    The other opinion you had relative to Colonel Smith's

2   opinion is that there is no scientific evidence that a Delta V

3   of 16 miles an hour could be consistent with the claimed

4   injuries.

5          Explain the basis for that opinion, please.

6   A    The basis for that has to do with -- basically, what

7   we've already discussed.  He had the kinematics wrong.  He

8   never calculated the force, the magnitudes of the forces, and

9   there was nothing else that he offered as a scientific basis

10  to be able to offer the opinion that the forces in this case

11  were consistent with the injuries.  And, essentially,

12  that's -- that's the purpose for that last opinion.

13  Q    Okay.  Did we talk about dynamics?

14  A    I believe we did.

15  Q    I think we did.  Just making sure.  Going through my

16  notes here, I don't want to take any more time than we have

17  to.

18          I think you touched on it a little bit, but one more

19  thing I want to make clear.

20          Colonel Smith testified that the forces experienced

21  by the people in the back of the bus would have been identical

22  or the same as the forces experienced by the people sitting in

23  the front of the bus.

24          Do you agree with that?

25  A    I don't.

Nobellini, PhD - direct - Barmen                2247

1    Q    Why not?

2    A    Well, the people at the front of the bus have only so

3    much distance between them and the point of impact.  Any crush

4    damage in front of them that occurs will absorb energy, but

5    then whatever energy is left over, they will be exposed to.

6    Being at the back of the bus, you would have more vehicle in

7    front of you to absorb more energy before it reaches you.

8              You can think about it this way:  When the front

9    edge of the bus collided with the truck, it stopped

10   instantaneously.  If the entire bus had stopped

11   instantaneously with the front edge, there would be no crush

12   damage, because the bus would have just stopped.  It would

13   have been a rigid bus that stopped, collided, and there would

14   be no crush damage.

15             The fact that there's crush damage means that the

16   front edge stopped rapidly, but the back end continued moving.

17   In other words, the deceleration of the back of the bus was

18   less than the deceleration of the front of the bus.  So,

19   therefore, the occupants at the rear are exposed to lower --

20   lower forces.

21   Q    Now, when you inspected the bus, did you also inspect the

22   undercarriage?

23   A    I did.

24   Q    Did you encounter more crush damage in the bus than was

25   evident in the pictures that the jury has already seen?

1   A    I don't know what pictures they've seen.

2   Q    That's fair.

3   A    Yes.

4   Q    Assume they've seen pictures, the police pictures of the

5   accident scene that you've also seen that show the actual

6   damage to the front of the bus and the back of the truck, but

7   they certainly don't show the undercarriage of the bus.

8   A    Okay, you can see on the side of the bus -- I don't know

9   if you have seen a picture of the side of the bus, but you can

10  see that partway down the side of the bus, there is a luggage

11  compartments, [sic] and that luggage compartment was deformed.

12          Below that point, if you look underneath, what

13  you'll see are the frame rails of the bus.  And those frame

14  rails were bent and deformed, in addition to the area.  And

15  there was other buckling and deformation in the body of the

16  vehicle as it moved back.  Of course, towards the rear of the

17  bus, you had much less than towards the front of the bus.

18  Q    Doctor, have all the opinions you've offered been to a

19  reasonable degree of biomechanical and mechanical engineering

20  certainty?

21  A    Yes, they have.

22          MR. BARMEN:  I don't have any other questions for

23  you.  Thank you.

24  CROSS-EXAMINATION

25  BY MR. McELFISH:

1    Q    Good afternoon.

2    A    Good afternoon.

3    Q    You've actually been involved in this accident, dealing

4    with the details of this accident since sometime in 2014,

5    correct?

6    A    Yes.

7    Q    In fact, when you inspected the bus, you did so sometime

8    back in 2014?

9    A    Yes.

10   Q    And you took photographs of the deformed seats, and you

11   went through the interior of the bus during that time, true?

12   A    Yes.

13   Q    And you've offered opinions to other juries on Delta V,

14   biomechanics and injury causation; true?

15   A    I have -- on this case?

16   Q    In this accident, other juries.

17   A    I have not.

18   Q    So you've offered no biomechanical opinion on any of the

19   injuries in this case?

20   A    With regards to what?

21   Q    Any other injuries.

22   A    Any other injuries to who?

23         THE COURT:  I think the problem is --

24         MR. BARMEN:  Objection, Your Honor.  Sidebar.

25         THE COURT:  -- injuries with regard to this case, as

1    opposed to this accident.

2          MR. McELFISH:  Let me withdraw it.

3    BY MR. McELFISH:

4    Q    Now, you say that Colonel Smith had no science backing up

5    his opinions, but he did rely upon the NAS database?

6          MR. BARMEN:  Objection, outside the scope.

7          THE COURT:  Overruled.

8    A    He did.

9    Q    And the NAS database has a collection of frontal barrier

10   crash testing, correct?

11   A    No.

12   Q    What's your understanding?

13   A    The NAS database is a database that was put together by

14   NHTSA which essentially is a collection of information on

15   real-world crashes of automobiles, pickup trucks, utility

16   vehicles, and the data includes issues related to the speed of

17   the vehicle when it's available.  It also includes data

18   related to the injuries that were incurred during those

19   accidents as well.

20   Q    I didn't hear you criticize his use of the NAS database

21   in your testimony.

22          MR. BARMEN:  Objection.

23          THE COURT:  Overruled.

24   A    The criticism in my report of the NAS database was

25   related to the accident reconstruction issues in this case,

1    not related to the biomechanics.

2    Q    Okay.  Now, were you provided with the trial transcripts

3    of Colonel Smith on the explanation he gave to the jury on the

4    injury causation to the lumbar spine?

5    A    I was.  I mean, I'm sorry.  I did, yes.

6    Q    And you saw that he gave an explanation with or without

7    the seatbelt, correct?

8    A    With or without?

9    Q    In other words, he was asked about the seatbelt, but he

10   gave an opinion on how the lower back can get injured in this

11   accident without a seatbelt?

12   A    I think of he tried to change the kinematics that he

13   offered in his report at that point.

14   Q    Sir, let me do it this way.  Did he offer an opinion on

15   biomechanics to this jury on how Mr. Bauta's back was injured

16   in this accident without the seatbelt; yes or no?

17   A    I believe he did.

18   Q    I didn't hear any criticism of that on your direct

19   examination.

20            MR. BARMEN:  Objection.

21            THE COURT:  Overruled.

22   A    Is that a question?

23   Q    Well, yes or no, you didn't criticize him, did you, for

24   that explanation that you read about how Mr. Bauta 's back was

25   hurt in this accident without a seatbelt.

1          MR. BARMEN:  Objection.

2          THE COURT:  Overruled.

3          Can you answer the question?

4          THE WITNESS:  I didn't criticize him.

5     BY MR. McELFISH:

6     Q    Okay.  So as an expert witness who's brought in here by

7     the defense who has read Colonel Smith's opinion that was

8     given to this jury, and you had no criticism of it on your

9     direct examination means it's fine and it's scientific?

10         MR. BARMEN:  Objection.

11         THE COURT:  Sustained.

12         MR. BARMEN:  Move to strike.

13         THE COURT:  No.

14         Can you answer that question?

15         THE WITNESS:  My -- my opinions in my report are

16    based upon what he said in his reports.

17    BY MR. McELFISH:

18    Q    I understand that, Doctor, but before taking the stand,

19    my point is -- before taking the stand, you read his opinion

20    that the jury has that doesn't include a seatbelt, and in your

21    direct examination with Mr. Barmen, you've made no comment or

22    criticism about it, is that true?

23    A    I was not asked about it.  But yes, it's true.

24    Q    And you saw in that testimony before this jury that

25    Colonel Smith relied upon various calculations and Newton

Nobellini, PhD - cross - McElfish                2253

1   laws, opinions and the NAS database and various other sources;

2   true?

3   A    I don't know that I saw that.

4         MR. McELFISH:  One moment, Your Honor.

5         (Pause.)

6   BY MR. McELFISH:

7   Q    But so I understand you, you are here as what is referred

8   to as a rebuttal witness, is that correct?

9         MR. BARMEN:  Objection.

10        THE COURT:  Sustained.

11  Q    You are here only to offer opinions which criticize

12  Colonel Smith, correct?

13  A    Not necessarily.

14  Q    Well, you did not in your report or in your deposition

15  offer any direct opinions on biomechanics on whether or not

16  Mr. Bauta's injuries were consistent with this accident,

17  correct?

18  A    I believe one of the opinions that I offered today was

19  that the forces were not -- it was not possible to calculate

20  those forces, which I -- is something that I agreed with

21  Colonel Smith about.

22  Q    I understand, but you did not come to a conclusion as to

23  whether or not Mr. Bauta's injuries were consistent or

24  inconsistent; true?

25  A    Without knowing what the forces are, there is no -- there

1   is no scientific way to determine the answer to that question.

2   Q    What I'd like you to do is listen to the question,

3   please --

4   A    I did.

5   Q    -- and answer.

6   A    I did.

7             MR. BARMEN:  Objection.

8             THE COURT:  Overruled.

9   BY MR. McELFISH:

10  Q    You do not have an opinion that says that Mr. Bauta's

11  injuries are inconsistent with this accident.

12  A    I cannot have an opinion, because I don't know the

13  forces.  The forces were not determined.

14  Q    Were you -- did you undertake any effort at all to try

15  and figure out whether or not a Delta V at 16 miles an hour

16  would cause these injuries?

17  A    I just described it.  It's not possible to determine.

18  Q    According to you?

19  A    According to me, and according to your expert as well,

20  because he said the same exact thing.

21  Q    But he did come in here and explain it to the jury with

22  scientific backing --

23  A    He did not.

24  Q    -- Which you did not criticize?

25  A    He did not.  He said that it was impossible to calculate

Nobellini, PhD - cross - McElfish                2255

1   the magnitude of forces, because there were too many unknown

2   variables.  Without knowing the magnitude of the forces, it is

3   impossible to determine whether they were high enough to cause

4   the injuries related -- that are being claimed in this

5   accident.

6           I mean, all -- all you consider is the kinematics.

7   If you consider movements, I'm moving my head right now to

8   flexion and extension, yet I didn't herniate a disk.  Why?

9   Because all I'm looking at is the kinematics.  That's the

10  movement that's occurring.

11  Q    Because you're not going at 67 miles an hour.

12          That's why, sir.

13          MR. BARMEN:  Objection.

14  A    There you go, exactly.  You're exactly right.  So the

15  question then becomes not the movements of the body, but the

16  amounts of force.  Without calculating the amount of force, it

17  is impossible to give an opinion to a reasonable degree of

18  engineering certainty that the forces were consistent with the

19  injury.  So you nailed it right on the head.

20  Q    Are you done?

21  A    Yes.

22  Q    Okay, let's do it this way.

23          MR. McELFISH:  Let's go to GLI-044011 for ID.

24          Small screens.

25          MR. BARMEN:  What is it, Mr. McElfish?

Nobellini, PhD - cross - McElfish                    2256

1              THE COURT:  Oh, hold on.

2              MR. McELFISH:  Sorry.  GLI 499.

3              MR. BARMEN:  I'm sorry.  44099?

4              MR. SAAL:  No.  Exhibit 499.

5              MR. McELFISH:  It's Exhibit 499.

6   BY MR. McELFISH:

7   Q    Okay.  Is this your report, Doctor?

8   A    I have no --

9              THE COURT:  Hold on, I'm sorry.

10             Can you see that?

11             THE WITNESS:  Yes, I can.

12             Thank you very much.

13  A    Yes, it is.

14  Q    Okay.  And in your report, you looked at an MCI bus crash

15  that NHTSA conducted, correct?

16  A    I did.

17             MR. BARMEN:  Objection.  Sidebar, Your Honor.

18             THE COURT:  All right.

19             (Sidebar held outside the hearing of the jury.)

20

21             (Continued on the following page.)

22

23

24

25

SAM      OCR      RMR      CRR      RPR

```
                          Sidebar                         2257
```

 1            (The following sidebar took place outside the
 2     hearing of the jury.)
 3            THE COURT:  Go ahead.
 4            MR. BARMEN:  I was very concerned with this witness
 5     that Mr. McElfish is going to try and back-door the NHTSA
 6     test, the video that he's been wanting and re-asked for five
 7     different times.  I want to try and address that before it
 8     goes too far.
 9            The NHTSA test that he reviewed related to the
10     accident reconstruction.  When he was retained, he was
11     retained on two things; to support the accident reconstruction
12     opinions of Steven Schorr that had to do with Delta V and some
13     other issues that included the NHTSA test, and biomechanics.
14            After the fact, you then granted his application for
15     collateral estoppel, so he no longer has any accident
16     reconstruction relevant opinions.
17            The NHTSA test has nothing to do with his
18     biomechanical opinions.  I didn't go into it on direct for
19     that very reason.  He should not be permitted to go into it
20     now, because it's only relevant to his work on the accident
21     reconstruction part that, based on his own application, is no
22     longer part of this case.
23            MR. McELFISH:  No.  The -- well, the test --
24            THE COURT:  It's always no.  It's always no.
25            MR. McELFISH:  Sorry, Judge.  The test takes -- it's

```
                          Sidebar                        2258
```

1   an -- it's a bus that runs into a wall.

2          THE COURT:  I know what it is, you went through that

3   with your other guy.

4          MR. McELFISH:  No, the other one.

5          THE COURT:  With your other expert.

6          MR. McELFISH:  Right.  So it's a crash that has

7   unrestrained passengers in it, and what they do is they test

8   the injury exposure or the injury criteria.  The head injury

9   criteria is called the HIC, head injury something.  And what

10  they did was they looked at how much injury -- because he just

11  got done testifying that people -- Colonel Smith is incorrect

12  that people in the back of the bus can receive injuries --

13         THE COURT:  That's not what he said.

14         MR. MANNION:  He didn't say that at all.

15         MR. McELFISH:  He said that Colonel Smith --

16         THE COURT:  Mr. McElfish, come on.

17         MR. McELFISH:  Judge, you got to let me even finish

18  before you start criticizing me.  I didn't even get a chance

19  to answer.

20         THE COURT:  You just said something that was wrong,

21  incorrect, demonstrably false, like you've been doing since

22  day one.  And you say, Don't insult me, on the record.  He did

23  not testify the way you just said, and you know that.  He said

24  Colonel Smith didn't calculate, couldn't calculate the forces;

25  that's why he's wrong.  Not that Colonel Smith is wrong

```
                         Sidebar                        2259
```

 1   because people in the back of the bus can get injured just

 2   like people in the front of the bus.  He said nothing about

 3   that.  Do you want --

 4            MR. McELFISH:  Well, I don't even know if I'm

 5   allowed to speak.

 6            THE COURT:  Go ahead.  Go ahead, create your record.

 7            MR. McELFISH:  Okay.  So he did ask him about

 8   Colonel Smith's testimony about how people in the back of the

 9   bus received the same injuries as in the front of the bus.

10            THE COURT:  He did not.

11            MR. McELFISH:  Judge --

12            THE COURT:  No --

13            MR. McELFISH:  -- I'll find it.

14            THE COURT:  Can you find it?

15            MR. McELFISH:  Can you please not get angry with me?

16            THE COURT:  Then stop lying to me to my face.  He

17   did not testify to that.  He did not.  You know it.

18            MR. McELFISH:  This is the test.  Mr. Barmen told

19   you that it only relates to accident reconstruction.

20            THE COURT:  Let him do it.  Let him do it.  Let him

21   do it.  Okay?  Let him do it, and then you --

22            MR. McELFISH:  I don't understand this.

23            THE COURT:  I cannot help you with your lack of

24   comprehension.  That is your problem.  He did not testify the

25   way you just said he testified, and you know that.  And you

1    are --

2              MR. BARMEN:  Which is why --

3              THE COURT:  -- and you are lying to my face, and

4    that is why I get angry, Mr. McElfish.  Not because you are

5    trying to advocate for your client, I get that, but when you

6    tell a judge something that is patently untrue that just

7    happened five minutes ago --

8              MR. BARMEN:  And, Your Honor, respectfully, I

9    understand what you're saying, but I can't --

10             THE COURT:  Let him do it.

11             MR. McELFISH:  I haven't even gotten a chance to

12   even --

13             THE COURT:  Ask him about this test, this crash

14   test.

15             MR. BARMEN:  No video.

16             THE COURT:  The video is not coming in.  Ask him

17   about the crash test.

18             MR. BARMEN:  Limited to these results?

19             THE COURT:  Mr. Barmen, go sit down.  Ask him about

20   the crash test.

21             (Sidebar concluded.)

22

23             (Continued on the following page.)

24

25

1            (In open court - jurors present.)

2            MR. McELFISH:  Judge, I am going to try to back up

3    and lay foundation.

4            THE COURT:  Go ahead.

5    EXAMINATION CONTINUING

6    BY MR. McELFISH:

7    Q    Doctor, you were talking on direct about the structure of

8    the bus and how they absorbed the energy.

9    A    Yes.

10   Q    And the result of that, I thought I heard you say, was

11   that the people in the back of the bus experienced less force?

12   A    That's correct.

13   Q    Okay.  And you were critical of Colonel Smith's opinions

14   on the fact that he did not -- he believed everybody in the

15   bus felt basically the same force, is that right?

16   A    Yes.

17   Q    Okay.  And did you testify to that today on direct, your

18   criticism about everybody feeling the same forces?

19   A    I think I testified with regards to that issue, but not

20   with regard to the criticism of him.  I'm not sure that the

21   criticism of him was brought up, or his testimony with regards

22   to that.

23   Q    Okay.  But you did testify about how the structures of

24   the bus and the crush zones reduced the force to people that

25   are in the middle of the bus or in the back of the bus?

1  A    Yes.

2  Q    Okay.  All right.  And in relying upon -- and in forming

3  that opinion -- or criticism, I guess you could call it.  It's

4  an opinion, but it's a criticism, correct?

5  A    However you want to take it.

6  Q    Right, okay.  In doing that, you relied upon a NHTSA bus

7  crash test to support the idea that people in the back don't

8  receive the same force as the people in the front.

9          MR. BARMEN:  Objection.

10          THE COURT:  Overruled.

11  A    I didn't rely upon it alone.  I used it as an example to

12  demonstrate that.

13  Q    Okay.  If you used it as an example and you are an expert

14  witness, you relied upon it.  It's in your report, correct?

15  A    It's in my report.

16  Q    Okay.

17          MR. McELFISH:  So now what I'd like to do, wherever

18  we were before -- 499 for ID, I want to go to 044011.

19          And I'm sorry, Your Honor, let me put it up here on

20  the small screens, please.

21  BY MR. McELFISH:

22  Q    Is this page 6 of your report?

23  A    Yes, it is.

24  Q    Okay.  And correct me if I'm wrong -- correct me if I'm

25  wrong, Doctor, but this is the basic results of the NHTSA bus

1  crash test?

2  A    I'm not sure what you mean by basic results.  This is

3  some of the results from that test, yes.

4  Q    Can you tell the jury what the idea was behind the test

5  or what you -- withdrawn.

6          Can you tell the jury what you were looking at the

7  test for?

8  A    Sure.  In this particular test, a motor coach bus was

9  crashed into a barrier at 30 miles per hour.  That's far more

10  severe than what happened in the subject incident.  Therefore,

11  we can't compare the two, as far as the injuries are

12  concerned, from one to the other.  But what I used it for was

13  to look and demonstrate that there are trends, with the forces

14  that occur in the front of the bus being higher than the

15  forces that occur at the rear of the bus.

16  Q    Okay.  Now, you are familiar with who Mr. Schorr is?

17  A    Yes, I am.

18  Q    He's a defense accident reconstruction expert?

19          MR. BARMEN:  Objection, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. McELFISH:

22  Q    If you take a look at this data -- and I'll cull it out

23  for you, Doctor, I think what it's trying to show is that when

24  you begin at the front -- well, withdrawn.

25          Let me lay a foundation.

Nobellini, PhD - cross - McElfish                2264

1      We have the row number of the bus, and you begin

2   with the fifth row and you go back to the twelfth row, right?

3   A    Yes.

4   Q    And I think we can agree, on a bus that has people 50

5   passengers in it, it has about 12 rows?

6           MR. BARMEN:  Objection.

7   A    I don't know --

8           THE COURT:  Overruled.

9   A    -- know the answer to that.

10  Q    Well, in this particular study, they used the back row of

11  the bus and that was the 12th row.

12          Do you understand that?

13  A    Okay.

14  Q    And they put some dummies -- unrestrained dummies in the

15  bus, true?

16  A    They put restrained dummies who were restrained with a

17  seat belt, a lap belt only; they put dummies that were

18  restrained with a lap and shoulder belt, and put dummies that

19  were unrestrained.  They also put 95th percentile dummies,

20  they put 5th percentile and 50th percentiles dummies.

21          THE COURT:  Doctor, what does that mean?

22          THE WITNESS:  A 50th percentile dummy is a dummy

23  approximately the size of an average man; 95th percentile

24  would be the size of a person who is in the 95th percentile.

25  So it would be the upper end or upper range of size for a male

1  subject.

2           THE COURT:  Like Mr. McElfish, right?

3           THE WITNESS:  Maybe.

4           THE COURT:  He is a big man.

5           THE WITNESS:  He is.

6           THE COURT:  Tall.

7           All right.  So, continue.

8  BY MR. McELFISH:

9  Q    HIC value is head injury criteria?

10 A    It is.

11 Q    Can you tell the jury what it is?

12          THE COURT:  Sustained.

13

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    Q    In this crash test there is, if you look from row 5 back

3    to row 12, they're comparing the values, let's call them, of

4    the passengers up front to the passengers in the back,

5    basically; right?

6    A    Yes.

7    Q    Okay.  And they're using the head injury criteria as a

8    measure of how to measure the front passengers versus the back

9    passengers.

10   A    Yes.

11   Q    For the head part of the stern.

12   A    Correct.

13   Q    Okay.  And so the head injury criteria is developed --

14   can you tell me quickly?

15            MR. BARMEN:  Objection.

16            THE COURT:  Sustained.

17            MR. McELFISH:  Can I side-bar this?

18            (Side-bar conference held on the record out of the

19   hearing of the jury.)

20

21            (Continued on following page.)

22

23

24

25

1          (Side-bar.)

2          MR. McELFISH:  So the point is, is that his opinion

3    is, is that people up front take the brunt of it.  What this

4    is showing is they actually tested this out with both

5    restrained and unrestrained passengers, and of course people

6    in the back receive less of an injury, because his opinion is

7    they go into the seats because it's softer and you're not

8    going into windshields and you're not going into metal objects

9    and things of that nature.

10          The problem is, in the test, one of the dummies went

11   into a security camera on the bus, which is metal.  And what

12   Mr. Bauta testified -- I'm giving my questions away now -- but

13   Mr. Bauta testified that he's in the middle of the bus and he

14   went into the metal seat and so the injury criteria goes sky

15   high.

16          THE COURT:  He is not talking about injuries,

17   though.  He is just talking about forces.

18          MR. McELFISH:  Well, the injury criteria is just a

19   way to measure force, that's all it is.

20          THE COURT:  No, it is not.

21          Listen, I could even tell you -- I have never read

22   the report and I can tell you it is not, because they put

23   restrained dummies, unrestrained dummies, some with lap belts,

24   some with shoulder belts, I am sure throughout the bus.  So if

25   there is an unrestrained dummy in the back of the bus, his

Side-Bar                                    2268

1   head injury criteria is going to be higher than a

2   fully-restrained dummy in the front of the bus where we know

3   the forces are greater.  So this is not what he is here to

4   testify about.

5          I know you want to get that people in the back of

6   the bus can be injured just like people in the front of the

7   bus.  They are not arguing that they cannot be.

8          MR. McELFISH:  Also, though, part of that test is

9   that, and part of his opinion in his report was that people in

10  the back of the bus, one of the other reasons they're not

11  injured so much is not just because they're away from the

12  accident, but because they're going into softer objects and

13  things.

14         What this test shows is that when -- because they

15  had like an anomaly, there was an anomaly in the test where

16  somebody slammed their head into something metal and the head

17  injury criteria went through the roof.  They had to actually

18  make a note of it.

19         And my point is, is that if somebody's not hitting a

20  soft seat and they're hitting a metal armrest, their head

21  injury criteria is going to go much higher, too.

22         I thought this would be fair game.  Maybe I'm wrong.

23  I thought it would be fair game.

24         THE COURT:  It is not.  It is not.

25         Ask him about what his opinions that he gave to the

Side-Bar                                    2269

1    jury are.  That is what is relevant.

2              MR. McELFISH:  He didn't have many.

3              THE COURT:  Because he cannot calculate the forces.

4    Neither could Smith and he has no opinions.

5              MR. McELFISH:  Let me see if I can go a little

6    further.

7              MR. BARMEN:  No, no.  He does have opinions.

8              THE COURT:  No, opinions as to whether the injuries

9    are consistent.

10             Which I thought was not the standard; right?  They

11   can only testify to general causation; correct?

12             MR. McELFISH:  Can you say that again?

13             THE COURT:  A biomechanical expert cannot testify as

14   to specific causation on injury; only general.

15             MR. McELFISH:  Right; correct.

16             MR. BARMEN:  Certainly Colonel Smith tried.  Real

17   hard.

18             THE COURT:  Go a little bit further.

19             MR. McELFISH:  I won't waste more time.

20             MR. BARMEN:  This camera mount thing should be off

21   limits.

22             THE COURT:  I am going to give him some leeway

23   because I do not know what head injury criteria has to do with

24   forces; if it is a direct link.

25             MR. BARMEN:  It doesn't if you can't calculate the

1    force.

2           MR. MANNION:  We would ask that he has to build a

3    foundation for that, first.

4           THE COURT:  Yes.

5           (Side-bar end.)

6

7           (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2    BY MR. McELFISH:

3    Q    Let me first just ask foundationally, what is a head

4    injury criteria?

5    A    Head injury criteria is an indicator as to the

6    probability of a head injury occurring.  It's basically

7    related to the acceleration and the time over which that

8    acceleration occurred.

9           Accelerations are obtained from accelerometers in

10   crash test dummies's heads during crashes.

11          THE COURT:  Does it have anything to do with whether

12   the dummy is restrained or not?

13          THE WITNESS:  It's a measurement of the

14   accelerations of the head.  So if the body is restrained, it's

15   going to change the accelerations of the head.  So, in

16   essence, yes, the restraint system would change the

17   accelerations.

18   Q    Let me just generally ask this foundationally.

19          Would the head injury criteria or the values go

20   up -- and I'll talk about value in a second -- if the

21   passenger is unrestrained?

22          MR. BARMEN:  Objection.

23          THE COURT:  Overruled.

24   A    It depends on what they contact.

25   Q    Just generally speaking, between a restrained

1    passenger --

2            MR. McELFISH:  Withdrawn.

3    Q    You've seen tests where both have been compared.

4    A    I've seen tests, yeah, with restrained and unrestrained

5    occupants.

6    Q    All right.  And --

7    A    In passenger cars; right.

8    Q    Okay.  Sure.

9            Is the acceleration and the force higher on

10   passengers that are unrestrained?

11           MR. BARMEN:  Objection.

12           THE COURT:  Overruled.

13   A    On passengers that are unrestrained?

14           Well, it depends on what the passenger interacts

15   with; right.  So say it's a rear seat passenger compared to a

16   front seat passenger.  A front seat passenger is going to

17   strike harder objects; is going to strike the steering wheel;

18   is going to strike the dash.  Whereas the rear seat occupant

19   is going to strike the back of a seat.  There's some padding.

20   There's some flexibility there to absorb energy.  So --

21   Q    I'm sorry.  One quick question.  I don't mean to

22   interrupt you, but I want to get to --

23           MR. BARMEN:  Let him finish his answer, please.

24           THE COURT:  Finish your answer.

25   Q    Okay.  Go ahead.

Nobilini - cross - McElfish                    2273

1   A    So the head accelerations that occur are going to be
2   dependent upon how the person interacts with the vehicle and
3   what they interact with.
4          So as far as whether head accelerations or hit
5   values are higher for restrained than unrestrained, it's going
6   to depend on what they interact with.
7   Q    If all else -- and I have more questions on that point,
8   doctor -- but all else being equal, apples to apples, is the
9   acceleration of forces on the head higher in unrestrained
10  passengers?
11         MR. BARMEN:  Objection.
12         THE COURT:  Overruled.
13  A    When you say all things being equal, describe what you
14  mean.
15  Q    Well, let's say you have two passengers.  They both are
16  hit interacting with the same object in the same way.  One is
17  restrained; one is not.  Are the values higher for
18  acceleration and force for the unrestrained passenger?  That's
19  all I'm trying to find out.
20         MR. BARMEN:  Objection.
21         THE COURT:  If the force?
22  Q    The acceleration and force is the driver under the HIC,
23  the criterion.
24         THE COURT:  Oh, are you waiting for me?
25         THE WITNESS:  I was waiting for you.

1          THE COURT:  You can answer the question.

2          THE WITNESS:  Thank you.

3    A    Well, again, it depends on how they interact with the

4    vehicle.  If a driver, for instance, moves forward into a

5    restraint system and the head flexes over the restraint system

6    and the head strikes the steering wheel, for instance, hit

7    values could be higher.  Then, say, an unrestrained passenger

8    who moves forward whose head is now above the steering wheel

9    and body flexes over the steering wheel, the accelerations

10   might be lower.

11   Q    In fact, I think I read in your report that you believe,

12   for instance, rear seat passengers have lower head injury

13   criteria than front seat passengers.

14          MR. BARMEN:  Objection.

15          THE COURT:  Sustained.

16   Q    From your answer to the question before, the one that was

17   sustained, I think I'm hearing that the harder the object is

18   that is struck with the head, the higher the values go.

19   A    It's not just the harder, but it's the -- the object has

20   to be stationary and stable, not movable.

21   Q    Understood.

22          I want you to make some assumptions for me real

23   quick.  I want you to assume that Mr. Bauta is an unrestrained

24   passenger and he's in the middle of the bus, not the back.

25   And his head goes into a metal, stationary, fixed armrest.

1          Do you have those assumptions in mind?

2    A    I can make those assumptions, but you realize that the

3    armrest is not fixed.  It actually flexes forward.  So it will

4    move.

5    Q    It's still metal.

6    A    Okay.  It's still metal.

7          It won't resist the movement of his head and create

8    as much acceleration as it would if it were stationary as

9    you're asking me to assume.

10   Q    Fair.

11         But if he hits his head on a metal armrest versus

12   the back of the seat, which is softer, the head injury

13   criteria goes up; correct?

14         MR. BARMEN:  Objection.

15   Q    Not the criteria, but the value goes up.

16         MR. BARMEN:  Objection.

17         THE COURT:  Overruled.

18   A    If he hits the metal armrest and it's stationary, then

19   the accelerations of the head could be greater than if he hits

20   the back of the seat.

21   Q    Okay.  Now, if we go to this exhibit, which is -- should

22   be on the screen.

23   A    Yes.

24   Q    They were testing the head injury criteria for various

25   bus passengers in this crash test; correct?

Nobilini - cross - McElfish                    2276

1    A    They did.  There were various crash test dummies in the

2    crash test; yes.

3    Q    Okay.

4              MR. McELFISH:  And just some foundational questions,

5    Your Honor, on this and I'm going to get through this quickly.

6    Q    We can assume that to the left -- I think I said this --

7    but we can assume to the left we're going backwards in the

8    bus; correct?

9    A    To the left.

10   Q    Yes, the row.

11   A    Oh, I'm sorry, yes.  It starts at row 5, 7, 8 and that's

12   from front to back; yes.

13   Q    Okay.  And focusing just on head injury criteria column,

14   the head injury values are higher up in row 5, higher than

15   they are in row 7 and further back; correct?

16   A    Yes.

17   Q    Okay.  And, in fact, when you get back to row 10, it's

18   like a third of what it is in the front; correct?

19   A    Yes.

20   Q    Okay.  And head injury values or head injuries criteria

21   values, that's biomechanically connected to head injuries;

22   correct?

23   A    Yes.

24   Q    Okay.  Now, I want you to make this assumption; that we

25   have the 12 rows in the bus; that the sixth row would be in

1   the middle of the bus.

2           Do you have that assumption in mind?

3   A    Sure.

4   Q    And do you recall from Mr. Bauta's testimony that he was

5   in the middle of the bus?

6   A    I think he said --

7           MR. BARMEN:  Objection.

8           THE COURT:  Do you know where he said he was?

9           THE WITNESS:  What he said was that he was in the

10  middle going back towards the back of the bus.  He wasn't

11  clear exactly where he was seated.

12  Q    I want you to assume that he testified he was in the

13  middle.  And --

14          MR. BARMEN:  Objection.

15          Your Honor, can we approach again, please?

16          THE COURT:  Overruled.

17  Q    I want you to assume that --

18          MR. McELFISH:  Let me start over, I'm sorry.

19  Q    I want you to assume he testified he was in the middle.

20  I want you to assume that the middle of the rows is, it would

21  be number six, based on this chart, okay?

22          You have that in mind?

23  A    Okay.

24  Q    We have two values for the fifth row and the seventh row

25  that we can sort of compare as a general area of where he

1  would be seated; correct?

2          MR. BARMEN:  Objection.

3          THE COURT:  Can you answer that question?

4          THE WITNESS:  Yeah.

5  A    No.

6  Q    Okay.  Well then let's do it this way.

7          THE COURT:  Why do you say no?

8          THE WITNESS:  I say no because this crash test was

9  done at 30 miles an hour into a barrier.  It wasn't at

10 16 miles an hour.  Into a barrier at 30 miles per hour the

11 Delta V is greater than 30 miles an hour.  Therefore, the

12 energy in this crash test was more than three-and-a-half times

13 greater than the incident.

14          So, the values that we're looking at here cannot be

15 applied to as looking at the injuries that occurred during

16 this accident.

17         THE COURT:  Okay.

18         MR. McELFISH:  I think I can wrap this up with one

19 more question.

20         THE COURT:  I think you need to.

21 Q    Okay.  Doctor, if you look over on the right side, that's

22 the neck injury, whatever it is.

23         What's NIJ?

24 A    Neck injury criteria.

25 Q    What's the J?

Nobilini - cross - McElfish                2279

1   A    The J is -- it's neck injury criteria.

2   Q    Oh, okay.  All right, it indicates that the dummy you in

3   the eighth row was reported to have struck a camera mount.

4        Do you see that?

5        MR. BARMEN:  Objection.  Objection.

6        THE COURT:  Overruled.

7   A    I see it.

8   Q    Okay.  And the neck injury values and the head injury

9   values were much higher than the row in front --

10  A    Actually, that's not true.

11       MR. McELFISH:  Hold on a second, let me finish the

12  question.

13  Q    The head injury values were higher than the row in front

14  of it?

15  A    That's not true.

16  Q    Well, one of them is -- one dummy was 613, the other was

17  728; correct?

18  A    Yes, and the eighth row was 700.

19  Q    I understand.  And the neck injury criteria was way over,

20  like three times the criteria of the people right in front of

21  it.

22       THE COURT:  Sustained.

23  Q    I guess all I'm trying to find out, Doctor, is when you

24  have people that are all seated in the bus and people running

25  into metal stationary objects, the injury criteria or the

Nobilini - redirect - Barmen                2280

1    values go up significantly; correct?

2            MR. BARMEN:  Objection.

3            THE COURT:  Sustained.

4    Q    You would agree with me that if a person is --

5            MR. McELFISH:  Withdrawn.

6    Q    The reason why you believe people in the front seats of

7    vehicles have higher values for head injury criteria is

8    because they run into heavy, stronger, metal objects,

9    basically.  Steering wheels, dashboards, things of that

10   nature.

11   A    They're running into harder objects, yes.

12   Q    Right.  So, if they're running into harder objects and

13   from, I guess, scientifically the way you would put it is, is

14   the harder objects that they're interacting with, the higher

15   the values are going to be.

16           Is that true?

17   A    If the hard object is stationary.  If the hard object can

18   move, then not necessarily.

19           MR. McELFISH:  No further questions.  Thank you.

20   REDIRECT EXAMINATION

21   BY MR. BARMEN:

22   Q    Dr. Nobilini, you were asked on cross-examination why you

23   did not specifically criticize Colonel Smith's opinions on the

24   NAS data and related issues in your direct.

25           Do you recall that?

Nobilini - redirect - Barmen                    2281

1    A    Yes.

2    Q    Is part of the reason because Colonel Smith changed his

3    opinions between his report, his deposition and when he came

4    into trial?

5    A    Well, part of it is, yes.  The other part is that the NAS

6    data did not apply to this accident in any way.

7    Q    I was going to follow up with that, but I don't need to

8    now, thanks.

9         Mr. McElfish was critical of you for not having an

10   opinion on the forces exerted on Mr. Bauta.

11        Tell the jury again why you didn't.

12   A    It's not possible to calculate them.

13   Q    Okay.

14   A    I think both myself and Colonel Smith agree on that

15   point.

16   Q    Okay.  And the only difference on that point between you

17   and Colonel Smith was Colonel Smith still took it a step

18   further and opined that the injuries alleged in this case

19   could have happened with the forces on the bus.

20        Is that scientifically valid?

21   A    Of course not.

22   Q    You said very quickly when you were talking to the Judge

23   that the crash test data that you were looking at, the numbers

24   the hit values with the dummies, et cetera, the forces in that

25   test were three-and-a-half times the forces or the -- because

Nobilini - redirect - Barmen                    2282

1    of the Delta V in this case.

2               Is that accurate?

3    A    No.   The energy level was three-and-a-half times greater

4    in this crash test.

5    Q    Okay.

6    A    Than the subject incident.

7    Q    But that crash test was at 30 miles an hour and the

8    jury's heard that the bus was going 67 miles an hour.

9               Explain how in a 30-mile-an-hour test crash the

10   forces were three-and-a-half times higher or the energy, I'm

11   sorry, was three-and-a-half times higher.

12   A    The speed that the bus was traveling is irrelevant.   It's

13   the change in speed that occurs which is relevant.   The change

14   in speed over the time it occurs in is going to give you the

15   acceleration.

16              Acceleration times mass gives you force.   So, Delta

17   V is irrelevant.   The speed that it was traveling beforehand

18   is irrelevant.   It's the speed change that's important.

19              When a bus goes into a barrier at 30 miles an hour,

20   and hits the barrier and then it rebounds, the total change in

21   speed is actually greater than 30 miles per hour.

22              In the subject incident, the change in speed that

23   occurred was 16 miles an hour, according to Colonel Smith.

24   So, when you look at energy levels, you're basing it upon the

25   velocity.   The velocity is -- it's one-half mass times

VB        OCR        CRR

1    velocity.  The change in velocity in the incident was 16.  The

2    change of velocity in the crash test was more than 30 miles an

3    hour.

4              If you simply square the velocities, you can get the

5    proportional ratio of the energies.  The energy in the crash

6    test was three-and-a-half times greater than the subject

7    incident.

8    Q    And finally, there was talk about the armrest.

9              First off, you actually inspected this bus.

10   A    Yes.

11   Q    You inspected the interior of the bus.

12   A    I did.

13   Q    And I understand the seats were deflected but can you

14   tell the jury about how much space there is -- well.

15             MR. BARMEN:  Strike that.

16   Q    It's my understanding that there were two rows of seats

17   on each side of the aisle; an aisle seat and a window seat.

18   A    Correct.

19   Q    How much space was between the window seat and the aisle

20   seat approximately?

21   A    Just enough to fit the armrest, basically, which is

22   probably...

23   Q    Three inches?

24   A    Not even.  Inch-and-a-half, two inches.

25   Q    Okay.  So, clearly Mr. Bauta's head couldn't have fit

Nobilini - redirect - Barmen                    2284

1   through that two-inch space.

2   A     Right.

3            MR. McELFISH:  Objection, move to strike.

4            THE COURT:  Overruled.

5   Q     And the armrest itself.  Describe the armrest to the

6   jury.

7   A     The armrest was a folding armrest.  It was basically, if

8   you consider the armrest on this chair, it would fold up into

9   the seat and get out of the way so passengers could get back

10  and forth across the seat, and it would fold down in between.

11  So, it was a movable armrest.

12            It had a pivot joint at the base, so had Mr. Bauta

13  actually struck the headrest -- the armrest, excuse me -- it

14  would have simply moved and flexed forward.  It would not have

15  resisted his movements.

16            He might have had a localized contusion or bruise,

17  but as far as the accelerations of the head, it's going to

18  move out of the case and it's not going to decelerate his

19  head.  Probably not any more rapidly than it would if he had

20  hit the seat.

21  Q     And finally, this was a full size MCI Motor Coach.

22            There are more than 12 rows of seats on that bus,

23  aren't there?

24  A     I don't recall, but...

25  Q     All right.

VB          OCR          CRR

1          MR. BARMEN:  I have no further questions.  Thank you

2    for your time.

3    RECROSS-EXAMINATION

4    BY MR. McELFISH:

5    Q    Part of the armrest is stationary, isn't it?  If you have

6    it folding up, the bottom of it's still stationary.

7    A    The bottom of it is down near your elbow at rest, right?

8    Down around your waist.

9          Mr. Bauta testified that during the incident he woke

10   up, he looked, and saw the vehicle coming into contact with

11   the trailer.  The seats in that vehicle are up here.  His head

12   had to be up over the seat to see that, right?  His head was

13   upright.  When he moves forward into the seat, it's likely his

14   head's well above the armrest.  I don't even think he hit the

15   armrest, but regardless.  His head's well above.

16         There's no way his head would have been low enough

17   to contact the bottom of the armrest.

18   Q    I think you are conflating his testimony.

19         He testified that when he saw the truck come through

20   the window, that he was looking.  But then he testified that

21   when the impact occurred, he went down into the seat into the

22   armrest.

23         You didn't read that?

24         MR. BARMEN:  Objection, move to strike.

25         THE COURT:  Overruled.

1          THE WITNESS:  I can talk about that.

2   A    There were no forces that caused him to move down into

3   the armrest.  If he had been wearing a lap belt, as

4   Colonel Smith assumed, then there would be forces present that

5   caused flexion of the lumbar spine and caused his body to go

6   down.

7          But those forces were not present.  He wasn't

8   wearing a lap belt.  His body would have moved forward with

9   respect to the vehicle.  Inertial forces on his body would

10  have caused him to continue to move in the direction and speed

11  he was moving prior to the impact.  So, he would have

12  continued moving straight ahead.

13  Q    Okay.  But because the forces in this accident can't be

14  known, you don't know that, right?

15  A    I can talk about the orientations of the forces.  I can't

16  talk about the magnitude of the forces.

17         Remember, force is a vector.  Two components; it has

18  direction and magnitude.  I cannot calculate the magnitudes.

19  I can talk about the directions, though.

20  Q    You still don't know, right, Doctor?

21         You don't know where his body went because it's not

22  able to be calculated.

23  A    I know how his body went because it's based on the laws

24  of physics.  It's based upon what we see in many crash tests,

25  his body moved forward.  He had to move forward, there's no

Nobilini - recross - McElfish                    2287

1    other way it can move.

2    Q    Forward into the back of the seat where the armrest is,

3    which is metal.  Come on.

4    A    Well, I think we have --

5              MR. BARMEN:  Objection; move to strike, Your Honor.

6              THE COURT:  No, I am going to let the jury keep it.

7              All right, you are excused Doctor.

8              THE WITNESS:  Thank you.

9              (Witness excused.)

10

11             (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                     2288

1    (continuing.)

2              THE COURT:  Okay, ladies and gentlemen.  We are done

3    for the day.  The lawyers tell me that we might be finished,

4    probably will be finished with the defendant's case on Monday.

5    That means that, if we all behave, that by Tuesday we will do

6    closings.  Actually, Monday is going to be a little truncated

7    day because we have to end at 3:30 and hopefully we can get

8    done by then.

9              So, Tuesday will be closings and the jury charge and

10   then you'll -- with any time, you'll get to deliberate Tuesday

11   afternoon early evening.  Deliberate as long you want through

12   Wednesday if necessary.  It's up to you, but that's just the

13   first part of the case.  Remember, we have punitive damages

14   yet.  And that Friday we're not sitting, Friday the 18th.

15             So we're moving along quickly.  Hopefully we will be

16   able to have you out before what I told you in jury selection,

17   which was June 1st.  Hopefully.  Keep your fingers crossed.

18   Thank you.  Same admonitions; keep an open mind, don't talk,

19   no research, and just smile to everyone when you see them in

20   the hall.  Have a great weekend.

21             (Jury exits.)

22             THE COURT:  Off the record.

23             (Discussion off the record.)

24      (Matter adjourned to Monday, May 14, 2018, at 9:00 a.m.)

25

Bauta v. Greyhound Lines, et al                    2289

1                            I N D E X

2

3   WITNESS                                                PAGE

4

5     JOEL E. MORGAN

6         DIRECT EXAMINATION BY MR. MANNION               2080

7         CROSS-EXAMINATION BY MR. KIEFFER                2148

8         REDIRECT EXAMINATION BY MR. MANNION             2206

9         RECROSS-EXAMINATION BY MR. KIEFFER              2228

10        REDIRECT EXAMINATION BY MR. MANNION             2229

11    ROBERT NOBILINI

12        DIRECT EXAMINATION BY MR. BARMAN                2230

13        CROSS-EXAMINATION BY MR. McELFISH               2248

14        REDIRECT EXAMINATION BY MR. BARMEN              2280

15        RECROSS-EXAMINATION BY MR. McELFISH             2285

16

17                        E X H I B I T S

18

19    Plaintiff's Exhibit 301                              2079

20

21

22

23

24

25

Bauta v. Greyhound Lines, et al _____1

## $

**$1,234** [1] - 2052:15
**$15,000** [1] - 2033:23
**$2,000** [2] - 2036:20, 2037:5
**$3,000** [2] - 2027:14, 2027:18
**$3,500** [1] - 2149:15
**$35,000** [1] - 2042:4
**$40,000** [2] - 2149:5, 2149:17
**$400** [1] - 2091:3
**$700** [2] - 2030:20, 2030:23
**$9,000** [1] - 2030:11

## '

**'13** [1] - 2013:25
**'14** [1] - 2226:23
**'15** [1] - 2013:25
**'16** [1] - 2234:19
**'2** [1] - 2033:4
**'52** [1] - 2044:18
**'92** [1] - 2231:15

## 0

**01** [7] - 2221:20, 2224:6, 2224:10, 2224:11, 2224:12, 2224:22
**044011** [1] - 2262:18

## 1

**1** [7] - 2068:4, 2113:25, 2127:1, 2213:6, 2223:22, 2224:11, 2224:12
**10** [8] - 2023:8, 2108:12, 2174:18, 2174:20, 2192:14, 2194:7, 2276:17
**10,000** [1] - 2119:13
**100** [8] - 2089:8, 2089:18, 2091:6, 2107:11, 2108:8, 2224:8, 2224:14
**10168** [1] - 2006:18
**10573** [1] - 2007:13
**10th** [1] - 2141:3
**11** [1] - 2006:7
**110** [3] - 2018:3, 2032:12, 2133:8
**11042** [1] - 2007:17
**11201** [1] - 2007:21
**1130** [1] - 2029:10
**1131** [1] - 2029:10
**12** [6] - 2030:11, 2195:12, 2264:5, 2266:3, 2276:25, 2284:22
**1208** [1] - 2028:23
**122** [1] - 2006:17
**12345** [2] - 2106:18
**12th** [1] - 2264:11
**13** [4] - 2019:3, 2084:14, 2226:22
**1375** [1] - 2007:5
**14** [4] - 2059:1, 2118:23, 2119:11, 2288:24
**14-CV-03725(FB)(RER** [1] - 2006:3
**145** [1] - 2025:3

**14629** [1] - 2107:9
**1481** [5] - 2027:17, 2030:23, 2031:9, 2036:21
**1482** [4] - 2031:15, 2032:20, 2034:5, 2034:7
**14th** [1] - 2218:17
**15** [12] - 2119:9, 2119:11, 2132:3, 2132:10, 2206:25, 2207:2, 2214:19, 2218:23, 2219:1
**155** [1] - 2017:7
**157** [2] - 2040:15, 2040:19
**16** [41] - 2008:19, 2010:9, 2013:15, 2013:16, 2013:22, 2017:11, 2018:9, 2107:24, 2112:22, 2113:15, 2115:8, 2115:9, 2115:18, 2116:5, 2118:22, 2118:23, 2119:7, 2119:9, 2119:11, 2125:23, 2134:11, 2163:4, 2213:6, 2216:19, 2217:5, 2217:14, 2219:18, 2226:5, 2229:4, 2236:3, 2236:21, 2236:23, 2236:25, 2237:4, 2237:9, 2246:3, 2254:15, 2278:10, 2282:23, 2283:1
**1600** [1] - 2007:6
**161** [1] - 2038:9
**162** [4] - 2203:11, 2203:15, 2203:18, 2204:11
**163** [2] - 2206:22, 2207:2
**17** [1] - 2057:15
**170** [1] - 2040:19
**171** [1] - 2040:19
**173** [1] - 2096:19
**174** [1] - 2099:16
**1777** [1] - 2042:2
**18** [2] - 2112:19, 2113:15
**180** [1] - 2021:6
**1800** [1] - 2072:16
**1889** [1] - 2036:23
**18th** [1] - 2288:14
**1916** [1] - 2045:25
**1929** [1] - 2045:11
**1941** [2] - 2046:17, 2047:9
**1950s** [1] - 2238:11
**1970** [1] - 2082:12
**1983** [1] - 2007:16
**1996** [1] - 2018:19
**1996)** [1] - 2028:1
**1997** [1] - 2016:25
**1:45** [2] - 2135:15, 2135:22
**1st** [2] - 2017:12, 2288:17

## 2

**2** [4] - 2057:15, 2068:6, 2127:1, 2174:18
**2,000** [1] - 2032:20
**2-7** [1] - 2119:20, 2119:21, 2120:1
**20** [5] - 2027:14, 2027:17, 2052:4, 2214:19
**200** [1] - 2214:25

**2000** [2] - 2231:13, 2231:15
**2002** [2] - 2018:14, 2028:10
**2004** [1] - 2085:10
**2005** [2] - 2017:12, 2140:6
**2008** [1] - 2231:3
**2010** [1] - 2017:4
**2013** [3] - 2018:3, 2164:2, 2164:10
**2013)** [1] - 2032:13
**2014** [3] - 2085:10, 2249:4, 2249:8
**2016** [9] - 2010:25, 2028:23, 2091:25, 2094:17, 2138:23, 2165:9, 2165:25, 2166:9, 2234:20
**2017** [6] - 2008:23, 2017:8, 2059:25, 2092:10, 2109:15, 2165:5
**2018** [2] - 2006:7, 2288:24
**2079** [1] - 2289:19
**2080** [1] - 2289:6
**21** [4] - 2203:15, 2203:18, 2203:19, 2204:11
**2100** [1] - 2006:17
**2148** [1] - 2289:7
**218** [1] - 2017:12
**219** [1] - 2018:10
**2206** [1] - 2289:8
**2228** [1] - 2289:9
**2229** [1] - 2289:10
**2230** [1] - 2289:12
**2248** [1] - 2289:13
**225** [1] - 2007:21
**2280** [1] - 2289:14
**2285** [1] - 2289:15
**23** [3] - 2122:14, 2122:15, 2123:2
**231** [2] - 2018:19, 2027:25
**24** [4] - 2108:12, 2140:18, 2141:3, 2218:4
**24/7** [1] - 2088:12
**250** [1] - 2085:23
**27-year** [1] - 2080:20
**271** [1] - 2067:14
**287** [1] - 2017:4
**2d** [8] - 2016:24, 2017:3, 2017:8, 2018:3, 2018:14, 2027:25, 2028:9
**2nd** [2] - 2018:19

## 3

**3** [5] - 2059:1, 2059:2, 2068:9, 2127:1, 2132:9
**3,500** [1] - 2024:10
**30** [11] - 2080:20, 2091:20, 2229:18, 2263:9, 2278:9, 2278:10, 2278:11, 2282:7, 2282:19, 2282:21, 2283:2
**30-mile-an-hour** [1] - 2282:9
**30-year** [1] - 2090:10
**300** [3] - 2006:22, 2018:14, 2028:9
**301** [7] - 2013:16, 2079:3, 2079:6, 2079:12, 2079:14, 2289:19
**302** [1] - 2013:15
**307** [1] - 2046:3

**308** [1] - 2046:3
**311** [1] - 2016:24
**335** [1] - 2046:3
**338** [1] - 2046:4
**345** [1] - 2046:4
**348** [1] - 2046:5
**34th** [3] - 2014:17, 2047:8, 2133:8
**350** [1] - 2025:3
**352** [1] - 2046:6
**353** [1] - 2046:6
**36** [1] - 2040:22
**36,000** [1] - 2149:7
**3740** [1] - 2006:22
**3:30** [1] - 2288:7
**3d** [5] - 2017:8, 2017:12, 2018:3, 2018:9, 2032:12

## 4

**4** [6] - 2068:12, 2120:11, 2127:1, 2132:9, 2157:17, 2175:4
**4,500** [1] - 2033:23
**40** [5] - 2085:17, 2091:20, 2143:9, 2143:21, 2229:18
**40-310** [1] - 2218:6
**40-minute** [1] - 2047:15
**40-ounce** [2] - 2195:15, 2211:4
**403** [1] - 2051:8
**403-110** [1] - 2051:9
**404** [2] - 2218:6, 2219:8
**406-123** [1] - 2052:11
**412** [2] - 2096:18, 2096:19
**412-173** [1] - 2099:16
**412-174** [1] - 2099:20
**42** [2] - 2123:1, 2123:2
**425** [1] - 2042:21
**426** [1] - 2042:22
**428** [6] - 2042:15, 2042:18, 2042:21, 2042:23, 2043:1, 2043:5
**429** [1] - 2043:5
**42nd** [1] - 2006:17
**436** [1] - 2057:15
**438** [2] - 2042:15, 2042:23
**440** [2] - 2042:15, 2042:23
**44099** [1] - 2256:3
**44114** [1] - 2007:6
**446** [2] - 2018:14, 2028:9
**45** [2] - 2113:7, 2113:8
**450** [1] - 2044:17
**466** [1] - 2043:12
**47** [2] - 2089:10, 2113:8
**475** [1] - 2043:12
**475-0018** [1] - 2053:10
**476** [1] - 2092:20
**477** [1] - 2092:20
**48** [6] - 2027:13, 2089:11, 2107:24, 2140:18, 2141:10, 2218:4
**48-hour** [1] - 2141:3
**49** [2] - 2113:9, 2146:18

**499** [4] - 2256:2, 2256:4, 2256:5, 2262:18
**4:15** [2] - 2229:10, 2229:11
**4:30** [1] - 2175:4
**4N6** [1] - 2230:25

## 5

**5** [10] - 2068:15, 2119:7, 2126:18, 2132:9, 2174:20, 2194:15, 2219:1, 2266:2, 2276:11, 2276:14
**5,000** [1] - 2119:6
**50** [8] - 2015:24, 2089:10, 2112:10, 2112:20, 2112:22, 2113:15, 2264:4
**50a** [1] - 2015:22
**50th** [4] - 2113:21, 2113:23, 2264:20, 2264:22
**51** [1] - 2146:18
**52718** [1] - 2107:20
**52817** [1] - 2107:18
**52827** [2] - 2107:7, 2107:8
**53** [1] - 2089:11
**55** [1] - 2123:13
**58** [3] - 2191:25, 2192:12, 2194:7
**5:30** [1] - 2229:22
**5th** [1] - 2264:20

## 6

**6** [4] - 2107:25, 2120:12, 2229:22, 2262:22
**6-4** [2] - 2119:21
**60** [2] - 2150:1, 2213:2
**606** [2] - 2018:19, 2027:25
**60s** [6] - 2183:9, 2183:11, 2197:9, 2201:8, 2213:8
**613** [1] - 2279:16
**64** [2] - 2125:4, 2183:22
**64112** [1] - 2006:23
**65** [1] - 2213:2
**650** [2] - 2031:14, 2031:17
**67** [7] - 2161:5, 2204:14, 2205:3, 2226:3, 2229:4, 2255:11, 2282:8

## 7

**7** [4] - 2043:12, 2120:11, 2276:11, 2276:15
**7-2** [1] - 2120:2
**70** [5] - 2150:12, 2151:18, 2203:5, 2203:6, 2206:2
**700** [1] - 2279:18
**705** [1] - 2017:3
**70s** [2] - 2183:9
**728** [1] - 2279:17
**75** [4] - 2150:12, 2151:18, 2207:4, 2207:9
**76** [1] - 2025:1
**783** [1] - 2059:1

**785** [1] - 2059:1
**787** [1] - 2043:22
**79** [1] - 2206:2

## 8

**8** [4] - 2033:25, 2057:15, 2174:20, 2276:11
**80** [2] - 2206:1
**800** [1] - 2007:12
**805** [1] - 2043:15
**84** [1] - 2217:3
**85** [7] - 2203:3, 2203:5, 2204:23, 2205:24, 2206:1, 2206:7, 2217:3
**874** [4] - 2024:9, 2024:15, 2024:19, 2024:21
**875** [2] - 2025:1, 2025:6
**876** [1] - 2025:6
**878-9** [1] - 2027:5
**881** [2] - 2027:8, 2027:12
**882** [1] - 2027:12
**884** [1] - 2027:6
**887** [1] - 2028:21
**887-8** [1] - 2029:3
**888-9** [1] - 2029:15
**889** [1] - 2030:1
**890** [2] - 2030:9, 2031:7
**891** [4] - 2031:7, 2031:11, 2032:19, 2033:3
**892** [2] - 2033:10, 2033:14
**899** [3] - 2033:16, 2033:22, 2035:22

## 9

**90** [1] - 2016:24
**900** [2] - 2036:7, 2036:15
**901** [2] - 2036:15, 2037:7
**902** [2] - 2037:7, 2037:14
**907** [1] - 2020:7
**915** [1] - 2038:5
**916** [2] - 2038:2, 2039:22
**917** [1] - 2019:2
**929** [1] - 2019:2
**937** [3] - 2033:23, 2034:1, 2035:23
**940** [2] - 2037:16, 2038:7
**941** [3] - 2036:18, 2037:16, 2038:7
**944** [1] - 2041:14
**945** [2] - 2041:16, 2041:20
**95th** [3] - 2264:19, 2264:23, 2264:24
**973** [3] - 2018:3, 2032:12, 2032:14
**974** [1] - 2018:3
**981** [1] - 2017:8
**99** [3] - 2108:8, 2114:1, 2224:15
**9:00** [2] - 2006:7, 2288:24
**9th** [3] - 2007:5, 2218:17

## A

**A.D** [5] - 2017:8, 2017:11, 2018:3,

2018:9, 2018:14

**a.m** [2] - 2006:7, 2288:24

**Abbreviated** [1] - 2125:2

**abbreviated** [2] - 2059:19, 2084:13

**abiding** [1] - 2060:11

**abilities** [8] - 2081:19, 2083:2, 2095:1, 2095:23, 2127:22, 2181:10, 2204:15, 2204:17

**ability** [12] - 2012:4, 2083:7, 2101:18, 2102:19, 2103:11, 2121:18, 2126:1, 2126:6, 2129:17, 2131:13, 2131:14, 2196:2

**ablations** [1] - 2035:22

**able** [34] - 2009:11, 2011:4, 2023:13, 2023:14, 2041:25, 2051:23, 2055:14, 2060:13, 2071:15, 2077:11, 2077:21, 2077:25, 2096:12, 2101:12, 2102:13, 2104:14, 2126:4, 2127:22, 2130:16, 2132:5, 2132:6, 2135:3, 2144:13, 2144:21, 2175:4, 2221:4, 2235:14, 2235:22, 2240:8, 2241:13, 2243:4, 2246:10, 2286:22, 2288:16

**ABPP** [2] - 2084:13

**absen5** [1] - 2108:1

**absence** [4] - 2016:5, 2028:11, 2029:18, 2082:6

**absent** [2] - 2071:11, 2090:11

**absolutely** [29] - 2023:13, 2026:8, 2042:3, 2063:5, 2074:24, 2088:5, 2098:6, 2099:7, 2101:6, 2105:11, 2107:12, 2111:4, 2120:6, 2123:8, 2133:3, 2135:8, 2143:1, 2165:3, 2185:7, 2197:19, 2210:24, 2212:19, 2220:25, 2221:17, 2223:6, 2226:13, 2227:5, 2232:16, 2245:5

**absorb** [6] - 2238:6, 2238:13, 2239:14, 2247:4, 2247:7, 2272:20

**absorbed** [1] - 2237:19, 2238:20, 2261:8

**absorbing** [1] - 2238:14

**absorption** [2] - 2238:7, 2239:15

**abstract** [1] - 2207:21

**absurd** [1] - 2123:25

**abundance** [1] - 2099:14

**academic** [1] - 2097:17

**Academy** [4] - 2083:25, 2084:1, 2084:9, 2085:7

**acceleration** [19] - 2237:6, 2237:7, 2237:10, 2237:14, 2237:15, 2237:20, 2238:16, 2238:21, 2238:23, 2240:1, 2271:7, 2271:8, 2272:9, 2273:9, 2273:18, 2273:22, 2275:8, 2282:15, 2282:16

**accelerations** [9] - 2271:9, 2271:14, 2271:15, 2271:17, 2273:1, 2273:4, 2274:9, 2275:19, 2284:17

**accelerometers** [1] - 2271:9

**accepted** [6] - 2055:5, 2057:22, 2130:21, 2146:14, 2146:16, 2199:16

**accident** [75] - 2029:23, 2041:16,

2042:13, 2043:20, 2045:15, 2045:21, 2045:24, 2046:2, 2046:13, 2057:19, 2077:15, 2077:19, 2077:25, 2078:2, 2087:19, 2093:4, 2093:11, 2093:21, 2094:2, 2094:4, 2102:12, 2103:13, 2103:14, 2103:15, 2128:24, 2129:14, 2138:15, 2138:18, 2140:1, 2147:17, 2147:20, 2160:17, 2160:19, 2160:22, 2162:7, 2177:14, 2178:9, 2196:12, 2218:16, 2226:2, 2226:23, 2228:14, 2229:4, 2234:22, 2235:17, 2235:19, 2235:21, 2236:2, 2236:8, 2236:12, 2237:19, 2238:13, 2248:5, 2249:3, 2249:4, 2249:16, 2250:1, 2250:25, 2251:11, 2251:16, 2251:25, 2253:16, 2254:11, 2255:5, 2257:10, 2257:11, 2257:15, 2257:20, 2259:19, 2263:18, 2268:12, 2278:16, 2281:6, 2286:13

**accidents** [1] - 2250:19

**accompany** [1] - 2043:10

**according** [9] - 2025:23, 2109:15, 2209:10, 2233:14, 2238:1, 2254:18, 2254:19, 2282:23

**account** [2] - 2105:10, 2177:9

**accounts** [2] - 2150:16, 2150:19

**accurate** [3] - 2092:16, 2098:22, 2282:2

**accurately** [1] - 2235:16

**accuse** [1] - 2144:25

**achieve** [1] - 2195:3

**achievement** [1] - 2097:17

**acquiring** [1] - 2194:20

**acronym** [2] - 2181:18, 2182:4

**ACTAR** [2] - 2077:16, 2078:1

**active** [1] - 2082:9

**activities** [3] - 2069:7, 2069:25, 2156:22

**activity** [1] - 2126:7

**acts** [1] - 2068:10

**actual** [9] - 2035:18, 2067:18, 2101:11, 2153:13, 2153:14, 2217:23, 2226:4, 2238:22, 2248:5

**acute** [1] - 2132:21

**AD** [3] - 2027:25, 2028:9, 2032:12

**ad** [1] - 2018:19

**adaptive** [1] - 2037:6

**add** [4] - 2030:12, 2057:2, 2120:24

**addition** [12] - 2047:7, 2101:1, 2101:10, 2115:25, 2140:9, 2141:15, 2143:4, 2211:15, 2232:1, 2238:25, 2242:13, 2248:4

**additional** [12] - 2074:1, 2093:16, 2093:21, 2094:3, 2094:5, 2116:1, 2149:11, 2159:24, 2160:2, 2160:4, 2178:22, 2180:1

**additionally** [2] - 2010:25, 2011:6, 2077:13

**address** [16] - 2011:15, 2016:16, 2023:19, 2026:13, 2039:11, 2045:18, 2047:18, 2047:19, 2049:8, 2057:2,

2102:23, 2103:2, 2103:3, 2103:8, 2257:7

**addressed** [4] - 2011:6, 2011:21, 2046:17, 2179:4

**adduced** [1] - 2044:1

**Adebiyi** [1] - 2017:3

**ADHD** [1] - 2060:22

**adjacent** [2] - 2040:4, 2052:2

**adjourned** [1] - 2288:24

**adjust** [2] - 2173:9

**adjustment** [2] - 2083:4, 2096:1

**administer** [2] - 2167:10, 2167:11

**administered** [2] - 2167:12, 2167:13

**administers** [1] - 2167:14

**administration** [1] - 2167:7

**admit** [2] - 2013:11

**admitted** [11] - 2008:16, 2019:1, 2041:15, 2041:19, 2042:13, 2042:16, 2050:13, 2096:20, 2099:16, 2099:17, 2145:11

**admitting** [1] - 2079:3

**admonitions** [1] - 2288:18

**adolescents** [1] - 2067:15

**adult** [1] - 2218:15

**adults** [2] - 2067:15, 2080:23

**advance** [2] - 2010:18, 2164:13

**advanced** [1] - 2088:11

**adversive** [1] - 2153:17

**advocate** [1] - 2260:5

**affect** [8] - 2068:7, 2104:11, 2174:11, 2175:9, 2176:16, 2180:11, 2220:9, 2245:11

**affected** [1] - 2081:22

**affects** [1] - 2158:5

**affiliated** [1] - 2083:17

**afraid** [1] - 2088:3

**AFTERNOON** [2] - 2135:24, 2136:1

**afternoon** [10] - 2015:10, 2148:25, 2149:1, 2206:14, 2229:10, 2230:15, 2230:16, 2249:1, 2249:2, 2288:11

**afterwards** [2] - 2129:7, 2141:7

**age** [2] - 2039:10, 2114:2

**aggression** [1] - 2157:15

**ago** [5] - 2050:17, 2152:2, 2190:3, 2190:8, 2260:7

**agree** [21] - 2038:22, 2061:3, 2061:12, 2067:22, 2073:8, 2087:2, 2103:24, 2103:25, 2124:1, 2131:17, 2164:9, 2171:11, 2175:17, 2176:10, 2182:25, 2203:3, 2235:6, 2246:24, 2264:4, 2280:4, 2281:14

**agreed** [3] - 2013:11, 2224:12, 2253:20

**agreement** [1] - 2055:3

**agrees** [2] - 2053:20, 2053:22

**ahead** [11] - 2189:2, 2201:24, 2201:25, 2206:13, 2225:22, 2257:3, 2259:6, 2261:4, 2272:25, 2286:12

**AHMUTY** [1] - 2007:15

**Aided** [1] - 2007:22

**aids** [3] - 2052:23, 2053:2, 2054:4

**Air** [2] - 2082:7, 2082:8

**aisle** [3] - 2283:17, 2283:19

**akin** [2] - 2071:1, 2175:12

**AKOS** [1] - 2006:8

**Akos** [2] - 2007:4, 2007:11

**alarm** [1] - 2102:24

**alcohol** [6] - 2156:13, 2158:6, 2195:13, 2195:14, 2195:15, 2211:5

**alcoholic** [2] - 2195:16, 2211:7

**alert** [2] - 2046:23, 2131:5

**alertness** [1] - 2131:11

**ALL** [1] - 2078:16

**all-nighters** [1] - 2175:12

**Alladin** [2] - 2014:18, 2014:22

**alleged** [2] - 2211:15, 2281:18

**alleviate** [1] - 2139:4

**allow** [4] - 2011:11, 2073:16, 2073:20, 2223:25

**allowable** [1] - 2035:8

**allowed** [2] - 2231:23, 2259:5

**allows** [1] - 2015:24

**almost** [6] - 2045:6, 2052:18, 2088:9, 2101:22, 2112:4, 2217:4

**alone** [3] - 2058:23, 2089:7, 2089:9, 2105:13, 2108:6, 2114:17, 2130:14, 2262:11

**alter** [2] - 2139:22, 2197:23

**alteration** [1] - 2141:12

**alterations** [3] - 2069:11, 2156:7, 2157:10

**alternate** [1] - 2127:2

**alternative** [1] - 2245:22

**aluminum** [1] - 2233:2

**Alzheimer's** [5] - 2060:22, 2088:12, 2090:11, 2117:17, 2142:6

**America** [2] - 2085:21, 2186:15

**American** [10] - 2017:7, 2071:4, 2084:1, 2084:8, 2084:9, 2084:12, 2085:16, 2085:19, 2085:25, 2190:16

**amnesia** [1] - 2156:12

**amount** [7] - 2053:8, 2213:14, 2216:22, 2237:20, 2238:15, 2240:12, 2255:16

**amounts** [2] - 2056:15, 2199:17, 2255:16

**analogy** [1] - 2213:24

**analysis** [8] - 2057:16, 2102:7, 2114:13, 2136:18, 2226:12, 2228:22, 2235:2, 2245:6

**analyzed** [1] - 2242:20

**analyzing** [1] - 2241:16

**anatomy** [3] - 2232:3, 2232:6, 2232:18

**ancillary** [1] - 2207:15

**AND** [2] - 2006:8, 2006:13

**anderson** [1] - 2016:14

**ANDERSON** [1] - 2006:8

**Anderson** [4] - 2007:4, 2007:11,

2007:16, 2015:20

**anger** [2] - 2069:23, 2156:20

**angry** [3] - 2157:14, 2259:15, 2260:4

**animations** [1] - 2062:23

**annd** [1] - 2007:16

**anomaly** [3] - 2114:8, 2268:15

**answer** [40] - 2029:22, 2059:11, 2089:19, 2089:15, 2092:15, 2095:7, 2096:1, 2098:12, 2101:15, 2101:16, 2101:19, 2108:11, 2108:13, 2122:15, 2127:24, 2127:25, 2165:23, 2182:12, 2194:3, 2194:7, 2194:10, 2194:13, 2204:4, 2207:12, 2207:22, 2208:16, 2224:16, 2228:8, 2252:3, 2252:14, 2254:1, 2254:5, 2258:19, 2264:9, 2272:23, 2272:24, 2274:1, 2274:16, 2278:3

**ANSWER** [6] - 2204:16, 2204:19, 2204:22, 2207:5, 2207:7, 2207:15

**answered** [2] - 2170:25, 2183:17

**answering** [1] - 2213:24

**answers** [19] - 2008:22, 2105:15, 2105:16, 2109:24, 2123:6, 2123:10, 2127:21, 2192:15, 2195:7, 2195:20, 2203:20, 2204:12, 2205:1, 2208:13, 2212:15, 2222:25, 2227:8, 2227:21, 2227:25

**anti** [2] - 2036:20, 2051:18

**anti-inflammatories** [1] - 2036:20

**anticipate** [1] - 2229:17

**anxiety** [3] - 2097:18, 2134:24, 2138:14

**anxious** [4] - 2134:2, 2134:6, 2134:23, 2134:25

**anyhow** [1] - 2052:8

**anyway** [2] - 2055:7, 2228:24

**apart** [1] - 2241:20

**apologies** [1] - 2010:18

**apologize** [8] - 2010:2, 2010:3, 2041:6, 2164:12, 2203:17, 2219:7, 2219:9, 2219:21

**Appeals** [1] - 2016:25

**appear** [1] - 2086:13

**appeared** [2] - 2057:18, 2103:18

**appearing** [1] - 2015:19

**Appellate** [1] - 2021:13

**apples** [3] - 2193:6, 2273:8

**application** [11] - 2008:9, 2010:22, 2011:3, 2011:4, 2011:7, 2011:12, 2012:25, 2013:3, 2093:24, 2257:14, 2257:21

**applications** [2] - 2009:22, 2011:9

**applied** [5] - 2017:2, 2232:22, 2233:13, 2242:23, 2278:15

**apply** [5] - 2067:15, 2233:4, 2233:5, 2236:21, 2281:6

**applying** [1] - 2233:10

**appointment** [2] - 2100:17, 2100:25

**appointments** [2] - 2045:10, 2083:12

**appreciate** [4] - 2047:13, 2150:20,

2230:17, 2236:6

**approach** [6] - 2092:19, 2168:12, 2190:24, 2199:2, 2203:7, 2277:15

**approaches** [1] - 2092:23

**appropriate** [3] - 2019:14, 2138:17, 2221:24

**appropriately** [3] - 2132:5, 2132:6, 2132:7

**approve** [1] - 2019:14

**approximate** [1] - 2150:3

**Ardis** [2] - 2064:19, 2066:23

**area** [11] - 2125:18, 2126:3, 2135:11, 2142:13, 2162:1, 2162:2, 2162:12, 2194:17, 2238:19, 2248:14, 2277:25

**areas** [8] - 2054:8, 2056:25, 2082:21, 2158:4, 2173:6, 2213:19, 2230:22, 2238:12

**arguably** [1] - 2068:18

**argue** [3] - 2030:24, 2036:2, 2037:16

**arguing** [2] - 2071:23, 2268:7

**argument** [9] - 2043:2, 2045:19, 2047:15, 2048:6, 2048:8, 2048:13, 2055:11, 2137:1, 2137:4

**arguments** [2] - 2021:21, 2048:21, 2055:24, 2076:25, 2077:2, 2078:4

**arise** [1] - 2099:2

**arithmetic** [1] - 2213:16

**arm** [1] - 2239:22

**armrest** [21] - 2268:20, 2274:25, 2275:3, 2275:11, 2275:18, 2283:8, 2283:21, 2284:5, 2284:7, 2284:8, 2284:11, 2284:13, 2285:5, 2285:14, 2285:15, 2285:17, 2285:22, 2286:3, 2287:2

**arousal** [1] - 2157:10

**arouse** [1] - 2069:8

**arriving** [1] - 2179:15

**artery** [1] - 2142:16

**articles** [2] - 2086:15, 2176:22

**articulated** [1] - 2137:19

**articulating** [1] - 2065:18

**artificially** [1] - 2197:23

**ASD** [1] - 2040:4

**aside** [2] - 2017:13, 2030:22

**asleep** [4] - 2100:21, 2127:16, 2157:19, 2175:4

**aspect** [5] - 2068:14, 2068:16, 2069:15, 2156:11, 2222:17

**aspects** [2] - 2103:16

**assess** [6] - 2095:22, 2098:8, 2122:9, 2175:23, 2182:7, 2221:23

**assessed** [1] - 2098:10

**assesses** [1] - 2122:9

**assessing** [2] - 2098:19, 2099:13

**assessment** [12] - 2059:11, 2081:18, 2094:19, 2141:24, 2170:14, 2171:2, 2173:23, 2181:11, 2181:12, 2222:16, 2222:19, 2222:20

**assigns** [1] - 2026:25

**assistant** [3] - 2091:8, 2102:14,

2167:8
**assisted** [1] - 2129:14
**assisting** [1] - 2091:7
**associated** [11] - 2017:22, 2018:21, 2028:4, 2068:2, 2068:25, 2069:4, 2069:9, 2069:12, 2156:8, 2157:11, 2177:14
**Association** [5] - 2084:3, 2085:4, 2085:16, 2085:19, 2085:25
**associations** [1] - 2083:23
**Assume** [1] - 2248:4
**assume** [18] - 2044:1, 2048:12, 2103:1, 2107:7, 2123:6, 2125:8, 2130:6, 2141:15, 2145:10, 2167:23, 2274:23, 2275:9, 2276:6, 2276:7, 2277:12, 2277:17, 2277:19, 2277:20
**assumed** [1] - 2286:4
**assuming** [2] - 2131:5, 2226:21
**assumption** [2] - 2276:24, 2277:2
**assumptions** [4] - 2154:8, 2274:22, 2275:1, 2275:2
**assured** [2] - 2098:21, 2222:8
**asthma** [1] - 2195:18
**astronomical** [2] - 2225:8, 2225:9
**athletes** [2] - 2081:15, 2130:13
**attached** [4] - 2013:25
**attack** [1] - 2071:3
**attempt** [1] - 2011:1
**attempting** [1] - 2127:8
**attempts** [1] - 2011:5
**attended** [3] - 2191:22, 2194:17, 2194:22
**attending** [1] - 2017:13
**attention** [9] - 2008:15, 2083:10, 2095:23, 2097:9, 2099:2, 2100:12, 2101:8, 2159:14, 2212:9
**attorney** [4] - 2090:18, 2099:23, 2135:20, 2172:4
**Attorney** [1] - 2090:19
**attorneys** [11] - 2006:21, 2007:15, 2090:19, 2096:12, 2172:2, 2179:25, 2185:13, 2214:13, 2222:4, 2222:18
**Attorneys** [3] - 2006:16, 2007:3, 2007:10
**attributable** [2] - 2057:21, 2158:5
**auditory** [3] - 2083:11, 2143:4, 2143:8
**authorization** [2] - 2012:7, 2012:20
**authorizations** [3] - 2009:17, 2009:18, 2009:21
**automatic** [1] - 2216:1
**automobile** [1] - 2238:10
**automobiles** [2] - 2238:9, 2250:15
**available** [3] - 2028:12, 2065:14, 2250:17
**Avenue** [3] - 2006:22, 2007:12, 2007:16
**average** [2] - 2206:1, 2264:23
**avoid** [6] - 2069:3, 2069:6, 2101:17, 2127:25, 2227:2, 2227:3
**avoidance** [7] - 2068:24, 2069:3,

2069:6, 2134:18, 2154:5, 2155:12, 2226:21
**avoided** [1] - 2135:5
**awake** [1] - 2131:11
**award** [12] - 2017:4, 2017:12, 2017:22, 2017:23, 2018:21, 2018:24, 2028:3, 2028:11, 2031:18, 2031:19, 2042:5, 2056:7
**awarded** [1] - 2021:5
**awards** [3] - 2017:1, 2017:16, 2031:24
**aware** [11] - 2015:23, 2131:5, 2167:23, 2168:5, 2169:7, 2172:18, 2173:11, 2175:2, 2190:5, 2199:23, 2245:13
**awareness** [5] - 2131:11, 2131:14, 2131:19, 2131:20, 2169:11
**awful** [1] - 2130:15

## B

**Bachelor's** [2] - 2091:14, 2231:6
**bachelors** [1] - 2082:15
**back-door** [1] - 2257:5
**background** [5] - 2102:5, 2103:15, 2231:5, 2231:14, 2232:13
**backing** [2] - 2250:4, 2254:22
**backwards** [4] - 2021:5, 2120:1, 2161:25, 2276:7
**bad** [2] - 2156:15, 2214:10
**badly** [1] - 2081:22
**balance** [1] - 2131:3
**ball** [5] - 2239:21, 2239:22, 2239:24, 2239:25, 2240:1
**ballpark** [1] - 2234:15
**banana** [1] - 2115:13
**bar** [10] - 2009:9, 2058:23, 2199:3, 2199:4, 2199:7, 2202:8, 2266:17, 2266:18, 2267:1, 2270:5
**Barclays** [1] - 2009:19
**barely** [1] - 2130:14
**Barman** [1] - 2090:21
**BARMAN** [2] - 2230:14, 2289:12
**BARMEN** [73] - 2007:7, 2013:21, 2014:6, 2014:8, 2014:14, 2014:23, 2015:2, 2015:7, 2015:14, 2075:25, 2078:13, 2078:20, 2079:11, 2137:8, 2137:18, 2137:24, 2201:12, 2201:14, 2229:15, 2229:17, 2230:2, 2234:6, 2234:12, 2234:14, 2234:17, 2243:12, 2245:2, 2248:22, 2249:24, 2250:6, 2250:22, 2251:20, 2252:1, 2252:10, 2252:12, 2253:9, 2254:7, 2255:13, 2255:25, 2256:3, 2256:17, 2257:4, 2260:2, 2260:8, 2260:15, 2260:18, 2262:9, 2263:19, 2264:6, 2266:15, 2269:7, 2269:16, 2269:20, 2269:25, 2271:22, 2272:11, 2273:17, 2273:20, 2274:14, 2275:14, 2275:16, 2277:7, 2277:14, 2278:2, 2279:5, 2280:2, 2280:21, 2283:15, 2285:1, 2285:24, 2287:5, 2289:14

**Barmen** [5] - 2013:11, 2079:17, 2252:21, 2259:18, 2260:19
**Barmen's** [2] - 2059:18, 2165:5
**barrier** [6] - 2250:9, 2263:9, 2278:9, 2278:10, 2282:19, 2282:20
**bars** [2] - 2037:8, 2053:23
**base** [2] - 2019:20, 2284:12
**baseball** [2] - 2161:25, 2239:20
**based** [30] - 2011:11, 2023:12, 2024:1, 2027:1, 2034:11, 2034:23, 2035:3, 2045:12, 2057:15, 2057:22, 2060:12, 2060:17, 2064:3, 2066:16, 2068:19, 2087:5, 2110:1, 2128:4, 2144:18, 2145:2, 2147:5, 2147:14, 2212:3, 2233:10, 2233:19, 2252:16, 2257:21, 2271:22, 2286:23, 2286:24
**baseline** [5] - 2081:19, 2081:22, 2163:7, 2163:8, 2163:9
**bases** [1] - 2019:5
**basic** [5] - 2137:1, 2207:9, 2207:16, 2262:25, 2263:2
**basing** [1] - 2282:24
**basis** [21] - 2016:3, 2016:17, 2023:18, 2036:8, 2038:10, 2040:6, 2040:13, 2040:25, 2048:18, 2056:18, 2077:18, 2144:16, 2145:2, 2146:24, 2152:25, 2199:21, 2199:22, 2235:3, 2246:5, 2246:6, 2246:9
**basketball** [1] - 2009:19
**Bate's** [1] - 2218:6
**batter** [1] - 2059:14
**battery** [2] - 2058:12, 2059:19
**battle** [1] - 2020:17
**bauta** [4] - 2097:13, 2100:1, 2168:16, 2240:7
**BAUTA** [1] - 2006:3
**Bauta** [155] - 2006:16, 2006:21, 2025:19, 2041:24, 2045:20, 2050:16, 2057:17, 2058:15, 2060:14, 2062:16, 2062:21, 2064:11, 2064:25, 2065:15, 2066:18, 2067:23, 2068:19, 2075:16, 2080:25, 2081:1, 2087:6, 2087:12, 2087:16, 2087:19, 2088:2, 2088:7, 2089:5, 2094:8, 2094:14, 2095:16, 2096:16, 2096:24, 2098:2, 2100:5, 2100:11, 2101:11, 2101:13, 2102:13, 2102:22, 2103:2, 2104:1, 2104:16, 2107:15, 2107:23, 2109:12, 2109:15, 2109:17, 2109:25, 2111:7, 2112:9, 2112:14, 2112:15, 2112:19, 2114:4, 2118:24, 2121:12, 2123:14, 2123:16, 2123:18, 2123:21, 2126:19, 2127:10, 2128:7, 2128:23, 2129:13, 2130:2, 2130:7, 2132:25, 2133:6, 2133:24, 2134:14, 2134:15, 2134:22, 2138:14, 2141:16, 2143:17, 2147:6, 2147:8, 2147:15, 2148:6, 2152:4, 2158:22, 2160:11, 2160:16, 2162:6, 2162:12, 2162:21, 2164:22, 2165:9, 2165:11, 2165:18, 2165:25, 2166:17, 2167:10,

2169:4, 2169:21, 2171:5, 2171:24, 2172:19, 2175:3, 2175:21, 2176:24, 2178:10, 2178:17, 2178:25, 2184:22, 2186:10, 2186:17, 2189:23, 2190:5, 2190:15, 2193:3, 2199:13, 2200:3, 2201:7, 2205:7, 2209:6, 2210:11, 2210:17, 2210:22, 2211:2, 2211:4, 2211:13, 2212:2, 2212:6, 2212:24, 2213:22, 2214:1, 2216:8, 2217:20, 2218:18, 2221:23, 2222:24, 2226:21, 2227:8, 2235:18, 2235:20, 2235:24, 2236:4, 2237:25, 2238:7, 2238:18, 2240:23, 2242:11, 2242:19, 2243:11, 2251:24, 2267:12, 2267:13, 2274:23, 2281:10, 2284:12, 2285:9

**Bauta's** [32] - 2062:9, 2063:10, 2066:16, 2070:18, 2087:14, 2103:11, 2113:13, 2122:25, 2143:24, 2144:5, 2164:1, 2165:4, 2169:15, 2172:16, 2178:6, 2179:9, 2183:11, 2183:21, 2183:23, 2200:14, 2228:13, 2239:16, 2240:5, 2240:16, 2241:18, 2243:5, 2251:15, 2253:16, 2253:23, 2254:10, 2277:4, 2283:25

**bauta's** [2] - 2013:10, 2103:23

**beam** [1] - 2233:3

**bear** [3] - 2021:21, 2159:4, 2179:17

**bears** [1] - 2159:2

**become** [4] - 2084:16, 2085:12, 2086:5, 2099:3

**becomes** [1] - 2255:15

**beep** [1] - 2143:14

**BEFORE** [1] - 2006:12

**beforehand** [1] - 2282:17

**begin** [5] - 2149:3, 2167:2, 2220:1, 2263:24, 2264:1

**beginning** [13] - 2026:17, 2026:19, 2038:13, 2068:2, 2068:25, 2069:12, 2091:5, 2101:20, 2156:8, 2157:11, 2192:14, 2194:7, 2221:19

**begins** [1] - 2203:6

**behalf** [8] - 2015:19, 2015:20, 2150:11, 2150:23, 2151:18, 2209:24, 2215:2, 2215:6

**behave** [3] - 2232:19, 2232:22, 2288:5

**behavior** [4] - 2083:1, 2102:8, 2157:13, 2157:16

**behind** [2] - 2112:2, 2263:4

**beliefs** [3] - 2069:17, 2156:14, 2209:11

**believes** [4] - 2022:1, 2070:22, 2071:8, 2071:19

**belong** [1] - 2024:6

**below** [19] - 2010:10, 2066:7, 2088:8, 2089:5, 2089:12, 2105:14, 2112:20, 2114:5, 2118:13, 2120:11, 2121:20, 2142:3, 2186:23, 2203:3, 2204:23, 2212:7, 2212:10, 2212:14, 2248:12

**belt** [11] - 2241:22, 2241:23, 2242:6, 2242:7, 2242:8, 2242:9, 2264:17, 2264:18, 2286:3, 2286:8

**belts** [2] - 2267:23, 2267:24

**bends** [1] - 2238:5

**beneficial** [1] - 2232:14

**benefits** [1] - 2151:9

**bent** [1] - 2248:14

**best** [6] - 2098:11, 2098:20, 2098:25, 2118:6, 2222:5, 2224:6

**better** [19] - 2089:24, 2100:24, 2113:24, 2114:2, 2120:12, 2163:1, 2163:3, 2163:6, 2163:9, 2163:18, 2167:15, 2193:5, 2208:2, 2216:19, 2217:4, 2219:18, 2232:19

**between** [20] - 2051:2, 2051:3, 2085:10, 2118:23, 2151:14, 2159:23, 2209:5, 2210:6, 2211:11, 2219:2, 2229:22, 2241:4, 2241:7, 2241:10, 2247:3, 2271:25, 2281:3, 2281:16, 2283:19, 2284:10

**Beverly** [1] - 2040:11

**beyond** [1] - 2070:20

**bifurcate** [1] - 2077:4

**bifurcated** [1] - 2077:11

**big** [5] - 2035:21, 2038:1, 2038:2, 2041:8, 2265:4

**big-ticket** [3] - 2038:1, 2038:2, 2041:8

**bigger** [1] - 2110:25

**bill** [3] - 2046:16, 2046:18, 2047:8

**billed** [3] - 2047:9, 2149:5, 2149:8

**billing** [1] - 2091:22

**bills** [4] - 2044:21, 2093:5, 2149:9, 2149:10

**binders** [2] - 2009:12, 2009:14

**biomechanical** [17] - 2136:16, 2136:18, 2226:12, 2228:20, 2231:11, 2231:17, 2232:15, 2232:20, 2234:3, 2234:8, 2234:11, 2235:9, 2245:6, 2248:19, 2249:18, 2257:18, 2269:13

**biomechanically** [1] - 2276:21

**biomechanics** [13] - 2014:16, 2077:20, 2230:21, 2231:10, 2232:24, 2233:23, 2243:9, 2249:14, 2251:1, 2251:15, 2253:15, 2257:13

**BISGAARD** [1] - 2007:3

**bit** [12] - 2059:19, 2061:14, 2071:24, 2080:17, 2140:15, 2142:3, 2149:6, 2167:20, 2230:19, 2231:4, 2246:18, 2269:18

**blame** [3] - 2069:21, 2154:9, 2156:19

**blamed** [1] - 2242:4

**bleeding** [1] - 2142:25

**block** [1] - 2036:7

**blocks** [4] - 2033:18, 2034:6, 2034:18, 2052:1

**blood** [2] - 2207:15, 2207:16

**board** [12] - 2082:21, 2082:22, 2084:7, 2084:10, 2084:11, 2084:16, 2084:22, 2085:2, 2085:6, 2085:8, 2085:13, 2091:15

**Board** [2] - 2084:8, 2084:12

**bodily** [1] - 2223:7

**body** [33] - 2160:24, 2228:13, 2232:6, 2233:8, 2233:22, 2237:1, 2237:16, 2238:4, 2239:4, 2239:6, 2239:7, 2239:16, 2239:18, 2240:5, 2240:9, 2240:16, 2241:17, 2241:20, 2242:1, 2242:21, 2242:23, 2243:5, 2248:15, 2255:15, 2271:14, 2274:9, 2286:5, 2286:8, 2286:9, 2286:21, 2286:23, 2286:25

**boil** [1] - 2164:22

**bona** [1] - 2058:22

**bone** [9] - 2233:9, 2233:11, 2233:15, 2233:16, 2233:17, 2233:18

**bones** [3] - 2233:12, 2233:13

**book** [6] - 2067:2, 2067:13, 2111:10, 2111:16, 2111:18, 2155:6

**books** [2] - 2086:14

**borderline** [9] - 2059:22, 2059:24, 2203:6, 2206:2, 2207:7, 2207:8, 2207:25, 2208:5

**boring** [1] - 2100:4

**born** [4] - 2186:17, 2190:18, 2194:13, 2210:13

**bottle** [1] - 2104:6

**bottles** [2] - 2195:15, 2211:4

**bottom** [6] - 2098:23, 2098:24, 2160:11, 2285:6, 2285:7, 2285:17

**bound** [1] - 2111:10

**Bovsun** [1] - 2075:3

**Bovsun/Sanperi** [1] - 2075:8

**box** [1] - 2063:25

**brace** [3] - 2050:14, 2053:24, 2053:25

**BRADLEY** [1] - 2007:7

**brain** [39] - 2016:11, 2042:9, 2042:10, 2045:9, 2057:18, 2059:4, 2059:8, 2059:16, 2060:2, 2060:14, 2061:1, 2062:21, 2063:11, 2063:16, 2063:17, 2083:1, 2089:3, 2097:8, 2126:3, 2142:5, 2142:6, 2142:11, 2142:17, 2147:20, 2159:13, 2161:16, 2161:23, 2177:2, 2177:9, 2220:8, 2220:9, 2220:11, 2220:12, 2220:13, 2220:16, 2225:25, 2226:1

**brain-related** [1] - 2097:8

**brakes** [1] - 2236:22

**branch** [2] - 2036:7, 2051:25

**break** [15] - 2054:13, 2076:8, 2096:3, 2099:11, 2104:24, 2135:14, 2168:25, 2169:24, 2187:24, 2202:6, 2206:11, 2206:14, 2222:2, 2229:10

**breakdown** [1] - 2051:2

**breaks** [4] - 2101:24, 2101:25, 2120:3

**brief** [7] - 2071:13, 2071:25, 2072:16, 2073:20, 2087:10, 2168:11, 2194:8

**briefed** [1] - 2049:5

**briefly** [5] - 2020:24, 2072:10, 2086:12, 2092:24, 2167:22

**bring** [8] - 2008:14, 2009:8, 2099:2, 2100:12, 2101:8, 2137:3, 2138:6, 2236:22

**brings** [2] - 2038:12, 2149:23
**BRISBOIS** [1] - 2007:3
**broad** [2] - 2181:5, 2181:14
**broader** [2] - 2146:16, 2146:17
**broke** [1] - 2167:24
**broken** [2] - 2221:15, 2227:11
**Brook** [1] - 2007:13
**Brookdale** [6] - 2093:7, 2132:22, 2140:4, 2141:2, 2216:14, 2218:12
**Brooklyn** [4] - 2006:5, 2009:20, 2080:21, 2190:18
**brother** [2] - 2043:5, 2093:24
**brother-in-law** [2] - 2043:5, 2093:24
**brought** [5] - 2039:10, 2095:10, 2137:16, 2252:6, 2261:21
**bruise** [1] - 2284:16
**brunt** [1] - 2267:3
**brush** [1] - 2053:22
**buckling** [1] - 2248:15
**build** [1] - 2270:2
**bulk** [2] - 2150:19, 2217:2
**bumping** [1] - 2228:9
**bunch** [1] - 2014:19
**burden** [4] - 2009:25, 2010:16, 2026:23, 2044:2
**bus** [103] - 2045:20, 2045:23, 2057:19, 2074:20, 2134:2, 2134:7, 2134:22, 2135:4, 2136:20, 2137:2, 2137:6, 2137:7, 2137:23, 2161:4, 2226:22, 2227:2, 2227:3, 2237:17, 2238:2, 2238:3, 2238:4, 2238:5, 2238:19, 2238:22, 2238:24, 2239:9, 2239:14, 2240:18, 2242:13, 2243:22, 2245:3, 2245:10, 2246:21, 2246:23, 2247:2, 2247:6, 2247:9, 2247:10, 2247:12, 2247:13, 2247:17, 2247:18, 2247:21, 2247:24, 2248:6, 2248:7, 2248:8, 2248:9, 2248:10, 2248:13, 2248:17, 2249:7, 2249:11, 2256:14, 2258:1, 2258:12, 2259:1, 2259:2, 2259:9, 2261:8, 2261:11, 2261:15, 2261:24, 2261:25, 2262:6, 2262:25, 2263:8, 2263:14, 2263:15, 2264:1, 2264:4, 2264:11, 2264:15, 2267:11, 2267:13, 2267:24, 2267:25, 2268:2, 2268:6, 2268:7, 2268:10, 2274:24, 2275:25, 2276:8, 2276:25, 2277:1, 2277:5, 2277:10, 2279:24, 2281:19, 2282:8, 2282:12, 2282:19, 2283:9, 2283:11, 2284:22
**busses** [1] - 2045:24
**but..** [1] - 2284:24
**buying** [1] - 2201:18
**buzzing** [1] - 2131:6
**BY** [59] - 2006:18, 2006:23, 2007:7, 2007:13, 2007:17, 2080:16, 2089:1, 2109:2, 2120:23, 2138:12, 2148:24, 2151:1, 2156:1, 2173:2, 2179:23, 2183:20, 2189:4, 2191:3, 2192:11, 2194:5, 2195:11, 2198:16, 2203:2,

2204:10, 2206:18, 2208:10, 2218:11, 2220:6, 2221:1, 2223:19, 2225:3, 2228:6, 2229:2, 2230:14, 2234:14, 2245:2, 2248:25, 2250:3, 2252:5, 2252:17, 2253:6, 2254:9, 2256:6, 2261:6, 2262:21, 2263:21, 2265:8, 2271:2, 2280:21, 2285:4, 2289:6, 2289:7, 2289:8, 2289:9, 2289:10, 2289:12, 2289:13, 2289:14, 2289:15

---

# C

**C-700** [1] - 2007:12
**cabbage** [2] - 2115:15, 2117:11
**cadavers** [2] - 2232:2, 2232:3
**Cadman** [1] - 2007:21
**calculate** [15] - 2235:20, 2236:7, 2236:13, 2240:9, 2240:15, 2241:14, 2243:4, 2253:19, 2254:25, 2258:24, 2269:3, 2269:25, 2281:12, 2286:18
**calculated** [3] - 2243:17, 2246:8, 2286:22
**calculating** [1] - 2255:16
**calculations** [1] - 2252:25
**Caldwell** [1] - 2021:9
**California** [7] - 2114:21, 2118:11, 2118:14, 2125:22, 2166:13, 2212:5, 2212:25
**camera** [6] - 2115:12, 2118:18, 2118:21, 2267:11, 2269:20, 2279:3
**cancer** [1] - 2073:11
**candidate** [2] - 2084:16, 2084:25
**candidates** [2] - 2085:14
**candor** [1] - 2035:9
**cane** [5] - 2037:19, 2037:20, 2054:1, 2128:9, 2128:12
**cannot** [25] - 2012:23, 2017:20, 2018:5, 2019:1, 2019:13, 2019:19, 2019:24, 2034:16, 2045:1, 2045:2, 2075:1, 2075:13, 2075:16, 2076:6, 2130:12, 2212:17, 2232:12, 2240:23, 2254:12, 2259:23, 2268:7, 2269:3, 2269:13, 2278:14, 2286:18
**cap** [1] - 2161:25
**capable** [2] - 2052:9, 2109:17
**car** [4] - 2115:12, 2236:21, 2236:22, 2236:25
**Cardiology's** [1] - 2071:5
**care** [42] - 2016:17, 2018:1, 2018:18, 2019:8, 2019:20, 2020:2, 2021:18, 2021:24, 2022:1, 2023:6, 2032:1, 2036:14, 2040:17, 2041:5, 2041:12, 2041:16, 2041:18, 2041:20, 2041:25, 2042:4, 2044:12, 2048:4, 2048:10, 2048:14, 2048:18, 2048:20, 2048:22, 2050:22, 2051:4, 2052:10, 2052:20, 2052:24, 2053:2, 2053:9, 2056:1, 2056:2, 2056:7, 2057:5, 2057:7, 2057:8, 2178:23
**career** [4] - 2090:6, 2090:10, 2214:21,

2232:15
**carefully** [1] - 2054:23
**carriage** [1] - 2236:19
**carried** [1] - 2227:16
**carriers** [3] - 2150:18, 2150:23, 2151:3
**cars** [1] - 2272:7
**CARTMELL** [1] - 2006:20
**case** [122] - 2008:11, 2008:19, 2012:11, 2012:24, 2015:4, 2016:2, 2016:12, 2016:23, 2018:9, 2018:10, 2018:13, 2018:17, 2018:20, 2020:3, 2020:25, 2021:9, 2025:12, 2027:23, 2031:21, 2032:5, 2035:4, 2035:9, 2039:10, 2039:21, 2054:5, 2056:1, 2056:2, 2056:5, 2059:2, 2071:2, 2071:23, 2073:11, 2074:2, 2074:5, 2074:12, 2075:23, 2076:6, 2076:9, 2076:13, 2076:16, 2076:19, 2077:1, 2077:5, 2077:10, 2077:14, 2078:7, 2084:23, 2087:12, 2090:15, 2091:4, 2091:24, 2095:16, 2099:22, 2114:7, 2137:3, 2139:7, 2144:11, 2145:8, 2146:2, 2146:5, 2149:3, 2149:17, 2150:12, 2159:17, 2159:18, 2162:16, 2168:3, 2171:20, 2172:16, 2178:1, 2185:2, 2185:4, 2185:6, 2185:12, 2186:8, 2189:5, 2189:14, 2189:19, 2195:23, 2195:25, 2196:3, 2196:24, 2197:6, 2197:17, 2198:2, 2199:10, 2203:15, 2205:10, 2205:22, 2208:25, 2209:3, 2209:6, 2209:13, 2209:17, 2209:19, 2211:21, 2217:16, 2220:19, 2228:22, 2234:15, 2234:25, 2235:4, 2236:16, 2237:5, 2237:6, 2238:18, 2241:12, 2243:2, 2245:13, 2246:10, 2249:15, 2249:19, 2249:25, 2250:25, 2257:22, 2281:18, 2282:1, 2284:18, 2288:4, 2288:13
**cases** [16] - 2057:3, 2057:4, 2074:14, 2084:20, 2084:21, 2145:21, 2150:6, 2150:10, 2150:15, 2150:16, 2151:17, 2180:16, 2184:25, 2230:21, 2234:21, 2237:4
**CAT** [1] - 2132:20
**catch** [1] - 2239:22
**catchall** [1] - 2235:25
**categories** [11] - 2036:19, 2062:20, 2063:10, 2063:13, 2064:21, 2070:17, 2071:25, 2153:3, 2153:7, 2153:8, 2164:23
**categorize** [1] - 2036:12
**categorized** [1] - 2059:21
**Category** [1] - 2157:20
**category** [10] - 2020:22, 2039:4, 2057:23, 2063:20, 2072:17, 2074:1, 2074:16, 2157:10, 2157:23, 2158:8
**causally** [4] - 2043:20, 2043:22, 2044:4, 2046:13
**causally-related** [1] - 2046:13
**causation** [8] - 2042:22, 2044:9,

2044:14, 2077:17, 2249:14, 2251:4, 2269:11, 2269:14
**CAUSE** [1] - 2006:12
**caused** [9] - 2042:13, 2057:18, 2057:19, 2102:24, 2233:14, 2286:2, 2286:5, 2286:10
**causes** [1] - 2158:2
**causing** [1] - 2154:10
**caution** [1] - 2099:14
**CAV** [3] - 2006:9, 2007:4, 2007:11
**ceiling** [2] - 2204:21, 2204:22
**cells** [2] - 2233:16, 2233:18
**Center** [3] - 2009:19, 2083:20, 2083:21
**center** [1] - 2009:19
**cephalexin** [1] - 2051:20
**cerebral** [1] - 2142:16
**certain** [13] - 2029:12, 2160:21, 2167:2, 2167:3, 2176:17, 2176:23, 2180:11, 2196:23, 2212:19, 2213:14, 2220:9, 2233:15, 2233:17
**certainly** [16] - 2014:8, 2037:5, 2045:14, 2046:12, 2049:8, 2052:9, 2053:4, 2063:23, 2064:14, 2179:14, 2210:21, 2215:1, 2220:16, 2227:2, 2248:7, 2269:16
**certainty** [27] - 2016:18, 2016:21, 2017:21, 2026:3, 2026:8, 2028:17, 2040:16, 2041:2, 2046:20, 2048:7, 2057:17, 2058:20, 2062:16, 2087:3, 2128:23, 2144:5, 2146:13, 2147:8, 2147:15, 2147:24, 2212:18, 2227:10, 2235:23, 2243:7, 2248:20, 2255:18
**certificate** [2] - 2094:6, 2207:11
**certification** [2] - 2084:10, 2084:11
**certified** [7] - 2082:21, 2082:22, 2084:16, 2084:22, 2085:2, 2085:13, 2091:15
**cervical** [21] - 2021:2, 2032:21, 2033:17, 2038:4, 2038:6, 2038:10, 2038:11, 2038:18, 2038:21, 2039:3, 2051:23, 2052:19, 2052:20, 2054:11, 2054:16, 2054:21, 2055:3, 2173:7, 2242:3, 2242:4, 2242:10
**cetera** [2] - 2097:8, 2281:24
**chair** [6] - 2023:9, 2037:7, 2053:22, 2111:18, 2111:19, 2284:8
**challenge** [2] - 2058:19, 2058:22
**chance** [42] - 2089:5, 2089:7, 2089:9, 2089:12, 2089:16, 2089:17, 2089:19, 2089:22, 2089:24, 2090:2, 2105:14, 2108:6, 2108:8, 2108:12, 2112:20, 2114:3, 2114:5, 2114:7, 2114:8, 2114:15, 2114:16, 2119:1, 2119:14, 2120:25, 2128:3, 2139:19, 2186:23, 2211:17, 2212:7, 2212:8, 2212:11, 2223:21, 2224:6, 2224:9, 2224:15, 2225:10, 2225:11, 2258:18, 2260:11
**chances** [1] - 2225:6
**change** [22] - 2008:13, 2129:6, 2159:21, 2225:18, 2226:4, 2226:15,

2233:10, 2237:10, 2237:11, 2237:12, 2243:1, 2243:2, 2251:12, 2271:15, 2271:16, 2282:13, 2282:18, 2282:20, 2282:22, 2283:1, 2283:2
**changed** [1] - 2281:2
**changes** [1] - 2238:15
**changing** [1] - 2237:9
**chapters** [1] - 2086:13
**characteristics** [1] - 2240:10
**characterizations** [1] - 2060:19
**characterized** [2] - 2194:18, 2194:19
**charge** [11] - 2015:6, 2015:8, 2020:20, 2020:23, 2040:7, 2057:3, 2057:5, 2074:3, 2091:21, 2149:11, 2288:9
**charged** [1] - 2197:18
**charges** [1] - 2198:10
**chart** [1] - 2277:21
**check** [3] - 2049:8, 2130:25, 2222:3
**checked** [1] - 2008:16
**checklist** [1] - 2066:20
**Chetrum** [2] - 2018:14, 2028:9
**Chicago** [1] - 2085:1
**child** [6] - 2183:25, 2184:14, 2194:14, 2198:10, 2200:5
**children** [9] - 2067:15, 2080:23, 2107:13, 2107:22, 2112:25, 2113:5, 2126:17, 2199:15, 2209:10
**chiropractic** [1] - 2051:6
**choice** [1] - 2107:6
**Choice** [1] - 2212:5
**choices** [3] - 2107:8, 2107:19, 2112:12
**choose** [4] - 2089:13, 2101:19, 2112:13, 2127:23
**chose** [5] - 2101:15, 2108:11, 2108:13, 2109:23, 2212:15
**chronic** [10] - 2058:16, 2105:6, 2105:7, 2105:8, 2124:1, 2139:25, 2163:19, 2172:20, 2174:23, 2175:8
**Circuit** [2] - 2015:24, 2074:5
**circumstances** [2] - 2170:11, 2209:12
**citations** [3] - 2016:23, 2028:7, 2049:6
**cite** [13] - 2016:21, 2017:2, 2017:7, 2017:11, 2018:2, 2018:3, 2018:8, 2018:9, 2021:10, 2027:24, 2032:10, 2076:18, 2076:20
**cited** [2] - 2025:12, 2057:3
**cites** [1] - 2028:7
**CITRIN** [1] - 2007:15
**City** [1] - 2006:23
**Civil** [1] - 2015:22
**civil** [1] - 2185:9
**CIVIL** [1] - 2006:12
**claim** [13] - 2016:4, 2040:12, 2042:9, 2045:13, 2045:18, 2045:22, 2046:11, 2058:23, 2063:21, 2063:24, 2074:18, 2074:19, 2075:25
**claimant** [2] - 2151:5, 2151:8, 2151:11
**claimant's** [1] - 2214:13
**claimed** [3] - 2063:11, 2246:3, 2255:4

**claiming** [2] - 2148:6, 2236:5
**claims** [7] - 2015:23, 2016:9, 2016:10, 2062:21, 2236:3, 2241:25, 2243:25
**clarification** [1] - 2150:20
**clarify** [6] - 2010:20, 2150:13, 2192:3, 2192:8, 2205:18, 2215:9
**classes** [5] - 2190:17, 2194:18, 2194:24, 2210:12, 2210:14
**Claxton** [1] - 2093:10
**cleans** [1] - 2041:12
**clear** [17] - 2058:25, 2064:11, 2064:16, 2064:17, 2065:9, 2148:12, 2152:22, 2153:12, 2157:5, 2169:17, 2177:23, 2177:25, 2206:3, 2212:3, 2212:5, 2246:19, 2277:11
**clearly** [10] - 2024:6, 2038:19, 2038:23, 2057:14, 2062:11, 2108:13, 2109:22, 2123:5, 2124:3, 2283:25
**clears** [1] - 2058:23
**CLERK** [1] - 2066:24
**Cleveland** [1] - 2007:6
**click** [2] - 2106:16, 2106:21
**client** [2] - 2059:4, 2260:5
**clinical** [11] - 2082:20, 2082:22, 2082:25, 2083:15, 2084:1, 2084:8, 2084:9, 2084:14, 2086:2, 2102:7, 2102:8
**clinically** [2] - 2158:2, 2232:1
**clinicians** [1] - 2231:17
**clock** [2] - 2229:19, 2229:20
**close** [11] - 2016:1, 2066:1, 2078:6, 2089:11, 2091:6, 2133:14, 2146:18, 2153:16, 2175:20, 2199:13, 2200:3
**closed** [3] - 2011:15, 2011:25, 2089:9
**closely** [3] - 2069:4, 2069:9, 2231:16
**closer** [1] - 2107:17
**closing** [1] - 2089:6
**closings** [3] - 2015:6, 2288:6, 2288:9
**clues** [2] - 2068:13, 2068:16
**clumsily** [1] - 2054:24
**co** [1] - 2177:16
**co-workers** [1] - 2177:16
**coach** [2] - 2237:16, 2263:8
**Coach** [1] - 2284:21
**cocaine** [2] - 2195:16, 2211:9
**coefficients** [1] - 2238:22
**coffee** [1] - 2095:9
**cognition** [5] - 2081:22, 2083:11, 2089:3, 2130:10, 2156:7
**cognitions** [3] - 2069:11, 2069:19, 2156:17
**cognitive** [21] - 2029:3, 2029:4, 2029:12, 2083:2, 2083:5, 2083:7, 2083:8, 2110:17, 2110:23, 2121:15, 2122:9, 2127:22, 2128:1, 2128:7, 2128:8, 2147:19, 2170:15, 2172:4, 2176:2, 2181:9, 2181:10
**cognitively** [1] - 2151:11
**coin** [2] - 2089:10, 2108:7
**coke** [1] - 2201:2

**COLEMAN** [1] - 2007:9
**collate** [1] - 2036:13
**collateral** [9] - 2057:25, 2058:1, 2077:1, 2078:5, 2097:7, 2177:12, 2177:13, 2199:17, 2257:15
**colleague** [1] - 2215:24
**colleagues** [2] - 2109:5, 2110:7
**collection** [2] - 2250:9, 2250:14
**College** [1] - 2071:4
**college** [4] - 2082:1, 2082:2, 2082:3, 2082:14
**collided** [2] - 2247:9, 2247:13
**colliding** [1] - 2242:13
**Colonel** [38] - 2077:19, 2235:1, 2235:12, 2235:15, 2235:19, 2236:7, 2241:1, 2241:11, 2241:16, 2242:16, 2242:20, 2243:2, 2243:16, 2243:24, 2245:13, 2246:1, 2246:20, 2250:4, 2251:3, 2252:7, 2252:25, 2253:12, 2253:21, 2258:11, 2258:15, 2258:24, 2258:25, 2259:8, 2261:13, 2269:16, 2280:23, 2281:2, 2281:14, 2281:17, 2282:23, 2286:4
**color** [1] - 2045:19
**column** [1] - 2276:13
**Coma** [4] - 2131:9, 2131:24, 2132:9, 2218:20
**coma** [3] - 2131:16, 2131:18, 2131:20
**combine** [3] - 2089:20, 2114:13, 2224:21
**combined** [1] - 2107:23
**comfortable** [8] - 2040:17, 2094:25, 2095:9, 2095:11, 2096:2, 2096:8, 2099:1, 2222:10
**coming** [5] - 2035:20, 2066:13, 2149:5, 2260:16, 2285:10
**command** [1] - 2132:7
**comment** [3] - 2030:5, 2074:1, 2252:21
**commentary** [1] - 2168:11
**common** [2] - 2140:25
**communicate** [1] - 2103:11
**community** [3] - 2061:12, 2146:16, 2146:17
**Commuter** [1] - 2017:11
**companies** [1] - 2172:2
**Company** [1] - 2017:7
**company** [2] - 2094:4, 2230:25
**compare** [3] - 2081:21, 2263:11, 2277:25
**compared** [3] - 2240:7, 2272:3, 2272:15
**compares** [1] - 2113:19
**comparing** [2] - 2193:6, 2266:3
**comparison** [4] - 2209:5, 2211:11, 2214:2, 2217:16
**compartment** [1] - 2248:11
**compartments** [1] - 2248:11
**compensate** [2] - 2017:17, 2075:11
**compensatory** [2] - 2075:19, 2077:9

**competent** [3] - 2017:5, 2017:25, 2031:25
**competing** [2] - 2020:14, 2057:4
**complain** [1] - 2170:14
**complained** [1] - 2164:5
**complaining** [3] - 2127:13, 2173:20, 2175:3
**complaints** [5] - 2121:14, 2127:9, 2164:1, 2176:2, 2176:3
**complete** [5] - 2016:5, 2042:5, 2102:23, 2177:24, 2179:15
**completely** [7] - 2033:22, 2098:13, 2156:16, 2217:4, 2219:6, 2219:9
**complex** [3] - 2058:15, 2125:25, 2126:2
**complication** [2] - 2173:12
**component** [2] - 2153:19
**components** [3] - 2131:12, 2242:25, 2286:17
**compound** [1] - 2100:8
**comprehension** [2] - 2207:21, 2259:24
**Computer** [1] - 2007:22
**computer** [3] - 2105:25, 2106:9, 2110:20
**Computer-Aided** [1] - 2007:22
**conceded** [2] - 2044:6, 2044:15
**concentrated** [1] - 2231:10
**concentration** [5] - 2083:9, 2095:24, 2097:9, 2157:18, 2163:24
**concept** [2] - 2238:8, 2238:11
**concern** [1] - 2049:7
**Concern** [1] - 2046:18
**concerned** [6] - 2081:13, 2083:3, 2158:11, 2236:14, 2257:4, 2263:12
**concerning** [1] - 2013:2
**conclude** [1] - 2067:24
**concluded** [3] - 2188:2, 2193:7, 2260:21
**conclusion** [6] - 2062:24, 2118:12, 2148:18, 2221:5, 2221:8, 2253:22
**conclusions** [4] - 2058:8, 2058:12, 2077:21, 2078:1
**conclusory** [1] - 2077:18
**concussed** [12] - 2081:20, 2128:17, 2129:16, 2130:12, 2130:14, 2140:21, 2141:21, 2217:3, 2217:7, 2217:8, 2217:20
**concussion** [35] - 2081:14, 2081:21, 2087:19, 2128:14, 2128:24, 2129:4, 2129:7, 2130:11, 2130:15, 2130:18, 2130:21, 2130:22, 2130:25, 2132:17, 2132:23, 2133:2, 2133:9, 2133:12, 2140:16, 2141:4, 2141:11, 2141:14, 2141:19, 2159:7, 2163:20, 2216:20, 2217:11, 2217:23, 2219:2, 2220:1, 2225:24, 2225:25, 2228:8, 2228:10
**concussions** [9] - 2081:14, 2081:16, 2128:16, 2129:7, 2162:25, 2163:5, 2163:11, 2163:18, 2216:24

**condition** [4] - 2026:6, 2061:13, 2158:6, 2173:4
**conditions** [2] - 2065:9, 2245:12
**conduct** [1] - 2168:16
**conducted** [1] - 2256:15
**conference** [7] - 2015:8, 2020:20, 2020:23, 2054:14, 2074:3, 2199:4, 2266:18
**confirm** [1] - 2012:5
**conflating** [1] - 2285:18
**conflict** [1] - 2146:4
**confounds** [1] - 2217:10
**conjecture** [2] - 2016:7
**conjunction** [2] - 2170:13, 2171:16
**connect** [2] - 2126:24, 2127:1
**connected** [2] - 2198:10, 2276:21
**connection** [3] - 2150:6, 2151:14, 2171:24
**consent** [9] - 2095:3, 2095:6, 2095:17, 2096:16, 2097:14, 2100:6, 2102:3, 2167:21, 2169:18
**consequences** [3] - 2069:20, 2156:18, 2198:6
**consider** [10] - 2030:18, 2055:15, 2056:20, 2057:5, 2140:12, 2173:23, 2236:20, 2255:6, 2255:7, 2284:8
**consideration** [4] - 2061:5, 2077:7, 2139:20, 2173:22
**considered** [11] - 2011:14, 2011:24, 2031:5, 2058:13, 2146:21, 2147:3, 2160:6, 2163:10, 2171:2, 2199:17, 2203:5
**considers** [1] - 2160:6
**consist** [1] - 2163:22
**consistent** [15] - 2100:10, 2103:3, 2103:6, 2155:12, 2164:10, 2217:22, 2221:15, 2235:23, 2243:7, 2246:3, 2246:11, 2253:16, 2253:23, 2255:18, 2269:9
**consistently** [5] - 2017:2, 2104:22, 2127:23, 2221:19, 2227:24
**consists** [2] - 2095:23, 2242:25
**constantly** [1] - 2099:12
**Constitutionally** [1] - 2077:8
**construct** [1] - 2075:10
**construed** [1] - 2074:9
**consultant** [1] - 2230:20
**consulting** [3] - 2149:25, 2150:6, 2231:11
**Consulting** [1] - 2230:25
**contact** [3] - 2271:24, 2285:10, 2285:17
**contacted** [1] - 2090:16
**contacts** [2] - 2239:5
**contemporaneously** [1] - 2162:10
**content** [1] - 2068:7
**context** [5] - 2058:14, 2073:7, 2185:10, 2222:21, 2231:23
**contexts** [1] - 2172:6
**contingency** [2] - 2145:22, 2146:2

Bauta v. Greyhound Lines, et al _____10

**continue** [11] - 2008:6, 2096:4, 2099:12, 2100:25, 2110:6, 2138:9, 2169:24, 2221:24, 2222:2, 2265:7, 2286:10
**continued** [10] - 2022:12, 2035:25, 2072:25, 2110:2, 2129:20, 2198:22, 2247:16, 2265:14, 2286:12
**Continued** [23] - 2007:1, 2049:11, 2061:16, 2079:23, 2088:16, 2108:15, 2135:24, 2150:25, 2154:15, 2155:17, 2172:24, 2185:22, 2188:4, 2192:20, 2193:9, 2202:10, 2220:25, 2244:4, 2256:21, 2260:23, 2266:21, 2270:7, 2287:11
**CONTINUES** [2] - 2109:1, 2173:1
**continues** [2] - 2050:18, 2068:22
**CONTINUING** [4] - 2189:3, 2194:4, 2245:1, 2261:5
**continuing** [2] - 2151:1, 2288:1
**Continuing** [12] - 2023:1, 2036:1, 2050:1, 2062:1, 2073:1, 2089:1, 2130:1, 2138:11, 2156:1, 2199:1, 2221:1, 2266:1
**Control** [1] - 2017:3
**control** [2] - 2043:12, 2145:19
**controversial** [2] - 2146:15, 2146:21
**contusion** [1] - 2284:16
**conversations** [2] - 2066:16, 2069:7
**convicted** [1] - 2046:3
**cooks** [1] - 2041:11
**cooperate** [1] - 2109:23
**cooperating** [1] - 2109:10
**cooperation** [2] - 2097:24, 2098:9
**cooperativeness** [1] - 2112:5
**coordination** [1] - 2126:5
**copied** [1] - 2009:9
**copies** [2] - 2013:13, 2013:18
**copy** [4] - 2126:10, 2126:11, 2191:4, 2191:6
**copying** [1] - 2013:13
**Cordiale** [11] - 2031:3, 2038:8, 2038:9, 2040:1, 2040:14, 2048:6, 2050:9, 2050:10, 2050:13, 2050:23, 2063:3
**Cordiale's** [1] - 2040:19
**Corn** [1] - 2018:19
**Corporal** [1] - 2077:16
**correct** [94] - 2014:23, 2062:2, 2068:20, 2075:3, 2078:25, 2079:1, 2079:8, 2079:10, 2116:24, 2132:3, 2145:24, 2149:20, 2151:19, 2152:4, 2152:5, 2152:16, 2152:19, 2157:8, 2158:25, 2159:7, 2159:18, 2160:17, 2160:20, 2161:5, 2161:12, 2162:17, 2164:3, 2164:10, 2164:24, 2165:11, 2166:9, 2166:15, 2166:22, 2167:5, 2168:8, 2168:25, 2172:10, 2173:6, 2174:7, 2174:14, 2174:25, 2176:3, 2176:4, 2178:14, 2179:12, 2179:15, 2180:2, 2181:25, 2183:6, 2185:6, 2185:14, 2189:6, 2189:10, 2189:24,

2197:9, 2197:12, 2203:4, 2204:21, 2208:5, 2218:13, 2218:20, 2218:23, 2222:19, 2223:1, 2224:3, 2224:23, 2232:10, 2240:21, 2245:18, 2249:5, 2250:10, 2251:7, 2253:8, 2253:12, 2253:17, 2256:15, 2261:12, 2262:4, 2262:14, 2262:24, 2266:12, 2269:11, 2269:15, 2275:13, 2275:25, 2276:8, 2276:15, 2276:18, 2276:22, 2278:1, 2279:17, 2280:1, 2283:18
**correctly** [6] - 2041:11, 2097:11, 2097:19, 2097:25, 2099:4, 2099:24
**correlate** [1] - 2213:11
**correlation** [1] - 2043:8
**corroborating** [2] - 2020:4, 2142:19
**cortical** [1] - 2159:12
**cost** [11] - 2017:22, 2018:1, 2025:2, 2031:2, 2031:22, 2032:1, 2032:2, 2033:5, 2037:3, 2039:17, 2039:18
**costs** [5] - 2018:4, 2022:5, 2025:2, 2039:13, 2135:6
**couch** [2] - 2062:17, 2070:23
**Council** [1] - 2085:16
**council** [4] - 2085:22, 2085:23, 2085:24, 2086:4
**Counsel** [1] - 2092:23
**counsel** [3] - 2043:7, 2103:1, 2120:19
**counseling** [4] - 2054:5, 2138:19, 2139:3, 2215:23
**counselor** [3] - 2027:3, 2027:8, 2041:23
**counter** [3] - 2036:24, 2037:2, 2050:5
**country** [1] - 2085:1
**couple** [9] - 2050:17, 2058:3, 2072:13, 2121:13, 2148:5, 2149:19, 2211:23, 2240:6
**course** [28] - 2076:20, 2083:3, 2087:4, 2087:8, 2098:4, 2100:2, 2104:15, 2115:20, 2120:4, 2128:21, 2137:18, 2153:18, 2159:11, 2166:21, 2182:14, 2208:17, 2208:21, 2209:16, 2209:18, 2211:19, 2212:21, 2221:13, 2222:11, 2227:19, 2227:22, 2248:16, 2267:5, 2281:21
**COURT** [328] - 2006:1, 2008:5, 2008:12, 2010:19, 2012:10, 2012:14, 2012:18, 2013:6, 2013:20, 2014:1, 2014:13, 2014:21, 2014:25, 2015:5, 2015:9, 2015:16, 2017:9, 2021:17, 2022:6, 2023:2, 2023:8, 2023:22, 2025:10, 2025:12, 2025:15, 2025:19, 2025:23, 2027:4, 2027:7, 2027:24, 2029:25, 2031:21, 2032:4, 2032:7, 2032:10, 2033:25, 2034:19, 2035:2, 2038:15, 2038:17, 2038:20, 2038:25, 2039:3, 2042:20, 2043:24, 2044:8, 2044:11, 2044:19, 2044:23, 2045:1, 2045:7, 2046:22, 2047:1, 2047:5, 2047:14, 2047:16, 2047:19, 2048:12, 2048:16, 2050:6, 2051:14, 2053:24,

2054:1, 2054:11, 2054:16, 2054:20, 2054:23, 2055:1, 2055:3, 2055:6, 2055:8, 2055:17, 2055:19, 2055:22, 2056:10, 2057:2, 2057:7, 2057:10, 2061:3, 2061:10, 2062:19, 2063:7, 2063:14, 2063:17, 2063:22, 2064:2, 2064:18, 2065:21, 2066:1, 2066:23, 2067:2, 2067:5, 2067:8, 2067:10, 2067:12, 2070:9, 2070:13, 2071:6, 2072:3, 2072:6, 2072:9, 2073:8, 2073:14, 2074:11, 2074:14, 2074:21, 2074:25, 2075:5, 2075:13, 2075:22, 2076:3, 2076:6, 2076:11, 2076:15, 2076:18, 2076:21, 2078:8, 2078:11, 2078:14, 2078:19, 2078:21, 2078:23, 2079:2, 2079:5, 2079:9, 2079:12, 2079:17, 2079:21, 2080:5, 2080:13, 2086:22, 2090:1, 2092:22, 2099:17, 2100:9, 2120:21, 2133:18, 2133:21, 2135:13, 2135:19, 2135:22, 2136:6, 2136:8, 2136:13, 2137:4, 2137:17, 2137:21, 2138:4, 2138:8, 2145:14, 2148:21, 2154:13, 2155:3, 2155:6, 2155:11, 2160:8, 2165:21, 2165:23, 2176:8, 2183:19, 2184:18, 2185:19, 2186:3, 2186:5, 2186:9, 2186:12, 2186:17, 2186:25, 2187:2, 2187:8, 2187:10, 2187:12, 2187:15, 2187:21, 2188:1, 2189:2, 2189:9, 2190:13, 2190:18, 2190:25, 2191:2, 2191:6, 2191:17, 2192:17, 2193:3, 2193:5, 2194:2, 2196:15, 2196:22, 2197:25, 2198:11, 2198:15, 2199:3, 2199:8, 2199:19, 2199:22, 2199:24, 2200:6, 2200:9, 2200:12, 2200:15, 2200:17, 2200:19, 2200:22, 2201:9, 2201:16, 2201:21, 2201:24, 2202:3, 2202:7, 2203:8, 2203:22, 2203:24, 2204:1, 2204:3, 2204:8, 2205:15, 2206:11, 2206:13, 2206:16, 2206:21, 2207:13, 2211:14, 2218:7, 2219:16, 2219:25, 2220:4, 2223:13, 2223:17, 2223:25, 2224:9, 2224:11, 2225:2, 2225:14, 2225:22, 2226:7, 2226:11, 2227:1, 2227:13, 2228:18, 2229:7, 2229:9, 2229:14, 2229:16, 2229:20, 2230:1, 2230:3, 2230:6, 2234:10, 2234:18, 2239:13, 2243:13, 2243:19, 2249:23, 2249:25, 2250:7, 2250:23, 2251:21, 2252:2, 2252:11, 2252:13, 2253:10, 2254:8, 2256:1, 2256:9, 2256:18, 2257:3, 2257:24, 2258:2, 2258:5, 2258:13, 2258:16, 2258:20, 2259:6, 2259:10, 2259:12, 2259:14, 2259:16, 2259:20, 2259:23, 2260:3, 2260:10, 2260:13, 2260:16, 2260:19, 2261:4, 2262:10, 2263:20, 2264:8, 2264:21, 2265:2, 2265:4, 2265:6, 2265:12, 2266:16, 2267:16, 2267:20, 2268:24, 2269:3, 2269:8, 2269:13, 2269:18, 2269:22, 2270:4, 2271:11, 2271:23,

VB      OCR      CRR

2272:12, 2272:24, 2273:12, 2273:21, 2273:24, 2274:1, 2274:15, 2275:17, 2277:8, 2277:16, 2278:3, 2278:7, 2278:17, 2278:20, 2279:6, 2279:22, 2280:3, 2284:4, 2285:25, 2287:6, 2288:2, 2288:22
**Court** [25] - 2007:20, 2008:18, 2009:4, 2014:19, 2015:23, 2015:25, 2016:22, 2016:25, 2021:11, 2035:9, 2046:23, 2049:6, 2059:17, 2060:10, 2063:10, 2065:18, 2070:11, 2070:16, 2070:22, 2071:8, 2072:22, 2078:2, 2136:23, 2156:2, 2204:7
**court** [29] - 2008:1, 2011:21, 2015:18, 2020:12, 2021:20, 2060:5, 2074:9, 2077:20, 2078:17, 2080:7, 2135:18, 2136:2, 2145:23, 2149:5, 2149:12, 2149:22, 2187:7, 2189:1, 2194:1, 2203:1, 2208:4, 2209:15, 2229:13, 2229:25, 2230:7, 2233:25, 2261:1, 2271:1
**Court's** [2] - 2071:13, 2228:4
**court's** [1] - 2008:15
**courtesy** [1] - 2156:2
**Courthouse** [1] - 2006:5
**COURTROOM** [2] - 2135:16, 2136:7
**courtroom** [4] - 2008:2, 2078:18, 2136:3, 2206:4
**courts** [2] - 2017:1, 2199:20
**cover** [5] - 2010:15, 2051:23, 2052:11, 2053:16, 2054:18
**covered** [4] - 2053:15, 2053:16, 2054:3
**covering** [1] - 2052:10
**covers** [1] - 2066:18
**cow** [1] - 2115:15
**crash** [24] - 2134:6, 2245:12, 2250:10, 2256:14, 2258:6, 2260:13, 2260:17, 2260:20, 2262:7, 2263:1, 2266:2, 2271:10, 2275:25, 2276:1, 2276:2, 2278:8, 2278:12, 2281:23, 2282:4, 2282:7, 2282:9, 2283:2, 2283:5, 2286:24
**crashed** [1] - 2263:9
**crashes** [2] - 2250:15, 2271:10
**crazy** [1] - 2187:6
**create** [3] - 2242:10, 2259:6, 2275:7
**created** [3] - 2075:10, 2077:21, 2242:2
**creates** [1] - 2146:3
**creating** [1] - 2077:10
**credentials** [1] - 2084:17
**credibility** [2] - 2199:12, 2200:2
**credible** [3] - 2087:15, 2110:6, 2144:10
**crime** [1] - 2197:18
**criminal** [5] - 2185:6, 2185:10, 2197:17, 2197:21, 2198:6
**criteria** [69] - 2046:7, 2046:9, 2061:8, 2061:12, 2064:7, 2064:17, 2064:18, 2066:18, 2066:21, 2066:25, 2067:15,

2071:14, 2072:15, 2072:23, 2073:4, 2147:9, 2152:4, 2152:6, 2152:16, 2152:18, 2152:21, 2152:24, 2153:2, 2153:4, 2153:11, 2153:12, 2153:19, 2153:21, 2154:2, 2154:4, 2156:6, 2157:6, 2157:7, 2157:21, 2157:24, 2158:2, 2158:12, 2159:3, 2215:10, 2226:20, 2258:8, 2258:9, 2265:9, 2266:7, 2266:13, 2267:14, 2267:18, 2268:1, 2268:17, 2268:21, 2269:23, 2271:4, 2271:5, 2271:19, 2274:13, 2275:13, 2275:15, 2275:24, 2276:13, 2276:20, 2278:24, 2279:1, 2279:19, 2279:20, 2279:25, 2280:7
**criterion** [3] - 2064:9, 2157:1, 2273:23
**critical** [2] - 2261:13, 2281:9
**criticism** [12] - 2177:4, 2177:5, 2177:11, 2250:24, 2251:18, 2252:8, 2252:22, 2261:18, 2261:20, 2261:21, 2262:3, 2262:4
**criticisms** [2] - 2176:23, 2177:1
**criticize** [6] - 2250:20, 2251:23, 2252:4, 2253:11, 2254:24, 2280:23
**criticizing** [1] - 2258:18
**critiques** [1] - 2058:7
**cross** [7] - 2050:19, 2059:6, 2187:21, 2200:22, 2200:24, 2229:21, 2280:22
**CROSS** [5] - 2148:23, 2248:24, 2289:7, 2289:13
**cross-examination** [5] - 2050:19, 2059:6, 2200:22, 2200:24, 2280:22
**CROSS-EXAMINATION** [4] - 2148:23, 2248:24, 2289:7, 2289:13
**cross-examine** [1] - 2187:21
**crossed** [1] - 2288:17
**crumple** [2] - 2137:9, 2238:10
**crush** [11] - 2137:9, 2137:10, 2237:18, 2237:21, 2240:18, 2247:3, 2247:11, 2247:14, 2247:15, 2247:24, 2261:24
**crushed** [2] - 2237:18, 2238:13
**crystal** [1] - 2152:22
**CT** [3] - 2132:19, 2132:20, 2133:4
**cube** [1] - 2125:18
**cull** [1] - 2263:22
**Cummings** [2] - 2028:22, 2053:8
**Cummings** [1] - 2053:19
**cumulative** [1] - 2223:23
**cumulatively** [1] - 2225:4
**curative** [1] - 2136:24
**current** [1] - 2155:4
**cut** [5] - 2014:17, 2014:24, 2120:11, 2122:14, 2123:2
**cut-off** [3] - 2120:11, 2122:14, 2123:2
**cutting** [1] - 2014:19
**CV** [1] - 2085:15
**CVLT** [4] - 2125:5, 2125:21, 2148:9, 2166:12
**CVLT-II** [2] - 2125:5, 2125:21
**CVS** [1] - 2050:8

**D**

**dad** [1] - 2082:3
**daily** [1] - 2195:14
**damage** [17] - 2017:22, 2076:4, 2142:11, 2219:18, 2237:19, 2238:2, 2238:4, 2238:6, 2238:20, 2247:4, 2247:12, 2247:14, 2247:15, 2247:24, 2248:6
**damaged** [2] - 2142:15, 2226:1
**damages** [13] - 2017:1, 2017:23, 2018:4, 2028:3, 2031:24, 2074:1, 2074:22, 2075:1, 2075:14, 2075:19, 2077:7, 2077:12, 2288:13
**danger** [4] - 2074:17, 2075:2, 2075:6, 2075:10
**dangerous** [1] - 2156:16
**dash** [1] - 2272:18
**dashboards** [1] - 2280:9
**data** [27] - 2010:9, 2042:17, 2042:25, 2060:25, 2081:19, 2093:13, 2117:7, 2142:4, 2166:5, 2166:7, 2176:22, 2177:4, 2177:12, 2177:13, 2195:25, 2196:7, 2199:17, 2221:3, 2221:5, 2221:12, 2222:8, 2250:16, 2250:17, 2263:22, 2280:24, 2281:6, 2281:23
**database** [7] - 2250:5, 2250:9, 2250:13, 2250:20, 2250:24, 2253:1
**databases** [2] - 2060:21, 2060:23
**date** [3] - 2166:3, 2218:13, 2219:22
**dates** [2] - 2058:6, 2093:7, 2218:12
**Daubert** [1] - 2199:21
**daughter** [1] - 2080:20
**Davis** [1] - 2021:9
**days** [7] - 2123:16, 2167:25, 2168:4, 2168:7, 2218:16, 2219:1, 2226:23
**deal** [4] - 2014:10, 2020:19, 2074:3, 2138:5
**dealing** [1] - 2249:3
**deals** [3] - 2016:16, 2020:21, 2083:1
**dealt** [4] - 2021:25, 2027:23, 2028:14, 2036:15
**death** [4] - 2067:18, 2153:13, 2198:10
**deceased** [3] - 2178:13, 2178:16, 2179:4
**deceive** [1] - 2227:18
**decelerate** [2] - 2239:6, 2239:18, 2284:18
**decelerated** [1] - 2240:1
**deceleration** [7] - 2239:8, 2239:15, 2239:19, 2240:4, 2240:18, 2247:17, 2247:18
**decide** [1] - 2020:11
**decided** [2] - 2014:16, 2014:23
**decimals** [1] - 2224:10
**decision** [2] - 2039:1, 2146:5
**deemed** [1] - 2018:10
**defendant** [1] - 2016:1
**defendant's** [5] - 2012:24, 2035:5,

2048:12, 2219:8, 2288:4
**Defendant's** [2] - 2092:20, 2218:6
**defendants** [15] - 2006:10, 2007:15, 2015:20, 2015:21, 2016:8, 2025:24, 2045:12, 2046:10, 2061:7, 2068:20, 2077:23, 2150:11, 2151:18, 2151:19, 2230:2
**Defendants** [3] - 2007:3, 2007:3, 2007:10
**defending** [1] - 2185:13
**Defense** [1] - 2230:10
**defense** [11] - 2008:21, 2054:6, 2058:7, 2059:6, 2076:24, 2077:14, 2079:18, 2171:20, 2234:6, 2252:7, 2263:18
**defense's** [1] - 2136:15
**deficits** [3] - 2112:24, 2128:7, 2161:15
**defines** [1] - 2141:13
**definitely** [1] - 2023:19
**definition** [2] - 2083:6, 2129:6
**definitional** [1] - 2141:13
**deflected** [1] - 2283:13
**deformation** [2] - 2240:19, 2248:15
**deformed** [6] - 2240:12, 2240:14, 2248:11, 2248:14, 2249:10
**deforms** [1] - 2240:3
**degree** [26] - 2016:21, 2046:12, 2057:17, 2058:16, 2058:17, 2058:20, 2062:15, 2082:15, 2087:3, 2091:14, 2105:2, 2128:6, 2128:22, 2144:4, 2146:12, 2147:7, 2147:15, 2147:23, 2227:9, 2235:8, 2235:22, 2243:6, 2243:10, 2248:19, 2255:17
**degrees** [1] - 2231:7
**delayed** [2] - 2130:18, 2140:16
**deliberate** [3] - 2165:14, 2288:10, 2288:11
**Delta** [13] - 2236:20, 2236:23, 2237:4, 2237:22, 2238:20, 2246:2, 2249:13, 2254:15, 2257:12, 2278:11, 2282:1, 2282:16
**delta** [1] - 2236:20
**delusional** [2] - 2209:9, 2209:11
**demanding** [1] - 2105:25
**demarcate** [1] - 2161:25
**demeanor** [1] - 2102:9
**demented** [3] - 2113:3, 2113:11, 2119:10
**dementia** [3] - 2108:1, 2142:6, 2216:25
**demonstrably** [1] - 2258:21
**demonstrate** [5] - 2017:20, 2161:21, 2215:19, 2262:12, 2263:13
**demonstrating** [1] - 2060:8
**denied** [2] - 2077:23, 2078:9
**Denise** [4] - 2091:12, 2101:1, 2101:8, 2102:14
**DENNEHEY** [1] - 2007:9
**Dennehey** [1] - 2090:16
**deny** [1] - 2056:23

**Department** [3] - 2028:1, 2028:10, 2032:12
**department** [8] - 2017:8, 2017:12, 2018:3, 2018:14, 2018:19, 2018:20, 2132:14, 2132:22
**departments** [3] - 2231:18, 2231:19
**dependent** [1] - 2273:2
**deposition** [36] - 2008:10, 2008:23, 2008:25, 2009:1, 2009:2, 2010:14, 2010:22, 2014:12, 2054:15, 2058:2, 2093:11, 2093:20, 2093:22, 2093:23, 2093:25, 2094:7, 2094:8, 2094:9, 2139:6, 2139:10, 2139:17, 2160:5, 2169:13, 2178:5, 2178:22, 2179:25, 2180:6, 2196:25, 2206:19, 2214:18, 2243:24, 2253:14, 2281:3
**depositions** [3] - 2139:7, 2139:11, 2178:25
**depression** [1] - 2097:18
**DEPUTY** [2] - 2135:16, 2136:7
**derangement** [3] - 2173:7, 2173:10, 2173:17
**descent** [1] - 2190:6
**describe** [6] - 2146:20, 2207:6, 2213:22, 2241:1, 2273:13, 2284:5
**described** [7] - 2066:12, 2152:15, 2157:24, 2179:4, 2241:8, 2242:20, 2254:17
**description** [1] - 2092:16
**design** [2] - 2238:9, 2239:12
**designations** [1] - 2053:11
**designed** [4] - 2042:15, 2168:14, 2239:10, 2239:14
**designs** [1] - 2167:15
**desire** [1] - 2222:5
**desk** [2] - 2064:19, 2115:15
**destructive** [1] - 2157:16
**detachment** [2] - 2070:1, 2156:23
**detail** [2] - 2015:23, 2100:3
**details** [8] - 2153:17, 2162:22, 2189:14, 2189:19, 2196:4, 2196:16, 2198:9, 2249:4
**detective** [1] - 2207:18
**determination** [3] - 2020:17, 2066:10, 2235:2
**determine** [11] - 2019:7, 2085:4, 2151:8, 2167:18, 2238:23, 2242:21, 2242:22, 2243:14, 2254:1, 2254:17, 2255:3
**determined** [2] - 2240:24, 2254:13
**developed** [3] - 2052:22, 2173:12, 2266:13
**development** [2] - 2024:9, 2125:13
**developmental** [1] - 2126:5
**Devils** [2] - 2081:10, 2081:12
**devoted** [2] - 2150:1, 2150:5
**diagnose** [5] - 2061:10, 2065:3, 2133:9, 2134:25, 2232:12
**diagnosed** [3] - 2044:17, 2084:20, 2195:1, 2210:25

**diagnoses** [2] - 2019:21, 2232:11
**diagnosing** [1] - 2071:5
**diagnosis** [14] - 2019:1, 2044:23, 2058:19, 2058:20, 2059:15, 2060:17, 2064:4, 2070:23, 2072:23, 2141:4, 2153:22, 2196:5, 2211:2, 2219:2
**diagnostic** [4] - 2060:6, 2097:7, 2152:15, 2158:12
**Diagnostic** [1] - 2152:9
**diamond** [2] - 2049:8, 2055:25
**Diamond** [1] - 2064:7
**DIAMOND** [6] - 2006:19, 2067:1, 2076:13, 2076:17, 2076:20, 2079:16
**dichotic** [3] - 2143:6, 2143:10, 2143:12
**Dickinson** [1] - 2082:16
**died** [2] - 2082:3, 2082:4
**difference** [6] - 2107:21, 2159:23, 2180:9, 2210:23, 2241:4, 2281:16
**different** [28] - 2009:22, 2020:13, 2038:15, 2039:4, 2050:18, 2053:11, 2056:15, 2056:16, 2058:12, 2076:4, 2084:14, 2106:14, 2106:20, 2107:6, 2107:9, 2107:10, 2107:20, 2118:7, 2125:24, 2152:14, 2166:21, 2209:12, 2209:13, 2211:12, 2213:10, 2227:11, 2232:25, 2257:7
**differentiated** [1] - 2021:11
**differently** [2] - 2165:24, 2174:19
**difficult** [7] - 2106:25, 2107:5, 2107:25, 2108:11, 2108:13, 2111:24, 2126:15
**difficulties** [2] - 2043:11, 2098:15, 2100:12, 2170:15
**difficulty** [3] - 2141:22, 2157:19, 2194:19
**digit** [5] - 2106:11, 2106:14, 2106:18, 2106:20
**Digit** [2] - 2119:16, 2119:17, 2120:10, 2120:13, 2212:4
**dignity** [1] - 2095:12
**dimensions** [1] - 2205:11
**diminished** [2] - 2069:24, 2156:21
**diploma** [1] - 2190:16
**DIRECT** [4] - 2080:15, 2138:11, 2289:6, 2289:12
**direct** [22] - 2022:10, 2064:8, 2064:11, 2136:17, 2149:4, 2153:15, 2160:12, 2174:5, 2191:25, 2214:1, 2229:17, 2230:13, 2251:18, 2252:9, 2252:21, 2253:15, 2257:18, 2261:7, 2261:17, 2269:24, 2280:24
**directed** [1] - 2171:18
**direction** [9] - 2122:15, 2166:8, 2233:15, 2233:16, 2233:18, 2239:21, 2243:1, 2286:10, 2286:18
**directions** [2] - 2243:3, 2286:19
**directly** [8] - 2008:24, 2010:14, 2029:1, 2067:20, 2067:24, 2186:7, 2199:11, 2200:1

**directors** [2] - 2084:8, 2085:6
**disability** [5] - 2125:14, 2150:18, 2150:23, 2172:5, 2222:17
**disabled** [2] - 2053:2, 2125:15
**disagree** [5] - 2048:12, 2056:12, 2066:11, 2103:24, 2201:20
**disagreement** [1] - 2053:8
**disassociative** [1] - 2068:9
**discharged** [1] - 2031:4
**discharging** [1] - 2040:17
**disclosed** [2] - 2010:1, 2012:1
**disclosure** [3] - 2010:11, 2010:24, 2224:25
**discomfort** [4] - 2100:14, 2169:8, 2169:22, 2172:21
**discontinue** [2] - 2099:21, 2099:23
**discounts** [1] - 2058:13
**discovery** [5] - 2010:14, 2011:15, 2011:20, 2012:20, 2013:24
**discrepant** [1] - 2144:16
**discrimination** [1] - 2143:15
**discuss** [2] - 2056:5, 2135:19
**discussed** [2] - 2024:9, 2246:7
**discussing** [2] - 2024:1, 2036:6
**Discussion** [1] - 2288:23
**discussion** [5] - 2018:18, 2060:4, 2061:7, 2067:11, 2167:20
**disease** [4] - 2040:4, 2052:2, 2088:12, 2117:17
**disk** [2] - 2063:4, 2255:8
**dismiss** [5] - 2033:19, 2045:13, 2046:10, 2046:15, 2144:22
**dismissal** [2] - 2016:9, 2042:9
**dismissed** [21] - 2024:23, 2025:8, 2028:23, 2029:5, 2029:13, 2029:15, 2030:7, 2030:11, 2032:25, 2033:7, 2033:9, 2036:3, 2036:9, 2037:13, 2037:17, 2038:24, 2039:23, 2041:9, 2042:7, 2042:10, 2045:18
**Disorder** [7] - 2046:11, 2067:14, 2087:22, 2133:17, 2133:23, 2133:25, 2134:12
**disorder** [8] - 2016:11, 2062:11, 2062:16, 2147:10, 2151:25, 2153:3, 2209:9, 2226:20
**disorders** [2] - 2097:18, 2152:14
**Disorders** [1] - 2152:10
**displace** [2] - 2233:4, 2233:5
**displacement** [3] - 2233:2, 2241:7, 2241:9
**dispositive** [1] - 2070:24
**disregard** [3] - 2013:2, 2020:6, 2136:25
**dissecting** [1] - 2232:3
**dissociative** [1] - 2156:12
**distance** [2] - 2238:15, 2247:3
**distorted** [2] - 2069:19, 2156:17
**distraction** [3] - 2241:19, 2242:2
**distress** [14] - 2058:17, 2063:21, 2063:22, 2063:24, 2064:3, 2068:12,

2074:2, 2074:6, 2074:8, 2076:1, 2076:2, 2131:1, 2153:24, 2158:3
**distressing** [5] - 2068:5, 2068:6, 2068:21, 2069:3, 2069:8
**District** [2] - 2015:25, 2017:4
**DISTRICT** [2] - 2006:1, 2006:1
**disturbance** [3] - 2157:23, 2158:2, 2158:4
**disturbances** [2] - 2157:18, 2175:3
**disturbs** [1] - 2216:2
**divided** [1] - 2237:11
**Division** [1] - 2085:16
**division** [3] - 2086:1, 2086:2
**divisions** [2] - 2085:25, 2086:3
**dixit** [1] - 2072:12
**dizziness** [1] - 2163:23
**dizzy** [1] - 2129:10
**doc** [1] - 2134:10
**doctor** [36] - 2018:25, 2019:19, 2027:1, 2027:16, 2029:22, 2030:2, 2031:2, 2031:3, 2031:6, 2032:24, 2037:11, 2041:18, 2041:19, 2048:3, 2051:4, 2053:4, 2056:3, 2087:25, 2096:9, 2147:4, 2156:2, 2158:10, 2159:6, 2206:9, 2206:20, 2206:22, 2219:25, 2222:23, 2225:15, 2228:7, 2232:7, 2232:8, 2248:18, 2261:7, 2264:21, 2273:8
**Doctor** [24] - 2052:25, 2086:25, 2096:22, 2096:25, 2100:4, 2148:25, 2157:20, 2191:21, 2196:17, 2203:11, 2203:19, 2203:22, 2204:11, 2225:4, 2227:7, 2229:7, 2252:18, 2256:7, 2262:25, 2263:23, 2278:21, 2279:23, 2286:20, 2287:7
**doctors** [7] - 2039:15, 2048:9, 2051:3, 2054:2, 2056:4, 2062:22, 2093:4
**document** [4] - 2008:15, 2128:9, 2128:11, 2128:12
**documentation** [1] - 2216:4
**documented** [1] - 2162:10
**documenting** [1] - 2178:10
**done** [35] - 2012:25, 2045:6, 2067:7, 2072:20, 2085:9, 2096:11, 2100:20, 2105:17, 2109:4, 2110:15, 2132:19, 2133:19, 2149:16, 2150:11, 2150:23, 2151:18, 2165:1, 2165:5, 2165:11, 2166:22, 2168:17, 2168:19, 2168:20, 2184:20, 2202:6, 2218:20, 2221:2, 2227:24, 2229:22, 2236:15, 2255:20, 2258:11, 2278:9, 2288:2, 2288:8
**door** [10] - 2011:8, 2011:11, 2011:23, 2012:16, 2137:21, 2175:20, 2215:24, 2223:24, 2225:22, 2257:5
**doubt** [5] - 2089:25, 2128:25, 2129:2, 2135:5, 2222:12
**down** [31] - 2052:4, 2052:23, 2073:24, 2080:10, 2106:22, 2131:2, 2131:3, 2151:22, 2162:22, 2164:19, 2164:22, 2172:19, 2203:6, 2205:25, 2206:24,

2207:2, 2209:21, 2213:15, 2214:5, 2233:16, 2236:21, 2239:4, 2242:15, 2248:10, 2260:19, 2284:10, 2285:7, 2285:8, 2285:21, 2286:2, 2286:6
**downstairs** [1] - 2009:9
**dozen** [2] - 2214:20, 2214:24
**Dr** [202] - 2008:23, 2008:25, 2009:6, 2010:7, 2010:22, 2014:15, 2014:18, 2014:22, 2015:3, 2015:4, 2019:4, 2019:7, 2019:8, 2019:10, 2019:12, 2019:15, 2021:23, 2024:8, 2025:7, 2026:19, 2026:21, 2027:14, 2027:16, 2028:24, 2029:5, 2029:8, 2029:10, 2029:19, 2030:2, 2030:10, 2031:3, 2031:9, 2031:12, 2032:20, 2034:2, 2034:5, 2034:8, 2034:24, 2035:12, 2036:4, 2036:19, 2037:5, 2038:8, 2038:9, 2038:17, 2038:18, 2040:1, 2040:14, 2040:19, 2040:22, 2041:11, 2042:11, 2043:13, 2043:15, 2043:19, 2043:21, 2043:24, 2043:25, 2044:6, 2044:15, 2044:21, 2046:2, 2047:23, 2048:6, 2050:9, 2050:10, 2050:13, 2050:22, 2050:23, 2051:7, 2051:19, 2051:21, 2051:22, 2052:9, 2052:14, 2052:16, 2052:18, 2052:22, 2053:5, 2053:15, 2054:2, 2054:3, 2057:14, 2057:21, 2058:9, 2058:10, 2058:11, 2058:13, 2058:14, 2058:23, 2058:24, 2058:25, 2059:3, 2059:5, 2059:6, 2059:7, 2059:9, 2059:10, 2060:9, 2060:12, 2060:18, 2062:4, 2062:9, 2062:13, 2063:2, 2063:3, 2064:15, 2065:2, 2065:3, 2065:6, 2065:8, 2065:22, 2066:2, 2066:5, 2066:8, 2066:13, 2066:15, 2070:18, 2078:12, 2079:18, 2079:21, 2080:8, 2080:17, 2086:19, 2086:22, 2093:2, 2093:6, 2093:9, 2093:12, 2093:13, 2093:14, 2093:20, 2093:21, 2093:22, 2094:3, 2094:5, 2094:11, 2103:22, 2104:23, 2106:5, 2106:6, 2109:14, 2109:16, 2109:18, 2110:12, 2110:21, 2112:1, 2120:11, 2120:12, 2130:18, 2133:7, 2135:19, 2136:15, 2138:13, 2140:10, 2140:11, 2140:14, 2141:23, 2143:5, 2143:20, 2144:6, 2144:12, 2144:21, 2145:5, 2145:7, 2145:9, 2145:10, 2145:11, 2158:16, 2158:24, 2164:19, 2164:23, 2165:1, 2167:24, 2168:2, 2168:7, 2178:20, 2178:22, 2184:4, 2186:24, 2220:21, 2221:4, 2229:14, 2230:2, 2230:8, 2232:9, 2234:7, 2234:10, 2280:22
**dr** [1] - 2230:3
**Dr.Nobilini** [1] - 2230:15
**draft** [1] - 2135:22
**drag** [1] - 2173:15
**draw** [6] - 2062:24, 2126:1, 2126:4, 2126:12, 2126:14, 2239:24

VB          OCR          CRR

**drawing** [4] - 2063:12, 2126:1, 2126:8, 2207:16
**drawings** [1] - 2124:21
**dream** [1] - 2068:7
**dreams** [1] - 2068:6
**Drexel** [1] - 2231:8
**drink** [2] - 2211:4, 2211:6
**driver** [2] - 2273:22, 2274:4
**driver's** [1] - 2238:2
**driving** [1] - 2236:21
**dropped** [1] - 2210:22
**dropping** [1] - 2195:5
**drowsiness** [1] - 2180:14
**drug** [1] - 2073:11
**drugs** [2] - 2156:13, 2195:13
**drunk** [1] - 2201:2
**DSM** [25] - 2046:7, 2062:3, 2062:7, 2062:17, 2064:7, 2064:16, 2064:19, 2065:20, 2066:18, 2066:21, 2066:23, 2067:13, 2067:24, 2070:23, 2071:11, 2071:14, 2071:25, 2072:19, 2147:9, 2152:18, 2153:2, 2156:6, 2157:5, 2157:21, 2215:9
**DSM-5** [6] - 2061:13, 2152:7, 2156:3, 2157:2, 2158:12, 2159:3
**duct** [1] - 2008:11
**due** [4] - 2046:19, 2047:11, 2077:3, 2156:11
**duly** [2] - 2080:3, 2230:11
**dummies** [12] - 2264:14, 2264:16, 2264:17, 2264:18, 2264:19, 2264:20, 2267:10, 2267:23, 2276:1, 2281:24
**dummies's** [1] - 2271:10
**dummy** [7] - 2264:22, 2267:25, 2268:2, 2271:12, 2279:2, 2279:16
**duration** [18] - 2018:1, 2027:20, 2028:17, 2029:10, 2031:19, 2031:22, 2032:4, 2033:2, 2036:9, 2039:6, 2039:11, 2052:3, 2052:8, 2053:8, 2056:6, 2138:25, 2139:3, 2157:23
**during** [23] - 2012:20, 2020:1, 2081:20, 2082:4, 2082:6, 2109:11, 2120:5, 2231:9, 2231:16, 2231:21, 2233:11, 2234:20, 2235:18, 2235:21, 2236:19, 2237:7, 2237:19, 2238:13, 2249:11, 2250:3, 2271:10, 2278:15, 2285:9
**duties** [1] - 2153:18
**dynamics** [2] - 2241:6, 2246:13
**dysfunction** [1] - 2147:16

## E

**e-mails** [1] - 2010:1
**e.g** [6] - 2068:9, 2156:15, 2156:20, 2156:24, 2157:18, 2158:6
**ear** [4] - 2143:14, 2143:15, 2143:18
**early** [4] - 2138:21, 2177:24, 2182:9, 2288:11
**ears** [1] - 2129:11

**ease** [3] - 2103:15, 2107:3, 2107:14
**easily** [3] - 2107:21, 2107:22, 2113:6
**East** [2] - 2006:17, 2007:5
**East/Brooklyn** [1] - 2007:21
**EASTERN** [1] - 2006:1
**Eastside** [1] - 2194:22
**easy** [15] - 2033:22, 2105:23, 2106:25, 2107:1, 2107:3, 2107:4, 2107:5, 2107:9, 2107:25, 2108:11, 2111:25, 2113:1, 2113:2, 2113:9
**economic** [1] - 2016:19
**economics** [1] - 2028:16
**ed** [1] - 2201:2
**edge** [3] - 2247:9, 2247:11, 2247:16
**edited** [1] - 2086:14
**edition** [2] - 2125:23, 2152:12
**Edition** [2] - 2121:5, 2124:7
**Edmund** [1] - 2018:25
**education** [13] - 2081:4, 2081:25, 2087:5, 2102:10, 2103:16, 2103:20, 2128:4, 2147:6, 2194:17, 2195:3, 2210:12, 2210:14, 2231:5
**Education** [1] - 2193:3
**effects** [3] - 2129:4, 2129:5, 2130:22
**efficacy** [1] - 2060:8
**effort** [16] - 2024:4, 2042:15, 2043:15, 2097:24, 2098:8, 2098:13, 2098:20, 2098:25, 2124:16, 2148:14, 2181:2, 2199:25, 2212:6, 2227:7, 2254:14
**efforts** [2] - 2069:3, 2069:6
**eight** [7] - 2031:6, 2045:24, 2158:4, 2196:3, 2226:22, 2227:4, 2231:16
**eight-ninety** [1] - 2031:6
**eighth** [2] - 2279:3, 2279:18
**either** [23] - 2008:14, 2010:13, 2047:12, 2064:8, 2064:15, 2064:22, 2090:18, 2104:5, 2106:5, 2106:15, 2136:23, 2142:15, 2144:24, 2153:15, 2153:23, 2175:22, 2178:20, 2179:5, 2179:11, 2180:16, 2217:4, 2222:19, 2243:1
**elastic** [1] - 2037:23
**elbow** [1] - 2285:7
**elected** [1] - 2086:6
**element** [1] - 2018:15
**elevating** [1] - 2024:4
**elevation** [1] - 2121:13
**elicit** [1] - 2044:3
**eliminating** [1] - 2024:4
**ELMO** [1] - 2223:15
**embedded** [8] - 2110:13, 2110:24, 2115:6, 2118:16, 2119:17, 2121:9, 2121:11
**emergency** [4] - 2132:14, 2132:22, 2141:17, 2210:7
**EMG** [1] - 2033:10
**EMGs** [1] - 2033:14
**Emotional** [1] - 2063:22
**emotional** [18] - 2058:17, 2063:21, 2063:24, 2064:3, 2069:22, 2074:2,

2074:6, 2074:8, 2075:1, 2075:14, 2075:17, 2075:21, 2076:1, 2076:2, 2083:3, 2097:18, 2153:24, 2156:20
**emotions** [2] - 2070:3, 2156:24
**employed** [1] - 2231:2
**employee** [1] - 2091:22
**employer** [1] - 2094:7
**employment** [5] - 2009:22, 2058:2, 2177:19, 2179:9, 2195:3
**EMT** [6] - 2008:10, 2093:8, 2130:7, 2130:8, 2133:9
**EMTs** [2] - 2131:22, 2210:3
**encounter** [1] - 2247:24
**end** [12] - 2009:25, 2020:3, 2026:18, 2073:20, 2101:21, 2115:5, 2167:3, 2202:8, 2247:16, 2264:25, 2270:5, 2288:7
**ended** [2] - 2161:4, 2161:8
**ends** [1] - 2155:16
**energies** [1] - 2283:5
**energy** [18] - 2238:6, 2238:7, 2238:14, 2238:20, 2239:14, 2239:15, 2247:4, 2247:5, 2247:7, 2261:8, 2272:20, 2278:12, 2282:3, 2282:10, 2282:24, 2283:5
**engaged** [2] - 2101:13, 2212:10
**engagement** [1] - 2112:6
**engaging** [1] - 2104:21
**engineering** [15] - 2230:20, 2231:8, 2232:9, 2232:23, 2233:1, 2233:24, 2234:1, 2234:4, 2234:8, 2234:11, 2235:9, 2235:22, 2248:19, 2255:18
**English** [22] - 2184:1, 2184:4, 2184:17, 2186:21, 2189:11, 2189:12, 2189:24, 2190:12, 2190:15, 2190:17, 2191:21, 2194:21, 2194:22, 2194:24, 2196:2, 2210:1, 2210:7, 2210:9, 2210:16, 2210:20
**English-speaking** [1] - 2190:17
**enlisted** [1] - 2082:7
**enroll** [1] - 2028:13
**ENTERPRISE** [1] - 2006:9
**Enterprise** [2] - 2007:5, 2007:11
**enters** [7] - 2008:2, 2078:18, 2078:22, 2079:20, 2136:3, 2138:7, 2229:24
**entire** [7] - 2011:18, 2126:9, 2143:21, 2155:7, 2196:7, 2214:21, 2247:10
**entirely** [2] - 2209:12, 2209:13
**entirety** [2] - 2031:15, 2043:21
**entitled** [2] - 2013:16, 2013:17
**entitling** [1] - 2016:14
**epidural** [2] - 2033:16, 2033:17
**epidurals** [1] - 2051:20
**equal** [3] - 2237:14, 2273:8, 2273:13
**equals** [1] - 2137:21
**equates** [1] - 2065:1
**equation** [1] - 2054:2
**equipment** [2] - 2037:6, 2053:21
**equivalent** [3] - 2125:12, 2131:20, 2229:4

**ER** [3] - 2132:25, 2133:8, 2218:18

**errors** [1] - 2116:2

**escaping** [1] - 2064:23

**especially** [1] - 2245:5

**ESQ** [7] - 2006:18, 2006:19, 2006:23, 2007:7, 2007:7, 2007:13, 2007:17

**essence** [2] - 2019:12, 2271:16

**essential** [1] - 2016:3

**essentially** [8] - 2088:8, 2109:25, 2114:16, 2224:6, 2233:18, 2237:20, 2246:11, 2250:14

**establish** [2] - 2026:4, 2046:19

**established** [7] - 2016:18, 2028:16, 2041:1, 2045:13, 2056:8, 2137:13, 2138:2

**establishes** [1] - 2031:25

**establishing** [1] - 2017:25

**estimate** [1] - 2204:14

**estoppel** [3] - 2077:1, 2078:5, 2257:15

**estrangement** [2] - 2070:1, 2156:23

**et** [2] - 2097:8, 2281:24

**ethical** [1] - 2146:10

**eval** [2] - 2027:4, 2027:5

**evaluate** [9] - 2062:13, 2124:18, 2133:2, 2139:19, 2140:10, 2170:6, 2170:9, 2170:12, 2170:16

**evaluated** [6] - 2044:16, 2134:20, 2175:2, 2189:5, 2198:6, 2209:7

**evaluating** [6] - 2140:9, 2170:20, 2170:22, 2171:4, 2171:8, 2171:9

**evaluation** [33] - 2025:1, 2026:11, 2026:12, 2026:16, 2035:3, 2062:4, 2065:14, 2081:2, 2097:6, 2099:1, 2099:20, 2099:21, 2124:2, 2124:14, 2145:13, 2151:8, 2170:24, 2171:2, 2171:16, 2171:17, 2171:24, 2171:25, 2172:4, 2172:5, 2172:9, 2172:10, 2173:24, 2173:25, 2174:17, 2175:19, 2175:20, 2175:21, 2185:13

**Evaluation** [1] - 2099:19

**evaluations** [4] - 2052:13, 2150:18, 2150:23, 2170:19

**Evangelical** [3] - 2093:3, 2132:14, 2216:13

**evened** [1] - 2015:4

**evening** [3] - 2015:9, 2015:10, 2288:11

**event** [25] - 2064:20, 2064:23, 2067:20, 2067:21, 2067:25, 2068:2, 2068:3, 2068:10, 2068:14, 2068:17, 2068:22, 2068:25, 2069:1, 2069:5, 2069:9, 2069:12, 2069:13, 2069:16, 2072:2, 2099:15, 2134:16, 2153:22, 2155:11, 2157:11, 2177:15

**events** [10] - 2068:5, 2068:8, 2069:20, 2102:12, 2155:13, 2156:8, 2156:9, 2156:11, 2156:18, 2157:12

**eventually** [1] - 2086:25

**everyday** [1] - 2111:12

**evidence** [54] - 2011:13, 2011:24,

2013:4, 2016:5, 2016:12, 2017:25, 2020:4, 2021:17, 2023:22, 2024:24, 2031:25, 2033:1, 2037:18, 2037:20, 2041:9, 2046:18, 2056:8, 2056:13, 2056:19, 2056:21, 2060:1, 2060:6, 2060:7, 2060:12, 2061:4, 2064:10, 2065:5, 2065:10, 2065:14, 2066:3, 2066:15, 2067:22, 2070:5, 2070:15, 2070:19, 2071:9, 2071:16, 2071:19, 2073:2, 2073:17, 2073:18, 2077:6, 2079:7, 2079:13, 2079:14, 2089:2, 2122:16, 2142:19, 2143:2, 2147:19, 2158:25, 2236:2, 2243:14, 2246:2

**evidenced** [4] - 2069:1, 2069:13, 2156:9, 2157:12

**evident** [1] - 2247:25

**evidentiary** [3] - 2030:18, 2056:18, 2077:13

**exact** [5] - 2052:7, 2060:20, 2142:4, 2187:9, 2254:20

**exactly** [13] - 2027:21, 2028:19, 2030:5, 2053:16, 2111:1, 2191:24, 2207:24, 2224:17, 2240:13, 2255:14, 2277:11

**exaggerate** [2] - 2098:14, 2127:8

**exaggerated** [5] - 2069:17, 2121:14, 2154:9, 2156:13, 2157:17

**exaggerating** [1] - 2122:18

**exaggeration** [1] - 2217:23

**exam** [10] - 2034:24, 2085:3, 2085:8, 2099:23, 2100:22, 2100:23, 2102:8, 2109:6, 2127:18, 2147:5

**examination** [24] - 2050:19, 2059:6, 2084:18, 2084:25, 2085:2, 2086:25, 2087:6, 2087:13, 2095:1, 2109:11, 2109:14, 2110:2, 2110:7, 2149:4, 2162:23, 2174:5, 2182:9, 2200:22, 2200:24, 2251:19, 2252:9, 2252:21, 2280:22

**EXAMINATION** [25] - 2080:15, 2109:1, 2138:11, 2148:23, 2173:1, 2189:3, 2194:4, 2206:17, 2228:5, 2229:1, 2230:13, 2245:1, 2248:24, 2261:5, 2280:20, 2285:3, 2289:6, 2289:7, 2289:8, 2289:9, 2289:10, 2289:12, 2289:13, 2289:14, 2289:15

**examine** [4] - 2034:25, 2035:13, 2094:14, 2187:21

**examined** [5] - 2019:9, 2080:3, 2081:1, 2085:14, 2230:11

**examinee** [1] - 2110:17

**examiner** [2] - 2102:17, 2119:18

**example** [29] - 2020:13, 2020:24, 2030:15, 2030:17, 2058:14, 2065:21, 2069:22, 2070:18, 2071:1, 2073:10, 2073:14, 2074:17, 2074:19, 2086:1, 2095:19, 2097:18, 2111:15, 2112:23, 2115:9, 2120:1, 2123:13, 2142:22, 2158:21, 2161:24, 2215:10, 2215:11, 2221:4, 2262:11, 2262:13

**examples** [2] - 2112:5, 2148:5

**exams** [2] - 2085:5, 2085:12

**excellent** [1] - 2012:10

**except** [4] - 2052:18, 2073:23, 2127:2, 2162:2

**exchanged** [8] - 2008:17, 2008:18, 2008:20, 2008:22, 2010:11, 2010:12, 2010:16, 2010:17

**excluded** [1] - 2136:23

**exclusion** [1] - 2077:14

**exclusively** [1] - 2019:7

**excuse** [4] - 2018:5, 2134:19, 2195:13, 2284:13

**excused** [3] - 2229:8, 2287:7, 2287:9

**executive** [5] - 2126:23, 2159:10, 2159:12, 2161:14

**exercises** [1] - 2050:18

**exerted** [1] - 2281:10

**exhaustive** [3] - 2057:24, 2062:4, 2065:14

**Exhibit** [12] - 2013:14, 2079:3, 2079:6, 2079:12, 2079:14, 2096:18, 2218:6, 2218:10, 2256:4, 2256:5, 2289:19

**exhibit** [4] - 2009:2, 2010:10, 2219:4, 2275:21

**Exhibits** [1] - 2092:20

**exhibits** [7] - 2009:4, 2009:7, 2009:12, 2010:7, 2010:10, 2010:14, 2010:22

**exist** [3] - 2045:14, 2046:12, 2065:1

**existent** [1] - 2177:5

**exists** [2] - 2016:4, 2062:25

**exits** [3] - 2135:17, 2229:12, 2288:21

**Expect** [1] - 2097:5

**expect** [3] - 2133:1, 2135:3, 2146:3

**expectations** [2] - 2069:18, 2156:14

**expected** [1] - 2135:1

**expense** [4] - 2017:21, 2046:20, 2047:11

**expenses** [13] - 2016:10, 2016:20, 2017:5, 2017:13, 2017:17, 2017:18, 2017:24, 2018:10, 2018:15, 2018:21, 2028:3, 2028:11, 2031:24

**experience** [14] - 2023:14, 2053:1, 2070:2, 2070:3, 2081:5, 2087:6, 2128:4, 2134:8, 2138:14, 2147:6, 2156:24, 2156:25, 2158:10, 2232:5

**experienced** [4] - 2064:11, 2067:25, 2235:21, 2236:19, 2243:11, 2246:20, 2246:22, 2261:11

**experiences** [1] - 2233:11

**experiencing** [4] - 2067:20, 2134:6, 2134:16, 2174:11

**expert** [55] - 2010:24, 2019:11, 2019:13, 2019:20, 2020:14, 2020:15, 2022:6, 2022:8, 2029:16, 2030:21, 2031:13, 2034:10, 2034:20, 2034:23, 2035:10, 2035:20, 2038:21, 2039:8, 2039:24, 2040:11, 2043:23, 2042:12, 2044:4, 2048:16, 2048:17, 2048:19, 2070:22, 2071:2, 2071:10, 2071:11,

2073:3, 2073:9, 2077:25, 2078:3,
2086:19, 2086:22, 2136:16, 2137:5,
2137:6, 2180:16, 2209:23, 2214:12,
2215:2, 2226:4, 2233:25, 2234:3,
2234:7, 2234:10, 2252:6, 2254:19,
2258:5, 2262:13, 2263:18, 2269:13
**expert's** [2] - 2009:15, 2009:16
**expertise** [2] - 2023:13, 2230:22
**experts** [9] - 2020:14, 2020:17,
2050:24, 2051:2, 2054:6, 2056:4,
2065:2, 2077:15, 2131:15
**explain** [23] - 2020:23, 2088:6,
2094:24, 2095:8, 2095:16, 2099:6,
2104:19, 2106:7, 2106:25, 2111:6,
2112:23, 2125:9, 2127:19, 2132:2,
2134:14, 2138:3, 2216:21, 2236:18,
2241:3, 2246:5, 2254:21, 2282:9
**explained** [11] - 2015:24, 2059:13,
2095:19, 2095:20, 2097:21, 2098:15,
2100:1, 2100:6, 2103:13, 2111:6,
2124:17
**explanation** [9] - 2108:10, 2198:17,
2199:8, 2199:14, 2199:15, 2245:20,
2251:3, 2251:6, 2251:24
**explore** [1] - 2046:5
**exposed** [9] - 2153:12, 2153:16,
2228:13, 2231:21, 2232:18, 2238:8,
2241:18, 2247:5, 2247:19
**exposure** [13] - 2064:8, 2064:12,
2064:20, 2067:17, 2068:13, 2136:21,
2137:2, 2153:15, 2153:17, 2153:25,
2154:1, 2258:8
**expressed** [2] - 2055:13, 2157:15
**expression** [1] - 2217:14
**extend** [1] - 2239:25
**extends** [1] - 2240:4
**extension** [2] - 2245:16, 2255:8
**extensive** [1] - 2058:4
**extensively** [1] - 2059:18
**extent** [6] - 2030:20, 2055:6, 2105:3,
2127:20, 2159:2, 2228:20
**external** [8] - 2068:13, 2068:16,
2069:6, 2240:15, 2241:25, 2242:18,
2242:19, 2242:24
**extra** [1] - 2091:22
**extrapolate** [1] - 2031:17
**extreme** [1] - 2122:11
**extremely** [3] - 2035:7, 2100:3,
2124:15
**eye** [1] - 2162:2
**eyeball** [2] - 2225:5, 2225:6
**eyebrows** [1] - 2162:4
**eyes** [4] - 2089:6, 2089:7, 2089:9,
2132:11

## F

**face** [5] - 2059:7, 2242:14, 2242:15,
2259:16, 2260:3
**facet** [5] - 2033:17, 2033:21, 2034:6,

2034:18, 2051:25
**facility** [1] - 2088:13
**facing** [2] - 2197:21, 2198:5
**fact** [26] - 2013:24, 2020:18, 2038:7,
2040:5, 2049:2, 2053:9, 2077:10,
2089:2, 2109:23, 2132:25, 2144:11,
2150:15, 2171:12, 2201:1, 2204:23,
2213:8, 2226:4, 2228:12, 2237:7,
2242:1, 2247:15, 2249:7, 2257:14,
2261:14, 2274:11, 2276:17
**facto** [1] - 2019:14
**factor** [1] - 2240:18
**factors** [3] - 2043:10, 2058:13,
2155:13, 2156:12, 2217:14
**facts** [2] - 2016:13, 2040:25
**factual** [2] - 2020:17, 2048:18
**fail** [3] - 2183:1, 2183:6, 2190:10
**failed** [15] - 2018:7, 2144:9, 2184:23,
2186:23, 2195:2, 2195:23, 2196:19,
2197:11, 2197:15, 2198:18, 2199:9,
2199:13, 2205:17, 2235:16, 2235:19
**failing** [5] - 2070:22, 2189:15,
2205:18, 2205:19, 2236:7
**failure** [3] - 2072:21, 2077:4, 2241:1
**fair** [22] - 2044:19, 2055:17, 2055:19,
2063:19, 2077:23, 2151:13, 2159:4,
2159:20, 2161:18, 2162:6, 2165:8,
2172:7, 2174:20, 2220:14, 2222:22,
2224:13, 2224:19, 2226:12, 2248:2,
2268:22, 2268:23, 2275:10
**Fair** [1] - 2083:21
**Fairleigh** [1] - 2082:16
**fairly** [3] - 2059:11, 2140:20
**fairness** [2] - 2077:4, 2077:22
**fake** [1] - 2201:4
**faker** [4] - 2110:1, 2160:11, 2160:16,
2201:8
**faking** [6] - 2042:18, 2043:1, 2087:16,
2088:2, 2122:19, 2176:5
**fall** [3] - 2072:17, 2131:3, 2175:4
**falling** [3] - 2100:20, 2127:15, 2157:19
**false** [3] - 2122:4, 2209:11, 2258:21
**familial** [1] - 2043:11
**familiar** [11] - 2023:16, 2152:24,
2153:19, 2154:2, 2157:1, 2157:20,
2157:25, 2158:7, 2159:10, 2169:19,
2263:16
**families** [1] - 2140:10
**Family** [1] - 2013:17
**family** [9] - 2042:1, 2043:6, 2043:7,
2046:5, 2058:3, 2075:12, 2103:19,
2139:11, 2177:16
**fancy** [2] - 2083:8, 2126:5
**far** [18] - 2030:15, 2031:7, 2031:8,
2105:14, 2114:5, 2161:18, 2187:16,
2191:8, 2195:3, 2195:13, 2195:16,
2214:17, 2236:14, 2257:8, 2263:9,
2263:11, 2273:4, 2284:17
**fast** [1] - 2014:4
**father** [2] - 2045:10, 2184:16

**fatigue** [3] - 2058:17, 2163:23, 2175:8
**fault** [1] - 2053:14
**favor** [2] - 2016:1, 2219:25
**favorable** [1] - 2146:6
**fear** [2] - 2069:23, 2156:20
**features** [2] - 2152:15, 2154:7
**February** [1] - 2094:17
**federal** [2] - 2017:1, 2021:20
**Federal** [1] - 2015:22
**fee** [2] - 2149:11, 2149:15
**feed** [1] - 2209:10
**Feed** [1] - 2093:25
**feedback** [1] - 2096:11
**feelings** [7] - 2069:4, 2069:8, 2070:1,
2070:4, 2154:6, 2156:22, 2156:25
**fees** [1] - 2149:3
**feigned** [1] - 2148:14
**feigning** [2] - 2122:19, 2124:16
**felon** [1] - 2046:3
**felt** [2] - 2240:23, 2261:15
**few** [11] - 2028:25, 2098:24, 2105:4,
2106:13, 2129:8, 2152:2, 2159:9,
2180:20, 2195:4, 2207:2, 2234:21
**Fiber** [1] - 2017:3
**fide** [1] - 2058:22
**field** [15] - 2023:24, 2086:10, 2106:3,
2145:18, 2146:21, 2147:1, 2163:13,
2163:16, 2176:22, 2177:7, 2181:24,
2230:20, 2231:10, 2233:23, 2241:6
**fifth** [8] - 2117:11, 2117:14, 2117:25,
2148:9, 2152:12, 2166:18, 2264:2,
2277:24
**figure** [4] - 2032:3, 2126:11, 2126:16,
2254:15
**file** [6] - 2009:3, 2009:15, 2009:16,
2011:18, 2012:5, 2164:2
**files** [1] - 2008:16
**fill** [1] - 2122:4
**filling** [1] - 2054:6
**film** [2] - 2142:22, 2142:23
**final** [2] - 2032:3, 2077:21
**finally** [3] - 2084:24, 2283:8, 2284:21
**financial** [3] - 2145:12, 2145:16,
2211:17
**findings** [3] - 2016:6, 2019:7, 2143:12
**fine** [10] - 2057:11, 2064:4, 2083:11,
2096:2, 2129:7, 2130:23, 2200:4,
2219:20, 2252:9
**finger** [1] - 2125:25
**fingers** [1] - 2288:17
**finish** [9] - 2059:3, 2104:25, 2186:18,
2258:17, 2272:23, 2272:24, 2279:11
**finished** [3] - 2032:17, 2288:3, 2288:4
**fire** [1] - 2094:4
**firehouse** [1] - 2054:14
**FIRM** [1] - 2006:15
**firm** [3] - 2090:17, 2090:19, 2090:22
**firming** [1] - 2054:7
**first** [104] - 2008:11, 2008:19, 2008:22,

2011:21, 2014:14, 2016:15, 2038:4, 2039:1, 2043:16, 2049:5, 2057:25, 2059:14, 2079:17, 2080:3, 2087:24, 2088:9, 2090:20, 2091:24, 2093:1, 2094:1, 2094:5, 2094:21, 2097:6, 2098:2, 2098:24, 2108:4, 2112:19, 2113:9, 2113:15, 2113:16, 2113:17, 2114:1, 2114:10, 2116:10, 2116:14, 2117:23, 2118:14, 2121:20, 2124:11, 2124:13, 2124:25, 2127:3, 2129:14, 2129:15, 2135:7, 2139:6, 2139:9, 2139:11, 2139:14, 2140:14, 2140:18, 2141:9, 2142:2, 2142:3, 2153:18, 2158:23, 2159:16, 2159:23, 2160:5, 2160:10, 2160:15, 2160:18, 2162:16, 2166:19, 2166:23, 2173:13, 2177:22, 2178:1, 2178:4, 2179:3, 2179:24, 2182:5, 2182:6, 2182:8, 2182:15, 2183:5, 2183:23, 2184:1, 2184:10, 2184:12, 2184:21, 2186:20, 2189:10, 2189:24, 2190:9, 2197:15, 2199:3, 2200:11, 2205:3, 2205:18, 2205:19, 2216:12, 2216:13, 2218:4, 2220:13, 2230:11, 2230:23, 2236:11, 2270:3, 2271:3, 2283:9, 2288:13
**fit** [4] - 2063:24, 2152:4, 2283:21, 2283:25
**five** [38] - 2024:10, 2058:5, 2064:21, 2078:15, 2090:8, 2101:24, 2106:11, 2106:14, 2106:18, 2106:20, 2107:14, 2107:21, 2111:25, 2113:5, 2114:25, 2115:1, 2115:10, 2116:25, 2118:19, 2118:24, 2119:8, 2119:22, 2133:19, 2133:21, 2148:7, 2156:6, 2156:21, 2157:17, 2166:16, 2168:4, 2186:15, 2213:4, 2213:7, 2218:16, 2227:23, 2257:6, 2260:7
**Five** [1] - 2119:9
**five-digit** [5] - 2106:11, 2106:14, 2106:18, 2106:20
**five-year** [1] - 2107:21
**five-year-olds** [2] - 2111:25, 2119:8
**Five-year-olds** [1] - 2119:9
**fix** [1] - 2072:22
**fixed** [2] - 2274:25, 2275:3
**flashbacks** [3] - 2065:11, 2068:9, 2153:24
**flashing** [1] - 2129:11
**flat** [1] - 2149:15
**Flat** [2] - 2018:2, 2031:23
**flex** [1] - 2242:8
**flexed** [3] - 2239:17, 2242:15, 2284:14
**flexes** [3] - 2274:5, 2274:9, 2275:3
**flexibility** [1] - 2272:20
**flexion** [8] - 2241:19, 2241:20, 2242:4, 2242:10, 2242:16, 2245:16, 2255:8, 2286:5
**flexion-type** [2] - 2242:4, 2242:10
**flies** [1] - 2055:10
**flip** [3] - 2089:10, 2111:16, 2111:17

**flipping** [1] - 2108:7
**fluency** [2] - 2121:16, 2191:21
**fluent** [2] - 2190:12, 2190:15
**fluke** [2] - 2224:7, 2224:13
**focus** [1] - 2181:16
**focused** [1] - 2150:4
**focuses** [2] - 2150:10, 2150:22
**focusing** [1] - 2276:13
**foil** [1] - 2111:21
**fold** [2] - 2284:8, 2284:10
**folder** [6] - 2008:25, 2009:3, 2009:8, 2009:9, 2009:10, 2010:8
**folding** [2] - 2284:7, 2285:6
**folks** [6] - 2085:12, 2126:17, 2163:5, 2163:18, 2200:3, 2213:2
**follow** [4] - 2031:13, 2149:2, 2159:9, 2281:7
**follow-up** [1] - 2149:2
**follow-ups** [2] - 2031:13, 2159:9
**following** [42] - 2008:3, 2022:12, 2035:25, 2049:11, 2061:16, 2067:14, 2067:19, 2068:1, 2069:2, 2069:14, 2072:25, 2079:23, 2088:16, 2108:15, 2129:20, 2135:24, 2136:4, 2150:25, 2153:14, 2153:23, 2154:6, 2155:1, 2156:10, 2157:13, 2172:24, 2185:22, 2186:1, 2188:4, 2192:20, 2193:1, 2193:9, 2198:22, 2202:10, 2220:25, 2244:4, 2256:21, 2257:1, 2260:23, 2265:14, 2266:21, 2270:7, 2287:11
**follows** [4] - 2016:15, 2038:1, 2080:4, 2230:12
**football** [1] - 2081:15
**Football** [1] - 2081:9
**FOR** [1] - 2006:12
**force** [27] - 2136:20, 2137:5, 2137:11, 2137:21, 2233:17, 2237:14, 2240:2, 2240:5, 2241:7, 2241:9, 2242:25, 2243:2, 2246:8, 2255:16, 2261:11, 2261:15, 2261:24, 2262:8, 2267:19, 2270:1, 2272:9, 2273:18, 2273:21, 2273:22, 2282:16, 2286:17
**Force** [2] - 2082:7, 2082:8
**Forced** [1] - 2212:5
**forced** [1] - 2233:2
**forces** [62] - 2137:7, 2138:1, 2228:12, 2232:22, 2235:18, 2235:23, 2236:4, 2236:7, 2236:13, 2237:15, 2237:23, 2239:2, 2240:9, 2240:15, 2240:19, 2240:23, 2241:8, 2241:11, 2241:13, 2242:1, 2242:24, 2243:3, 2243:5, 2243:7, 2243:11, 2243:15, 2243:17, 2246:8, 2246:10, 2246:20, 2246:22, 2247:20, 2253:19, 2253:20, 2253:25, 2254:13, 2255:1, 2255:2, 2255:18, 2258:24, 2261:18, 2263:3, 2263:15, 2267:17, 2268:3, 2269:3, 2269:24, 2273:9, 2281:10, 2281:19, 2281:24, 2281:25, 2282:10, 2286:2, 2286:4, 2286:7, 2286:9, 2286:13, 2286:15,

2286:16
**forehead** [1] - 2162:2
**forensic** [11] - 2145:20, 2145:24, 2149:19, 2149:22, 2150:2, 2150:15, 2150:16, 2150:17, 2150:19, 2150:22
**forethought** [1] - 2043:23
**forget** [1] - 2025:12
**forgetfulness** [1] - 2164:7
**forgive** [1] - 2166:6
**form** [13] - 2062:14, 2095:3, 2095:6, 2095:17, 2096:8, 2096:16, 2096:24, 2098:23, 2100:6, 2102:3, 2167:22, 2169:18
**formal** [6] - 2064:4, 2098:21, 2105:19, 2110:23, 2175:22, 2231:22
**format** [1] - 2167:21
**former** [1] - 2091:17
**formerly** [1] - 2081:9
**forming** [1] - 2262:2
**forms** [1] - 2177:2
**forth** [14] - 2095:2, 2095:25, 2098:13, 2098:20, 2099:12, 2119:23, 2152:15, 2157:23, 2178:5, 2178:22, 2209:3, 2212:6, 2216:25, 2284:10
**forward** [22] - 2023:15, 2026:21, 2086:25, 2236:24, 2237:2, 2238:3, 2238:25, 2239:4, 2239:17, 2241:20, 2242:6, 2242:7, 2242:8, 2274:4, 2274:8, 2275:3, 2284:14, 2285:13, 2286:8, 2286:25, 2287:2
**foul** [1] - 2239:21
**foundation** [39] - 2019:16, 2019:19, 2019:25, 2020:6, 2020:10, 2020:12, 2022:8, 2023:17, 2024:25, 2025:8, 2028:24, 2029:5, 2029:16, 2030:8, 2030:13, 2030:16, 2030:18, 2033:1, 2033:6, 2033:9, 2033:12, 2033:20, 2034:16, 2035:21, 2036:3, 2037:12, 2038:14, 2042:3, 2042:6, 2051:3, 2053:4, 2055:15, 2055:16, 2056:9, 2225:21, 2261:3, 2263:25, 2273:3
**foundational** [2] - 2271:3, 2271:18
**four** [18] - 2009:18, 2064:21, 2070:9, 2070:10, 2090:8, 2117:17, 2117:24, 2119:22, 2120:24, 2122:23, 2156:19, 2214:6, 2227:23
**fourth** [3] - 2069:11, 2117:6, 2117:24
**Fourth** [1] - 2124:7
**frame** [3] - 2238:5, 2248:13
**frank** [1] - 2056:20
**frankly** [1] - 2037:4
**free** [4] - 2099:11, 2099:21, 2110:18, 2110:20
**free-standing** [2] - 2110:18, 2110:20
**frequency** [8] - 2018:1, 2031:19, 2031:22, 2032:4, 2033:1, 2035:22, 2036:9, 2039:5, 2039:11, 2052:3, 2052:8, 2056:6
**frequent** [1] - 2039:16

**freshman** [1] - 2082:4
**Friday** [3] - 2006:7, 2288:14
**fridge** [1] - 2095:10
**friend** [1] - 2153:16
**front** [39] - 2024:6, 2099:15, 2117:7, 2138:1, 2174:6, 2201:17, 2216:10, 2237:17, 2238:19, 2239:1, 2246:23, 2247:2, 2247:4, 2247:7, 2247:8, 2247:11, 2247:16, 2247:18, 2248:6, 2248:17, 2259:2, 2259:9, 2262:8, 2263:14, 2263:24, 2266:4, 2266:8, 2267:3, 2268:2, 2268:6, 2272:16, 2274:13, 2276:12, 2276:18, 2279:9, 2279:13, 2279:20, 2280:6
**frontal** [10] - 2142:14, 2161:16, 2161:18, 2161:21, 2161:23, 2162:1, 2162:3, 2162:13, 2238:3, 2250:9
**full** [4] - 2043:14, 2077:23, 2200:25, 2284:21
**fully** [1] - 2268:2
**fully-restrained** [1] - 2268:2
**function** [2] - 2097:9, 2126:2
**functioning** [8] - 2124:9, 2128:1, 2158:4, 2159:10, 2159:12, 2161:14, 2161:15, 2181:10
**functions** [5] - 2087:16, 2088:11, 2126:23, 2159:12, 2170:17
**fundamental** [2] - 2077:4, 2077:22
**furthermore** [4] - 2009:11, 2242:3, 2242:11
**fusion** [15] - 2021:2, 2021:3, 2038:2, 2038:4, 2038:6, 2038:10, 2038:11, 2038:18, 2038:21, 2039:3, 2039:22, 2040:11, 2052:19, 2052:20, 2055:3
**fusions** [4] - 2052:2, 2054:11, 2054:16, 2054:21
**future** [40] - 2016:9, 2016:19, 2017:4, 2017:12, 2017:16, 2017:19, 2017:24, 2018:5, 2018:10, 2018:21, 2019:8, 2022:1, 2025:22, 2026:21, 2026:22, 2028:3, 2028:11, 2028:15, 2028:16, 2028:25, 2031:24, 2037:10, 2040:3, 2040:8, 2040:18, 2041:1, 2041:20, 2048:4, 2048:7, 2048:10, 2048:14, 2048:18, 2051:6, 2051:20, 2056:7, 2057:5, 2057:7, 2057:8

## G

**gain** [3] - 2043:11, 2211:17, 2223:3
**game** [3] - 2239:21, 2268:22, 2268:23
**garden** [1] - 2064:3
**GCS** [3] - 2131:8, 2132:1, 2218:15
**GED** [2] - 2094:6, 2210:22
**general** [5] - 2181:1, 2231:20, 2269:11, 2269:14, 2277:25
**generalization** [1] - 2174:21
**generalized** [2] - 2063:20, 2063:23
**generally** [8] - 2044:8, 2051:1, 2130:21, 2174:14, 2186:11, 2186:12,

2271:18, 2271:25
**gentleman** [3] - 2009:23, 2026:5, 2030:3
**gentlemen** [2] - 2135:15, 2168:10, 2288:2
**geometric** [1] - 2126:16
**gist** [2] - 2177:1, 2180:8
**given** [18] - 2027:20, 2028:18, 2066:9, 2087:14, 2090:5, 2109:13, 2116:1, 2167:5, 2167:18, 2167:19, 2175:25, 2182:10, 2212:23, 2213:2, 2214:18, 2227:7, 2227:8, 2252:8
**glad** [1] - 2095:4
**Glasgow** [4] - 2131:9, 2131:24, 2132:9, 2218:20
**GLI** [1] - 2256:2
**GLI-044011** [1] - 2255:23
**goals** [1] - 2195:3
**God** [1] - 2209:9
**God's** [1] - 2209:11
**Godinez** [27] - 2185:2, 2185:12, 2185:13, 2185:16, 2186:9, 2187:13, 2187:22, 2189:5, 2189:22, 2190:11, 2190:13, 2190:21, 2191:5, 2191:11, 2191:22, 2194:9, 2194:13, 2195:23, 2196:8, 2196:12, 2201:1, 2209:23, 2210:3, 2210:15, 2210:22, 2210:25
**Godinez's** [1] - 2196:1
**GOGGIN** [1] - 2007:9
**gold** [1] - 2200:11
**Goldman** [3] - 2046:2, 2094:3, 2158:24
**goldman** [1] - 2093:9, 2103:22
**Goldman's** [2] - 2062:9, 2070:18
**gonna** [1] - 2032:22
**grab** [2] - 2037:8, 2053:22
**grade** [5] - 2043:16, 2186:22, 2189:12, 2194:23, 2213:13
**graduate** [2] - 2175:14, 2231:8
**graduation** [1] - 2013:10
**Grand** [1] - 2006:22
**grandparent** [1] - 2194:15
**grant** [3] - 2012:25, 2015:25, 2039:3
**granted** [4] - 2016:4, 2055:6, 2055:7, 2257:14
**granting** [1] - 2077:1
**great** [3] - 2015:16, 2107:3, 2288:20
**greater** [12] - 2237:13, 2237:24, 2238:15, 2239:16, 2268:3, 2275:19, 2278:11, 2278:13, 2282:3, 2282:21, 2283:6
**greatest** [1] - 2020:8
**greet** [1] - 2094:22
**grew** [3] - 2103:19, 2186:14, 2194:16
**GREYHOUND** [1] - 2006:7
**Greyhound** [7] - 2007:4, 2007:10, 2007:15, 2015:20, 2016:14, 2045:23, 2045:24
**Greyhound's** [2] - 2009:14, 2077:6
**gross** [1] - 2217:23

**grossly** [1] - 2040:12
**group** [2] - 2086:2, 2114:2
**guarantee** [1] - 2008:18
**Gubica** [4] - 2007:4, 2007:11, 2007:11
**GUBICA** [2] - 2006:8
**guess** [10] - 2009:19, 2047:22, 2062:7, 2071:12, 2114:20, 2173:8, 2204:22, 2262:3, 2279:23, 2280:13
**guessing** [2] - 2212:9, 2234:19
**guidelines** [1] - 2071:5
**guilt** [2] - 2069:23, 2156:21
**gun** [1] - 2039:2
**Gutstein** [2] - 2093:2
**guy** [5] - 2034:10, 2040:10, 2041:23, 2044:13, 2258:3

## H

**half** [17] - 2089:7, 2089:10, 2089:11, 2101:24, 2113:22, 2113:24, 2114:6, 2229:20, 2233:6, 2278:12, 2281:25, 2282:3, 2282:10, 2282:11, 2282:25, 2283:6, 2283:24
**hall** [1] - 2288:20
**Hall** [1] - 2083:14
**Halstead** [2] - 2058:11, 2059:14
**hand** [8] - 2021:16, 2037:7, 2079:22, 2092:19, 2230:4, 2239:22, 2239:24, 2240:2
**hand-held** [1] - 2037:7
**handed** [2] - 2142:12, 2219:22
**handheld** [1] - 2053:22
**handle** [1] - 2054:22
**handled** [1] - 2054:18
**hands** [2] - 2067:13, 2239:25
**happiness** [2] - 2070:3, 2156:25
**hard** [8] - 2107:16, 2107:17, 2123:20, 2196:5, 2269:17, 2280:17
**harder** [8] - 2107:2, 2113:3, 2272:17, 2274:17, 2274:19, 2280:11, 2280:12, 2280:14
**harm** [1] - 2168:19
**Harrison** [1] - 2016:22
**head** [73] - 2049:4, 2072:11, 2073:5, 2081:14, 2131:6, 2133:1, 2156:12, 2160:17, 2160:19, 2160:23, 2162:7, 2162:9, 2162:12, 2178:6, 2199:15, 2201:2, 2216:8, 2216:16, 2217:11, 2225:16, 2225:23, 2225:24, 2228:9, 2228:13, 2242:8, 2255:7, 2255:19, 2258:8, 2258:9, 2265:9, 2266:7, 2266:11, 2266:13, 2268:1, 2268:16, 2268:20, 2269:23, 2271:5, 2271:5, 2271:6, 2271:14, 2271:15, 2271:19, 2273:1, 2273:4, 2273:9, 2274:5, 2274:6, 2274:8, 2274:12, 2274:18, 2274:25, 2275:7, 2275:11, 2275:12, 2275:19, 2275:24, 2276:13, 2276:14, 2276:20, 2276:21, 2279:8, 2279:13, 2280:7, 2283:25, 2284:17, 2284:19,

2285:11, 2285:12, 2285:16
**head's** [2] - 2285:14, 2285:15
**headache** [2] - 2140:24, 2163:23
**headaches** [2] - 2139:25, 2140:5
**headrest** [1] - 2284:13
**heads** [1] - 2271:10
**hear** [15] - 2008:7, 2015:16, 2038:25, 2055:8, 2056:10, 2056:23, 2061:14, 2088:1, 2114:25, 2115:1, 2115:2, 2127:9, 2130:6, 2250:20, 2251:18
**heard** [20] - 2047:24, 2048:2, 2048:5, 2053:5, 2063:10, 2068:19, 2083:5, 2103:22, 2110:12, 2118:19, 2121:6, 2128:13, 2130:20, 2143:16, 2148:7, 2158:22, 2209:9, 2210:1, 2261:10, 2282:8
**hearing** [16] - 2049:5, 2050:3, 2143:13, 2143:14, 2144:2, 2154:14, 2155:2, 2185:20, 2186:2, 2192:18, 2193:2, 2199:5, 2256:19, 2257:2, 2266:19, 2274:17
**hears** [1] - 2114:23
**heart** [1] - 2071:3
**heavily** [2] - 2191:8, 2191:18
**heavy** [1] - 2280:8
**held** [7] - 2037:7, 2154:14, 2185:20, 2192:18, 2199:4, 2256:19, 2266:18
**help** [6] - 2024:7, 2042:1, 2050:20, 2051:16, 2098:25, 2259:23
**helped** [6] - 2129:14, 2130:3, 2130:7, 2141:16, 2210:3, 2210:6
**helpful** [3] - 2072:1, 2139:4, 2240:13
**helping** [1] - 2141:15
**helps** [1] - 2091:8
**hemisphere** [3] - 2142:12, 2142:17
**Hepburn** [1] - 2093:10
**herniate** [1] - 2255:8
**herniated** [1] - 2063:4
**herself** [1] - 2156:19
**hi** [1] - 2080:8
**HIC** [3] - 2258:9, 2265:9, 2273:22
**High** [1] - 2194:22
**high** [7] - 2082:2, 2183:9, 2190:15, 2195:15, 2197:9, 2255:3, 2267:15
**higher** [22] - 2142:4, 2159:12, 2164:24, 2237:5, 2237:6, 2263:14, 2268:1, 2268:21, 2272:9, 2273:5, 2273:9, 2273:17, 2274:7, 2274:18, 2276:14, 2279:9, 2279:13, 2280:7, 2280:14, 2282:10, 2282:11
**highlight** [2] - 2098:24, 2099:19
**highly** [1] - 2213:11
**Hills** [1] - 2040:12
**himself** [6] - 2011:5, 2034:12, 2037:15, 2041:12, 2041:25, 2156:19
**himself/herself** [1] - 2069:21
**hired** [2] - 2150:11, 2185:12
**history** [14] - 2102:10, 2102:11, 2103:21, 2144:11, 2194:8, 2194:12, 2195:17, 2196:16, 2209:3, 2217:9,

2217:25, 2218:3
**hit** [14] - 2072:11, 2073:4, 2133:1, 2160:17, 2211:23, 2216:8, 2216:16, 2225:24, 2273:4, 2273:16, 2274:6, 2281:24, 2284:20, 2285:14
**hits** [4] - 2275:11, 2275:18, 2275:19, 2282:20
**hitting** [2] - 2268:19, 2268:20
**Hoang** [1] - 2064:14
**hoc** [1] - 2019:14
**hockey** [2] - 2081:16, 2128:19
**hold** [8] - 2013:16, 2087:3, 2147:22, 2207:17, 2235:8, 2256:1, 2256:9, 2279:11
**holes** [1] - 2054:7
**home** [21] - 2023:6, 2023:19, 2041:5, 2041:12, 2041:16, 2041:18, 2041:20, 2042:4, 2050:18, 2052:24, 2053:2, 2053:9, 2066:14, 2088:13, 2100:15, 2100:24, 2112:24, 2113:12, 2183:24, 2184:13, 2194:21
**honest** [3] - 2059:23, 2070:24, 2098:11
**honestly** [1] - 2098:13
**honesty** [1] - 2098:9
**Honor** [70] - 2012:12, 2013:8, 2013:14, 2013:21, 2014:14, 2014:23, 2015:2, 2015:7, 2016:16, 2017:10, 2020:2, 2027:23, 2029:14, 2029:20, 2032:8, 2033:15, 2035:22, 2038:5, 2039:9, 2045:6, 2047:13, 2048:8, 2052:14, 2057:13, 2057:14, 2058:10, 2058:13, 2058:14, 2058:23, 2059:3, 2059:7, 2062:2, 2062:4, 2062:13, 2063:2, 2064:15, 2065:2, 2065:3, 2065:6, 2065:8, 2065:12, 2065:13, 2065:22, 2066:2, 2066:5, 2066:13, 2066:15, 2072:10, 2073:23, 2076:12, 2076:23, 2078:16, 2078:20, 2079:1, 2079:11, 2079:15, 2079:16, 2079:18, 2080:14, 2086:18, 2086:24, 2092:19, 2093:20, 2094:11, 2096:20, 2106:5, 2110:12, 2110:21, 2120:11, 2120:12, 2120:19, 2135:10, 2137:8, 2138:10, 2148:1, 2148:20, 2148:22, 2158:16, 2167:24, 2183:18, 2184:4, 2186:4, 2189:8, 2190:24, 2191:1, 2191:16, 2192:2, 2198:14, 2199:2, 2201:7, 2203:23, 2208:8, 2218:9, 2221:4, 2223:14, 2223:15, 2226:17, 2229:15, 2234:6, 2234:17, 2249:24, 2253:4, 2256:17, 2260:8, 2262:19, 2263:19, 2276:5, 2277:15, 2287:5
**honor** [14] - 2042:11, 2044:6, 2044:15, 2093:14, 2130:18, 2133:7, 2140:14, 2141:23, 2143:5, 2143:20, 2144:12, 2144:21, 2145:9, 2220:21
**Honor's** [4] - 2057:21, 2164:19, 2164:23, 2168:2
**honor's** [3] - 2059:10, 2140:10, 2144:6

**HONORABLE** [1] - 2006:12
**hope** [1] - 2222:4
**hopefully** [4] - 2060:3, 2288:7, 2288:15, 2288:17
**horrible** [1] - 2131:7
**horror** [2] - 2069:23, 2156:20
**Hospital** [7] - 2083:19, 2083:20, 2093:3, 2134:9, 2134:10, 2140:4, 2215:18
**hospital** [5] - 2093:3, 2093:7, 2093:10, 2140:5, 2231:15
**hospitalized** [1] - 2122:12
**hospitals** [2] - 2083:17, 2092:7
**hot** [1] - 2216:24
**hotel** [1] - 2013:13
**hour** [30] - 2085:3, 2091:2, 2091:3, 2161:5, 2169:9, 2226:3, 2226:5, 2229:4, 2229:20, 2236:3, 2236:20, 2236:21, 2236:23, 2236:25, 2237:5, 2237:9, 2246:3, 2254:15, 2255:11, 2263:9, 2278:9, 2278:10, 2278:11, 2282:7, 2282:8, 2282:19, 2282:21, 2282:23, 2283:3
**hours** [10] - 2045:25, 2050:25, 2091:4, 2091:19, 2101:23, 2140:18, 2141:10, 2218:4, 2226:22, 2227:4
**house** [2] - 2115:11, 2115:12
**huge** [1] - 2142:24
**hum** [1] - 2190:25
**human** [6] - 2232:6, 2232:18, 2233:6, 2233:8, 2233:22
**hundred** [17] - 2114:9, 2114:10, 2114:11, 2114:18, 2119:1, 2119:12, 2119:13, 2120:14, 2120:16, 2120:17, 2120:18, 2212:20, 2213:13
**hundred-thousand** [1] - 2120:18
**hundreds** [1] - 2128:17
**hurt** [2] - 2075:11, 2251:25
**Hut** [1] - 2011:10
**Hyatt** [3] - 2017:11, 2018:9, 2025:18
**hypertension** [1] - 2218:19
**hypervigilance** [1] - 2157:17
**hypothetical** [2] - 2066:13, 2226:25
**hypothetically** [1] - 2174:17

**I**

**ID** [2] - 2255:23, 2262:18
**idea** [7] - 2031:20, 2113:1, 2130:21, 2223:9, 2238:12, 2262:7, 2263:4
**identical** [2] - 2052:18, 2246:21
**identify** [1] - 2235:16
**ignore** [1] - 2215:3
**II** [3] - 2125:1, 2125:5, 2125:21
**imagine** [1] - 2215:7
**imagined** [1] - 2017:15
**imaging** [1] - 2031:14
**immediate** [3] - 2129:5, 2130:22, 2140:20

VB    OCR    CRR

**immediately** [4] - 2014:11, 2103:2, 2129:12, 2141:11
**immovable** [2] - 2237:1, 2237:8
**impact** [20] - 2104:16, 2105:2, 2109:20, 2127:21, 2129:5, 2130:23, 2132:9, 2141:12, 2141:18, 2143:11, 2145:12, 2177:9, 2239:23, 2240:2, 2242:6, 2242:12, 2247:3, 2285:21, 2286:11
**impaired** [15] - 2125:16, 2125:17, 2151:12, 2195:2, 2201:3, 2203:4, 2203:6, 2204:24, 2205:25, 2206:2, 2206:23, 2210:25
**impairment** [10] - 2087:17, 2122:18, 2124:16, 2127:8, 2128:8, 2132:11, 2147:19, 2148:15, 2158:3, 2206:7
**imparted** [1] - 2236:4
**impeaching** [1] - 2186:4
**impeachment** [3] - 2191:16, 2192:16, 2203:21
**implicit** [1] - 2060:24
**important** [12] - 2018:13, 2018:17, 2041:4, 2069:15, 2156:11, 2158:4, 2181:24, 2182:20, 2182:21, 2200:16, 2200:19, 2282:18
**importantly** [1] - 2017:16
**impossibility** [1] - 2130:17
**impossible** [8] - 2089:21, 2121:1, 2225:10, 2236:13, 2254:25, 2255:3, 2255:17
**improper** [4] - 2039:19, 2191:16, 2192:16, 2203:21
**improvement** [4] - 2059:21, 2060:25, 2165:4, 2165:20
**improving** [1] - 2060:15
**impulse** [1] - 2043:11
**in-person** [1] - 2067:21
**inability** [7] - 2069:15, 2070:2, 2070:3, 2154:7, 2156:10, 2156:24
**INC** [1] - 2006:7
**Inc** [5] - 2007:4, 2007:10, 2007:16, 2017:3, 2018:2
**incalculable** [1] - 2090:4
**incarceration** [1] - 2197:22
**inch** [4] - 2233:5, 2233:6, 2283:24, 2284:1
**inch-and-a-half** [1] - 2283:24
**inches** [2] - 2283:23, 2283:24
**incident** [10] - 2236:5, 2236:19, 2242:12, 2263:10, 2278:13, 2282:6, 2282:22, 2283:1, 2283:7, 2285:9
**incidentally** [1] - 2019:2
**inclined** [1] - 2056:22
**include** [2] - 2097:16, 2252:20
**included** [2] - 2137:10, 2257:13
**includes** [4] - 2031:14, 2097:7, 2250:16, 2250:17
**including** [17] - 2016:20, 2043:11, 2057:24, 2058:1, 2064:14, 2065:12, 2065:14, 2077:14, 2093:22, 2116:13,

2134:18, 2145:20, 2164:7, 2178:13, 2218:13, 2238:3
**incompetence** [1] - 2144:24
**incomplete** [1] - 2226:25
**incomprehensible** [1] - 2088:8
**inconsistent** [2] - 2253:24, 2254:11
**incorporate** [1] - 2062:7
**incorrect** [5] - 2208:13, 2208:16, 2211:16, 2258:11, 2258:21
**incorrectly** [3] - 2143:18, 2242:19, 2242:20
**increase** [1] - 2140:22
**incredibly** [1] - 2201:16
**incurred** [7] - 2017:21, 2047:11, 2235:18, 2235:24, 2236:23, 2237:20, 2250:18
**incurring** [1] - 2239:2
**independent** [4] - 2052:23, 2053:3, 2054:4, 2170:21
**indicate** [4] - 2031:4, 2101:15, 2108:4, 2217:2
**indicated** [14] - 2009:2, 2020:2, 2041:17, 2041:18, 2041:19, 2055:25, 2062:9, 2062:10, 2184:1, 2194:13, 2195:2, 2204:13, 2207:11, 2216:16
**indicates** [4] - 2128:1, 2217:9, 2217:13, 2279:2
**indicating** [1] - 2031:13
**indication** [7] - 2018:11, 2018:22, 2028:5, 2028:6, 2132:17, 2132:22, 2141:4
**indicator** [1] - 2271:5
**indicators** [1] - 2115:6
**indirect** [1] - 2153:16
**indirectly** [1] - 2175:23
**individual** [7] - 2022:3, 2042:4, 2068:10, 2069:20, 2156:19, 2208:12, 2240:20
**individuals** [6] - 2175:9, 2177:13, 2183:4, 2184:21, 2190:9, 2197:20
**industry** [1] - 2111:3
**inertial** [1] - 2286:9
**infant** [1] - 2028:12
**infarction** [1] - 2071:4
**infinitesimal** [1] - 2090:4
**inflammatories** [2] - 2036:20, 2051:18
**inflate** [1] - 2040:12
**inflection** [2] - 2076:1, 2076:2
**information** [14] - 2009:23, 2011:1, 2012:21, 2012:23, 2043:3, 2057:25, 2058:1, 2102:5, 2102:10, 2162:15, 2177:25, 2179:14, 2228:16, 2250:14
**informed** [1] - 2014:3
**infrequent** [1] - 2180:21
**inhaler** [1] - 2195:18
**initial** [6] - 2010:23, 2011:7, 2056:11, 2062:9, 2105:17, 2221:18
**injections** [5] - 2033:16, 2033:18, 2033:21, 2036:7, 2051:21
**injured** [1] - 2059:8

**injured** [10] - 2045:9, 2059:4, 2137:22, 2215:3, 2222:18, 2251:10, 2251:15, 2259:1, 2268:6, 2268:11
**injuries** [38] - 2016:20, 2062:20, 2063:11, 2081:14, 2093:19, 2136:23, 2136:25, 2137:12, 2137:24, 2161:15, 2180:17, 2220:12, 2223:7, 2223:11, 2235:23, 2236:4, 2243:7, 2246:4, 2246:11, 2249:19, 2249:21, 2249:22, 2249:25, 2250:18, 2253:16, 2253:23, 2254:11, 2254:16, 2255:4, 2258:12, 2259:9, 2263:11, 2267:16, 2269:8, 2276:20, 2276:21, 2278:15, 2281:18
**injury** [92] - 2016:11, 2023:4, 2023:16, 2042:9, 2042:10, 2057:18, 2059:16, 2060:2, 2060:14, 2060:15, 2061:1, 2062:21, 2062:22, 2062:25, 2063:11, 2063:14, 2067:18, 2074:18, 2074:22, 2074:23, 2074:25, 2075:5, 2075:14, 2136:20, 2137:2, 2137:22, 2142:5, 2142:7, 2143:1, 2147:20, 2153:13, 2156:13, 2160:22, 2161:16, 2177:2, 2177:9, 2177:10, 2178:6, 2217:11, 2220:9, 2220:11, 2220:14, 2220:16, 2225:23, 2225:25, 2241:2, 2241:19, 2242:10, 2242:22, 2249:14, 2251:4, 2255:19, 2258:8, 2258:9, 2258:10, 2265:9, 2266:7, 2266:13, 2267:6, 2267:14, 2267:18, 2268:1, 2268:17, 2268:21, 2269:14, 2269:23, 2271:4, 2271:5, 2271:6, 2271:19, 2274:12, 2275:12, 2275:24, 2276:13, 2276:14, 2276:20, 2278:22, 2278:24, 2279:1, 2279:8, 2279:13, 2279:19, 2279:25, 2280:7
**inquire** [2] - 2169:21, 2171:1
**inquired** [1] - 2222:15
**insofar** [1] - 2158:10
**inspect** [3] - 2243:21, 2245:9, 2247:21
**inspected** [4] - 2247:21, 2249:7, 2283:9, 2283:11
**inspecting** [1] - 2245:3
**instance** [8] - 2049:4, 2051:4, 2233:1, 2237:16, 2240:5, 2274:4, 2274:6, 2274:12
**instances** [2] - 2151:2, 2196:17
**instantaneous** [1] - 2239:20
**instantaneously** [2] - 2247:10, 2247:11
**instead** [3] - 2013:13, 2156:3, 2214:8
**instruct** [2] - 2020:3, 2072:18
**instructed** [3] - 2106:21, 2115:2, 2118:20
**instructing** [1] - 2209:10
**instruction** [3] - 2013:1, 2071:19, 2136:24
**insufficient** [7] - 2016:13, 2028:24, 2029:5, 2032:25, 2041:9, 2056:13, 2073:17
**insult** [1] - 2258:22

insulting [1] - 2211:13
insurance [5] - 2150:18, 2150:23, 2151:2, 2172:2, 2172:6
insured [1] - 2077:6
intact [1] - 2103:18
integrals [1] - 2213:19
intellect [1] - 2125:17
intellectual [1] - 2125:13
intellectually [1] - 2125:15
intelligence [1] - 2191:8
Intelligence [1] - 2125:2
intended [3] - 2018:8, 2018:16, 2028:13
intense [1] - 2068:12
intention [1] - 2227:16
intentional [2] - 2076:1, 2227:9
intentionally [7] - 2127:20, 2222:25, 2224:15, 2227:18, 2227:20, 2227:25, 2238:12
interact [4] - 2102:13, 2273:3, 2273:6, 2274:3
interacting [2] - 2273:16, 2280:14
interaction [1] - 2222:1
interacts [2] - 2272:14, 2273:2
interest [5] - 2145:16, 2146:4, 2146:7, 2156:21, 2232:20
interested [1] - 2009:24
interesting [2] - 2033:21, 2045:20
interestingly [2] - 2043:15, 2053:7
interests [1] - 2069:24
interfere [1] - 2104:11
interior [4] - 2243:22, 2245:9, 2249:11, 2283:11
internal [6] - 2029:20, 2030:1, 2030:6, 2068:13, 2068:15, 2242:23
international [2] - 2085:21, 2086:16
International [1] - 2084:2
internist [1] - 2029:23
internship [1] - 2134:10
interpret [1] - 2123:4
interpretation [3] - 2059:20, 2109:20, 2109:22
interpreted [1] - 2058:6
interpreting [1] - 2221:12
interrupt [1] - 2272:22
interrupting [1] - 2170:8
intervening [1] - 2209:11
interview [10] - 2096:14, 2096:15, 2097:7, 2102:4, 2102:9, 2102:12, 2103:10, 2105:17, 2189:23
interviewed [2] - 2162:22, 2172:19
interviews [2] - 2058:3, 2066:17
introduce [3] - 2080:6, 2094:22, 2230:6
introduction [1] - 2095:13
intrusion [2] - 2068:1, 2116:2
intrusions [3] - 2117:19, 2117:23, 2118:1
intrusive [2] - 2068:4, 2068:21

invalid [4] - 2143:25, 2144:7, 2180:18, 2245:20
invalidates [1] - 2212:22
inventories [1] - 2170:25
Inventory [2] - 2121:4, 2121:23
invite [1] - 2033:13
involuntary [1] - 2068:21
involved [8] - 2090:15, 2099:22, 2145:7, 2198:9, 2231:25, 2232:2, 2233:22, 2249:3
involves [1] - 2126:4
involving [1] - 2196:25
ipse [1] - 2072:12
IQ [30] - 2125:4, 2125:8, 2176:16, 2183:5, 2183:9, 2183:11, 2183:21, 2184:22, 2196:8, 2197:8, 2199:13, 2201:7, 2201:14, 2203:3, 2204:13, 2205:3, 2205:12, 2205:24, 2205:25, 2206:1, 2206:7, 2207:4, 2207:8, 2207:9, 2209:14, 2211:25, 2212:1, 2212:22, 2213:2, 2213:10
IQs [5] - 2183:1, 2183:7, 2203:5, 2204:23, 2213:8
irrelevant [3] - 2282:12, 2282:17, 2282:18
irritable [1] - 2157:13
isolating [1] - 2200:6
issue [44] - 2011:6, 2011:10, 2011:15, 2011:21, 2011:24, 2011:25, 2012:24, 2013:9, 2016:3, 2020:12, 2021:16, 2045:17, 2046:24, 2046:25, 2048:24, 2048:25, 2052:3, 2052:16, 2052:17, 2052:19, 2056:18, 2057:13, 2060:4, 2065:18, 2070:24, 2071:22, 2077:10, 2077:12, 2077:22, 2092:9, 2096:11, 2136:10, 2136:14, 2136:22, 2145:19, 2170:1, 2173:17, 2173:20, 2177:7, 2236:6, 2243:20, 2245:18, 2261:19
issued [17] - 2047:8, 2091:24, 2092:12, 2093:1, 2093:16, 2138:23, 2159:16, 2159:17, 2160:10, 2160:15, 2160:18, 2162:16, 2177:22, 2178:1, 2178:4, 2179:24, 2180:4
issues [29] - 2040:21, 2046:4, 2046:5, 2046:15, 2048:22, 2052:10, 2054:9, 2055:21, 2070:15, 2077:3, 2077:4, 2077:8, 2077:13, 2077:24, 2083:4, 2094:18, 2100:18, 2101:8, 2103:21, 2124:18, 2208:23, 2211:24, 2230:22, 2231:17, 2250:16, 2250:25, 2257:13, 2280:24
issuing [2] - 2092:2, 2094:13
item [20] - 2017:22, 2017:25, 2021:22, 2025:9, 2026:24, 2035:14, 2036:11, 2037:1, 2038:2, 2038:11, 2041:5, 2041:8, 2049:7, 2074:4, 2074:7, 2074:15, 2075:20, 2076:7
itemization [5] - 2020:21, 2021:7, 2021:12, 2021:15, 2024:5
itemized [1] - 2037:1

items [30] - 2016:16, 2019:19, 2020:5, 2020:9, 2021:8, 2021:19, 2022:1, 2024:5, 2030:12, 2033:8, 2036:12, 2037:8, 2038:1, 2042:8, 2046:8, 2049:2, 2050:14, 2050:25, 2053:3, 2074:4, 2107:4, 2107:5, 2107:25, 2108:11, 2108:12, 2108:13, 2122:10
itself [5] - 2032:5, 2236:20, 2238:22, 2239:2, 2284:5
IV [2] - 2124:6, 2124:21


J

Jackson [2] - 2018:13, 2028:9
JAMIE [1] - 2006:19
January [2] - 2008:23, 2028:23
Jersey [11] - 2080:19, 2081:10, 2082:15, 2082:16, 2083:14, 2083:19, 2083:21, 2185:4, 2190:22, 2191:23, 2203:14
Jersey's [1] - 2083:15
Jets [3] - 2081:9, 2081:11, 2128:19
job [4] - 2011:9, 2072:20, 2093:24, 2207:17
jobs [1] - 2207:18
JOEL [2] - 2080:1, 2289:5
Joel [3] - 2014:15, 2079:18, 2080:8
joint [2] - 2033:21, 2284:12
JONATHAN [1] - 2006:23
JOSE [1] - 2006:3
Jose [2] - 2006:16, 2006:21
journal [1] - 2086:15
judge [5] - 2014:9, 2258:17, 2259:11, 2260:6, 2261:2
Judge [10] - 2065:7, 2078:18, 2136:3, 2136:7, 2187:19, 2201:15, 2203:7, 2204:9, 2257:25, 2281:22
JUDGE [2] - 2006:13, 2008:2
judgment [5] - 2015:21, 2015:25, 2016:8, 2016:14, 2207:20
July [3] - 2013:25, 2092:9, 2226:23
jump [4] - 2018:3, 2018:9, 2028:7, 2039:2
jumped [1] - 2155:13
juncture [1] - 2086:18
June [1] - 2288:17
juries [2] - 2249:13, 2249:16
jurors [6] - 2008:5, 2056:7, 2077:11, 2189:1, 2194:1, 2261:1
Jury [4] - 2078:22, 2135:17, 2138:7, 2288:21
JURY [2] - 2006:12, 2006:13
jury [95] - 2008:4, 2013:2, 2016:2, 2020:3, 2020:6, 2020:9, 2021:14, 2023:21, 2024:6, 2024:7, 2026:25, 2030:18, 2031:1, 2031:16, 2031:17, 2033:13, 2034:17, 2036:10, 2038:13, 2041:2, 2042:5, 2044:20, 2047:12, 2055:14, 2055:18, 2056:14, 2056:17, 2057:3, 2057:5, 2061:5, 2062:24,

2063:1, 2065:1, 2065:4, 2066:3, 2066:4, 2066:5, 2066:9, 2067:23, 2071:19, 2072:19, 2073:17, 2073:19, 2080:6, 2083:5, 2103:22, 2110:12, 2135:18, 2136:5, 2145:11, 2154:14, 2155:2, 2158:21, 2159:6, 2161:21, 2176:1, 2185:20, 2186:2, 2192:18, 2193:2, 2199:5, 2201:17, 2206:6, 2218:10, 2228:23, 2229:12, 2229:24, 2230:6, 2230:19, 2230:23, 2231:4, 2236:18, 2241:3, 2247:25, 2251:3, 2251:15, 2252:8, 2252:20, 2252:24, 2254:21, 2256:19, 2257:2, 2263:4, 2263:6, 2265:11, 2266:19, 2269:1, 2281:11, 2283:14, 2284:6, 2287:6, 2288:9, 2288:16

**jury's** [4] - 2016:6, 2077:7, 2130:6, 2282:8

**justification** [1] - 2028:10

# K

**Kansas** [1] - 2006:23
**KAROLY** [1] - 2006:8
**Karoly** [2] - 2007:4, 2007:11
**keep** [7] - 2030:2, 2171:4, 2201:17, 2214:19, 2287:6, 2288:17, 2288:18
**keeping** [1] - 2055:9
**kept** [2] - 2060:10, 2212:24
**key** [3] - 2041:3, 2077:13, 2154:7
**kids'** [1] - 2126:25
**kieffer** [1] - 2226:3
**KIEFFER** [96] - 2006:23, 2057:9, 2057:13, 2062:2, 2063:6, 2063:8, 2063:15, 2063:19, 2063:23, 2064:6, 2065:7, 2065:25, 2066:11, 2070:8, 2070:11, 2070:14, 2071:7, 2072:5, 2072:7, 2079:1, 2079:3, 2079:8, 2079:15, 2086:21, 2120:19, 2148:22, 2148:24, 2151:1, 2155:4, 2155:9, 2156:1, 2173:2, 2179:17, 2179:20, 2179:23, 2183:20, 2186:4, 2186:6, 2186:11, 2186:14, 2186:18, 2187:1, 2187:4, 2187:7, 2187:9, 2187:11, 2187:14, 2187:16, 2187:19, 2189:4, 2190:24, 2191:3, 2191:7, 2192:6, 2192:9, 2192:11, 2193:4, 2194:5, 2195:10, 2195:11, 2197:18, 2198:16, 2199:2, 2199:11, 2199:21, 2199:23, 2200:1, 2200:8, 2200:10, 2200:21, 2201:6, 2201:11, 2201:15, 2201:22, 2203:2, 2203:7, 2203:10, 2203:18, 2203:25, 2204:9, 2204:10, 2206:9, 2219:15, 2223:16, 2223:23, 2224:24, 2225:13, 2225:21, 2226:6, 2226:10, 2226:25, 2227:12, 2228:3, 2228:6, 2289:7, 2289:9
**Kieffer** [8] - 2054:17, 2055:24, 2056:10, 2056:24, 2078:24, 2148:21, 2206:23, 2207:3

**kind** [12] - 2028:15, 2038:12, 2065:19, 2071:25, 2106:1, 2134:6, 2149:23, 2161:3, 2161:9, 2161:15, 2181:4, 2235:25
**kinds** [1] - 2134:20
**kinematics** [11] - 2241:4, 2241:5, 2241:9, 2241:12, 2241:15, 2241:16, 2242:18, 2246:7, 2251:12, 2255:6, 2255:9
**kinetics** [2] - 2241:2, 2241:8
**Kinko's** [1] - 2013:12
**knocked** [1] - 2131:2
**knowing** [3] - 2238:21, 2253:25, 2255:2
**knowledge** [5] - 2128:16, 2210:5, 2210:8, 2210:12, 2211:10
**known** [4] - 2182:1, 2182:2, 2216:17, 2286:14
**knows** [3] - 2044:12, 2168:24, 2243:4
**Korn** [5] - 2027:21, 2027:24, 2028:18, 2028:19, 2029:1
**Krausless** [1] - 2091:12
**Krisla** [1] - 2203:14

# L

**laceration** [2] - 2162:9, 2225:15
**lack** [8] - 2016:17, 2020:10, 2033:8, 2043:2, 2131:19, 2137:6, 2167:15, 2259:23
**lacked** [1] - 2056:9
**lacking** [9] - 2021:18, 2025:8, 2029:15, 2030:7, 2033:19, 2036:3, 2039:6, 2042:6, 2073:2
**lacks** [3] - 2033:6, 2033:12, 2034:16
**ladies** [3] - 2013:12, 2135:14, 2288:2
**lady** [2] - 2196:25, 2200:4
**lady's** [1] - 2205:11
**Lake** [1] - 2007:17
**landscaping** [1] - 2195:4
**language** [17] - 2071:11, 2183:5, 2183:23, 2184:1, 2184:5, 2184:6, 2184:10, 2184:12, 2184:13, 2184:21, 2186:20, 2189:10, 2189:24, 2190:9, 2196:2, 2210:9
**lap** [7] - 2241:22, 2241:23, 2264:17, 2264:18, 2267:23, 2286:3, 2286:8
**laptop** [1] - 2106:10
**large** [1] - 2119:15
**largest** [2] - 2085:20, 2161:23
**last** [15] - 2009:9, 2011:16, 2012:3, 2041:5, 2047:24, 2060:2, 2098:24, 2147:4, 2148:9, 2166:11, 2166:23, 2204:3, 2204:5, 2235:25, 2246:12
**lastly** [4] - 2045:16, 2046:14, 2235:25
**late** [6] - 2011:16, 2012:3, 2015:9, 2082:4, 2175:12, 2229:21
**Lattuga** [4] - 2019:8, 2052:17, 2055:12, 2055:13, 2093:6
**Lattuga's** [3] - 2019:7, 2019:10,

2133:8
**laundry** [1] - 2046:8
**LAW** [2] - 2006:15, 2066:24
**law** [24] - 2015:21, 2016:1, 2016:8, 2016:13, 2016:15, 2020:11, 2020:12, 2036:10, 2039:24, 2042:7, 2042:11, 2043:5, 2045:19, 2056:1, 2056:2, 2065:17, 2065:19, 2075:19, 2076:13, 2076:15, 2090:16, 2093:24, 2233:14
**Law** [2] - 2233:14, 2237:14
**Lawrenceville** [1] - 2082:15
**laws** [2] - 2253:1, 2286:23
**lawsuit** [1] - 2185:9
**lawyer** [1] - 2096:13
**lawyers** [3] - 2165:17, 2171:21, 2288:3
**lay** [6] - 2019:25, 2021:21, 2161:24, 2233:16, 2261:3, 2263:25
**layperson's** [1] - 2083:6
**lead** [2] - 2156:18, 2217:14
**leading** [2] - 2100:8, 2243:18
**League** [1] - 2081:9
**leap** [2] - 2065:4, 2065:16
**learn** [4] - 2162:6, 2207:9, 2207:10, 2207:17
**learned** [2] - 2162:9, 2207:11
**learner** [1] - 2194:19
**Learning** [6] - 2114:21, 2118:11, 2118:15, 2125:22, 2166:13, 2212:25
**learning** [3] - 2141:24, 2142:14, 2153:15
**leash** [1] - 2060:10
**least** [14] - 2030:17, 2030:22, 2030:24, 2030:25, 2056:20, 2113:8, 2167:22, 2167:23, 2168:11, 2181:16, 2189:12, 2197:11, 2205:6, 2223:10
**leave** [3] - 2037:8, 2069:20, 2082:5
**leaves** [1] - 2229:20
**leaving** [1] - 2058:3
**led** [1] - 2059:15
**leeway** [1] - 2269:22
**left** [10] - 2063:20, 2142:11, 2142:12, 2142:17, 2156:4, 2169:4, 2247:5, 2276:6, 2276:7, 2276:9
**leg** [1] - 2093:8
**legal** [13] - 2020:10, 2030:16, 2033:6, 2033:8, 2033:12, 2033:20, 2034:16, 2092:7, 2095:20, 2096:10, 2099:22, 2149:22, 2149:25
**legally** [14] - 2016:2, 2024:24, 2028:24, 2029:5, 2029:15, 2030:7, 2032:25, 2036:3, 2037:17, 2041:9, 2056:17, 2062:6, 2062:14, 2071:11
**lengthy** [2] - 2059:11, 2059:12, 2134:23, 2179:9
**less** [9] - 2136:20, 2137:2, 2137:22, 2145:3, 2247:18, 2248:17, 2261:11, 2267:6
**lessen** [1] - 2138:1
**lessened** [1] - 2137:11
**letter** [2] - 2010:15, 2214:8

**letters** [1] - 2127:3
**Lettuce** [1] - 2093:25
**level** [19] - 2040:10, 2043:16, 2088:7, 2131:11, 2131:14, 2131:19, 2132:8, 2171:1, 2173:17, 2186:9, 2186:11, 2186:13, 2186:22, 2189:12, 2212:7, 2212:18, 2225:7, 2235:20, 2282:3
**levels** [4] - 2207:20, 2223:21, 2282:24
**Levick** [5] - 2027:22, 2027:24, 2028:18, 2028:20, 2029:1
**Levit** [1] - 2018:19
**LEWIS** [1] - 2007:3
**liability** [7] - 2046:15, 2046:25, 2073:11, 2077:1, 2077:8, 2077:12, 2078:5
**lie** [1] - 2113:14
**Liebowitz** [1] - 2093:12
**lien** [3] - 2059:4, 2145:21, 2146:2
**life** [23] - 2016:16, 2018:18, 2019:20, 2020:2, 2020:16, 2021:18, 2021:24, 2023:3, 2027:18, 2027:19, 2032:22, 2036:14, 2042:8, 2048:22, 2051:3, 2052:5, 2052:10, 2056:1, 2056:2, 2080:22, 2103:16, 2210:12, 2233:20
**lifecare** [1] - 2034:19
**lifetime** [2] - 2052:6, 2225:25
**light** [4] - 2050:19, 2144:10, 2163:23, 2170:23
**lights** [1] - 2129:10
**likely** [7] - 2026:7, 2026:9, 2050:9, 2137:22, 2216:18, 2227:7, 2285:13
**likewise** [1] - 2221:7
**limine** [2] - 2019:3
**limited** [3] - 2064:14, 2175:21, 2260:18
**limits** [1] - 2269:21
**limping** [1] - 2127:12
**line** [25] - 2024:24, 2036:11, 2037:1, 2038:11, 2059:1, 2074:4, 2074:7, 2074:15, 2075:20, 2075:22, 2076:7, 2155:7, 2160:12, 2192:14, 2194:7, 2195:12, 2203:9, 2203:15, 2203:17, 2203:18, 2203:19, 2204:11, 2206:25, 2207:2
**linear** [2] - 2233:3, 2233:7
**lines** [5] - 2057:15, 2059:1, 2174:13, 2207:2, 2228:9
**Lines** [3] - 2007:4, 2007:10, 2007:16
**LINES** [1] - 2006:7
**lingering** [3] - 2163:10, 2163:12, 2219:18
**link** [1] - 2269:24
**linking** [1] - 2066:4
**list** [23] - 2016:23, 2033:24, 2034:2, 2035:23, 2036:17, 2036:19, 2046:8, 2114:24, 2115:1, 2115:12, 2115:16, 2116:4, 2116:11, 2116:15, 2116:23, 2118:3, 2118:19, 2118:20, 2118:23, 2148:7, 2177:24
**listed** [4] - 2010:9, 2051:17, 2092:7,

2212:24
**listen** [2] - 2254:2, 2267:21
**listening** [3] - 2143:6, 2143:10, 2143:13
**Listserve** [1] - 2059:3
**literally** [3] - 2086:9, 2089:21, 2090:9
**literature** [11] - 2086:9, 2105:8, 2174:22, 2216:23, 2217:8, 2217:13, 2217:16, 2217:22, 2218:1, 2220:19, 2220:24
**litigate** [1] - 2077:24
**litigated** [3] - 2150:6, 2150:10, 2151:16
**litigating** [3] - 2095:14, 2150:15, 2150:16
**litigation** [12] - 2019:13, 2030:21, 2034:10, 2035:20, 2040:11, 2042:12, 2044:17, 2095:15, 2124:19, 2145:12, 2145:16, 2149:23
**litigation-retained** [5] - 2019:13, 2030:21, 2034:10, 2035:20, 2040:11
**lived** [1] - 2102:22
**lives** [1] - 2080:21
**living** [4] - 2052:23, 2053:3, 2054:4, 2232:25
**LLC** [4] - 2006:9, 2007:5, 2007:11, 2231:1
**LLP** [3] - 2006:20, 2007:3, 2007:15
**load** [2] - 2233:17, 2235:20
**loaded** [1] - 2233:12
**loading** [4] - 2233:19, 2241:25, 2242:2, 2235:20, 2242:19, 2242:22
**loads** [6] - 2233:10, 2233:12, 2233:21, 2235:20, 2242:19, 2242:22
**lobe** [8] - 2161:16, 2161:18, 2161:22, 2161:23, 2162:1, 2162:3, 2162:13
**lobes** [2] - 2142:14, 2142:15
**local** [1] - 2081:7
**localized** [1] - 2284:16
**logic** [2] - 2060:18, 2061:1
**logical** [2] - 2039:12, 2108:10
**long-term** [5] - 2083:10, 2103:17, 2103:18, 2103:21, 2103:23
**look** [36] - 2009:6, 2012:14, 2012:15, 2035:11, 2035:17, 2042:17, 2042:25, 2043:21, 2045:21, 2062:20, 2067:2, 2073:8, 2076:6, 2092:5, 2092:15, 2097:5, 2098:23, 2113:3, 2123:9, 2126:8, 2201:7, 2201:16, 2206:24, 2221:4, 2221:7, 2221:18, 2233:6, 2234:16, 2235:1, 2248:12, 2263:13, 2263:22, 2266:2, 2278:21, 2282:24
**looked** [12] - 2008:24, 2009:16, 2021:24, 2088:1, 2178:10, 2206:22, 2219:22, 2221:3, 2242:12, 2256:14, 2258:10, 2285:10
**looking** [17] - 2059:12, 2097:5, 2125:24, 2206:19, 2229:18, 2232:20, 2232:24, 2241:6, 2244:7, 2245:7, 2245:9, 2255:9, 2263:6, 2278:14, 2278:15, 2281:23, 2285:20

**looks** [1] - 2117:6
**lose** [1] - 2164:15
**loss** [2] - 2105:4, 2121:15
**lousy** [1] - 2130:24
**love** [1] - 2056:10
**loving** [2] - 2070:4, 2156:25
**low** [22] - 2037:23, 2105:14, 2108:5, 2119:2, 2120:13, 2124:15, 2132:9, 2142:2, 2142:24, 2144:10, 2144:16, 2176:16, 2183:1, 2183:8, 2183:9, 2196:8, 2206:1, 2215:3, 2217:21, 2222:6, 2285:16
**lower** [8] - 2093:8, 2183:5, 2240:19, 2247:19, 2247:20, 2251:10, 2274:10, 2274:12
**lowest** [3] - 2087:13, 2108:5, 2165:10
**lucky** [1] - 2114:4
**luggage** [2] - 2248:10, 2248:11
**lumbar** [20] - 2021:3, 2021:6, 2032:21, 2033:14, 2033:16, 2038:2, 2039:22, 2040:2, 2040:8, 2040:9, 2040:18, 2041:1, 2051:23, 2052:2, 2053:23, 2173:8, 2241:18, 2242:2, 2251:4, 2286:5
**lump** [2] - 2035:15, 2115:14
**lunch** [7] - 2095:10, 2101:25, 2135:14, 2168:25, 2169:5, 2169:9, 2221:19
**lying** [2] - 2259:16, 2260:3

**M**

**M-O-R-G-A-N** [1] - 2080:9
**machine** [2] - 2037:14, 2095:10
**MAGISTRATE** [1] - 2006:13
**magnitude** [6] - 2243:1, 2243:4, 2255:1, 2255:2, 2268:16, 2286:18
**magnitudes** [3] - 2236:14, 2246:8, 2286:18
**mails** [1] - 2010:1
**main** [1] - 2159:23
**maintain** [1] - 2080:21
**major** [1] - 2077:24
**majority** [13] - 2111:4, 2112:7, 2147:1, 2150:5, 2150:9, 2150:10, 2150:17, 2150:21, 2150:22, 2151:17, 2162:25, 2163:8, 2217:9
**male** [1] - 2264:25
**Malingered** [1] - 2121:23
**malingered** [1] - 2124:3
**malingerer** [1] - 2165:14
**Malingering** [2] - 2110:10, 2181:22
**malingering** [19] - 2042:18, 2043:1, 2043:10, 2043:13, 2122:14, 2122:16, 2122:17, 2122:18, 2123:5, 2144:14, 2144:15, 2144:19, 2145:2, 2176:1, 2181:2, 2196:5, 2217:23, 2223:1, 2223:5
**malpractice** [1] - 2071:1
**man** [6] - 2042:18, 2042:25, 2059:7, 2062:5, 2264:23, 2265:4

**management** [14] - 2031:6, 2031:11, 2031:13, 2032:18, 2034:3, 2034:8, 2035:19, 2036:4, 2051:5, 2051:19, 2051:20, 2051:22, 2052:21, 2054:5

**manages** [1] - 2091:8

**manner** [2] - 2209:15, 2233:14

**MANNION** [87] - 2007:7, 2079:18, 2080:10, 2080:14, 2080:16, 2086:18, 2086:24, 2089:1, 2092:19, 2096:18, 2109:2, 2120:22, 2120:23, 2133:19, 2133:22, 2135:10, 2138:10, 2138:12, 2145:15, 2148:1, 2148:3, 2148:20, 2154:11, 2155:5, 2155:7, 2155:14, 2160:7, 2165:22, 2176:7, 2183:17, 2184:19, 2187:6, 2187:18, 2187:20, 2187:24, 2189:8, 2191:1, 2191:12, 2191:16, 2192:2, 2192:8, 2192:16, 2195:9, 2196:14, 2196:21, 2197:24, 2198:14, 2201:13, 2201:23, 2202:1, 2202:6, 2203:9, 2203:17, 2203:21, 2203:23, 2205:14, 2206:12, 2206:15, 2206:18, 2207:14, 2208:8, 2208:10, 2218:9, 2218:11, 2219:6, 2219:9, 2219:21, 2220:3, 2220:5, 2220:6, 2221:1, 2223:14, 2223:18, 2223:19, 2223:24, 2225:1, 2225:3, 2226:17, 2227:6, 2228:15, 2228:17, 2229:2, 2258:14, 2270:2, 2289:6, 2289:8, 2289:10

**mannion** [2] - 2166:12, 2228:7

**Mannion** [8] - 2009:7, 2138:9, 2149:2, 2152:21, 2166:17, 2169:18, 2174:10, 2219:5

**mannion's** [2] - 2158:14, 2164:18

**Mannion's** [1] - 2152:2

**manual** [2] - 2152:6, 2152:14

**Manual** [1] - 2152:9

**Marcus** [1] - 2007:16

**Maria** [3] - 2041:24, 2094:9, 2158:22

**mark** [1] - 2013:15

**marked** [2] - 2068:15, 2157:10

**markedly** [2] - 2069:24, 2156:21

**married** [1] - 2080:20

**Marshal** [1] - 2090:16

**MARSHALL** [1] - 2007:9

**Martin** [3] - 2093:24, 2158:22, 2178:25

**mass** [3] - 2237:15, 2282:16, 2282:25

**massive** [2] - 2142:25, 2143:1

**Master's** [1] - 2231:6

**master's** [1] - 2231:9

**masters** [1] - 2082:16

**material** [7] - 2057:20, 2124:9, 2159:24, 2160:2, 2160:4, 2180:1, 2233:1

**materials** [7] - 2087:7, 2092:2, 2092:12, 2092:21, 2092:25, 2093:17, 2233:1

**math** [4] - 2021:5, 2213:13, 2213:21, 2225:5

**mathematically** [1] - 2225:12

**mathematics** [1] - 2150:4

**matter** [21] - 2011:14, 2015:21, 2015:25, 2016:8, 2016:13, 2016:14, 2020:11, 2036:9, 2039:24, 2040:5, 2042:7, 2042:11, 2045:18, 2060:18, 2061:1, 2071:18, 2150:4, 2168:15, 2191:5, 2191:11, 2288:24

**mayhem** [1] - 2064:13

**McDonald's** [2] - 2094:7, 2179:10

**McElfish** [123] - 2006:15, 2006:18, 2008:9, 2008:13, 2010:25, 2011:8, 2011:11, 2011:16, 2011:23, 2012:16, 2012:22, 2013:4, 2013:9, 2013:24, 2014:3, 2014:7, 2015:11, 2015:15, 2024:12, 2024:16, 2024:18, 2024:21, 2025:4, 2032:11, 2032:14, 2032:16, 2039:1, 2047:15, 2047:17, 2047:21, 2048:1, 2048:15, 2048:20, 2050:2, 2050:8, 2051:16, 2053:25, 2054:12, 2054:17, 2054:21, 2054:24, 2055:2, 2055:7, 2055:10, 2055:18, 2055:20, 2055:23, 2057:1, 2057:10, 2057:12, 2063:16, 2072:8, 2100:8, 2133:6, 2136:10, 2136:15, 2200:13, 2200:16, 2200:18, 2201:24, 2219:4, 2234:9, 2239:11, 2243:18, 2248:25, 2250:2, 2250:3, 2252:5, 2252:17, 2253:4, 2253:6, 2254:9, 2255:23, 2255:25, 2256:2, 2256:5, 2256:6, 2257:5, 2257:23, 2257:25, 2258:4, 2258:6, 2258:15, 2258:16, 2258:17, 2259:4, 2259:7, 2259:11, 2259:13, 2259:15, 2259:18, 2259:22, 2260:4, 2260:11, 2261:2, 2261:6, 2262:17, 2262:21, 2263:21, 2265:2, 2265:8, 2266:17, 2267:2, 2267:18, 2268:8, 2269:2, 2269:5, 2269:12, 2269:15, 2269:19, 2271:2, 2272:2, 2276:4, 2277:18, 2278:18, 2279:11, 2280:5, 2280:19, 2281:9, 2284:3, 2285:4, 2289:13, 2289:15

**mcElfish's** [1] - 2011:5

**McElfish's** [1] - 2012:25

**MCI** [2] - 2256:14, 2284:21

**mean** [51] - 2023:7, 2026:7, 2030:24, 2031:16, 2037:20, 2039:9, 2040:5, 2040:23, 2047:10, 2051:15, 2052:24, 2064:2, 2064:4, 2065:10, 2066:17, 2070:7, 2072:16, 2083:7, 2094:21, 2099:9, 2105:12, 2108:9, 2113:17, 2113:18, 2113:25, 2114:14, 2117:2, 2121:25, 2132:4, 2160:12, 2175:19, 2186:12, 2196:3, 2199:21, 2208:16, 2208:19, 2209:8, 2212:1, 2212:8, 2214:1, 2215:19, 2215:23, 2215:25, 2217:6, 2222:2, 2251:5, 2255:6, 2263:2, 2264:21, 2272:21, 2273:14

**means** [13] - 2051:13, 2089:14, 2113:22, 2114:1, 2132:5, 2146:2, 2239:15, 2241:19, 2241:20, 2242:14,

2247:15, 2252:9, 2288:5

**meant** [1] - 2063:17

**meanwhile** [1] - 2043:16

**measure** [6] - 2083:2, 2097:24, 2119:18, 2266:8, 2267:19

**measurement** [2] - 2113:19, 2271:13

**measures** [7] - 2097:16, 2110:24, 2112:2, 2118:14, 2131:11, 2131:14, 2131:19

**mechanical** [10] - 2007:22, 2230:20, 2231:8, 2232:23, 2233:24, 2233:25, 2234:7, 2234:11, 2235:8, 2248:19

**mechanics** [1] - 2235:16

**mechanism** [8] - 2160:22, 2241:2, 2241:21, 2241:24, 2242:5, 2242:10, 2242:16, 2242:22

**medial** [1] - 2051:25

**Medical** [2] - 2083:20, 2083:21

**medical** [79] - 2016:10, 2016:20, 2017:5, 2017:12, 2017:17, 2017:18, 2017:24, 2018:1, 2018:5, 2018:10, 2018:15, 2018:25, 2019:8, 2019:18, 2019:21, 2022:2, 2022:3, 2023:17, 2026:5, 2027:1, 2027:16, 2028:11, 2031:24, 2032:1, 2032:24, 2033:11, 2033:18, 2034:20, 2034:23, 2036:8, 2037:11, 2038:20, 2045:10, 2045:14, 2046:12, 2048:7, 2051:5, 2052:9, 2052:20, 2053:4, 2053:11, 2054:5, 2054:10, 2055:21, 2056:3, 2056:4, 2057:5, 2057:7, 2057:25, 2058:1, 2062:25, 2071:1, 2072:23, 2083:16, 2092:6, 2093:4, 2093:11, 2097:8, 2102:11, 2103:20, 2142:19, 2144:11, 2158:6, 2162:10, 2164:2, 2178:19, 2195:17, 2207:15, 2216:4, 2222:8, 2231:14, 2231:22, 2232:7, 2232:8, 2232:13

**medicals** [2] - 2024:2, 2028:15

**medication** [4] - 2050:11, 2052:21, 2158:6, 2169:9

**medications** [11] - 2036:13, 2036:14, 2037:2, 2050:2, 2050:12, 2051:17, 2053:20, 2104:2, 2180:11, 2180:13, 2180:14

**medicine** [4] - 2029:20, 2030:1, 2030:6, 2173:15

**meet** [3] - 2044:2, 2061:11, 2072:14

**meeting** [1] - 2190:5

**meetings** [1] - 2086:17

**meets** [1] - 2061:8

**member** [3] - 2075:12, 2084:3, 2134:11

**members** [11] - 2043:6, 2043:7, 2058:3, 2085:7, 2085:21, 2085:24, 2112:3, 2112:4, 2112:7, 2139:11, 2177:16

**membership** [1] - 2085:20

**memories** [5] - 2068:5, 2068:21, 2069:4, 2069:8, 2153:24

**memorize** [5] - 2106:12, 2106:13, 2106:19, 2111:13, 2111:14
**memorized** [2] - 2107:20, 2123:6
**memory** [31] - 2083:10, 2095:23, 2097:9, 2100:10, 2101:18, 2103:17, 2103:18, 2103:21, 2103:23, 2106:24, 2107:1, 2107:2, 2111:9, 2114:23, 2118:8, 2121:14, 2121:18, 2124:8, 2124:16, 2124:23, 2125:15, 2125:17, 2126:13, 2141:24, 2142:14, 2142:24, 2148:6, 2148:16, 2195:22, 2213:9, 2213:10
**Memory** [4] - 2110:10, 2110:22, 2124:7, 2181:22
**mental** [10] - 2081:19, 2083:9, 2095:22, 2101:18, 2125:12, 2129:6, 2129:17, 2141:12, 2181:10
**mentally** [3] - 2101:12, 2183:8, 2207:7
**mention** [3] - 2073:25, 2107:16, 2139:24
**mentioned** [10] - 2024:3, 2040:18, 2049:2, 2051:12, 2052:19, 2063:11, 2110:19, 2166:12, 2181:17, 2201:14
**Mercedes** [1] - 2238:11
**message** [1] - 2059:3
**met** [6] - 2046:9, 2066:21, 2073:4, 2147:8, 2172:19, 2173:19
**metal** [13] - 2267:8, 2267:11, 2267:14, 2268:16, 2268:20, 2274:25, 2275:5, 2275:6, 2275:11, 2275:18, 2279:25, 2280:8, 2287:3
**metastatic** [1] - 2142:18
**methodology** [3] - 2057:22, 2113:4, 2175:22
**methods** [4] - 2057:23, 2058:8, 2058:10, 2058:22
**Metro** [1] - 2017:11
**mic** [1] - 2080:11
**mid** [2] - 2206:14, 2229:10
**mid-afternoon** [2] - 2206:14, 2229:10
**middle** [16] - 2085:1, 2142:16, 2162:5, 2167:4, 2218:15, 2238:1, 2238:18, 2261:25, 2267:13, 2274:24, 2277:1, 2277:5, 2277:10, 2277:13, 2277:19, 2277:20
**middleman** [1] - 2151:4
**might** [17] - 2104:11, 2104:21, 2107:18, 2135:11, 2137:23, 2159:4, 2174:18, 2175:9, 2175:12, 2178:11, 2180:14, 2233:2, 2233:4, 2233:5, 2274:10, 2284:16, 2288:3
**migraine** [1] - 2139:25
**migraines** [1] - 2140:7
**Mikelis** [1] - 2044:21
**mild** [5] - 2059:22, 2060:1, 2125:12, 2163:10, 2163:12
**mild/moderate** [2] - 2059:22, 2059:24
**mildly** [4] - 2113:3, 2113:11, 2119:10, 2125:14
**mile** [1] - 2229:4

**miles** [24] - 2161:5, 2226:3, 2226:5, 2236:3, 2236:20, 2236:21, 2236:23, 2236:25, 2237:4, 2237:9, 2246:3, 2254:15, 2255:11, 2263:9, 2278:9, 2278:10, 2278:11, 2282:7, 2282:8, 2282:19, 2282:21, 2282:23, 2283:2
**millions** [3] - 2089:22, 2090:3
**mind** [14] - 2008:13, 2014:19, 2053:17, 2055:9, 2097:2, 2102:19, 2133:11, 2133:14, 2147:12, 2212:16, 2275:1, 2277:2, 2277:22, 2288:18
**Minnesota** [1] - 2121:4
**minor** [1] - 2105:3
**minority** [3] - 2163:15, 2217:5, 2217:15
**minute** [2] - 2219:6, 2226:17
**minutes** [6] - 2078:15, 2129:8, 2133:20, 2133:21, 2229:18, 2260:7
**miserable** [2] - 2217:5, 2217:15
**missed** [1] - 2024:12
**missing** [1] - 2040:7
**Missouri** [1] - 2006:23
**misspeak** [1] - 2208:2
**misspoke** [2] - 2205:25, 2206:7
**misstate** [1] - 2174:8
**MMPI** [2] - 2121:2, 2121:6
**Mobin** [33] - 2019:12, 2019:15, 2021:23, 2025:7, 2027:14, 2027:16, 2029:5, 2029:19, 2030:10, 2031:9, 2031:12, 2032:20, 2034:5, 2034:24, 2035:12, 2036:19, 2037:5, 2038:17, 2038:18, 2039:24, 2041:11, 2041:21, 2047:23, 2051:19, 2051:22, 2052:9, 2052:14, 2052:16, 2052:17, 2052:22, 2053:15, 2054:2, 2063:3
**Mobin's** [2] - 2040:22, 2051:7
**Mobine** [1] - 2053:5
**modalities** [4] - 2033:19, 2034:13, 2052:15, 2052:21
**modality** [1] - 2147:2
**moderate** [2] - 2059:15, 2117:17
**moderately** [1] - 2141:21
**moment** [12] - 2021:10, 2047:4, 2057:16, 2058:24, 2067:6, 2106:19, 2141:12, 2148:1, 2152:22, 2190:3, 2190:8, 2227:6, 2253:4
**moments** [1] - 2152:2
**Monday** [5] - 2015:2, 2015:9, 2288:4, 2288:6, 2288:24
**money** [1] - 2149:8
**month** [2] - 2157:24, 2219:23
**months** [2] - 2050:17, 2141:6
**mood** [4] - 2069:11, 2095:2, 2095:25, 2156:7
**MORGAN** [2] - 2080:1, 2289:5
**Morgan** [18] - 2008:23, 2009:6, 2009:12, 2014:15, 2014:25, 2058:9, 2078:12, 2079:19, 2079:21, 2080:8, 2080:17, 2086:19, 2086:22, 2104:23, 2112:1, 2135:19, 2138:13, 2186:24

**morgan** [1] - 2014:15
**Morgan's** [3] - 2008:25, 2010:7, 2010:22
**morning** [6] - 2015:3, 2015:18, 2104:12, 2175:5, 2192:7, 2224:5
**Moroknek** [1] - 2090:18
**Morristown** [1] - 2080:19
**most** [12] - 2050:9, 2052:10, 2058:10, 2062:7, 2105:3, 2113:8, 2118:21, 2118:23, 2124:1, 2174:23, 2182:20
**mostly** [3] - 2048:22, 2217:7, 2217:12
**mother** [1] - 2194:16
**motion** [15] - 2015:25, 2016:4, 2019:2, 2019:3, 2019:5, 2021:14, 2046:15, 2055:6, 2056:12, 2056:23, 2073:20, 2078:6, 2241:8, 2241:10, 2245:6
**motions** [2] - 2008:7, 2015:17
**motivation** [2] - 2208:15, 2211:15
**motivations** [1] - 2197:22
**motor** [9] - 2083:11, 2095:24, 2126:5, 2131:14, 2132:6, 2207:17, 2236:19, 2237:16, 2263:8
**Motor** [1] - 2284:21
**Motrin** [1] - 2036:16
**mount** [2] - 2269:20, 2279:3
**mouse** [5] - 2106:16, 2111:17, 2111:19, 2111:20, 2111:23
**movable** [2] - 2274:20, 2284:11
**move** [33] - 2015:21, 2045:12, 2045:16, 2046:10, 2046:15, 2054:16, 2071:7, 2080:10, 2086:9, 2132:6, 2154:11, 2175:20, 2198:14, 2201:22, 2220:4, 2225:14, 2232:21, 2234:12, 2237:2, 2239:4, 2242:7, 2243:20, 2252:12, 2275:4, 2280:18, 2284:3, 2284:18, 2285:24, 2286:10, 2286:25, 2287:1, 2287:5
**moved** [4] - 2186:15, 2248:16, 2284:14, 2286:8, 2286:25
**movement** [6] - 2235:17, 2238:25, 2241:17, 2245:11, 2255:10, 2275:7
**movements** [2] - 2255:7, 2255:15, 2284:15
**moves** [3] - 2274:4, 2274:8, 2285:13
**moving** [9] - 2054:8, 2239:3, 2241:20, 2247:16, 2255:7, 2286:11, 2286:12, 2288:15
**MR** [436] - 2008:9, 2008:13, 2010:20, 2012:12, 2012:15, 2013:4, 2013:8, 2013:9, 2013:21, 2013:24, 2014:3, 2014:6, 2014:7, 2014:8, 2014:14, 2014:23, 2015:2, 2015:7, 2015:11, 2015:14, 2015:15, 2015:18, 2017:10, 2021:19, 2022:7, 2023:7, 2023:12, 2023:23, 2024:12, 2024:14, 2024:16, 2024:17, 2024:18, 2024:19, 2024:21, 2024:22, 2025:4, 2025:6, 2025:11, 2025:13, 2025:21, 2025:21, 2026:3, 2027:5, 2027:8, 2027:25, 2030:1, 2031:23, 2032:6, 2032:8, 2032:11,

2032:12, 2032:14, 2032:15, 2032:16, 2032:17, 2034:1, 2035:1, 2035:7, 2036:2, 2038:16, 2038:19, 2038:22, 2039:2, 2039:9, 2042:21, 2043:25, 2044:10, 2044:15, 2044:22, 2044:24, 2045:4, 2045:8, 2046:23, 2047:2, 2047:4, 2047:7, 2047:15, 2047:17, 2047:21, 2047:25, 2048:1, 2048:15, 2048:20, 2050:2, 2050:8, 2051:16, 2053:25, 2054:12, 2054:17, 2054:21, 2054:24, 2055:2, 2055:7, 2055:10, 2055:18, 2055:20, 2055:23, 2057:1, 2057:6, 2057:9, 2057:12, 2057:13, 2062:2, 2063:6, 2063:8, 2063:15, 2063:16, 2063:19, 2063:23, 2064:6, 2065:7, 2065:25, 2066:11, 2066:25, 2067:4, 2067:6, 2067:9, 2070:8, 2070:11, 2070:14, 2071:7, 2072:5, 2072:7, 2072:10, 2073:2, 2073:13, 2073:22, 2074:13, 2074:16, 2074:24, 2075:3, 2075:7, 2075:15, 2075:24, 2075:25, 2076:5, 2076:9, 2076:12, 2076:23, 2078:10, 2078:13, 2078:20, 2079:1, 2079:3, 2079:8, 2079:11, 2079:15, 2079:18, 2080:10, 2080:14, 2080:16, 2086:18, 2086:21, 2086:24, 2089:1, 2092:19, 2096:18, 2100:8, 2109:2, 2120:19, 2120:22, 2120:23, 2133:19, 2133:22, 2135:10, 2136:10, 2136:15, 2137:8, 2137:18, 2137:24, 2138:10, 2138:12, 2145:15, 2148:1, 2148:3, 2148:20, 2148:22, 2148:24, 2151:1, 2154:11, 2155:4, 2155:5, 2155:7, 2155:9, 2155:14, 2156:1, 2160:7, 2165:22, 2173:2, 2176:7, 2179:17, 2179:20, 2179:23, 2183:17, 2183:20, 2184:19, 2186:4, 2186:6, 2186:11, 2186:14, 2186:18, 2187:1, 2187:4, 2187:6, 2187:7, 2187:9, 2187:11, 2187:14, 2187:16, 2187:18, 2187:19, 2187:20, 2187:24, 2189:4, 2189:8, 2190:24, 2191:1, 2191:3, 2191:7, 2191:12, 2191:16, 2192:2, 2192:6, 2192:8, 2192:9, 2192:11, 2192:16, 2193:4, 2194:5, 2195:9, 2195:10, 2195:11, 2196:14, 2196:21, 2197:24, 2198:12, 2198:14, 2198:16, 2199:2, 2199:11, 2199:21, 2199:23, 2200:1, 2200:8, 2200:10, 2200:13, 2200:16, 2200:18, 2200:21, 2201:6, 2201:11, 2201:12, 2201:13, 2201:14, 2201:15, 2201:20, 2201:22, 2201:23, 2202:1, 2202:6, 2203:2, 2203:7, 2203:9, 2203:10, 2203:17, 2203:18, 2203:21, 2203:23, 2203:25, 2204:9, 2204:10, 2205:14, 2206:9, 2206:12, 2206:15, 2206:18, 2207:14, 2208:8, 2208:10, 2218:8, 2218:9, 2218:11, 2219:4, 2219:6, 2219:8, 2219:9, 2219:15, 2219:21, 2220:3, 2220:5, 2220:6, 2221:1, 2223:14, 2223:16,

2223:18, 2223:19, 2223:23, 2223:24, 2224:24, 2225:1, 2225:3, 2225:13, 2225:21, 2226:6, 2226:10, 2226:17, 2226:25, 2227:6, 2227:12, 2228:3, 2228:6, 2228:15, 2228:17, 2229:2, 2229:15, 2229:17, 2230:2, 2230:14, 2234:6, 2234:9, 2234:12, 2234:14, 2234:17, 2239:11, 2243:12, 2243:18, 2245:2, 2248:22, 2248:25, 2249:24, 2250:2, 2250:3, 2250:6, 2250:22, 2251:20, 2252:1, 2252:5, 2252:10, 2252:12, 2252:17, 2253:4, 2253:6, 2253:9, 2254:7, 2254:9, 2255:13, 2255:23, 2255:25, 2256:2, 2256:3, 2256:4, 2256:5, 2256:6, 2256:17, 2257:4, 2257:23, 2257:25, 2258:4, 2258:6, 2258:14, 2258:15, 2258:17, 2259:4, 2259:7, 2259:11, 2259:13, 2259:15, 2259:18, 2259:22, 2260:2, 2260:8, 2260:11, 2260:15, 2260:18, 2261:2, 2261:6, 2262:9, 2262:17, 2262:21, 2263:19, 2263:21, 2264:6, 2265:8, 2266:15, 2266:17, 2267:2, 2267:18, 2268:8, 2269:2, 2269:5, 2269:7, 2269:12, 2269:15, 2269:16, 2269:19, 2269:20, 2269:25, 2270:2, 2271:2, 2271:22, 2272:2, 2272:11, 2272:23, 2273:11, 2273:20, 2274:14, 2275:14, 2275:16, 2276:4, 2277:7, 2277:14, 2277:18, 2278:2, 2278:18, 2279:5, 2279:11, 2280:2, 2280:5, 2280:19, 2280:21, 2283:15, 2284:3, 2285:1, 2285:4, 2285:24, 2287:5, 2289:6, 2289:7, 2289:8, 2289:9, 2289:10, 2289:12, 2289:13, 2289:14, 2289:15

**MRI** [1] - 2052:1

**MRIs** [3] - 2032:19, 2032:21, 2062:23

**MS** [6] - 2055:5, 2067:1, 2076:13, 2076:17, 2076:20, 2076:24

**Multiphasic** [1] - 2121:4

**multiple** [9] - 2062:13, 2065:12, 2066:17, 2114:20, 2167:25, 2168:7, 2173:16, 2217:14

**multiplier** [2] - 2039:17, 2039:18

**multitasking** [1] - 2159:13

**muscle** [7] - 2036:20, 2036:24, 2037:2, 2050:4, 2050:11, 2053:21, 2104:5

**must** [6] - 2016:20, 2017:5, 2017:24, 2031:24, 2045:18, 2048:13

**myocardial** [1] - 2071:3

## N

**N-O-B-I-L-I-N-I** [1] - 2230:9

**nail** [1] - 2119:9

**nailed** [1] - 2255:19

**name** [9] - 2015:19, 2047:24, 2080:6, 2091:11, 2092:5, 2196:25, 2230:7, 2230:8

**narcotics** [1] - 2036:19

**NAS** [8] - 2250:5, 2250:9, 2250:13, 2250:20, 2250:24, 2253:1, 2280:24, 2281:5

**national** [1] - 2086:16

**National** [2] - 2081:9, 2083:25

**natural** [1] - 2138:14

**Nature** [1] - 2099:19

**nature** [16] - 2010:4, 2021:20, 2049:6, 2056:5, 2089:11, 2125:19, 2127:13, 2127:16, 2138:25, 2142:25, 2175:22, 2177:20, 2213:19, 2228:21, 2267:9, 2280:10

**near** [2] - 2212:20, 2285:7

**neat** [1] - 2063:25

**necessarily** [9] - 2035:3, 2056:12, 2076:19, 2139:2, 2165:16, 2168:19, 2177:14, 2253:13, 2280:18

**necessary** [4] - 2022:2, 2066:22, 2070:25, 2288:12

**neck** [6] - 2140:24, 2278:22, 2278:24, 2279:1, 2279:8, 2279:19

**need** [60] - 2011:15, 2013:11, 2014:18, 2017:15, 2017:25, 2019:8, 2022:2, 2023:6, 2023:9, 2023:10, 2023:15, 2023:17, 2023:18, 2025:7, 2025:22, 2025:25, 2026:7, 2026:9, 2031:22, 2031:25, 2032:1, 2034:4, 2034:22, 2036:8, 2038:21, 2039:16, 2040:9, 2040:13, 2040:15, 2040:18, 2040:23, 2041:1, 2044:12, 2048:17, 2051:6, 2051:19, 2051:21, 2052:19, 2056:1, 2056:3, 2057:2, 2072:19, 2096:3, 2098:9, 2099:11, 2100:15, 2104:24, 2105:15, 2106:23, 2109:7, 2142:7, 2169:24, 2206:11, 2229:21, 2240:8, 2240:10, 2278:20, 2281:7

**needed** [6] - 2028:25, 2033:5, 2036:5, 2038:8, 2048:3, 2053:6

**needing** [2] - 2049:1, 2049:3

**needs** [32] - 2019:23, 2020:14, 2020:16, 2022:4, 2026:17, 2026:22, 2027:19, 2030:9, 2031:2, 2031:3, 2033:19, 2034:6, 2034:9, 2034:10, 2035:4, 2036:22, 2037:17, 2037:20, 2038:6, 2039:8, 2039:13, 2040:3, 2040:8, 2041:2, 2052:21, 2052:24, 2054:8, 2055:12, 2222:1

**negative** [6] - 2069:11, 2069:17, 2069:22, 2154:8, 2156:14, 2156:20

**Negative** [1] - 2156:7

**negligent** [1] - 2076:1

**nervous** [1] - 2156:16

**neurocognitive** [1] - 2147:16

**neurological** [1] - 2146:16

**neurologist** [1] - 2015:4

**neurology** [2] - 2216:23, 2231:20

**neuropsych** [4] - 2014:16, 2026:11, 2026:16, 2026:25, 2027:4, 2027:5

**neuropsychological** [49] - 2025:9,

2054:9, 2054:18, 2057:23, 2058:4, 2080:25, 2081:2, 2083:23, 2094:19, 2097:6, 2098:22, 2105:8, 2106:2, 2111:2, 2144:5, 2144:13, 2145:1, 2145:18, 2146:7, 2146:13, 2146:17, 2146:25, 2147:8, 2147:23, 2151:7, 2165:10, 2166:5, 2166:7, 2170:13, 2170:17, 2170:22, 2171:16, 2171:25, 2172:10, 2173:25, 2174:12, 2174:16, 2175:10, 2175:21, 2175:24, 2176:2, 2176:11, 2176:17, 2179:15, 2184:20, 2185:8, 2196:18, 2197:23, 2223:11
**Neuropsychological** [2] - 2084:2, 2084:3
**neuropsychologically** [1] - 2171:8
**neuropsychologist** [8] - 2080:18, 2081:8, 2081:10, 2093:14, 2093:15, 2118:1, 2180:17, 2224:22
**neuropsychologists** [10] - 2042:16, 2042:24, 2081:7, 2083:2, 2084:22, 2085:3, 2085:11, 2119:3, 2145:21, 2146:23
**neuropsychology** [14] - 2052:14, 2080:22, 2082:22, 2082:23, 2082:24, 2082:25, 2084:11, 2084:15, 2086:3, 2086:20, 2086:23, 2150:2, 2174:23, 2216:23
**Neuropsychology** [4] - 2084:1, 2084:2, 2084:8, 2084:9
**neuroradiologist** [2] - 2015:3, 2015:14
**neuroscience** [1] - 2216:23
**neurosurgeons** [1] - 2051:11
**neurosurgeon** [7] - 2021:25, 2030:9, 2030:10, 2034:21, 2051:12, 2051:14
**neurosurgery** [1] - 2051:13
**never** [24] - 2008:17, 2019:8, 2040:18, 2044:1, 2047:9, 2090:13, 2110:4, 2117:16, 2119:2, 2119:5, 2119:7, 2130:20, 2151:10, 2201:14, 2213:5, 2215:4, 2217:21, 2222:20, 2243:16, 2246:8, 2267:21
**Never** [1] - 2119:4
**nevertheless** [4] - 2058:19, 2073:14, 2073:16, 2196:19
**New** [31] - 2006:1, 2006:5, 2006:18, 2007:13, 2007:17, 2010:11, 2016:19, 2016:24, 2017:2, 2017:4, 2046:16, 2047:7, 2075:19, 2080:19, 2080:21, 2081:8, 2081:10, 2082:15, 2082:16, 2082:17, 2082:18, 2083:15, 2083:19, 2083:21, 2093:5, 2185:4, 2190:20, 2190:22, 2191:23, 2203:14
**new** [2] - 2085:12, 2142:13
**Newark** [3] - 2190:21, 2191:22, 2194:16
**Newton** [1] - 2252:25
**Newton's** [1] - 2237:14
**next** [16] - 2025:9, 2029:3, 2036:12, 2064:6, 2071:23, 2097:16, 2098:12, 2099:18, 2136:10, 2140:21, 2154:15,

2155:17, 2175:15, 2229:14, 2230:1, 2243:21
**NFL** [1] - 2216:25
**NHTSA** [8] - 2250:14, 2256:15, 2257:5, 2257:9, 2257:13, 2257:17, 2262:6, 2262:25
**Nicaragua** [2] - 2194:14, 2210:13
**nice** [2] - 2009:7, 2009:8
**night** [4] - 2009:9, 2011:17, 2012:3, 2206:16
**nighters** [1] - 2175:12
**nightmare** [1] - 2072:14
**nightmares** [3] - 2064:23, 2065:11, 2153:24
**nights** [1] - 2175:12
**NIJ** [1] - 2278:23
**nine** [1] - 2196:3
**ninety** [1] - 2031:6
**NOBILINI** [2] - 2230:10, 2289:11
**Nobilini** [9] - 2136:11, 2229:14, 2230:2, 2230:3, 2230:8, 2232:9, 2234:7, 2234:10, 2280:22
**Nobilini's** [1] - 2136:15
**nobody** [1] - 2012:3
**Nobolini** [3] - 2014:15, 2014:16, 2014:25
**noise** [1] - 2216:2
**NOLAN** [1] - 2007:20
**NolanEDNY@aol.com** [1] - 2007:21
**non** [5] - 2042:12, 2043:6, 2054:5, 2095:15, 2177:5
**non-existent** [1] - 2177:5
**non-family** [1] - 2043:6
**non-litigation** [1] - 2095:15
**non-medical** [1] - 2054:5
**non-treating** [1] - 2042:12
**noncontroversial** [1] - 2013:9
**none** [4] - 2036:25, 2065:1, 2097:4, 2148:6
**None** [1] - 2180:8
**nonetheless** [4] - 2174:25, 2180:18, 2184:23, 2186:21
**nonvoluntary** [1] - 2216:1
**norm** [1] - 2066:7
**normal** [8] - 2102:17, 2103:12, 2125:15, 2128:1, 2132:1, 2132:20, 2212:6, 2213:8
**normalized** [2] - 2060:20, 2060:23
**nose** [1] - 2162:5
**not-chance** [1] - 2223:21
**notable** [1] - 2058:9
**note** [6] - 2013:14, 2045:8, 2055:25, 2067:14, 2202:1, 2268:18
**noted** [4] - 2028:3, 2132:11, 2164:1, 2202:3
**notes** [5] - 2093:6, 2128:9, 2174:6, 2179:18, 2246:16
**nothing** [18] - 2011:2, 2034:17, 2041:21, 2053:18, 2057:19, 2063:5,

2072:13, 2072:15, 2138:3, 2167:4, 2199:24, 2224:24, 2229:6, 2241:15, 2243:4, 2246:9, 2257:17, 2259:2
**notice** [1] - 2073:25
**noticed** [1] - 2100:20
**notwithstanding** [1] - 2205:12
**nowhere** [1] - 2030:4
**Number** [1] - 2071:18
**number** [43] - 2015:22, 2026:25, 2031:17, 2032:9, 2039:19, 2039:20, 2042:14, 2042:23, 2053:15, 2058:1, 2071:16, 2073:15, 2080:25, 2081:3, 2086:4, 2086:13, 2086:14, 2086:15, 2087:1, 2092:12, 2106:11, 2106:12, 2106:17, 2106:18, 2106:19, 2107:7, 2107:8, 2107:19, 2107:21, 2118:7, 2119:15, 2123:23, 2126:25, 2143:8, 2164:5, 2203:17, 2204:14, 2214:8, 2215:13, 2219:4, 2243:3, 2264:1, 2277:21
**numbers** [16] - 2042:17, 2042:25, 2106:14, 2106:20, 2107:6, 2107:17, 2119:19, 2119:20, 2119:21, 2119:25, 2126:24, 2127:3, 2214:19, 2281:23
**numerous** [2] - 2016:9, 2016:16
**nursing** [3] - 2088:13, 2112:24, 2113:12
**NY** [2] - 2007:21, 2016:24

# O

**Oaks** [1] - 2083:21
**oath** [1] - 2206:4
**object** [8] - 2154:11, 2155:7, 2237:8, 2273:16, 2274:17, 2274:19, 2280:17
**Objection** [2] - 2197:24, 2243:12
**objection** [69] - 2010:10, 2010:12, 2011:7, 2013:20, 2013:23, 2021:11, 2051:8, 2079:9, 2079:11, 2086:21, 2100:8, 2120:19, 2160:7, 2165:22, 2176:7, 2183:17, 2189:8, 2191:1, 2191:12, 2192:16, 2196:14, 2196:21, 2202:1, 2203:21, 2205:14, 2219:15, 2223:16, 2223:23, 2224:24, 2225:13, 2225:21, 2226:6, 2226:10, 2226:25, 2227:12, 2228:15, 2228:17, 2234:9, 2239:11, 2249:24, 2250:6, 2250:22, 2251:20, 2252:1, 2252:10, 2253:9, 2254:7, 2255:13, 2256:17, 2262:9, 2263:19, 2264:6, 2266:15, 2271:22, 2272:11, 2273:11, 2273:20, 2274:14, 2275:14, 2275:16, 2277:7, 2277:14, 2278:2, 2279:5, 2280:2, 2284:3, 2285:24, 2287:5
**objections** [3] - 2014:9, 2048:9, 2078:6
**objective** [3] - 2060:25, 2147:19, 2221:10
**objects** [11] - 2069:7, 2111:12, 2157:16, 2267:8, 2268:12, 2272:17,

2279:25, 2280:8, 2280:11, 2280:12, 2280:14

**observation** [3] - 2100:11, 2101:10, 2103:3

**observations** [2] - 2101:1, 2128:5

**observe** [5] - 2102:6, 2102:13, 2102:16, 2127:12, 2131:18

**observed** [3] - 2075:12, 2127:14, 2221:25

**observing** [2] - 2099:13, 2102:8

**obtain** [2] - 2011:4, 2011:5

**obtained** [1] - 2271:9

**obtaining** [1] - 2102:5

**obviously** [13] - 2015:7, 2026:19, 2029:6, 2032:1, 2039:17, 2041:8, 2058:16, 2073:23, 2090:24, 2100:24, 2195:25, 2232:18, 2241:10

**occasion** [1] - 2110:5

**occasions** [1] - 2062:13

**occupant** [1] - 2272:18

**occupants** [7] - 2179:19, 2237:21, 2237:24, 2238:16, 2245:6, 2247:19, 2272:5

**occupational** [1] - 2158:3

**occur** [4] - 2242:1, 2263:14, 2263:15, 2273:1

**occurred** [21] - 2068:3, 2069:1, 2069:13, 2111:7, 2156:9, 2157:12, 2211:20, 2235:17, 2236:3, 2237:12, 2237:21, 2237:22, 2238:5, 2239:16, 2241:21, 2241:25, 2242:19, 2271:8, 2278:15, 2282:23, 2285:21

**occurring** [4] - 2231:24, 2242:12, 2255:10, 2271:6

**occurs** [11] - 2008:3, 2067:21, 2129:5, 2136:4, 2141:11, 2238:2, 2239:8, 2240:4, 2247:4, 2282:13, 2282:14

**October** [4] - 2091:25, 2164:2, 2164:10, 2234:19

**odds** [1] - 2090:2

**OF** [2] - 2006:1, 2006:12

**offer** [10] - 2018:7, 2065:13, 2086:19, 2230:21, 2243:10, 2245:20, 2246:10, 2251:14, 2253:11, 2253:15

**offered** [10] - 2136:16, 2168:10, 2196:19, 2245:14, 2246:9, 2248:18, 2249:13, 2249:18, 2251:13, 2253:18

**offering** [3] - 2077:17, 2200:2, 2243:6

**offers** [1] - 2079:6

**office** [12] - 2011:18, 2012:3, 2012:12, 2090:16, 2091:9, 2091:18, 2094:23, 2118:11, 2133:8, 2165:2, 2169:5, 2215:24

**offices** [1] - 2009:22

**Official** [1] - 2204:7

**official** [1] - 2156:3

**often** [7] - 2026:6, 2030:23, 2031:18, 2081:16, 2131:2, 2132:9, 2224:14

**Ogdensburg** [1] - 2093:10

**Ohio** [1] - 2007:6

**old** [6] - 2080:20, 2107:22, 2126:18, 2186:15, 2194:15, 2196:4

**older** [1] - 2067:15

**olds** [4] - 2107:14, 2111:25, 2119:8, 2119:9

**once** [10] - 2020:15, 2030:24, 2032:23, 2052:6, 2053:13, 2095:6, 2105:17, 2221:2, 2239:5

**one** [206] - 2008:22, 2009:20, 2013:6, 2020:20, 2022:10, 2023:24, 2025:4, 2026:13, 2026:17, 2026:18, 2026:21, 2029:17, 2029:22, 2030:9, 2037:9, 2039:17, 2040:21, 2041:7, 2041:10, 2042:9, 2042:21, 2044:6, 2044:15, 2045:17, 2045:24, 2046:6, 2046:8, 2047:4, 2052:13, 2060:22, 2061:1, 2061:14, 2063:9, 2063:23, 2064:9, 2064:18, 2064:22, 2067:19, 2068:1, 2069:1, 2070:9, 2071:17, 2073:14, 2073:24, 2075:22, 2076:7, 2077:14, 2077:24, 2081:6, 2081:7, 2081:8, 2084:14, 2085:11, 2085:24, 2086:3, 2089:18, 2089:22, 2090:2, 2091:17, 2094:1, 2103:7, 2105:15, 2106:15, 2106:16, 2106:21, 2107:9, 2107:10, 2107:18, 2107:19, 2108:7, 2110:8, 2110:19, 2111:10, 2111:20, 2112:10, 2112:13, 2114:9, 2114:10, 2114:18, 2114:19, 2115:6, 2115:25, 2116:3, 2116:5, 2117:11, 2117:15, 2118:25, 2119:12, 2119:13, 2120:14, 2120:16, 2120:17, 2120:18, 2123:11, 2125:23, 2126:3, 2131:15, 2134:23, 2136:19, 2140:15, 2143:9, 2143:14, 2145:2, 2146:10, 2148:1, 2148:3, 2148:10, 2148:11, 2150:7, 2151:17, 2153:7, 2153:8, 2153:21, 2154:4, 2155:4, 2155:9, 2155:14, 2156:10, 2156:15, 2157:5, 2157:13, 2157:24, 2158:23, 2161:17, 2165:13, 2165:15, 2165:24, 2166:9, 2166:11, 2166:18, 2166:19, 2167:15, 2172:8, 2175:6, 2181:8, 2181:16, 2182:5, 2182:8, 2182:15, 2182:17, 2182:20, 2186:23, 2186:25, 2187:4, 2189:15, 2197:11, 2200:6, 2200:9, 2200:11, 2200:15, 2200:16, 2201:11, 2202:4, 2203:10, 2205:17, 2207:19, 2208:8, 2209:15, 2209:19, 2212:25, 2213:22, 2215:10, 2219:5, 2223:14, 2224:8, 2224:9, 2224:14, 2226:17, 2226:20, 2227:3, 2227:6, 2235:15, 2237:5, 2243:1, 2243:2, 2246:18, 2253:4, 2253:18, 2258:4, 2258:22, 2263:12, 2267:10, 2268:10, 2272:21, 2273:16, 2277:17, 2274:16, 2278:18, 2279:16, 2282:25

**One** [2] - 2115:24, 2186:14

**one's** [4] - 2069:18, 2154:9, 2156:14, 2225:23

**one-half** [1] - 2282:25

**one-percent** [1] - 2224:9

**one-time** [1] - 2039:17

**ones** [9] - 2093:18, 2107:17, 2116:3, 2116:13, 2118:25, 2172:5, 2176:23, 2182:15, 2182:17

**ongoing** [1] - 2172:20

**onset** [2] - 2130:18, 2140:16

**open** [14] - 2008:1, 2055:9, 2078:17, 2135:18, 2136:2, 2137:21, 2189:1, 2194:1, 2203:1, 2229:13, 2229:25, 2261:1, 2271:1, 2288:18

**opened** [7] - 2011:8, 2011:23, 2012:16, 2040:10, 2155:9, 2223:24, 2225:22

**opening** [1] - 2011:11

**opens** [1] - 2215:24

**operated** [1] - 2040:1

**opine** [4] - 2028:24, 2044:14, 2048:17, 2053:6

**opined** [2] - 2029:17, 2281:18

**opines** [2] - 2034:21, 2071:2

**opining** [1] - 2160:15

**opinion** [75] - 2022:9, 2027:2, 2048:7, 2048:14, 2053:19, 2055:14, 2055:15, 2062:5, 2062:6, 2062:14, 2065:13, 2065:15, 2066:19, 2070:23, 2071:11, 2072:11, 2073:3, 2087:24, 2088:1, 2088:3, 2127:21, 2128:6, 2128:22, 2133:24, 2137:15, 2141:18, 2141:20, 2144:4, 2146:12, 2146:25, 2147:7, 2147:14, 2160:12, 2168:11, 2179:15, 2185:14, 2186:7, 2196:20, 2199:19, 2200:2, 2205:9, 2205:10, 2226:15, 2227:8, 2228:20, 2235:7, 2235:22, 2235:25, 2236:2, 2243:6, 2243:10, 2243:14, 2243:21, 2245:20, 2245:22, 2246:1, 2246:2, 2246:5, 2246:10, 2246:12, 2249:18, 2251:10, 2251:14, 2252:7, 2252:19, 2254:10, 2254:12, 2255:17, 2262:3, 2262:4, 2267:2, 2267:6, 2268:9, 2281:10

**opinions** [54] - 2019:21, 2022:9, 2077:18, 2081:3, 2087:1, 2087:2, 2087:5, 2087:11, 2087:12, 2087:18, 2087:21, 2136:17, 2136:19, 2137:19, 2139:22, 2143:11, 2147:22, 2151:22, 2159:7, 2159:20, 2178:1, 2178:5, 2180:8, 2180:9, 2187:9, 2199:12, 2224:4, 2225:18, 2228:23, 2230:22, 2235:3, 2235:4, 2235:8, 2235:11, 2235:13, 2235:14, 2248:18, 2249:13, 2250:5, 2252:15, 2253:1, 2253:11, 2253:15, 2253:18, 2257:12, 2257:16, 2257:18, 2261:13, 2268:25, 2269:4, 2269:7, 2269:8, 2280:23, 2281:3

**opportunity** [10] - 2011:17, 2012:9, 2076:25, 2077:23, 2094:10, 2094:14, 2102:6, 2128:15, 2139:10, 2140:10

**oppose** [3] - 2037:19, 2037:22, 2037:25

**opposed** [6] - 2033:17, 2044:16, 2151:5, 2229:4, 2239:18, 2250:1
**opposite** [2] - 2186:7, 2187:9
**opposition** [2] - 2076:25, 2078:5
**optimal** [1] - 2233:21
**optional** [1] - 2112:17
**oral** [3] - 2084:25, 2085:2, 2085:4
**orally** [1] - 2086:16
**orange** [6] - 2008:25, 2009:3, 2009:8, 2009:9, 2009:10, 2010:8
**oranges** [1] - 2193:6
**orbits** [1] - 2162:3
**order** [17] - 2010:9, 2011:18, 2061:10, 2089:4, 2089:12, 2101:16, 2108:6, 2115:3, 2116:13, 2127:23, 2151:22, 2151:23, 2167:18, 2167:19, 2240:8, 2242:20, 2242:21
**ordered** [1] - 2133:4
**ordinarily** [1] - 2023:2
**organization** [4] - 2084:12, 2085:20, 2151:4, 2159:13
**orientations** [1] - 2286:15
**original** [1] - 2042:21
**orthopedic** [5] - 2034:21, 2051:15, 2093:5, 2093:13
**orthopedics** [2] - 2053:17, 2231:18
**orthopedist** [6] - 2030:14, 2030:16, 2030:19, 2031:7, 2053:13, 2053:18
**orthosis** [1] - 2053:23
**orthotic** [2] - 2037:23, 2052:24
**ORTIZ** [68] - 2007:17, 2015:18, 2017:10, 2021:19, 2022:7, 2023:7, 2023:12, 2023:23, 2024:14, 2024:17, 2024:19, 2024:22, 2025:6, 2025:11, 2025:13, 2025:17, 2025:21, 2026:3, 2027:5, 2027:8, 2027:25, 2030:1, 2031:23, 2032:6, 2032:8, 2032:12, 2032:15, 2032:17, 2034:1, 2035:1, 2035:7, 2036:2, 2038:16, 2038:19, 2038:22, 2039:2, 2039:9, 2042:21, 2043:25, 2044:10, 2044:15, 2044:22, 2044:24, 2045:4, 2045:8, 2046:23, 2047:4, 2047:7, 2047:25, 2057:6, 2066:25, 2067:4, 2067:6, 2067:9, 2072:10, 2073:2, 2073:13, 2073:22, 2074:13, 2074:16, 2074:24, 2075:3, 2075:7, 2075:15, 2075:24, 2076:5, 2076:9, 2076:12
**Ortiz** [7] - 2015:19, 2047:25, 2048:1, 2048:2, 2049:2, 2053:5, 2053:14
**ortiz** [1] - 2053:17
**Osterrieth** [1] - 2125:25
**otherwise** [7] - 2026:10, 2026:24, 2071:2, 2071:9, 2071:10, 2076:8, 2196:20
**out-of-pocket** [1] - 2017:18
**outbursts** [1] - 2157:14
**outcome** [1] - 2146:5
**outside** [14] - 2008:3, 2082:9, 2135:18, 2136:4, 2154:14, 2155:1, 2185:20,

2186:1, 2192:18, 2193:1, 2239:11, 2250:6, 2256:19, 2257:1
**outstanding** [1] - 2149:10
**over-the-counter** [3] - 2036:24, 2037:2, 2050:5
**overall** [3] - 2171:2, 2173:24, 2184:24
**overlay** [1] - 2058:18
**overruled** [8] - 2100:9, 2160:8, 2227:1, 2227:13, 2228:18, 2239:13, 2243:13, 2285:25
**Overruled** [21] - 2176:8, 2189:9, 2191:2, 2196:15, 2196:22, 2197:25, 2205:15, 2250:7, 2250:23, 2251:21, 2252:2, 2254:8, 2262:10, 2264:8, 2271:23, 2272:12, 2273:12, 2275:17, 2277:16, 2279:6, 2284:4
**overtly** [1] - 2154:8
**overview** [1] - 2094:20
**overwhelming** [2] - 2042:14, 2042:23
**owing** [2] - 2046:19, 2047:12
**own** [10] - 2009:15, 2043:18, 2053:1, 2059:11, 2094:9, 2101:1, 2173:23, 2230:25, 2257:21

---

## P

**p.m** [2] - 2135:15, 2135:22
**packing** [1] - 2066:14
**padding** [1] - 2272:19
**page** [59] - 2022:12, 2027:4, 2027:12, 2029:25, 2030:1, 2035:25, 2036:7, 2038:9, 2040:15, 2041:18, 2049:5, 2049:11, 2052:11, 2057:14, 2057:15, 2059:1, 2061:16, 2067:13, 2072:25, 2079:23, 2088:16, 2096:19, 2098:25, 2099:18, 2108:15, 2129:20, 2135:24, 2150:25, 2154:15, 2155:17, 2172:24, 2182:11, 2185:22, 2188:4, 2191:25, 2192:12, 2192:20, 2193:9, 2194:7, 2198:22, 2202:10, 2203:9, 2203:11, 2203:15, 2204:11, 2206:22, 2206:24, 2207:1, 2220:25, 2244:4, 2256:21, 2260:23, 2262:22, 2265:14, 2266:21, 2270:7, 2287:11
**PAGE** [1] - 2289:3
**pages** [5] - 2036:15, 2042:20, 2051:10, 2072:16, 2099:15
**paid** [10] - 2046:19, 2090:24, 2091:2, 2146:3, 2146:6, 2149:5, 2149:9, 2149:16, 2151:9
**pain** [71] - 2031:6, 2031:11, 2031:13, 2032:17, 2034:3, 2034:8, 2035:19, 2036:4, 2051:5, 2051:17, 2051:19, 2051:20, 2051:22, 2052:21, 2058:16, 2074:6, 2074:22, 2075:6, 2093:8, 2100:7, 2100:14, 2104:16, 2104:20, 2105:1, 2105:3, 2105:6, 2105:7, 2105:8, 2105:10, 2105:13, 2127:10, 2132:24, 2140:22, 2140:24, 2169:8, 2169:21, 2169:22, 2170:1, 2170:2,

2170:3, 2170:6, 2170:10, 2170:12, 2170:14, 2170:18, 2170:20, 2170:21, 2170:25, 2171:1, 2171:9, 2171:15, 2171:23, 2172:4, 2172:9, 2172:20, 2173:20, 2173:23, 2174:11, 2174:17, 2174:20, 2174:22, 2174:23, 2175:23, 2221:22, 2222:16, 2222:19, 2222:20, 2227:18, 2239:23
**paper** [2] - 2011:18, 2012:5
**papers** [1] - 2164:16
**paragraph** [1] - 2097:23
**paralegal** [2] - 2012:10, 2012:19
**paraphrase** [1] - 2174:7
**parcel** [2] - 2075:19, 2077:10
**pardon** [1] - 2212:13
**Part** [2] - 2126:22
**part** [28] - 2024:6, 2034:11, 2045:16, 2074:6, 2075:18, 2077:10, 2102:9, 2107:16, 2110:23, 2124:23, 2134:16, 2150:16, 2160:23, 2167:11, 2170:6, 2170:24, 2228:22, 2257:21, 2257:22, 2266:11, 2268:8, 2268:9, 2281:2, 2281:5, 2285:5, 2288:13
**partial** [1] - 2074:6
**partially** [1] - 2166:3
**participant** [1] - 2064:12
**participation** [3] - 2069:24, 2099:20, 2156:22
**particular** [14] - 2019:23, 2021:8, 2049:7, 2056:18, 2067:7, 2151:24, 2153:7, 2181:16, 2208:12, 2208:23, 2209:6, 2233:14, 2263:8, 2264:10
**particularly** [6] - 2048:5, 2056:24, 2081:15, 2129:16, 2140:24, 2142:13
**particulars** [1] - 2178:23
**parts** [3] - 2054:6, 2060:17, 2107:4
**partway** [1] - 2248:10
**party** [2] - 2056:18, 2215:3
**pass** [14] - 2061:4, 2084:18, 2084:22, 2107:3, 2107:14, 2107:22, 2111:25, 2113:3, 2113:5, 2113:8, 2113:12, 2126:20, 2205:16, 2205:20
**passed** [7] - 2084:24, 2109:16, 2126:20, 2126:21, 2197:13, 2197:14, 2222:7
**passenger** [12] - 2178:13, 2179:4, 2271:21, 2272:1, 2272:7, 2272:14, 2272:15, 2272:16, 2273:18, 2274:7, 2274:24
**passengers** [17] - 2137:12, 2137:13, 2258:7, 2264:5, 2266:4, 2266:8, 2266:9, 2267:5, 2272:10, 2272:13, 2273:10, 2273:15, 2274:12, 2274:13, 2275:25, 2284:9
**passengers'** [2] - 2136:22, 2136:25
**passing** [1] - 2205:19
**past** [12] - 2017:18, 2017:24, 2024:2, 2025:21, 2025:22, 2031:24, 2068:18, 2084:6, 2084:7, 2183:2, 2234:1, 2234:4

**patented** [1] - 2238:11
**patently** [1] - 2260:6
**pathology** [2] - 2132:21, 2142:23
**patience** [1] - 2230:17
**patient** [56] - 2023:13, 2035:13, 2058:15, 2071:3, 2090:11, 2094:22, 2094:23, 2094:25, 2095:3, 2095:6, 2095:11, 2095:12, 2095:14, 2095:15, 2096:7, 2098:20, 2099:13, 2102:7, 2102:17, 2106:8, 2106:10, 2106:20, 2111:9, 2111:11, 2112:11, 2113:7, 2113:23, 2114:23, 2116:3, 2116:16, 2119:18, 2122:10, 2122:23, 2131:1, 2143:15, 2146:8, 2170:12, 2170:16, 2170:25, 2171:4, 2171:6, 2171:7, 2171:8, 2171:9, 2171:18, 2174:16, 2174:18, 2208:23, 2221:25, 2222:1
**patient's** [4] - 2102:8, 2112:5, 2113:19, 2131:13
**patients** [37] - 2084:21, 2090:10, 2095:13, 2098:9, 2104:23, 2105:3, 2105:6, 2105:8, 2105:9, 2105:25, 2108:1, 2112:24, 2113:3, 2113:8, 2113:11, 2117:16, 2122:12, 2124:1, 2125:14, 2128:17, 2134:12, 2146:14, 2163:15, 2170:6, 2170:9, 2170:14, 2174:23, 2196:18, 2211:17, 2215:15, 2217:3, 2217:7, 2217:8, 2222:3, 2222:4, 2232:1
**pattern** [2] - 2060:24, 2142:18
**patterns** [2] - 2060:20, 2144:11
**Pause** [4] - 2047:6, 2148:2, 2204:2, 2208:9
**pause** [4] - 2102:24, 2179:22, 2226:18, 2253:5
**paying** [1] - 2212:8
**payroll** [2] - 2011:2, 2093:25
**Peachey** [3] - 2014:6, 2015:1, 2054:13
**peculiar** [1] - 2050:7
**pediatric** [1] - 2082:23
**pelvis** [1] - 2241:22
**penalties** [1] - 2197:21
**pencil** [1] - 2124:21
**Pennsylvania** [2] - 2010:11, 2077:16
**people** [56] - 2037:19, 2040:23, 2053:2, 2069:7, 2075:11, 2107:3, 2107:11, 2113:20, 2113:22, 2114:1, 2118:21, 2118:22, 2118:23, 2121:6, 2123:18, 2137:3, 2137:25, 2138:3, 2157:15, 2161:24, 2162:25, 2163:11, 2180:17, 2182:25, 2183:1, 2183:7, 2192:5, 2201:1, 2203:3, 2203:5, 2204:23, 2207:9, 2213:8, 2222:18, 2246:21, 2246:22, 2247:2, 2258:11, 2258:12, 2259:1, 2259:2, 2259:8, 2261:11, 2261:24, 2262:7, 2262:8, 2264:4, 2267:3, 2267:5, 2268:5, 2268:6, 2268:9, 2279:20, 2279:24, 2280:6
**per** [18] - 2027:14, 2027:18, 2032:20,

2053:13, 2091:2, 2195:15, 2211:5, 2226:3, 2226:5, 2229:4, 2236:3, 2236:20, 2236:23, 2237:4, 2237:9, 2263:9, 2278:10, 2282:21
**percent** [24] - 2040:22, 2107:11, 2113:25, 2114:1, 2145:3, 2146:18, 2150:1, 2150:12, 2151:18, 2163:4, 2212:20, 2216:19, 2217:3, 2217:5, 2217:14, 2219:18, 2223:22, 2224:6, 2224:9, 2224:10, 2224:11, 2224:12, 2224:15
**percentage** [3] - 2113:13, 2113:14, 2114:7
**percentile** [24] - 2088:9, 2113:16, 2113:17, 2113:19, 2113:21, 2113:23, 2114:1, 2118:14, 2121:20, 2124:11, 2124:13, 2124:25, 2127:3, 2142:2, 2142:3, 2186:14, 2196:8, 2205:3, 2205:7, 2264:19, 2264:20, 2264:22, 2264:23, 2264:24
**percentiles** [1] - 2264:20
**perceptually** [3] - 2195:2, 2201:3, 2210:25
**Percocet** [1] - 2036:15
**perfect** [2] - 2132:7, 2218:24
**perfectly** [1] - 2103:12
**perform** [8] - 2059:11, 2109:8, 2112:14, 2121:12, 2121:19, 2174:19, 2175:9, 2213:18
**performance** [13] - 2110:16, 2110:17, 2113:2, 2113:20, 2122:8, 2122:9, 2124:8, 2144:9, 2144:16, 2177:2, 2179:10, 2181:8, 2212:3
**performed** [10] - 2042:14, 2046:6, 2058:5, 2080:25, 2081:1, 2118:11, 2165:24, 2166:8, 2196:18, 2220:22
**performing** [2] - 2151:7, 2245:5
**perhaps** [18] - 2051:5, 2058:10, 2059:6, 2059:12, 2063:1, 2089:2, 2133:4, 2149:6, 2165:19, 2168:12, 2171:4, 2173:23, 2180:15, 2184:25, 2185:1, 2196:23, 2198:18, 2215:5
**period** [9] - 2058:5, 2168:16, 2231:15, 2231:16, 2237:10, 2237:23, 2239:8, 2239:16, 2239:17
**permanent** [1] - 2219:13
**permanently** [1] - 2156:16
**permissible** [1] - 2018:24
**permission** [1] - 2228:4
**permit** [1] - 2071:24
**permitted** [2] - 2017:23, 2257:19
**persistence** [1] - 2155:12
**persistent** [10] - 2068:24, 2069:17, 2069:19, 2069:22, 2070:2, 2155:12, 2156:13, 2156:17, 2156:20, 2156:23
**persistently** [1] - 2153:22
**person** [21] - 2010:2, 2023:15, 2035:20, 2039:15, 2040:9, 2044:6, 2044:15, 2067:21, 2086:16, 2118:19, 2140:22, 2142:12, 2153:12, 2165:13,

2168:14, 2178:16, 2207:6, 2264:24, 2273:2, 2280:4
**personal** [1] - 2074:21
**Personality** [1] - 2121:4
**personality** [5] - 2083:4, 2095:2, 2095:25, 2097:17, 2121:7
**personnel** [1] - 2133:1
**perspective** [2] - 2039:12, 2062:25
**pertinent** [1] - 2179:14
**ph** [1] - 2091:12
**Ph.D** [5] - 2082:17, 2082:19, 2231:7, 2231:9, 2232:9
**Philadelphia** [3] - 2077:3, 2077:5, 2082:3
**phlebotomy** [1] - 2207:16
**photograph** [1] - 2225:15
**photographs** [3] - 2013:10, 2178:13, 2249:10
**Photos** [1] - 2013:17
**photos** [4] - 2093:19, 2093:20, 2178:6, 2178:9
**phrase** [1] - 2224:14
**phrased** [1] - 2169:23
**physiatrist** [3] - 2029:14, 2029:17, 2053:12
**physical** [38] - 2017:14, 2017:15, 2020:14, 2025:5, 2025:20, 2026:1, 2026:6, 2027:11, 2027:12, 2027:21, 2028:17, 2050:17, 2050:21, 2051:5, 2051:18, 2052:5, 2053:10, 2074:18, 2074:23, 2074:25, 2075:5, 2075:14, 2075:21, 2093:9, 2137:8, 2137:14, 2138:1, 2138:2, 2153:25, 2157:15, 2169:21, 2176:2, 2215:21, 2215:25, 2216:1, 2231:19
**physically** [2] - 2035:13, 2101:12
**physician** [22] - 2017:14, 2019:13, 2023:2, 2025:24, 2027:9, 2029:16, 2031:11, 2032:18, 2033:4, 2034:3, 2034:8, 2034:22, 2035:19, 2036:4, 2036:21, 2036:8, 2041:10, 2041:22, 2048:13, 2048:23, 2073:10, 2093:6
**physician's** [1] - 2013:2
**physicians** [2] - 2019:22, 2046:6
**physics** [1] - 2286:24
**physiological** [2] - 2068:15, 2158:5
**physiometry** [1] - 2091:15
**pick** [3] - 2156:4, 2227:20, 2227:25
**picking** [3] - 2195:12, 2203:19, 2204:11
**pickup** [1] - 2250:15
**picture** [7] - 2111:12, 2111:13, 2111:14, 2111:16, 2155:5, 2200:25, 2248:9
**pictures** [13] - 2111:9, 2111:11, 2111:20, 2112:8, 2112:10, 2112:12, 2112:16, 2113:10, 2178:16, 2247:25, 2248:1, 2268:4
**piles** [1] - 2164:15
**pilgrim** [1] - 2031:23

**Pilgrim** [3] - 2018:2, 2032:10, 2056:5
**PINERA** [1] - 2055:5
**PINERA-VAZQUEZ** [1] - 2055:5
**pivot** [1] - 2284:12
**Pizza** [1] - 2011:10
**place** [5] - 2085:1, 2155:1, 2186:1, 2193:1, 2257:1
**placement** [1] - 2173:8
**places** [2] - 2052:13, 2069:7
**Plaintiff** [4] - 2006:4, 2006:16, 2006:21, 2013:17
**plaintiff** [45] - 2008:8, 2014:1, 2016:3, 2017:13, 2017:15, 2017:17, 2017:20, 2018:4, 2018:12, 2018:16, 2018:23, 2019:9, 2019:23, 2025:25, 2027:20, 2028:6, 2028:13, 2029:9, 2029:16, 2034:24, 2036:17, 2036:22, 2040:17, 2041:11, 2041:15, 2041:17, 2041:19, 2042:12, 2042:14, 2043:9, 2043:14, 2043:16, 2044:16, 2045:9, 2047:8, 2074:18, 2074:22, 2078:24, 2079:2, 2079:6, 2093:12, 2093:19, 2094:6, 2140:5
**plaintiff's** [12] - 2016:1, 2016:9, 2016:12, 2040:1, 2043:4, 2043:6, 2043:17, 2046:16, 2077:19, 2078:7, 2103:1, 2214:13
**Plaintiff's** [5] - 2079:12, 2079:14, 2096:19, 2099:19, 2289:19
**plaintiffs** [3] - 2093:23, 2109:13, 2215:6
**Plaintiffs** [1] - 2006:15
**plaintiffs'** [1] - 2222:17
**plan** [17] - 2016:17, 2018:18, 2019:14, 2019:20, 2020:2, 2021:18, 2021:24, 2024:9, 2024:14, 2024:16, 2034:13, 2036:14, 2041:5, 2042:8, 2048:22, 2052:10, 2053:3
**planner** [1] - 2034:20
**planners** [3] - 2051:4, 2056:1, 2056:3
**planning** [1] - 2159:13
**plateaus** [1] - 2029:9
**play** [2] - 2076:2, 2237:7
**players** [3] - 2081:15, 2081:16, 2081:18
**Plaza** [1] - 2007:21
**plenty** [1] - 2052:25
**pocket** [1] - 2017:18
**point** [37] - 2011:14, 2011:24, 2012:4, 2013:1, 2014:18, 2029:2, 2035:8, 2035:9, 2039:25, 2059:21, 2059:24, 2060:16, 2065:16, 2067:7, 2068:18, 2071:6, 2076:3, 2100:4, 2117:18, 2121:1, 2122:19, 2126:12, 2130:23, 2130:24, 2173:3, 2173:22, 2228:12, 2232:20, 2247:3, 2248:12, 2251:13, 2252:19, 2267:2, 2268:19, 2273:7, 2281:15, 2281:16
**pointed** [2] - 2160:4, 2245:14
**points** [2] - 2010:20, 2105:4

**poisoning** [1] - 2077:7
**police** [4] - 2094:4, 2179:7, 2199:18, 2248:4
**poor** [4] - 2176:10, 2177:2, 2211:24, 2211:25
**poorly** [5] - 2042:14, 2042:22, 2176:11, 2186:22, 2201:4
**portion** [10] - 2059:8, 2102:12, 2115:5, 2120:10, 2125:24, 2126:11, 2197:11, 2204:6, 2205:22, 2238:19
**portions** [3] - 2103:13, 2126:10, 2232:3
**portrait** [1] - 2126:14
**position** [15] - 2008:17, 2020:9, 2022:7, 2024:23, 2026:10, 2029:4, 2029:11, 2034:7, 2034:15, 2035:5, 2036:25, 2040:24, 2086:6, 2238:3, 2242:15
**positioned** [1] - 2237:25
**positioning** [1] - 2052:24
**positions** [1] - 2084:5
**positive** [2] - 2070:2, 2156:24
**possible** [18] - 2089:17, 2095:9, 2095:11, 2096:8, 2098:11, 2098:13, 2099:1, 2174:22, 2174:25, 2175:1, 2220:18, 2238:23, 2240:15, 2241:14, 2243:8, 2253:19, 2254:17, 2281:12
**possibly** [7] - 2129:17, 2130:12, 2130:13, 2204:14, 2214:9
**Post** [7] - 2046:10, 2067:14, 2087:21, 2133:16, 2133:23, 2133:25, 2134:12
**post** [16] - 2016:11, 2019:14, 2021:13, 2045:24, 2062:10, 2062:16, 2081:21, 2134:10, 2147:10, 2151:25, 2153:2, 2163:20, 2217:23, 2218:16, 2226:19
**post-accident** [2] - 2045:24, 2218:16
**post-concussion** [3] - 2081:21, 2163:20, 2217:23
**post-doc** [1] - 2134:10
**post-traumatic** [5] - 2016:11, 2147:10, 2151:25, 2153:2, 2226:19
**Post-Traumatic** [6] - 2046:10, 2087:21, 2133:16, 2133:23, 2133:25, 2134:12
**post-trial** [1] - 2021:13
**posted** [1] - 2059:3
**postoperatively** [1] - 2173:13
**potential** [2] - 2040:14, 2198:5
**potentially** [2] - 2031:5, 2223:3
**pounds** [2] - 2233:4, 2233:5
**Powerball** [1] - 2089:24
**practice** [19] - 2011:19, 2080:18, 2080:22, 2101:4, 2105:23, 2106:17, 2128:20, 2134:13, 2150:1, 2150:5, 2150:9, 2150:21, 2152:25, 2168:15, 2171:10, 2172:9, 2182:6, 2194:22, 2210:16
**practicing** [1] - 2080:19
**preceding** [1] - 2018:12
**precise** [3] - 2150:21, 2182:12,

2240:23
**preclude** [1] - 2019:4
**precluded** [3] - 2018:15, 2077:17, 2078:2
**predates** [1] - 2019:11
**predicate** [2] - 2065:9, 2071:20
**predominantly** [2] - 2183:24, 2184:13
**preexisting** [1] - 2057:21
**preface** [1] - 2029:7
**prefer** [1] - 2099:3
**preferably** [1] - 2022:2
**preferred** [4] - 2184:5, 2184:6, 2184:10, 2210:9
**prejudicial** [1] - 2010:4
**preparation** [1] - 2123:9
**preponderance** [3] - 2056:21, 2065:5, 2073:18
**prescribe** [2] - 2023:11, 2051:4
**prescribed** [2] - 2050:10, 2050:21
**prescribing** [1] - 2050:11
**preseason** [1] - 2081:18
**presence** [5] - 2008:3, 2068:1, 2097:17, 2135:18, 2136:4
**present** [10] - 2164:2, 2164:10, 2189:1, 2194:1, 2241:24, 2242:6, 2242:9, 2261:1, 2286:4, 2286:7
**presentation** [1] - 2062:10
**presented** [2] - 2043:9, 2086:16
**preservation** [3] - 2019:5, 2019:17, 2021:22
**pressure** [1] - 2207:16
**pretrial** [2] - 2009:12, 2009:14
**pretty** [10] - 2062:11, 2114:14, 2126:2, 2134:23, 2161:18, 2161:25, 2164:10, 2181:1, 2209:4, 2236:13
**previous** [2] - 2078:4, 2217:9, 2218:2
**previously** [4] - 2018:6, 2025:15, 2180:2, 2234:22
**primarily** [1] - 2241:12
**primary** [2] - 2083:23, 2142:18
**principle** [3] - 2137:8, 2138:1, 2138:2
**principles** [1] - 2137:14
**printer** [1] - 2013:13
**printout** [2] - 2067:3, 2156:3
**private** [3] - 2028:14, 2080:18, 2134:13
**privately** [1] - 2078:2
**privately-retained** [1] - 2078:2
**probability** [3] - 2120:25, 2224:12, 2271:6
**probable** [1] - 2040:24
**probably..** [1] - 2283:22
**problem** [13] - 2027:15, 2035:21, 2061:6, 2062:19, 2064:24, 2070:7, 2089:3, 2137:23, 2138:5, 2214:4, 2249:23, 2259:24, 2267:10
**problematic** [1] - 2048:8
**problems** [7] - 2099:2, 2121:15,

2122:24, 2146:8, 2157:18, 2163:24, 2217:10
**Procedure** [1] - 2015:22
**procedure** [1] - 2133:5
**procedures** [1] - 2020:5
**proceed** [4] - 2080:12, 2096:14, 2222:10, 2222:13
**proceeded** [1] - 2100:13
**proceeding** [1] - 2169:12
**Proceedings** [1] - 2007:22
**proceedings** [7] - 2047:6, 2148:2, 2149:22, 2149:23, 2204:2, 2208:9, 2226:18
**process** [4] - 2095:24, 2099:1, 2103:10, 2112:6
**processing** [4] - 2083:10, 2095:24, 2097:10, 2159:14
**produce** [1] - 2009:11
**produced** [6] - 2007:22, 2010:5, 2010:13, 2011:3, 2012:19, 2168:3
**product** [1] - 2073:10
**profession** [9] - 2085:7, 2086:14, 2086:15, 2106:4, 2111:5, 2112:4, 2112:7, 2128:15, 2149:25
**professional** [14] - 2057:17, 2058:20, 2062:14, 2062:15, 2081:13, 2081:15, 2084:13, 2085:20, 2090:24, 2109:5, 2150:5, 2153:18, 2158:10, 2168:15
**proficiency** [1] - 2191:21
**proficient** [1] - 2186:21
**profound** [2] - 2140:21, 2142:21
**program** [4] - 2028:12, 2028:13, 2081:15, 2081:17
**progress** [1] - 2060:9
**project** [2] - 2023:14
**projected** [2] - 2052:13, 2052:20
**projecting** [1] - 2023:3
**prolonged** [1] - 2068:12
**prominent** [1] - 2140:20
**proof** [4] - 2017:6, 2029:18, 2047:10, 2072:21
**proper** [5] - 2019:16, 2019:25, 2021:7, 2030:17, 2048:18
**properly** [2] - 2045:5, 2077:11
**properties** [1] - 2233:9
**property** [1] - 2233:9
**proportional** [1] - 2283:5
**proposition** [1] - 2018:2
**prospect** [1] - 2197:21
**protect** [1] - 2238:16
**protocol** [3] - 2167:16, 2168:14, 2170:7
**Provder** [32] - 2016:17, 2018:25, 2019:16, 2019:18, 2019:24, 2026:17, 2027:1, 2027:9, 2027:13, 2027:15, 2030:2, 2032:19, 2032:22, 2033:11, 2033:23, 2034:12, 2035:16, 2035:23, 2036:16, 2037:10, 2037:14, 2038:7, 2041:11, 2041:15, 2041:16, 2041:21, 2052:18, 2052:25, 2054:3, 2055:11

**Provder's** [8] - 2019:4, 2021:18, 2024:8, 2028:21, 2031:7, 2031:12, 2034:1, 2036:14
**provder's** [1] - 2019:11
**proven** [2] - 2016:20, 2046:11
**provenzale** [1] - 2015:12
**Provenzale** [1] - 2015:3
**prover's** [1] - 2019:15
**provide** [5] - 2040:25, 2076:9, 2076:13, 2096:16, 2192:15
**provided** [6] - 2010:24, 2012:7, 2048:18, 2097:14, 2236:1, 2251:2
**provider** [4] - 2024:2, 2038:20, 2039:6, 2039:7
**providers** [2] - 2092:6, 2093:4
**provocation** [1] - 2157:14
**prudent** [1] - 2168:12
**psychiatric** [10] - 2061:11, 2122:1, 2122:7, 2122:24, 2124:1, 2181:13, 2217:10, 2217:12, 2217:25, 2218:2
**Psychiatric** [1] - 2152:10
**psychological** [15] - 2028:19, 2028:21, 2028:25, 2029:2, 2029:6, 2061:11, 2068:12, 2091:16, 2144:13, 2145:1, 2146:13, 2147:7, 2147:23, 2175:24, 2181:13
**Psychological** [3] - 2085:16, 2085:19, 2085:25
**psychologically** [1] - 2151:11
**psychologist** [5] - 2018:22, 2018:23, 2028:4, 2028:6, 2093:9
**psychologists** [2] - 2085:20, 2145:20
**Psychology** [1] - 2084:13
**psychology** [9] - 2082:20, 2083:1, 2083:3, 2086:1, 2086:2, 2086:3, 2086:19, 2086:23, 2091:14
**psychomotor** [2] - 2126:7, 2126:23
**psychopathology** [3] - 2122:12, 2123:5, 2124:4
**psychotherapy** [1] - 2139:4
**psychotic** [1] - 2209:8
**PT** [3] - 2025:1, 2026:12, 2026:13
**PTSD** [57] - 2045:18, 2045:22, 2046:2, 2046:7, 2055:24, 2056:11, 2056:23, 2061:5, 2061:11, 2062:3, 2062:22, 2063:2, 2063:3, 2063:12, 2063:14, 2063:18, 2063:25, 2064:1, 2064:7, 2065:1, 2065:3, 2065:5, 2066:1, 2066:2, 2066:9, 2066:19, 2066:21, 2067:17, 2070:23, 2071:21, 2072:12, 2072:20, 2072:23, 2078:7, 2087:23, 2134:4, 2134:7, 2134:8, 2134:14, 2134:15, 2134:20, 2134:24, 2134:25, 2135:2, 2135:3, 2151:25, 2152:4, 2153:3, 2153:22, 2154:2, 2156:7, 2158:12, 2215:8, 2215:16, 2215:23, 2227:3
**public** [1] - 2190:21
**publications** [2] - 2086:9, 2177:7
**published** [2] - 2086:10, 2218:10

**Puerto** [1] - 2190:6
**pull** [1] - 2202:4
**pulling** [2] - 2175:12, 2241:20
**punitive** [3] - 2077:7, 2077:12, 2288:13
**punitives** [1] - 2077:9
**pure** [1] - 2026:10
**purpose** [10] - 2044:16, 2098:2, 2098:7, 2102:4, 2122:6, 2122:8, 2146:1, 2208:20, 2238:13, 2246:12
**purposefully** [4] - 2089:13, 2101:15, 2105:16, 2108:10
**purposely** [1] - 2212:15
**purposes** [9] - 2018:17, 2019:6, 2019:17, 2021:13, 2021:22, 2058:14, 2095:20, 2096:10, 2124:18
**pursuant** [2] - 2012:6, 2015:21
**pushups** [1] - 2050:20
**put** [41] - 2010:9, 2014:7, 2014:10, 2026:24, 2030:21, 2031:16, 2050:18, 2052:4, 2053:9, 2053:10, 2053:11, 2053:12, 2059:25, 2062:3, 2066:19, 2096:18, 2098:13, 2098:20, 2123:11, 2124:15, 2131:20, 2136:21, 2138:21, 2148:14, 2169:18, 2180:10, 2212:6, 2214:8, 2238:12, 2239:21, 2250:13, 2262:19, 2264:14, 2264:16, 2264:17, 2264:18, 2264:19, 2264:20, 2267:22, 2280:13
**putting** [1] - 2043:14

# Q

**qEEG** [8] - 2060:4, 2060:6, 2060:7, 2060:13, 2060:17, 2060:25, 2093:22, 2146:14
**qualifications** [3] - 2051:3, 2052:25, 2091:13
**qualified** [5] - 2058:21, 2062:15, 2065:13, 2071:2, 2071:10
**quarter** [1] - 2233:5
**QUESTION** [5] - 2204:13, 2204:17, 2204:20, 2207:4, 2207:6
**questioning** [1] - 2155:8
**questions** [39] - 2043:22, 2048:9, 2054:10, 2055:20, 2089:8, 2095:2, 2095:5, 2095:7, 2096:1, 2096:13, 2098:12, 2103:7, 2123:10, 2147:4, 2149:2, 2152:2, 2158:14, 2164:18, 2169:25, 2192:15, 2195:6, 2195:19, 2203:20, 2204:12, 2204:25, 2214:5, 2215:8, 2221:14, 2223:20, 2224:4, 2226:19, 2229:3, 2248:22, 2267:12, 2273:7, 2276:4, 2280:19, 2285:1
**quick** [7] - 2037:8, 2072:9, 2148:1, 2208:8, 2228:3, 2272:21, 2274:23
**quicker** [3] - 2038:5, 2121:3, 2124:5
**quickly** [7] - 2016:24, 2092:24, 2127:1, 2266:14, 2276:5, 2281:22, 2288:15
**Quihano** [1] - 2017:10

**Quijiano** [2] - 2017:7, 2017:9
**quit** [1] - 2194:23
**quite** [7] - 2056:6, 2057:14, 2090:13, 2167:20, 2183:1, 2204:14, 2229:9
**quote** [6] - 2020:4, 2027:23, 2028:2, 2067:17, 2110:13, 2119:1

# R

**Rabin** [1] - 2015:4
**Radiator** [1] - 2016:22
**radio** [1] - 2035:22
**radiologist** [1] - 2015:12
**radiology** [1] - 2093:5
**rails** [2] - 2248:13, 2248:14
**raise** [6] - 2046:24, 2072:4, 2079:21, 2104:13, 2136:11, 2230:3
**raised** [7] - 2011:10, 2011:16, 2012:2, 2012:3, 2012:7, 2019:5, 2136:22
**raisotomies** [1] - 2051:25
**Rambrich** [1] - 2014:21
**Ramirez** [1] - 2014:21
**RAMON** [4] - 2006:12, 2008:2, 2078:18, 2136:3
**Rampersaud** [1] - 2014:21
**range** [9] - 2141:3, 2141:24, 2161:21, 2183:8, 2184:22, 2206:1, 2206:2, 2207:8, 2264:25
**ranked** [2] - 2174:18, 2174:20
**rapidly** [3] - 2121:18, 2247:16, 2284:19
**rare** [1] - 2120:15
**rate** [3] - 2170:3, 2237:5, 2237:6
**rather** [2] - 2067:2, 2172:2
**ratio** [1] - 2283:5
**raw** [4] - 2093:13, 2221:3, 2221:5
**RAYMOND** [1] - 2006:18
**rays** [1] - 2033:3
**rays'** [1] - 2033:3
**re** [3] - 2012:2, 2012:3, 2257:6
**re-asked** [1] - 2257:6
**re-raised** [2] - 2012:2, 2012:3
**reached** [3] - 2058:19, 2081:3, 2186:7
**reaches** [2] - 2058:12, 2247:7
**reaction** [3] - 2056:11, 2215:11, 2215:12
**reactions** [2] - 2068:9, 2068:15
**reactivity** [2] - 2153:25, 2157:11
**read** [38] - 2043:16, 2043:17, 2043:18, 2095:3, 2095:5, 2097:3, 2097:10, 2097:19, 2097:25, 2099:4, 2099:24, 2115:7, 2115:9, 2115:10, 2115:18, 2115:21, 2116:5, 2116:11, 2116:15, 2123:18, 2123:20, 2169:18, 2186:21, 2189:12, 2195:9, 2196:2, 2204:3, 2204:6, 2204:8, 2205:23, 2207:12, 2207:13, 2251:24, 2252:7, 2252:19, 2267:21, 2274:11, 2285:23
**reading** [4] - 2059:25, 2117:14,

2194:20, 2243:24
**reads** [2] - 2095:6, 2119:18
**ready** [5] - 2057:9, 2070:12, 2078:19, 2136:7, 2136:13
**real** [10] - 2072:9, 2087:16, 2088:10, 2088:13, 2107:19, 2147:12, 2207:9, 2250:15, 2269:16, 2274:22
**real-world** [1] - 2250:15
**realize** [1] - 2275:2
**really** [45] - 2011:14, 2040:24, 2048:6, 2077:22, 2082:5, 2083:8, 2087:15, 2088:10, 2088:13, 2089:4, 2089:14, 2092:16, 2095:11, 2096:7, 2096:10, 2100:5, 2100:6, 2101:16, 2104:23, 2105:15, 2107:17, 2113:1, 2115:11, 2118:5, 2125:8, 2127:6, 2128:1, 2129:9, 2131:5, 2131:19, 2141:13, 2142:9, 2159:21, 2169:6, 2189:14, 2196:4, 2196:16, 2212:9, 2216:24, 2217:10, 2222:5, 2222:16, 2240:15
**rear** [8] - 2161:4, 2161:8, 2247:19, 2248:16, 2263:15, 2272:15, 2272:18, 2274:12
**rear-ended** [2] - 2161:4, 2161:8
**reason** [17] - 2020:22, 2021:8, 2035:14, 2054:12, 2055:12, 2098:18, 2100:4, 2137:9, 2151:24, 2172:8, 2201:3, 2208:12, 2215:5, 2222:12, 2257:19, 2280:6, 2281:2
**reasonable** [35] - 2016:2, 2016:17, 2016:18, 2016:21, 2017:21, 2026:3, 2028:16, 2040:16, 2041:2, 2045:14, 2046:12, 2046:20, 2048:7, 2056:17, 2057:17, 2058:20, 2062:15, 2087:3, 2128:6, 2128:22, 2138:18, 2138:20, 2144:4, 2146:12, 2147:7, 2147:15, 2147:23, 2220:18, 2227:9, 2235:8, 2235:22, 2243:6, 2243:10, 2248:19, 2255:17
**reasonably** [2] - 2029:11, 2062:24
**reasoning** [1] - 2207:21
**reasons** [1] - 2268:10
**rebounds** [1] - 2282:20
**rebuttal** [3] - 2136:16, 2137:16, 2253:8
**receive** [6] - 2012:6, 2136:20, 2178:15, 2258:12, 2262:8, 2267:6
**received** [15] - 2011:12, 2011:23, 2012:21, 2018:6, 2018:12, 2025:15, 2025:19, 2041:15, 2079:13, 2079:14, 2086:22, 2180:1, 2218:7, 2234:10, 2259:9
**receiving** [2] - 2028:20, 2028:22
**Recess** [1] - 2078:17
**recess** [1] - 2229:23
**recitation** [1] - 2065:19
**recited** [1] - 2064:16
**reckless** [1] - 2157:16
**recognition** [6] - 2106:24, 2107:1, 2107:2, 2111:8, 2112:17, 2118:17
**recognize** [4] - 2106:23, 2151:13,

2197:20, 2225:6
**recognized** [3] - 2106:2, 2163:12, 2163:16
**recollection** [3] - 2048:5, 2048:10, 2092:21
**recommendations** [1] - 2019:21
**recommended** [2] - 2020:5, 2041:10
**recommending** [2] - 2019:22, 2038:10
**reconstruction** [10] - 2077:15, 2077:25, 2078:3, 2250:25, 2257:10, 2257:11, 2257:16, 2257:21, 2259:19, 2263:18
**reconstructionist** [2] - 2077:17, 2077:19, 2078:1
**record** [47] - 2008:14, 2022:9, 2024:11, 2025:3, 2029:18, 2033:5, 2033:10, 2034:15, 2035:18, 2040:20, 2042:3, 2042:19, 2052:22, 2053:12, 2053:18, 2054:22, 2054:25, 2055:16, 2061:4, 2062:9, 2066:3, 2067:10, 2067:11, 2067:12, 2067:23, 2070:6, 2070:15, 2070:24, 2071:9, 2071:10, 2071:16, 2072:15, 2077:2, 2099:15, 2153:11, 2166:21, 2168:2, 2197:4, 2199:4, 2202:1, 2204:6, 2222:8, 2258:22, 2259:6, 2266:18, 2288:22, 2288:23
**recorded** [3] - 2007:22, 2165:9, 2167:4
**records** [51] - 2011:2, 2011:4, 2011:5, 2034:24, 2050:13, 2052:16, 2056:4, 2056:5, 2057:25, 2058:1, 2058:2, 2066:16, 2070:18, 2092:2, 2092:4, 2092:6, 2092:7, 2093:2, 2093:7, 2093:8, 2093:9, 2093:11, 2093:12, 2093:14, 2093:21, 2093:25, 2094:3, 2094:5, 2094:6, 2094:7, 2094:13, 2097:7, 2131:22, 2132:15, 2140:4, 2162:10, 2168:3, 2177:19, 2178:19, 2179:9, 2216:5, 2216:13, 2216:14, 2218:12
**recover** [3] - 2018:4, 2018:5, 2075:16
**recoverable** [1] - 2018:11
**RECROSS** [4] - 2228:5, 2285:3, 2289:9, 2289:15
**recross** [2] - 2223:24, 2228:3
**RECROSS-EXAMINATION** [4] - 2228:5, 2285:3, 2289:9, 2289:15
**recurrent** [2] - 2068:4, 2068:20
**recurring** [2] - 2068:6, 2068:11
**redacted** [1] - 2044:24
**REDIRECT** [6] - 2206:17, 2229:1, 2280:20, 2289:8, 2289:10, 2289:14
**redirect** [3] - 2011:8, 2011:12, 2012:17
**reduce** [3] - 2238:16, 2240:1
**reduced** [5] - 2056:7, 2237:20, 2238:21, 2239:7, 2261:24
**reduces** [1] - 2240:5
**redundant** [1] - 2175:19
**reeled** [1] - 2045:15
**reenforces** [1] - 2109:22

Bauta v. Greyhound Lines, et al _____ 34

**reexperienced** [1] - 2153:23
**reexperiencing** [1] - 2134:18
**refer** [6] - 2144:1, 2152:18, 2171:5, 2181:9, 2181:12, 2223:1
**reference** [2] - 2062:7, 2063:10
**referenced** [6] - 2010:23, 2011:9, 2032:19, 2034:5, 2046:7, 2153:11
**referencing** [1] - 2010:25
**referencned** [1] - 2059:9
**referral** [6] - 2133:6, 2170:16, 2171:17, 2171:20, 2172:3, 2172:13
**referred** [4] - 2145:9, 2163:19, 2222:3, 2253:7
**referring** [5] - 2152:6, 2152:19, 2152:23, 2153:5, 2181:5
**refers** [3] - 2149:22, 2159:12, 2177:13
**reflect** [1] - 2168:4
**refresh** [2] - 2092:20, 2195:22
**refused** [1] - 2021:12
**refuted** [1] - 2043:17
**regard** [15] - 2019:4, 2020:9, 2023:25, 2024:8, 2029:14, 2042:5, 2046:24, 2052:8, 2073:5, 2078:3, 2169:16, 2236:12, 2241:3, 2249:25, 2261:20
**regarding** [5] - 2011:1, 2012:1, 2077:4, 2141:18, 2230:22
**regardless** [5] - 2167:14, 2171:12, 2172:7, 2285:15
**regards** [5] - 2235:17, 2241:17, 2249:20, 2261:19, 2261:21
**regular** [4] - 2083:3, 2152:25, 2210:14, 2222:4
**rehab** [2] - 2027:3, 2027:8
**rehabilitation** [4] - 2024:9, 2024:14, 2024:16, 2054:5
**reinforces** [1] - 2141:20
**Reitan** [2] - 2058:11, 2059:14
**reiterate** [1] - 2101:6
**rejected** [1] - 2199:19
**relate** [5] - 2043:20, 2043:23, 2046:2, 2073:6, 2194:11
**related** [21] - 2029:24, 2044:4, 2046:13, 2068:7, 2097:8, 2154:5, 2154:6, 2154:7, 2170:15, 2176:3, 2230:22, 2231:17, 2236:5, 2250:16, 2250:18, 2250:25, 2251:1, 2255:4, 2257:9, 2271:7, 2280:24
**relates** [7] - 2060:11, 2147:20, 2153:2, 2157:1, 2176:1, 2205:22, 2259:19
**relation** [1] - 2112:23
**relationship** [4] - 2102:18, 2233:3, 2241:7, 2241:10
**relationships** [1] - 2083:1
**relative** [5] - 2153:16, 2234:22, 2235:11, 2240:7, 2246:1
**relaxant** [1] - 2104:5
**relaxants** [3] - 2036:20, 2050:12, 2053:21
**relaxer** [1] - 2036:24
**relaxers** [2] - 2037:3, 2050:4

**relevance** [1] - 2186:3
**relevant** [7] - 2044:11, 2199:9, 2200:1, 2257:16, 2257:20, 2269:1, 2282:13
**Reliable** [3] - 2120:9, 2120:13, 2212:4
**reliable** [3] - 2098:22, 2120:9, 2222:9
**relied** [6] - 2019:7, 2055:11, 2241:12, 2252:25, 2262:6, 2262:14
**rely** [7] - 2034:14, 2055:14, 2056:3, 2241:13, 2241:15, 2250:5, 2262:11
**relying** [1] - 2262:2
**remained** [1] - 2180:9
**remember** [28] - 2024:3, 2069:10, 2069:15, 2106:22, 2111:12, 2111:17, 2111:18, 2113:10, 2115:3, 2115:23, 2116:13, 2116:17, 2142:4, 2148:6, 2148:10, 2156:10, 2184:25, 2185:2, 2189:11, 2189:14, 2195:24, 2196:4, 2196:10, 2196:16, 2213:6, 2213:12, 2286:17, 2288:13
**remembered** [4] - 2103:13, 2107:7, 2114:24, 2115:25
**remembering** [1] - 2103:8
**reminded** [1] - 2064:7
**reminders** [4] - 2069:6, 2153:25, 2154:1, 2154:7
**remodels** [1] - 2233:20
**removal** [1] - 2037:15
**remove** [2] - 2036:17, 2038:7
**removed** [1] - 2037:15
**render** [4] - 2048:14, 2062:5, 2185:14, 2235:4
**renew** [5] - 2019:2, 2019:6, 2019:10, 2073:20, 2076:25
**renewing** [2] - 2077:2, 2078:6
**repeat** [2] - 2119:19, 2119:21
**report** [69] - 2010:23, 2019:6, 2019:10, 2019:11, 2051:7, 2051:9, 2055:12, 2077:18, 2091:24, 2092:2, 2092:5, 2092:8, 2092:9, 2092:13, 2092:16, 2093:1, 2093:8, 2093:13, 2093:16, 2094:4, 2096:11, 2137:17, 2137:19, 2138:21, 2138:23, 2139:9, 2139:17, 2139:24, 2148:4, 2159:16, 2159:24, 2159:25, 2160:10, 2160:15, 2160:18, 2162:16, 2177:23, 2178:4, 2179:7, 2179:24, 2180:4, 2184:4, 2198:2, 2204:13, 2216:13, 2234:16, 2234:19, 2235:2, 2235:15, 2239:12, 2241:16, 2243:25, 2245:14, 2245:18, 2250:24, 2251:13, 2252:15, 2253:14, 2256:7, 2256:14, 2262:14, 2262:15, 2262:22, 2267:22, 2268:9, 2274:11, 2281:3
**reported** [11] - 2121:14, 2122:10, 2132:24, 2170:17, 2170:20, 2175:6, 2178:17, 2194:23, 2195:14, 2195:17, 2279:3
**Reporter** [4] - 2007:20, 2009:4, 2016:23, 2204:7
**reporter** [2] - 2080:7, 2230:7
**reports** [21] - 2010:24, 2092:20,

2093:5, 2093:15, 2123:11, 2159:17, 2159:20, 2163:22, 2164:9, 2172:20, 2175:7, 2177:14, 2177:16, 2195:2, 2199:18, 2216:10, 2242:17, 2252:16
**represent** [1] - 2087:15
**representation** [1] - 2183:13
**representations** [1] - 2122:11
**representative** [5] - 2085:15, 2085:24, 2086:4, 2086:5, 2124:3
**representatives** [2] - 2085:22, 2085:23
**represented** [2] - 2010:21, 2088:10
**reprocessing** [1] - 2083:11
**request** [2] - 2071:12, 2172:15
**requested** [3] - 2021:10, 2172:12, 2204:6
**requests** [2] - 2170:16, 2172:1
**require** [5] - 2041:20, 2048:23, 2088:12, 2157:5, 2207:20
**required** [7] - 2024:11, 2064:10, 2153:8, 2153:21, 2154:4, 2195:18, 2215:13
**requirement** [2] - 2035:3, 2068:24
**requirements** [1] - 2070:10
**requires** [12] - 2026:6, 2027:10, 2029:17, 2064:8, 2065:17, 2065:19, 2067:17, 2127:24, 2134:5, 2134:16, 2134:17, 2196:7
**reschedule** [2] - 2096:5, 2100:16
**research** [7] - 2105:7, 2216:22, 2217:1, 2217:2, 2231:17, 2231:24, 2288:19
**Research** [1] - 2082:17
**resemble** [2] - 2068:14, 2068:16
**resist** [4] - 2233:17, 2233:21, 2275:7
**resisted** [1] - 2284:15
**resorb** [1] - 2233:18
**respect** [10] - 2020:8, 2047:22, 2087:18, 2087:21, 2095:12, 2206:19, 2215:8, 2223:11, 2237:25, 2286:9
**respectfully** [2] - 2065:7, 2260:8
**respond** [8] - 2012:9, 2063:6, 2067:6, 2070:8, 2070:11, 2131:13, 2132:5
**responded** [8] - 2059:5, 2123:14, 2123:16, 2123:18, 2123:21, 2132:7, 2143:17, 2152:3
**responder** [3] - 2094:5, 2153:18, 2179:4
**responders** [4] - 2094:2, 2129:14, 2129:15, 2158:23
**responding** [1] - 2097:24
**response** [13] - 2010:15, 2013:25, 2131:6, 2134:18, 2157:17, 2158:14, 2164:18, 2174:12, 2183:15, 2213:5, 2215:21, 2216:1
**responses** [2] - 2009:21, 2143:24
**rest** [6] - 2013:10, 2014:2, 2017:6, 2052:5, 2109:11, 2285:7
**resting** [1] - 2008:8
**restless** [1] - 2157:19
**restrain** [1] - 2242:7

**restrained** [14] - 2237:3, 2241:22, 2264:16, 2264:18, 2267:5, 2267:23, 2268:2, 2271:12, 2271:14, 2271:25, 2272:4, 2273:5, 2273:17
**restraint** [3] - 2271:16, 2274:5
**restroom** [1] - 2101:25
**rests** [1] - 2079:2
**result** [14] - 2016:6, 2029:23, 2118:10, 2138:14, 2145:2, 2147:16, 2205:12, 2205:13, 2224:19, 2235:21, 2238:8, 2238:21, 2238:24, 2261:10
**resulted** [3] - 2077:5, 2077:6, 2239:2
**resulting** [1] - 2077:8
**results** [60] - 2011:6, 2043:2, 2043:3, 2058:8, 2059:13, 2059:20, 2060:13, 2066:7, 2081:21, 2081:24, 2087:14, 2088:2, 2089:2, 2090:12, 2101:11, 2103:6, 2104:17, 2105:2, 2105:10, 2108:2, 2108:4, 2109:11, 2109:12, 2109:15, 2109:20, 2110:6, 2112:23, 2113:13, 2120:8, 2125:9, 2128:5, 2140:11, 2141:23, 2142:1, 2143:5, 2143:20, 2144:6, 2145:5, 2145:13, 2164:19, 2168:22, 2170:20, 2170:21, 2171:1, 2174:11, 2180:12, 2184:24, 2196:20, 2197:23, 2199:16, 2211:16, 2211:18, 2213:22, 2222:5, 2227:10, 2260:18, 2262:25, 2263:2, 2263:3
**resumes** [1] - 2136:9
**retained** [25] - 2009:6, 2019:13, 2030:21, 2031:13, 2034:10, 2034:20, 2035:20, 2039:7, 2040:11, 2042:12, 2048:16, 2048:17, 2078:2, 2094:24, 2151:2, 2165:18, 2179:25, 2214:12, 2215:6, 2222:17, 2234:15, 2234:22, 2234:25, 2257:10, 2257:11
**retardation** [1] - 2125:13
**retarded** [2] - 2183:8, 2207:7
**retention** [2] - 2077:6, 2112:18
**retest** [1] - 2165:18
**retesting** [3] - 2059:17, 2165:5, 2165:17
**retrieve** [1] - 2121:18
**return** [3] - 2163:6, 2163:8, 2163:9
**reverse** [1] - 2119:25
**review** [16] - 2021:13, 2031:14, 2057:24, 2092:3, 2092:12, 2093:17, 2094:10, 2097:7, 2123:9, 2131:22, 2132:14, 2139:10, 2141:23, 2158:18, 2158:24
**reviewed** [17] - 2057:20, 2071:10, 2084:17, 2084:21, 2087:7, 2087:10, 2092:21, 2092:25, 2093:18, 2139:16, 2147:5, 2158:15, 2159:24, 2160:5, 2169:15, 2216:13, 2257:9
**reviewing** [2] - 2017:1, 2235:15
**reviews** [1] - 2179:10
**revisit** [1] - 2012:23
**Rey** [1] - 2125:25
**Rey-Osterrieth** [1] - 2125:25

**REYES** [4] - 2006:12, 2008:2, 2078:18, 2136:3
**Rezireksyon** [15] - 2196:25, 2197:1, 2197:2, 2197:8, 2197:11, 2197:17, 2198:5, 2198:17, 2200:23, 2203:14, 2205:10, 2205:22, 2209:1, 2209:8
**REZIREKSYON** [1] - 2197:4
**Rezireksyon's** [2] - 2199:8, 2206:3
**Rican** [1] - 2190:6
**ride** [1] - 2134:22
**Rider** [1] - 2082:14
**ridiculous** [1] - 2225:7
**riding** [1] - 2134:2
**right-handed** [1] - 2142:12
**rightfully** [1] - 2241:13
**rigid** [1] - 2247:13
**ringing** [1] - 2129:11
**rise** [2] - 2110:5, 2135:16
**river** [1] - 2082:18
**Rivera** [4] - 2093:23, 2093:24, 2158:23, 2178:25
**road** [1] - 2236:21
**Rob** [1] - 2024:12
**rOBERT** [1] - 2007:17
**Robert** [3] - 2014:15, 2015:19, 2230:8
**ROBERT** [2] - 2230:10, 2289:11
**rods** [3] - 2173:8, 2173:9, 2173:16
**role** [1] - 2146:1
**roof** [1] - 2268:17
**roofing** [1] - 2195:4
**room** [2] - 2054:14, 2141:17, 2210:7
**rooted** [1] - 2048:22
**Rosenrerg** [1] - 2050:22
**round** [1] - 2059:15
**row** [19] - 2264:1, 2264:2, 2264:10, 2264:11, 2266:2, 2266:3, 2276:10, 2276:11, 2276:14, 2276:15, 2276:17, 2276:25, 2277:24, 2279:3, 2279:9, 2279:13, 2279:18
**rows** [5] - 2264:5, 2276:25, 2277:20, 2283:16, 2284:22
**RR** [1] - 2017:11
**ruined** [1] - 2156:17
**rule** [6] - 2056:16, 2062:10, 2144:14, 2144:15, 2144:21, 2145:2
**Rule** [7] - 2008:19, 2010:9, 2013:15, 2013:16, 2013:21, 2015:22, 2015:24
**ruled** [4] - 2060:5, 2062:11, 2062:12
**rules** [2] - 2145:18, 2146:10
**ruling** [3] - 2011:22, 2077:1, 2078:5
**run** [2] - 2054:15, 2280:8
**rundown** [1] - 2092:25
**running** [3] - 2279:24, 2280:11, 2280:12
**runs** [1] - 2258:1
**Rutgers** [2] - 2083:15, 2083:20
**Rye** [1] - 2007:13
**Ryebrook** [1] - 2012:5

## S

**Saal** [4] - 2045:17, 2046:14, 2046:21, 2090:19
**saal** [1] - 2010:19
**SAAL** [12] - 2007:13, 2010:20, 2012:12, 2012:15, 2013:8, 2047:2, 2076:23, 2078:10, 2218:8, 2219:8, 2256:4
**SABRINA** [1] - 2006:8
**Sabrina** [4] - 2007:4, 2007:10, 2007:16, 2015:20
**salaried** [1] - 2091:22
**sample** [2] - 2084:23, 2084:24
**samples** [1] - 2084:19
**sandbagging** [1] - 2200:24
**Sanperi** [1] - 2075:3
**sat** [3] - 2162:22, 2164:18, 2172:19
**satisfaction** [2] - 2070:3, 2156:25
**satisfied** [4] - 2064:17, 2065:10, 2157:6, 2157:7
**satisfy** [2] - 2061:12, 2070:19
**Sav** [10] - 2008:15, 2009:10, 2009:18, 2009:21, 2009:22, 2010:21, 2011:1, 2011:12, 2012:22, 2093:25
**Sav-a-Lot** [10] - 2008:15, 2009:10, 2009:18, 2009:21, 2009:22, 2010:21, 2011:1, 2011:12, 2012:22, 2093:25
**saw** [22] - 2059:20, 2085:15, 2105:10, 2106:15, 2106:16, 2106:21, 2111:22, 2127:20, 2145:5, 2148:3, 2165:6, 2168:12, 2178:16, 2231:24, 2242:12, 2242:13, 2251:6, 2252:24, 2253:3, 2285:10, 2285:19
**scale** [3] - 2148:16, 2174:18, 2174:20
**Scale** [6] - 2124:7, 2125:2, 2131:9, 2131:24, 2132:9, 2218:20
**scales** [2] - 2121:10, 2121:13
**scan** [2] - 2132:20
**scene** [14] - 2093:20, 2094:2, 2129:13, 2130:7, 2130:11, 2130:14, 2141:16, 2178:9, 2178:10, 2179:5, 2210:3, 2219:1, 2248:5
**scheduled** [1] - 2014:13
**schedules** [1] - 2045:10
**schizophrenia** [1] - 2209:9
**schizophrenic** [1] - 2122:12
**Schmidt** [1] - 2077:16
**School** [2] - 2082:17, 2194:23
**school** [18] - 2058:2, 2082:2, 2083:16, 2086:1, 2094:6, 2097:8, 2175:13, 2175:14, 2176:11, 2177:19, 2190:16, 2194:17, 2194:18, 2195:1, 2195:5, 2213:13, 2213:18
**schools** [3] - 2028:14, 2190:21, 2191:22
**Schorr** [2] - 2257:12, 2263:16
**Schultz** [1] - 2016:22
**science** [6] - 2112:2, 2221:9, 2221:11,

2243:9, 2245:24, 2250:4
**Science** [2] - 2231:6, 2231:7
**scientific** [13] - 2087:3, 2128:6, 2128:23, 2146:24, 2147:19, 2176:22, 2235:3, 2236:1, 2246:2, 2246:9, 2252:9, 2254:1, 2254:22
**scientifically** [3] - 2136:21, 2280:13, 2281:20
**scope** [2] - 2239:12, 2250:6
**score** [21] - 2059:23, 2059:25, 2089:12, 2091:16, 2108:6, 2122:20, 2122:25, 2132:7, 2183:11, 2183:15, 2183:21, 2186:9, 2199:13, 2201:8, 2209:14, 2209:19, 2218:22, 2218:24, 2221:3
**scored** [16] - 2088:7, 2088:8, 2089:5, 2101:14, 2118:13, 2121:20, 2122:15, 2127:3, 2183:11, 2186:22, 2196:8, 2205:7, 2212:6, 2212:8, 2212:10
**scores** [38] - 2087:13, 2088:10, 2089:4, 2105:13, 2108:5, 2113:21, 2142:2, 2142:3, 2142:8, 2142:9, 2142:24, 2144:10, 2144:17, 2144:18, 2144:19, 2164:22, 2165:4, 2165:8, 2165:10, 2165:15, 2165:19, 2177:10, 2180:18, 2183:9, 2184:22, 2195:24, 2200:3, 2205:11, 2208:19, 2209:4, 2209:6, 2215:3, 2217:21, 2217:22, 2221:15, 2222:6, 2222:7
**scoring** [2] - 2114:15, 2176:17
**screen** [4] - 2096:21, 2106:12, 2106:15, 2275:22
**screens** [3] - 2021:1, 2255:24, 2262:20
**screws** [1] - 2173:16
**scripts** [1] - 2050:13
**search** [1] - 2202:5
**season** [1] - 2081:20
**seat** [41] - 2142:13, 2239:1, 2239:2, 2239:5, 2239:6, 2239:8, 2239:9, 2239:12, 2239:17, 2239:19, 2240:3, 2240:8, 2240:11, 2240:12, 2240:14, 2240:19, 2242:14, 2264:17, 2267:14, 2268:20, 2272:15, 2272:16, 2272:18, 2272:19, 2274:12, 2274:13, 2275:12, 2275:20, 2283:17, 2283:19, 2283:20, 2284:9, 2284:10, 2284:20, 2285:12, 2285:13, 2285:21, 2287:2
**seatbelt** [12] - 2236:24, 2237:2, 2237:3, 2241:23, 2241:24, 2245:11, 2251:7, 2251:9, 2251:11, 2251:16, 2251:25, 2252:20
**seatbelts** [4] - 2243:20, 2245:4, 2245:8, 2245:15
**seated** [8] - 2078:23, 2080:5, 2136:6, 2138:8, 2240:13, 2277:11, 2278:1, 2279:24
**seats** [9] - 2239:9, 2239:14, 2249:10, 2267:7, 2280:6, 2283:13, 2283:16, 2284:22, 2285:11
**second** [34] - 2008:23, 2018:20,

2025:4, 2030:22, 2039:21, 2093:16, 2097:23, 2100:23, 2109:14, 2112:21, 2113:16, 2114:11, 2116:18, 2117:1, 2117:24, 2125:8, 2125:22, 2139:15, 2139:16, 2139:17, 2159:23, 2159:25, 2186:22, 2189:12, 2197:13, 2203:10, 2205:20, 2207:19, 2208:8, 2223:14, 2235:19, 2240:9, 2271:20, 2279:11
**Second** [6] - 2015:24, 2027:25, 2028:10, 2032:12, 2074:5, 2121:4
**secondary** [4] - 2043:11, 2208:12, 2211:17, 2223:3
**secondly** [1] - 2236:11
**seconds** [1] - 2106:13
**section** [1] - 2096:14
**security** [1] - 2267:11
**see** [69] - 2008:17, 2010:3, 2010:5, 2013:22, 2030:10, 2034:7, 2035:17, 2037:3, 2040:19, 2051:1, 2053:9, 2057:4, 2080:22, 2081:20, 2081:22, 2096:21, 2096:22, 2106:11, 2106:14, 2111:9, 2111:21, 2111:22, 2112:13, 2117:11, 2126:2, 2126:6, 2127:15, 2129:15, 2130:12, 2131:1, 2131:15, 2131:24, 2133:7, 2134:19, 2134:20, 2138:4, 2140:3, 2140:9, 2141:3, 2141:6, 2142:16, 2142:17, 2142:18, 2143:2, 2143:4, 2144:1, 2144:12, 2145:1, 2145:7, 2165:18, 2187:25, 2203:22, 2211:16, 2215:22, 2216:3, 2216:4, 2217:21, 2226:22, 2238:9, 2248:8, 2248:10, 2248:13, 2256:10, 2269:5, 2279:4, 2279:7, 2285:12, 2286:24, 2288:19
**seeing** [4] - 2018:23, 2028:6, 2050:9, 2243:25
**seek** [4] - 2016:8, 2018:8, 2025:16, 2138:18
**seeking** [1] - 2151:9
**segment** [3] - 2040:4, 2052:2, 2192:6
**selected** [2] - 2085:6, 2085:8
**selection** [1] - 2288:16
**selectively** [1] - 2109:23
**Selenia** [3] - 2093:23, 2158:22, 2178:25
**self** [7] - 2069:18, 2077:6, 2154:9, 2156:14, 2157:16, 2231:2
**self-destructive** [1] - 2157:16
**self-employed** [1] - 2231:2
**self-insured** [1] - 2077:6
**semi** [1] - 2161:4
**sending** [1] - 2012:22
**senior** [1] - 2085:6
**sense** [4] - 2060:3, 2087:15, 2100:14, 2222:7
**sensitive** [1] - 2098:19
**sensitivity** [1] - 2163:23
**sent** [6] - 2012:5, 2012:20, 2043:7, 2046:17, 2149:9, 2179:25
**sentence** [3] - 2097:6, 2097:16,

2098:12
**sentences** [1] - 2098:24
**separate** [8] - 2058:5, 2074:7, 2074:15, 2074:16, 2075:20, 2075:25, 2077:12, 2168:4
**separately** [2] - 2026:13, 2091:21
**series** [2] - 2165:25, 2166:9
**serious** [7] - 2061:6, 2067:18, 2122:11, 2132:8, 2153:13, 2197:18, 2225:25
**seriously** [1] - 2212:9
**served** [4] - 2008:24, 2009:20, 2013:24, 2082:7
**service** [2] - 2047:9, 2082:11
**serving** [1] - 2048:10
**session** [4] - 2096:15, 2105:18, 2192:7
**SESSION** [2] - 2135:25, 2136:1
**sessions** [1] - 2052:4
**set** [6] - 2017:13, 2147:4, 2152:15, 2157:23, 2196:7, 2209:12
**Seton** [1] - 2083:14
**sets** [1] - 2034:6
**setting** [4] - 2058:15, 2178:5, 2178:22, 2179:10
**settled** [2] - 2012:8, 2016:19
**seven** [1] - 2156:23
**seventh** [1] - 2277:24
**several** [8] - 2083:5, 2092:6, 2099:7, 2134:22, 2151:22, 2153:3, 2166:14, 2168:16
**severe** [5] - 2104:21, 2130:15, 2220:12, 2220:16, 2263:10
**severely** [4] - 2129:16, 2142:15, 2217:7, 2217:8
**sexual** [2] - 2067:18, 2153:14
**shame** [2] - 2069:23, 2156:21
**shape** [3] - 2233:10, 2233:13, 2233:21
**shared** [3] - 2159:6, 2167:12, 2228:21
**SHAUB** [1] - 2007:15
**sheer** [1] - 2016:6
**sheet** [5] - 2021:4, 2023:25, 2026:20, 2038:11, 2038:23
**shift** [1] - 2058:24
**shock** [1] - 2075:17
**short** [5] - 2008:9, 2056:7, 2083:10, 2103:23, 2139:3
**short-term** [2] - 2103:23, 2139:3
**shortening** [1] - 2014:4
**shorter** [3] - 2237:10, 2237:13, 2237:23
**shoulder** [5] - 2242:6, 2242:7, 2242:8, 2264:18, 2267:24
**show** [22] - 2008:21, 2010:1, 2010:5, 2010:13, 2010:16, 2026:23, 2063:5, 2071:15, 2072:19, 2073:12, 2074:11, 2111:11, 2112:8, 2132:8, 2134:3, 2137:3, 2212:12, 2212:14, 2248:5, 2248:7, 2263:23
**showed** [5] - 2011:3, 2104:6, 2132:20, 2144:19, 2165:19

**shower** [5] - 2023:9, 2037:7, 2037:8, 2053:22

**showing** [4] - 2037:21, 2060:25, 2178:6, 2267:4

**shown** [2] - 2112:10, 2141:10

**shows** [4] - 2065:10, 2071:20, 2109:8, 2268:14

**siblings** [1] - 2103:20

**sic** [1] - 2248:11

**side** [12] - 2094:24, 2095:21, 2106:15, 2146:6, 2199:3, 2238:2, 2248:8, 2248:9, 2248:10, 2266:17, 2278:21, 2283:17

**Side** [6] - 2199:4, 2199:7, 2202:8, 2266:18, 2267:1, 2270:5

**side-bar** [2] - 2199:3, 2266:17

**Side-bar** [6] - 2199:4, 2199:7, 2202:8, 2266:18, 2267:1, 2270:5

**Sidebar** [8] - 2154:14, 2155:16, 2185:20, 2188:2, 2192:18, 2193:7, 2256:19, 2260:21

**sidebar** [9] - 2020:1, 2154:13, 2155:1, 2185:19, 2186:1, 2193:1, 2249:24, 2256:17, 2257:1

**sign** [2] - 2095:3, 2096:24

**signature** [2] - 2060:20, 2060:23

**signed** [1] - 2102:3

**significant** [9] - 2069:25, 2077:3, 2077:22, 2112:24, 2156:22, 2158:2, 2182:22, 2198:5, 2207:20

**significantly** [5] - 2108:1, 2212:10, 2212:14, 2237:18, 2280:1

**signs** [1] - 2127:12

**silence** [1] - 2179:20

**silent** [1] - 2074:9

**silly** [1] - 2201:17

**similar** [4] - 2107:20, 2122:8, 2127:2, 2213:24

**simple** [3] - 2060:18, 2061:1, 2150:4

**simply** [5] - 2062:3, 2073:10, 2243:8, 2283:4, 2284:14

**SIMS** [2] - 2121:22, 2121:23

**single** [4] - 2200:6, 2200:9, 2202:4, 2219:1

**sister** [3] - 2041:24, 2093:23, 2094:8

**sisters** [1] - 2043:4

**sit** [4] - 2073:24, 2084:25, 2231:23, 2260:19

**sitting** [2] - 2246:22, 2288:14

**situation** [5] - 2019:9, 2066:12, 2077:15, 2211:16, 2243:10

**situations** [1] - 2069:7

**six** [10] - 2013:18, 2067:16, 2086:8, 2101:24, 2117:23, 2123:16, 2156:22, 2157:18, 2277:21

**sixth** [1] - 2276:25

**size** [4] - 2264:23, 2264:24, 2264:25, 2284:21

**skills** [9] - 2081:19, 2083:9, 2083:11, 2191:9, 2194:20, 2196:1, 2207:10,
2207:17

**skip** [1] - 2155:10

**skipped** [1] - 2155:3

**skipping** [2] - 2164:12, 2179:17

**skirt** [2] - 2201:1, 2201:6

**sky** [1] - 2267:14

**Skype** [1] - 2009:1

**slammed** [1] - 2268:16

**slavish** [1] - 2065:19

**sleep** [3] - 2157:18, 2157:19, 2175:3

**sleeping** [1] - 2046:4

**sleeplessness** [1] - 2175:8

**slide** [1] - 2106:23

**slight** [2] - 2204:14, 2204:16

**slow** [1] - 2194:19

**slower** [1] - 2239:3

**slowly** [1] - 2115:21

**slows** [1] - 2239:4

**small** [2] - 2255:24, 2262:20

**smaller** [1] - 2150:16

**smile** [1] - 2175:4

**SMITH** [1] - 2007:3

**Smith** [32] - 2077:20, 2136:17, 2137:19, 2235:12, 2235:16, 2235:19, 2236:7, 2241:11, 2241:16, 2242:16, 2242:20, 2243:2, 2243:16, 2245:13, 2246:20, 2250:4, 2251:3, 2252:25, 2253:12, 2253:21, 2258:11, 2258:15, 2258:24, 2258:25, 2269:4, 2269:16, 2281:2, 2281:14, 2281:17, 2282:23, 2286:4

**Smith's** [9] - 2235:1, 2235:15, 2241:1, 2243:24, 2246:1, 2252:7, 2259:8, 2261:13, 2280:23

**SN-5** [1] - 2061:8

**sniggering** [1] - 2243:6

**social** [2] - 2102:10, 2158:3

**Social** [1] - 2082:17

**Society** [1] - 2084:3

**soft** [1] - 2268:20

**softer** [3] - 2267:7, 2268:12, 2275:12

**solve** [1] - 2125:18

**solved** [1] - 2214:4

**someone** [12] - 2021:2, 2037:12, 2061:10, 2064:25, 2066:7, 2101:17, 2104:20, 2127:24, 2174:10, 2176:10, 2176:16, 2210:19

**Somerset** [2] - 2083:20

**sometime** [3] - 2234:20, 2249:4, 2249:7

**sometimes** [12] - 2037:21, 2110:4, 2134:24, 2151:4, 2152:15, 2163:19, 2170:22, 2175:4, 2175:9, 2179:16, 2185:9, 2232:1

**somewhat** [3] - 2092:24, 2174:19, 2200:23

**somewhere** [5] - 2054:14, 2067:3, 2118:23, 2214:19, 2238:1

**soon** [1] - 2129:5

**SOPHIE** [1] - 2007:20

**sorry** [28] - 2013:16, 2024:12, 2028:5, 2030:2, 2031:7, 2033:14, 2034:1, 2038:5, 2052:25, 2075:9, 2124:12, 2162:19, 2170:8, 2181:20, 2190:14, 2194:7, 2195:10, 2207:1, 2251:5, 2256:2, 2256:3, 2256:9, 2257:25, 2262:19, 2272:21, 2276:11, 2277:18, 2282:11

**sort** [16] - 2037:24, 2057:21, 2083:6, 2083:8, 2085:1, 2089:9, 2095:13, 2102:7, 2105:24, 2113:4, 2116:2, 2126:24, 2127:19, 2129:5, 2171:23, 2277:25

**sorts** [2] - 2162:22, 2163:24

**sought** [1] - 2025:16

**sound** [7] - 2040:6, 2143:14, 2143:18, 2210:17, 2210:19, 2216:2, 2245:24

**sounded** [1] - 2177:24

**soundness** [1] - 2077:2

**sounds** [3] - 2107:1, 2171:3, 2171:7

**source** [7] - 2064:16, 2169:11, 2170:16, 2171:18, 2171:20, 2172:7, 2172:13

**sources** [2] - 2043:4, 2253:1

**South** [1] - 2186:15

**Southern** [1] - 2017:4

**space** [3] - 2283:14, 2283:19, 2284:1

**Span** [5] - 2119:16, 2119:17, 2120:10, 2120:13, 2212:4

**span** [1] - 2080:22

**Spanish** [14] - 2130:8, 2130:9, 2182:25, 2183:5, 2183:23, 2184:12, 2184:21, 2186:20, 2189:10, 2190:9, 2194:21, 2210:2, 2210:6, 2210:19

**Spanish-speaking** [1] - 2182:25

**spasms** [1] - 2050:20

**spatial** [1] - 2097:9

**speaking** [7] - 2130:8, 2182:25, 2190:17, 2210:1, 2210:2, 2220:7, 2271:25

**Special** [1] - 2193:3

**special** [3] - 2194:17, 2201:2, 2210:12

**specialist** [4] - 2030:23, 2051:13, 2052:6, 2053:13

**specialists** [2] - 2051:10, 2051:11

**Specialists** [1] - 2093:6

**specialties** [1] - 2084:14

**specific** [5] - 2021:15, 2021:17, 2065:20, 2123:10, 2269:14

**specifically** [16] - 2011:2, 2021:25, 2043:6, 2074:5, 2074:17, 2115:14, 2162:21, 2169:21, 2170:2, 2184:2, 2184:25, 2195:24, 2196:10, 2234:25, 2245:9, 2280:23

**specificity** [1] - 2031:8

**specifics** [2] - 2020:22, 2185:16

**specifies** [1] - 2157:7

**speculate** [2] - 2026:4, 2039:14

**speculation** [4] - 2017:6, 2026:10, 2033:13, 2042:6

**speculative** [8] - 2018:22, 2028:4, 2029:12, 2031:20, 2037:4, 2039:20, 2045:13, 2046:11
**speech** [1] - 2102:9
**speed** [21] - 2095:25, 2159:14, 2161:10, 2213:16, 2226:8, 2226:14, 2226:15, 2239:7, 2240:7, 2250:16, 2282:12, 2282:13, 2282:14, 2282:17, 2282:18, 2282:21, 2282:22, 2286:10
**spell** [2] - 2080:6, 2230:7
**spelled** [1] - 2080:9
**spend** [2] - 2091:19, 2227:4
**spent** [2] - 2091:4, 2226:22
**spinal** [1] - 2222:23
**spine** [19] - 2029:7, 2030:23, 2040:2, 2051:10, 2051:13, 2052:6, 2052:14, 2053:12, 2054:3, 2173:15, 2222:22, 2241:18, 2242:2, 2242:3, 2242:4, 2242:11, 2251:4, 2286:5
**Spine** [3] - 2046:16, 2047:7, 2093:6
**spiral** [2] - 2111:10
**spiral-bound** [1] - 2111:10
**spitzer** [1] - 2094:1
**split** [2] - 2021:1, 2168:4
**spoken** [3] - 2183:24, 2184:13, 2194:21
**sports** [2] - 2081:7, 2081:13
**SPRATT** [1] - 2007:15
**square** [1] - 2283:4
**squats** [1] - 2050:19
**stable** [1] - 2274:20
**staff** [1] - 2134:10
**stagger** [2] - 2129:10, 2131:3
**stake** [2] - 2145:12, 2146:4
**stamped** [1] - 2218:6
**stand** [7] - 2051:8, 2079:20, 2131:2, 2136:9, 2145:11, 2252:18, 2252:19
**standalone** [5] - 2110:13, 2110:18, 2110:20, 2110:21, 2110:22
**standard** [11] - 2011:19, 2017:2, 2052:7, 2056:16, 2105:23, 2111:2, 2133:5, 2169:2, 2195:3, 2200:11, 2269:10
**standing** [2] - 2110:18, 2110:20
**standpoint** [2] - 2144:13, 2232:21
**stands** [2] - 2121:23, 2152:9
**stark** [1] - 2114:14
**start** [17] - 2047:22, 2047:23, 2082:1, 2096:19, 2105:19, 2105:20, 2105:21, 2106:1, 2106:11, 2119:20, 2121:2, 2151:24, 2182:14, 2200:18, 2236:6, 2258:18, 2277:18
**started** [3] - 2038:12, 2082:2
**startle** [2] - 2134:18, 2157:17
**startled** [2] - 2215:11, 2215:12
**starts** [3] - 2143:13, 2162:5, 2276:11
**State** [2] - 2077:16, 2203:14
**state** [3] - 2016:24, 2069:22, 2156:20
**statement** [1] - 2087:25
**states** [2] - 2096:8, 2123:13

**STATES** [2] - 2006:1, 2006:13
**States** [5] - 2006:5, 2082:8, 2082:9, 2123:13, 2194:14
**static** [1] - 2058:18
**stating** [1] - 2056:7
**stationary** [8] - 2274:20, 2274:25, 2275:8, 2275:18, 2279:25, 2280:17, 2285:5, 2285:6
**Statistical** [1] - 2152:9
**status** [4] - 2088:11, 2088:14, 2129:6, 2141:13
**stay** [1] - 2229:21
**staying** [1] - 2157:19
**steel** [2] - 2233:2, 2233:4
**steering** [5] - 2272:17, 2274:6, 2274:8, 2274:9, 2280:9
**stenography** [1] - 2007:22
**step** [5] - 2013:7, 2063:9, 2081:25, 2090:14, 2281:17
**stern** [1] - 2266:11
**STEVEN** [1] - 2007:13
**Steven** [2] - 2093:13, 2257:12
**sticks** [1] - 2053:17
**stiff** [3] - 2059:25, 2239:19, 2239:22
**stiff-arm** [1] - 2239:22
**stiffness** [3] - 2238:22, 2239:9, 2240:10
**still** [14] - 2012:16, 2015:5, 2030:25, 2031:2, 2039:14, 2044:2, 2050:23, 2184:24, 2216:9, 2275:5, 2275:6, 2281:17, 2285:6, 2286:20
**stimuli** [7] - 2068:25, 2107:24, 2131:13, 2132:6, 2154:5, 2155:12
**stimulus** [1] - 2216:2
**Stitzer** [1] - 2179:3
**stitzer** [1] - 2158:23
**stop** [9] - 2100:15, 2100:23, 2109:6, 2135:7, 2203:24, 2204:1, 2236:22, 2259:16
**stopped** [11] - 2026:14, 2050:17, 2100:22, 2127:18, 2206:23, 2207:3, 2247:9, 2247:10, 2247:12, 2247:13, 2247:16
**storage** [1] - 2207:17
**straight** [1] - 2286:12
**strange** [1] - 2040:6
**Street** [4] - 2006:17, 2007:5, 2014:17, 2047:8
**stress** [9] - 2016:11, 2062:10, 2062:16, 2075:17, 2147:10, 2151:25, 2153:3, 2226:20, 2233:15
**Stress** [7] - 2046:11, 2067:14, 2087:21, 2133:16, 2133:23, 2133:25, 2134:12
**stressed** [1] - 2134:3
**stricken** [5] - 2044:25, 2045:4, 2045:5, 2090:1, 2198:15
**strike** [16] - 2045:2, 2062:2, 2154:12, 2159:17, 2190:3, 2198:14, 2237:1, 2252:12, 2272:17, 2272:18, 2272:19,

2283:15, 2284:3, 2285:24, 2287:5
**strikes** [1] - 2274:6
**striking** [4] - 2225:23, 2228:9, 2237:8, 2238:24
**strip** [1] - 2135:4
**strokes** [1] - 2142:16
**strong** [1] - 2087:25
**stronger** [1] - 2280:8
**struck** [10] - 2010:15, 2050:6, 2160:19, 2162:7, 2162:12, 2237:16, 2242:14, 2274:18, 2279:3, 2284:13
**structure** [2] - 2242:23, 2261:7
**Structured** [1] - 2121:23
**structures** [5] - 2232:19, 2232:21, 2232:24, 2232:25, 2261:23
**student** [2] - 2176:10, 2211:24, 2211:25
**students** [1] - 2091:17
**studies** [5] - 2031:14, 2032:21, 2052:1, 2217:2, 2231:9
**study** [3] - 2032:20, 2033:10, 2264:10
**stuff** [7] - 2036:22, 2040:15, 2054:3, 2054:10, 2054:18, 2055:21, 2193:6
**style** [1] - 2097:17
**subcategories** [1] - 2157:6
**subject** [10] - 2015:8, 2079:3, 2081:16, 2180:22, 2236:2, 2263:10, 2265:1, 2282:6, 2282:22, 2283:6
**subjectively** [1] - 2221:12
**submark** [1] - 2013:19
**submission** [1] - 2033:13
**submit** [2] - 2037:13, 2084:17, 2084:19
**submitted** [1] - 2016:12
**subsequent** [1] - 2013:1
**subsequently** [1] - 2092:9
**subset** [1] - 2163:3
**subspecialty** [1] - 2082:25
**substance** [1] - 2158:5
**substantial** [7] - 2056:1, 2056:2, 2066:15, 2150:10, 2151:17, 2160:2, 2160:4
**substantially** [1] - 2227:10
**subtle** [1] - 2142:20
**Success** [1] - 2007:17
**successful** [1] - 2207:18
**suffered** [2] - 2042:13, 2062:21
**suffering** [3] - 2074:7, 2074:22, 2075:6
**suffers** [1] - 2070:6
**sufficient** [21] - 2016:2, 2024:24, 2029:16, 2030:8, 2030:25, 2033:6, 2033:9, 2033:12, 2033:20, 2036:3, 2037:18, 2040:25, 2056:17, 2062:6, 2070:5, 2070:15, 2071:8, 2071:11, 2071:16, 2134:25, 2236:4
**sufficiently** [1] - 2177:8
**suggest** [2] - 2165:18
**suggesting** [1] - 2057:20
**suggestion** [4] - 2059:2, 2059:5,

VB     OCR     CRR

2059:18, 2165:6
**Suite** [4] - 2006:17, 2006:22, 2007:6, 2007:12
**summary** [2] - 2052:11, 2087:10
**summer** [4] - 2010:25, 2082:4, 2082:5, 2234:20
**Summit** [1] - 2083:21
**Sunoco** [1] - 2011:9
**supervision** [2] - 2088:12, 2091:18
**supp** [1] - 2017:3
**supplemental** [4] - 2092:9, 2148:4, 2245:14, 2245:18
**support** [12] - 2021:18, 2022:2, 2033:12, 2037:23, 2037:25, 2042:1, 2060:1, 2070:16, 2220:24, 2236:2, 2257:11, 2262:7
**supported** [5] - 2017:5, 2017:24, 2024:24, 2031:25, 2037:17
**supporting** [2] - 2016:5, 2177:5
**supportive** [1] - 2139:3
**supports** [1] - 2224:4
**suppose** [1] - 2205:2
**supposed** [4] - 2053:16, 2072:18, 2145:21, 2209:21
**supposedly** [1] - 2116:16
**supposition** [1] - 2017:6
**surbeon** [1] - 2051:15
**surgeon** [5] - 2034:21, 2040:2, 2041:3, 2051:15, 2093:13
**surgeries** [7] - 2020:25, 2021:4, 2062:23, 2173:6, 2173:8, 2173:12, 2231:23
**surgery** [13] - 2040:3, 2040:9, 2040:10, 2040:15, 2040:18, 2041:1, 2051:6, 2063:4, 2093:5, 2173:4, 2173:13, 2196:13, 2231:20
**surgical** [2] - 2173:9
**surmise** [1] - 2016:6
**survive** [1] - 2048:4
**sustainable** [1] - 2077:9
**Sustained** [16] - 2120:21, 2145:14, 2183:19, 2184:18, 2191:17, 2198:11, 2211:14, 2219:16, 2252:11, 2253:10, 2263:20, 2265:12, 2266:16, 2274:15, 2279:22, 2280:3
**sustained** [15] - 2048:9, 2087:19, 2090:1, 2128:23, 2133:25, 2147:16, 2154:13, 2165:21, 2223:17, 2225:2, 2225:14, 2226:7, 2226:11, 2243:19, 2274:17
**sworn** [2] - 2080:3, 2230:11
**sworn/affirmed** [1] - 2230:5
**symbolize** [2] - 2068:13, 2068:16
**symptom** [2] - 2122:7, 2181:12
**Symptom** [1] - 2105:21
**Symptomatolgy** [1] - 2121:24
**symptoms** [20] - 2044:13, 2066:16, 2068:2, 2098:14, 2122:1, 2122:9, 2122:18, 2123:25, 2124:2, 2134:15, 2134:17, 2134:21, 2139:5, 2140:17,

2140:19, 2140:20, 2140:22, 2163:12, 2181:13
**Symptoms** [1] - 2121:24
**syndrome** [3] - 2163:20, 2163:22, 2217:24
**sypmtomatology** [1] - 2060:15
**system** [6] - 2156:16, 2195:1, 2198:6, 2271:16, 2274:5
**systems** [1] - 2163:10

**T**

**T-O-M-M** [1] - 2110:9
**T2** [1] - 2148:5
**tack** [1] - 2200:13
**talks** [3] - 2137:13, 2187:15, 2226:20
**tall** [1] - 2265:6
**tap** [1] - 2096:21
**taught** [1] - 2194:24
**TBI** [21] - 2042:13, 2043:18, 2043:19, 2043:22, 2044:17, 2045:13, 2055:23, 2056:11, 2056:23, 2057:13, 2058:23, 2060:6, 2060:17, 2060:24, 2063:1, 2063:12, 2063:14, 2065:23, 2066:5, 2066:8, 2066:14
**TDL** [1] - 2148:5
**tea** [1] - 2095:9
**teach** [1] - 2083:14
**teacher** [1] - 2195:2
**teaching** [2] - 2083:12, 2083:15
**team** [2] - 2012:22, 2128:19
**teams** [2] - 2081:7, 2081:13
**technique** [1] - 2146:22
**technology** [1] - 2207:15
**temple** [1] - 2142:13
**Temple** [1] - 2082:3
**temporal** [1] - 2142:14
**ten** [4] - 2040:23, 2085:9, 2133:19, 2133:21
**tend** [2] - 2162:25, 2165:13
**tender** [1] - 2234:7
**TENS** [1] - 2037:14
**tenth** [1] - 2194:23
**term** [14] - 2083:5, 2083:8, 2083:10, 2103:17, 2103:18, 2103:21, 2103:23, 2126:5, 2139:3, 2159:10, 2163:21, 2181:1, 2184:8
**terminated** [1] - 2018:6
**terminology** [2] - 2062:17, 2180:25
**terms** [20] - 2019:20, 2023:20, 2024:1, 2030:3, 2035:8, 2051:20, 2058:11, 2060:20, 2070:23, 2130:21, 2137:15, 2139:2, 2166:5, 2166:6, 2166:7, 2166:24, 2167:4, 2167:7, 2191:21, 2196:2
**test** [186] - 2010:9, 2042:17, 2042:25, 2043:2, 2043:3, 2048:4, 2081:24, 2087:14, 2088:2, 2089:7, 2089:8, 2089:18, 2090:11, 2099:10, 2101:11, 2103:6, 2104:14, 2104:22, 2105:19,

2105:23, 2105:24, 2106:1, 2106:2, 2106:7, 2106:9, 2106:11, 2107:1, 2107:4, 2107:22, 2108:2, 2108:4, 2109:12, 2109:13, 2109:14, 2109:23, 2110:1, 2110:9, 2110:20, 2110:21, 2110:22, 2110:23, 2110:25, 2111:6, 2111:8, 2111:24, 2111:25, 2112:1, 2112:10, 2112:14, 2113:8, 2113:20, 2113:21, 2113:22, 2114:2, 2114:22, 2114:23, 2114:25, 2115:4, 2115:5, 2118:6, 2118:16, 2118:17, 2120:7, 2120:8, 2120:10, 2121:7, 2121:16, 2121:17, 2122:1, 2122:6, 2122:7, 2122:14, 2124:2, 2124:8, 2125:25, 2126:1, 2126:20, 2126:21, 2127:22, 2140:11, 2141:23, 2143:4, 2143:5, 2143:6, 2143:10, 2143:13, 2144:5, 2145:2, 2145:5, 2165:10, 2165:24, 2166:5, 2166:7, 2166:14, 2166:23, 2167:2, 2167:3, 2167:5, 2167:7, 2167:15, 2168:14, 2175:15, 2176:14, 2180:12, 2180:18, 2181:24, 2182:5, 2182:6, 2182:15, 2183:1, 2183:6, 2199:9, 2199:14, 2199:16, 2200:6, 2200:9, 2200:10, 2200:13, 2200:14, 2200:15, 2205:11, 2205:20, 2208:18, 2209:15, 2211:18, 2212:1, 2212:22, 2212:23, 2213:21, 2213:25, 2221:15, 2222:5, 2224:18, 2227:10, 2257:6, 2257:9, 2257:13, 2257:17, 2257:23, 2257:25, 2258:7, 2259:18, 2260:13, 2260:14, 2260:17, 2260:20, 2262:7, 2263:1, 2263:3, 2263:4, 2263:7, 2263:8, 2266:2, 2267:10, 2268:8, 2268:14, 2268:15, 2271:10, 2275:25, 2276:1, 2276:2, 2278:8, 2278:12, 2281:23, 2281:25, 2282:4, 2282:7, 2282:9, 2283:2, 2283:6
**Test** [12] - 2105:21, 2110:10, 2110:22, 2114:21, 2118:15, 2119:16, 2119:17, 2121:22, 2125:22, 2166:13, 2181:22, 2212:25
**tested** [5] - 2057:22, 2090:9, 2168:7, 2197:8, 2267:4
**testified** [61] - 2017:15, 2022:1, 2025:7, 2026:14, 2026:17, 2027:9, 2027:20, 2028:22, 2029:8, 2030:9, 2035:23, 2036:14, 2036:22, 2037:5, 2037:14, 2037:24, 2040:14, 2041:25, 2042:11, 2043:9, 2043:13, 2043:19, 2050:2, 2050:10, 2050:16, 2052:4, 2052:18, 2055:11, 2057:14, 2058:9, 2077:20, 2080:3, 2103:22, 2137:5, 2149:4, 2158:14, 2167:8, 2169:7, 2174:5, 2183:2, 2184:24, 2187:7, 2190:8, 2191:11, 2200:10, 2209:15, 2230:11, 2233:25, 2234:3, 2242:11, 2242:14, 2246:20, 2259:25, 2261:19, 2267:12, 2267:13, 2277:12, 2277:19, 2285:9, 2285:19, 2285:20
**testify** [19] - 2029:6, 2034:3, 2036:4,

2036:5, 2040:5, 2044:8, 2048:3,
2053:1, 2077:21, 2137:6, 2190:3,
2258:23, 2259:17, 2259:24, 2261:17,
2261:23, 2268:4, 2269:11, 2269:13
**testifying** [7] - 2078:3, 2120:20,
2145:24, 2186:8, 2187:11, 2223:8,
2258:11
**testimonial** [1] - 2158:24
**testimony** [108] - 2013:2, 2018:7,
2018:16, 2019:4, 2019:15, 2020:6,
2021:1, 2021:3, 2024:8, 2024:10,
2027:9, 2027:16, 2027:19, 2028:12,
2028:22, 2029:8, 2029:11, 2029:18,
2029:19, 2030:20, 2030:22, 2031:8,
2031:12, 2031:15, 2031:17, 2031:19,
2033:1, 2033:3, 2033:4, 2033:11,
2033:18, 2034:2, 2034:7, 2035:18,
2036:8, 2037:16, 2039:5, 2040:19,
2040:22, 2043:18, 2043:21, 2044:3,
2045:2, 2046:16, 2060:6, 2060:7,
2060:16, 2060:24, 2062:3, 2064:17,
2064:25, 2065:9, 2065:11, 2066:17,
2068:19, 2069:10, 2070:18, 2070:19,
2070:20, 2071:14, 2071:24, 2077:5,
2094:11, 2128:13, 2135:20, 2140:11,
2140:12, 2145:13, 2149:11, 2158:15,
2158:18, 2158:21, 2159:2, 2167:21,
2168:3, 2169:12, 2169:13, 2169:14,
2169:15, 2169:19, 2171:7, 2175:25,
2177:24, 2179:3, 2180:8, 2181:17,
2186:6, 2191:4, 2191:13, 2192:4,
2192:10, 2203:13, 2205:21, 2206:4,
2206:6, 2206:21, 2206:22, 2214:17,
2228:21, 2228:23, 2250:21, 2252:24,
2259:8, 2261:21, 2277:4, 2285:18
**testing** [75] - 2026:25, 2043:14,
2046:6, 2058:4, 2059:13, 2059:15,
2062:4, 2065:23, 2080:25, 2081:21,
2091:8, 2091:17, 2101:6, 2101:13,
2104:10, 2104:12, 2110:17, 2112:6,
2148:5, 2164:23, 2165:1, 2166:2,
2166:7, 2167:12, 2167:24, 2168:4,
2168:16, 2168:25, 2170:21, 2170:22,
2174:12, 2174:19, 2175:10, 2176:17,
2176:23, 2180:22, 2181:1, 2181:2,
2181:4, 2181:9, 2183:12, 2183:16,
2183:21, 2184:21, 2184:23, 2185:17,
2186:23, 2187:3, 2187:5, 2187:14,
2190:10, 2195:23, 2196:9, 2196:18,
2196:19, 2197:8, 2197:12, 2197:23,
2198:18, 2199:12, 2200:3, 2205:6,
2205:13, 2209:6, 2220:7, 2220:10,
2221:18, 2221:24, 2223:20, 2227:17,
2232:2, 2232:4, 2250:10, 2275:24
**tests** [119] - 2042:15, 2042:23, 2066:6,
2087:14, 2088:7, 2088:9, 2088:10,
2089:5, 2089:13, 2089:17, 2089:20,
2090:5, 2091:16, 2095:22, 2095:23,
2095:25, 2097:8, 2097:23, 2098:8,
2098:19, 2098:22, 2100:7, 2100:13,

2101:12, 2101:15, 2101:22, 2102:20,
2103:7, 2105:4, 2105:9, 2105:14,
2107:2, 2107:23, 2109:9, 2110:6,
2110:8, 2110:11, 2110:12, 2110:15,
2110:16, 2110:18, 2110:19, 2110:23,
2110:24, 2112:3, 2112:4, 2112:5,
2113:1, 2113:2, 2113:5, 2113:12,
2114:15, 2118:7, 2118:10, 2120:5,
2120:24, 2121:9, 2122:8, 2126:23,
2126:24, 2127:24, 2128:5, 2142:24,
2143:8, 2144:6, 2144:9, 2144:16,
2164:23, 2166:9, 2166:11, 2166:21,
2167:10, 2167:12, 2167:13, 2167:18,
2167:19, 2174:24, 2176:11, 2176:13,
2176:18, 2177:3, 2177:8, 2181:9,
2181:12, 2182:14, 2186:10, 2186:23,
2186:25, 2187:12, 2187:22, 2189:16,
2191:8, 2208:19, 2208:20, 2209:4,
2212:4, 2212:7, 2213:12, 2213:13,
2213:17, 2213:18, 2213:23, 2217:21,
2220:22, 2220:24, 2221:2, 2222:7,
2222:24, 2222:25, 2224:5, 2225:4,
2225:7, 2272:3, 2272:4, 2286:24
**Thailand** [1] - 2082:10
**THE** [355] - 2006:12, 2008:5, 2008:12,
2010:19, 2012:10, 2012:14, 2012:18,
2013:6, 2013:20, 2014:1, 2014:13,
2014:21, 2014:25, 2015:5, 2015:9,
2015:16, 2017:9, 2021:17, 2022:6,
2023:2, 2023:8, 2023:22, 2025:10,
2025:12, 2025:15, 2025:19, 2025:23,
2027:4, 2027:7, 2027:24, 2029:25,
2031:21, 2032:4, 2032:7, 2032:10,
2033:25, 2034:19, 2035:2, 2038:15,
2038:17, 2038:20, 2038:25, 2039:3,
2042:20, 2043:24, 2044:8, 2044:11,
2044:19, 2044:23, 2045:1, 2045:7,
2046:22, 2047:1, 2047:5, 2047:14,
2047:16, 2047:19, 2048:12, 2048:16,
2050:6, 2051:14, 2053:24, 2054:1,
2054:11, 2054:16, 2054:20, 2054:23,
2055:1, 2055:3, 2055:6, 2055:8,
2055:17, 2055:19, 2055:22, 2056:10,
2057:2, 2057:7, 2057:10, 2061:3,
2061:10, 2062:19, 2063:7, 2063:14,
2063:17, 2063:22, 2064:2, 2064:18,
2065:21, 2066:1, 2066:23, 2066:24,
2067:2, 2067:5, 2067:8, 2067:10,
2067:12, 2070:9, 2070:13, 2071:6,
2072:3, 2072:6, 2072:9, 2073:8,
2073:14, 2074:11, 2074:14, 2074:21,
2074:25, 2075:5, 2075:13, 2075:22,
2076:3, 2076:6, 2076:11, 2076:15,
2076:18, 2076:21, 2078:8, 2078:11,
2078:14, 2078:19, 2078:21, 2078:23,
2079:2, 2079:5, 2079:9, 2079:12,
2079:17, 2079:21, 2080:8, 2080:8,
2080:13, 2086:22, 2090:1, 2092:22,
2099:17, 2100:9, 2120:21, 2133:18,
2133:21, 2135:13, 2135:16, 2135:19,
2135:21, 2135:22, 2136:6, 2136:7,

2136:8, 2136:13, 2137:4, 2137:17,
2137:21, 2138:4, 2138:8, 2145:14,
2148:21, 2154:13, 2155:3, 2155:6,
2155:11, 2160:8, 2165:21, 2165:23,
2176:8, 2179:19, 2179:21, 2183:19,
2184:18, 2185:19, 2186:3, 2186:5,
2186:9, 2186:12, 2186:17, 2186:25,
2187:2, 2187:8, 2187:10, 2187:12,
2187:15, 2187:21, 2188:1, 2189:2,
2189:9, 2190:13, 2190:14, 2190:18,
2190:19, 2190:25, 2191:2, 2191:6,
2191:17, 2191:20, 2192:17, 2193:3,
2193:5, 2194:2, 2196:15, 2196:22,
2197:25, 2198:11, 2198:15, 2199:3,
2199:8, 2199:19, 2199:22, 2199:24,
2200:6, 2200:9, 2200:12, 2200:15,
2200:17, 2200:19, 2200:22, 2201:9,
2201:16, 2201:21, 2201:24, 2202:3,
2202:7, 2203:8, 2203:22, 2203:24,
2204:1, 2204:3, 2204:8, 2205:15,
2206:11, 2206:13, 2206:16, 2206:21,
2207:13, 2211:14, 2218:7, 2219:10,
2219:16, 2219:25, 2220:2, 2220:4,
2223:13, 2223:17, 2223:25, 2224:9,
2224:11, 2225:2, 2225:14, 2225:22,
2226:7, 2226:11, 2227:1, 2227:13,
2228:18, 2229:7, 2229:9, 2229:14,
2229:16, 2229:20, 2230:1, 2230:3,
2230:6, 2230:8, 2234:10, 2234:18,
2239:13, 2243:13, 2243:19, 2249:23,
2249:25, 2250:7, 2250:23, 2251:21,
2252:2, 2252:4, 2252:11, 2252:13,
2252:15, 2253:10, 2254:8, 2256:1,
2256:9, 2256:11, 2256:18, 2257:3,
2257:24, 2258:2, 2258:5, 2258:13,
2258:16, 2258:20, 2259:6, 2259:10,
2259:12, 2259:14, 2259:16, 2259:20,
2259:23, 2260:3, 2260:10, 2260:13,
2260:16, 2260:19, 2261:4, 2262:10,
2263:20, 2264:8, 2264:21, 2264:22,
2265:2, 2265:3, 2265:4, 2265:5,
2265:6, 2265:12, 2266:16, 2267:16,
2267:20, 2268:24, 2269:3, 2269:8,
2269:13, 2269:18, 2269:22, 2270:4,
2271:11, 2271:13, 2271:21, 2272:12,
2272:24, 2273:12, 2273:21, 2273:24,
2273:25, 2274:1, 2274:2, 2274:15,
2275:17, 2277:8, 2277:9, 2277:16,
2278:3, 2278:4, 2278:7, 2278:8,
2278:17, 2278:20, 2279:6, 2279:22,
2280:3, 2284:4, 2285:25, 2286:1,
2287:6, 2287:8, 2288:2, 2288:22
**theme** [1] - 2036:6
**themselves** [2] - 2075:11, 2233:13
**theoretically** [2] - 2050:25, 2175:1
**therapeutic** [1] - 2052:15
**therapy** [28] - 2017:14, 2017:16,
2020:15, 2023:19, 2025:5, 2025:20,
2026:1, 2026:6, 2027:11, 2027:12,
2027:21, 2028:17, 2028:19, 2028:21,

VB      OCR      CRR

2029:3, 2029:4, 2029:9, 2029:13,
2050:17, 2050:21, 2051:5, 2051:19,
2052:5, 2053:11, 2093:9, 2138:19,
2231:19
**thereabouts** [1] - 2205:4
**thereafter** [2] - 2178:5, 2180:4
**therefore** [6] - 2018:24, 2241:14,
2242:18, 2247:19, 2263:10, 2278:11
**they've** [9] - 2021:4, 2066:8, 2084:20,
2084:21, 2099:17, 2131:2, 2180:18,
2248:1, 2248:4
**thinking** [5] - 2015:5, 2097:10, 2109:6,
2145:9, 2242:5
**third** [7] - 2019:15, 2068:24, 2116:24,
2117:1, 2117:3, 2117:24, 2276:18
**THOMAS** [1] - 2007:7
**Thomas** [40] - 2026:19, 2026:21,
2028:24, 2029:8, 2043:13, 2043:15,
2043:19, 2043:24, 2043:25, 2044:21,
2058:11, 2058:24, 2058:25, 2059:5,
2059:6, 2060:9, 2060:12, 2060:18,
2064:15, 2065:3, 2065:12, 2065:22,
2066:8, 2093:21, 2094:5, 2094:11,
2106:5, 2106:6, 2109:14, 2109:16,
2109:18, 2110:12, 2145:7, 2145:10,
2145:11, 2158:16, 2167:24, 2168:7,
2178:20, 2220:21
**thomas** [2] - 2059:9, 2093:14
**Thomas'** [2] - 2093:22, 2165:1
**Thomas's** [5] - 2029:10, 2043:21,
2140:11, 2145:5, 2178:22
**thoughts** [6] - 2069:4, 2069:8,
2123:18, 2123:20, 2154:6, 2154:8
**thousand** [4] - 2090:8, 2114:19,
2120:18, 2227:23
**thousands** [2] - 2090:7, 2090:9
**threatened** [4] - 2067:18, 2153:13,
2153:14
**threatening** [1] - 2106:1
**three** [37] - 2009:18, 2014:6, 2019:4,
2020:15, 2026:1, 2027:13, 2032:22,
2032:23, 2037:8, 2062:20, 2070:10,
2083:25, 2084:22, 2085:2, 2116:18,
2117:1, 2117:17, 2117:23, 2117:24,
2119:22, 2122:23, 2131:12, 2156:17,
2157:16, 2172:8, 2172:15, 2231:7,
2235:14, 2278:12, 2279:20, 2281:25,
2282:3, 2282:10, 2282:11, 2283:6,
2283:23
**three-and-a-half** [6] - 2278:12,
2281:25, 2282:3, 2282:10, 2282:11,
2283:6
**threshold** [2] - 2189:21, 2206:7
**throughout** [17] - 2083:13, 2099:7,
2100:18, 2101:5, 2101:6, 2104:13,
2104:22, 2112:6, 2124:20, 2127:9,
2169:25, 2194:18, 2210:12, 2221:16,
2233:19, 2233:20, 2267:24
**thrown** [2] - 2064:13, 2236:23
**thrust** [1] - 2056:13

**ticket** [3] - 2038:1, 2038:2, 2041:8
**tied** [1] - 2065:20
**tight** [1] - 2060:10
**time-tested** [1] - 2057:22
**timing** [2] - 2166:24, 2167:5
**tired** [5] - 2096:4, 2099:3, 2100:7,
2127:15, 2227:20
**tissue** [3] - 2233:6, 2233:8, 2233:22
**tizanidine** [4] - 2036:16, 2051:17,
2104:7, 2104:8
**today** [16] - 2014:5, 2014:25, 2018:18,
2068:22, 2080:24, 2100:24, 2104:10,
2123:9, 2147:22, 2149:5, 2149:12,
2149:24, 2160:12, 2230:17, 2253:18,
2261:17
**together** [9] - 2035:16, 2036:13,
2101:3, 2107:18, 2120:24, 2125:16,
2125:17, 2149:7, 2250:13
**Tom** [1] - 2187:19
**TOMM** [35] - 2110:9, 2110:20, 2111:6,
2111:8, 2181:18, 2181:19, 2181:21,
2182:3, 2182:4, 2182:5, 2182:15,
2183:1, 2183:6, 2186:22, 2186:23,
2186:25, 2187:5, 2187:14, 2189:16,
2190:10, 2195:23, 2196:19, 2197:12,
2197:13, 2197:14, 2198:18, 2199:9,
2199:14, 2200:16, 2205:12, 2205:16,
2205:19, 2205:20, 2209:19, 2212:4
**tomorrow** [1] - 2104:25
**took** [13] - 2059:7, 2082:5, 2113:20,
2113:22, 2114:2, 2134:22, 2155:1,
2186:1, 2193:1, 2239:18, 2249:10,
2257:1, 2281:17
**top** [1] - 2049:4
**topic** [8] - 2151:24, 2159:7, 2159:9,
2165:17, 2167:23, 2169:20, 2216:24,
2228:8
**topics** [2] - 2151:21, 2176:1
**tops** [1] - 2229:18
**torso** [1] - 2242:7
**total** [7] - 2055:18, 2131:19, 2166:2,
2201:8, 2214:17, 2240:18, 2282:20
**totality** [2] - 2035:11
**touch** [3] - 2131:14, 2167:22, 2243:20
**touched** [1] - 2246:18
**tough** [2] - 2045:21, 2194:25
**tougher** [1] - 2175:15
**towards** [5] - 2157:15, 2191:18,
2248:16, 2248:17, 2277:10
**track** [1] - 2164:15
**traditional** [1] - 2194:2
**trailer** [1] - 2285:11
**trailmaking** [3] - 2126:22, 2126:24,
2127:2
**trained** [2] - 2091:16, 2134:9
**training** [10] - 2081:5, 2087:6, 2128:4,
2147:6, 2158:11, 2231:5, 2231:22,
2232:5, 2232:14
**TRANSCRIPT** [1] - 2006:12
**transcript** [30] - 2007:22, 2009:6,

2010:7, 2014:11, 2019:2, 2020:7,
2024:20, 2025:1, 2027:6, 2030:4,
2032:20, 2036:23, 2038:3, 2038:8,
2038:9, 2041:13, 2045:25, 2047:10,
2049:8, 2051:9, 2057:15, 2059:1,
2059:8, 2072:17, 2093:12, 2094:1,
2192:1, 2203:12, 2203:13, 2243:25
**Transcription** [1] - 2007:22
**transcripts** [6] - 2010:14, 2058:2,
2094:7, 2094:8, 2202:3, 2251:2
**transfer** [1] - 2126:3
**Transit** [1] - 2017:7
**translate** [7] - 2126:6, 2130:8,
2130:16, 2141:16, 2210:4, 2210:6
**translates** [1] - 2210:19
**translation** [2] - 2129:15, 2130:3
**trauma** [11] - 2064:9, 2142:16,
2153:15, 2153:16, 2153:17, 2154:5,
2154:6, 2154:7, 2154:8, 2154:10
**trauma-related** [3] - 2154:5, 2154:6,
2154:7
**traumatic** [45] - 2016:10, 2016:11,
2042:9, 2042:10, 2057:18, 2059:16,
2060:2, 2060:14, 2060:25, 2062:10,
2062:16, 2064:20, 2067:20, 2067:25,
2068:2, 2068:3, 2068:5, 2068:8,
2068:10, 2068:14, 2068:17, 2068:22,
2068:25, 2069:1, 2069:5, 2069:9,
2069:12, 2069:13, 2069:16, 2069:20,
2134:16, 2147:10, 2151:25, 2153:2,
2153:22, 2153:25, 2154:1, 2155:13,
2156:8, 2156:9, 2156:11, 2156:18,
2157:11, 2157:12, 2226:19
**Traumatic** [7] - 2046:10, 2067:14,
2087:21, 2133:16, 2133:23, 2133:25,
2134:12
**traumatically** [1] - 2045:9
**traumatized** [2] - 2045:20, 2045:23
**traveling** [2] - 2282:12, 2282:17
**travels** [1] - 2137:10
**treat** [5] - 2023:4, 2035:12, 2095:12
**treated** [2] - 2044:7, 2044:16
**treater** [5] - 2022:3, 2030:21, 2035:10,
2039:24, 2044:4
**treaters** [3] - 2044:8, 2132:12, 2133:7
**treating** [28] - 2017:14, 2019:12,
2022:3, 2023:2, 2023:3, 2023:12,
2025:24, 2025:25, 2034:8, 2034:22,
2035:18, 2036:21, 2039:7, 2041:10,
2041:22, 2042:12, 2043:25, 2044:13,
2048:2, 2048:9, 2048:13, 2048:23,
2052:16, 2053:2, 2054:1, 2073:10,
2096:9, 2180:16
**treatment** [20] - 2018:6, 2018:7,
2018:8, 2018:12, 2018:16, 2018:21,
2019:22, 2023:13, 2028:4, 2039:10,
2044:12, 2060:8, 2060:13, 2093:8,
2141:2, 2144:2, 2146:14, 2146:22,
2147:1, 2178:19
**treatments** [1] - 2018:5

**tree** [2] - 2115:11, 2115:12

**tremendous** [3] - 2141:22, 2216:22, 2239:23

**trends** [1] - 2263:13

**trial** [44] - 2016:12, 2017:14, 2018:13, 2018:24, 2021:13, 2024:8, 2024:20, 2026:22, 2027:6, 2028:7, 2029:1, 2051:2, 2094:10, 2112:18, 2112:19, 2112:21, 2113:7, 2113:9, 2113:15, 2113:16, 2116:10, 2116:24, 2148:9, 2158:15, 2158:18, 2169:13, 2169:14, 2169:15, 2191:4, 2197:13, 2205:18, 2205:19, 2205:20, 2206:21, 2206:22, 2209:19, 2209:20, 2209:21, 2209:22, 2212:5, 2214:23, 2251:2, 2281:4

**TRIAL** [1] - 2006:12

**trials** [4] - 2112:16, 2115:1, 2166:14

**tried** [4] - 2052:11, 2201:1, 2251:12, 2269:16

**trips** [1] - 2045:24

**trivialize** [1] - 2065:18

**trouble** [2] - 2103:8, 2104:21

**troublesome** [1] - 2056:24

**truck** [11] - 2115:14, 2118:18, 2118:21, 2161:5, 2237:17, 2238:24, 2242:13, 2247:9, 2248:6, 2285:19

**trucks** [1] - 2250:15

**true** [54] - 2008:20, 2010:4, 2071:15, 2101:20, 2103:8, 2115:19, 2122:4, 2123:15, 2123:17, 2123:19, 2123:22, 2123:23, 2137:3, 2150:2, 2150:12, 2153:8, 2159:25, 2160:6, 2161:1, 2161:7, 2161:10, 2161:16, 2162:13, 2163:13, 2165:1, 2165:2, 2165:12, 2168:21, 2168:23, 2172:8, 2176:12, 2176:14, 2180:18, 2181:3, 2182:7, 2190:11, 2196:5, 2205:23, 2213:19, 2228:10, 2228:23, 2228:23, 2234:23, 2240:3, 2249:11, 2249:14, 2252:22, 2252:23, 2253:2, 2253:24, 2264:15, 2279:10, 2279:15, 2280:16

**true/false** [1] - 2122:1

**truism** [1] - 2163:16

**truncated** [1] - 2288:6

**trust** [2] - 2066:14, 2112:4

**trusted** [1] - 2156:15

**truthfulness** [1] - 2097:24

**try** [14] - 2094:25, 2095:8, 2095:11, 2096:2, 2096:7, 2123:20, 2127:6, 2131:2, 2197:22, 2234:12, 2254:14, 2257:5, 2257:7, 2261:2

**trying** [11] - 2034:11, 2059:22, 2118:5, 2164:15, 2165:14, 2201:4, 2201:6, 2260:5, 2263:23, 2273:19, 2279:23

**Tuesday** [4] - 2015:5, 2288:5, 2288:9, 2288:10

**tumors** [1] - 2142:17

**turn** [4] - 2011:20, 2055:23, 2111:19, 2203:11

**turning** [3] - 2021:16, 2046:14,

2067:13

**twelfth** [1] - 2264:2

**twice** [4] - 2045:23, 2054:7, 2112:15, 2233:6

**two** [84] - 2008:22, 2009:18, 2009:21, 2014:4, 2019:11, 2026:17, 2027:13, 2034:6, 2040:10, 2042:8, 2045:23, 2045:25, 2052:13, 2054:13, 2063:9, 2064:22, 2069:13, 2070:6, 2070:10, 2070:14, 2071:14, 2071:18, 2081:6, 2081:8, 2084:19, 2084:20, 2099:15, 2106:14, 2106:20, 2107:3, 2107:8, 2110:15, 2111:20, 2112:16, 2114:13, 2114:15, 2117:6, 2118:18, 2119:20, 2119:23, 2126:10, 2134:9, 2139:6, 2151:14, 2156:9, 2156:13, 2157:13, 2157:16, 2159:17, 2159:20, 2170:23, 2172:12, 2173:6, 2173:12, 2173:17, 2181:5, 2181:14, 2195:14, 2204:5, 2209:20, 2209:21, 2209:22, 2211:4, 2211:11, 2213:10, 2219:10, 2219:11, 2219:20, 2224:21, 2228:3, 2233:5, 2241:10, 2242:25, 2243:3, 2257:11, 2263:11, 2273:15, 2277:24, 2283:16, 2283:24, 2284:1, 2286:17

**two-inch** [1] - 2284:1

**two-level** [2] - 2040:10, 2173:17

**two-year** [1] - 2134:9

**type** [18] - 2019:1, 2090:5, 2138:25, 2142:5, 2142:6, 2142:15, 2143:20, 2144:2, 2181:8, 2181:11, 2215:12, 2220:8, 2220:22, 2231:14, 2232:13, 2241:19, 2242:4, 2242:10

**types** [8] - 2076:4, 2134:17, 2142:8, 2181:5, 2181:12, 2181:14, 2220:9, 2220:11

**typical** [2] - 2043:10, 2122:20

**typically** [9] - 2128:11, 2156:11, 2157:14, 2161:15, 2171:15, 2172:1, 2182:5, 2182:16, 2183:1

## U

**uh-hum** [1] - 2190:25

**ultimate** [1] - 2056:13, 2146:5

**ultimately** [3] - 2066:19, 2205:16, 2245:14

**umbrella** [1] - 2084:12

**UMDNJ** [1] - 2083:19

**un-Constitutionally** [1] - 2077:8

**unable** [1] - 2141:22

**unawareness** [1] - 2132:8

**uncommon** [7] - 2140:21, 2171:9, 2171:12, 2172:8, 2183:3, 2183:4, 2190:8

**under** [21] - 2008:18, 2040:24, 2050:22, 2064:9, 2071:25, 2072:17, 2075:19, 2075:22, 2084:11, 2084:13, 2091:17, 2156:6, 2158:12, 2196:8, 2197:8, 2205:6, 2206:4, 2215:13,

2243:9, 2245:12, 2273:22

**undercarriage** [2] - 2247:22, 2248:7

**underestimate** [2] - 2204:16, 2204:17

**underlying** [1] - 2023:18

**underneath** [2] - 2238:5, 2248:12

**underscored** [1] - 2204:23

**understood** [2] - 2178:17, 2274:21

**undertake** [3] - 2018:16, 2175:22, 2254:14

**undisputedly** [1] - 2058:21

**unfortunately** [2] - 2021:20, 2088:14

**unimpaired** [1] - 2103:23

**unique** [4] - 2232:25, 2233:8, 2233:9, 2233:23

**uniqueness** [1] - 2233:22

**UNITED** [1] - 2006:1, 2006:13

**United** [5] - 2006:5, 2082:8, 2082:9, 2123:13, 2194:14

**university** [1] - 2083:12

**University** [6] - 2082:3, 2082:14, 2083:14, 2083:15, 2083:19, 2231:8

**unknown** [1] - 2255:1

**unless** [2] - 2074:25, 2075:1

**unlike** [1] - 2110:7

**unrestrained** [15] - 2258:7, 2264:14, 2264:19, 2267:5, 2267:23, 2267:25, 2271:21, 2272:4, 2272:10, 2272:13, 2273:5, 2273:9, 2273:18, 2274:7, 2274:23

**untrue** [1] - 2260:6

**unusual** [3] - 2135:1, 2143:12, 2143:19

**unwanted** [1] - 2153:23

**up** [77] - 2010:19, 2020:2, 2030:6, 2030:11, 2030:13, 2039:10, 2039:20, 2047:20, 2050:24, 2054:7, 2063:9, 2066:4, 2066:14, 2070:21, 2073:15, 2096:18, 2096:21, 2096:22, 2100:23, 2103:19, 2104:24, 2106:17, 2106:20, 2116:3, 2116:4, 2117:22, 2118:2, 2120:16, 2131:2, 2141:10, 2148:12, 2149:2, 2155:9, 2156:4, 2164:2, 2165:15, 2167:24, 2168:4, 2169:18, 2186:14, 2189:21, 2194:16, 2195:12, 2201:17, 2203:19, 2204:11, 2209:21, 2221:5, 2221:7, 2221:15, 2223:13, 2227:11, 2242:12, 2242:15, 2242:25, 2245:22, 2250:4, 2261:2, 2261:21, 2262:19, 2266:4, 2267:3, 2271:20, 2275:13, 2275:15, 2276:14, 2278:18, 2280:1, 2281:7, 2284:8, 2285:6, 2285:10, 2285:11, 2285:12, 2288:12

**upper** [2] - 2264:25

**upright** [1] - 2285:13

**ups** [2] - 2031:13, 2159:9

**upsetting** [1] - 2153:24

**upstairs** [2] - 2008:10, 2054:15

**upward** [1] - 2242:15

**uses** [1] - 2050:14

**usual** [1] - 2100:13

utility [1] - 2250:15

# V

VA [5] - 2083:19, 2134:9, 2134:10, 2134:11, 2215:18
valid [24] - 2098:22, 2109:11, 2125:7, 2142:9, 2142:10, 2144:6, 2145:1, 2147:1, 2147:3, 2180:17, 2183:13, 2184:24, 2196:20, 2199:16, 2200:22, 2205:8, 2205:11, 2212:1, 2215:13, 2217:17, 2220:7, 2222:9, 2235:3, 2281:20
validity [49] - 2043:3, 2043:14, 2046:5, 2110:12, 2110:16, 2110:25, 2113:2, 2115:4, 2115:5, 2115:6, 2118:16, 2120:10, 2121:9, 2121:10, 2121:13, 2121:17, 2122:7, 2122:8, 2124:8, 2143:23, 2144:9, 2144:16, 2176:23, 2177:3, 2177:8, 2180:22, 2181:1, 2181:4, 2181:9, 2181:11, 2181:12, 2182:7, 2182:14, 2184:23, 2187:2, 2200:13, 2200:14, 2200:15, 2208:20, 2212:3, 2212:7, 2215:3, 2220:9, 2220:22, 2220:24, 2221:2, 2222:6, 2222:24, 2223:20
Validity [2] - 2105:21, 2212:5
value [4] - 2059:7, 2265:9, 2271:20, 2275:15
values [18] - 2266:3, 2271:19, 2273:5, 2273:17, 2274:7, 2274:18, 2276:14, 2276:20, 2276:21, 2277:24, 2278:14, 2279:8, 2279:9, 2279:13, 2280:1, 2280:7, 2280:15, 2281:24
Vargas [1] - 2014:21
variability [1] - 2180:11
variable [1] - 2153:7
variables [2] - 2236:12, 2240:22, 2255:2
variety [1] - 2064:3
various [14] - 2048:21, 2092:6, 2093:4, 2093:6, 2093:7, 2093:15, 2139:11, 2152:14, 2218:12, 2233:12, 2252:25, 2253:1, 2275:24, 2276:1
vast [4] - 2111:4, 2112:7, 2147:1, 2199:17
VAZQUEZ [1] - 2055:5
vector [1] - 2286:17
vehicle [25] - 2064:12, 2161:3, 2161:8, 2161:9, 2226:8, 2237:2, 2237:8, 2237:21, 2238:12, 2238:14, 2238:17, 2239:1, 2239:3, 2239:5, 2241:18, 2241:24, 2245:12, 2247:6, 2248:16, 2250:17, 2273:2, 2274:4, 2285:10, 2285:11, 2286:9
vehicles [2] - 2250:16, 2280:7
velocities [1] - 2283:4
velocity [9] - 2226:4, 2237:9, 2237:11, 2238:15, 2282:25, 2283:1, 2283:2
verbal [13] - 2095:24, 2097:10,

2103:12, 2114:23, 2121:16, 2124:9, 2131:13, 2132:5, 2148:5, 2157:15, 2191:9, 2191:19, 2194:20
Verbal [6] - 2114:21, 2118:11, 2118:15, 2125:22, 2166:13, 2212:25
verbally [2] - 2098:5, 2099:6
verbiage [1] - 2065:20
verbose [1] - 2157:4
verdict [10] - 2016:5, 2020:21, 2021:4, 2021:11, 2023:25, 2026:20, 2038:11, 2038:23, 2077:3, 2146:5
verdicts [1] - 2077:9
versed [1] - 2152:24
version [2] - 2059:20, 2156:3
versions [1] - 2057:4
versus [22] - 2016:22, 2018:2, 2018:13, 2018:19, 2021:9, 2027:22, 2027:24, 2028:9, 2028:18, 2028:20, 2029:1, 2031:23, 2035:10, 2075:3, 2077:9, 2077:12, 2203:14, 2210:1, 2213:22, 2223:21, 2266:8, 2275:11
veteran [1] - 2215:23
via [1] - 2009:1
Victoria [5] - 2105:21, 2109:13, 2110:19, 2204:5, 2212:4
video [5] - 2014:7, 2037:21, 2257:6, 2260:15, 2260:16
videotape [1] - 2015:1
Vietnam [2] - 2082:6, 2082:10
view [2] - 2146:15, 2232:20
vigilance [1] - 2104:13
violence [2] - 2067:18, 2153:14
virtually [2] - 2177:5, 2189:11
virtue [1] - 2089:11
viscoelastic [1] - 2233:7
visibly [1] - 2131:1
vision [1] - 2200:5
visions [1] - 2199:15
visit [2] - 2030:20, 2030:23
visual [8] - 2083:10, 2089:7, 2089:8, 2095:24, 2097:10, 2111:8, 2124:9, 2124:23
voices [1] - 2209:9
voluminous [2] - 2092:4, 2092:6
Voluntary [1] - 2099:19
voluntary [2] - 2068:4, 2099:20
volunteers [1] - 2231:25

# W

WAGSTAFF [1] - 2006:20
waist [1] - 2285:8
wait [4] - 2025:10, 2195:9, 2207:19, 2219:6
waiting [3] - 2054:13, 2273:24, 2273:25
waiver [1] - 2074:10
wake [1] - 2100:23
Walgreen's [1] - 2011:10

walked [1] - 2051:7
wall [3] - 2050:20, 2237:1, 2258:1
wants [1] - 2076:24
war [1] - 2082:6
WARNER [1] - 2007:9
WAS [1] - 2125:1
WAS-II [1] - 2125:1
waste [1] - 2269:19
watching [2] - 2104:13, 2201:19
water [12] - 2116:3, 2116:6, 2116:20, 2116:21, 2116:22, 2116:23, 2117:4, 2117:9, 2117:13, 2117:22, 2212:24, 2213:4
wave [1] - 2137:10
ways [8] - 2067:19, 2097:15, 2110:15, 2153:14, 2153:23, 2154:6, 2161:17, 2233:12
weak [2] - 2035:7, 2063:1
wearing [3] - 2161:24, 2286:3, 2286:8
Wechsler [3] - 2124:7, 2125:2, 2148:16
Wednesday [1] - 2288:12
week [4] - 2020:15, 2027:13, 2071:13, 2123:16
weekend [1] - 2288:20
weekends [1] - 2195:16
weeks [3] - 2027:13, 2045:25, 2134:22
weighted [2] - 2191:8, 2191:18
well-accepted [1] - 2057:22
well-established [2] - 2137:13, 2138:2
well-familiar [1] - 2152:24
well-known [2] - 2182:1, 2182:2
well-settled [1] - 2016:19
well-used [2] - 2182:1, 2182:2
well-versed [1] - 2152:24
Wendy [2] - 2053:8, 2053:19
West [3] - 2014:17, 2047:8, 2133:8
Westchester [1] - 2007:12
Westlaw [1] - 2067:3
whatnot [2] - 2058:12, 2176:1
wheel [4] - 2272:17, 2274:6, 2274:8, 2274:9
wheels [1] - 2280:9
whereas [1] - 2272:18
wherein [1] - 2077:19
whole [7] - 2019:9, 2046:7, 2113:1, 2116:15, 2156:16, 2165:9, 2239:17
wide [1] - 2141:24
widely [2] - 2106:4, 2163:15
willing [3] - 2059:4, 2071:13, 2215:3
Wilson [2] - 2018:2, 2031:23
window [3] - 2283:17, 2283:19, 2285:20
windshields [1] - 2267:8
Winn [4] - 2034:2, 2034:8, 2036:4, 2051:21
winning [1] - 2089:24
wish [1] - 2099:22
withdraw [1] - 2250:2

**withdrawn** [9] - 2013:4, 2021:2, 2034:15, 2166:6, 2190:4, 2263:5, 2263:24, 2272:2, 2280:5
**withdrew** [2] - 2034:13
**Witness** [3] - 2079:20, 2136:9, 2287:9
**witness** [16] - 2014:14, 2022:6, 2040:7, 2064:23, 2072:21, 2079:17, 2080:2, 2136:11, 2199:18, 2229:8, 2230:1, 2230:5, 2252:6, 2253:8, 2257:4, 2262:14
**WITNESS** [25] - 2080:8, 2135:21, 2179:19, 2179:21, 2190:14, 2190:19, 2191:20, 2219:10, 2220:2, 2230:8, 2252:4, 2252:15, 2256:11, 2264:22, 2265:3, 2265:5, 2271:13, 2273:25, 2274:2, 2277:9, 2278:4, 2278:8, 2286:1, 2287:8, 2289:3
**witnessed** [1] - 2064:13
**witnesses** [9] - 2014:4, 2014:17, 2014:20, 2015:11, 2054:19, 2065:12, 2071:22, 2078:25, 2158:19
**witnesses'** [1] - 2192:10
**witnessing** [3] - 2064:9, 2067:21, 2153:15
**WMS** [2] - 2124:6, 2124:21
**WMS-IV** [2] - 2124:6, 2124:21
**woke** [1] - 2285:9
**Wolff's** [1] - 2233:14
**word** [9] - 2059:10, 2116:22, 2117:15, 2118:20, 2149:19, 2167:15, 2171:5, 2206:23, 2225:9
**Word** [1] - 2110:21
**words** [42] - 2032:6, 2058:18, 2089:6, 2091:15, 2096:7, 2099:10, 2114:24, 2114:25, 2115:1, 2115:3, 2115:7, 2115:9, 2115:10, 2115:12, 2115:16, 2115:17, 2115:18, 2116:1, 2116:5, 2116:8, 2116:12, 2116:14, 2116:15, 2117:22, 2118:2, 2118:3, 2118:18, 2118:22, 2121:18, 2125:23, 2142:9, 2148:7, 2169:22, 2176:6, 2181:10, 2212:24, 2233:3, 2241:19, 2247:17, 2251:9
**workers** [1] - 2177:16
**works** [3] - 2080:21, 2081:17, 2106:9
**world** [5] - 2069:18, 2154:9, 2156:15, 2250:15
**worse** [6] - 2112:21, 2113:22, 2129:8, 2140:19, 2197:22, 2211:18
**worsening** [3] - 2069:12, 2156:8, 2157:12
**worst** [2] - 2140:17, 2166:18
**Wow** [1] - 2121:25
**wrap** [2] - 2223:13, 2278:18
**write** [2] - 2106:22, 2137:17
**writing** [1] - 2098:5
**written** [4] - 2084:18, 2086:13, 2097:14, 2214:5
**wrote** [2] - 2151:22, 2184:4

## X

**X-rays** [1] - 2033:3
**X-rays'** [1] - 2033:3

## Y

**Yankee** [1] - 2017:3
**year** [25] - 2018:12, 2027:14, 2027:17, 2027:18, 2029:22, 2030:11, 2030:24, 2036:20, 2037:5, 2042:4, 2052:4, 2052:6, 2052:15, 2053:13, 2059:18, 2082:4, 2082:10, 2107:14, 2107:21, 2111:25, 2119:8, 2119:9, 2134:9
**years** [26] - 2020:15, 2023:8, 2024:10, 2026:1, 2027:13, 2032:22, 2032:23, 2040:23, 2080:20, 2083:13, 2083:18, 2085:9, 2086:4, 2086:8, 2126:18, 2134:11, 2143:9, 2143:21, 2186:15, 2194:15, 2195:5, 2196:3, 2219:10, 2219:11, 2219:20, 2231:16
**yesterday** [12] - 2008:15, 2011:7, 2012:8, 2026:14, 2027:20, 2036:22, 2037:24, 2041:25, 2043:17, 2046:1, 2050:16, 2103:1
**yielded** [1] - 2011:6
**York** [19] - 2006:1, 2006:5, 2006:18, 2007:13, 2007:17, 2010:11, 2016:19, 2016:24, 2017:2, 2017:4, 2046:16, 2047:7, 2075:19, 2080:21, 2081:9, 2082:18, 2093:6, 2190:20
**young** [2] - 2113:5, 2126:18
**yourself** [3] - 2080:6, 2080:17, 2230:6

## Z

**Zanaflex** [1] - 2036:16
**zero** [4] - 2036:8, 2038:10, 2148:7, 2148:10
**zone** [4] - 2074:17, 2075:1, 2075:6, 2075:10
**zones** [3] - 2137:9, 2238:10, 2261:24