```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------x
     JOSE BAUTA,
 3                      PLAINTIFF,

 4          versus                      14 CV 03725(RER)

 5   GREYHOUND LINES, INC., ET AL,      U. S. Courthouse
                                        Brooklyn, New York
 6                   DEFENDANTS.        May 4th, 2018
     -------------------------------x   9:30 AM
 7
                TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
 8                BEFORE THE HONORABLE RAMON REYES
                  UNITED STATES MAGISTRATE JUDGE
 9
                             APPEARANCES
10
     Attorneys for Plaintiff:
11   MCELFISH & ASSOCIATES, LLC
     122 East 42nd Street, Suite 2100
12   New York, New York 10168
     BY:  RAYMOND MCELFISH, ESQ.
13        JAMIE DIAMOND, ESQ.

14   Attorneys for Defendants:
     LEWIS BRISBOIS BISGAARD & SMITH, LLP
15   1375 East 9th Street, Suite 1600
     Cleveland, Ohio 44114
16   BY:  BRADLEY BARMEN, ESQ., ESQ.

17   MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
     800 Westchester Avenue, Suite C-700
18   Rye Brook, New York 10573
     BY:  STEVEN SAAL, ESQ.
19
     SHAUB, AHMUTY, CITRIN & SPRATT, LLP
20   77 Water Street, Suite 702
     New York, New York 10005
21   BY:  JONATHAN SHAUB, ESQ.

22   Official Court Reporter:
     LISA SCHMID, CCR, RMR
23   225 Cadman Plaza East
     Brooklyn, New York 11201
24   Phone:  718-613-2644
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1              (In open court, outside the presence of the jury.)
 2              THE COURT:  Okay.  I wanted to raise a couple of
 3    issues.  We got requests from a couple of jurors to
 4    accommodate their schedules.  Juror Number 7, Lichelle
 5    Bartley, needs to leave at 3:30 on both May 14th and May 21st
 6    for doctors' appointments.
 7              MS. DIAMOND:  Is that the 21st, Your Honor?
 8              THE COURT:  The 14th and the 21st.
 9              And Juror Number 4, Michelle Knowles-Smith, needs to
10    leave early also at 3:00, at 3:00 o'clock.
11              Correct, Marian?
12              THE CLERK:  That's correct.
13              THE COURT:  3:00 o'clock on May 24th to attend her
14    brother's wedding.
15              Who knows if we'll be going on May 24th.  Hopefully
16    not.  Hopefully we'll be done by then but what I would propose
17    is that we sort of play it by ear and try to accommodate their
18    schedule and, if not, if we can't, then we may have to excuse
19    them.  We have 12 jurors.  So, we got through.  We'll continue
20    to monitor the situation.
21              The second thing I wanted to ask you about is the --
22    if you've made any further arrangements regarding these two
23    witnesses that you want to call.
24              I'm talking to the defendants now.
25              MR. SAAL:  Yes, Your Honor.  Right now we don't see
```

```
 1    a problem for us calling Ms. Peachey on the morning of

 2    May 11th, if we were to do it live.  We prefer to do the trial

 3    depos as would normally be done, have the videotape and play

 4    it for the jury; but we leave that determination for the

 5    Court.  Our preference is to do trial depositions and play the

 6    video for the jury at a point during our case.  That's our

 7    stated preference, and that's how we -- for Mr. Blatt, and

 8    what we intend to do.

 9               THE COURT:  Have you arranged for a service in

10    Myrtle Beach?

11               MR. SAAL:  Yes, and in Harrisburg, PA, for the 11th.

12    We have already -- that has already been addressed.  We have

13    an office in Harrisburg.  We're arranging with the appropriate

14    court reporter.  I believe Diamond will do the video

15    deposition and the witnesses are confirmed and we have already

16    made all those arrangements.

17               THE COURT:  Okay.  So, Ms. Peachey is what time on

18    the 11th?

19               MR. SAAL:  May 11th at 10:00 a.m.

20               THE COURT:  And Mr. Blatt is ...

21               MR. SAAL:  May 9th at 9:00 a.m.

22               THE COURT:  Okay.  Do you have the address for Ms.

23    Peachey, her home where you served the testimony?

24               MR. SAAL:  Oh, we actually served her at her place

25    of employment, Your Honor.
```

```
 1                 THE COURT:  Where is that?

 2                 MR. SAAL:  I have it right here.  That is Lewisburg,

 3      Pennsylvania, Your Honor.

 4                 THE COURT:  Okay.

 5                 MR. SAAL:  And she resides in Middleburg,

 6      Pennsylvania.

 7                 THE COURT:  Middleburg?

 8                 MR. SAAL:  Middleburg, yes.  That's Middleburg

 9      without an "H" at the end.  It's Middle and then B-U-R-G.

10                 THE COURT:  Okay.

11                 MR. SAAL:  And I have the same thing with Lewisburg,

12      the spelling.

13                 THE COURT:  Okay.  So, Ms. Peachey is May 11th at

14      10:00, you said.

15                 MR. SAAL:  Yes, Your Honor.

16                 THE COURT:  And mister -- where is mister -- he's

17      punitives.

18                 MR. SAAL:  Yes.

19                 And, Your Honor, there is another punitives witness

20      we didn't get to yesterday in discussing.

21                 THE COURT:  Who is that?

22                 MR. SAAL:  It's Corporal Steven Schmit who testified

23      as the defendant's accident reconstructionist that we'll be

24      seeking to examine on rebuttal based on information that

25      Colonel Schmit testified to as he was certified as an accident
```

1    reconstructionist and the jury heard his testimony and we're

2    going to rebut certain things have been offered by the

3    plaintiffs that they have now heard even on the compensatory

4    case that we feel we need to respond to that.

5              MR. BARMEN:  It goes a little further than that,

6    Judge.  Similar to the issues we discussed yesterday with

7    Mr. Blatt, again, the jury's going to have to make a

8    determination on the level of reprehensibility of the conduct

9    of Sabrina Anderson because they are again seeking punitive

10   damages against her, as well as Greyhound.

11             So, it goes to what she encountered.  There was a

12   dispute about the speed of the truck.  The Pennsylvania State

13   Police determined the truck was going 16 miles an hour on the

14   highway the night of the crash after a four-month

15   investigation.  So, in addition to what Mr. Saal said, it goes

16   beyond that; and they do have to evaluate the conduct.

17             THE COURT:  So, I don't understand what -- you have

18   him listed.

19             MR. SAAL:  We have him listed as reserve.  We do

20   intend to --

21             THE COURT:  What do you mean you have him listed as

22   reserve?

23             MR. SAAL:  We listed him in the schedule.  He was

24   listed, at needed.

25             THE COURT:  If necessary.

1              MR. SAAL:  Yes.

2              THE COURT:  So, you're saying he's necessary.

3              MR. SAAL:  Yes, Your Honor.

4              THE COURT:  Have you -- and he is your expert.

5              MR. SAAL:  He is one of our accident

6    reconstructionists.  We have two accident reconstruction

7    experts.  He's --

8              MR. BARMEN:  He's a corporal in the Pennsylvania

9    State Police.  He's a trooper.  He's also part of their ACTAR

10   unit which is dedicated accident reconstruction.

11             In the Pennsylvania case we wanted to bring him in

12   as a fact witness because he has the investigation of the

13   accident reconstruction.  We also had a separate professional

14   accident reconstruction guy out of Pennsylvania.  Judge

15   Foglietta prior to trial on the plaintiff's motion basically

16   told us choose one.  You don't get both.  You can bring in

17   Corporal Schmit and he can talk to the facts and the

18   reconstruction or you can bring in Mr. Shore and then not have

19   Corporal Schmit testify.  So, we brought in Corporal Schmit

20   under that direction, as both a fact and expert witness.  He

21   is certainly qualified as an expert because of his work.

22             THE COURT:  But I don't understand was the issue is

23   with him.

24             MR. BARMEN:  There is no issue.

25             MR. SAAL:  There is no issue.  He is teaching

1    classes.  He teaches these classes to certify people in

2    accident reconstruction.  He's going to be teaching classes

3    basically every day, all day during the time that we're on

4    trial.  He's going to be in Columbus, Ohio, for the most part

5    during the punitives phase.  So, the week of May 15th, he's

6    going to be in the vicinity of Williamsport, PA, where he

7    lives and will be able appear for a trial deposition that

8    we're going to organize at a local hotel with a local court

9    reporter.

10          MR. BARMEN:  And, again, we can do it, schedule it,

11   and do it as a satellite or video, so they don't have to

12   travel.

13          THE COURT:  When did you know this?

14          MR. BARMEN:  It really just became an issue after

15   some of Mr. Smith's testimony yesterday.  I'm sorry.

16          THE COURT:  What is the issue that became apparent?

17          MR. BARMEN:  Well, he went in as accident

18   reconstruction.  He talked about the delta-V which goes to the

19   speed of the truck.

20          THE COURT:  You always knew he was going to talk

21   about the delta-V, whether he's an accident reconstructionist

22   or a biomechanical expert.  You knew that from Day One.

23          MR. BARMEN:  Well, we had Corporal Schmit listed

24   from Day One.

25          THE COURT:  That's right.  But you didn't check what

LISA SCHMID, CCR, RMR

```
 1    his schedule was?

 2              MR. BARMEN:  We did.

 3              MR. SAAL:  We did but he doesn't have the ability to

 4    alter his --

 5              MR. BARMEN:  He can't be here during trial.

 6              THE COURT:  So, I'm asking you:  When did you know

 7    that he couldn't be here for trial?  When you submitted the

 8    joint pretrial order?

 9              MR. SAAL:  No.  After that, Your Honor.  It's in

10    between that and the trial that --

11              THE COURT:  You served him with a subpoena to

12    testify?

13              MR. SAAL:  Yes.

14              THE COURT:  And you didn't check with him until

15    after the joint -- when did you serve him with the subpoena?

16              MR. SAAL:  I believe it would have been roughly late

17    March or early April.  I'd have to check the date.

18              THE COURT:  And you didn't check with him until

19    after the trial started to find out if he was available?

20              MR. SAAL:  Well, we had contact -- we had contacted

21    him.  With his teaching schedule and everything else, he's an

22    extremely busy individual and not always the easiest to get

23    ahold of him but we left some messages.  We'd gotten in

24    contact with him roughly at some point in midst April.

25              THE COURT:  Who else have you not gotten in
```

1    contacted with that you're going to tell me next week --

2              MR. BARMEN:  That's --

3              THE COURT:  -- that there's --

4              MR. BARMEN:  There's no one else, Your Honor.

5              MR. SAAL:  Well, the only other --

6              MR. BARMEN:  No one else, Your Honor.

7              THE COURT:  Speak now or forever hold your peace.

8              MR. BARMEN:  That's a different issue.  We have

9    subpoenaed several people from 110 West 34th Street for the

10   issues you're aware of.  We have just been contacted by the

11   lawyer for 110 West 34th Street, raising an issue about those

12   people coming here.  It has nothing to do with people who

13   aren't identified or doing trial depos or anything like that.

14             We're just fighting with the lawyer from 110 West

15   34th Street.  He wants to -- he's basically telling us that,

16   if all those people have to come to trial, we're somehow

17   obligated to pay the office for the inconvenience.  So, we're

18   trying to work something out by agreement with them so we

19   don't put too much of a burden on their office on any one day;

20   but it also impacts our schedule.

21             So, we're trying to work that out; but it has

22   nothing to do with these other issues we're talking about.

23             THE COURT:  So, Corporal Steven Schmit is a retained

24   expert?

25             MR. BARMEN:  No, he's not a retained expert.

```
 1              THE COURT:  He didn't submit an expert report?

 2              MR. BARMEN:  No, Your Honor.

 3              THE COURT:  All right.

 4              MR. BARMEN:  He was disclosed that way.  He offered

 5    the police report that they have had.

 6              THE COURT:  He was disclosed what way?

 7              MR. SAAL:  He was disclosed in Rule 26 as an expert

 8    based on his ACTAR reconstruction of the part of the accident

 9    that he did pursuant through his employment with the

10    Pennsylvania State Police.  So, that was the report that was

11    noticed in the Rule 26.

12              MR. BARMEN:  His job was --

13              THE WITNESS:  But you are not paying him as an

14    expert.

15              MR. BARMEN:  No, Your Honor.

16              MR. SAAL:  No.

17              THE COURT:  Have you arranged with him a date to sit

18    for a trial deposition?

19              MR. SAAL:  Yes, Your Honor.  Wednesday, May 16th, at

20    10:00 a.m. in Williamsport, Pennsylvania.

21              THE CLERK:  Did you say 10:00 a.m.?

22              MR. SAAL:  10:00 a.m., yes.

23              He advised he was available.  We told him it was

24    subject to confirmation of the Court and everyone's

25    availability, and he said he can pencil it in.
```

```
 1              THE COURT:  All right.  Do you want to say anything,

 2    Mr. McElfish?

 3              MR. McELFISH:  Staying above the fray, Judge.

 4              THE COURT:  You can let each of these people sit for

 5    trial depositions.  You will make, whether it's here at the

 6    courthouse -- I'd prefer it to be here at the courthouse --

 7    arrange not the day before, not the day of.  Start the

 8    arrangements now.  Make sure the video links work, all of

 9    that.  Get it up and running.

10              Each of the depositions will consist of one hour.

11    That means defendants have half an hour.  Plaintiffs have a

12    half an hour.  If necessary, I will sit there with you.  So,

13    you'd better have it tight.  These people are being called for

14    very limited purposes.  Maybe Corporal Schmit I'll give you

15    two hours.

16              But you're taking away trial time.  By scheduling

17    them for 10:00 a.m, you're taking away trial time; and it's

18    going to be your trial times that's impacted, not the

19    plaintiff's.

20              If I need to be there to be the referee for you

21    folks, I will be.  I prefer not, but you're going to be on a

22    strict time clock.  So, get in, get out, get it done.  Then

23    you have to make arrangements.  I don't know if they're going

24    to email you the video.  We're going to have to edit it.  So,

25    this is a huge logistical nightmare that's been created.
```

```
 1              These witness are unavailable because they're more

 2     than a hundred miles from the courthouse -- I've checked --

 3     each of them or each of the places where the subpoenas were

 4     served.  So, it's not improper; but it's unusual.

 5              As far as these -- Ms. Rampersaud, Ms. Ramirez, Ms.

 6     Vargas?

 7              MR. SAAL:  Ms. Rampersaud and Dr. Vasile.

 8              THE COURT:  Okay.  If you can't work it out with

 9     this lawyer, you need to raise it with me tout suite, because

10     that's on the 10th that you have it.  It looks like we're

11     going to -- probably not going to get that long.  Plaintiff

12     looks like you're closing on compensatory damages on

13     Wednesday.

14              MR. McELFISH:  Somewhere around Wednesday, depending

15     on how we go between -- how fast we go between now and then.

16              THE COURT:  Well ...

17              MR. SAAL:  Your Honor, that does highlight another

18     issue that we really need a firm schedule or what plaintiff

19     intends to do.  For example, plaintiff listed as a full date

20     for this coming Monday our four investigators and our lifecare

21     plan, which we agreed to produce and arrange with our

22     witnesses but, you know, Dr. Thomas is going to be coming back

23     in to finish his direct and cross-examination.

24              THE COURT:  I don't know how it could be a full day

25     for the investigators and the lifecare planner.  Investigators
```

```
 1    are on and off.  The lifecare planner is not going to take

 2    that long.  So, even with Dr. Thomas, you can finish that.

 3               MR. SAAL:  Understood, Your Honor.  We just wanted

 4    to make sure that we can confirm that plaintiff intends to

 5    close their case at the end of the day Wednesday, so we can

 6    make sure, for example, this issue we're having with the West

 7    34th Street witnesses, that we tell them we want the witnesses

 8    beginning 9:30 on Thursday and that schedule doesn't get

 9    shifted if the plaintiff's case runs long.

10               THE COURT:  I don't know what to tell you, Mr. Saal.

11               MR. SAAL:  We're going to make every arrangement we

12    have to, Your Honor.  We're just trying to get some

13    clarification from plaintiff.

14               THE COURT:  Plaintiff, if all goes as planned,

15    plaintiff intends to close on Wednesday.

16               Yes, Mr. McElfish?  Wednesday or thereabouts is what

17    you said?  I don't know what that means.  Is it Friday?  Is it

18    Thursday?  Is it Tuesday?  You tell me.

19               MR. McELFISH:  I mean, we have given you a schedule.

20    We intend to try to stick to it; but there's been a lot of

21    time wasted by Mr. Saal and Mr. Barmen.  So, I don't know if I

22    can bring it in exactly as scheduled.  If they stop wasting

23    time, we will get there.

24               THE COURT:  Are you calling Dr. Kolb?

25               MR. McELFISH:  Not today.
```

```
 1              THE COURT:  Are you calling Mark Smith?

 2              MR. McELFISH:  Perhaps Monday.  I don't think in

 3   light of the ruling on qEEG that we need Mark Smith; but if

 4   Dr. Thomas testifies on Monday and all of a sudden there's

 5   some new objections about the qEEG Foundation or the reading

 6   of it or the interpretation of it, he may be needed.  I just

 7   don't know what they're going to come up with.  So I have to

 8   leave my options open as you've seen.

 9              The problem is I have all these witnesses ready to

10   go and I have done my best to get them in each day, but

11   there's just so much time being wasted.  Well, you know what

12   I'm saying.

13              THE COURT:  Who do we have today?

14              MR. McELFISH:  We have Mr. Provder first.

15              THE COURT:  And Ms. Kucsma.

16              MR. McELFISH:  And Dr. Kucsma.  And then after

17   lunch, we have Selenia Rivera; potentially in reserve Martin

18   Rivera; the reading of Dr. Lichy; and the video of Vincent

19   Stitzer.  That should be a day.

20              THE COURT:  Let's get that done today, and then

21   we'll figure out the remaining schedule.

22              MR. McELFISH:  Well, Monday's figured out.  Tuesday

23   I'm going to reserve all day for Dr. Mobin.

24              THE COURT REPORTER:  Doctor who?

25              THE COURT:  Mobin, M-O-B-I-N.
```

1          MR. McELFISH:  I saw the eyebrow -- I mean the

2     question as to why I would do that.  The reason is, is that my

3     experience, with a neurosurgeon or a main medical expert like

4     that, he has a lot of ground to cover.  He has to cover the

5     treatment and care as an expert.  He has to cover the bills.

6     As you know, nobody has agreed to the bills as they said they

7     would.  So, I'm going to put the bills in through Dr. Mobin.

8     We've got to get into future care.

9          Dr. Mobin also was the one witness that, due to his

10    qualifications, was in rebuttal to two or three of their

11    people.  So he's rebutting the radiologist, Dr. Provenzale;

12    he's rebutting their neurologist, Dr. Rabin; and he's

13    rebutting Dr. Casden, the orthopedic spine surgeon.  So that's

14    just going to just take some time.  If we finish with

15    Dr. Mobin early on Tuesday for some reason, we have Maria

16    Bauta; or I guess we can begin with Jose Bauta, one to two, to

17    get the day filled out on Tuesday.

18          THE COURT:  Andrew Casden is --

19          MR. McELFISH:  Defense expert.

20          THE COURT:  You're calling him on your case?

21          MR. McELFISH:  Absolutely.

22          THE COURT:  And he knows that?

23          MR. BARMEN:  Yes, Your Honor, he's all set.

24          THE COURT:  Let's get today done, and then we'll

25    figure it out.

```
 1              MR. McELFISH:  And I think I have enough for today.

 2              THE COURT:  That's -- what you've laid out is

 3   plenty.

 4              MR. McELFISH:  Great.

 5              THE COURT:  All right.  So let's get going then.

 6              MR. BARMEN:  Thank you, Your Honor.

 7              MR. SAAL:  Just once thing to clarify with the video

 8   deposition.  Does that mean you want the questioning we're all

 9   in courthouse and nobody is local with those witnesses?

10              THE COURT:  I would prefer that you be here.  You

11   need someone -- you have other people who are going to do the

12   questioning?

13              MR. BARMEN:  We'll be here, ready to roll.  If we

14   have somebody go there, that's somebody else.  We're not going

15   to take trial time for that, Your Honor.  We never intended

16   to.

17              THE COURT:  All right.  The questioning will be from

18   here, or will it be from there?

19              MR. BARMEN:  Well, Harold, Mr. Moroknek, was

20   intending to go to Myrtle Beach to meet with Mr. Blatt; but we

21   never intended that trial time would not be moving at the same

22   time, Your Honor.

23              THE COURT:  You need to make arrangements with --

24   the plaintiff's counsel should not be traveling.

25              MR. BARMEN:  No.  They will have the opportunity to
```

1   be here; but if Mr. Moroknek wants to go there, it's not going

2   to impact where they have to be.

3          MR. McELFISH:  Judge, one other what I would

4   categorize as a more real issue is:  This morning I received

5   updated calcs -- calculations -- from Dr. Kucsma just on the

6   issue of -- because when she was deposed, she did projections

7   based on the date of the deposition.  Obviously, when you get

8   to trial, every economist updates the calculations to shorten

9   the period, because you don't do that until trial, because you

10  don't know what the trial date's going to be or if it going to

11  move.

12         So, she simply actually, I think, lowered the

13  numbers because the future is shorter; and they object to this

14  somehow.  She's actually lowering the numbers because the

15  future is shorter than it was when it was at her deposition.

16         THE COURT:  Well, she lowered the future --

17         MR. McELFISH:  Right.

18         THE COURT:  -- but she increased the past.

19         MR. McELFISH:  Right.

20         MR. BARMEN:  And she also increased the projections

21  in terms of percentages.  So, the number is not lower.

22  Frankly, I -- the problem is we've known about this trial date

23  for quite sometime.  So, she could have certainly done this

24  months ago.  We got it this morning which means I really

25  haven't had an opportunity to look at anything other than the

```
 1   bottom-line number and we certainly haven't had an opportunity

 2   to have our expert take a look at it and she's testifying in a

 3   few hours.

 4          So, I would ask that she stick to what we know or

 5   she come back next week so I can have time to have my people

 6   look at it but she should not be permitted to come in and

 7   testify to something new that they knew about and could have

 8   given us and didn't until 8:00 o'clock this morning.

 9          THE COURT:  I don't understand how -- so she at some

10   point in time she said these are his -- this is his future

11   care.  From this point forward, this is the future care.

12          MR. McELFISH:  Right.

13          THE COURT:  That's what a lifecare planner does.

14          MR. McELFISH:  A year ago.

15          THE COURT:  A year ago.

16          MR. BARMEN:  She's not the lifecare planner.  She's

17   the economist.  She puts the number on the lifecare plan.

18   Mr. Provder is the lifecare planner.

19          THE COURT:  Okay.  Is the overall number greater in

20   this revised?

21          MR. BARMEN:  It went to 3.4 reduced to present

22   value.  So, I believe it is but, again, I haven't had time to

23   compare they because we just got -- I literally got the email

24   when I sat in this chair this morning.

25          THE COURT:  You have to explain it to Mr. McElfish.
```

LISA SCHMID, CCR, RMR

```
 1    I don't understand how the number can change, it become
 2    greater.  If all she's doing is calculating the future
 3    lifecare --
 4              MR. McELFISH:  Yes.
 5              THE COURT:  -- how can it be more now?
 6              MR. McELFISH:  I'd have to ask her, myself, because
 7    I was busy doing other stuff.  So, I can ask her.
 8              MR. MCEFLISH:  We don't have a huge day today.  So,
 9    maybe if we can just take a break after Mr. Provder, I can ask
10    her and maybe sort it out.
11              THE COURT:  Maybe -- yeah, okay.  You're going to do
12    Dr. Provder first?
13              MR. MCEFLISH:  It's, yeah, "mister," yes.
14              THE COURT:  Okay.  Let go.
15              THE CLERK:  Judge, the initial exhibits, they
16    haven't been filed online nor have they been handed to the
17    Court ask you asked.
18              THE COURT:  What's up with that?  I ask you every
19    night --
20              THE CLERK:  And he provide them --
21              THE COURT:  -- provide a copy of the exhibits to the
22    Court the following day.  Upload them.
23              MS. DIAMOND:  Your Honor, we were just waiting for
24    the little tabs that you guys wanted.  We had ordered some,
25    but they haven't all arrived.
```

LISA SCHMID, CCR, RMR

```
 1              THE COURT:  There's a place on Court Street.

 2              MS. DIAMOND:  Oh, okay.

 3              THE COURT:  Court Supply.

 4              MS. DIAMOND:  I didn't want to upload without them.

 5              (Clerk confers with the judge.)

 6              THE COURT:  And they'll replace it at the end of the

 7     trial.

 8              MR. SAAL:  Your Honor, they're not the files.

 9     They're only -- they're not the actual files.

10              (Discussion off the record.)

11              THE COURT:  If you've had five pages from

12     Plaintiff's Exhibit 164 --

13              MS. DIAMOND:  Uh-hum (affirmative response).

14              THE COURT:  -- that were received into evidence

15     separately, they should all be put together as Plaintiff's

16     164.

17              MS. DIAMOND:  Got it.  And upload as one.

18              THE COURT:  Uploaded as one.

19              THE CLERK:  As one exhibit, document, excluding the

20     pages that the judge removed from that document.

21              MR. BARMEN:  Your Honor, and --

22              THE COURT:  Wait until Mr. McElfish comes back,

23     please.

24              MR. BARMEN:  I didn't realize he left.  Sorry.

25              THE COURT:  When you're ready, let me know.  I have
```

```
 1    the answer.
 2             MR. BARMEN:  Could I ask real quickly to do
 3    something else my appellate guy's telling me I need to do it
 4    so I don't get in trouble?
 5             THE COURT:  Yes.
 6             MR. BARMEN:  I would just -- the defense would like
 7    to renew their objection and move to strike any testimony by
 8    Colonel Schmit -- Smith -- going to the issues of causation of
 9    the injuries and I just want to preserve that on the record.
10             THE COURT:  Okay.
11             MR. BARMEN:  Thank you.
12             THE COURT:  It's preserved.
13             Still leaving my option open to issue a limiting
14    instruction to the jury at the end of the case.
15             MR. BARMEN:  Understood.  Thank you, Your Honor.
16             THE COURT:  Although, as I said, I think you cleared
17    it up on cross-examination; and he did not disagree with you.
18             Do you want to say something about Dr. Kucsma?
19             MR. MCEFLISH:  Dr. Kucsma, yes.
20             THE COURT:  All right.
21             MR. McELFISH:  Just that she's here and she
22    basically said the number grows because it was one year less
23    discounting.  So, because the future is shorter, the number
24    grows because you discounted less; but it's still the same
25    analysis.  It's just a time calculation, and it discounts
```

```
 1    adjustment.
 2              MR. BARMEN:  I went to law school because I don't do
 3    numbers.  That's why I have an expert.  I don't -- I'm not
 4    saying I disagree with what he's saying.
 5              THE COURT:  If you have access to your expert, shoot
 6    him an email.
 7              MR. BARMEN:  He is on Pacific time right now.  He's
 8    back in -- I'm not going to hear back from him before she goes
 9    on the stand.  I emailed him immediately.
10              THE COURT:  Pacific time is 7:00 a.m.  So, let's see
11    what he says.
12              We'll go ahead with Mr. Provder.
13              Okay.  Let's get the jury, please.
14              MR. BARMEN:  Thank you.
15              (Discussion off the record.)
16              THE CLERK:  All rise.
17              THE COURT:  You may be seated.
18              MR. MCEFLISH:  Thank you.
19              THE COURT:  Good morning, ladies and gentlemen.
20              JURORS:  (All answer "good morning.")
21              THE COURT:  Call your next witness, Mr. McElfish.
22              MR. MCEFLISH:  Yes, Your Honor.  Thank you.
23              Good morning.
24              Plaintiff calls lifecare planner Edmond Provder.
25              Come on, Mr. Provder.
```

PROVDER/DIRECT/MCELFISH

```
1                    (Witness sworn.)

2              THE WITNESS:  I do, Your Honor.

3              THE COURT:  Okay.  Please be seated.

4              Mr. Provder, will you please state and spell your

5    name for the court reporter?

6              THE WITNESS:  Edmond, E-D-M-O-N-D, Alan, A-L-A-N,

7    Provder, P-R-O-V-D-E-R.

8              THE COURT:  You may inquire.

9                    DIRECT EXAMINATION

10   BY MR. MCEFLISH:

11   Q    Good morning, sir.

12   A    Good morning.

13   Q    Would you introduce yourself to the jury and tell them

14   what kind of expert witness you are.

15   A    Yes.  My name is Ed Provder.  I'm a rehabilitation

16   counselor.  Part of being a rehabilitation counselor is doing

17   what we call lifecare planning, which looks at the type of

18   care, and the cost of care somebody's going to require, due to

19   their injures and their impairments.

20   Q    Okay.  And if you would, please, tell the jury what

21   lifecare planing is.

22   A    Yeah.  Lifecare planning is a essentially a road map or a

23   blueprint that details the type of care and the cost of care

24   that somebody's going to require over their lifetime, due to

25   their injuries.
```

LISA SCHMID, CCR, RMR

PROVDER/DIRECT/MCELFISH

1              It looks at the type of equipment, supplies, medical

2    care, any surgery they may require, home care they may need

3    and what the cost is in their local geographical area.

4    Q    Thank you.

5              MR. McELFISH:  If you could slow down a little bit,

6    that would be great.  Thank you.

7    BY MR. McELFISH:

8    Q    Mr. Porvder, if would you, please, would you tell the

9    jury how long you've been doing this kind of work?

10   A    Yes, this is my 45th year as a rehabilitation counselor.

11   Q    All right.  And if you would, please, tell the jury a

12   little bit about your background, training and experience.

13   A    Okay.  I have a bachelors degree in rehabilitation

14   counseling from the Pennsylvania State University; masters

15   degree rehabilitation counseling from the Pennsylvania State

16   University.

17             After receiving my masters degree, I continued with

18   my education at New York University in the rehabilitation

19   counseling doctoral program, completing the 42 credits towards

20   a doctorate, only leaving my dissertation to be completed.

21   Q    Okay.  And are you licensed?

22   A    Yes.  I'm what is known as a certified rehabilitation

23   counselor, which is a national certification of rehabilitation

24   counselors.

25             In order to be certified, you have to be a graduate

LISA SCHMID, CCR, RMR

PROVDER/DIRECT/MCELFISH

1    of a masters level rehabilitation counseling program, Penn

2    State being one of the oldest programs in the country.  You

3    have to be supervised by a certified rehabilitation counselor.

4    You have to have a number of professional references, and most

5    importantly, you have to successfully complete an examination

6    which measures your knowledge in the field of rehabilitation

7    counseling.

8              I've been certified since the onset of certification

9    in 1974.  In order to maintained my certification, I've had to

10   complete one hundred course credit hours in a five-year period

11   since 1974, so every five years, another one hundred course

12   credit hours.  And I have been certified since then.

13             I am also what is known as a certified lifecare

14   planner, means that that I have taken a 128 course credit

15   hours in catastrophic injured individuals.  This was through

16   the University of Florida, a program called INTALCUS.

17             In addition, in order to be certified, you have to

18   have a number of years of experience.  You have to pass an

19   examination.  You have to have your lifecare plan reviewed by

20   your peers.  In fact, I believe I'm the oldest practicing

21   lifecare planner continuously practicing since the onset of

22   lifecare planning, in the early eighties.

23   Q    Thank you.

24             Mr. Provder, could you explain to the jury, please,

25   how rehabilitative counseling is related and needed in

LISA SCHMID, CCR, RMR

PROVDER/DIRECT/MCELFISH

1   lifecare planning?

2   A    Yes.  Well, a rehabilitation counselor is an individual

3   who's been educated and trained to work with people who have a

4   variety of disabilities or handicaps.  These could be physical

5   disabilities, emotional disabilities, cognitive disabilities,

6   sensory disabilities.

7           And what we do is, we've had training and experience

8   in working with individuals with these types of disabilities,

9   and we're able to provide what's called case management

10  services, which means that we work along with the individuals

11  to make sure they receive the necessary care they require due

12  to their disabilities or handicaps.

13          In order to have this expertise in a masters-level

14  rehabilitation counseling program, we have courses in

15  medicine, courses in the impact of injuries on people's

16  ability to function, and take we take a wide variety of

17  different course work:  Sociology, psychology, which brings

18  together all the necessary information needed to do

19  rehabilitation counseling and lifecare planning.

20  Q    And could you give the jury some idea of the various

21  institutions you actually worked for, such as the government?

22  A    Yes.  Okay.  Well, I started out after graduating from

23  Penn State in 1973 being employed as a rehabilitation

24  counselor at the Federation of the Handicapped, here in New

25  York City.

LISA SCHMID, CCR, RMR

PROVDER/DIRECT/MCELFISH

1              At the Federation, I was involved in a program

2    called the Higher Horizons for the homebound, which is a

3    program geared to people that has severe injuries, that

4    prevented them from going to work.

5              I was involved in providing counseling for them,

6    preparation for work, testing for them, but most importantly I

7    provided case managements services or for lifecare planning

8    services to about 250 individual that we had at home that were

9    involved in our program.

10             So did I that for about a year and-a-half, and then

11   became employed at Mount Sinai Hospital, Department of

12   Rehabilitation Medicine, here in New York City.  At Mount

13   Sinai, I supervised the vocational facilities.  I supervised

14   five professional staff members.  Worked as the liaison

15   counselor between the state vocational rehabilitation program

16   and the Mount Sinai vocational rehabilitation program,  and I

17   was a member of the rehabilitation team because I was in the

18   Department of Rehabilitation Medicine.

19             So I worked with a wide variety of individuals, both

20   who had been inpatient, as well as outpatient.  I also served

21   as a liaison between our rehabilitation medicine program and

22   the psychiatric program at Mount Sinai, working with both in

23   and outpatient individuals.  I was at Mount Sinai from 1974

24   through 1978, and again from 1979 to 1980.

25             Since 1978, I've had my own company called

PROVDER/DIRECT/MCELFISH

1    Occupational Assessment services, which provides

2    rehabilitation counseling services to people that have become

3    injured.

4            I work with a wide variety of different individuals,

5    individuals that have injured their backs, their necks, people

6    that have had brain injuries, peopled with emotional problems,

7    people that are in wheelchairs, every type of disability, and

8    provide what's called case management services, being that I

9    make sure they receive the necessary care they require, and I

10   develop -- in order to do that, we develop lifecare plans to

11   detail the type of care they're going to need and the cost

12   they're going to need on that care.

13   Q    And --

14   A    That brings me in addition -- one other thing.  Sorry.

15   In addition, I served as an expert for the federal government,

16   being called by -- the I'm sorry.

17           Being called by the federal government, the federal

18   U. S. Administrative Law Judges to render opinions as to the

19   employability of people seeking disability benefits.  In that

20   capacity, I served as an expert for the government on over

21   2500 occasions, being called as a witness for the government.

22   Q    Now you mentioned the term, "case management."

23   A    Yes.

24   Q    In the context of lifecare planning and in the context of

25   this case, sir, can you explain to the jury what you mean by

PROVDER/DIRECT/MCELFISH

1  case management?

2  A    Yes.  They'll see that when we talk about the lifecare

3  plan, there's a case manager as part of the lifecare plan.

4  And that person is a real important because they make sure

5  that the injured person receives the necessary care they

6  require.

7          The person serves as a liaison between the injured

8  party, and the various treating doctors, treating sources.

9  The person can also make changes in the lifecare plan

10  depending on the particular injured party's circumstances.

11  The person may get worse, need more care.  They get better,

12  they may not need all the care.

13          So this person works closely with the injured party,

14  make sure they receive the necessary care.

15  Q    Okay.  Thank you.

16          Now, let's talk about this case.  What were you

17  retained -- what was the scope of your retention by my law

18  firm in this case?

19  A    Yes.  Well, I was asked to create a lifecare plan for Mr.

20  Bauta, given his injuries.

21  Q    And what were you asked to do in that regard?

22  A    Well, I did what we call a lifecare plan, and that's a

23  five-step process.

24          The first part of the process involves reviewing

25  various records that were forwarded to me.  As you can tell

PROVDER/DIRECT/MCELFISH

1    from my binders, there were a lot of records in this case.

2            Secondly, I conducted what we call a standard

3    diagnostic interview to obtain information regarding

4    Mr. Bauta, his age, his medical condition, the treatment that

5    he's received, his complaints that he has.

6            Then based on that information and my experience as

7    a case manager and rehabilitation counselor, I put together a

8    lifecare plan  detailing all the different types of care I

9    thought he would need, given my experience, not only now but

10   into the future.

11           In order to do that, I also have various records at

12   the time and records after I did my lifecare plan from

13   physicians that detailed -- that basically agreed with my

14   findings.

15           Then what once I formulated the lifecare plan, I

16   then did research.  This is a very important part of the

17   lifecare plan in that I went out and looked at the cost of

18   care that he was going to require in his geographical area,

19   here in New York City.  I contacted anywhere from three to

20   five different vendors of each service to find out what their

21   cost would be.

22           Say for example, once the of things he needed would

23   be an orthopedic doctor an orthopedic surgeon.  So I contacted

24   -- first, I started with his treating doctors and then worked

25   outward to find out what the cost is for an orthopedic surgeon

 1   in his geographical area.

 2          And I like I said, what we then did -- what I then

 3   did is provided a range of costs, including the person who is

 4   the lowest cost and the person that's the highest cost,

 5   because given the range the low cost person may not available

 6   when he needs the service or the high cost person may not

 7   available when he needs the service.  So I provide the entire

 8   range.

 9          Based on all that material, I then formulated my

10   opinion as to his employability -- I'm sorry, as to his

11   lifecare planning needs, longterm medical care needs and the

12   cost of these items.

13   Q    Okay.

14          THE COURT:  Mr. McElfish, you want to offer him as

15   an expert?

16          MR. McELFISH:  Oh, yes, sir.  I was actually about

17   to do that and I forgot.  Okay.

18          At this point, Judge -- thank you -- the plaintiff

19   offers Mr. Provder as an expert in lifecare planning and case

20   management.

21          MR. BARMEN:  No objection.

22          THE COURT:  He will receive testimony from Mr.

23   Provder as an expert in lifecare planning and case management.

24   BY MR. McELFISH:

25   Q    Now, you mentioned -- and I want to go through the steps

PROVDER/DIRECT/MCELFISH

1   of what you did for the jury.  When you talked about the

2   review of records, can you -- are you able to remember all the

3   records that you reviewed?

4   A    Well, that's why I have them in front of me.  So I -- not

5   specifically, but I can give you a general analysis of what I

6   reviewed.

7   Q    So per permission of the Court, if you had a list of the

8   records you reviewed, would that refresh your recollection?

9   A    Sure.

10          MR. McELFISH:  Your Honor, may the witness rely upon

11   them?

12          THE COURT:  Why don't you give us your general

13   recollection first?

14          THE WITNESS:  Yes.  I had hospital records.  I had

15   treating physician reports.  I had consultative physician

16   reports.  I had diagnostic tests.  I had reports from pain

17   management.  I had physical therapy records.

18          I also, after I did my evaluation, received various

19   depositions and consultative records.

20   BY MR. McELFISH:

21   Q    Did you have surgical records?

22   A    I did.

23   Q    And did you have records from the treating surgeons?

24   A    I did.

25   Q    You had depositions the of parties?

PROVDER/DIRECT/MCELFISH

1    A    I did.

2    Q    And with experts and treating doctors?

3    A    Yes.

4    Q    And I believe -- and we'll get to it later -- you also

5    had the reports of the defense witness in this case, Ms.

6    Cummings --

7    A    Yes.

8    Q    -- who is a lifecare planner?

9    A    Yes.

10   Q    Okay.  Were you provided with any records of any injuries

11   he may have had prior to the accident?

12   A    No.

13   Q    Okay.  Now, what's the -- after the review of records,

14   what's the next thing that you did in forming your opinion?

15   A    Yes.  I did what we call a standard diagnostic evaluation

16   of him.  Basically, I sat down.  I spoke with him for a period

17   of time in my office here in New York City, and gathered

18   information.

19   Q    Okay.  And can you say for the jury how long it took you

20   to go through all the medical records?

21   A    Well, the reports are voluminous, but I would say -- and

22   I review records about two to three times before I write my

23   report, so I'd say at least a good six to ten hours.

24   Q    Okay.  And how long was the diagnostic interview?

25   A    The interview itself was an about a hour and-a-half.

PROVDER/DIRECT/MCELFISH

1   Q      And how many times did you interview him?

2   A      One occasion.

3   Q      Okay.  Do you need more than one?

4   A      No.

5   Q      Okay.  What did you do after the diagnostic interview?

6   A      Yes.  Then I set aside as the -- detailed the items or

7   their road map of the items that he would need.  And then

8   after that, I then researched the cost of those items.

9   Q      Okay.  And if you could, please, before we get to the

10  items, can you tell the jury your methodology and how it is

11  you actually end up with the costs?  I know you said earlier

12  you get the high and low, but how do you actually do that,

13  database or a phone?

14  A      Sure.  No problem.

15         Well, methodologies are important.  As I'm

16  indicated, I believe I'm the longest practicing, longest

17  continuously practicing lifecare planner, starting in the

18  early eighties, being trained by the person who founded the

19  field of lifecare planning.

20         And the methodology that we trained to do, which I

21  still do today, is to look at the cost of the items in their

22  geographical area.  So if you have an individual in the New

23  York City area, all the costs are going to be researched in

24  their geographical area here in New York City.

25         What I start with is I start with the treating

LISA SCHMID, CCR, RMR

PROVDER/DIRECT/MCELFISH

1    doctor and I try to get the cost of the care that the treating

2    doctor provides, both the initial cost for initial evaluation,

3    as well as the follow-up costs.

4            A lot of the people that I work with, such as

5    Mr. Bauta, have significant or severe injuries.  So they may

6    require more period of time for medical care than just a

7    follow-up visit, so provide both, the initial and the

8    follow-up cost.

9    Q    Do you use a database or do you physically call to get

10   the numbers?  How do you do that?

11   A    Physically call.  I have a contact sheet for everybody I

12   contacted.  I do the calls myself, personally.  And I find

13   out, again, I start with the treating doctors.  I Then --

14   nothing very scientific.  I use Google, and try to find

15   doctors that have the same training that I'm looking for --

16   orthopedic surgeons, physical medicine and rehabilitation

17   doctors -- and then look at the cost of care they're going to

18   provide.  I actually contacted them, talked to somebody in

19   their office and find out what the costs are.

20   Q    What did you do next?

21   A    Well, after I did that, I -- after I found the cost, I

22   actually formulated the lifecare plan.  I put everything into

23   a chart format.

24           The lifecare plan is developed so that it's easy to

25   be understood.  And also, very important is the fact that the

PROVDER/DIRECT/MCELFISH

1   lifecare plan is what we call a preventative plan, meaning

2   that there's various evaluations built into the plan to

3   prevent complications that can occur into the future.

4           So the -- there's no cost at the end of the plan for

5   complications because the theory in a lifecare plan is that if

6   the person in an actual lifecare plans and follows it, that

7   there won't be any complications that can occur.

8   Q    Before we continue further into the lifecare plan, I just

9   briefly want to go back to the records for foundation.

10          Did you review a report by Dr. Sabastian Lattuga?

11  A    Yes.

12  Q    Okay.  Do you have an understanding as to who he is?

13  A    Yes.  He works for the same group where Mr. Bauta

14  receives his medical care.

15  Q    Is that the Dr. Cordiale's group, the surgeon?

16  A    Yes.

17  Q    Okay.  And to your understanding, was Dr. Lattuga the

18  treating doctor in this case or an expert?

19  A    I believe he's an expert.

20  Q    Okay.  And did you also review the reports and records of

21  Dr. Fardad Mobin?

22  A    Yes.

23  Q    And what's your understanding as to who Dr. Mobin is?

24  A    He's a neurosurgeon.  He's also an expert.

25  Q    Okay.  Did you speak to either -- in formulating the

PROVDER/DIRECT/MCELFISH

1    foundation for your opinions, did you speak to either

2    Dr. Lattuga or Dr. Mobin?

3    A    Dr. Mobin.

4    Q    And when did you do that?

5    A    I did it when I found out he was added, had written a

6    report, and he had gotten my lifecare plan, and I basically

7    went over the lifecare plan with him, and he essentially

8    agreed with my findings.

9    Q    October.  So you received Dr. Lattuga's report and then

10   you wrote your report?

11   A    Yes, sir.

12   Q    And then after you wrote your report, you received

13   Dr. Mobin's reports?

14   A    Yes, sir.

15   Q    And did you change your report based on what Dr. Mobin's

16   report said?

17   A    No, sir.

18   Q    Can you tell the Court and the jury why not?

19   A    Yes.  Well, Dr. Mobin basically had one particular area

20   that he did not agree with my lifecare plan that Dr. Lattuga

21   had that dealt with surgery, a cervical surgery.

22          And I left it in there because I didn't change the

23   lifecare plan because I believe it's left to the fact finders

24   as to whether he's going to require that surgery or not, those

25   services or not.

PROVDER/DIRECT/MCELFISH

```
1    Q    To be clear -- to be clear, the only area of disagreement

2    between Dr. Lattuga and Dr. Mobin was that Dr. Mobin

3    believed -- Dr. Lattuga believed that Mr. Bauta needed future

4    cervical or neck fusion and Dr. Mobin did not believe he

5    needed neck fusion?

6    A    True.

7    Q    Everything else the same?

8    A    Yes.

9    Q    Do you have an understanding as to whether or not

10   Dr. Lattuga streeted Mr. Bauta?

11   A    He did not.

12   Q    Do you have an understanding from his report that he

13   stated he did?

14   A    Yes.

15   Q    And what's your understanding of that?

16   A    Well, from what I understand, that was a typographical

17   error that his group treated Mr. Bauta, but not Dr. Lattuga.

18   Q    And last question on the subject, how many records and

19   reports did you review from Dr. Cordiale who actually treated

20   Mr. Bauta?

21   A    Many.  I believe I had contact sheets, records from every

22   visit, I believe.

23   Q    Okay.  So, getting back to the lifecare plan itself, do

24   we begin at projected evaluations with rehabilitation, plan

25   development?
```

1   A     Yes, sir.  Just give me a second.

2   Q     Sure.

3   A     (Perusing documents.)

4         Yes, sir, do you want to go through each one?

5   Q    Well, let's begin with your opinions on the future for

6   Mr. Bauta with respect to -- let me withdraw that.  Let me ask

7   a better question and withdraw that.

8         What -- first of all, what is rehabilitation  plan

9   development?

10  A    Rehabilitation plan development is essentially the

11  lifecare plan.  We did the first one -- I did the first one

12  already.  That's the one we're going to talk about.

13        But Mr. Bauta should be evaluated once every five

14  years to monitor his condition, to see whether there are any

15  changes in his condition as time goes on.

16        As I indicated we'll talk about this the next page,

17  but there's a case manager also in the case to supervise,

18  provide case management services.  So therefore, the lifecare

19  plan could be changed before the five-year period, if

20  necessary.

21        But this is a point in time where the case manager,

22  Mr. Bauta, and his doctors look at his care, and look at what

23  he's going to need into the future for the next five years.

24  Q    Mr. Provder, I apologize.  I want to go back on

25  foundation one more minute.

1          Based on the records you reviewed, sir, from Dr.

2   Cordiale and all the treating doctors, the hospitals, did you

3   have an understanding when you met with Mr. Bauta as to what

4   injuries he had?

5   A    Yes.

6   Q    And can you tell the jury, please, what your

7   understanding was of his injuries from the -- was from the

8   records and at the time you met him?

9   A    Well, he reported that due to the accident, he sustained

10   an injury to his head, his neck, his low back.

11   Q    Okay.  And did you have an understanding, sir, as a

12   lifecare planner as to what kind of prolonged treatment he

13   underwent?

14   A    Yes.  He had two surgeries on his back.  He's had pain

15   management.  He's had epidural injections.  He received

16   physical therapy.  He's received psychological service.  He's

17   received neuropsychological services.

18   Q    Do you have an understanding as to the surgery being a

19   fusion, a double-level fusion?

20   A    Yes.

21   Q    Okay.  Now, can you tell the jury -- going back to

22   rehabilitation plan development, can you tell the jury how

23   much you believe it would cost to have Mr. Bauta evaluated one

24   time every five years?

25   A    Yes.  The cost every five years is $3,500.

```
 1    Q     Okay.  And is that something you believe he needs?

 2    A     Yes.

 3    Q     Can you tell the jury why?

 4    A     Yes.  As I indicated, good practice is to evaluate the

 5    individual on a regular basis -- once every five years is the

 6    standard -- to make a determination of what his condition is,

 7    whether there are any changes required in the lifecare plan.

 8    Q     So if, for instance, you evaluate him five years from

 9    nows and he gets better or he gets worse, you might need to

10    make an adjustment?

11    A     Yes.

12    Q     Can you the jury an example of how that might happen,

13    what might happen?

14              MR. BARMEN:  Objection.

15              THE COURT:  Overruled.

16    A     Well, his pain can intensify and he needs -- could need

17    more self-care.  He may get worse.  He may need other types of

18    positioning devices.  He -- right now, he uses a cane.  There

19    may be other types of devices, just depends on how his

20    condition progresses as he gets older.

21    Q     And what's your understanding, if you can tell the jury,

22    please, what his age is now?

23    A     Yes.  I believe he's 42.

24    Q     Oh.  So let's go to the next item.  Is it physical

25    therapy?
```

LISA SCHMID, CCR, RMR

1    A    Yes.  These are evaluations.  He should be evaluated once

2    a year to see what his physical status is.  You're going to

3    see that I have physical therapy as part of the plan, the

4    actual therapy itself, for a diminished period of time, but he

5    should be a evaluated on a yearly basis to see if he requires

6    additional therapy treatments.

7    Q    Okay.  And to your understanding, Mr. Provder, has

8    Mr. Bauta to date underwent -- undergone significant physical

9    therapy?

10             MR. BARMEN:  Objection.

11             MR. McELFISH:  Let me rephrase, withdrawn and

12   rephrase.

13   BY MR. McELFISH:

14   Q    Mr. Provder, have you reviewed numerous physical therapy

15   records where Mr. Bauta has undergone physical therapy to now?

16   A    Yes.

17   Q    So in terms of you as a lifecare planner predicting

18   future care for physical therapy, is that a pretty easy one

19   for you?

20             MR. BARMEN:  Objection.

21             THE COURT:  Sustained.  Rephrase.

22   BY MR. McELFISH:

23   Q    And I guess --

24             MR. McELFISH:  Okay.  I will rephrase, Judge, thank

25   you.  But I'll broaden the question.

PROVDER/DIRECT/MCELFISH

```
 1    BY MR. McELFISH:
 2    Q    If someone's receiving services, medical services,
 3    therapy now or recently, as a lifecare planner, do you feel
 4    the probability of that need is much higher?
 5              MR. BARMEN:  Objection.
 6              THE COURT:  Overruled.
 7    A    Yes.
 8    BY MR. McELFISH:
 9    Q    Okay.  Now, going back to physical therapy, one time a
10    year for the re-eval, right?
11    A    For an evaluation.  Yes, sir.
12    Q    Okay.  Can you give the jury an idea of what in your vast
13    experience you believe that cost would be?
14    A    Yes.  This is based on my research.  The cost range for
15    anywhere from $145 to $350 for the evaluation.
16    Q    Okay.  And that, again, was arrived at by making some
17    phone calls and some contact sheets?
18    A    True.
19    Q    Let's go to next item:  Neuropsychological evaluation?
20    A    Yes.
21    Q    What is that?
22    A    Neuropsychological evaluation is testings on Mr. Bauta,
23    to see how he's functioning from a neuropsychological
24    standpoint.
25              There are two evaluations.  First is at the
```

LISA SCHMID, CCR, RMR

PROVDER/DIRECT/MCELFISH

```
 1   beginning.  It's what we call a baseline evaluation, that I've
 2   recommended as part of the therapeutic modalities.
 3               Cognitive rehabilitation, which is treatment or
 4   therapy or treatment to help him compensate for his
 5   neuropsychological impairments.  And after that, therapy is
 6   completed the cognitive rehabilitation, then a second
 7   evaluation or neuropsychological evaluation is done to see
 8   what progress he has made in the cognitive rehabilitation.
 9               So we have a baseline and now we have the second one
10   that's done to measure his progress to see whether he needs my
11   more therapy.
12   Q    Thank you.  I just want to point out one other sort of
13   scope of your testimony issue.  You're here to determine the
14   needs of Mr. Bauta and the cost of those needs and their
15   present value, correct?
16   A    Yes.
17               THE COURT:  Overruled.
18   BY MR. McELFISH:
19   Q    You're not here to make any projections as to what the
20   cost would be say, 20, 30 or 40 years from now?
21   A    It's out of my area of expertise.
22   Q    You understand Dr. Kucsma --
23               THE COURT:  Sustained.
24   BY MR. McELFISH:
25   Q    Can you give the jury, please, the pricing -- withdrawn.
```

1          On the neuropsychological evaluations, what is the

2    frequency that you believe he needs them?

3    A    Need two times only, one is a baseline, one after therapy

4    is completed.

5    Q    Okay.  And do you know when that will be?

6    A    Well, I recommend a period of therapy for I believe it's

7    three years.  So, that would be before when therapy starts and

8    when therapy ends.

9    Q    Okay.  And can you give the jury, please, an idea of

10   the -- call it baseline costs?

11   A    Yes.

12   Q    Or ranges for that service?

13   A    Yes.  The cost per evaluation is $1600 to $4,200 per

14   session or per testing, and the total cost would be $3,200 to

15   $8,400.

16   Q    Thank you.  Now, the next one is case manager,

17   rehabilitation counselor?

18   A    Yes.

19   Q    Can you tell the jury what that is?

20   A    Yes.  As I previously explained, a case manager is

21   somebody who works with Mr. Bauta, who the person is usually a

22   rehabilitation counselor or a nurse case manager, to make sure

23   that he's received the necessary care as noted in the lifecare

24   plan, to serve as liaison between Mr. Bauta and his treating

25   doctors or any prospective new doctors.

PROVDER/DIRECT/MCELFISH

1    Q    Okay.  I want to make the distinction between the items

2    you just testified to a minute ago and the ones that are

3    coming.  The ones that you have already testified to are just

4    the evaluations themselves, not the treatment?

5    A    That's actually correct.  As I indicated before, the

6    purpose of the lifecare plan is to prevent complications from

7    occurring, so in order to do, there are various evaluations

8    that are built into the plan.

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROVDER/DIRECT/McELFISH

1   BY MR. McELFISH: (Continuing.)

2   Q    Mr. Provder, after the evaluations and now in particular

3   we're talking about the actual treatment that he's going to

4   need?

5   A    Yes, sir.

6   Q    And, so, for the rehabilitation counselor aspect, do you

7   have a frequency for how often you think that needs to occur?

8   A    Yes.  It would be two to four hours four times a year.

9   Q    And do you have a researched cost for what that would be?

10  A    Yes.  The cost ranges from $125 to $180 per hour.  The

11  total cost per year would be 1,000 to $2,880 per year.

12  Q    Now, with respect to physical therapy that you believe he

13  needs -- we all know what physical therapy is.

14  A    Yes, he was receiving physical therapy at the time I saw

15  him.

16  Q    Mr. Provder, can you give the jury an idea of what you

17  believe is reasonable for Mr. Bauta to receive for physical

18  therapy into the future?

19          MR. BARMEN:  Objection.

20          THE COURT:  Overruled.

21  A    Yes.  I recommend Mr. Bauta receive two years of physical

22  therapy three times a week for 48 weeks and I use a 48-week

23  year, you'll see that noted.  It's what we call a clinical

24  year because people get sick, clients get sick, therapists go

25  on vacation and so on.  So my I use a 48-week clinical year so

SOPHIE NOLAN, CSR

1  my recommendation is two years, three times a week for 48

2  weeks.

3          THE COURT:  When did you see Mr. Bauta?

4          THE WITNESS:  I saw Mr. Bauta on -- let me get the

5  exact date.  September 14, 2015, over two years ago.

6          THE COURT:  Okay.

7  Q    The next item is psychological therapy?

8  A    Yes.

9          MR. BARMEN:  Objection Your Honor.  Sidebar.

10          THE COURT:  Sure.

11                  (Sidebar held outside of the hearing of

12  the jury.)

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
 1              (Sidebar.)

 2              (The following sidebar took place outside the

 3   hearing of the jury.)

 4              MR. BARMEN:  We're going to have an issue on a lot

 5   of this stuff because the law in New York is pretty clear.

 6   Mr. Bauta is not in psychotherapy now.  The law in New York

 7   states if he's not having that treatment, it cannot be part of

 8   any future care plan or costs as associated with that plan.

 9   Future economic injuries including medical expenses must be

10   proven with reasonable certainty.  The plaintiff may not

11   recover damages for the costs of future medical treatments

12   where he has not either previously received the treatment,

13   terminated such treatment or failed to offer any testimony

14   that he intends to seek it.  There's not going to be one

15   person that's going to come in here and say he needs

16   psychological treatment going forward.

17              MR. McELFISH:  And Ms. Cummings.

18              MR. BARMEN:  They're not doctors.  They're not

19   capable of making the recommendation.  He doesn't have a

20   physician that's treating him in any type of psychotherapy.

21   He is having cognitive therapy with Dr. Thomas.  He hasn't yet

22   said he needs it going forward.  I know on Monday he will but

23   the law is clear in New York.  He can't get damages for

24   treatments he's not having.

25              MR. McELFISH:  May I respond to that?
```

SIDEBAR

```
 1              THE COURT:  Yes.
 2              MR. McELFISH:  First of all, this is his ambush
 3    style.  They could have talked to me about this.  They could
 4    have filed a motion or a brief.  They wait until the witnesses
 5    get on the stand and they come up with this case law that is
 6    most likely inaccurate, which it always is, and
 7    misrepresenting the holdings in this case, and the facts in
 8    this case are that he has received everything that Mr. Provder
 9    is testifying to and with the required certainty, or whatever
10    it was, he will need it in the future.
11              THE COURT:  Didn't he just testify that he needs a
12    neuropsych evaluation?
13              MR. BARMEN:  Yes.
14              THE COURT:  Which he already had.
15              MR. BARMEN:  He had already had more than says he
16    needs.
17              MR. McELFISH:  He needs it in the future.
18              THE COURT:  He needs an initial neuropsych
19    evaluation in the future when he's already receiving treatment
20    from Dr. Thomas?
21              MR. BARMEN:  He's had four neuropsych evaluations,
22    Your Honor.  I'm not going to respond to the personal attacks.
23
24              THE COURT:  You cite the law on what the damages are
25    and we will put it in the final jury charge.
```

SIDEBAR

```
1            MR. McELFISH:  If it's the law.

2            THE COURT:  And the jury will make its

3    determination.  You are going to cross him on all of this

4    stuff.  He has had it already and he does not need it again

5    and I will instruct the jury.

6            MR. BARMEN:  That's fine and I will do that, but

7    based on needing to preserve my record I will make the same

8    objection every time he goes into an area that he's not being

9    treated for or that no one has recommended that he needs other

10   than the life care planner.  I'm not going to need a sidebar

11   every time, but I'm going to make my objections.

12           THE COURT:  Okay.

13           MR. McELFISH:  Can we have it -- I try to give

14   issues up front.  Is there any way they can stop ambushing me

15   in the middle of my expert's testimony?  They've had this

16   report for two or three years.  They blew it off on motions in

17   limine.  The man is on the stand and they're interrupting the

18   proceedings and wasting time.  Again, this is a waste of time.

19           MR. BARMEN:  Mr. McElfish never ceases to remind me

20   that he's very familiar with New York law because he practiced

21   here --

22           MR. McELFISH:  I'm still licensed here.

23           MR. BARMEN:  -- I think.

24           MR. McELFISH:  I think you misinterpreted the law or

25   Mr. Saal has, as he usually does.
```

SIDEBAR

```
 1              MR. BARMAN:   We don't know what he's going to

 2    do --

 3              THE COURT:  Stop talking, all of you.  Continue with

 4    the examination.  Make your objections, cross-examine him.

 5    Show the jury where he is saying he needs things that no

 6    medical provider has said he needs.  It will make him look

 7    silly in front of the jury.  Propose that as a final jury

 8    charge and we will deal with it.

 9              MR. McELFISH:  Your Honor, can he have a running

10    objection so it's not interrupting every time?

11              THE COURT:  Do you want to agree that there is a

12    running objection to every question he poses to your expert?

13              MR. McELFISH:  No, I do not, but I'm trying to

14    figure out a way to avoid the interruptions is all.  Never

15    mind.  I'm trying to be nice and it back fires.

16              MR. BARMEN:  You're always very nice.

17              (Sidebar ends.)

18              (Continued on next page.)

19

20

21

22

23

24

25
```

```
 1                    (In open court.)
 2                    MR. McELFISH:  Proceed?
 3                    THE COURT:  Yes.
 4                    MR. McELFISH:  Thank you.
 5     BY MR. McELFISH:
 6     Q     On the psychological therapy, is that where we were?
 7     A     Yes.
 8     Q     What do you think he needs into the future?
 9     A     Yes, my recommendation was once every two weeks.  That
10     was the frequency he was being treated at the time I saw him,
11     for a total -- it should be a five-year period.
12     Q     Okay.  And what's the cost for that for the jury?
13     A     The cost ranges anywhere from $60 at the low end to $250
14     at the high end with the yearly cost of $1,440 to $6,000 per
15     year.
16     Q     Okay.  And the defense, Ms. Cummings, has also said he
17     needs some of the same care; correct?
18                    MR. BARMEN:  Objection.
19                    THE COURT:  Sustained.
20     Q     You've read some of Ms. Cummings' report?
21     A     Yes.
22                    MR. BARMEN:  Objection.
23                    THE COURT:  Sustained.
24     Q     Let's go to cognitive therapy.  What is that?
25     A     Cognitive therapy is both counseling as well as various
```

1    tasks to allow a person to compensate for their cognitive

2    limitations, their impaired concentration, memory and so

3    forth.  And it's done -- as I said, a baseline

4    neuropsychological testing is done at the beginning and at the

5    end of the therapy, neuropsychological testing is done at the

6    end to measure the person's progress based on the therapy.

7    Q     And how much do you think he needs?

8    A     The cost is -- well, the frequency is twice a week for 48

9    weeks.  The cost ranges from 95 to $200 per session.  So the

10   total amount is $9,120 dollars to $19,200 per year.

11   Q     Thank you.  Now, let's get into medical stuff if you

12   don't mind.  What's a physiatrist?

13   A     A physiatrist is a doctor of physical medicine and

14   rehabilitation who specializes in working with people that

15   have significant impairments or chronic impairments, to

16   monitor their conditions as well as to make recommendations

17   regarding therapy and any other types is of treatment

18   modalities that person may require.

19   Q     Would that include pain management?

20   A     It could.

21   Q     Okay.  All right.  And how much physiatry or pain

22   management to you believe he needs?

23           MR. BARMEN:  Objection.

24           THE COURT:  Overruled.

25   A     Yes.  Well I divided them up.  Physical medicine and

1  rehabilitation would be twice a year.  The cost ranges from

2  150 to $1,000 per year.

3  Q    Okay.  And I don't know if I asked you this, but for how

4  long?

5  A    Well, these are for his life, for life.

6  Q    So from now on it's not for two years, it's for life?

7  A    Correct.

8  Q    Okay.  Internal medicine, and from a life care planning

9  point of view, what is it?

10 A    Yes, well, we all know that we should see an internal

11 medicine or a general practitioner on a yearly basis, but

12 because of Mr. Bauta's condition, his injuries, it's more

13 important for him to see internal medicine doctor on a regular

14 basis.  So I recommend a yearly evaluation.  The cost ranges

15 from 75 to $300 per year.

16           MR. BARMEN:  Objection, move to strike.

17           THE COURT:  Doctor, doesn't everyone need to see

18 their doctor at least once a year?

19           THE WITNESS:  Yes, everyone should see a general

20 practitioner, internal medicine doctor, once a year, yes, Your

21 Honor.

22           THE COURT:  So even without this accident Mr. Bauta

23 should see an internal medicine doctor once a year?

24           THE WITNESS:  That's true.

25           THE COURT:  Okay.  Overruled.

```
 1   BY MR. McELFISH:

 2   Q     You have next neurosurgeon?

 3   A     Yes.

 4              MR. BARMEN:  Objection.

 5              THE COURT:  Overruled.

 6   Q    We know what a --

 7              MR. McELFISH:  Is there an objection?

 8              THE COURT:  There was.  It was overruled.

 9   Q     We know what a neurosurgeon is.  How many in his

10   lifetime?  What does he need?

11   A     Well, it's 12 times a year, basically once a month.  The

12   cost ranges from $2,640 to $9,000 per year.

13   Q     And what is the cost you have associated with that?

14   A     Yes.  Well, the cost of the initial evaluation is 240 to

15   $750.  Followup are 220 to $400.

16   Q     Mr. Provder, can you slow down a little bit?  Start over

17   on that one if you don't mind.

18   A     They changed court reporters.  So anyway, the initial

19   evaluation is $240 to $750.  The followup is $220 to $400 with

20   the yearly amount of $2,640 to $9,000.

21   Q     And that's based on your estimation of cost here in the

22   New York City area?

23   A     Yes, sir.

24   Q     Orthopedist, we know what that is.  How often does he

25   need it?
```

PROVDER/DIRECT/McELFISH

```
 1              MR. BARMEN:  Objection.
 2              THE COURT:  Overruled.
 3   A    Four times a year.  Cost ranges from 150 to $500 for the
 4   initial evaluation; followup, 75 to $250 for a yearly cost of
 5   $300 to $2,000.
 6   Q    Okay.  I see now we have pain management here.  How often
 7   does he need that?
 8   A    That's what he was seen -- the pain management doctor was
 9   12 times a year, once a month.  Initial evaluation was 240 to
10   $650.  The followup, 150 to $225 for a yearly total of $2,550
11   to $11,050.
12   Q    I note the MRIs next.
13   A    Yes.
14   Q    These are over his lifetime for -- beginning with his low
15   back, how many MRIs does he need?
16   A    Once every three years.  The cost per year would be 116
17   to $443.
18   Q    I note that you have MRIs for cervical.  How many does he
19   need?
20   A    The same frequency; once every three years, same cost,
21   $115 to $433.
22   Q    Okay.  I see that you have X-rays.  How often?
23   A    Yes, they would be twice a year.  The cost is $46 to $110
24   with the lumbar area and the total cost per year would be $92
25   to $220.
```

PROVDER/DIRECT/McELFISH

1  Q     And what about for the cervical?

2  A     Cervical spine would be once a year.  The cost is $60 to

3  $110 per year.

4  Q     What's an EMG study?

5  A     It's a nerve conduction study of either the arms or the

6  legs.  The recommendation would be for his legs to see whether

7  he has any neurological problems of the lower extremities.

8  Q     Cost -- sorry, frequency?

9  A     Once every two years.  The cost would be 225 to $750 per

10  year.

11  Q     We, we meaning all of us including the jury, heard from

12  Dr. Terrence Winn yesterday about pain management and epidural

13  injections and a series of those injections of three series

14  under the standard of care, can you say tell the jury please

15  here how much of that treatment Mr. Bauta will need into the

16  future?

17            MR. BARMEN:  Objection.

18            THE COURT:  Overruled.  Is this part of the

19  continuing objection?

20            MR. BARMEN:  This is different.  It is, but there's

21  a different issue in addition.  Would you like me to

22  articulate?

23            THE COURT:  Yes.

24            MR. BARMEN:  Dr. Winn testified that he hadn't come

25  back for many, many months and he had to contact --

1              MR. McELFISH:  Judge.

2              THE COURT:  Let's do it at sidebar.

3                        (Sidebar held outside of the hearing of

4    the jury.)

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
1                (Sidebar.)

2                (The following sidebar took place outside the

3       hearing of the jury.)

4                MR. BARMEN:  I think by articulating he means

5       grounds.

6                THE COURT:  It was my fault.

7                MR. BARMEN:  Dr. Winn did not testify -- the actual

8       pain management doctor did not testify that Mr. Bauta needs

9       additional blocks in the future.  In fact, he's no longer

10      treating him.  There is no doctor other than Lattuga, which

11      we'll deal with, who has recommended any type of pain

12      management going forward.  So as he's not being treated for it

13      and he has no prescription for it, it's not appropriate and

14      it's contrary -- and part of my objection was Mr. McElfish set

15      this up with Dr. Winn as if to suggest that Dr. Winn agrees

16      that this man needs pain management when his testimony was

17      actually the opposite.

18               THE COURT:  Cross-examine him on it.

19               MR. BARMEN:  I need to preserve my record.

20               MR. McELFISH:  May I preserve my record?

21               THE COURT:  Yes.

22               MR. McELFISH:  This is all false, Judge.  I'm tired

23      of them telling you things that aren't true.  Dr. Mobin, an

24      expert witness, talked about the future pain management that

25      he needs.
```

SIDEBAR

1          THE COURT:  And he also talked about the fact that

2     he doesn't need cervical surgery, but your guy here says that

3     he does.

4          MR. McELFISH:  It has nothing to do with pain

5     management.

6          THE COURT:  You're talking about false.  Don't throw

7     things and like that around because they come back to bite you

8     in the ass.  You are saying that what this guy is saying is

9     false.  He is saying he needs difference surgery.

10         MR. McELFISH:  That's a difference in opinion

11    between experts, please.

12         THE COURT:  I am going to allow you to make an

13    objection, all right.  Do not state the basis for it.  I will

14    make a ruling.  If you absolutely need a sidebar, fine.  If it

15    is one person testified differently, whatever, you deal with

16    that on cross.

17         MR. BARMEN:  But the reason I did it there is

18    because of the implication he's trying to raise.  It was

19    improper but I understand what you're saying.

20         THE COURT:  Do not preface your questions with what

21    anyone else said.  It is what he says.  That is all that the

22    jury needs to have here.

23         MR. McELFISH:  Now the last thing is that if I'm

24    trying to get future care out of Dr. Winn, there would have

25    been five more sidebars about how he's not an expert and can't

SIDEBAR

```
1    have an opinion on future care.
2              THE COURT:  That is why you have Dr. Mobin.
3              MR. McELFISH:  I understand that, but he made the
4    argument to you that Dr. Winn didn't say he needed future
5    care.
6              THE COURT:  He cannot say he needs future care.
7              MR. McELFISH:  That's right.
8              THE COURT:  Then don't bring up Dr. Winn in the
9    preface of your question.  Don't bring up anyone in the
10   preface of your question.
11             MR. McELFISH:  Do you understand why I did it?
12             THE COURT:  And don't add things after an answer.
13             MR. McELFISH:  I'm trying not to.
14             THE COURT:  Stop it.  I do not care if you are
15   trying.  Trying does not matter.  Just do not do it anymore.
16             MR. McELFISH:  The only reason -- I won't do it.
17   The only reason I did it is they heard what an epidural was.
18   I didn't want to waste time going through what an epidural is.
19             THE COURT:  This is a smart jury.  They do not need
20   to hear testimony over again.  When was Mr. Bauta's fusion?
21             MR. McELFISH:  Four years.
22             MR. BARMEN:  End of May 2015.
23             MR. McELFISH:  When was his fusion?  I thought you
24   said future.
25             MR. BARMEN:  May 27.
```

SIDEBAR

```
 1            THE COURT:  Of 2015?

 2            MR. BARMEN:  Yes, sir.

 3            THE COURT:  He needs another fusion, another lumbar

 4    fusion?

 5            MR. McELFISH:  You don't know about adjacent segment

 6    disease?

 7            THE COURT:  There's been no testimony about that.

 8            MR. McELFISH:  Given our discussions I thought you

 9    might know about that.  I actually thought about that.

10            THE COURT:  Who was recommending another lumbar

11    fusion?

12            MR. McELFISH:  Dr. Mobin and Dr. Lattuga both.

13            THE COURT:  It's in Dr. Mobin's report.

14            MR. BARMEN:  Yes, but not the cervical, the lumbar

15    certainly.

16            MR. McELFISH:  Judge, the cervical is a close

17    surgical call because he's in pain.  He's being treating for

18    it.

19            THE COURT:  He is not a doctor.

20            MR. McELFISH:  Who?

21            THE COURT:  This guy.  It's beautiful cross.  I

22    cannot wait to see it.

23            MR. McELFISH:  One says he does, the other says --

24            THE COURT:  Good luck.

25            MR. McELFISH:  Wow, this is not good.
```

SOPHIE NOLAN, CSR

SIDEBAR

1            MR. BARMEN:  It's not bad.

2         (Sidebar ends.)

```
 1              (Continued on next page.)

 2              THE COURT:  Continue, please.

 3   BY MR. McELFISH:

 4   Q    With regard to the lumbar epidural injections and the

 5   series of injections that are required under the standard of

 6   care what is your recommendation for Mr. Bauta in the future?

 7   A    The series would be done once every three years, the cost

 8   is 4,500 to 15,000.

 9   Q    With respect to cervical epidural injections, what is

10   your recommendation under the series and standard of care?

11   A    Yes, the series would be done every three years.  The

12   same cost, 4,500 to 15,000.

13   Q    Or -- and that's for epidurals; right?

14   A    Yes, sir.

15   Q    For facet joint injections into the facets, what's your

16   recommendation?

17              MR. BARMEN:  Objection.

18              THE COURT:  Overruled.

19   A    Yes, there are three injections, the cost is 4,500 to

20   15,000.

21   Q    Radio frequency ablations?

22   A    Yes.

23   Q    What is the frequency and the cost?

24              MR. BARMEN:  Objection.

25              THE COURT:  Overruled.
```

PROVDER/DIRECT/McELFISH

```
1    A    Again, the same cost, 4,500 to 15,000, three times.

2    Q    Branch block injections.

3    A    The same cost.

4    Q    What is the frequency and what is the cost?

5    A    The same frequency.  The cost is 1,500 to 5,000 each

6    injection for a total amount of 4,500 to 15,000.

7    Q    Did you evaluate the medications that he may need?

8    A    I did.  I costed out the medications that Mr. Bauta was

9    taking at the time that I saw him.

10   Q    Okay.  And would you tell us what medications you

11   recommend, frequency and cost?

12   A    Yes, the first is Percocet, 5/325 milligrams three times

13   a day for pain.  The cost is $444 to $1,680.

14   Q    And that's for a lifetime?

15   A    This is per year.

16   Q    Okay, per year.  Go ahead.

17             MR. BARMEN:  Objection, move to strike.

18             MR. McELFISH:  Oppose.

19             THE COURT:  Read it back, please.

20             (Record read.)

21             THE COURT:  Overruled.

22   Q    What's the next medication?

23   A    Tizanidine or Zanaflex four milligrams, takes it for

24   anxiety and spasms.  The cost per year is $384 to $636 per

25   year.
```

SOPHIE NOLAN, CSR

PROVDER/DIRECT/McELFISH

1    Q    And he was taking that when you saw?

2    A    Yes, sir.

3    Q    What's next?

4    A    Motrin 200 milligrams three times a day for pain.  The

5    cost is $122, $13 per year.

6    Q    Where did you get those prices from?

7    A    I used two different sources.  The first source I used is

8    through the internet and the second source I used is what we

9    call brick and mortar drug stores such as Walgreen's or CVS.

10   The reason I used both is because some people do not want to

11   get their drugs over the internet so they prefer to do brick

12   and mortar, so I provide both ranges.

13   Q    Let's talk about -- withdrawn.  Did you evaluate

14   Mr. Bauta for aids for independent living that he may need?

15   A    Yes.

16   Q    Just briefly, it seems logical what it is, but can you

17   tell the jury what it is in terms of life care?

18   A    Yes, these are devices that Mr. Bauta requires due to his

19   impairments, both to assist him in what we call his activities

20   of daily living but also as preventative type of equipment to

21   prevent any complications that could occur particularly in the

22   bathroom, falling, such things like that.  So various items

23   are recommended.

24   Q    Would you tell us what the items are, please?

25   A    Yes.  The first one is a shower chair replaced every

PROVDER/DIRECT/McELFISH

1   three years.  The cost is $83 to $96 for the three-year

2   period.  The second is a handheld shower.

3   Q    Slow down.

4   A    Once every three years.  The cost is $21 to $43.  The

5   next is grab bars, replacement once every five years.  Reason,

6   for support and positioning.  The cost is $39 to $96 once

7   every five years.  The next is he was using a methodology to

8   help him control his pain called a TENS machine.  Replacement

9   once every three years for pain management cost is $65 to $88

10  and on a yearly basis a TENS machine needs supplies.  The cost

11  for the supplies ranges from $312 to $816 per year.

12  Q    Now, those are sort of more unique items.  Where did you

13  obtain the cost figures for those?

14  A    These items were all paid through the internet.  Costs,

15  various medical supply companies that specialize in these

16  areas.

17  Q    Give me one example.

18  A    Yes, I contacted vitalitymedical.com, activeforever.com,

19  southwestmedical.com.

20  Q    Okay.  Are these aids for independent living things that

21  you typically see for people with the injuries that Mr. Bauta

22  has?

23  A    Yes.

24  Q    Let's go to orthotic needs.  What's an orthotic need?

25  A    That's the type of support that he requires, support

SOPHIE NOLAN, CSR

1   positioning.  He was using it at the time I saw him and

2   elastic low back support.  Replacement once every two years.

3   Cost is $22 to $36 every two years.

4   Q    And we heard about -- well withdrawn.  The straight cane.

5   A    Yes, he was using a straight cane at the time I saw him

6   for support and balance.  Replacement once every two years,

7   the cost $8 to $20 every two years.

8   Q    Let's talk about future surgery.

9   A    Yes.

10  Q    First of all, where did you obtain the information for

11  future surgery?

12  A    The cost?

13  Q    The need for it.

14         MR. BARMEN:  Objection.

15  Q    The foundation for it.

16         MR. BARMEN:  Objection.

17         THE COURT:  Overruled.

18  A    Yes.  As I indicated --

19         THE COURT:  Actually, I want a sidebar.

20              (Sidebar held outside of the hearing of

21  the jury.)

22         (Continued on next page.)

23

24

25

```
 1              (Sidebar.)

 2              (The following sidebar took place outside the

 3    hearing of the jury.)

 4              THE COURT:  Your objection?

 5              MR. BARMEN:  Well, again, there's not a single --

 6    the treating surgeon who came in, Cordiale, testified he

 7    doesn't need cervical lumbar surgery -- cervical spine surgery

 8    and he can't say whether or not he's ever going to need lumbar

 9    surgery again.  They vary artfully handled the Lattuga issue

10    which certainly is going to be dealt with.

11              MR. McELFISH:  Thank you.

12              MR. BARMEN:  It was well done.  There's absolutely

13    no basis in the record for it.  Now, he did his -- it's going

14    to come out.  He did his report based solely on Lattuga and

15    after the report is done and given to us, he has a 15-minute

16    call with Mobin after the fact so that they can try and

17    resolve this issue but there's no basis in the medical

18    records.  Nobody is going to say, based on the medical records

19    he needs cervical fusion.

20              THE COURT:  Okay.  Did Lattuga's records get

21    admitted into evidence?

22              MR. BARMEN:  No, Cordiale's treatment notes did, but

23    Lattuga's report has not been.  We're bringing Lattuga in in

24    our case.

25              MR. McELFISH:  If they bring Lattuga in, he's going
```

SIDEBAR

```
 1   to testify as to his opinions.
 2          THE COURT:  You're going to bring Lattuga in on your
 3   case?
 4          MR. BARMEN:  Oh, yeah, we have every intention of
 5   doing so.
 6          THE COURT:  If you're going to do that then I'm
 7   going to let him ask about what Lattuga recommended.  If
 8   you're not going to bring in Lattuga I'm not going to let him
 9   testify what Lattuga recommended because they're not in
10   evidence and they won't be.  If nobody in his report says no
11   cervical fusion, that's out.  If Mobin says lumbar fusion I'll
12   let him talk about it.
13          MR. BARMEN:   He doesn't say cervical.
14          MR. McELFISH:  He reviewed Mobin's reports.
15          THE COURT:  He can testify about -- I have a hard
16   time believing that a life care planner can make up medical
17   procedures that someone needs.
18          MR. McELFISH:  He didn't.  He's relying upon Mobin
19   and he reviewed all of Mobin's reports.  Judge, the one thing
20   you have to realize --
21          THE COURT:  Let me finish.
22          MR. McELFISH:  Sure.
23          THE COURT:  I have a hard time believing the law
24   allows that a life care planner to testify on medical
25   procedures that do not appear anywhere in the treatment notes
```

SIDEBAR

```
 1   or treatment records or other medical expert reports.  So if

 2   they do, if these things appear in other experts' reports or

 3   in treatment notes, he can testify to them.  If they

 4   recommended future lumbar fusion, I recommended this.

 5              MR. BARMEN:  Mobin says this.

 6              MR. McELFISH:  If I can get a word in edgewise.

 7              MR. BARMEN:  When I'm done talking.

 8              THE COURT:  He can talk about this.  If Lattuga's

 9   recommendation is not in evidence, it's not coming into

10   evidence through him.

11              MR. McELFISH:  Here is what my suggestion is, they

12   are standing here telling you they're going to call Lattuga

13   and if they do I'm going to cross him on his opinions and what

14   I think the Court should do is allow the testimony based on

15   the reports that he reviewed because it is proper foundation.

16   It was looked at and reviewed before he issued his report.  If

17   Lattuga does not come in and testify you can strike the

18   opinion on the cervical from the record but they're

19   downplaying how much influence Mobin had.  It wasn't a 15

20   minute conversation.  Mobin -- it wasn't just the

21   conversation -- I'm not disputing the length of the call.  I

22   could care less about that.  Mobin issued a couple of pretty

23   serious expert reports about the future care for lumbar fusion

24   with respect to adjacent segment disease.

25              They've taken Mobin's deposition two times in
```

SIDEBAR

1   Beverly Hills so he's going to testify that he just didn't

2   change his report after seeing Mobin's stuff because it was

3   consistent with Lattuga.

4           MR. BARMEN:  So we're clear on Lattuga, we do intend

5   to bring him in on the billing issues.  That's why we're

6   bringing him in.  So --

7           THE COURT:  But if you bring him --

8           MR. McELFISH:  If you bring him in --

9           MR. BARMEN:  You can't go outside the cope of my

10  cross.

11          MR. McELFISH:  You've been going over and the court

12  has been allowing it to some degree.

13          MR. BARMEN:  Okay.

14          MR. McELFISH:  What did you think, Judge?

15          THE COURT:  It's hard to take a life care planner

16  before the medical experts have testified.

17          MR. McELFISH:  Well, yes and no.  It's subject to

18  connection.  Mobin is going to lay the foundation like you've

19  never seen.

20          THE COURT:  I will let him testify.  I'm going to

21  make an instruction at the end of the case that if there is no

22  corroborating evidence for any of these procedures, any of

23  these recommended items in the records, then there's no

24  foundation for it and the jury can disregard that testimony.

25          MR. BARMEN:  I would appreciate that.

SOPHIE NOLAN, CSR

SIDEBAR

```
 1              THE COURT:  A medical procedure -- a life care
 2    planner can say he needs a cane.
 3              MR. BARMEN:  Of course.
 4              MR. McELFISH:  But if there is foundation you're not
 5    going to give that instruction I would assume.
 6              THE COURT:   There are going to be aspects that do
 7    have foundation and others that don't so I will probably give
 8    the instruction if you don't find the foundation in the
 9    testimony of the medical providers or other medical experts,
10    you can disregard the life care planner's testimony that he
11    needs a procedure.  A life care planner can't come in and say
12    he needs a right knee scope or a left knee scope if there's
13    nothing in the records.
14              MR. McELFISH:  Judge, I'm the king of foundation.  I
15    know all of this.
16              THE COURT:  You cannot do it.
17              MR. BARMEN:  I'm learning a lot.
18              THE COURT:  He can say he needs a hair transplant.
19              MR. McELFISH:  Judge, every one of my experts have
20    foundation for the things that they're going to testify to.
21    Mobin will lay a foundation until the cows come home and it's
22    going to be another problem.
23              THE COURT:  But not for cervical fusion.
24              MR. McELFISH:  Because he didn't testify he needed
25    it.
```

SIDEBAR

1          MS. DIAMOND:   Are you going to give the instruction

2    if there's corroborating and foundation?

3          THE COURT:   I am likely going to give it.

4          MS. DIAMOND:  No matter what?

5          THE COURT:   If you have a foundation for three

6    things that he recommends but ten others there is nothing, why

7    would I not give the instruction?  You have to make sure there

8    is something supporting everything this guy is saying.   If

9    there is not I am going to tell them.

10          MR. McELFISH:  I have a very seasoned suggestion,

11   that when we get to that point because we do a lot of

12   prognosticating, when we get to that point they can make a

13   proffer as to what doesn't have support and if they have a

14   valid point that something doesn't have support, you can give

15   the instruction, but if they don't have anything which is what

16   I suspect it's going to be, then there shouldn't be an

17   instruction.

18          MR. BARMEN:  It's not our burden to lay this

19   foundation for him.

20          THE COURT:  It's your burden if you want me to put

21   it in the jury charge at the very least.  Did he already talk

22   about the cervical fusion?

23          MR. BARMEN:  Yes, he said it's up to the jury to

24   decide.

25          THE COURT:  Did he already say it?

SIDEBAR

```
1          MR. BARMEN:  He did and I objected.

2          THE COURT:  Unless Mobin comes in and says yeah he

3   needs a cervical fusion.

4          MR. McELFISH:  He's going to say It's a close call

5   and he wanted to be conservative.

6          MR. BARMEN:  That's funny because it's not in his

7   report.

8          THE COURT:  I am going to leave it to them to decide

9   what had a foundation and what didn't.

10         MR. McELFISH:  If there's anything that didn't have

11  foundation --

12         THE COURT:  And it looks like there's going to be.

13         MR. McELFISH:  You know what, based on this --

14         THE COURT:  A close call, unless he says I

15  recommend or it's my opinion that he's going to need a

16  cervical fusion, he can't --

17         MR. McELFISH:  Based on this, I might make an

18  application to the Court.  Because we've noticed Lattuga.  I

19  might call him on my case.  I might make an application to

20  call him and see how did you figure it out.

21         MR. BARMAN:  I love it.

22         THE COURT:  We'll see.  Make that application.

23         MR. BARMEN:  Thank you.

24         (Sidebar ends.)

25         (Continued on next page.)
```

SOPHIE NOLAN, CSR

PROCEEDINGS

1                    (In open court.)

2                    THE COURT:  We will take a ten-minute bathroom

3       break.

4                    (Jury exits.)

5                    (Recess taken.)

6                    (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    (In open court - jury not present.)

3              THE COURT:   Miriam, can you get the jury, please?

4              THE COURTROOM DEPUTY:   They are here.

5              THE COURT:   Right outside?

6              THE COURTROOM DEPUTY:   Yes.

7              (Jury enters.)

8              THE COURT:   You may be seated.  You may continue.

9              MR. McELFISH:   Thank you.

10   DIRECT EXAMINATION CONTINUES

11   BY MR. McELFISH:

12   Q    Mr. Provder, did you do an evaluation on whether or not

13   Mr. Bauta would need future surgery?

14             MR. BARMEN:   Objection.

15             THE COURT:   Overruled.

16   A    Yes.  Yes, sir.

17   Q    And what foundational purposes, what was the evaluation

18   based on?

19   A    The valuation was based on the medical records that I had

20   reviewed, as well as the two medical reports that talked about

21   surgeries.

22   Q    Okay, and when you say the two medical reports, you are

23   referring to Dr. Lattuga and Dr. Mobin?

24   A    Yes, sir.

25   Q    Okay.  Let's go to surgical fusion first.  We talked

1    about it a little bit earlier.

2           What is your opinion as a lifecare planner as to

3    Mr. Bauta's surgical needs?

4           MR. BARMEN:  Objection.

5           THE COURT:  Sustained.

6           THE WITNESS:  I don't have my screen up.  I don't --

7           MR. McELFISH:  That's my fault, I've got to present.

8    Okay.  Don't answer the question, the judge sustained it.

9    BY MR. McELFISH:

10          Okay, do you believe as a lifecare planner, based on

11   the records you reviewed, that Mr. Bauta needs future surgery?

12          MR. BARMEN:  Objection.

13          THE COURT:  Overruled.

14   A    Yes.

15   Q    Can you explain to the jury what he needs?

16   A    Well, two surgeries have been recommended.  One a

17   cervical fusion and one a lumbar fusion.

18   Q    Okay.

19          THE COURT:  Who recommended the cervical fusion?

20          THE WITNESS:  The cervical fusion was recommended

21   by Dr. Lattuga.

22          THE COURT:  You understand that Dr. Lattuga never

23   examined Mr. Bauta?

24          THE WITNESS:  Yes, sir, I understand, Your Honor.

25          THE COURT:  Do you know that Dr. Lattuga has not

 1   been admitted as an expert in this case?

 2            THE WITNESS:   Yes, I understand.

 3            THE COURT:   Other than Dr. Lattuga, has anyone in

 4   the medical records that you reviewed recommended cervical

 5   fusion surgery?

 6            THE WITNESS:   No, sir.

 7            THE COURT:   Okay.

 8            MR. McELFISH:  May I follow up that, Judge?

 9            THE COURT:   You may continue.

10   BY MR. McELFISH:

11   Q    Even though Dr. Lattuga has not yet testified in the

12   trial, and we don't know if he will, he did author an expert

13   report?

14            THE COURT:   Sustained.

15   BY MR. McELFISH:

16   Q    Was it your opinion that he needs lumbar fusion?

17   A    Yes, that's been recommended by Dr. Mobin.

18   Q    And also Dr. Lattuga, correct?

19   A    Yes.

20            MR. BARMEN:   Objection.

21            THE COURT:   I'll sustain the objection with respect

22   to Dr. Lattuga.

23   BY MR. McELFISH:

24   Q    Okay.  Dr. Mobin, Fardad Mobin, he is a neurosurgeon,

25   correct?

1    A    Yes.

2    Q    What has he recommended for what Mr. Bauta needs in terms

3    of future surgery?

4              MR. BARMEN:  Objection.  Sidebar.

5              THE COURT:   Dr. Mobin?

6              MR. BARMEN:  Yes, Your Honor.

7              THE COURT:  Overruled.

8    A    Dr. Mobin recommended lumbar fusion.

9    Q    Okay.  And with respect to --

10             MR. BARMEN:  Your Honor, sidebar, please.

11             MR. McELFISH:  Oppose.

12             MR. BARMEN:  I'll withdraw it.  Sorry.  Fine, I'll

13   deal with it on cross.

14   BY MR. McELFISH:

15   Q    With respect to the cervical fusion, what pricing did you

16   put on that?

17   A    The cervical fusion?

18   Q    Yes, sir.

19   A    $58,741 to $80,000.

20             MR. BARMEN:  Objection, move to strike.

21             MR. McELFISH:  Oppose.  We discussed it.

22             THE COURT:  Overruled.

23   BY MR. McELFISH:

24   Q    And what pricing -- well, let me actually back up.  With

25   respect to the cervical fusion, I just want to ask you so that

PROVDER/DIRECT/McELFISH

```
 1    the issue is complete, how many cervical fusions do you
 2    believe he needs?
 3              MR. BARMEN:  Objection.
 4              MR. McELFISH:  Just the frequency, Judge, that's
 5    all.
 6              MR. BARMEN:  Objection.
 7              MR. McELFISH:  Let me withdraw it.  Let me try to
 8    ask it this way.
 9    BY MR. McELFISH:
10    Q    You believe that Mr. Bauta, according to Dr. Lattuga,
11    needed one cervical fusion?
12              MR. BARMEN:  Objection.
13              THE COURT:  Overruled.
14    A    Yes, sir.
15    Q    Okay.  And the same question with respect, just in terms
16    of frequency, how many future lumbar surgeries did Mr. Bauta
17    need?
18              MR. BARMEN:  Same objection.
19              THE COURT:  Overruled.
20    A    One.
21    Q    Okay.  And what pricing did you put on the lumbar, future
22    lumbar fusion?
23    A    90,000 to 125,000.
24    Q    Do you have an opinion as to whether or not, at some
25    point, Mr. Bauta will need home care?
```

```
1              MR. BARMEN:  Objection.
2              THE COURT:  Overruled.
3    A    Yes.
4    Q    Okay.  And what is your evaluation or -- withdrawn.
5              What is the frequency of the home care that he
6    needs.
7    A    Four hours a day, seven days a week.
8    Q    Okay, and for how long?
9    A    It would be lifetime -- life expectancy, for life.
10   Q    And what is the base cost that you've come up with for
11   that service?
12   A    Base cost ranges anywhere from 22 to $24 per hour, and
13   the range of cost per year is $32,120 to $35,040.
14   Q    Now, do you have any other recommendations for
15   Mr. Bauta's future care, other than what you've already
16   testified to?
17   A    No, sir.
18   Q    And that completes the list of items you believe he
19   needs, in your expert opinion?
20   A    Yes, sir.
21   Q    Now, were you able to take the individual costs that
22   you've testified to before this jury and add them up in a cost
23   summary chart?
24   A    Yes, sir.
25             MR. McELFISH:  Now, at this point, small screens,
```

 1   Your Honor.

 2           As per prior agreement with counsel and I, I am

 3   going to redact that document right now.  Agreed?

 4           MR. BARMEN:  Agreed you redacted it, yes.

 5           MR. McELFISH:  That it's redacted correctly?

 6           MR. BARMEN:  It is redacted, thank you.

 7   BY MR. McELFISH:

 8   Q    If you would please, look at the small screen,

 9   Mr. Provder, and can you identify that record?

10   A    Yes, this is a cost summary sheet of each of the charts

11   that we had as to the average cost in each chart for each of

12   the sections.

13   Q    I see.

14           And did you also come up with an annual total plan

15   cost, which is what the pricing would be per year.

16   A    Correct.  As of the time I did the evaluation, yes, sir.

17   Q    In other words, it's not a price for the particular

18   service category, but it's a price of everything per year?

19   A    Yes, sir.

20   Q    And you totaled everything up for the life expectancy?

21   A    Yes, sir.

22   Q    And if you look at 406-123 for identification, is that a

23   document you prepared?

24   A    Yes, sir.

25   Q    And is it based upon your opinions?

```
 1   A    Yes, sir.
 2            MR. McELFISH:  Plaintiff moves to admit that single
 3   page.
 4            MR. BARMEN:  Objection.
 5            THE COURT:  Sustained.
 6   BY MR. McELFISH:
 7   Q    Can you tell the jury, please, when you add everything up
 8   and prepare the total plan costs per year, what the cost is
 9   per year?
10            MR. BARMEN:  Objection.
11            THE COURT:  Overruled.
12   A    $77,923.
13   Q    And for the life expectancy, can you tell the jury how
14   much the plan cost per year is for that period of time?
15            MR. BARMEN:  Objection.
16            THE COURT:  Overruled.
17   A    The cost, the entire cost over his life expectancy?
18   Q    Yes.
19   A    Yes, the cost is $3,148,089.
20            MR. McELFISH:  Now, plaintiff again, given the last
21   several answers, Your Honor, to be specific, is now moving to
22   admit 406-123.
23            MR. BARMEN:  Objection.
24            THE COURT:  Sustained.
25   BY MR. McELFISH:
```

1    Q    Now, Mr. Provder, as an expert in this case for the

2    plaintiff, for Mr. Bauta, did you have an opportunity to

3    review the defense reports, the defense report from your

4    counterpart, Wendy Cummings?

5    A    Yes.

6    Q    And do you have opinions, sir, as to -- in rebuttal form,

7    if you will, as to her lifecare plan and her opinion?

8            MR. BARMEN:  Objection.

9            THE COURT:  Overruled.

10   A    Yes.

11   Q    Can you tell the jury -- well, is there a way for you to

12   break down your rebuttal opinions as to Ms. Cummings into

13   categories?

14   A    Yes.  Well, I've compared her lifecare plan to my

15   lifecare plan and the cost that she has compared to my cost.

16   Q    And what is your opinion in that regard?

17   A    Well, there are certain things in the lifecare plan that

18   I have that she agrees with, maybe not in the frequency that I

19   have but in the category itself.  And most importantly, she

20   agrees in part with the need for home care.

21   Q    Okay, can you tell the jury, please, specifically what it

22   is she agrees with you on?

23           MR. BARMEN:  Objection.

24           THE COURT:  Overruled.

25   A    Well, she agrees with me in categories, but not the

1    frequency.  She agrees that he is going to need physical

2    therapy evaluations; that he is going to need actual physical

3    therapy; he is going to need some psychological therapy; he is

4    going to need physical medicine and rehabilitation, a

5    physiatrist; a neurosurgeon; an orthopedist and the various

6    diagnostic tests that I have noted.

7              She also agrees with one of the medications.  She

8    agrees with the various aids for independent living, meaning

9    the shower chair, the handheld shower hose and the grab bars.

10             She agrees with the need for a low back support.

11   She agrees with the need for a cane.  And as I noted before,

12   she agrees with the need for some type of homemaking services,

13   less frequent than I have in my report.

14   Q    Okay, and can you tell the jury what she does not agree

15   with?

16   A    She did not agree with having a rehabilitation plan

17   development or with the neuropsychological evaluations.  She

18   did not agree with the case manager.  She did not agree with

19   the need for cognitive therapy.  She did not agree with the

20   need for internal medicine doctor, pain management doctor.

21   She did not believe there was any need for pain management

22   treatments.  She did not believe there was need for two out of

23   the three medications that Mr. Bauta was taking.

24             She did not agree that he needed a tens machine and

25   supplies.  And as I noted before, she did not agree with the

 1    need for surgery.  And she did not fully agree with the need,

 2    we differed in the amount of homemaking care that Mr. Bauta

 3    requires.

 4    Q    And to what do you attribute her disagreement?

 5             MR. BARMEN:  Objection.

 6             THE COURT:   I will allow it.

 7    A    Yes, well, she indicated that she had reviewed the

 8    medical records.  I think that she viewed Mr. Bauta's needs

 9    different than I did.  We have different backgrounds, that may

10    be one of the reasons we disagreed.

11    Q    And what do you mean by that, how is her background

12    different than yours?

13             MR. BARMEN:  Objection.

14             THE COURT:   Sustained.

15    BY MR. McELFISH:

16    Q    Do you have an understanding as to what her background

17    is?

18    A    Yes.

19    Q    And in reviewing her report and her deposition materials,

20    did you come to understand what it is?

21    A    Yes.

22    Q    And can you tell the jury what it is?

23             MR. BARMEN:  Objection.

24             THE COURT:   Overruled.

25    A    She has a Bachelor's degree in psychology.

1    Q      How does that differ from what you have?

2    A      Well, my degree is in working with -- in rehabilitation

3    counseling is working with disabled people, which I have done

4    for 45 years.  Psychologist is a different background in

5    education and training.

6    Q      And did you have an understanding of those materials that

7    were provided by the defense for how long she has been doing

8    this work?

9    A      Yes, I think she indicated that she's been certified as a

10   lifecare planner since 2001.

11   Q      Okay.  Her background, training and experience, her view

12   of the medical records, is there any other basis that you

13   believe supports this difference in opinion?

14   A      No, sir, that seems to be the -- the basis.

15   Q      All right.

16          MR. McELFISH:  Now, what I would like to do is go to

17   P-432-0096 for ID, small screens.

18   BY MR. McELFISH:

19   Q      Mr. Provder, does Ms. Cummings, in the materials you've

20   reviewed, believe that Mr. Bauta needs physical therapy?

21   A      Yes.

22   Q      And how much does she believe he needs?

23          THE COURT:  I am going to sustain the objection

24   that has not been made, but --

25          MR. BARMEN:  It was coming.

```
1              THE COURT:   He is just reading from her report.
2              MR. McELFISH:   Okay.
3    BY MR. McELFISH:
4    Q    Is it more often than not, Mr. Provder, that when you're
5    in cases like this that the lifecare planner actually believes
6    that the plaintiff needs substantial care?
7              MR. BARMEN:   Objection.
8              THE COURT:   Sustained.
9              MR. McELFISH:   Mr. Provder, I have no further
10   questions of you at this time, sir.   Thank you very much for
11   coming in.
12             MR. BARMEN:   Bear with me, I have a lot of paper
13   here.   One moment.
14             May I proceed, Your Honor?
15             THE COURT:   Yes.
16             MR. BARMEN:   Thank you.
17   CROSS-EXAMINATION
18   BY MR. BARMEN:
19   Q    Mr. Provder, how are you?
20   A    Good.
21   Q    Nice to see you again.   Do you recall we were together
22   back in January of '17 for your first deposition?
23   A    A long time ago.
24   Q    A long time ago.   You were deposed twice in this case,
25   correct?
```

PROVDER/CROSS/BARMEN

```
 1   A    True.
 2   Q    My partner, Harold Moroknek, deposed you in February of
 3   '17 because of issues relating to your reliance upon
 4   Dr. Lattuga.  Do you recall that?
 5   A    True.
 6   Q    We will come back to that.  First I want to kind of work
 7   backwards.  You were talking about your disagreements with the
 8   defense lifecare planner, Wendy Cummings.
 9   A    She disagrees with me, yes, sir.
10   Q    Well, you disagree with each other on certain things,
11   right?
12   A    That's true.
13   Q    And two qualified professionals can disagree, can they
14   not?
15   A    Possible.
16   Q    Okay.  And you made a point, or Mr. McElfish made a point
17   to point out that she's only been a certified lifecare planner
18   since 2001?
19   A    Yes.
20   Q    Okay.
21   A    She's been doing life care planning since 2001, yes, sir.
22   Q    Seventeen years?
23   A    Yes, sir.
24   Q    Certainly not 45 years like yourself?
25   A    True.
```

PROVDER/CROSS/BARMEN

```
1   Q    You would agree with me, you've been -- how many life

2   care plans have you -- do you think you've done, ballpark, in

3   45 years?  Just ballpark?

4   A    Probably 700 to a thousand.

5   Q    And in 45 years, 700 to a thousand life care plans,

6   something happened in this case that you've never seen before

7   in your career; isn't that true?

8   A    I don't know what you're asking about, sorry.

9   Q    Well, again, we had that issue with Dr. Lattuga, right?

10  A    Yes.

11  Q    Where you relied on his report to come up with several of

12  your opinions, and then you found out that Dr. Lattuga never

13  actually treated Mr. Bauta.  Do you recall that?

14  A    Yes, I do recall.

15  Q    And, in fact, you relied on a report from Dr. Lattuga

16  that said I treated Jos Bauta from November 15th to a certain

17  day, and you found out not only had Dr. Lattuga not treated

18  Mr. Bauta, he'd actually never met Mr. Bauta, right?

19          MR. McELFISH:  Objection.

20          THE COURT:  Overruled.

21  A    That's what I understand, yes, sir.

22  Q    And when you were deposed on this back in February, you

23  admitted or stated, when asked, that you'd never seen anything

24  like this in your career.

25          Do you recall that?
```

1   A    I've never had a report that I reviewed where a person

2   stated that he had treated somebody and had not.

3   Q    Well, not only did you review that report, you relied on

4   it heavily, didn't you?

5   A    That was one of the reports I relied upon, yes, sir.

6   Q    Okay, the other being Dr. Mobin?

7   A    Yes, sir.

8   Q    Isn't it true you completed your lifecare plan and

9   submitted it to the defense prior to ever speaking with

10  Dr. Mobin?

11  A    Yes.  The report was submitted prior to Dr. Mobin writing

12  his report or me speaking with him, yes, sir.

13  Q    Okay.  And your speaking with Dr. Mobin consisted of a

14  15-minute phone call after you had completed your report and

15  it had been sent to us, correct?

16  A    True.

17  Q    And in that phone call you talked to Dr. Mobin and he

18  said he agreed with you?

19  A    Yes.

20  Q    With the exception of cervical fusion, correct?

21  A    Yes, sir.

22  Q    Dr. Mobin does not believe that Mr. Bauta needs cervical

23  fusion, right?

24  A    True.

25  Q    The only person that does is Dr. Lattuga?

```
 1   A     True.

 2   Q     Who never met Mr. Bauta?

 3   A     True.

 4   Q     And despite having submitted a report, as far as you

 5   know, you can't say he ever reviewed Mr. Bauta's medical

 6   records, can you?

 7   A     Well, his medical records -- there are a number of

 8   records in his report that he states that are noted in there.

 9   Whether he read those records or not, I do not know.

10   Q     Correct.  Dr. Lattuga's report does not say I actually

11   looked at these records, does it?

12   A     It does not.

13   Q     So you don't know if he ever reviewed his records, true?

14   A     True.

15   Q     So it's possible you relied on a report to do your

16   lifecare plan based on a medical expert who had never met the

17   patient nor reviewed his records, fair?

18   A     That's true.

19   Q     Okay.  Let's talk about some of the items.

20         Well, before we do that, I'm sorry, I forgot about

21   this Wendy Cummings issue.  Let's talk about that.

22         Do you agree with me, generally, that the purpose of

23   a lifecare plan is to do an independent, objective evaluation

24   of the person's needs by way of their medicals and come up

25   with a fair and reasonable plan to take care of those needs.
```

1    A     Yes.

2    Q     You are not making any type of diagnosis?

3    A     Can not.

4    Q     Right.

5    A     None of us can, we're not physicians.

6    Q     Exactly.  Wendy Cummings is not and neither are you?

7    A     True.

8    Q     You have to rely on the medicals?

9    A     True.

10   Q     And you look at the medicals and then you use your

11   expertise and the methods you talked about to come up with

12   this plan?

13   A     Yes.

14   Q     And the goal, when you're working here, is not to come up

15   with the most expensive plan you can, is it?

16   A     No.

17   Q     No.  The goal is to come up with a plan that reasonably

18   will take care of the needs the patient is actually going to

19   have now and going forward through their life expectancy?

20   A     We actually call them evaluees, but that would be

21   correct.

22   Q     Evaluees, thank you.  We'll refer to Mr. Bauta as

23   Mr. Bauta, but I understand what you're saying.

24   A     No problem.

25   Q     One thing you don't do is make a determination what's

1    real or what's not relative to what's in the medical records;

2    fair?

3    A    That's true.  That would be out of our area of expertise.

4    Q    Of course.  So any reasonable lifecare planner, if

5    they're doing an objective review and evaluation, are going to

6    look at what's in the medical records and provide a plan to

7    take care of that.  Fair?

8    A    I'm not sure what you mean by that.

9    Q    I'll rephrase it, it wasn't from very artful.

10        You look at the medical records, and you see this

11   man has an injury in the medical records, and he's been having

12   physical therapy and there is a prescription for physical

13   therapy going forward.  Are you following me so far?

14   A    Yes, sir.

15   Q    It certainly would not be appropriate for any lifecare

16   planner to not include physical therapy in a report, would it?

17   A    True.

18   Q    Okay, and that's what Wendy Cummings did, right?

19   A    True.

20   Q    Wendy Cummings took the medical records at face value, as

21   you, yourself, did and said, based on what's in these medical

22   records and based on Mr. Bauta's subjective complaints, taking

23   all that to be true, here is what he would need.  Fair?

24   A    She gave her opinion as to his long-term care needs, yes,

25   sir.

1    Q    Based on the methods I just laid out, true?

2    A    Yes, sir.

3    Q    And any reasonable lifecare planner would do that, right?

4    A    True.

5    Q    Okay.  So you're not critical of Wendy Cummings for doing

6    what you did, you just have a difference in opinion in the

7    amount of care and the ultimate amount of money.  Fair?

8    A    True.

9    Q    Okay.  Let's talk about a few of the things you two

10   disagreed with and I think I wrote them all down.  I might

11   have missed one, so let me know.

12            Neuro-psych evaluation.

13   A    Yes.

14   Q    You believe he needs one, he, Mr. Bauta needs one, and

15   Wendy Cummings does not.  Right?

16   A    True.

17   Q    And I think on direct examination, and you tell me if I

18   am wrong, you said he needs one to form a baseline, then he

19   needs cognitive therapy, and then he would need another

20   neuro-psych evaluation to determine if the cognitive therapy

21   was useful?

22   A    Yes, and whether he would need further therapy, that

23   would be correct.

24   Q    Okay.  You saw Mr. Bauta in September of '15?

25   A    September 2015, yes, sir.

PROVDER/CROSS/BARMEN

```
1    Q     Have you seen him since?

2    A     No, sir.

3    Q     Have you talked to him since?

4    A     No, sir.

5    Q     Do you know how many neuropsychological evaluations he's

6    had from September 15th to today?

7    A     No, sir.

8    Q     Do you know if what you suggest has already been done?

9    A     No, sir.

10   Q     And if it has, you would take that out of your report;

11   would you not?

12   A     True.

13   Q     Did you speak with counsel before you came to court

14   today?

15   A     Briefly.

16   Q     Did you do anything to prepare for your testimony?

17   A     I reviewed all these documents, particularly my two

18   depositions.

19   Q     You were not told that Mr. Bauta is currently treating in

20   cognitive therapy with a Dr. Thomas?

21   A     I was told that.

22   Q     Were you not told about the fact that he has had four

23   neuropsychological evaluations till today?

24   A     No, sir.

25   Q     Can we agree we can take that off the list?
```

PROVDER/CROSS/BARMEN

1  A    If he's already received that testing, that would be

2  correct.

3  Q    Okay.  Let's talk about a case manager.  Actually, before

4  we do that, let's skip it.

5            Cognitive therapy, he's in it now, are you aware of

6  that.

7  A    That's what I understand.

8  Q    Okay.  And are you aware that he is being treated

9  cognitively by a man who is doing it on a lien?

10  A    I was -- that was told to me, yes, sir.

11  Q    Do you know what that means?

12            MR. McELFISH:  Objection, relevance.

13            THE COURT:  Overruled.

14  A    That means that he doesn't get paid until the case

15  finishes.

16  Q    Okay.  Mr. Bauta is never going to owe for that

17  treatment, that's what it means, correct?

18            MR. McELFISH:  Objection, argumentative.

19  A    That I don't know.

20            THE COURT:  Overruled.

21            MR. McELFISH:  Argumentative and foundation.

22            THE COURT:  Overruled.

23  BY MR. BARMEN:

24  Q    Do you know who the lien is between; do you know if the

25  lien is between the doctor and Mr. Bauta or the doctor and his

PROVDER/CROSS/BARMEN

1  lawyer?

2  A    I have no idea.

3        MR. McELFISH:  Relevance.

4        THE COURT:  Overruled.  He doesn't know about the

5  lien.

6        MR. BARMEN:  Okay.

7  BY MR. BARMEN:

8  Q    I want you to assume, as an expert, that Mr. Bauta is in

9  cognitive therapy and for everything that he has had up to now

10  he doesn't owe a dime.  Would you then take that off the list?

11        MR. McELFISH:  Foundation and argumentative.

12        THE COURT:  Hold on, hold on.

13        Sustained.

14  BY MR. BARMEN:

15  Q    If he has certain treatments that he ultimately doesn't

16  have to pay for, do you include them in the overall total in

17  the plans?

18        MR. McELFISH:  Objection.

19        THE COURT:  Overruled.

20  A    Even though he is not paying for them, there is still

21  value and cost to those items.  Whether he's paying for them

22  or not, there is still cost to those items.

23  Q    Okay, so you would not take it out of the plan?

24  A    True.

25  Q    Internal medicine, I think the judge questioned you on

```
 1   this one.  We all need to go to our doctors, right?

 2   A    True.

 3   Q    And Mr. Bauta --

 4   A    I think we all need to go to our internal medicine or

 5   general practitioners, that's true.

 6   Q    I call it a PCP, primary care physician, but we're

 7   talking about the same thing, right?

 8   A    Yes, sir.

 9   Q    Okay, and that's what you're talking about here for

10   Mr. Bauta?

11   A    Yes, sir.

12   Q    Do you know if Mr. Bauta had a primary care physician

13   before the accident?

14   A    No, sir.

15   Q    Do you know if he regularly went to the doctor?

16   A    No, sir.

17   Q    Do you care?

18   A    I didn't hear the last part.

19          MR. McELFISH:  Objection, argumentative.

20   BY MR. BARMEN:

21   Q    Do you care?

22          THE COURT:  Overruled.

23   Q    Do you care?

24   A    No, I don't care because these are the services he

25   requires, whether he had it in the past or not.
```

PROVDER/CROSS/BARMEN

1    Q    So you would include in the plan things that don't go to

2    treat his current situations that they relate to the accident

3    and things that he never had before; fair?

4    A    It's two questions.

5    Q    Do you want me to break them down?

6    A    Please.

7    Q    Do you include in your plan things that no physician who

8    is treating him for injuries or illnesses or symptoms, or

9    whatever he is claiming in his accident --

10            THE COURT:   Let's take a break.

11            (Jury exits.)

12            (Pause.)

13            (Jury enters.)

14            THE COURT:   You may be seated.

15            MR. BARMEN:  May I continue, Your Honor?

16            THE COURT:   Yes, you may.

17            MR. BARMEN:  Thank you.

18   EXAMINATION CONTINUES

19   BY MR. BARMEN:

20   Q    Before we took the break, we were going over some of the

21   areas where you and Ms. Cummings disagree.  I just want to

22   finish running through that.

23            She doesn't believe that Mr. Bauta needs pain

24   management anymore, and you do; correct.

25   A    True.

PROVDER/CROSS/BARMEN

```
1   Q    Were you told about the testimony of Dr. Winn from -- was
2   it yesterday or the day before, it's all running together.
3   A    No, sir.
4   Q    Dr. Winn actually was one of Mr. Bauta's pain management
5   physicians?
6   A    Yes, sir.
7   Q    Gave these facet blocks that you say he needs?
8   A    Yes, sir.
9   Q    Dr. Winn didn't say anything about him needing more.
10          Would you defer to the treating physician as to what
11  Mr. Bauta needs going forward?
12          MR. McELFISH:  Objection.
13          THE COURT:  Overruled.
14  A    Yes, sir.
15  Q    So if his treating pain management guy didn't say he
16  needs more, and actually said Bauta hasn't seen him in months,
17  would you take that off the list?
18  A    I'm not sure what you mean take it off the list.  The
19  actual visits to the pain management or the treatments?
20  Q    Both.
21  A    I wouldn't take the pain management off, but I would take
22  the treatments off.
23  Q    So you would take the facet blocks and the ablations off
24  the list, that kind of thing?
25  A    Yes, sir.
```

```
1   Q    That's a pretty big ticket item, right?

2   A    Well, there's items that I believe that he needed; if his

3   treating physician says he doesn't need them, then I would

4   take it off the list.

5   Q    Did you ever make an effort to talk to any of Mr. Bauta's

6   treating physicians?

7   A    No, sir.

8   Q    Am I to understand that the only doctor you ever talked

9   to was Dr. Mobin?

10  A    Yes, sir.

11  Q    The plaintiff's retained neurologist?

12  A    Neurosurgeon, yes, sir.

13  Q    And you spoke to him for 15 minutes one time?

14  A    Yes, sir.

15  Q    And that, again, was after you had already authored and

16  submitted your report?

17  A    Yes.

18          MR. McELFISH:  Asked and answered.

19  A    You asked that question already, the answer is yes.

20          THE COURT:  Sustained.

21          MR. BARMEN:   I'll withdraw it.

22          THE COURT:   Is it part of your practice,

23  Mr. Provder, to -- when you are doing a lifecare plan, to

24  routinely speak with the treating physicians?

25          THE WITNESS:  Not usually, Your Honor.  Usually I
```

1   get a written document from the physician that states that

2   this is what the person needs, or I will submit a written

3   document to the physician to have him review it and then sign

4   and indicate that he agrees with these items.

5            THE COURT:   Okay.

6            THE WITNESS:   Either one or the other, or I could

7   do it verbal, which I did with Dr. Mobin.

8   BY MR. BARMEN:

9   Q    But in this case, Doctor, you had a situation you hadn't

10  encountered in 45 years, and that one of the reports you

11  relied on, by someone who purported to be a treating

12  physician, turned out not to be.

13           Under those circumstances, do you think it would

14  have made sense to follow up with any of Mr. Bauta's real

15  treaters?

16           MR. McELFISH:   Objection, argumentative.

17           THE COURT:   Overruled.

18           MR. McELFISH:   Relevance.

19  A    As I indicated, the only doctor I spoke with was

20  Dr. Mobin.

21  Q    That wasn't my question, sir.

22           Do you think it would have been reasonable, under

23  the unusual circumstances you had here, to make an effort to

24  actually talk to any of his treating doctors?

25  A    Again, I did not do that.

PROVDER/CROSS/BARMEN

1   Q     Would it have been reasonable?

2   A     Oh, in my opinion I didn't think I needed to do it.  I

3   had a foundation for Dr. Mobin.  I didn't think I had to go

4   any further.

5   Q     Isn't the foundation you have to use to build on, isn't

6   that the definition of a foundation?

7               MR. McELFISH:  Argumentative.

8               THE COURT:  Sustained.  Move on.

9   BY MR. BARMEN:

10  Q     You and Wendy Cummings disagree about the number of meds

11  Mr. Bauta needs, right?

12  A     Yes.  I based my medication list on what he was taking at

13  the time I saw him.

14  Q     What was he taking at the time you saw him?

15  A     He was taking Percocet, Zanaflex, Motrin.

16  Q     What is he prescribed now?

17  A     I do not know.

18  Q     So if he's only being prescribed by his treating

19  physicians one of those three medications, would you take the

20  other two off the list?

21  A     Yes, sir.

22  Q     Do you know if he's still using a tens machine?

23  A     I do not.

24  Q     If he's not, would you take it off the list?

25  A     If he's not using it and it was not effective in helping

1    him cope with his pain, yes.

2    Q    Do you know of any one person who has treated him or

3    continues to treat him that suggests he still needs a tens

4    unit?

5    A    I have no such information.

6    Q    And if there is no such information, you would take it

7    off the list?

8    A    Yes, sir.

9    Q    Let's talk about the surgery.

10            Dr. Mobin does not believe Mr. Bauta needs cervical

11   fusion at any point in time; correct.

12   A    True.

13   Q    Were you told about the testimony of Dr. Cordiale from

14   the first day of trial, the surgeon who actually performed the

15   surgery on Mr. Bauta?

16   A    I was not.

17   Q    Would you be surprised to learn he doesn't think

18   Mr. Bauta needs cervical fusion?

19   A    I have been doing this for 45 years, nothing would ever

20   surprise me.

21   Q    Okay.  Well, if his surgeon who actually performed the

22   procedure doesn't think he needs it, and Dr. Mobin doesn't

23   think he needs it, would you take it off the list?

24   A    Yes, sir.

25   Q    Even though Dr. Lattuga thinks he needs it?

```
 1    A    Yes, well, I've explained that in my direct examination
 2    why I kept it on.  But, again, if his treating doctor, who did
 3    his prior surgery, says that's not something that he would
 4    require, then I would -- yield to his opinion.
 5    Q    I think what you said on direct examination was that that
 6    was the question?
 7                THE COURT:  Sustained.
 8                MR. BARMEN:  Hum?
 9                THE COURT:  Sustained.
10    BY MR. BARMEN:
11    Q    Okay, let's move on.  The amount of homemaking.
12                You think Mr. Bauta needs four hours a day, seven
13    days a week for the rest of his life.
14    A    Yes, sir.
15    Q    And the homemaking is not skilled nursing care, right?
16    A    No.
17    Q    No, it's some cooking and some cleaning and some helping
18    him around the house?
19    A    Yes.
20    Q    And you believe that costs 22 to $24 an hour?
21    A    22 to $24 an hour is what the research indicates from the
22    various nursing agencies, yes, sir.
23    Q    Various nursing agencies, but he doesn't need a nurse,
24    does he?
25    A    No, but homemaking services come from nursing agencies
```

1    from private agencies.

2    Q    If you go through them, there are other ways to find that

3    kind of help, aren't there?

4    A    You have to give me an example.  I don't understand what

5    you're asking me.

6    Q    Hire a housekeeper for 10 bucks an hour?

7    A    Hire somebody off the street, is that what you're saying?

8    Q    Or through a different type of agency.

9    A    Well, I use homemaking services through nursing agencies

10   because of the fact that they will make sure that the person

11   is present when they are needed, and if there's vacations or

12   sickness or whatever, they can compensate for that by

13   providing another individual.  I've always used individuals

14   who are homemakers through nursing agencies.

15   Q    You would agree with me that, of all the items on your

16   list, the homemaking, roughly $35,000 a year for the next

17   40 years, is the biggest ticket item, right?

18   A    True.

19   Q    About $1.4 million of your 3 point whatever?

20   A    Whatever your calculations are.

21   Q    I calculate 35,000 for 40 years came out to 1.4 million?

22   A    Sounds good.

23   Q    Okay.  Now, when you hire someone to do home care;

24   cooking, cleaning, laundry, helping around the house a little

25   bit, you are not actually hiring that person, you are going to

PROVDER/CROSS/BARMEN

1   an agency, right?

2   A    Yes, sir.

3   Q    And you insist it's got to be a nursing agency?

4   A    I've always used nursing agencies to provide that

5   service.

6   Q    Has any one person who has ever seen Mr. Bauta medically

7   since October of 2013 said he needs a nurse?

8   A    I never -- that's never been my recommendation that he

9   needs a nurse and I've never seen anybody make that

10  recommendation.

11  Q    There are cleaning services, aren't there?

12  A    There are.

13  Q    Did you check to see what those cost?

14  A    I did not.

15  Q    Okay.  You interviewed Mr. Bauta back in September of

16  '15, correct?

17  A    September 2015, yes, sir.

18  Q    Okay.  And you took a history from him?

19  A    Yes, sir.

20  Q    And he told you what he could do and what he can't do?

21  A    Yes, sir.

22  Q    And he told you he's able to cook and clean and take care

23  of himself, it just takes him a little longer, right?

24  A    He had difficulty, but it took him longer, yes, sir.

25  Q    He also has two sisters and a brother-in-law that live in

PROVDER/CROSS/BARMEN

1   the area that help him at times?

2   A    That's what he indicated.

3   Q    He's been getting by just fine without any kind of home

4   care since the accident, hasn't he?

5   A    If you're asking me has he received home care since the

6   accident, the answer, he has not.

7   Q    When you met with him, did he indicate he would like it?

8   A    I don't recall whether I asked him one way or the other,

9   I'm sorry.

10  Q    Yet, you include that in your plan to the tune of almost

11  50 percent of the total; true?

12  A    It's a service that he needs, in my opinion.

13  Q    In your opinion.  What doctor has ever said he needs it?

14  A    There is no doctor that I've noted that states he needs

15  home care.

16  Q    That is completely and totally your opinion, correct?

17  A    My opinion based on my experience, yes, sir.

18

19              (Continued on the following page.)

20

21

22

23

24

25

```
 1              CROSS-EXAMINATION (CONTINUED)
 2   BY MR. BARMEN:
 3   Q    I think you said in talking about Wendy Cummings -- and
 4   then we'll move on to the next subject -- you made a point to
 5   say she has a BA in psychology?
 6   A    Yes.
 7   Q    And you said that, unlike you, psychologists don't deal
 8   with disabled people?
 9   A    Physically disabled.
10   Q    Right.  Physically disabled.
11              Isn't Mr. Bauta claiming a psychological disability
12   in this case?
13   A    Part of the psychological disability and a physical
14   disability, yes, sir.
15   Q    Okay.  So, based on your rationale, your way of thinking,
16   wouldn't Ms. Cummings be more qualified to opine on the
17   psychological issues than you?
18   A    I have 36 credits in psychology from the Pennsylvania
19   State University.  I also have masters level programs in
20   psychology also; but my speciality is working with disabled
21   individuals, not as a psychologist.  In fact, in a deposition
22   she stated that her work experience dealt with mental health
23   in a clinic.
24   Q    Will you answer my question, please, sir?
25   A    I don't know.  I answered the best I can.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. BARMEN:
 3   Q    Do you know if Mr. Bauta still uses a cane?
 4   A    I do not.
 5   Q    Were you ever shown surveillance we have of him?
 6   A    No, sir.
 7   Q    Let's talk about some of the items in your plan, sir.
 8   A    I can't hear you.  You have to speak into the microphone.
 9   I'm sorry.
10   Q    I said let's talk about some of the items in your plan.
11   A    Okay.
12   Q    I thought I understood you to say that, as part of your
13   assignment, you made -- you did a Google search, right?
14   A    In order to locate physicians in his geographical area,
15   yes, sir.
16   Q    And then you would call three to five of -- you would
17   look up an orthopedic on Google.  You'd see them come up in
18   the tristate area and you'd call three to five have those and
19   see what their services cost.  Fair?
20   A    I believe in the New York City area, yes.
21   Q    Okay.  New York City.
22              What about outside of New York City?
23   A    Like Westchester?
24   Q    Connecticut?  Jersey?
25   A    No, I tried to get --
```

PROVDER/CROSS/BARMEN

1   Q     Brooklyn?

2   A     I tried to get as close to the geographical area as

3   possible.

4   Q     Did you look in Brooklyn or was it just -- when you say

5   New York City, do you mean Manhattan?

6   A     I mean New York, Brooklyn, the Bronx.

7   Q     Okay.

8         THE COURT:  The five boroughs?

9         THE WITNESS:  The five boroughs, yes.

10        THE COURT:  Which is New York City.

11  BY MR. BARMEN:

12  Q     Let's talk about, for an example, orthopedists you have

13  listed here.  300 to $2,000.

14  A     Yes, sir.

15  Q     If you can get a service for 300, why would you ever pay

16  2,000?

17  A     I think I've testified to that already, that the service

18  for 300 may not be available at the time the person needs it.

19  Q     So, you go a different day?

20  A     Excuse me?

21  Q     So, you go a different day?

22  A     I don't understand your question.  There's a doctor that

23  charges $300 for the service.  There's another doctor that

24  charges more.  That doctor, when the person needs that

25  particular service, may not be available to them, because

LISA SCHMID, CCR, RMR

PROVDER/CROSS/BARMEN

```
 1    they're retired or they've sold their practice or whatever.

 2    So, that's why I give a range of the cost of the services.

 3    Q     Did you do anything to determine the quality of the

 4    services between the 300-dollar orthopedic or the 2,000-dollar

 5    orthopedic?

 6    A     I did not.

 7    Q     Right.  You don't know, do you?

 8    A     I do not.

 9    Q     Okay.  If you can find one qualified orthopedic to

10    provide services at 300, it's reasonable to think there are

11    more in the area, isn't there?

12    A     Not necessarily.

13    Q     But you don't know because you only checked with three to

14    five, right?

15    A     Well, three to five is the standard.

16    Q     It's your standard.

17    A     Well, Ms. Cummings didn't contact anybody.  She got it

18    all out of a book.

19    Q     That your understanding.

20    A     That's what she testified in her deposition.

21    Q     Okay.  In terms of you took a range.  In terms -- do you

22    know anything about statistics?

23    A     I'm not a mathematician.  Sorry.

24    Q     Do you know if three to five is a reasonable sample size

25    to get a mean?
```

PROVDER/CROSS/BARMEN

```
1                 MR. MCELFISH:  Objection.

2                 THE COURT:  Sustained.

3                 THE WITNESS:  Again, I'm not a mathematician.

4                 THE COURT:  Sustained.

5    BY MR. BARMEN:

6    Q    When you were on direct, you started with physiatry or

7    Mr. McElfish started with physiatry and you included pain

8    management in that, correct?

9    A    No, he said physiatry.  I said -- I included physiatry

10   individually and then pain individually.

11   Q    Right.  You're not double-billing, are you?

12   A    No, I'm not.

13   Q    We already talked about pain management.  So, we don't

14   have to worry about that.

15               Neurosurgeon, 2,640 to $9,000.  Can you name me one

16   neurosurgeon that Mr. Bauta has ever seen since the accident

17   at issue in the case?

18   A    I don't know whether he saw a neurosurgeon or not.  I

19   can't recall.

20   Q    Then why would you include it in your report to the tune

21   of nine grand?

22   A    I think it's noted in either Dr. Lattuga and Dr. Mobin's

23   reports.

24   Q    Take a look.

25   A    (Peruses document.)
```

LISA SCHMID, CCR, RMR

1          I do not see it in Dr. Lattuga's.

2    Q    I'm sorry?

3    A    I don't see it in Dr. Lattuga's report that he wrote.  I

4    do know that I went over it with Dr. Mobin.  When I spoke with

5    him, he said it was needed.

6    Q    Is it in Dr. Mobin's report, sir?

7    A    I don't have Dr. Mobin's report.  What happened was that

8    you took my files and never returned them to me.  So,

9    therefore, I have to redo my files.

10          MR. BARMEN:  May I approach?

11          THE COURT:  You may approach.

12          MR. BARMEN:  Here is Dr. Mobin's report (handing.)

13          MR. MCELFISH:  Both of them?

14          MR. BARMEN:  No.  I don't have it.  If you give me

15    the other one, I'll give it to him, too.  It's not in here.

16          THE WITNESS:  (Peruses document.)

17          Dr. Mobin has a spine specialist in his report.  He

18    could be a neurosurgeon.

19    BY MR. BARMEN:

20    Q    Does Dr. Mobin say he needs a neurosurgeon, sir?

21    A    Just says a spine specialist.

22    Q    Was the doctor that actually performed the surgery on his

23    spine a neurosurgeon or an orthopedist?

24    A    Orthopedist.

25    Q    Thank you.

1           And to be fair with you, sir, there were two reports

2   from Dr. Mobin.  There's one that postdates this one.  So, you

3   would agree with me that doesn't matter because you had

4   already done your report when you received Mobin's first

5   report.

6   A    I already testified to that; that's correct.

7   Q    So, could it be that you included neurosurgeon because

8   you were under the mistaken belief that Dr. Lattuga, the

9   doctor who never actually treated him, was a neurosurgeon?

10  A    No.

11  Q    You didn't say that Dr. Lattuga was a neurosurgeon in

12  your report?

13  A    (Peruses document).  I don't --

14  Q    May I direct you to page 10 of your report?

15  A    Hold on.  I see it.

16  Q    Will you answer my question, please?  Did you refer to

17  Dr. Lattuga in your report as a neurosurgeon?

18  A    Yes, sir.

19  Q    Now, do you -- does that refresh your recollection of why

20  you included a neurosurgeon in your lifecare plan?

21  A    Again, I don't recall.  I'm sorry.

22  Q    Would you agree with me that the only reference to the

23  record that you have about a neurosurgeon is your reference to

24  Dr. Lattuga as one?

25  A    In my report?

```
 1   Q    Yes.

 2   A    Yes, sir.

 3   Q    Dr. Lattuga is not a neurosurgeon, is he?

 4   A    True.

 5   Q    It's important to be accurate when you're doing these

 6   things, isn't it?

 7   A    I try to be as accurate as possible, yes, sir.

 8   Q    It's important to be thorough?

 9   A    I try.

10   Q    It's important to be fair?

11   A    I'm always fair, and I'm always objective.

12   Q    Okay.  Going back to the items in your plan, sir, do you

13   know if Mr. Bauta is currently doing physical therapy?

14   A    I do not.

15   Q    Do you know when the last time Mr. Bauta did physical

16   therapy?

17   A    I do not.

18   Q    Do you know if, when Mr. Bauta was actually prescribed

19   physical therapy, he was compliant?

20   A    I do not.

21   Q    Does it matter?

22   A    He needs the service.  Whether he's compliant or not --

23   Q    According --

24   A    -- that's up to him.

25   Q    According to who other than you?
```

```
 1   A     I don't understand the question.

 2   Q     You said he needed the service.  I want to know, other

 3   than you, who has said so.

 4   A     Well, at the time that I was evaluating him, he was

 5   receiving physical therapy.  Also, both Dr. Lattuga and

 6   Dr. Mobin indicated such.

 7   Q     Well, Dr. Mobin just agreed what you had already written

 8   after the fact, right?

 9             MR. MCELFISH:  Objection.  Argumentive.

10             THE COURT:  Sustained.

11             MR. BARMEN:  Okay.

12   BY MR. BARMEN:

13   Q     You saw Mr. Bauta in September of '15.  It is May of

14   2018.  Do you know when the last time he had physical therapy

15   was?

16   A     I already asked that question.  I answered the question:

17   I do not know.

18   Q     Do you know when the last time he was prescribed physical

19   therapy?

20   A     I do not know.

21   Q     Do you know if any physician, other than ones being paid

22   by his counsel, have recommended physical therapy for him?

23   A     I do not know.

24   Q     Does it matter?

25   A     Well, at the time I saw him, he was receiving physical
```

PROVDER/CROSS/BARMEN

1    therapy.  He needed the physical therapy due to his pain and

2    his discomfort, and it was noted by Dr. Mobin and Dr. Lattuga

3    he will need it in the future.

4    Q    Nobody other than Mobin or Lattuga.  Fair?

5    A    As far as I know, I don't recall any other doctors in the

6    reports noting it.

7    Q    Do you really believe that if two doctors disagree on a

8    course of treatment for this man that it's up to the jury to

9    decide what he needs medically?

10   A    I think the jury has to make a decision, has to weigh the

11   information.

12   Q    Let's talk about what we know in your report.

13        It purely comes from Dr. Lattuga, and I'm looking at

14   your Table A3.  It was Lattuga who said he would need MRIs of

15   the lumbar spine with the frequency that you have here,

16   correct?

17   A    You have to give me a second.  I have to get my ...

18   Q    Take your time, sir.

19   A    Okay.  Go ahead.

20   Q    Was it Dr. Lattuga who recommended the MRI for the

21   cervical and lumbar spines in their frequency?

22   A    Yes.

23   Q    Was it Dr. Lattuga who recommended the EMG study?

24   A    Yes.

25        (Continued on the next page.)

MDL   RPR

1    CROSS EXAMINATION

2    BY MR. BARMEN:  (Continuing)

3    Q    Was it Dr. Lattuga who initially -- strike that.  We

4    already talked about pain management.  I'm sorry.  I withdraw

5    it.

6              I think we covered everything, so we can move on.

7    Back to your report.

8    Q    You have some big ticket items; you have some small

9    ticket items in your report.  Just for example, a handheld

10   shower hose, $21 to $43, that's for the same item; right?

11   A    Yes.

12   Q    Well, if you can get it for 21, why would you pay 43?

13   A    I have already testified to that.  I testified the reason

14   is a range.  The 21 may not be available.

15   Q    When you called, and I'm assuming you're not calling over

16   an extended period of time, when you were calling on one item,

17   you're making these calls close in time; right?

18   A    Yes, exactly, but now we're three years since I saw him

19   approximately.  These items may not be available at this rate

20   in a three-year period.

21   Q    But this is what was available when you did this report

22   in 2015?

23   A    Exactly correct.

24   Q    Have you been done anything to update to see if there

25   have been any changes?

1   A     No.

2          THE COURT:  Sustained.

3   Q     You're not suggesting in here that on a handheld shower

4   hose it could be $21 one day and $43 some other time, this is

5   what it was at that time, correct?

6          MR. BARMEN:  Objection.

7          THE COURT:  Overruled.

8   A     Yes.

9   Q     If you can get it for $21, why would you include in your

10  report 43?

11         THE COURT:  Sustained.  Asked and answered.

12  Q     The cane, $8 or $20, why would you pay 20 if you can pay

13  8?

14         THE COURT:  Same answer, Mr. Provder?

15         THE WITNESS:  Yes.

16         THE COURT:  Sustained.

17         Everything in here as far as the durable medical

18  equipment and things like that, you provide a range because of

19  what you have explained, yes?

20         THE WITNESS:  Yes.

21  Q     Do you think Mr. Bauta needs a case manager?

22  A     Yes.

23  Q     I mean, you have seen the records, you know how many

24  different medical providers he has seen since 2013 and the

25  frequency with which he did so?

```
1    A     Yes.

2    Q     And he managed to do that by himself just fine, didn't

3    he?

4    A     Yes.

5    Q     But now he needs a case manager?

6    A     In my opinion, yes.

7    Q     When at the time he was managing himself, he had a whole

8    lot more doctors' appointments, didn't he, than he has now?

9    A     I don't know what his doctors' appointments are now.  I'm

10   sorry.

11   Q     Do you know as you sit here today how many different

12   treating providers he's treating with?

13   A     No, sir.

14   Q     If it were two, would he still need a case manager?

15   A     In my opinion, he needs a case manager.

16   Q     If they were only treating with two doctors at this time,

17   would he still need a case manager going forward?

18   A     The answer is yes.

19   Q     Okay.  How has he managed to get by without one so far?

20         THE COURT:  Sustained.

21         MR. McELFISH:  Objection.

22         I was going to make an objection.

23         MR. BARMEN:  Withdrawn.

24   Q     I know from reading your report and doing your

25   depositions that you think it's very important when you do
```

PROVDER/CROSS/BARMEN

1   these things to get the entire picture?

2   A    I try.

3   Q    And that includes how people were prior to whatever

4   incident that caused the problems you're doing a life care

5   plan for; right?

6   A    I'm not sure I understand your question.  I'm sorry.

7   Q    Well, I note from your report that you typically state --

8   or you state that you like to get a picture of the whole

9   person and look at any preexisting problems.

10  A    I take a history of preexisting problems because the fact

11  that attorneys ask me about preexisting problems, it's

12  irrelevant to me.  I am not a causality witness.

13  Q    But isn't it important to know how somebody functioned

14  before the incident that caused the purported change?

15  A    I'm not sure what you mean by function.

16  Q    Well, would it be interesting to know if he had ever

17  complained of head problems before the accident?

18  A    Again, I'm not a causality witness.

19  Q    Okay.  You were only provided with medical records that

20  go back to the date of the accident forward?

21         MR. McELFISH:  Objection.  Foundation.

22  A    That would be correct.  I've testified to that already.

23         THE COURT:  Overruled.

24         MR. BARMEN:  I'm just checking my notes here for a

25  moment.

 1          Mr. Provder, I don't have any other questions for

 2   you.  I appreciate your time, sir.

 3          THE WITNESS:  Thank you.

 4          MR. McELFISH:  Brief redirect.

 5          THE COURT:  Yes.

 6   REDIRECT EXAMINATION

 7   BY MR. McELFISH:

 8   Q    Okay.  Mr. Provder, I just want to cover a couple of

 9   things Mr. Barmen was questioning you about.  On the

10   neuropsych, you only understood -- you only relied upon

11   information that was provided to you prior to your

12   depositions; right?

13   A    True.

14   Q    If I were to tell you contrary to what Mr. Barmen told

15   you that Mr. Bauta has been undergoing psychological therapy

16   and treatment, would you still believe he would need a

17   baseline evaluation to bring it current?

18          MR. BARMEN:  Objection.

19          Sidebar, Your Honor.

20          MR. McELFISH:  Oppose.

21          (Sidebar held outside the hearing of the jury.)

22              (Continued on the following page.)

23

24

25

SIDEBAR

```
 1              (The following sidebar held outside of the hearing

 2    of the jury.)

 3              MR. BARMEN:  It's an inappropriate question and I

 4    ask that there be a clarification, because he just through

 5    dispersions to me at me in front of the jury.  I've

 6    acknowledged he is undergoing cognitive therapy he is not

 7    having any psychotherapy right now.  There is a difference.

 8              MR. McELFISH:  Why does that need a sidebar?

 9              MR. BARMEN:  Because I couldn't articulate my issue

10    in front --

11              MR. McELFISH:  It's not an issue.  It's not up to

12    you, Ray, it's up to the, Judge.

13              THE COURT:  Do you want to respond to that?

14              MR. McELFISH:  You can sustain the objection  and I

15    will re-ask it.

16              THE COURT:  Sustained.

17              MR. BARMEN:  I would  ask for a curative because now

18    it looks like I am misrepresenting something.

19              (Sidebar concluded.)

20

21

22

23

24

25
```

```
 1                  (Continued on next page.)

 2                  THE COURT:  Sustained.

 3                  MR. McELFISH:  I will withdraw and re-ask it.

 4                  MR. BARMEN:  As to the objection, Your Honor?

 5                  THE COURT:  Sustained.

 6                  MR. McELFISH:  Well, I withdraw it, but anyway.

 7  BY MR. McELFISH:

 8  Q    Mr. Provder, I want you to make the assumption that Mr.

 9  Bauta is still receiving cognitive therapy from one doctor,

10  Dr. Thomas.  Do you have the assumption in mind?

11  A    Yes.

12  Q    Do you still believe that not withstanding the cognitive

13  therapy he will still need a neuropsychological evaluation to

14  establish a baseline for future care?

15                  MR. BARMEN:  Objection.

16                  THE COURT:  Overruled.

17  A    Yes.

18                  THE COURT:  If you knew that Dr. Thomas was seeing

19  him repeatedly and continuing tests on him intermittently,

20  would your opinion be the same?

21                  THE WITNESS:  Well, a neuropsychological evaluation

22  consists of pretty much a full day's worth of testing and

23  measures areas of person's function.

24                  THE COURT:   Battery of tests?

25                  THE WITNESS:  Battery of tests, yes.
```

PROVDER/REDIRECT/McELFISH

1          THE COURT:  Assume that Dr. Thomas is doing to him.

2          THE WITNESS:  If he administering the batteries of

3    testing to him on a regular basis, then he wouldn't need the

4    neuropsychological evaluation either at the baseline or at the

5    end.

6          THE COURT:  Okay, go end.

7    Q    Mr. Provder, in follow-up questions to the Court, I want

8    you to make the assumptions that the last round of actual full

9    day of TBI testing by Dr. Thomas was more than a year or so or

10   two ago, given  that assumption in mind, would he need a

11   baseline test to have a projection for the future?

12          MR. BARMEN:  Objection.

13          THE COURT:  Overruled.

14   A    Well, the purpose of the neuropsychological evaluation is

15   to measure where the person's starts with and where he ends

16   after the cognitive rehabilitation.  So if he's already in

17   cognitive rehabilitation, a baseline has already past, so

18   there's no need for initial evaluation.  It's probably been

19   done already.

20          If there is a measurement as to his future needs and

21   whether he needs more cognitive rehabilitation he may need

22   another neuropsychological.

23          If, as the judge indicated, that he's receiving

24   testing on a regular basis, then there wouldn't be any need

25   for an end point of neurological testing.

PROVDER/REDIRECT/McELFISH

1    Q    So it comes down to what the doctors who are doing that

2    work have to say?

3    A    True.

4    Q    Okay.  Mr. Barmen was asking you about liens and what Mr.

5    Bauta owes or doesn't owe with respect to his liens on his

6    cognitive therapy.  Do you know, Mr. Provder, whether or not

7    Mr. Bauta actually owes that money or not under the lien

8    agreement?

9    A    I have no idea.

10   Q    As far as you're concerned here in front of this jury,

11   notwithstanding the questions you were asked, he very well may

12   be responsible for those balances?

13            THE COURT:  Sustained.  Sustained.  You don't know

14   what this lien is or whether he owes money or doesn't owe any

15   money, do you?

16            THE WITNESS:  I do not.

17   Q    You were asked by Mr. Barmen about the testimony of Dr.

18   Winn who was here yesterday before the jury talking about his

19   treatment of pain management.  I want you to make the

20   assumption that Dr. Winn was not asked to make a future

21   projection as to what type of pain management Mr. Bauta might

22   need in the future.  Do you have that in mind?

23   A    Yes, sir.

24   Q    Would you -- would it be proper and appropriate for you

25   as an expert in life care to opine, to rely upon the reports

1   and opinions of experts who have made such projections?

2   A    True.

3   Q    In fact, Dr. Winn, I want you to assume, testified that

4   he had not seen Mr. Bauta in a year or so, but nobody -- you

5   have no understanding as to why he did not go back until now?

6   A    True.

7   Q    Now, if you would, sir, I would like you to turn to Dr.

8   Mobin's report dated August 2016.

9             MR. McELFISH:  For the Court, Counsel, and the

10   witness, small screens, it is 403-0110.  So it is up for you,

11   Your Honor.

12   A    It is coming up on my screen?

13   Q    Yes.  It should be on -- sorry, now it should be up on

14   your screen.

15   A    Okay.

16   Q    Before I ask you about this area, Mr. Provder, can we

17   agree that as a life-care planner there are certain things

18   that you have enough background, education, and experience to

19   have an opinion on and there are other things, such as medical

20   opinions, that you need to rely upon others for those

21   opinions?

22   A    True.

23   Q    Okay.  So let's talk about the medical opinions that you

24   relied upon for your life-care planning in this case.  Would

25   you please tell the jury what Dr. Mobin opined, who is an

```
 1    expert neurosurgeon for Mr. Bauta on the medical?

 2              MR. BARMEN:  Objection.

 3              THE COURT:  This document that you're looking at,

 4    you didn't see that before you issued your opinion; correct?

 5              THE WITNESS:  No, I did not.  My opinion was issued

 6    before this.

 7              THE COURT:  And your opinion was issued prior to

 8    speaking with Dr. Mobin?

 9              THE WITNESS:  True.  As far as I know, this report

10    was rendered after I did my evaluation after I formulated my

11    opinion.

12              THE COURT:  What was the question?

13    Q    What were the items Dr. Mobin recommended for medical?

14              THE COURT:  Sustained.

15              MR. BARMEN:  Objection.

16              MR. McELFISH:  May I have a sidebar on that?

17              THE COURT:  Sure.

18              (Sidebar held outside the hearing of the jury.)

19              (Continued on the following page.)

20

21

22

23

24

25
```

SIDEBAR

```
1              (Sidebar.)

2              (The following sidebar held outside of the hearing

3    of the jury.)

4              MR. McELFISH:  The reason why I wanted one of my

5    rare sidebars, because he has -- well, he testified in

6    depositions and here on trial that he issued his report, that

7    he talked to Dr. Mobin and he read Dr. Mobin's reports and he

8    was going to supplement his report but he did not need to

9    because everything in Dr. Mobin's reports were consistent with

10   what Dr. Lattuga had offered as well other than the cervical

11   fusion.  He has already testified to that.  So you can't now

12   exclude him from opining on something that he reviewed and

13   elected not to update a report on and then he was deposed

14   twice.  He was deposed twice and Dr. Mobin was deposed twice

15   after that.

16             THE COURT:  There are a couple things that aren't

17   consistent with what Dr. Mobin testified to, but that's up to

18   you.

19             MR. BARMEN:  He can't say that he relied on

20   something that he didn't have at the time.

21             THE COURT:  No.  He is not asking that.  He's going

22   to ask if there are these things in Dr. Mobin's report which

23   was consistent with what was in his original report and,

24   therefore, he didn't need to supplement it.

25             MR. BARMEN:  Right.
```

SIDEBAR

1          MR. McELFISH:  Right.  Exactly.

2          MR. BARMEN:  I maintain my objection.

3          THE COURT:  All right.  Do it quickly.

4          MR. McELFISH:  I'm trying.

5          (Sidebar concluded.)

SIDEBAR

1          (Continued on the following page.)

2          (In open court.)

3          MR. BARMEN:  Right.

4          MR. McELFISH:  Right, exactly.

5          MR. BARMEN:  I maintain my objection, you're the

6     judge.

7          THE COURT:  All right.  Do it quickly.

8          MR. McELFISH:  I'm trying.

9          (Sidebar concluded.)

10          (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court.)
 2   Q    Mr. Provder, with respect to Dr. Mobin's reports, I
 3   believe you testified earlier to this jury that you reviewed
 4   two of his reports after you issued your report and you did
 5   not issue a supplemental report; correct?
 6   A    Right.
 7   Q    Can you tell the jury, please, why you did not change or
 8   update your report after seeing Dr. Mobin's extensive
 9   reporting?
10              MR. BARMEN:   Objection.
11   A    The only change was as I have indicated in prior
12   testimony was Dr. Mobin did not believe Mr. Bauta required a
13   cervical fusion.
14              (Continued on following page.)
15
16
17
18
19
20
21
22
23
24
25
```

1    REDIRECT EXAMINATION CONTINUES

2    BY MR. McELFISH:

3    Q    Well, here's what I'm getting at:  You made your original

4    report based upon the reports of Dr. Lattuga, correct?

5    A    Yes.

6    Q    Okay.  And then you reviewed Dr. Mobin's opinions and

7    reports after your report, correct?

8    A    Yes, and spoke with Dr. Mobin.

9    Q    Okay.  And what was the only thing different between

10   Dr. Lattuga's report and Dr. Mobin's reports?

11   A    Need for cervical fusion.

12   Q    And everything else was the same?

13   A    Yes.

14   Q    Now, going to P-403-0110, what was it that you took from

15   Dr. Mobin's reports or that were consistent with what

16   Dr. Lattuga had recommended that were items you were not,

17   yourself, qualified to opine on?

18            MR. BARMEN:  Objection.

19            THE COURT:  Sustained.

20   BY MR. McELFISH:

21   Q    For instance, Mr. Barmen was asking you about spine

22   specialists, orthopedists and neurosurgeons, do you remember

23   that?

24   A    Yes.

25   Q    Dr. Mobin believes, according to his opinions that you

1    relied upon, that he needed that, true?

2            MR. BARMEN:   Objection.

3    A    Yes.

4            THE COURT:   Sustained.   He do not rely upon

5    Dr. Mobin's opinions in rendering his first report.

6    BY MR. McELFISH:

7    Q    Did Dr. Lattuga believe that Mr. Bauta needed future

8    spine care and future surgery based on his report?

9    A    Yes.

10   Q    And that was consistent with what Dr. Mobin said, except

11   for the cervical fusion?

12   A    Yes.

13   Q    All right.   And most importantly, Mr. Barmen was asking

14   you questions related to Dr. Winn and pain management.   Did

15   Dr. Lattuga recommend future pain management, epidurals, facet

16   blocks?

17   A    Yes.

18   Q    And Dr. Mobin did as well?

19   A    Yes.

20   Q    So, in your view, they were consistent in that regard?

21   A    Yes.

22           THE COURT:   But you didn't know that until after

23   you issued your report?

24           THE WITNESS:   True.

25   BY MR. McELFISH:

1  Q    But if you knew that after you issued your report and

2  they were the same, you elected not to go back and change your

3  report because it did not change your opinion?

4           MR. BARMEN:  Objection, asked and answered.

5           THE COURT:  Sustained.

6  BY MR. McELFISH:

7  Q    And with respect to medial branch blocks, Dr. Lattuga,

8  the orthopedic spine surgeon, recommended that those be

9  needed?

10  A    Yes.

11  Q    And Dr. Mobin did, as well?

12  A    Yes.

13  Q    And that was consistent?

14  A    Yes.

15  Q    With respect to -- just two more items, the MRIs and

16  imaging that would be needed in the future, Dr. Lattuga

17  recommended that those would be needed?

18  A    Yes.

19  Q    And Dr. Mobin, the neurosurgeon who will testify here,

20  agreed with that and it was consistent?

21  A    Yes.

22  Q    You were asked about the opinion of Dr. Cordiale, the

23  surgeon in this case who testified before the jury on Monday.

24  I want you to make the assumption that Dr. Cordiale said he

25  was not sure yet whether or not he needed future surgery, he

```
 1    was still monitoring Mr. Bauta.
 2            Do you have that opinion in mind?
 3    A    Yes.
 4            MR. BARMEN:  Objection.
 5            THE COURT:  Sustained.
 6            No, I will allow it.
 7            MR. McELFISH:  May I ask you to have the court
 8    reporter to read it back?
 9            Well, before I do that...
10    BY MR. McELFISH:
11    Q    Before you do that, Mr. Provder, do you have the question
12    in mind?
13    A    Yes.
14    Q    Go ahead.
15    A    Yes, well, he indicated that he had been monitoring his
16    situation, which means he may or may not need future surgery.
17            THE COURT:   In that situation, what would you do
18    with your lifecare plan?
19            THE WITNESS:  Well, I would do exactly what I have.
20    I have both options.  Certainly, the back surgery seems to be
21    recommended by possible both doctors, so I included it both.
22            THE COURT:  So you would include cervical surgery,
23    even though his spine doctor is just monitoring that?
24            THE WITNESS:  No.  I think that these are two
25    options, but certainly there is a possibility of -- Dr. Mobin
```

1    talks about this also -- about future back surgery, lumbar

2    surgery.

3              THE COURT:   So you would include the lumbar

4    surgery, but not the cervical surgery?

5              THE WITNESS:   True.

6    BY MR. McELFISH:

7    Q    Now, Mr. Provder, if you make the assumption that the

8    treating doctor wasn't out of place in his treatment to make a

9    prognosis on what future care he might need, would you find

10   that information more reliable or the information from an

11   expert witness, and in this case two expert witnesses, who

12   have offered the opinion that future care is more probable

13   than not?

14             MR. BARMEN:   Objection, Your Honor.

15             THE COURT:   Sustained.

16             MR. BARMEN:   There is only one expert witness.

17             THE COURT:   Correct.

18             MR. McELFISH:   Let me rephrase the question then.

19   BY MR. McELFISH:

20   Q    I want you to assume hypothetically that the treating

21   surgeon who was still monitoring the patient, Mr. Bauta, with

22   respect to any future prognosis of future surgery, would you

23   rely more on that being undetermined or would you rely upon

24   the opinion of a neurosurgeon who has an opinion to a

25   reasonable degree of medical certainty on future care?

 1             MR. BARMEN:  Objection.

 2             THE COURT:  Sustained.  I don't understand the

 3    hypothetical.

 4    BY MR. McELFISH:

 5    Q    In other words, a treating doctor hasn't issued an

 6    opinion, an expert opinion, on what the future care will be,

 7    more probable than not; an expert witness has.  Which one is

 8    more reliable?

 9             MR. BARMEN:  Objection.

10    Q    For lifecare planning.

11             THE COURT:  I will allow it.

12    A    I can't answer that question.  You've got one doctor who

13    is the consulting expert witness says that he needs it, and

14    then you have a treating doctor who says he's monitoring it.

15    I can't -- I can't cut the baby in half.  I don't know.

16    Q    Okay.  But for your opinion, you've relied upon expert

17    witnesses who have made that projection?

18    A    True.

19    Q    I want to discuss homemaking with you.

20             MR. McELFISH:  I am getting near the end,

21    thankfully.

22    Q    The homemaking, you were asked by Mr. Barmen about

23    whether or not he would need a nurse, which you said he did

24    not need a nurse?

25    A    I never recommended a nurse.

1    Q    I understand.  But you did testify that when you put

2    these numbers into your life care plans, you rely on certain

3    agencies?

4    A    Yes, there are agencies that provide homemaking services.

5    Q    And can you tell the jury why you would recommend and

6    it's your opinion to have the -- the proper agency to do this

7    work, rather than a cleaning service or a custodial service?

8             THE COURT:   He has already testified to that.

9             You testified to that, right, Mr. Provder?

10            THE WITNESS:   Yes, sir.  Yes, Your Honor.

11   BY MR. McELFISH:

12   Q    Lastly, you were asked why, if Mr. Bauta has had all

13   these doctor's appointments up until now, why he would need a

14   case manager going toward.  Do you have an opinion on that?

15   A    Yes, I've already testified that he's going to need a

16   case manager to coordinate any services he's going to require,

17   coordinate between him and any future care he is going to

18   need.

19   Q    Well, the suggestion was made he didn't need it before up

20   until now.  What is your opinion on why he will need it going

21   forward?

22   A    The same opinion that he needed it before; it's to make

23   sure he receives the necessary services, serve as a liaison

24   between him and the various doctors and any future care or

25   items he is going to need, as well as the system and adjusting

```
1    to his disability.

2              MR. McELFISH:  Thank you.

3              MR. BARMEN:  No need.

4              THE COURT:  Thank you, Mr. Provder.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  You are excused.

7              (Witness excused.)

8              THE COURT:  All right, we are going to take our

9    lunch break, ladies and gentlemen.  We will resume at

10   two o'clock.

11             (Jury exits.)

12             THE COURT:  This Dr. Kucsma is going to testify to

13   the present value of the lifecare plan?

14             MR. McELFISH:  Yes.

15             THE COURT:  That's it?

16             MR. McELFISH:  Yes.

17             THE COURT:  It will take 10 minutes?

18             MR. McELFISH:  It depends on the interruptions.

19             MR. BARMEN:  Well, there is an issue about that,

20   Your Honor.

21             MR. McELFISH:  See.

22             MR. BARMEN:  And it's a different issue.  I mean

23   because, really, the difference between the number -- I had a

24   chance to look at it.  The difference between the number, and

25   it is lower by about 17 grand, that's not the issue.
```

1           The issue is -- and, again, I'm not an economist,

2     but when you take Mr. Provder's number and reduce it to

3     present value, it's supposed to be lower, right?  How can an

4     economist come in and reduce his number to present value and

5     it be higher than his number?

6           THE COURT:  Based on which, based on which of her

7     opinions, the one --

8           MR. BARMEN:  Both of them.

9           THE COURT:  -- in the supplemental?

10          MR. BARMEN:  May I approach?

11          THE COURT:  Yes.

12          MR. BARMEN:  Here is Provder, total plan cost.  That

13    is not reduced to present value.  Reduced to present value --

14    there is the number they sent me this morning (indicating) by

15    their economist.  Reduced to present value, that's higher.  I

16    don't understand it.  I need my economist to look at this.

17          THE COURT:  Are you calling an economist?

18          MR. BARMEN:  We have one with our plan, but --

19          THE COURT:  Well, they can explain it.

20          MR. BARMEN:  I mean, if they're not actually

21    reducing it to present value, how is she relevant to testify?

22          THE COURT:  Well, this is per year.

23          MR. BARMEN:  Right, and this is the total of the

24    plan costs.

25          THE COURT:  Total plan costs, I see.  So these are

1    the total plan costs.  So this is -- I don't have my

2    calculator.  I see.  So if you take -- and he's got

3    40.4 years --

4            MR. McELFISH:  Well, she has a different number on

5    the years.  They didn't ask Provder about that, but her

6    numbers are different.

7            MR. BARMEN:  Life expectancy is life expectancy.

8    The table is the table.

9            MR. McELFISH:  She has different years, she used the

10   table and he didn't.

11           THE COURT:  Did you depose her?

12           MR. BARMEN:  We did, but then we got different

13   numbers this morning.

14            If she is going to come in-- if the only point of

15   her is to reduce it to present value, why does she need to

16   testify if her number is higher?  There's the number.

17           THE COURT:  I don't know why, frankly.  I don't

18   know why you need an economist at all.  This can all be

19   handled post trial.  You take the number and discounting to

20   present value is an arithmetic computation.  It should not

21   really be in dispute and you can do it afterwards.

22           But look, you paid for your experts, let them

23   testify.  She can bring in the new one.  It makes sense, and

24   you cross-examine her and you deal with it.

25           MR. BARMEN:  Okay, thank you.

```
 1              THE COURT:   But she is going to be done.  We are

 2    going to start her at 2:00 and I would like her to be done by

 3    three o'clock, including cross-examination, because you do not

 4    have to go through each and every single thing.  Give the

 5    methodology and the totals, and then she gets cross-examined.

 6              MR. McELFISH:   Why did you sustain objections to the

 7    publication of the summary lifecare plan?

 8              THE COURT:   Because its an expert report and the

 9    jury can do the calculation.  They were all taking down the

10    numbers that he said.

11              MR. McELFISH:   Oh, they were.

12              Just so I understand, what about for just for

13    demonstrative purposes --

14              MR. BARMEN:   I would object.

15              MR. McELFISH:    -- as opposed to putting it into

16    evidence?  I just want to understand so I know.  We still have

17    a ways to go in the trial.  I mean, that's what I offered it

18    for.

19              MR. BARMEN:   Expert reports haven't been coming in.

20              THE COURT:   If you want to create a demonstrative

21    saying the totals of Mr. Provder's things are this, that and

22    the other thing, you create your own as a demonstrative, that

23    is fine.

24              MR. McELFISH:   That's what that was.

25              THE COURT:   It has to be based on his testimony.
```

```
 1              THE COURT:   No, it is his report.

 2              MR. BARMEN:  Right.

 3              MR. McELFISH:  Like in state court, that is used

 4    just as the demonstrative because it's really not part of the

 5    report in how --

 6              THE COURT:   Demonstratives are not going to be

 7    going back to the jury room.

 8              MR. McELFISH:  Correct.

 9              MR. BARMEN:  I understand that.

10              MR. McELFISH:  But I can use it in closing, correct?

11              THE COURT:   Sure.

12              MR. BARMEN:  Thank you, Your Honor.

13              THE COURT:  But technically, if you use this piece

14    of paper as a demonstrative, it is still his report.  So type

15    it up again --

16              MR. McELFISH:  Okay.

17              THE COURT:   -- and show it to them before you give

18    it.

19              MR. McELFISH:  Okay.

20              MR. BARMEN:  Thank you.

21              (Luncheon recess now taken.)

22

23

24

25
```

```
 1                  A F T E R N O O N   S E S S I O N
 2            THE COURT:  Okay.  I want to raise an issue with you
 3    and I take full responsibility for this but it will speed up
 4    the trial, however slightly.
 5            I intend --
 6            MR. BARMEN:  Your Honor, I'm sorry.  The next
 7    witness is in the courtroom.  Is that okay?
 8            MR. McELFISH:  Ms. Kucsma, can you sit outside?
 9            DR. KUCSMA:  Oh, sure.
10            THE COURT:  Thank you.
11            DR. KUCSMA:  Yes.
12            (Dr. Kucsma leaves the courtroom.)
13            THE COURT:  Ms. Kucsma, Dr. Kucsma, and the
14    defendant's economic expert will testify as to present value?
15            MR. McELFISH:  Yes.
16            THE COURT:  We're not hearing that testimony.  We're
17    going to take it after the trial is over.
18            The jury's -- for many reasons.  A jury, if you look
19    at the special verdict sheet that I gave you, we asked them
20    two questions related to futures damages.  (5) is future pain
21    and suffering and emotional distress; and we asked them to
22    state the number of years.  And then (7) is medical care and
23    et cetera, et cetera; and similarly they would have to state
24    the number of years.
25            There's no way for the jury to make the present
```

value calculation on their own.  They're just not going to be

able to do it, and it's typically done by the Court.  If you

look at CPLR 5041 or is it -- it's 5041, I think.  It

specifically says that the Court -- it talks about entering

judgments.  The Court has to enter judgment after the trier of

fact has determined certain issues.  Entering judgments for

future pain and suffering, you state, you gave the number of

years found by the trier of fact, 410, whichever is less; and

for damages of greater than $250,000, you have to discount it

to present value.

          The jury's not going to be able to do it.  They're

just not going to be able to it.  I've done it in the past,

and I should have raised this with you before.  I've done it

in the past after the jury's entered these similar findings,

if the parties cannot agree to what the present value is.

          MR. McELFISH:  The problem is is that the witnesses

to date have not put the life expectancy on the number of

years in evidence, and that's one thing that Ms. Kucsma was

going to testify about.  So, I don't want to cut her loose

unless we have all issues wrapped up.  I mean, she may be able

to testify as to things that we need for yourself, to --

          THE COURT:  I know how to do --

          MR. McELFISH:  You know what I mean.

          THE COURT:  Then she can do that.  She can testify

to --

```
1              MR. BARMEN:  We can stipulate to ...

2              THE COURT:  I mean, well, she has different life

3    expectancy than --

4              MR. McELFISH:  Yes.

5              THE COURT:  -- Mr. Provder and your expert, yes.

6              MR. BARMEN:  The U.S. Department of Labor, I mean,

7    whatever the Federal Government says it is, we would stipulate

8    to that.

9              THE COURT:  Where does she get her life expectancy?

10             MR. McELFISH:  I'd have to ask her.  I'd have to ask

11   her.  I mean, I've got her here.

12             THE COURT:  Well, I'm not going to -- I'm not going

13   to -- because she's going to say, "I relied on his numbers,

14   Provder's numbers" --

15             MR. McELFISH:  Yeah.

16             THE COURT:  -- and calculated the present value and

17   it's -- she going to tell what her discount rate is that she

18   used, which may or may not be in line with the case law.

19   Right?  And she's going to say and it's this.

20             What if the jury finds that the number that she used

21   for home care, that he provided is different?  Then her

22   calculation, shhh, gone.  We're going to end up with that,

23   unless the numbers that the jury puts down are exactly what he

24   testified to.

25             MR. McELFISH:  What are you pointing at?  (7) now?
```

```
1              THE COURT:  Pointing at (7).  So, if you want her to
2    tell me -- tell the jury what his life expectancy is and why,
3    that's fine.  That's five minutes in five minutes of cross
4    but -- and I apologize and this is my fault.  I don't want to
5    confuse them with a lot of present value discussions and what
6    a discount rate is and how it applies if they're not going to
7    be asked to do that at the end of the day.
8              MR. McELFISH:  Okay.  Fine.  Can I just ask that we
9    do one thing then?  Can we have, just because I don't know the
10   answer to this -- I'm not an economist.  So, can Dr. Kucsma
11   come in out of the presence of the jury and not have, like, a
12   formal hearing or anything but have you for two minutes go
13   through the things that you need or are going to calculate and
14   ask her, "Are you going to testify to anything else," so that
15   I don't lose that.
16             And if she -- if you already have everything you
17   need, she can't add anything new to it and the only thing left
18   is the life expectancy, fine, I don't care.
19             MR. BARMEN:  I don't understand what he's saying.  I
20   mean, if the Court --
21             THE COURT:  I think what Mr. McElfish is saying is
22   he wants to make sure that I have the information that I need
23   and my methodology is going to be the proper methodology on
24   determining present value of whatever the jury finds.
25             MR. BARMEN:  Well, here's the issue I have with
```

1    that; and I'll be the first one to tell you I'm way out of my

2    element when it comes to this kind of stuff but my economist

3    says her -- you know, if there's a dispute as to what's wrong,

4    if the Court has a method the Court has used in the past and

5    the Court is comfortable with, I would much rather you do that

6    rather than take advice from the economist they're paying for.

7            MR. McELFISH:  I'm not asking you to take advice

8    from them.  What I'm trying to make sure of is that she

9    doesn't -- and I shouldn't -- I have to tell you.  I should

10   know every area of her testimony by heart, and I just don't

11   right now off the top of my head.  She may have an area of

12   testimony that she can tell you she has, that you say, "Well,

13   that's something she can testify to that I don't need."  Do

14   you see what I'm saying?  It will only take a minute.  We

15   could have done it already.

16           THE COURT:  Sure.  All right.  Your expert can look

17   at her testimony and give me the same education or not the

18   same but I guess it would be a different education.

19           MR. BARMEN:  My expert can look at her testimony.

20   There's not a separation of witnesses order that we have to be

21   concerned about?

22           THE COURT:  I only want to hear from your expert

23   if -- I'm going to ask, through Mr. McElfish, ask her, "How do

24   you calculate present value?"

25           You take this.  Multiply it by this.

1          MR. McELFISH:  Oh, I had a different idea.

2          THE COURT:  And you divide it by that.

3          MR. BARMEN:  But shouldn't this be done at the 50(b)

4    hearing?

5          THE COURT:  But she's here.  The point is she's

6    here.

7          MR. McELFISH:  She's here.

8          THE COURT:  And so he would have to pay her another

9    time to come back.

10         MR. BARMEN:  So, understanding the Court's not going

11   to take this testimony in open court, I now have to pay to

12   bring my guy in to do the same thing?

13         THE COURT:  You'd have to pay your guy to do it at a

14   50(b) hearing, too, right?

15         MR. BARMEN:  Well, now it seems like it's going to

16   have to happen twice.

17         THE COURT:  You can wait until then if you want.  I

18   mean, the point is she's here.

19         MR. McELFISH:  I don't want to take much time with

20   it.  I just want to make sure I have all of her opinions; and

21   you might say, well, that is an opinion that she can offer to

22   the jury that I don't need.

23         THE COURT:  You're not running through everything.

24         MR. McELFISH:  It would only take a minute, only a

25   few minutes.  I promise you just a couple of minutes.

```
 1              MR. BARMEN:  Your Honor, respectfully, I don't
 2    understand.  You either come and you tell us you made a
 3    decision and he convinces you otherwise and it happens time
 4    and time again.  I mean --
 5              THE COURT:  And it's happened the other way, too.  I
 6    give everyone the opportunity to change my mind.  All right.
 7              So, let's have her come and testify outside the
 8    presence of the jury.
 9              MR. McELFISH:  Doctor, would you please step
10    forward, please?
11              DR. KUCSMA:  Yes.
12              MR. SHAUB:  Your Honor, one more point.  Present
13    value is not an issue for the jury, according to the PJI, New
14    York PJI, which is what we've all agreed applies in this case.
15              THE COURT:  She's -- oh, that's defined to me.
16              MR. SHAUB:  Mr. McElfish said we're going to open
17    this up and have the jury to decide present value.
18              THE COURT:  Well, the jury needs to decide life
19    expectancy.
20              MR. SHAUB:  Okay.
21              MR. McELFISH:  Judge, one other issue is that do
22    we -- are we able to get a number into -- you didn't let me
23    get numbers in on the opening, which I understand.  Can I get
24    numbers into closing without her specific testimony as to what
25    the numbers are?
```

1          THE COURT:  What numbers?

2          MR. McELFISH:  The future -- for the future medical

3     care.  Now, Mr. Provder gave a number.

4          THE COURT:  Yes, but that doesn't come in through

5     Dr. Kucsma.

6          MR. McELFISH:  Okay.  That's what I wanted to know.

7     So, if it came in through Provder, that's the number I'll use.

8          THE COURT:  From what I understand, Dr. Kucsma

9     relied on his numbers to do the present value calculation.

10         MR. McELFISH:  Well, we're going to find out.  Let's

11    take a minute and do it.

12         THE COURT:  Sure.

13         MR. McELFISH:  I'm going to skip all of the --

14         THE COURT:  Please stand up.

15         DR. KUCSMA:  Sure.

16         (Witness sworn by the judge.)

17         THE COURT:  Please be seated.  Tell the jury -- the

18    court reporter your name and please spell it.

19         THE WITNESS:  Kristin, K-R-I-S-T-I-N; Kucsma,

20    K-U-C-S-M-A.

21         THE COURT:  Go ahead.

22                         EXAMINATION

23    BY MR. McELFISH:

24    Q    Dr. Kucsma, good afternoon.

25    A    Good afternoon.

1   Q     You're the economist for the plaintiff in this case?

2   A     Yes, I am.

3   Q     Can you tell the Court briefly the different -- if you

4   have, like, a list of opinions in the case, to make it simple,

5   what are the areas you intend to testify on?

6   A     In this case I intended to testify about the calculation

7   of lifetime care costs.  My calculations consist of two

8   pieces.

9         Number One, I researched and determined the

10  appropriate inflation rates to apply to each one of the base

11  costs in Ed Provder's report.  That's necessary, of course, to

12  calculate how the costs are going to increase each year over

13  the plaintiff's life expectancy.

14        Once I've calculated the future cost for each and

15  every year from 2018 through the plaintiff's statistical life

16  expectancy, I then also reduced those figures to present

17  value.  There are two steps involved:  Number One, the

18  application of the proper and appropriate inflation rates; and

19  then, Number Two, subsequent reduction to present value.

20  Q     And that's the discount rates.

21  A     That's the discount rate, yes.

22  Q     And, Doctor, do you for --

23        THE COURT:  What is the discount rate, the inflation

24  rate or the present -- that you use for the present value?

25        THE WITNESS:  The discount rate is the interest rate

1  used to reduce the future value to present value, and I used a

2  discount rate or an interest rate of 4 percent.

3         THE COURT:  If the case law says it's 2 percent in

4  New York?

5         THE WITNESS:  Then, yes, the case law, I believe,

6  links it to the U.S. Treasury rate.  I could use those.  My

7  numbers then would all be larger than those calculated.

8         THE COURT:  Your discount rate is what?

9         THE WITNESS:  Four percent.

10         THE COURT:  Four percent?

11         THE WITNESS:  Yes.

12         THE COURT:  And how do you calculate present value?

13  Tell me that.

14         THE WITNESS:  How did I select 4 percent?

15         THE COURT:  Give me your formula for calculating --

16         THE WITNESS:  The formula for --

17         THE COURT:  Present value.

18         THE WITNESS:  -- present value is to take the future

19  value in each year, divide it by open parenthesis, one plus

20  the interest rate, closed parentheses, raised to the number of

21  years.

22         So, for example, if we're looking at cost in Year

23  Two, it's cost in Year Two divided by one plus five squared.

24  If we're looking at cost in Year Ten it, it's cost in Year Ten

25  divided by one plus the interest rate, raised to the tenth

1    power.

2              And that computation has to be performed

3    individually for each year from 2018 through 2054; and it has

4    to be calculated and performed for each element of

5    Mr. Provder's lifecare plan.

6              THE COURT:  So, the future value for each year is

7    determined by taking what Mr. Provder said, what it cost for

8    whatever?

9              THE WITNESS:  Correct, and applying inflation rates

10   to it.

11             THE COURT:  Which is 4 percent.

12             THE WITNESS:  No.  The inflation rates are

13   different.  The discount rate is the interest rate.  That

14   represents the average interest rate that the plaintiff could

15   get if he got a lump sum award in this matter and invested it.

16   That's completely different from the inflation rates which are

17   a reflection of how much the cost of each category of care are

18   likely to increase each year going forward.

19             THE COURT:  Where do you get those?  Where do you

20   get the inflation rate?

21             THE WITNESS:  The inflation rates are based

22   primarily on data published through the U.S. Department of

23   Labor.  I started by considering various Consumer Price

24   Indexes published through the U.S. Department of Labor.  There

25   are different Consumer Price Indexes for different categories

1    of medical care.  For example, there's a CPI for physician

2    services that is different from the CPI for other medical

3    professionals and so on.  So, I looked at all the different

4    categories.  I also considered data published in the -- by the

5    U.S. Department of Labor about projections of growth in

6    various health-related industries.

7                    THE COURT:  Let me ask you a question.

8                    THE WITNESS:  Sure.

9                    THE COURT:  You used Mr. Provder's numbers as a

10   starting point.

11                   THE WITNESS:  Yes, Your Honor.

12                   THE COURT:  And if the jury finds a different number

13   for whatever it is, your calculation is meaningless.

14                   THE WITNESS:  Yes and no.  I say that only because,

15   for example, if I came with up with a figure of one million

16   dollars for pain management --

17                   THE COURT:  Um-hum (affirmative response.)

18                   THE WITNESS:  -- and the jury decided that Mr.

19   Provder's number should be half of what it was, they could

20   take my number and cut it in half.  The advantage to having my

21   calculations, at least I think, is that it builds in the

22   inflation rate and that's significant.  I mean, you know, 50

23   years ago it cost 20 cents to ride the subway in New York.

24   Now, it costs $2.75.

25                   THE COURT:  What is the life expectancy of

1    Mr. Bauta?

2            THE WITNESS:  Based on the most up-to-date National

3    Vital Statistics reports, it is 78.94 years, so in other

4    words, through November 30th, 2054.

5            THE COURT:  And what did Mr. Provder -- well, he did

6    it back when, right?

7            THE WITNESS:  Yes.

8            THE COURT:  2015?

9            THE WITNESS:  2015, correct.

10           THE COURT:  What was -- did he testify to his

11   life -- to Mr. Bauta's life expectancy or no?

12           MR. McELFISH:  He did not, and the reason is is that

13   I knew Ms. Kucsma was going to give the proper life

14   expectancy.  So, I didn't want to start going down that road.

15           MR. BARMEN:  If that's the number, stipulate to it.

16           THE COURT:  All right.  We'll stipulate to 78.9

17   years.

18   BY MR. McELFISH:

19   Q    What is that based on, Chris?

20   A    That's based on the most up-to-date National Vital

21   Statistic reports.

22           (The Court confers with the law clerk.)

23           THE COURT:  Okay.  And how old is he now?

24           THE WITNESS:  Forty-two.

25           MR. McELFISH:  Forty-two.

```
 1              MR. BARMEN:  The question, I guess, becomes:  What's
 2     the appropriate table to use?
 3              Social Security has a slightly different table.  So,
 4     what I'm willing to stipulate to is what is generally regarded
 5     as the proper one to use.  I don't think the number's
 6     significantly different but it should be the number that is
 7     typically used in these situations and I'm not sure it's that
 8     one.
 9              THE COURT:  What table did you use?
10              THE WITNESS:  I think it is.
11              What I've done, and what I always do when I testify
12     in New York in both Federal and state court, is simply use the
13     same data source that is cited in the PJI, which is the
14     National Vital Statistics reports.  What I use though is the
15     most current data.  The PJI is usually a few years behind,
16     which makes sense.  So, I simply go online and I simply go to
17     the Centers for Disease Control and download the most
18     up-to-National Vital Statistics report.
19              MR. BARMEN:  Your Honor, we're fine with that.
20              THE COURT:  So, they'll stipulated to -- and that,
21     as of today, that's what his life expectancy is?
22              THE WITNESS:  Yes.
23              THE COURT:  78.9 years?
24              MR. McELFISH:  Yes.
25              THE COURT:  So, they'll stipulate to that.
```

1              Are you okay with that?

2              MR. McELFISH:  Of course.

3              THE COURT:  The jury doesn't need to hear that from

4   Dr. Kucsma.

5              MR. McELFISH:  Okay.

6              THE COURT:  All right.  Everything else you've

7   testified to is in my mind an issue for the Court to decide.

8              MR. McELFISH:  Let me just ask one more question.

9   BY MR. McELFISH:

10  Q    Other than the opinions you've given to the Court today

11  in terms of the general contract categories, Doctor, do you

12  have any other opinions that you have not expressed?

13  A    Yes.  Again, typically what I do when I have testified in

14  other cases in New York and we have not reduced the figures to

15  presented value, what I do in those cases is I testify to the

16  inflation rates and I'm certainly not the legal expert in the

17  room but I think in those cases the CPLR says that I should

18  testify to the yearly amount in current dollars, as well as

19  the yearly increase going forward.  So, that's what I usually

20  will do in those cases.

21             For example, in medical malpractice, personal injury

22  in New York, what I'll typically do is testify to the actual

23  inflation rates but not perform the calculations.

24             THE COURT:  And you get your inflation rates where?

25             THE WITNESS:  My inflation rates are based on data

1    published through the U.S. Department of Labor.

2              Number One, I look at Consumer Price Index data.

3    Number Two, I look at wage data.  Number Three, I look at data

4    published through the Occupational Outlook Handbook that

5    contains ten-year projections about anticipated growth in

6    various industries -- home health aides, physical therapists,

7    physicians, and so on.

8              And as some of my background research, I typically

9    review reports that are published by the Centers for Medicaid

10   and Medicare Services as well; but I don't really extract any

11   data from that source.

12             THE COURT:  And you used a New York 4 percent

13   discount.

14             THE WITNESS:  That's the interest rate, yes.  I

15   actually have multiple, different inflation rates, depending

16   on the different categories of care contained in Mr. Provder's

17   report.

18             THE COURT:  And if you were provided with the

19   findings of fact from the jury as to each category of damage,

20   future damage, and the number of years over which that damage

21   is expected to occur --

22             THE WITNESS:  Yes.

23             THE COURT:  -- you could plug that into, you know,

24   the spreadsheet that will kick out a number?

25             THE WITNESS:  I --

1          THE COURT:  Numbers.

2          THE WITNESS:  It would kick out lots of numbers.

3          THE COURT:  Numbers.

4          THE WITNESS:  That's exactly what I would need to do

5    is take their -- whatever cost the jury decided was

6    appropriate, whether it was Mr. Provder's or something higher

7    or lower.  I would take that, put it into the spreadsheets.

8    Then I would have to apply the inflation rates year over year.

9    Then I could reduce to it present value, or I could leave that

10   obviously for the Court to handle post-verdict.

11         THE COURT:  If I told you that the discount rate

12   should be 2 percent, you could get a calculation.

13         THE WITNESS:  I could also do that as well.  I could

14   do all the calculations if you gave me all the inputs.

15         THE COURT:  Okay.

16         THE WITNESS:  Of course.

17         THE COURT:  All right.

18   BY MR. McELFISH:

19   Q    Do you have any other opinions, Dr. Kucsma, we've not

20   discussed?  I just want to made make sure I don't miss

21   anything.

22   A    Uh --

23   Q    Not rebuttal opinions on Dr. Goldman.  We don't need

24   that.

25   A    I don't believe -- I think the only thing I haven't

1    expressly stated --

2            THE WITNESS:  I don't know if you want me to or not,

3    Your Honor.  Just tell me.  I have not expressly stated the

4    inflation rates.  I don't know if you want me to or if you

5    want to save that for later.

6            THE COURT:  I would -- let's save it for later.

7            THE WITNESS:  (Nods head affirmatively.)

8            THE COURT:  You could submit an affidavit for -- I

9    don't know that I'm going to need live testimony from

10   Dr. Kucsma or from Goldman, Fred Goldman.

11           MR. McELFISH:  Judge, one thing you could do is take

12   whatever testimony we have from Chris today and whatever

13   expert reports they have and do the post-trial work on that, I

14   guess.

15           THE COURT:  Okay.  Why don't you run through your

16   inflation rates for the -- what Mr. Provder has in his report

17   as the different areas of future care?

18           THE WITNESS:  Sure.  I do have -- would it be

19   helpful?  I have hard copies.  I know I have to read them into

20   the record.

21           But would it be helpful for me to give to you, Your

22   Honor, at least a hard copy?

23           THE COURT:  What do they have?

24           THE WITNESS:  It's a table that looks like this that

25   has various inflation rates.  I could just give you that

KUCSMA/DIRECT/McELFISH

1    single page if you want.

2            THE COURT:  That's fine.  Enter that as an exhibit.

3            MR. BARMEN:  Is that the CPI?

4            THE COURT:  It's the inflation rate she provided.

5            THE WITNESS:  Inflation rate.

6            THE COURT:  She applied to the various categories of

7    future damage.

8            MR. BARMEN:  If we're talking about the same thing,

9    I mean, I just download and printed today from the U.S.

10   Department of Labor all the CPI's for all of these things.

11   They can be pulled at any time.  They're completely accurate,

12   and there's no dispute about what they are.

13           THE COURT:  That's fine.  That's fine.  Why should

14   she not be able to show me what she calculated from what she

15   found?

16           MR. BARMEN:  Because they are what they are.

17           THE COURT:  So, if they're the same numbers, then

18   you've got no problem.

19           MR. BARMEN:  Well, they're not.

20           THE WITNESS:  Could I -- yeah, they're not and I'll

21   tell you.  They're --

22           THE COURT:  Hold on.  Hold on.

23           Could you -- actually let's do this.  Ask the court

24   exhibit.

25           Do you have this?

1              MR. BARMEN:  If it's what's in her report but if

2    there's another free copy there, I would love one.

3              THE WITNESS:  There certainly is.

4              MR. McELFISH:  Is that the new one, Chris, or the

5    old one?

6              THE WITNESS:  This is just -- well, I'm giving

7    everybody the inflation rate.

8              MR. BARMEN:  May I approach, Your Honor?

9              THE COURT:  Yes.

10             THE WITNESS:  It is what you should have gotten

11   earlier.

12             THE COURT:  I'm marking this Court Exhibit Number 1.

13   It's a document entitled:  "Yearly Increases."  And I would

14   like Dr. Kucsma to explain this to me, particularly what

15   short-term yearly increase is and long-term.

16             THE WITNESS:  The reason you see short-term and

17   long-term yearly increases is because in his report

18   Mr. Provder provided me with information about how much the

19   various categories of care would have cost in 2015.

20             So, the first thing I needed to do was calculate how

21   much each category of care would cost this year in 2018 and in

22   order to do that, I used the short-term yearly increase and I

23   used that because of the fact that in recent years, as a

24   result of the recent recession, the yearly increases in

25   various categories of medical care have been lower than the

1    long-run average.

2           Once I determined how much each category of care

3    would cost to today in 2018, using Mr. Provder's base cost as

4    my starting point, I then applied the long-term inflation

5    rates to calculate on overage how much these costs of care

6    would increase each year over the next approximately 36 years

7    of Mr. Bauta's remaining life expectancy.

8           THE COURT:  And the short-term yearly increase,

9    that's to physician services, from 15 to 16 went up 3 percent.

10   16 to 17 went up another 3 percent.  17 to 18 went up another

11   3 percent.

12          THE WITNESS:  That's what I used, yes --

13          THE COURT:  Okay.

14          THE WITNESS:  -- to calculate each cost in the year

15   2018, correct.

16          THE COURT:  And that physician services short-term

17   yearly increase comes from where?  Consumer Price Index?

18          THE WITNESS:  No.  It's not only Consumer Price

19   Index data because to simply rely on the current Consumer

20   Price Index or Historical Consumer Price Index date is simply

21   wrong.  It's economically unsound; and the reason it is, is

22   because cost and prices are affected by supply and demand.

23   So, what I did was I started by examining Consumer Price Index

24   data.  There certainly is value to me as an economist of

25   looking back in time at how much these costs had increased

1    historically.  But I also had to take into account (A) the

2    Occupational Outlook Handbook data that I mentioned earlier

3    that talks about projections of various industries over the

4    next ten year.

5              For example, the demand for home health aide is

6    projected to increase 41 percent over the next ten year; and

7    basic economic theory tells us that's going to put upward

8    pressure on the cost of home health aide.  In every single

9    category within the Occupational Handbook related to

10   healthcare occupations, every single category has projected

11   growth that is either faster than average or much faster than

12   average.  So, I have to build that into account.

13             THE COURT:  Wait a second.  So, this 3 percent is

14   your number you --

15             THE WITNESS:  Yes.  It's based on my consolidation

16   of several sources.

17             THE COURT:  All right.  That would be the same for

18   all of these numbers.

19             THE WITNESS:  Yes, that's correct, your Honor.

20             THE COURT:  And that would be the same for all the

21   long-term yearly increase numbers.

22             THE WITNESS:  That's correct, Your Honor.

23             THE COURT:  All right.  So, it's not simply finding

24   a Consumer Price Index or any other index that's published by

25   the Federal Government.

1          THE WITNESS:  No, In fact, the Centers for Medicare

2   and Medicare Services released a publication in February of

3   this year, indicating that we are, quote, on the cusp of

4   increased medical inflation, end quote; and they cited very

5   specifically in their report one of the things that's going to

6   put upward pressure on these costs is rising wages of

7   healthcare support workers.

8          So, again, that's why I needed to consider all of

9   the factors that are going to increase these costs going

10  forward.

11          THE COURT:  Okay.

12          MR. BARMEN:  And as far as we're concerned, Your

13  Honor, therein lies the rub.

14          THE COURT:  We'll have a hearing on it after the

15  trial.

16          MR. BARMEN:  Perhaps.  Now, are you going to still,

17  prior to the end of trial, on the day we would have

18  Mr. Goldman testify, do you still want us to come do the same

19  thing; or can we wait until the Rule 50?

20          THE COURT:  What I -- I think we wait for the Rule

21  50.  What we do is -- that's a state court thing.  I think

22  what we do is get the jury's numbers and the number of years.

23  Give them to Dr. Kucsma.  Give them to -- is it Mr. Goldman?

24          MR. BARMEN:  Mr. Goldman, Fred Goldman.

25          THE COURT:  Mr. Goldman.

KUCSMA/DIRECT/McELFISH

```
 1            Have them do their crunch-the-numbers with the

 2    agreed-upon 78.9 life expectancy.  Submit affidavits with

 3    their calculations.  Then we have our hearing.  We'll look at

 4    the collateral sources and all that.

 5            MR. BARMEN:  Will we recall our experts?

 6            THE COURT:  I might need it.  There might be such

 7    slight difference between the two.  If we need to have live

 8    testimony, I'll let you know.  You know, you might be able to

 9    work it out.  Collateral source.

10    BY MR. McELFISH:

11    Q    Dr. Kucsma, is there any other opinions you have, other

12    than the inflation rate, that you have not discussed today,

13    other than rebuttal of Dr. Goldman?

14    A    No, I believe we've discussed everything.  I suppose, in

15    case Your Honor's interested, just to let you know, the basis

16    for my 4 percent also is linked to U.S. Treasury securities

17    and municipal bonds.  I don't use the current spot rate though

18    which I believe is what the PJI or the CPLR references.  I

19    take into account the interest rates going forward.

20            THE COURT:  Is there any standard way to calculate

21    the short-term yearly increase and long-term yearly increase,

22    or have you come up with your own special thoughts?

23            THE WITNESS:  The methodology that I use is the

24    generally accepted methodology.  For example, I have reviewed

25    Mr. Goldman's report.  He considers and references much of the
```

1    same data I do.  In my professional opinion, he does not

2    consider or doesn't place perhaps the proper weight, for lack

3    of any better phrase, on the other factors that are going to

4    impact the man; but by and large we're all using the same

5    generally accepted method.

6              THE COURT:  Is this generally accepted method

7    documented in any treatise or textbook or, you know, GAAP

8    manual or anything like that?

9              THE WITNESS:  No, we don't.  We, meaning forensic

10   economists, don't have such a manual like that.  So, there is

11   no specific treatise that will say this is the way to

12   determine, for example, the inflation rates for a lifecare

13   plan.

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings

```
 1    (Continuing.)
 2              THE COURT:  All right.  We'll have our hearing.
 3    We'll figure it out later.
 4              MR. MCELFISH:  No further questions.  Thank you,
 5    Dr. Kucsma.  You're excused.
 6              THE COURT:  So, we're going to do some read-in and
 7    video.
 8              MR. MCELFISH:  I have live witnesses; the family.
 9              THE COURT:  Oh, the family.
10              MR. SAAL:  Before the jury enters, we had an issue
11    regarding the deposition read-in for Dr. Lichy.
12              We're not objecting to the read-in, but there's a
13    PowerPoint presentation that Plaintiffs have prepared that
14    really purports to accentuate testimony.  We don't think it's
15    appropriate.  We think it should be standard, with someone
16    sitting in the chair and being read in.
17              THE COURT:  That's how I usually do it.
18              MR. MCELFISH:  Can't publish the words -- that's all
19    it is -- so the jury can see the words?
20              MR. SAAL:  Your Honor, these slides are designed in
21    a way to emphasize testimony.
22              MR. MCELFISH:  They have testimony on them that's
23    being read.  They're not designed to emphasize.
24              THE COURT:  Is there any highlighting?
25              MR. SAAL:  Yes.
```

Proceedings

```
 1              THE COURT:  Is there any bolding?

 2              MR. SAAL:  Yes.  They're snapshots an increased

 3    sizes of certain testimony.

 4              THE COURT:  No.  We'll read it.

 5              That's the way it's done.

 6              MR. MCELFISH:  Can we change the slides?

 7              We're not doing him now.  We have people here.  Lisa

 8    can do it, she can just clean out all the highlighting and

 9    that stuff.  If there is any, we'll take it out.

10              THE COURT:  Why do you --

11              MR. MCELFISH:  That's what I want to do.  If it's

12    within your discretion to allow me to do it, I want to do it.

13    I'll make it so it's just the wording of the transcript and

14    that's it.  Demonstrative aid.

15              THE COURT:  Just put the transcript as you're

16    reading it onto the Elmo, each page.

17              MR. MCELFISH:  I already did this.  I don't want to

18    have to be clumsily going through a transcript.  I actually

19    prepared this so I didn't have to go through all that.

20              THE COURT:  So you could accentuate certain

21    testimony.

22              MR. MCELFISH:  Well, it wasn't really for that.

23              We'll take it out.  It's easy to take out.

24              THE COURT:  Either put it on the Elmo or read it.

25    They don't need to see it in a PowerPoint.  That's the way
```

S. Rivera – direct – McElfish

1   it's done.  I've never done it any other way, other than read

2   it like that.  It's neutral, it's the deposition transcript,

3   it's reading.

4              We're not getting to him today, right, or are we?

5              MR. MCELFISH:  I hope so.  If they stop having

6   issues, we can get moving.  We were to have the jury come in

7   ten minutes ago.

8              MR. BARMEN:  I'm sorry, we'll stop doing our job.

9              (Jury enters.)

10              THE COURT:  Call your next witness.

11              MR. MCELFISH:  Yes, sir.  Plaintiff calls Selenia

12   Rivera.

13              THE COURT:  Good afternoon, Ms. Rivera.

14              THE WITNESS:  Good afternoon.

15              (Witness sworn.)

16              THE COURT:  Please be seated.

17              Can you tell the court reporter your name and spell

18   it?

19              THE WITNESS:  Good afternoon, everyone.

20              My name is Selenia Rivera.  First name is

21   S-E-L-E-N-I-A, last name is R-I-V-E-R-A.

22              MR. MCELFISH:  May I inquire?

23              THE COURT:  Yes, please.

24

25

S. Rivera – direct – McElfish

```
 1   SELENIA RIVERA,
 2              called as a witness by the Plaintiff, having been
 3              duly sworn, was examined and testified as follows:
 4   DIRECT EXAMINATION
 5   BY MR. MCELFISH:
 6   Q    Good afternoon.
 7   A    Good afternoon.
 8   Q    Ms. Rivera, can you tell the jury, please, what your
 9   relationship is to Jose Bauta?
10   A    I'm his sister, older sister.
11   Q    Your name, I want to get this cleared up.  Your last name
12   is Rivera?
13   A    Yes, it is.
14   Q    And your sister Maria Bauta is married to another witness
15   in this case, Martin Rivera?
16   A    Yes.
17   Q    Do you have a direct relationship to Martin?
18   A    No, we do not.
19   Q    Okay.  So, you both have the name Rivera, but it's not
20   the same.
21   A    Yes.
22   Q    In other words, Martin is not your husband.
23   A    No, he's not.
24   Q    How long have you known Jose Bauta?
25   A    All my life.  That's my younger brother.
```

S. Rivera – direct – McElfish

```
1   Q    Let's go back to the beginning.

2           What is the age difference between you and Jose?

3   A    I'm -- we're three years apart.  I'm 45 and he's 43.

4   Q    And where did you guys grow up together?

5   A    East New York, Brooklyn.

6   Q    And did you all live together throughout your formative

7   years?

8   A    Yes, we did.

9   Q    Would you describe for the jury, please -- and we're

10  talking, of course, prior to the accident -- what kind of guy

11  Jose was?

12  A    Okay.  We had a guy that was very young, vibrant, that

13  was able to move around with no problems.  If we asked him to

14  go to any activities or amusement parks, things like that, he

15  was able to get up and go with no issues.

16  Q    And was he a jovial guy or a quiet guy?  How would you

17  describe him?

18  A    He was very funny, always joking, you would always have

19  conversations about the day, and he'll laugh about a lot of

20  things.

21  Q    And you understand that Jose moved upstate somewhere

22  around 2000?

23  A    Yes.

24  Q    To Ogdensburg, New York.

25  A    Yes.
```

S. Rivera – direct – McElfish

1    Q    Prior to that, did you guys see each other every day?

2    A    Yes, we did.

3    Q    And when he went to Ogdensburg, New York, did he come

4    back frequently?

5    A    I really cannot say.  I really don't know.

6    Q    Did he come back?

7    A    Yes, he did.

8    Q    Do you know what he was doing in Ogdensburg?

9    A    He went up there to meet up with a girlfriend.

10   Q    And do you know if Jose had any children?

11   A    Yes.

12   Q    He has two daughters?

13   A    Yes, he does.

14   Q    And has he been around them for his whole life?

15   A    In the beginning he wasn't and now he's very involved.

16   Q    And when you say "very involved," when would you say

17   since when?

18   A    Since he came back after the accident.

19   Q    Okay.  You understand that Jose had some legal trouble

20   when he was younger?

21   A    Yes.

22   Q    Do you know how long ago it was?

23   A    I do not.

24   Q    When did you first learn about this accident?

25   A    Around October 2013.

S. Rivera – direct – McElfish

1   Q     And what did you learn had happened?

2   A     Excuse me, could you repeat that again?

3   Q     Yes.  What did you learn had happened?

4   A     He came over to my house and I asked him how he was

5   doing, and he showed me that he had bruises on his forehead

6   and knees and shins.

7   Q     Did you learn what kind of an accident he was in?

8   A     I did not until I asked him.  I was trying to find out

9   what was going on with him, and he said he was in a bus

10  accident.

11  Q     I see.  Okay.

12        And what injuries, Selenia, did you know of that he

13  had from the accident?

14  A     He said that he had a lot of headaches, head pain; his

15  legs, knees, were hurting; and his back.

16  Q     Thank you.

17        Now, prior to the accident, I'd like you to sort of

18  give the jury an idea of the kinds of activities that you

19  personally were aware of that Jose was involved in.  Let's

20  start with social activities.

21  A     He used to go out a lot; we used to go out to the beach a

22  lot; to the park; Coney Island, his favorite thing, play games

23  out there; do a lot of walking; he used to do a lot of sports.

24  Q     What kind?

25  A     He used to play baseball and football.

S. Rivera – direct – McElfish

1    Q      What else do you recall that he was doing in terms of

2    social activities?

3    A      He used to ride bicycles, go hang out with his friends.

4    Q      Would you say he was just an everyday normal guy?

5    A      Normal person.  Normal.

6    Q      Are you aware, Selenia, as his sister, whether or not

7    Jose had any kind of an injury -- let's start with physical

8    injuries -- to his body prior to this accident?

9    A      No, he did not have any.

10   Q      And are you aware, Selenia, whether or not he had any

11   kind of mental infirmaries or issues of any kind in terms of

12   psychological issues or cognitive issues of any kind prior to

13   this accident?

14   A      No, he did not.

15   Q      And why is it that you did not know Jose was in an

16   accident until he came over and told you?

17          MR. BARMEN:  Objection.

18          THE COURT:  Overruled.

19          You can answer.

20   A      Say it again, please.

21   Q      Why didn't you know he was in an accident until he came

22   over to visit you?

23   A      He really -- he didn't call.  He didn't call me.  He

24   didn't let me know anything that was going on.

25   Q      Now, after this accident, did you see changes in him

S. Rivera – direct – McElfish

1    because of his injuries?

2    A    Yes, I did.

3    Q    And can you please describe for the jury whatever changes

4    it is that you observed?

5    A    Okay.  From a vibrant person that was able to move around

6    freely with no help, he started now complaining that his back

7    is hurting a lot.  He has a lot of headaches.

8              We try to get him out of the house; he refuses.

9    Sometimes he's not up to it.

10             He takes short walks, where he used to walk on sand,

11   walk in the park, amusement; he's not into all that anymore.

12   Sitting for a long time, he's not able to do that or walking.

13             It's very uncomfortable for him.  He's always in

14   pain.

15   Q    Anything else?

16   A    We just try to get him out of the house.

17             We have to let him know ahead of time to get ready.

18   He needs time to get ready.  It's not -- I can't call him, Can

19   you be ready in 15 minutes?

20             No.

21             We have to let him know days in advance.  He has to

22   put it in his calendar just for him to remember.  I call him

23   early in the morning, Are you ready?  We're going to get out

24   today, okay?

25             He's like, Okay. I'm gonna start getting ready now.

S. Rivera – direct – McElfish

```
1              It takes him a while now to get ready, something
2    that used to take a few minutes.  It's frustrating because he
3    used to just get up and go and now it's like, Why is it taking
4    so long for you just to get ready?
5              And sometimes after getting ready, he's in pain
6    again, he's done.  He stays home, he doesn't want to come out.
7    And it wasn't like that before.
8    Q    Am I to understand you, Selenia, that you have to give
9    him days' notice to just go somewhere like to the store or
10   something?
11   A    Yes.  If he's not reminded or given days in advance, he
12   forgets.
13             And then when we approach him, Oh, do you know that
14   we have to do this today?
15             Well, I forgot.
16             And it's frustrating because things are important
17   that we have to get done and he just doesn't remember.  He
18   gets upset, we get upset, and it's frustrating.  It's not his
19   fault, it's just so upsetting.
20   Q    Do you know how long it takes him to get ready now as
21   opposed to before?
22   A    It takes over an hour, two hours at least, more, to get
23   ready.  Just for him to get himself up and adjust himself and
24   shower and get dressed and just try to go out.
25   Q    Now, are you aware of any differences in his memory?
```

S. Rivera – direct – McElfish

```
 1   A    He's forgetful, which is upsetting sometimes.  If we have
 2   something to do, Remember, we have this to do?
 3              He says, Okay.  I have to look at my watch.
 4              He has to look at a calendar to remember.  He has to
 5   write it down; if not, he's not going to remember anything
 6   that we have to do.
 7   Q    Did he ever do that before?
 8   A    No.  He had no issues before.  None.
 9   Q    Does he express himself to you in terms of his feelings
10   and his concerns?
11   A    Now, after the accident, it's very hard.  We ask him
12   questions how he's doing and he shuts down.  We want to know
13   how he's doing, how he's feeling, he shuts down.  He gets very
14   upset.
15              So, we just tend to stay away, give him a few hours,
16   give him time, approach him again, and he just shuts down, he
17   won't give us any feedback.
18   Q    Has that always been true of the changes -- withdrawn.
19              Have the changes all been true since the accident up
20   to the present?
21   A    Yes.
22   Q    And are they worse now than they were right after the
23   accident?
24   A    They're worse.  Memory is really not there.
25   Q    And prior to the accident, do you ever recall observing
```

1    him being physical or, you know, running, jumping, climbing?

2    A    He was very active.  He used to play sports.  He'll go to

3    the park and football, throw a ball, pitch baseball, things

4    like that.

5         And now, it's like he just -- he sits and he looks

6    and he can't do it.  He can't move fast.  He can't jump.  He

7    can't do these things anymore.

8    Q    How far would you be able to say he's able to walk now?

9    A    Walking with him, not more than 30 minutes.

10        And I like to walk.  And I have to slow my pace to

11   keep up with him -- so he can keep up with me, really, because

12   after a few minutes he starts saying, Okay, my back is

13   starting to bother.  He's starting to feel uncomfortable.

14   Q    And have you observed his ability -- his inability or his

15   ability to sit for long periods of time?

16   A    He's not able to sit for a long time because he says that

17   when he has to get up, he has to, like, balance himself.  And

18   his -- he feels when his back is beginning to get stiff, so

19   it's hard for him to get up.

20   Q    Now, I want to ask you about this issue about the GED or

21   the high school diploma.

22        Prior to the accident, how close was he to getting

23   the high school diploma or GED?

24   A    He was very close, very close.

25   Q    To your understanding, did he finish that after the

S. Rivera – direct – McElfish

```
 1   accident?
 2   A     Yes, he did.
 3   Q     How did he do that?
 4   A     With the help of family.
 5   Q     Can you explain what you mean?
 6   A     He had issues understanding any reading assignments that
 7   were given to him.  He had issues with math problems that were
 8   given to him.
 9              So, we had to pitch in and help him because we
10   wanted him to pass.  He was not able to do it on his own.
11   Q     And did you ever -- withdrawn.
12              Are these things that he needed help with before the
13   accident?
14   A     He didn't need it before, no.
15   Q     Was he able to read and do basic math and things before
16   the accident?
17   A     Yes.
18   Q     When did you become aware of when Jose needed to use a
19   cane?
20   A     After he told me that he was hurt in the bus, that he had
21   the accident.
22   Q     Okay.  And what's your understanding as to why he needs
23   the cane?
24   A     Just to balance himself, to have some support for his
25   legs, for his back.
```

S. Rivera – direct – McElfish

1  Q     Okay.  Are there times he doesn't use it?

2  A     There are times.  It depends on how he's feeling.

3  Q     Okay.  Does he use it when he's around his kids?

4  A     Sometimes, but he really tries to avoid because he

5  doesn't want his girls to see him walking with the cane.

6  Q     Has he expressed to you, Selenia, in whatever limited

7  expressions he's given you, did he express to you his

8  frustrations -- withdrawn.

9          Has he expressed to you, Selenia, in his limited

10  frustrations his concerns for his future?

11  A     Yes, he has.

12  Q     And would you tell the jury, please, what he has told

13  you?

14  A     It's hard.  He's always saying that he's concerned about

15  his daughters.  He has a 14- and a 17-year-old.  One is

16  getting ready to go to college and he can't afford that.  He

17  has to support for them, he has to get support for himself.

18  He has to try to make it physically.  He's concerned he's

19  going to have more surgeries.  Those things he have in his

20  mind, like, are they going to be part of him?  Trying to help

21  his daughters, is that going to help -- see if you understand

22  what I'm saying.

23          It's just a big issue for him, a big issue.  He

24  wants to be able to provide for his kids.  And that's one of

25  the problems, his health.

S. Rivera – cross – Barmen

1   Q    You mentioned he's afraid of future surgery.  Did he give

2   you any more detail of that?

3   A    He's scared to know -- well, he's getting older now, but

4   he's fearing if he has to get more surgery.

5   Q    Do you know whether or not he's presently still in pain?

6   A    He has his days when he does.  And, as a matter of fact,

7   yesterday he was in pain.

8   Q    When you say he's in pain, what pain is he having, if you

9   know?

10  A    From his back.  He feels uncomfortable from his back.

11  Q    And what about headaches, has he expressed any headaches

12  to you since the accident?

13  A    Yes.

14  Q    And how often?  What magnitude?

15       Can you give us any information on that?

16  A    A few times a week; not many, but he does complain of his

17  head.

18  Q    Selenia, do you know if Jose is taking any medications?

19  A    I do not know.

20  Q    My last question to you, Selenia, is Jose the man he used

21  to be before this accident?

22  A    Definitely not.  He has -- I'm sorry.

23  Q    You've seen substantial change in him?

24  A    Yes.

25       He has these rods in his back for the rest of his

S. Rivera – cross – Barmen

1   life.  He has this cane that is always there.  He's moving at

2   a slow pace, very slow pace.  It's not a get-up-and-go, I'm

3   going to do it in two minutes.  No, it takes time.

4            At times, he's calling, I can't do it today.

5            And it's like it's sad, it's really sad.  This is my

6   young brother.  This is a person that used to get up and just

7   freely, freely, with no issues, not fear anything and this is

8   a fear for him.

9            He has two daughters that he has to raise and he's

10  wondering, Am I going to get better with this if I have a

11  little surgery?  Am I going to have a surgery or not?

12            It's scary for him.  It's very scary.

13            MR. MCELFISH:  Thank you for coming in.  Mr. Barmen

14  may have some questions for you now.

15  CROSS-EXAMINATION

16  BY MR. BARMEN:

17  Q    Hello, ma'am.  How are you?

18            My name is Brad Barmen.  We've never met before, but

19  I think I've seen you around the hotel the last couple of

20  days.

21            MR. MCELFISH:  Objection.  Move to strike.

22            THE COURT:  Sustained.  Stricken.

23  Q    How many times have you spoken to Mr. McElfish about

24  coming here to testify today?

25  A    About none.

S. Rivera – cross – Barmen

1  Q    You've never discussed your testimony with any of the

2  lawyers here?

3  A    No.

4  Q    Okay.  When your brother went to Ogdensburg, he was gone

5  for twelve years, wasn't he?

6  A    I'm not sure how long.

7  Q    And you don't know how many times you saw him in that

8  twelve years?

9  A    I'm not sure.

10 Q    Do you know what he was doing to support his daughters

11 during those twelve years?

12 A    No, I do not.

13 Q    Do you know what he was doing after he moved back to

14 support his daughters before he had the accident?

15 A    Say that again, please.

16 Q    I'll try.

17      MR. BARMEN:  I'll withdraw that.

18 Q    When did you brother move back from Ogdensburg; do you

19 know?

20 A    I believe after the accident.

21 Q    After the accident?

22 A    Yes.

23 Q    You didn't know that your brother had been in an accident

24 until three days after the accident, right?

25 A    Yes.

M. Rivera – direct – McElfish

1   Q    And after those three days, he came and told you what had

2   happened, correct?

3   A    He really did not tell me.  He showed me the bruises that

4   he had on his body.

5   Q    Did he tell you at that time that his back hurt?

6   A    Yes.

7   Q    Is there a reason you didn't mention that in your

8   deposition in 2016?

9           MR. MCELFISH:  Objection.

10          THE COURT:  Overruled.

11  A    I don't recall that.

12  Q    You certainly don't know what, if any, medical treatment

13  your brother had during the twelve years he was in Ogdensburg,

14  do you?

15  A    No, I do not.

16  Q    Isn't it true that when it comes to your brother's memory

17  the only thing he has trouble with are dates and time?

18  A    Yes.

19          MR. BARMEN:  I appreciate your time, ma'am.  I don't

20  have any other questions for you.

21          MR. MCELFISH:  No questions.

22          THE COURT:  Thank you, Ms. Rivera.  You're excused.

23          (Witness excused.)

24          MR. MCELFISH:  Plaintiff calls his next witness,

25  Martin Rivera.

M. Rivera – direct – McElfish

```
 1                THE COURT:  Come on up, Mr. Rivera.

 2                THE WITNESS:  Good afternoon.

 3                (Witness sworn.)

 4                THE COURT:  Please be seated.  If you can, tell the

 5      court reporter your name and spell it also.

 6                THE WITNESS:  My name is Martin Rivera, M-A-R-T-I-N,

 7      last name Rivera, R-I-V-E-R-A.

 8      MARTIN RIVERA,

 9                called as a witness by the Plaintiff, having been

10                duly sworn, was examined and testified as follows:

11      DIRECT EXAMINATION

12      BY MR. MCELFISH:

13      Q    Good afternoon, sir.

14      A    Good afternoon.

15                MR. MCELFISH:  I should say may I inquire, Judge?

16                THE COURT:  Yes.

17                MR. MCELFISH:  Sorry.

18      Q    Good afternoon.  What is your relationship to Jose Bauta,

19      sir?

20      A    Family member.

21      Q    Specifically?

22      A    He calls me, like, his brother-in-law.  His older sister

23      Maria, we're finances.

24      Q    You're not related marital-wise to Selenia who was just

25      in here.
```

M. Rivera – direct – McElfish

```
 1   A     Right.

 2   Q     She's your sister-in-law, sort of.

 3   A     Yes.

 4   Q     How long, sir, have you know Jose Bauta?

 5   A     About 20 years.

 6   Q     And what were the circumstances under which you began to

 7   know him?

 8   A     Through his oldest sister, when I started dating Maria.

 9   Q     You guys have been together that long?

10   A     Yes.

11   Q     All right.  How would you describe Jose in terms of his

12   demeanor and his abilities prior to this accident?

13   A     Healthy, normal person, active person, bit of a jokester,

14   somebody you could talk to.

15   Q     And over the 20 years that you've known him, have you had

16   a chance to spend time with him?

17   A     Yes.

18   Q     And can you explain to the jury those circumstances,

19   please, when you had a chance to do things with him and spend

20   time with him?

21   A     Mostly get-togethers with family; like Maria, all the

22   sisters, Selenia, maybe his kids.  Get-togethers like

23   holidays, Christmas, New Year's.  We would invite the family

24   to our residence, me and Maria, to get together for dinner.

25   Things like what.
```

M. Rivera – direct – McElfish

1    Q    Were you in a position, Mr. Rivera, to see Mr. Bauta's

2    physical capabilities?

3    A    Yes.

4    Q    And can you tell the jury what things you observed him

5    doing and participating in prior to the accident?

6    A    I guess --

7              MR. MCELFISH:  Sorry.  Can we get the printer to

8    stop?

9              THE COURT:  Yes, please.

10             MR. BARMEN:  Sorry about that, counsel.

11             MR. MCELFISH:  If you don't mind, Judge, will you

12   have the court reporter --

13             THE COURT:  You want that read back?

14             MR. MCELFISH:  Have her read back the question,

15   please.

16             (Record read.)

17   A    Yes.

18   Q    Please.

19   A    Like things of us going to the movies.  We live in

20   Brooklyn.  Sometimes we would walk to the movie theater.  It's

21   about a half-mile away, so we walk to the movie theater.

22   Get-togethers, come over the house, maybe walk somewhere,

23   maybe go to the mall, go see another family member.

24             Mostly, like, walking around, mostly going places

25   with him.

M. Rivera – direct – McElfish

1  Q     Did he ever have any limitations or any physical

2  inabilities to walk?

3  A     No.

4  Q     Did you ever see him run?  Jump?  Climb?

5  A     Run, yes.

6  Q     And what were the circumstances of that?

7  A     Probably, like, joking around when we would go outside.

8  Maybe a quick run or dash.

9  Q     Did he ever have any limitations in terms of just

10  everyday things, like bending over and sitting down?

11  A     No.

12  Q     When did you first learn that Jose was in this accident?

13  A     I believe it was a couple of days after the accident.

14  Q     And what were the circumstances of that?

15  A     You mean the conversation we had?

16  Q     However.  I mean how and when and where did you learn he

17  was in an accident?

18  A     It was a couple of days after the accident, maybe two or

19  three days.  I guess he made a phone call to Maria, and I may

20  have had a short conversation with him to see how he was

21  doing, I guess letting us know what had happened.

22         He explained he had an accident on a bus trip to

23  Cleveland, Ohio.  There was some sort of truck in front of

24  him, and he was sitting in the bus and he mentioned he was

25  resting and he looked at his phone, and when he looked up

M. Rivera – direct – McElfish

1    there was a truck in front of him and some materials came into

2    the bus.

3    Q    He told you that?

4    A    Yes.

5    Q    Did he tell you any other details of the accident or

6    anything right after the accident?

7    A    No.

8    Q    And what injuries did you understand Mr. Rivera --

9    withdrawn.

10            What injuries did you understand Jose had from this

11   accident?

12   A    His back, he sustained injuries in his back, lower back.

13   Mostly about his back area, injuries about his back.

14   Q    What about his head or his legs?

15   A    The only thing I can remember is, like, later on with

16   him, maybe his head being, like, swollen or, like, larger than

17   usual.  I think some problem with his right leg.

18   Q    What do you mean by that?

19   A    I think, like, weakness.

20            (Continued on next page.)

21

22

23

24

25

M. Rivera – direct – McElfish

```
 1   DIRECT EXAMINATION
 2   BY MR. McELFISH:
 3   Q     Prior to the accident, did Jose do anything else
 4   physical, like lift weights?
 5   A     Yes.
 6   Q     Ride bikes?
 7   A     Yes.
 8   Q     Did you ever observe him in any particular instance after
 9   the accident in pain?
10   A     Yes.
11   Q     Can you describe the circumstances of that event to this
12   jury, please?
13   A     I recall one time he came over our house and we live in a
14   two-family house, so we had to -- we walk up a flight of
15   stairs.  As he was walking up and we went to greet him, he was
16   like in a lot of pain, he was like screaming, like
17   excruciating pain, and he kind of startled us.  So he began
18   crying and I guess the pain was bothering him, you know, a
19   lot.  So it scared us a little bit.  So we thought we had to
20   call the ambulance or contact someone, like an emergency
21   person.  So a few minutes afterwards he sat down and he was
22   still crying and then he would, like, say to us, I apologize.
23   I say apologize about what?  He said for me crying about this
24   episode.  I said no, as long as you're okay, you'll be fine.
25   So he sat down for a while.  I guess he calmed down.  And
```

M. Rivera – direct – McElfish

1    then, you know, he still had the pain, but he wasn't like

2    screaming and crying afterward, maybe like 10, 15 minutes

3    later.

4    Q    Have you observed his ability to walk after the accident?

5    A    Yes.

6    Q    Can you describe for the jury how far walking you've seen

7    him able to do?

8    A    Not as he used to do before the accident.  He walks with

9    a limp.  He doesn't walk as he used to before the accident.  I

10   don't know if he would walk for long distances.  To me it

11   feels like he walks not as much as he used to.  It takes him

12   awhile to do certain things.  So if he had a couple errands to

13   do for the day, it would be very taxing and time him a long

14   time to do those things.

15   Q    Did he ride a bike before the accident?

16   A    Yes.

17   Q    Does he do that now?

18   A    No.

19   Q    Did he ever do that after the accident?

20   A    Ride a bike?

21   Q    Yes.

22   A    No.

23   Q    And when you were around him since the accident, Mr.

24   Rivera, have you observed his ability or inability to sit for

25   any period of time?

M. Rivera – direct – McElfish

1   A     He has trouble with that.  I think –– he mentioned to me

2   and I've seen it in person, like when he's over our house, if

3   we're watching a movie, he can't sit down for too long, after

4   a while he'll say I have to stand up, his back is bothering

5   him, the stiffness, the pain.  Like he'll stand up for a

6   while.  He mentions too also standing for a long time will

7   bother him.  So he will have to, like, alternate for sitting

8   and standing.  He can't do both for a very long time.

9   Q     Over the 20 years you have known him, are you aware of

10  any other accidents or injuries he has had before this bus

11  accident?

12  A     No.

13  Q     Prior to this accident in October of 2013, were you aware

14  of any mental issues or psychological issues or therapy needs

15  that he had that related to his head or his brain?

16  A     No.

17  Q     And since this accident, has his memory changed?

18  A     Yes.

19  Q     Can you explain how, just from what you observed.

20  A     Like just to give an example, like if we go to the

21  movies, he would go with family members, be with us or maybe

22  the next day or later that week when we talk about certain

23  scenes in the movie, something we enjoyed watching and it

24  would feel like he should know what we were talking about, so

25  we would talk about a certain scene in a movie, but it would

M. Rivera – direct – McElfish

```
 1   be like he would forget or be on the tip of his tongue to say
 2   something, but he couldn't remember.
 3            To me it felt like, you know, he should have known
 4   those things.  Like before the accident, he seemed very sharp
 5   and I never seen any issues with his memory.
 6   Q    And how would you describe any change in his emotional
 7   state since this accident?
 8   A    I guess very down on himself, depressed.  Things bother
 9   him very easy.  He gets a little impatient, frustrated.  I
10   guess him being like an active person or doing things on his
11   own, and I guess now after the accident it's like very hard
12   for him to do certain things so that would frustrate him a
13   lot.
14   Q    And does he let you help him?
15   A    Rarely, rarely.
16            He seems like the person that wants to do the things
17   on his own.  He's like a private person, so he won't say I
18   need help.  It would be very few times that he would ask for
19   help.  Maybe his sister, the older sister Maria would have to
20   pry it out of him maybe a few occasions to ask for help.  If
21   he did ask for help, it's very few times.
22   Q    Now, Mr. Rivera, this will be my last question for you,
23   is Jose Bauta the man he was before this accident?
24   A    No.
25   Q    Are the changes substantial in your mind?
```

M. RIVERA/CROSS/BARMEN

```
1    A    Yes.
2            MR. McELFISH:  I have no further questions of you,
3    Mr. Rivera.  Mr. Barmen may have some questions.
4    CROSS EXAMINATION
5    BY MR. BARMEN:
6    Q    Mr. Rivera, sir, how are you?
7    A    Good afternoon, sir.
8    Q    My name is Brad Barmen.  Nice to meet you.
9            Have you discussed the testimony you have given with
10   Mr. McElfish prior to today.
11   A    Yes.
12   Q    In fact, I know you met with Mr. McElfish and a lawyer by
13   name of Colbert before your deposition.
14   A    Yes.
15   Q    Who is Mr. Colbert?
16   A    A lawyer.
17   Q    Do you know how soon after the accident Jose, Mr. Bauta,
18   retained Mr. Colbert?
19   A    I would say maybe a couple days to a week afterwards.
20   Q    Okay.  And you have -- you spent about two hours with Mr.
21   Colbert at that initial meeting and Mr. McElfish was on the
22   phone?
23   A    At the deposition?
24   Q    The meeting the day before the deposition, sir.
25   A    About an hour.
```

M. RIVERA/REDIRECT/McELFISH

```
 1    Q    It wasn't two?

 2    A    I'm not really sure.  I would say about an hour.

 3    Q    Are you sure it wasn't a few hours, sir?

 4    A    It could be one or two hours.  I'm sticking with one

 5    hour.

 6    Q    And you have had other meetings with Mr. McElfish between

 7    that meeting and today?

 8    A    Yes.

 9    Q    And Selenia would have been at those meetings?

10    A    Yes.

11    Q    At least some of them to discuss your testimony here

12    today?

13    A    Yes.

14              MR. BARMEN:  Thank you.

15    REDIRECT EXAMINATION

16    BY MR. McELFISH:

17    Q    Mr. Rivera, have you ever testified in court before under

18    oath, in court in front of a judge or a jury?

19    A    Yes.

20              MR. McELFISH:  Okay, I don't have any further

21    questions.  You're free to go.  Sorry, Judge.

22              THE COURT:  That's my job.

23              You're free to go.

24              THE WITNESS:  Thank you.

25              MR. McELFISH:  I believe the plaintiff intends to do
```

PROCEEDINGS

```
 1    a reading of Jacob Lichy.  I've got cross designations, but I
 2    mean, they're not...
 3              THE COURT:  Are there any objections -- you know
 4    what, let's excuse the jury.
 5              MR. SAAL:  Yes, Your Honor, we do have some standard
 6    objections.
 7              THE COURT:  Let's excuse the jury for a few minutes.
 8    Sorry to make you walk back and forth.
 9              (Jury exits the courtroom.)
10              (In open court - jury not present.)
11              THE COURT:  Okay.  Why don't you tell me where the
12    defendant's first objection is designation by plaintiff?
13    Let me take a step back.  You questioned them separately,
14    plaintiff and then -- no, defendant went first?
15              MR. McELFISH:  Plaintiff first.
16              MR. SAAL:  Defendant went first.  I don't believe
17    Mr. McElfish asked questions during the deposition.
18              THE COURT:  This is plaintiff's radiologist.
19              MR. McELFISH:  Correct, treating.
20              MR. SAAL:  Treating.
21              THE COURT:  Defendant asked questions.  Did you ask
22    questions, Mr. McElfish?
23              MR. McELFISH:  I don't remember.
24              THE COURT:  So where is the first objection that the
25    defendants have.
```

PROCEEDINGS

```
 1              MR. SAAL:  Just to make the Court aware, we are
 2    withdrawing the first objection of what was e-filed, so we
 3    don't have to address that.
 4              THE COURT:  Okay.
 5              MR. SAAL:  The second objection begins at 28, 22.
 6              MR. McELFISH:  Hold on.
 7              THE COURT:  28, 22.
 8              MR. SAAL:  The answer ends at 29, 4.  Page 29, line
 9    4.
10              THE COURT:   Okay.  So you're saying that the
11    indications in the spine aren't indicative either way of the
12    other areas of the spine, that the condition in the cervical
13    spine isn't necessarily indicative of the conditions in the
14    lumbar spine?
15              ANSWER:  Right.
16              MR. SAAL:  Yes, Your Honor, and the basis for the
17    objection is that Mr. McElfish, at lines 5 and 6 on that page,
18    objected to the question, calling for an expert opinion.
19              THE COURT:  But that's a question that you guys
20    asked.
21              MR. SAAL:  We understand that, but just for him to
22    object to the question and seek to read it in just seems to be
23    kind of estoppel idea.  It seems to be a little reverse.  He
24    adopts an opinion and then, because he decides he likes it, he
25    changes his position on the issue.
```

PROCEEDINGS

```
 1              THE COURT:  So you asked that question, it's going

 2   in even though Mr. McElfish objected to it during the

 3   deposition.

 4              Is it an otherwise improper question?

 5              MR. SAAL:  He didn't state any other basis for the

 6   objection.

 7              THE COURT:  It's in.

 8              What else?

 9              MR. SAAL:  The other two are along the same lines.

10   At this point, the third and fourth objections were of the

11   same theme.

12              THE COURT:  I will allow them in.

13              Now, what about the cross destinations?  I would

14   like to read the destinations and cross designations as the

15   cross is being taken.

16              MR. McELFISH:  I just got theirs.  Was it filed

17   earlier.

18              MR. SAAL:  It was filed earlier.  We made some

19   additions partially in rebuttal to what's been testified so

20   far.

21              Additionally, as Your Honor said, I actually added

22   something on what would be a reread based on what Your Honor

23   said, for a need of context.  If we do it contiguously, then

24   some of the lines that I added in were already noticed by

25   plaintiff.  I am just continuing on the testimony.
```

PROCEEDINGS

1              MR. McELFISH:  Can we do this?  I just got it.

2    There's not that many.  Can we look at each passage?  I will

3    tell you if I object or not.  I might not even.

4              So the first one that I have is page 18, line 9.

5              MR. SAAL:  No.

6              MR. McELFISH:  21, 17.

7              MR. SAAL:  21, 17, yes.

8              MR. McELFISH:  Okay, let's go there.  I have no

9    objection to that.

10             24, 16 is next.

11             MR. SAAL:  Actually, we are going to begin at 23,

12   22, but you had noticed for that, which is going to be

13   addressed if this is going to be read contiguously.

14             MS. DIAMOND:  So that's subsumed by the designation?

15             MR. SAAL:  Yes.

16             MR. McELFISH:  24, 16 through 24, 18.  Well, you got

17   to read the whole thing, my feeling about it is you have to go

18   down to line 24.

19             MR. SAAL:  I actually added -- yes, that's part of

20   what's added in.

21             MS. DIAMOND:  What's written on the left side,

22   you're going to go down to line 24?

23             MR. SAAL:  24.

24             MR. McELFISH:  On the next page, we go down to 25.

25             MR. SAAL:  25, 8.  And it continues through 26, 5.

PROCEEDINGS

1          THE COURT:  26, 5.

2          MR. SAAL:  26, 5 and 26, 8.  I omitted where the

3     doctor's lawyer noted an objection.  If no one is objecting.

4          MR. McELFISH:  I'm sorry, let me ask, this passage,

5     it is about a 10/25/13 report, is that an X-ray?

6          MR. SAAL:  Yes, I believe that's the X-ray that he

7     reviewed in December of that year.

8          MR. McELFISH:   The fact that it is an X-ray, that

9     part of the reading, 23, line -- it goes back to 23, line 11,

10    down through the rest of that page.

11         MR. SAAL:  I think if you go down to 23, 14, which

12    is in the middle of your designation, it says the films were

13    taken 10/25/13.

14         MR. McELFISH:  If we can agree to start at 11,

15    that's fine.

16         MR. SAAL:  We have already read that in.  We are

17    going to be starting at 23, too.

18         THE COURT:  All of the designations, when they are

19    agreed to, it is going to be read once just from the first

20    page all the way to the end.  We are not going to read the

21    designations and the counter designations.  We are going to

22    read the entire transcript as it was occurring.

23         MR. McELFISH:  I mean, I have no way of knowing how

24    to put that together right now.

25         THE COURT:  You look at your designations as to what

PROCEEDINGS

1    was not objected to or agreed to, you look at theirs and you

2    just do it sequentially, and then you do that reading.  It's

3    difficult.

4                MR. McELFISH:  Okay.  Maybe if we sat down for two

5    minutes and got a transcript and highlighted everything.

6                MR. SAAL:  I have already highlighted mine.  If you

7    want to take one of my transcripts and then highlight yours.

8                THE COURT:  Here, this is my transcript, we can give

9    you a highlighter.

10               MR. McELFISH:  Here's what we will do to make it

11   easy, I will take Mr. Saal's transcript and we will highlight

12   quickly because he.

13               MR. BARMEN:  Okay.  I will quickly put in what I am

14   reading for us and we'll be ready to go.

15               THE COURT:  Great.  I will give you a few minutes.

16               MR. McELFISH:  This is better.  Thank you.

17               THE COURT:  No problem.

18               MR. McELFISH:  Where are we?

19               THE COURT:  Do it together.

20               MR. McELFISH:  Let's do it together.

21               THE COURT:  When you're done, figure out who's going

22   to read.

23               (Recess taken.)

24               THE COURT:  Are we ready then?

25               MR. McELFISH:  We are ready.

PROCEEDINGS

```
 1                    (Jury exits the courtroom.)

 2               THE COURT:  You may be seated.

 3               Ladies and gentleman, sorry to keep you waiting.  We

 4    were having significant technical difficulties trying to get

 5    these things working.

 6               From what I understand now, we are going to see a

 7    series of video clips on the plaintiff's case from a witness

 8    by the name of Andrew --

 9               MR. McELFISH:  Vincent Stitzer.

10               THE COURT:  Vincent Stitzer, who was the EMS

11    technician, one of the EMS technicians who responded to the

12    scene the night of October, early morning, I guess, of October

13    9, 2013.  It's both -- he had his deposition taken in another

14    case, in the Pennsylvania case.

15               MR. McELFISH:  Yes.

16               THE COURT:  So these are clips of his videotape

17    deposition designated by both the plaintiff and the defendant,

18    so you get to see the full -- it's not the full deposition.

19    It's very short, but both sides wanted you to see this

20    information.

21    So I am going to dim the lights so you can see it a little

22    better.  There we go.

23                    (Deposition of Vincent Stitzer videotape playing.)

24                    (Videotape stopped.)

25    MR. DAVIDSON:  That is it, Your Honor.
```

PROCEEDINGS

```
 1              THE COURT:  That's it?

 2              MR. McELFISH:  That's it for the video, Your Honor.

 3   When you're ready, I have one more thing.  I would like to

 4   move in the photographs and publish them.

 5              THE COURT:  Of the accident?

 6              MR. McELFISH:  Ms. Hoang.

 7              MR. BARMEN:  What?

 8              THE COURT:  Photographs of Ms. Hoang.

 9              MR. McELFISH:  They were shown, but they weren't

10   moved in.

11              THE COURT:  What exhibits?

12              MR. McELFISH:  Can I just go back, hook up and go to

13   the small screen so we can do it that way?

14              THE COURT:  Sure.

15              MR. BARMEN:  I don't know the foundation is proper

16   with what we just had.

17              MR. McELFISH:  Why don't we go to small screens and

18   you can look.

19              MR. BARMEN:   Is this in addition to the ones that

20   already --

21              THE COURT:  The same ones.  They were not moved in.

22              MR. McELFISH:  The same ones.  They were not moved

23   in during the trial.  They were agreed to at the opening for

24   the trial.  But if they're in, I would like to publish them.

25   If I don't have to move them in, I can just publish them.
```

PROCEEDINGS

```
 1              MR. BARMEN:  I object.

 2              MR. McELFISH:  Does that make sense?  If they are

 3    not in, I want to move them in.  If they're in, I will publish

 4    them.

 5              MR. BARMEN:  There is no indication that they were

 6    shown to this witness at that deposition.

 7              THE COURT:  What exhibit numbers are they?

 8              MR. McELFISH:  They're 159-005, 159-006, 159-009,

 9    159-010.  These were the ones that were provided to chambers

10    as well.

11              MR. BARMEN:   We just confirmed, Your Honor, they

12    were not used in that deposition.  We have the first page of

13    the deposition indicating what was used.

14              THE COURT:  That's fine.  I will receive those in

15    evidence since there was no objection to Mr. McElfish using

16    them in the opening.  I will instruct the jury that these are

17    pictures you have seen already in the opening, but they were

18    not shown to Mr. Stitzer, but I will receive them into

19    evidence and we will publish them.  It provides context for

20    what he was testifying to.

21              (Plaintiff's Exhibits 159-005, 159-006, 159-009,

22    159-010 received in evidence.)

23              MR. McELFISH:  Correct.  Again, just heads up for

24    the graphic nature.

25              May I go from small screens to big screens, please?
```

MDL   RPR

PROCEEDINGS

1   And we will begin with 159-005 in evidence.

2                 (Continued on next page.)

PROCEEDINGS

```
 1              MR. McELFISH:  Your Honor, why don't you tell me how
 2   long we should stay, and I'll do that.
 3              THE COURT:  That's good.
 4              MR. McELFISH:  159-0006 for -- in evidence.
 5              (Publishes exhibit.)
 6              THE COURT:  That's good.
 7              MR. McELFISH:  159-009, in evidence.
 8              (Publishes evidence.)
 9              THE COURT:  That's good.
10              MR. McELFISH:  159-001 -- sorry, 0010 in evidence.
11              (Publishes exhibit.)
12              THE COURT:  That's good.
13              MR. McELFISH:  Plaintiff has no further witnesses
14   today.
15              THE COURT:  Okay.  Ladies and gentlemen, we're going
16   break for the weekend.  We've got a full day Monday, from what
17   I hear.  We'll begin -- I'd like you here at nine o'clock.  We
18   will begin promptly at 9:30.
19              I know there are a couple of you who have some
20   concerns about timing and days you need some relief.  We know
21   about it.  We've talked to the lawyers about it.  We will
22   address it.  I don't know think we'll have a problem, but
23   we're not going to deal it right yet.
24              Don't talk about the case.  Keep an open mind.  You
25   haven't seen all the evidence.  Don't do any independent
```

PROCEEDINGS

1    research -- and again, don't discuss it with the parties.

2    Don't say hello to them.  Just smiled politely if you see them

3    in the halls.  Okay?

4              Thank you very much.  Have a wonderful weekend.

5              (Jury exits.)

6              (Continued on the next page.)

PROCEEDINGS

```
 1              THE COURT:  So, Monday, we have what -- is it
 2    Dr. Thomas?
 3              MR. McELFISH:  Whitlock.
 4              THE COURT:  Whitlock. Dr. Thomas.  We're going to
 5    finish Ms. Cummings, and then, Lannigan, Gauthier, and
 6    Viggiano, and then the read-ins that we were supposed to do
 7    today.  Yes?
 8              MR. McELFISH:  Yes, sir.
 9              THE COURT:  All right.  You're done with the
10    transcripts or prepping them?
11              MR. McELFISH:  We're going to do it.
12              THE COURT:  You're going to do it?
13              (Discussion off the record.)
14              MR. SAAL:  Thank you, Your Honor.  Have a nice
15    weekend.  I'll report back on Monday if there is a further
16    issue.
17              THE COURT:  Okay.
18              MR. McELFISH:  Have a good weekend.
19              THE COURT:  Okay.
20         (Trial adjourned to May 7, 2018, at 9:30 a. m.)
21
22
23
24
25
```

INDEX

PROVDER/DIRECT/MCELFISH          858
PROVDER/CROSS/BARMEN            925
PROVDER/REDIRECT/McELFISH       961
KUCSMA/DIRECT/McELFISH          991
S. RIVERA/DIRECT/McELFISH      1012
S. RIVERA/CROSS/BARMEN         1024
M. RIVERA/DIRECT/McELFISH      1027
M. RIVERA/CROSS/BARMEN         1036
M. RIVERA/REDIRECT/McELFISH    1037
PEX 150-005                    1046
PEX 150-006                    1046
PEX 159-009                    1046
PEX 150-010                    1046

**$**

**$1,000 [1]**   889/2
**$1,440 [1]**   887/14
**$1,680 [1]**   900/13
**$1.4 [1]**   943/19
**$1.4 million [1]**   943/19
**$11,050 [1]**   891/11
**$110 [2]**   891/23 892/3
**$115 [1]**   891/21
**$122 [1]**   901/5
**$125 [1]**   881/10
**$13 [1]**   901/5
**$145 [1]**   877/15
**$1600 [1]**   879/13
**$180 [1]**   881/10
**$19,200 [1]**   888/10
**$2,000 [2]**   891/5 948/13
**$2,550 [1]**   891/10
**$2,640 [2]**   890/12 890/20
**$2,880 [1]**   881/11
**$2.75 [1]**   994/24
**$20 [2]**   903/7 957/12
**$200 [1]**   888/9
**$21 [4]**   902/4 956/10 957/4
957/9
**$22 [1]**   903/3
**$220 [2]**   890/19 891/25
**$225 [1]**   891/10
**$24 [3]**   917/12 942/20
942/21
**$240 [1]**   890/19
**$250 [2]**   887/13 891/4
**$250,000 [1]**   984/9
**$3,148,089 [1]**   919/19
**$3,200 [1]**   879/14
**$3,500 [1]**   874/25
**$300 [3]**   889/15 891/5
948/23
**$312 [1]**   902/11
**$32,120 [1]**   917/13
**$35,000 [1]**   943/16
**$35,040 [1]**   917/13
**$350 [1]**   877/15
**$36 [1]**   903/3
**$384 [1]**   900/24
**$39 [1]**   902/6
**$4,200 [1]**   879/13
**$400 [2]**   890/15 890/19
**$43 [3]**   902/4 956/10 957/4
**$433 [1]**   891/21
**$443 [1]**   891/17
**$444 [1]**   900/13
**$46 [1]**   891/23
**$500 [1]**   891/3
**$58,741 [1]**   915/19
**$6,000 [1]**   887/14
**$60 [2]**   887/13 892/2
**$636 [1]**   900/24
**$65 [1]**   902/9
**$650 [1]**   891/10
**$750 [3]**   890/15 890/19
892/9
**$77,923 [1]**   919/12
**$8 [2]**   903/7 957/12
**$8,400 [1]**   879/15
**$80,000 [1]**   915/19
**$816 [1]**   902/11
**$83 [1]**   902/1
**$88 [1]**   902/9
**$9,000 [3]**   890/12 890/20
950/15

**$9,120 [1]**   888/10
**$92,781 [1]**   894/24
**$96 [2]**   902/1 902/6

**'**

**'15 [3]**   931/24 944/16
954/13
**'17 [2]**   924/22 925/3

**-**

**-- I [1]**   885/23
-----------------------------
835/2 835/6

**0**

**0006 [1]**   1047/4
**001 [1]**   1047/10
**0010 [1]**   1047/10
**005 [3]**   1045/8 1045/21
1046/1
**006 [2]**   1045/8 1045/21
**009 [3]**   1045/8 1045/21
1047/7
**0096 [1]**   923/17
**010 [2]**   1045/9 1045/22
**0110 [2]**   965/10 971/14
**03725 [1]**   835/4

**1**

**1,000 [1]**   881/11
**1,500 [1]**   900/5
**1.4 million [1]**   943/21
**10 [3]**   943/6 952/14 1032/2
**10 minutes [1]**   978/17
**10/25/13 [2]**   1041/5
1041/19
**10005 [1]**   835/20
**10168 [1]**   835/12
**10573 [1]**   835/18
**10:00 [5]**   837/19 838/14
844/21 844/22 845/17
**10:00 a.m [1]**   844/20
**10th [1]**   846/10
**11 [2]**   1041/9 1041/14
**110 [3]**   843/9 843/11
843/14
**11201 [1]**   835/23
**116 [1]**   891/16
**11th [5]**   837/2 837/11
837/18 837/19 838/13
**12 [3]**   836/19 890/11 891/9
**122 [1]**   835/11
**123 [2]**   918/22 919/22
**125,000 [1]**   916/23
**128 [1]**   859/14
**13 [2]**   1041/5 1041/13
**1375 [1]**   835/15
**14 [4]**   835/4 882/5 1021/15
1041/11
**14th [2]**   836/5 836/8
**15 [4]**   906/19 1003/9
1016/19 1032/2
**15 minutes [1]**   938/13
**15,000 [5]**   899/8 899/12
899/20 900/1 900/6
**15-minute [2]**   904/15
927/14
**150 [3]**   889/2 891/3 891/10
**159-0006 [1]**   1047/4
**159-001 [1]**   1047/10
**159-005 [3]**   1045/8 1045/21
1046/1
**159-006 [2]**   1045/8 1045/21

**159-009 [3]**   1045/8 1045/21
1046/1
**159-010 [2]**   1045/9 1045/22
**15th [3]**   841/5 926/16
932/6
**16 [5]**   839/13 1003/9
1003/10 1040/10 1040/16
**1600 [1]**   835/15
**164 [2]**   854/12 854/16
**16th [1]**   844/19
**17 [5]**   978/25 1003/10
1003/10 1040/6 1040/7
**17-year-old [1]**   1021/15
**18 [3]**   1003/10 1040/4
1040/21
**1973 [1]**   860/23
**1974 [3]**   859/9 859/11
861/23
**1978 [2]**   861/24 861/25
**1979 [1]**   861/24
**1980 [1]**   861/24

**2**

**2,000 [1]**   948/16
**2,000-dollar [1]**   949/4
**2,640 [1]**   950/15
**20 [6]**   878/20 957/12
994/23 1027/5 1027/15
1033/9
**200 [1]**   901/4
**2000 [1]**   1012/22
**2001 [3]**   923/10 925/18
925/21
**2013 [5]**   944/7 957/24
1013/25 1033/13 1043/13
**2015 [9]**   882/5 896/22
897/1 931/25 944/17 956/22
995/8 995/9 1002/19
**2016 [2]**   965/8 1025/8
**2018 [8]**   835/6 954/14
991/15 993/3 1002/21
1003/3 1003/15 1049/20
**2054 [2]**   993/3 995/4
**21 [4]**   956/12 956/14
1040/6 1040/7
**2100 [1]**   835/11
**21st [3]**   836/5 836/7 836/8
**22 [6]**   917/12 942/20
942/21 1038/5 1038/7
1040/12
**220 [1]**   890/15
**225 [2]**   835/23 892/9
**23 [5]**   1040/11 1041/9
1041/9 1041/11 1041/17
**24 [6]**   1040/10 1040/16
1040/16 1040/18 1040/22
1040/23
**240 [2]**   890/14 891/9
**24th [2]**   836/13 836/15
**25 [2]**   1040/24 1040/25
**250 [1]**   861/8
**2500 [1]**   862/21
**26 [6]**   844/7 844/11
1040/25 1041/1 1041/2
1041/2
**2644 [1]**   835/24
**27 [1]**   896/25
**28 [2]**   1038/5 1038/7
**29 [2]**   1038/8 1038/8
**2:00 [1]**   981/2

**3**

**3 percent [3]**   1003/9

# 3

**3 percent... [2]** 1003/10 1004/13
**3.4 [1]** 852/21
**30 [2]** 878/20 1019/9
**300 [4]** 948/13 948/15 948/18 949/10
**300-dollar [1]** 949/4
**30th [1]** 995/4
**325 [1]** 900/12
**34th [4]** 843/9 843/11 843/15 847/7
**35,000 [1]** 943/21
**36 [2]** 946/18 1003/6
**3:00 [3]** 836/10 836/10 836/13
**3:30 [1]** 836/5

# 4

**4,500 [5]** 899/8 899/12 899/19 900/1 900/6
**40 [1]** 878/20
**40 years [2]** 943/17 943/21
**40.4 years [1]** 980/3
**403-0110 [1]** 965/10
**406-123 [2]** 918/22 919/22
**41 [1]** 1004/6
**410 [1]** 984/8
**42 [2]** 858/19 875/23
**42nd [1]** 835/11
**43 [3]** 956/12 957/10 1012/3
**44114 [1]** 835/15
**45 [3]** 923/4 926/3 1012/3
**45 years [4]** 925/24 926/5 939/10 941/19
**45th [1]** 858/10
**48 [3]** 881/22 882/1 888/8
**48-week [2]** 881/22 881/25
**4th [1]** 835/6

# 5

**5,000 [1]** 900/5
**5/325 [1]** 900/12
**50 [5]** 988/3 988/14 994/22 1005/19 1005/21
**50 percent [1]** 945/11
**5041 [2]** 984/3 984/3

# 7

**700 [3]** 835/17 926/4 926/5
**702 [1]** 835/20
**718-613-2644 [1]** 835/24
**75 [2]** 889/15 891/4
**77 [1]** 835/20
**78.9 [3]** 995/16 996/23 1006/2
**78.94 [1]** 995/3
**7:00 a.m [1]** 856/10

# 8

**800 [1]** 835/17
**8:00 [1]** 852/8

# 9

**90,000 [1]** 916/23
**95 [1]** 888/9
**9:00 a.m [1]** 837/21
**9:30 [4]** 835/6 847/8 1047/18 1049/20
**9th [2]** 835/15 837/21

# A

**A-L-A-N [1]** 857/6
**a.m [7]** 837/19 837/21 844/20 844/21 844/22 845/17 856/10
**A3 [1]** 955/14
**abilities [1]** 1027/12
**ability [6]** 842/3 860/16 1019/14 1019/15 1032/4 1032/24
**ablations [2]** 899/21 937/23
**able [23]** 841/7 860/9 866/2 917/21 944/22 984/2 984/11 984/12 984/20 989/22 1001/14 1006/8 1012/13 1012/15 1016/5 1016/12 1019/8 1019/8 1019/16 1020/10 1020/15 1021/24 1032/7
**absolutely [3]** 849/21 895/14 904/12
**accentuate [2]** 1008/14 1009/20
**accepted [3]** 1006/24 1007/5 1007/6
**access [1]** 856/5
**accident [77]** 838/23 838/25 840/5 840/6 840/10 840/13 840/14 841/2 841/17 841/21 844/8 867/11 874/9 889/22 935/13 936/2 936/9 945/4 945/6 950/16 959/17 959/20 1012/10 1013/18 1013/24 1014/7 1014/10 1014/13 1014/17 1015/8 1015/13 1015/16 1015/21 1015/25 1018/11 1018/19 1018/23 1018/25 1019/22 1020/1 1020/13 1020/16 1020/21 1022/12 1022/21 1024/14 1024/20 1024/21 1024/23 1024/24 1027/12 1028/5 1029/12 1029/13 1029/17 1029/18 1029/22 1030/5 1030/6 1030/11 1031/3 1031/9 1032/4 1032/8 1032/9 1032/15 1032/19 1032/23 1033/11 1033/13 1033/17 1034/4 1034/7 1034/11 1034/23 1035/17 1044/5
**accidents [1]** 1033/10
**accommodate [2]** 836/4 836/17
**according [5]** 916/10 953/23 953/25 971/25 989/13
**account [3]** 1004/1 1004/12 1006/19
**accurate [3]** 953/5 953/7 1001/11
**acknowledged [1]** 961/6
**ACTAR [2]** 840/9 844/8
**active [3]** 1019/2 1027/13 1034/10
**activeforever.com [1]** 902/18
**activities [5]** 901/19 1012/14 1014/18 1014/20 1015/2

**actual [9]** 854/9 870/6 876/14 881/1 886/7 923/23 937/19 963/8 997/22
**add [4]** 896/12 917/22 919/7 986/17
**added [5]** 871/5 1039/21 1039/24 1040/19 1040/20
**addition [6]** 839/15 859/17 862/14 862/15 892/21 1044/19
**additional [2]** 876/6 894/9
**Additionally [1]** 1039/21
**additions [1]** 1039/19
**address [3]** 837/22 1038/3 1047/22
**addressed [2]** 837/12 1040/13
**adjacent [2]** 897/5 906/24
**adjourned [1]** 1049/20
**adjust [1]** 1017/23
**adjusting [1]** 977/25
**adjustment [2]** 856/1 875/10
**administering [1]** 963/2
**Administrative [1]** 862/18
**admit [2]** 919/2 919/22
**admitted [3]** 904/21 914/1 926/23
**adopts [1]** 1038/24
**advance [2]** 1016/21 1017/11
**advantage [1]** 994/20
**advice [2]** 987/6 987/7
**advised [1]** 844/23
**affected [1]** 1003/22
**affidavit [1]** 1000/8
**affidavits [1]** 1006/2
**affirmatively [1]** 1000/7
**afford [1]** 1021/16
**afraid [1]** 1022/1
**afternoon [12]** 990/24 990/25 1010/13 1010/14 1010/19 1011/6 1011/7 1026/2 1026/13 1026/14 1026/18 1035/7
**afterwards [3]** 980/21 1031/21 1035/19
**age [3]** 864/4 875/22 1012/2
**agencies [9]** 942/22 942/23 942/25 943/1 943/9 943/14 944/4 977/3 977/4
**agency [4]** 943/8 944/1 944/3 977/6
**ago [11]** 851/24 852/14 852/15 880/2 882/5 924/23 924/24 963/10 994/23 1010/7 1013/22
**agree [19]** 871/20 886/11 921/14 921/16 921/18 921/18 921/19 921/24 921/25 922/1 926/1 928/22 932/25 943/15 952/3 952/22 965/17 984/15 1041/14
**agreed [14]** 846/21 849/6 864/13 871/8 918/3 918/4 927/18 954/7 973/20 989/14 1006/2 1041/19 1042/1 1044/23
**agreed-upon [1]** 1006/2
**agreement [3]** 843/18 918/2 964/8

**A**

agrees [12]   894/15 920/18
 920/20 920/22 920/25 921/1
 921/7 921/8 921/10 921/11
 921/12 939/4
ahead [6]   856/12 900/16
 955/19 974/14 990/21
 1016/17
AHMUTY [1]   835/19
ahold [1]   842/23
aid [1]   1009/14
aide [2]   1004/5 1004/8
aided [1]   835/25
aides [1]   998/6
aids [3]   901/14 902/20
 921/8
AL [1]   835/5
Alan [1]   857/6
allow [8]   888/1 895/12
 906/14 922/6 974/6 976/11
 1009/12 1039/12
allowing [1]   907/12
allows [1]   905/24
almost [1]   945/10
alter [1]   842/4
alternate [1]   1033/7
ambulance [1]   1031/20
ambush [1]   884/2
ambushing [1]   885/14
amount [8]   888/10 890/20
 900/6 922/2 931/7 931/7
 942/11 997/18
amusement [2]   1012/14
 1016/11
analysis [2]   855/25 866/5
and-a-half [2]   861/10
 867/25
Anderson [1]   839/9
Andrew [2]   849/18 1043/8
annual [1]   918/14
answer [14]   855/1 856/20
 896/12 913/8 938/19 945/6
 946/24 952/16 957/14
 958/18 976/12 986/10
 1015/19 1038/8
answered [5]   938/18 946/25
 954/16 957/11 973/4
answers [1]   919/21
anticipated [1]   998/5
anxiety [1]   900/24
anyway [2]   890/18 962/6
apart [1]   1012/3
apologize [4]   873/24 986/4
 1031/22 1031/23
apparent [1]   841/16
appear [3]   841/7 905/25
 906/2
APPEARANCES [1]   835/9
appellate [1]   855/3
application [4]   910/18
 910/19 910/22 991/18
applied [2]   1001/6 1003/4
applies [2]   986/6 989/14
apply [2]   991/10 999/8
applying [1]   993/9
appointments [4]   836/6
 958/8 958/9 977/13
appreciate [3]   907/25
 960/2 1025/19
approach [6]   951/10 951/11
 979/10 1002/8 1017/13

appropriate [9]   837/13
 894/13 930/15 964/24
 991/10 991/18 996/2 999/6
 1008/15
April [2]   842/17 842/24
area [23]   858/3 864/18
 865/1 868/22 868/23 868/24
 871/19 872/1 878/21 885/8
 890/22 891/24 930/3 945/1
 947/14 947/18 947/20 948/2
 949/11 965/16 987/10
 987/11 1030/13
areas [6]   902/16 936/21
 962/23 991/5 1000/17
 1038/12
argument [1]   896/4
argumentative [6]   933/18
 933/21 934/11 935/19
 939/16 940/7
Argumentive [1]   954/9
arithmetic [1]   980/20
arms [1]   892/5
arrange [2]   845/7 846/21
arranged [2]   837/9 844/17
arrangement [1]   847/11
arrangements [5]   836/22
 837/16 845/8 845/23 850/23
arranging [1]   837/13
arrived [2]   853/25 877/16
artful [1]   930/9
artfully [1]   904/9
articulate [2]   892/22
 961/9
articulating [1]   894/4
aside [1]   868/6
aspect [1]   881/6
aspects [1]   908/6
ass [1]   895/8
Assessment [1]   862/1
assignment [1]   947/13
assignments [1]   1020/6
assist [1]   901/19
associated [2]   883/8
 890/13
ASSOCIATES [1]   835/11
assume [5]   908/5 934/8
 963/1 965/3 975/20
assuming [1]   956/15
assumption [6]   962/8
 962/10 963/10 964/20
 973/24 975/7
assumptions [1]   963/8
attacks [1]   884/22
attend [1]   836/13
attorneys [3]   835/10
 835/14 959/11
attribute [1]   922/4
August [1]   965/8
author [1]   914/12
authored [1]   938/15
availability [1]   844/25
available [9]   842/19
 844/23 865/5 865/7 948/18
 948/25 956/14 956/19
 956/21
Avenue [1]   835/17
average [5]   918/11 993/14
 1003/1 1004/11 1004/12
avoid [2]   886/14 1021/4
award [1]   993/15
aware [11]   843/10 933/5

 933/8 1014/19 1015/6
 1015/10 1017/25 1020/18
 1033/9 1033/13 1038/1
awhile [1]   1032/12

**B**

B-U-R-G [1]   838/9
BA [1]   946/5
baby [1]   976/15
Bachelor's [1]   922/25
bachelors [1]   858/13
background [7]   858/12
 922/11 922/16 923/4 923/11
 965/18 998/8
backgrounds [1]   922/9
backs [1]   862/5
backwards [1]   925/7
bad [1]   898/1
balance [3]   903/6 1019/17
 1020/24
balances [1]   964/12
ball [1]   1019/3
ballpark [2]   926/2 926/3
BARMEN [25]   835/16 847/21
 924/18 933/23 934/7 934/14
 935/20 936/19 939/8 940/9
 942/10 956/2 960/9 960/14
 964/4 964/17 971/21 972/13
 976/22 1023/13 1023/16
 1023/18 1035/3 1035/5
 1035/8
bars [2]   902/5 921/9
Bartley [1]   836/5
base [4]   917/10 917/12
 991/10 1003/3
baseball [2]   1014/25
 1019/3
based [39]   838/24 844/8
 851/7 864/6 865/9 871/15
 874/1 877/14 885/7 888/6
 890/21 904/24 904/18
 906/14 910/13 910/17
 912/18 912/19 913/10
 918/25 928/16 930/21
 930/22 931/1 940/12 945/17
 946/15 971/4 972/8 979/6
 979/6 981/25 993/21 995/2
 995/19 995/20 997/25
 1004/15 1039/22
baseline [11]   878/1 878/9
 879/3 879/10 888/3 931/18
 960/17 962/14 963/4 963/11
 963/17
basic [2]   1004/7 1020/15
basis [15]   875/5 876/5
 889/11 889/14 895/13
 902/10 904/13 904/17
 923/12 923/14 963/3 963/24
 1006/15 1038/16 1039/5
bathroom [2]   901/22 911/2
batteries [1]   963/2
Battery [2]   962/24 962/25
BAUTA [101]   835/2 849/16
 849/16 863/20 864/4 869/5
 870/13 872/3 872/10 872/17
 872/20 873/6 873/13 873/22
 874/3 874/23 876/8 876/15
 877/22 878/14 879/21
 879/24 881/17 881/21 882/3
 882/4 883/6 889/22 892/15
 894/8 899/6 900/8 901/14
 901/18 902/21 912/13

**B**

**BAUTA... [65]** 913/11
913/23 915/2 916/10 916/16
916/25 920/2 921/23 922/2
923/20 926/13 926/16
926/18 926/18 927/22 928/2
929/22 929/23 931/14
931/24 932/19 933/16
933/25 934/8 935/3 935/10
935/12 936/23 937/11
937/16 940/11 941/10
941/15 941/18 942/12 944/6
944/15 946/11 947/3 950/16
953/13 953/15 953/18
954/13 957/21 960/15 962/9
964/5 964/7 964/21 965/4
966/1 970/12 972/7 974/1
975/21 977/12 995/1 1011/9
1011/14 1011/24 1026/18
1027/4 1034/23 1035/17
**Bauta's [13]** 889/12 896/20
913/3 917/15 922/8 928/5
930/22 937/4 938/5 939/14
995/11 1003/7 1028/1
**beach [3]** 837/10 850/20
1014/21
**Bear [1]** 924/12
**beautiful [1]** 897/21
**became [3]** 841/14 841/16
861/11
**become [3]** 853/1 862/2
1020/18
**becomes [1]** 996/1
**began [2]** 1027/6 1031/17
**begin [7]** 849/16 872/24
873/5 1040/11 1046/1
1047/17 1047/18
**beginning [7]** 847/8 878/1
888/4 891/14 1012/1
1013/15 1019/18
**begins [1]** 1038/5
**behind [1]** 996/15
**belief [1]** 952/8
**believes [2]** 924/5 971/25
**bending [1]** 1029/10
**benefits [1]** 862/19
**best [2]** 848/10 946/25
**better [8]** 845/13 863/11
873/7 875/9 1007/3 1023/10
1042/16 1043/22
**between [21]** 842/10 846/15
846/15 861/15 861/21 863/7
872/2 879/24 880/1 895/11
933/24 933/25 949/4 971/9
977/17 977/24 978/23
978/24 1006/7 1012/2
1036/6
**Beverly [1]** 907/1
**beyond [1]** 839/16
**bicycles [1]** 1015/3
**big [5]** 938/1 956/8
1021/23 1021/23 1045/25
**biggest [1]** 943/17
**bike [2]** 1032/15 1032/20
**bikes [1]** 1031/6
**billing [2]** 907/5 950/11
**bills [3]** 849/5 849/6
849/7
**binders [1]** 864/1
**biomechanical [1]** 841/22
**BISGAARD [1]** 835/14

**bit [7]** 858/5 858/12
890/16 913/10 913/15
1027/13 1031/19
**bite [1]** 895/7
**Blatt [4]** 837/7 837/20
839/7 850/20
**blew [1]** 885/16
**block [1]** 900/2
**blocks [5]** 894/9 937/7
937/23 972/16 973/7
**blueprint [1]** 857/23
**body [2]** 1015/8 1025/4
**bolding [1]** 1009/1
**bonds [1]** 1006/17
**book [1]** 949/18
**boroughs [2]** 948/8 948/9
**bother [3]** 1019/13 1033/7
1034/8
**bothering [2]** 1031/18
1033/4
**bottom [1]** 852/1
**bottom-line [1]** 852/1
**Brad [2]** 1023/18 1035/8
**BRADLEY [1]** 835/16
**brain [2]** 862/6 1033/15
**branch [2]** 900/2 973/7
**break [8]** 853/9 911/3
920/12 936/5 936/10 936/20
978/9 1047/16
**brick [1]** 901/9 901/11
**brief [2]** 884/4 960/4
**briefly [4]** 870/9 901/16
932/15 991/3
**bring [15]** 840/11 840/16
840/18 847/22 896/8 896/9
904/25 905/2 905/8 907/5
907/7 907/8 960/17 980/23
988/12
**bringing [2]** 904/23 907/6
**brings [2]** 860/17 862/14
**BRISBOIS [1]** 835/14
**broaden [1]** 876/25
**Bronx [1]** 948/6
**Brook [1]** 835/18
**Brooklyn [7]** 835/5 835/23
948/1 948/4 948/6 1012/5
1028/20
**brother [8]** 944/25 1011/25
1023/6 1024/4 1024/18
1024/23 1025/13 1026/22
**brother's [2]** 836/14
1025/16
**brother-in-law [2]** 944/25
1026/22
**brought [1]** 840/19
**bruises [2]** 1014/5 1025/3
**bucks [1]** 943/6
**build [2]** 940/5 1004/12
**builds [1]** 994/21
**built [2]** 870/2 880/8
**burden [3]** 843/19 909/18
909/20
**bus [6]** 1014/9 1020/20
1029/22 1029/24 1030/2
**busy [2]** 842/22 853/7

**C**

**C-700 [1]** 835/17
**Cadman [1]** 835/23
**calcs [1]** 851/5
**calculate [9]** 943/21

**986/13** 987/24 991/12
992/1 1002/20 1003/7
1003/14 1006/20
**calculated [5]** 985/16
991/14 992/7 993/4 1001/14
**calculating [2]** 853/2
992/15
**calculation [8]** 855/25
981/9 984/1 985/22 990/9
991/6 994/13 999/12
**calculations [8]** 851/5
851/8 943/20 991/7 994/21
997/23 999/14 1006/3
**calculator [1]** 980/2
**calendar [2]** 1016/22
1018/4
**calmed [1]** 1031/25
**cane [11]** 875/18 903/4
903/5 908/2 921/11 947/3
957/12 1020/19 1020/23
1021/5 1023/1
**cannot [6]** 883/7 896/6
897/22 908/16 984/15
1013/5
**capabilities [1]** 1028/2
**capable [1]** 883/19
**capacity [1]** 862/20
**care [103]** 849/5 849/8
852/11 852/11 857/18
857/18 857/23 857/23 858/2
858/2 860/11 862/9 862/11
862/12 863/5 863/11 863/12
863/14 864/8 864/18 865/11
869/1 869/6 869/17 870/14
873/22 875/17 876/18
879/23 883/8 885/10 887/17
889/8 892/14 895/24 896/1
896/5 896/6 896/14 899/6
899/10 901/17 905/16
905/24 906/22 906/23
907/15 917/5 917/15 920/20
922/2 924/6 925/21 926/2
926/5 928/25 929/18 930/7
930/24 931/7 935/6 935/12
935/17 935/21 935/23
935/24 942/15 943/23
944/22 945/4 945/5 945/15
959/4 962/14 964/25 965/17
965/24 972/8 975/9 975/12
975/25 976/6 977/2 977/17
977/24 983/22 985/21
986/18 990/3 991/7 993/17
994/1 998/16 1000/17
1002/19 1002/21 1002/25
1003/2 1003/5
**career [2]** 926/7 926/24
**Casden [2]** 849/13 849/18
**case [69]** 837/6 839/4
840/11 847/5 847/9 849/20
855/14 860/9 861/7 862/8
862/22 862/25 863/1 863/3
863/16 863/18 864/1 864/7
865/19 865/23 867/5 870/18
873/17 873/17 873/18
873/21 879/16 879/20
879/22 884/5 884/7 884/8
904/24 905/3 907/21 910/19
914/1 920/1 921/18 924/24
926/6 933/3 933/14 939/9
946/12 950/17 957/21 958/5
958/14 958/15 958/17

**C**

case... **[18]** 965/24 973/23
975/11 977/14 977/16
985/18 989/14 991/1 991/4
991/6 992/3 992/5 1006/15
1011/15 1043/7 1043/14
1043/14 1047/24
cases **[5]** 924/5 997/14
997/15 997/17 997/20
catastrophic **[1]** 859/15
categories **[9]** 920/13
920/25 993/25 994/4 997/11
998/16 1001/6 1002/19
1002/25
categorize **[1]** 851/4
category **[8]** 918/18 920/19
993/17 998/19 1002/21
1003/2 1004/9 1004/10
causality **[2]** 959/12
959/18
causation **[1]** 855/8
caused **[2]** 959/4 959/14
CCR **[1]** 835/22
ceases **[1]** 885/19
Centers **[3]** 996/17 998/9
1005/1
cents **[1]** 994/23
certain **[14]** 839/2 920/17
925/10 926/16 934/15
965/17 977/2 984/6 1009/3
1009/20 1032/12 1033/22
1033/25 1034/12
certainly **[13]** 840/21
851/23 852/1 897/15 904/10
925/24 930/15 974/20
974/25 997/16 1002/3
1003/24 1025/12
certainty **[3]** 883/10 884/9
975/25
certification **[3]** 858/23
859/8 859/9
certified **[10]** 838/25
858/22 858/25 859/3 859/8
859/12 859/13 859/17 923/9
925/17
certify **[1]** 841/1
cervical **[40]** 871/21 872/4
891/18 892/1 892/2 895/2
897/14 897/16 899/9 904/7
904/7 904/19 905/11 905/13
906/18 908/23 909/22 910/3
910/16 913/17 913/19
913/20 914/4 915/15 915/17
915/25 916/1 916/11 927/20
927/22 941/10 941/18
955/21 967/10 970/13
971/11 972/11 974/22 975/4
1038/12
cetera **[2]** 983/23 983/23
chair **[4]** 852/24 901/25
921/9 1008/16
chambers **[1]** 1045/9
chance **[3]** 978/24 1027/16
1027/19
change **[13]** 853/1 871/15
871/22 907/2 959/14 970/7
970/11 973/2 973/3 989/6
1009/6 1022/23 1034/6
changed **[3]** 873/19 890/18
1033/17
changes **[10]** 863/9 873/15

875/7 956/25 1015/25
1016/3 1018/8 1018/19
1034/25 1038/25
charge **[3]** 884/25 886/8
909/21
charges **[2]** 948/23 948/24
chart **[3]** 869/23 917/23
918/11
charts **[1]** 918/10
check **[5]** 841/25 842/14
842/17 842/18 944/13
checked **[2]** 846/2 949/13
checking **[1]** 959/24
children **[1]** 1013/10
choose **[1]** 840/16
Chris **[3]** 995/19 1000/12
1002/4
Christmas **[1]** 1027/23
chronic **[1]** 888/15
circumstances **[8]** 863/10
939/13 939/23 1027/6
1027/18 1029/6 1029/14
1031/11
cite **[1]** 884/24
cited **[2]** 996/13 1005/4
CITRIN **[1]** 835/19
City **[12]** 860/25 861/12
864/19 867/17 868/23
868/24 890/22 947/20
947/21 947/22 948/5 948/10
CIVIL **[1]** 835/7
claiming **[2]** 936/9 946/11
clarification **[2]** 847/13
961/4
clarify **[1]** 850/7
classes **[3]** 841/1 841/1
841/2
clean **[2]** 944/22 1009/8
cleaning **[4]** 942/17 943/24
944/11 977/7
clear **[5]** 872/1 872/1
883/5 883/23 907/4
cleared **[2]** 855/16 1011/11
clerk **[2]** 854/5 995/22
Cleveland **[2]** 835/15
1029/23
clients **[1]** 881/24
Climb **[1]** 1029/4
climbing **[1]** 1019/1
clinic **[1]** 946/23
clinical **[2]** 881/23 881/25
clips **[2]** 1043/7 1043/16
clock **[1]** 845/22
close **[10]** 847/5 847/15
897/16 910/4 910/14 948/2
956/17 1019/22 1019/24
1019/24
closed **[1]** 992/20
closely **[1]** 863/13
closing **[3]** 846/12 982/10
989/24
clumsily **[1]** 1009/18
cognitive **[22]** 860/5 878/3
878/6 878/8 883/21 887/24
887/25 888/1 921/19 931/19
931/20 932/20 933/5 934/9
961/6 962/9 962/12 963/16
963/17 963/21 964/6
1015/12
cognitively **[1]** 933/9
Colbert **[4]** 1035/13
1035/15 1035/18 1035/21

COLEMAN **[1]** 835/17
collateral **[1]** 1006/8
1006/9
college **[1]** 1021/16
Colonel **[2]** 838/25 855/8
Columbus **[1]** 841/4
comfortable **[1]** 987/5
coming **[11]** 843/12 846/20
846/22 880/3 906/9 923/25
924/11 965/12 981/19
1023/13 1023/24
companies **[1]** 902/15
company **[1]** 861/25
compare **[1]** 852/23
compared **[2]** 920/14 920/15
compensate **[3]** 878/4 888/1
943/12
compensatory **[2]** 839/3
846/12
complain **[1]** 1022/16
complained **[1]** 959/17
complaining **[1]** 1016/6
complaints **[2]** 864/5
930/22
complete **[3]** 859/5 859/10
916/1
completed **[5]** 858/20 878/6
879/4 927/8 927/14
completely **[3]** 945/16
993/16 1001/11
completes **[1]** 917/18
completing **[1]** 858/19
compliant **[2]** 953/19
953/22
complications **[5]** 870/3
870/5 870/7 880/6 901/21
computation **[2]** 980/20
993/2
computer **[1]** 835/25
computer-aided **[1]** 835/25
concentration **[1]** 888/2
concerned **[5]** 964/10
987/21 1005/12 1021/14
1021/18
concerns **[3]** 1018/10
1021/10 1047/20
concluded **[3]** 961/19 968/5
969/9
condition **[7]** 864/4 873/14
873/15 875/6 875/20 889/12
1038/12
conditions **[2]** 888/16
1038/13
conduct **[2]** 839/8 839/16
conducted **[1]** 864/2
conduction **[1]** 892/5
Coney **[1]** 1014/22
confers **[2]** 854/5 995/22
confirm **[1]** 847/4
confirmation **[1]** 844/24
confirmed **[2]** 837/15
1045/11
confuse **[1]** 986/5
Connecticut **[1]** 947/24
connection **[1]** 907/18
conservative **[1]** 910/5
consider **[2]** 1005/8 1007/2
considered **[1]** 994/4
considering **[1]** 993/23
considers **[1]** 1006/25
consist **[2]** 845/10 991/7
consisted **[1]** 927/13

**C**

**consistent [9]** 907/3 967/9
967/17 967/23 971/15
972/10 972/20 973/13
973/20
**consists [1]** 962/22
**consolidation [1]** 1004/15
**consultative [2]** 866/3
866/19
**consulting [1]** 976/13
**Consumer [9]** 993/23 993/25
998/2 1003/17 1003/18
1003/19 1003/20 1003/23
1004/24
**contact [8]** 842/20 842/24
869/11 872/21 877/17
892/25 949/17 1031/20
**contacted [8]** 842/20 843/1
843/10 864/19 864/23
869/12 869/18 902/18
**contained [1]** 998/16
**contains [1]** 998/5
**context [4]** 862/24 862/24
1039/23 1045/18
**contiguously [2]** 1039/23
1040/13
**continue [7]** 836/19 870/8
886/3 899/2 912/8 914/9
936/15
**continued [22]** 858/17
880/9 882/13 886/18 893/5
899/1 903/22 910/25 911/6
945/19 946/1 955/25 960/22
962/1 966/19 969/1 969/10
970/14 1007/14 1030/20
1046/2 1048/6
**continues [5]** 912/10
936/18 941/3 971/1 1040/25
**continuing [7]** 881/1
892/19 912/1 956/2 962/19
1008/1 1039/25
**continuously [2]** 859/21
868/17
**contract [1]** 997/11
**contrary [2]** 894/14 960/14
**control [2]** 902/8 996/17
**conversation [4]** 906/20
906/21 1029/15 1029/20
**conversations [1]** 1012/19
**convinces [1]** 989/3
**cook [1]** 944/22
**cooking [2]** 942/17 943/24
**coordinate [2]** 977/16
977/17
**cope [2]** 907/9 941/1
**copies [1]** 1000/19
**copy [3]** 853/21 1000/22
1002/2
**Cordiale [6]** 872/19 874/2
904/6 941/13 973/22 973/24
**Cordiale's [2]** 870/15
904/22
**corporal [8]** 838/22 840/8
840/17 840/19 840/19
841/23 843/23 845/14
**Corporal Schmit [5]** 840/17
840/19 840/19 841/23
845/14
**correct [42]** 836/11 836/12
878/15 880/5 887/17 889/7
914/18 914/25 918/16

924/15 927/15 927/20
928/10 929/20 931/23 933/2
933/17 936/24 941/11
944/16 945/16 950/8 952/6
955/16 956/23 957/5 959/22
966/4 970/5 971/4 971/7
975/17 982/8 982/10 993/9
995/9 1003/15 1004/19
1004/22 1025/2 1037/19
1045/23
**correctly [1]** 918/5
**corroborating [2]** 907/22
909/2
**cost [108]** 857/18 857/23
858/3 862/11 864/17 864/21
864/25 865/4 865/4 865/5
865/6 865/12 868/8 868/21
869/1 869/2 869/8 869/17
869/21 870/4 874/23 874/25
877/13 877/14 878/14
878/20 879/13 879/14 881/9
881/10 881/11 887/12
887/13 887/14 888/8 888/9
889/1 889/14 890/12 890/13
890/14 890/21 891/3 891/4
891/16 891/20 891/23
891/24 892/2 892/8 892/9
899/7 899/12 899/19 899/23
900/1 900/3 900/4 900/5
900/11 900/13 900/24 901/5
902/1 902/4 902/6 902/9
902/10 902/13 903/3 903/7
903/12 917/10 917/12
917/13 917/22 918/10
918/11 918/15 919/8 919/14
919/17 919/17 919/19
920/15 920/15 934/21
934/22 944/13 947/19 949/2
979/12 991/14 992/22
992/23 992/24 992/24 993/7
993/17 994/23 999/5
1002/19 1002/21 1003/3
1003/3 1003/14 1003/22
1004/8
**costed [1]** 900/8
**costs [23]** 865/3 868/11
868/23 869/3 869/19 879/10
883/8 883/11 902/14 917/21
919/8 942/20 979/24 979/25
980/1 991/7 991/11 991/12
994/24 1003/5 1003/25
1005/6 1005/9
**counsel [6]** 850/24 918/2
932/13 954/22 965/9
1028/10
**counseling [12]** 858/14
858/15 858/19 859/1 859/7
859/25 860/14 860/19 861/5
862/12 887/25 923/3
**counselor [12]** 857/16
857/16 858/10 858/23 859/3
860/2 860/24 861/15 864/7
879/17 879/22 881/6
**counselors [1]** 858/24
**counter [1]** 1041/21
**counterpart [1]** 920/4
**country [1]** 859/2
**couple [12]** 836/2 836/3
906/22 960/8 967/16 988/25
1023/19 1029/13 1029/18
1032/12 1035/19 1047/19
**course [11]** 859/10 859/11

859/14 860/17 908/3 930/4
955/18 971/1 987/2 999/16
1012/10
**courses [2]** 860/14 860/15
**Court's [1]** 988/10
**courthouse [5]** 835/5 845/6
845/6 846/2 850/9
**courtroom [4]** 983/7 983/12
1037/9 1043/1
**cover [4]** 849/4 849/4
849/5 960/8
**covered [1]** 956/6
**cows [1]** 908/21
**CPI [3]** 994/1 994/2 1001/3
**CPI's [1]** 1001/10
**CPLR [3]** 984/3 997/17
1006/18
**crash [1]** 839/14
**create [3]** 863/19 981/20
981/22
**created [1]** 845/25
**credit [3]** 859/10 859/12
859/14
**credits [2]** 858/19 946/18
**critical [1]** 931/5
**cross [23]** 846/23 855/17
885/3 886/4 894/18 895/16
897/21 906/13 907/10
915/13 924/17 946/1 956/1
980/24 981/3 981/5 986/3
1023/15 1035/4 1037/1
1039/13 1039/14 1039/15
**cross-examination [6]**
846/23 855/17 924/17 946/1
981/3 1023/15
**cross-examine [3]** 886/4
894/18 980/24
**cross-examined [1]** 981/5
**crunch [1]** 1006/1
**crunch-the-numbers [1]**
1006/1
**crying [4]** 1031/18 1031/22
1031/23 1032/2
**Cummings [19]** 867/6 883/17
887/16 920/4 920/12 923/19
925/8 928/21 929/6 930/18
930/20 931/5 931/15 936/21
940/10 946/3 946/16 949/17
1049/5
**Cummings' [1]** 887/20
**curative [1]** 961/17
**current [6]** 936/2 960/17
996/15 997/18 1003/19
1006/17
**cusp [1]** 1005/3
**custodial [1]** 977/7
**cut [3]** 976/15 984/19
994/20
**CV [1]** 835/4
**CVS [1]** 901/9

**D**

**daily [1]** 901/20
**damage [4]** 998/19 998/20
998/20 1001/7
**damages [7]** 839/10 846/12
883/11 883/23 884/24
983/20 984/9
**dash [1]** 1029/8
**data [13]** 993/22 994/4
996/13 996/15 997/25 998/2
998/3 998/3 998/11 1003/19

**D**

**data... [3]** 1003/24 1004/2 1007/1
**database [2]** 868/13 869/9
**date [12]** 842/17 844/17 846/19 851/7 851/22 876/8 882/5 959/20 984/17 995/2 995/20 1003/20
**date's [1]** 851/10
**dated [1]** 965/8
**dates [1]** 1025/17
**dating [1]** 1027/8
**daughters [6]** 1013/12 1021/15 1021/21 1023/9 1024/10 1024/14
**DAVIDSON [1]** 1043/25
**day's [1]** 962/22
**days [13]** 917/7 942/13 1016/21 1017/11 1022/6 1023/20 1024/24 1025/1 1029/13 1029/18 1029/19 1035/19 1047/20
**days' [1]** 1017/9
**deal [7]** 886/8 894/11 895/15 915/13 946/7 980/24 1047/23
**dealt [3]** 871/21 904/10 946/22
**December [1]** 1041/7
**decide [6]** 909/24 910/8 955/9 989/17 989/18 997/7
**decided [2]** 994/18 999/5
**decides [1]** 1038/24
**decision [2]** 955/10 989/3
**dedicated [1]** 840/10
**defendant [4]** 1037/14 1037/16 1037/21 1043/17
**defendant's [3]** 838/23 983/14 1037/12
**defendants [5]** 835/6 835/14 836/24 845/11 1037/25
**defense [9]** 849/19 855/6 867/5 887/16 920/3 920/3 923/7 925/8 927/9
**defer [1]** 937/10
**defined [1]** 989/15
**Definitely [1]** 1022/22
**definition [1]** 940/6
**degree [7]** 858/13 858/15 858/17 907/12 922/25 923/2 975/25
**delta [2]** 841/18 841/21
**delta-V [2]** 841/18 841/21
**demand [2]** 1003/22 1004/5
**demeanor [1]** 1027/12
**demonstrative [6]** 981/13 981/20 981/22 982/4 982/14 1009/14
**Demonstratives [1]** 982/6
**DENNEHEY [1]** 835/17
**Department [8]** 861/11 861/18 985/6 993/22 993/24 994/5 998/1 1001/10
**depos [2]** 837/3 843/13
**depose [1]** 980/11
**deposed [7]** 851/6 924/21 925/2 926/22 967/13 967/14 967/14
**deposition [26]** 837/15 841/7 844/18 850/8 851/7
**851/15 906/25 922/19
**922/22 946/20 949/20 1007/18 1008/6 1008/11 1010/2 1025/8 1035/13 1035/23 1035/24 1037/17 1039/3 1043/13 1043/17 1043/18 1043/23 1045/6 1045/12 1045/13
**depositions [9]** 837/5 845/5 845/10 866/19 866/25 932/18 958/25 960/12 967/6
**depressed [1]** 1034/8
**describe [7]** 1012/9 1012/17 1016/3 1027/11 1031/11 1032/6 1034/6
**designated [1]** 1043/17
**designation [3]** 1037/12 1040/14 1041/12
**designations [6]** 1037/1 1039/14 1041/18 1041/21 1041/21 1041/25
**designed [2]** 1008/20 1008/23
**despite [1]** 928/4
**destinations [2]** 1039/13 1039/14
**detail [2]** 862/11 1022/2
**detailed [2]** 864/13 868/6
**detailing [1]** 864/8
**details [2]** 857/23 1030/5
**determination [5]** 837/4 839/8 875/6 885/3 929/25
**determine [4]** 878/13 931/20 949/3 1007/12
**determined [5]** 839/13 984/6 991/9 993/7 1003/2
**determining [1]** 986/24
**develop [2]** 862/10 862/10
**developed [1]** 869/24
**development [5]** 872/25 873/9 873/10 874/22 921/17
**devices [3]** 875/18 875/19 901/18
**diagnosis [1]** 929/2
**diagnostic [6]** 864/3 866/16 867/15 867/24 868/5 921/6
**DIAMOND [2]** 835/13 837/14
**differ [1]** 923/1
**differed [1]** 922/2
**difference [9]** 895/9 895/10 923/13 931/6 961/7 978/23 978/24 1006/7 1012/2
**differences [1]** 1017/25
**different [40]** 843/8 860/17 862/4 864/8 864/20 892/20 892/21 901/7 922/9 922/9 922/12 923/4 943/8 948/19 948/21 957/24 958/11 971/9 978/22 980/4 980/6 980/9 980/12 985/2 985/21 987/18 988/1 991/3 993/13 993/16 993/25 993/25 994/2 994/3 994/12 996/3 996/6 998/15 998/16 1000/17
**differently [1]** 895/15
**difficult [1]** 1042/3
**difficulties [1]** 1043/4
**difficulty [1]** 944/24
**dim [1]** 1043/21
**dime [1]** 934/10
**diminished [1]** 876/4
**dinner [1]** 1007/7
**diploma [2]** 1019/21 1019/23
**direct [12]** 846/23 857/9 912/10 931/17 942/1 942/5 950/6 952/14 1011/4 1011/17 1026/11 1031/1
**direction [1]** 840/20
**disabilities [7]** 860/4 860/5 860/5 860/5 860/8 860/12
**disability [6]** 862/7 862/19 946/11 946/13 946/14 978/1
**disabled [5]** 923/3 946/8 946/9 946/10 946/20
**disagree [7]** 855/17 856/4 925/10 925/13 936/21 940/10 955/7
**disagreed [2]** 922/10 931/10
**disagreement [2]** 872/1 922/4
**disagreements [1]** 925/7
**disagrees [1]** 925/9
**disclosed [3]** 844/4 844/6 844/7
**discomfort [1]** 955/2
**discount [12]** 984/9 985/17 986/6 991/20 991/21 991/23 991/25 992/2 992/8 993/13 998/13 999/11
**discounted [1]** 855/24
**discounting [2]** 855/23 980/19
**discounts [1]** 855/25
**discretion [1]** 1009/12
**discuss [3]** 976/19 1036/11 1048/1
**discussed [7]** 839/6 915/21 999/20 1006/12 1006/14 1024/1 1035/9
**discussing [1]** 838/20
**Discussion [3]** 854/10 856/15 1049/13
**discussions [2]** 897/8 986/5
**disease [3]** 897/6 906/24 996/17
**dispersions [1]** 961/5
**dispute [4]** 839/12 980/21 987/3 1001/12
**disputing [1]** 906/21
**disregard [2]** 907/24 908/10
**dissertation [1]** 858/20
**distances [1]** 1032/10
**distinction [1]** 880/1
**distress [1]** 983/21
**DISTRICT [2]** 835/1 835/1
**divide [2]** 988/2 992/19
**divided [3]** 888/25 992/23 992/25
**doctor [40]** 848/24 864/23 869/1 869/2 870/18 888/13 889/13 889/17 889/18 889/20 889/23 891/8 894/8 894/10 897/19 921/20 921/20 933/25 933/25 935/15 938/8 939/9 939/19 942/2 945/13 945/14 948/22

**D**

doctor... [13]  948/23
 948/24 951/22 952/9 962/9
 974/23 975/8 976/5 976/12
 976/14 989/9 991/22 997/11
doctor's [2]  977/13 1041/3
doctoral [1]  858/19
doctorate [1]  858/20
doctors [19]  863/8 864/24
 867/2 869/13 869/15 869/17
 873/22 874/2 879/25 879/25
 883/18 935/1 939/24 955/5
 955/7 958/16 964/1 974/21
 977/24
doctors' [3]  836/6 958/8
 958/9
document [11]  854/19
 854/20 918/3 918/23 939/1
 939/3 950/25 951/16 952/13
 966/3 1002/13
documented [1]  1007/7
documents [2]  873/3 932/17
dollar [2]  949/4 949/4
dollars [3]  888/10 994/16
 997/18
done [38]  836/16 837/3
 845/22 848/10 848/20
 849/24 851/23 878/7 878/10
 888/3 888/4 888/5 899/7
 899/11 904/12 904/15 906/7
 923/3 926/2 932/8 952/4
 956/24 963/19 981/1 981/2
 984/2 984/12 984/13 987/15
 988/3 996/11 1009/5 1010/1
 1010/1 1017/6 1017/17
 1042/21 1049/9
double [2]  874/19 950/11
double-billing [1]  950/11
double-level [1]  874/19
down [27]  858/5 867/16
 890/16 902/3 920/12 931/10
 936/5 964/1 981/9 985/23
 995/14 1018/5 1018/12
 1018/13 1018/16 1029/10
 1031/21 1031/25 1031/25
 1033/3 1034/8 1040/18
 1040/22 1040/24 1041/10
 1041/11 1042/4
download [2]  996/17 1001/9
downplaying [1]  906/19
Dr [55]  846/7 848/18
 848/23 849/11 870/15
 870/17 872/3 872/17 872/19
 874/1 883/21 884/20 892/12
 894/7 894/23 896/2 896/4
 897/12 950/22 950/22 951/4
 951/6 951/7 951/12 951/17
 951/20 952/2 953/3 954/7
 955/2 956/3 962/10 962/18
 963/1 963/9 964/17 964/20
 965/3 965/7 965/25 966/8
 966/13 967/7 967/7 967/9
 967/10 967/14 967/17
 967/22 970/2 970/8 970/12
 983/12 1005/23 1006/11
Dr. [126]  846/22 847/2
 847/24 848/4 848/16 849/7
 849/9 849/12 849/13 849/15
 851/5 853/12 855/18 855/19
 870/10 870/21 870/23 871/2
 871/2 871/3 871/9 871/13

871/15 871/19 871/20 872/2
 872/21 872/21 872/14 872/10
 878/22 892/24 894/15
 894/15 895/24 896/8 897/12
 897/13 912/23 912/23
 913/21 913/22 913/25 914/3
 914/11 914/17 914/18
 914/22 914/24 915/5 915/8
 916/10 925/4 926/9 926/12
 926/15 926/17 927/6 927/10
 927/11 927/13 927/17
 927/22 927/25 928/10
 932/20 937/1 937/4 937/9
 938/9 939/7 939/20 940/3
 941/10 941/13 941/22
 941/25 951/1 951/3 952/8
 952/11 952/17 952/24 954/5
 954/6 955/2 955/13 955/20
 955/23 971/4 971/6 971/8
 971/10 971/10 971/15
 971/16 971/25 972/5 972/7
 972/10 972/14 972/15
 972/18 973/7 973/11 973/16
 973/19 973/22 973/24
 974/25 978/12 983/13
 986/10 990/5 990/8 990/24
 997/4 999/19 999/23
 1000/10 1002/14 1006/13
 1008/5 1008/11 1049/2
 1049/4
Dr. Casden [1]  849/13
Dr. Cordiale [3]  941/13
 973/22 973/24
Dr. Fardad [1]  870/21
Dr. Goldman [2]  999/23
 1006/13
Dr. Kolb [1]  847/24
Dr. Kucsma [16]  848/16
 851/5 855/18 855/19 878/22
 978/12 983/13 986/10 990/5
 990/8 990/24 997/4 999/19
 1000/10 1002/14 1008/5
Dr. Lattuga [36]  871/2
 871/20 872/2 872/10 897/12
 912/23 913/21 913/22
 913/25 914/3 914/11 914/18
 914/22 916/10 925/4 926/9
 926/12 926/15 926/17
 927/25 941/25 952/8 952/11
 952/17 952/24 954/5 955/2
 955/13 955/20 955/23 971/4
 971/16 972/7 972/15 973/7
 973/16
Dr. Lattuga's [5]  871/9
 928/10 951/1 951/3 971/10
Dr. Lichy [1]  1008/11
Dr. Mobin [35]  849/7 849/9
 849/15 870/23 871/2 871/3
 871/19 872/2 872/2 872/4
 912/23 914/17 914/24 915/5
 915/8 927/6 927/10 927/11
 927/13 927/17 927/22 938/9
 939/7 939/20 940/3 941/10
 941/22 954/6 971/8 971/25
 972/10 972/18 973/11
 973/19 974/25
Dr. Mobin's [7]  871/13
 871/15 897/13 971/6 971/10
 971/15 972/5
Dr. Provder [1]  853/12
Dr. Rabin [1]  849/12
Dr. Sabastian [1]  870/10

Dr. Thomas [6]  846/22
 847/2 872/21 873/22 1049/2
 1049/4
Dr. Winn [9]  892/24 894/15
 894/15 895/24 896/8 937/1
 937/4 937/9 972/14
dressed [1]  1017/24
drug [1]  901/9
drugs [1]  901/11
due [7]  849/9 857/18
 857/24 860/11 874/9 901/18
 955/1
duly [2]  1011/3 1026/10
durable [1]  957/17
during [9]  837/6 841/3
 841/5 842/5 1024/11
 1025/13 1037/17 1039/2
 1044/23

**E**

E-D-M-O-N-D [1]  857/6
e-filed [1]  1038/2
ear [1]  836/17
early [7]  836/10 842/17
 849/15 859/22 868/18
 1016/23 1043/12
easiest [1]  842/22
East [4]  835/11 835/15
 835/23 1012/5
EASTERN [1]  835/1
easy [5]  869/24 876/18
 1009/23 1034/9 1042/11
economic [3]  883/9 983/14
 1004/7
economically [1]  1003/21
economist [13]  851/8
 852/17 979/1 979/4 979/15
 979/16 979/17 980/18
 986/10 987/2 987/6 991/1
 1003/24
economists [1]  1007/10
Ed [2]  857/15 991/11
edgewise [1]  906/6
edit [1]  845/24
Edmond [2]  856/24 857/6
educated [1]  860/3
education [5]  858/18 923/5
 965/18 987/17 987/18
effective [1]  940/25
effort [2]  938/5 939/23
eighties [2]  859/22 868/18
either [11]  870/25 871/1
 883/12 892/5 939/6 950/22
 963/4 989/2 1004/11
 1009/24 1038/11
elastic [1]  903/2
elected [2]  967/13 973/2
element [2]  987/2 993/4
Elmo [2]  1009/16 1009/24
email [3]  845/24 852/23
 856/6
emailed [1]  856/9
emergency [1]  1031/20
EMG [2]  892/4 955/23
emotional [4]  860/5 862/6
 983/21 1034/6
emphasize [2]  1008/21
 1008/23
employability [2]  862/19
 865/10
employed [2]  860/23 861/11
employment [2]  837/25

**E**

**employment... [1]** 844/9
**EMS [2]** 1043/10 1043/11
**encountered [2]** 839/11
939/10
**end [21]** 838/9 847/5 854/6
855/14 868/11 870/4 887/13
887/14 888/5 888/6 896/22
907/21 963/5 963/6 963/25
976/20 985/22 986/7 1005/4
1005/17 1041/20
**ends [6]** 879/8 886/17
898/2 910/24 963/15 1038/8
**enjoyed [1]** 1033/23
**enter [2]** 984/5 1001/2
**entered [1]** 984/14
**entering [2]** 984/4 984/6
**enters [4]** 912/7 936/13
1008/10 1010/9
**entire [4]** 865/7 919/17
959/1 1041/22
**entitled [1]** 1002/13
**epidural [6]** 874/15 892/12
896/17 896/18 899/4 899/9
**epidurals [2]** 899/13
972/15
**episode [1]** 1031/24
**equipment [3]** 858/1 901/20
957/18
**errands [1]** 1032/12
**error [1]** 872/17
**ESQ [6]** 835/12 835/13
835/16 835/16 835/18
835/21
**essentially [3]** 857/22
871/7 873/10
**establish [1]** 962/14
**estimation [1]** 890/21
**estoppel [1]** 1038/23
**et [3]** 835/5 983/23 983/23
**eval [1]** 877/10
**evaluate [5]** 839/16 875/4
875/8 900/7 901/13
**evaluated [4]** 873/13
874/23 876/1 876/5
**evaluating [1]** 954/4
**evaluation [33]** 866/18
867/15 869/2 877/11 877/15
877/19 877/22 878/1 878/7
878/7 879/13 884/12 884/19
889/14 890/14 890/19 891/4
891/9 912/12 912/17 917/4
918/16 928/23 930/5 931/12
931/20 960/17 962/13
962/21 963/4 963/14 963/18
966/10
**evaluations [13]** 870/2
872/24 876/1 877/25 879/1
880/4 880/7 881/2 884/21
921/2 921/17 932/5 932/23
**evaluees [2]** 929/20 929/22
**event [1]** 1031/11
**everyday [2]** 1015/4
1029/10
**evidence [17]** 854/14
904/21 905/10 906/9 906/10
907/22 981/16 984/18
1045/15 1045/19 1045/22
1046/1 1047/4 1047/7
1047/8 1047/10 1047/25
**exact [1]** 882/5

**exactly [9]** 847/22 929/6
956/18 956/23 968/19 969/4
974/19 985/23 999/4
**examination [24]** 846/23
855/17 857/9 859/5 859/19
886/4 912/10 924/17 931/17
936/18 942/1 942/5 946/1
956/1 960/6 971/1 981/3
990/22 1011/4 1023/15
1026/11 1031/1 1035/4
1036/15
**examine [4]** 838/24 886/4
894/18 980/24
**examined [4]** 913/23 981/5
1011/3 1026/10
**examining [1]** 1003/23
**example [16]** 846/19 847/6
864/22 875/12 902/17 943/4
948/12 956/9 992/22 994/1
994/15 997/21 1004/5
1006/24 1007/12 1033/20
**except [1]** 972/10
**exception [1]** 927/20
**exclude [1]** 967/12
**excluding [1]** 854/19
**excruciating [1]** 1031/17
**excuse [5]** 836/18 948/20
1014/2 1037/4 1037/7
**excused [5]** 978/6 978/7
1008/5 1025/22 1025/23
**exhibit [8]** 854/12 854/19
1001/2 1001/24 1002/12
1045/7 1047/5 1047/11
**exhibits [4]** 853/15 853/21
1044/11 1045/21
**exits [6]** 911/4 936/11
978/11 1037/9 1043/1
1048/5
**expectancy [21]** 917/9
918/20 919/13 919/17
929/19 980/7 980/7 984/17
985/3 985/9 986/2 986/18
989/19 991/13 991/16
994/21 995/11 995/14
996/21 1003/7 1006/2
**expected [1]** 998/21
**expenses [1]** 883/9
**expensive [1]** 929/15
**experience [11]** 849/3
858/12 859/18 860/7 864/6
864/9 877/13 923/11 945/17
946/22 965/18
**expert [54]** 840/4 840/20
840/21 841/22 843/24
843/25 844/1 844/7 844/14
849/3 849/5 849/19 852/2
856/3 856/5 857/14 862/15
862/20 865/15 865/19
865/23 870/18 870/19
870/24 886/12 894/24
895/25 906/1 906/23 914/1
914/12 917/19 920/1 928/16
934/8 964/25 966/1 975/11
975/11 975/16 976/6 976/7
976/13 976/16 981/8 981/19
983/14 985/3 987/16 987/19
987/22 997/16 1000/13
1038/18
**expert's [1]** 885/15
**expertise [4]** 860/13
878/21 929/11 930/3
**experts [9]** 840/7 867/2

895/11 907/16 908/9 908/19
935/1 1280/7 1006/7
**experts' [1]** 906/2
**explain [9]** 852/25 859/24
862/25 913/15 979/19
1002/14 1020/5 1027/18
1033/19
**explained [4]** 879/20 942/1
957/19 1029/22
**express [2]** 1018/9 1021/7
**expressed [4]** 997/12
1021/6 1021/9 1022/11
**expressions [1]** 1021/7
**expressly [2]** 1000/1
1000/3
**extended [1]** 956/16
**extensive [1]** 970/8
**extract [1]** 998/10
**extremely [1]** 842/22
**extremities [1]** 892/7
**eyebrow [1]** 849/1

**F**

**face [1]** 930/20
**facet [4]** 899/15 937/7
937/23 972/15
**facets [1]** 899/15
**facilities [1]** 861/13
**fact [23]** 840/12 840/20
859/20 869/25 871/23 894/9
895/1 904/16 926/15 932/22
943/10 946/21 954/8 959/10
965/3 984/6 984/8 998/19
1002/23 1005/1 1022/6
1035/12 1041/8
**factors [2]** 1005/9 1007/3
**facts [2]** 840/17 884/7
**failed [1]** 883/13
**fair [12]** 928/17 928/25
930/2 930/7 930/23 931/7
936/3 947/19 952/1 953/10
953/11 955/4
**falling [1]** 901/22
**false [3]** 894/22 895/6
895/9
**familiar [1]** 885/20
**family [9]** 1008/8 1008/9
1020/4 1026/20 1027/21
1027/23 1028/23 1031/14
1033/21
**far [12]** 846/5 928/4
930/13 955/5 957/17 958/19
964/10 966/9 1005/12
1019/8 1032/6 1039/20
**Fardad [2]** 870/21 914/24
**fast [2]** 846/15 1019/6
**faster [2]** 1004/11 1004/11
**fault [4]** 894/6 913/7
986/4 1017/19
**favorite [1]** 1014/22
**fear [2]** 1023/7 1023/8
**fearing [1]** 1022/4
**February [3]** 925/2 926/22
1005/2
**federal [6]** 862/15 862/17
862/17 985/7 996/12
1004/25
**Federation [2]** 860/24
861/1
**feedback [1]** 1018/17
**feelings [1]** 1018/9
**felt [1]** 1034/3

# F

**few [15]**  852/3 931/9
988/25 996/15 1017/2
1018/15 1019/12 1022/16
1031/21 1034/18 1034/20
1034/21 1036/3 1037/7
1042/15
**field [2]**  859/6 868/19
**fighting [1]**  843/14
**figure [7]**  848/21 849/25
886/14 910/20 994/15
1008/3 1042/21
**figured [1]**  848/22
**figures [3]**  902/13 991/16
997/14
**filed [5]**  853/16 884/4
1038/2 1039/16 1039/18
**files [4]**  854/8 854/9
951/8 951/9
**filled [1]**  849/17
**films [1]**  1041/12
**final [2]**  884/25 886/7
**finances [1]**  1026/23
**finders [1]**  871/23
**findings [4]**  864/14 871/8
984/14 998/19
**fine [16]**  885/6 895/14
915/12 945/3 958/2 981/23
986/3 986/8 986/18 996/19
1001/2 1001/13 1001/13
1031/24 1041/15 1045/14
**finish [7]**  846/23 847/2
849/14 905/21 936/22
1019/25 1049/5
**finishes [1]**  933/15
**fires [1]**  886/15
**firm [2]**  846/18 863/18
**first [34]**  848/14 853/12
863/24 864/24 866/13 873/8
873/11 873/11 877/25 884/2
900/12 901/7 901/25 903/10
912/25 924/22 925/6 941/14
952/4 972/5 987/1 1002/20
1010/20 1013/24 1029/12
1037/12 1037/14 1037/15
1037/16 1037/24 1038/2
1040/4 1041/19 1045/12
**five [27]**  854/11 859/10
859/11 861/14 863/23
864/20 873/13 873/19
873/23 874/24 874/25 875/5
875/8 887/11 895/25 902/5
902/7 947/16 947/18 948/8
948/9 949/14 949/15 949/24
986/3 986/3 992/23
**five-step [1]**  863/23
**five-year [3]**  859/10
873/19 887/11
**flight [1]**  1031/14
**Florida [1]**  859/16
**Foglietta [1]**  840/15
**folks [1]**  845/21
**follow [6]**  869/3 869/7
869/8 914/8 939/14 963/7
**follow-up [4]**  869/3 869/7
869/8 963/7
**following [14]**  853/22
883/2 894/2 904/2 911/6
930/13 945/19 960/22 961/1
966/19 967/2 969/1 969/10
970/14

**follows [3]**  870/6 1011/3
1026/10
**followup [4]**  890/15 890/19
891/4 891/10
**football [2]**  1014/25
1019/3
**forehead [1]**  1014/5
**forensic [1]**  1007/9
**forever [1]**  843/7
**forget [1]**  1034/1
**forgetful [1]**  1018/1
**forgets [1]**  1017/12
**forgot [3]**  865/17 928/20
1017/15
**form [2]**  920/6 931/18
**formal [1]**  986/12
**format [1]**  869/23
**formative [1]**  1012/6
**forming [1]**  867/14
**formula [2]**  992/15 992/16
**formulated [4]**  864/15
865/9 869/22 966/10
**formulating [1]**  870/25
**forth [2]**  888/3 1037/8
**Forty [2]**  995/24 995/25
**Forty-two [2]**  995/24
995/25
**forward [15]**  852/11 883/16
883/22 894/12 929/19
930/13 937/11 958/17
959/20 977/21 989/10
993/18 997/19 1005/10
1006/19
**forwarded [1]**  863/25
**foundation [26]**  848/5
870/9 871/1 873/25 903/15
906/15 907/18 907/24 908/4
908/7 908/8 908/14 908/20
908/21 909/2 909/5 909/19
910/9 910/11 933/21 934/11
940/3 940/5 940/6 959/21
1044/15
**foundational [1]**  912/17
**founded [1]**  868/18
**four [13]**  839/14 846/20
881/8 881/8 884/21 891/3
896/21 900/23 917/7 932/22
942/12 992/9 992/10
**Four hours [1]**  917/7
**four-month [1]**  839/14
**fourth [1]**  1039/10
**frankly [2]**  851/22 980/17
**fray [1]**  845/3
**Fred [2]**  1000/10 1005/24
**free [3]**  1002/2 1036/21
1036/23
**freely [3]**  1016/6 1023/7
1023/7
**frequency [19]**  879/2 881/7
887/10 888/8 891/20 892/8
899/21 899/23 900/4 900/5
900/11 916/4 916/16 917/5
920/18 921/1 955/15 955/21
957/25
**frequent [1]**  921/13
**frequently [1]**  1013/4
**Friday [1]**  847/17
**friends [1]**  1015/3
**front [9]**  866/4 885/14
886/7 961/5 961/10 964/10
1029/23 1030/1 1036/18
**frustrate [1]**  1034/12

**frustrated [1]**  1034/9
**frustrating [3]**  1017/11
1017/16 1017/18
**frustrations [2]**  1021/8
1021/10
**full [8]**  846/19 846/24
962/22 963/8 983/3 1043/18
1043/18 1047/16
**fully [1]**  922/1
**function [3]**  860/16 959/15
962/13
**functioned [1]**  959/13
**functioning [1]**  877/23
**funny [2]**  910/6 1012/18
**fusion [39]**  872/4 872/5
874/19 874/19 896/20
896/23 897/3 897/4 897/11
904/19 905/11 905/11 906/4
906/23 908/23 909/22 910/3
910/16 912/25 913/17
913/17 913/19 913/20 914/5
914/16 915/8 915/15 915/17
915/25 916/11 916/22
927/20 927/23 941/11
941/18 967/11 970/13
971/11 972/11
**fusions [1]**  916/1
**future [75]**  849/8 851/13
851/15 851/16 852/10
852/11 853/2 855/23 864/10
870/3 872/3 873/5 873/23
876/18 881/18 883/8 883/9
883/11 884/10 884/17
884/19 887/8 892/16 894/9
894/24 895/24 896/1 896/4
896/6 896/24 899/6 903/8
903/11 906/4 906/23 912/13
913/11 915/3 916/16 916/21
917/15 955/3 962/14 963/11
963/20 964/20 964/22 972/7
972/8 972/15 973/16 973/25
974/16 975/1 975/9 975/12
975/22 975/22 975/25 976/6
977/17 977/24 983/20 984/7
990/2 990/2 991/14 992/1
992/18 993/6 998/20
1000/17 1001/7 1021/10
1022/1
**futures [1]**  983/20

# G

**GAAP [1]**  1007/7
**games [1]**  1014/22
**gathered [1]**  867/17
**Gauthier [1]**  1049/5
**geared [1]**  861/3
**GED [2]**  1019/20 1019/23
**general [6]**  866/5 866/12
889/11 889/19 935/5 997/11
**generally [5]**  928/22 996/4
1006/24 1007/5 1007/6
**gentleman [1]**  1043/5
**gentlemen [3]**  856/19 978/9
1047/15
**geographical [7]**  858/3
864/18 865/1 868/22 868/24
947/14 948/2
**get-togethers [3]**  1027/21
1027/22 1028/22
**get-up-and-go [1]**  1023/2
**girlfriend [1]**  1013/9
**girls [1]**  1021/5

**G**

given [15]  847/19 852/8
 863/20 864/9 865/5 897/8
 904/15 919/20 963/10
 997/10 1017/11 1020/7
 1020/8 1021/7 1035/9
goal [2]  929/14 929/17
GOGGIN [1]  835/17
Goldman [9]  999/23 1000/10
 1000/10 1005/18 1005/23
 1005/24 1005/24 1005/25
 1006/13
Goldman's [1]  1006/25
gonna [1]  1016/25
Google [3]  869/14 947/13
 947/17
government [7]  860/21
 862/15 862/17 862/20
 862/21 985/17 1004/25
grab [2]  902/5 921/9
graduate [1]  858/25
graduating [1]  860/22
grand [2]  950/21 978/25
graphic [1]  1045/24
great [3]  850/4 858/6
 1042/15
greater [3]  852/19 853/2
 984/9
greet [1]  1031/15
GREYHOUND [2]  835/5 839/10
ground [1]  849/4
grounds [1]  894/5
group [3]  870/13 870/15
 872/17
grow [1]  1012/4
grows [2]  855/22 855/24
growth [3]  994/5 998/5
 1004/11
guess [14]  849/16 876/23
 987/18 996/1 1000/14
 1028/6 1029/19 1029/21
 1031/18 1031/25 1034/8
 1034/10 1034/11 1043/12
guy [13]  840/14 895/2
 895/8 897/21 909/8 937/15
 988/12 988/13 1012/10
 1012/12 1012/16 1012/16
 1015/4
guys [5]  853/24 1012/4
 1013/1 1027/9 1038/19

**H**

hair [1]  908/18
half [8]  845/11 845/12
 861/10 867/25 976/15
 994/19 994/20 1028/21
half-mile [1]  1028/21
halls [1]  1048/3
Handbook [3]  998/4 1004/2
 1004/9
handed [1]  853/16
handheld [4]  902/2 921/9
 956/9 957/3
Handicapped [1]  860/24
handicaps [2]  860/4 860/12
handing [1]  951/12
handle [1]  999/10
handled [2]  904/9 980/19
hang [1]  1015/3
hard [9]  905/15 905/23
 907/15 1000/19 1000/22

 1018/11 1019/19 1021/14
 1032/11
Harold [2]  850/19 925/2
Harrisburg [2]  837/11
 837/13
head [9]  874/10 959/17
 987/11 1000/7 1014/14
 1022/17 1030/14 1030/16
 1033/15
headaches [4]  1014/14
 1016/7 1022/11 1022/11
heads [1]  1045/23
health [6]  946/22 994/6
 998/6 1004/5 1004/8
 1021/25
health-related [1]  994/6
healthcare [2]  1004/10
 1005/7
Healthy [1]  1027/13
hear [7]  856/8 896/20
 935/18 947/8 987/22 997/3
 1047/17
heard [5]  839/1 839/3
 892/11 896/17 903/4
hearing [17]  882/11 883/3
 893/3 894/3 903/20 904/3
 960/21 961/1 966/18 967/2
 983/16 986/12 988/4 988/14
 1005/14 1006/3 1008/2
heart [1]  987/10
heavily [1]  927/4
held [7]  882/11 893/3
 903/20 960/21 961/1 966/18
 967/2
hello [2]  1023/17 1048/2
help [15]  878/4 902/8
 943/3 945/1 1016/6 1020/4
 1020/9 1020/12 1021/20
 1021/21 1034/14 1034/18
 1034/19 1034/20 1034/21
helpful [2]  1000/19
 1000/21
helping [3]  940/25 942/17
 943/24
high [5]  865/6 868/12
 887/14 1019/21 1019/23
higher [4]  861/2 877/4
 979/5 979/15 980/16 999/6
highest [1]  865/4
highlight [3]  846/17
 1042/7 1042/11
highlighted [2]  1042/5
 1042/6
highlighter [1]  1042/9
highlighting [2]  1008/24
 1009/8
highway [1]  839/14
Hills [1]  907/1
himself [10]  944/23 958/2
 958/7 1017/23 1017/23
 1018/9 1019/17 1020/24
 1021/17 1034/8
hire [3]  943/6 943/7
 943/23
hiring [1]  943/25
Historical [1]  1003/20
historically [1]  1004/1
history [2]  944/18 959/10
Hoang [2]  1044/6 1044/8
hold [7]  843/7 934/12
 934/12 952/15 1001/22
 1001/22 1038/6

 holdings [1]  884/7
 holidays [1]  927/23
home [16]  837/23 858/2
 861/8 908/21 916/25 917/5
 920/20 943/23 945/3 945/5
 945/15 985/21 998/6 1004/5
 1004/8 1017/6
homebound [1]  861/2
homemakers [1]  943/14
homemaking [10]  921/12
 922/2 942/11 942/15 942/25
 943/9 943/16 976/19 976/22
 977/4
Honor [68]  836/7 836/25
 837/25 838/3 838/15 838/19
 840/3 842/9 843/4 843/6
 844/2 844/15 844/19 846/17
 847/3 847/12 849/23 850/6
 850/15 850/22 853/23 854/8
 854/21 855/15 856/22 857/2
 866/10 882/9 884/22 886/9
 889/21 913/24 915/6 915/10
 918/1 919/21 924/14 936/15
 938/25 960/19 962/4 965/11
 975/14 977/10 978/5 978/20
 982/12 983/6 989/1 989/12
 994/11 996/19 1000/3
 1000/22 1002/8 1004/19
 1004/22 1005/13 1008/20
 1037/5 1038/16 1039/21
 1039/22 1043/25 1044/2
 1045/11 1047/1 1049/14
Honor's [1]  1006/15
HONORABLE [1]  835/8
hook [1]  1044/12
hope [1]  1010/5
Hopefully [2]  836/15
 836/16
Horizons [1]  861/2
hose [3]  921/9 956/10
 957/4
hospital [2]  861/11 866/14
hospitals [1]  874/2
hotel [2]  841/8 1023/19
hour [14]  839/13 845/10
 845/11 845/12 867/25
 881/10 917/12 942/20
 942/21 943/6 1017/22
 1035/25 1036/2 1036/5
hours [14]  845/15 852/13
 859/10 859/12 859/15
 867/23 881/8 917/7 942/12
 1017/22 1018/15 1035/20
 1036/3 1036/4
house [9]  942/18 943/24
 1014/4 1016/8 1016/16
 1028/22 1031/13 1031/14
 1033/2
housekeeper [1]  943/6
huge [2]  845/25 853/8
hum [3]  854/13 942/8
 994/17
hundred [3]  846/2 859/10
 859/11
hurt [2]  1020/20 1025/5
hurting [1]  1014/15 1016/7
husband [1]  1011/22
hypothetical [1]  976/3
hypothetically [1]  975/20

**I**

I'd [8]  842/17 845/6 853/6

# I

**I'd... [5]** 867/23 985/10 985/10 1014/17 1047/17
**I'll [19]** 845/14 876/25 905/11 914/21 915/12 915/12 930/9 938/21 951/15 987/1 990/7 997/22 1001/20 1006/8 1009/13 1024/16 1024/17 1047/2 1049/15
**I'm [87]** 836/24 841/15 842/6 848/12 848/23 849/7 856/3 856/8 857/15 858/22 859/20 862/16 865/10 868/15 868/16 869/15 884/22 885/10 885/11 885/22 886/13 886/15 894/22 895/23 896/13 905/6 905/8 906/7 906/13 906/21 907/20 908/14 908/17 928/20 930/8 937/18 945/9 947/9 949/23 950/3 950/12 951/2 952/21 953/11 953/11 955/13 956/4 956/15 958/9 959/6 959/6 959/15 959/18 959/24 968/4 969/8 971/3 979/1 983/6 985/12 985/12 986/10 987/1 987/7 987/8 987/14 987/23 990/13 996/4 996/7 997/16 1000/9 1002/6 1002/12 1010/8 1011/10 1012/3 1012/3 1016/25 1021/22 1022/22 1023/2 1024/6 1024/9 1036/2 1036/4 1041/4
**I've [26]** 846/2 859/8 859/9 861/25 878/1 913/7 920/14 927/1 942/1 943/13 944/4 944/9 945/14 948/17 959/22 961/5 977/15 984/12 984/13 985/11 991/14 996/11 1010/1 1023/19 1033/2 1037/1
**ID [1]** 923/17
**idea [9]** 860/20 877/12 879/9 881/16 934/2 964/9 988/1 1014/18 1038/23
**identification [1]** 918/22
**identified [1]** 843/13
**identify [1]** 918/9
**illnesses [1]** 936/8
**imaging [1]** 973/16
**immediately [1]** 856/9
**impact [3]** 851/2 860/15 1007/4
**impacted [1]** 845/18
**impacts [1]** 843/20
**impaired [1]** 888/2
**impairments [5]** 857/19 878/5 888/15 888/15 901/19
**impatient [1]** 1034/9
**implication [1]** 895/18
**important [7]** 863/4 864/16 868/15 869/25 889/13 953/5 953/8 953/10 958/25 959/13 1017/16
**importantly [4]** 859/5 861/6 920/19 972/13
**improper [3]** 846/4 895/19 1039/4
**inabilities [1]** 1029/2
**inability [2]** 1019/14

1032/24
**inaccurate [1]** 884/6
**inappropriate [1]** 961/3
**INC [1]** 835/5
**incident [2]** 959/4 959/14
**include [10]** 888/19 930/16 934/16 936/1 936/7 945/10 950/20 957/9 974/22 975/3
**included [5]** 950/7 950/9 952/7 952/20 974/21
**includes [1]** 959/3
**including [4]** 865/3 883/9 892/11 981/3
**inconvenience [1]** 843/17
**increase [13]** 991/12 993/18 997/19 1002/15 1002/22 1003/6 1003/8 1003/17 1004/6 1004/21 1005/9 1006/21 1006/21
**increased [5]** 851/18 851/20 1003/25 1005/4 1009/2
**increases [3]** 1002/13 1002/17 1002/24
**independent [5]** 901/14 902/20 921/8 928/23 1047/25
**index [8]** 998/2 1003/17 1003/19 1003/20 1003/20 1003/23 1004/20 1004/24
**Indexes [2]** 993/24 993/25
**indicate [2]** 939/4 945/7
**indicated [13]** 868/16 873/16 875/4 880/5 903/18 922/7 923/9 939/19 945/2 954/6 963/23 970/11 974/15
**indicates [1]** 942/21
**indicating [3]** 979/14 1005/3 1045/13
**indication [1]** 1045/5
**indications [1]** 1038/11
**indicative [2]** 1038/11 1038/13
**individual [7]** 842/22 860/2 861/8 868/22 875/5 917/21 943/13
**individually [3]** 950/10 950/10 993/3
**individuals [9]** 859/15 860/8 860/10 861/19 861/23 862/4 862/5 943/13 946/21
**industries [3]** 994/6 998/6 1004/3
**infirmaries [1]** 1015/11
**inflation [25]** 991/10 991/18 991/23 993/9 993/12 993/16 993/20 993/21 994/22 997/16 997/23 997/24 997/25 998/15 999/8 1000/4 1000/16 1000/25 1001/4 1001/5 1002/7 1003/4 1005/4 1006/12 1007/12
**influence [1]** 906/19
**information [16]** 838/24 860/18 864/3 864/6 867/18 903/10 941/5 941/6 955/11 960/11 975/10 975/10 986/22 1002/18 1022/15 1043/20
**initial [11]** 853/15 862/2 869/2 869/7 884/18 890/14

890/18 891/4 891/9 963/18 963/18 963/18
**injection [1]** 900/6
**injections [9]** 874/15 892/13 892/13 899/4 899/5 899/9 899/15 899/19 900/2
**injured [7]** 859/15 862/3 862/5 863/5 863/7 863/10 863/13
**injures [1]** 857/19
**injuries [22]** 855/9 857/25 860/15 861/3 862/6 863/20 867/10 869/5 874/4 874/7 883/9 889/12 902/21 936/8 1014/12 1015/8 1016/1 1030/8 1030/10 1030/12 1030/13 1033/10
**injury [4]** 874/10 930/11 997/21 1015/7
**inpatient [1]** 861/20
**inputs [1]** 999/14
**inquire [3]** 857/8 1010/22 1026/15
**insist [1]** 944/3
**instance [3]** 875/8 971/21 1031/8
**institutions [1]** 860/21
**instruct [2]** 885/5 1045/16
**instruction [8]** 855/14 907/21 908/5 908/8 909/1 909/7 909/15 909/17
**INTALCUS [1]** 859/16
**intend [6]** 837/8 839/20 847/20 907/4 983/5 991/5
**intended [3]** 850/15 850/21 991/6
**intending [1]** 850/20
**intends [5]** 846/19 847/4 847/15 883/14 1036/25
**intensify [1]** 875/16
**intention [1]** 905/4
**interest [8]** 991/25 992/2 992/20 992/25 993/13 993/14 998/14 1006/19
**interested [1]** 1006/15
**interesting [1]** 959/16
**intermittently [1]** 962/19
**internal [8]** 889/8 889/10 889/13 889/20 889/23 921/20 934/25 935/4
**internet [3]** 901/8 901/11 902/14
**interpretation [1]** 848/6
**interrupting [2]** 885/17 886/10
**interruptions [2]** 886/14 978/18
**interview [5]** 864/3 867/24 867/25 868/1 868/5
**interviewed [1]** 944/15
**introduce [1]** 857/13
**invested [1]** 993/15
**investigation [2]** 839/15 840/12
**investigators [3]** 846/20 846/25 846/25
**invite [1]** 1027/23
**involved [7]** 861/1 861/5 861/9 991/17 1013/15 1013/16 1014/19
**involves [1]** 863/24
**irrelevant [1]** 959/12

# I

**Island [1]** 1014/22
**issue [39]** 840/22 840/24
840/25 841/14 841/16 843/8
843/11 846/18 847/6 851/4
851/6 855/13 878/13 883/4
892/21 904/9 904/17 916/1
926/9 928/21 950/17 961/9
961/11 970/5 978/19 978/22
978/25 979/1 983/2 986/25
989/13 989/21 997/7
1008/10 1019/20 1021/23
1021/23 1038/25 1049/16
**issued [10]** 906/16 906/22
966/4 966/5 966/7 967/6
970/4 972/23 973/1 976/5
**issues [23]** 836/3 839/6
843/10 843/22 855/8 885/14
907/5 925/3 946/17 984/6
984/20 1010/6 1012/15
1015/11 1015/12 1015/12
1018/8 1020/6 1020/7
1023/7 1033/14 1033/14
1034/5
**item [7]** 875/24 877/19
882/7 938/1 943/17 956/10
956/16
**items [29]** 865/12 868/6
868/7 868/8 868/10 868/21
880/1 901/22 901/24 902/12
902/14 907/23 917/18
928/19 934/21 934/22 938/2
939/4 943/15 947/7 947/10
953/12 956/6 956/9 956/19
966/13 971/16 973/15
977/25
**itself [4]** 867/25 872/1
876/4 920/19

# J

**Jacob [1]** 1037/1
**JAMIE [1]** 835/13
**January [1]** 924/22
**Jersey [1]** 947/24
**job [3]** 844/12 1010/8
1036/22
**joint [3]** 842/8 842/15
899/15
**jokester [1]** 1027/13
**joking [2]** 1012/18 1029/7
**JONATHAN [1]** 835/21
**Jos [1]** 926/16
**JOSE [23]** 835/2 849/16
1011/9 1011/24 1012/2
1012/11 1012/21 1013/10
1013/19 1014/19 1015/7
1015/15 1020/18 1022/18
1022/20 1026/18 1027/4
1027/11 1029/12 1030/10
1031/3 1034/23 1035/17
**jovial [1]** 1012/16
**judge [31]** 835/8 839/6
840/14 845/3 851/3 853/15
854/5 854/20 865/18 876/24
893/1 894/22 897/16 905/19
907/14 908/14 908/19 913/8
914/8 916/4 934/25 961/12
963/23 969/6 989/21 990/16
1000/11 1026/15 1028/11
1036/18 1036/21
**Judges [1]** 862/18

**judgment [1]** 984/5
**judgments [2]** 984/15 984/16
**jump [2]** 1019/6 1029/4
**jumping [1]** 1019/1
**Juror [2]** 836/4 836/9
**jurors [2]** 836/3 836/19
**jury [120]** 835/7 836/1
837/4 837/6 839/1 855/14
856/13 857/13 857/20 858/9
858/11 859/24 860/20
862/25 866/1 867/19 868/10
871/18 874/6 874/21 874/22
875/3 875/12 875/21 877/12
878/25 879/9 879/19 881/16
882/12 883/3 884/25 885/2
885/5 886/5 886/7 886/7
887/12 892/11 892/14 893/4
894/3 895/22 896/19 901/17
903/21 904/3 907/24 909/21
909/23 911/4 912/2 912/3
912/7 913/15 917/22 919/7
919/13 920/11 920/21
921/14 922/22 936/11
936/13 955/8 955/10 960/21
961/2 961/5 964/10 964/18
965/25 966/18 967/3 970/3
970/7 973/23 977/5 978/11
981/9 982/7 983/18 983/25
985/20 985/23 986/2 986/11
986/24 988/22 989/8 989/13
989/17 989/18 990/17
994/12 994/18 997/3 998/19
999/5 1008/10 1008/19
1010/6 1010/9 1011/8
1012/9 1014/18 1016/3
1021/12 1027/18 1028/4
1031/12 1032/6 1036/18
1037/4 1037/7 1037/9
1037/10 1043/1 1045/16
1048/5
**jury's [5]** 839/7 983/18
984/11 984/14 1005/22

# K

**K-R-I-S-T-I-N [1]** 990/19
**K-U-C-S-M-A [1]** 990/20
**keep [4]** 1019/11 1019/11
1043/3 1047/24
**kept [1]** 942/2
**kick [2]** 998/24 999/2
**kids [3]** 1021/3 1021/24
1027/22
**kind [17]** 857/14 858/9
874/12 925/6 937/24 943/3
945/3 987/2 1012/10 1014/7
1014/24 1015/7 1015/11
1015/11 1015/12 1031/17
1038/23
**kinds [1]** 1014/18
**king [1]** 908/14
**knee [2]** 908/12 908/12
**knees [2]** 1014/6 1014/15
**knowing [1]** 1041/23
**knowledge [1]** 859/6
**Knowles [1]** 836/9
**Knowles-Smith [1]** 836/9
**known [7]** 851/22 858/22
859/13 1011/24 1027/15
1033/9 1034/3
**knows [2]** 836/15 849/22
**Kolb [1]** 847/24
**Kristin [1]** 990/19

# L

**Labor [6]** 985/6 993/23
993/24 994/5 998/1 1001/10
**lack [1]** 1007/2
**ladies [4]** 856/19 978/9
1043/3 1047/15
**laid [2]** 850/2 931/1
**Lannigan [1]** 1049/5
**large [1]** 1007/4
**larger [2]** 992/7 1030/16
**last [14]** 872/18 895/23
919/20 935/18 953/15
954/14 954/18 963/8
1010/21 1011/11 1022/20
1023/19 1026/7 1034/22
**Lastly [1]** 977/12
**late [1]** 842/16
**Lattuga [60]** 870/10 870/17
871/2 871/20 872/2 872/3
872/10 872/17 894/10
897/12 904/9 904/14 904/23
904/25 905/2 905/7 905/8
905/9 906/12 906/17 907/3
907/4 910/18 912/23 913/21
913/22 913/25 914/3 914/11
914/18 914/22 916/10 925/4
926/9 926/12 926/15 926/17
927/25 941/25 950/22 952/8
952/11 952/17 952/24 953/3
954/5 955/2 955/4 955/13
955/14 955/20 955/23 956/3
967/10 971/4 971/16 972/7
972/15 973/7 973/16
**Lattuga's [8]** 871/9 904/20
904/23 906/8 928/10 951/1
951/3 971/10
**laugh [1]** 1012/19
**laundry [1]** 943/24
**law [19]** 856/2 862/18
863/17 883/5 883/6 883/23
884/5 884/24 885/1 885/20
885/24 905/23 944/25
985/18 992/3 992/5 995/22
1026/22 1027/2
**lawyer [7]** 843/11 843/14
846/9 934/1 1035/12
1035/16 1041/3
**lawyers [2]** 1024/2 1047/21
**lay [3]** 907/18 908/21
909/18
**learn [7]** 941/17 1013/24
1014/1 1014/3 1014/7
1029/12 1029/16
**learning [1]** 908/17
**least [7]** 867/23 889/18
909/21 994/21 1000/22
1017/22 1036/11
**leave [6]** 836/5 836/10
837/4 848/8 910/8 999/9
**leaves [1]** 983/12
**leaving [2]** 855/13 858/20
**left [7]** 842/23 854/24
871/22 871/23 908/12

# Kucsma [25] 848/15 848/16
851/15 851/18 855/1 978/22
978/12 983/8 983/12 983/13
983/13 984/18 986/10 990/5
990/8 990/19 990/24 995/13
997/4 999/19 1000/10
1002/14 1005/23 1006/11
1008/5

**L**

**left...** [2]   986/17 1040/21
**leg** [1]   1030/17
**legal** [2]   997/16 1013/19
**legs** [5]   892/6 892/6
1014/15 1020/25 1030/14
**length** [1]   906/21
**less** [5]   855/22 855/24
906/22 921/13 984/8
**let's excuse** [1]   1037/4
**letting** [1]   1029/21
**level** [5]   839/8 859/1
860/13 874/19 946/19
**LEWIS** [1]   835/14
**Lewisburg** [2]   838/2 838/11
**liaison** [5]   861/14 861/21
863/7 879/24 977/23
**licensed** [2]   858/21 885/22
**Lichelle** [1]   836/4
**Lichy** [3]   848/18 1008/11
1037/1
**lien** [6]   933/9 933/24
933/25 934/5 964/7 964/14
**liens** [2]   964/4 964/5
**lies** [1]   1005/13
**life** [47]   885/10 889/5
889/5 889/6 889/8 901/17
905/16 905/24 907/15 908/1
908/10 908/11 917/9 917/9
918/20 919/13 919/17
925/21 926/1 926/5 929/19
942/13 959/4 964/25 965/17
965/24 977/2 980/7 980/7
984/17 985/2 985/9 986/2
986/18 989/18 991/13
991/15 994/25 995/11
995/11 995/13 996/21
1003/7 1006/2 1011/25
1013/14 1023/1
**life-care** [2]   965/17
965/24
**lifecare** [79]   846/20
846/25 847/1 852/13 852/16
852/17 852/18 853/3 856/24
857/17 857/21 857/22
859/13 859/19 859/21
859/22 860/1 860/19 861/7
862/10 862/24 863/2 863/3
863/9 863/19 863/22 864/8
864/12 864/15 864/17
865/11 865/19 865/23 867/8
868/17 868/19 869/22
869/24 870/1 870/5 870/6
870/8 871/6 871/7 871/20
871/23 872/23 873/11
873/18 874/12 875/7 876/17
877/3 879/23 880/6 913/2
913/10 920/7 920/14 920/15
920/17 923/10 924/5 925/8
925/17 927/8 928/16 928/23
930/4 930/15 931/3 938/23
952/20 974/18 976/10
978/13 981/7 993/5 1007/12
**lifetime** [6]   837/24 890/10
891/14 900/14 917/9 991/7
**lift** [1]   1031/4
**light** [1]   848/3
**lights** [1]   1043/21
**likely** [3]   884/6 909/3
993/18
**limine** [1]   885/17

**limitations** [3]   888/2
1029/1 1029/7
**limited** [3]   845/14 1021/6
1021/9
**limiting** [1]   855/13
**limp** [1]   1032/9
**line** [8]   852/1 985/18
1038/8 1040/4 1040/18
1040/22 1041/9 1041/9
**lines** [4]   835/5 1038/17
1039/9 1039/24
**linked** [1]   1006/16
**links** [2]   845/8 992/6
**LISA** [2]   835/22 1009/7
**list** [15]   866/7 917/18
932/25 934/10 937/17
937/18 937/24 938/4 940/12
940/20 940/24 941/7 941/23
943/16 991/4
**listed** [8]   839/18 839/19
839/21 839/23 839/24
841/23 846/19 948/13
**literally** [1]   852/23
**live** [8]   837/2 944/25
1000/9 1006/7 1008/8
1012/6 1028/19 1031/13
**lives** [1]   841/7
**living** [4]   901/14 901/20
902/20 921/8
**LLC** [1]   835/11
**LLP** [2]   835/14 835/19
**local** [4]   841/8 841/8
850/9 858/3
**locate** [1]   947/14
**logical** [1]   901/16
**logistical** [1]   845/25
**long-run** [1]   1003/1
**long-term** [6]   930/24
1002/15 1002/17 1003/4
1004/21 1006/21
**longest** [2]   868/16 868/16
**longterm** [1]   865/11
**look** [34]   851/25 852/2
852/6 868/21 869/17 873/22
873/22 886/6 918/8 918/22
929/10 930/6 930/10 947/17
948/4 950/24 959/9 978/24
979/16 980/22 983/18 984/3
987/16 987/19 998/2 998/3
998/3 1006/3 1018/3 1018/4
1040/2 1041/25 1042/1
1044/18
**looked** [6]   864/17 906/16
928/11 994/3 1029/25
1029/25
**looking** [6]   869/15 955/13
966/3 992/22 992/24
1003/25
**looks** [8]   846/10 846/12
857/17 858/1 910/12 961/18
1000/24 1019/5
**loose** [1]   984/19
**lose** [1]   986/15
**love** [2]   910/21 1002/2
**low** [7]   865/5 868/12
874/10 887/13 891/14 903/2
921/10
**lower** [7]   851/21 892/7
978/25 979/3 999/7 1002/25
1030/12
**lowered** [2]   851/12 851/16
**lowering** [1]   851/14

**lowest** [1]   865/4
**lucky** [1]   897/14
**lumbar** [21]   891/24 897/3
897/10 897/14 899/4 904/7
904/8 905/11 906/4 906/23
913/17 914/16 915/8 916/16
916/21 916/22 955/15
955/21 975/1 975/3 1038/14
**lump** [1]   993/15
**lunch** [2]   848/17 978/9
**Luncheon** [1]   982/21

**M**

**M-A-R-T-I-N** [1]   1026/6
**M-O-B-I-N** [1]   848/25
**ma'am** [2]   1023/17 1025/19
**machine** [4]   902/8 902/10
921/24 940/22
**MAGISTRATE** [1]   835/8
**magnitude** [1]   1022/14
**main** [1]   849/3
**maintain** [2]   968/2 969/5
**maintained** [1]   859/9
**mall** [1]   1028/23
**malpractice** [1]   997/21
**man** [8]   885/17 894/16
930/11 933/9 955/8 1007/4
1022/20 1034/23
**managed** [2]   958/2 958/19
**management** [35]   860/9
862/8 862/22 863/1 865/20
865/23 866/17 873/18
874/15 888/19 888/22 891/6
891/8 892/12 894/8 894/12
894/16 894/24 895/5 902/9
921/20 921/21 936/24 937/4
937/15 937/19 937/21 950/8
950/13 956/4 964/19 964/21
972/14 972/15 994/16
**managements** [1]   861/7
**manager** [16]   863/3 864/7
873/17 873/21 879/16
879/20 879/22 921/18 933/3
957/21 958/5 958/14 958/15
958/17 977/14 977/16
**managing** [1]   958/7
**Manhattan** [1]   948/5
**manual** [2]   1007/8 1007/10
**map** [2]   857/22 868/7
**March** [1]   842/17
**Maria** [8]   849/15 1011/14
1026/23 1027/8 1027/21
1027/24 1029/19 1034/19
**Marian** [1]   836/11
**marital** [1]   1026/24
**marital-wise** [1]   1026/24
**Mark** [2]   848/1 848/3
**marking** [1]   1002/12
**married** [1]   1011/14
**MARSHALL** [1]   835/17
**Martin** [7]   848/17 1011/15
1011/17 1011/22 1025/25
1026/6 1026/8
**masters** [5]   858/14 858/17
859/1 860/13 946/19
**masters-level** [1]   860/13
**material** [1]   865/9
**materials** [4]   922/19 923/6
923/19 1030/1
**math** [2]   1020/7 1020/15
**mathematician** [2]   949/23
950/3

**M**

**matter [7]** 896/15 909/4
952/3 953/21 954/24 993/15
1022/6
**May 11th [1]** 837/2
**May 14th [1]** 836/5
**May 24th [2]** 836/13 836/15
**MCELFISH [62]** 835/11
835/12 845/2 847/16 852/25
854/22 856/21 865/14 881/1
885/19 887/5 890/1 894/14
899/3 912/11 913/9 914/10
914/15 914/23 915/14
915/23 916/9 918/7 919/6
919/25 922/15 923/18 924/3
925/16 950/7 960/4 960/7
962/7 971/2 971/20 972/6
972/25 973/6 974/10 975/6
975/19 976/4 977/11 986/21
987/23 989/16 1011/5
1023/23 1026/12 1031/2
1035/10 1035/12 1035/21
1036/6 1036/16 1037/17
1037/22 1038/17 1039/2
1040/16 1042/4 1045/15
**mean [32]** 839/21 847/19
849/1 850/8 862/25 922/11
930/8 937/18 948/5 948/6
949/25 957/23 959/15
978/22 979/20 981/17
984/20 984/23 985/2 985/6
985/11 986/20 988/18 989/4
994/22 1001/9 1020/5
1029/15 1029/16 1030/18
1037/2 1041/23
**meaning [4]** 870/1 892/11
921/8 1007/9
**meaningless [1]** 994/13
**means [10]** 845/11 847/17
851/24 859/14 860/10 894/4
933/11 933/14 933/17
974/16
**measure [3]** 878/10 888/6
963/15
**measurement [1]** 963/20
**measures [2]** 859/6 962/23
**mechanical [1]** 835/24
**medial [1]** 973/7
**Medicaid [1]** 998/9
**medical [53]** 849/3 858/1
864/4 865/11 867/20 869/6
870/14 877/2 883/9 883/11
886/6 888/11 902/15 904/17
904/18 905/16 905/24 906/1
907/16 908/1 908/9 908/9
912/19 912/20 912/22 914/4
922/8 923/12 928/5 928/7
928/16 930/1 930/6 930/10
930/11 930/20 930/21
957/17 957/24 959/19
965/19 965/23 966/1 966/13
975/25 983/22 990/2 994/1
994/2 997/21 1002/25
1005/4 1025/12
**medically [2]** 944/6 955/9
**medicals [3]** 928/24 929/8
929/10
**Medicare [3]** 998/10 1005/1
1005/2
**medication [2]** 900/22
940/12

**medications [7]** 900/7
900/8 900/10 921/7 921/23
940/19 1022/18
**medicine [16]** 860/15
861/12 861/18 861/21
869/16 888/13 888/25 889/8
889/11 889/13 889/20
889/23 921/4 921/20 934/25
935/4
**meds [1]** 940/10
**meet [3]** 850/20 1013/9
1035/8
**meeting [3]** 1035/21
1035/24 1036/7
**meetings [2]** 1036/6 1036/9
**member [3]** 861/17 1026/20
1028/23
**members [2]** 861/14 1033/21
**memory [6]** 888/2 1017/25
1018/24 1025/16 1033/17
1034/5
**mental [3]** 946/22 1015/11
1033/14
**mention [1]** 1025/7
**mentioned [6]** 862/22
865/25 1004/2 1022/1
1029/24 1033/1
**mentions [1]** 1033/6
**messages [1]** 842/23
**met [8]** 874/3 874/8 926/18
928/2 928/16 945/7 1023/18
1035/12
**method [3]** 987/4 1007/5
1007/6
**methodologies [1]** 868/15
**methodology [8]** 868/10
868/20 902/7 981/5 986/23
986/23 1006/23 1006/24
**methods [2]** 929/11 931/1
**Michelle [1]** 836/9
**microphone [1]** 947/8
**middle [3]** 838/9 885/15
1041/12
**Middleburg [4]** 838/5 838/7
838/8 838/8
**midst [1]** 842/24
**might [15]** 875/9 875/12
875/13 897/9 910/17 910/19
910/19 931/10 964/21 975/9
988/21 1006/6 1006/6
1006/8 1040/3
**mile [1]** 1028/21
**miles [2]** 839/13 846/2
**milligrams [3]** 900/12
900/23 901/4
**million [3]** 943/19 943/21
994/15
**mind [14]** 886/15 888/12
890/17 962/10 963/10
964/22 974/2 974/12 989/6
997/7 1021/20 1028/11
1034/25 1047/24
**mine [1]** 1042/6
**minute [9]** 873/25 880/2
904/15 906/20 911/2 927/14
987/14 988/24 990/11
**minutes [18]** 938/13 978/17
986/3 986/3 986/12 988/25
988/25 1010/7 1016/19
1017/2 1019/9 1019/12
1023/3 1031/21 1032/2
1037/7 1042/5 1042/15

**Miriam [1]** 912/3
**misinterpreted [1]** 885/24
**misrepresenting [2]** 884/7
961/18
**miss [1]** 999/20
**missed [1]** 931/11
**mistaken [1]** 952/8
**mister [3]** 838/16 838/16
853/13
**Mobin [66]** 848/23 848/25
849/7 849/9 849/15 870/21
870/23 871/2 871/3 871/19
872/2 872/2 872/4 894/23
896/2 897/12 904/16 905/11
905/18 906/5 906/19 906/20
906/22 907/18 908/21 910/2
912/23 914/17 914/24
914/24 915/5 915/8 927/6
927/10 927/11 927/13
927/17 927/22 938/9 939/7
939/20 940/3 941/10 941/22
951/4 951/17 951/20 952/2
954/6 954/7 955/2 955/4
965/25 966/8 966/13 967/7
967/14 967/17 970/12 971/8
971/25 972/10 972/18
973/11 973/19 974/25
**Mobin's [22]** 871/13 871/15
897/13 905/14 905/19
906/25 907/2 950/22 951/6
951/7 951/12 952/4 965/8
967/7 967/9 967/22 970/2
970/8 971/6 971/10 971/15
972/5
**modalities [2]** 878/2
888/18
**moment [2]** 924/13 959/25
**Monday [8]** 846/20 848/2
848/4 883/22 973/23
1047/16 1049/1 1049/15
**Monday's [1]** 848/22
**money [4]** 931/7 964/7
964/14 964/15
**monitor [3]** 836/20 873/14
888/16
**monitoring [5]** 974/1
974/15 974/23 975/21
976/14
**month [3]** 839/14 890/11
891/9
**months [3]** 851/24 892/25
937/16
**morning [14]** 837/1 851/4
851/24 852/8 852/24 856/19
856/20 856/23 857/11
857/12 979/14 980/13
1016/23 1043/12
**Moroknek [3]** 850/19 851/1
925/2
**mortar [2]** 901/9 901/12
**most [11]** 841/4 859/4
861/6 884/6 920/19 929/15
972/13 995/2 995/20 996/15
996/17
**mostly [1]** 1027/21 1028/24
1028/24 1030/13
**motion [2]** 840/15 884/4
**motions [1]** 885/16
**Motrin [2]** 901/4 940/15
**Mount [5]** 861/11 861/12
861/16 861/22 861/23
**move [17]** 851/11 855/7

**M**

**move...** **[15]** 889/16 900/17
915/20 940/8 942/11 946/4
956/6 1012/13 1016/5
1019/6 1023/21 1024/18
1044/4 1044/25 1045/3
**moved** **[5]** 1012/21 1024/13
1044/10 1044/21 1044/22
**moves** **[1]** 919/2
**movie** **[5]** 1028/20 1028/21
1033/3 1033/23 1033/25
**movies** **[2]** 1028/19 1033/21
**moving** **[4]** 850/21 919/21
1010/6 1023/1
**Mr** **[124]** 837/1 839/7 851/1
853/9 854/22 856/12 856/25
857/4 858/8 859/24 863/19
865/14 865/19 865/22
873/13 873/24 876/7 876/14
876/15 877/22 881/1 881/2
887/5 890/1 899/3 912/11
913/9 914/10 914/15 914/23
915/14 915/23 916/9 918/7
919/6 919/25 922/15 923/18
924/3 924/18 926/18 933/23
934/7 934/14 935/20 936/19
939/8 940/9 942/10 946/11
953/13 956/2 957/14 957/21
960/1 960/4 960/7 960/8
960/9 960/14 960/15 962/7
962/8 962/8 963/7 964/4
964/4 964/6 964/7 964/17
964/21 965/4 965/16 966/1
970/2 970/12 971/2 971/20
972/6 972/25 973/6 974/10
975/6 975/19 976/4 977/11
985/5 990/3 993/7 994/9
994/18 995/5 999/6 1000/16
1011/5 1023/16 1026/12
1031/2 1032/23 1034/22
1035/3 1035/3 1035/5
1035/6 1035/10 1035/12
1035/15 1035/17 1035/18
1035/20 1035/21 1036/6
1036/16 1036/17 1037/17
1037/22 1038/17 1039/22
1040/16 1042/4 1042/11
1043/25 1045/15 1045/16
**Mr.** **[143]** 837/20 839/15
840/18 841/15 845/2 847/10
847/16 847/21 847/21
848/14 850/19 850/20
852/18 852/25 856/21 864/4
869/5 870/13 872/3 872/10
872/17 872/20 873/6 873/22
874/3 874/23 876/8 878/14
879/21 879/24 881/16
881/17 881/21 882/3 882/4
883/6 884/8 885/19 885/25
889/12 889/22 890/16
892/15 894/8 894/14 896/20
899/6 900/8 901/14 901/18
902/21 912/12 912/13 913/3
913/11 913/23 915/2 916/10
916/16 916/25 917/15 918/9
920/1 920/2 921/23 922/2
922/8 923/19 923/20 924/4
924/9 924/19 925/16 926/13
926/18 927/22 928/2 928/5
929/22 929/23 930/22
931/14 931/24 932/19

933/16 933/25 934/8 935/3
935/12 935/10 936/23 937/4
937/11 938/5 938/23 939/14
940/11 941/10 941/15
941/18 942/12 944/6 944/15
947/3 950/7 950/16 953/15
953/18 954/13 971/21 972/7
972/13 974/1 974/11 975/7
975/21 976/22 977/9 977/12
978/4 979/2 981/21 986/21
987/23 989/16 993/5 995/1
995/11 998/16 1002/18
1003/3 1003/7 1005/18
1005/23 1005/24 1005/25
1006/25 1023/13 1023/23
1026/1 1028/1 1028/1
1030/8
**Mr. Barmen** **[5]** 847/21
971/21 972/13 976/22
1023/13
**Mr. Bauta** **[73]** 864/4 869/5
870/13 872/3 872/10 872/17
872/20 873/6 873/22 874/3
874/23 876/8 878/14 879/21
879/24 881/17 881/21 882/3
882/4 883/6 889/22 892/15
894/8 899/6 900/8 901/14
901/18 902/21 912/13
913/11 913/23 915/2 916/10
916/16 916/25 920/2 921/23
922/2 923/20 926/13 926/18
927/22 928/2 929/22 929/23
931/14 931/24 932/19
933/16 933/25 934/8 935/3
935/10 935/12 936/23
937/11 940/11 941/10
941/15 941/18 942/12 944/6
944/15 947/3 950/16 953/15
953/18 954/13 972/7 974/1
975/21 977/12 995/1
**Mr. Bauta's** **[13]** 889/12
896/20 913/3 917/15 922/8
928/5 930/22 937/4 938/5
939/14 995/11 1003/7
1028/1
**Mr. Blatt** **[2]** 837/20
850/20
**Mr. Goldman** **[4]** 1005/18
1005/23 1005/24 1005/25
**Mr. Goldman's** **[1]** 1006/25
**Mr. McElfish** **[12]** 845/2
847/16 852/25 856/21
885/19 894/14 925/16 950/7
986/21 987/23 989/16
1023/23
**Mr. Moroknek** **[1]** 850/19
**Mr. Provder** **[18]** 848/14
852/18 881/16 884/8 890/16
912/12 918/9 920/1 923/19
924/4 924/9 924/19 938/23
974/11 975/7 977/9 978/4
1002/18
**Mr. Provder's** **[5]** 979/2
981/21 993/5 998/16 1003/3
**Mr. Rivera** **[3]** 1026/1
1028/1 1030/8
**Mr. Saal** **[4]** 839/15 847/10
847/21 885/25
**Mr. Shore** **[1]** 840/18
**Mr. Smith's** **[1]** 841/15
**MRI** **[1]** 955/20
**MRIs** **[5]** 891/12 891/15

891/18 955/14 973/15
955/21 1044/18 1044/25
**Ms.** **[18]** 837/10 837/17
837/22 838/13 846/5 846/5
846/5 846/7 848/15 867/5
887/20 946/16 983/8 984/18
995/13 1044/6 1044/8
1049/5
**Ms.** **[10]** 883/17 887/16
920/12 923/19 936/21
949/17 983/13 1010/13
1011/8 1025/22
**Ms. Cummings** **[6]** 883/17
887/16 920/12 923/19
936/21 949/17
**Ms. Kucsma** **[1]** 983/13
**Ms. Rivera** **[3]** 1010/13
1011/8 1025/22
**multiple** **[1]** 998/15
**Multiply** **[1]** 987/25
**municipal** **[1]** 1006/17
**must** **[1]** 883/9
**Myrtle** **[2]** 837/10 850/20

**N**

**name** **[18]** 857/5 857/15
950/15 990/18 1010/17
1010/20 1010/20 1010/21
1011/11 1011/11 1011/19
1023/18 1026/5 1026/6
1026/7 1035/8 1035/13
1043/8
**national** **[5]** 858/23 995/2
995/20 996/14 996/18
**nature** **[1]** 1045/24
**near** **[1]** 976/20
**necessarily** **[2]** 949/12
1038/13
**necessary** **[12]** 839/25
840/2 845/12 860/11 860/18
862/9 863/5 863/14 873/20
879/23 977/23 991/11
**neck** **[3]** 872/4 872/5
874/10
**necks** **[1]** 862/5
**need** **[116]** 839/4 845/20
846/9 846/18 848/3 850/11
850/23 855/3 858/2 862/11
862/12 863/11 863/12 864/9
868/3 868/7 873/23 875/9
875/16 875/17 877/4 879/3
881/4 884/10 885/4 885/10
889/17 890/10 890/25 891/7
891/15 891/19 892/15
894/19 895/2 895/14 896/19
900/7 901/14 902/24 903/13
904/7 904/8 910/15 912/13
916/17 916/25 920/20 921/1
921/2 921/3 921/4 921/10
921/11 921/12 921/19
921/20 921/21 921/22 922/1
922/1 930/23 931/19 931/22
935/1 935/4 938/3 942/23
955/3 955/14 958/14 958/17
960/16 961/8 962/13 963/3
963/10 963/18 963/21
963/24 964/22 965/20 967/8
967/24 971/11 974/16 975/9
976/23 976/24 977/13
977/15 977/18 977/19
977/20 977/25 978/3 979/16
980/15 980/18 984/21
986/13 986/17 986/22

Case 1:14-cv-02725-RER   Document 44-9   Filed 05/19/16   Page 233 of 244 PageID #: 1057998

**need... [13]**  987/13 988/22
 997/3 999/4 999/23 1000/9
 1006/6 1006/7 1009/25
 1020/14 1034/18 1039/23
 1047/20
**needed [28]**  839/24 848/6
 859/21 860/18 864/22 872/3
 872/5 896/4 908/24 916/11
 921/24 938/2 940/2 943/11
 951/5 954/2 955/1 972/1
 972/7 973/9 973/16 973/17
 973/25 977/22 1002/20
 1005/8 1020/12 1020/18
**needing [2]**  885/7 937/9
**needs [97]**  836/5 836/9
 865/6 865/7 865/11 865/11
 875/1 875/16 878/10 878/14
 878/14 879/2 881/7 881/13
 883/15 883/22 884/11
 884/16 884/17 884/18 885/9
 886/5 886/6 887/8 887/17
 888/7 888/22 894/8 894/16
 894/25 895/9 895/22 896/6
 897/3 902/10 902/24 904/19
 905/17 908/2 908/11 908/12
 908/18 910/3 913/3 913/11
 913/15 914/16 915/2 916/2
 917/6 917/19 922/8 923/20
 923/22 924/6 927/22 928/24
 928/25 929/18 930/24
 931/14 931/14 931/18
 931/19 936/23 937/7 937/11
 937/16 939/2 940/11 941/3
 941/10 941/18 941/22
 941/23 941/25 942/12 944/7
 944/9 945/12 945/13 945/14
 948/18 948/24 951/20
 953/22 955/9 957/21 958/5
 958/15 963/20 963/21
 976/13 989/18 1016/18
 1020/22 1033/14
**nerve [1]**  892/5
**neuro [2]**  931/12 931/20
**neuro-psych [2]**  931/12
 931/20
**neurological [2]**  892/7
 963/25
**neurologist [2]**  849/12
 938/11
**neuropsych [4]**  884/12
 884/18 884/21 960/10
**neuropsychological [17]**
 874/17 877/19 877/22
 877/23 878/5 878/7 879/1
 888/4 888/5 921/17 932/5
 932/23 962/13 962/21 963/4
 963/14 963/22
**neurosurgeon [23]**  849/3
 870/24 890/2 890/9 914/24
 921/5 938/12 950/15 950/16
 950/18 951/18 951/20
 951/23 952/7 952/9 952/11
 952/17 952/20 952/23 953/3
 966/1 973/19 975/24
**neurosurgeons [1]**  971/22
**neutral [1]**  1010/2
**never [25]**  850/15 850/21
 885/19 886/14 907/19
 913/22 926/6 926/12 926/18
 926/23 927/1 928/2 928/16

 933/16 936/3 944/8 944/8
 944/9 951/8 957/9 976/25
 1010/1 1023/18 1024/1
 1034/5
**new [43]**  835/1 835/5
 835/12 835/12 835/18
 835/20 835/20 835/23 848/5
 852/7 858/18 860/24 861/12
 864/19 867/17 868/22
 868/24 877/25 883/5 883/6
 883/23 885/20 890/22
 947/20 947/21 947/22 948/5
 948/6 948/10 980/23 986/17
 989/13 992/4 994/23 996/12
 997/14 997/22 998/12
 1002/4 1012/5 1012/24
 1013/3 1027/23
**next [41]**  843/1 852/5
 856/21 867/14 869/20
 873/16 873/23 875/24
 877/19 879/16 880/9 882/7
 882/13 886/18 890/2 891/12
 893/5 899/1 900/22 901/3
 902/5 902/7 903/22 910/25
 943/16 946/4 955/25 962/1
 983/6 1003/6 1004/4 1004/6
 1007/14 1010/10 1025/24
 1030/20 1033/22 1040/10
 1040/24 1046/2 1048/6
**nice [5]**  886/15 886/16
 924/21 1035/8 1049/14
**night [3]**  839/14 853/19
 1043/12
**nightmare [1]**  845/25
**nine [2]**  950/21 1047/17
**nobody [6]**  849/6 850/9
 904/18 905/10 955/4 965/4
**none [3]**  929/5 1018/8
 1023/25
**normal [4]**  1015/4 1015/5
 1015/5 1027/13
**normally [1]**  837/3
**note [3]**  891/12 891/18
 959/7
**noted [10]**  879/23 881/23
 921/6 921/11 921/25 928/8
 945/14 950/22 955/2 1041/3
**notes [4]**  904/22 905/25
 906/3 959/24
**nothing [7]**  843/12 843/22
 869/14 895/4 908/13 909/6
 941/19
**notice [1]**  1017/9
**noticed [4]**  844/11 910/18
 1039/24 1040/12
**noting [1]**  955/6
**notwithstanding [1]**  964/11
**November [2]**  926/16 995/4
**November 15th [1]**  926/16
**November 30th [1]**  995/4
**nows [1]**  875/9
**number [48]**  836/4 836/9
 851/21 852/15 852/17 852/19
 853/1 855/22 855/23 859/4
 859/18 928/7 940/10 978/23
 978/24 979/2 979/4 979/5
 979/14 980/4 980/16 980/16
 980/19 983/22 983/24 984/7
 984/17 985/20 989/22 990/3
 990/7 991/9 991/17 991/19
 992/20 994/12 994/19
 994/20 995/15 996/6 998/2

 998/3 998/9 998/20 998/24
 1003/24 1004/19 1007/23
**number's [1]**  996/5
**numbers [27]**  851/13 851/14
 856/3 869/10 977/2 980/6
 980/13 981/10 985/13
 985/14 985/23 989/23
 989/24 989/25 990/1 990/9
 992/7 994/9 999/1 999/2
 999/3 1001/17 1004/18
 1004/21 1005/22 1006/1
 1045/7
**numerous [1]**  876/14
**nurse [7]**  879/22 942/23
 944/7 944/9 976/23 976/24
 976/25
**nursing [8]**  942/15 942/22
 942/23 942/25 943/9 943/14
 944/3 944/4

**O**

**o'clock [6]**  836/10 836/13
 852/8 978/10 981/3 1047/17
**oath [1]**  1036/18
**object [5]**  851/13 981/14
 1038/22 1040/3 1045/1
**objected [4]**  910/1 1038/18
 1039/2 1042/1
**objecting [2]**  1008/12
 1041/3
**objection [93]**  855/7
 865/21 875/14 876/10
 876/20 877/5 881/19 882/9
 885/8 886/10 886/12 887/18
 887/22 888/23 889/16 890/4
 890/7 891/1 892/17 892/19
 894/14 895/13 899/17
 899/24 900/17 903/14
 903/16 904/4 912/14 913/4
 913/12 914/20 914/21 915/4
 915/20 916/3 916/6 916/12
 916/18 917/1 919/4 919/10
 919/15 919/23 920/8 920/23
 922/5 922/13 922/23 923/23
 924/7 926/19 933/12 933/18
 934/18 935/19 937/12
 939/16 950/1 954/9 957/6
 958/21 958/22 959/21
 960/18 961/14 962/4 962/15
 963/12 966/2 966/15 968/2
 969/5 970/10 971/18 972/2
 973/4 974/4 975/14 976/1
 976/9 1015/17 1023/21
 1025/9 1037/12 1037/24
 1038/2 1038/5 1038/17
 1039/6 1040/9 1041/3
 1045/15
**objections [7]**  848/5
 885/11 886/4 981/6 1037/3
 1037/6 1039/10
**objective [3]**  928/23 930/5
 953/11
**obligated [1]**  843/17
**observe [1]**  1031/8
**observed [6]**  1016/4
 1019/14 1028/4 1032/4
 1032/24 1033/19
**observing [1]**  1018/25
**obtain [3]**  864/3 902/13
 903/10
**obviously [2]**  851/7 999/10
**occasion [1]**  868/2

**Q**

occasions [2]   862/21
 1034/20
Occupational [4]   862/1
 998/4 1004/2 1004/9
occupations [1]   1004/10
occur [5]   870/3 870/7
 881/7 901/21 998/21
occurring [2]   880/7
 1041/22
October [6]   871/9 944/7
 1013/25 1033/13 1043/12
 1043/12
October 2013 [1]   1013/25
offer [3]   865/14 883/13
 988/21
offered [5]   839/2 844/4
 967/10 975/12 981/17
offers [1]   865/19
office [5]   837/13 843/17
 843/19 867/17 869/19
Official [1]   835/22
often [6]   881/7 890/24
 891/6 891/22 924/4 1022/14
Ogdensburg [6]   1012/24
 1013/3 1013/8 1024/4
 1024/18 1025/13
Ohio [3]   835/15 841/4
 1029/23
old [3]   995/23 1002/5
 1021/15
older [5]   875/20 1011/10
 1022/3 1026/22 1034/19
oldest [3]   859/2 859/20
 1027/8
omitted [1]   1041/2
once [26]   850/7 864/15
 864/22 873/13 875/5 876/1
 887/9 889/18 889/20 889/23
 890/11 891/9 891/16 891/20
 892/2 892/9 899/7 902/4
 902/5 902/6 902/9 903/2
 903/6 991/14 1003/2
 1041/19
one [114]   840/5 840/16
 841/22 841/24 843/4 843/6
 843/19 845/10 849/9 849/16
 851/3 854/17 854/18 854/19
 855/22 859/2 859/10 859/11
 862/14 868/2 868/3 871/19
 873/4 873/11 873/11 873/12
 873/25 874/23 876/18 877/9
 878/9 878/12 879/3 879/3
 879/16 883/14 885/9 890/17
 895/15 897/23 901/25
 902/17 905/19 908/19
 913/16 913/17 916/11
 916/20 921/7 922/10 924/13
 927/5 929/25 931/11 931/14
 931/14 931/18 935/1 937/4
 938/13 939/6 939/10 940/19
 941/2 944/6 945/8 949/9
 950/15 951/15 952/2 952/2
 952/24 956/16 957/4 958/19
 962/9 967/4 975/16 976/7
 976/12 977/9 979/18 980/23
 984/18 986/9 987/1 989/12
 989/21 991/9 991/10 991/17
 992/19 992/23 992/25
 994/15 996/5 996/8 997/8
 998/2 1000/11 1002/2

ones [7]   880/2 880/3
 954/21 1044/19 1044/21
 1044/22 1045/9
ones that [1]   1044/19
online [2]   853/16 996/16
onset [2]   859/8 859/21
open [13]   836/1 848/8
 855/13 887/1 911/1 912/2
 969/2 970/1 988/11 989/16
 992/19 1037/10 1047/24
opening [4]   989/23 1044/23
 1045/16 1045/17
opine [3]   946/16 964/25
 971/17
opined [1]   965/25
opining [1]   967/12
opinion [46]   865/10 867/14
 895/10 896/1 906/18 910/15
 913/2 914/16 916/24 917/19
 920/7 920/16 923/13 930/24
 931/6 940/2 942/4 945/12
 945/13 945/16 945/17 958/6
 958/15 962/20 965/19 966/4
 966/5 966/7 966/11 973/3
 973/22 974/2 975/12 975/24
 975/24 976/6 976/6 976/16
 977/6 977/14 977/20 977/22
 988/21 1007/1 1038/18
 1038/24
opinions [24]   862/18 871/1
 873/5 905/1 906/13 918/25
 920/6 920/12 926/12 965/1
 965/20 965/21 965/23 971/6
 971/25 972/5 979/7 988/20
 991/4 997/10 997/12 999/19
 999/23 1006/11
opportunity [5]   850/25
 851/25 852/1 920/2 989/6
Oppose [4]   900/18 915/11
 915/21 960/20
opposed [2]   981/15 1017/21
opposite [1]   894/17
option [1]   855/13
options [3]   848/8 974/20
 974/25
or illnesses [1]   936/8
order [11]   842/8 858/25
 859/9 859/17 860/13 862/10
 864/11 880/7 947/14 987/20
 1002/22
ordered [1]   853/24
organize [1]   841/8
original [2]   967/23 971/3
orthopedic [10]   849/13
 864/23 864/23 864/25
 869/16 947/17 949/4 949/5
 949/9 973/8
orthopedist [4]   890/24
 921/5 951/23 951/24
orthopedists [2]   948/12
 971/22
orthotic [2]   902/24 902/24
otherwise [2]   989/3 1039/4
Outlook [2]   998/4 1004/2
outpatient [2]   861/20
 861/23
outside [17]   836/1 882/11

883/2 893/3 894/2 903/20
 904/12 907/9 912/5 947/22
 960/21 961/1 966/18 967/2
 983/8 989/7 1029/7
outward [1]   864/25
overage [1]   1003/5
overall [2]   852/19 934/16
overruled [41]   875/15
 877/6 878/17 881/20 888/24
 889/25 890/5 890/8 891/2
 892/18 899/18 899/25
 900/21 903/17 912/15
 913/13 915/7 915/22 916/13
 916/19 917/2 919/11 919/16
 920/9 920/24 922/24 926/20
 933/13 933/20 933/22 934/4
 934/19 935/22 937/13
 939/17 957/7 959/23 962/16
 963/13 1015/18 1025/10
owe [4]   933/16 934/10
 964/5 964/14
owes [3]   964/5 964/7
 964/14
own [7]   861/25 981/22
 984/1 1006/22 1020/10
 1034/11 1034/17

**P**

P-403-0110 [1]   971/14
P-432-0096 [1]   923/17
P-R-O-V-D-E-R [1]   857/7
pace [3]   1019/10 1023/2
 1023/2
Pacific [2]   856/7 856/10
page [32]   873/16 880/9
 882/13 886/18 893/5 899/1
 903/22 910/25 911/6 919/3
 945/19 952/14 955/25
 960/22 962/1 966/19 969/1
 969/10 970/14 1001/1
 1007/14 1009/16 1030/20
 1038/8 1038/17 1040/4
 1040/24 1041/10 1041/20
 1045/12 1046/2 1048/6
pages [2]   854/11 854/20
paid [4]   902/14 933/14
 954/21 980/22
pain [51]   866/16 874/14
 875/16 888/19 888/21 891/6
 891/8 892/12 894/8 894/11
 894/16 894/24 895/4 897/17
 900/13 901/4 902/8 902/9
 921/20 921/21 936/23 937/4
 937/15 937/19 937/21 941/1
 950/7 950/10 950/13 955/1
 956/4 964/19 964/21 972/14
 972/15 983/20 984/7 994/16
 1014/14 1016/14 1017/5
 1022/5 1022/7 1022/8
 1022/8 1031/9 1031/16
 1031/17 1031/18 1032/1
 1033/5
paper [2]   924/12 982/12
parentheses [1]   992/20
parenthesis [1]   992/19
park [3]   1014/22 1016/11
 1019/3
parks [1]   1012/14
part [21]   840/9 841/4
 844/8 857/16 863/3 863/24
 864/16 876/3 878/2 883/7
 892/18 894/14 920/20

**P**

**part...** **[8]** 935/18 938/22
946/13 947/12 982/4
1021/20 1040/19 1041/9
**partially** **[1]** 1039/19
**participating** **[1]** 1028/5
**particular** **[6]** 863/10
871/19 881/2 918/17 948/25
1031/8
**particularly** **[3]** 901/21
932/17 1002/14
**parties** **[3]** 866/25 984/15
1048/1
**partner** **[1]** 925/2
**party** **[2]** 863/8 863/13
**party's** **[1]** 863/10
**pass** **[2]** 859/18 1020/10
**passage** **[2]** 1040/2 1041/4
**past** **[6]** 851/18 935/25
963/17 984/12 984/14 987/4
**patient** **[3]** 928/17 929/18
975/21
**Pause** **[1]** 936/12
**pay** **[9]** 843/17 934/16
948/15 956/12 957/12
957/12 988/8 988/11 988/13
**paying** **[4]** 844/13 934/20
934/21 987/6
**PCP** **[1]** 935/6
**peace** **[1]** 843/7
**Peachey** **[4]** 837/1 837/17
837/23 838/13
**peers** **[1]** 859/20
**pencil** **[1]** 844/25
**Penn** **[2]** 859/1 860/23
**Pennsylvania** **[12]** 838/3
838/6 839/12 840/8 840/11
840/14 844/10 844/20
858/14 858/15 946/18
1043/14
**people** **[25]** 841/1 843/9
843/12 843/12 843/16 845/4
845/13 849/11 850/11 852/5
860/3 861/3 862/2 862/5
862/7 862/19 869/4 881/24
888/14 901/10 902/21 923/3
946/8 959/3 1009/7
**people's** **[1]** 860/15
**peopled** **[1]** 862/6
**per** **[32]** 866/7 879/13
879/13 879/14 881/10
881/11 881/11 887/14 888/9
888/10 889/2 889/15 890/12
891/16 891/24 892/3 892/9
900/15 900/16 900/24
900/24 901/5 902/11 917/12
917/13 918/12 918/15 918/18
919/8 919/9 919/14 979/22
**percent** **[15]** 945/11 992/2
992/3 992/9 992/10 992/14
993/11 998/12 999/12
1003/9 1003/10 1003/11
1004/6 1004/13 1006/16
**percentages** **[1]** 851/21
**Percocet** **[2]** 900/12 940/15
**perform** **[1]** 997/23
**performed** **[5]** 941/14
941/21 951/22 993/2 993/4
**perhaps** **[3]** 848/2 1005/16
1007/2
**period** **[13]** 851/9 859/10

**period...** **[9]** 887/11 919/14
956/16 956/20 1032/25
**periods** **[1]** 1019/15
**permission** **[1]** 866/7
**permitted** **[1]** 852/6
**person** **[37]** 863/4 863/5
863/7 863/5 863/11 863/13
865/3 865/4 865/5 865/6
868/18 870/6 879/21 883/15
888/1 888/18 895/15 927/1
927/25 939/2 941/2 943/10
943/25 944/6 948/18 948/24
959/9 1015/5 1016/5 1023/6
1027/13 1027/13 1031/21
1033/2 1034/10 1034/16
1034/17
**person's** **[4]** 888/6 928/24
962/23 963/15
**personal** **[2]** 884/22 997/21
**personally** **[2]** 869/12
1014/19
**Peruses** **[3]** 950/25 951/16
952/13
**Perusing** **[1]** 873/3
**phase** **[1]** 841/5
**phone** **[8]** 835/24 868/13
877/17 927/14 927/17
1029/19 1029/25 1035/22
**photographs** **[2]** 1044/4
1044/8
**phrase** **[1]** 1007/3
**physiatrist** **[3]** 888/12
888/13 921/5
**physiatry** **[5]** 888/21 950/6
950/7 950/9 950/9
**physical** **[42]** 860/4 866/17
869/16 874/16 875/24 876/2
876/3 876/8 876/14 876/15
876/18 877/9 881/12 881/13
881/14 881/17 881/21
888/13 888/25 921/1 921/2
921/4 923/20 930/12 930/12
930/16 946/13 953/13
953/15 953/19 954/5 954/14
954/18 954/22 954/25 955/1
998/6 1015/7 1019/1 1028/2
1029/1 1031/4
**physically** **[5]** 869/9
869/11 946/9 946/10
1021/18
**physician** **[15]** 866/15
866/15 883/20 935/6 935/12
936/7 937/10 938/3 939/1
939/3 939/12 954/21 994/1
1003/9 1003/16
**physicians** **[8]** 864/13
929/5 937/5 938/6 938/24
940/19 947/14 998/7
**picture** **[2]** 959/1 959/8
**pictures** **[1]** 1045/17
**piece** **[1]** 982/13
**pieces** **[1]** 991/8
**pitch** **[2]** 1019/3 1020/9
**PJI** **[5]** 989/13 989/14
996/13 996/15 1006/18
**place** **[7]** 837/24 854/1
883/2 894/2 904/2 975/8
1007/2
**places** **[2]** 846/3 1028/24
**plaintiff** **[29]** 835/3
835/10 846/11 846/18

846/19 847/4 847/13 847/14
883/16 883/18 864/865/18
883/10 919/2 919/20 920/2
924/6 991/1 993/14 1010/11
1011/2 1025/24 1026/9
1036/25 1037/12 1037/14
1037/15 1039/25 1043/17
1047/13
**plaintiff's** **[12]** 840/15
845/19 847/9 850/24 854/12
854/15 938/11 991/13
991/15 1037/18 1043/7
1045/21
**plaintiffs** **[3]** 839/3
845/11 1008/13
**plan** **[74]** 846/21 852/17
859/19 863/3 863/3 863/9
863/19 863/22 864/8 864/12
864/15 864/17 869/22
869/24 870/1 870/1 870/2
870/4 870/5 870/8 871/6
871/7 871/20 871/23 872/23
872/24 873/8 873/10 873/11
873/19 874/22 875/7 876/3
879/24 880/6 880/8 883/8
883/8 918/14 919/8 919/14
920/7 920/14 920/15 920/17
921/16 927/8 928/16 928/23
928/25 929/12 929/15
929/17 930/6 934/23 936/1
936/7 938/23 945/10 947/7
947/10 952/20 953/12 959/5
974/18 978/13 979/12
979/18 979/24 979/25 980/1
981/7 993/5 1007/13
**planing** **[1]** 857/21
**planned** **[1]** 847/14
**planner** **[29]** 846/25 847/1
852/13 852/16 852/18
856/24 859/14 859/21 867/8
868/17 874/12 876/17 877/3
885/10 905/16 905/24
907/15 908/2 908/11 913/2
913/10 923/10 924/5 925/8
925/17 930/4 930/16 931/3
965/17
**planner's** **[1]** 908/10
**planning** **[15]** 857/17
857/22 859/22 860/1 860/19
861/7 862/24 865/11 865/19
865/23 868/19 889/8 925/21
965/24 976/10
**plans** **[6]** 862/10 870/6
926/2 926/5 934/17 977/2
**play** **[6]** 836/17 837/3
837/5 1014/22 1014/25
1019/2
**playing** **[1]** 1043/23
**Plaza** **[1]** 835/23
**plenty** **[1]** 850/3
**plug** **[1]** 998/23
**plus** **[3]** 992/19 992/23
992/25
**point** **[27]** 837/6 842/24
852/10 852/11 865/18
873/21 878/12 889/9 909/11
909/12 909/14 916/25
917/25 925/16 925/16
925/17 941/11 943/19 946/4
963/25 980/14 988/5 988/18
989/12 994/10 1003/1
1039/10

**P**

pointing [2]   985/25 986/1
police [4]   839/13 840/9
 844/5 844/10
politely [1]   1048/2
Porvder [1]   858/8
poses [1]   886/12
position [2]   1028/1
 1038/25
positioning [3]   875/18
 902/6 903/1
possibility [1]   974/25
possible [5]   925/15 928/15
 948/3 953/7 974/21
post [3]   980/19 999/10
 1000/13
post-trial [1]   1000/13
post-verdict [1]   999/10
postdates [1]   952/2
potentially [1]   848/17
power [1]   993/1
PowerPoint [1]   1008/13
 1009/25
practice [3]   875/4 938/22
 949/1
practiced [1]   885/20
practicing [4]   859/20
 859/21 868/16 868/17
practitioner [2]   889/11
 889/20
practitioners [1]   935/5
predicting [1]   876/17
preexisting [3]   959/9
 959/10 959/11
preface [3]   895/20 896/9
 896/10
prefer [5]   837/2 845/6
 845/21 850/10 901/11
preference [2]   837/5 837/7
preparation [1]   861/6
prepare [2]   919/8 932/16
prepared [3]   918/23
 1008/13 1009/19
prepping [1]   1049/10
prescribed [4]   940/16
 940/18 953/18 954/18
prescription [2]   894/13
 930/12
presence [3]   836/1 986/11
 989/8
present [36]   852/21 878/15
 912/2 913/7 943/11 978/13
 979/3 979/4 979/13 979/13
 979/15 979/21 980/15
 980/20 983/14 983/25
 984/10 984/15 985/16 986/5
 986/24 987/24 989/12
 989/17 990/9 991/16 991/19
 991/24 991/24 992/1 992/12
 992/17 992/18 999/9
 1018/20 1037/10
presentation [1]   1008/13
presented [1]   997/15
presently [1]   1022/5
preserve [4]   855/9 885/7
 894/19 894/20
preserved [1]   855/12
pressure [2]   1004/8 1005/6
pretrial [1]   842/8
pretty [5]   876/18 883/5
 906/22 938/1 962/22

prevent [3]   870/3 880/6
 901/21
preventative [2]   870/1
 901/20
prevented [1]   861/4
previously [2]   879/20
 883/12
price [11]   918/17 918/18
 993/23 993/25 998/2
 1003/17 1003/18 1003/20
 1003/20 1003/23 1004/24
prices [2]   901/6 1003/22
pricing [5]   878/25 915/15
 915/24 916/21 918/15
primarily [1]   993/22
primary [2]   935/6 935/12
printed [1]   1001/9
printer [1]   1028/7
private [2]   943/1 1034/17
probability [1]   877/4
probable [2]   975/12 976/7
problem [11]   837/1 848/9
 851/22 868/14 908/22
 929/24 984/16 1001/18
 1030/17 1042/17 1047/22
problems [10]   862/6 892/7
 959/4 959/9 959/10 959/11
 959/17 1012/13 1020/7
 1021/25
procedure [3]   908/1 908/11
 941/22
procedures [3]   905/17
 905/25 907/22
proceed [2]   887/2 924/14
proceedings [2]   835/24
 885/18
process [2]   863/23 863/24
produce [1]   846/21
produced [1]   835/25
professional [4]   840/13
 859/4 861/14 1007/1
professionals [2]   925/13
 994/3
proffer [1]   909/13
prognosis [2]   975/9 975/22
prognosticating [1]   909/12
program [11]   858/19 859/1
 859/16 860/14 861/1 861/3
 861/9 861/15 861/16 861/21
 861/22
programs [2]   859/2 946/19
progress [3]   878/8 878/10
 888/6
progresses [1]   875/20
projected [3]   872/24
 1004/6 1004/10
projection [3]   963/11
 964/21 976/17
projections [7]   851/6
 851/20 878/19 965/1 994/5
 998/5 1004/3
prolonged [1]   874/12
promise [1]   988/25
promptly [1]   1047/18
proper [9]   906/15 964/24
 977/6 986/23 991/18 995/13
 996/5 1007/2 1044/15
propose [2]   836/16 886/7
prospective [1]   879/25
Provder [49]   848/14 852/18
 853/9 853/12 856/12 856/24
 856/25 857/4 857/7 857/15

859/24 865/19 865/23
 873/1 874/8 876/14 881/2
 881/16 884/8 890/16 912/12
 918/9 920/1 923/19 924/4
 924/9 924/19 938/23 957/14
 960/1 960/8 962/8 963/7
 964/6 965/16 970/2 974/11
 975/7 977/9 978/4 979/12
 980/5 985/5 990/3 990/7
 993/7 995/5 1000/16
 1002/18
Provder's [10]   979/2
 981/21 985/14 991/11 993/5
 994/9 994/19 998/16 999/6
 1003/3
proven [1]   883/10
Provenzale [1]   849/11
provide [15]   853/20 853/21
 860/9 862/8 865/7 869/7
 869/18 873/18 901/12 930/6
 944/4 949/10 957/18 977/4
 1021/24
provided [11]   861/7 865/3
 867/10 923/7 959/19 960/11
 985/21 998/18 1001/4
 1002/18 1045/9
provider [1]   886/6
providers [3]   908/9 957/24
 958/12
provides [3]   862/1 869/2
 1045/19
providing [2]   861/5 943/13
pry [1]   1034/20
psych [2]   931/12 931/20
psychiatric [1]   861/22
psychological [11]   874/16
 882/7 883/16 887/6 921/3
 946/11 946/13 946/17
 960/15 1015/12 1033/14
psychologist [2]   923/4
 946/21
psychologists [1]   946/7
psychology [5]   860/17
 922/25 946/5 946/18 946/20
psychotherapy [3]   883/6
 883/20 961/7
publication [2]   981/7
 1005/2
publish [6]   1008/18 1044/4
 1044/24 1044/25 1045/3
 1045/19
published [7]   993/22
 993/24 994/4 998/1 998/4
 998/9 1004/24
Publishes [3]   1047/5
 1047/8 1047/11
pulled [1]   1001/11
punitive [1]   839/9
punitives [3]   838/17
 838/19 841/5
purely [1]   955/13
purported [2]   939/11
 959/14
purports [1]   1008/14
purpose [3]   880/6 928/22
 963/14
purposes [3]   845/14 912/17
 981/13
pursuant [1]   844/9
put [19]   843/19 849/7
 854/15 864/7 869/22 884/25
 909/20 915/16 916/21 977/1

**P**

put... **[9]** 984/17 999/7 1004/7 1005/6 1009/15 1009/24 1016/22 1041/24 1042/13
puts **[2]** 852/17 985/23
putting **[1]** 981/15

**Q**

qEEG **[2]** 848/3 848/5
qualifications **[1]** 849/10
qualified **[5]** 840/21 925/13 946/16 949/9 971/17
quality **[1]** 949/3
questioned **[2]** 934/25 1037/13
questioning **[4]** 850/8 850/12 850/17 960/9
questions **[19]** 895/20 924/10 936/4 960/1 963/7 964/11 972/14 983/20 1008/4 1018/12 1023/14 1025/20 1025/21 1035/2 1035/3 1036/21 1037/17 1037/21 1037/22
quick **[1]** 1029/8
quickly **[5]** 855/2 968/3 969/7 1042/12 1042/13
quiet **[1]** 1012/16
quite **[1]** 851/23
quote **[2]** 1005/3 1005/4

**R**

R-I-V-E-R-A **[2]** 1010/21 1026/7
Rabin **[1]** 849/12
Radio **[1]** 899/21
radiologist **[2]** 849/11 1037/18
raise **[5]** 836/2 846/9 895/18 983/2 1023/9
raised **[3]** 984/13 992/20 992/25
raising **[1]** 843/11
Ramirez **[1]** 846/5
RAMON **[1]** 835/8
Rampersaud **[2]** 846/5 846/7
range **[9]** 865/3 865/5 865/8 877/14 917/13 949/2 949/21 956/14 957/18
ranges **[11]** 879/12 881/10 887/13 888/9 889/1 889/14 890/12 891/3 901/12 902/11 917/12
rare **[1]** 967/5
rarely **[2]** 1034/15 1034/15
rate **[26]** 956/19 985/17 986/6 991/21 991/23 991/24 991/25 991/25 992/2 992/2 992/6 992/8 992/20 992/25 993/13 993/13 993/14 993/20 994/22 998/14 999/11 1001/4 1001/5 1002/7 1006/12 1006/17
rates **[19]** 991/10 991/18 991/20 993/9 993/12 993/16 993/21 997/16 997/23 997/24 997/25 998/15 999/8 1000/4 1000/16 1000/25 1003/5 1006/19 1007/12
rather **[3]** 977/7 987/5 987/6

rationale **[1]** 946/15
ray **[5]** 864/17 1041/5 1041/6 1041/8
RAYMOND **[1]** 835/12
rays **[1]** 891/22
re **[3]** 877/10 961/15 962/3
re-ask **[2]** 961/15 962/3
re-eval **[1]** 877/10
read **[29]** 887/20 900/19 900/20 928/9 967/7 974/8 1000/19 1008/6 1008/11 1008/12 1008/16 1008/23 1009/4 1009/24 1010/1 1020/15 1028/13 1028/14 1028/16 1038/22 1039/14 1040/13 1040/17 1041/16 1041/19 1041/20 1041/22 1042/22 1049/6
read-in **[3]** 1008/6 1008/11 1008/12
read-ins **[1]** 1049/6
reading **[11]** 848/5 848/18 924/1 958/24 1009/16 1010/3 1020/6 1037/1 1041/9 1042/2 1042/14
ready **[18]** 848/9 850/13 854/25 1016/17 1016/18 1016/19 1016/23 1016/25 1017/1 1017/4 1017/5 1017/20 1017/23 1021/16 1042/14 1042/24 1042/25 1044/3
real **[5]** 851/4 855/2 863/4 930/1 939/14
realize **[2]** 854/24 905/20
really **[19]** 841/14 846/18 851/24 955/7 978/23 980/21 982/4 998/10 1008/14 1009/22 1013/5 1013/5 1015/23 1018/24 1019/11 1021/4 1023/5 1025/3 1036/2
reason **[13]** 849/2 849/15 895/17 896/16 896/17 901/10 902/5 956/13 967/4 995/12 1002/16 1003/21 1025/7
reasonable **[10]** 881/17 883/10 928/25 930/4 931/3 939/22 940/1 949/10 949/24 975/25
reasonably **[1]** 929/17
reasons **[2]** 922/10 983/18
rebut **[1]** 839/2
rebuttal **[7]** 838/24 849/10 920/6 920/12 999/23 1006/13 1039/19
rebutting **[3]** 849/11 849/12 849/13
receive **[8]** 860/11 862/9 863/14 865/22 881/17 881/21 1045/14 1045/18
received **[16]** 851/4 854/14 864/5 866/18 871/9 871/12 874/15 874/16 874/17 879/23 883/12 884/8 933/1 945/5 952/4 1045/22
receives **[3]** 863/5 870/14 977/23
receiving **[8]** 858/17 877/2 881/14 884/19 954/5 954/25 962/9 963/23

recent **[2]** 1002/23 1002/24
recently **[1]** 877/3
recess **[3]** 911/5 982/21 1042/23
recession **[1]** 1002/24
recollection **[3]** 866/8 866/13 952/19
recommend **[7]** 879/6 881/21 889/14 900/11 910/15 972/15 977/5
recommend or **[1]** 910/15
recommendation **[10]** 882/1 883/19 887/9 892/6 899/6 899/10 899/16 906/9 944/8 944/10
recommendations **[2]** 888/16 917/14
recommended **[25]** 878/2 885/9 894/11 901/23 905/7 905/9 906/4 906/4 907/23 913/16 913/19 913/20 914/4 914/17 915/2 915/8 954/22 955/20 955/23 966/13 971/16 973/8 973/17 974/21 976/25
recommending **[1]** 897/10
recommends **[1]** 909/6
reconstruction **[8]** 840/6 840/10 840/13 840/14 840/18 841/2 841/18 844/8
reconstructionist **[3]** 838/23 839/1 841/21
reconstructionists **[1]** 840/6
record **[14]** 854/10 855/9 856/15 885/7 894/19 894/20 900/20 904/13 906/18 918/9 952/23 1000/20 1028/16 1049/13
recorded **[1]** 835/24
records **[49]** 863/25 864/1 864/11 864/12 866/2 866/3 866/8 866/14 866/17 866/19 866/21 866/23 867/10 867/13 867/20 867/22 870/9 870/20 872/18 872/21 874/1 874/8 876/15 904/18 904/18 904/20 906/1 907/23 908/13 912/19 913/11 914/4 922/8 923/12 928/6 928/7 928/8 928/9 928/11 928/13 928/17 930/1 930/6 930/10 930/11 930/20 930/22 957/23 959/19
recover **[1]** 883/11
redact **[1]** 918/3
redacted **[3]** 918/4 918/5 918/6
redirect **[4]** 960/4 960/6 971/1 1036/15
redo **[1]** 951/9
reduce **[5]** 979/2 979/4 980/15 992/1 999/9
reduced **[6]** 852/21 979/13 979/13 979/15 991/16 997/14
reducing **[1]** 979/21
reduction **[1]** 991/19
refer **[2]** 929/22 952/16
referee **[1]** 845/20
reference **[2]** 952/22 952/23

**R**

references [3] 859/4
  1006/18 1006/25
referring [1] 912/23
reflection [1] 993/17
refresh [2] 866/8 952/19
refuses [1] 1016/8
regard [4] 863/21 899/4
  920/16 972/20
regarded [1] 996/4
regarding [4] 836/22 864/3
  888/17 1008/11
regular [4] 875/5 889/13
  963/3 963/24
regularly [1] 935/15
rehabilitation [42] 857/15
  857/16 858/10 858/13
  858/15 858/18 858/22
  858/23 859/1 859/3 859/6
  860/2 860/14 860/19 860/23
  861/12 861/15 861/16
  861/17 861/18 861/21 862/2
  864/7 869/16 872/24 873/8
  873/10 874/22 878/3 878/6
  878/8 879/17 879/22 881/6
  888/14 889/1 921/4 921/16
  923/2 963/16 963/17 963/21
rehabilitative [1] 859/25
relate [1] 936/2
related [7] 859/25 972/14
  983/20 994/4 1004/9
  1026/24 1033/15
relating [1] 925/3
relationship [3] 1011/9
  1011/17 1026/18
relative [1] 930/1
released [1] 1005/2
relevance [3] 933/12 934/3
  939/18
relevant [1] 979/21
reliable [2] 975/10 976/8
reliance [1] 925/3
relied [13] 926/11 926/15
  927/3 927/5 928/15 939/11
  960/10 965/24 967/19 972/1
  976/16 985/13 990/9
relief [1] 1047/20
rely [9] 866/10 929/8
  964/25 965/20 972/4 975/23
  975/23 977/2 1003/19
relying [1] 905/18
remaining [2] 848/21
  1003/7
remember [10] 866/2 971/22
  1016/22 1017/17 1018/2
  1018/4 1018/5 1030/15
  1034/2 1037/23
remind [1] 885/19
reminded [1] 1017/11
removed [1] 854/20
render [1] 862/18
rendered [1] 966/10
rendering [1] 972/5
renew [1] 855/7
repeat [1] 1014/2
repeatedly [1] 962/19
rephrase [6] 876/11 876/12
  876/21 876/24 930/9 975/18
replace [1] 854/6
replaced [1] 901/25
replacement [4] 902/5

902/8 903/2 903/6
report [33] 844/1 844/5
  844/10 867/23 870/10 871/6
  871/9 871/10 871/12 871/15
  871/16 872/12 885/16
  887/20 887/13 904/14
  904/15 904/23 905/10
  906/16 907/2 910/7 914/13
  920/3 921/13 922/19 924/1
  926/11 926/15 927/1 927/3
  927/11 927/12 927/14 928/4
  928/8 928/10 928/15 930/16
  932/10 938/16 950/20 951/3
  951/6 951/7 951/12 951/17
  952/4 952/5 952/12 952/14
  952/17 952/25 955/12 956/7
  956/9 956/21 957/10 958/24
  959/7 965/8 966/9 967/6
  967/8 967/13 967/22 967/23
  970/4 970/5 970/8 971/4
  971/7 971/10 972/5 972/8
  972/23 973/1 973/3 981/8
  982/1 982/5 982/14 991/11
  996/18 998/17 1000/16
  1002/1 1002/17 1005/5
  1006/25 1041/5 1049/15
reported [1] 874/9
reporter [9] 835/22 837/14
  841/9 857/5 974/8 990/18
  1010/17 1026/5 1028/12
reporters [1] 890/18
reporting [1] 970/9
reports [37] 866/15 866/16
  866/16 867/5 867/21 870/20
  871/13 872/19 905/14
  905/19 906/1 906/2 906/15
  906/23 912/20 912/22 920/3
  927/5 939/10 950/23 952/1
  955/6 964/25 967/7 967/9
  970/2 970/4 971/4 971/7
  971/10 971/15 981/19 995/3
  995/21 996/14 998/9
  1000/13
reprehensibility [1] 839/8
represents [1] 993/14
requests [1] 836/3
require [2] 857/18 857/24
  858/2 860/11 862/9 863/6
  864/18 869/6 871/24 888/18
  942/4 977/16
required [4] 875/7 884/9
  899/5 970/12
requires [5] 876/5 901/18
  902/25 922/3 935/25
RER [1] 835/4
reread [1] 1039/22
research [5] 864/16 877/14
  942/21 998/8 1048/1
researched [4] 868/8
  868/23 881/9 991/9
reserve [4] 839/19 839/22
  848/17 848/23
residence [1] 1027/24
resides [1] 838/5
resolve [1] 904/17
respect [14] 873/6 881/12
  899/9 906/24 914/21 915/9
  915/15 915/25 916/15 964/5
  970/2 973/7 973/15 975/22
respectfully [1] 989/1
respond [4] 839/4 883/25
  884/22 961/13

responded [1] 1043/11
response [2] 854/13 904/17
responsibility [1] 983/3
responsible [1] 964/12
rest [3] 942/13 1022/25
  1041/10
resting [1] 1029/25
result [1] 1002/24
resume [1] 978/9
retained [5] 843/23 843/25
  863/17 938/11 1035/18
retention [1] 863/17
retired [1] 949/1
returned [1] 951/8
reverse [1] 1038/23
review [11] 866/2 867/13
  867/22 870/10 870/20
  872/19 920/3 927/3 930/5
  939/3 998/9
reviewed [25] 859/19 866/3
  866/6 866/8 874/1 876/14
  905/14 905/19 906/15
  906/16 912/20 913/11 914/4
  922/7 923/20 927/1 928/5
  928/13 928/17 932/17
  967/12 970/3 971/6 1006/24
  1041/7
reviewing [2] 863/24
  922/19
revised [1] 852/20
REYES [1] 835/8
ride [5] 994/23 1015/3
  1031/6 1032/15 1032/20
rise [1] 856/16
rising [1] 1005/6
Rivera [23] 848/17 848/18
  1010/12 1010/13 1010/20
  1011/1 1011/8 1011/12
  1011/15 1011/19 1025/22
  1025/25 1026/1 1026/6
  1026/7 1026/8 1028/1
  1030/8 1032/24 1034/22
  1035/3 1035/6 1036/17
RMR [1] 835/22
road [3] 857/22 868/7
  995/14
rods [1] 1022/25
roll [1] 850/13
room [2] 982/7 997/17
roughly [3] 842/16 842/24
  943/16
round [1] 963/8
routinely [1] 938/24
rub [1] 1005/13
Rule [4] 844/7 844/11
  1005/19 1005/20
ruling [2] 848/3 895/14
run [5] 1000/15 1003/1
  1029/4 1029/5 1029/8
running [7] 845/9 886/9
  886/12 936/22 937/2 988/23
  1019/1
runs [1] 847/9
Rye [1] 835/18

**S**

S-E-L-E-N-I-A [1] 1010/21
SAAL [5] 835/18 839/15
  847/10 847/21 885/25
Saal's [1] 1042/11
Sabastian [1] 870/10
Sabrina [1] 839/9

**S**

**sad [2]**   1023/5 1023/5
**sample [1]**   949/24
**sand [1]**   1016/10
**sat [5]**   852/24 867/16
 1031/21 1031/25 1042/4
**satellite [1]**   841/11
**save [2]**   1000/5 1000/6
**saw [16]**   849/1 881/14
 882/4 887/10 900/9 901/1
 903/1 903/5 931/24 940/13
 940/14 950/18 954/13
 954/25 956/18 1024/7
**scared [2]**   1022/3 1031/19
**scary [2]**   1023/12 1023/12
**scene [2]**   1033/25 1043/12
**scenes [1]**   1033/23
**schedule [10]**   836/18
 839/23 841/10 842/1 842/21
 843/20 846/18 847/8 847/19
 848/21
**scheduled [1]**   847/22
**schedules [1]**   836/4
**scheduling [1]**   845/16
**SCHMID [1]**   835/22
**Schmit [9]**   838/22 838/25
 840/17 840/19 840/19
 841/23 843/23 845/14 855/8
**school [3]**   856/2 1019/21
 1019/23
**scientific [1]**   869/14
**scope [4]**   863/17 878/13
 908/12 908/12
**screaming [2]**   1031/16
 1032/2
**screen [5]**   913/6 918/8
 965/12 965/14 1044/13
**screens [6]**   917/25 923/17
 965/10 1044/17 1045/25
 1045/25
**search [1]**   947/13
**seasoned [1]**   909/10
**seated [8]**   856/17 857/3
 912/8 936/14 990/17
 1010/16 1026/4 1043/2
**second [9]**   836/21 873/1
 878/6 878/9 901/8 902/2
 955/17 1004/13 1038/5
**Secondly [1]**   864/2
**sections [1]**   918/12
**securities [1]**   1006/16
**Security [1]**   996/3
**see [56]**   836/25 856/10
 863/2 873/14 876/2 876/3
 876/5 877/23 878/7 878/10
 881/23 882/3 889/10 889/13
 889/17 889/19 889/23 891/6
 891/22 892/6 897/22 902/21
 910/20 910/22 918/13
 924/21 930/10 944/13
 947/17 947/19 951/1 951/3
 952/15 956/24 966/4 978/21
 979/25 980/2 987/14
 1002/16 1008/19 1009/25
 1013/1 1014/11 1015/25
 1021/5 1021/21 1028/1
 1028/23 1029/4 1029/20
 1043/6 1043/18 1043/19
 1043/21 1048/2
**seeing [3]**   907/2 962/18
 970/8

**seek [2]**   883/14 1038/22
**seeking [3]**   878/24 930/9
 862/19
**segment [2]**   897/5 906/24
**select [1]**   992/14
**Selenia [15]**   848/17
 1010/11 1010/20 1011/1
 1014/12 1015/6 1015/10
 1017/8 1021/6 1021/9
 1022/18 1022/20 1026/24
 1027/22 1036/9
**self [1]**   875/17
**self-care [1]**   875/17
**sense [4]**   939/14 980/23
 996/16 1045/2
**sensory [1]**   860/6
**sent [2]**   927/15 979/14
**separate [1]**   840/13
**separately [2]**   854/15
 1037/13
**separation [1]**   987/20
**September [7]**   882/5 931/24
 931/25 932/6 944/15 944/17
 954/13
**September 2015 [2]**   931/25
 944/17
**sequentially [1]**   1042/2
**series [7]**   892/13 892/13
 899/5 899/7 899/10 899/11
 1043/7
**serious [1]**   906/23
**serve [3]**   842/15 879/24
 977/23
**served [7]**   837/23 837/24
 842/11 846/4 861/20 862/15
 862/20
**serves [1]**   863/7
**service [18]**   837/9 864/20
 865/6 865/7 874/16 879/12
 917/11 918/18 944/5 945/12
 948/15 948/17 948/23
 948/25 953/22 954/2 977/7
 977/7
**services [28]**   860/10 861/7
 861/8 862/1 862/2 862/8
 871/25 873/18 874/17 877/2
 877/2 921/12 935/24 942/25
 943/9 944/11 947/19 949/2
 949/4 949/10 977/4 977/16
 977/23 994/2 998/10 1003/9
 1003/16 1005/2
**session [2]**   879/14 888/9
**set [3]**   849/23 868/6
 894/14
**seven [2]**   917/7 942/12
**seven days [1]**   917/7
**Seventeen [1]**   925/22
**Seventeen years [1]**   925/22
**several [4]**   843/9 919/21
 926/11 1004/16
**severe [2]**   861/3 869/5
**sharp [1]**   1034/4
**SHAUB [2]**   835/19 835/21
**sheet [3]**   869/11 918/10
 983/19
**sheets [2]**   872/21 877/17
**shhh [1]**   985/22
**shifted [1]**   847/9
**shins [1]**   1014/6
**shoot [1]**   856/5
**Shore [1]**   840/18
**short [9]**   1002/15 1002/16

 1002/22 1003/8 1003/16
 1002/16 1002/22 1003/8
 1003/16 1006/21
**short-term [6]**   1002/15
**shorten [1]**   851/8
**shorter [3]**   851/13 851/15
 855/23
**show [3]**   886/5 982/17
 1001/14
**showed [2]**   1014/5 1025/3
**shower [7]**   901/25 902/2
 921/9 921/9 956/10 957/3
 1017/24
**shown [4]**   947/5 1044/9
 1045/6 1045/18
**shuts [3]**   1018/12 1018/13
 1018/16
**sick [2]**   881/24 881/24
**sickness [1]**   943/12
**side [1]**   1040/21
**sidebar [30]**   882/9 882/11
 883/1 883/2 885/10 886/17
 893/2 893/3 894/1 894/2
 895/14 898/2 903/19 903/20
 904/1 904/2 910/24 915/4
 915/10 960/19 960/21 961/1
 961/8 961/19 966/16 966/18
 967/1 967/2 968/5 969/9
**sidebars [2]**   895/25 967/5
**sides [1]**   1043/19
**sign [1]**   939/3
**significant [5]**   869/5
 876/8 888/15 994/22 1043/4
**significantly [1]**   996/6
**silly [1]**   886/7
**similar [2]**   839/6 984/14
**similarly [1]**   983/23
**simple [1]**   991/4
**simply [7]**   851/12 996/12
 996/16 996/16 1003/19
 1003/20 1004/23
**Sinai [5]**   861/11 861/13
 861/16 861/22 861/23
**single [6]**   904/5 919/2
 981/4 1001/1 1004/8
 1004/10
**sister [9]**   1011/10 1011/10
 1011/14 1015/6 1026/22
 1027/2 1027/8 1034/19
 1034/19
**sister-in-law [1]**   1027/2
**sisters [2]**   944/25 1027/22
**sit [9]**   844/17 845/4
 845/12 958/11 983/8
 1019/15 1019/16 1032/24
 1033/3
**sits [1]**   1019/5
**sitting [5]**   1008/16
 1016/12 1029/10 1029/24
 1033/7
**situation [4]**   836/20 939/9
 974/16 974/17
**situations [2]**   936/2 996/7
**six [1]**   867/23
**size [1]**   949/24
**sizes [1]**   1009/3
**skilled [1]**   942/15
**skip [2]**   933/4 990/13
**slides [2]**   1008/20 1009/6
**slight [1]**   1006/7

**S**

slightly **[2]** 983/4 996/3
slow **[6]** 858/5 890/16
902/3 1019/10 1023/2
1023/2
small **[8]** 917/25 918/8
923/17 956/8 965/10
1044/13 1044/17 1045/25
smart **[1]** 896/19
smiled **[1]** 1048/2
SMITH **[5]** 835/14 836/9
848/1 848/3 855/8
Smith's **[1]** 841/15
snapshots **[1]** 1009/2
social **[3]** 996/3 1014/20
1015/2
Sociology **[1]** 860/17
sold **[1]** 949/1
solely **[1]** 904/14
someone **[6]** 850/11 905/17
939/11 943/23 1008/15
1031/20
sometime **[1]** 851/23
sometimes **[5]** 1016/9
1017/5 1018/1 1021/4
1028/20
somewhere **[4]** 846/14
1012/21 1017/9 1028/22
soon **[1]** 1035/17
sorry **[29]** 841/15 854/24
862/14 862/16 865/10 892/8
915/12 926/8 928/20 945/9
947/9 949/23 951/2 952/21
956/4 958/10 959/6 965/13
983/6 1010/8 1022/22
1026/17 1028/7 1028/10
1036/21 1037/8 1041/4
1043/3 1047/10
sort **[7]** 836/17 853/10
878/12 902/12 1014/17
1027/2 1029/23
Sounds **[1]** 943/22
source **[5]** 901/7 901/8
996/13 998/11 1006/9
sources **[4]** 863/8 901/7
1004/16 1006/4
southwestmedical.com **[1]**
902/19
spasms **[1]** 900/24
speaking **[4]** 927/9 927/12
927/13 966/8
special **[2]** 983/19 1006/22
specialist **[2]** 951/17
951/21
specialists **[1]** 971/22
speciality **[1]** 946/20
specialize **[1]** 902/15
specializes **[1]** 888/14
specific **[3]** 919/21 989/24
1007/11
specifically **[5]** 866/5
920/21 984/4 1005/5
1026/21
speed **[3]** 839/12 841/19
983/3
spell **[4]** 857/4 990/18
1010/17 1026/5
spelling **[1]** 838/12
spend **[2]** 1027/16 1027/19
spent **[1]** 1035/20
spine **[15]** 849/13 892/2

904/7 951/17 951/21 951/23
955/15 971/20 972/18 973/8
974/23 1038/11 1038/12
1038/13 1038/14
spines **[1]** 955/21
spoken **[1]** 1023/23
sports **[2]** 1014/23 1019/2
spot **[1]** 1006/17
SPRATT **[1]** 835/19
spreadsheet **[1]** 998/24
spreadsheets **[1]** 999/7
squared **[1]** 992/23
staff **[1]** 861/14
stairs **[1]** 1031/15
stand **[6]** 856/9 884/5
885/17 990/14 1033/4
1033/5
standard **[11]** 864/2 867/15
875/6 892/14 899/5 899/10
949/15 949/16 1006/20
1008/15 1037/5
standing **[3]** 906/12 1033/6
1033/8
standpoint **[1]** 877/24
start **[11]** 845/7 868/25
868/25 869/13 890/16 981/2
995/14 1014/20 1015/7
1016/25 1041/14
started **[9]** 842/19 860/22
864/24 950/6 950/7 993/23
1003/23 1016/6 1027/8
starting **[6]** 868/17 994/10
1003/4 1019/13 1019/13
1041/17
startled **[1]** 1031/17
starts **[3]** 879/7 963/15
1019/12
state **[21]** 839/12 840/9
844/10 857/4 858/14 858/15
859/2 860/23 861/15 895/13
946/19 959/7 959/8 982/3
983/22 983/23 984/7 996/12
1005/21 1034/7 1039/5
states **[6]** 835/1 835/8
883/7 928/8 939/1 945/14
Statistic **[1]** 995/21
statistical **[1]** 991/15
statistics **[4]** 949/22
995/3 996/14 996/18
status **[1]** 876/2
stay **[2]** 1018/15 1047/2
Staying **[1]** 845/3
stays **[1]** 1017/6
stenography **[1]** 835/24
step **[3]** 863/23 989/9
1037/13
steps **[2]** 865/25 991/17
STEVEN **[3]** 835/18 838/22
843/23
stick **[2]** 847/20 852/4
sticking **[1]** 1036/4
stiff **[1]** 1019/18
stiffness **[1]** 1033/5
still **[24]** 855/13 855/24
868/21 885/22 934/20
934/22 940/22 941/3 947/3
958/14 958/17 960/16 962/9
962/12 962/13 974/1 975/21
981/16 982/14 1005/16
1005/18 1022/5 1031/22
1032/1
stipulate **[6]** 985/1 985/7

995/15 995/16 996/4 996/25
997/12 997/16 997/18 997/25
stipulated **[1]** 996/7
Stitzer **[5]** 848/19 1043/9
1043/10 1043/23 1045/18
stop **[7]** 847/22 885/14
886/3 896/14 1010/5 1010/8
1028/8
stopped **[1]** 1043/24
store **[1]** 1017/9
stores **[1]** 901/9
straight **[2]** 903/4 903/5
street **[9]** 835/11 835/15
835/20 843/9 843/11 843/15
847/7 854/1 943/7
streeted **[1]** 872/10
Stricken **[1]** 1023/22
strict **[1]** 845/22
strike **[7]** 855/7 889/16
900/17 906/17 915/20 956/3
1023/21
study **[3]** 892/4 892/5
955/23
stuff **[7]** 853/7 883/5
885/4 888/11 907/2 987/2
1009/9
style **[1]** 884/3
subject **[4]** 844/24 872/18
907/17 946/4
subjective **[1]** 930/22
submit **[4]** 844/1 939/2
1000/8 1006/2
submitted **[5]** 842/7 927/9
927/11 928/4 938/16
subpoena **[2]** 842/11 842/15
subpoenaed **[1]** 843/9
subpoenas **[1]** 846/3
subsequent **[1]** 991/19
substantial **[3]** 924/6
1022/23 1034/25
subsumed **[1]** 1040/14
subway **[1]** 994/23
successfully **[1]** 859/5
sudden **[1]** 848/4
suffering **[2]** 983/21 984/7
suggest **[2]** 894/15 932/8
suggesting **[1]** 957/3
suggestion **[3]** 906/11
909/10 977/19
suggests **[1]** 941/3
suite **[5]** 835/11 835/15
835/17 835/20 846/9
sum **[1]** 993/15
summary **[3]** 917/23 918/10
981/7
supervise **[1]** 873/17
supervised **[3]** 859/3
861/13 861/13
supplement **[2]** 967/8
967/24
supplemental **[2]** 970/5
979/9
supplies **[4]** 858/1 902/10
902/11 921/25
supply **[3]** 854/3 902/15
1003/22
support **[14]** 902/6 902/25
902/25 903/2 903/6 909/13
909/14 921/10 1005/7
1020/24 1021/17 1021/17
1024/10 1024/14
supporting **[1]** 909/8
supports **[1]** 923/13

**S**

**suppose [1]** 1006/14
**supposed [2]** 979/3 1049/6
**surgeon [10]** 849/13 864/23
864/25 870/15 904/6 941/14
941/21 973/8 973/23 975/21
**surgeons [2]** 866/23 869/16
**surgeries [5]** 874/14
912/21 913/16 916/16
1021/19
**surgery [35]** 858/2 871/21
871/21 871/24 874/18 895/2
895/9 903/8 903/11 904/7
904/7 904/9 912/13 913/11
914/5 915/3 922/1 941/9
941/15 942/3 951/22 972/8
973/25 974/16 974/20
974/22 975/1 975/2 975/4
975/4 975/22 1022/1 1022/4
1023/11 1023/11
**surgical [4]** 866/21 897/17
912/25 913/3
**surprise [1]** 941/20
**surprised [1]** 941/17
**surveillance [1]** 947/5
**suspect [1]** 909/16
**sustain [4]** 914/21 923/23
961/14 981/6
**sustained [39]** 874/9
876/21 878/23 887/19
887/23 913/5 913/8 914/14
919/5 919/24 922/14 924/8
934/13 938/20 940/8 942/7
942/9 947/1 950/2 950/4
954/10 957/2 957/11 957/16
958/20 961/16 962/2 962/5
964/13 964/13 966/14
971/19 972/4 973/5 974/5
975/15 976/2 1023/22
1030/12
**swollen [1]** 1030/16
**sworn [6]** 857/1 990/16
1010/15 1011/3 1026/3
1026/10
**symptoms [1]** 936/8
**system [1]** 977/25

**T**

**table [8]** 955/14 980/8
980/8 980/10 996/2 996/3
996/9 1000/24
**tabs [1]** 853/24
**talks [3]** 975/1 984/4
1004/3
**tasks [1]** 888/1
**taxing [1]** 1032/13
**TBI [1]** 963/9
**teaches [1]** 841/1
**teaching [3]** 840/25 841/2
842/21
**team [1]** 861/17
**technical [1]** 1043/4
**technically [1]** 982/13
**technician [1]** 1043/11
**technicians [1]** 1043/11
**ten [9]** 867/23 909/6 911/2
992/24 992/24 998/5 1004/4
1004/6 1010/7
**ten-minute [1]** 911/2
**ten-year [1]** 998/5
**tend [1]** 1018/15

**tens [5]** 902/8 902/10
921/24 940/20 941/19
**tenth [1]** 992/25
**term [13]** 862/22 930/24
1002/15 1002/15 1002/16
1002/17 1002/22 1003/4
1003/8 1003/16 1004/21
1006/21 1006/21
**terminated [1]** 883/13
**terms [13]** 851/21 876/17
901/17 915/2 916/15 949/21
949/21 997/11 1015/1
1015/11 1018/9 1027/11
1029/9
**Terrence [1]** 892/12
**test [1]** 963/11
**testified [33]** 838/22
838/25 880/2 880/3 892/24
895/15 904/6 907/16 914/11
917/16 917/22 948/17
949/20 952/6 956/13 956/13
959/22 965/3 967/5 967/11
967/17 970/3 973/23 977/8
977/9 977/15 985/24 997/7
997/13 1011/3 1026/10
1036/17 1039/19
**testifies [1]** 848/4
**testify [38]** 840/19 842/12
852/7 884/11 894/7 894/8
905/1 905/9 905/15 905/24
906/3 906/17 907/1 907/20
908/20 908/24 973/19 977/1
978/12 979/21 980/16
980/23 983/14 984/19
984/21 984/24 986/14
987/13 989/7 991/5 991/6
995/10 996/11 997/15
997/18 997/22 1005/18
1023/24
**testifying [3]** 852/2 884/9
1045/20
**testimony [40]** 837/23
839/1 841/15 855/7 865/22
878/13 883/13 885/15
894/16 896/20 897/7 906/14
907/24 908/9 908/10 932/16
937/1 941/13 964/17 970/12
981/25 983/16 987/10
987/12 987/17 987/19
988/11 989/24 1000/9
1000/12 1006/8 1008/14
1008/21 1008/22 1009/3
1009/21 1024/1 1035/9
1036/11 1039/25
**testing [10]** 861/6 879/14
888/4 888/5 933/1 962/22
963/3 963/9 963/24 963/25
**testings [1]** 877/22
**tests [5]** 866/16 921/6
962/19 962/24 962/25
**textbook [1]** 1007/7
**thankfully [1]** 976/21
**theater [2]** 1028/20
1028/21
**theirs [2]** 1039/16 1042/1
**theme [1]** 1039/11
**themselves [1]** 880/4
**theory [2]** 870/5 1004/7
**therapeutic [1]** 878/2
**therapists [2]** 881/24
998/6
**therapy [61]** 866/17 874/16

**875/25** 876/3 876/4 876/6
876/9 876/14 876/17 876/18
877/3 877/9 878/4 878/5
878/11 879/3 879/6 879/7
879/8 881/12 881/13 881/14
881/18 881/22 882/7 883/21
887/6 887/24 887/25 888/5
888/6 888/17 921/2 921/3
921/3 921/19 923/20 930/12
930/13 930/16 931/19
931/20 931/22 932/20 933/5
934/9 953/13 953/16 953/19
954/5 954/14 954/19 954/22
955/1 955/1 960/15 961/6
962/9 962/13 964/6 1033/14
**thereabouts [1]** 847/16
**therefore [3]** 873/18 951/9
967/24
**therein [1]** 1005/13
**they've [3]** 885/15 906/25
949/1
**thinking [1]** 946/15
**thinks [1]** 941/25
**third [1]** 1039/10
**Thomas [12]** 846/22 847/2
848/4 883/21 884/20 932/20
962/10 962/18 963/1 963/9
1049/2 1049/4
**thorough [1]** 953/8
**thoughts [1]** 1006/22
**thousand [2]** 926/4 926/5
**three [36]** 849/10 864/19
867/22 879/7 881/22 882/1
885/16 891/16 891/20
892/13 899/7 899/11 899/19
900/1 900/12 901/4 902/1
902/1 902/4 902/9 909/5
921/23 940/19 947/16
947/18 949/13 949/15
949/24 956/18 956/20 981/3
998/3 1012/3 1024/24
1025/1 1029/19
**three o'clock [1]** 981/3
**three-year [2]** 902/1
956/20
**throughout [1]** 1012/6
**throw [2]** 895/6 1019/3
**Thursday [2]** 847/8 847/18
**ticket [4]** 938/1 943/17
956/8 956/9
**tight [1]** 845/13
**timing [1]** 1047/20
**tip [1]** 1034/1
**tired [1]** 894/22
**Tizanidine [1]** 900/23
**today [27]** 847/25 848/13
848/20 849/24 850/1 853/8
868/21 932/6 932/14 932/23
958/11 996/21 997/10
1000/12 1001/9 1003/3
1006/12 1010/4 1016/24
1017/14 1023/4 1023/24
1035/10 1036/7 1036/12
1047/14 1049/7
**together [12]** 854/15
860/18 864/7 924/21 937/2
1012/4 1012/6 1027/9
1027/24 1041/24 1042/19
1042/20
**togethers [3]** 1027/21
1027/22 1028/22
**tongue [1]** 1034/1

**T**

**took [11]** 867/19 883/2
894/2 904/2 930/20 936/20
944/18 944/24 949/21 951/8
971/14
**top [1]** 987/11
**total [15]** 879/14 881/11
887/11 888/10 891/10
891/24 900/6 918/14 919/8
934/16 945/11 979/12
979/23 979/25 980/1
**totaled [1]** 918/20
**totally [1]** 945/16
**totals [2]** 981/5 981/21
**tout [1]** 846/9
**toward [1]** 977/14
**towards [1]** 858/19
**trained [3]** 860/3 868/18
868/20
**training [5]** 858/12 860/7
869/15 923/5 923/11
**transcript [10]** 835/7
835/24 1009/13 1009/15
1009/18 1010/2 1041/22
1042/5 1042/8 1042/11
**transcription [1]** 835/25
**transcripts [2]** 1042/7
1049/10
**transplant [1]** 908/18
**travel [1]** 841/12
**traveling [1]** 850/24
**Treasury [2]** 992/6 1006/16
**treat [2]** 936/2 941/3
**treated [12]** 872/17 872/19
885/9 887/10 894/12 926/13
926/16 926/17 927/2 933/8
941/2 952/9
**treaters [1]** 939/15
**treating [36]** 863/8 863/8
864/24 866/15 866/23 867/2
868/25 869/1 869/13 870/18
874/2 879/24 883/20 894/10
897/17 904/6 932/19 936/8
937/10 937/15 938/3 938/6
938/24 939/11 939/24
940/18 942/2 958/12 958/12
958/16 975/8 975/20 976/5
976/14 1037/19 1037/20
**treatise [2]** 1007/7
1007/11
**treatment [24]** 849/5 864/4
874/12 878/3 878/4 880/4
881/3 883/7 883/12 883/13
883/16 884/19 888/17
892/15 904/22 905/25 906/1
906/3 933/17 955/8 960/16
964/19 975/8 1025/12
**treatments [7]** 876/6
883/11 883/24 921/22
934/15 937/19 937/22
**trial [37]** 835/7 837/2
837/5 840/15 841/4 841/7
842/5 842/7 842/10 842/19
843/13 843/16 844/18 845/5
845/16 845/17 845/18
850/15 850/21 851/8 851/9
851/10 851/22 854/7 914/12
941/14 967/6 980/19 981/17
983/4 983/17 1000/13
1005/15 1005/17 1044/23
1044/24 1049/20

**tried [2]** 947/25 948/2
**tries [2]** 884/15 984/4
**tries [1]** 1021/4
**trip [1]** 1029/22
**tristate [1]** 947/18
**trooper [1]** 840/9
**trouble [4]** 855/4 1013/19
1025/17 1033/1
**truck [5]** 839/12 839/13
841/19 1029/23 1030/1
**true [49]** 872/6 877/18
889/24 894/23 925/1 925/5
925/12 925/25 926/7 927/8
927/16 927/24 928/1 928/3
928/13 928/14 928/18 929/7
929/9 930/3 930/17 930/19
930/23 931/1 931/4 931/8
931/16 932/12 934/24 935/2
935/5 936/25 941/12 943/18
945/11 953/4 960/13 964/3
965/2 965/6 965/22 966/9
972/1 972/24 975/5 976/18
1018/18 1018/19 1025/16
**try [15]** 836/17 847/20
869/1 869/14 885/13 904/16
916/7 953/7 953/9 959/2
1016/8 1016/16 1017/24
1021/18 1024/16
**trying [16]** 843/18 843/21
847/12 886/13 886/15
895/18 895/24 896/13
896/15 896/15 968/4 969/8
987/8 1014/8 1021/20
1043/4
**Tuesday [4]** 847/18 848/22
849/15 849/17
**tune [2]** 945/10 950/20
**turn [1]** 965/7
**turned [1]** 939/12
**twelve [4]** 1024/5 1024/8
1024/11 1025/13
**twice [8]** 888/8 889/1
891/23 924/24 967/14
967/14 967/14 988/16
**two [65]** 836/22 840/6
845/15 849/10 849/16
867/22 874/14 877/25 879/3
881/8 881/21 882/1 882/5
885/16 887/9 889/6 892/9
901/7 903/2 903/3 903/6
903/7 906/25 912/20 912/22
913/16 921/22 925/13 931/9
932/17 936/4 940/20 944/25
952/1 955/7 958/14 958/16
963/10 970/4 973/15 974/24
975/11 978/10 983/20
986/12 991/7 991/17 991/19
992/23 992/23 995/24
995/25 998/3 1006/7
1013/12 1017/22 1023/3
1023/9 1029/18 1031/14
1035/20 1036/1 1036/4
1039/9 1042/4
**two o'clock [1]** 978/10
**two-family [1]** 1031/14
**type [14]** 857/17 857/23
858/1 862/7 862/11 883/20
894/11 901/20 902/25
921/12 929/2 943/8 964/21
982/14
**types [5]** 860/8 864/8
875/17 875/19 888/17

**typically [7]** 902/21 959/7
981/3 984/5 989/1 990/1
998/8
**typographical [1]** 872/16

**U**

**U.S [8]** 985/6 992/6 993/22
993/24 994/5 998/1 1001/9
1006/16
**Uh-hum [1]** 854/13
**ultimate [1]** 931/7
**ultimately [1]** 934/15
**Um-hum [1]** 994/17
**unavailable [1]** 846/1
**uncomfortable [3]** 1016/13
1019/13 1022/10
**under [10]** 840/20 892/14
899/5 899/10 939/13 939/22
952/8 964/7 1027/6 1036/17
**undergoing [2]** 960/15
961/6
**undergone [2]** 876/8 876/15
**understood [5]** 847/3
855/15 869/25 947/12
960/10
**underwent [2]** 874/13 876/8
**undetermined [1]** 975/23
**unique [1]** 902/12
**unit [2]** 840/10 941/4
**UNITED [2]** 835/1 835/8
**University [5]** 858/14
858/16 858/18 859/16
946/19
**unless [4]** 910/2 910/14
984/20 985/23
**unlike [1]** 946/7
**unsound [1]** 1003/21
**unusual [2]** 846/4 939/23
**up [81]** 845/9 848/2 853/18
855/17 868/11 869/3 869/7
869/8 884/5 885/14 888/25
894/15 896/8 896/9 905/16
909/23 913/6 914/8 915/24
917/10 917/22 918/14
918/20 919/7 926/11 928/24
929/11 929/14 929/17 934/9
939/14 947/17 947/17
953/24 955/8 961/11 961/12
963/7 965/10 965/12 965/13
967/17 977/13 977/19
982/15 983/3 984/20 985/22
989/17 990/14 994/15 995/2
995/20 996/18 1003/9
1003/10 1003/10 1006/22
1011/11 1012/4 1012/15
1013/9 1013/9 1016/9
1017/3 1017/23 1018/19
1019/11 1019/11 1019/17
1019/19 1023/2 1023/6
1026/1 1029/25 1031/14
1031/15 1033/4 1033/5
1044/12 1045/23
**up-to-date [2]** 995/2
995/20
**up-to-National [1]** 996/18
**update [3]** 956/24 967/12
970/8
**updated [1]** 851/5
**updates [1]** 851/8
**upload [3]** 853/22 854/4
854/17
**Uploaded [1]** 854/18

**U**

**upset [3]**   1017/18  1017/18
1018/14
**upsetting [2]**   1017/19
1018/1
**upstate [1]**   1012/21
**upward [2]**   1004/7  1005/6
**useful [1]**   931/21
**uses [2]**   875/18  947/3
**usual [1]**   1030/17

**V**

**vacation [1]**   881/25
**vacations [1]**   943/11
**valid [1]**   909/14
**valuation [1]**   912/19
**value [37]**   852/22  878/15
930/20  934/21  978/13  979/3
979/4  979/13  979/13  979/15
979/21  980/15  980/20
983/14  984/1  984/10  984/15
985/16  986/5  986/24  987/24
989/13  989/17  990/9  991/17
991/19  991/24  992/1  992/1
992/12  992/17  992/18
992/19  993/6  997/15  999/9
1003/24
**Vargas [1]**   846/6
**variety [4]**   860/4  860/16
861/19  862/4
**various [23]**   860/20  863/8
863/25  864/11  866/18  870/2
880/7  887/25  901/22  902/15
921/5  921/8  942/22  942/23
977/24  993/23  994/6  998/6
1000/25  1001/6  1002/19
1002/25  1004/3
**vary [1]**   904/9
**Vasile [1]**   846/7
**vast [1]**   877/12
**vendors [1]**   864/20
**verbal [1]**   939/7
**verdict [2]**   983/19  999/10
**versus [1]**   835/4
**vibrant [2]**   1012/12  1016/5
**vicinity [1]**   841/6
**video [10]**   837/6  837/14
841/11  845/8  845/24  848/18
850/7  1008/7  1043/7  1044/2
**videotape [4]**   837/3
1043/16  1043/23  1043/24
**view [3]**   889/9  923/11
972/20
**viewed [1]**   922/8
**Viggiano [1]**   1049/6
**Vincent [4]**   848/18  1043/9
1043/10  1043/23
**visit [3]**   869/7  872/22
1015/22
**visits [1]**   937/19
**Vital [4]**   995/3  995/20
996/14  996/18
**vitalitymedical.com [1]**
902/18
**vocational [3]**   861/13
861/15  861/16
**voluminous [1]**   867/21

**W**

**wage [1]**   998/3
**wages [1]**   1005/6
**wait [7]**   854/22  884/4

897/22  988/17  1004/13
1008/19  1005/20  1012/19
**waiting [2]**   853/23  1043/15
**Walgreen's [1]**   901/9
**walk [13]**   1016/10  1016/11
1019/8  1019/10  1028/20
1028/21  1028/22  1029/2
1031/14  1032/4  1032/9
1032/10  1037/8
**walking [7]**   1014/23
1016/12  1019/9  1021/5
1028/24  1031/15  1032/6
**walks [3]**   1016/10  1032/8
1032/11
**wants [5]**   843/15  851/1
986/22  1021/24  1034/16
**WARNER [1]**   835/17
**waste [2]**   885/18  896/18
**wasted [2]**   847/21  848/11
**wasting [2]**   847/22  885/18
**watch [1]**   1018/3
**watching [2]**   1033/3
1033/23
**water [1]**   835/20
**ways [2]**   943/2  981/17
**weakness [1]**   1030/19
**wedding [1]**   836/14
**Wednesday [6]**   844/19
846/13  846/14  847/5  847/15
847/16
**week [13]**   841/5  843/1
852/5  881/22  881/22  881/25
882/1  888/8  917/7  942/13
1022/16  1033/22  1035/19
**weekend [4]**   1047/16  1048/4
1049/15  1049/18
**weeks [4]**   881/22  882/2
887/9  888/9
**weigh [1]**   955/10
**weight [1]**   1007/2
**weights [1]**   1031/4
**Wendy [10]**   920/4  925/8
928/21  929/6  930/18  930/20
931/5  931/15  940/10  946/3
**West [4]**   843/9  843/11
843/14  847/6
**Westchester [2]**   835/17
947/23
**wheelchairs [1]**   862/7
**whichever [1]**   984/8
**Whitlock [2]**   1049/3  1049/4
**whole [4]**   958/7  959/8
1013/14  1040/17
**wide [3]**   860/16  861/19
862/4
**Williamsport [2]**   841/6
844/20
**willing [1]**   996/4
**Winn [15]**   892/12  892/24
894/7  894/15  894/15  895/24
896/4  896/8  937/1  937/4
937/9  964/18  964/20  965/3
972/14
**wise [1]**   1026/24
**withdraw [9]**   873/6  873/7
915/12  916/7  938/21  956/4
962/3  962/6  1024/17
**withdrawing [1]**   1038/2
**withdrawn [10]**   876/11
878/25  901/13  903/4  917/4
958/23  1018/18  1020/11
1021/8  1030/9

**withstanding [1]**   962/12
**witness [32]**   838/19  840/12
840/20  846/1  849/9  856/21
857/1  857/14  862/21  866/10
867/5  894/24  959/12  959/18
965/10  975/11  975/16  976/7
976/13  978/7  983/7  990/16
1010/10  1010/15  1011/2
1011/14  1025/23  1025/24
1026/3  1026/9  1043/7
1045/6
**witnesses [14]**   836/23
837/15  846/22  847/7  847/7
848/9  850/9  884/4  975/11
976/17  984/16  987/20
1008/8  1047/13
**wonderful [1]**   1048/4
**wondering [1]**   1023/10
**word [1]**   906/6
**wording [2]**   1009/13
**words [6]**   918/17  976/5
995/4  1008/18  1008/19
1011/22
**workers [1]**   1005/7
**working with [1]**   923/2
**works [3]**   863/13  870/13
879/21
**worry [1]**   950/14
**worse [5]**   863/11  875/9
875/17  1018/22  1018/24
**worth [1]**   962/22
**Wow [1]**   897/25
**wrapped [1]**   984/20
**write [2]**   867/22  1018/5
**writing [1]**   927/11
**written [5]**   871/5  939/1
939/2  954/7  1040/21
**wrote [4]**   871/10  871/12
931/10  951/3

**X**

**X-ray [3]**   1041/5  1041/6
1041/8
**X-rays [1]**   891/22

**Y**

**year [73]**   852/14  852/15
855/22  858/10  859/10
861/10  873/19  876/2  877/10
881/8  881/11  881/11  881/23
881/24  881/25  887/11
887/15  888/10  889/1  889/2
889/15  889/18  889/20
889/23  890/11  890/12  891/3
891/9  891/16  891/23  891/24
892/2  892/3  892/10  900/15
900/16  900/24  900/25  901/5
902/1  902/11  917/13  918/15
918/18  919/8  919/9  919/14
943/16  956/20  963/9  965/4
979/22  991/12  991/15
992/19  992/22  992/23
992/24  992/24  993/3  993/6
993/18  998/5  999/8  999/8
1002/21  1003/6  1003/14
1004/4  1004/6  1005/3
1021/15  1041/7
**Year's [1]**   1027/23
**yearly [20]**   876/5  887/14
889/11  889/14  890/20  891/4
891/10  902/10  997/18
997/19  1002/13  1002/15

**Y**

**yearly... [8]**  1002/17
1002/22 1002/24 1003/8
1003/17 1004/21 1006/21
1006/21
**years [66]**  859/11 859/18
873/14 873/23 874/24
874/25 875/5 875/8 878/20
879/7 881/21 882/1 882/5
885/16 889/6 891/16 891/20
892/9 896/21 899/7 899/11
902/1 902/4 902/5 902/7
902/9 903/2 903/3 903/6
903/7 923/4 925/22 925/24
926/3 926/5 939/10 941/19
943/17 943/21 956/18 980/3
980/5 980/9 983/22 983/24
984/8 984/18 992/21 994/23
995/3 995/17 996/15 996/23
998/20 1002/23 1003/6
1005/22 1012/3 1012/7
1024/5 1024/8 1024/11
1025/13 1027/5 1027/15
1033/9
**yesterday [7]**  838/20 839/6
841/15 892/12 937/2 964/18
1022/7
**yield [1]**  942/4
**YORK [36]**  835/1 835/5
835/12 835/12 835/18
835/20 835/20 835/23
858/18 860/25 861/12
864/19 867/17 868/23
868/24 883/5 883/6 883/23
885/20 890/22 947/20
947/21 947/22 948/5 948/6
948/10 989/14 992/4 994/23
996/12 997/14 997/22
998/12 1012/5 1012/24
1013/3
**young [2]**  1012/12 1023/6
**younger [2]**  1011/25
1013/20
**yourself [5]**  857/13 925/24
930/21 971/17 984/21

**Z**

**zanaflex [2]**  900/23 940/15