```
 1  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
 2
    ------------------------------x
 3                                     14-CV-03725(FB)(RER)
    JOSE BAUTA,
 4                                     United States Courthouse
             Plaintiff,                Brooklyn, New York
 5
             – versus –                May 30th, 2018
 6                                     9:30 AM
    GREYHOUND LINES, INC.,
 7  SABRINA ANDERSON, AKOS GUBICA,
    KAROLY GUBICA,
 8  AND CAV ENTERPRISE, LLC,
 9           Defendants.
    ------------------------------x
10
                 TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
11               BEFORE THE HONORABLE RAMON E. REYES, JR.
                     UNITED STATES MAGISTRATE JUDGE
12
13                          APPEARANCES
14
    Attorney for Plaintiff:  McELFISH LAW FIRM
15                           1112 North Sherbourne Drive
                             West Hollywood, California 90069
16                           BY:  RAYMOND D. McELFISH, ESQ.
                                  JAMIE DIAMOND, ESQ.
17
18  Attorney for Defendant:  WAGSTAFF & CARTMELL, LLP
                             4740 Grand Avenue
19                           Suite 300
                             Kansas City, Missouri 64112
20                           BY:  JONATHAN P. KIEFFER, ESQ.
21
    Attorney for Defendants  LEWIS BRISBOIS BISGAARD & SMITH, LLP
22                           1375 East 9th Street
                             Suite 1600
23                           Cleveland, Ohio 44114
                             BY:  BRADLEY J. BARMEN, ESQ.
24
25
```

```
 1                      APPEARANCES (CONTINUED)

 2
     Attorney for Defendants:   MARSHALL, DENNEHEY, WARNER,
 3                              COLEMAN & GOGGIN, P.C.
                                800 Westchester Avenue
 4                              Suite C-700
                                Rye Brook New York 10573
 5                              BY:  HAROLD L. MOROKNEK, ESQ.
                                     STEVEN B. SAAL, ESQ.
 6
     Attorney for Defendants:   SHAUB, AHMUTY, CITRIN & SPRATT, LLP
 7                              1983 Marcus Avenue
                                Suite 260
 8                              Lake Success, New York 11042
                                BY:  JONATHAN SHAUB, ESQ.
 9

10

11

12

13

14

15

16

17

18

19

20

21
     Court Reporter:                LISA SCHMID, CCR, RMR
22                                  Phone:  718-613-2644
                                    Fax:  718-613-2379
23                                  Email:
     LisaSchmidCCR.RMR@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

```
 1            (In open court, outside the presence of the jury.)
 2            THE COURT:  Are we ready to proceed?
 3            MR. MCELFISH:  Judge, I was here at nine with the
 4  rebuttal transcripts.  Mr. Saal hasn't --
 5            (Discussion off the record.)
 6            THE COURT:  Mr. Saal, are you complete with that?
 7            MR. SAAL:  Yes, Your Honor.  Just reviewing -- I was
 8  just going through, checking the marked Post-its.
 9            (Jury enters.)
10            THE COURT:  You may be seated.
11            Okay.  Ladies and gentlemen, good morning.
12            JURORS:  Good morning.
13            THE COURT:  We're going to continue with the
14  videotape deposition of Corporal Smith (sic), so we'll go
15  right into that.
16            (Video played in open court.)
17            THE COURT:  Okay, ladies and gentlemen.  We're going
18  to take our mid-morning break a little early.  So we'll resume
19  again at 11:30.
20            (Jury exits.)
21            THE COURT:  Okay.  Get that transcript ready.  I
22  have to say I'm a little disappointed that you didn't get me
23  these things when I asked for them.  Now we're having to take
24  time.  Get that one ready to be read in.  I'm going to go
25  finish these in chambers.
```

PROCEEDINGS

```
 1            (Recess.)
 2            THE COURT:  Are we ready go?
 3            MR. MCELFISH:  Ready to go.
 4            THE COURT:  All right.  The court reporter is here.
 5            MR. BARMEN:  Your Honor, not yet.
 6            We have a few exhibits to move into evidence that
 7    were used during Corporal Schmit and one other safety bulletin
 8    that was used previously but not admitted and then we are
 9    prepared to rest.
10            THE COURT:  We have Gubica's -- oh, I'm sorry.  I'm
11    sorry.  I see.  What exhibits are they?
12            MR. BARMEN:  Steven?
13            MR. SAAL:  First, Your Honor, we have Defendant's
14    70.  It's a January, 2012, safety bulletin that was not
15    included in what was admitted by plaintiffs.
16            THE COURT:  Defendant's 70?
17            MR. SAAL:  Defendant's 70.  It was admitted in
18    Pennsylvania with Dr. Moore-Ede in Pennsylvania, and we seek
19    to have that admitted.  It was admitted in Pennsylvania with
20    Dr. Moore-Ede.
21            THE COURT:  M-O-O-R-E hyphen E-D-E.
22            Any objection?
23            MR. MCELFISH:  I'm looking at it.  I don't recall
24    this, but --
25            MR. BARMEN:  Don't recall what?
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
1              MR. MCELFISH:  What?  This -- this was admitted in
2    PA?
3              MR. BARMEN:  Yes, it was.
4              MR. MCELFISH:  Okay.  If you say so.  Fine.
5              THE COURT:  All right.  Received.
6              (Defendant's Exhibit 70 was received in evidence.)
7              THE COURT:  What else?
8              MR. SAAL:  Your Honor, we also at this time renew
9    our request to admit the entirety of the Pennsylvania state
10   police report which was admitted in its entirety in the
11   Pennsylvania action.
12             Corporal Schmit's testimony incorporates the sum and
13   substance of the report, the witness accounts, the physical
14   evidence, going to his calculations.  It sufficiently
15   corroborates his testimony.
16             Plaintiffs have addressed some redactions with us,
17   which we have provided to them, that we had no problem
18   redacting certain matters which could be prejudicial.  We
19   don't agree with what plaintiffs are trying to say, that we
20   cannot admit portions of this report that were not
21   specifically testified to by Corporal Schmit.
22             The entirety of the report goes to his opinions and
23   the foundation for his opinions, and he's offered sufficient
24   testimony for that.  It would be akin to not -- it would be
25   akin to redacting a medical record.
```

PROCEEDINGS

```
 1              THE COURT:  The police report?

 2              MR. SAAL:  The entirety of the Pennsylvania state

 3    police report, yes, which includes --

 4              THE COURT:  All 700 pages?

 5              MR. SAAL:  375, Your Honor.

 6         And it includes --

 7              THE COURT:  Denied.

 8              MR. SAAL:  Well --

 9              THE COURT:  Denied.  Move on.

10              MR. SAAL:  We do have Corporal Schmit's 45-page

11    report, Your Honor, within that that we would seek to have

12    admitted.

13              THE COURT:  Same ruling.

14         Create your record.

15              MR. SAAL:  All right.  Your Honor, and that is -- we

16    do have a copy of what was admitted -- I'm sorry -- pardon

17    me -- withdrawn -- what was used and shown to Corporal Schmit

18    during the deposition, including a couple of photographs.

19              I will represent to the Court that there is in one

20    page in that paperclip with GLI Bates Number 120.  It was not

21    specifically shown to Corporate Schmit trial deposition.

22              THE COURT:  120?

23              MR. SAAL:  120.  But it does -- it's essentially a

24    restatement of his testimony, giving a sequence of the events

25    that occurred based on his findings, and we don't see there's
```

PROCEEDINGS

```
 1   any reason why that would not be admissible based on his

 2   testimony and, again, it was admitted during the Pennsylvania

 3   trial.  I don't believe there's anything on page 120 that ...

 4            THE COURT:  Mr. Kieffer --

 5            MR. KIEFFER:  Briefly, Judge.  I have no objection

 6   to the photos that the officer authenticated.  As it relates

 7   to 120, I would object on the basis that it's just cumulative

 8   with his testimony to the extent he testified about it; and

 9   then there are certain of the other pages that Mr. Saal handed

10   up that I have some objections to, even with the redactions

11   they made.  I can go through those if the Court wants me to.

12            THE COURT:  Sure.  120 is in.

13            MR. SAAL:  Thank you, Your Honor.

14            MR. KIEFFER:  Page 91, with the redactions, we don't

15   have an objection to; the same for 93, 94, and 100.

16            101, I don't believe -- there was some general

17   testimony by the officer about the D Deck module, but I don't

18   recall in the testimony him being specifically asked about the

19   information on that page.  If I'm mistaken, I'm happy to --

20            THE COURT:  General testimony is enough.  It's in.

21            MR. KIEFFER:  Then turning to 106, Your Honor, the

22   only thing that the officer was asked about as it relates to

23   106 was a general question about the condition of the tires.

24   The other things were not touched on in the testimony.

25            Same for 107, it was just asked generally about tire
```

PROCEEDINGS

```
 1    damage with no specific reference to the details on 107.

 2    Shall I keep going on or pause?

 3              THE COURT:  I'm just looking.  Shouldn't you want to

 4    get in evidence of damage to the bus?  I mean, isn't that in

 5    the plaintiff's interest?  The more damaged the bus was, the

 6    worse the accident was.

 7              I mean, come on folks.  It's in.

 8              MR. KIEFFER:  On page 119, Your Honor, the only

 9    thing he was asked about was the middle section about Mr.

10    Gubica.

11              THE COURT:  Operator -- Operator Unit Two?

12              MR. KIEFFER:  Yes.  They made some redactions about

13    Anderson but there are still statements in there about hearsay

14    accounts from her and references to her considerable medical

15    care.  He didn't testify to it.  We don't think that's

16    appropriate.

17              MR. SAAL:  It's already been put before the jury or

18    before the jury that Ms. Anderson lost her leg in the

19    accident.  I don't think there's anything there that's going

20    to cause any prejudice to the plaintiff's case.

21              THE COURT:  I'd take out, "Following this collision,

22    Ms. Anderson related she received a considerable amount of

23    medical care."

24              MR. SAAL:  Okay.

25              MR. KIEFFER:  The sentence above that, Your Honor,
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

1    "Ms. Anderson did not recall using the horn or getting too

2    close to another vehicle or having anybody blow their horn at

3    her."

4            Again, that's a hearsay statement attributed to

5    Anderson from this report.  We don't think that's appropriate.

6            MR. SAAL:  My position would be that it's a police

7    report, Your Honor.  It contains hearsay.  It's a regular

8    business document.

9            THE COURT:  I'll leave it in.

10           MR. KIEFFER:  Pages 120 --

11           THE COURT:  He said he didn't have any objection to

12   that.

13           MR. KIEFFER:  No -- not on -- oh, yeah, he took care

14   of 120.  I'm sorry.  Pages 122 and 123, which are

15   calculations, are fine, as is the top of 124, continuing

16   calculation.

17           The bottom narrative part contains opinions and

18   editorial about, for example, "Judging distance to a vehicle

19   traveling ahead in the same direction at night presents a

20   somewhat difficult problem." Kind of an opinion and narrative

21   the officer didn't testify to at all.  He only testified to

22   those equations.

23           MR. SAAL:  I believe there was testimony as to

24   closing speed of the vehicles approaching the truck, from

25   Corporal Schmit during his -- there's also similar testimony.

PROCEEDINGS

```
 1              MR. KIEFFER:  Not -- not in the sense of how it's
 2   described here as presenting a difficult problem.
 3              THE COURT:  It's fine.
 4              MR. KIEFFER:  And then 181, with the redactions, is
 5   acceptable; and 264, which is the D Deck readout, there's no
 6   objection to that.
 7              THE COURT:  You make some additional redactions.
 8              MR. SAAL:  Yes, Your Honor.
 9              MR. KIEFFER:  Thank you.
10              MR. SAAL:  No problem.  As Exhibit One.  And then
11   there were a additional photographs with Exhibit Two that
12   plaintiff's counsel had no objection.  I'm going to prepare to
13   file them.  They were not in evidence.
14              MR. KIEFFER:  The photos?
15              MR. SAAL:  Yeah, the photos.
16              MR. BARMEN:  Are we -- are we the exhibits done?
17              MR. SAAL:  The exhibit are done, and they are
18   admitted with redactions.
19              MR. BARMEN:  Your Honor, based on that, at this time
20   the defense rests.  Presumably, Mr. Shaub has something to
21   address and it's not Valentino.
22              THE COURT:  I guess you're going to reiterate your
23   --
24              MR. SHAUB:  Yes, Your Honor, just briefly.
25              THE COURT:  Where are you guys getting that every
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1   single time you have to make an objection or it's not

 2   preserved?

 3           MR. SHAUB:  We just do it as judgment as a matter of

 4   law.  So we want to make sure it's done at the end of the

 5   plaintiff's case and it's done at the end of the defendants'

 6   case.

 7           So, again, we're just renewing our motion under Rule

 8   50(a) for judgment as a matter of law on the grounds that any

 9   award of punitive damages in this case would be successive to

10   the verdict in Pennsylvania and Ohio and violate defendants'

11   due process rights.

12           And we renew our opposition to the application of

13   offensive collateral estoppel in this cases; and, again,

14   that's based on the explanation stated on the record on Friday

15   and the memorandum filed at Docket Entry 219-4.

16           THE COURT:  Denied.

17           (Discussion between counsel; off the record.)

18           THE COURT:  You're ready to go with that Smith

19   transcript?

20           MR. MCELFISH:  Ready to go.

21           THE COURT:  All right.  Bring the jury back.

22           (Jury enters.)

23           THE COURT:  You may be seated.

24           Mr. Barmen, do you have any further witnesses?

25           MR. BARMEN:  We do not, Your Honor.
```

DEPOSITION OF COLONEL SMITH

1          At this time the defense rests.

2          THE COURT:  Okay.  Ladies and gentlemen, we now have

3    what we're going to call the rebuttal case from the plaintiff,

4    which will consist of testimony from two witnesses, one of

5    whom we already heard from.  That's Mr. Smith.  We'll read in

6    some of his testimony from the Pennsylvania trial, if I'm not

7    mistaken.

8          Who's going to do the read-in?

9          MR. SAAL:  I'll be answering, Your Honor.

10         THE COURT:  Okay.

11         MR. MCELFISH:  Judge, we don't have introduction

12   question and answer; but you've stated it's Colonel Smith.  So

13   we'll pick it up with just the first question and answer.

14         THE COURT:  Go ahead.

15         MR. MCELFISH:  Ready, Colonel Smith?

16         MR. SAAL:  Yes, sir.

17         MR. MCELFISH:  Okay.  Just to get started, page 23,

18   line 13.

19         You mentioned --

20         Do you want question and answer, Judge?

21         THE COURT:  It's easier to take it down when you do

22   that.  Yes, please.

23         MR. MCELFISH:  Okay.

24   BY MR. MCELFISH:

25   Q    You mentioned GPS in your last answer.  Is there any GPS

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1    evidence in this case that you reviewed?

2    A    We do.  There's also a K Deck system.  I don't know what

3    K Deck stands for.  It may just actually be his name.  It's a

4    GPS system, not unique per se, if you have Garmin or other

5    types of GPS's.  GPS technology is really pretty simple.  They

6    may have slightly different software on how they manage the

7    data, but how they collect the data and determine positions is

8    all the same.

9    Q    What vehicle in this crash was equipped with the

10   technology discussed:  The K Deck and the D Deck?

11   A    That was the Greyhound bus had those.

12            MR. MCELFISH:  Page 27, line 18.

13   BY MR. MCELFISH:

14   Q    You mentioned certain depositions of police officers.

15   You reviewed them.

16   A    I did.

17   Q    Anything we need to discuss foundationally at this point

18   with respect to those depositions?

19   A    Just the methodology wasn't valid.

20   Q    Was not what?

21   A    Valid.

22   Q    Okay.  Putting methodology aside, we'll get to some

23   opinions later.  Just foundationally, is there anything you

24   took from the depositions or the police investigation

25   foundationally that you then utilize when you're

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1  reconstructing or investigating the crash?

2  A    Well, they found that the lights were out on the

3  vehicles.  I can see the lights are on the vehicles.

4          MR. MCELFISH:  Page 40, line 2.

5  BY MR. MCELFISH:

6  Q    I want to discuss briefly hazard lights with you.

7  A    Sure.

8  Q    There's some information in the police file that the

9  hazard lights, the switch didn't work.

10         Did you take a look at that?

11  A    I saw that, yes.

12  Q    Any opinion?

13  A    Well, the hazard lights, we don't know why they're not

14  working.  In collision, things stop working all the time.  I

15  don't know if a cable came loose.  I don't know any of those

16  things.  So all I can say from an engineering standpoint is

17  that they were reported not to work after the collision.

18  However, that truck, there was no need for it to have hazard

19  lights on -- have hazards lights on.

20         MR. MCELFISH:  Go to line 22.

21         I'll do the Court.

22         "THE COURT:  State the reason for that opinion.

23         "THE WITNESS:  It was moving at least -- it was

24  moving at at least 43 miles an hour and from my review of the

25  police investigation and the applicable parts of Pennsylvania

DEPOSITION OF COLONEL SMITH

1    Rules of the Road, this vehicle is not required to have hazard

2    lights on at 43 miles an hour."

3             MR. MCELFISH:  Page 41, line 7.

4    BY MR. MCELFISH:

5    Q    And just to be clear, would that point, the opinion that

6    you're -- the opinion you're going to provide to this jury in

7    a few moment as 43 miles an hour --

8    A    Yes.

9    Q    -- based on that speed, was Mr. Gubica required to have

10   his hazard lights on at the time of the crash?

11   A    I don't believe he was.

12             MR. MCELFISH:  Page 48, line 19.

13   BY MR. MCELFISH:

14   Q    The opinion that the bus is moving to the right at the

15   time of impact, is that consistent with the GPS data in this

16   case, the K Deck?

17   A    It is.  How do I want to say this?  K Deck doesn't give

18   us exact positions.  It gives us general positions; and, yes,

19   it's consistent with the movement.

20   Q    Consistent generally with the movement.

21   A    Consistent generally with the movement.

22   Q    That movement --

23   A    Yes.

24   Q    -- before a crash is consistent with the GPS?

25   A    Correct.

DEPOSITION OF COLONEL SMITH

1  Q    And, again, the movement is towards the right.

2  A    Correct.

3        MR. MCELFISH:  Going over to page 57, line 2.

4  BY MR. MCELFISH:

5  Q    Okay.  I want to talk a little bit next about -- you can

6  take that down -- about the tarping of the Gubica truck.

7        MR. MCELFISH:  Question, line 22.

8  BY MR. MCELFISH:

9  Q    Did you have an opportunity to analyze the movements of

10  the loads in relation to the crash?

11        MR. MCELFISH:  Going to page 58, line 3.

12  Q    And --

13        MR. SAAL:  No, there's -- it wasn't ...

14        "THE WITNESS:  Yes, I did."

15        MR. MCELFISH:  Oh, sorry.  Okay.

16  BY MR. MCELFISH:

17  Q    Okay.  And what is your opinion?

18  A    Well, based on the laws of physics, specifically Newton's

19  first law, the load had to shift on impact; and the physical

20  evidence supports that.

21  Q    Now, let's pull up P159-144.

22        MR. MCELFISH:  And coming out of the transcript,

23  Judge, Mr. Barmen and I have an agreement that 144 -- 159-144

24  will be admitted and I'm going to publish.

25        Large screens.

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1          MR. BARMEN:  We do have that agreement, Your Honor.

2          THE COURT:  All right.

3          (Publishes exhibit to the jury.)

4          MR. MCELFISH:  Going to page 58, line 14.

5   BY MR. MCELFISH:

6   Q    I want you to let the jury know whether the load shown in

7   this photograph is consistent with the shifting opinion you

8   just provided.  And, if so, how is it consistent?

9   A    Well, right above the tire that we've already talked

10  about, you can see that the straps are angled; and if we're

11  looking at the photograph on the other side, you can see

12  they're angled on the other side.  Well, that's not how you

13  strap a truck.  They should go straight up and down across.

14  It would actually take some significant effort to get the

15  straps to do that but on impact, what occurs -- do you want me

16  to explain Newton's first law?

17  Q    Yeah.  Do you want to use -- if you have some sort of

18  demonstrative or the bus or something, just the idea of --

19  A    Sir Isaac Newton published three laws of motion over 300

20  years ago, and they explain how we interact with the world.

21          And his first law of motion says that an object at

22  rest remains at rest, unless acted upon by an outside force;

23  and an object in motion remains in position, unless acted upon

24  by an outside force.

25          All that means is that my calculator is sitting

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1    here.  It's not going to fly across the room.  If I want it to

2    move, I have to apply a force to it.  Similarly, once it

3    starts moving, it's going to keep moving until a force is

4    applied.  Now that force could be the friction of the roadway.

5    That could do it.

6            Well, the same thing is going to explain what's

7    going to happen to the trash on the truck.  Originally, the

8    trash is at rest on the trailer relative to it.  They're both

9    moving down the highway, but they're at rest.  So, when we hit

10   the trailer, we can set that the trash is going to move

11   backwards.  In reality, the trash is trying to stay put as the

12   trailer is being moved out from underneath it.  Well, that's

13   what happened here.

14           Also, the trash attempted to remain where it was as

15   the trailer was shoved out from underneath it; and that caused

16   what we see in the straps.  That's why they're aligned like

17   that now.

18   Q    If I'm understanding this right, all you're saying and

19   explaining to the jury is at impact the truck went forward and

20   its load went backwards?

21           "THE COURT:  I believe he said it stayed.

22           "THE WITNESS:  It tried to stay put."

23   Q    Right.

24   A    The truck moved forward faster.  The load, the result is

25   that the load goes rearward.

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1    Q      Okay.

2    A      Relative to it.

3              "THE COURT:  Relative to the base of the truck?

4              "THE WITNESS:  Correct.  Relative to the flatbed."

5    Q      And the condition of that load is consistent with your

6    opinion in that regard?

7    A      Absolutely.

8              MR. MCELFISH:  Going over to page 69, line 8.

9    BY MR. MCELFISH:

10   Q      Let's separate them.  Let's start with the bus driver,

11   Ms. Anderson.

12   A      The D Deck shows brake application at one second

13   post-impact.  It's not quite that accurate, but it does show

14   the brake coming on.  It shows cruise control coming off.  It

15   shows brake coming on.  It shows the clutch being disengaged.

16   No, it's not a clutch you push on.  It's still a clutch with

17   the vehicle.

18              So it shows these things occurring all right about

19   time on the D-Deck time zero, which would be the collision,

20   around the collision point.  It takes time for the system to

21   read those values.  It doesn't do it instantaneously.  So you

22   can have some variation.

23              And the other problem is we deal with one-second

24   increments.  So if it says the brake lights at one second,

25   well, is that actually .3 or 1.4?  That wasn't going to be

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1    exactly one second.  It's a snapshot in time.  So, when you do

2    those things, the brakes are coming on sometime around the

3    time of the actual impact.

4    Q    Do you have an opinion in relation to this crash as to

5    when Ms. Anderson applied the brakes?

6    A    It's going to be around the time of impact, maybe a

7    little bit after, maybe a little bit before, but around the

8    time of impact.

9              MR. MCELFISH:  Going to page 75, line 14.

10   BY MR. MCELFISH:

11   Q    Can you take the jury through what you did in this case

12   with respect --

13   A    Sure.

14   Q    -- to analyzing the damage?

15   A    Well, many of us have heard that energy can neither be

16   created nor destroyed.  That actually comes from what's known

17   as the first law of thermodynamics; but the way you can think

18   of it the energy that comes into the collision, we now have to

19   account for that in the collision.  So for kinetic, the energy

20   that comes into the collisions is possessed by the two

21   vehicles; and it's known as kinetic energy.  It's one half

22   their mass multiplied by the velocity squared.  The faster

23   you're going, the more energy you have.  That energy is going

24   to go one of four primary places.

25              It also goes into noise and heat, but we can really

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1    ignore those.  They're too small to worry about.

2              So on impact the two vehicles are stuck together,

3    and they still have kinetic energy.  The Gubica vehicle has

4    been sped up.  So it has more kinetic energy.  The Anderson

5    bus has been slowed down.  So it has less kinetic energy.  But

6    they have kinetic energy.

7              Then you have the energy that goes into damaging the

8    bus.  Then you have energy that goes into damaging the

9    trailer.  In order to absorb energy, you have to do what's

10   known as plastic deformation.  You have to bend it out,

11   something out of shape.  You have to break something.  You

12   have to do something to do damage in this type of collision to

13   absorb energy.

14             So then what I did is I went to the National Highway

15   Traffic Safety Administration, and there are a lot of crash

16   tests out there.  There's just not a lot of crash tests on

17   buses.  In fact, I think there are only four of them of this

18   bus that have been tested by the U.S. Government.  Two were

19   into a barrier, solid wall; and two were rollovers.  So I

20   looked at the damage in the wrecks.  Now, I use a lower speed

21   test.

22             I did review what Mr. Minchin did.  He used higher

23   speed test, but we came out with almost -- came out with very

24   similar answers.  So I looked at the damage on that, and then

25   I had to scale the damage to our collision.  So I know the

DEPOSITION OF COLONEL SMITH

```
 1   speed of the bus into the barrier when the Department of
 2   Transportation did it, and I knew how much it weighs because
 3   the Department of Transportation told us that.  So I know how
 4   much energy is present.
 5             So now I scale that energy for our collision because
 6   our damage doesn't go all across the front.  So when I scale
 7   it for our collision, I get closing speed of the vehicles of
 8   25 miles an hour.  That's the damage you'd expect under any
 9   condition when the two vehicles moving are 25 miles-an-hour
10   difference in speed.  That's conservative.  It could be a
11   little bit less because I kept bumping up energy.  I bumped up
12   some of the energy values to give the benefit of the doubt to
13   Ms. Anderson, but it's no more than a 25 mile-an-hour
14   differential.
15             So now we have mister -- Ms. Anderson at 67.7.
16   We'll say 68.  We have a 25 mile-an-hour differential.  You
17   subtract that; and now you have him at 43, the Gubica vehicle
18   at 43.
19             MR. MCELFISH:  Page 87, line 15.
20   BY MR. MCELFISH:
21   Q    And you talk about a closing speed of 25, but I just want
22   to make sure we're clear what did you -- what you did and what
23   it is in your opinion as to speed of the truck.  So based on
24   the energy analysis you did, which included comparisons to the
25   crash data, that the Federal Government did --
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1    A      Right.

2    Q      -- the calculations you ran, the momentum issues you

3    analyzed vis-a-vis a coefficient of friction, do you have an

4    opinion as to all of that work as to the speed of Gubica's

5    truck at the time of this crash?

6    A      Yes.  The Gubica vehicle was doing at least 43 miles an

7    hour.  It wasn't doing 60, 44 sure, but at least 43.

8    Q      I want to talk a little bit now about K Deck.  We

9    referenced it a few times generally.  In this case did you

10   have an opportunity to look at the K Deck data and map it for

11   this crash?

12   A      I did.

13   Q      And can you explain how it works, if you have haven't

14   already, with the number of satellites?  I don't want you to

15   take too much time because we've been over here for sometime

16   already, but I need you to orient the jury what K Deck is and

17   what you did in relation to determining whether the data we

18   have from K Deck is consistent for this crash.

19   A      Well, just briefly, to explain how GPS works, there's a

20   constellation of satellites and the satellite knows where it

21   is and it sends out a signal of two different modulations

22   typically that your receiver picks up in your car or your boat

23   or whatever and it picks it up and it knows how far it is from

24   the satellite.

25          So with one satellite you know how far you are from

DEPOSITION OF COLONEL SMITH

1    the satellite.  So you can picture it forming a ball around

2    the satellite.  You're somewhere on that ball.

3              With a second satellite, you have another ball where

4    they incept.  You kind of have a circle.

5              With a third satellite where they intersect, you now

6    have two points on that circle where you could be.

7              And then with the fourth satellite, you have what is

8    called a unique position; but there's still associated with

9    it.

10             So as you kick in more satellites -- five, six,

11   seven, eight, nine -- your accuracy increases proportionally

12   with that.  So what you want to do, mapping K Deck data, is

13   you want to make sure that it's consistent.  Does it match?

14             First of all, are there enough satellites?  If they

15   only have four satellites, you have a lot of air associated

16   with it; but in this case, there were enough satellites up at

17   that time.

18   Q    How many?

19   A    It varied.  They are always coming up and going down, but

20   I believe it was seven to nine is how it was varied.

21   Q    From an accuracy standpoint, what does seven to nine tell

22   you?

23   A    That gives you enough accuracy.

24   Q    Okay.

25   A    So then you can map it onto a roadway and see.  Make sure

DEPOSITION OF COLONEL SMITH

1   it follows the roadways.  Now sometimes you'll get a spurious

2   point where the path is suddenly in the middle of a lake.

3   Well, you know those aren't right.  You can get rid of those.

4   You look to see if the path follows the roadway; and if it

5   does, now you've validated that affix.  Now you can start

6   looking at the movement of the vehicle within the lanes.

7           So, for instance, it's not accurate enough to show

8   you exactly when a vehicle crosses a fog light; but it will

9   show you the vehicle as it's going right and left.  It will

10  show you that.

11          So that's how we used, I used the K Deck data and

12  mapped it to -- you map it to Google Earth imagery and run it

13  that way.

14  Q    And did you rely at least in part on the K Deck data in

15  coming to some of your opinions in this case?

16  A    I did.

17  Q    Am I correct in looking at K Deck you're looking for

18  trends, trends and movement?

19  A    Trends and movement, not exact points.

20  Q    Explain to the jury what you mean by that.  Are you going

21  to say the bus was right there at this particular point in

22  time?

23  A    No, because there's still error associated with it.  You

24  can see it's a straight line.  You can see it's straight lines

25  when the bus is following straight lines, and you can see

DEPOSITION OF COLONEL SMITH

```
 1   where the bus is coming left and right.  Sometimes when you
 2   map it, it goes onto -- crosses the fog light.  I can't say
 3   that's exactly where it crossed the fog light.  It's not that
 4   accurate.  You can look at it for trends, showing, yes, the
 5   bus is going left and right, moving back and forth.
 6   Q    You can see movement relative to straight?
 7   A    Correct.
 8   Q    To be clear, you mapped the K Deck data in this case?
 9   A    Correct.  I mapped it, and other people mapped it.  They
10   were all consistent.
11   Q    And you found it to be accurate?
12   A    Yes.
13              MR. MCELFISH:  Page 92, line 20.
14   BY MR. MCELFISH:
15   Q    Start off when we see it.  Just orient the jury what
16   we're looking at when we're doing -- how the bus is displayed,
17   what types of things we're looking for vis-a-vis this data.
18   Start there.  What are you seeing?
19   A    K Deck, well, GPS will give you latitude and longitude.
20   That's what happened on Google Earth.
21   Q    So what is this line we're seeing?
22   A    So the line is the path reported for the bus.  Obviously,
23   those vehicles weren't there.  Those are the vehicles that
24   were there when Google Earth took the photo.
25   Q    This is showing us the bus?
```

DEPOSITION OF COLONEL SMITH

```
 1   A    Correct.  It's showing on the left side of the lane.

     It's not that accurate.

 3   Q    We talked about looking for trends.

 4            What are we looking for?

 5   A    We're looking for places where it might go left or right,

 6   shift left or right.

 7   Q    We're about 7 miles before the crash; is that right?

 8   A    Yes.

 9   Q    Okay.

10   A    Now, you cannot use bridges.  You can see right there the

11   bridges are kind of wavy looking.  Bridges just don't map well

12   on Google, Google Earth.

13            MR. MCELFISH:  Going to page 27 in the afternoon

14   session.

15            MR. SAAL:  We have designations starting on page 23.

16            MR. MCELFISH:  Okay.  Page 23, line 12.

17            Well, let's go to line 10.

18   Q    Bear with me.  I will jump around a little bit.  I will

19   try to get through this as quick as I can.  Accident

20   reconstruction is collecting available data and applying it to

21   the principals of mathematics, physics, and engineering,

22   right?

23   A    Correct.

24   Q    And sometimes you can determine what happens; and

25   sometimes you can't, right?
```

DEPOSITION OF COLONEL SMITH

1   A    That's correct.

2   Q    Sometimes you can only determine what might have

3   happened.

4   A    Correct.

5   Q    And two different people, two different qualified

6   accident reconstructionists can look at something and come up

7   with different opinions, right?

8   A    Of course.

9   Q    You agree that accident reconstruction though generally

10  does not involve higher-level math or physics, don't you?

11  A    I'm not sure how you mean that.  It's derived from

12  calculus, but you don't have to do calculus normally to do it.

13  Q    The math is really pretty simple when you come down to

14  it, isn't it?

15  A    Most of it is.

16          MR. MCELFISH:  Page 24, line 24.

17  BY MR. MCELFISH:

18  Q    Now you did testify that K Deck is not accurate enough to

19  be able to pinpoint the bus's exact location at any one point,

20  right?

21  A    Correct.  It's crossing the fog line.  Can't do that.

22  Q    You know from doing this with me once before that there

23  are times in that video where, if it were accurate, it would

24  show the bus on the guardrail, right?

25  A    I don't remember seeing it on a guardrail.  It would

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
 1    certainly be on the shoulder.

 2    Q    That's fair.  You can't determine whether the line goes

 3    over the shoulder, the bus is actually on the shoulder at that

 4    point in time.  What you're looking for is trend.

 5    A    Correct.

 6              MR. MCELFISH:  Page 26, line 4.

 7    BY MR. MCELFISH:

 8    Q    Now, in addition to looking at some data in this case,

 9    you reviewed the police report, right, Pennsylvania state

10    police report?

11    A    Yes, sir.

12    Q    I think you set on direct it was 230 pages.  Would it

13    surprise you to remember that it's actually 375 pages?

14    A    Doesn't surprise me at all.  It's gigantic.

15    Q    You reviewed the whole thing right?

16    A    Yes, sir.

17    Q    You took their findings into consideration in your work

18    in this case, right?

19    A    Yes.

20    Q    Obviously, you disagree with the findings of

21    Corporal Schmit, the Pennsylvania state police accident

22    reconstructionist who determined that the Guyana truck was

23    going 16 miles an hour at impact, correct?

24    A    I do disagree with that.

25              MR. MCELFISH:  Now I think we're at 27, line 7.
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
 1   BY MR. MCELFISH:

 2   Q    In disagreeing with Corporal Schmit and his determination

 3   that the Gubica truck was going 16 miles an hour, you felt

 4   like his investigation was incomplete, correct?

 5   A    He didn't reconstruct the collision.

 6   Q    For the reasons we testified on direct, right?  He didn't

 7   take into consideration the crush energy and the various other

 8   variables that you do, right?

 9   A    Correct.

10        MR. MCELFISH:  Page 28, line 19.

11   BY MR. MCELFISH:

12   Q    Before we get into some other specifics and D Deck and K

13   Deck and the calculations that he did, I want to talk about

14   some generalities.

15        You reviewed the statements in the police report,

16   right?

17   A    Yes.

18   Q    You reviewed statements of various passengers, correct?

19   A    Yes.

20   Q    Most were sleeping, but a few were awake.

21   A    Right.

22   Q    You reviewed statements of witness James Evans who had

23   already testified before this jury, right?

24   A    I did.

25   Q    You reviewed the testimony of Mr. John Black who will
```

DEPOSITION OF COLONEL SMITH

```
 1  testify in a few weeks right?
 2  A    Testimony and statements.
 3  Q    You know that Mr. Blatt was the last person to see the
 4  Greyhound bus prior to impact right?
 5  A    Correct.  The last person who stopped, correct.
 6  Q    No.  He was really the last person that actually saw the
 7  Greyhound bus prior to impact.  True?
 8  A    No.  I don't think that's true.
 9  Q    Who else do you think saw it after Mr. Blatt?
10  A    Mr. Blatt said there was another car present that left
11  the scene.
12  Q    That's absolutely right.
13            And you're a hundred percent accurate.  We don't
14  know who that person was, correct?
15  A    Right.
16  Q    Mr. Blatt is the last person that the jury will hear from
17  that actually saw that bus before the impact, right?
18  A    I think that's correct.
19  Q    Because Mr. Evans lost sight of it when it passed Mr.
20  Blatt, correct?
21  A    Correct.  Lost sight of it, certainly.
22  Q    You have saw Mr. Blatt's testimony.  You've seen his
23  statements where he said the bus made a courteous pass of him,
24  right?
25  A    Yes.
```

DEPOSITION OF COLONEL SMITH

```
 1   Q    The bus passed him on the left-hand side when Mr. Blatt
 2   was going approximately 62 miles an hour based on how his
 3   yellow truck was governed, correct?
 4   A    I don't recall the exact 62, but that's generally
 5   correct.
 6   Q    He estimated the speed of the Greyhound bus when she was
 7   passing was between 65 and 70, correct?
 8   A    That sounds familiar, yes, sir.
 9   Q    Which we know, relying on the K Deck or the D Deck, is
10   accurate.
11   A    Correct.
12   Q    He said the bus got a certain distance ahead of him; and
13   he flashed his lights, correct?
14   A    Again, I don't have it memorized.  That's sounds
15   familiar.
16   Q    He also said that the bus then activated its right turn
17   signal.
18   A    Yes.
19   Q    And made a courteous pass and continued down the road.
20   A    You mean a lane change.
21   Q    After making the pass, correct, made a lane change and
22   continued down the road?
23   A    Yes, that's how I understood his testimony.
24   Q    Mr. Blatt had saw the Greyhound bus from the time it
25   passed him until the time of impact, right?
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1   A    I think that's correct.

2   Q    He said he never saw anything unusual.  He never saw any

3   weaving, never saw any drifting, right?

4   A    That's correct.

5   Q    You mentioned in your reports I think you said on

6   direct -- please, correct me if I'm wrong -- that Mr. Blatt

7   also said he saw the back of the bus jump when the impact

8   occurred and he initially thought it hit a herd of deer,

9   right?

10  A    He saw the back end jump.  Originally thought it was a

11  deer.  Originally he saw the tires, but later on he said he

12  didn't see the tires.  He saw the back of it.

13  Q    The sworn testimony the last time around was the lights

14  went up; but he can't say whether the tires ever came off the

15  ground, right?

16  A    Correct.

17          MR. MCELFISH:  Page 33, line 3.

18  BY MR. MCELFISH:

19  Q    He testified on direct that at 43 miles an hour, based on

20  your understanding, Mr. Gubica does not have to have his

21  hazard lights on under Pennsylvania law, true?

22  A    That's what I understood.

23  Q    Under 40, he would, would he not?

24  A    I don't know that.

25  Q    How do you know he didn't have to have them on at 42?

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1  A    When I reviewed the trooper deposition, they said that

2  the higher speeds he would not need to.  I don't recall

3  specifically at what speed he was required to do it.

4  Q    So you don't know, if he was going 35 at any point in

5  time, that he would need to put his hazards on.

6  A    I don't know it off the top of my head.

7  Q    All you know, when you inspected that truck

8  post-accident, the switch for the hazards was not --

9  non-functioning.

10 A    The police officer investigated the switch, and he said

11 it was not working.  I did not investigate.  I did not inspect

12 the truck.

13 Q    I apologize.  You inspected the bus but not the truck.

14      You're relying on the police for the hazard switch,

15 right?

16 A    Correct.  They're the only ones that said it didn't work.

17 Q    Now you said in your reports, again on direct, it's your

18 opinion that an attentive driver would have seen, perceived,

19 and avoided the bus, the truck, correct?

20 A    You're right.

21 Q    You agree with me, because of what Mr. Blatt testified to

22 and what he will tell this jury about with the courteous pass

23 and the turning signal, that is not a driver who is out of

24 control, correct?

25 A    Correct.  At that moment in time he describes the driver

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1   in control.

2   Q     That is not a driver who is being in any way reckless,

3   correct?

4   A     He does not describe it being reckless.

5   Q     At any point in timeframe as she passes him until the

6   accident happens, according to Mr. Blatt, she is in control

7   and driving reasonably and safely, right?

8          "THE COURT:  Is that what you understood from

9   reviewing the testimony in this case?

10         "THE WITNESS:  Not precisely that.  He did say she

11  passed courteously.  She gets further ahead where he's not in

12  a position to see precisely what is going on."

13  BY MR. MCELFISH:

14  Q     That's not true, sir.  He testified earlier very clearly

15  he saw her from the moment she passed until the point of

16  impact.  He didn't see anything out of ordinary, right?

17         "THE COURT:  Do you recall that testimony?

18         "THE WITNESS:  I don't recall that specific

19  testimony."

20         MR. MCELFISH:  Page 36, line 9.

21  BY MR. MCELFISH:

22  Q     This was while there's a slight bend at one point in the

23  road.  This was essentially a straight stretch of the road,

24  right?

25  A     Effectively straight.

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
 1              MR. MCELFISH:  Line 20 -- sorry.  Line 20.
 2    BY MR. MCELFISH:
 3    Q    Mr. Blatt testified he never saw the truck, the Gubica
 4    truck, right?
 5    A    I think that's correct.
 6    Q    Mr. Evans testified he never saw the Gubica truck right
 7    after Mount Pocono.
 8    A    Yes, after Mount Pocono, he did not see it again until at
 9    rest.
10    Q    In fact, there is nobody that can testify they saw the
11    Gubica truck after Mr. Evans saw it at Mount Pocono and prior
12    to the accident, correct?
13    A    Nobody reports seeing it.
14              MR. MCELFISH:  Line 21.
15    BY MR. MCELFISH:
16    Q    Suffice to say, you haven't seen anything from anybody
17    indicating that they actually saw what they claim to be
18    Mr. Gubica's truck from the time Mr. Evans passed it on Mount
19    Pocono until the time of impact in this case, right?
20    A    I haven't seen any testimony about that.
21              MR. MCELFISH:  Page 38, line 19.
22    BY MR. MCELFISH:
23    Q    And up to at the top in the left-hand corner where it
24    says minus 059, that's 59 seconds before impact, correct?
25    A    Approximately.  We don't know the exact moment of impact.
```

DEPOSITION OF COLONEL SMITH

```
1   That's how D Deck records it.

2   Q     It records it in one-second intervals.

3   A     Correct.

4   Q     This demonstrates that from 59:29 seconds on this page

5   you've got the bus going essentially between 65.5 and 68 miles

6   an hour with a cruise control indication on, correct?

7   A     No.  There is some at 64 miles at 42 seconds.

8   Q     You're right.  From 42, 64 on the low to a high of 68

9   with the cruise control on, correct?

10  A     Can you say that again.

11  Q     On this page it indicates you got this bus going various

12  speeds in this essentially 40-second period from a low of 64.5

13  to a high of 68 miles an hour, right?

14  A     64.0.

15  Q     You're right.  64.0 to 68.

16  A     Yes.

17  Q     And it indicates in the cruise line that the cruise is on

18  the entire time.

19  A     Correct.

20  Q     Do you attribute the variation in the speed of 4 miles an

21  hour to a change in grade that you are going uphill or

22  downhill?

23  A     You said grade?

24  Q     Yes.

25  A     Grade is the most common cause of that.
```

DEPOSITION OF COLONEL SMITH

```
 1   Q     Is the most ...
 2   A     Is.
 3   Q     When you see here at 65 at the top of the page and 68
 4   towards the bottom of the page, you can assume at some point
 5   she went uphill where she gets at 64 and starts going
 6   downgrade.
 7   A     Correct.  D Deck can be off more than the range you're
 8   talking about.
 9   Q     When that -- then when we -- of course, this indicates no
10   brakes on the front page, no clutch on the front page, and the
11   engine load is a hundred percent up until 26 seconds, right,
12   the engine load?
13   A     Yes.
14   Q     Does the engine load indicate that she is now going
15   downhill because it's -- the engine loaded is going down and
16   the speed is going up?
17   A     Well, that's certainly -- that certainly is a
18   possibility.  We have to map the time and space to see if
19   that's what is going on.
20   Q     You never did that?
21   A     But we still have to keep in mind that D Deck is not as
22   accurate as these values.
23         MR. MCELFISH:  41, page 41, line 9.
24   BY MR. MCELFISH:
25   Q     And then the next column to the right we have vehicle
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
 1   speed, right?
 2   A     So, the second column is the speed.
 3   Q     The third column is RPM, right, engine speed?
 4   A     Engine speed.
 5              MR. MCELFISH:  Page 42, line 12.
 6   BY MR. MCELFISH:
 7   Q     Under the column that says "zero" across, you still have
 8   a speed at 67 miles an hour, right?
 9   A     Not still.  It's dropped from 67.5 to 67.
10   Q     That's fair.  You have a speed at 67 miles an hour.
11   You're going upgrade at that point.  I think you said
12   2.4 percent, right?
13   A     Well, yes, but all the 67.5 is a similar grade.  That's
14   not a grade difference.
15   Q     At zero, you have the bus at 67 miles an hour.
16   A     Yes, sir.
17   Q     You have the RPM 1352, correct?
18   A     Yes.
19   Q     Both brake and clutch still reading zero, correct?
20   A     Yes.
21   Q     You still have engine load at 100, right?
22   A     Yes.
23   Q     You got a throttle spike to .8 percent where it's zero
24   all the way prior to that and on the last page.
25              MR. MCELFISH:  Going over to -- I believe there's an
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1   answer there on line 9, page 43.

2          "THE WITNESS:  Correct."

3          MR. MCELFISH:  Okay.  Page 47, line 11.

4   BY MR. MCELFISH:

5   Q    You were retained in this case, sir, within two months of

6   the accident, right?

7   A    It was in early 2014.

8   Q    So the accident happened in the second week of October of

9   '13, so maybe three months after the accident?

10  A    Four or five, I would think.

11         MR. MCELFISH:  Page 48, line 25.

12  BY MR. MCELFISH:

13  Q    Your position is the relevant speed, the differential

14  speed between the bus and the truck at impact was

15  approximately 25 miles an hour.

16  A    Twenty-five miles or less.

17  Q    Which is where you get the 43 miles an hour roughly for

18  Mr. Gubica.

19  A    Correct.

20         MR. MCELFISH:  Page 58, line 17.

21  BY MR. MCELFISH:

22  Q    You know the left side of the bus actually bowed because

23  of the force of the impact.

24  A    Yes, I saw a picture of that.

25  Q    The bus actually bowed out to the left as part of the

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1   impact, right?

2   A    Correct.  That's not the picture I was shown; but there

3   was some bowing to the exterior, which allowed the window to

4   open, which allowed the ejection.

5   Q    But the point is the force was significant enough to

6   actually bow the bus to the point where a window popped out.

7   A    Open.

8   Q    Yes?

9   A    Yes.

10  Q    You also know, sir, that the right front tire of the bus

11  and the axle were displaced nearly 3 feet rearward, correct?

12  A    Correct.

13  Q    And the bed of the trailer didn't hit the axle of the

14  bus, right?

15  A    Correct.

16  Q    And that was because of the force of the impact.

17  A    Right.  From the tires.

18        MR. MCELFISH:  Page 62, line 13 -- 14.

19  BY MR. MCELFISH:

20  Q    Obviously this is post-accident and prior to the vehicles

21  being separated.

22  A    That's correct.

23  Q    You can't tell from this picture whether or not the load

24  is actually shifted beyond the end of the bed of the trailer.

25        MR. MCELFISH:  And I believe we're back on this

DEPOSITION OF COLONEL SMITH

1   picture according to transcript.  So let me start over there.

2   BY MR. MCELFISH:

3   Q    You can't tell from this picture whether or not the load

4   is actually shifted beyond the end of the bed of the trailer,

5   can you?

6   A    It looks like the load itself has shifted beyond the end

7   of the trailer.

8   Q    What I'm saying, sir, you can't actually tell the

9   material on the back of that truck shifted so much that it

10  actually -- that it's actually overhanging the back of the

11  trailer.  Does that make sense?

12  A    From that photo I can't see if the pallets are off the

13  end of the trailer.

14  Q    Again, if we refer back to the last photo, Mr. Gossell's

15  photo after they were separated, you didn't see any overhang

16  of the actual material off the back of the trailer, right?

17          Do you recall that?

18  A    It's behind the tarp.  We'd have to move the tarp to see

19  it.

20  Q    Let's talk about the straps.  Correct me if I'm wrong but

21  I thought it was your position on direct examination that the

22  straps are -- straps angled towards the back is an indication

23  of load shifting.

24  A    Correct.

25  Q    Proper strapping should be straight up and down.

DEPOSITION OF COLONEL SMITH

1    A    Correct.

2    Q    But you have seen other photographs that indicate there

3    was straps that were going a different direction, right?

4    A    What are you referring to?

5    Q    Well, if you look over here to the left of this

6    photograph, you got one --

7              MR. MCELFISH:  Sorry.  Going over to page 64, line

8    16.

9    BY MR. MCELFISH:

10   Q    If you look over here to the left of this photograph, you

11   got one strap angling back like you talked about on direct.

12   A    Right.

13   Q    And yet you got another strap angling forward.

14   A    Correct.

15   Q    Is that a result of shifting the load, or do you know if

16   that's how he tarped his load in the first place?

17   A    Obviously we can ask him that question.

18   Q    I'm asking you, sir.

19   A    Well, do I know if that's how he tarped it?  No, I don't,

20   I mean, you can see the load has certainly shifted.  There is

21   no doubt that the load has shifted.

22   Q    You have no idea how he strapped it, do you?

23   A    I don't know if the front strap was originally at an

24   angle.

25   Q    That's a "yes" to my question.  Yes, you don't know,

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

1   correct?

2   A     What?

3   Q     You don't know how he strapped it, yes or no?

4   A     I don't know how the front strap was angled but the back

5   straps.

6   Q     The front strap, just the strap that is further forward,

7   and then the back strap, right, not necessarily the front of

8   the truck.  That appears to be --

9   A     The one all the way to the left.

10        MR. MCELFISH:  And then this is 27833, which I

11   don't -- I'll take this down because I'm not sure if it's the

12   same.

13        Could you blow up from essentially the middle of the

14   trailer forward if there is a way to do that?

15   BY MR. MCELFISH:

16   Q     Sir, here you have another strap angled forward, not

17   back, right?

18   A     Isn't that the same one?

19   Q     No, because do you recall in the first picture -- we'll

20   put it back up -- you had both straps pretty close together?

21   Again, they're towards the back of the trailer, right?

22   A     Right.

23   Q     Do you see where it says "Municipal Waste" below it?

24   Back up.

25   A     Got you.

DEPOSITION OF COLONEL SMITH

```
 1              MR. MCELFISH:  All right.

 2              MR. SAAL:  There was more to that.

 3              MR. MCELFISH:  Sorry.

 4   BY MR. MCELFISH:

 5   Q    It's no the same strap, correct?

 6   A    Got you.

 7   Q    You got at least two straps angled forward, not back.

 8   A    That could be with the forward, with the angle forward,

 9   with the load though.

10   Q    That's normal tarping, after you told the jury on direct

11   it should be up and down?

12   A    For the back part, it has to be up and down.  You don't

13   want the tarp to come out and the trash to blow off.  This you

14   can put in the front if you want, if you choose to put it at

15   an angle, to keep the load from shifting forward to the cab

16   when you're braking.

17   Q    Again, you don't know, correct?

18   A    Which part?  You could certainly.

19   Q    You don't know if it was the result of the accident.  You

20   don't know if it's the typical way that Mr. Gubica tarped it.

21   You don't know.

22   A    Oh, that one I don't know, correct.

23   Q    The first one that is angled the other way, you don't

24   know that either.

25   A    Correct.
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
1    Q    Right?

2    A    Correct.

3    Q    I want to talk a little bit about the --

4         MR. MCELFISH:  Let's stop there, because we're

5    getting into something else.  It was mistakenly put in there.

6         MR. SAAL:  That's not an issue.

7         MR. MCELFISH:  Let's go to page 70, line 3.

8    BY MR. MCELFISH:

9    Q    So it's your position that everything in there is 100

10   percent accurate based on what you know?

11   A    I'm not sure if everything is perfect; but it was as

12   accurate as we could, to the best of our abilities.  Is it

13   possible you will find something that might be a little off?

14   Of course, you might be able to.

15   Q    I think when the K Deck mapping video was running, there

16   was some time that showed the bus on the right shoulder of the

17   right lane.

18   A    It did.

19   Q    Is there any testimony in this case that you're aware of,

20   of anybody saying that the bus hit the rumble strips on the

21   right side of the right lane?

22   A    I only -- I don't recall them saying which rumble strips

23   she hit.

24   Q    Mr. Evans says the rumble strips were hit on the left

25   side when the bus was passing in the left lane.
```

DEPOSITION OF COLONEL SMITH

1    A     Yes.

2    Q     Fnu Saifullah -- F-N-U, S-A-I-F-U-L-L-A-H -- testified

3    similarly to Mr. Evans.

4    A     I can't answer that.

5    Q     Assume he does.  Other than those two who testified, that

6    the rumble strip --

7    A     I don't recall the specifics of everybody's testimony.

8    They talk about it moving back and forth and the people

9    hearing the rumble strips, but I don't have it memorized.

10              MR. MCELFISH:  Page 71, line 14.

11   BY MR. MCELFISH:

12   Q     You have zero information to indicate that this bus ever

13   hit the rumble strips on the right side of the highway, the

14   north side of the right-hand lane, correct?

15   A     I thought some people talked about it going to the right

16   and hearing rumble strips, but I don't have it memorized.  I

17   thought people talked about that, but people's testimony is

18   people's testimony.

19   Q     You used some of those statements of testimony in

20   formulating your opinions though.

21   A     They talked about her weaving, her going back and forth.

22   That fits with what we saw with K Deck.  But I also said we

23   don't have precise positions.  If it went off of the right

24   side, it could have hit the rumble strips.  Absolutely could.

25   If it went off the left side, too, it could have hit the

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
 1   rumble strips.  Absolutely.

 2           MR. MCELFISH:  Page 77, line 13.

 3   BY MR. MCELFISH:

 4   Q    Mr. Barmen talked to you about the speed column and some

 5   fluctuation.

 6   A    Yes.

 7   Q    Does that mean cruise was on and off?

 8   A    No.  Probably the most likely thing is trains, and hills,

 9   and valleys.

10   Q    Does the speed calculation conflict that there is no

11   braking?

12   A    Correct.  There's no braking.  So you would not expect

13   she can accelerate without putting a code in; but if she

14   brakes, the code would come in.  The two things are not

15   inconsistent, right.

16   Q    There was a D Deck page that shows the 33.5 number that

17   Mr. Barmen was talking to you about at length.

18   A    Yes.

19           MR. MCELFISH:  Page 79, line 7.

20   BY MR. MCELFISH:

21   Q    Is there any dispute from in anybody in case that the

22   load did, in fact, shift at impact?

23           MR. SAAL:  "Answer" --

24           THE COURT:  It's just:  "Answer:  No."

25           MR. SAAL:  But there's a sustained objection to that
```

LISA SCHMID, CCR, RMR

DEPOSITION OF COLONEL SMITH

```
 1   question in the record.  (Hands document to The Court.)
 2            MR. MCELFISH:  I think the Court's indicating just
 3   it stops at the answer "no."
 4            THE COURT:  That's correct.
 5            MR. MCELFISH:  Can we do that again?  Line 7.
 6   BY MR. MCELFISH:
 7   Q    Is there any dispute from anybody in the case that the
 8   load did, in fact, shift at impact?
 9   A    No.
10            MR. MCELFISH:  Line 20.
11   BY MR. MCELFISH:
12   Q    We talked a little bit about K Deck.  The jury saw the
13   chart.  Are portions of that map inconsistent with your
14   opinions relating to the driver attentiveness?
15   A    Yes.
16            MR. MCELFISH:  Page 80, line 7.
17   BY MR. MCELFISH:
18   Q    You've talked to the jury about what he described as
19   seeing the lights jump or bounce.  I forgot the exact
20   terminology.
21            Do you remember that?
22   A    Yes.
23   Q    Specifically related to the wheels, would he be able to
24   see to wheels actually come off the ground from that distance?
25   A    No, it's too far away.  It's too dark.  He might be able
```

LISA SCHMID, CCR, RMR

```
 1   to see the lights move but not the wheels.
 2   (Continuing)
 3          MR. McELFISH:  And that concludes the testimony of
 4   Colonel Smith.
 5          THE COURT:  It is probably appropriate to take our
 6   lunch break now and return at quarter to 2.  We will do the
 7   remaining read-in testimony and then go right into closings
 8   and jury charge.
 9          So I will see you at 1:45, ladies and gentlemen.
10          (Jury exits.)
11          MR. BARMEN:  Your Honor, understanding it would be
12   extremely brief, are we having a charge conference?
13          THE COURT:  Sure.  Why don't we do it now.
14   Actually, we will do it at 1:30.
15          MR. BARMEN:  Thank you, Your Honor.
16          THE COURT:  And Ardis will get you a copy of the
17   latest version, I made some tweaks to it.  So she will print
18   it off and give you copies of it so you can look at it during
19   lunch.
20          MR. McELFISH:  You received our formal objections to
21   it?
22          THE COURT:  Yes.
23          MR. McELFISH:  I know we've filed it, I just want to
24   make sure you've had a chance to review that.
25          (Luncheon recess taken.)
```

```
 1              A F T E R N O O N   S E S S I O N
 2              (In open court - jury not present.)
 3              THE COURT:  Okay, charge conference.  Any
 4    objections to the charge?
 5              MR. McELFISH:  Plaintiff has some objections.
 6              THE COURT:  I want to hear from the defendants
 7    first.
 8              MR. McELFISH:  Oh, all right.
 9              THE COURT:  Go ahead.
10              MR. SHAUB:  Yes, Your Honor.
11    On the first paragraph in the introductory charges, I believe
12    it's the third sentence, it says:  It is your job now to
13    determine how much.
14              THE COURT:  Yes.
15              MR. SHAUB:  We would add the words, if any.
16              THE COURT:  No.
17              MR. SHAUB:  Your Honor, we believe --
18              THE COURT:  No.
19              MR. SHAUB:  Can we be heard briefly on --
20              THE COURT:  No, it is denied because a zero
21    punitive damages verdict is undercutting, eviscerating the
22    collateral estoppel rulings.
23              MR. SHAUB:  But, Your Honor, the jury heard
24    testimony that Ms. Anderson lost her leg.  They've heard that
25    Greyhound has the best safety program in the entire industry.
```

CHARGE CONFERENCE

1   They could determine that there is no additional money

2   required to punish the defendants or to deter their conduct.

3            THE COURT:   No.

4            MR. SHAUB:   Then on the second page the sentence

5   that begins:  The jury in Pennsylvania has already determined

6   that Greyhound's and Sabrina Anderson's conduct satisfies this

7   standard as opposed to was outrageous.

8   We've already said that the conduct, what the standard is--

9            THE COURT:   Wait, what page are you on?

10            MR. SHAUB:   Page 2, I believe.

11            THE COURT:   2?

12            MR. SHAUB:   Yes, page 2 of the charge.  I'm sorry,

13   I was putting the proposed language in.  It's the sentence --

14            THE COURT:   A jury in Pennsylvania has already

15   determined that Greyhound's and Sabrina Anderson's conduct --

16            MR. SHAUB:   Instead of was outrageous, satisfies

17   this standard.

18            THE COURT:   All right.  Why?

19            MR. SHAUB:   They've already heard that

20   the conduct -- what the standard is for the conduct.  We don't

21   think there's any reason to emphasize that it was outrageous.

22   The Pennsylvania jury has made the determination.  Your Honor

23   has instructed them about that, so we don't think that you

24   need to emphasize the fact that it was willful, wanton,

25   oppressive or reckless.  It creates the impression that the

```
 1   Court has made this determination, so we just request that the

 2   standard --

 3           THE COURT:   By saying that the word outrageous

 4   again --

 5           MR. SHAUB:   Yes.

 6           THE COURT:   -- it creates the impression that the

 7   Court what?

 8           MR. McELFISH:   That it's outrageous.

 9           MR. SHAUB:   But you've already explained what the

10   standard is, we don't need to stress it.

11           THE COURT:   You don't want them to hear it twice?

12           MR. SHAUB:   Correct.

13           THE COURT:   Denied.

14           MR. SHAUB:   Next sentence:   It is your job to fix

15   the amount of punitive damages, and I understand I've heard

16   your objection, but I just want to make it clear so on the

17   record what it is.   It is your job to fix the amount of

18   punitive damages, if any.   That's what we believe that should

19   be.

20           THE COURT:   Denied.

21           MR. SHAUB:   Denied.

22   On the next going down after factor of three, we think you can

23   take out that whole sentence because there is now evidence on

24   this issue as to the amount of the punitive damages.   I

25   believe there was an exhibit already admitted into evidence.
```

CHARGE CONFERENCE

```
 1              MR. BARMEN:  The balance sheet was put into evidence
 2    with that number on it.
 3              THE COURT:  The balance sheet actually has --
 4              MR. BARMEN:  $647-million-number on it, yes, it
 5    does.
 6              THE COURT:  No, I am going to leave it.
 7              MR. SHAUB:  Then on the next sentence, we believe
 8    that we'd like the Court to go back to what its original
 9    charge was on, I think you circulated it on Friday.  And we
10    believe that that's necessary because it further instructs the
11    jury that they are to award the punitive damages based on each
12    individual's conduct, whether that's Greyhound or Sabrina
13    Anderson.  And that mirrors the Pattern jury charge on 8.20.
14              THE COURT:  I do not don't understand why that
15    first sentence doesn't capture the law.
16              MR. SHAUB:  The model jury charge includes the
17    language:  Damages are to be assessed against each defendant
18    by that defendant's conduct alone.  We think that we should
19    adhere to that because, again, it makes it clear that you are
20    supposed to -- you are supposed to measure this conduct and
21    award punitive damages as to each defendant.
22    That is what Your Honor had provided us in the prior charge.
23    It's what the Pattern jury instructions says.  So we would
24    request --
25              THE COURT:  Well, no, hold on.  Hold on, let me go
```

SAM     OCR     RMR     CRR     RPR

CHARGE CONFERENCE

1   back to that.

2   No, no, the reason why I changed this was because the prior

3   version said:  Whereas here, there is more than one defendant,

4   you must decide whether punitive damages are to be assessed.

5   And that is not what they are being called upon to decide

6   here, it is the amount of punitive damages.

7   And actually, I think that's wrong because wouldn't Greyhound

8   be responsible for Sabrina Anderson's conduct, but Sabrina

9   Anderson is not responsible for Greyhound's conduct?

10          MR. McELFISH:  Correct.

11          THE COURT:  So in looking at Greyhound in the

12  punitive damages, the amount to be assessed against them, the

13  jury is entitled to consider Sabrina Anderson's outrageous

14  conduct because they are vicariously responsible, that is

15  their employee.

16          MR. SHAUB:  Correct, but --

17          THE COURT:  And vice versa, the other way around,

18  no, Sabrina Anderson is not responsible for Greyhound's

19  inadequate sleep program.

20          MR. SHAUB:  Right.  But so that's language, I

21  think, that clarifies that point and makes it clear that

22  Sabrina Anderson is not responsible and you have to consider

23  that conduct individually.

24          THE COURT:  No, it does not because looking at each

25  defendant's conduct alone, maybe the way I have it in the

SAM      OCR      RMR      CRR      RPR

CHARGE CONFERENCE

1   revised charge does not capture it completely, but certainly

2   the prior version does not capture it at all because if you

3   look at each defendant's conduct alone, that means let's

4   assess Greyhound.  We only can take into account Greyhound's

5   conduct, not Anderson's conduct also.  I think that is wrong

6   as a matter of law.

7   I mean it will be convoluted, we could say, okay, you could

8   take into account in assessing punitive damages against

9   Greyhound, take into account Greyhound's conduct and

10  Anderson's conduct; but in assessing punitive damages against

11  Anderson you can only look at her conduct alone.

12  Am I wrong on that?

13          MR. SHAUB:   I see what you're saying, Your Honor,

14  but I still think we have that danger, though, of Sabrina

15  Anderson's conduct -- Greyhound's conduct being considered to

16  punish Sabrina Anderson.  I think that that charge, as

17  written, says you have to consider each of their --

18          THE COURT:   But I don't know how:  Whereas here,

19  there is more than one defendant you must decide the amount of

20  punitive damages to be assessed, and measured by your

21  consideration of the factors I have listed as they apply to

22  each particular defendant.  So that is a different way of

23  wording that defendant's conduct alone.

24          MR. SHAUB:   Okay, Your Honor.

25          THE COURT:   But it might not be enough, it might be

CHARGE CONFERENCE

1  wrong, but I am sticking with it.

2          MR. SHAUB:   Just to go back briefly, Your Honor, to

3  go back up to the sentence where we were talking about

4  satisfies the standard and the conduct was outrageous.

5          THE COURT:   Yes.

6          MR. SHAUB:   And I apologize for going back.

7  Could we add a jury in Pennsylvania has already determined

8  that some conduct of Greyhound and Sabrina Anderson, so we are

9  going to insert the words some conduct of, because it is not

10  clear what the jury in Pennsylvania determined was the

11  outrageous conduct.

12          THE COURT:   Because there was no special verdict

13  sheet.

14          MR. SHAUB:  Yes.

15          MR. McELFISH:  Do you want me to chime in or do you

16  want me to wait?

17          THE COURT:   Yes, why don't you wait on that.   You

18  have rejected everything that they have proposed so far, so

19  what about that point?

20          MR. McELFISH:   Just because there was no special

21  verdict sheet it's just conduct.   I mean because it is right

22  the way it is, in other words.   Because if you start getting

23  into some conduct, then you are starting to parse out, we

24  really don't know what they did, so you can't start parsing

25  out some, they might have thought all was outrageous.

CHARGE CONFERENCE

```
 1              MR. SHAUB:   But the point is we don't know what
 2    they thought.   They might think all of it is or the jury might
 3    have found only one specific incident of it was outrageous.
 4              MR. McELFISH:  But they're the ones that were
 5    outrageous, so it should be all.   That is the point.
 6              MR. MANNION:    What?
 7              THE COURT:   I don't know.  I am going to leave it
 8    the way it is.
 9              MR. SHAUB:   Your Honor, there is just the danger
10    that all of the conduct now, everything that is going to come
11    in, we don't know what the basis was, so everything then that
12    Mr. McElfish is going to say in summation the jury is going to
13    think was the cause of the punitive verdict in this case.  All
14    conduct, any conduct, we just don't know.  I think it should
15    say some conduct of.  We truly don't know what they found was
16    the outrageous conduct.
17              MR. McELFISH:  By the way, Judge --
18              THE COURT:   I will leave it the way it is.
19              MR. McELFISH:  All right.  See how quick I dropped
20    that?
21              MR. SHAUB:   But, Your Honor, then we would add the
22    caveat that in closing Mr. McElfish not be permitted to say
23    that the Pennsylvania jury found any specific act outrageous.
24              THE COURT:   If Mr. McElfish makes any assertions as
25    to specifically what the jury found in Pennsylvania, lodge an
```

1    objection during his closing and I will deal with it then.

2            MR. SHAUB:   Then going down to the next sentence

3    that begins:  Although you returned your award of compensatory

4    damages in one lump sum, we would ask that we add the words if

5    any after return a separate verdict as to punitive damages, if

6    any, against each of the defendants separately.

7    Again, this sentence says that they have to return a verdict

8    of punitive damages or they have to return an amount of

9    punitive damages.

10           THE COURT:   How can it be that conduct was

11   outrageous satisfies the element of punitive damages, but they

12   get nothing for it, not -- that is like saying to a civil

13   rights plaintiff, your constitutional rights were violated,

14   you suffered damage, but we are going to give you nothing.  At

15   least, at least in that context they can get a dollar's

16   nominal damages.

17           MR. SHAUB:   Right.

18           THE COURT:   So here --

19           MR. SHAUB:   Your Honor actually read where I was

20   going.  I was going to mention some nominal damages as we go

21   on, but, again, the purpose of punitive damages is to punish

22   and deter.  The jury has heard that Ms. Anderson is no longer

23   driving a bus.  She lost her leg.  How would they need to

24   deter someone who is no longer driving a bus?  And they could

25   determine that losing her leg was punishment enough in this

CHARGE CONFERENCE

1  case.  They heard testimony that Greyhound is the leader in

2  industry safety.  The Government comes to Greyhound.  They

3  have the premiere bus program in the entire country.  There is

4  no other testimony, expert testimony, from plaintiffs saying

5  that any other bus company in the nation has any of their

6  fatigue management programs.  They could say --

7         THE COURT:  Well, punish and deter are two separate

8  things, right?

9         MR. SHAUB:  Right, okay.

10         THE COURT:  So they could say to Ms. Anderson:  You

11  got behind the wheel of a bus, you were sleep derived, you

12  deserve to be punished; here is an amount.

13  We know she is not going to do it again because she cannot

14  drive a bus.  She does not have a CDL anymore, but she

15  deserves to be punished for her conduct because they are not

16  mutually exclusive things.

17         MR. SHAUB:  But a jury could also say this woman

18  lost her leg.  She travels in a scooter now.  Every day she

19  lives with this and is reminded of this accident, hasn't she

20  been punished enough?  She almost died in this accident, how

21  much more do we need to punish someone?

22         THE COURT:  That is an argument you make in

23  closing.

24         MR. SHAUB:  But there is no ability for them to

25  award zero under these instructions.

CHARGE CONFERENCE

```
 1              THE COURT:  I am telling you they cannot award
 2   zero.
 3              MR. McELFISH:  Actually, I don't -- I just want to
 4   chime in on that.  I don't think they can make that argument
 5   that she's been punished enough because, first of all, that
 6   leg comment should not have come in.  But besides that point,
 7   you know, that's suggesting that she -- they're not -- that
 8   she's not liable for punitive damages.  That is not an
 9   argument they can make.  She's been punished enough, I mean
10   that's ridiculous.  I lodge an objection.
11              MR. SHAUB:  Should I respond to that?
12              THE COURT:  No, deal with the charges, let's not
13   deal with closings.
14              MR. SHAUB:  And then one more point.  The jury has
15   heard that you've applied collateral estoppel and they could
16   decide that that was punishment enough.  Whatever was awarded
17   there was punishment enough.  They have heard this, that
18   there's been a punitive verdict and they necessarily know that
19   now.  So that kind of deals with the issue of the punishment
20   and the deterrence.
21              THE COURT:  I am not changing it.
22              MR. SHAUB:  Understood, Your Honor.
23   And then lastly at the end of the final paragraph.
24              THE COURT:  When you have answered all the
25   questions?
```

CHARGE CONFERENCE

```
1            MR. SHAUB:   I'm sorry:  But you are not to punish
2     the defendants for the impact.
3            MR. McELFISH:  Where are you at?
4            MR. SHAUB:   At the bottom of page 2.
5            THE COURT:   But you are not to punish the
6     defendants --
7            MR. SHAUB:   Correct.
8            THE COURT:   -- for the impact of their alleged
9     misconduct on persons other than plaintiff.
10           MR. SHAUB:   We would propose this final sentence:
11    As to the amount of punitive damages that you may award, you
12    can award more or less than the compensatory damages awarded,
13    nominal damages, e.g. one dollar or no damages at all.
14    And that goes to your concern about, you know, in a civil
15    rights case they are entitled to one dollar.  The jury should
16    be able to hear, okay, if they have to award something that
17    something could be nominal damages and it can be more or less
18    than the compensatory damages.  And I believe the more or less
19    language was actually in your original charge.
20           MR. McELFISH:  If he wants that, then I get to ask
21    for whatever number I want.
22           MR. SHAUB:   Those things are not the same.
23           MR. McELFISH:   Oh, they're not?
24           MR. SHAUB:   Those are not the same.  This is a
25    legal instruction versus a summation that is designed to
```

SAM      OCR      RMR      CRR      RPR

CHARGE CONFERENCE

```
 1   anchor the size of the verdict.
 2            MR. McELFISH:  You got it right by taking that out.
 3            THE COURT:   I am not suggesting any specific amount
 4   of what they can or can't do.  It is up to them.
 5            MR. SHAUB:   So there is no way we are going to be
 6   allowed to put in the nominal damages or something to that
 7   effect?
 8            THE COURT:   No.
 9            MR. SHAUB:   And then do you want -- can we do the
10   verdict form briefly or do you want --
11            THE COURT:   Sure.
12   What is the matter with it?
13            MR. SHAUB:   And then, Your Honor, on the verdict
14   form to insert the words if any, the total amount of punitive
15   damages, if any, that plaintiff may award.
16            THE COURT:   Denied.
17            MR. SHAUB:   Then, Your Honor, if I can just lodge
18   two global objections to the verdict form and the jury charge.
19            THE COURT:   Sure.
20            MR. SHAUB:   That we would maintain that this issue,
21   there should be no special verdict form here, there should be
22   no jury charge, because any award of punitive damages in this
23   case would be successive, as we've said before, and violate
24   the defendant's due process rights.
25   And we further maintain our objection to the application of
```

CHARGE CONFERENCE

```
 1    offense of collateral estoppel and we would like to maintain
 2    those global objections to the verdict form and the jury
 3    charge.
 4              THE COURT:   Mr. McElfish.
 5              MR. McELFISH:  I have global objections.
 6    All right, let's start with the charge.  Page 2, at the
 7    bottom, the sentence you were just talking about a minute ago.
 8              THE COURT:   Which sentence?
 9              MR. McELFISH:  The last sentence:  But you are
10    not --
11              THE COURT:   The last sentence of what?
12              MR. McELFISH:  Of page 2.
13              THE COURT:   But you are not to punish?
14              MR. McELFISH:  Yes.  The problem with that sentence
15    is, is that according to -- well, first of all, it's not in
16    the model charge in Pennsylvania.  I am curious where it came
17    from.  And then there is a case --
18              THE COURT:   It is not really curious at all.
19    If your position is that this jury can punish Greyhound and
20    Sabrina Anderson for things that happened to other people who
21    they've already been punished for, that would bring it
22    squarely in line with their argument that it is a due process
23    violation and it is going to get kicked, and that is what you
24    are arguing.
25              MR. McELFISH:  No, actually, so with respect to the
```

SAM      OCR      RMR      CRR      RPR

 1   deterrence issue, I don't think anything should be said there,

 2   that's my point, is that with respect to deterrence, certainly

 3   as to other people in the future, the general public, motoring

 4   public as an example, this would deter the conduct as to those

 5   people.

 6              THE COURT:   This has nothing to do with deterrence.

 7   The sentence reads:  But you are not to punish the defendants

 8   for the impact of their alleged misconduct on persons other

 9   than the plaintiff.

10   We talk about it in other parts of the charge, that it is to

11   punish and deter.  This is not the deterrence aspect of it.

12              MR. McELFISH:   And even on the punishment aspect we

13   cited this Haslip case, I believe, in Pennsylvania that says:

14   Factors to be considered, as seen in Haslip, are culpability,

15   desirability of deterring others, and impact on the parties

16   and other factors including the impact on innocent

17   third-parties.

18   I believe -- did we cite the Haslip case?

19              THE COURT:   The case from 1927 or 1917?

20              MR. SHAUB:   Your Honor --

21              MR. McELFISH:   No, 1991.

22              MR. SHAUB:   -- it predates the Philip Morris case,

23   which is the United States Supreme Court, which says this is a

24   due process issue.  So the United States Supreme Court case

25   would control on this issue, and that's Philip Morris versus

CHARGE CONFERENCE

1    Williams 549 U.S. 346 at 355 from 2007.

2         MR. McELFISH:   Okay, fine.

3    So then can we get then the other part of it, that deterrence

4    can be as to -- the language in Haslip was impact on innocent

5    third-parties.

6    I see your point now, I didn't think of it quite that way.

7    Now that I see what you're saying, we should have the second

8    part so they don't assume that deterrence doesn't apply to

9    innocent third-parties.

10         THE COURT:   We have that on page 1:  Punitive

11    damages are awarded in order to punish the defendants for

12    outrageous conduct and to deter the defendants and others from

13    committing similar acts in the future.

14         MR. McELFISH:   But the way it reads, it's still as

15    only against Mr. Bauta, which is wrong.

16         MR. SHAUB:   Your Honor, deterrence has --

17         THE COURT:   No, if you read the two sentences

18    together on page 2:

19    The sole purpose of punitive damages is to punish the

20    defendants' outrageous conduct and to deter the defendants and

21    others from similar acts, but you are not to punish the

22    defendant for the impact of their alleged misconduct on

23    persons other than the plaintiff.

24    It is limiting punishment to this particular plaintiff, not

25    limiting deterrence in any way, shape or form, and that is

 1    clear from the charge.

 2           MR. McELFISH:  I think that should be said, that's

 3    all.

 4           THE COURT:   All right.

 5           MR. McELFISH:  And that is the only thing I'm asking

 6    for on that.  If it's just said so they understand that it

 7    doesn't apply to deterrence.

 8           THE COURT:   Denied.

 9           MR. McELFISH:  Okay, special verdict form.  Third

10    line into it, evidence he is entitled to.  We believe should

11    be evidence that should be imposed or something like that

12    because it is not so much an entitlement damage as it is or an

13    award as it is --

14           THE COURT:   State the total amount of punitive

15    damages that plaintiff Jose Bauta has established by a

16    preponderance of the evidence --

17           MR. McELFISH:  Right, that should be imposed.

18           THE COURT:   -- that should be imposed upon

19    Greyhound and Sabrina Anderson.

20           MR. McELFISH:  Yes, because it is not a compensatory

21    question.

22           THE COURT:   He is entitled to the change it should

23    be imposed.  Do you have a problem with that?

24           MR. SHAUB:   I don't see why there was any problem

25    with how it was drafted.

```
 1              THE COURT:   Aside from that, do you have any
 2    problem with replacing is entitled to with should be imposed?
 3              MR. BARMEN:   Yes, we have a problem with that
 4    because the money goes to him.  I think it should stay as
 5    written.
 6              MR. McELFISH:  The problem is, is that it unduly
 7    highlights number two of the three areas in the charge, the
 8    nature and extent of the harm to the plaintiff.  Plus, again,
 9    it's not a compensatory entitlement request, it's a
10    imposition.
11              THE COURT:   I will change it to should be imposed.
12              MR. SHAUB:   Your Honor, can you note our objection
13    for the record?  We believe it should be he is entitled to.
14              THE COURT:   Objection is noted.
15              MR. McELFISH:  One last thing, just back on the
16    charge, or even on the verdict sheet depending.  Is there any
17    way to signal to the jury -- I am just wondering are they
18    going to wonder does Anderson have to pay this?  Is there any
19    way to signal the vicariousness of that?
20              THE COURT:   No, no, no.
21              MR. McELFISH:  Okay.  I am just --
22              THE COURT:   I mean there is law against that,
23    right?
24              MR. SHAUB:   Your Honor, that is absolutely improper
25    for that to be signaled.
```

CHARGE CONFERENCE

```
 1              THE COURT:  It is like --
 2              MR. SHAUB:   It is like introducing insurance.
 3              THE COURT:   It is like in the case of a police
 4    officer.
 5              MR. McELFISH:   Right.  No, you're right.  Okay,
 6    that's it.  That's all of plaintiff's objections.
 7              THE COURT:   So this is the only change, Ardis, it
 8    should be he is entitled to should be imposed as a result of
 9    the actions.
10    Okay, good.
11    Do you have Gubica's transcript ready to go?
12              MR. KIEFFER:   Yes, Judge.
13              MR. McELFISH:  One last thing.  Yesterday you said
14    no slides and I am not going to, I'm not going to, but I do
15    have a couple of exhibits that just because of ease I put them
16    on -- it's a slide, but it's just a blank slide, like we did
17    the others.
18              MR. BARMEN:  No, Your Honor, no.  I argued
19    against --
20              MR. McELFISH:  It's just exhibits.
21              MR. BARMEN:  Of course the slides would be exhibits.
22    I prepared without them because of what you said.  When he
23    reargued for 45 minutes instead of 30, you gave him
24    45 minutes, you did not reverse yourself on the no slides.  It
25    would be absolutely improper.
```

SAM      OCR      RMR      CRR      RPR

CHARGE CONFERENCE

1          THE COURT:  Well, to be fair, he did not argue for

2    slides at that point.  He was arguing for 45 minutes not 30.

3          MR. BARMEN:  But you did change on the one, you did

4    not change on the other, so I prepared without them.

5          THE COURT:  I am not changing on the slides.

6          MR. McELFISH:  But all that it is, is the exhibits.

7    It's -- actually, you can't even tell --

8          THE COURT:  You can tell them exhibit number

9    such-and-such.

10          MR. McELFISH:  And I'll put it up that way.

11          MR. BARMEN:  No.

12          MR. McELFISH:  But, Judge, it's just the exhibit.  I

13    don't follow.  It's just the exhibit.

14          THE COURT:  No.

15          MR. McELFISH:  There is no writing, no nothing.

16          THE COURT:  Tell them.  Tell them it is in

17    Exhibit 6.  Ask for it if you want to see it.  And then you

18    make your argument and then if they want to see it in their

19    deliberations, they will get the exhibit.

20          MR. BARMEN:  They will have the exhibits in

21    deliberations anyway.

22          THE COURT:  No, they will not.  They did not have

23    the exhibits before.  If they want the exhibits, they will get

24    them.

25          MR. McELFISH:  Can we put it on the ELMO?

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1              THE COURT:   No.  We are just going to argue.  You
 2    are going to talk.
 3              MR. McELFISH:   Oh, man, this is the first time I've
 4    ever closed without using any exhibits in evidence.
 5              THE COURT:   Throw that crutch away.  You do not
 6    need it.
 7              (Pause.)
 8              THE COURT:   All right, let's bring them back.
 9              (Pause in the proceedings.)
10              (Jury enters.)
11              THE COURT:  You may be seated.
12              Okay, ladies and gentlemen.  The final witness is
13    Akos Gubica, the driver of the truck.
14    Whenever you are ready to proceed.
15              MR. KIEFFER:   Thank you.
16    (The deposition of Akos Gubica was read as follows:  Questions
17    by Mr. Kieffer and Answers by Mr. Saal.)
18    DEPOSITION TESTIMONY OF AKOS GUBICA:
19    Q    Please introduce yourself to the jury.
20    A    My name is Akos Gubica.
21    Q    And at the time of this crash and the present day, what
22    is it that you do for employment?
23    A    I drive a truck.
24    Q    Mr. Gubica, I am not using this to talk to the accident,
25    I want to show the jury an overshot of the truck.
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1   Now, I see two different colors; is that right?

2           MR. SAAL:  We missed something at the bottom of

3   page 6.

4           THE COURT:   The bottom of page 6, please.

5           MR. KIEFFER:   What is the issue?  I'm sorry.

6           MR. SAAL:  Line 25, page 6 and line 1, page 7, those

7   two specify who was driving the truck.

8           THE COURT:  No, no, no.  You only get until here.

9   (Indicating.)  Remember I struck that.

10          MR. SAAL:  No.  You had struck 5 and 6 I thought;

11  okay.

12          (Deposition reading resumes.)

13  Q    Page 11, line 4:

14  Question:  Mr. Gubica, I am not using this to talk to the

15  accident, I want to show the jury an overshot of the truck.

16  Now, I see two different colors, is that right?

17  A    Yes.

18  Q    Different shades?

19  A    Yes.

20  Q    Is that two different tarps?

21  A    Yes, sir.

22  Q    Is there anything different about either of them or just

23  the shade of them?

24  A    Same tarp, probably got dirty on the landfill, probably

25  mud covering one of them.

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1   Q     What is the tarp made of, do you know?

2   A     It's a mesh type of material.

3   Q     Like mesh you see through?

4   A     Yes.

5   Q     Now, you told the jury that a gentleman at Hi-Tech starts

6   the process.  Which tarp starts and how does it work?

7   A     The back tarp goes on first.

8   Q     The darker one?

9   A     The back one, yes.  The front one goes on top of that, so

10  this way when the trailer is traveling down the highway the

11  wind doesn't grab the tarp.  The first one will hold the last

12  tarp or the back tarp.

13  Q     Does the gentleman at Hi-Tech do anything in addition for

14  you at this time except just lay them?

15  A     No, he just lays them and bungees the corners, so when I

16  come out the wind doesn't blow it away.

17  Q     Once he does that, do you leave the facility?

18  A     No, I get scaled out, get paper work, and I pull on the

19  street to finish the tarping job.

20  Q     Let's just stay with the tarps.

21  So you pull out of the facility and basically pull to the side

22  of the road?

23  A     Or get on the scale afterwards.

24  Q     Talking just the tarp, before you actually get on the

25  highway, do you do anything in addition to secure your tarp?
```

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1    A    Yes.

2    Q    You talked about bungees.  What does that mean, what do

3    you do with them?

4    A    It's a rubber bungee, probably 22 inches long, which

5    secures the tarp onto the flatbed to cover the garbage.

6         MR. KIEFFER:  Question at line 7 -- I'm sorry,

7    line 2 -- line 7.

8         (Deposition reading resumes.)

9    Q    I'm using this to talk about the crash, these things.

10   Are these bungees?

11   A    Yes, sir.

12   Q    Basically, is there like -- are there holes in the tarp

13   that you tie the bungee to, is that how that works?

14   A    Yes, the tarp includes holes that they put in there from

15   the manufacturer.

16   Q    Then you wrap the bungee around like the frame of the

17   trailer?

18   A    Around the rub rail on the side of the trailer.

19   Q    Rub rail?

20   A    Rub rail.

21   Q    Term of art, okay.

22   About how many bungees do you use?

23   A    Roughly about 50 or so.

24   Q    Basically, you are bungeeing down both sides and the

25   back?
```

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1    A      Both sides, front and the back.

2    Q      You do that?

3    A      I do that.

4    Q      Obviously, you use the bungee to keep it down?

5    A      To keep it down, yeah.

6    Q      Let's stay with this picture while we have it.

7    In addition to the bungees, what are these things?

8    A      Those are vinyl straps.

9    Q      Do you put them on?

10   A      Yes, I do.

11   Q      About how many?

12   A      Probably nine or ten.

13   Q      Take me through how you do it.

14   A      Which part, the bungees or the whole thing?

15   Q      I think we are through the bungees.  We understand the

16   bungees are along the sides, back and front.

17   In addition to the bungees, you told me about these, what did

18   you call them?

19   A      Straps.

20   Q      You said eight, nine or ten, is that what you said?

21   A      Yes, sir.

22   Q      Just take me through how you do one.

23   A      Well, you wind it out if you have two-inch strap.  Those

24   are the thinner ones.  The back ones that you see, the

25   ratchets on those are the two inch ones.
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1   Q    These ratchets are like a self-ratcheting mechanism,

2   right?

3   A    Yes.

4   Q    You rachet it by hand?

5   A    Yes, sir.

6   Q    The rachet tightens it?

7   A    Yes, usually I put the load bar afterwards to make that

8   secure.

9   Q    What is a load bar, a piece of steel?

10  A    Yes, roughly about that one.

11  Q    Insert it into the rachet and crank it?

12  A    Using your hand and body and crank it down.

13  Q    The purpose of that is what?

14  A    To make it tight, hold the load secured, and then the

15  other ones are four-inch ones, that's --

16  Q    Up here?

17  A    Yeah, those are -- they come with the trailer from the

18  manufacturer.  Those are wrapped onto a roller, which you also

19  use a load bar when you throw it over to rachet it down.

20  Q    You just tighten this instrument right here?

21  A    Yes.

22  Q    So the ones that we see that go kind of under the

23  trailer, though, were part of the initial trailer?

24  A    Yes, sir.

25  Q    And then back here these are -- are the extras that you

SAM     OCR     RMR     CRR     RPR

DEPOSITION TESTIMONY OF AKOS GUBICA

1    put on?

2    A    They are extras because the load sometimes varies.  So

3    sometimes you can't move the big ones where you need to, so

4    you need loose ones to strap the loads down.

5    Q    In the back, I want to talk to you about the back

6    specifically.

7    The jury's seen the picture enough, but take me through what

8    you do with the back part of the tarp.  How do you secure it,

9    do you tuck it?  Take us through that in some detail.

10   A    Each tarp has an individual flap.  Well, one for the back

11   portion, another for the front portion.  I would grab that,

12   roll it up, and pull it backwards so it would be tied with two

13   bungees on each corner, wrapped nice and secure under it.

14   Q    So once the tarping process is complete on October 8th,

15   where do you go next?

16   A    I would go to a truck stop.

17   Q    Is that truck stop in New Jersey?

18   A    Yes, sir.

19   Q    Is it the Delaware Truck Stop, is that what it's called?

20   A    It's called Delaware Truck Stop, yes, sir.

21   Q    Is it off Exit 4?

22   A    Exit 4, Interstate 80.

23   Q    What time do you get there about?

24   A    Roughly 4 o'clock, 4:30 in the afternoon.

25   Q    Let me take one step back.

DEPOSITION TESTIMONY OF AKOS GUBICA

1  When you leave Hi-Tech, am I correct your final destination is

2  Ohio?

3  A    Yes, sir.

4  Q    At a landfill?

5  A    Yes, sir.

6  Q    That trip is about 400 miles?

7  A    Roughly, yes.

8  Q    It takes about 8 hours?

9  A    Give or take, yes.

10  Q    8 or 9 hours?

11  A    Yes.

12  Q    And you're -- are you due there at a date certain, you

13  have to be there by X time?

14  A    Usually I keep a schedule myself.

15  Q    I understand that you planned to get there around 5 or 6

16  in the morning?

17  A    Yes, sir.

18  Q    Let's talk about between 11 and 11:30 before you get back

19  on the road.

20  During that period of time do you check your tarp?

21  A    Yes.

22  Q    And do you have a specific recollection of having to make

23  any adjustments to your tarp that evening?

24  A    No, I don't.

25  Q    Is it your practice when checking your tarp if something

SAM     OCR     RMR     CRR     RPR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1   is out of place to put it back in place?
2   A    Yes, all the time.
3   Q    During this 30 minutes between 11 and 11:30 while still
4   at the rest stop, do you check the lights on your trailer and
5   tractor?
6   A    Yes.
7   Q    And do you do that, basically, just by turning them on
8   and walking around?
9   A    Yeah, pretty much.
10  Q    I am just talking about lights.  Tell me how you just
11  check the lights.
12  A    I would put the switch on for each individual light for
13  parking, regular headlights, blinkers separate, hazard lights
14  separate.  Every time you would put those lights on you would
15  go to the front of the truck, side, back of the truck, and
16  trailer and check if it works.
17  Q    Do you have a specific recollection of having any of
18  issues with your lights that evening?
19  A    No, sir.
20            (Continued on the following page.)
21
22
23
24
25
```

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1  BY MR. KIEFFER:
 2  Q    Is it your practice that if you have an issue just with
 3  the lights that you would take care of --
 4  A    Say that question again.
 5  Q    Let me take a step back.  When you did your light check
 6  that evening, anything out of place with the lights?
 7  A    No.
 8  Q    The jury has seen this picture numerous times as well.
 9  So I don't want to show it again.  But they've seen the back
10  of your trailer, about nine or ten lights across the back.
11  A    Ten lights.
12  Q    Three, three, three, and then the license plate lights
13  up?
14  A    Yes, sir.
15  Q    So three, three, three is nine, plus the license plate;
16  and then also there is a piece of reflective tape that goes
17  across?
18  A    Yes, sir.
19  Q    During this light check on October 8th, do you check your
20  hazards?
21  A    Yes, sir.
22  Q    How do you do that?
23  A    There is a mechanism on the left side of the steering
24  wheel.  That also has the blinker on it.  You have to pull it
25  out to make the hazards work.
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   Q    Were your hazards working before you left?
 2   A    Yes, sir.
 3   Q    You have heard the testimony in this case, correct, so
 4   far?
 5   A    Yes, sir.
 6   Q    There hasn't been any evidence that your lights were not
 7   working, but there has been some discussion that a check of
 8   the hazards post-crash raised an issue with the switch.
 9            Did you hear that testimony or that evidence?
10   A    Yes, I did.
11   Q    Let me rephrase the question.  Do you have any personal
12   knowledge as to whether the hazards were affected at all by
13   the crash?
14   A    Well, I just got hit by a 20-ton bus.  So these got
15   jolted out of place, relayed, or I don't know.
16   Q    Let's go back now.  You're at the rest stop.  You check
17   the tarp.  You check your lights.  Now do you leave for --
18            MR. SAAL:  I'm on page 24.
19            MR. KIEFFER:  Sorry.
20            MR. SAAL:  Yeah.  Do you have page 24?
21            MR. KIEFFER:  I don't.
22            MR. SAAL:  That's why.  It actually noted that's an
23   objection because there was no answer as to the next question.
24            MR. KIEFFER:  What is the next page?
25            MR. SAAL:  I don't have it.  There was no
```

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1    designation on it.  That's why I objected.  There was no
2    designated answer to the question.
3              MR. KIEFFER:  Move on to the top, 25, line 2.
4              THE COURT:  All right.  Strike that testimony or
5    that question.
6              MR. KIEFFER:  Page 25, line 2.
7    BY MR. KIEFFER:
8    Q    Are there times -- again, I'm talking specific to the
9    night right now -- were there times that night where you had
10   to go below 65 miles an hour?
11   A    Yes, sir.
12   Q    And what would cause you to go below 65 miles an hour?
13   A    Inclines and hills.
14   Q    Generally, now about I-80, let's talk more generally
15   about it -- I'm not talking about maybe wetter or things like
16   that involved -- just normal nights.  Is it your general
17   practice on I-80 to go about 60 miles an hour, absent a grade?
18   A    Say that again.
19   Q    Generally speaking, when you're on I-80, because I
20   understand that you take I-80 or this route other times,
21   correct?
22   A    Yes.
23   Q    Generally, when you're on I-80, is your speed 65 miles an
24   hour, absent a grade, absent grade use?
25   A    Yes, sir.
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1  Q    Are there times on I-80 when you need your hazards,

2  generally?

3  A    Generally, no.

4  Q    If there's a posted minimum speed and you're below it,

5  are hazards required?

6  A    It's required by the law, yes, sir.

7  Q    And have you had opportunities -- twofold.  On the night

8  of the crash, did you ever go below a posted minimum speed?

9  A    No, sir.

10 Q    On the night of the crash, at any time were you required

11 by law to have your hazards on the night of the crash?

12 A    Say that again.

13 Q    The night of the crash, was there ever a period of time

14 on your stretch of I-80 that you were required to by law to

15 have your hazards on?

16 A    Under 40 miles an hour.

17 Q    You, yourself, that night, traveling that night, did you

18 have to do that?

19 A    No, sir.

20 Q    You talked at some of your depositions when some other

21 attorneys were asking you questions that speed, certain speeds

22 on the highway could be a hazard.

23      Do you agree with that?

24 A    Yes, sir.

25 Q    And a slow-moving car or truck could be a hazard?

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1    A      Could be, yes, sir.

 2    Q      And you recognize that.

 3    A      Yes, sir.

 4    Q      And when you are below a posted minimum, it is your

 5    practice to use your hazards?

 6    A      Yes, sir.

 7    Q      In the area of the crash, you talked about the grade with

 8    us a little bit.  Just taking I-80 generally, was the grade at

 9    the area of the crash a small, medium, or large grade relative

10    to the other parts you have taken?

11    A      Smaller grade than the rest.

12    Q      The jury has heard about a grade called Mount Pocono.

13           Are you familiar with that grade?

14    A      Yes, sir.

15    Q      And you would have passed Mount Pocono by the time you

16    got to the crash site, correct?

17    A      Yes, sir.

18    Q      Mount Pocono is one the bigger grades on 80, if not, I

19    guess, the largest, if that's the right way to say it.

20    A      Yes, sir.

21    Q      I understand that on Mount Pocono your customary speed is

22    about 40 to 45?

23    A      Roughly, yes, sir.

24    Q      This is an approximate.  You're doing approximates?

25    A      Approximately.
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1  Q    And then at the crash site your testimony is your general

2  speed is about a 5-mile-an-hour difference?

3  A    Yes, sir.

4  Q    At the time of this crash, your testimony in the case is

5  that you were going 45 miles an hour?

6  A    Approximately, yes, sir.

7  Q    Approximately.  Okay.  And that's consistent about what

8  we just talked about with the jury the 5-mile-an-hour

9  difference between Mount Pocono and the accident and crash

10  site?

11  A    Yes, sir.

12  Q    I want to get back to speed in a second.  I want to talk

13  about the little bit, what you do to check your mirrors as a

14  truck driver.  Do you check your mirrors?

15  A    Yeah.

16  Q    Is the purpose of checking your mirrors to see what is

17  going on around you?

18  A    Yes.  That's the only way to recognize other individuals

19  behind you.

20  Q    You had a couple of mirrors on each side.  There is a

21  rectangular mirror in the center?

22  A    In the center of?

23  Q    Is there a mirror like on the hood, the front of the

24  hood?

25  A    Two round ones up front of the hood and we have separate

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1  ones on each side.

2  Q    I understand that your practice is to look in mirrors

3  about every 15 or 20 seconds, I believe, or 10 or 15 seconds?

4  A    Roughly, give or take, depending on traffic or

5  situations.

6  Q    So maybe more or less, depending on the circumstances?

7  A    Yes.

8  Q    I understand that you never saw the bus before the crash,

9  correct?

10  A    Yes, sir.

11  Q    I understand that it may have been closer to a minute the

12  last time you looked in your mirrors before the crash,

13  correct?

14  A    Possibly, yes.

15  Q    And you were approximating closer to a minute?

16  A    Yes, sir.

17  Q    Am I correct that you waited closer to a minute -- well,

18  why?  Just because it was a calm night?

19  A    Calm night, not much traffic, and I usually pay attention

20  in front of me more than anything else.  It's usually a lot of

21  deers around there.  So usually a main concern is in front of

22  you when it's a quiet night.

23  Q    You told the jury you were going 45 miles an hour at the

24  time of the crash.

25  A    Yes, sir.

DEPOSITION TESTIMONY OF AKOS GUBICA

1   Q    And has that testimony ever changed from the morning of
2   the crash until today?
3   A    No, sir.
4   Q    You have been asked about speed a few times at least.
5   A    Yes, sir.
6   Q    I want to go through some of that with you.
7        We're talking about discussions you had in relation
8   to speed from the morning of the crash basically until today.
9   You remember talking with the police at 2:15 in the morning?
10  A    Yes, sir.
11  Q    The notes we have say:
12       He related that he was traveling on I-80 in the
13  right lane at approximately 45 miles an hour and concentrating
14  on the road.
15       Is that your recollection?
16  A    Yes, sir.
17  Q    Do you remember talking again with the police about speed
18  at 3:30 that morning?
19  A    No, I don't.
20  Q    I have it here.  Now, in the first note that I read, at
21  2:15 in the morning, there is a line that says:
22       When asked why he was traveling 45, he was unable to
23  provide an answer.  And then an hour later at 3:30, when asked
24  why he was traveling 45, he advised that he had recently had
25  the transmission in his truck worked on and rebuilt and he

DEPOSITION TESTIMONY OF AKOS GUBICA

1   didn't want to push the transmission too hard.

2           Did you tell the police that with respect to your

3   transmission?

4   A    I probably said something like I just did my transmission

5   myself.  I worked on it for over a month or so and I was

6   babying it because it was -- because it just got on the road

7   two weeks ago.

8   Q    And post-crash, did you have an instinct to try to

9   protect the transmission?

10  A    Oh, yes, sir.

11  Q    And did you do that basically by throwing it in neutral?

12  A    Yes, sir.

13  Q    I understand we will talk about the crash in a minute.

14          But the crash, you throw it in neutral, both hands

15  on the wheel, hitting the break, and you kind of coast to the

16  shoulder?

17  A    To the shoulder, yes, sir.

18  Q    So we have at 2:15.  So that's 45 minutes to an hour

19  after the crash.  Then we have 3:30, which is about two hours

20  after the crash, both at 45.  Then the jury has heard that you

21  provided a statement to Greyhound about 7:30 in the morning?

22  A    Yes, sir.

23  Q    And I want to play just a question and answer about

24  speed.  That's obviously you on the tape?

25  A    Yes, sir.

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1  Q    Telling Greyhound you went 45 at the time of the crash?

2  A    Yes, sir.

3  Q    Lawyers have asked you questions about speed a few times.

4  I want to go over that.  In December of '14 you provide some

5  testimony.  I would like to play that.

6         And then there was one more in May of '15 -- I'm

7  sorry -- August of '14.

8         In May of' 15, so there was an upgrade; and at some

9  point you went from 65 to approximately what speed, sir?

10 A    Approximately forty --

11        MR. SAAL:  That's you.

12 BY MR. KIEFFER:

13 Q    Your answer:  Approximately 45 miles per hour.

14        "QUESTION:  Do you recall how long you were

15 traveling at 45 miles per hour before the accident?  How long

16 of a time either timewise or distance-wise?"

17        Your answer:  I would say a couple minutes roughly,

18 give or take.

19        Do you remember that testimony?

20 A    Yes, sir.

21 Q    At anytime in the last basically three years, when you

22 have been asked about the speed of your tractor trailer,

23 starting with literally an hour after the crash to today,

24 whatever it is, 900 days later, have you ever set the speed

25 other than about 45 miles per hour?

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1   A      No.   That's what I was doing, 45, roughly.

2   Q      You know your truck.  And your testimony is 45?

3   A      Yes, sir.

4   Q      And from a speed standpoint, not a doubt in your mind

5   about 45?

6   A      That's what my truck usually does at that grade, so, yes,

7   roughly 45.

8   Q      You had an approximate 400-mile trip you were making,

9   correct?

10  A      Yes, sir.

11  Q      You passed or they passed you numerous times, truck

12  trucks, cars, buses, all sorts of vehicles, true?

13  A      Yes, sir.

14  Q      Probably hundreds, if not thousands, of people out on

15  that highway over that 400 miles, true?

16  A      True.

17  Q      So it's important for you to follow safety rules as well.

18  Fair?

19  A      Yes, sir.

20  Q      When we heard questions about the fact that you were not

21  carrying passengers, you don't take your responsibilities any

22  less seriously because there is other people on the road,

23  true?

24  A      Yes, sir.

25  Q      And you referred to the bus as a 20-ton bus.  How many

DEPOSITION TESTIMONY OF AKOS GUBICA

1    tons is your tractor trailer?

2    A    How many tons is mine?  Loaded or unloaded?

3    Q    On the night of this incident.

4    A    Forty tons.

5    Q    A little over 40, right?

6    A    Below 40, slightly.

7    Q    About 8,000 pounds, over 40 tons, correct?

8    A    No, less than 40 tons.

9    Q    Well, what was it weighed at after the accident?

10   A    Are you talking about what the police weighed it?

11   Q    Sure.

12   A    I can't remember.

13   Q    It was 88,350, correct, sir?

14   A    If that's what your paperwork says.

15        "THE COURT:  When you left the rest stop, you had to

16   weigh out, right?

17        "ANSWER:  When I left Hi-Tech in Brooklyn, I got

18   weighed out.

19        "THE COURT:  What was the weight at that time?

20        "ANSWER:  79,020 pounds."

21   BY MR. KIEFFER:

22   Q    Regardless whether it was 80,000 or 88,000, it was about

23   twice the weight of the bus?

24   A    Give or take.

25   Q    And that's one of the reasons it's so important that you

DEPOSITION TESTIMONY OF AKOS GUBICA

1   don't create a hazard on the highway.  Fair?

2   A    Can you ask that question again?

3   Q    Sure.  The fact that you're on the highway with other

4   people and you have a 40-ton tractor trailer, that's one of

5   the reasons why it's so important for you not to create a

6   hazard on that highway, true?

7   A    True.

8   Q    And as a professional driver, you would agree, wouldn't

9   you, sir, that a tractor trailer driving 16 miles per hour on

10  this stretch of highway under the conditions of this night and

11  without four-way hazards on would constitute a hazard?

12  A    Yes, sir.

13  Q    That's not safe either, is it?

14  A    It wouldn't be safe, no.

15  Q    On the condition of this night without four-way flashers,

16  would that have been safe?

17  A    No.

18  Q    It would have created a hazard for you and other drivers

19  on the road, true?

20  A    Yes.

21  Q    Did anybody at either Brooklyn or Exit 4 check to see if

22  you were too tired to drive or check to see if your logs were

23  in order?

24  A    No, sir.

25       MR. KIEFFER:  Picking up at line 24 on page 51.

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1            Steven.
 2            "ANSWER:  I would like to correct that.  My usual
 3   stop is Delaware truck stop from Brooklyn to Ohio."
 4   BY MR. KIEFFER:
 5   Q    Okay.  And from Exit 4 to Ohio, how long is that trip?
 6   A    Six hours, roughly, give or take.
 7   Q    At the point of impact, sir, you don't recall any
 8   vehicles in front of you, true?
 9   A    True.
10   Q    Other than the lights from your headlights, it was pitch
11   dark to you, other than that, true?
12   A    True.
13   Q    There were no lights on the side of the road.  Fair?
14   A    Fair.
15            MR. KIEFFER:  Page 73, line 20.
16   BY MR. KIEFFER:
17   Q    Mr. Gubica, I want to talk a little bit about the area
18   where you drove by the Poconos.
19            How long a stretch of highway is that?
20   A    Are you talking about just the Pocono mountains?
21   Q    Yes, as you're going through there on I-80.
22   A    That would be from Mile Marker 299 to 286, roughly.
23   Q    And one of the things that you have noticed when you
24   drive your tractor trailer is that the steeper the grade, the
25   slower you go?
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1   A    Yes, sir.

2   Q    And, in fact, this is the steepest grade along I-80 in

3   Pennsylvania, isn't it?

4   A    Yes.

5   Q    So, I assume you go considerably slower in that area than

6   you do in the area of the accident?

7   A    What do you mean by "considerably slower"?

8   Q    How much slower do you go?

9   A    Two to six miles per hour less than the Poconos.  Poconos

10  is less than the other grade.

11  Q    Two to six?

12  A    Two to six, yeah, probably.

13  Q    Are you telling this jury that the Poconos mountains, the

14  steep grade on I-80, in your words much steeper than the grade

15  at this accident site, you would only go 2 miles per hour

16  slower?

17  A    I just said two to six.

18  Q    If you were going six miles per hour slower, that would

19  have taken you down to around 35 to 37 miles per hour,

20  wouldn't it?

21  A    No.  If I was doing roughly 40 -- if I was doing roughly

22  40 miles per hour.

23  Q    Well, you heard Mr. Smith even do some numbers and saying

24  you were going 43.  Do you recall that?

25  A    Yes.

DEPOSITION TESTIMONY OF AKOS GUBICA

1   Q    If he's right, then you were doing 37 to 40 in the

2   Poconos, true?

3   A    Well, 43 is further than 37, I would say.

4   Q    Forty-three minus six is 37?

5   A    I would say 45 minus 6 would be around 39.

6   Q    But you would agree you didn't have your four-way hazards

7   on in the Poconos, true?

8   A    Yes, sir.

9   Q    If you were going under 40, you should have, shouldn't

10  you, sir?

11  A    If I was under 40, I should have had it on, yes, sir; but

12  I wasn't.

13  Q    This is a photograph of your tractor trailer the

14  following morning.

15  A    That's what it looks like, yes, sir.

16  Q    It extends a little further to the left.  It's just not

17  in the picture.

18  A    True.

19  Q    These are dark gray tarps is how you describe them to me

20  on deposition?

21  A    Dark gray tarps.

22  Q    I think, when we saw the picture earlier, it looked like

23  the back one was darker than the front.  Was that true or just

24  that particular picture?

25  A    The back one is darker.  Like I said before, it was

DEPOSITION TESTIMONY OF AKOS GUBICA

1    probably covered in mud, the first tarp.  When you get to the

2    landfill, sometimes it rains; and sometimes you get mud on it.

3    Q    You have no lights at the top of your tractor trailer,

4    true?

5    A    No lights on the back of my trailer, no.

6    Q    Thank you for correcting me.

7         No lights on the top of the your trailer, correct?

8    A    There is no top.  The top is the deck, the top of the

9    load.  You mean the trash?

10   Q    Right.

11   A    There is no lights on top of the trash, no.

12   Q    You have an obligation to know whether or not or how

13   other vehicles on the road can observe your vehicle, don't

14   you?

15   A    Yes, sir.

16   Q    This is the tractor part, correct?

17   A    Yes, sir.

18   Q    And the remaining is the trailer?

19   A    Yes, sir.

20   Q    And you don't expect that a vehicle behind this with the

21   load you have on this, that they're able to reasonably see the

22   tractor portion of the tractor trailer, true?

23   A    You follow the trailer.  You have the truck in front of

24   you.  You're not going to see the truck, no.

25   Q    That's what I was going to clarify.  You're not going to

DEPOSITION TESTIMONY OF AKOS GUBICA

1   see the truck part, the tractor part, true?

2   A    Probably not.

3         MR. SAAL:  I'm sorry.

4         "THE WITNESS:  You follow a trailer.  You have the

5   truck in front of you.  You're not going to see the truck, no.

6   BY MR. KIEFFER:

7   Q    There has been some questions about whether you ever

8   changed your story about your speed.  You have changed your

9   story about how often you look into your side-view mirror on

10  the night of this accident, haven't you?

11  A    I made a correction, yes, sir.

12  Q    Well, at one point you said 10 to 15 minutes when first

13  asked, correct?  Minutes the first time, correct?

14  A    Yes, sir.

15  Q    We played that video.  You saw that.

16  A    Yes, sir.

17  Q    Later, you tried to say 10 to 15 seconds, true?

18  A    I corrected myself that I meant to say 10 to 15 seconds.

19  Q    You recall, sir, you and I having a conversation about

20  this in your deposition?

21  A    About what?

22  Q    About looking in your side-view mirror and about whether

23  you could see the Greyhound bus or not.

24  A    Yes, sir.

25  Q    You told me you would have seen it if you had looked in

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   your mirror, true?  Sir, you were asked under oath:
 2              "QUESTION:  Sure, if you had looked in your mirrors
 3   15 or 20 seconds before this accident, you would agree that
 4   the Greyhound bus would have been visible, correct?"
 5              Correct.
 6              What was your answer?
 7   A   "Yes."
 8   Q   You agree with that today, don't you, sir?
 9   A   Yes.
10   Q   What explanation do you have for not seeing the Greyhound
11   bus prior to impact?  What was your answer?
12   A   "It wasn't 15 or 20 seconds.  Looking in my mirrors might
13   have been a minute."
14   Q   So, as we talked it through at the deposition, you
15   realized it could have been up to a minute before you looked
16   in your mirrors, correct?
17   A   It's possible, correct.
18   Q   And you would agree you also told me at your deposition,
19   that wouldn't be safe and cautious like you were taught, true?
20   A   I don't recall that.
21   Q   Let me ask you this.  Wouldn't you agree if you didn't
22   check those mirrors that you may not be aware of your
23   surroundings of a potential danger?
24   A   Can you repeat that again?
25   Q   Sure.  If you didn't look in your mirrors -- I'll get the
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1    exact wording here; let's start this question over -- and if a

2    tractor trailer operator does not check those mirrors every 15

3    to 20 seconds, that would not be safe, would it?  How do you

4    answer that?

5    A    Can you repeat it one more time?

6    Q    If a tractor trailer operator does not check those

7    mirrors every 15 to 20 seconds, that would not be safe, would

8    it?  What is your answer?

9    A    It all depends.

10   Q    When you were asked under oath, sir, if a tractor tailor

11   operator does not check those mirrors every 15 to 20 seconds,

12   that would not be safe, what was your answer?

13   A    It wouldn't be safe, no.

14   Q    It would not be safe, no.

15        That was your answer.

16   A    That was my answer.

17   Q    And the reason for that is that you may not be aware of

18   surroundings that post some type of potential danger, correct?

19   What was your answer?

20   A    I said:  Yes.

21   Q    You agree that four-way hazards help prevent rear-end

22   accidents, don't you?

23   A    Yes, sir.

24   Q    When you're out, driving at night, as a professional

25   truck driver, you have certain expectations of other drivers

DEPOSITION TESTIMONY OF AKOS GUBICA

1  on the road?

2  A    Yes, sir.

3  Q    Would you expect, if you saw taillights in front of you

4  on a dark night like this on this stretch of highway, without

5  four-way hazards, wouldn't you expect that that driver would

6  be traveling school-zone-type speeds?

7  A    If the vehicle wouldn't have the hazards on?

8  Q    Without the hazards.

9  A    You would expect it's going regular speed.

10  Q    That was my point.  When you see those taillights, you

11  expect it to be going highway speeds, true?

12  A    Yes, sir.

13  Q    And we talked about earlier at the beginning of the

14  examination about driving 16 miles per hour on the highway at

15  night without four-way flashers.

16        Do you recall that we talked about that?

17  A    We did talk about such things, yes.

18  Q    You use a pretty strong word to describe what type of

19  danger that would be, don't you?

20  A    The danger would be what?

21  Q    Driving 16 miles per hour without four-way hazards on

22  this stretch of highway under the conditions of this night.

23  A    It would be dangerous, yes.

24  Q    What you said under questioning from counsel for a bus

25  passenger was it would be suicidal, true?

DEPOSITION TESTIMONY OF AKOS GUBICA

1   A     It would be suicidal, yes, sir.

2   Q     And you don't mean intentionally, but you mean it would

3   be highly dangerous.

4   A     It would be highly dangerous.

5   Q     Why?

6   A     Because you're not telling the individual behind you that

7   you are going under 40 miles per hour, that you are a

8   slow-moving vehicle.

9   Q     Why is that dangerous?

10  A     Because other person doesn't know that he is going slow.

11  So they can't react to it in a proper fashion.

12  Q     The same is true for 20 miles per hour, right, sir?

13  A     Yes, sir.

14  Q     In fact, even at 25, I think your testimony was that it

15  would not -- that it would not only dangerous and hazardous,

16  it would be absurd to drive that slow on this stretch of

17  highway at night without four-way flashers, true?

18  A     Yes, sir.

19  Q     You also said the same for 30 miles per hour, correct,

20  sir?

21  A     No, sir.

22  Q     We can go to that same deposition.

23  A     I think we stopped at 26 miles per hour, the last

24  conversation we had about that, if I recall correctly.

25  Q     So you do remember the conversation?

DEPOSITION TESTIMONY OF AKOS GUBICA

1   A    It was 26.  I think that's when we shut it off at, yeah.

2   Q    Let me ask the question one more time.

3            Would you agree that traveling 30 miles per hour on

4   that stretch of highway under the same conditions without

5   hazards would be dangerous?

6   A    It would be dangerous, yes, sir.

7   Q    Same is true for 35 miles per hour, correct?

8   A    Yes, sir.

9   Q    And even 37 or 38 without hazards, correct?

10  A    Yes, sir.

11  Q    And why would it be dangerous?

12  A    Because the other person behind you does not know that

13  you're going a slow speed.  This way they could react to you.

14  Q    Because there is nothing on your vehicle that is

15  communicating that to the other drivers without the four-way

16  hazards, true?

17  A    If it's under 40 mile per hour, yes.

18  Q    And you were well aware that if you were under 40 miles

19  per hour, you were required to put your hazards on, true?

20  A    Yes, sir.

21  Q    Would you consider 35 considerably slower than 65 on this

22  type of highway?

23  A    Yes, sir.

24  Q    Now you knew when you talked to state troopers that

25  night, if you were going under 40, you were required to have

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   your hazards on.  You knew that, true?
 2   A    Yes, sir.
 3   Q    And you also knew that if you were going under 40 miles
 4   per hour without your hazards that night that you would
 5   creating a hazard for others, true?
 6   A    Yes, sir.
 7   Q    And when you talked to Trooper Andress, he asked you
 8   specifically why you were going the speed you were going.
 9            Didn't he ask you that?
10   A    That's not how it came up, no.
11   Q    In fact, you were not able to give him an answer, were
12   you?
13   A    I gave him the answer the very first time, when they
14   asked me, and I told them -- I told him the very first time
15   they asked me, Andress.  He's the one that came up to me the
16   first time for a report.
17   Q    Let me just ask you this, sir.  You understand the police
18   report indicates, when asked why he was traveling 45 miles per
19   hour, the operator was unable to provide an answer.  You know
20   it says that, true?
21   A    Who says this?
22   Q    Trooper Andress.
23   A    Says what again?
24   Q    That you were unable to provide him an answer as to why
25   you were traveling the speed you were traveling.
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   A    That's correct.  It might say it in the police report,

 2   but that's incorrect.  I'm sorry.

 3   Q    And, in fact, when Corporal Schmit talked to you that

 4   night, as he testified and it's in the report, you then told

 5   him it was because of your transmission, tried?

 6   A    No.  I never spoke to Corporal Schmit.  That's not the

 7   first time I'm telling you this.  I never spoke to him.  He

 8   never had an interview with me.

 9   Q    The jury doesn't know everything we talked about.

10   A    I apologize.

11   Q    Sir, you understand that Corporal Schmit, at least

12   according to him, when he talked to you, you gave him a

13   different answer than what you gave to Trooper Andress, true?

14   A    No.

15   Q    You disagree with that; but you understand that's what he

16   is saying, isn't it?

17   A    He can say that, but that's not what happened.

18   Q    And then subsequently you got a call from Trooper Andress

19   when you were at your house, didn't you?

20   A    No.  That would be the other officer.  It wasn't Andress,

21   no.  It was Schmit.

22   Q    Another trooper called you when you were at your house

23   and said:

24        We want to ask you some more questions because we

25   are hearing different stories.
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1              Didn't he tell you that?
2   A    It wasn't at my house, but he did call me two days later.
3   Q    You do agree, though, that transmission problems can
4   cause you to go slower, especially on grades, true?
5   A    It is possible.
6   Q    Having a heavier vehicle, the heavier it is, the slower
7   you might go as well, true?
8   A    Possible.
9   Q    When you were asked whether transmission problems can
10  impact the speed of the tractor trailer, in your deposition
11  you said it can, didn't you?
12  A    I don't recall.
13  Q    You were asked at your deposition in December, 2014, at
14  page 270, line 10:
15              Could a transmission problem impact the speed of the
16  tractor trailer?
17              And your answer was:  It can.
18              Could a transmission problem impact the speed of the
19  tractor trailer?
20              Your answer was:  It can.
21              Did I read that correctly?
22  A    You're reading it correctly.
23  Q    That was your answer under oath, correct?
24  A    Yes, sir.
25  Q    And although you're claiming that you didn't talk to
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1    Corporal Schmit about your transmission, you agree that you

2    had just worked on your transmission a couple of weeks before

3    this?

4    A    Yes, sir.

5    Q    And you're not a DOT-certified mechanic in anyway, are

6    you?

7    A    No.

8    Q    Mr. Gubica, you will agree that after the accident, the

9    switch in the cab, the truck part, was found to be inoperable

10   to the hazards in the back, correct?

11   A    After the accident, yes.

12   Q    And you never looked inside that switch yourself, did

13   you?

14   A    No, I did not.

15   Q    And there were no repairs to the inside of that cab, were

16   there?

17   A    Say that again.

18   Q    Were there any repairs to the inside of that cab?

19   A    When?

20   Q    After the accident.

21   A    No.

22   Q    Even though the switch wasn't operable, true?

23   A    After the accident, true.

24         MR. KIEFFER:  Page 143.

25   BY MR. KIEFFER:

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1   Q    Mr. Mannion asked you a few questions about the

2   transmission.  You had it rebuilt, what, like two or three

3   days before the crash; is that right?

4   A    Yes, sir.

5   Q    You had driven about six or 8,000 miles on that

6   transmission?

7   A    Yes, sir.

8   Q    We talked a lot or Mr. Mannion talked a lot about hazards

9   and when your hazard lights are on at speeds of 16, 20 and 30.

10           Do you remember all that testimony?

11  A    Yes.

12  Q    Were you doing any of those speeds?

13  A    No, I was not.

14  Q    How fast were you going at the time of the crash?

15  A    Approximately about 45 miles per hour.

16  Q    You understand that is consistent with some other experts

17  that this jury has heard, correct?

18  A    Yes, sir.

19           MR. KIEFFER:  This is a continuation of Mr. Gubica's

20  testimony on July 18th, the morning session.

21  BY MR. KIEFFER:

22  Q    Mr. Gubica, so it's clear, please state your full name

23  for the judge and jury.

24  A    Akos Gubica.

25  Q    When this accident occurred, when you were rear-ended by

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1   the Greyhound bus, how fast were you going?

2   A    Approximately 45 miles an hour.

3   Q    Every time a police officer asked you how fast you were

4   going at the time of the accident, what did you say?

5   A    Going about 45 miles per hour.

6   Q    You were in court when you heard Trooper Schmit testify

7   that he thought you were going 16 miles per hour at the time

8   of the accident, right?

9   A    That's what he said, yeah.

10  Q    Is that true?

11  A    No.

12  Q    How fast were you going at the time of impact?

13  A    Approximately 45 miles per hour.

14  Q    On the night of October 8th, in the early morning hour of

15  October 9, were you having any problems with the transmission?

16  A    No, sir.

17  Q    Tell me about the lights.  Tell the jury, rather, about

18  the lights in the back of your trailer.

19  A    I had three sets of three circular LED lights which glow

20  red; and I had one LED light for my license plate, so

21  altogether ten LED light.

22  Q    Also in the back of the trailer is there any -- I think

23  we're heard the term "conspicuity" or reflective tape?

24  A    DOT reflective tape, yes, sir.

25  Q    Now in the ride from Hi-Tech through New York City,
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1   across the GW, to the Delaware truck stop, any problems at all
2   with the operation of your vehicle?
3   A    No, sir.
4   Q    Now after you woke up, what did you do while you were
5   still at the Delaware truck stop?
6   A    I would get my papers in order and do a pre-trip
7   inspection again.
8   Q    I don't want to belabor it but:  Did that consist of all
9   the same things that you described when you did the pre-trip
10  inspection at Hi-Tech?
11  A    Yes, sir.  I do the same pre-trip inspection.  I check my
12  load to see if all the straps are tight, see if all my lights
13  are in working order, and check the tires; and I would go.
14  Q    Were all the lights in working order?
15  A    Yes, sir.
16  Q    Were the hazards lights in working order?
17  A    Yes, sir.
18  Q    Was your load still secure?
19  A    Yes, sir.
20  Q    Had it shifted on the trip from New York City to the
21  Delaware truck stop?
22  A    No.
23  Q    Was the tarp in the condition that it was when you put
24  the original load together?
25  A    Yes, sir.

DEPOSITION TESTIMONY OF AKOS GUBICA

1   Q    The road that you're taking, 80, is that just straight

2   and flat the whole way across the Commonwealth of

3   Pennsylvania?

4   A    No.

5   Q    Can you describe the road as you get up to the area of

6   the accident?

7   A    Pennsylvania has a lot of hills, a lot of curves, turns,

8   90-degree sharp ends.  That's about it.

9   Q    In the location of this accident, how would you describe

10  the road?

11  A    Slight inclined with a slight bend to the road to the

12  right.

13  Q    Were you able to do the Pocono climb without any problem?

14  A    Yeah, no problems.

15  Q    Now, you seen and you heard the testimony about speed

16  limits in the area of 65.  And the minimum being what?  Do you

17  know?

18  A    Forty miles per hour.

19  Q    Were your hazards on when this accident occurred?

20  A    No, sir.

21  Q    Why not?

22  A    Because I wasn't going that low a speed.  I was doing

23  approximately 45 miles per hour, and I don't need to have my

24  hazards on.

25  Q    Have there been times as a truck driver where you're

DEPOSITION TESTIMONY OF AKOS GUBICA

1  driving when you've gone under 40 miles per hour and put your

2  hazards on?

3  A    Yes, sir.

4  Q    In what situations has that happened?

5  A    As truckers, we usually put hazards on if it's real foggy

6  outside or you have to drive slow or there is a slow-moving

7  vehicle in front of you or it's an emergency stop, to let the

8  people behind you know that something is going on.

9  Q    Would you ever drive at 16 miles an hour without hazards?

10 A    No, sir.

11 Q    Would you ever drive at 25 miles per hour without

12 hazards?

13 A    No.

14 Q    As you proceeded across I-80 that day and that evening in

15 the morning, what was your range of speed?

16 A    Between 40 to whatever the speed limit allows, 65, and

17 now 70, but back in those days it was 65, I think.

18 Q    Why would you be going at the lower speeds?

19 A    Inclines, mountains.

20 Q    Let's talk about the accident.  You're driving down the

21 road.  What lane were you in?

22      MR. SAAL:  I have that stricken.  I have it

23 stricken.  Do you want to check?

24      (Discussion between counsel; off the record.)

25      MR. KIEFFER:  Page 46, line 9.

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   BY MR. KIEFFER:
 2   Q    Let's talk about the accident.  You're driving down the
 3   road.  What lane were you in?
 4   A    Right lane.
 5   Q    What is the next thing?  What happened?
 6   A    A big jolt from behind.  I got hit from behind.
 7   Q    What did you do?
 8   A    Since I just did the transmission job on the truck, I
 9   wanted to protect my transmission as best I can.  So I put it
10   in neutral, held onto the steering wheel; and I steered both
11   vehicles to the shoulder because we were interlocked at that
12   time.
13   Q    Did you bring the vehicles to a stop?
14   A    Yes, I did.
15           MR. KIEFFER:  That concludes Mr. Gubica's testimony.
16           THE COURT:  Okay.  Does that conclude the rebuttal
17   case?
18           MR. MCELFISH:  Yes, Your Honor.  At this time, the
19   plaintiff rests.
20           THE COURT:  Great.
21           MR. BARMEN:  Up to you, Your Honor.
22           THE COURT:  Why don't we go right into closings,
23   then, ladies and gentlemen?  All right?
24           MR. BARMEN:  May I proceed, Your Honor?
25           THE COURT:  You may.
```

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1              MR. BARMEN:  Thank you.

 2          Good afternoon, ladies and gentlemen.

 3          JURORS:  Good afternoon.

 4              MR. BARMEN:  My last chance to speak with you during

 5     the course of this trial.  Before I really get into what I

 6     want to talk about, I want to thank you once again for your

 7     time and your attention and your patience, and your sacrifice.

 8              I want to thank Judge Reyes and his staff who have

 9     been fantastic, and I want to acknowledge plaintiff's counsel

10     and his team.  Clearly, we don't always agree on things.  If

11     we did, we wouldn't be here, but I respect their ability as

12     lawyers.  They're good lawyers, and they have done a nice job

13     for their client.

14              In this case -- and they have done what good lawyers

15     are supposed to do.  They tried to convince you that their

16     narrative is correct, that their position is right.  They have

17     done everything in their power to do that.  But remember, in

18     this case, your decision has to be based on facts and the law,

19     and your common sense.  So remember that as you go forward.

20     You did that in phase one.  All I ask is that you do it again

21     here in phase two, nothing more, nothing less.

22              We're here in the punitive damage phase because

23     another jury in Pennsylvania determined as a result of this

24     accident, Greyhound and Sabrina Anderson acted outrageously,

25     and the judge will explain a little more about that to you
```

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   later on when he charges you.
 2           Now, we don't know what it was they found that they
 3   determined to be outrageous, but here we are.
 4           MR. MCELFISH:  Objection.
 5           THE COURT:  Overruled.
 6           MR. BARMEN:  I tried the Cleveland case along with
 7   Tom Mannion.  I tried the Philly case.  I don't know why we're
 8   here, but we're here.
 9           And because we're here, you're going to be charged
10   that you have to fix an amount of money for the benefit of
11   Mr. Bauta to punish Greyhound and Sabrina Anderson for the
12   conduct that caused the accident and to deter Greyhound and
13   Sabrina Anderson from similar conduct in the future -- and
14   again, the judge will charge you on that.
15           I submit to you upfront, there's no reason to deter
16   Sabrina Anderson.  Her professional driving career ended when
17   this accident happened and she lost her leg.  She's not
18   permitted to drive anymore.
19           You're going to need to decide how much punishment
20   and how much deterrence is necessary.  In doing so, you're
21   going to need to consider some critical factors.
22           The first in Mr. McElfish's opening in this phase
23   about a week ago, he told you -- one of the first things he
24   said was this phase of the trial is the not about Mr. Bauta.
25   You recall that?  Not about Mr. Bauta.
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1          I submit that's a hundred percent false.  It is

2    about Mr. Bauta.  Mr. McElfish doesn't get to tell you what

3    the law is.  Judge Reyes, when I'm done with my summation and

4    Mr. McElfish is done with his, will charge you on the law that

5    applies to this phase of the trial, as he did after the first

6    phase of the trial.

7          And one of the things he's going to tell you is that

8    in fixing the number for punishment and deterrence, one of the

9    factors you have to consider is the harm done to Mr. Bauta.

10   That's something you have to consider in fixing the number.

11   You also understand that the money that you give -- whatever

12   it is -- goes to Mr. Bauta.

13         MR. MCELFISH:  Objection to this line.

14         THE COURT:  Overruled.

15         MR. BARMEN:  So it is about Mr. Bauta.  It's

16   absolutely about Mr. Bauta.  You will be told when it comes to

17   the punishment aspect of punitive damages, you are only to

18   consider Mr. Bauta, the harm done that you've already done

19   determined was done to Mr. Bauta and no one else, just

20   Mr. Bauta.  It is about Mr. Bauta.

21         I told you, they're good lawyers.  They had a

22   narrative.  They have an agenda, and their motivations are in

23   line with their client.  That's pretty standard.

24         You heard the evidence.  Do you believe based on

25   what you have heard over these last five weeks -- going on

DEPOSITION TESTIMONY OF AKOS GUBICA

1  five weeks -- that their concern is how Greyhound does

2  business, that their concern is to deter Greyhound and change

3  Greyhound's operations and behavior to prevent these things in

4  the future -- or is it about money?

5        That's the question that you will have to decide.  I

6  think you know where I stand on it.  But that's something that

7  you will decide based on the facts and the evidence, and the

8  law and your common sense.

9        In making the decision, what their motivations are

10  and what this is about, I ask you to remember one thing from

11  the last phase of the trial.  These are the same money people

12  that tried to convince you of a manufacturer brain injury.

13        MR. MCELFISH:  Objection.

14        THE COURT:  Sustained.

15        MR. BARMEN:  Consider the motivations when you are

16  making the determination.

17        I believe the evidence you have heard supports my

18  position and our team's position.  Let's talk about that

19  evidence.  What have you heard?  What haven't you heard?

20        You heard Greyhound is the gold standard in the

21  motor coach industry in terms of training and safety.  You've

22  heard that they are the benchmark in safety.  Their own expert

23  agrees.  The only expert they brought in here, Dr. Czeisler,

24  the sleep expert, came in here and told you that Greyhound's

25  fatigue management program as of 2006 was the benchmark in the

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1    industry -- and that was the program put together by Alertness

2    Solutions and Dr. Mark Rosekind, who went on to become an

3    administrator at NHTSA, after being appointed to that position

4    by President Obama.

5         Dr. Czeisler goes on to say that while they were the

6    benchmark in the industry in 2006, they were woefully

7    inadequate in 2013 when this accident occurred.  Those were

8    the words he used:  "Woefully inadequate."

9         But he can't tell you a single motor coach company

10   in the world that does anything better than Greyhound, that

11   does anything more than Greyhound.

12        Why?  He told you.  I never looked at anybody else.

13   I can come in here and tell you Greyhound is woefully

14   inadequate, but I don't know what the industry standards are.

15   I don't know what the industry does.  I just know they're

16   woefully inadequate.  We will talk about his opinions and how

17   he reached those later -- but again, I just want you to

18   remember those pieces as we move through this, this morning.

19        So what do you have to consider?  For starters, you

20   have to consider the conduct -- the conduct of Sabrina

21   Anderson on the night of the accident, going back even a

22   couple nights before that and you have to consider the conduct

23   of Greyhound in contributing to this accident, and how that

24   conduct contributed to the harm suffered by Mr. Bauta.

25        Let's start with Sabrina Anderson.  To assess her

1  conduct, you have to consider the conditions she faced on the

2  night of the accident, and you heard quite a bit about it, in

3  this phase.  The accident happened at 1:30 in the morning on

4  October 9th, 2013.  It was pitch-black.  John Blatt called it

5  the lonely stretch of I-80.

6           On that stretch of I-80, she encountered a garbage

7  hauler driven by Mr. Gubica -- who you just heard from --

8  going 16 miles-an-hour in a 65 mile-an-hour zone -- sixteen.

9  How do we know that?

10          You heard from Corporal Schmit of the Pennsylvania

11  State Police Cars unit, a specially-trained highly qualified

12  accident reconstruction trooper from the state police, who was

13  qualified as an expert in this case, who did a four-month

14  accident investigation with full reconstruction, and using the

15  physics of accident reconstruction and the conversation of

16  linear momentum, he determined the truck was going 16

17  miles-an-hour, but of course, Mr. Gubica disputes that.  He

18  doesn't dispute he didn't have his hazards on.  He does

19  dispute that the switch was broken, but there's no dispute

20  that after the accident, the switch was broken.

21          There was no damage to the cab of the truck.  The

22  bus hit the back of the trailer.  You heard him say there were

23  no repairs to the tractor post-accident.  Why?  Because all

24  the damage was to the back of the trailer.  So what makes

25  sense?  It's another situation where the pieces don't fit, and

DEPOSITION TESTIMONY OF AKOS GUBICA

1    use your common sense.

2           You heard from Mr. Evans, Jim Evans, the independent

3    trucker who came and testified on behalf of the plaintiff.

4    He's the one that saw Mr. Gubica ninety miles east of the

5    accident back on Mount Pocono.

6           He agreed with me.  Gubica could have been going as

7    slow as 35 miles-an-hour on Mount Pocono -- and guess what,

8    ladies and gentlemen, he didn't have his hazard lights on.  If

9    he was under 40, he was required to do it.

10          And you heard Mr. Gubica just say -- a matter of

11   moments ago -- to go 16 miles-an-hour on that highway would be

12   suicide.  To go 35 without hazards on that highway would be

13   extremely dangerous.  Why?  Because you pose a hazard to

14   everyone else on the road because the people coming up behind

15   you can't discern how quickly they're closing on you and

16   discern you as a hazard unless you give them warning.  Sabrina

17   Anderson had no warning because the hazards weren't on.

18          Now, do the Pennsylvania State Police have a dog in

19   this fight?  No.  And they determined independently that

20   Mr. Gubica was going 16 miles-an-hour without his hazard

21   lights on.

22          Now, they're going to point to the fact, that

23   Sabrina Anderson never saw the truck as evidence that she was

24   fatigued or drowsy or experiencing micro-sleeps or whatever

25   else they want to say.  But they ignore her testimony that I

DEPOSITION TESTIMONY OF AKOS GUBICA

1    didn't see the truck, because it doesn't fit their narrative.

2    And again, they're being good lawyers, sticking to the

3    narrative.

4            Sabrina Anderson's testimony is evidence.

5    Everything they say to contradict that is supposition.

6    Sabrina Anderson has testified at three different trials and

7    been deposed at least five times and her testimony on this

8    issue has never wavered:  I wasn't tired.  I wasn't fatigued.

9    I secured my rest.  I didn't see the truck.

10           Who else didn't see the truck?  You heard from John

11   Blatt.  He was the other independent truck driver, the only

12   witness to the accident, the person who saw Sabrina Anderson

13   driving for the last five to seven miles prior to impact, the

14   only person who saw the impact.

15           What did he tell you?  It was a clear night.  The

16   sightlines were two to five miles.  There was a slight curve

17   in the road.  I never saw the truck.  If was the truck was

18   there to be seen that night, I would have seen it.  But he

19   didn't see it.  He thought when the accident occurred and he

20   saw the bus stop and the back lights on the bus go up, he

21   thought the bus had hit a deer because he didn't see the truck

22   up ahead.

23           Who else did you hear from in that regard?  Remember

24   Rausario Sanchez?  I believe her video was played yesterday.

25   She was the passenger on the bus from Santo Domingo, Dominican

DEPOSITION TESTIMONY OF AKOS GUBICA

1  Republic.  What did she tell you?  She was awake that light,

2  unlike most of the other passengers because she can't sleep on

3  the bus at night and she was praying the Rosary.

4          And prior to the accident, she was looking out the

5  front window, and what did she see?  Nothing.  Blackness.

6  Didn't see a single light.  And she was looking out the front

7  window at the time of impact.  Remember she said it was black

8  and then there was a big explosion, but she didn't see

9  anything other than darkness.

10          Now, why didn't Sabrina Anderson see the truck?  Why

11  didn't John Blatt see the truck?  Why didn't Rausario Sanchez

12  see the truck?  You saw photographs throughout the course of

13  this case -- and you can refer to it as Defense Exhibit 2 when

14  you deliberate -- of the vehicles taken by the Pennsylvania

15  State Police post-crash, when the vehicles were still fused

16  together.

17          Just remember, you heard Gubica say, too, he steered

18  them to the side because the vehicles essentially became one.

19  The bed of the truck infiltrated the cab of the bus by about

20  six feet.  They became one unit.  There was no rebound.  And

21  you saw the photograph of the vehicles on the side of the road

22  still together with the tarp covering the back lights of the

23  trailer.

24          Now, there is no way, I submit, that that tarp could

25  have gotten into that position post-crash -- because again,

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1   there was no rebound.  If the tarp was up at impact, it
 2   couldn't have gotten down after impact.  It had to be there
 3   before.  It's physically impossible for any other explanation.
 4           Now, they point to a photograph post-accident when
 5   the vehicles had been separated, the back of the truck, and
 6   you can see the lights on the truck.  What they don't tell
 7   you -- because they're good lawyers -- is that was after the
 8   Pennsylvania State Police had tested the lights for hot shock.
 9           MR. MCELFISH:  Objection.  This is not in evidence.
10           THE COURT:  Ladies and gentlemen, these are closing
11   statements.  It's your recollection of the evidence that
12   controls, not what the lawyers tell you the evidence is.
13   Okay?
14           MR. BARMEN:  There's no dispute as to whether the
15   lights on the truck were on.  The dispute is whether they were
16   covered and visible, and you have that photograph to look at.
17   And there's no other explanation for it other than the fact
18   that it was down.
19           You also saw the photograph early on of the
20   passenger side of the tractor trailer further up towards the
21   cab, where the tarp was clearly out covering the conspicuity
22   tape from the middle of the trailer forward.
23           And you remember what Jim Evans said?  Well, yeah.
24   When I saw it ninety miles back, the tarp was secure in the
25   back.  The tarp was secure on the driver's side, the left
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1  side, but I never saw the passenger side.

2       And I showed him that photograph and he agreed with

3  me.  If that was the condition of the tarp at any point on the

4  route, that Mr. Gubica was not driving professionally.  He was

5  not doing what he was supposed to do and he was posing a

6  hazard, just like it would be a hazard if you were driving

7  below 40 miles-an-hour without your hazards on or driving 16

8  miles-an-hour, which he himself admits would have been

9  suicidal.

10       Again, Sabrina Anderson has been adamant from the

11  start:  I wasn't tired.  I secured my rest.  I was fit to

12  drive.  In response, they offered supposition and innuendo and

13  speculation.  They attack her to make her look like a liar.

14  They throw her phone records up and say, you must have been on

15  the phone.  Look at these.  They ignore the fact that she has

16  testified consistently for years that when she was at home,

17  she would sleep in her room and her phone would be charging

18  outside and the four family members and the other people that

19  came in the house with her used her phone.

20       The phone records are a red herring and here's why.

21  Both experts you heard from agree.  Well, you heard from more

22  experts than two.  The sleep experts, Morey and Czeisler both

23  agree on a couple of things.  Phone records notwithstanding,

24  Sabrina Anderson had seven plus hours to secure rest in

25  Cleveland on October 7th before she left for New York.  They

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
1   also agree -- Czeisler included -- that she had seven plus
2   hours of time to sleep in the dorms in New York on October
3   8th, before she started the return trip to Cleveland.
4          So what do they do, being good lawyers to try to
5   skew that narrative?  Well, Czeisler says it must have been
6   too noisy in the dorms.  Glen Mitchell disagrees.  Sabrina
7   Anderson disagrees.  Their expert says what he says, and
8   that's to be expected.
9          But no one can say Sabrina Anderson wasn't telling
10  the truth today, a year ago, two years ago, the eight or so
11  times she has testified, sworn testimony under oath that she
12  secured her rest in Cleveland, and that she secured her rest
13  in New York -- not one person can tell you different.
14         Now, I want to go back to John Blatt, to allay any
15  lingering concerns that you might have that Sabrina Anderson
16  was fatigued at the time of this accident or that she wasn't
17  fully paying attention.  John Blatt, as you recall, was the
18  Yellow Roadway Driver, YRC, with nearly 50 years of driving
19  experience, both tractor trailers and motor coaches.
20  Remember, he drove motor coaches, too.
21         He was the only person that witnesses this accident,
22  the only person that saw how Sabrina Anderson was driving in
23  the ten minutes or so leading up to the accident, including
24  the accident.
25         And what did he see, ladies and gentlemen?  He
```

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

 1   recalled seeing the bus come up behind him on I-80.  Now, he
 2   wasn't sure 'til it got close to him that it was a bus, but he
 3   knew it was a larger vehicle.  And nothing he saw then
 4   concerned him about how it was being operated.
 5           Then the bus moved to the left lane to pass him, and
 6   what did he say?  He said the bus made a courteous pass, a
 7   professional pass.  And as the bus was passing him, he gave
 8   its speed as just under 70 miles-an-hour.  He was right.  It
 9   was 67, as we know.
10           What else did he say?  As the bus cleared him, it
11   activated its right turn signal.  When it was far enough ahead
12   and clear, he flashed his lights and he said that's an old
13   thing truckers did as a courtesy to say, you're clear.  Go
14   ahead and move over.
15           At that point, Sabrina Anderson moved over.  What
16   happened then?  Sabrina Anderson flashed her back lights as an
17   acknowledgment to Mr. Blatt.  And she proceeded to drive
18   straight and level, without a waver or a wobble from that
19   point until the accident.  John Blatt told you that.  What's
20   John Blatt's interest in any of this?  Absolutely nothing.
21           Like Jim Evans was a man who was subpoenaed to come
22   in here multiple times now and testify to what he saw.  And
23   what he saw, I submit is the most critical thing of anything
24   you've heard, because Jim Evans didn't see from the crash.
25   Jim Evans didn't see how Sabrina Anderson was driving that

DEPOSITION TESTIMONY OF AKOS GUBICA

1    bus at the critical moments before the accident.

2            Jim Evans only saw the tractor trailer ninety miles

3    and two hours east of the accident site and he told you -- I

4    think Jim Evans is a good guy -- and he told you what you

5    would expect him to say:  I have no idea what happened with

6    that truck and the tarp and how it was being operated in the

7    ninety miles between when I saw it on Mount Pocono and when I

8    came across it again after the accident.  The only one who

9    knows those things are John Blatt.

10            And if she was asleep or fatigued at that moment in

11   time, John Blatt would have known it.  And John Blatt would

12   have radioed someone because he said he would have.  Jim Evans

13   says, the bus passed me.  It was swerving a little bit.  It

14   hit the rumble strips, but he wasn't concerned enough to radio

15   anybody.  He told you he's not a shy guy and if he saw

16   something he thought was dangerous on the road, he would get

17   on the radio and he would have done it in the past, but he

18   didn't do it here.  Why?  Because it wasn't necessary.

19            Also remember Jim Evans' testimony evolved a little

20   bit.  His statement evolved a little bit.  Initially, it hit

21   the rumble strip once, the bus hit the rumble strip once and

22   when she moved to the right, he never had to adjust his path

23   of travel.  But later when he talked to Attorney John Ashcroft

24   and gave that statement, things had changed.  I'm not

25   suggesting that Jim Evans lied.  I'm suggesting that maybe he

DEPOSITION TESTIMONY OF AKOS GUBICA

1    was influenced a little bit in what he remembered, but it

2    wasn't what he told the police initially.  It changed.

3         So is that consistent -- is what John Blatt saw

4    consistent with someone who was asleep at the switch?  You

5    know it was not.

6         Let's talk about how Sabrina Anderson was trained,

7    because that's going to lead me back into Greyhound, too.

8         She had months of intensive schooling.  There were

9    at a military base for three months in in Illinois before she

10   ever had the opportunity to get behind a wheel of a bus with

11   passengers and when she did, it was only with a supervisor on

12   board.

13        And the training continued, repetitively, refresher

14   training every two years at least, from the time she started

15   driving in around '01 until this accident occurred in 2013.

16   And the training that you heard about, we're going to talk

17   about a little more is the most intensive in the industry, and

18   it is substantially above and beyond what any law or

19   regulation requires because that's what Greyhound does.  They

20   go above and beyond.

21        Now, the training she had included fatigue

22   recognition, fatigue mitigation, fatigue management.  Why?

23   Because, as Mr. McElfish told you in his opening in this

24   phase, Greyhound, of course, was aware of the science on

25   fatigue and the importance of mitigating fatigue and the

DEPOSITION TESTIMONY OF AKOS GUBICA

1   potential dangers fatigue can cause when you are in a driving

2   industry, especially when your cargo is people.

3          But also keep in mind that the industry standards

4   that apply to professional drivers and motor coaches are the

5   same industry standards that apply to Mr. Gubica, Mr. Evans,

6   Mr. Blatt, commercial truck drivers; and the only regulation

7   anybody could tell you is you can driver ten hours in a clip

8   before you've got to go on rest duty.

9          There's not one regulation that says you have to

10  stop at 150 miles or approximately 150 miles or two hours or

11  three hours.  There's not one.  They didn't bring in an

12  industry standard expert to tell you that there is because

13  there isn't.  It just simply doesn't excess.  We're going to

14  talk about the 150 miles in a few more minutes; but keep in

15  mind, when we get there, this was an internal company rule,

16  not a standard, not a requirement, not a regulation, not a

17  law.

18         Now, back to Sabrina Anderson.  They showed you,

19  they showed you first all the Stay Sharp and Alertness

20  Solutions bulletins that we had.  On the one hand they tell

21  you we did nothing relative to fatigue management after

22  Alertness Solutions was gone in 2006; but then they show you

23  all these bulletins from 2004 to 2013, right up to when this

24  accident happened.  We're putting out these bulletins all the

25  time.  That is part of the ongoing training.  Sabrina received

DEPOSITION TESTIMONY OF AKOS GUBICA

1   those.  All the employees received those, not just the

2   drivers.  Hans Phillipe got it; Rey Osselin got them, because

3   safety is a top-to-bottom issue for Greyhound.  It has to be.

4           And what do those bulletins say?  You can ask for

5   them in evidence and take a look at them.  They include

6   everything that they and Dr. Czeisler told you that we should

7   have been doing that we weren't doing:  Circadian rhythms,

8   sleep cycles, proper nutrition, proper rest, how to recognize

9   signs of fatigue, how to mitigate fatigue.  It's all in there

10  time and time and time and time and time again.  Yet they tell

11  you it's not because they're good lawyers and they have a

12  narrative.  But it's there.  You've seen it.  You can see it

13  again.

14          By looking at it and reading what's in there,

15  actually having the opportunity to read what's being said,

16  it's the exact science, it's the exact things that Czeisler

17  came in here and told you we weren't doing.  We were doing it.

18  We were doing it from the moment it became known as a science,

19  not before Alertness Solutions.  We brought Alertness

20  Solutions to come in, in 2003.  Dr. Mark Rosekind, you

21  remember him?  Got promoted to administrator of NHTSA by

22  President Obama because of his expertise?  And both Drs

23  Czeisler and Moore-Ede agree on that, Dr. Rosekind's

24  expertise.  He did the program, Alertness Solutions program

25  for Greyhound.

DEPOSITION TESTIMONY OF AKOS GUBICA

1        Now, when a company hires a consultant, you're not

2   hiring that consult in perpetuity.  You're hiring that

3   consultant for a reason.  Here, it was come and in look at our

4   program.  Look at what we do.  Make it better.  Make it

5   stronger.  Implement something better for us.  When we get to

6   the point where we can run with it, we don't need you anymore.

7   That's how it works, and that's what happened here.  But it

8   didn't end in 2006.  It was built upon after that.  Sabrina

9   Anderson was always, always involved in that part of the

10  training.

11       What do they focus on?  What do they build their

12  punitive damage case around?  G40.  I mentioned it to you a

13  little earlier, the internal code tire check rules that was

14  antiquated.  It was never a fatigue rule.  It was a tire check

15  rule put in place at a time where those kind of stops were

16  required by Federal law because of the nature of balloon tires

17  and because of the roads and, as tire technology changed and

18  you went from balloon tires to steel-belted radials and as

19  roads changed from primarily two-lane, country highways to

20  multilane superhighways like I-80, that law, that requirement

21  came off the books but Greyhound kept it in there because

22  Greyhound always goes above the bare minimum.

23       Keep in mind a law, a regulation, that's the floor.

24  That's the bare minimum requirement.  Do you want a company

25  like Greyhound to do the bare minimum, or do you want them to

DEPOSITION TESTIMONY OF AKOS GUBICA

1   do more?  Greyhound always strived to do more and that's what

2   G40 was, but it was never about fatigue.

3          Now, when Alertness Solutions came in, they looked

4   at it; and say, hey, you know, here's something that requires

5   some stops.  Use those to refresh yourself.  That's what those

6   bulletins say.  Remember G40 to refresh yourself.

7          I want to ask you:  Would we be here if Greyhound

8   hadn't kept G40 on the books?  If when the law went away, the

9   requirement went away, they took it out, what would their

10  argument be then?  They can't say we violated any state or

11  Federal law or regulation because we didn't.  All they point

12  to is internal company rule.

13         Ladies and gentlemen, remember, despite the fact

14  that their entire case is G40, G40 was off the books when this

15  accident happened.  Remember Rule 5.8 and the rule book that

16  took the place of the one with G40 in July of 2013?  It's in

17  evidence.  What do they tell you about that?  Next to nothing.

18  Because, again, they're good lawyers and it doesn't fit their

19  narrative.

20         What does 5.8 say?  It still says every

21  approximately 150 miles get out and check your tires.  It

22  doesn't say anything about that fatigue.  What else does it

23  say?  It expressly says those checks can be done at designated

24  meal and rest stops.  That's Milesburg at least on this run.

25  That's was the rule that was in place when this accident

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

 1   happened, not G40.  Yet that's what they want to talk about ad

 2   nauseam:  G40.  It wasn't even the rule in place.  It's

 3   undisputed 5.8 was, and 5.8 permitted Sabrina Anderson and

 4   every other driver to stop at the designated meal or rest

 5   stop.  Did they tell you that?  I don't remember that they

 6   did.

 7        What was Greyhound's practice relative to stops?

 8   The minute you start to feel fatigued, stop anywhere, anytime,

 9   whether you're 30 miles from the terminal, 130 miles from the

10   terminal, or 150 miles.  The minute you don't feel up to

11   driving, find a safe spot and stop and then call dispatch and

12   they will send a replacement driver and the driver who makes

13   that call is not penalized for doing it.  It's encouraged

14   because it's a safe practice.  It's the safest practice.

15        These are professional drivers.  Giving them the

16   discretion to stop wherever or wherever you want is the best

17   practice.  That's what Dr. Moore-Ede told you.  It just makes

18   good sense.  It's common sense.

19        If G40 and 5.8 never existed, would we be here in

20   front of you with you going to assess punitive damages against

21   Greyhound and Sabrina Anderson for some failure to follow an

22   internal rule (A) that wasn't the rule at the time and (B)

23   doesn't represent what they tell you it does?  That's

24   something you really have to consider and think about hard

25   when you're in that jury room, deliberating on this issue.

DEPOSITION TESTIMONY OF AKOS GUBICA

1          Now, Greyhound has been in business for over a

2     hundred years.  I submit to you Greyhound would be not in

3     business a hundred days if they weren't fully committed to

4     safety, considering the business that they're in; and they've

5     been the industry leader for over a hundred years because of

6     the firm commitment to safety.

7          You heard from David Leach, the president and CEO of

8     the company, a man who over several years and several trials

9     I've gotten to know and admire greatly.  He started with the

10    company as a baggage handler, and he worked his way up to the

11    CEO.  That says a lot about him and his drive for excellence.

12    I think it also says a lot about a company that gives someone

13    the opportunity to go from baggage handler to president and

14    CEO.  What did David Leach tell you?  Greyhound is -- safety

15    is the DNA.  It's the culture; and it starts from the baggage

16    handlers, like he was, to the CEO that he is and everyone in

17    between.  It's preached at every level; and the goals he told

18    you are zero, zero accidents, zero workplace injuries, zero,

19    zero, zero, zero.  He stood there, being the man that he is,

20    and he told you we haven't gotten there yet.  We strive to do

21    better, we can do better, and the goal is zero.

22          But when you drive hundreds of millions of miles a

23    year, which Greyhound does, accidents are going to happen,

24    because you're still dealing with human beings like Sabrina

25    Anderson and other people on the road; and you heard that

DEPOSITION TESTIMONY OF AKOS GUBICA

1   there is one preventable accident, meaning one accident found

2   to be Greyhound's fault, every 4 million miles driven, one

3   accident Greyhound's fault every 4 million miles driven.

4   David Leach isn't satisfied with that because that's not who

5   he is, and he will not be satisfied until the number is zero.

6   Zero.

7           And he told you about how they strive to do that and

8   the training and the commitment and no stones left unturned

9   and no corners cut.  You heard from David Leach.

10          You heard from Al Smith, another gentleman who

11  worked his way up in the company.  He started as a driver and

12  now he is the National Safety Director and he is the foremost

13  expert in the industry on safety.  When I say the industry,

14  ladies and gentlemen, I don't mean the motor coach industry.

15  I mean the transportation industry.  You heard Mr. Smith.  You

16  heard David Leach talk about Mr. Smith.

17          Mr. Smith is the chairman of a committee of 150

18  motor carriers because of his reputation and his excellence

19  and his knowledge in the field.  He is sought out by the U.S.

20  Government, DOT, DOD, NHTSA, NTSB to lecture to them for his

21  expertise and his excellent and his commitment to safety in

22  the transportation industry.  He doesn't waiver about it.

23  He's the National Safety Director.  If he's on the highway,

24  driving his personal vehicle, and he sees a Greyhound bus,

25  he'll follow it for 50 or 60 or 70 miles and then he'll write

DEPOSITION TESTIMONY OF AKOS GUBICA

1   up what he saw, because of his commitment to safety, and he

2   leads by example just like David Leach.

3           I have a tremendous of amount of respect for the

4   people at Greyhound, for the way they care about the company

5   and the way they put safety first and where their values are.

6   That's why the company has succeeded for as long as it has.

7   It's people like David Leach and Al Smith and Rey Osselin and

8   Hans Phillipe and Sabrina Anderson, all down the line.

9           But keep in mind, folks, at the end of the day

10  people are still people.  People make mistakes.  Accidents

11  happen.  I'm not saying this accident was the result of

12  anything they claim it is but certainly the accident should

13  not have happened and it did and it was our fault.  But was it

14  an institutional failure, or was it a tragic and unfortunate

15  accident?  Accidents happen, despite the goal being zero.

16          Now, you heard from Dr. Moore-Ede.  You heard from

17  Al Smith.  The training considers proper rest, sleep cycles,

18  circadian rhythms, recognizing science fatigue, the importance

19  of securing proper rest, nutrition.  What did Sabrina Anderson

20  tell you?  If I didn't feel up to driving, I called off, which

21  is what we were trained to do, and I've done it in the past

22  and I've never gotten in trouble for it.  They make a big deal

23  out of, well, if you call off, you're not going to get paid.

24  A lot of people have jobs where, if you call off sick, you

25  don't get paid.  That's life.

DEPOSITION TESTIMONY OF AKOS GUBICA

1          But if you're making a run and doing turnaround and

2    you can't make the turnaround and you still get paid half or

3    you get to deadhead back, the point is the training says if

4    you are not rested, if you are not fully ready to go, call

5    off.  You know, they want to tell you we didn't have anybody

6    trained to recognize signs of fatigue.  Well, Dr. Czeisler

7    told you he can't name one company in the motor transport

8    industry that can say we have dedicated people that are doing

9    fatigue checks on every driver that goes out.  He told you

10   that.  Yet for some reason we should have it, when nobody has

11   it and it's not the industry standard.

12          What we do have are people like Rey Osselin who are

13   trained in reasonable suspicion training, to look for certain

14   signs.  Before you leave New York, you meet with Rey Osselin

15   or someone on the same level with him.  He checks your

16   paperwork.  He checks your license.  He checks your logs to

17   make sure everything is in order.  He interacts with the

18   driver to make sure nothing's out of the ordinary.  And he's

19   been trained to recognize signs.  He didn't see bloodshot eyes

20   or shaking hands.  We had a couple of passengers say that.

21   Remember?  And what does Dr. Czeisler tell you?  Well,

22   disregard what Rey Osselin says.  Disregard what Hans Phillipe

23   says.  They're not trained to assess fatigue.  Oh, but look at

24   these passengers as if they are trained to assess fatigue.

25   Makes no sense, none whatsoever.

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1          What was Dr. Czeisler's opinion?  Again, Greyhound's

2    Fatigue Management Program was state of the art in 2006; and

3    it was woefully inadequate in 2013.  What does he point to, to

4    support those opinions?  One thing that he told you about, the

5    FMCSA program that he initially testified was distributed to

6    motor coach and carrier companies like Greyhound, as if to

7    suggest they sent it to us.  And then when I pressed him on

8    cross-examination, remember he said, oh, no, I didn't mean to

9    say distributed but it was there on the website if they wanted

10   to go get it and they never went and got it.

11         Well, what did Dr. Moore-Ede tell you?  Everything

12   that was in that FMCSA program, Greyhound was already doing at

13   least that and more.  Dr. Moore-Ede told you the same thing.

14   We had modules.  We had training on those things.  Sabrina was

15   trained on those things.

16         The issue is:  Was the training in place?  Of

17   course, it was; and it was stressed time and time again.

18         If you have any questions still about Dr. Czeisler

19   and where his interests lie, remember the testimony about the

20   UPS case he was involved in.  Heard most of it from

21   Dr. Moore-Ede.  You remember what Dr. Moore-Ede said about it.

22         Dr. Czeisler was retained by UPS as an expert in a

23   case involving a UPS truck accident.  In that case where

24   Dr. Czeisler said UPS's Fatigue Management Program was fine

25   and dandy and suitable and not a single problem with it, that

DEPOSITION TESTIMONY OF AKOS GUBICA

1  driver that was involved in the accident from UPS had been up

2  for 21.5 straight hours prior to the accident.  He had been

3  diagnosed with sleep apnea prior to the accident.  He had been

4  terminated by UPS before the accident because he stopped on a

5  route to rest because he was tired.

6         Think about that.  They hired him back; but they

7  made it clear to him you are not to stop on a route, even if

8  tired, because you've got to get from A to B to C on time.

9         Now in our case Sabrina Anderson was awake for five

10  hours before the accident and she had been driving for three

11  and Dr. Czeisler said he had no problem, no issues with either

12  of those timeframe.  But up for 21.5 hours, not allowed to

13  stop for fatigue, was diagnosed with sleep apnea, and he says

14  that program's fine.  Yet Greyhound's program is woefully

15  inadequate.  Does that make sense?  Do those pieces fit, or is

16  it part of the narrative?  I think you know the answer.

17         Now, I'm going to wrap up here.  Dr. Moore-Ede,

18  again, told you that the program, our program was the gold

19  standard.  Giving drivers discretion to stop whenever they

20  feel necessary is the proper course of action.

21         Greyhound implemented every recommendation by the

22  FMCSA and did more.  No one in the industry does more or does

23  it better than Greyhound.

24         And you do what you did with Alertness Solutions.

25  You implement it and then you move on and you run it yourself

DEPOSITION TESTIMONY OF AKOS GUBICA

1   and Greyhound did all those things and continued to do them

2   right up to this accident and continues to do them today.

3           Now, one more thing about Czeisler, the sleep

4   expert, sleep expert.  What did he tell you about Mark

5   Soberay, the passenger whose statement he relied on?  Remember

6   Mark Soberay was the one who said, I was sitting in the front

7   seat.  I saw the driver dozing off.  I was so frightened.  I

8   thought about asking her to pull over on the side of the road

9   and let me off.  I was scared for my life.  So, what did I do?

10  I went to sleep.

11          And I asked Dr. Czeisler:  Does that make sense,

12  Mr. Sleep Expert, if someone's in fear for their life and

13  saying the things he claims he said, that he would just go to

14  sleep?

15          What did Dr. Czeisler say?  Well, that's not

16  unusual.

17          That's what the sleep expert said because it fits

18  the narrative.  Ask yourself if that makes sense.  Certainly

19  it didn't make sentence to Dr. Moore-Ede.

20          Also consider of all the people on the bus that were

21  awake, there's not a single text.  There's not a single email.

22  There's not a single phone call from any of them, saying, I'm

23  concerned about how the bus is being driven, not one.  In this

24  day and age of cell phones and social media, not one.  You

25  know why.

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

```
 1          So, how did we get to this point?  Is Greyhound an

 2  unsafe bus company that doesn't value safety above all else,

 3  or is it the result of good lawyering and false narratives?

 4  You have to make that decision.  That's for you to decide.  No

 5  one really knows what happened on that night on that highway,

 6  but we know the conditions Sabrina was facing when she

 7  encountered the slow-moving truck at 16 miles an hour with no

 8  hazard lights on.  We know what John Black said.  We know

 9  that, despite Greyhound's best efforts, accidents can and do

10  still happen.

11          You have to determine what the conduct warrants as

12  it relates to injures and harm to Mr. Bauta and nothing else.

13  When you determine that, thinking about Sabrina's conduct,

14  remember she's a human being.  Certainly no one has suggested

15  that either he or Greyhound set out to do harm.  Nobody has

16  suggested that.  The issue is:  What happened that night, and

17  did Greyhound take the steps to properly train people to avoid

18  these types of situations?  I submit to you that they did.

19  Accidents still happen.

20          Balance Sabrina's conduct with Greyhound's culture

21  and commitment to safety.  Again, this wasn't an institutional

22  failure.  Again, this is to punish and deter.  Think about

23  what you are punishing and what you're trying to deter.  How

24  much punishment is warranted based on what you heard and what

25  you know, and what deterrent is needed going forward for a
```

DEPOSITION TESTIMONY OF AKOS GUBICA

1   company that is Number One in the industry and committed to

2   safety with a goal of zero accidents going forward?

3          Those are the determinations you have to make, and

4   you have a responsibility to consider everything you heard.

5   Again, your common sense and your common experiences are

6   important.  Please don't forget those.

7          I told you many weeks ago now that this is not the

8   Powerball.  This is not a casino.  This is a court of law, the

9   United States for the Eastern District of New York.  The facts

10  and the law matters; and your duty is to weigh that all and be

11  reasonable, like you did the first time, like I have every

12  confidence you will do again.

13         The conduct specifically related to Mr. Bauta,

14  despite -- listen to the law that the judge gives you at the

15  end of the case.

16         We're not perfect.  Greyhound's not perfect but

17  Greyhound strives to be the best and they're the industry

18  leader and they continue to do so because safety of the

19  passengers and the employees is paramount and it always has

20  been and it always will be.

21         Now, all I ask is, when you review the evidence and

22  weigh the facts, that you be reasonable and do what you feel

23  in good conscience will serve the purposes of punitive damages

24  as the judge gives them to you.

25         Once again, I thank you for your time.

LISA SCHMID, CCR, RMR

DEPOSITION TESTIMONY OF AKOS GUBICA

1          THE COURT:  Ladies and gentlemen, it's time for the

2    plaintiff's closing which will be 45 minutes.

3          Does anyone want to take a break before then?

4          Okay.  Let's take a bathroom break.  Come back in

5    ten minutes.  Okay.

6          (Jury exits.)

7          (Recess.)

8          THE COURT:  Mr. McEflish, there is an application

9    from your adversary.

10          MR. MCELFISH:  I know.

11          THE COURT:  Go ahead.

12          MR. SHAUB:  Your Honor, again, we are -- after the

13    plaintiff put on his rebuttal case, we're briefly renewing our

14    motion for judgment as a matter of law under Rule 50(a), on

15    the grounds that any award of punitive damages in this case

16    would be a successive verdict to the Pennsylvania and Ohio

17    verdicts and thereby violate the defendants' due process

18    rights.

19          We also are maintaining our opposition to the

20    application of offensive collateral estoppel for the reasons

21    previously stated on the record and the memorandum of law that

22    was filed at Docket Entry Number 219-4.

23          THE COURT:  Denied.

24          MR. SHAUB:  Thank you, your Honor.

25          MR. MCELFISH:  Judge, he went from 25 to 45.  Can I

LISA SCHMID, CCR, RMR

1   get more than 45?

2          THE COURT:  No.

3          (Discussion off the record.)

4          THE COURT:  You may be seated.

5          Okay.  You may begin, Mr. McElfish.

6          MR. MCELFISH:  Thank you, Your Honor.

7          Good afternoon.

8          JURORS:  (No response.)

9          MR. MCELFISH:  Testing.  Good afternoon?

10         JURORS:  Good afternoon.

11         MR. MCELFISH:  Thank you, guys.

12         All right.  First of all, obviously, you know, it's

13  not lip service.  We are grateful for your service.  It is

14  unbelievable how long this trial is going on.  You guys are

15  real, real, real troopers for hanging in there.

16         I noticed that you paid close attention.  You took a

17  lot of notes.  So we appreciate your doing that.  I know that

18  you're going to listen closely, look closely at the evidence

19  when you make your decisions.

20         I do thank Mr. Barmen for all the compliments.  I

21  think I found counted it nine or ten times, he said we're good

22  lawyers.  I appreciate that.

23         (Continued on the next page.)

24

25

1          MR. McELFISH:  Summation – Mr. McElfish (Continuing)
2   We try to be good lawyers, we try to get the evidence in so
3   you can consider it.  There is no narratives, we are just here
4   to get the evidence is and that's what good lawyering is
5   about, what it is supposed to be about.  So in five weeks ask
6   yourselves so what is this about?  What is it that we are here
7   for?  Obviously it is a big commitment.  And I suggest to you
8   it's a big reason why you are here.  To be able to decide this
9   case and make a difference in the world the way that you are
10  going to be able to do in this case is a big deal and in the
11  way that I am going to describe it and in the way the evidence
12  has gone in.  It certainly is, I think, a giant privilege and
13  we appreciate the fact that you are doing that.
14          Now, Mr. Barmen brought up a couple of times well,
15  why are we here?  Is it good lawyering?  We are here because a
16  jury in Pennsylvania found them liable for the accident and
17  found their conduct outrageous.  That's why we are here.  No
18  other reason.  So that was a little bit sort of misleading in
19  that way because he knows why we are here.  The jury in
20  Philadelphia certainly came to that conclusion.  The judge is
21  going to instruct you on that that their conduct both Anderson
22  and Greyhound was outrageous.  That's it.
23  Most of what I heard from the defense in their closing
24  arguments, and I thought he did a good job, was really to try
25  and convince you about what the jury in Pennsylvania already

 1   decided, to try to convince you, for instance, that Anderson

 2   is not at fault because somehow this truck was invisible --

 3            MR. BARMEN:  Objection.

 4            THE COURT:  Overruled.

 5            MR. McELFISH:  -- to try and somehow convince you

 6   that Greyhound's management fatigue programs aren't inadequate

 7   so they shouldn't be held to punitive damages and that's

 8   already decided.

 9            MR. BARMEN:  Objection, Your Honor.

10            THE COURT:  Sustained.

11            MR. BARMEN:  Move to strike.

12            MR. McELFISH:  So your job here is really only one

13   thing.  And he kept bringing us the first phase of the trial

14   and what I said about how this phase is not going to be about

15   Mr. Bauta's faults.  That's not true.  You didn't hear

16   anything about Mr. Bauta in the second phase of the case.  It

17   was really about assessing Greyhound's conduct.  That's all it

18   is about.

19   And when you get the charge from the Judge, he is going to

20   instruct you you can consider harm to Mr. Bauta, but you don't

21   have to consider that.  You can consider the conduct of this

22   company and the character of this conduct.  That's really what

23   this is about.

24   And the other thing that you did not hear from the defense,

25   and I'm a little surprised about, is that you consider also

 1    their wealth, their money when deciding how much money to give

 2    in a punitive damage award.  It wasn't mentioned.  So what I

 3    said wasn't false.  You already dealt with Mr. Bauta's issues

 4    in the first part of the case.  It's all good.  We are here to

 5    discuss something different and that's what we've been doing

 6    for two and a half weeks.  So your job is two things:  To make

 7    an award against Anderson and Greyhound that punishes them for

 8    what they did.  I am going to get into exactly -- I'm not

 9    going to be trying to prove it.  I am going to tell you

10    exactly what it is and why you should award:  One, to punish

11    them for what they did in this accident.  That's in the

12    instructions.  That's not coming from me.  That's not good

13    lawyering.  That's just in the Court's instructions.  It is to

14    punish them for the conduct that led to this accident that you

15    have heard about.  The second thing is to deter this conduct,

16    deter this conduct in the future, to stop it.  That's your

17    job.  And that's what these five weeks have culminated in, is

18    your chance and ability to do that.

19    Now, they've certainly muddied up the facts in the case, such

20    things as was Anderson sleepy, wasn't she sleepy, was the

21    truck visible, wasn't it visible, were the fatigue programs

22    good or not back in 2003?  I mean, this has already been dealt

23    with.  So you are bound to follow that determination that was

24    already handed down in Philadelphia.

25    What you did not hear out of the defense in closing arguments

 1   I'm going to tell you, you did not hear since 2016, when that

 2   case was tried, that they have made any changes.

 3            MR. BARMEN:  Objection.

 4            THE COURT:  Sustained.

 5            MR. BARMEN:  Move to strike.

 6            THE COURT:  Stricken.

 7            MR. McELFISH:  Mr. Leach testified that they have

 8   not made any changes to G-40 or any of the rules that were at

 9   issue in this case even up until the present day.

10            Do you remember what I said in the first trial?  A

11   trial fears no evidence because when it's put on and when it's

12   cross-examined, the truth comes out.  And the failure to make

13   any changes to the company policies came up in context with

14   Mr. Leach --

15            MR. BARMEN:  Objection.

16            THE COURT:  Sustained.

17            MR. McELFISH:  When Mr. Leach was asked, he was

18   talking about how they had the lowest incident rates in the

19   industry and he was asked about how many accidents they have a

20   week.  They have one bad accident a week, ladies and

21   gentleman.  You can say you were the benchmark in 2003 or 2006

22   or you were the gold standard over a decade ago, but it came

23   out, and he tried to paint it as fender-benders.  Those are

24   DOT reportable accidents where they have to be reported to the

25   United States Government Department of Transportation where

 1    injury, serious injury, death, and a towed bus are involved.

 2    That's the conduct that's outrageous.  Since 2013, over 250

 3    serious accidents have happened if you just do the math --

 4              MR. BARMEN:  Objection.

 5              THE COURT:  Overruled.

 6              MR. McELFISH:  -- if you just do the math at that

 7    rate.

 8              You heard that this is a business model that by its

 9    own parent company deems it to be a high severity operation,

10    meaning risk of injury is high.  Meaning, they run on highway

11    at high speeds, in the middle of the night.  It's high

12    exposure, and, as I mentioned, high frequency.  It is a

13    dangerous business that they're in, their own company

14    acknowledges that.  So, call it what you want, but what we are

15    here to do -- we are not here for rollerball or lotteries.  We

16    are not here for that.  The narrative, as I see it, is we want

17    to make a difference.  We want to make a difference.  And the

18    question that you have to ask yourself is how do we do that

19    with a company like this.  The answer is you look at their net

20    worth.  You look at the money they have and you penalize them

21    in a way that they will recognize it and it will not be shoved

22    under the carpet and it will not be pushed aside, so it can

23    keep happening over and over.  That's the narrative.  Call it

24    good lawyering, call it the truth.

25              They came in here and they tell you the G-40 is not

1    fatigue rule.  Well, that's wrong.  That's wrong.  You know,

2    Mr. Barmen kept saying well, what if we didn't have this, what

3    if we didn't have that.  Well, that's a lot of what it is.  We

4    wouldn't be here.  We didn't put out the fatigues rules,

5    folks.  We didn't put out the bulletins telling their drivers

6    to pull over.  And one of the key questions that I asked in

7    this trial was do these bulletins assume that the stops will

8    be made, because if the stops aren't made, then you are not

9    getting out and doing anything.  There has to be that built-in

10   assumption into those bulletins that if these things matter,

11   that if these fatigue directions matter in these bulletins the

12   stops have to be made or otherwise it just doesn't happen.

13   And the answer over and over from Greyhound executives was

14   they have to be made, they have to be made.

15   What's alarming to me is that they come into court and they

16   tell you how great they are and that their rules are no big

17   deal.  It's their rules, guys.  It's their rules.  They made

18   them.  It was no accident they made these rules.  You hear how

19   important they think safety is and how Al Smith goes around

20   all these committees.  You think it was an accident that they

21   need the drivers to take a break, call it 150 miles, call it

22   approximately 150 miles, call it G-40, call it five-eight.

23   They determined drivers need to take a break in a dangerous

24   business.  But yet every single executive got on the stand and

25   said they don't enforce it.  I will come back to that.

1    So what do we know?  I'm not going to spend half an hour

2    telling you about how Anderson ran into the back of a

3    tractor-trailer that had its lights on.  You've already heard

4    that.  It had reflective tape.  That wasn't mentioned.  They

5    forgot about that.  You heard the tarp, load shifted.  You

6    could see the load shift.  You could see everything moving.

7    You could see the straps moving back.  It's from the accident.

8    You heard witnesses say they saw the tarp was fine.  I mean,

9    it's just -- it's made up.  It's absolutely made up.

10   You even heard Mr. Gubica say well, it's mesh, so presumably

11   it will cover anything, you could still see it.  The crazy

12   thing is this is a truck that had its lights on, right.  I

13   mean, you see in the pictures the lights are on.  You heard

14   from the witnesses, and I can mention them to you, that they

15   saw the truck's lights before the accident as they were

16   looking out the window.  We don't know what Ms. Sanchez was

17   looking at, but we know that several other passengers saw the

18   lights on the truck before the accident.  Mr. Saifullah was

19   another one of those.  Mr. Soberay was another, I believe.

20   And Mr. Blatt didn't see this thing right away.  I mean, he

21   testified that it was 10 to 15 minutes after she passed him

22   that the accident happened.  That's what he has testified to

23   on videotape.  But what does that prove?  All experts admit

24   you can go into microsleep, you can have moments of

25   non-sleepiness and then you're right back to it again.

1          What's amazing about this whole big truck thing is

2   she hit the rear of this truck at 67 miles an hour without

3   touching the brakes.  I mean, you heard a little bit about

4   brakes in the D deck, but that was just the recording of it.

5   Every expert, even Schmit, the police officer, said there was

6   no braking in this accident, no steer input, straight in with

7   nine lights.

8          Greyhound wants to impugn its own passengers to

9   protect itself.  It's really crazy.  All of these -- these

10  people didn't all get together and try to figure this out, all

11  these passengers from different places, different walks of

12  life.  You got Mr. Evans who had no dog in the fight talking

13  about the truck, how good it looked, talking about the bus,

14  how it almost hit him.  That matches right up with Mr.

15  Saifullah who said he saw the bus move over and almost hit a

16  truck that blew its horn.  I mean, these are independent

17  sources of evidence that fit.

18  Mr. Osborn was thrown in his seat.  Ms. Liaca, whose

19  boyfriend's legs fell off her lap, she saw the lights coming

20  before the accident.

21  Mr. Soberay saw the driver falling asleep.  I mean, how do you

22  get around that?  The man was sitting in the front seat on the

23  passenger side of the bus and saw her dozing off.

24          There was also evidence in the police report of the

25  red eyes and you heard from the defense case some of their

 1    people.  I'll talk about that.
 2    Passengers told police officers what they saw in statements to
 3    the officers of the law.  What does Greyhound do?  They go get
 4    a baggage handler who hadn't said a word in three years and
 5    prep him up and put him up there to tell you she looked fine.
 6    Really?  Whose got the narrative now?  They get the lady from
 7    the security company who hadn't said a word in three years.  I
 8    don't know if you noticed, that's where my cross-examine was
 9    going, because she clearly was picked up by the lawyers and
10    prepped up and put up there to say she looked fine.  Do we
11    know whether she saw her?  Nobody knows.  There's no
12    contemporaneous report of that.  It was three later before
13    they ever said a word because the attorneys went and got them
14    for Greyhound.
15            Anderson in, our view, is a product of a reckless
16    culture.  They're really hanging her out to dry in some ways
17    because it's Greyhound that has the business.  It's Greyhound
18    that makes the money off the tickets.  But what do they do?
19    Despite all of their fatigue management and all their
20    bulletins.  What do they do?  They let it all on her.  They
21    let it all on her.  They told you she has financial
22    responsibility.  She takes care of everybody in her house.
23    She's going to work.  She's not going to take a pay cut to
24    ride pushing.  She's not going to call off.  She has bills to
25    pay.  I understand that, but this company let's it on her

1   back.  That's not right.  You got to step up and have a

2   failsafe plan here because they admit to you in opening and in

3   closing people are human.  Ladies and gentleman of this jury,

4   they are in the human business.  They know their drivers are

5   human.  So where are the policies to protect?  Why aren't they

6   enforced?  That's the outrageous behavior.  That's the conduct

7   that you look at when you decide this case.

8           Let's look at Anderson.  I mean, is she a rule

9   follower?  Is she an ideal driver, an ideal employee?  Well,

10  you heard about the phone bills.  I am not going to get into

11  those weeds.  The bills get matched up between when somebody

12  else supposedly had access and when she's in New York on her

13  own.  She admits she's violating company policy using her own

14  cell phone while she's driving and she'd get in trouble for

15  that if anybody knew about it.  She's using slot party on her

16  Facebook and posting to Facebook while she's driving and

17  working.  I mean, nobody really knows how much rest she had.

18  She might have slept just fine.  She might not have had sleep

19  for a week because the records are pretty good that she had

20  trouble sleeping and what supports it is the inverse sleep

21  schedule, frankly.

22  You look at when this was all going on and when she might have

23  been on the phone and you say well, that makes sense because

24  she had been on her daytime/nighttime sleep schedule just

25  prior to that and she was trying to convert over.  You heard

1     from all the experts that that's natural.

2             You heard about how she was asked by DOT doctors

3     about whether or not she had any illnesses.  Was that a

4     mistake or a lie?  I don't know, but it's certainly a problem,

5     that she didn't tell the DOT doctors about the cancer in 2013,

6     in August, three months before this accident.  She went and

7     got recertified without them knowing about that.  That's not a

8     small thing.  That's not a small thing when you are operating

9     a commercial motor vehicle with people on it.

10    You heard about, in opening statements, how quiet these dorms

11    were.  Ms. Mitchell took the stand and you heard how nosey

12    they were with the pool balls and the people in the hallways,

13    and the MTA drivers coming in and out.  It's a lot of drivers

14    coming in and out.  It's understandable.

15            And then we have the -- I think this is really

16    important, more so than anything else.  If you ask yourself is

17    Anderson a problem driver, you look at the incident from the

18    year before.  Folks, three months, two months -- excuse me,

19    two months after the stay-sharp video training or whatever it

20    was, she's weaving on the road.  And how do we know that?

21    Because it doesn't matter what Al Smith tells you here in

22    trial.  The report says it is a rest-fatigue issue.  It just

23    goes to the fact they don't want to accept responsibility for

24    this.  They come in here and deny and defend, deny and defend.

25    It's like as plain as the nose on your face when you look at

1   the report.  It's about rest.  It's about fatigue.  What did

2   she do, the model employee?  She blows it off, just blows it

3   off.  And what did they do?  They blew it off.  They track her

4   down, they go, hey, miss, I mean, kind of got to deal with

5   this here, got to get some training, maybe put you on a day

6   shift, maybe we'll change things up a little bit, maybe we'll

7   give you someone to keep an eye on you for a little bit.

8   Nothing.  It's outrageous.  Because they're in a dangerous

9   business.  Everything has to be seen, ladies and gentleman,

10  about how dangerous, high severity business they are in is.

11        Greyhound has a duty that I believe they have failed

12  miserably and they are not protecting the passengers and the

13  public from drivers who either make mistakes -- because people

14  make mistakes, we know that -- bad judgment, incompetence,

15  whatever it is.  They have to make sure, to the best of their

16  ability, that they do that.

17        Now, Greyhound claims safety is in its DNA.  That's

18  wrong.  We know that's not true, because -- and interestingly

19  enough, they have all these different executives.  They have

20  Mr. Lytle, who's the head of Cleveland, and they have Al

21  Smith, who's the national safety guy, and they got Dave Leach

22  who runs the thing.  And look, they're not on the same page

23  about this.  Al Smith sits and tells you cannot have safety

24  without rules.  Rules have to be enforced or you don't have

25  safety, including G-40.

1   And then Jim Lytle says we don't ever stop there.  We don't do

2   that, never did that, not going to do it, don't train for it.

3   You got to get on the same page if you are going to make up a

4   defense.

5   So what do they say about checking drivers?  Not a bad idea.

6   Have somebody trained who sees every driver.  Not somebody who

7   is a dispatcher who they have pulled out of service three

8   years after the accident and prepped him up.  I am talking

9   about people that are trained that they have to see every

10   time.  Because even Al Smith said Ray Ossling saw her, but

11   it's a random thing, we don't have a policy where we see

12   everybody.

13   Now, interesting Jim Lytle said we don't see anybody, there's

14   nobody to check.

15   Guys, if you want somebody to believe you're safe get on the

16   same page, at least.  They're so all over the place, it's not

17   even funny.

18            Is safety in their DNA?  Let's count the ways.  The

19   fatigue management program is old.  Even Mauryie (phonetic)

20   admitted that.  There's things they could be doing.  I don't

21   know if you remember, their own witness said that.  There's

22   plenty more they can be doing.  Drivers rate themselves on the

23   quizzes for fatigue.  Same videos, no verification.  There was

24   testimony that the timetables are just as important, if not

25   more important than safety.  How does that happen if safety

1   number one?

2   Drivers don't stop at G-40.  Interestingly, Mr. Barmen said

3   well, that's an old tire rule.  That's wrong.  That's not

4   right.  If you look at their own bulletins, we know that's not

5   true.  So why did they put it back in the book in July of

6   2013?  Why did they do that?  It still says stop at

7   approximately every 150 miles to take a break.  Why is he

8   making an argument to you that oh, that's not the rule

9   anymore, that's not G-40 anymore.  It's the same rule.  I'm

10  the one that showed it to you in opening statements where I

11  put them up side by side, and the only reason we called it

12  G-40 is because that's the book that Anderson last had.  But

13  for purposes of your duties here as jurors, it's the same

14  rule.  In fact, it is written tighter.  They have to be more

15  compliant with this five-eight.  So that argument makes no

16  sense at all, that somehow we are hiding from you that it's

17  not G-40, it is five-eight; it's the same rule.  It's just

18  that Anderson knew G-40 because that was the book she had and

19  nobody was really sure if she got the July book.

20          Let's assume that Greyhound enforced all of its

21  rules.  You know, is its fatigue management program any good?

22  It's probably okay.  I don't know.  But the problem is they

23  don't enforce it.  In fact, they don't enforce it and then

24  accidents happen and then they come into court and they try to

25  twist it around for you.  Oh, it's the fatigue rule.  No, it's

 1    not the fatigue rule.  Oh, it's the tire rule.  Oh, it's

 2    antiquated.  Oh, we should've taken it out, but we didn't.

 3    Come on.  It doesn't take good lawyering to see that, that

 4    little spin that they put on it.

 5            Yet, let's talk about G-40 and let's talk about

 6    breaks.  They want to minimize G-40 as some internal safety

 7    rule.  Okay.  That is a rule where drivers need to take a

 8    break so they don't crash rule.  That's what it is.  What did

 9    the scheduling people say about that?  People that weren't --

10    that weren't in line to defend these cases, if you follow me.

11    Tim Therrian and Rex Kemp, they said, oh, yeah, that's a rule

12    you got to follow and there's room in the schedule to do that,

13    you know, if they're going to do that, there's room, it's not

14    going to wreck the schedule.  So why don't they do it?

15    I asked Al Smith, do you remember the Google maps?  Those are

16    Exhibits 88, 89, and 90.  They have all the stops in Buckhorn

17    and Brookdale, all the Travel Americas.  I asked Al Smith, you

18    know, if you wanted to you can schedule these stops and then

19    drivers have to stop, right.  That's what makes sense.  Mr.

20    Barmen was talking about what makes sense, what doesn't make

21    sense.  That makes sense.  If you have a rule, which is a good

22    rule, stop, take a break, mitigate fatigue so you can driver,

23    not fall asleep, enforce it by scheduling the stops.

24            The trial fears no evidence.  Why don't they do it?

25    Because Dave Leach told you that if they did it it would cost

1    them money.  On this one particular route, 14,600 a year on

2    the Boston route, $167,000 a year, and that's only two routes

3    out of thousands on the timetable.  This is outrageous.  They

4    know it's safer.  They said it's safer.  Two  is better than

5    one stop.  Three is better than two stops, on and on.  Where

6    does it stop?  Nobody knows.  That whole game.  Make it two

7    and pay for it, instead of keeping all your wealth.  Protect

8    your drivers and your passengers and the public.  Stop lip

9    servicing people to death.  Schedule it, know the drivers will

10   stop.  Take the uncertainty, the human frailty out of the

11   equation.  Take it out.

12            Even Mr. Leach admitted, I guess we can do that.  It

13   shouldn't be a problem.  But the problem is money.  He doesn't

14   hear from safety directly.  He hears from the money people,

15   the financial people.  And I get that's part of running a

16   business.  But, ladies and gentleman, safety is also part of

17   running a business when it's high severity, high frequency.

18   You have to put money into that.  Deterrence.  Deterrence.

19   You can punish them.  Punish them.  That's fine.  You know,

20   but to stop this going forward so drivers are on the road with

21   breaks.  You go by a Greyhound bus you know they took a break.

22   It is an eerie feeling to leave it all up to a driver who's

23   trained that they cannot recognize their own fatigue.  Doesn't

24   it make sense?  Remember my example of, you know, you have the

25   remote in your hand and you fall asleep to TV.  I mean, that

1   happens to people no matter how trained they are, no matter

2   what their best intentions are, the company has to check them

3   before they stop at whatever cost it is.

4   It not only protects against drivers who make mistakes, but it

5   also protects against drivers that they know are a problem.

6   It's a really good way to sort of design around the human

7   mistake or human problem and they have to do that.  They can't

8   just go well, they left the terminal and it's out of our hands

9   now, we trained them.  That's crazy.  I'm sorry.  Driving all

10  the way through the night, she gets one stop fours hours or

11  four and a half hours into the trip and she only get a few

12  minutes for her own break.

13          There was a lot of double talk going on in this

14  trial by these executives.  All they have done, and I submit

15  to you I can't say is any plainer, I just can't say it any

16  simpler, all they are doing is justifying.  They spent five

17  weeks of justifying a system that's broken, that they don't

18  want to fix because it costs money.  That's all they have been

19  doing.  Again, punishment for the past, that's one thing you

20  can do because we know it happened.  Deterrence is more

21  important because it's into the future.  It's from this day

22  forward.  And, ladies and gentleman, it is across the

23  timetables, across the board at the company.

24  Mr. Barmen can say all day long that it's not institutional,

25  but when you don't have G-40 stops and you don't have drivers

1    taking appropriate breaks based on fatigue science and running

2    the risks of your passengers' lives, every route in the

3    timetable, that's institutional.

4         I want roadways to be safe.  I want them to be

5    saved.  They are an important part of our culture.  Yes, they

6    are.  But they don't get a pass for that.  They don't get a

7    pass.  And a stop is being put to it.  You're just anotFher

8    part of that process where you have to put a stop to it.  It's

9    been going on long enough.

10        I represent people and it matters to me.  That's the

11   narrative.  They represent corporations.  They are here to

12   protect their financial interest.  I get that.  I represent

13   people and I'm proud of that and I want people to be

14   protected.  Don't attack my narrative.  Don't a fact my

15   narrative.  My narrative is to protect people.  That's what we

16   want.  Whatever it is you decide to do, we hope that's what

17   it's about.

18        I know you get it.  I have a few more minutes.  I

19   want to say a few more things.  I appreciate your patience.

20        What does it take to get their attention?  Again,

21   there is an agreement, or it is in evidence that their wealth

22   in this case is $647 million.  As a jury, as a conscious for

23   our community, you can look at that and decide.  I cannot

24   suggest anything to you about what your award should be.

25   That's not what I am here for.  I'm not allowed to do that.

 1    What you can do is you can look at that, that amount of money.

 2    You can't even get your head around that amount of money.  And

 3    you can think about what Mr. Leach said about how much it

 4    would cost to change just two routes in a timetable with

 5    thousands.  You heard they travel 140 million miles a year.

 6    Great.  Good for them.  All we're asking -- we're not here to

 7    put them away.  That's not what this is about.  We are here to

 8    dock them.  That's what you do.  If you have a good athlete on

 9    your team, you don't want to cut them from the team.  But if

10    they break the rules, they have to be docked, their pay is

11    suspended and they're benched.

12            We're asking you to look at that wealth.  We are

13    asking you to consider what Mr. Leach is so worried about for

14    those two routes and take it across all the timetables,

15    because what Mr. Barmen left out, and I'm going to emphasize

16    it again, is that, under the law that Judge Reyes is going to

17    read to you, you are to consider this conduct and you are to

18    consider this wealth, that's what punitive damages are, folks.

19    It is deterrent for conduct that's outrageous.

20            Nor can I tell you how much of that wealth you can

21    attack.  I cannot.  But what I will say to you is you make it

22    substantial so that they are aware of it and they think twice

23    about doing this anymore, so they think twice about the danger

24    that they put people in, unsuspecting people who just want to

25    get from point A to point B, see their families, see their

 1    friends.

 2            Call is good lawyering, call it moments of honesty.

 3    Whatever you want to call it, what has happened is clearly

 4    profit over safety.

 5            MR. BARMEN:  Objection, Your Honor.

 6            THE COURT:  Overruled.

 7            MR. McELFISH:  Those were conscious decisions that

 8    were made at the top and they need to be changed.  The most

 9    important thing -- and I'm about to wrap up.  The most

10    important thing I think you can do with this verdict is to

11    prevent this from ever happening again.  Let them know that it

12    won't be tolerated, whether it is in Pennsylvania, Texas, or

13    Georgia, or in New York.  Let Mr. Leach know that he can't

14    keep all the money, he has to spend some, make things safe.

15    And wouldn't the drivers like a little more of a break.  Let's

16    face it.  We're talking about the safety of the public and

17    we're talking about the safety of the passengers.  That's the

18    bigger numbers here.  But you have a driver on the road for

19    eight hours staring into the dark roads with deer running

20    around, where the bus is dark and people are asleep.  That's a

21    long time, eight hours.  And it's not the only route that

22    that's long.  Give the driver two stops from New York to

23    Cleveland and let Mr. Leach pay for it because it's better for

24    the passengers, it's better for the public, and let the driver

25    have a break.

1    It is within your power, ladies and gentleman, to make this

2    change and to make this difference.  I have every belief that

3    you will and you will do it in a way, you will do it in a way

4    in which they understand that it is unacceptable and it won't

5    be tolerated.  You have, from the bottom of my heart, all my

6    thanks and hope.  I know you will do the right thing.  Thank

7    you.

8              THE COURT:  Members of the jury, I will now instruct

9    you on the law applicable to this phase of the case and then

10   you will retire for your final deliberations.  You have now

11   heard all of the evidence introduced by the parties and you

12   have learned the conclusions of which each party believes

13   should be drawn from the evidence presented to you.  It is

14   your job now to determine how much the plaintiff, Jose Bauta,

15   may receive in punitive damages from defendants Greyhound and

16   Sabrina Anderson.  It making that determination, you are to be

17   guided by my prior general instructions to you concerning the

18   role of the jury and the Court, the definition of evidence,

19   direct and circumstantial evidence, credibility, testimony

20   from expert witnesses, deposition testimony, and the quality

21   of litigants.

22             Punitive damages are awarded in order to punish the

23   defendants for outrageous conduct and to deter the defendants

24   and others from committing similar acts in the future.  A

25   person's conduct is outrageous when it is malicious, wanton,

willful, or oppressive, or shows reckless indifference to the interest of others.

A jury in Pennsylvania has already determined that Greyhound's and Sabrina Anderson's conduct was outrageous, and based upon the legal doctrine called collateral estoppel, the Court has applied that determination to this case.  It is your job to fix the amount of punitive damages separately against each defendant, Greyhound and Sabrina Anderson.

In doing so, you may consider any or all of the following factors:  One, the character of the defendant's acts.

Two, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause.

Three, the wealth of the defendant insofar as it is relevant in fixing an amount that will punish it and deter it and others from like conduct in the future.

The parties have agreed that Greyhound's net worth for the purpose of this trial is $647 million.  Whereas here, there is more than one defendant, you must decide the amount of punitive damages to be assessed and measured by your consideration of the factors I have listed as they apply to each particular defendant.

Although you returned your award of compensatory damages in one lump sum amount as to all defendants, you must return a separate verdict as to punitive damages against each of the defendants separately.

JURY CHARGE

1        The amount of punitive damages awarded must not be

2   the result of passion or prejudice against the defendants on

3   the part of the jury.  The sole purpose of punitive damages is

4   to punish the defendant's outrageous conduct and to deter the

5   defendants and others from similar acts.  But you are not to

6   punish the defendants for the impact of their alleged

7   misconduct on persons other than the plaintiff, in other

8   words, nonparties to this action.

9        I have now outlined for you the rules of law that

10   apply to this part of the case.  In a few minutes you will

11   retire to the jury room for your deliberations.  The same

12   rules apply during these deliberations as they did previously.

13   You may not communicate with anyone outside the jury room

14   about your deliberations or about anything touching this case

15   if it becomes necessary during your deliberations to

16   communicate with me, you may send a note through the marshal

17   signed by your foreperson.  If, in the course of your

18   deliberations, your recollection of any part of the testimony

19   should fail or you should find yourself in doubt concerning my

20   instructions to you on the law, it is your privilege, if you

21   so desire, to return to the courtroom for the purpose of

22   having such testimony or instructions read back to you.

23   Again, you may make such a request by a note to the marshal.

24        I will remind you that when you are in the jury room

25   you should listen to each other and discuss the evidence and

 1   issues in this case amongst yourselves.  You should examine

 2   the issues and the evidence before you with candor and

 3   frankness and with proper respect and regard for the opinions

 4   of each other.  You may not rely on any outside knowledge or

 5   evidence in reaching your decision.  You are to decide the

 6   case solely on the evidence presented here in the courtroom

 7   and in the same manner as you decided the compensatory damages

 8   part of the case.

 9          When you have and all the questions that require

10   answers on the special verdict form, which I'll give you,

11   simply send me a note signed by your foreperson that you have

12   reached a verdict.  Do not indicate what the verdict is.  In

13   no communications with the Court should you give a numerical

14   count of where the jury stands in its deliberations.

15          I just want to make a quick note about the special

16   verdict form.  There is one question on it, and the question

17   reads, "State the total amount of punitive damages that

18   plaintiff, Jose Bauta, has established by a preponderance of

19   the evidence should be imposed as a result of the actions of

20   Greyhound and Sabrina Anderson?"

21   And then there are two subparts to that.  Subpart A, punitive

22   damages for Greyhound's conduct, with a blank for amount.  And

23   then subpart B, punitive damages for Sabrina Anderson's

24   conduct with a blank for an amount, and then, finally, subpart

25   C is the total for subparts A and B.  You just do the math and

1    add it up.  So that's the special verdict form.

2            I am going to give you a copy of my instructions.

3    It has been marked as Court Exhibit 34, and the special

4    verdict form, Court Exhibit 35.  Once we have a marshal.  I

5    will swear him in and he will bring you back to deliberate.  I

6    will ask Ardis to give this to Ms. Morales.

7            MR. MANNION:  Your Honor, we do have one issue we

8    would like to discuss at sidebar before.

9            THE COURT:  Sure, come on up.

10           (Sidebar held outside the hearing of the jury.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
 1              (Continued on the following page.)

 2              (The following sidebar held outside of the hearing

 3   of the jury.)

 4              MR. SHAUB:  In closing arguments, Mr. McElfish

 5   highlighted the fact that Greyhound's fatigue management

 6   program was the outrageous conduct.  There is no indication

 7   that that was the case, so we would like a curative

 8   instruction on that, and that should read "We do not know what

 9   conduct the jury found to be outrageous in Philadelphia.  It

10   is for you to decide the adequacy of Greyhound's fatigue

11   management program as that issue has not already been

12   determined.

13              THE COURT:  Is that it?

14              MR. SHAUB:  And then the second issue was that Mr.

15   McElfish said -- told you that even at the present time

16   Greyhound has not made any changes to its policies.  That

17   comment should not have been made because there is no support

18   in the record and no evidence of that.  The Court excluded

19   that evidence of conduct that occurred after the accident and,

20   therefore, it shouldn't have been brought up at all in this

21   case, and therefore, you have no evidence -- the proposed

22   curative is the Court excludes evidence of conduct that

23   occurred after the accident and, therefore, you should -- you

24   have no evidence before you as to what actions Greyhound did

25   or did not take after the accident and you should not take
```

SIDEBAR

```
 1   that into consideration.

 2            MR. MANNION:  One additional thing right here.

 3            MR. SHAUB:  Yes.  Mr. McElfish argued that the

 4   policies hadn't been changed and they have, in fact, been

 5   changed.

 6            MR. MANNION:   Please.  He doesn't want two

 7   lawyers,  so please --

 8            MR. SHAUB:   We were not permitted to tell the jury

 9   about the revisions to this rule.

10            MR. McELFISH:  Excuse me, I consent to Mr. Mannion

11   can argue this issue as well.

12            MR. MANNION:  In the Cleveland and Philadelphia

13   trials, which Mr. McElfish watched Cleveland and he was

14   counsel in Philadelphia, we attempted to introduce the current

15   rule and it was excluded.  He knows the rule had been changed

16   and he just told this jury that we didn't make any changes to

17   it.  That's an outright misrepresentation.  And in this case

18   all post-accident conduct was precluded.  That's absolutely

19   improper and he knew it was not true.

20            THE COURT:  Go ahead.

21            MR. McELFISH:  First of all, taking the last one in

22   order first, I, in making that argument, Judge, I relied

23   strictly on the testimony of David Leach when I asked him has

24   anything changed and he said no, nothing's changed, and that

25   there was no objection to that testimony, and that's all I am
```

SIDEBAR

1    referring to.  There was no reference to any new rules.  He

2    simply said nothing has changed.  And I said to him you have

3    had one accident a week when he testified in Philadelphia and

4    you still have it now, nothing's changed.  So I wasn't

5    referring to policy.  I was talking about the fact that the

6    accident rates haven't changed.  That's number one.

7            MR. MANNION:  No.

8            THE COURT:  Let him finish.

9            MR. McELFISH:   Secondly, when I said fatigue

10   management, I was saying that was one of the things that the

11   jury in Philadelphia considered, just like they considered

12   everything else.  I didn't say that was their conclusion.

13           MR. BARMEN:  Yes, you did.

14           MR. McELFISH:  There was a lot of stuff I could have

15   objected to from them.  The lawyers are arguing their case.

16           MR. MANNION:   Your Honor --

17           MR. McELFISH:  There is no need for a curative

18   instruction for any of this.

19           THE COURT:  I hear what you are saying and I am

20   denying your request.  I am sending the jury back.

21           (Sidebar concluded.)

22

23

24

25

PROCEEDINGS

1              (Continued on the following page.)

2              THE COURT:  Mr. Marshal, raise you right hand.

3    (Marshal sworn.)

4              THE COURT:  Please take the jury back to the jury

5    room to begin their deliberations.

6              (Jury exits at 4:51 p.m.)

7          (Court is in recess, awaiting verdict of the jury.)

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1              (Time noted:  5:27 p. m.)

 2              THE COURT:  On the record.

 3              We've received a note from the jury.  It's been

 4    marked as Court Exhibit 36, today's date, time 5:14 p.m:

 5    "Judge Reyes, what guidelines do we use to determine Sabrina

 6    Anderson's wealth in consideration to punitive damages?"

 7    Signed by the foreperson, Liana Morales.

 8              MR. BARMEN:  Good question, Your Honor.

 9              MR. MANNION:  It's pretty good question.

10              THE COURT:  $64,000 question.

11              MR. BARMEN:  I don't think it's that much.

12              THE COURT:  Probably not.

13              What do we tell them, that there was no evidence?

14    My initial reaction is there was no evidence submitted

15    concerning Ms. Anderson's net worth.

16              MR. BARMEN:  That would be my position --

17              THE COURT:  Net worth.

18              MR. BARMEN:  -- for the defendants, Your Honor.  It

19    would have been incumbent upon the plaintiff to do that and

20    they didn't.  I think the jury should be told it was the

21    plaintiff's burden to do that.

22              THE COURT:  Was there any evidence submitted

23    concerning her financial situation other than her testimony

24    that she lives in a house.  That's her house with her extended

25    family --
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1            MR. BARMEN:  None.
 2            THE COURT:  -- which is not directly -- some of whom
 3    she supports and I think she did testify to that.
 4            MR. BARMEN:  Yes, Your Honor.
 5            MR. MCELFISH:  I was thinking it still comes -- you
 6    said it's against the law to say it, but it would be -- I
 7    mean, Greyhound's going to pay it, as being in the scope of
 8    her employment -- of her employment with them.
 9            THE COURT:  That's not -- that's not what I said.
10            MR. MCELFISH:  I'm not saying that's what you said.
11    That's what I heard, which are different.
12            THE COURT:  What I said was that Greyhound is
13    vicariously responsible for her conduct as her employer.
14            MR. MCELFISH:  Right.
15            THE COURT:  So her conduct can be considered in
16    determining Greyhound's punitive damages, but not visa-versa,
17    because she's not responsible for whatever sufficient sleep
18    program they have.
19            But -- and I also say in the civil rights context,
20    when officers -- and I didn't say in as much detail but when
21    police officers are on the hook for punitive damages, you are
22    not permitted to tell the jury that they will be -- that will
23    be paid by the municipality.
24            And so, we cannot tell this jury that any punitive
25    damages assessed against Ms. Anderson will be paid by
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

1    Greyhound would be the same thing.

2            MR. MANNION:  And I believe, Your Honor, there are a

3    lot of legal issues around that, and so I mean, I think that

4    would be wrong to tell them.

5            MR. MCELFISH:  She was in the scope of her

6    employment.  Just trying to --

7            MR. BARMEN:  Yes, but their whole argument, Your

8    Honor, is that she was acting outrageously, which would have

9    been off the reservation in terms of course and scope.

10           MR. MANNION:  There's a lot of issues that aren't

11   going to be decided now and so I don't think they need to, and

12   certainly, the jury should not be told anything about that

13   issue.

14           MR. MCELFISH:  I was getting ready to look at that,

15   too, to see if there is something in there.

16           THE COURT:  Okay.  I know what I think we should do.

17   We should bring the jury back in.  I will explain to them that

18   there was no evidence introduced concerning Ms. Anderson's net

19   worth -- actually, concerning -- the way the charge was

20   phrased was the wealth of the defendant.

21           I'll say there is no evidence submitted concerning

22   Ms. Anderson's wealth or her net worth; however, I remind you

23   of the specific charge, that in fixing the amount of punitive

24   damages, you may consider any or all of the following, and

25   then give them the three factors that they can consider.

PROCEEDINGS

```
 1            So the law is, they don't have to consider all of
 2   these.  They can consider any of them.  So they could exclude
 3   her wealth from the calculation and just focus on her conduct
 4   and the harm to Mr. Bauta or they can consider all of it.  It
 5   is up to them.  It's not a balancing test.  Here are the
 6   factors you may consider.  So that's -- I think that's the
 7   best we can do.
 8            MR. MCELFISH:  How about the only evidence of wealth
 9   in the case was Greyhound's wealth.
10            MR. BARMEN:  No, they didn't ask that.
11            MR. MANNION:  They didn't ask about Greyhound.
12            THE COURT:  I agree.  So that's what we'll do.
13            (Discussion off the record.)
14            (Jury enters.)
15            THE COURT:  You may be seated.
16            Ladies and gentlemen, we have received your note.
17   It has been marked as Court Exhibit 36, and it reads, "Judge
18   Reyes, what guidelines do we use to determine Sabrina
19   Anderson's wealth in consideration to punitive damages?"
20            I've spoken with the attorneys about this, and we
21   have decided to advise you as followings:  There was no
22   evidence submitted in this trial, as you probably know,
23   concerning Ms. Anderson's wealth or her net worth.
24            But we remind you of the specific instruction on
25   determining the amount of punitive damages, and I'll read it
```

PROCEEDINGS

1    again and I know you have a copy of this.

2            "It is your job to fix the amount of punitive

3    damages separately against defendants, Greyhound and Sabrina

4    Anderson.  In so doing, you may consider any or all of the

5    following factors:  The character of the defendant's acts, the

6    nature and extent of the harm to the plaintiff that the

7    defendant caused or intended to cause, and third, the wealth

8    of the defendant insofar as it is relevant in fixing an amount

9    that will publish it and deter it and others from like conduct

10   in the future."

11           So it's any or all of those factors.  It is up to

12   you to determine how to fix the amount of punitive damages.

13   That's the best we can do.  Okay?

14           JUROR:  Am I allow to speak?

15           THE COURT:  Technically, no.  I think Ms. Del Turzo

16   asked a questioned previously.  If you have something that you

17   want to ask, go back, talk about it, and then you can send us

18   another note.  Thank you.

19           (Jury exits.)

20           THE COURT:  Okay.  Ladies and gentlemen, we have

21   received a note from the jury.  It's been marked as Court

22   Exhibit 39, today's date.  5:52 p.m.

23           It reads -- you have a copy of it, but it reads,

24   "Judge Reyes, the jury has not finished deliberations, however

25   we would like to end today and resume tomorrow."

PROCEEDINGS

 1              Unless, you disagree, I'm going to send them back

 2    this note with a note that says, you may leave for the day,

 3    same admonitions, return tomorrow at 9:00 p.m. to resume your

 4    deliberations once all jurors are present.

 5              MR. MCELFISH:  Plaintiff's agrees.

 6              THE COURT:  Okay.

 7              MR. BARMEN:  (Nods head affirmatively.)

 8              THE COURT:  Okay.

 9              MR. MCELFISH:  Can you read it, Judge?

10              THE COURT:  Yes.  "Jury, you may leave for today and

11    return tomorrow to continue your deliberations once all jurors

12    are present.  Same admonitions as always.  Judge Reyes."

13              MR. MCELFISH:  Great.

14              MR. BARMEN:  Thank you, Your Honor.

15              THE COURT:  Okay.  Thank you.  See you tomorrow at

16    nine o'clock.

17              MR. MCELFISH:  They're not coming back here?

18              THE COURT:  Just going to take off.

19              MR. MCELFISH:  Okay.

20          (Trial adjourned to May 31st, 2018, at 9:00 a. m.)

21

22

23

24

25

INDEX

DEPOSITION TESTIMONY OF COLONEL JOHN SMITH

          READ BY MR. McELFISH AND MR. SAAL       4156

DEPOSITION TESTIMONY OF AKOS GUBICA

          READ BY MR. KIEFFER AND MR. SAAL       4216


BARMEN/SUMMATION                                 4257

McELFISH/SUMMATION                               4287

JURY CHARGE                                      4308

**$**

**$167,000 [1]** 4303/2
**$64,000 [1]** 4317/10
**$647 [3]** 4198/4 4305/22
4309/17
**$647-million-number [1]**
4198/4

**'**

**'01 [1]** 4271/15
**'13 [1]** 4184/9
**'14 [2]** 4233/4 4233/7
**'15 [1]** 4233/6
**'til [1]** 4269/2

**-**

-------------------------
4145/2 4145/9

**.**

**.3 [1]** 4163/25
**.8 [1]** 4183/23
**.8 percent [1]** 4183/23

**0**

**03725 [1]** 4145/3
**059 [1]** 4180/24

**1**

**1.4 [1]** 4163/25
**10 [7]** 4171/17 4230/3
4241/12 4241/17 4241/18
4249/14 4294/21
**100 [3]** 4151/15 4183/21
4190/9
**101 [1]** 4151/16
**10573 [1]** 4146/4
**106 [2]** 4151/21 4151/23
**107 [2]** 4151/25 4152/1
**11 [4]** 4184/3 4216/13
4222/18 4223/3
**11042 [1]** 4146/8
**1112 [1]** 4145/15
**119 [1]** 4152/8
**11:30 [3]** 4147/19 4222/18
4223/3
**12 [2]** 4171/16 4183/5
**120 [8]** 4150/20 4150/22
4150/23 4151/3 4151/7
4151/12 4153/10 4153/14
**122 [1]** 4153/14
**123 [1]** 4153/14
**124 [1]** 4153/15
**13 [3]** 4156/18 4185/18
4192/2
**130 [1]** 4276/9
**1352 [1]** 4183/17
**1375 [1]** 4145/22
**14 [4]** 4161/4 4164/9
4185/18 4191/10
**14,600 [1]** 4303/1
**14-CV-03725 [1]** 4145/3
**140 [1]** 4306/5
**143 [1]** 4250/24
**144 [3]** 4160/21 4160/23
4160/23
**15 [12]** 4166/19 4230/3
4230/3 4233/8 4241/12
4241/17 4241/18 4242/3
4242/12 4243/2 4243/7
4243/11
**15 minutes [1]** 4294/21

**150 [8]** 4272/10 4272/10
4293/14 4293/21 4293/21
4293/21 4293/22 4301/7
**150 miles [1]** 4275/21
**159-144 [1]** 4160/23
**16 [15]** 4173/23 4174/3
4187/8 4236/9 4244/14
4244/21 4251/9 4252/7
4255/9 4262/8 4262/16
4263/11 4263/20 4267/7
4284/7
**1600 [1]** 4145/22
**17 [1]** 4184/20
**18 [1]** 4157/12
**181 [1]** 4154/4
**18th [1]** 4251/20
**19 [3]** 4159/12 4174/10
4180/21
**1917 [1]** 4209/19
**1927 [1]** 4209/19
**1983 [1]** 4146/7
**1991 [1]** 4209/21
**1:30 [2]** 4194/14 4262/3
**1:45 [1]** 4194/9

**2**

**2.4 percent [1]** 4183/12
**20 [13]** 4170/13 4180/1
4180/1 4193/10 4230/3
4237/15 4242/3 4242/12
4243/3 4243/7 4243/11
4245/12 4251/9
**20-ton [2]** 4225/14 4234/25
**2003 [3]** 4273/20 4290/22
4291/21
**2004 [1]** 4272/23
**2006 [6]** 4260/25 4261/6
4272/22 4274/8 4281/2
4291/21
**2007 [1]** 4210/1
**2012 [1]** 4148/14
**2013 [9]** 4261/7 4262/4
4271/15 4272/23 4275/16
4281/3 4292/2 4298/5
4301/6
**2014 [2]** 4184/7 4249/13
**2016 [1]** 4291/1
**2018 [2]** 4145/5 4322/20
**21 [1]** 4180/14
**21.5 [2]** 4282/2 4282/12
**219-4 [2]** 4155/15 4286/22
**22 [2]** 4158/20 4160/7
**22 inches [1]** 4218/4
**23 [3]** 4156/17 4171/15
4171/16
**230 [1]** 4173/12
**2379 [1]** 4146/22
**24 [5]** 4172/16 4172/16
4225/18 4225/20 4236/25
**25 [13]** 4166/8 4166/9
4166/13 4166/16 4166/21
4184/11 4184/15 4216/6
4226/3 4226/6 4245/14
4255/11 4286/25
**250 [1]** 4292/2
**26 [4]** 4173/6 4182/11
4245/23 4243/21 4246/1
**260 [1]** 4146/7
**264 [1]** 4154/5
**2644 [1]** 4146/22
**27 [3]** 4157/12 4171/13
4173/25

**270 [2]** 4249/14
**27031 [1]** 4180/10
**28 [1]** 4174/10
**286 [1]** 4237/22
**299 [1]** 4237/22
**2:15 [3]** 4231/9 4231/21
4232/18

**3**

**30 [6]** 4213/23 4214/2
4245/19 4246/3 4251/9
4276/9
**30 minutes [1]** 4223/3
**300 [2]** 4145/19 4161/19
**30th [1]** 4145/5
**31st [1]** 4322/20
**33 [1]** 4177/17
**33.5 [1]** 4192/16
**34 [1]** 4312/3
**346 [1]** 4210/1
**35 [7]** 4178/4 4238/19
4246/7 4246/21 4263/7
4263/12 4312/4
**355 [1]** 4210/1
**36 [3]** 4179/20 4317/4
4320/17
**37 [5]** 4238/19 4239/1
4239/3 4239/4 4246/9
**375 [2]** 4150/5 4173/13
**38 [2]** 4180/21 4246/9
**39 [2]** 4239/5 4321/22
**3:30 [3]** 4231/18 4231/23
4232/19

**4**

**4 o'clock [1]** 4221/24
**40 [32]** 4158/4 4177/23
4227/16 4228/22 4235/5
4235/6 4238/21 4238/22
4239/1 4239/9 4239/11
4245/7 4246/17 4246/18
4246/25 4247/3 4255/1
4255/16 4263/9 4267/7
4291/8 4292/25 4293/2
4299/25 4301/2 4301/9
4301/12 4301/17 4301/18
4302/5 4302/6 4304/25
**40 tons [2]** 4235/7 4235/8
**40-second [1]** 4181/12
**40-ton [1]** 4236/4
**400 [1]** 4234/15
**400 miles [1]** 4222/6
**400-mile [1]** 4234/8
**41 [3]** 4159/3 4182/23
4182/23
**4156 [1]** 4323/4
**42 [4]** 4177/25 4181/7
4181/8 4183/5
**4216 [1]** 4323/6
**4257 [1]** 4323/8
**4287 [1]** 4323/9
**43 [12]** 4158/24 4159/2
4159/7 4166/17 4166/18
4167/6 4167/7 4177/19
4184/1 4184/17 4238/24
4239/3
**4308 [1]** 4323/10
**44 [1]** 4167/7
**44114 [1]** 4145/23
**45 [26]** 4228/22 4229/5
4230/23 4231/13 4231/22
4231/24 4232/18 4232/20

**4**

**45... [18]**   4233/1 4233/13
4233/15 4233/25 4234/1
4234/2 4234/5 4234/7
4239/5 4247/18 4251/15
4252/2 4252/5 4252/13
4254/23 4286/2 4286/25
4287/1
**45 minutes [3]**   4213/23
4213/24 4214/2
**45-page [1]**   4150/10
**46 [1]**   4255/25
**47 [1]**   4184/3
**4740 [1]**   4145/18
**48 [2]**   4159/12 4184/11
**4:30 in [1]**   4221/24
**4:51 [1]**   4316/6

**5**

**5-mile-an-hour [2]**   4229/2
4229/8
**5.8 [5]**   4275/15 4275/20
4276/3 4276/3 4276/19
**50 [5]**   4155/8 4218/23
4268/18 4278/25 4286/14
**51 [1]**   4236/25
**549 [1]**   4210/1
**57 [1]**   4160/3
**58 [3]**   4160/11 4161/4
4184/20
**59 [1]**   4180/24
**59:29 [1]**   4181/4
**5:14 [1]**   4317/4
**5:27 [1]**   4317/1
**5:52 [1]**   4321/22

**6**

**60 [3]**   4167/7 4226/17
4278/25
**62 [3]**   4176/2 4176/4
4185/18
**64 [4]**   4181/7 4181/8
4182/5 4187/7
**64.0 [2]**   4181/14 4181/15
**64.5 [1]**   4181/12
**64112 [1]**   4145/19
**65 [11]**   4176/7 4182/3
4226/10 4226/12 4226/23
4233/9 4246/21 4254/16
4255/16 4255/17 4262/8
**65.5 [1]**   4181/5
**67 [6]**   4183/8 4183/9
4183/10 4183/15 4269/9
4295/2
**67.5 [2]**   4183/9 4183/13
**67.7 [1]**   4166/15
**68 [6]**   4166/16 4181/5
4181/8 4181/13 4181/15
4182/3
**69 [1]**   4163/8

**7**

**70 [9]**   4148/14 4148/16
4148/17 4149/6 4176/7
4190/7 4255/17 4269/8
4278/25
**700 [2]**   4146/4 4150/4
**71 [1]**   4191/10
**718-613-2379 [1]**   4146/22
**718-613-2644 [1]**   4146/22
**73 [1]**   4237/15
**75 [1]**   4164/9

**77 [1]**   4192/2
**79 [1]**   4192/19
**79,020 [1]**   4235/20
**7:30 [1]**   4232/21
**7th [1]**   4267/25

**8**

**8 hours [1]**   4222/8
**8,000 miles [1]**   4251/5
**8,000 pounds [1]**   4235/7
**8.20 [1]**   4198/13
**80 [21]**   4193/16 4221/22
4226/14 4226/17 4226/19
4226/20 4226/23 4227/1
4227/14 4228/8 4228/18
4231/12 4237/21 4238/2
4238/14 4254/1 4255/14
4262/5 4262/6 4269/1
4274/20
**80,000 [1]**   4235/22
**800 [1]**   4146/3
**87 [1]**   4166/19
**88 [1]**   4302/16
**88,000 [1]**   4235/22
**88,350 [1]**   4235/13
**89 [1]**   4302/16
**8th [4]**   4221/14 4224/19
4252/14 4268/3

**9**

**9 hours [1]**   4222/10
**90 [1]**   4302/16
**90-degree [1]**   4254/8
**900 [1]**   4233/24
**90069 [1]**   4145/15
**91 [1]**   4151/14
**92 [1]**   4170/13
**93 [1]**   4151/15
**94 [1]**   4151/15
**9:00 [1]**   4322/20
**9:00 p.m [1]**   4322/3
**9:30 [1]**   4145/6
**9th [2]**   4145/22 4262/4

**A**

**abilities [1]**   4190/12
**ability [4]**   4204/24
4257/11 4290/18 4299/16
**able [10]**   4172/19 4190/14
4193/23 4193/25 4206/16
4240/21 4247/11 4254/13
4288/8 4288/10
**absent [3]**   4226/17 4226/24
4226/24
**absolutely [10]**   4163/7
4175/12 4191/24 4192/1
4212/24 4213/25 4259/16
4269/20 4294/9 4314/18
**absorb [2]**   4165/9 4165/13
**absurd [1]**   4245/16
**accelerate [1]**   4192/13
**accept [1]**   4298/23
**acceptable [1]**   4154/5
**access [1]**   4297/12
**accident [100]**   4152/6
4152/19 4171/19 4172/6
4172/9 4173/21 4178/8
4179/6 4180/12 4184/6
4184/8 4184/9 4185/20
4189/19 4204/19 4204/20
4215/24 4216/15 4229/3
4233/15 4235/9 4238/6
4238/15 4241/10 4242/3

**4250/7 4250/11 4250/20**
4252/3 4254/5 4254/7
4252/8 4254/6 4254/9
4254/19 4255/20 4256/2
4257/24 4258/12 4258/17
4261/7 4261/21 4261/23
4262/2 4262/3 4262/12
4262/14 4262/15 4262/20
4262/23 4263/5 4264/12
4264/19 4265/4 4266/4
4268/16 4268/21 4268/23
4268/24 4269/19 4270/1
4270/3 4270/8 4271/15
4272/24 4275/15 4275/25
4278/1 4278/1 4278/3
4279/11 4279/12 4279/15
4281/23 4282/1 4282/2
4282/3 4282/4 4282/10
4283/2 4288/16 4290/11
4290/14 4291/20 4293/18
4293/20 4294/7 4294/15
4294/18 4294/22 4295/6
4295/20 4298/6 4300/8
4313/19 4313/23 4313/25
4314/18 4315/3 4315/6
**accidents [12]**   4243/22
4277/18 4277/23 4279/10
4279/15 4284/9 4284/19
4285/2 4291/19 4291/24
4292/3 4301/24
**according [4]**   4179/6
4186/1 4208/15 4248/12
**account [4]**   4164/19 4200/4
4200/8 4200/9
**accounts [2]**   4149/13
4152/14
**accuracy [3]**   4168/11
4168/21 4168/23
**accurate [12]**   4163/13
4169/7 4170/4 4170/11
4171/2 4172/18 4172/23
4175/13 4176/10 4182/22
4190/10 4190/12
**acknowledge [1]**   4257/9
**acknowledges [1]**   4292/14
**acknowledgment [1]**   4269/17
**act [1]**   4202/23
**acted [3]**   4161/22 4161/23
4257/24
**acting [1]**   4319/8
**action [3]**   4149/11 4282/20
4310/8
**actions [3]**   4213/9 4311/19
4313/24
**activated [2]**   4176/16
4269/11
**acts [6]**   4210/13 4210/21
4308/24 4309/10 4310/5
4321/5
**actual [2]**   4164/3 4186/16
**ad [1]**   4276/1
**adamant [1]**   4267/10
**add [5]**   4195/15 4201/7
4202/21 4203/4 4312/1
**addition [5]**   4173/8
4217/13 4217/25 4219/7
4219/17
**additional [4]**   4154/7
4154/11 4196/1 4314/2
**address [1]**   4154/21
**addressed [1]**   4149/16
**adequacy [1]**   4313/10

**A**

adhere [1] 4198/19
adjourned [1] 4322/20
adjust [1] 4270/22
adjustments [1] 4222/23
Administration [1] 4165/15
administrator [2] 4261/3
 4273/21
admire [1] 4277/9
admissible [1] 4151/1
admit [4] 4149/9 4149/20
 4294/23 4297/2
admits [2] 4267/8 4297/13
admitted [15] 4148/8
 4148/15 4148/17 4148/19
 4148/19 4149/1 4149/10
 4150/12 4150/16 4151/2
 4154/18 4160/24 4197/25
 4300/20 4303/12
admonitions [2] 4322/3
 4322/12
adversary [1] 4286/9
advise [1] 4320/21
advised [1] 4231/24
affected [1] 4225/12
affirmatively [1] 4322/7
affix [1] 4169/5
afternoon [7] 4171/13
 4221/24 4257/2 4257/3
 4287/7 4287/9 4287/10
afterwards [2] 4217/23
 4220/7
age [1] 4283/24
agenda [1] 4259/22
ago [9] 4161/20 4208/7
 4232/7 4258/23 4263/11
 4268/10 4268/10 4285/7
 4291/22
agree [21] 4149/19 4172/9
 4178/21 4227/23 4236/8
 4239/6 4242/3 4242/8
 4242/18 4242/21 4243/21
 4246/3 4249/3 4250/1
 4250/8 4257/10 4267/21
 4267/23 4268/1 4273/23
 4320/12
agreed [3] 4263/6 4267/2
 4309/16
agreement [3] 4160/23
 4161/1 4305/21
agrees [2] 4260/23 4322/5
ahead [10] 4153/19 4156/14
 4176/12 4179/11 4195/9
 4264/22 4269/11 4269/14
 4286/11 4314/20
AHMUTY [1] 4146/6
aided [1] 4146/25
air [1] 4168/15
akin [2] 4149/24 4149/25
AKOS [7] 4145/7 4215/13
 4215/16 4215/18 4215/20
 4251/24 4323/5
Al [10] 4278/10 4279/7
 4279/17 4299/19 4298/21
 4299/20 4299/23 4300/10
 4302/15 4302/17
alarming [1] 4293/15
Alertness [8] 4261/1
 4272/19 4272/22 4273/19
 4273/19 4273/24 4275/3
 4282/24

aligned [1] 4162/16
alikas [1] 4205/14
alleged [4] 4206/8 4209/8
 4210/22 4310/6
allow [1] 4321/14
allowed [5] 4185/3 4185/4
 4207/6 4282/12 4305/25
allows [1] 4255/16
almost [4] 4165/23 4204/20
 4295/14 4295/15
alone [5] 4198/18 4199/25
 4200/3 4200/11 4200/23
altogether [1] 4252/21
amazing [1] 4295/1
Americas [1] 4302/17
amount [30] 4152/22
 4197/15 4197/17 4197/24
 4199/6 4199/12 4200/19
 4203/8 4204/12 4206/11
 4207/3 4207/14 4211/14
 4258/10 4279/3 4306/1
 4306/2 4309/7 4309/14
 4309/18 4309/23 4310/1
 4311/17 4311/22 4311/24
 4319/23 4320/25 4321/2
 4321/8 4321/12
analysis [1] 4166/24
analyze [1] 4160/9
analyzed [1] 4167/3
analyzing [1] 4164/14
anchor [1] 4207/1
ANDERSON [68] 4145/7
 4152/13 4152/18 4152/22
 4153/1 4153/5 4163/11
 4164/5 4165/4 4166/13
 4166/15 4195/24 4198/13
 4199/9 4199/18 4199/22
 4200/11 4200/16 4201/8
 4203/22 4204/10 4208/20
 4211/19 4212/18 4257/24
 4258/11 4258/13 4258/16
 4261/21 4261/25 4263/17
 4263/23 4264/6 4264/12
 4265/10 4267/10 4267/24
 4268/7 4268/9 4268/15
 4268/22 4269/15 4269/16
 4269/25 4271/6 4272/18
 4274/9 4276/3 4276/21
 4277/25 4279/8 4279/19
 4282/9 4288/21 4289/1
 4290/7 4290/20 4294/2
 4296/15 4297/8 4298/17
 4301/12 4301/18 4308/16
 4309/8 4311/20 4318/25
 4321/4
Anderson's [16] 4196/6
 4196/15 4199/8 4199/13
 4200/5 4200/10 4200/15
 4264/4 4309/4 4311/23
 4317/6 4317/15 4319/18
 4319/22 4320/19 4320/23
Andress [6] 4247/7 4247/15
 4247/22 4248/13 4248/18
 4248/20
angle [3] 4187/24 4189/8
 4189/15
angled [7] 4161/10 4161/12
 4186/22 4188/4 4188/16
 4189/7 4189/23
angling [2] 4187/11
 4187/13
anotFher [1] 4305/7

answer [34] 4156/12
 4156/13 4156/20 4156/25
 4184/1 4191/4 4192/23
 4192/24 4193/3 4225/23
 4226/2 4231/23 4232/23
 4233/13 4233/17 4242/6
 4242/11 4243/4 4243/8
 4243/12 4243/15 4243/16
 4243/19 4247/11 4247/13
 4247/19 4247/24 4248/13
 4249/17 4249/20 4249/23
 4282/16 4292/19 4293/13
answered [1] 4205/24
answering [1] 4156/9
answers [3] 4165/24
 4215/17 4311/10
antiquated [2] 4274/14
 4302/2
anytime [2] 4233/21 4276/8
anyway [2] 4214/21 4250/5
apnea [2] 4282/3 4282/11
apologize [3] 4178/13
 4201/6 4248/10
APPEARANCES [2] 4145/13
 4146/1
applicable [2] 4158/25
 4308/9
application [5] 4155/12
 4163/12 4207/25 4286/8
 4286/20
applied [4] 4162/4 4164/5
 4205/15 4309/6
applies [1] 4259/5
apply [9] 4162/2 4200/21
 4203/8 4211/7 4272/4
 4272/5 4309/20 4310/10
 4310/12
applying [1] 4171/20
appointed [1] 4261/3
appreciate [4] 4287/17
 4287/22 4288/13 4305/19
approaching [1] 4153/24
appropriate [4] 4152/16
 4153/5 4194/5 4305/1
approximate [2] 4228/24
 4234/8
approximates [1] 4228/24
approximating [1] 4230/15
Ardis [3] 4194/16 4213/7
 4312/6
area [7] 4228/7 4228/9
 4237/17 4238/5 4238/6
 4254/5 4254/16
areas [1] 4212/7
argue [3] 4214/1 4215/1
 4314/11
argued [2] 4213/18 4314/3
arguing [3] 4208/24 4214/2
 4315/15
argument [10] 4204/22
 4205/4 4205/9 4208/22
 4214/18 4275/10 4301/8
 4301/15 4314/22 4319/7
arguments [3] 4288/24
 4290/25 4313/4
art [2] 4218/21 4281/2
Ashcroft [1] 4270/23
aside [3] 4157/22 4212/1
 4292/22
asleep [6] 4270/10 4271/4
 4295/21 4302/23 4303/25
 4307/20

**A**

**aspect [3]** 4209/11 4209/12 4259/17
**assertions [1]** 4202/24
**assess [5]** 4200/4 4261/25 4276/20 4280/23 4280/24
**assessed [6]** 4198/17 4199/4 4199/12 4200/20 4309/19 4318/25
**assessing [3]** 4200/8 4200/10 4289/17
**associated [3]** 4168/8 4168/15 4169/23
**assume [6]** 4182/4 4191/5 4210/8 4238/5 4293/7 4301/20
**assumption [1]** 4293/10
**athlete [1]** 4306/8
**attack [3]** 4267/13 4305/14 4306/21
**attempted [2]** 4162/14 4314/14
**attention [5]** 4230/19 4257/7 4268/17 4287/16 4305/20
**attentive [1]** 4178/18
**attentiveness [1]** 4193/14
**Attorney [6]** 4145/17 4145/18 4145/21 4146/2 4146/6 4270/23
**attorneys [3]** 4227/21 4296/13 4320/20
**attribute [1]** 4181/20
**attributed [1]** 4153/4
**August [2]** 4233/7 4298/6
**authenticated [1]** 4151/6
**available [1]** 4171/20
**Avenue [3]** 4145/18 4146/3 4146/7
**avoid [1]** 4284/17
**avoided [1]** 4178/19
**awaiting [1]** 4316/7
**awake [4]** 4174/24 4265/1 4282/9 4283/21
**award [18]** 4155/9 4198/11 4198/21 4203/3 4204/25 4205/1 4206/11 4206/12 4206/16 4207/15 4207/22 4211/13 4286/15 4290/2 4290/7 4290/10 4305/24 4309/22
**award as [1]** 4211/13
**awarded [5]** 4205/16 4206/12 4210/11 4308/22 4310/1
**aware [6]** 4190/19 4242/22 4243/17 4246/18 4271/24 4306/22
**axle [2]** 4185/11 4185/13

**B**

**babying [1]** 4232/6
**backwards [3]** 4162/11 4162/20 4221/12
**bad [3]** 4291/20 4299/14 4300/5
**baggage [4]** 4277/10 4277/13 4277/15 4296/4
**balance [3]** 4198/1 4198/3 4284/20
**balancing [1]** 4320/5

**ball [3]** 4168/1 4168/2 4168/3
**balloon [2]** 4274/16 4274/18
**balls [1]** 4298/12
**bar [3]** 4220/7 4220/9 4220/19
**bare [3]** 4274/22 4274/24 4274/25
**BARMEN [13]** 4145/23 4155/24 4160/23 4192/4 4192/17 4287/20 4288/14 4293/2 4301/2 4302/20 4304/24 4306/15 4323/8
**BARMEN/SUMMATION [1]** 4323/8
**barrier [2]** 4165/19 4166/1
**base [2]** 4163/3 4271/9
**based [17]** 4150/25 4151/1 4154/19 4155/14 4159/9 4160/18 4166/23 4176/2 4177/19 4190/10 4198/11 4257/18 4259/24 4260/7 4284/24 4305/1 4309/5
**basis [2]** 4151/7 4202/11
**Bates [1]** 4150/20
**bathroom [1]** 4286/4
**BAUTA [23]** 4145/3 4210/15 4211/15 4258/11 4258/24 4258/25 4259/2 4259/9 4259/12 4259/15 4259/16 4259/18 4259/19 4259/20 4259/20 4261/24 4284/12 4285/13 4289/16 4289/20 4308/14 4311/18 4320/4
**Bauta's [2]** 4289/15 4290/3
**Bear [1]** 4171/18
**became [3]** 4265/18 4265/20 4273/18
**become [1]** 4261/2
**becomes [1]** 4310/15
**bed [4]** 4173/5 4185/24 4186/4 4265/19
**begin [2]** 4287/5 4316/5
**beginning [1]** 4244/13
**begins [2]** 4196/5 4203/3
**behalf [1]** 4263/3
**behavior [2]** 4260/3 4297/6
**behind [12]** 4186/18 4204/11 4229/19 4240/20 4245/6 4246/12 4255/8 4256/6 4256/6 4263/14 4269/1 4271/10
**beings [1]** 4277/24
**belabor [1]** 4253/8
**belief [1]** 4308/2
**believes [1]** 4308/12
**below [8]** 4188/23 4226/10 4226/12 4227/4 4227/8 4228/4 4235/6 4267/7
**belted [1]** 4274/18
**benched [1]** 4306/11
**benchmark [4]** 4260/22 4260/25 4261/6 4291/21
**bend [3]** 4165/10 4179/22 4254/11
**benders [1]** 4291/23
**benefit [2]** 4166/12 4258/10
**best [10]** 4190/12 4195/25 4256/9 4276/16 4284/9 4285/17 4299/15 4304/2

**bet [2]** 4320/7 4321/13
**better [10]** 4261/10 4274/4 4274/5 4277/21 4277/21 4282/23 4303/4 4303/5 4307/23 4307/24
**between [12]** 4155/17 4176/7 4181/5 4184/14 4222/18 4223/3 4229/9 4255/16 4255/24 4270/7 4277/17 4297/11
**beyond [5]** 4185/24 4186/4 4186/6 4271/18 4271/20
**big [9]** 4221/3 4256/6 4265/8 4279/22 4288/7 4288/8 4288/10 4293/16 4295/1
**bigger [2]** 4228/18 4307/18
**bills [3]** 4296/24 4297/10 4297/11
**BISGAARD [1]** 4145/21
**bit [20]** 4160/5 4164/7 4164/7 4166/11 4167/8 4171/18 4190/3 4193/12 4228/8 4229/13 4237/17 4262/2 4270/13 4270/20 4270/20 4271/1 4288/18 4295/3 4299/6 4299/7
**black [4]** 4174/25 4262/4 4265/7 4284/8
**Blackness [1]** 4265/5
**blank [3]** 4213/16 4311/22 4311/24
**Blatt [24]** 4175/3 4175/9 4175/10 4175/16 4175/20 4176/1 4176/24 4177/6 4178/21 4179/6 4180/3 4262/4 4264/11 4265/11 4268/14 4268/17 4269/17 4269/19 4270/9 4270/11 4270/11 4271/3 4272/6 4294/20
**Blatt's [2]** 4175/22 4269/20
**blew [2]** 4295/16 4299/3
**blinker [1]** 4224/24
**blinkers [1]** 4223/13
**bloodshot [1]** 4280/19
**blow [4]** 4153/2 4188/13 4189/13 4217/16
**blows [2]** 4299/2 4299/2
**board [2]** 4271/12 4304/23
**boat [1]** 4167/22
**body [1]** 4220/12
**book [5]** 4275/15 4301/5 4301/12 4301/18 4301/19
**books [3]** 4274/21 4275/8 4275/14
**Boston [1]** 4303/2
**bottom [8]** 4153/17 4182/4 4206/4 4208/7 4216/2 4216/4 4273/3 4308/5
**bounce [1]** 4193/19
**bound [1]** 4290/23
**bow [1]** 4185/6
**bowed [2]** 4184/22 4184/25
**bowing [1]** 4185/3
**boyfriend's [1]** 4295/19
**BRADLEY [1]** 4145/23
**brain [1]** 4260/12
**brake [5]** 4163/12 4163/14 4163/15 4163/24 4183/19
**brakes [6]** 4164/2 4164/5

**B**

**brakes... [4]**  4182/10
4192/14 4295/3 4295/4
**braking [4]**  4189/16
4192/11 4192/12 4295/6
**break [16]**  4147/18 4165/11
4194/6 4232/15 4286/3
4286/4 4293/21 4293/23
4301/7 4302/8 4302/22
4303/21 4304/12 4306/10
4307/15 4307/25
**breaks [3]**  4302/6 4303/21
4305/1
**bridges [3]**  4171/10
4171/11 4171/11
**brief [1]**  4194/12
**briefly [8]**  4151/5 4154/24
4158/6 4167/19 4195/19
4201/2 4207/10 4286/13
**bring [7]**  4155/21 4208/21
4215/8 4256/13 4272/11
4312/5 4319/17
**bringing [1]**  4289/13
**BRISBOIS [1]**  4145/21
**broken [3]**  4262/19 4262/20
4304/17
**Brook [1]**  4146/4
**Brookdale [1]**  4302/17
**Brooklyn [4]**  4145/4
4235/17 4236/21 4237/3
**brought [4]**  4260/23
4273/19 4288/14 4313/20
**Buckhorn [1]**  4302/16
**build [1]**  4274/11
**built [2]**  4274/8 4293/9
**built-in [1]**  4293/9
**bulletin [2]**  4148/7
4148/14
**bulletins [11]**  4272/20
4272/23 4272/24 4273/4
4275/6 4293/5 4293/7
4293/10 4293/11 4296/20
4301/4
**bumped [1]**  4166/11
**bumping [1]**  4166/11
**bungee [4]**  4218/4 4218/13
4218/16 4219/4
**bungeeing [1]**  4218/24
**bungees [10]**  4217/15
4218/2 4218/10 4218/22
4219/7 4219/14 4219/15
4219/16 4219/17 4221/13
**burden [1]**  4317/21
**bus [87]**  4152/4 4152/5
4157/11 4159/14 4161/18
4163/10 4165/5 4165/8
4165/18 4166/1 4169/21
4169/25 4170/1 4170/5
4170/16 4170/22 4170/25
4172/24 4173/3 4175/4
4175/7 4175/17 4175/23
4176/1 4176/6 4176/12
4176/16 4176/24 4177/7
4178/13 4178/19 4181/5
4181/11 4183/15 4184/14
4184/22 4184/25 4185/6
4185/10 4185/14 4190/16
4190/20 4190/25 4191/12
4203/23 4203/24 4204/3
4204/5 4204/11 4204/14
4225/14 4230/8 4234/25

**C**

**C-700 [1]**  4146/4
**cab [7]**  4189/15 4250/9
4250/15 4250/18 4262/21
4265/19 4266/21
**cable [1]**  4158/15
**calculation [3]**  4153/16
4192/10 4320/3
**calculations [4]**  4149/14
4153/15 4167/2 4174/13
**calculator [1]**  4161/25
**calculus [2]**  4172/12
4172/12
**California [1]**  4145/15
**calm [2]**  4230/18 4230/19
**cancer [1]**  4298/5
**candor [1]**  4311/2
**cannot [9]**  4149/20 4171/10
4204/13 4205/1 4299/23
4303/21 4305/23 4306/21
4318/24
**capture [3]**  4198/15 4200/1
4200/2
**car [3]**  4167/22 4175/10
4227/25
**care [6]**  4152/15 4152/23
4153/13 4224/3 4279/4
4296/22
**career [1]**  4258/16
**cargo [1]**  4272/2
**carpet [1]**  4292/22
**carrier [1]**  4281/6
**carriers [1]**  4278/18
**carrying [1]**  4234/21
**cars [2]**  4234/12 4262/11
**CARTMELL [1]**  4145/18
**case [71]**  4152/20 4155/5
4155/6 4155/9 4156/3
4157/1 4159/16 4164/11
4167/9 4168/16 4169/15
4170/8 4173/8 4173/18
4179/9 4180/19 4184/5
4190/19 4192/21 4193/7
4202/13 4204/1 4206/15
4207/23 4208/17 4209/13
4209/18 4209/19 4209/22
4209/24 4213/3 4225/3
4229/4 4256/17 4257/14
4257/18 4258/6 4258/7
4262/13 4265/13 4274/12
4275/14 4281/20 4281/23

**C** (right column)
**C-700** repeated... 

**cases [2]**  4155/13 4302/10
**casino [1]**  4285/8
**caused [4]**  4162/5 4258/12
4309/12 4321/7
**cautious [1]**  4242/19
**CAV [1]**  4145/8
**caveat [1]**  4202/22
**CCR [1]**  4146/21
**CDL [1]**  4204/14
**cell [2]**  4283/24 4297/14
**center [2]**  4229/21 4229/22
**CEO [4]**  4277/7 4277/11
4277/14 4277/16
**certain [8]**  4149/18 4151/9
4157/14 4176/12 4222/12
4227/21 4243/25 4280/13
**certainly [16]**  4173/1
4175/21 4182/17 4182/17
4187/20 4189/18 4200/1
4209/2 4279/12 4283/18
4284/14 4288/12 4288/20
4290/19 4298/4 4319/12
**certified [1]**  4250/5
**chairman [1]**  4278/17
**chambers [1]**  4147/25
**chance [3]**  4194/24 4257/4
4290/18
**change [12]**  4176/20
4176/21 4181/21 4211/22
4212/11 4213/7 4214/3
4214/4 4260/2 4299/6
4306/4 4308/2
**changed [17]**  4199/2 4231/1
4241/8 4241/8 4270/24
4271/2 4274/17 4274/19
4307/8 4314/4 4314/5
4314/15 4314/24 4314/24
4315/2 4315/4 4315/6
**changes [5]**  4291/2 4291/8
4291/13 4313/16 4314/16
**changing [2]**  4205/21
4214/5
**character [3]**  4289/22
4309/10 4321/5
**charge [27]**  4194/8 4194/12
4195/3 4195/4 4196/12
4198/9 4198/13 4198/16
4198/22 4200/1 4200/16
4206/19 4207/18 4207/22
4208/3 4208/6 4208/16
4209/10 4211/1 4212/7
4212/16 4258/14 4259/4
4289/19 4319/19 4319/23
4323/10
**charged [1]**  4258/9
**charges [3]**  4195/11
4205/12 4258/1
**charging [1]**  4267/17
**chart [1]**  4193/13
**check [26]**  4222/20 4223/4
4223/11 4223/16 4224/5
4224/19 4224/19 4225/7
4225/16 4225/17 4229/13

Case 1:14-cv-02725-RER Document 114 Filed 07/16/19 Page 185 of 209 PageID #: 1894

**C**
**check... [15]**  4229/14
  4236/21 4236/22 4242/22
  4243/2 4243/6 4243/11
  4253/11 4253/13 4255/23
  4274/13 4274/14 4275/21
  4300/14 4304/2
**checking [4]**  4147/8
  4222/25 4229/16 4300/5
**checks [5]**  4275/23 4280/9
  4280/15 4280/16 4280/16
**chime [2]**  4201/15 4205/4
**choose [1]**  4189/14
**circadian [2]**  4273/7
  4279/18
**circle [2]**  4168/4 4168/6
**circular [1]**  4252/19
**circulated [1]**  4198/9
**circumstances [1]**  4230/6
**circumstantial [1]**  4308/19
**cite [1]**  4209/18
**cited [1]**  4209/13
**CITRIN [1]**  4146/6
**City [3]**  4145/19 4252/25
  4253/20
**civil [4]**  4145/10 4203/12
  4206/14 4318/19
**claim [2]**  4180/17 4279/12
**claiming [1]**  4249/25
**claims [2]**  4283/13 4299/17
**clarifies [1]**  4199/21
**clarify [1]**  4240/25
**clear [13]**  4159/5 4166/22
  4170/8 4197/16 4198/19
  4199/21 4201/10 4211/1
  4251/22 4264/15 4269/12
  4269/13 4282/7
**cleared [1]**  4269/10
**clearly [5]**  4179/14
  4257/10 4266/21 4296/9
  4307/3
**Cleveland [9]**  4145/23
  4258/6 4267/25 4268/3
  4268/12 4299/20 4307/23
  4314/12 4314/13
**client [2]**  4257/13 4259/23
**climb [1]**  4254/13
**clip [1]**  4272/7
**close [4]**  4153/2 4188/20
  4269/2 4287/16
**closed [1]**  4215/4
**closely [2]**  4287/18
  4287/18
**closer [3]**  4230/11 4230/15
  4230/17
**closing [13]**  4153/24
  4166/7 4166/21 4202/22
  4203/1 4204/23 4263/15
  4266/10 4286/2 4288/23
  4290/25 4297/3 4313/4
**closings [3]**  4194/7
  4205/13 4256/22
**clutch [5]**  4163/15 4163/16
  4163/16 4182/10 4183/19
**coach [4]**  4260/21 4261/9
  4278/14 4281/6
**coaches [3]**  4268/19
  4268/20 4272/4
**coast [1]**  4232/15
**code [3]**  4192/13 4192/14
  4274/13

**coefficient [1]**  4167/3
**COLEMAN [1]**  4146/9
**collateral [6]**  4155/13
  4195/22 4205/15 4208/1
  4286/20 4309/5
**collect [1]**  4157/7
**collecting [1]**  4171/20
**collision [12]**  4152/21
  4158/14 4158/17 4163/19
  4163/20 4164/18 4164/19
  4165/12 4165/25 4166/5
  4166/7 4174/5
**collisions [1]**  4164/20
**Colonel [4]**  4156/12
  4156/15 4194/4 4323/3
**colors [2]**  4216/1 4216/16
**column [5]**  4182/25 4183/2
  4183/3 4183/7 4192/4
**coming [14]**  4160/22
  4163/14 4163/14 4163/15
  4164/2 4168/19 4169/15
  4170/1 4263/14 4290/12
  4295/19 4298/13 4298/14
  4322/17
**comment [2]**  4205/6 4313/17
**commercial [2]**  4272/6
  4298/9
**commitment [6]**  4277/6
  4278/8 4278/21 4279/1
  4284/21 4288/7
**committed [2]**  4277/3
  4285/1
**committee [1]**  4278/17
**committees [1]**  4293/20
**committing [2]**  4210/13
  4308/24
**common [7]**  4181/25 4257/19
  4260/8 4263/1 4276/18
  4285/5 4285/5
**Commonwealth [1]**  4254/2
**communicate [2]**  4310/13
  4310/16
**communicating [1]**  4246/15
**communications [1]**  4311/13
**community [1]**  4305/23
**companies [1]**  4281/6
**company [25]**  4204/5 4261/9
  4272/15 4274/1 4274/24
  4275/12 4277/8 4277/10
  4277/12 4278/11 4279/4
  4279/6 4280/7 4284/2
  4285/1 4289/22 4291/13
  4292/9 4292/13 4292/19
  4296/7 4296/25 4297/13
  4304/2 4304/23
**comparisons [1]**  4166/24
**compensatory [7]**  4203/3
  4206/12 4206/18 4211/20
  4212/9 4309/22 4311/7
**complete [2]**  4147/6
  4221/14
**completely [1]**  4200/1
**compliant [1]**  4301/15
**compliments [1]**  4287/20
**computer [1]**  4146/25
**computer-aided [1]**  4146/23
**concentrating [1]**  4231/13
**concern [4]**  4206/14
  4230/21 4260/1 4260/2
**concerned [3]**  4269/4
  4270/14 4283/23
**concerning [8]**  4308/17

**coefficient [1]**  4167/3
**collide [1]**  4164/10
**collided [1]**  4319/6
**collision [21]**  4310/19 4319/6
  4320/23
**concerns [1]**  4268/15
**conclude [1]**  4256/16
**concluded [1]**  4315/21
**concludes [2]**  4194/3
  4256/15
**conclusion [2]**  4288/20
  4315/12
**conclusions [1]**  4308/12
**condition [6]**  4151/23
  4163/5 4166/9 4236/15
  4253/23 4267/3
**conditions [5]**  4236/10
  4244/22 4246/4 4262/1
  4284/6
**conduct [78]**  4196/2 4196/6
  4196/8 4196/15 4196/20
  4196/20 4198/12 4198/18
  4198/20 4199/8 4199/9
  4199/14 4199/23 4199/25
  4200/3 4200/5 4200/5
  4200/9 4200/10 4200/11
  4200/15 4200/15 4200/23
  4201/4 4201/8 4201/9
  4201/11 4201/21 4201/23
  4202/10 4202/14 4202/14
  4202/15 4202/16 4203/10
  4204/15 4209/4 4210/12
  4210/20 4258/12 4258/13
  4261/20 4261/20 4261/22
  4261/24 4262/1 4284/11
  4284/13 4284/20 4285/13
  4288/17 4288/21 4289/17
  4289/21 4289/22 4290/14
  4290/15 4290/16 4292/2
  4297/6 4306/17 4306/19
  4308/23 4308/25 4309/4
  4309/15 4310/4 4311/22
  4311/24 4313/6 4313/9
  4313/19 4313/22 4314/18
  4318/13 4318/15 4320/3
  4321/9
**conference [2]**  4194/12
  4195/3
**confidence [1]**  4285/12
**conflict [1]**  4192/10
**conscience [1]**  4285/23
**conscious [2]**  4305/22
  4307/7
**consent [1]**  4314/10
**conservative [1]**  4166/10
**consider [32]**  4199/13
  4199/22 4200/17 4246/21
  4258/21 4259/9 4259/10
  4259/18 4260/15 4261/19
  4261/20 4261/22 4262/1
  4276/24 4283/20 4285/4
  4288/3 4289/20 4289/21
  4289/21 4289/25 4306/13
  4306/17 4306/18 4309/9
  4319/24 4319/25 4320/1
  4320/2 4320/4 4320/6
  4321/4
**considerable [2]**  4152/14
  4152/22
**considerably [3]**  4238/5
  4238/7 4246/21
**consideration [7]**  4173/17
  4174/7 4200/21 4309/20
  4314/1 4317/6 4320/19

## C

**considered [5]**  4200/15
4209/14 4315/11 4315/11
4318/15
**considering [1]**  4277/4
**considers [1]**  4279/17
**consist [2]**  4156/4 4253/8
**consistent [15]**  4159/15
4159/19 4159/20 4159/21
4159/24 4161/7 4161/8
4163/5 4167/18 4168/13
4170/10 4229/7 4251/16
4271/3 4271/4
**consistently [1]**  4267/16
**conspicuity [2]**  4252/23
4266/21
**constellation [1]**  4167/20
**constitute [1]**  4236/11
**constitutional [1]**  4203/13
**consult [1]**  4274/2
**consultant [2]**  4274/1
4274/3
**contains [2]**  4153/7
4153/17
**contemporaneous [1]**
4296/12
**context [3]**  4203/15
4291/13 4318/19
**continuation [1]**  4251/19
**continue [3]**  4147/13
4285/18 4322/11
**continued [10]**  4146/1
4176/19 4176/22 4223/20
4271/13 4283/1 4287/23
4313/1 4316/1 4316/8
**continues [1]**  4283/2
**continuing [3]**  4153/15
4194/2 4288/1
**contradict [1]**  4264/5
**contributed [1]**  4261/24
**contributing [1]**  4261/23
**control [7]**  4163/14
4178/24 4179/1 4179/6
4181/6 4181/9 4209/25
**controls [1]**  4266/12
**conversation [4]**  4241/19
4245/24 4245/25 4262/15
**convert [1]**  4297/25
**convince [5]**  4257/15
4260/12 4288/25 4289/1
4289/5
**convoluted [1]**  4200/7
**copies [1]**  4194/18
**copy [5]**  4150/16 4194/16
4312/2 4321/1 4321/23
**corner [2]**  4180/23 4221/13
**corners [2]**  4217/15 4278/9
**Corporal [14]**  4147/14
4148/7 4149/12 4149/21
4150/10 4150/17 4153/25
4173/21 4174/2 4248/3
4248/6 4248/11 4250/1
4262/10
**Corporal Schmit [8]**  4148/7
4149/21 4153/25 4173/21
4248/3 4248/6 4248/11
4250/1
**Corporal Schmit's [1]**
4149/12
**Corporate [1]**  4150/21
**corporations [1]**  4305/11

**correct [99]**  4159/25
4160/2 4163/4 4169/17
4170/7 4170/9 4171/1
4171/23 4172/1 4172/4
4172/21 4173/5 4173/23
4174/4 4174/9 4174/18
4175/5 4175/5 4175/14
4175/18 4175/20 4175/21
4176/3 4176/5 4176/7
4176/11 4176/13 4176/21
4177/1 4177/4 4177/6
4177/16 4178/16 4178/19
4178/24 4178/25 4179/3
4180/5 4180/12 4180/24
4181/3 4181/6 4181/9
4181/19 4182/7 4183/17
4183/19 4184/2 4184/19
4185/2 4185/11 4185/12
4185/15 4185/22 4186/20
4186/24 4187/1 4187/14
4188/1 4189/5 4189/17
4189/22 4189/25 4190/2
4191/14 4192/12 4193/4
4197/12 4199/10 4199/16
4206/7 4222/1 4225/3
4226/21 4228/16 4230/9
4230/13 4230/17 4234/9
4235/7 4235/13 4237/2
4240/7 4240/16 4241/13
4241/13 4242/4 4242/5
4242/16 4242/17 4243/18
4245/19 4246/7 4246/9
4248/1 4249/23 4250/10
4251/17 4257/16
**corrected [1]**  4241/18
**correcting [1]**  4240/6
**correction [1]**  4241/11
**correctly [3]**  4245/24
4249/21 4249/22
**corroborates [1]**  4149/15
**cost [3]**  4302/25 4304/3
4306/4
**costs [1]**  4304/18
**counsel [6]**  4154/12
4155/17 4244/24 4255/24
4257/9 4314/14
**count [2]**  4300/18 4311/14
**counted [1]**  4287/21
**country [2]**  4204/3 4274/19
**couple [9]**  4150/18 4213/15
4229/20 4233/17 4250/2
4261/22 4267/23 4280/20
4288/14
**course [12]**  4172/8 4182/9
4190/14 4213/21 4257/5
4262/17 4265/12 4271/24
4281/17 4282/20 4310/17
4319/9
**Court's [2]**  4193/2 4290/13
**courteous [4]**  4175/23
4176/19 4178/22 4269/6
**courteously [1]**  4179/11
**courtesy [1]**  4269/13
**Courthouse [1]**  4145/4
**courtroom [2]**  4310/21
4311/6
**cover [2]**  4218/5 4294/11
**covered [2]**  4240/1 4266/16
**covering [3]**  4216/25
4265/22 4266/21
**crank [2]**  4220/11 4220/12
**crash [45]**  4157/9 4158/1

4159/10 4159/24 4160/10
4164/1 4165/15 4165/19
4166/25 4167/5 4167/11
4167/18 4171/7 4215/21
4218/9 4225/8 4225/13
4227/8 4227/10 4227/11
4227/13 4228/7 4228/9
4228/16 4229/1 4229/4
4229/9 4230/8 4230/12
4230/24 4231/2 4231/8
4232/8 4232/13 4232/14
4232/19 4232/20 4233/1
4233/23 4251/3 4251/14
4265/15 4265/25 4269/24
4302/8
**crazy [3]**  4294/11 4295/9
4304/9
**create [3]**  4150/14 4236/1
4236/5
**created [2]**  4164/16
4236/18
**creates [2]**  4196/25 4197/6
**creating [1]**  4247/5
**credibility [1]**  4308/19
**critical [3]**  4258/21
4269/23 4270/1
**cross [3]**  4281/8 4291/12
4296/8
**cross-examination [1]**
4281/8
**cross-examine [1]**  4296/8
**cross-examined [1]**  4291/12
**crossed [1]**  4170/3
**crosses [2]**  4169/8 4170/2
**crossing [1]**  4172/21
**cruise [6]**  4163/14 4181/6
4181/9 4181/17 4181/17
4192/7
**crush [1]**  4174/7
**crutch [1]**  4215/5
**culminated [1]**  4290/17
**culpability [1]**  4209/14
**culture [4]**  4277/15
4284/20 4296/16 4305/5
**cumulative [1]**  4151/7
**curative [3]**  4313/7
4313/22 4315/17
**curious [2]**  4208/16
4208/18
**current [1]**  4314/14
**curve [1]**  4264/16
**curves [1]**  4254/7
**customary [1]**  4228/21
**cut [3]**  4278/9 4296/23
4306/9
**CV [1]**  4145/3
**cycles [2]**  4273/8 4279/17
**Czeisler [17]**  4260/23
4261/5 4267/22 4268/1
4268/5 4273/6 4273/16
4273/23 4280/6 4280/21
4281/18 4281/22 4281/24
4282/11 4283/3 4283/11
4283/15
**Czeisler's [1]**  4281/1

## D

**D-Deck [1]**  4163/19
**damage [16]**  4152/1 4152/4
4164/14 4165/12 4165/20
4165/24 4165/25 4166/6
4166/8 4203/14 4211/12

**D**

**damage... [5]** 4257/22
  4262/21 4262/24 4274/12
  4290/2
**damaged [1]** 4152/5
**damages [62]** 4155/9
  4195/21 4197/15 4197/18
  4197/24 4198/11 4198/17
  4198/21 4199/4 4199/6
  4199/12 4200/8 4200/10
  4200/20 4203/4 4203/5
  4203/8 4203/9 4203/11
  4203/16 4203/20 4203/21
  4205/8 4206/11 4206/12
  4206/13 4206/13 4206/17
  4206/18 4207/6 4207/15
  4207/22 4210/11 4210/19
  4211/15 4259/17 4276/20
  4285/23 4286/15 4289/7
  4306/18 4308/15 4308/22
  4309/7 4309/19 4309/22
  4309/24 4310/1 4310/3
  4311/7 4311/17 4311/22
  4311/23 4317/6 4318/16
  4318/21 4318/25 4319/24
  4320/19 4320/25 4321/3
  4321/12
**damages or [1]** 4203/8
**damaging [2]** 4165/7 4165/8
**dandy [1]** 4281/25
**danger [7]** 4200/14 4202/9
  4242/23 4243/18 4244/19
  4244/20 4306/23
**dangerous [14]** 4244/23
  4245/3 4245/4 4245/9
  4245/15 4246/5 4246/6
  4246/11 4263/13 4270/16
  4292/13 4293/23 4299/8
  4299/10
**dangers [1]** 4272/1
**dark [7]** 4193/25 4237/11
  4239/19 4239/21 4244/4
  4307/19 4307/20
**darker [3]** 4217/8 4239/23
  4239/25
**darkness [1]** 4265/9
**data [13]** 4157/7 4157/7
  4159/15 4166/25 4167/10
  4167/17 4168/12 4169/11
  4169/14 4170/8 4170/17
  4171/20 4173/8
**date [3]** 4222/12 4317/4
  4321/22
**Dave [2]** 4299/21 4302/25
**David [8]** 4277/7 4277/14
  4278/4 4278/9 4278/16
  4279/2 4279/7 4314/23
**days [5]** 4233/24 4249/2
  4251/3 4255/17 4277/3
**daytime [1]** 4297/24
**daytime/nighttime [1]**
  4297/24
**deadhead [1]** 4280/3
**deal [8]** 4163/23 4203/1
  4205/12 4205/13 4279/22
  4288/10 4293/17 4299/4
**dealing [1]** 4277/24
**deals [1]** 4205/19
**dealt [2]** 4290/3 4290/22
**death [2]** 4292/1 4303/9
**decade [1]** 4291/22

**December [2]** 4233/4
  4249/13
**decide [15]** 4199/4 4199/5
  4200/19 4205/16 4258/19
  4260/5 4260/7 4284/4
  4288/8 4297/7 4305/16
  4305/23 4309/14 4311/5
  4313/10
**decided [5]** 4289/1 4289/8
  4311/7 4319/11 4320/21
**deciding [1]** 4290/1
**decision [4]** 4257/18
  4260/9 4284/4 4311/5
**decisions [2]** 4287/19
  4307/7
**deck [34]** 4151/17 4154/5
  4157/2 4157/3 4157/10
  4157/10 4159/16 4159/17
  4163/12 4163/19 4167/8
  4167/10 4167/16 4167/21
  4168/12 4169/11 4169/14
  4169/17 4170/8 4170/19
  4172/18 4174/12 4174/13
  4176/9 4176/9 4181/1
  4182/7 4182/21 4190/15
  4191/22 4192/16 4193/12
  4240/8 4295/4
**dedicated [1]** 4280/8
**deems [1]** 4292/9
**deer [4]** 4177/8 4177/11
  4264/21 4307/19
**deers [1]** 4230/21
**defend [3]** 4298/24 4298/24
  4302/10
**defendant [15]** 4145/18
  4198/17 4198/21 4199/3
  4200/19 4200/22 4210/22
  4309/8 4309/12 4309/13
  4309/18 4309/21 4319/20
  4321/7 4321/8
**defendant's [12]** 4148/13
  4148/16 4148/17 4149/6
  4198/18 4199/25 4200/3
  4200/23 4207/24 4309/10
  4310/4 4321/5
**defendants [23]** 4145/9
  4145/21 4146/2 4146/6
  4195/6 4196/2 4203/6
  4206/2 4206/6 4209/7
  4210/11 4210/12 4210/20
  4308/15 4308/23 4308/23
  4309/23 4309/25 4310/2
  4310/5 4310/6 4317/18
  4321/3
**defendants' [4]** 4155/5
  4155/10 4210/20 4286/17
**defense [8]** 4154/20 4156/1
  4265/13 4288/23 4289/24
  4290/25 4295/25 4300/4
**definition [1]** 4308/18
**deformation [1]** 4165/10
**degree [1]** 4254/8
**Del [1]** 4321/15
**Delaware [6]** 4221/19
  4221/20 4237/3 4253/1
  4253/5 4253/21
**deliberate [2]** 4265/14
  4312/5
**deliberating [1]** 4276/25
**deliberations [13]** 4214/19
  4214/21 4308/10 4310/11
  4310/12 4310/14 4310/15

**4310/18 4311/14 4316/5
  4321/24 4321/24
**demonstrates [1]** 4181/4
**demonstrative [1]** 4161/18
**denied [10]** 4150/7 4150/9
  4155/16 4195/20 4197/13
  4197/20 4197/21 4207/16
  4211/8 4286/23
**DENNEHEY [1]** 4146/2
**deny [2]** 4298/24 4298/24
**denying [1]** 4315/20
**Department [3]** 4166/1
  4166/3 4291/25
**deposed [1]** 4264/7
**deposition [18]** 4147/14
  4150/18 4150/21 4178/1
  4215/16 4215/18 4216/12
  4218/8 4239/20 4241/20
  4242/14 4242/18 4245/22
  4249/10 4249/13 4308/20
  4323/3 4323/5
**depositions [4]** 4157/14
  4157/18 4157/24 4227/20
**derived [2]** 4172/11
  4204/11
**describe [6]** 4179/4
  4239/19 4244/18 4254/5
  4254/9 4288/11
**described [3]** 4154/2
  4193/18 4253/9
**describes [1]** 4178/25
**deserve [1]** 4204/12
**deserves [1]** 4204/15
**design [1]** 4304/6
**designated [3]** 4226/2
  4275/23 4276/4
**designation [1]** 4226/1
**designations [1]** 4171/15
**designed [1]** 4206/25
**desirability [1]** 4209/15
**desire [1]** 4310/21
**despite [5]** 4275/13
  4279/15 4284/9 4285/14
  4296/19
**destination [1]** 4222/1
**destroyed [1]** 4164/16
**detail [2]** 4221/9 4318/20
**details [1]** 4152/1
**deter [19]** 4196/2 4203/22
  4203/24 4204/7 4209/4
  4209/11 4210/12 4210/20
  4258/12 4258/15 4260/2
  4284/22 4284/23 4290/15
  4290/16 4308/23 4309/14
  4310/4 4321/9
**determination [7]** 4174/2
  4196/22 4197/1 4260/16
  4290/23 4308/16 4309/6
**determinations [1]** 4285/3
**determine [13]** 4157/7
  4171/24 4172/2 4173/2
  4195/13 4196/1 4203/25
  4284/11 4284/13 4308/14
  4317/5 4320/18 4321/12
**determined [13]** 4173/22
  4196/5 4196/15 4201/7
  4201/10 4257/23 4258/3
  4259/19 4262/16 4263/19
  4293/23 4309/3 4313/12
**determining [3]** 4167/17
  4318/16 4320/25
**deterrence [15]** 4205/20

**D**

**deterrence... [14]** 4209/1
4209/2 4209/6 4209/11
4210/3 4210/8 4210/16
4210/25 4211/7 4258/20
4259/4 4303/18 4303/18
4304/20
**deterrent [2]** 4284/25
4306/19
**deterring [1]** 4209/15
**diagnosed [2]** 4282/3
4282/13
**DIAMOND [1]** 4145/16
**died [1]** 4204/20
**difference [8]** 4166/10
4183/14 4229/2 4229/9
4288/9 4292/17 4292/17
4308/2
**different [21]** 4157/6
4167/21 4172/5 4172/5
4172/7 4187/3 4200/22
4216/1 4216/16 4216/18
4216/20 4216/22 4248/13
4248/25 4264/6 4268/13
4290/5 4295/11 4295/11
4299/19 4318/11
**differential [3]** 4166/14
4166/16 4184/13
**difficult [2]** 4153/20
4154/2
**direct [9]** 4173/12 4174/6
4177/6 4177/19 4178/17
4186/21 4187/11 4189/10
4308/19
**direction [2]** 4153/19
4187/3
**directions [1]** 4293/11
**directly [2]** 4303/14
4318/2
**Director [2]** 4278/12
4278/23
**dirty [1]** 4216/24
**disagree [4]** 4173/20
4173/24 4248/15 4322/1
**disagreeing [1]** 4174/2
**disagrees [2]** 4268/6
4268/7
**disappointed [1]** 4147/22
**discern [2]** 4263/15
4263/16
**discretion [2]** 4276/16
4282/19
**discuss [5]** 4157/17 4158/6
4290/5 4310/25 4312/8
**discussed [1]** 4157/10
**discussion [6]** 4147/5
4155/17 4225/7 4255/24
4287/3 4320/13
**discussions [1]** 4231/7
**disengaged [1]** 4163/15
**dispatch [1]** 4276/11
**dispatcher [1]** 4300/7
**displaced [1]** 4185/11
**displayed [1]** 4170/16
**dispute [7]** 4192/21 4193/7
4262/18 4262/19 4262/19
4266/14 4266/15
**disputes [1]** 4262/17
**disregard [2]** 4280/22
4280/22
**distance [4]** 4153/18

4176/12 4193/24 4233/16
**distance-wise [1]** 4233/16
**distributed [2]** 4281/5
4281/9
**DISTRICT [3]** 4145/1 4145/1
4285/9
**DNA [3]** 4277/15 4299/17
4300/18
**dock [1]** 4306/8
**docked [1]** 4306/10
**Docket [2]** 4155/15 4286/22
**doctors [2]** 4298/2 4298/5
**doctrine [1]** 4309/5
**document [2]** 4153/8 4193/1
**DOD [1]** 4278/20
**dog [2]** 4263/18 4295/12
**dollar [1]** 4206/13 4206/15
**dollar's [1]** 4203/15
**Domingo [1]** 4264/25
**Dominican [1]** 4264/25
**done [17]** 4154/16 4154/17
4155/4 4155/5 4257/12
4257/14 4257/17 4259/3
4259/4 4259/9 4259/18
4259/18 4259/19 4270/17
4275/23 4279/21 4304/14
**dorms [3]** 4268/2 4268/6
4298/10
**DOT [6]** 4250/5 4252/24
4278/20 4291/24 4298/2
4298/5
**DOT-certified [1]** 4250/5
**double [1]** 4304/13
**doubt [4]** 4166/12 4187/21
4234/4 4310/19
**down [31]** 4156/21 4160/6
4161/13 4162/9 4165/5
4168/19 4172/13 4176/19
4176/22 4182/15 4186/25
4188/11 4189/11 4189/12
4197/22 4203/2 4217/10
4218/24 4219/4 4219/5
4220/12 4220/19 4221/4
4238/19 4255/20 4256/2
4266/2 4266/18 4279/8
4290/24 4299/4
**downgrade [1]** 4182/6
**downhill [2]** 4181/22
4182/15
**dozing [2]** 4283/7 4295/23
**Dr [6]** 4148/18 4273/6
4280/21 4281/1 4281/22
4282/11
**Dr. [19]** 4148/20 4260/23
4261/2 4261/5 4273/20
4273/23 4276/17 4279/16
4280/6 4281/11 4281/13
4281/18 4281/21 4281/21
4281/24 4282/17 4283/11
4283/15 4283/19
**Dr. Czeisler [7]** 4260/23
4261/5 4280/6 4281/18
4281/24 4283/11 4283/15
**Dr. Mark [2]** 4261/2
4273/20
**Dr. Moore-Ede [9]** 4148/20
4276/17 4279/16 4281/11
4281/13 4281/21 4281/21
4282/17 4283/19
**Dr. Rosekind's [1]** 4273/23
**drafted [1]** 4211/25
**drawn [1]** 4308/13

**drifting [1]** 4177/3
**drive [14]** 4145/17 4204/14
4215/23 4236/22 4237/24
4245/16 4255/6 4255/9
4255/11 4258/18 4267/12
4269/17 4277/11 4277/22
**driven [5]** 4251/5 4262/7
4278/2 4278/3 4283/23
**driver [32]** 4163/10
4178/18 4178/23 4178/25
4179/2 4193/14 4215/13
4229/14 4236/8 4243/25
4244/5 4254/25 4264/11
4268/18 4272/7 4276/4
4276/12 4276/12 4278/11
4280/9 4280/18 4282/1
4283/7 4295/21 4297/9
4298/17 4300/6 4302/22
4303/22 4307/18 4307/22
4307/24
**driver's [1]** 4266/25
**drivers [27]** 4236/18
4243/25 4246/15 4272/4
4272/6 4273/2 4276/11
4282/19 4293/5 4293/21
4293/23 4297/4 4298/13
4298/13 4299/13 4300/5
4300/22 4301/2 4302/7
4302/19 4303/8 4303/9
4303/20 4304/4 4304/5
4304/25 4307/15
**driving [28]** 4179/7
4203/23 4203/24 4216/7
4236/9 4243/24 4244/14
4244/21 4255/1 4255/20
4256/2 4258/16 4264/13
4267/4 4267/6 4267/7
4268/18 4268/22 4269/25
4271/15 4272/1 4276/11
4278/24 4279/20 4282/10
4297/14 4297/16 4304/9
**dropped [2]** 4183/9 4202/19
**drove [2]** 4237/18 4268/20
**drowsy [1]** 4263/24
**Drs [1]** 4273/22
**dry [1]** 4296/16
**due [6]** 4155/11 4207/24
4208/22 4209/24 4222/12
4286/17
**during [12]** 4148/7 4150/18
4151/2 4153/25 4194/18
4203/1 4222/20 4223/3
4224/19 4257/4 4310/12
4310/15
**duties [1]** 4301/13
**duty [3]** 4272/8 4285/10
4299/11

**E**

**E-D-E [1]** 4148/21
**e.g [1]** 4206/13
**early [4]** 4147/18 4184/7
4252/14 4266/19
**Earth [4]** 4169/12 4170/20
4170/24 4171/12
**ease [1]** 4213/15
**easier [1]** 4156/21
**east [3]** 4145/22 4263/4
4270/3
**EASTERN [2]** 4145/1 4285/9
**Ede [11]** 4148/18 4148/20
4273/23 4276/17 4279/16

**E**

**Ede... [6]**  4281/11 4281/13
 4281/21 4281/21 4282/17
 4283/19
**editorial [1]**  4153/18
**eerie [1]**  4303/22
**effect [1]**  4207/7
**Effectively [1]**  4179/25
**effort [1]**  4161/14
**efforts [1]**  4284/9
**eight [8]**  4168/11 4219/20
 4268/10 4293/22 4301/15
 4301/17 4307/19 4307/21
**either [8]**  4189/24 4216/22
 4233/16 4236/13 4236/21
 4282/11 4284/15 4299/13
**ejection [1]**  4185/4
**element [1]**  4203/11
**ELMO [1]**  4214/25
**email [2]**  4146/23 4283/21
**emergency [1]**  4255/7
**emphasize [3]**  4196/21
 4196/24 4306/15
**employee [3]**  4199/15
 4297/9 4299/2
**employees [2]**  4273/1
 4285/19
**employer [1]**  4318/13
**employment [4]**  4215/22
 4318/8 4318/8 4319/6
**encountered [2]**  4262/6
 4284/7
**encouraged [1]**  4276/13
**end [13]**  4155/4 4155/5
 4177/10 4185/24 4186/4
 4186/6 4186/13 4205/23
 4243/21 4274/8 4279/9
 4285/15 4321/25
**ended [2]**  4251/25 4258/16
**ends [1]**  4254/8
**energy [20]**  4164/15
 4164/18 4164/19 4164/21
 4164/23 4164/23 4165/3
 4165/4 4165/5 4165/6
 4165/7 4165/8 4165/9
 4165/13 4166/4 4166/5
 4166/11 4166/12 4166/24
 4174/7
**enforce [4]**  4293/25
 4301/23 4301/23 4302/23
**enforced [3]**  4297/6
 4299/24 4301/20
**engine [7]**  4182/11 4182/12
 4182/14 4182/15 4183/3
 4183/4 4183/21
**engineering [2]**  4158/16
 4171/21
**ENTERPRISE [1]**  4145/8
**enters [4]**  4147/9 4155/22
 4215/10 4320/14
**entire [4]**  4181/18 4195/25
 4204/3 4275/14
**entirety [4]**  4149/9
 4149/10 4149/22 4150/2
**entitled [7]**  4199/13
 4206/15 4211/10 4211/22
 4212/2 4212/13 4213/8
**entitlement [2]**  4211/12
 4212/9
**Entry [2]**  4155/15 4286/22
**equation [1]**  4303/11

**equations [1]**  4153/22
**equipped [1]**  4157/19
**error [1]**  4169/23
**especially [2]**  4249/4
 4272/2
**ESQ [7]**  4145/16 4145/16
 4145/20 4145/23 4146/5
 4146/5 4146/8
**essentially [6]**  4150/23
 4179/23 4181/5 4181/12
 4188/13 4265/18
**established [2]**  4211/15
 4311/18
**estimated [1]**  4176/6
**estoppel [6]**  4155/13
 4195/22 4205/15 4208/1
 4286/20 4309/5
**Evans [19]**  4174/22 4175/19
 4180/6 4180/11 4180/18
 4190/24 4191/3 4263/2
 4263/2 4266/23 4269/21
 4269/24 4269/25 4270/2
 4270/4 4270/12 4270/25
 4272/5 4295/12
**Evans' [1]**  4270/19
**evening [4]**  4222/23
 4223/18 4224/6 4255/14
**events [1]**  4150/24
**evidence [58]**  4148/6
 4149/6 4149/14 4152/4
 4154/13 4157/1 4160/20
 4197/23 4197/25 4198/1
 4211/10 4211/11 4211/16
 4215/4 4225/6 4225/9
 4259/24 4260/7 4260/17
 4260/19 4263/23 4264/4
 4266/9 4266/11 4266/12
 4273/5 4275/17 4285/21
 4287/18 4288/2 4288/4
 4288/11 4291/11 4295/17
 4295/24 4302/24 4305/21
 4308/11 4308/13 4308/18
 4308/19 4310/25 4311/2
 4311/5 4311/6 4311/19
 4313/18 4313/19 4313/21
 4313/22 4313/24 4317/13
 4317/14 4317/22 4319/18
 4319/21 4320/8 4320/22
**eviscerating [1]**  4195/21
**evolved [2]**  4270/19
 4270/20
**exact [9]**  4159/18 4169/19
 4172/19 4176/4 4180/25
 4193/19 4243/1 4273/16
 4273/16
**exactly [5]**  4164/1 4169/8
 4170/3 4290/8 4290/10
**examination [3]**  4186/21
 4244/14 4281/8
**examine [2]**  4296/8 4311/1
**examined [1]**  4291/12
**example [4]**  4153/18 4209/4
 4279/2 4303/24
**excellence [2]**  4277/11
 4278/18
**excellent [1]**  4278/21
**except [1]**  4217/14
**excess [1]**  4272/13
**exclude [1]**  4320/2
**excluded [2]**  4313/18
 4314/15
**excludes [1]**  4313/22

**exclusive [1]**  4204/16
**excuse [2]**  4298/4 4318/10
**executive [1]**  4293/24
**executives [3]**  4293/13
 4299/19 4304/14
**exhibit [17]**  4149/6
 4154/10 4154/11 4154/17
 4161/3 4197/25 4214/8
 4214/12 4214/13 4214/17
 4214/19 4265/13 4312/3
 4312/4 4317/4 4320/17
 4321/22
**Exhibit 6 [1]**  4214/17
**exhibits [12]**  4148/6
 4148/11 4154/16 4213/15
 4213/20 4213/21 4214/6
 4214/20 4214/23 4214/23
 4215/4 4302/16
**existed [1]**  4276/19
**Exit [4]**  4221/21 4221/22
 4236/21 4237/5
**exits [5]**  4147/20 4194/10
 4286/6 4316/6 4321/19
**expect [8]**  4166/8 4192/12
 4240/20 4244/3 4244/5
 4244/9 4244/11 4270/5
**expectations [1]**  4243/25
**expected [1]**  4268/8
**experience [1]**  4268/19
**experiences [1]**  4285/5
**experiencing [1]**  4263/24
**expert [15]**  4204/4 4260/22
 4260/23 4260/24 4262/13
 4268/7 4272/12 4278/13
 4281/22 4283/4 4283/4
 4283/12 4283/17 4295/5
 4308/20
**expertise [3]**  4273/22
 4273/24 4278/21
**experts [6]**  4251/16
 4267/21 4267/22 4267/22
 4294/23 4298/1
**explain [8]**  4161/16
 4161/20 4162/6 4167/13
 4167/19 4169/20 4257/25
 4319/17
**explained [1]**  4197/9
**explaining [1]**  4162/19
**explanation [4]**  4155/14
 4242/10 4266/3 4266/17
**explosion [1]**  4265/8
**exposure [1]**  4292/12
**expressly [1]**  4275/23
**extended [1]**  4317/24
**extends [1]**  4239/16
**extent [4]**  4151/8 4212/8
 4309/11 4321/6
**exterior [1]**  4185/3
**extras [2]**  4220/25 4221/2
**extremely [2]**  4194/12
 4263/13
**eye [1]**  4299/7
**eyes [2]**  4280/19 4295/25

**F**

**F-N-U [1]**  4191/2
**face [2]**  4298/25 4307/16
**Facebook [2]**  4297/16
 4297/16
**faced [1]**  4262/1
**facility [2]**  4217/17
 4217/21

**F**

**facing [1]**   4284/6
**fact [23]**   4165/17 4180/10
  4192/22 4193/8 4196/24
  4234/20 4236/3 4238/2
  4245/14 4247/11 4248/3
  4263/22 4266/17 4267/15
  4275/13 4288/13 4298/23
  4301/14 4303/21 4305/14
  4313/5 4314/4 4315/5
**factor [1]**   4197/22
**factors [11]**   4200/21
  4209/14 4209/16 4258/21
  4259/9 4309/10 4309/20
  4319/25 4320/6 4321/5
  4321/11
**facts [5]**   4257/18 4260/7
  4285/9 4285/22 4290/19
**fail [1]**   4310/19
**failed [1]**   4299/11
**failsafe [1]**   4297/2
**failure [4]**   4276/21
  4279/14 4284/22 4291/12
**fair [7]**   4173/2 4183/10
  4214/1 4234/18 4236/1
  4237/13 4237/14
**fall [2]**   4302/23 4303/25
**falling [1]**   4295/21
**false [3]**   4259/1 4284/3
  4290/3
**familiar [3]**   4176/8
  4176/15 4228/13
**families [1]**   4306/25
**family [2]**   4267/18 4317/25
**fantastic [1]**   4257/9
**far [6]**   4167/23 4167/25
  4193/25 4201/18 4225/4
  4269/11
**fashion [1]**   4245/11
**fast [4]**   4251/14 4252/1
  4252/3 4252/12
**faster [2]**   4162/24 4164/22
**fatigue [40]**   4204/6
  4260/25 4271/21 4271/22
  4271/22 4271/25 4271/25
  4272/1 4272/21 4273/9
  4273/9 4274/14 4275/2
  4275/22 4279/18 4280/6
  4280/9 4280/23 4280/24
  4281/2 4281/24 4282/13
  4289/6 4290/21 4293/1
  4293/11 4296/19 4298/22
  4299/1 4300/19 4300/23
  4301/21 4301/25 4302/1
  4302/22 4303/23 4305/1
  4313/5 4313/10 4315/9
**fatigued [5]**   4263/24
  4264/8 4268/16 4270/10
  4276/8
**fatigues [1]**   4293/4
**fault [4]**   4278/2 4278/3
  4279/13 4289/2
**faults [1]**   4289/15
**Fax [1]**   4146/22
**FB [1]**   4145/3
**fear [1]**   4283/12
**fears [2]**   4291/11 4302/24
**Federal [3]**   4166/25
  4274/16 4275/11
**feet [2]**   4185/11 4265/20
**fell [1]**   4295/19

**felt [1]**   4174/3
**fender [1]**   4291/23
**fender-benders [1]**   4291/23
**few [13]**   4148/6 4159/7
  4167/9 4174/20 4175/1
  4231/4 4233/3 4251/1
  4272/14 4304/11 4305/18
  4305/19 4310/10
**field [1]**   4278/19
**fight [2]**   4263/19 4295/12
**figure [1]**   4295/10
**file [2]**   4154/13 4158/8
**filed [3]**   4155/15 4194/23
  4286/22
**final [5]**   4205/23 4206/10
  4215/12 4222/1 4308/10
**finally [1]**   4311/24
**financial [4]**   4296/21
  4303/15 4305/12 4317/23
**findings [3]**   4150/25
  4173/17 4173/20
**fine [11]**   4149/4 4153/15
  4154/3 4210/2 4281/24
  4282/14 4294/8 4296/5
  4296/10 4297/18 4303/19
**finish [3]**   4147/25 4217/19
  4315/8
**finished [1]**   4321/24
**firm [2]**   4145/14 4277/6
**first [38]**   4148/13 4156/13
  4160/19 4161/16 4161/21
  4164/17 4168/14 4187/16
  4188/19 4189/23 4195/7
  4195/11 4198/15 4205/5
  4208/15 4215/3 4217/7
  4217/11 4231/20 4240/1
  4241/12 4241/13 4247/13
  4247/14 4247/16 4248/7
  4258/22 4258/23 4259/5
  4272/19 4279/5 4285/11
  4287/12 4289/13 4290/4
  4291/10 4314/21 4314/22
**fit [6]**   4262/25 4264/1
  4267/11 4275/18 4282/15
  4295/17
**fits [2]**   4191/22 4283/17
**five [15]**   4168/10 4184/10
  4184/16 4259/25 4260/1
  4264/7 4264/13 4264/16
  4282/9 4288/5 4290/17
  4293/22 4301/15 4301/17
  4304/16
**five-eight [3]**   4293/22
  4301/15 4301/17
**fix [7]**   4197/14 4197/17
  4258/10 4304/18 4309/7
  4321/2 4321/12
**fixing [5]**   4259/8 4259/10
  4309/14 4319/23 4321/8
**flap [1]**   4221/10
**flashed [3]**   4176/13
  4269/12 4269/16
**flashers [3]**   4236/15
  4244/15 4245/17
**flat [1]**   4254/2
**flatbed [2]**   4163/4 4218/5
**floor [1]**   4274/23
**fluctuation [1]**   4192/5
**fly [1]**   4162/1
**FMCSA [3]**   4281/5 4281/12
  4282/22
**Fnu [1]**   4191/2

**focus [2]**   4274/11 4320/3
**fog [4]**   4169/8 4170/2
  4170/3 4172/21
**foggy [1]**   4255/5
**folks [5]**   4152/7 4279/9
  4293/5 4298/18 4306/18
**follow [9]**   4214/13 4234/17
  4240/23 4241/4 4276/21
  4278/25 4290/23 4302/10
  4302/12
**follower [1]**   4297/9
**following [10]**   4152/21
  4169/25 4223/20 4239/14
  4309/9 4313/1 4313/2
  4316/1 4319/24 4321/5
**followings [1]**   4320/2
**follows [3]**   4169/1 4169/4
  4215/16
**force [8]**   4161/22 4161/24
  4162/2 4162/3 4162/4
  4184/23 4185/5 4185/16
**foremost [1]**   4278/12
**foreperson [2]**   4310/17
  4311/11 4317/7
**forget [1]**   4285/6
**forgot [2]**   4193/19 4294/5
**form [11]**   4207/10 4207/14
  4207/18 4207/21 4208/2
  4210/25 4211/9 4311/10
  4311/16 4312/1 4312/4
**formal [1]**   4194/20
**forming [1]**   4168/1
**formulating [1]**   4191/20
**forth [3]**   4170/5 4191/8
  4191/21
**forty [4]**   4233/10 4235/4
  4239/4 4254/18
**Forty-three [1]**   4239/4
**forward [16]**   4162/19
  4162/24 4187/13 4188/6
  4188/14 4188/16 4189/7
  4189/8 4189/8 4189/15
  4257/19 4266/22 4284/25
  4285/2 4303/20 4304/22
**foundation [1]**   4149/23
**foundationally [3]**   4157/17
  4157/23 4157/25
**four [17]**   4164/24 4165/17
  4168/15 4184/10 4220/15
  4236/11 4236/15 4239/6
  4243/21 4244/5 4244/15
  4244/21 4245/17 4246/15
  4262/13 4267/18 4304/11
**four-inch [1]**   4220/15
**four-month [1]**   4262/13
**four-way [9]**   4236/11
  4236/15 4239/6 4243/21
  4244/5 4244/15 4244/21
  4245/17 4246/15
**fours [1]**   4304/10
**fourth [1]**   4168/7
**frailty [1]**   4303/10
**frame [1]**   4218/16
**frankly [1]**   4297/21
**frankness [1]**   4311/3
**frequency [2]**   4292/12
  4303/17
**friction [2]**   4162/4 4167/3
**Friday [2]**   4155/14 4198/9
**friends [1]**   4307/1
**frightened [1]**   4283/7
**front [29]**   4166/6 4182/10

**F**

front... **[27]**  4182/10
4185/10 4187/23 4188/4
4188/6 4188/7 4189/14
4217/9 4219/1 4219/16
4221/11 4223/15 4229/23
4229/25 4230/20 4230/21
4237/4 4239/23 4240/23
4241/5 4244/3 4255/7
4265/5 4265/6 4276/20
4283/6 4295/22
full **[2]**  4251/22 4262/14
fully **[3]**  4268/17 4277/3
4280/4
functioning **[1]**  4178/9
funny **[1]**  4300/17
fused **[1]**  4265/15
future **[9]**  4209/3 4210/13
4258/13 4260/4 4290/16
4304/21 4308/24 4309/15
4321/10

**G**

G-40 **[12]**  4291/8 4292/25
4293/22 4299/25 4301/2
4301/9 4301/12 4301/17
4301/18 4302/5 4302/6
4304/25
G40 **[10]**  4274/12 4275/2
4275/6 4275/8 4275/14
4275/14 4275/16 4276/1
4276/2 4276/19
game **[1]**  4303/6
garbage **[2]**  4218/5 4262/6
Garmin **[1]**  4157/4
general **[8]**  4151/16
4151/20 4151/23 4159/18
4209/3 4226/16 4229/1
4308/17
generalities **[1]**  4174/14
generally **[13]**  4151/25
4159/20 4159/21 4167/9
4172/9 4176/4 4226/14
4226/14 4226/19 4226/23
4227/2 4227/3 4228/8
gentleman **[9]**  4217/5
4217/13 4278/10 4291/21
4297/3 4299/9 4303/16
4304/22 4308/1
gentlemen **[15]**  4147/11
4147/17 4156/2 4194/9
4215/12 4256/23 4257/2
4263/8 4266/10 4268/25
4275/13 4278/14 4286/1
4320/16 4321/20
Georgia **[1]**  4307/13
giant **[1]**  4288/12
gigantic **[1]**  4173/14
Glen **[1]**  4268/6
GLI **[1]**  4150/20
global **[3]**  4207/18 4208/2
4208/5
glow **[1]**  4252/19
gmail.com **[1]**  4146/23
goal **[3]**  4277/21 4279/15
4285/2
goals **[1]**  4277/17
GOGGIN **[1]**  4146/3
gold **[3]**  4260/20 4282/18
4291/22
Google **[6]**  4169/12 4170/20

4170/24 4171/12 4171/12
4202/15
Gossell's **[1]**  4186/14
governed **[1]**  4176/3
Government **[5]**  4165/18
4166/25 4204/2 4278/20
4291/25
GPS **[8]**  4156/25 4156/25
4157/4 4157/5 4159/15
4159/24 4167/19 4170/19
GPS's **[1]**  4157/5
grab **[2]**  4217/11 4221/11
grade **[20]**  4181/21 4181/23
4181/25 4183/13 4183/14
4226/17 4226/24 4226/24
4228/7 4228/8 4228/9
4228/11 4228/12 4228/13
4234/6 4237/24 4238/2
4238/10 4238/14 4238/14
grades **[2]**  4228/18 4249/4
Grand **[1]**  4145/18
grateful **[1]**  4287/13
gray **[2]**  4239/19 4239/21
great **[4]**  4256/20 4293/16
4306/6 4322/13
greatly **[1]**  4277/9
GREYHOUND **[80]**  4145/6
4157/11 4175/4 4175/7
4176/6 4176/24 4195/25
4198/12 4199/7 4199/11
4200/4 4200/9 4201/8
4204/1 4204/2 4208/19
4211/19 4232/21 4233/1
4241/23 4242/4 4242/10
4252/1 4257/24 4258/11
4258/12 4260/1 4260/2
4260/20 4261/10 4261/11
4261/13 4261/23 4271/7
4271/19 4271/24 4273/3
4273/25 4274/21 4274/22
4274/25 4275/1 4275/7
4276/21 4277/1 4277/2
4277/14 4277/23 4278/24
4279/4 4281/6 4281/12
4282/21 4282/23 4283/1
4284/1 4284/15 4284/17
4285/17 4288/22 4290/7
4293/13 4295/8 4296/3
4296/14 4296/17 4296/17
4299/11 4299/17 4301/20
4303/21 4308/15 4309/8
4311/20 4313/16 4313/24
4318/12 4319/1 4320/11
4321/3
Greyhound's **[27]**  4196/6
4196/15 4199/9 4199/18
4200/4 4200/9 4200/15
4260/3 4260/24 4276/7
4278/2 4278/3 4281/1
4282/14 4284/9 4284/20
4285/16 4289/6 4289/17
4309/4 4309/16 4311/22
4313/5 4313/10 4318/7
4318/16 4320/9
ground **[2]**  4177/15 4193/24
grounds **[2]**  4155/8 4286/15
guardrail **[2]**  4172/24
4172/25
GUBICA **[36]**  4145/7 4145/7
4152/10 4159/9 4160/6
4165/3 4166/17 4167/6
4174/3 4177/20 4180/3

4180/6 4180/11 4184/18
4189/20 4215/16 4215/18
4215/18 4215/20 4215/24
4216/14 4237/17 4250/8
4251/22 4251/24 4262/7
4262/17 4263/4 4263/6
4263/10 4263/20 4265/17
4267/4 4272/5 4294/10
4323/5
Gubica's **[6]**  4148/10
4167/4 4180/18 4213/11
4251/19 4256/15
guess **[4]**  4154/22 4228/19
4263/7 4303/12
guided **[1]**  4308/17
guidelines **[2]**  4317/5
4320/18
guy **[3]**  4270/4 4270/15
4299/21
Guyana **[1]**  4173/22
guys **[5]**  4154/25 4287/11
4287/14 4293/17 4300/15
GW **[1]**  4253/1

**H**

half **[5]**  4164/21 4280/2
4290/6 4294/1 4304/11
hallways **[1]**  4298/12
hand **[8]**  4176/1 4180/23
4191/14 4220/4 4220/12
4272/20 4303/25 4316/2
handed **[2]**  4151/9 4290/24
handler **[3]**  4277/10
4277/13 4296/4
handlers **[1]**  4277/16
hands **[4]**  4193/1 4232/14
4280/20 4304/8
hanging **[2]**  4287/15
4296/16
Hans **[3]**  4273/2 4279/8
4280/22
happy **[1]**  4151/19
hard **[2]**  4232/1 4276/24
harm **[10]**  4212/8 4259/9
4259/18 4261/24 4284/12
4284/15 4289/20 4309/11
4320/4 4321/6
HAROLD **[1]**  4146/5
Haslip **[4]**  4209/13 4209/14
4209/18 4210/4
hauler **[1]**  4262/7
hazard **[24]**  4158/6 4158/9
4158/13 4158/18 4159/1
4159/10 4177/21 4178/14
4223/13 4227/22 4227/25
4236/1 4236/6 4236/11
4236/18 4247/5 4251/9
4263/8 4263/13 4263/16
4263/20 4267/6 4267/6
4284/8
hazardous **[1]**  4245/15
hazards **[39]**  4158/19
4178/5 4178/8 4224/20
4224/25 4225/1 4225/8
4225/12 4227/1 4227/5
4227/11 4227/15 4228/5
4236/11 4239/6 4243/21
4244/5 4244/7 4244/8
4244/21 4246/5 4246/9
4246/16 4246/19 4247/1
4247/4 4250/10 4251/8
4253/16 4254/19 4254/24

**H**

**hazards... [8]**   4255/2
   4255/5 4255/9 4255/12
   4262/18 4263/12 4263/17
   4267/7
**head [4]**   4178/6 4299/20
   4306/2 4322/7
**headlights [2]**   4223/13
   4237/10
**hear [13]**   4175/16 4195/6
   4197/11 4206/16 4225/9
   4264/23 4289/15 4289/24
   4290/25 4291/1 4293/18
   4303/14 4315/19
**heard [68]**   4156/5 4164/15
   4195/19 4195/23 4195/24
   4196/19 4197/15 4203/22
   4204/1 4205/15 4205/17
   4225/3 4228/12 4232/20
   4234/20 4238/23 4251/17
   4252/6 4252/23 4254/15
   4259/24 4259/25 4260/17
   4260/19 4260/19 4260/20
   4260/22 4262/2 4262/7
   4262/10 4262/22 4263/2
   4263/10 4264/10 4265/17
   4267/21 4267/21 4269/24
   4271/16 4277/7 4277/25
   4278/9 4278/10 4278/15
   4278/16 4279/16 4279/16
   4281/20 4284/24 4285/4
   4288/23 4290/15 4292/8
   4294/3 4294/5 4294/8
   4294/10 4294/13 4295/3
   4295/25 4297/10 4297/25
   4298/2 4298/10 4298/11
   4306/5 4308/11 4318/11
**hearing [5]**   4191/9 4191/16
   4248/25 4312/10 4313/2
**hears [1]**   4303/14
**hearsay [3]**   4152/13 4153/4
   4153/7
**heart [1]**   4308/5
**heat [1]**   4164/25
**heavier [2]**   4249/6 4249/6
**held [4]**   4256/10 4289/7
   4312/10 4313/2
**help [1]**   4243/21
**herd [1]**   4177/8
**herring [1]**   4267/20
**Hi [6]**   4217/5 4217/13
   4222/1 4235/17 4252/25
   4253/10
**Hi-Tech [6]**   4217/5 4217/13
   4222/1 4235/17 4252/25
   4253/10
**hiding [1]**   4301/16
**high [10]**   4181/8 4181/13
   4292/9 4292/10 4292/11
   4292/11 4292/12 4299/10
   4303/17 4303/17
**higher [3]**   4165/22 4172/10
   4178/2
**higher-level [1]**   4172/10
**highlighted [1]**   4313/5
**highlights [1]**   4212/7
**highly [3]**   4245/3 4245/4
   4262/11
**highway [24]**   4162/9
   4165/14 4191/13 4217/10
   4217/25 4227/22 4234/15

   4236/1 4236/3 4236/6
   4236/10 4237/9 4243/9
   4244/11 4244/14 4244/22
   4245/17 4246/4 4246/22
   4263/11 4263/12 4278/23
   4284/5 4292/10
**highways [1]**   4274/19
**hills [3]**   4192/8 4226/13
   4254/7
**himself [1]**   4267/8
**hired [1]**   4282/6
**hires [1]**   4274/1
**hiring [2]**   4274/2 4274/2
**hit [19]**   4162/9 4177/8
   4185/13 4190/20 4190/23
   4190/24 4191/13 4191/24
   4191/25 4225/14 4256/6
   4262/22 4264/21 4270/14
   4270/20 4270/21 4295/2
   4295/14 4295/15
**hitting [1]**   4232/15
**hold [4]**   4198/25 4198/25
   4217/11 4220/14
**holes [2]**   4218/12 4218/14
**Hollywood [1]**   4145/15
**home [1]**   4267/16
**honesty [1]**   4307/2
**Honor [55]**   4147/7 4148/5
   4148/13 4149/8 4150/5
   4150/11 4150/15 4151/13
   4151/21 4152/8 4152/25
   4153/7 4154/8 4154/19
   4154/24 4155/25 4156/9
   4161/1 4194/11 4194/15
   4195/10 4195/17 4195/23
   4196/22 4198/22 4200/13
   4200/24 4201/2 4202/9
   4202/21 4203/19 4205/22
   4207/13 4207/17 4209/20
   4210/16 4212/12 4212/24
   4213/18 4256/18 4256/21
   4256/24 4286/12 4286/24
   4287/6 4289/9 4307/5
   4312/7 4315/16 4317/8
   4317/18 4318/4 4319/2
   4319/8 4322/14
**HONORABLE [1]**   4145/11
**hood [3]**   4229/23 4229/24
   4229/25
**hook [1]**   4318/21
**hope [2]**   4305/16 4308/6
**horn [3]**   4153/1 4153/2
   4295/16
**hot [1]**   4266/8
**hour [77]**   4158/24 4159/2
   4159/7 4166/8 4166/9
   4166/13 4166/16 4167/7
   4173/23 4174/3 4176/2
   4177/19 4181/6 4181/13
   4181/21 4183/8 4183/10
   4183/15 4184/15 4184/17
   4226/10 4226/12 4226/17
   4226/24 4227/16 4229/2
   4229/5 4229/8 4230/23
   4231/13 4231/23 4232/18
   4233/13 4233/15 4233/23
   4233/25 4236/9 4238/9
   4238/15 4238/18 4238/19
   4238/22 4244/14 4244/21
   4245/7 4245/12 4245/19
   4245/23 4246/3 4246/7
   4246/17 4246/19 4247/4

   4247/19 4251/15 4252/2
   4252/14 4254/18 4254/23
   4255/1 4255/9 4255/11
   4262/8 4262/8 4262/17
   4263/7 4263/11 4263/20
   4267/7 4267/8 4269/8
   4284/7 4294/1 4295/2
**hours [17]**   4222/8 4222/10
   4232/19 4237/6 4267/24
   4268/2 4270/3 4272/7
   4272/10 4272/11 4282/2
   4282/10 4282/12 4304/10
   4304/11 4307/19 4307/21
**house [7]**   4248/19 4248/22
   4249/2 4267/19 4296/22
   4317/24 4317/24
**human [8]**   4277/24 4284/14
   4297/3 4297/4 4297/5
   4303/10 4304/6 4304/7
**hundred [6]**   4175/13
   4182/11 4259/1 4277/2
   4277/3 4277/5
**hundreds [2]**   4234/14
   4277/22
**hyphen [1]**   4148/21

**I**

**I'd [1]**   4152/21
**I'll [10]**   4153/9 4156/9
   4158/21 4188/11 4214/10
   4242/25 4296/1 4311/10
   4312/21 4320/25
**I'm [53]**   4147/22 4147/24
   4148/10 4148/10 4148/23
   4150/16 4151/19 4151/19
   4152/3 4153/14 4154/12
   4156/6 4160/24 4162/18
   4172/11 4177/6 4186/8
   4186/20 4187/18 4188/11
   4190/11 4196/12 4206/1
   4211/5 4213/14 4216/5
   4218/6 4218/9 4225/18
   4226/8 4226/15 4233/6
   4241/3 4248/2 4248/7
   4259/3 4270/24 4270/25
   4279/11 4282/17 4283/22
   4289/25 4290/8 4291/1
   4294/1 4301/9 4304/9
   4305/13 4305/25 4306/15
   4307/9 4318/10 4322/1
**I've [6]**   4197/15 4215/3
   4277/9 4279/21 4279/22
   4320/20
**I-80 [17]**   4226/14 4226/17
   4226/19 4226/20 4226/23
   4227/1 4227/14 4228/8
   4231/12 4237/21 4238/2
   4238/14 4255/14 4262/5
   4262/6 4269/1 4274/20
**idea [4]**   4161/18 4187/22
   4270/5 4300/5
**ideal [2]**   4297/9 4297/9
**ignore [3]**   4165/1 4263/25
   4267/15
**Illinois [1]**   4271/9
**illnesses [1]**   4298/3
**imagery [1]**   4169/12
**impact [44]**   4159/15
   4160/19 4161/15 4162/19
   4163/13 4164/3 4164/6
   4164/8 4165/2 4173/23

**I**

**impact... [34]**   4175/4
4175/7 4175/17 4176/25
4177/7 4179/16 4180/19
4180/24 4180/25 4184/14
4184/23 4185/1 4185/16
4192/22 4193/8 4206/2
4206/8 4209/8 4209/15
4209/16 4210/4 4210/22
4237/7 4242/11 4249/10
4249/15 4249/18 4252/12
4264/13 4264/14 4265/7
4266/1 4266/2 4310/6
**implement [2]**   4274/5
4282/25
**implemented [1]**   4282/21
**importance [2]**   4271/25
4279/18
**important [12]**   4234/17
4235/25 4236/5 4285/6
4293/19 4298/16 4300/24
4300/25 4304/21 4305/5
4307/9 4307/10
**imposed [8]**   4211/11
4211/17 4211/18 4211/23
4212/2 4212/11 4213/8
4311/19
**imposition [1]**   4212/10
**impossible [1]**   4266/3
**impression [2]**   4196/25
4197/6
**improper [3]**   4212/24
4213/25 4314/19
**impugn [1]**   4295/8
**inadequate [8]**   4199/19
4261/7 4261/8 4261/14
4261/16 4281/3 4282/15
4289/6
**INC [1]**   4145/6
**incept [1]**   4168/4
**inch [3]**   4219/23 4219/25
4220/15
**inches [1]**   4218/4
**incident [4]**   4202/3 4235/3
4291/18 4298/17
**inclined [1]**   4254/11
**Inclines [2]**   4226/13
4255/19
**include [1]**   4273/5
**included [4]**   4148/15
4166/24 4268/1 4271/21
**includes [4]**   4150/3 4150/6
4198/16 4218/14
**including [4]**   4150/18
4209/16 4268/23 4299/25
**incompetence [1]**   4299/14
**incomplete [1]**   4174/4
**inconsistent [2]**   4192/15
4193/13
**incorporates [1]**   4149/12
**incorrect [1]**   4248/2
**increases [1]**   4168/11
**increments [1]**   4163/24
**incumbent [1]**   4317/19
**independent [3]**   4263/2
4264/11 4295/16
**independently [1]**   4263/19
**indicate [4]**   4182/14
4187/2 4191/12 4311/12
**indicates [4]**   4181/11
4181/17 4182/9 4247/18

**indicating [3]**   4180/17
4193/2  4260/7
**indication [3]**   4181/6
4186/22 4313/6
**indifference [1]**   4309/1
**individual [3]**   4221/10
4223/12 4245/6
**individual's [1]**   4198/12
**individually [1]**   4199/23
**individuals [1]**   4229/18
**industry [24]**   4195/25
4204/2 4260/21 4261/1
4261/6 4261/14 4261/15
4271/17 4272/2 4272/3
4272/5 4272/12 4277/5
4278/13 4278/13 4278/14
4278/15 4278/22 4280/8
4280/11 4282/22 4285/1
4285/17 4291/19
**infiltrated [1]**   4265/19
**influenced [1]**   4271/1
**information [3]**   4151/19
4158/8 4191/12
**initial [2]**   4220/23
4317/14
**injures [1]**   4284/12
**injuries [1]**   4277/18
**injury [4]**   4260/12 4292/1
4292/1 4292/10
**innocent [3]**   4209/16
4210/4 4210/9
**innuendo [1]**   4267/12
**inoperable [1]**   4250/9
**input [1]**   4295/6
**insert [3]**   4201/9 4207/14
4220/11
**inside [3]**   4250/12 4250/15
4250/18
**insofar [2]**   4309/13 4321/8
**inspect [1]**   4178/11
**inspected [2]**   4178/7
4178/13
**inspection [3]**   4253/7
4253/10 4253/11
**instance [2]**   4169/7 4289/1
**instantaneously [1]**
4163/21
**instead [3]**   4196/16
4213/23 4303/7
**instinct [1]**   4232/8
**institutional [4]**   4279/14
4284/21 4304/22 4305/3
**instruct [3]**   4288/21
4289/20 4308/8
**instructed [1]**   4196/23
**instruction [4]**   4206/25
4313/8 4315/18 4320/24
**instructions [8]**   4198/23
4204/25 4290/12 4290/13
4308/17 4310/20 4310/22
4312/2
**instructs [1]**   4198/10
**instrument [1]**   4220/20
**insurance [1]**   4213/2
**intended [2]**   4309/12
4321/7
**intensive [2]**   4271/8
4271/17
**intentionally [1]**   4245/2
**intentions [1]**   4304/2
**interact [1]**   4161/20
**interacts [1]**   4280/17

**interest [4]**   4152/5
4269/20 4305/10 4309/2
**interesting [1]**   4300/13
**interestingly [2]**   4299/18
4301/2
**interests [1]**   4281/19
**interlocked [1]**   4256/11
**internal [5]**   4272/15
4274/13 4275/12 4276/22
4302/6
**intersect [1]**   4168/5
**Interstate [1]**   4221/22
**Interstate 80 [1]**   4221/22
**intervals [1]**   4181/2
**interview [1]**   4248/8
**introduce [2]**   4215/19
4314/14
**introduced [2]**   4308/11
4319/18
**introducing [1]**   4213/2
**introduction [1]**   4156/11
**introductory [1]**   4195/11
**inverse [1]**   4297/20
**investigate [1]**   4178/11
**investigated [1]**   4178/10
**investigating [1]**   4158/1
**investigation [4]**   4157/24
4158/25 4174/4 4262/14
**invisible [1]**   4289/2
**involve [1]**   4172/10
**involved [5]**   4226/16
4274/9 4281/20 4282/1
4292/1
**involving [1]**   4281/23
**Isaac [1]**   4161/19
**issue [22]**   4190/6 4197/24
4205/19 4207/20 4209/1
4209/24 4209/25 4216/5
4224/2 4225/8 4264/8
4273/3 4276/25 4281/16
4284/16 4291/9 4298/22
4312/7 4313/11 4313/14
4314/11 4319/13
**issues [8]**   4167/2 4223/18
4282/11 4290/3 4311/1
4311/2 4319/3 4319/10
**itself [2]**   4186/6 4295/9

**J**

**James [1]**   4174/22
**JAMIE [1]**   4145/16
**January [1]**   4148/14
**Jersey [1]**   4221/17
**Jim [12]**   4263/2 4266/23
4269/21 4269/24 4269/25
4270/2 4270/4 4270/12
4270/19 4270/25 4300/1
4300/13
**job [13]**   4195/12 4197/14
4197/17 4217/19 4256/8
4257/12 4288/24 4289/12
4290/6 4290/17 4308/14
4309/7 4321/2
**jobs [1]**   4279/24
**John [15]**   4174/25 4262/4
4264/10 4265/11 4268/14
4268/17 4269/19 4269/20
4270/9 4270/11 4270/11
4270/23 4271/3 4284/8
4323/3
**jolt [1]**   4256/6
**jolted [1]**   4225/15

## J

**JONATHAN [2]** 4145/20 4146/8
**JOSE [4]** 4145/3 4211/15 4308/14 4311/18
**JR [1]** 4145/11
**judge [26]** 4145/11 4147/3 4151/5 4156/11 4156/20 4160/23 4202/17 4213/12 4214/12 4251/23 4257/8 4257/25 4258/14 4259/3 4285/14 4285/24 4286/25 4288/20 4289/19 4306/16 4314/22 4317/5 4320/17 4321/24 4322/9 4322/12
**Judging [1]** 4153/18
**judgment [4]** 4155/3 4155/8 4286/14 4299/14
**July [4]** 4251/20 4275/16 4301/5 4301/19
**July 18th [1]** 4251/20
**jump [4]** 4171/18 4177/7 4177/10 4193/19
**jurors [3]** 4301/13 4322/4 4322/11
**jury [103]** 4145/10 4147/1 4147/9 4147/20 4152/17 4152/18 4155/21 4155/22 4159/6 4161/3 4161/6 4162/19 4164/11 4167/16 4169/20 4170/15 4174/23 4175/16 4178/22 4189/10 4193/12 4193/18 4194/8 4194/10 4195/2 4195/23 4196/5 4196/14 4196/22 4198/11 4198/13 4198/16 4198/23 4199/13 4201/7 4201/10 4202/2 4202/12 4202/23 4202/25 4203/22 4204/17 4205/14 4206/15 4207/18 4207/22 4208/2 4208/19 4212/17 4215/10 4215/19 4215/25 4216/15 4217/5 4224/8 4228/12 4229/8 4230/23 4232/20 4238/13 4248/9 4251/17 4251/23 4252/17 4257/23 4276/25 4286/6 4288/16 4288/19 4288/25 4297/3 4305/22 4308/8 4308/18 4309/3 4310/3 4310/11 4310/13 4310/24 4311/14 4312/10 4313/3 4313/9 4314/8 4314/16 4315/11 4315/20 4316/4 4316/4 4316/6 4316/7 4317/3 4317/20 4318/22 4318/24 4319/12 4319/17 4320/14 4321/19 4321/21 4321/24 4322/10 4323/10
**jury's [1]** 4221/7
**justifying [2]** 4304/16 4304/17

## K

**Kansas [1]** 4145/19
**KAROLY [1]** 4145/7
**keep [14]** 4152/2 4162/3 4182/21 4189/15 4219/4 4219/5 4222/14 4272/3 4272/14 4274/23 4279/9

4292/23 4299/7 4307/14
**keeping [1]** 4303/19
**Kemp [1]** 4302/11
**kept [5]** 4166/11 4274/21 4275/8 4289/13 4293/2
**key [1]** 4293/6
**kick [1]** 4168/10
**kicked [1]** 4208/23
**KIEFFER [4]** 4145/20 4151/4 4215/17 4323/6
**kind [8]** 4153/20 4168/4 4171/11 4205/19 4220/22 4232/15 4274/15 4299/4
**kinetic [6]** 4164/19 4164/21 4165/3 4165/4 4165/5 4165/6
**knowing [1]** 4298/7
**knowledge [3]** 4225/12 4278/19 4311/4
**known [5]** 4164/16 4164/21 4165/10 4270/11 4273/18
**knows [9]** 4167/20 4167/23 4270/9 4284/5 4288/19 4296/11 4297/17 4303/6 4314/15

## L

**ladies [21]** 4147/11 4147/17 4156/2 4194/9 4215/12 4256/23 4257/2 4263/8 4266/10 4268/25 4275/13 4278/14 4286/1 4291/20 4297/3 4299/9 4303/16 4304/22 4308/1 4320/16 4321/20
**lady [1]** 4296/6
**lake [2]** 4146/8 4169/2
**landfill [3]** 4216/24 4222/4 4240/2
**lane [13]** 4171/1 4176/20 4176/21 4190/17 4190/21 4190/25 4191/14 4231/13 4255/21 4256/3 4256/4 4269/5 4274/19
**lanes [1]** 4169/6
**language [5]** 4196/13 4198/17 4199/20 4206/19 4210/4
**lap [1]** 4295/19
**large [2]** 4160/25 4228/9
**larger [1]** 4269/3
**largest [1]** 4228/19
**last [22]** 4156/25 4175/3 4175/5 4175/6 4175/16 4177/13 4183/24 4186/14 4208/9 4208/11 4212/15 4213/13 4217/11 4230/12 4233/21 4245/23 4257/4 4259/25 4260/11 4264/13 4301/12 4314/21
**lastly [1]** 4205/23
**latest [1]** 4194/17
**latitude [1]** 4170/19
**law [37]** 4145/14 4155/4 4155/8 4160/19 4161/16 4161/21 4164/17 4177/21 4198/15 4200/6 4212/22 4227/6 4227/11 4227/14 4257/18 4259/3 4259/4 4260/8 4271/18 4272/17 4274/16 4274/20 4274/23 4275/8 4275/11 4285/8

4285/10 4285/14 4286/14 4308/9 4310/9 4310/20 4318/6 4320/1
**laws [2]** 4160/18 4161/19
**lawyering [7]** 4284/3 4288/4 4288/15 4290/13 4292/24 4302/3 4307/2
**lawyers [16]** 4233/3 4257/12 4257/12 4257/14 4259/21 4264/2 4266/7 4266/12 4268/4 4273/11 4275/18 4287/22 4288/2 4296/9 4314/7 4315/15
**lay [1]** 4217/14
**lays [1]** 4217/15
**Leach [18]** 4277/7 4277/14 4278/4 4278/9 4278/16 4279/2 4279/7 4291/7 4291/14 4291/17 4299/21 4302/25 4303/12 4306/3 4306/13 4307/13 4307/23 4314/23
**lead [1]** 4271/7
**leader [3]** 4204/1 4277/5 4285/18
**leading [1]** 4268/23
**leads [1]** 4279/2
**learned [1]** 4308/12
**least [15]** 4158/23 4158/24 4167/6 4167/7 4169/14 4189/7 4203/15 4203/15 4231/4 4248/11 4264/7 4271/14 4275/24 4281/13 4300/16
**leave [11]** 4153/9 4198/6 4202/7 4202/18 4217/17 4222/1 4225/17 4280/14 4303/22 4322/2 4322/10
**lecture [1]** 4278/20
**led [4]** 4252/9 4252/20 4252/21 4290/14
**left [28]** 4169/9 4170/1 4170/5 4171/1 4171/5 4171/6 4175/10 4176/1 4180/23 4184/22 4184/25 4187/5 4187/10 4188/9 4190/24 4190/25 4191/25 4224/23 4225/1 4235/15 4235/17 4239/16 4266/25 4267/25 4269/5 4278/8 4304/8 4306/15
**left-hand [2]** 4176/1 4180/23
**leg [7]** 4152/18 4195/24 4203/23 4203/25 4204/18 4205/6 4258/17
**legal [3]** 4206/25 4309/5 4319/3
**legs [1]** 4295/19
**length [1]** 4192/17
**less [12]** 4165/5 4166/11 4184/16 4206/12 4206/17 4206/18 4230/6 4234/22 4235/8 4238/9 4238/10 4257/21
**level [4]** 4172/10 4269/18 4277/17 4280/15
**LEWIS [1]** 4145/21
**liable [2]** 4205/8 4288/16
**Liaca [1]** 4295/18
**Liana [1]** 4317/7

**L**

**liar [1]** 4267/13
**license [4]** 4224/12
  4224/15 4252/20 4280/16
**lie [2]** 4281/19 4298/4
**lied [1]** 4270/25
**life [4]** 4279/25 4283/9
  4283/12 4295/12
**light [10]** 4169/8 4170/2
  4170/3 4223/12 4224/5
  4224/19 4252/20 4252/21
  4265/1 4265/6
**lights [58]** 4158/2 4158/3
  4158/6 4158/9 4158/13
  4158/19 4158/19 4159/2
  4159/10 4163/24 4176/13
  4177/13 4177/21 4193/19
  4194/1 4223/4 4223/10
  4223/11 4223/13 4223/14
  4223/18 4224/3 4224/6
  4224/10 4224/11 4224/12
  4225/6 4225/17 4237/10
  4237/13 4240/3 4240/5
  4240/7 4240/11 4251/9
  4252/17 4252/18 4252/19
  4253/12 4253/14 4253/16
  4263/8 4263/21 4264/20
  4265/22 4266/6 4266/8
  4266/15 4269/12 4269/16
  4284/8 4294/3 4294/12
  4294/13 4294/15 4294/18
  4295/7 4295/19
**likely [1]** 4192/8
**limit [1]** 4255/16
**limiting [2]** 4210/24
  4210/25
**limits [1]** 4254/16
**line [66]** 4156/18 4157/12
  4158/4 4158/20 4159/3
  4159/12 4160/3 4160/7
  4160/11 4161/4 4163/8
  4164/9 4166/19 4169/24
  4170/13 4170/21 4170/22
  4171/16 4171/17 4172/16
  4172/21 4173/2 4173/6
  4173/25 4174/10 4177/17
  4179/20 4180/1 4180/1
  4180/14 4180/21 4181/17
  4182/23 4183/5 4184/1
  4184/3 4184/11 4184/20
  4185/18 4187/7 4190/7
  4191/10 4192/2 4192/19
  4193/5 4193/10 4193/16
  4208/22 4211/10 4216/6
  4216/6 4216/13 4218/6
  4218/7 4218/7 4226/3
  4226/6 4231/21 4236/25
  4237/15 4249/14 4255/25
  4259/13 4259/23 4279/8
  4302/10
**line 1 [1]** 4216/6
**line 2 [1]** 4218/7
**Line 25 [1]** 4216/6
**line 4 [1]** 4216/13
**line 7 [2]** 4218/6 4218/7
**linear [1]** 4262/16
**lines [3]** 4145/6 4169/24
  4169/25
**lingering [1]** 4268/15
**lip [2]** 4287/13 4303/8
**LISA [1]** 4146/21

**listed [2]** 4200/21 4309/20
**listen [3]** 4285/14 4287/18
  4310/25
**literally [1]** 4233/23
**litigants [1]** 4308/21
**lives [3]** 4204/19 4305/2
  4317/24
**LLC [1]** 4145/8
**LLP [3]** 4145/18 4145/21
  4146/6
**load [34]** 4160/19 4161/6
  4162/20 4162/24 4162/25
  4163/5 4182/11 4182/12
  4182/14 4183/21 4185/23
  4186/3 4186/6 4186/23
  4187/15 4187/16 4187/20
  4187/21 4189/9 4189/15
  4192/22 4193/8 4220/7
  4220/9 4220/14 4220/19
  4221/2 4240/9 4240/21
  4253/12 4253/18 4253/24
  4294/5 4294/6
**loaded [2]** 4182/15 4235/2
**loads [2]** 4160/10 4221/4
**location [2]** 4172/19
  4254/9
**lodge [3]** 4202/25 4205/10
  4207/17
**logs [2]** 4236/22 4280/16
**lonely [1]** 4262/5
**longitude [1]** 4170/19
**look [35]** 4158/10 4167/10
  4169/4 4170/4 4172/6
  4187/5 4187/10 4194/18
  4200/3 4200/11 4230/2
  4241/9 4242/25 4266/16
  4267/13 4267/15 4273/5
  4274/3 4274/4 4280/13
  4280/23 4287/18 4292/19
  4292/20 4297/7 4297/8
  4297/22 4298/17 4298/25
  4299/22 4301/4 4305/23
  4306/1 4306/12 4319/14
**looked [13]** 4165/20
  4165/24 4230/12 4239/22
  4241/25 4242/2 4242/15
  4250/12 4261/12 4275/3
  4295/13 4296/5 4296/10
**looking [23]** 4148/23
  4152/3 4161/11 4169/6
  4169/17 4169/17 4170/16
  4170/17 4171/3 4171/4
  4171/5 4171/11 4173/4
  4173/8 4199/11 4199/24
  4241/22 4242/12 4265/4
  4265/6 4273/14 4294/16
  4294/17
**looks [2]** 4186/6 4239/15
**loose [2]** 4158/15 4221/4
**losing [1]** 4203/25
**lost [7]** 4152/18 4175/19
  4175/21 4195/24 4203/23
  4204/18 4258/17
**lotteries [1]** 4292/15
**low [3]** 4181/8 4181/12
  4254/22
**lower [2]** 4165/20 4255/18
**lowest [1]** 4291/18
**lump [2]** 4203/4 4309/23
**lunch [2]** 4194/6 4194/19

**Luncheon [1]** 4194/25
**Lyst [3]** 4301/22 4300/1
  4300/13

**M**

**M-O-O-R-E [1]** 4148/21
**MAGISTRATE [1]** 4145/11
**main [1]** 4230/21
**maintain [3]** 4207/20
  4207/25 4208/1
**maintaining [1]** 4286/19
**malicious [1]** 4308/25
**man [5]** 4215/3 4269/21
  4277/8 4277/19 4295/22
**manage [1]** 4157/6
**management [13]** 4204/6
  4260/25 4271/22 4272/21
  4281/2 4281/24 4289/6
  4296/19 4300/19 4301/21
  4313/5 4313/11 4315/10
**manner [1]** 4311/7
**Mannion [4]** 4251/1 4251/8
  4258/7 4314/10
**manufacturer [3]** 4218/15
  4220/18 4260/12
**map [7]** 4167/10 4168/25
  4169/12 4170/2 4171/11
  4182/18 4193/13
**mapped [4]** 4169/12 4170/7
  4170/9 4170/9
**mapping [2]** 4168/12
  4190/15
**maps [1]** 4302/15
**Marcus [1]** 4146/7
**Mark [4]** 4261/2 4273/20
  4283/4 4283/6
**marked [5]** 4147/8 4312/3
  4317/4 4320/17 4321/21
**Marker [1]** 4237/22
**marshal [5]** 4310/16
  4310/23 4312/4 4316/2
  4316/3
**MARSHALL [1]** 4146/2
**mass [1]** 4164/22
**match [1]** 4168/13
**matched [1]** 4297/11
**matches [1]** 4295/14
**material [3]** 4186/9
  4186/16 4217/2
**math [5]** 4172/10 4172/13
  4292/3 4292/6 4311/25
**mathematics [1]** 4171/21
**matter [11]** 4155/3 4155/8
  4200/6 4207/12 4263/10
  4286/14 4293/10 4293/11
  4298/21 4304/1 4304/1
**matters [3]** 4149/18
  4285/10 4305/10
**Mauryie [1]** 4300/19
**McEflish [1]** 4286/8
**MCELFISH [17]** 4145/14
  4145/16 4202/12 4202/22
  4202/24 4208/4 4259/2
  4259/4 4271/23 4287/5
  4288/1 4313/4 4313/15
  4314/3 4314/13 4323/4
  4323/9
**McElfish's [1]** 4258/22
**MCELFISH/SUMMATION [1]**
  4323/9
**meal [2]** 4275/24 4276/4
**mean [32]** 4152/4 4152/7

**M**

**mean... [30]** 4169/20
4172/11 4176/20 4187/20
4192/7 4200/7 4201/21
4205/9 4212/22 4218/2
4238/7 4240/9 4245/2
4245/2 4278/14 4278/15
4281/8 4290/22 4294/8
4294/13 4294/20 4295/3
4295/16 4295/21 4297/8
4297/17 4299/4 4303/25
4318/7 4319/3
**meaning [3]** 4278/1 4292/10
4292/10
**means [2]** 4161/25 4200/3
**meant [1]** 4241/18
**measure [1]** 4198/20
**measured [2]** 4200/20
4309/19
**mechanic [1]** 4250/5
**mechanical [1]** 4146/24
**mechanism [2]** 4220/1
4224/23
**media [1]** 4283/24
**medical [3]** 4149/25
4152/14 4152/23
**medium [1]** 4228/9
**meet [1]** 4280/14
**members [2]** 4267/18 4308/8
**memorandum [2]** 4155/15
4286/21
**memorized [3]** 4176/14
4191/9 4191/16
**mention [2]** 4203/20
4294/14
**mentioned [8]** 4156/19
4156/25 4157/14 4177/5
4274/12 4290/2 4292/12
4294/4
**mesh [3]** 4217/2 4217/3
4294/10
**methodology [2]** 4157/19
4157/22
**micro [1]** 4263/24
**micro-sleeps [1]** 4263/24
**microsleep [1]** 4294/24
**mid [1]** 4147/18
**mid-morning [1]** 4147/18
**middle [5]** 4152/9 4169/2
4188/13 4266/22 4292/11
**might [17]** 4171/5 4172/2
4190/13 4190/14 4193/25
4200/25 4200/25 4201/25
4202/2 4202/2 4242/12
4248/1 4249/7 4268/15
4297/18 4297/18 4297/22
**mile [8]** 4166/13 4166/16
4229/2 4229/8 4234/8
4237/22 4246/17 4262/8
**mile-an-hour [3]** 4166/13
4166/16 4262/8
**miles [93]** 4158/24 4159/2
4159/7 4166/8 4166/9
4167/6 4171/7 4173/23
4174/3 4176/2 4177/19
4181/5 4181/7 4181/13
4181/20 4183/8 4183/10
4183/15 4184/15 4184/16
4184/17 4222/6 4226/10
4226/12 4226/17 4226/23
4227/16 4229/5 4230/23

4231/13 4233/13 4233/15
4233/25 4234/11 4235/9
4238/9 4238/15 4238/18
4238/19 4238/22 4244/14
4244/21 4245/7 4245/12
4245/19 4245/23 4246/3
4246/7 4246/18 4247/3
4247/18 4251/5 4251/15
4252/2 4252/5 4252/7
4252/13 4254/18 4254/23
4255/1 4255/9 4255/11
4262/8 4262/17 4263/4
4263/7 4263/11 4263/20
4264/13 4264/16 4266/24
4267/7 4267/8 4269/8
4270/2 4270/7 4272/10
4272/10 4272/14 4275/21
4276/9 4276/9 4276/10
4277/22 4278/2 4278/3
4278/25 4284/7 4293/21
4293/22 4295/2 4301/7
4306/5
**miles-an-hour [9]** 4166/9
4262/8 4262/17 4263/7
4263/11 4263/20 4267/7
4267/8 4269/8
**Milesburg [1]** 4275/24
**military [1]** 4271/9
**million [6]** 4198/4 4278/2
4278/3 4305/22 4306/5
4309/17
**millions [1]** 4277/22
**Minchin [1]** 4165/22
**mind [6]** 4182/21 4234/4
4272/3 4272/15 4274/23
4279/9
**mine [1]** 4235/2
**minimize [1]** 4302/6
**minimum [7]** 4227/4 4227/8
4228/4 4254/16 4274/22
4274/24 4274/25
**minus [3]** 4180/24 4239/4
4239/5
**minute [9]** 4208/7 4230/11
4230/15 4230/17 4232/13
4242/13 4242/15 4276/8
4276/10
**minutes [16]** 4213/23
4213/24 4214/2 4223/3
4232/18 4233/17 4241/12
4241/13 4268/23 4274/14
4286/2 4286/5 4294/21
4304/12 4305/18 4310/10
**mirror [5]** 4229/21 4229/23
4241/9 4241/22 4242/1
**mirrors [15]** 4198/13
4229/13 4229/14 4229/16
4229/20 4230/2 4230/12
4242/2 4242/12 4242/16
4242/22 4242/25 4243/2
4243/7 4243/11
**misconduct [4]** 4206/9
4209/8 4210/22 4310/7
**miserably [1]** 4299/12
**misleading [1]** 4288/18
**misrepresentation [1]**
4314/17
**miss [1]** 4299/4
**missed [1]** 4216/2
**Missouri [1]** 4145/19
**mistake [2]** 4298/4 4304/7
**mistaken [2]** 4151/19

4156/7
**mistakenly [1]** 4190/5
**mistakes [4]** 4279/10
4299/13 4299/14 4304/4
**mister [1]** 4166/15
**Mitchell [2]** 4268/6
4298/11
**mitigate [2]** 4273/9
4302/22
**mitigating [1]** 4271/25
**mitigation [1]** 4271/22
**model [4]** 4198/16 4208/16
4292/8 4299/2
**modulations [1]** 4167/21
**module [1]** 4151/17
**modules [1]** 4281/14
**moment [6]** 4159/7 4178/25
4179/15 4180/25 4270/10
4273/18
**moments [4]** 4263/11 4270/1
4294/24 4307/2
**momentum [2]** 4167/2
4262/16
**money [18]** 4196/1 4212/4
4258/10 4259/11 4260/4
4260/11 4290/1 4290/1
4292/20 4296/18 4303/1
4303/13 4303/14 4303/18
4304/18 4306/1 4306/2
4307/14
**month [2]** 4232/5 4262/13
**months [8]** 4184/5 4184/9
4271/8 4271/9 4298/6
4298/18 4298/18 4298/19
**Moore [11]** 4148/18 4148/20
4273/23 4276/17 4279/16
4281/11 4281/13 4281/21
4281/21 4282/17 4283/19
**Moore-Ede [2]** 4148/18
4273/23
**Morales [2]** 4312/6 4317/7
**Morey [1]** 4267/22
**morning [16]** 4147/11
4147/12 4147/18 4222/16
4231/1 4231/8 4231/9
4231/18 4231/21 4232/21
4239/14 4251/20 4252/14
4255/15 4261/18 4262/3
**MOROKNEK [1]** 4146/5
**Morris [2]** 4209/22 4209/25
**most [12]** 4172/15 4174/20
4181/25 4182/1 4192/8
4265/2 4269/23 4271/17
4281/20 4288/23 4307/8
4307/9
**motion [5]** 4155/7 4161/19
4161/21 4161/23 4286/14
**motivations [3]** 4259/22
4260/9 4260/15
**motor [10]** 4260/21 4261/9
4268/19 4268/20 4272/4
4278/14 4278/18 4280/7
4281/6 4298/9
**motoring [1]** 4209/3
**Mount [12]** 4180/7 4180/8
4180/11 4180/18 4228/12
4228/15 4228/18 4228/21
4229/9 4263/5 4263/7
4270/7
**mountains [3]** 4237/20
4238/13 4255/19
**move [14]** 4148/6 4150/9

**M**

**move... [12]** 4162/2
 4162/10 4186/18 4194/1
 4221/3 4226/3 4261/18
 4269/14 4282/25 4289/11
 4291/5 4295/15
**moved [5]** 4162/12 4162/24
 4269/5 4269/15 4270/22
**movement [9]** 4159/19
 4159/20 4159/21 4159/22
 4160/1 4169/6 4169/18
 4169/19 4170/6
**movements [1]** 4160/9
**moving [15]** 4158/23
 4158/24 4159/14 4162/3
 4162/3 4162/9 4166/9
 4170/5 4191/8 4227/25
 4245/8 4255/6 4284/7
 4294/6 4294/7
**Mr [66]** 4147/4 4151/9
 4152/9 4155/24 4160/23
 4175/3 4175/10 4175/19
 4180/18 4184/18 4186/14
 4191/3 4192/4 4215/17
 4215/17 4237/17 4258/22
 4259/2 4259/4 4262/7
 4262/17 4263/4 4263/10
 4267/4 4272/6 4286/8
 4287/5 4287/20 4288/1
 4288/14 4289/15 4289/16
 4289/20 4290/3 4291/7
 4291/14 4291/17 4293/2
 4294/10 4294/18 4294/19
 4294/20 4295/12 4295/14
 4295/18 4295/21 4299/20
 4301/2 4302/19 4303/12
 4304/24 4306/3 4306/15
 4306/15 4307/13 4307/23
 4313/4 4313/14 4314/3
 4314/10 4314/13 4316/2
 4323/4 4323/4 4323/6
 4323/6
**Mr. [64]** 4147/6 4151/4
 4154/20 4156/5 4159/9
 4165/22 4174/25 4175/9
 4175/16 4175/19 4175/22
 4176/1 4176/24 4177/6
 4177/20 4178/21 4179/6
 4180/3 4180/6 4180/11
 4180/18 4189/20 4190/24
 4192/17 4202/12 4202/22
 4202/24 4208/4 4210/15
 4215/24 4216/14 4248/23
 4250/8 4251/1 4251/8
 4251/19 4251/22 4256/15
 4258/11 4258/24 4258/25
 4259/2 4259/9 4259/12
 4259/15 4259/16 4259/18
 4259/19 4259/20 4259/20
 4261/24 4263/2 4263/20
 4269/17 4271/23 4272/5
 4272/5 4278/15 4278/16
 4278/17 4283/12 4284/12
 4285/13 4320/4
**Mr. Barmen [1]** 4192/17
**Mr. Bauta [17]** 4210/15
 4258/11 4258/24 4258/25
 4259/2 4259/9 4259/12
 4259/15 4259/16 4259/18
 4259/19 4259/20 4259/20
 4261/24 4284/12 4285/13

**Mr. Blatt's [1]** 4175/22
 4175/16 4176/1 4176/24
 4177/6 4178/21 4179/6
 4180/3 4269/17
**Mr. Blatt's [1]** 4175/22
**Mr. Evans [6]** 4175/19
 4180/6 4180/11 4190/24
 4263/2 4272/5
**Mr. Gubica [9]** 4159/9
 4177/20 4189/20 4215/24
 4216/14 4250/8 4251/22
 4263/20 4272/5
**Mr. Gubica's [3]** 4180/18
 4251/19 4256/15
**Mr. John [1]** 4174/25
**Mr. Kieffer [1]** 4151/4
**Mr. Mannion [2]** 4251/1
 4251/8
**Mr. McElfish [5]** 4202/12
 4202/22 4202/24 4208/4
 4271/23
**Mr. Minchin [1]** 4165/22
**Mr. Saal [1]** 4147/6
**Mr. Shaub [1]** 4154/20
**Mr. Sleep [1]** 4283/12
**Mr. Smith [5]** 4156/5
 4238/23 4278/15 4278/16
 4278/17
**Ms [16]** 4152/18 4152/22
 4153/1 4163/11 4164/5
 4166/13 4166/15 4294/16
 4295/18 4298/11 4312/6
 4317/15 4318/25 4319/18
 4319/22 4320/23
**Ms. [4]** 4195/24 4203/22
 4204/10 4321/15
**Ms. Anderson [3]** 4195/24
 4203/22 4204/10
**Ms. Del [1]** 4321/15
**MTA [1]** 4298/13
**mud [3]** 4216/25 4240/1
 4240/2
**muddied [1]** 4290/19
**multilane [1]** 4274/20
**multiple [1]** 4269/22
**multiplied [1]** 4164/22
**Municipal [1]** 4188/23
**municipality [1]** 4318/23
**must [7]** 4199/4 4200/19
 4267/14 4268/5 4309/18
 4309/23 4310/1
**mutually [1]** 4204/16

**N**

**name [4]** 4157/3 4215/20
 4251/22 4280/7
**narrative [18]** 4153/17
 4153/20 4257/16 4259/22
 4264/1 4264/3 4268/5
 4273/12 4275/19 4282/16
 4283/18 4292/16 4292/23
 4296/6 4305/11 4305/14
 4305/15 4305/15
**narratives [2]** 4284/3
 4288/3
**nation [1]** 4204/5
**national [4]** 4165/14
 4278/12 4278/23 4299/21
**natural [1]** 4298/1
**nature [4]** 4212/8 4274/16
 4309/11 4321/6
 4320/4

**nauseam [1]** 4276/2
**nearly [2]** 4185/4 4268/18
**necessarily [2]** 4188/7
 4205/18
**necessary [5]** 4198/10
 4258/20 4270/18 4282/20
 4310/15
**need [23]** 4157/17 4158/18
 4167/16 4178/2 4178/5
 4196/24 4197/10 4203/23
 4204/21 4215/6 4221/3
 4221/4 4227/1 4254/23
 4258/19 4258/21 4274/6
 4293/21 4293/23 4302/7
 4307/8 4315/17 4319/11
**needed [1]** 4284/25
**net [7]** 4292/19 4309/16
 4317/15 4317/17 4319/18
 4319/22 4320/23
**neutral [3]** 4232/11
 4232/14 4256/10
**never [23]** 4177/2 4177/2
 4177/3 4180/3 4180/6
 4182/20 4230/8 4248/6
 4248/7 4248/8 4250/12
 4261/12 4263/23 4264/8
 4264/14 4267/1 4270/22
 4274/14 4275/2 4276/19
 4279/22 4281/10 4300/2
**new [16]** 4145/1 4145/4
 4146/4 4146/8 4221/17
 4252/25 4253/20 4267/25
 4268/2 4268/13 4280/14
 4285/9 4297/12 4307/13
 4307/22 4315/1
**New Jersey [1]** 4221/17
**Newton [1]** 4161/19
**Newton's [2]** 4160/18
 4161/16
**next [13]** 4160/5 4182/25
 4197/14 4197/22 4198/7
 4203/2 4221/15 4225/23
 4225/24 4256/5 4275/17
 4287/23 4316/8
**NHTSA [3]** 4261/3 4273/21
 4278/20
**nice [2]** 4221/13 4257/12
**night [34]** 4153/19 4226/9
 4226/9 4227/7 4227/10
 4227/11 4227/13 4227/17
 4227/17 4230/18 4230/19
 4230/22 4235/3 4236/10
 4236/15 4241/10 4243/24
 4244/14 4244/15 4244/22
 4248/4 4252/14 4261/21
 4262/2 4264/15 4264/18
 4265/3 4284/5 4284/16
 4292/11 4304/10
**nights [2]** 4226/16 4261/22
**nighttime [1]** 4297/24
**nine [11]** 4147/3 4168/11
 4168/20 4168/21 4219/12
 4219/20 4224/10 4224/15
 4287/21 4295/7 4322/16
**ninety [4]** 4263/4 4266/24
 4270/2 4270/7
**nobody [9]** 4180/10 4180/13
 4280/10 4284/15 4296/11
 4297/17 4300/14 4301/19
 4303/6
**noise [1]** 4164/25

## N

**noisy [1]** 4268/6
**nominal [5]** 4203/16
4203/20 4206/13 4206/17
4207/6
**non [2]** 4178/9 4294/25
**non-functioning [1]** 4178/9
**non-sleepiness [1]** 4294/25
**none [2]** 4280/25 4318/1
**nonparties [1]** 4310/8
**normal [2]** 4189/10 4226/16
**normally [1]** 4172/12
**north [2]** 4145/15 4191/14
**nose [1]** 4298/25
**nosey [1]** 4298/11
**note [12]** 4212/12 4231/20
4310/16 4310/23 4311/11
4311/15 4317/3 4320/16
4321/18 4321/21 4322/2
4322/2
**noted [3]** 4212/14 4225/22
4317/1
**notes [2]** 4231/11 4287/17
**nothing [15]** 4203/12
4203/14 4209/6 4214/15
4246/14 4257/21 4257/21
4265/5 4269/3 4269/20
4272/21 4275/17 4284/12
4299/8 4315/2
**nothing's [3]** 4280/18
4314/24 4315/4
**noticed [3]** 4237/23
4287/16 4296/8
**notwithstanding [1]**
4267/23
**NTSB [1]** 4278/20
**number [15]** 4150/20
4167/14 4192/16 4198/2
4198/4 4206/21 4212/7
4214/8 4259/8 4259/10
4278/5 4285/1 4286/22
4301/1 4315/6
**number two [1]** 4212/7
**numbers [2]** 4238/23
4307/18
**numerical [1]** 4311/13
**numerous [2]** 4224/8
4234/11
**nutrition [2]** 4273/8
4279/19

## O

**o'clock [2]** 4221/24
4322/16
**oath [4]** 4242/1 4243/10
4249/23 4268/11
**Obama [2]** 4261/4 4273/22
**object [3]** 4151/7 4161/21
4161/23
**objected [2]** 4226/1
4315/15
**objection [26]** 4148/22
4151/5 4151/15 4153/11
4154/6 4154/12 4155/1
4192/25 4197/16 4203/1
4205/10 4207/25 4212/12
4212/14 4225/23 4258/4
4259/13 4260/13 4266/9
4289/3 4289/9 4291/3
4291/15 4292/4 4307/5
4314/25

**objections [8]** 4151/10
4198/20 4199/4 4199/5
4207/18 4208/2 4208/5
4213/6
**obligation [1]** 4240/12
**observe [1]** 4240/13
**obviously [8]** 4170/22
4173/20 4185/20 4187/17
4219/4 4232/24 4287/12
4288/7
**occurred [9]** 4150/25
4177/8 4251/25 4254/19
4261/7 4264/19 4271/15
4313/19 4313/23
**occurring [1]** 4163/18
**occurs [1]** 4161/15
**October [8]** 4184/8 4221/14
4224/19 4252/14 4252/15
4262/4 4267/25 4268/2
**October 8th [2]** 4221/14
4224/19
**October 9 [1]** 4252/15
**of' [1]** 4233/8
**offense [1]** 4208/1
**offensive [2]** 4155/13
4286/20
**offered [2]** 4149/23
4267/12
**officer [9]** 4151/6 4151/17
4151/22 4153/21 4178/10
4213/4 4248/20 4252/3
4295/5
**officers [5]** 4157/14
4296/2 4296/3 4318/20
4318/21
**often [1]** 4241/9
**Ohio [6]** 4145/23 4155/10
4222/2 4237/3 4237/5
4286/16
**old [3]** 4269/12 4300/19
4301/3
**once [11]** 4162/2 4172/22
4217/17 4221/14 4257/6
4270/21 4270/21 4285/25
4312/4 4322/4 4322/11
**one [102]** 4147/24 4148/7
4150/19 4154/10 4156/4
4163/12 4163/23 4163/24
4164/1 4164/21 4164/24
4167/25 4172/19 4179/22
4181/2 4187/6 4187/11
4188/9 4188/18 4189/22
4189/23 4199/3 4200/19
4202/3 4203/4 4205/14
4206/13 4206/15 4212/15
4213/13 4214/3 4216/25
4217/8 4217/9 4217/9
4217/11 4219/22 4220/10
4221/10 4221/25 4228/18
4233/6 4235/25 4236/4
4237/23 4239/23 4239/25
4241/12 4243/5 4246/2
4247/15 4252/20 4257/20
4258/23 4259/7 4259/8
4259/19 4260/10 4263/4
4265/18 4265/20 4268/9
4268/13 4270/8 4272/9
4272/11 4272/20 4275/16
4278/1 4278/1 4278/2
4280/7 4281/4 4282/2
4283/3 4283/6 4283/23
4283/24 4284/5 4284/14

**4285/1 4289/12 4290/10
4291/1 4293/6 4294/19**
4301/1 4301/10 4303/1
4303/5 4304/10 4304/19
4309/10 4309/18 4309/23
4311/16 4312/7 4314/2
4314/21 4315/3 4315/6
4315/10
**one-second [2]** 4163/23
4181/2
**ones [12]** 4178/16 4202/4
4219/24 4219/24 4219/25
4220/15 4220/15 4220/2
4221/3 4221/4 4229/25
4230/1
**ongoing [1]** 4272/25
**open [5]** 4147/1 4147/16
4185/4 4185/7 4195/2
**opening [5]** 4258/22
4271/23 4297/2 4298/10
4301/10
**operable [1]** 4250/22
**operated [2]** 4269/4 4270/6
**operating [1]** 4298/8
**operation [2]** 4253/2
4292/9
**operations [1]** 4260/3
**operator [6]** 4152/11
4152/11 4243/2 4243/6
4243/11 4247/19
**opinion [14]** 4153/20
4158/12 4158/22 4159/5
4159/6 4159/14 4160/17
4161/7 4163/6 4164/4
4166/23 4167/4 4178/18
4281/1
**opinions [11]** 4149/22
4149/23 4153/17 4157/23
4169/15 4172/7 4191/20
4193/14 4261/16 4281/4
4311/3
**opportunities [1]** 4227/7
**opportunity [5]** 4160/9
4167/10 4271/10 4273/15
4277/13
**opposed [1]** 4196/7
**opposition [2]** 4155/12
4286/19
**oppressive [2]** 4196/25
4309/1
**order [10]** 4165/9 4210/11
4236/23 4253/6 4253/13
4253/14 4253/16 4280/17
4308/22 4314/22
**ordinary [2]** 4179/16
4280/18
**orient [2]** 4167/16 4170/15
**original [3]** 4198/8
4206/19 4253/24
**originally [4]** 4162/7
4177/10 4177/11 4187/23
**Osborn [1]** 4295/18
**Osselin [5]** 4273/2 4279/7
4280/12 4280/14 4280/22
**Ossling [1]** 4300/10
**otherwise [1]** 4293/12
**outlined [1]** 4310/9
**outrageous [30]** 4196/7
4196/16 4196/21 4197/3
4197/8 4199/13 4201/4
4201/11 4201/25 4202/3
4202/5 4202/16 4202/23

## Q

**outrageous... [17]** 4203/11
4210/12 4210/20 4258/3
4288/17 4288/22 4292/2
4297/6 4299/8 4303/3
4306/19 4308/23 4308/25
4309/4 4310/4 4313/6
4313/9
**outrageously [2]** 4257/24
4319/8
**outright [1]** 4314/17
**outside [9]** 4147/1 4161/22
4161/24 4255/6 4267/18
4310/13 4311/4 4312/10
4313/2
**overhang [1]** 4186/15
**overhanging [1]** 4186/10
**Overruled [5]** 4258/5
4259/14 4289/4 4292/5
4307/6
**overshot [2]** 4215/25
4216/15
**own [10]** 4260/22 4292/9
4292/13 4295/8 4297/13
4297/13 4300/21 4301/4
4303/23 4304/12

## P

**P.C [1]** 4146/3
**p.m [4]** 4316/6 4317/4
4321/22 4322/3
**P159 [1]** 4160/21
**P159-144 [1]** 4160/21
**page [79]** 4150/10 4150/20
4151/3 4151/14 4151/19
4152/8 4156/17 4157/12
4158/4 4159/3 4159/12
4160/3 4160/11 4161/4
4163/8 4164/9 4166/19
4170/13 4171/13 4171/15
4171/16 4172/16 4173/6
4174/10 4177/17 4179/20
4180/21 4181/4 4181/11
4182/3 4182/4 4182/10
4182/10 4182/23 4183/5
4183/24 4184/1 4184/3
4184/11 4184/20 4185/18
4187/7 4190/7 4191/10
4192/2 4192/16 4192/19
4193/16 4196/4 4196/9
4196/10 4196/12 4206/4
4208/6 4208/12 4210/10
4210/18 4216/3 4216/4
4216/6 4216/6 4216/13
4223/20 4225/18 4225/20
4225/24 4226/6 4236/25
4237/15 4249/14 4250/24
4255/5 4287/23 4299/22
4300/3 4300/16 4313/1
4316/1 4316/8
**Page 11 [1]** 4216/13
**page 2 [4]** 4196/10 4206/4
4208/6 4210/18
**page 6 [3]** 4216/3 4216/4
4216/6
**page 7 [1]** 4216/6
**pages [6]** 4150/4 4151/9
4153/10 4153/14 4173/12
4173/13
**paid [6]** 4279/23 4279/25
4280/2 4287/16 4318/23

**pain [1]** 4291/23
**pallets [1]** 4186/12
**paper [1]** 4217/18
**paperclip [1]** 4150/20
**papers [2]** 4253/6
**paperwork [2]** 4235/14
4280/16
**paragraph [2]** 4195/11
4205/23
**paramount [1]** 4285/19
**pardon [1]** 4150/16
**parent [1]** 4292/9
**parking [1]** 4223/13
**parse [1]** 4201/23
**parsing [1]** 4201/24
**part [26]** 4153/17 4169/14
4184/25 4189/12 4189/18
4210/3 4210/8 4219/14
4220/23 4221/8 4240/16
4241/1 4241/1 4250/9
4272/25 4274/9 4282/16
4290/4 4303/15 4303/16
4305/5 4305/8 4310/3
4310/10 4310/18 4311/8
**particular [6]** 4169/21
4200/22 4210/24 4239/24
4303/1 4309/21
**parties [6]** 4209/15
4209/17 4210/5 4210/9
4308/11 4309/16
**parts [3]** 4158/25 4209/10
4228/10
**party [2]** 4297/15 4308/12
**pass [9]** 4175/23 4176/19
4176/21 4178/22 4269/5
4269/6 4269/7 4305/6
4305/7
**passed [11]** 4175/19 4176/1
4176/25 4179/11 4179/15
4180/18 4228/15 4234/11
4234/11 4270/13 4294/21
**passenger [6]** 4244/25
4264/25 4266/20 4267/1
4283/5 4295/23
**passengers [15]** 4174/18
4234/21 4265/2 4271/11
4280/20 4280/24 4285/19
4294/17 4295/8 4295/11
4296/2 4299/12 4303/8
4307/17 4307/24
**passengers' [1]** 4305/2
**passes [1]** 4179/5
**passing [3]** 4176/7 4190/25
4269/7
**passion [1]** 4310/2
**past [3]** 4270/17 4279/21
4304/19
**path [4]** 4169/2 4169/4
4170/22 4270/22
**patience [2]** 4257/7
4305/19
**Pattern [2]** 4198/13
4198/23
**pause [3]** 4152/2 4215/7
4215/9
**pay [8]** 4212/18 4230/19
4296/23 4296/25 4303/7
4306/10 4307/23 4318/7
**paying [1]** 4268/17
**penalize [1]** 4292/20
**penalized [1]** 4276/13

**Pennsylvania [35]** 4148/18
4148/19 4148/20 4149/8
4149/11 4150/2 4151/2
4155/10 4156/6 4158/25
4173/9 4173/21 4177/21
4196/5 4196/14 4196/22
4201/7 4201/10 4202/23
4202/25 4208/16 4209/13
4238/3 4254/3 4254/7
4257/23 4262/10 4263/18
4265/14 4266/8 4286/16
4288/16 4288/25 4307/12
4309/3
**people [47]** 4170/9 4172/5
4191/8 4191/15 4191/17
4208/20 4209/3 4209/5
4234/14 4234/22 4236/4
4255/8 4260/11 4263/14
4267/18 4272/2 4277/25
4279/4 4279/7 4279/10
4279/10 4279/10 4279/24
4280/8 4280/12 4283/20
4284/17 4295/10 4296/1
4297/3 4298/9 4298/12
4299/13 4300/9 4302/9
4302/9 4303/9 4303/14
4303/15 4304/1 4305/10
4305/13 4305/13 4305/15
4306/24 4306/24 4307/20
**people's [2]** 4191/17
4191/18
**per [30]** 4157/4 4233/13
4233/15 4233/25 4236/9
4238/9 4238/15 4238/18
4238/19 4238/22 4244/14
4244/21 4245/7 4245/12
4245/19 4245/23 4246/3
4246/7 4246/17 4246/19
4247/4 4247/18 4251/15
4252/5 4252/7 4252/13
4254/18 4254/23 4255/1
4255/11
**perceived [1]** 4178/18
**percent [6]** 4175/13
4182/11 4183/12 4183/23
4190/10 4259/1
**perfect [3]** 4190/11
4285/16 4285/16
**period [3]** 4181/12 4222/20
4227/13
**permitted [5]** 4202/22
4258/18 4276/3 4314/8
4318/22
**perpetuity [1]** 4274/2
**person [12]** 4175/3 4175/5
4175/6 4175/14 4175/16
4245/10 4246/12 4264/12
4264/14 4268/13 4268/21
4268/22
**person's [1]** 4308/25
**personal [2]** 4225/11
4278/24
**persons [4]** 4206/9 4209/8
4210/23 4310/7
**phase [14]** 4257/20 4257/21
4257/22 4258/22 4258/24
4259/5 4259/6 4260/11
4262/3 4271/24 4289/13
4289/14 4289/16 4308/9
**Philadelphia [7]** 4288/20
4290/24 4313/9 4314/12
4314/14 4315/3 4315/11

**P**

**Philip [2]** 4209/22 4209/23
**Phillipe [3]** 4273/2 4279/8
4280/22
**Philly [1]** 4258/7
**phone [11]** 4146/22 4267/14
4267/15 4267/17 4267/19
4267/20 4267/23 4283/22
4297/10 4297/14 4297/23
**phones [1]** 4283/24
**phonetic [1]** 4300/19
**photo [4]** 4170/24 4186/12
4186/14 4186/15
**photograph [10]** 4161/7
4161/11 4187/6 4187/10
4239/13 4265/21 4266/4
4266/16 4266/19 4267/2
**photographs [4]** 4150/18
4154/11 4187/2 4265/12
**photos [3]** 4151/6 4154/14
4154/15
**phrased [1]** 4319/20
**physical [2]** 4149/13
4160/19
**physically [1]** 4266/3
**physics [4]** 4160/18
4171/21 4172/10 4262/15
**pick [1]** 4156/13
**picked [1]** 4296/9
**Picking [1]** 4236/25
**picks [2]** 4167/22 4167/23
**picture [13]** 4168/1
4184/24 4185/2 4185/23
4186/1 4186/3 4188/19
4219/6 4221/7 4224/8
4239/17 4239/22 4239/24
**pictures [1]** 4294/13
**piece [2]** 4220/9 4224/16
**pieces [3]** 4261/18 4262/25
4282/15
**pinpoint [1]** 4172/19
**pitch [2]** 4237/10 4262/4
**pitch-black [1]** 4262/4
**place [11]** 4187/16 4223/1
4223/1 4224/6 4225/15
4274/15 4275/16 4275/25
4276/2 4281/16 4300/16
**places [3]** 4164/24 4171/5
4295/11
**plain [1]** 4298/25
**plainer [1]** 4304/15
**plaintiff [21]** 4145/4
4145/14 4156/3 4195/5
4203/13 4206/9 4207/15
4209/9 4210/23 4210/24
4211/15 4212/8 4256/19
4263/3 4286/13 4308/14
4309/11 4310/7 4311/18
4317/19 4321/6
**plaintiff's [9]** 4152/5
4152/20 4154/12 4155/5
4213/6 4257/9 4286/2
4317/21 4322/5
**plaintiffs [4]** 4148/15
4149/16 4149/19 4204/4
**plan [1]** 4297/2
**planned [1]** 4222/15
**plastic [1]** 4165/10
**plate [3]** 4224/12 4224/15
4252/20
**play [2]** 4232/23 4233/5

**played [3]** 4147/16 4241/15
4276/24
**plenty [1]** 4300/22
**plus [4]** 4212/8 4224/15
4267/24 4268/1
**Pocono [14]** 4180/7 4180/8
4180/11 4180/19 4228/12
4228/15 4228/18 4228/21
4229/9 4237/20 4254/13
4263/5 4263/7 4270/7
**Poconos [6]** 4237/18 4238/9
4238/9 4238/13 4239/2
4239/7
**point [40]** 4157/17 4159/5
4163/20 4169/2 4169/21
4172/19 4173/4 4178/4
4179/5 4179/15 4179/22
4182/4 4183/11 4185/5
4185/6 4199/21 4201/19
4202/1 4202/5 4205/6
4205/14 4209/2 4210/6
4214/2 4233/9 4237/7
4241/12 4244/10 4263/22
4266/4 4267/3 4269/15
4269/19 4274/6 4275/11
4280/3 4281/3 4284/1
4306/25 4306/25
**points [2]** 4168/6 4169/19
**police [32]** 4149/10 4150/1
4150/3 4153/6 4157/14
4157/24 4158/8 4158/25
4173/9 4173/10 4173/21
4174/15 4178/10 4178/14
4213/3 4231/9 4231/17
4232/2 4235/10 4247/17
4248/1 4252/3 4262/11
4262/12 4263/18 4265/15
4266/8 4271/2 4295/5
4295/24 4296/2 4318/21
**policies [4]** 4291/13
4297/5 4313/16 4314/4
**policy [3]** 4297/13 4300/11
4315/5
**pool [1]** 4298/12
**popped [1]** 4185/6
**portion [3]** 4221/11
4221/11 4240/22
**portions [2]** 4149/20
4193/13
**pose [1]** 4263/13
**posing [1]** 4267/5
**position [14]** 4153/6
4161/23 4168/8 4179/12
4184/13 4186/21 4190/9
4208/19 4257/16 4260/18
4260/18 4261/3 4265/25
4317/16
**positions [4]** 4157/7
4159/18 4159/18 4191/23
**possessed [1]** 4164/20
**possibility [1]** 4182/18
**possible [4]** 4190/13
4242/17 4249/5 4249/8
**Possibly [1]** 4230/14
**post [12]** 4147/8 4163/13
4178/8 4185/20 4225/8
4232/8 4243/18 4262/23
4265/15 4265/25 4266/4
4314/18
**post-accident [5]** 4178/8
4185/20 4262/23 4266/4
4314/18

**post-crash [4]** 4225/8
4232/8 4243/18 4265/15
**post-impact [1]** 4163/13
**Post-its [1]** 4147/8
**posted [3]** 4227/4 4227/8
4228/4
**posting [1]** 4297/16
**potential [3]** 4242/23
4243/18 4272/1
**pounds [2]** 4235/7 4235/20
**power [2]** 4257/17 4308/1
**Powerball [1]** 4285/8
**practice [9]** 4222/25
4224/2 4226/17 4228/5
4230/2 4276/7 4276/14
4276/14 4276/17
**praying [1]** 4265/3
**pre [3]** 4253/6 4253/9
4253/11
**pre-trip [3]** 4253/6 4253/9
4253/11
**preached [1]** 4277/17
**precise [1]** 4191/23
**precisely [2]** 4179/10
4179/12
**precluded [1]** 4314/18
**predates [1]** 4209/22
**prejudice [2]** 4152/20
4310/2
**prejudicial [1]** 4149/18
**premiere [1]** 4204/3
**prep [1]** 4296/5
**prepare [1]** 4154/12
**prepared [3]** 4148/9
4213/22 4214/4
**preponderance [2]** 4211/16
4311/18
**prepped [2]** 4296/10 4300/8
**presence [1]** 4147/1
**present [8]** 4166/4 4175/10
4195/2 4215/21 4291/9
4313/15 4322/4 4322/12
**presented [2]** 4308/13
4311/6
**presenting [1]** 4154/2
**presents [1]** 4153/19
**preserved [1]** 4155/2
**president [4]** 4261/4
4273/22 4277/7 4277/13
**pressed [1]** 4281/7
**presumably [2]** 4154/20
4294/10
**pretty [8]** 4157/5 4172/13
4188/20 4223/9 4244/18
4259/23 4297/19 4317/9
**prevent [3]** 4243/21 4260/3
4307/11
**preventable [1]** 4278/1
**previously [4]** 4148/8
4286/21 4310/12 4321/16
**primarily [1]** 4274/19
**primary [1]** 4164/24
**principals [1]** 4171/21
**print [1]** 4194/17
**privilege [2]** 4288/12
4310/20
**problem [23]** 4149/17
4153/20 4154/2 4154/10
4163/23 4208/14 4211/23
4211/24 4212/2 4212/3
4212/6 4249/15 4249/18
4254/13 4281/25 4282/11

**P**

**problem...** [7] 4298/4
 4298/17 4301/22 4303/13
 4303/13 4304/5 4304/7
**problems** [5] 4249/3 4249/9
 4252/15 4253/1 4254/14
**proceed** [3] 4147/2 4215/14
 4256/24
**proceeded** [2] 4255/14
 4269/17
**proceedings** [2] 4146/24
 4215/9
**process** [8] 4155/11
 4207/24 4208/22 4209/24
 4217/6 4221/14 4286/17
 4305/8
**produced** [1] 4146/25
**product** [1] 4296/15
**professional** [6] 4236/8
 4243/24 4258/16 4269/7
 4272/4 4276/15
**professionally** [1] 4267/4
**profit** [1] 4307/4
**program** [20] 4195/25
 4199/19 4204/3 4260/25
 4261/1 4273/24 4273/24
 4274/4 4281/2 4281/5
 4281/12 4281/24 4282/14
 4282/18 4282/18 4300/19
 4301/21 4313/6 4313/11
 4318/18
**program's** [1] 4282/14
**programs** [3] 4204/6 4289/6
 4290/21
**promoted** [1] 4273/21
**proper** [8] 4186/25 4245/11
 4273/8 4273/8 4279/17
 4279/19 4282/20 4311/3
**properly** [1] 4284/17
**proportionally** [1] 4168/11
**propose** [1] 4206/10
**proposed** [3] 4196/13
 4201/18 4313/21
**protect** [7] 4232/9 4256/9
 4295/9 4297/5 4303/7
 4305/12 4305/15
**protected** [1] 4305/14
**protecting** [1] 4299/12
**protects** [2] 4304/4 4304/5
**proud** [1] 4305/13
**prove** [2] 4290/9 4294/23
**provide** [5] 4159/6 4231/23
 4233/4 4247/19 4247/24
**provided** [4] 4149/17
 4161/8 4198/22 4232/21
**public** [6] 4209/3 4209/4
 4299/13 4303/8 4307/16
 4307/24
**publish** [2] 4160/24 4321/9
**published** [1] 4161/19
**Publishes** [1] 4161/3
**pull** [8] 4160/21 4217/18
 4217/21 4217/21 4221/12
 4224/24 4283/8 4293/6
**pulled** [1] 4300/7
**punish** [24] 4196/2 4200/16
 4203/21 4204/7 4204/21
 4206/1 4206/5 4208/13
 4208/19 4209/7 4209/11
 4210/11 4210/19 4210/21
 4258/11 4284/22 4290/10

 4290/14 4303/19 4303/19
 4308/22 4309/11 4310/5
 4310/6
**punished** [6] 4204/12
 4204/15 4204/20 4205/5
 4205/9 4208/21
**punishes** [1] 4290/7
**punishing** [1] 4284/23
**punishment** [11] 4203/25
 4205/16 4205/17 4205/19
 4209/12 4210/24 4258/19
 4259/8 4259/17 4284/24
 4304/19
**punitive** [55] 4155/9
 4195/21 4197/15 4197/18
 4197/24 4198/11 4198/21
 4199/4 4199/6 4199/12
 4200/8 4200/10 4200/20
 4202/13 4203/5 4203/8
 4203/9 4203/11 4203/21
 4205/8 4205/18 4206/11
 4207/14 4207/22 4210/10
 4210/19 4211/14 4257/22
 4259/17 4274/12 4276/20
 4285/23 4286/15 4289/7
 4290/2 4306/18 4308/15
 4308/22 4309/7 4309/19
 4309/24 4310/1 4310/3
 4311/17 4311/21 4311/23
 4317/6 4318/16 4318/21
 4318/24 4319/23 4320/19
 4320/25 4321/2 4321/12
**purpose** [7] 4203/21
 4210/19 4220/13 4229/16
 4309/17 4310/3 4310/21
**purposes** [2] 4285/23
 4301/13
**push** [2] 4163/16 4232/1
**pushed** [1] 4292/22
**pushing** [1] 4296/24
**put** [43] 4152/17 4162/11
 4162/22 4178/5 4188/20
 4189/14 4189/14 4190/5
 4198/1 4207/6 4213/15
 4214/10 4214/25 4218/14
 4219/9 4220/7 4221/1
 4223/1 4223/12 4223/14
 4246/19 4253/23 4255/1
 4255/5 4256/9 4261/1
 4274/15 4279/5 4286/13
 4291/11 4293/4 4293/5
 4296/5 4296/10 4299/5
 4301/5 4301/11 4302/4
 4303/18 4305/7 4305/8
 4306/7 4306/24
**putting** [4] 4157/22
 4192/13 4196/13 4272/24

**Q**

**qualified** [3] 4172/5
 4262/11 4262/13
**quality** [1] 4308/20
**quarter** [1] 4194/6
**questioned** [1] 4321/16
**questioning** [1] 4244/24
**questions** [11] 4205/25
 4215/16 4227/21 4233/3
 4234/20 4241/7 4248/24
 4251/1 4281/18 4293/6
 4311/9
**quick** [3] 4171/19 4202/19
 4311/15

**quickly** [1] 4263/15
**quiet** [1] 4230/22 4288/10
**quite** [3] 4163/13 4210/6
 4262/2
**quizzes** [1] 4300/23

**R**

**rachet** [4] 4220/4 4220/6
 4220/11 4220/19
**radials** [1] 4274/18
**radio** [2] 4270/14 4270/17
**radioed** [1] 4270/12
**rail** [3] 4218/18 4218/19
 4218/20
**rains** [1] 4240/2
**raise** [1] 4316/2
**raised** [1] 4225/8
**RAMON** [1] 4145/11
**ran** [2] 4167/2 4294/2
**random** [1] 4300/11
**range** [2] 4182/7 4255/15
**ratcheting** [1] 4220/1
**ratchets** [2] 4219/25
 4220/1
**rate** [2] 4292/7 4300/22
**rates** [2] 4291/18 4315/6
**rather** [1] 4252/17
**Rausario** [2] 4264/24
 4265/11
**Ray** [1] 4300/10
**RAYMOND** [1] 4145/16
**reached** [2] 4261/17
 4311/12
**reaching** [1] 4311/5
**react** [2] 4245/11 4246/13
**reaction** [1] 4317/14
**read** [18] 4147/24 4156/5
 4156/8 4163/21 4194/7
 4203/19 4210/17 4215/16
 4231/20 4249/21 4273/15
 4306/17 4310/22 4313/8
 4320/25 4322/9 4323/4
 4323/6
**read-in** [2] 4156/8 4194/7
**reading** [5] 4183/19
 4216/12 4218/8 4249/22
 4273/14
**readout** [1] 4154/5
**reads** [6] 4209/7 4210/14
 4311/17 4320/17 4321/23
 4321/23
**ready** [12] 4147/2 4147/21
 4147/24 4148/2 4148/3
 4155/18 4155/20 4156/15
 4213/11 4215/14 4280/4
 4319/14
**real** [4] 4255/5 4287/15
 4287/15 4287/15
**reality** [1] 4162/11
**realized** [1] 4242/15
**really** [20] 4157/5 4164/25
 4172/13 4175/6 4201/24
 4208/18 4257/5 4276/24
 4284/5 4288/24 4289/12
 4289/17 4289/22 4295/9
 4296/6 4296/16 4297/17
 4298/15 4301/19 4304/6
**rear** [3] 4243/21 4251/25
 4295/2
**rear-end** [1] 4243/21
**rear-ended** [1] 4251/25
**reargued** [1] 4213/23

**R**

rearward [2]  4162/25 4185/11
reason [11]  4151/1 4158/22 4196/21 4199/2 4243/17 4258/15 4274/3 4280/10 4288/8 4288/18 4301/11
reasonable [3]  4280/13 4285/11 4285/22
reasonably [2]  4179/7 4240/21
reasons [4]  4174/6 4235/25 4236/5 4286/20
rebound [2]  4265/20 4266/1
rebuilt [2]  4231/25 4251/2
rebuttal [4]  4147/4 4156/3 4256/16 4286/13
recalled [1]  4269/1
receive [1]  4308/15
received [9]  4149/5 4149/6 4152/22 4194/20 4272/25 4273/1 4317/3 4320/16 4321/21
receiver [1]  4167/22
recently [1]  4231/24
recertified [1]  4298/7
recess [4]  4148/1 4194/25 4286/7 4316/7
reckless [5]  4179/2 4179/4 4196/25 4296/15 4309/1
recognition [1]  4271/22
recognize [7]  4228/2 4229/18 4273/8 4280/6 4280/19 4292/21 4303/23
recognizing [1]  4279/18
recollection [5]  4222/22 4223/17 4231/15 4266/11 4310/18
recommendation [1]  4282/21
reconstruct [1]  4174/5
reconstructing [1]  4158/1
reconstruction [5]  4171/20 4172/9 4262/12 4262/14 4262/15
reconstructionist [1]  4173/22
reconstructionists [1]  4172/6
record [14]  4147/5 4149/25 4150/14 4155/14 4155/17 4193/1 4197/17 4212/13 4255/24 4286/21 4287/3 4313/18 4317/2 4320/13
recorded [1]  4146/24
recording [1]  4295/4
records [6]  4181/1 4181/2 4267/14 4267/20 4267/23 4297/19
rectangular [1]  4229/21
red [3]  4252/20 4267/20 4295/25
redacting [2]  4149/18 4149/25
redactions [7]  4149/16 4151/10 4151/14 4152/12 4154/4 4154/7 4154/18
refer [2]  4186/14 4265/13
reference [2]  4152/1 4315/1
referenced [1]  4167/9
references [1]  4152/14

referred [1]  4234/25
referring [13]  4187/4 4315/1 4315/5
reflective [4]  4224/16 4252/3 4252/24 4294/4
refresh [2]  4275/5 4275/6
refresher [1]  4271/13
regard [3]  4163/6 4264/23 4311/3
Regardless [1]  4235/22
regular [3]  4153/7 4223/13 4244/9
regulation [6]  4271/19 4272/6 4272/9 4272/16 4274/23 4275/11
reiterate [1]  4154/22
rejected [1]  4201/18
related [4]  4152/22 4193/23 4231/12 4285/13
relates [3]  4151/6 4151/22 4284/12
relating [1]  4193/14
relation [4]  4160/10 4164/4 4167/17 4231/7
relative [8]  4162/8 4163/2 4163/3 4163/4 4170/6 4228/9 4272/21 4276/7
relayed [1]  4225/15
relevant [3]  4184/13 4309/13 4321/8
relied [2]  4283/5 4314/22
rely [2]  4169/14 4311/4
relying [2]  4176/9 4178/14
remain [1]  4162/14
remaining [2]  4194/7 4240/18
remains [2]  4161/22 4161/23
remember [35]  4172/25 4173/13 4193/21 4216/9 4231/9 4231/17 4233/19 4235/12 4245/25 4251/10 4257/17 4257/19 4260/10 4261/18 4264/23 4265/7 4265/17 4266/23 4268/20 4270/19 4273/21 4275/6 4275/13 4275/15 4276/5 4280/21 4281/8 4281/19 4281/21 4283/5 4284/14 4291/10 4300/21 4302/15 4303/24
remembered [1]  4271/1
remind [3]  4310/24 4319/22 4320/24
reminded [1]  4204/19
remote [1]  4303/25
renew [2]  4149/8 4155/12
renewing [2]  4155/7 4286/13
repairs [3]  4250/15 4250/18 4262/23
repeat [2]  4242/24 4243/5
repetitively [1]  4271/13
rephrase [1]  4225/11
replacement [1]  4276/12
replacing [1]  4212/2
report [20]  4149/10 4149/13 4149/20 4149/22 4150/1 4150/3 4150/11 4153/5 4153/7 4173/9 4173/10 4174/15 4247/16 4247/18 4248/1 4248/4

4295/24 4296/12 4298/22 4299/14
reportable [1]  4291/24
reported [3]  4158/17 4170/22 4291/24
reporter [2]  4146/21 4148/4
reports [3]  4177/5 4178/17 4180/13
represent [5]  4150/19 4276/23 4305/10 4305/11 4305/12
Republic [1]  4265/1
reputation [1]  4278/18
request [6]  4149/9 4197/1 4198/24 4212/9 4310/23 4315/20
require [1]  4311/9
required [12]  4159/1 4159/9 4178/3 4196/2 4227/5 4227/6 4227/10 4227/14 4246/19 4246/25 4263/9 4274/16
requirement [4]  4272/16 4274/20 4274/24 4275/9
requires [2]  4271/19 4275/4
RER [1]  4145/3
reservation [1]  4319/9
respect [8]  4157/18 4164/12 4208/25 4209/2 4232/2 4257/11 4279/3 4311/3
respond [1]  4205/11
response [2]  4267/12 4287/8
responsibilities [1]  4234/21
responsibility [3]  4285/4 4296/22 4298/23
responsible [7]  4199/8 4199/9 4199/14 4199/18 4199/22 4318/13 4318/17
rest [25]  4148/9 4161/22 4161/22 4162/8 4162/9 4180/9 4223/4 4225/16 4228/11 4235/15 4264/9 4267/11 4267/24 4268/12 4268/12 4272/8 4273/8 4275/24 4276/4 4279/17 4279/19 4282/5 4297/17 4298/22 4299/1
rest-fatigue [1]  4298/22
restatement [1]  4150/24
rested [1]  4280/4
rests [3]  4154/20 4156/1 4256/19
result [9]  4162/24 4187/15 4189/19 4213/8 4257/23 4279/11 4284/3 4310/2 4311/19
resume [3]  4147/18 4321/25 4322/3
resumes [2]  4216/12 4218/8
retained [2]  4184/5 4281/22
retire [2]  4308/10 4310/11
return [9]  4194/6 4203/5 4203/7 4203/8 4268/3 4309/23 4310/21 4322/3 4322/11
returned [2]  4203/3

**R**

**returned... [1]** 4309/22
**reverse [1]** 4213/24
**review [4]** 4158/24 4165/22
4194/24 4285/21
**reviewed [9]** 4157/1
4157/15 4173/9 4173/15
4174/15 4174/18 4174/22
4174/25 4178/1
**reviewing [2]** 4147/7
4179/9
**revised [1]** 4200/1
**revisions [1]** 4314/9
**Rex [1]** 4302/11
**Rey [5]** 4273/2 4279/7
4280/12 4280/14 4280/22
**REYES [8]** 4145/11 4257/8
4259/3 4306/16 4317/5
4320/18 4321/24 4322/12
**rhythms [2]** 4273/7 4279/18
**rid [1]** 4169/3
**ride [2]** 4252/25 4296/24
**ridiculous [1]** 4205/10
**right-hand [1]** 4191/14
**rights [7]** 4155/11 4203/13
4203/13 4206/15 4207/24
4286/18 4318/19
**risk [1]** 4292/10
**risks [1]** 4305/2
**RMR [1]** 4146/21
**road [29]** 4159/1 4176/19
4176/22 4179/22 4179/23
4217/22 4222/19 4231/14
4232/6 4234/22 4236/19
4237/13 4240/13 4244/1
4254/1 4254/5 4254/10
4254/11 4255/21 4256/3
4263/14 4264/17 4265/21
4270/16 4277/25 4283/8
4298/20 4303/20 4307/18
**roads [3]** 4274/17 4274/19
4307/19
**roadway [4]** 4162/4 4168/25
4169/4 4268/18
**roadways [2]** 4169/1 4305/4
**role [1]** 4308/18
**roll [1]** 4221/12
**roller [1]** 4220/18
**rollerball [1]** 4292/15
**rollovers [1]** 4165/19
**room [9]** 4162/1 4267/17
4276/25 4302/12 4302/13
4310/11 4310/13 4310/24
4316/5
**Rosary [1]** 4265/3
**Rosekind [2]** 4261/2
4273/20
**Rosekind's [1]** 4273/23
**roughly [14]** 4184/17
4218/23 4220/10 4221/24
4222/7 4228/23 4230/4
4233/17 4234/1 4234/7
4237/6 4237/22 4238/21
4238/21
**round [1]** 4229/25
**route [8]** 4226/20 4267/4
4282/5 4282/7 4303/1
4303/2 4305/2 4307/21
**routes [3]** 4303/2 4306/4
4306/14
**RPM [2]** 4183/3 4183/17

**rub [3]** 4218/18 4218/19
4218/20
**rubber [1]** 4218/4
**rule [31]** 4155/7 4272/15
4274/14 4274/15 4275/12
4275/15 4275/15 4275/25
4276/2 4276/22 4276/22
4286/14 4297/1 4297/8
4301/3 4301/8 4301/9
4301/14 4301/17 4301/25
4302/1 4302/1 4302/7
4302/7 4302/8 4302/11
4302/21 4302/22 4314/9
4314/15 4314/15
**rules [16]** 4159/1 4234/17
4274/13 4291/8 4293/4
4293/16 4293/17 4293/17
4293/18 4299/24 4299/24
4301/21 4306/10 4310/9
4310/12 4315/1
**ruling [1]** 4150/13
**rulings [1]** 4195/22
**rumble [12]** 4190/20
4190/22 4190/24 4191/6
4191/9 4191/13 4191/16
4191/24 4192/1 4270/14
4270/21 4270/21
**run [6]** 4169/12 4274/6
4275/24 4280/1 4282/25
4292/10
**running [5]** 4190/15
4303/15 4303/17 4305/1
4307/19
**runs [1]** 4299/22
**Rye [1]** 4146/4

**S**

**S-A-I-F-U-L-L-A-H [1]**
4191/2
**SAAL [7]** 4146/5 4147/4
4147/6 4151/9 4215/17
4323/4 4323/6
**SABRINA [55]** 4145/7 4196/6
4196/15 4198/12 4199/8
4199/8 4199/13 4199/18
4199/22 4200/14 4200/16
4201/8 4208/20 4211/19
4257/24 4258/11 4258/13
4258/16 4261/20 4261/25
4263/16 4263/23 4264/4
4264/6 4264/12 4265/10
4267/10 4267/24 4268/6
4268/9 4268/15 4268/22
4269/15 4269/16 4269/25
4271/6 4272/18 4272/25
4274/8 4276/3 4276/21
4277/24 4279/8 4279/19
4281/14 4282/9 4284/6
4308/16 4309/4 4309/8
4311/20 4311/23 4317/5
4320/18 4321/3
**Sabrina's [2]** 4284/13
4284/20
**sacrifice [1]** 4257/7
**safe [14]** 4236/13 4236/14
4236/16 4242/19 4243/3
4243/7 4243/12 4243/13
4243/14 4276/11 4276/14
4300/15 4305/4 4307/14
**safely [1]** 4179/7
**safer [2]** 4303/4 4303/4
**safest [1]** 4276/14

**safety [36]** 4148/7 4148/14
4161/5 4175/5 4175/5 4204/22
4234/17 4260/21 4260/22
4273/3 4277/4 4277/6
4277/14 4278/12 4278/13
4278/21 4278/23 4279/1
4279/5 4284/2 4284/21
4285/2 4285/18 4293/19
4299/17 4299/21 4299/23
4299/25 4300/18 4300/25
4300/25 4302/6 4303/14
4303/16 4307/4 4307/16
4307/17
**Saifullah [3]** 4191/2
4294/18 4295/15
**Sanchez [3]** 4264/24
4265/11 4294/16
**Santo [1]** 4264/25
**satellite [8]** 4167/20
4167/24 4167/25 4168/1
4168/2 4168/3 4168/5
4168/7
**satellites [6]** 4167/14
4167/20 4168/10 4168/14
4168/15 4168/16
**satisfied [2]** 4278/4
4278/5
**satisfies [4]** 4196/6
4196/16 4201/4 4203/11
**saved [1]** 4305/5
**saw [57]** 4158/11 4175/6
4175/9 4175/17 4175/22
4176/24 4177/2 4177/2
4177/3 4177/7 4177/10
4177/11 4177/12 4179/15
4180/3 4180/6 4180/10
4180/11 4180/17 4184/24
4191/22 4193/12 4230/8
4239/22 4241/15 4244/3
4263/4 4263/23 4264/12
4264/14 4264/17 4264/20
4265/12 4265/21 4266/19
4266/24 4267/1 4268/22
4269/3 4269/22 4269/23
4270/2 4270/7 4270/15
4271/3 4279/1 4283/7
4294/8 4294/15 4294/17
4295/15 4295/19 4295/21
4295/23 4296/2 4296/11
4300/10
**scale [4]** 4165/25 4166/5
4166/6 4217/23
**scaled [1]** 4217/18
**scared [1]** 4283/9
**scene [1]** 4175/11
**schedule [7]** 4222/14
4297/21 4297/24 4302/12
4302/14 4302/18 4303/9
**scheduling [2]** 4302/9
4302/23
**SCHMID [1]** 4146/21
**Schmit [15]** 4148/7 4149/21
4150/17 4150/21 4153/25
4173/21 4174/2 4248/3
4248/6 4248/11 4248/21
4250/1 4252/6 4262/10
4295/5
**Schmit's [2]** 4149/12
4150/10
**school [1]** 4244/6
**school-zone-type [1]**
4244/6

**S**

**schooling [1]**   4271/8
**science [5]**   4271/24
 4273/16 4273/18 4279/18
 4305/1
**scooter [1]**   4204/18
**scope [3]**   4318/7 4319/5
 4319/9
**screens [1]**   4160/25
**se [1]**   4157/4
**seat [3]**   4283/7 4295/18
 4295/22
**seated [5]**   4147/10 4155/23
 4215/11 4287/4 4320/15
**second [15]**   4163/12
 4163/23 4163/24 4164/1
 4168/3 4181/2 4181/12
 4183/2 4184/8 4196/4
 4210/7 4229/12 4289/16
 4290/15 4313/14
**Secondly [1]**   4315/9
**seconds [13]**   4180/24
 4181/4 4181/7 4182/11
 4230/3 4230/3 4241/17
 4241/18 4242/3 4242/12
 4243/3 4243/7 4243/11
**section [1]**   4152/9
**secure [8]**   4217/25 4220/8
 4221/8 4221/13 4253/18
 4266/24 4266/25 4267/24
**secured [5]**   4220/14 4264/9
 4267/11 4268/12 4268/12
**secures [1]**   4218/5
**securing [1]**   4279/19
**security [1]**   4296/7
**see [84]**   4148/11 4150/25
 4158/3 4161/10 4161/11
 4162/16 4168/25 4169/4
 4169/24 4169/24 4169/25
 4170/6 4170/15 4171/10
 4175/3 4177/12 4179/12
 4179/16 4180/8 4182/3
 4182/18 4186/12 4186/15
 4186/18 4187/20 4188/23
 4193/24 4194/1 4194/9
 4200/13 4202/19 4210/6
 4210/7 4211/24 4214/17
 4214/18 4216/1 4216/16
 4217/3 4219/24 4220/22
 4229/16 4236/21 4236/22
 4240/21 4240/24 4241/1
 4241/5 4241/23 4244/10
 4253/12 4253/12 4264/1
 4264/9 4264/10 4264/19
 4264/21 4265/5 4265/6
 4265/8 4265/10 4265/11
 4265/12 4266/6 4268/25
 4269/24 4269/25 4273/12
 4280/19 4292/16 4294/6
 4294/6 4294/7 4294/11
 4294/13 4294/20 4300/9
 4300/11 4300/13 4302/3
 4306/25 4306/25 4319/15
 4322/15
**seeing [7]**   4170/18 4170/21
 4172/25 4180/13 4193/19
 4242/10 4269/1
**seek [2]**   4148/18 4150/11
**sees [2]**   4278/24 4300/6
**self [1]**   4220/1
**self-ratcheting [1]**   4220/1

**send [5]**   4276/12 4310/16
 4311/15 4321/21 4322/1
**sending [1]**   4315/20
**sends [1]**   4167/21
**sense [20]**   4154/1 4186/11
 4257/19 4260/8 4262/25
 4263/1 4276/18 4276/18
 4280/25 4282/15 4283/11
 4283/18 4285/5 4297/23
 4301/16 4302/19 4302/20
 4302/21 4302/21 4303/24
**sent [1]**   4281/7
**sentence [19]**   4152/25
 4195/12 4196/4 4196/13
 4197/14 4197/23 4198/7
 4198/15 4201/3 4203/2
 4203/7 4206/10 4208/7
 4208/8 4208/9 4208/11
 4208/14 4209/7 4283/19
**sentences [1]**   4210/17
**separate [7]**   4163/10
 4203/5 4204/7 4223/13
 4223/14 4229/25 4309/24
**separated [3]**   4185/21
 4186/15 4266/5
**separately [4]**   4203/6
 4309/7 4309/25 4321/3
**sequence [1]**   4150/24
**serious [2]**   4292/1 4292/3
**seriously [1]**   4234/22
**serve [1]**   4285/23
**service [3]**   4287/13
 4287/13 4300/7
**servicing [1]**   4303/9
**session [2]**   4171/14
 4251/20
**set [4]**   4162/10 4173/12
 4233/24 4284/15
**sets [1]**   4252/19
**seven [6]**   4168/11 4168/20
 4168/21 4264/13 4267/24
 4268/1
**several [3]**   4277/8 4277/8
 4294/17
**severity [3]**   4292/9
 4299/10 4303/17
**shade [1]**   4216/23
**shades [1]**   4216/18
**shaking [1]**   4280/20
**Shall [1]**   4152/2
**shape [2]**   4165/11 4210/25
**sharp [3]**   4254/8 4272/19
 4298/19
**SHAUB [3]**   4146/6 4146/8
 4154/20
**sheet [5]**   4198/1 4198/3
 4201/13 4201/21 4212/16
**Sherbourne [1]**   4145/15
**shift [6]**   4160/19 4171/6
 4192/22 4193/8 4294/6
 4299/6
**shifted [8]**   4185/24 4186/4
 4186/6 4186/9 4187/20
 4187/21 4253/20 4294/5
**shifting [4]**   4161/7
 4186/23 4187/15 4189/15
**shock [1]**   4266/8
**should've [1]**   4302/2
**shoulder [7]**   4173/1 4173/3
 4173/3 4190/16 4232/16
 4232/17 4256/11
**shoved [2]**   4162/15 4292/21

**show [9]**   4163/13 4169/7
 4169/20 4169/10 4172/24
 4215/25 4216/15 4224/9
 4272/22
**showed [5]**   4190/16 4267/2
 4272/18 4287/12 4301/10
**showing [3]**   4170/4 4170/25
 4171/1
**shown [4]**   4150/17 4150/21
 4161/6 4185/2
**shows [7]**   4163/12 4163/14
 4163/15 4163/15 4163/18
 4192/16 4309/1
**shut [1]**   4246/1
**shy [1]**   4270/15
**sic [1]**   4147/14
**sick [1]**   4279/24
**side [30]**   4161/11 4161/12
 4171/1 4176/1 4184/22
 4190/21 4190/25 4191/13
 4191/14 4191/24 4191/25
 4217/21 4218/18 4223/15
 4224/23 4229/20 4230/1
 4237/13 4241/9 4241/22
 4265/18 4265/21 4266/20
 4266/25 4267/1 4267/1
 4283/8 4295/23 4301/11
 4301/11
**side-view [2]**   4241/9
 4241/22
**sidebar [4]**   4312/8 4312/10
 4313/2 4315/21
**sides [3]**   4218/24 4219/1
 4219/16
**sight [2]**   4175/19 4175/21
**sightlines [1]**   4264/16
**signal [6]**   4167/21 4176/17
 4178/23 4212/17 4212/19
 4269/11
**signaled [1]**   4212/25
**signed [3]**   4310/17 4311/11
 4317/7
**significant [2]**   4161/14
 4185/5
**signs [4]**   4273/9 4280/6
 4280/14 4280/19
**similar [8]**   4153/25
 4165/24 4183/13 4210/13
 4210/21 4258/13 4308/24
 4310/5
**similarly [2]**   4162/2
 4191/3
**simple [2]**   4157/5 4172/13
**simpler [1]**   4304/16
**simply [3]**   4272/13 4311/11
 4315/2
**single [8]**   4155/1 4261/9
 4265/6 4281/25 4283/21
 4283/21 4283/22 4293/24
**site [5]**   4228/16 4229/1
 4229/10 4238/15 4270/3
**sits [1]**   4299/23
**sitting [3]**   4161/25 4283/6
 4295/22
**situation [2]**   4262/25
 4317/23
**situations [3]**   4230/5
 4255/4 4284/18
**six [10]**   4168/10 4237/6
 4238/9 4238/11 4238/12
 4238/17 4238/18 4239/4
 4251/5 4265/20

**S**

**sixteen [1]**  4262/8
**size [1]**  4207/1
**skew [1]**  4268/5
**sleep [21]**  4199/19 4204/11
 4260/24 4265/2 4267/17
 4267/22 4268/2 4273/8
 4279/17 4282/3 4282/13
 4283/3 4283/4 4283/10
 4283/12 4283/14 4283/17
 4297/18 4297/20 4297/24
 4318/17
**sleepiness [1]**  4294/25
**sleeping [2]**  4174/20
 4297/20
**sleeps [1]**  4263/24
**sleepy [2]**  4290/20 4290/20
**slept [1]**  4297/18
**slide [2]**  4213/16 4213/16
**slides [5]**  4213/14 4213/21
 4213/24 4214/2 4214/5
**slight [4]**  4179/22 4254/11
 4254/11 4264/16
**slightly [2]**  4157/6 4235/6
**slot [1]**  4297/15
**slow [9]**  4227/25 4245/8
 4245/10 4245/16 4246/13
 4255/6 4255/6 4263/7
 4284/7
**slow-moving [4]**  4227/25
 4245/8 4255/6 4284/7
**slowed [1]**  4165/5
**slower [9]**  4237/25 4238/5
 4238/7 4238/8 4238/16
 4238/18 4246/21 4249/4
 4249/6
**small [4]**  4165/1 4228/9
 4298/8 4298/8
**Smaller [1]**  4228/11
**SMITH [22]**  4145/21 4147/14
 4155/18 4156/5 4156/12
 4156/15 4194/4 4238/23
 4278/10 4278/15 4278/16
 4278/17 4279/7 4279/17
 4293/19 4298/21 4299/21
 4299/23 4300/10 4302/15
 4302/17 4323/3
**snapshot [1]**  4164/1
**Soberay [4]**  4283/5 4283/6
 4294/19 4295/21
**social [1]**  4283/24
**software [1]**  4157/6
**sole [2]**  4210/19 4310/3
**solely [1]**  4311/6
**solid [1]**  4165/19
**Solutions [8]**  4261/2
 4272/20 4272/22 4273/19
 4273/20 4273/24 4275/3
 4282/24
**someone [7]**  4203/24
 4204/21 4270/12 4271/4
 4277/12 4280/15 4299/7
**sometime [2]**  4164/2
 4167/15
**sometimes [9]**  4169/1
 4170/1 4171/24 4171/25
 4172/2 4221/2 4221/3
 4240/2 4240/2
**somewhat [1]**  4153/20
**somewhere [1]**  4168/2
**sorry [17]**  4148/10 4148/11

**S**

**sort [3]**  4161/17 4288/18
 4304/6
**sorts [1]**  4234/12
**sought [1]**  4278/19
**sounds [2]**  4176/8 4176/14
**sources [1]**  4295/17
**space [1]**  4182/18
**speaking [1]**  4226/19
**special [8]**  4201/12
 4201/20 4207/21 4211/9
 4311/10 4311/15 4312/1
 4312/3
**specially [1]**  4262/11
**specially-trained [1]**
 4262/11
**specific [10]**  4152/1
 4179/18 4202/3 4202/23
 4207/3 4222/22 4223/17
 4226/8 4319/23 4320/24
**specifically [10]**  4149/21
 4150/21 4151/18 4160/18
 4178/3 4193/23 4202/25
 4221/6 4247/8 4285/13
**specifics [2]**  4174/12
 4191/7
**specify [1]**  4216/7
**speculation [1]**  4267/13
**sped [1]**  4165/4
**speed [53]**  4153/24 4159/9
 4165/20 4165/23 4166/1
 4166/7 4166/10 4166/21
 4166/23 4167/4 4176/6
 4178/3 4181/20 4182/16
 4183/1 4183/2 4183/3
 4183/4 4183/8 4183/10
 4184/13 4184/14 4192/4
 4192/10 4226/23 4227/4
 4227/8 4227/21 4228/21
 4229/2 4229/12 4231/4
 4231/8 4231/17 4232/24
 4233/3 4233/9 4233/22
 4233/24 4234/4 4241/8
 4244/9 4246/13 4247/8
 4247/25 4249/10 4249/15
 4249/18 4254/15 4254/22
 4255/15 4255/16 4269/8
**speeds [9]**  4178/2 4181/12
 4227/21 4244/6 4244/11
 4251/9 4251/12 4255/18
 4292/11
**spend [2]**  4294/1 4307/14
**spent [1]**  4304/16
**spike [1]**  4183/23
**spin [1]**  4302/4
**spoken [1]**  4320/20
**spot [1]**  4276/11
**SPRATT [1]**  4146/6
**spurious [1]**  4169/1
**squared [1]**  4164/22
**squarely [1]**  4208/22
**staff [1]**  4257/8
**stand [3]**  4260/6 4293/24
 4298/11
**standard [14]**  4196/7
 4196/8 4196/17 4196/20
 4197/2 4197/10 4201/4
 4259/23 4260/20 4272/12

**S**

**standard...**  4272/16 4280/11 4282/19
**standards [3]**  4261/14
 4272/3 4272/5
**standpoint [3]**  4158/16
 4168/21 4234/4
**stands [2]**  4157/3 4311/14
**staring [1]**  4307/19
**start [12]**  4163/10 4169/5
 4170/15 4170/18 4186/1
 4201/22 4201/24 4208/6
 4243/1 4261/25 4267/11
 4276/8
**started [5]**  4156/17 4268/3
 4271/14 4277/9 4278/11
**starters [1]**  4261/19
**starting [3]**  4171/15
 4201/23 4233/23
**starts [5]**  4162/3 4182/5
 4217/5 4217/6 4277/15
**state [16]**  4149/9 4150/2
 4158/22 4173/9 4173/21
 4211/14 4246/24 4251/22
 4262/11 4262/12 4263/18
 4265/15 4266/8 4275/10
 4281/2 4311/17
**statement [5]**  4153/4
 4232/21 4270/20 4270/24
 4283/5
**statements [11]**  4152/13
 4174/15 4174/18 4174/22
 4175/2 4175/23 4191/19
 4266/11 4296/2 4298/10
 4301/10
**STATES [7]**  4145/1 4145/4
 4145/11 4209/23 4209/24
 4285/9 4291/25
**stay [7]**  4162/11 4162/22
 4212/4 4217/20 4219/6
 4272/19 4298/19
**stay-sharp [1]**  4298/19
**stayed [1]**  4162/21
**steel [2]**  4220/9 4274/18
**steel-belted [1]**  4274/18
**steep [1]**  4238/14
**steeper [2]**  4237/24
 4238/14
**steepest [1]**  4238/2
**steer [1]**  4295/6
**steered [2]**  4256/10
 4265/17
**steering [2]**  4224/23
 4256/10
**stenography [1]**  4146/24
**step [3]**  4221/25 4224/5
 4297/1
**steps [1]**  4284/17
**STEVEN [3]**  4146/5 4148/12
 4237/1
**sticking [2]**  4201/1 4264/2
**still [28]**  4152/13 4163/16
 4165/3 4168/8 4169/23
 4182/21 4183/7 4183/9
 4183/19 4183/21 4200/14
 4210/14 4223/3 4253/5
 4253/18 4265/15 4265/22
 4275/20 4277/24 4279/10
 4280/2 4281/18 4284/10
 4284/19 4294/11 4301/6
 4315/4 4318/5
**stones [1]**  4278/8
**stood [1]**  4277/19

**S**

**stop [41]**   4158/14 4190/4
4221/16 4221/17 4221/19
4221/20 4223/4 4225/16
4235/15 4237/3 4237/3
4253/1 4253/5 4253/21
4255/7 4256/13 4264/20
4272/10 4276/4 4276/5
4276/8 4276/11 4276/16
4282/7 4282/13 4282/19
4290/16 4300/1 4301/2
4301/6 4302/19 4302/22
4303/5 4303/6 4303/8
4303/10 4303/20 4304/3
4304/10 4305/7 4305/8
**stopped [3]**   4175/5 4245/23
4282/4
**stops [14]**   4193/3 4274/15
4275/5 4275/24 4276/7
4293/7 4293/8 4293/12
4302/16 4302/18 4302/23
4303/5 4304/25 4307/22
**stories [1]**   4248/25
**story [2]**   4241/8 4241/9
**straight [12]**   4161/13
4169/24 4169/24 4169/25
4170/6 4179/23 4179/25
4186/25 4254/1 4269/18
4282/2 4295/6
**strap [12]**   4161/13 4187/11
4187/13 4187/23 4188/4
4188/6 4188/6 4188/7
4188/16 4189/5 4219/23
4221/4
**strapped [2]**   4187/22
4188/3
**strapping [1]**   4186/25
**straps [14]**   4161/10
4161/15 4162/16 4186/20
4186/22 4186/22 4187/3
4188/5 4188/20 4189/7
4219/8 4219/19 4253/12
4294/7
**street [2]**   4145/22 4217/19
**stress [1]**   4197/10
**stressed [1]**   4281/17
**stretch [10]**   4179/23
4227/14 4236/10 4237/19
4244/4 4244/22 4245/16
4246/4 4262/5 4262/6
**stricken [3]**   4255/22
4255/23 4291/6
**strictly [1]**   4314/23
**strike [3]**   4226/4 4289/11
4291/5
**strip [3]**   4191/6 4270/21
4270/21
**strips [9]**   4190/20 4190/22
4190/24 4191/9 4191/13
4191/16 4191/24 4192/1
4270/14
**strive [2]**   4277/20 4278/7
**strived [1]**   4275/1
**strives [1]**   4285/17
**strong [1]**   4244/18
**stronger [1]**   4274/5
**struck [2]**   4216/9 4216/10
**stuck [1]**   4165/2
**stuff [1]**   4315/14
**submit [7]**   4258/15 4259/1
4265/24 4269/23 4277/2

**submitted [4]**   4317/14
4317/22 4319/21 4320/22
**subpart [3]**   4311/21
4311/23 4311/24
**subparts [2]**   4311/21
4311/25
**subpoenaed [1]**   4269/21
**subsequently [1]**   4248/18
**substance [1]**   4149/13
**substantial [1]**   4306/22
**substantially [1]**   4271/18
**subtract [1]**   4166/17
**succeeded [1]**   4279/6
**Success [1]**   4146/8
**successive [3]**   4155/9
4207/23 4286/16
**such-and-such [1]**   4214/9
**suddenly [1]**   4169/2
**suffered [2]**   4203/14
4261/24
**Suffice [1]**   4180/16
**sufficient [2]**   4149/23
4318/17
**sufficiently [1]**   4149/14
**suggest [3]**   4281/7 4288/7
4305/24
**suggested [2]**   4284/14
4284/16
**suggesting [4]**   4205/7
4207/3 4270/25 4270/25
**suicidal [3]**   4244/25
4245/1 4267/9
**suicide [1]**   4263/12
**suitable [1]**   4281/25
**Suite [4]**   4145/19 4145/22
4146/4 4146/7
**sum [3]**   4149/12 4203/4
4309/23
**summation [6]**   4202/12
4206/25 4259/3 4288/1
4323/8 4323/9
**superhighways [1]**   4274/20
**supervisor [1]**   4271/11
**support [2]**   4281/4 4313/17
**supports [4]**   4160/20
4260/17 4297/20 4318/3
**supposed [5]**   4198/20
4198/20 4257/15 4267/5
4288/5
**supposedly [1]**   4297/12
**supposition [2]**   4264/5
4267/12
**Supreme [2]**   4209/23
4209/24
**surprise [2]**   4173/13
4173/14
**surprised [1]**   4289/25
**surroundings [2]**   4242/23
4243/18
**suspended [1]**   4306/11
**suspicion [1]**   4280/13
**sustained [5]**   4192/25
4260/14 4289/10 4291/4
4291/16
**swear [1]**   4312/5
**swerving [1]**   4270/13
**switch [12]**   4158/9 4178/8
4178/10 4178/14 4223/12
4225/8 4250/9 4250/12
4250/22 4262/19 4262/20
4271/4

**sworn [3]**   4177/13 4268/11
4318/20
**system [4]**   4157/2 4157/4
4163/20 4304/17

**T**

**taillights [2]**   4244/3
4244/10
**tailor [1]**   4243/10
**tape [6]**   4224/16 4232/24
4252/23 4252/24 4266/22
4294/4
**tarp [33]**   4186/18 4186/18
4189/13 4216/24 4217/1
4217/6 4217/7 4217/11
4217/12 4217/12 4217/24
4217/25 4218/5 4218/12
4218/14 4221/8 4221/10
4222/20 4222/23 4222/25
4225/17 4240/1 4253/23
4265/22 4265/24 4266/1
4266/21 4266/24 4266/25
4267/3 4270/6 4294/5
4294/8
**tarped [3]**   4187/16 4187/19
4189/20
**tarping [4]**   4160/6 4189/10
4217/19 4221/14
**tarps [4]**   4216/20 4217/20
4239/19 4239/21
**taught [1]**   4242/19
**team [3]**   4257/10 4306/9
4306/9
**team's [1]**   4260/18
**Tech [6]**   4217/5 4217/13
4222/1 4235/17 4252/25
4253/10
**Technically [1]**   4321/15
**technology [3]**   4157/5
4157/10 4274/17
**ten [9]**   4219/12 4219/20
4224/10 4224/11 4252/21
4268/23 4272/7 4286/5
4287/21
**term [2]**   4218/21 4252/23
**terminal [3]**   4276/9
4276/10 4304/8
**terminated [1]**   4282/4
**terminology [1]**   4193/20
**terms [2]**   4260/21 4319/9
**test [3]**   4165/21 4165/23
4320/5
**tested [2]**   4165/18 4266/8
**testified [22]**   4149/21
4151/8 4153/21 4174/6
4174/23 4177/19 4178/21
4179/14 4180/3 4180/6
4191/2 4191/5 4248/4
4263/3 4264/6 4267/16
4268/11 4281/5 4291/7
4294/21 4294/22 4315/3
**testify [8]**   4152/15
4153/21 4172/18 4175/1
4180/10 4252/6 4269/22
4318/3
**testimony [65]**   4149/12
4149/15 4149/24 4150/24
4151/2 4151/8 4151/17
4151/18 4151/20 4151/24
4153/23 4153/25 4156/4
4156/6 4174/25 4175/2
4175/22 4176/23 4177/13

**T**

**testimony... [46]** 4179/9
4179/17 4179/19 4180/20
4190/19 4191/7 4191/17
4191/18 4191/19 4194/3
4194/7 4195/24 4204/1
4204/4 4204/4 4215/18
4225/3 4225/9 4226/4
4229/1 4229/4 4231/1
4233/5 4233/19 4234/2
4245/14 4251/10 4251/20
4254/15 4256/15 4263/25
4264/4 4264/7 4268/11
4270/19 4281/19 4300/24
4308/19 4308/20 4310/18
4310/22 4314/23 4314/25
4317/23 4323/3 4323/5
**Testing [1]** 4287/9
**tests [2]** 4165/16 4165/16
**Texas [1]** 4307/12
**text [1]** 4283/21
**the conduct [1]** 4196/20
**the standard [1]** 4196/8
**themselves [1]** 4300/22
**thereby [1]** 4286/17
**therefore [3]** 4313/20
4313/21 4313/23
**thermodynamics [1]** 4164/17
**Therrian [1]** 4302/11
**they've [6]** 4195/24
4196/19 4208/21 4224/9
4277/4 4290/19
**thinking [2]** 4284/13
4318/5
**thinner [1]** 4219/24
**third [8]** 4168/5 4183/3
4195/12 4209/17 4210/5
4210/9 4211/9 4321/7
**third-parties [3]** 4209/17
4210/5 4210/9
**thousands [3]** 4234/14
4303/3 4306/5
**three [28]** 4161/19 4184/9
4197/22 4212/7 4224/12
4224/12 4224/12 4224/15
4224/15 4224/15 4233/21
4239/4 4251/2 4252/19
4252/19 4264/6 4271/9
4272/11 4282/10 4296/4
4296/7 4296/12 4298/6
4298/18 4300/7 4303/5
4309/13 4319/25
**throttle [1]** 4183/23
**throughout [1]** 4265/12
**throw [4]** 4215/5 4220/19
4232/14 4267/14
**throwing [1]** 4232/11
**thrown [1]** 4295/18
**tickets [1]** 4296/18
**tie [1]** 4218/13
**tied [1]** 4221/12
**tight [2]** 4220/14 4253/12
**tighten [1]** 4220/20
**tightens [1]** 4220/6
**tighter [1]** 4301/14
**Tim [1]** 4302/11
**timeframe [2]** 4179/5
4282/12
**timetable [3]** 4303/3
4305/3 4306/4
**timetables [3]** 4300/24

4304/23 4306/14
**timewise [1]** 4233/16
**tire [8]** 4151/25 4161/9
4185/10 4274/13 4274/14
4274/17 4301/3 4302/1
**tired [5]** 4236/22 4264/8
4267/11 4282/5 4282/8
**tires [9]** 4151/23 4177/11
4177/12 4177/14 4185/17
4253/13 4274/16 4274/18
4275/21
**today [8]** 4231/2 4231/8
4233/23 4242/8 4268/10
4283/2 4321/25 4322/10
**today's [2]** 4317/4 4321/22
**together [8]** 4165/2
4188/20 4210/18 4253/24
4261/1 4265/16 4265/22
4295/10
**tolerated [2]** 4307/12
4308/5
**Tom [1]** 4258/7
**tomorrow [4]** 4321/25
4322/3 4322/11 4322/15
**ton [3]** 4225/14 4234/25
4236/4
**tons [5]** 4235/1 4235/2
4235/4 4235/7 4235/8
**took [9]** 4153/13 4157/24
4170/24 4173/17 4275/9
4275/16 4287/16 4298/11
4303/21
**top [14]** 4157/15 4178/6
4180/23 4182/3 4217/9
4226/3 4240/3 4240/7
4240/8 4240/8 4240/8
4240/11 4273/3 4307/8
**top-to-bottom [1]** 4273/3
**total [4]** 4207/14 4211/14
4311/17 4311/25
**touched [1]** 4151/24
**touching [2]** 4295/3
4310/14
**towards [5]** 4160/1 4182/4
4186/22 4188/21 4266/20
**towed [1]** 4292/1
**track [1]** 4299/3
**tractor [23]** 4223/5
4233/22 4235/1 4236/4
4236/9 4237/24 4239/13
4240/3 4240/16 4240/22
4240/22 4241/1 4243/2
4243/6 4243/10 4249/10
4249/16 4249/19 4262/23
4266/20 4268/19 4270/2
4294/3
**tractor-trailer [1]** 4294/3
**traffic [3]** 4165/15 4230/4
4230/19
**tragic [1]** 4279/14
**trailer [50]** 4162/8
4162/10 4162/12 4162/15
4165/9 4185/13 4185/24
4186/4 4186/7 4186/11
4186/13 4186/16 4188/14
4188/21 4217/10 4218/17
4218/18 4220/17 4220/23
4220/23 4223/4 4223/16
4224/10 4233/22 4235/1
4236/4 4236/9 4237/24
4239/13 4240/3 4240/5
4240/7 4240/18 4240/22

4240/23 4241/4 4243/2
4243/6 4248/21 4248/24
4249/19 4252/18 4252/22
4262/22 4262/24 4265/23
4266/20 4266/22 4270/2
4294/3
**trailers [1]** 4268/19
**train [2]** 4284/17 4300/2
**trained [14]** 4262/11
4271/6 4279/21 4280/6
4280/13 4280/19 4280/23
4280/24 4281/15 4300/6
4300/9 4303/23 4304/1
4304/9
**training [15]** 4260/21
4271/13 4271/14 4271/16
4271/21 4272/25 4274/10
4278/8 4279/17 4280/3
4280/13 4281/14 4281/16
4298/19 4299/5
**trains [1]** 4192/8
**transcript [7]** 4145/10
4146/24 4147/21 4155/19
4160/22 4186/1 4213/11
**transcription [1]** 4146/25
**transcripts [1]** 4147/4
**transmission [17]** 4231/25
4232/1 4232/3 4232/4
4232/9 4248/5 4249/3
4249/9 4249/15 4249/18
4250/1 4250/2 4251/2
4251/6 4252/15 4256/8
4256/9
**transport [1]** 4280/7
**transportation [5]** 4166/2
4166/3 4278/15 4278/22
4291/25
**trash [8]** 4162/7 4162/8
4162/10 4162/11 4162/14
4189/13 4240/9 4240/21
**travel [3]** 4270/23 4302/17
4306/5
**traveling [12]** 4153/19
4217/10 4227/17 4231/12
4231/22 4231/24 4233/15
4244/6 4246/3 4247/18
4247/25 4247/25
**travels [1]** 4204/18
**tremendous [1]** 4279/3
**trend [1]** 4173/4
**trends [5]** 4169/18 4169/18
4169/19 4170/4 4171/3
**trial [20]** 4145/10 4150/21
4151/3 4156/6 4257/5
4258/24 4259/5 4259/6
4260/11 4287/14 4289/13
4291/10 4291/11 4293/7
4298/22 4302/24 4304/14
4309/17 4320/22 4322/20
**trials [3]** 4264/6 4277/8
4314/13
**tried [9]** 4162/22 4241/17
4248/5 4257/15 4258/6
4258/17 4260/12 4291/2
4291/23
**trip [9]** 4222/6 4234/8
4237/5 4253/6 4253/9
4253/11 4253/20 4268/3
4304/11
**trooper [8]** 4178/1 4247/7
4247/22 4248/13 4248/18
4248/22 4252/6 4262/12

**T**

troopers **[2]**   4246/24
   4287/15
trouble **[3]**   4279/22
   4297/14 4297/20
truck **[84]**   4153/24 4158/18
   4160/6 4161/13 4162/7
   4162/19 4162/24 4163/3
   4166/23 4167/5 4173/22
   4174/3 4176/3 4178/7
   4178/12 4178/13 4178/19
   4180/3 4180/4 4180/6
   4180/11 4180/18 4184/14
   4186/9 4188/8 4215/13
   4215/23 4215/25 4216/7
   4216/15 4221/16 4221/17
   4221/19 4221/20 4223/15
   4223/15 4227/25 4229/14
   4231/25 4234/2 4234/6
   4234/11 4237/3 4240/23
   4240/24 4241/1 4241/5
   4241/5 4243/25 4250/9
   4253/1 4253/5 4253/21
   4254/25 4256/8 4262/16
   4262/21 4263/23 4264/1
   4264/9 4264/10 4264/11
   4264/17 4264/17 4264/21
   4265/10 4265/11 4265/12
   4265/19 4266/5 4266/6
   4266/15 4270/6 4272/6
   4281/23 4284/7 4289/2
   4290/21 4294/12 4294/18
   4295/1 4295/2 4295/13
   4295/16
truck's **[1]**   4294/15
trucker **[1]**   4263/3
truckers **[2]**   4255/5
   4269/13
trucks **[1]**   4234/12
true **[45]**   4175/7 4175/8
   4177/21 4179/14 4234/12
   4234/15 4234/16 4234/23
   4236/6 4236/7 4236/19
   4237/8 4237/9 4237/11
   4237/12 4239/2 4239/7
   4239/18 4239/23 4240/4
   4240/22 4241/1 4241/17
   4242/1 4242/19 4244/11
   4244/25 4245/12 4245/17
   4246/7 4246/16 4246/19
   4247/1 4247/5 4247/20
   4248/13 4249/4 4249/7
   4250/22 4250/23 4252/10
   4289/15 4299/18 4301/5
   4314/19
truly **[1]**   4202/15
truth **[3]**   4268/10 4291/12
   4292/24
try **[10]**   4171/19 4232/8
   4268/4 4288/2 4288/2
   4288/24 4289/1 4289/5
   4295/10 4301/24
trying **[6]**   4149/19 4162/11
   4284/23 4290/9 4297/25
   4319/6
tuck **[1]**   4221/9
turn **[2]**   4176/16 4269/11
turnaround **[2]**   4280/1
   4280/2
turning **[3]**   4151/21
   4178/23 4223/7

turns **[1]**   4254/7
turzs **[1]**   4291/15
TV **[1]**   4303/25
tweaks **[1]**   4194/17
Twenty **[1]**   4184/16
Twenty-five **[1]**   4184/16
twice **[4]**   4197/11 4235/23
   4306/22 4306/23
twist **[1]**   4301/25
two **[58]**   4152/11 4154/11
   4156/4 4164/20 4165/2
   4165/18 4165/19 4166/9
   4167/21 4168/6 4172/5
   4172/5 4184/5 4189/7
   4191/5 4192/14 4204/7
   4207/18 4210/17 4212/7
   4216/1 4216/7 4216/16
   4216/20 4219/23 4219/25
   4221/12 4229/25 4232/7
   4232/19 4238/9 4238/11
   4238/12 4238/17 4249/2
   4251/2 4257/21 4264/16
   4267/22 4268/10 4270/3
   4271/14 4272/10 4274/19
   4290/6 4290/6 4298/18
   4298/19 4303/2 4303/4
   4303/5 4303/6 4306/4
   4306/14 4307/22 4309/11
   4311/21 4314/6
two-inch **[1]**   4219/23
two-lane **[1]**   4274/19
twofold **[1]**   4227/7
type **[6]**   4165/12 4217/2
   4243/18 4244/6 4244/18
   4246/22
types **[3]**   4157/5 4170/17
   4284/18
typical **[1]**   4189/20
typically **[1]**   4167/22

**U**

U.S **[3]**   4165/18 4210/1
   4278/19
unable **[3]**   4231/22 4247/19
   4247/24
unacceptable **[1]**   4308/4
unbelievable **[1]**   4287/14
uncertainty **[1]**   4303/10
under **[30]**   4155/7 4166/8
   4177/21 4177/23 4183/7
   4204/25 4220/22 4221/13
   4227/16 4236/10 4239/9
   4239/11 4242/1 4243/10
   4244/22 4244/24 4245/7
   4246/4 4246/17 4246/18
   4246/25 4247/3 4249/23
   4255/1 4263/9 4268/11
   4269/8 4286/14 4292/22
   4306/16
undercutting **[1]**   4195/21
underneath **[2]**   4162/12
   4162/15
understandable **[1]**   4298/14
understood **[4]**   4176/23
   4177/22 4178/9 4205/22
undisputed **[1]**   4276/3
unduly **[1]**   4212/6
unfortunate **[1]**   4279/14
unique **[2]**   4157/4 4168/8
unit **[3]**   4152/11 4262/11
   4265/20
UNITED **[7]**   4145/1 4145/4

4145/11 4209/23 4209/24
   4258/8 4309/21/25
unless **[4]**   4161/22 4161/23
   4263/16 4322/1
unlike **[1]**   4265/2
unloaded **[1]**   4235/2
unsafe **[1]**   4284/2
unsuspecting **[1]**   4306/24
unturned **[1]**   4278/8
unusual **[2]**   4177/2 4283/16
up **[79]**   4151/10 4156/13
   4160/21 4161/13 4165/4
   4166/11 4166/11 4167/22
   4167/23 4168/16 4168/19
   4172/6 4177/14 4180/23
   4182/11 4182/16 4186/25
   4188/13 4188/20 4188/24
   4189/11 4189/12 4201/3
   4207/4 4214/10 4220/16
   4221/12 4224/13 4229/25
   4236/25 4242/15 4247/10
   4247/15 4253/4 4254/5
   4256/21 4263/14 4264/20
   4264/22 4266/1 4266/20
   4267/14 4268/23 4269/1
   4272/23 4276/10 4277/10
   4278/11 4279/1 4279/20
   4282/1 4282/12 4282/17
   4283/2 4288/14 4290/19
   4291/9 4291/13 4294/9
   4294/9 4295/14 4296/5
   4296/5 4296/9 4296/10
   4296/10 4297/1 4297/11
   4299/6 4300/3 4300/8
   4301/11 4303/22 4307/9
   4312/1 4312/9 4313/20
   4320/5 4321/11
upfront **[1]**   4258/15
upgrade **[2]**   4183/11 4233/8
uphill **[2]**   4181/21 4182/5
UPS **[5]**   4281/20 4281/22
   4281/23 4282/1 4282/4
UPS's **[1]**   4281/24
usual **[1]**   4237/2
utilize **[1]**   4157/25

**V**

Valentino **[1]**   4154/21
valid **[2]**   4157/19 4157/21
validated **[1]**   4169/5
valleys **[1]**   4192/9
value **[1]**   4284/2
values **[4]**   4163/21 4166/12
   4182/22 4279/5
variables **[1]**   4174/8
variation **[2]**   4163/22
   4181/20
varied **[2]**   4168/19 4168/20
varies **[1]**   4221/2
various **[3]**   4174/7 4174/18
   4181/11
vehicle **[23]**   4153/2
   4153/18 4157/9 4159/1
   4163/17 4165/3 4166/17
   4167/6 4169/6 4169/8
   4169/9 4182/25 4240/13
   4240/20 4244/7 4245/8
   4246/14 4249/6 4253/2
   4255/7 4269/3 4278/24
   4298/9
vehicles **[20]**   4153/24
   4158/3 4158/3 4164/21

## V

vehicles... [16]  4165/2
  4166/7 4166/9 4170/23
  4170/23 4185/20 4234/12
  4237/8 4240/13 4256/11
  4256/15 4265/14 4265/15
  4265/18 4265/21 4266/5
velocity [1]  4164/22
verdict [26]  4155/10
  4195/21 4201/12 4201/21
  4202/13 4203/5 4203/7
  4205/18 4207/1 4207/10
  4207/13 4207/18 4207/21
  4208/2 4211/9 4212/16
  4286/16 4307/10 4309/24
  4311/10 4311/12 4311/12
  4311/16 4312/1 4312/4
  4316/7
verdicts [1]  4286/17
verification [1]  4300/23
versa [2]  4199/17 4318/16
version [3]  4194/17 4199/3
  4200/2
versus [3]  4145/5 4206/25
  4209/25
vicariously [1]  4199/14
  4318/13
vicariousness [1]  4212/19
vice [1]  4199/17
video [6]  4147/16 4172/23
  4190/15 4241/15 4264/24
  4298/19
videos [1]  4300/23
videotape [2]  4147/14
  4294/23
view [3]  4241/9 4241/22
  4296/15
vinyl [1]  4219/8
violate [3]  4155/10
  4207/23 4286/17
violated [2]  4203/13
  4275/10
violating [1]  4297/13
violation [1]  4208/23
vis [4]  4167/3 4167/3
  4170/17 4170/17
vis-a-vis [2]  4167/3
  4170/17
visa [1]  4318/16
visa-versa [1]  4318/16
visible [4]  4242/4 4266/16
  4290/21 4290/21

## W

WAGSTAFF [1]  4145/18
wait [3]  4196/9 4201/16
  4201/17
waited [1]  4230/17
waiver [1]  4278/22
walking [1]  4223/8
walks [1]  4295/11
wall [1]  4165/19
wanton [2]  4196/24 4308/25
wants [3]  4151/11 4206/20
  4295/8
WARNER [1]  4146/2
warning [2]  4263/16
  4263/17
warranted [1]  4284/24
warrants [1]  4284/11
Waste [1]  4188/23

watched [1]  4314/13
waves [1]  4269/18
wavered [1]  4264/8
wavy [1]  4171/11
ways [2]  4296/16 4300/18
wealth [16]  4290/1 4303/7
  4305/21 4306/12 4306/18
  4306/20 4309/13 4317/6
  4319/20 4319/22 4320/3
  4320/8 4320/9 4320/19
  4320/23 4321/7
weaving [3]  4177/3 4191/21
  4298/20
website [1]  4281/9
weeds [1]  4297/11
week [6]  4184/8 4258/23
  4291/20 4291/20 4297/19
  4315/3
weeks [10]  4175/1 4232/7
  4250/2 4259/25 4260/1
  4285/7 4288/5 4290/6
  4290/17 4304/17
weigh [3]  4235/16 4285/10
  4285/22
weighed [3]  4235/9 4235/10
  4235/18
weighs [1]  4166/2
weight [2]  4235/19 4235/23
West [1]  4145/15
Westchester [1]  4146/3
wetter [1]  4226/15
whatsoever [1]  4280/25
wheel [5]  4204/11 4224/24
  4232/15 4256/10 4271/10
wheels [3]  4193/23 4193/24
  4194/1
whereas [3]  4199/3 4200/18
  4309/17
whole [7]  4173/15 4197/23
  4219/14 4254/2 4295/1
  4303/6 4319/7
willful [2]  4196/24 4309/1
Williams [1]  4210/1
wind [3]  4217/11 4217/16
  4219/23
window [5]  4185/3 4185/6
  4265/5 4265/7 4294/16
wise [1]  4233/16
withdrawn [1]  4150/17
witness [5]  4149/13
  4174/22 4215/12 4264/12
  4300/21
witnesses [6]  4155/24
  4156/4 4268/21 4294/8
  4294/14 4308/20
wobble [1]  4269/18
woefully [6]  4261/6 4261/8
  4261/13 4261/16 4281/3
  4282/14
woke [1]  4253/4
woman [1]  4204/17
wonder [1]  4212/18
wondering [1]  4212/17
word [5]  4197/3 4244/18
  4296/4 4296/7 4296/13
wording [2]  4200/23 4243/1
words [8]  4195/15 4201/9
  4201/22 4203/4 4207/14
  4238/14 4261/8 4310/8
workplace [1]  4277/18
works [5]  4167/13 4167/19
  4218/13 4223/16 4274/7

world [3]  4161/20 4261/10
  4263/15
worried [1]  4306/13
worry [1]  4165/1
worse [1]  4152/6
worth [7]  4292/20 4309/16
  4317/15 4317/17 4319/19
  4319/22 4320/23
wrap [3]  4218/16 4282/17
  4307/9
wrapped [2]  4220/18
  4221/13
wreck [1]  4302/14
wrecks [1]  4165/20
write [1]  4278/25
writing [1]  4214/15
written [3]  4200/17 4212/5
  4301/14

## Y

year [6]  4268/10 4277/23
  4298/18 4303/1 4303/2
  4306/5
years [12]  4161/20 4233/21
  4267/16 4268/10 4268/18
  4271/14 4277/2 4277/5
  4277/8 4296/4 4296/7
  4300/8
yellow [2]  4176/3 4268/18
yesterday [2]  4213/13
  4264/24
YORK [14]  4145/1 4145/4
  4146/4 4146/8 4252/25
  4253/20 4267/25 4268/2
  4268/13 4280/14 4285/9
  4297/12 4307/13 4307/22
yourself [11]  4213/24
  4215/19 4227/17 4250/12
  4275/5 4275/6 4282/25
  4283/18 4292/18 4298/16
  4310/19
yourselves [2]  4288/6
  4311/1
YRC [1]  4268/18

## Z

zero [21]  4163/19 4183/7
  4183/15 4183/19 4183/23
  4191/12 4195/20 4204/25
  4205/2 4277/18 4277/18
  4277/18 4277/18 4277/19
  4277/19 4277/19 4277/21
  4278/5 4278/6 4279/15
  4285/2
zone [2]  4244/6 4262/8