UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


----------------------------X
                    :

JOSE BAUTA,           :

                  :    14-CV-3725 (RER)

          Plaintiff,  :

                  :    December 13, 2019

                  :

          V.         :    Brooklyn, New York

                  :

GREYHOUND LINES, INC.,  :

et al.,         :

          Defendant.  :

----------------------------X


TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE RAMON E. REYES, JR
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        RAYMOND McELFISH, ESQ.


For the Defendant:        BRADLEY BARMEN, ESQ.
                             THOMAS MANNION, ESQ.
                             JONATHAN SHAUB, ESQ.
                             STEVEN SAAL, ESQ.

Audio Operator:


Court Transcriber:        ARIA SERVICES, INC.
                             c/o Elizabeth Barron
                             102 Sparrow Ridge Road
                             Carmel, NY 10512
                             (845) 260-1377


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1              THE CLERK:  Civil cause for telephone
 2    conference in case number 14-CV-3725, Bauta v.
 3    Greyhound Lines, Inc., et al.
 4              Counsel for the plaintiff, please state your
 5    name for the record.
 6              MR. McELFISH:  Raymond McElfish for the
 7    plaintiff.
 8              THE CLERK:  And counsel for defendants?
 9              MR. BARMEN:  Brad Barmen for defendants
10    Greyhound Lines, Inc. and Sabrina Anderson.
11              MR. SAAL:  Steven Saal for defendants
12    Greyhuond Lines and Sabrina Anderson.
13              MR. BARMEN:  And as I stated, Jonathan Shaub
14    was supposed to be on.  I don't understand why he's not
15    but he may join us.
16              THE COURT:  I hope it wasn't to argue that
17    Valentino issue again.
18              MR. BARMEN:  It wouldn't be us, Judge, if we
19    weren't trying that one.
20              THE COURT:  Thank you for calling in,
21    gentlemen.  I needed to speak with you about scheduling
22    the retrial on past and future pain and suffering and
23    vicarious punitive damages.  I want to apologize for
24    taking as long as we did to issue the decision.  It
25    wasn't an easy task.  We thought long and hard about
```

1    it.  But in thinking about this retrial, I thought -- I

2    sort of came back to something that Mr. McElfish had

3    argued for in the motion for a new trial, something

4    that I thought seriously about but ended up not going

5    for it.  That was a Gasperini (ph) hearing, I think is

6    what you called it.

7              I had an initial problem with that because

8    of the case law that says that in federal court, you

9    can't do additur.  Put aside whether that should be the

10   lqaw or not.  The reasoning behind that is that additur

11   violates the right to a jury trial.  But couldn't you

12   waive your right to a jury trial on the retrial?

13             MR. McELFISH:  This is McElfish.  I don't

14   have it in front of me but my recollection of it was

15   that it wasn't waivable.  I can go back and look.  I

16   certainly don't want to give the impression that I

17   think that's true but I do have a recollection of that,

18   that it may not be waivable, but I'll check.

19             THE COURT:  I would appreciate if you would

20   check and we'll check, too.  It seems kind of odd

21   because you can waive your right to a jury trial

22   initially, right?  You could have -- file a complaint

23   or whatever cause of action and not demand a jury, not

24   demand it --

25             MR. MANNION:  Hi, guys, this is Tom.

```
1              THE COURT:  Who is this now?

2              MR. MANNION:  Tom Mannion.

3              THE COURT:  Okay.  We'll look into that but

4   my suggestion is this:  We're looking at a three-week

5   -- possibly a three-week retrial on past and future

6   pain and suffering and vicarious punitive damages.

7   That's not an inexpensive proposition.  We've already

8   had evidence --

9              MR. McELFISH:  Judge, I'm sorry to interrupt

10  you.  Whoever just came on the phone, there's a lot of

11  background noise.  I can't hear anything you're saying.

12  I apologize for interrupting you.

13             THE COURT:  That's quite all right.  I want

14  you to be able to hear.

15             MR. McELFISH:  I can't hear.  Whoever came

16  on has a lot of background noise going.

17             THE COURT:  Can you mute that phone?

18             MR. MANNION:  I already did.  I just muted

19  it and then I just unmuted it to say this.  I'm going

20  to mute it right now.  If you still hear it, it's not

21  me.

22             THE COURT:  Is that better, Mr. McElfish?

23             MR. McELFISH:  For the time being, yes,

24  unless it happens again.

25             THE COURT:  My suggestion is this:  Let's
```

1   try these issues to the bench and we could structure --

2   if you even want to put on new evidence or you want to

3   have some sort of argument cititng me to the evidence

4   that's already in the record.  I thihnk it would be

5   more efficient and it would expedite things greatly if

6   we did that.  Think about it and get back to me.

7           MR. McELFISH:  May I respond to that real

8   quick?

9           THE COURT:  Yeah.

10          MR. McELFISH:  So I know that that was

11  raised early on, right after the initial verdict.  I

12  think that was in the original post-trial motions.  I

13  thought that under the circumstances at the time, it

14  would have been a good idea.  But since now -- just my

15  gut reaction to it is that since now we not only have a

16  retrial on the pain and suffering side, I would like a

17  jury to look at the punitive damage issue, and I don't

18  want to create any more appellate issues.  I think we

19  can all agree on that.

20          I think you did a good job, for what it's

21  worth, fixing whatever there was to be fixed and

22  setting it straight.  I don't want to get back off

23  track on anoither issue that could potentially raise

24  appellate issues for the defendants.  I thinik another

25  jury trial would be just as easy, put the evidence on

1   and be done with it.  Let them go to the Second Circuit

2   and that's it.  That's my inclination.

3          MR. BARMEN:  Judge, this is Barmen, if I

4   may.  My understanding is if both parties agree to

5   waive a jury, it can be done, but if one party doesn't

6   agree to the waiver, they're entitled to a jury.

7   Separtae and apart from that, it's the vicarious

8   liability on the punitive issue in your recent order

9   that I was hoping to get some clarity on.  My

10  understanding of vicarious liability is if me, the

11  employee, is liable for something and I'm in the course

12  and scope, then my employer is vicariously liable for

13  that -- whatever that liability is.

14          In this case, the jury found Sabrina

15  Anderson liable for reckless conduct.  Greyhound is

16  vicariously liable for that.  So the verdict against

17  Sabrina, the 1.6 for punitive damages that they found

18  relative to her individual conduct, Greyhound is on the

19  hook for that.

20          THE COURT:  That's not correct.  That's only

21  partially correct.  You need to read <u>Dillow</u> (ph) and

22  the other cases that talk about it.

23          MR. BARMEN:  I have read it, Judge.  I have

24  read them.

25          THE COURT:  The employer can be liable in a

1   separate amount.

2          MR. McELFISH:  That's the Dillow case,

3   gentlemen.

4          THE COURT:  Based on -- let me finish.

5   Based on the employee's conduct and the other punitive

6   damage elements or factors and the employer's net

7   worth, so it could be a separate amount.  It could be

8   greater, less.  It's not that the employer pays the

9   employee's judgments.  The employee is liable for their

10  punitive damages and the employer can be liable for a

11  separate amount.  That's the Pennsylvania law.

12         MR. BARMEN:  I understand that --

13         THE COURT:  It's different than in other

14  states but that's Pennsylvania law.

15         MR. BARMEN:  Your Honor, in Dillow, the

16  employer had also been found to be liable for that type

17  of conduct, which now, based on the decision from the

18  Superior Court in Pennsylvania, that court determined

19  that --

20         THE COURT:  Wrong, wrong, Mr. Barmen.

21  You're wrong, okay?

22         MR. BARMEN:  Respectfully, I don't read it

23  that way.

24         THE COURT:  Mr. Barmen, Mr. Barmen, you need

25  to have Mr. Saal take a look at this or someone else in

1    addition to you --

2            MR. BARMEN:  We have.

3            THE COURT:  -- because you're wrong.

4            MR. SHAUB:  Your Honor, it's Jonathan Shaub.

5    I apologize, I'm late.  I was at my son's Christmas

6    recital.  I respectfully agree with Mr. Barmen.  If you

7    look at the part of the decision, it says "defendant's

8    wanton reckless conduct," so there was a finding of

9    independent liability against the trucking company in

10    Dillow.  There's no other case in Pennsylvania that has

11    these two line items.

12            THE COURT:  You're wrong, you're wrong.

13    You're wrong, Mr. Shaub.  I researched it at length,

14    okay?  An employer is vicariously liable for their

15    employee's punitive conduct if the employee was acting

16    within the scope of the employment and acting for the

17    benefit of the employer.  There are three factors, and

18    they can be liable for a different amount of punitive

19    damages.

20            MR. SHAUB:  Respectfully, that then is

21    creating an independent tort.  That's not vicarious

22    liability, that's basically saying they're negligent or

23    they're independently punitively liable, and we're just

24    talking about Pennsylvania law.  I think there are some

25    real due process concerns here with giving two awards

1    for these --

2              THE COURT:  Raise that with the Circuit.

3    Raise that with the Circuit.  You want to make another

4    motion?  Is that what you're telling me?

5              MR. SHAUB:  We would like to brief the issue

6    because we believe we can persuade you that under

7    Pennsylvania law, this is an anomalous outcome and

8    under the Constitution, there's a real issue with this,

9    and we'd be happy to direct you to the authority on

10   this.  Dillow is an outlier, which is --

11             THE COURT:  Fine.  Make your motion by the

12   end of next week.

13             MR. SHAUB:  So fourteen days for a

14   reargument motion?  You want us to treat this as a

15   moition for reargument, your Honor?

16             THE COURT:  No, this is a new argument

17   you're making.  You didn't make it -- you could have

18   made this in the prior motion, you didn't make it.

19             MR. SHAUB:  We didn't think that the

20   vicarious liability was actually a path to liability.

21   It was independent liability.  Mr. McElfish never pled

22   a claim for vicarious liability for punitive damages

23   against Greyhound, so we're just as much --

24             THE COURT:  Judge Folietta charged the jury

25   in Pennsylvania on vicarious liability for punitive

1    damages.

2              MR. SHAUB:  Your Honor, if we go back and

3    look at plaintiff's complaint, there's no allegation to

4    that effect, so we'd be guessing at what happened in

5    Pennsylvania and reading that into plaintiff's

6    complaint.

7              THE COURT:  We talked about this in our case

8    when we were talking about the jury charge.

9              MR. BARMEN:  Judge, this is Barmen.  I don't

10   -- there was never any conversation that I recall where

11   we talked about a separate potential number fixed

12   against the company based on Sabrina Anderson's

13   conduct.  The jury was asked, do you find that there

14   was reckless conduct relative to Sabrina?

15             THE COURT:  No, we did.

16             MR. BARMEN:  And separate and distinct --

17   that's what the jury was asked.  Fix a number against

18   Sabrina and fix a number against the company.  Based on

19   the collaterial estoppel finding that --

20             THE COURT:  You didn't read the colloquy in

21   the charge conference.  You were there.  You should

22   remember it.  I made a mistake and I didn't follow

23   through with what we discussed in the charge conference

24   and put it in the actual charge.

25             MR. BARMEN:  So you're saying that in the

1   first trial, there should have been (ui)?

2          THE COURT:  Judge Folietta charged the jury

3   the right way and it had a discussion of vicarious

4   liability.  Look, you want to make a motion, fine.

5          MR. McELFISH:  Judge, I think they've made

6   enough motions.  I mean, this thing has got to go to

7   resolution.

8          THE COURT:  Well, no one seems to want that.

9          MR. McELFISH:  They just keep coming up with

10  new stuff that's baseless.  Everything they do is

11  baseless.

12         MR. SHAUB:  This is a brand new issue based

13  on the ruling that came out.  This was never anything

14  that was an issue prior to (ui).

15         MR. McELFISH:  Let it be dealt with in the

16  Circuit.  The law in Pennsylvania is clear.

17         MR. SHAUB:  Frankly, the law in Pennsylvania

18  is not clear.  It's one intermediate Pennsylvania

19  Appellate Court decision that's readily

20  distinguishable.  Respectfully, I have not seen another

21  decision with two line items that awards one against

22  the employee and one against the employer on a theory

23  of vicarious liability.

24         MR. McELFISH:  Okay, then let me ask you

25  this, and this should put the matter to rest.  Why

1   didn't Judge Folietta see that difference?  Why did

2   Judge Folietta rely upon the <u>Dillow</u> decision?  Why did

3   the Superior Court of Pennsylvania affirm vicarious

4   liability based on the <u>Dillow</u> decision and others?

5   Seriuosly, Mr. Shaub, this is ridiculous.  It was a

6   single verdict --

7          MR. BARMEN:  Go ahead, John.

8          MR. McELFISH:  If the Court of appeals

9   thought that you were right, they would have decided

10  that.

11         MR. SHAUB:  It was a single line item in

12  Pennsylvania, which is a distinguishing factor in this

13  casde.  We are liable for Sabrina's 1.6, no one

14  disputes that.  You just don't get to double recover

15  for the same thing.

16         MR. McELFISH:  That's not what <u>Dillow</u> says.

17         MR. SHAUB:  (Ui) due process laws, it's not

18  consistent with Pennsylvania law, and we look forward

19  to having the opportunity to brief this issue.

20         MR. McELFISH:  Well, I don't think you

21  should get it because you've already had the

22  opportunity, number one.  Number two, Judge Folietta

23  didn't agree with you.  Number three, the Superior

24  Court of Pennsylvania didn't agree with you.  If they

25  felt that way about it, they would have ruled that way.

1   They did not and they cited Dillow.

2           MR. SHAUB:  You can oppose us in our motion.

3           MR. McELFISH:  I don't want to oppose any

4   more of these ridiculous motions.  I want to try the

5   case.

6           THE COURT:  Stop, stop, stop.

7           MR. McELFISH:  Let me just ask this, Jduge:

8   Don't you think, since everybody was so anticipating

9   the Superior Court decision, that if the Superior Court

10  of Pennsylvania thought Mr. Shaub had a point, they

11  would have raised that?  That was argued by them.  He

12  was part of that appellate team and they did not --

13          MR. SHAUB:  I was not a part of that

14  appellate team.

15          MR. McELFISH:  Stop interrupting me.

16          THE COURT:  Stop, please.

17          MR. SHAUB:  Just be accurate, Ray.

18          MR. McELFISH:  Just stop interrupting me.

19          THE COURT:  Everyone stop talking, everyone

20  stop talking.

21          MR. McELFISH:  May I finish?

22          THE COURT:  No.

23          MR. McELFISH:  Okay.

24          THE COURT:  I need to look at something.

25  Give me a minute.

1          So, Mr. Shaub, you want to make a motion to

2    reargue?

3          MR. SHAUB:  I think we would make a motion

4    to reargue and say that plaintiff's entire punitive

5    case should be dismissed and it's done against

6    Greyhound.  If your Honor would like us to proceed --

7          THE COURT:  So you say you have fourteen

8    days to make that motion?

9          MR. SHAUB:  Yes.

10         THE COURT:  So why is the end of next week

11   not good?

12         MR. SHAUB:  No, it absolutely is, your

13   Honor.  I just was trying to clarify what you envision

14   this motion looking like.

15         THE COURT:  I don't envision -- I don't

16   envision it looking like anything.  It's your motion.

17   You should have the vision.

18         MR. SHAUB:  Okay, fair enough, your Honor.

19   I just was trygin to get some clarity as to deadlines

20   with the end of the year approaching.  As our local

21   rules say, it's fourteen days.  If that's the time

22   frame you want it in, we might style it as a motion for

23   reargument.

24         THE COURT:  You style it however you want

25   to.  End of next week is fourteen days from the date of

1   my decision.

2          MR. SHAUB:  Right.

3          THE COURT:  Then you respond in kind, Mr.

4   McElfish, but we're setting a trial date.  If you don't

5   agree to waive the jury trial, that's fine.  I'll give

6   you the dates that I currently have available.  How

7   long, three weeks do you think is enough?

8          MR. McELFISH:  I think three.  Depending on

9   the scope of the evidence on -- because we already know

10  the scope of the evidence in the pain-and-suffering

11  case basically, so depending on the scope of the

12  evidence in the punitive case, two to three weeks.

13         MR. BARMEN:  Judge, this is Barmen.  Put

14  aside the fact that we're going to brief this issue and

15  we believe that there is a legitaimte issue.  Put that

16  aside.  What is this punitive trial comprised of?  Are

17  we just looking then at Sabrina Anderson's conduct?

18         THE COURT:  Yes.

19         MR. BARMEN:  Okay, so nothing about the

20  company, nothing about fatigue management, nothing

21  about G40, because if that's the case, that's a couple

22  of days.

23         THE COURT:  It's about Sabrina Anderson's

24  conduct and Greyhound's net worth, and the jury would

25  be instructed that -- along the lines of what Judge

1  Folietta instructed the jury.

2        MR. BARMEN:  Judge, for my reference -- I'm

3  not assuming you have it in front of you but you keep

4  referring to Judge Folietta's -- how he instructed the

5  jury.  Can you reference me to which instruction so I

6  can pull it?

7        THE COURT:  Emily, do you have a quick --

8  Mr. Saal knows where it is because we asked Mr. Saal to

9  point it out in the rexord where the Pennsylvania jury

10  instruxctions were, where he actually read them to the

11  jury.

12        THE CLERK:  There's also a cite in the order

13  that was issued to the exact instruxtion.

14        MR. SAAL:  We're talking about the trial

15  volume from the Pennsylvania case, correct?

16        THE CLERK:  Yes.

17        THE COURT:  Yes.

18        MR. SAAL:  We have that, Brad.

19        MR. BARMEN:  Can someone point out to me

20  where it is?

21        MR. McELFISH:  It's in the order, they said,

22  Judge Reyes' order.

23        MR. SAAL:  I believe it was -- wasn't it

24  570, John?

25        MR. SHAUB:  I don't have it offhand.

```
1              MR. SAAL:  We were talking about it that
2    night.
3              THE COURT:  It's not jumping out at me.  I'm
4    scanning the decision, hold on.
5              MR. SAAL:  It's document 71 on ECF, and then
6    if you click on that, there are exhibits within that
7    that include the trial volumes.
8              THE COURT:  All right, so here are the
9    dates:  I'm still thinking three weeks.  January 21st,
10   February 3rd, February 17th, March 2nd, April 27th, May
11   11th, or May 26th.
12             MR. BARMEN:  Judge, this is Barmen.  I'm
13   engaged to start a trial in Astibule (ph), Ohio on
14   Tuesday, January 21st that will last two and a half
15   weeks, so January and February are certainly out for
16   me.
17             THE COURT:  Someone is playing Candy Crush.
18             MR. BARMEN:  I'm in a car.  That was just
19   the car starting, your Honor.  My car makes funny
20   noises.
21             MR. McELFISH:  The only date I can do is
22   March 2nd.  That's the best date.
23             MR. SAAL:  I have a trial starting on
24   February 24th that should last two weeks, so March 2nd
25   is --
```

1          MR. BARMEN:  And I have another trial set to

2     start on March 2nd in (ui) County.  I think that will go

3     away but it is on the books for right now.  The April

4     date is good for me, your Honor, the May date is good

5     for me.  Like I said, I think the March date will clear

6     but as of now, I have a conflict of a case that's been

7     pending for some time.

8          Tom, are you there?  Do you have your

9     calendar available?

10          THE COURT:  You're saying, Mr. McElfish, you

11     can't do April?

12          MR. McELFISH:  I have a five-week starting

13     in front of the Eastern District federal court in

14     California in front of Judge Mendez on May 11th.  That's

15     scheduled for four to five weeks, and I don't see how I

16     could do the April date and bump into his trial date,

17     so I think the March 2nd date works the best.

18          MR. BARMEN:  Respectfully, it might work the

19     best for you, it's problematic for me.  Again, I

20     haven't heard from Tom.  I know Tom is on the call.  We

21     have to consider Tom's trial schedule as well.

22          THE COURT:  This is why you should waive a

23     jury trial and let me do it.

24          MR. McELFISH:  Your Honor, I'm not waiving a

25     jury trial because they have a bunch of things on

1   calendar.

2           THE COURT:  You should waive a jury trial

3   because three weeks of expenses at the Marriott in

4   Brooklyn is not insignificant to your client.

5           MR. BARMEN:  Again, I just want to be able

6   to say -- hang on a minute.  For the defendants, I

7   would recommend it.  I would need approval for waiver

8   of a jury trial.  But I certainly -- based on what

9   you're saying, your Honor, I would recommend it but I

10  can't commit to it.  It's really a moot point if Mr.

11  McElfish won't agree to it.

12          MR. McELFISH:  I'm not agreeing to it.

13          MR. BARMEN:  Understanding that, Mr.

14  McElfish shouldn't get to dictate the date based on

15  what's most convenient for him, when there are other

16  people that have calendars as well.

17          THE COURT:  Do you want to do it June 8th?

18          MR. BARMEN:  I'm sorry, say that date

19  against, please?

20          THE COURT:  June 8th or June 22nd.

21          MR. BARMEN:  That works for me, Barmen, your

22  Honor.  June 8th would work for me.  The 22nd would not

23  but the 8th would.

24          MR. McELFISH:  The 8th doesn't work for me

25  because I have that four- to five-week in front of the

1   Eastern District in California starting on May 11th.

2              MR. BARMEN:  The 22nd date, it's a situation

3   again where I have a trial scheduled that I think will

4   go away.  We're mediating the case in February.

5              MR. McELFISH:  Why don't we just do March 2nd

6   if you think the case is going to go away?  This case

7   is old.

8              MR. SAAL:  I also have a trial and I also

9   frankly have a booked vacation for the last week of

10  March, and if we go a day over three weeks, I'm in

11  trouble.

12             MR. BARMEN:  Ray, respectfully, your

13  calendar is no more important than mine.

14             MR. McELFISH:  I know, but I'm only one and

15  you guys are five.  So come on, guys, seriously.

16             MR. BARMEN:  It's my calendar and Tom's

17  calendar that need to be most considered, along with

18  Steven's because obviously, he's involved.  I don't

19  want to double-book myself for obvious reasons.  Just

20  because I think it's going to go away doesn't mean it's

21  going to go away.

22             THE COURT:  Again, Mr. Barmen, you can't do

23  March 2nd?  You have another trial that's not going

24  away?

25             MR. BARMEN:  No, I have a trial set for

1    March 2nd.  I believe it will go away, your Honor, but I

2    can't -- I certainly can't guarantee that.  I believe

3    that case will go away but as of right now, we still

4    have a trial date that the judge has said is good.  I

5    think the case has a decent chance to resolve between

6    now and March 2nd, but we've been there before on this

7    case and it hasn't happened.  Frankly, it's more likely

8    that the June 22nd trial will go away than the March 2nd

9    trial.

10             THE COURT:  It's more likely that the June

11   22nd --

12             MR. BARMEN:  Yes.  That's the one I'm

13   mediating in February.

14             THE COURT:  That, Mr. McElfish, you don't

15   have your May 11th -- is it May 11th for a five-week

16   trial?

17             MR. McELFISH:  Yeah, that's May 11th, but I'm

18   also booked throughout June.  That's why the March date

19   is better.  May I make a suggestion?

20             THE COURT:  Yes.

21             MR. McELFISH:  Judge, can I make a

22   suggestion?

23             THE COURT:  Yes.

24             MR. McELFISH:  Order the March 2nd trial

25   date.  If Mr. Barmen is engaged, we can move it to a

1   July date at that time.

2           THE COURT:  All right, fine.

3           MR. SAAL:  Respectfully, this is Mr. Saal.

4   I have a trial starting February 24th that could go into

5   that week.  To prep two trials back to back -- also, in

6   full disclose to the Court, I have a booked vacation

7   the last week of March.  I'm on a plane March 21st.  If

8   this trial goes one day past three weeks -- that's the

9   only date I have an issue with is that March 2nd date.

10  I understand I'm not lead counsel but I have been

11  involved in the case and I just wanted the Court to be

12  aware.  That's literlaly the worst date -- for me,

13  that's literally the worst date we've discussed.

14          MR. BARMEN:  Again, if Mr. McElfish is

15  suggesting to set it for March and then if that doesn't

16  work, set it for July, why don't we pick a date in July

17  that we know works?

18          MR. McELFISH:  Because March 2nd will work.

19  We won't go a day over --

20          MR. BARMEN:  For you, Ray.

21          MR. McELFISH:  No, no, hold on, guys.  It's

22  always one against five and that's fine, I like it that

23  way.  But the bottom line is that we won't go a day

24  over so he'll go on his little vacation, and your trial

25  will go away and we'll try the case March 2nd.  What's

1  the big deal?

2          MR. SAAL:  I also have a trial a week

3  before, Ray.

4          MR. BARMEN:  Of course it's not a big deal

5  for you because it's what you want and it's what works

6  for you, but this is not just about you.  If we can

7  pick a date in July we know that works for everyone

8  without any issues and we can lock it in and we don't

9  have a tentative backup date, that makes the most sense

10  for everybody, whether you like it or not.

11          MR. McELFISH:  I want the Court to order

12  March 2nd.

13          THE COURT:  I can't do July 6th.  We're going

14  to put it on March 2nd and if Mr. Barmen's case does not

15  go -- when will you know if it's going away or not?

16          MR. BARMEN:  I won't know until probably

17  mid-February, when the final pretrial hits, if it

18  doesn't settle before then.

19          MR. SAAL:  Your Honor, respectfully, this is

20  Mr. Saal.  My February 24th trial is not going away and

21  I don't know if that trial is going to conclude by

22  March 2nd.

23          THE COURT:  Mr. Saal, you know, there are --

24  you've got Mr. Shaub, Mr. Ortiz, Mr. Barmen, Mr.

25  Mannion.

1          MR. McELFISH:  Mr. Moroknek.

2          THE COURT:  Mr. Moroknek, and probably other

3   folks, too, so as involved as you were, you know, I

4   think they can do without you if need be.  So March 2nd

5   and then if not March 2nd, July -- if the other dates

6   are no good for you, July the 20th is my next

7   availability.

8          MR. BARMEN:  July 20th works for me, Barmen.

9          THE COURT:  Okay.  That's what it will be.

10  All right, anything else?

11         MR. McELFISH:  Yes.  You said that this new

12  motion, whatever it is, is due when?

13         THE COURT:  The end of next week.  That's

14  December what, December 20th.

15         MR. McELFISH:  Okay.  And what's the -- you

16  said I would respond but when do you want me to respond

17  by?

18         THE COURT:  How about January 10th?

19         MR. McELFISH:  And I guess page limits go by

20  local rules or do you want shorter page limits?  It's a

21  narrow issue.

22         THE COURT:  Yeah, I don't want to see 25

23  pages on this.  I want -- I'm not going to set a limit

24  but keep it short.

25         MR. SHAUB:  Understood, your Honor.

 1          MR. McELFISH:  Okay.  Nothing else, your

 2   Honor, from the plaintiff.  Thank you.

 3          THE COURT:  All right.  Do you want to

 4   submit a list of witnesses and exhibits for this

 5   retrial?

 6          MR. McELFISH:  Yeah.  Do you want to set a

 7   pretrial deadline or a conference for witnesses and

 8   exhibits?

 9          MR. BARMEN:  Before we get there, this

10   relates to that.  You had mentioned something about,

11   you don't know if there's going to be new evidence.

12   How could this case involve any evidence that wasn't

13   previously entered the first time around?

14          THE COURT:  Don't you have surveillance

15   videos that you're going to be showing, additional

16   surveillance videos?  Didn't I hear something about

17   that along the way somewhere?

18          MR. BARMEN:  I don't know that we would be

19   showing that.  I mean, if there's a ruling -- if we're

20   retrying the same issue and the first trial had to do

21   with just the evidence that was involved in the

22   Pennsylvania case, how would this be different?

23          THE COURT:  Because it's -- you're talking

24   about the punitive damages.

25          MR. BARMEN:  I'm talking about all of it?

1          THE COURT:  Mr. Barmen, Mr. Bauta had

2    nothing to do with the Pennsylvania case.  There was no

3    evidence.  All we're doing is past and future pain and

4    suffering on him.  That's all different evidence than

5    Pennsylvania.

6          MR. BARMEN:  But the first trial was --

7    okay.  The first trial -- okay.  So they're going to

8    put in additional evidence that they didn't put in in

9    the first trial relative to that injury?

10          THE COURT:  Mr. McElfish, is there any

11   additional evidence that you have that you're going to

12   seek to introduce on past and future pain and

13   suffering?

14          MR. McELFISH:  No.

15          THE COURT:  Do you have any new evidence,

16   Mr. Barmen?

17          MR. BARMEN:  There was subsequent

18   surveillance but I don't know that we would use it.

19          THE COURT:  All right.  So if you want -- if

20   you want to stick to what was in Bauta 1, we can do

21   that.

22          MR. BARMEN:  I'm just trying to figure out

23   what the parameters are.

24          THE COURT:  If you want to do that, that's

25   fine.  If Mr. McElfish agrees, that's fine.  I didn't

1   think there was going to be any new evidence other than

2   maybe these vidoes that you were going to seek to

3   introduce, but I didn't make a ruling on that because I

4   wasn't quite sure.  But if you're not going to use

5   them, fine, it's just what was in Bauta 1.  But I'd

6   still like to see the list of witnesses and the

7   exhibits that you're going to use for past and future

8   pain and suffering and Ms. Anderson's punitive conduct.

9           MR. BARMEN:  Okay, and do you --

10          THE COURT:  Have that by --

11          MR. BARMEN:  Sorry.

12          THE COURT:  Have that by -- March 2nd.  Have

13   that by February 7th and then we can have -- there

14   should be no in limine motions because that was all

15   done in the first trial.  We can have a final pretrial

16   by telephone on February 20th at 2:00 p.m.

17          MR. McELFISH:  February 20th at 2:00 p.m.?

18          THE COURT:  Correct.

19          MR. McELFISH:  There was one in limine issue

20   that's left over, if you want me to tell you about it.

21          THE COURT:  That was left?  What do you

22   mean, that was left over?

23          MR. BARMEN:  How could that be?

24          MR. McELFISH:  There wqas one in limine --

25   there was one in limine issue that was open as we were

1  getting ready to head into the trial date last June,

2  and it got pushed aside because the appellate decision

3  came down.  We had filed briefings.  They were trying

4  to get into the application for employment that

5  mentioned felony, and we had refiled motions on that

6  and briefed that issue.  That was never responded to or

7  ruled on, so that's sitting out there and I think

8  that's important.

9         THE COURT:  Can you tell me what numbers

10  they are on the docket sheet?

11        MR. McELFISH:  I can't right this second but

12  let me see.  I don't have the docket open in front of

13  me.  Let me look.  So the last trial date -- that whole

14  thing with our telephone conference where you continued

15  the trial date when my family member was sick, I think

16  it was the end of May.  I think the letter --

17        THE COURT:  Wait a second, wait a second.

18  Oh, you know what?  I'm sorry, gentlemen, we have -- we

19  have a joint pretrial order already for the second

20  trial.  You filed that back in -- I forgot that you

21  filed that back in May.  So all we would need is

22  anything related to the punitive damages issue.  So

23  that's what you'll file on February the 20th?

24        MR. BARMEN:  I guess that's one of the

25  issues I'm not understanding, Judge, because you

1  mentioend witnesses to try punitive damages against

2  Sabrina Anderson.  That's already been done so I guess

3  how do we do it again?  That will be part of John's

4  brief but that's the part I'm having a real hard time

5  wrapping my head around.  That's already been tried,

6  the jury has already decided it.  Now we're trying the

7  same thing again, when there's already been a

8  determination made.

9        THE COURT:  It's really not hard if you

10  think about it.

11        MR. BARMEN:  I'm not --

12        THE COURT:  Evidence of the employee's --

13  maybe Mr. Shaub can convince me that I'm wrong.  I

14  really don't think I am.  I've looked at the cases in

15  Pennsylvania.  The employee's punitive conduct can be

16  considered, what the employee did that was outrageous,

17  in determining an amount of vicarious punitive

18  liability for the employer.

19        MR. BARMEN:  Okay, but just the way you said

20  it about witnesses to try Sabrina Anderson's punitive

21  liability, that's the part where I keep getting stuck

22  because that's been done.

23        THE COURT:  Mr. Barmen, you did that the

24  first time around, right?

25        MR. BARMEN:  Right.  We did it, the jury

1   made a determination and that determination is still

2   there.

3           THE COURT:  And this jury -- and this jury

4   needs to find -- if they're going to give any amount

5   for vicarious punitive damages on Greyhound for Ms.

6   Anderson's conduct, they need to know what Ms.

7   Anderson's conduct was.

8           MR. BARMEN:  Okay.  I'm not -- we'll brief

9   it.  John understands it better than I do but, again,

10  even you saying that, the idea that we're doing

11  something that's already been done, that's been

12  determined, it's still there.  That hasn't been wiped

13  out by you or by the Pennsylvania court in any way,

14  shape, or form.  I didn't understand it when I read it,

15  I still don't understand it, but I guess I don't have

16  to.

17          THE COURT:  I can't help you with that, Mr.

18  Barmen.

19          MR. BARMEN:  I wish you could articulate it

20  to me in a way that I could understand but --

21  respectfully --

22          MR. SHAUB:  I'll be happy to do it if you

23  want me to.

24          THE COURT:  No.  By February 20th, any --

25  you're going to list the witnesses and exhibits on the

1    punitive damage issue in a separate -- you can do it in

2    a separate pretrial order, so we'll have two.  We'll

3    have one that you already submitted, and I'm going to

4    keep you to that.  It's document number 765 on the

5    docket sheet.  That's for the past and future pain and

6    suffering.  Then we'll have another one for punitive

7    damages.

8            MR. SHAUB:  Judge, on the in limine

9    issue --

10           THE COURT:  Go ahead.

11           MR. SHAUB:  On the in limine issue, I assume

12   this is going to be a bifurcated trial again as well,

13   so we don't need to brief that issue?

14           THE COURT:  Yeah, I mean, bifurcated in the

15   sense that we'll get past and future pain and suffering

16   and then immediately roll into the punitive.

17           MR. McELFISH:  Judge, this is Mr. McElfish.

18   Your Honor, I should say, this is Mr. McElfish.  The

19   felony issue that kept wanting to pop up was briefed in

20   our filing, docket number 766, so that was the one

21   filed right after -- that was our letter brief filed

22   right after the first pretrial order.

23           THE COURT:  Okay, I'll deal with that.

24           MR. McELFISH:  Okay.

25           MR. BARMEN:  This is Barmen again.  So when

1   we're submitting witnesses on the punitive, Judge, am I

2   to understand that since we're just dealing with

3   Sabrina Anderson's conduct, this is not going to be a

4   situation where Mr. McElfish is going to be able to

5   parade a whole bunch of Greyhound executives in because

6   their conduct is not relevant.  Is that accurate?

7          THE COURT:  Correct, correct.

8          MR. McELFISH:  Well, their conduct might be

9   accurate (sic) as it relates to Anderson.  I'll make

10  that showing.

11         THE COURT:  No, no, that was dealt with by

12  the Pennsylvania court.  Greyhound's conduct, its own

13  conduct is irrelevant.  It's Anderson's conduct that

14  they can be held vicariously liable for.  You folks,

15  this is your doing.  Well, it's really Mr. McElfish's

16  doing.

17         MR. BARMEN:  Your Honor, I'm loathe to

18  remind you that we asked you to stay the whole thing

19  until after the Pennsylvania court of appeals ruled.

20         MR. McELFISH:  Say that again?

21         THE COURT:  He's saying it's my fault.  I

22  should have waited.

23         MR. BARMEN:  No, no, well --

24         THE COURT:  That's what you just said.

25         MR. BARMEN:  Well, we were concerned that

1    these kind of issues could pop up.

2              MR. McELFISH:  Why don't we wait until the

3    Supreme Court of Pennsylvania rules.  Oh, you settled

4    it, sorry.

5              MR. BARMEN:  Right, so there's no further --

6              MR. McELFISH:  Can we go?

7              THE COURT:  To the Second Circuit?  You

8    could if you ask for an interlocutory order.

9              MR. McELFISH:  I was trying to be funny,

10   Judge, by saying that they settled it.

11             MR. BARMEN:  Wait a minute, wait a minute.

12   Would you certify it, Judge?  Would you certify this

13   question?

14             THE COURT:  What question?

15             MR. BARMEN:  On the issue of the vicarious

16   liability.

17             THE COURT:  I don't know.  If you want to

18   ask for that, fine.  Could I certify something like the

19   court of appeals does to the New York court of appeals?

20   Could I go to the Pennsylvania --

21             MR. BARMEN:  Supreme Court?

22             THE COURT:  Yes.

23             MR. SHAUB:  I'm not sure you can, your

24   Honor, but we can research that for you.  I think it

25   would have to come from the Circuit.

```
1               THE COURT:  Maybe that's what's going to

2   happen, so you won't get an ultimate decision for

3   another couple three years at least.

4               MR. SHAUB:  Matter 10, 11, and 12.

5               THE COURT:  Or you could settle but we tried

6   that.  All right, any other questions, concerns?

7               MR. McELFISH:  No other questions or

8   concerns for the plaintiff.

9               MR. BARMEN:  None that I can think of, your

10  Honor.

11              THE COURT:  All right, thank you, gentlemen.

12              MR. McELFISH:  Thank you.

13              MR. SHAUB:  Thank you, your Honor.

14                        *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON                    January 22, 2020