# Transcript of the Testimony of
# **Andrew M. Casden, M.D.**

**Date:** February 23, 2017

**Case:** Jose Bauta v. Greyhound Lines, Inc., et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x

JOSE BAUTA,

                         Plaintiff,

      -vs-

GREYHOUND LINES, INC., SABRINA
ANDERSON, AKOS GUBICA, KAROLY GUBICA,
CAV ENTERPRISE LLC, FIRST GROUP
AMERICA, INC., and FIRSTGROUP, PLC,

                         Defendants.

Case No.:  14-3725 (FB)(RER)

----------------------------------------x

                    5 East 98th Street
                    New York, New York

                    February 23, 2017
                    1:57 p.m.


        Deposition of ANDREW M. CASDEN, M.D.,

pursuant to Notice, before Darby Ginsberg,

RPR, a Notary Public of the State of New York.

**Andrew M. Casden, M.D.**
**2/23/2017**

```
                                                    Page 2
 1    A P P E A R A N C E S:

 2

 3    McELFISH LAW FIRM, LC

 4    Attorneys for Plaintiff

 5         1112 North Sherbourne Drive

 6         West Hollywood, California 90069

 7    BY:  RAYMOND D. McELFISH, ESQ.

 8         PHONE    310.659.4900

 9         FAX      310.659.4926

10         rmcelfish@mcelfishlaw.com

11

12

13    LEWIS BRISBOIS BISGAARD & SMITH, LLP

14    Attorneys for Defendants

15         1375 East 9th Street, Suite 1600

16         Cleveland, Ohio 44114

17    BY:  BRAD J. BARMEN, ESQ.

18         PHONE    215.586.8810

19         FAX      216.344.9421

20         brad.barmen@lewisbrisbois.com

21

22

23

24

25
```

**Andrew M. Casden, M.D.**
**2/23/2017**

```
                                                      Page 3
 1    A P P E A R A N C E S: (Cont'd)

 2

 3    MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

 4    Attorneys for Defendants

 5         800 Westchester Avenue

 6         Rye Brook, New York 10573

 7    BY:   HAROLD L. MOROKNEK, ESQ.

 8         PHONE    914.977.7300

 9         FAX      914.977.7301

10         hlmoroknek@mdwcg.com

11

12

13    ALSO PRESENT:

14         HONORABLE RAMON E. REYES, JR.

15         (Appearing via telephone during telephone

16         hearing only)

17

18

19

20

21

22

23

24

25
```

```
                                                      Page 4
1      ------------------- I N D E X -------------------

2      WITNESS                 EXAMINATION BY         PAGE

3      ANDREW M. CASDEN        MR. McELFISH              5

4

5

6      ---------------- E X H I B I T S ----------------

7      CASDEN          DESCRIPTION            FOR I.D.

8      Exhibit 1       Report of Dr. Casden dated      124

9                      September 28, 2016

10

11

12                    (EXHIBIT TO BE PRODUCED)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Andrew M. Casden, M.D.**
**2/23/2017**

```
 1   A N D R E W   M.   C A S D E N, M.D., called
 2        as a witness, having been first duly sworn,
 3        was examined and testified as follows:
 4
 5   EXAMINATION BY
 6   MR. McELFISH:
 7        Q.  Okay, Doctor.  Good afternoon.  How are
 8   you today?
 9        A.  Good, thanks.
10        Q.  Tell me a little bit about your
11   background.
12        A.  I went to Cornell University, med school
13   also; trained in orthopedic surgery at the
14   Hospital for Joint Disease, and then spent a year
15   in Chicago doing spinal surgery.
16        Q.  Okay.  And you are board certified in
17   what areas?
18        A.  Orthopedic surgery.
19        Q.  Okay.  And how long have you been doing
20   expert witness work?
21        A.  Oh, probably about seven years or so.
22        Q.  How long have you been practicing
23   medicine?
24        A.  Twenty-eight years or so.
25        Q.  What made you begin doing expert work?
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 6

1        A.  A friend of mine is a lawyer; asked me

2    if I wanted to do some work for him, and it

3    sounded like a good opportunity, so I started

4    doing a little work.

5        Q.  What was his name?

6        A.  John Fabiani.

7        Q.  You guys just had a case together,

8    didn't you?

9        A.  Yes.

10       Q.  Everly?

11       A.  Correct.

12       Q.  Do you know what happened in that case?

13       A.  Yeah.

14       Q.  Okay.  Now, when were you first

15   contacted by the defense in this case?

16       A.  Can I have my file back?

17       Q.  Oh, yes.  Yes.  Of course.

18       A.  Sometime around a month or two before

19   January of '16.

20       Q.  Okay.  Who contacted you?

21       A.  Somebody from the firm of Marshall,

22   Dennehey, Warner, Coleman & Goggin.

23       Q.  Okay.  Now, you brought with you your

24   report today?

25       A.  Correct.

**Andrew M. Casden, M.D.**
**2/23/2017**

```
 1        Q.  Okay.  And did you bring any other file
 2   materials or notes or bills or reading material
 3   or records?
 4        A.  No, I didn't.
 5        Q.  Do you have other materials?
 6        A.  Not anymore, no.
 7        Q.  What did you do with them?
 8        A.  I destroy them.  I shred them when I am
 9   done with them.  Otherwise, I would have big
10   piles.  I just keep the reports.
11        Q.  Okay.  In your report that you have
12   today, does it lay out the records that you
13   reviewed in preparation for your opinions in the
14   case?
15        A.  It lays out the ones I thought were
16   pertinent and valid and important.
17        Q.  Does it lay out the ones that you did
18   not think were important?
19        A.  No.
20        Q.  All right.  What -- do you recall who
21   the person was from Marshall Dennehey that
22   contacted you?
23        A.  Probably Nadia Niazi.
24        Q.  Okay.  Had you ever had cases with that
25   law firm before?
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 8

1        A.   I don't believe so.

2        Q.   How about Lewis Brisbois?  Have you ever

3    worked for that law firm?

4        A.   Yes.

5        Q.   How many times?

6        A.   Quite a few.  Probably 25 now, I would

7    say, maybe even a little more.

8        Q.   All right.  Give me one second here.  I

9    just kind of walked in.  Let me get it together

10   for a second.

11           Can you recall, either from your

12   recollection or if it's in your report, what the

13   scope of your assignment was in this case?

14       A.   My assignment is an examination of the

15   plaintiff, a review of the medical records and

16   MRIs, and then a report.

17       Q.   Were you asked to opine on anything in

18   particular?

19       A.   I opined as to -- no, nothing in

20   particular.

21       Q.   Were you asked to review, for instance,

22   whether or not the injuries in this case to Mr.

23   Bauta were causally related to the accident?

24       A.   Yes.  That would be part of the scope of

25   what I report on usually.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 9

1     Q.  Okay.  Were you asked, for instance, to

2  report on and have an opinion as to whether or

3  not the treatment and care he received, including

4  the surgery, was reasonable and necessary?

5     A.  You know, usually I don't -- I am not

6  asked to opine of anything in particular.  It's

7  just the report that I write.  That may include

8  that.  It may not include that.  I don't recall

9  in this particular case that I was asked whether

10  surgery was necessary or not.

11     Q.  Were you asked whether or not any future

12  care would be needed in this case?

13     A.  We may have -- that may have come up.

14     Q.  Okay.  Now, were you also asked to

15  examine Mr. Bauta?

16     A.  Yes.

17     Q.  And when did you do that?

18     A.  On January 19th, 2016.

19     Q.  And where did you see him at?

20     A.  Right in this office.

21     Q.  In this exact room that we are in?

22     A.  No.  Around the corner.

23     Q.  Around the corner.  So by "office" you

24  mean this building and this hospital?

25     A.  Correct.  Right.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 10

1      Q.   All right.  How long did that

2    examination take?

3      A.   Probably about 30 to 45 minutes.

4      Q.   How long did you physically examine him?

5      A.   Probably 10 minutes.

6      Q.   In other cases you testified in the past

7    that your examinations have been five minutes or

8    less, true?

9          MR. MOROKNEK:  Objection to form.

10          THE WITNESS:  I may have.  He may have

11        taken a little longer.

12   BY MR. McELFISH:

13     Q.   Why, if you know, did he take a little

14   longer?

15     A.   Well, for one thing I said he had

16   difficulty getting up from the chair.  He walked

17   with a limp.  So it may have taken a few minutes

18   longer or less.  Also, depending on how much they

19   are cooperating or not cooperating and listening

20   and understanding what I am asking.

21     Q.   Sure.  Okay.  Now I did note that when

22   you did the examination, you put some notations

23   in your report about what you observed?

24     A.   Correct.

25     Q.   Okay.  And with respect to the -- was it

**Andrew M. Casden, M.D.**
**2/23/2017**

1   limping you said?

2          A.  Yes.

3          Q.  Can you describe the limping in terms of

4   what side of the body he was limping on?

5          A.  No.  I don't recall.

6          Q.  Okay.  The reason I am asking you is

7   because if you are able to know or remember or if

8   you recorded what side of the body he was limping

9   on when you observed him, my question would be:

10  Did you test that area or that side to see if

11  that limp was real?

12         A.  I don't know.  I don't recall.

13         Q.  Okay.  Fair enough.

14             I didn't ask you this at the beginning,

15  but even though you have been only doing expert

16  witness work for seven years, I am aware of a lot

17  of the testimony you have given.  My question I

18  suppose is:  Can we just dispense with

19  admonitions?

20         A.  I don't know what you mean by that.

21         Q.  Usually in every deposition of an expert

22  or any witness, for that matter, at the beginning

23  I generally walk through the rules of the

24  deposition.  They are called admonitions.

25         A.  Oh.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 12

1      Q.   And so when I am asking you if we can

2   dispense with them or waive them, I am asking you

3   if I can just bypass them?

4      A.   I think so.  I mean, I know to answer in

5   words and not expressions, so I guess so.  Yeah.

6      Q.   Okay.  You understand, then, that your

7   deposition here, like the ones I have read from

8   other cases, are under oath?

9      A.   Yes.

10      Q.   All right.  And they can be, as you have

11   seen it happen, they can be used against you in

12   trial and commented upon by the lawyers in the

13   case?

14      A.   Correct.

15      Q.   All right.  So what was -- other than

16   your observation of Mr. Bauta, tell me what you

17   did.  Sort of walk through your exam, the exam

18   day with me, if you will.

19      A.   The exam day?

20      Q.   You know what I mean.  From the time he

21   arrived and you started working on him, what did

22   you do?

23      A.   Well, he is put in a room.  I take a

24   history and ask questions about the accident and

25   about how they feel and their past medical

JE50-0013

Page 13

```
 1   history.  Then I examined him.  Go through the
 2   typical spinal examination, and then from there,
 3   usually that's it.
 4        Q.  Now, with respect to Mr. Bauta, did he
 5   tell you anything about any type of medical
 6   history relating to his back in terms of any
 7   types of prior accidents or injuries or issues
 8   like that?
 9        A.  He did.
10        Q.  And what history did he have prior to
11   this accident?
12        A.  He said he had none.
13        Q.  Okay.  And have you been presented with
14   any information to the contrary of that,
15   Dr. Casden?
16        A.  No.
17        Q.  So as far as you understand here in your
18   deposition today, and I just want to ask it a
19   slightly different way if I can just to nail down
20   that issue.
21             As you sit here today, you are not aware
22   of any prior injuries Mr. Bauta suffered to his
23   spine prior to the bus accident?
24             MR. MOROKNEK:  Objection to form.
25             THE WITNESS:  Correct.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 14

```
 1   BY MR. McELFISH:
 2       Q.  Okay.  Are you aware of any -- putting
 3   accidents aside -- are you aware of any other
 4   kinds of events or medical conditions that Mr.
 5   Bauta had that related to his lower spine prior
 6   to this bus accident in 2013?
 7       A.  No, I am not.
 8       Q.  All right.  Are you aware of any
 9   documentation, for lack of a better term, of any
10   type of complaints or pain in his low back prior
11   to this bus accident in October of 2013?
12       A.  No, I am not.
13       Q.  All right.  And certainly, based on your
14   testimony so far today, if you had received such
15   a record, it would have been something you would
16   have kept and not shredded, true?
17            MR. MOROKNEK:  Objection to form.
18            MR. McELFISH:  No, let me phrase that.
19   BY MR. McELFISH:
20       Q.  If you had received such a record, you
21   would have noted it in your report?  Whether you
22   shredded or not is a different --
23       A.  Correct.
24       Q.  You would have noted it as important?
25       A.  Correct.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 15

1      Q.   And you noted no such documentation?

2      A.   Correct.

3      Q.   And did you note in any place -- and I

4   do have your report, so I am going to try not to

5   ask you things I can see from here -- but did you

6   note Mr. Bauta's age at the time that he came to

7   see you?

8      A.   Yes.  He was 40 years old.

9      Q.   And did you note his age at the time of

10   this accident in 2013?

11      A.   I didn't specifically note it, but it

12   was about two years earlier, three years earlier,

13   so I guess he was 37.

14      Q.   Other than the limp you observed, what

15   else did you observe about him that caught your

16   attention?

17      A.   He just walked slowly.  His range of

18   motion in the lumbar spine is -- when I asked him

19   to bend forward, was about ten degrees.  His

20   bending backwards was about 0 degrees.  His neck,

21   he flexed his cervical spine about 40 degrees.

22   Extended 20 degrees.  Rotated to the left and the

23   right 20 degrees.  He had 5 out of 5 strength;

24   that means full strength in his upper

25   extremities.  His right side had full strength.

**Andrew M. Casden, M.D.**
**2/23/2017**

```
 1    I detected some weakness on the left side, but I
 2    thought that was due to a poor effort and not an
 3    absolute neurologic deficit.
 4         Q.  When you say left side, I am sorry to
 5    interrupt you.
 6         A.  Left leg.
 7         Q.  Left leg.
 8         A.  Left leg.
 9         Q.  And what test did you perform that
10    demonstrated the weakness?
11         A.  You asked him to resist you to -- a
12    command.  So hold your leg out straight, and then
13    you try and bend the knee, for instance.
14         Q.  Is that the straight leg raise test?
15         A.  No.  That's different.
16         Q.  What is this one called?
17         A.  It's just muscle testing.
18         Q.  Okay.  And why did you feel that it was
19    related to poor effort?
20         A.  You can just get a feel sometimes when
21    you are examining somebody.  I have been doing it
22    long enough.  It's a subjective test, neurologic
23    testing for motor strength.  So it's not an
24    objective finding.  So sometimes you can just get
25    that feeling that somebody is not giving you a
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 17

1   good effort.

2        Q.   Okay.  But that's all it is, it's based

3   on your feeling; it's not based on any type of,

4   for instance, test result or --

5        A.   No.

6        Q.   -- EMG or anything?

7        A.   Correct.

8        Q.   Okay.  What else did you note in the

9   exam?

10        A.   He had no long track findings, and his

11   reflexes were one plus but equal and symmetric

12   throughout.

13        Q.   What about his right leg?

14        A.   His right leg had full strength as well.

15        Q.   He wasn't exaggerating the right leg?

16        A.   No.  Not that I am aware of.

17        Q.   Are you aware of whether or not he had

18   surgery?

19        A.   Yes, I am.

20        Q.   And what surgery did he have?

21        A.   He underwent a lumbar laminectomy and a

22   fusion and an instrumentation at L4-L5 and L5-S1.

23        Q.   How do you know that?

24        A.   From reviewing the medical records.

25        Q.   And did you have a chance -- let me not

Case 1:14-cv-03725-RER   Document 874   Filed 09/01/20   Page 19 of 151 PageID #: 36858

Page 18

1   get ahead of my own self.

2          Going back to the exam, did you note the

3   surgical scarring in the areas where the surgery

4   was?

5          A.   Yes.

6          Q.   And with respect to the forward bend,

7   what do you attribute that to, the 10 degrees?

8          A.   Well, I mean, it certainly can be due to

9   pain.  It can be due to previous surgery, and it

10  can also be -- it's -- again, it's a subjective

11  test.  Somebody can just stop bending at that

12  point and tell me that's all they can do, so I

13  don't have any way of knowing.

14         Q.   I know.  But you have been doing this

15  even before you did expert witness work for a

16  couple of decades at least.  Did you have any --

17  well, more than 20 years you said; we are all

18  doing it more than a couple of decades -- but did

19  you have any sense that when he registered the 10

20  degrees on the forward bend, that he was not

21  giving you full effort?

22         A.   I don't recall.

23         Q.   Did you note that?

24         A.   No, I didn't note it.  No.

25         Q.   Okay.  And same question with respect to

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 19

```
 1    the 0 degrees on the backward bend of the lumbar
 2    spine?
 3         A.   Same answer.
 4         Q.   You don't recall?
 5         A.   I don't recall.  And I didn't note it.
 6         Q.   All right.  And I should ask you this,
 7    but the measurements that you took in terms of
 8    the degrees, were they just estimates or were
 9    they measured by a -- I forgot the term.  There
10    is a --
11         A.   Goniometer.
12         Q.   Goniometer.
13         A.   These are estimates.  I don't use a
14    goniometer.
15         Q.   They were just estimates?
16         A.   Correct.
17         Q.   What else did you note from the exam?
18         A.   I think we covered it.
19         Q.   So you did -- let me just see if I have
20    this -- you did the exam.  You did the -- a
21    forward test, forward bend test, the backward
22    bend test; you tested the upper extremities and
23    the lower extremities with the muscle resistance
24    test that you described.
25              What else did you physically do?
```

Page 20

1         A.   His reflexes I checked.

2         Q.   Is that with the little hammer?

3         A.   With the little hammer, uh-huh.

4         Q.   How were those?

5         A.   Those were fine.  They were a little

6    diminished, but equal and symmetric we call it,

7    so that's a normal finding.

8         Q.   And what specifically are you referring

9    to, in the knees?

10        A.   The knees, the biceps, the triceps, the

11   brachioradialis, the knees, and the ankles.

12        Q.   Okay.  What else did you do in the exam?

13        A.   We checked the long track findings.

14        Q.   What's that?

15        A.   Those are signs of pressure on the

16   spinal cord.

17        Q.   How do you do that?

18        A.   There is a thing called clonus where you

19   push the foot up and scratch the bottom of the

20   foot.  There is another one.  The reflexes are

21   also signs of long track findings, and then there

22   is one other with the fingers.

23        Q.   Okay.  Well, the fingers wouldn't relate

24   to the low back?

25        A.   Correct.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 21

1      Q.   Right.   Is the one with the toes that
2   relates to the low back similar to the --
3      A.   Yes.
4      Q.   Did you do it?
5      A.   I don't think so, no.
6      Q.   Why not?
7      A.   He probably still had his socks on at
8   the time.
9      Q.   Did he take the socks off?
10      A.   He did, but I didn't do it.
11      Q.   And then how did it end?  You just -- I
12   don't want to sound like Chuck Woolery, but how
13   did it end?  How did the exam end?
14      A.   That's it.   Cordially, and he left.
15      Q.   And what did you do after that that day?
16   Did you record your findings?
17      A.   I take notes as I am working with him.
18      Q.   Okay.   And how did the report get
19   prepared?  Did you type that yourself?
20      A.   No.   I have a dictation service that
21   does it.
22      Q.   Okay.  Did you dictate the notes into
23   the machine?
24      A.   Yes, into the phone.
25      Q.   Okay.  Did you save that or did you tape

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 22

```
 1    over it or what happened?
 2         A.  I sometimes modify the report as more
 3    records become available, but I just call them up
 4    and add to it or I make modifications myself.
 5         Q.  Did you keep the recordings?
 6         A.  No.  I don't get the recordings, either.
 7    They are somewhere in the country somewhere.
 8         Q.  I see.  With respect to the report you
 9    have here today, what's the date?
10         A.  The date on this one is September 28,
11    2016.
12         Q.  And the exam was in January?
13         A.  Correct.
14         Q.  Why is there such a long period of time
15    between the exam and the report?
16         A.  I update the date of the report if I
17    review additional records.
18         Q.  Did you have any drafts of this report
19    prior to this final report?
20         A.  There may have been, but I don't save
21    them.
22         Q.  How many were there, do you think?
23         A.  Two or three.
24         Q.  And why don't you save them?
25         A.  I don't think they are of importance.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 23

1    They are updated.  It's the new version.  It

2    would be a lot of paperwork for me.

3        Q.  But the original reports contained your

4    opinions and your findings and your

5    observations --

6        A.  Correct.

7        Q.  -- as of the time that you prepared

8    those --

9        A.  Correct.

10       Q.  -- let me just -- sorry.  That's one of

11   the admonitions.  I will try not -- and I try not

12   to violate this rule, but I will try not to

13   interrupt you, but try not to because she can't

14   type two people.  We violated that enough

15   yesterday.  We will try not to do that today, and

16   she is mad at me for sure.  She has every right.

17           Okay.  So but the draft reports that

18   we're referring to, those would contain your

19   opinions and observations and whatever other

20   documentation you had at the time you prepared

21   it?

22       A.  Correct.

23       Q.  So we don't -- we will not ever know

24   without seeing them what changes were made from

25   the old reports to the current reports?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 24

```
 1        A.  Correct.
 2        Q.  Okay.  If we can do this, and I am going
 3   to try not to do this for any reason other than I
 4   want to ask you about these particular documents.
 5             What documents did you find important in
 6   this case?
 7        A.   I saw the emergency room records from
 8   Evangelical Community Hospital; I looked at the
 9   records of Brookdale Hospital; Dr. Alladin's
10   notes; Dr. Rosenberg's notes; Dr. Demetrios
11   Mikelis's notes; Dr. Cordiale's notes.  I believe
12   in addition to that I had the notes by Franklin
13   General Hospital from the surgery, and then I
14   reviewed some of the radiologic studies that were
15   done.
16        Q.  Okay.  Now, with respect to when you say
17   Dr. Alladin's notes, are you referring to his
18   reports?
19        A.   His office notes, it would be.
20        Q.  Okay.  And with respect to Dr. Mikelis,
21   are you referring to the report he generated in
22   the case or something else?
23        A.   It's usually the office notes.
24        Q.  Same with Dr. Cordiale?
25        A.   Correct.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 25

```
 1        Q.   So you didn't see any of the reports
 2    from Dr. Cordiale or Mikelis or Alladin?
 3             MR. MOROKNEK:  Objection to form.
 4        Objection to form.  Yes, he did, but he
 5        testified.
 6             MR. McELFISH:  We are not starting
 7        again, are we?
 8             MR. MOROKNEK:  I don't know.
 9             MR. BARMEN:  Proceed.
10             MR. McELFISH:  It's a pretty simple
11        question.  What's the objection?
12             MR. BARMEN:  Should he take the Fifth?
13             MR. MOROKNEK:  Not yet.
14             MR. McELFISH:  What is the objection?
15             Read the question back, would you
16        please?
17             (Record read.)
18             THE WITNESS:  I don't recall seeing
19        their actual reports.  I just recall seeing
20        -- having the notes in my records.
21    BY MR. McELFISH:
22        Q.   Okay.  What about Dr. Capiola?  Did you
23    see his records?
24        A.   I may have.  I don't recall.
25        Q.   Did you see Dr. Rosenberg's records?
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 26

```
 1        A.  Yes.
 2        Q.  How about Dr. Chen?  Did you see
 3   Dr. Chen's records?
 4        A.  Not that I am aware of.
 5        Q.  Did you see Dr. Lichy's records?
 6        A.  Not that I am aware of.
 7        Q.  Dr. Kolb?
 8        A.  Not that I am aware.
 9        Q.  What about Dr. Winn?
10        A.  Not that I am aware of.  Wait a second.
11   You know, I don't recall if I saw his records or
12   those of the Alladin's where they reference
13   Winn's notes, but I may have.  But I have some
14   references as to what Dr. Winn did.
15        Q.  Did you see the operative reports for
16   Dr. Winn?
17        A.  I believe I did, yes.
18        Q.  Did you note them in your report?
19        A.  I did.
20        Q.  Let me ask you this:  Is the scope of
21   your testimony in this case related to the spinal
22   injuries or the head injuries or just the spinal?
23        A.  Just the spinal injuries.
24        Q.  So you are not interested in the
25   neuropsychologist and the psychology and the
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 27

1   psychology notes and records?

2        A.   Correct.

3        Q.   Okay.  Now, you were talking about some

4   of the radiological studies.  Can you be specific

5   with me about which studies you saw?

6        A.   Sure.  I saw the CT scan of the cervical

7   spine dated October 9, 2013; the MRI of the

8   lumbar spine dated November 28th, 2013; MRI

9   cervical spine dated November 8th, 2013; MRI of

10  the lumbar spine dated February 11, 2015;

11  radiographs of the cervical and lumbar spine

12  dated October 25th, 2013.

13       Q.   I am sorry.  The last one is radiographs

14  of what?

15       A.   The cervical and the lumbar spine dated

16  October 25th, 2013.

17       Q.   Now, when we are talking about the dates

18  of these studies, did you just see the reports or

19  did you actually see the studies?

20       A.   I saw the studies.

21       Q.   Do you have them with you today?

22       A.   I do not.

23       Q.   Is there a way you can get them?  Is

24  this -- do you have a board --

25            MR. MOROKNEK:  A box?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 28

```
 1   BY MR. McELFISH:
 2        Q.  Do you have a light box we could look at
 3   the studies?
 4        A.  We would have to go into another room.
 5        Q.  Do you have the studies here at the
 6   hospital?
 7        A.  No.
 8        Q.  So we would be looking at a light box
 9   with no studies if we did that?
10        A.  Unless you have them, correct.
11        Q.  No, I don't.  All right.  What was
12   the --
13             MR. BARMEN:  There's a nice white box.
14        It's very nice.  It's worth seeing.  We'll
15        show you on the way out.
16   BY MR. McELFISH:
17        Q.  What was it that you noted from the
18   radiographs from October of '13?  What was
19   important to you about them?
20        A.  The X-rays taken on October 25th, 2013,
21   I saw a retrolisthesis it's called of L5 and S1.
22   There was no evidence of any fractures, and there
23   were degenerative changes at L5-S1.
24        Q.  So a retrolisthesis, tell me what that
25   is.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 29

```
1          A.   That's a little bit of one vertebra has

2    slipped behind the other vertebra, it goes

3    backwards a little bit.

4          Q.   In general, are those degenerative or

5    traumatic?

6          A.   They are traumatic.  Excuse me.

7    Degenerative.

8          Q.   And generally you say they are

9    degenerative?

10         A.   They are degenerative, yes.

11         Q.   They are never traumatic?

12         A.   I have never seen one, no.

13         Q.   Have you ever read about one or heard

14   about one?

15         A.   Not this type, no.

16         Q.   Okay.  And what level is that, L4-5?

17         A.   L5-S1.

18         Q.   Does that relate to your opinions in any

19   way in this case?

20         A.   Yes.

21         Q.   How?

22         A.   I don't think there was any evidence of

23   an injury to the bony structure of the spine at

24   the time of the accident.

25         Q.   By bony structure, what do you mean?
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 30

```
 1        A.  Well, the X-rays show you that there is
 2   no fractures, no dislocations to the spine.
 3        Q.  None are being claimed.  No bony -- no
 4   fractures of the spine, right?
 5        A.  Not that I know of, no.
 6        Q.  All right.  You mentioned the studies
 7   from -- well, there were two sets.  There was a
 8   set of the neck and back in '13.  Then there was
 9   just the back in '15, the MRIs?
10        A.  Correct.
11        Q.  Right?  In the 2013 MRI, did you see the
12   large herniation that was noted?
13            MR. MOROKNEK:  Objection to form.
14            THE WITNESS:  I saw a herniation on the
15        left side with a large disk herniation
16        towards the left side at L5-S1.
17   BY MR. McELFISH:
18        Q.  Did you measure it?
19        A.  No.
20        Q.  Do you have an estimate of how large it
21   is?
22        A.  No.
23        Q.  Were you able to look at, since you
24   looked at the films, were you ever able to look
25   at the hydration of that disc?
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 31

1          A.   You look at the hydration of the disc.

2    I never looked at the hydration, nor can I

3    comment on the hydration of a herniation.

4          Q.   Okay.  Was it hydrated or dehydrated?

5          A.   I don't recall, but again, it's not

6    something I ever report on.

7          Q.   As an orthopedic surgeon, certainly you

8    receive reports from radiologists about MRIs,

9    true?

10         A.   True.

11         Q.   But you also look at those films on

12   people you are operating on before you do the

13   operations?

14         A.   True.

15         Q.   All right.  So you have some experience

16   in looking at MRI films?

17         A.   True.

18         Q.   Okay.  Now, you understand what I mean

19   when I say a hydrated disc or a dehydrated disc?

20         A.   Yes.

21         Q.   Tell me what that is.

22         A.   Well, a hydrated disc has a certain

23   signal characteristics on an MRI, and a

24   dehydrated disc has other signal characteristics.

25   The size and the height of the disc can also

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 32

1  change.  The look of the disc can change.

2       Q.  All right.  So I want to ask you about

3  that, and let's start with the lumbar films in

4  2013.  Were you able to make any comparisons

5  between the L5-S1 level and the other levels as

6  to their hydration qualities?

7       A.  The -- not in my report, so I don't

8  recall.

9       Q.  If it's not in your report, you didn't

10 do it?  Can you say that?

11      A.  No.  I am just saying that I don't

12 specifically have in my report that there were

13 degenerative changes at L5-S1.  Although I think

14 there were.

15      Q.  What I am trying to get at, though, is,

16 you know, you examined Mr. Bauta over a year

17 ago --

18      A.  Right.

19      Q.  You wrote the report over six months

20 ago?

21      A.  Correct.

22      Q.  Today is your deposition, and I wanted

23 to get sort of a final opinion from you if I

24 could --

25      A.  Sure.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 33

1      Q.   -- on the question of whether or not you
2   observed hydration or dehydration at the
3   herniated disc at L5-S1?
4      A.   There were degenerative changes noted,
5   correct.
6      Q.   Well, when you say degenerative changes,
7   can you be specific with me about what you are
8   talking about?
9      A.   Retrolisthesis is a sign of degenerative
10  changes.   That's one.   Degeneration of the disc
11  is another sign of degenerative changes, and
12  those are the ones that we are looking at
13  primarily.
14     Q.   But I want to go back to my question,
15  which was:   Did you have an opportunity to
16  observe whether or not the L5-S1 disc was
17  hydrated or not?
18     A.   Yes.
19     Q.   Was it?
20     A.   No.
21     Q.   It lost its hydration?
22     A.   Correct.
23     Q.   Were you able to make any comparisons
24  between that disc at L5-S1 and the other levels
25  of the lumbar spine?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 34

1      A.   Yes.   The other ones were more normal-
2    looking levels.
3         Q.   And they were hydrated?
4         A.   Correct.
5         Q.   And you know that from looking at it and
6    the signal, the intensity of the signal?
7         A.   Correct.
8         Q.   So with respect to -- have you seen
9    Dr. Mobin's report?
10        A.   I did.
11        Q.   Do you agree with him in that regard?
12        A.   You are going to have to remind me what
13   he said.
14        Q.   Just that, that the L5-S1 disc had no
15   hydration, and that the other levels, by
16   comparison, were hydrated and normal.
17        A.   I would agree with that.
18        Q.   Thank you.
19             You did you see his deposition,
20   Dr. Mobin?
21        A.   I looked at it, yes.
22        Q.   Did you see the exhibits to it?
23        A.   The exhibits?  Not that I recall, no.
24        Q.   Well, the reason I am asking you, and
25   maybe this will help refresh your recollection

**Andrew M. Casden, M.D.**
**2/23/2017**

1  is, Dr. Mobin had printed out a picture of the --

2  at the sagittal and the axial views of the lumbar

3  spine at that level --

4  　　　　A.　Uh-huh.

5  　　　　Q.　-- and he put a measurement on the film.

6  　　　　A.　Uh-huh.

7  　　　　Q.　Did you get a chance to see that?

8  　　　　A.　No.

9  　　　　Q.　Because I was going to ask you if you

10  agreed or disagreed?

11  　　　　A.　I did not see that.

12  　　　　Q.　Fair enough.

13  　　　　　　Okay.　Now while we are on the subject

14  with respect to the 2013 lumbar film, did you see

15  any other abnormalities on that film?

16  　　　　A.　There was a central and left-sided disc

17  herniation.

18  　　　　Q.　So when you say central, you are

19  referring to the herniation that is not lateral,

20  but it's in the middle where the spinal canal

21  was?

22  　　　　A.　Correct.

23  　　　　Q.　And to the extent of its herniation or

24  its protrusion, if you will -- because a

25  herniation can protrude, true?

Page 36

1          MR. MOROKNEK:  Form.

2          THE WITNESS:  That's not how I generally

3     look at it.

4  BY MR. McELFISH:

5     Q.  Let me rephrase.

6     A.  Sure.

7     Q.  Sorry.  It was a terrible question.

8          With respect to this film and disc

9  herniation at L5-S1, is there a way for you, sir,

10  to describe the direction in which it was

11  protruding or where it had extruded its material?

12     A.  Yes.

13     Q.  Which way?

14     A.  To the left.

15     Q.  So none of the extrusion was to the

16  right?

17     A.  No.

18     Q.  None was to the back or posterior to the

19  front?

20     A.  I don't follow you.

21     Q.  So the disc can extrude to the front or

22  to the back or left or to the right, true?

23     A.  We don't think of disc herniations to

24  the front.  You mean anteriorly to the spine?

25     Q.  Anteriorly.  True.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 37

1          A.   We don't look at disc herniations as
2     herniations anteriorly.  It's not a recognized
3     finding.
4          Q.   Fair.  Did you observe any thecal sac --
5     any thecal sac impression on that film?
6          A.   Yes.
7          Q.   And what was it?
8          A.   It encroached centrally on the thecal
9     sac, and then it contacted the S1 nerve root.
10         Q.   On what side?
11         A.   On the left side.
12         Q.   But the central herniation or the
13    central compression was where?
14         A.   Centrally.
15         Q.   Okay.  And can the central compression
16    cause right or left-sided weakness?
17              MR. MOROKNEK:  Objection to form.
18              THE WITNESS:  No, it should not.
19    BY MR. McELFISH:
20         Q.   Can it?
21              MR. MOROKNEK:  Objection to form.
22              THE WITNESS:  No.
23    BY MR. McELFISH:
24         Q.   So if you -- putting aside a minute the
25    extrusion to the left -- if he had compression to

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 38

1  the central canal, that cannot cause right-sided

2  weakness?

3       A.   No.  Not at L5-S1.

4       Q.   Okay.  Now, with respect to -- was there

5  any lateral stenosis with respect --

6       A.   There was some foraminal stenosis.

7       Q.   And at what level?

8       A.   L5-S1.

9       Q.   And how did that compare to the other

10  levels?

11       A.   That was more significant.

12       Q.   And was there compression in the

13  foramina?

14       A.   There was compression in the

15  neuroforamen, yes.

16       Q.   On the right side?

17       A.   It was on the left and the right side.

18       Q.   And right-sided compression in the

19  foramina can cause right-sided weakness?

20            MR. MOROKNEK:  Objection to form.

21            THE WITNESS:  Yes, it can.

22  BY MR. McELFISH:

23       Q.   And specifically, if you can tell me,

24  which -- which level of the foramen causes

25  numbness and weakness into the right leg?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 39

1        A.   It could be L4, L5, S1.

2        Q.   All right.  And that can -- that can

3    come to the form of radiation into the buttocks

4    or groin, true?

5        A.   Not into the groin, but into the

6    buttocks.

7        Q.   All right.  What about the quad?

8        A.   Quad would be more at L4.

9        Q.   All right.  Did you note in some of

10   Dr. -- did you have Dr. Gutstein's records?

11       A.   Yes.

12       Q.   Did you note in his early records that

13   there was a finding of weakness in Mr. Bauta's

14   right quad?

15            MR. MOROKNEK:  Objection to form.

16            THE WITNESS:  I don't recall.

17   BY MR. McELFISH:

18       Q.   But if there was an injury to the L4-5

19   in the foramen or a compression in the foramen,

20   that would explain the weakness in the quad?

21       A.   I don't think we established compression

22   at L4-L5 of the L4 nerve.

23       Q.   All right.  So you think the compression

24   was only L5-S1?

25       A.   Correct.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 40

1        Q.   Where would the L5-S1 reveal itself in
2    terms of its radicular --
3        A.   Usually that's either gastroc weakness,
4    or lifting up the toe.  We call it EHL weakness.
5        Q.   What about weakness down the leg and,
6    you know, like you described earlier when Mr.
7    Bauta was walking, he was walking with a limp;
8    could an L5-S1 compression laterally in the
9    foramina cause that type of weakness?
10       A.   It could.
11       Q.   So when you have compression in this
12   case, for instance, at the L5-S1 on the right
13   side and the foramen --
14       A.   Uh-huh.
15       Q.   -- that could be causing the injured --
16   that could be causing the weakness rather than
17   the extrusion which may be to the left?
18            MR. MOROKNEK:  Objection to form.
19            THE WITNESS:  That's not --
20   BY MR. McELFISH:
21       Q.   Let me rephrase.
22       A.   Yes.
23       Q.   Sorry.  If the extruding material is to
24   the left and the -- centrally -- and if the
25   compression inside the foramen is to the right,

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 41

1  then you could actually look at it and say, well,

2  the left-sided extrusion is not causing the

3  right-sided weakness, but the right-sided

4  compression is causing it?

5  　　　　　MR. MOROKNEK:  Form.

6  　　　　　THE WITNESS:  You could and you would,

7  　　yes.

8  BY MR. McELFISH:

9  　　Q.  You could, and you would?

10  　　A.  Yes.

11  　　Q.  In other words, that makes medical

12  sense?  It makes logical --

13  　　A.  Yeah, it wasn't said very well, but it

14  makes sense.

15  　　Q.  It's never going to be for me.  I

16  apologize.  When I get to medical school, I will

17  do better.

18  　　　　　So you did have -- you did say you had

19  Dr. Gutstein's records, but I didn't hear you say

20  that when you read off the list.

21  　　A.  I read them.  I have seen them

22  subsequently more recently, but they are not in

23  my report.

24  　　Q.  They are not?

25  　　A.  Correct.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 42

```
 1        Q.  And what did you note from Dr.
 2   Gutstein's records that, if it's not in your
 3   report, what do you recollect about it?
 4        A.  I don't recall it offhand.
 5        Q.  So I am assuming if you didn't update
 6   your report, and you don't -- and you don't know
 7   what they said, it wasn't important?
 8            MR. MOROKNEK:  Objection to form.
 9            THE WITNESS:  I don't know if they were
10        important.  I just didn't update my report
11        after that as I saw those.
12   BY MR. McELFISH:
13        Q.  But that's what I am trying to find out.
14   So you have a report --
15        A.  Correct.
16        Q.  -- and then you have Dr. Gutstein's
17   records?
18        A.  Correct.
19        Q.  And then you shredded Dr. Gutstein's
20   records?
21        A.  Correct.
22        Q.  And you did not update your report?
23        A.  Correct.
24        Q.  Okay.
25            MR. MOROKNEK:  Objection to form.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 43

```
 1    BY MR. McELFISH:
 2         Q.  Now, going back to the films for a
 3    minute, just so we can clean up the lumbar films
 4    in 2013.  Was there anything else that you noted
 5    on the film either of a traumatic nature or a
 6    degenerative nature?
 7         A.  Not of a traumatic nature, no, and just
 8    bulging of the disc at 2-3, 3-4 and 4-5.
 9         Q.  Okay.  But those bulges were out of
10    proportion to the herniation at L5-S1?
11              MR. MOROKNEK:  Objection to form.
12    BY MR. McELFISH:
13         Q.  Were those bulges out of proportion to
14    the herniation at L5-S1?
15              MR. MOROKNEK:  Objection to form only
16         because I am not sure what you mean by "out
17         of proportion."
18              THE WITNESS:  Do you mean larger out of
19         proportion?
20         Q.  Smaller out of proportion.
21              In other words, was the L5-S1 herniation
22    out of proportion in terms of its size compared
23    to the protrusions at L2, L3 and L4?
24              MR. MOROKNEK:  Objection to form.
25              You can answer.
```

Case 1:14-cv-03725-RER   Document 874   Filed 09/01/20   Page 45 of 151 PageID #: 36884

Page 44

1              THE WITNESS:  Assuming you mean larger,
2        yes.
3    BY MR. McELFISH:
4         Q.  So they were larger?
5         A.  No, L5-S1 was larger.
6         Q.  That's what I meant.
7         A.  Yes.
8         Q.  Okay.  Much larger?
9              MR. MOROKNEK:  Objection to form.
10             THE WITNESS:  Larger.
11   BY MR. McELFISH:
12        Q.  With respect to the right-sided
13   compression that we have been discussing in the
14   L4-L5 or the L5 -- the L5-S1 foramina, did you
15   note nerve root impingement?
16        A.  Yes.
17        Q.  And is there a way for you to quantify
18   it?
19        A.  No.
20        Q.  Okay.  Have you ever seen any signs or
21   any papers written on how a traumatic event can
22   increase symptoms in a nerve root that's
23   compressed?
24        A.  No.
25             MR. MOROKNEK:  Objection to form.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 45

```
 1          You can answer.
 2     BY MR. McELFISH:
 3          Q.  No?
 4          A.  No papers on it, no.
 5          Q.  Have you ever heard of it happening?
 6          A.  It could.
 7          Q.  It could?
 8          A.  Uh-huh.
 9          Q.  How about the records of Vincent Vasile?
10     Did you have those?
11          A.  I don't recall.  No.  I don't recall.
12          Q.  Okay.  Now, earlier I asked you whether
13     you were going to opine on the head or the back,
14     and you said the back.  I just had one more
15     follow-up question in that regard in terms of
16     scope.
17          A.  Uh-huh.
18          Q.  You have seen in the records that Mr.
19     Bauta had a knee injury in this accident?
20          A.  I probably did, yes.
21          Q.  Do you have any opinion as to whether or
22     not the knee injury was causally related to this
23     accident?
24          A.  I don't have any opinion on that.
25          Q.  You were not asked to review that?
```

Case 1:14-cv-03725-RER   Document 874   Filed 09/01/20   Page 47 of 151 PageID #: 36886

```
 1        A.  No.  No.
 2        Q.  Now, given the number of records that
 3   you did look at that we have talked about, would
 4   you say that Mr. Bauta's -- in terms of the
 5   course and scope of his treatment, would you say
 6   it was consistent?
 7             MR. MOROKNEK:  Objection to form.
 8             MR. McELFISH:  Let me rephrase.
 9             Can you not object on every question?
10        Honestly, it's really distracting.
11             MR. MOROKNEK:  Ray, the ones that are
12        not objectionable --
13             MR. McELFISH:  They don't make any
14        sense.
15             MR. BARMEN:  Just ask a question.
16             MR. MOROKNEK:  Your questions don't make
17        sense.
18             MR. McELFISH:  But it's distracting.
19             MR. MOROKNEK:  That's why I'm objecting.
20             MR. BARMEN:  That's kind of the job we
21        chose.  Just ask your questions.
22             MR. MOROKNEK:  This is ridiculous.
23             MR. McELFISH:  When you don't know what
24        it is, the objections don't make sense.
25             They don't make sense.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 47

```
 1            MR. MOROKNEK:  Okay.  Okay.
 2            MR. BARMEN:  Don't start.  There is no
 3       need.  Get through it.  Get this man out of
 4       here, and don't start your shenanigans.
 5            MR. McELFISH:  Don't talk to me like
 6       that.
 7            MR. BARMEN:  Shenanigans.
 8            MR. McELFISH:  Seriously.
 9            MR. BARMEN:  Shenanigans.
10            MR. MOROKNEK:  You like that word.
11            MR. BARMEN:  I do.  I like that word.
12       Continue.
13  BY MR. McELFISH:
14       Q.  Were Mr. Bauta's complaints consistent
15  with regard to his low back?  Were they
16  consistent from the time of the accident
17  throughout --
18            MR. MOROKNEK:  Objection.
19            MR. McELFISH:  I am not even done with
20       the question.
21            MR. MOROKNEK:  I thought you were.
22            MR. McELFISH:  Brad, stop honestly.
23            MR. BARMEN:  Stop?  Stop what?
24            MR. McELFISH:  Stop.
25            MR. BARMEN:  Stop your shenanigans.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 48

```
 1            MR. McELFISH:  Knock it off, dude.

 2            MR. BARMEN:  Shenanigans.

 3            MR. McELFISH:  Can we go off the record?

 4            (Recess taken.)

 5            MR. MOROKNEK:  Let the record reflect

 6       Mr. McElfish went in the hallway and got in

 7       Mr. Barmen's face, okay, and threatened him

 8       with physical violence.

 9            MR. McELFISH:  No, I did not.

10            MR. MOROKNEK:  He said, and I quote --

11            MR. McELFISH:  You said, "Do you want to

12       go outside?"

13            MR. MOROKNEK:  -- "I am going to F you

14       up."

15            MR. McELFISH:  I did not.  I did not.  I

16       did not.

17            MR. MOROKNEK:  That's what I heard.

18            MR. McELFISH:  Did not.

19            MR. BARMEN:  Multiple times.

20            MR. MOROKNEK:  So having said that, I

21       think at this point we are going to stop the

22       deposition.  I am not going to subject the

23       doctor to this any further.

24            MR. McELFISH:  There is no subjecting

25       the doctor.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 49

1          MR. MOROKNEK:  If Mr. McElfish wants the

2     deposition of the doctor, again, he can make

3     an application to the Court, and he will get

4     it, but as of now, this deposition is over.

5          MR. McELFISH:  I would like to finish

6     this deposition.

7          MR. MOROKNEK:  Well, guess what?  It's

8     not happening.

9          MR. McELFISH:  Let's go.  Guys.

10         MR. MOROKNEK:  You think I am kidding,

11     dude.  I am not kidding.  You are not going

12     to threaten him with physical harm and

13     expect to depose my witness.

14         MR. McELFISH:  I asked him to stop it.

15         MR. MOROKNEK:  You're a two-year-old,

16     Ray.  I am making an objection, and you say

17     it interrupts you?

18         MR. McELFISH:  I asked him to stop it.

19         MR. MOROKNEK:  I am done.

20         Doctor, thank you.  I appreciate your

21     time today.

22         THE WITNESS:  Thank you.

23         MR. McELFISH:  Well --

24         THE WITNESS:  I can't continue without

25     them.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 50

1           MR. McELFISH:  I understand.  Are you

2      able to continue?  We are here to do this,

3      guys.

4           MR. MOROKNEK:  We are here to behave as

5      professionals, not to threaten --

6           MR. McELFISH:  You are not going to

7      threaten me.

8           MR. MOROKNEK:  This is not a threat.

9      This is we are doing.

10          MR. McELFISH:  Let's get the judge on

11     the phone now since we're all here.

12          MR. MOROKNEK:  Knock yourself out.

13          MR. McELFISH:  Honestly, you do have

14     stop it, bro.  I'm telling you.

15          MR. MOROKNEK:  Let's go.

16          MR. McELFISH:  Let's finish this

17     deposition so we don't have to come back.

18          MR. MOROKNEK:  Come with me.  I will not

19     listen.  You will not be treated this way.

20          MR. McELFISH:  Harold, let's finish the

21     deposition.

22          (Recess taken.)

23          MR. BARMEN:  Let's go on the record.

24          MR. McELFISH:  Why don't you make a

25     statement about this?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 51

1          MR. MOROKNEK:  I will.

2          MR. McELFISH:  Because I have the Court

3     coming onto the line.  I would actually like

4     to make it first.

5          First of all, no more staring.  No more

6     games.  Enough, guys.  You are doing it now.

7          You and I will deal with it afterwards.

8          MR. BARMEN:  We will.

9          MR. McELFISH:  We will.

10         MR. BARMEN:  You are going to threaten

11    me again with shenanigans?

12         MR. McELFISH:  You and I will go outside

13    and discuss it.

14         MR. MOROKNEK:  What are you saying?

15         MR. McELFISH:  We are going to discuss

16    it.

17         MR. BARMEN:  Raymond, who are you going

18    to call and tell on me this time?

19         MR. McELFISH:  You have no idea, dude.

20         MR. BARMEN:  Oh, I don't.  That sounds

21    like another threat.

22         MR. McELFISH:  Can you get just rid of

23    him?

24         MR. BARMEN:  Sounds like another threat.

25         MR. McELFISH:  I am going to ask the

**Andrew M. Casden, M.D.**
**2/23/2017**

```
 1        judge to have you off this case.  I'm

 2        telling you.  This is ridiculous.

 3             MR. BARMEN:  I say, good luck with that.

 4             MR. McELFISH:  I tell you what, let's

 5        call Tom.

 6             MR. BARMEN:  Go ahead.

 7             MR. MOROKNEK:  Let's do it.

 8             MR. McELFISH:  No, no.  I'm doing it.

 9             MR. MOROKNEK:  You can do whatever you

10        want.  You have got two minutes to start

11        this deposition again --

12             MR. McELFISH:  No, no.  I am waiting on

13        the judge before I start.

14             MR. MOROKNEK:  You really called the

15        judge?

16             MR. McELFISH:  I did.  He is calling

17        back.

18             MR. MOROKNEK:  Good.

19             MR. McELFISH:  Doctor, you may want to

20        just step out for this if you don't mind.

21        Just for a few minutes.  I apologize.

22             MR. MOROKNEK:  How does he get around

23        the fact that he physically threatened you?

24             MR. BARMEN:  He heard it, too.

25             MR. MOROKNEK:  The doctor heard it, his
```

JE50-0053

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 53

1          whole staff heard it.  That's harassment.

2              MR. McELFISH:  You said, do you want to

3          go outside and fight.  That's what you said.

4              MR. BARMEN:  After you said you were

5          going to fuck me up.

6              MR. MOROKNEK:  Three times.

7              MR. McELFISH:  I have had enough of you,

8          dude.

9              MR. BARMEN:  The world according to Ray.

10             MR. McELFISH:  I've had enough.

11             MR. BARMEN:  I don't care.

12             MR. MOROKNEK:  So you don't want to do

13         the deposition anymore?

14             Do you want to do the deposition or not?

15             MR. McELFISH:  I want to talk to the

16         judge first.

17             MR. MOROKNEK:  And you called the judge

18         and he is calling back?

19             MR. McELFISH:  Yup.

20             MR. MOROKNEK:  Do you have that on the

21         record?

22             MR. McELFISH:  No.  I called.  You

23         weren't here.  I don't go on the record when

24         you are not here.

25             MR. BARMEN:  So you just made an ex

**Andrew M. Casden, M.D.**
**2/23/2017**

```
                                              Page 54
 1        parte call to the Court?
 2             MR. McELFISH:  To the clerk.
 3             MR. MOROKNEK:  You said you called the
 4        Court.
 5             MR. McELFISH:  Clerk.
 6             MR. MOROKNEK:  You called the Court,
 7        right?
 8             MR. McELFISH:  So what?
 9             MR. MOROKNEK:  Without us.
10             MR. McELFISH:  Yes, Tom, this is Ray.
11        We have a little problem.  Can you call me
12        back, please?  Thank you.
13             (The following is a phone call.)
14             MR. McELFISH:  Hello?
15             UNIDENTIFIED SPEAKER:  Hi, Mr. McElfish?
16             MR. McELFISH:  Yes.
17             UNIDENTIFIED SPEAKER:  Hi.  I have just
18        patched the judge in.  Is everyone still
19        available?
20             MR. McELFISH:  We are here.  We are
21        ready.
22             UNIDENTIFIED SPEAKER:  Before I patch
23        you in, who else is on the line?
24             MR. MOROKNEK:  Harold Moroknek and
25        Bradley Barmen.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 55

```
 1              UNIDENTIFIED SPEAKER:  Okay, guys.  Hang

 2        on one second.  I will put you on hold, and

 3        then I will patch the judge through.

 4              MR. MOROKNEK:  This is crazy.

 5              MR. McELFISH:  It is crazy, but this is

 6        the way it's going to be.

 7              MR. MOROKNEK:  He can be arrested for

 8        what he said to you.

 9              MR. McELFISH:  Great.

10              MR. MOROKNEK:  Do you realize that.

11              MR. BARMEN:  Technically, it is an

12        assault.

13              MR. MOROKNEK:  No technically -- not

14        assault.  It's harassment, which is a B

15        misdemeanor.

16              MR. McELFISH:  He said the same thing to

17        me, Harold.

18              MR. BARMEN:  I did?

19              MR. McELFISH:  Yes.

20              MR. BARMEN:  God, you just lie and lie

21        and lie.

22              MR. McELFISH:  Okay, buddy.

23              MR. BARMEN:  The problem is there are

24        witnesses.

25              UNIDENTIFIED SPEAKER:  This is telephone
```

**Andrew M. Casden, M.D.**
**2/23/2017**

                                                          Page 56

1        conference in Bauta versus Greyhound Lines,

2        Inc., et al.  Docket number 14-cv-3725.

3            Counsel for the plaintiff, please

4        identify yourself for the record.

5            MR. McELFISH:  Raymond McElfish,

6        attorney for Bauta.

7            UNIDENTIFIED SPEAKER:  And counsel for

8        the defendants identify yourselves for the

9        record.

10           MR. MOROKNEK:  Harold Moroknek and

11       Bradley Barmen.

12           MR. BARMEN:  And we also, for the

13       record, have Dr. Casden in the room as well

14       as our court reporter.

15           THE COURT:  Okay.  What's the problem?

16           MR. McELFISH:  Good afternoon, Judge.

17       This is Ray McElfish calling.  I was

18       reluctant to call you, but I want to tell

19       you what this is.  I apologize for doing

20       this to begin with.

21           I am trying to take the deposition of

22       Dr. Casden, and counsel for the defendant,

23       Mr. Barmen, is -- been intimidating me in

24       this room and staring at me, and

25       Mr. Moroknek -- they like gang up on me in a

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 57

```
 1       way, and I don't mean to sound like that,
 2       but it really is enough at every single
 3       deposition.  Everybody is laughing at me
 4       right now.
 5            MR. MOROKNEK:  Including the doctor,
 6       Judge.
 7            MR. McELFISH:  Including the doctor.  We
 8       went outside.  Mr. Barmen asked me if I
 9       wanted to take it outside, and I said some
10       things I shouldn't have said.  Mr. Moroknek
11       then terminated the deposition.
12            The real reason I am calling you is, I
13       am tired of being harassed, Your Honor.  I
14       am tired of this, and I am just trying to
15       get this gentleman who -- the doctor has
16       been a gentleman.  I'm trying to get his
17       deposition done without these guys doing
18       this.
19            I don't know what else to do, but this
20       was really about the termination because --
21       and since I called your chambers to ask for
22       a conference, they have come back in the
23       room now; but I would like some direction.
24       They are going to tell you lies about what I
25       said, and it's not true.
```

Page 58

1          MR. MOROKNEK:  He is unbelievable.

2          MR. BARMEN:  Your Honor --

3          MR. MOROKNEK:  No, let me go first.  I

4     want to go first because he is pathological,

5     and it needs to be stopped immediately.

6          Your Honor, this is Harold Moroknek, and

7     I apologize for this phone call.  I am going

8     to give the facts as best I can.

9          MR. McELFISH:  From my phone.

10          MR. MOROKNEK:  Mr. -- Mr. McElfish was

11     asking questions, some of them I found

12     objectionable as to form, and I voiced my

13     objection.

14          With due respect, and you can see the

15     record on that, Your Honor, Mr. McElfish

16     takes offense when anyone objects or

17     questions anything he ever asks, so he took

18     offense to my objection.  Told me not to

19     object.  He is -- as I tell my daughters --

20     he is a bully, Judge.  It's just that

21     simple, and it has come out in this case to

22     a point where it's amazing to me what's

23     going on here.

24          He and Mr. Barmen then had communication

25     about the objection, about the questioning.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 59

```
 1        The two of them did go outside.

 2            Mr. McElfish physically threatened

 3        Mr. Barmen outside where the doctor's staff

 4        sits and exists in an active medical

 5        practice.  It's amazing to me that he gets

 6        on the phone and says the things that he has

 7        said to you, Judge.  I am amazed by the

 8        entire thing.

 9            Did I come back and say the deposition

10        is over?  Yes, I did.  I had a doctor who

11        told me that he feels uncomfortable; that

12        Mr. McElfish made him feel uncomfortable;

13        and, quite frankly, he physically threatened

14        Mr. Barmen.

15            So I did not feel that this was an

16        appropriate way to proceed.

17            We did speak with the doctor and

18        Mr. Barmen, you know, a little bit after

19        that, and we decided we would give

20        Mr. McElfish one final chance to behave

21        himself, and that's where we are right now.

22            MR. BARMEN:  And, Judge, this is

23        Mr. Barmen.  I have never, frankly,

24        experienced anything in a professional

25        setting like what just happened.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 60

```
 1         Mr. McElfish not only threatened me, he
 2    did so in a very aggressive manner loudly in
 3    front of the doctor and several other
 4    witnesses.  What he told you is simply
 5    untrue.  Again, there are witnesses,
 6    including the doctor, who is here.  I said,
 7    "Let's go outside" because he was causing a
 8    scene in the doctor's office.
 9         So, you know, for him to call you and
10    say that -- say that somehow we are
11    harassing him, it's just part and parcel of
12    what we are being -- what we have been
13    dealing with, but it's absolutely
14    inappropriate, unprofessional and like
15    nothing I have ever seen before.
16         MR. McELFISH:  Well, my brief response
17    to that is, is that they are teaming up, and
18    they are lying, and I am sorry, but I am
19    trying to get through a deposition with an
20    expert; and the real reason I called you,
21    even though they claim I said and did these
22    things, which is not true, is because I was
23    trying to avoid the termination and us
24    coming back from other cities and having to
25    reschedule this gentleman.  That's really
```

Page 61

1      it.

2          Now, if they want to go on and on about

3      things I didn't do, that's what they have

4      been doing.  I don't care as much about

5      that.  I am more grown up than that, but I

6      really do want to make sure that this

7      deposition does get concluded.

8          THE COURT:  All right.  You are going to

9      conclude the deposition?

10         MR. McELFISH:  I just don't know if it's

11     going to continue.  I mean, it is --

12         MR. MOROKNEK:  Judge, very, very --

13         MR. McELFISH:  It is obstructionist.  It

14     is obstructionist.

15         THE COURT:  Mr. Moroknek, you are going

16     to let it go forward, right?

17         MR. MOROKNEK:  Judge, certainly.  And

18     here is what we are going to do:  I came

19     back in and I told Mr. McElfish, not-

20     withstanding his behavior, we would give him

21     one final chance.  He will not direct who to

22     object and who not to object.  If I have --

23     if I find his questions objectionable, which

24     many of them are --

25         THE COURT:  I will say this:  The

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 62

```
 1      deposition is going to continue.  One
 2      counsel makes objections.
 3          MR. MOROKNEK:  And that's the way it's
 4      been, Your Honor.  I didn't mean to -- I
 5      didn't mean to suggest otherwise.
 6          THE COURT:  And if it gets to the point
 7      where the doctor feels uncomfortable
 8      continuing, then you let me know.
 9          MR. McELFISH:  Your Honor, may I ask
10      that Mr. Moroknek has been defending these
11      depositions all week.  Mr. Barmen was not
12      even supposed to be here.  He was supposed
13      to be in a Philly case, but he is here.  Can
14      I ask that just Mr. Moroknek be present for
15      these depositions because Mr. Barmen is
16      causing the problems, in my opinion?
17          MR. MOROKNEK:  And, Judge, that's just
18      not --
19          MR. McELFISH:  I am not done.
20          MR. MOROKNEK:  Oh, I see.
21          MR. McELFISH:  And that would make the
22      world of difference here, and there is no
23      need for him to be here.  All they do is
24      talk in the deposition and stare at me and
25      do all sorts of childish things.
```

Page 63

```
 1              MR. BARMEN:  He's unbelievable.
 2              MR. MOROKNEK:  Your Honor, none of this
 3         is true.  Okay?
 4              MR. McELFISH:  You have to say that.
 5              MR. MOROKNEK:  He just makes things up
 6         as we go along.  Mr. Barmen represents a
 7         client.  He is being the quintessential
 8         professional here.  It's really -- I have
 9         never -- Judge, you know, since '87 in the
10         Town of Warwick Justice Court I have never
11         seen anything like this in my life, ever.
12              MR. BARMEN:  I don't think I have said
13         two words in here.
14              MR. MOROKNEK:  No, you haven't.  You
15         haven't.
16         Judge, Your Honor, we are going to try
17         to proceed.  We are going to try to proceed
18         as best we can.  If we have continued
19         issues, we will advise the Court
20         accordingly.
21              MR. McELFISH:  I would like Mr. Barmen
22         removed.  I honestly -- they don't need --
23         they don't need two lawyers.
24              MR. MOROKNEK:  I can't proceed without
25         him, Judge.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 64

 1          MR. McELFISH:  They don't need two
 2     lawyers, Judge.
 3          THE COURT:  They can have two lawyers if
 4     they want.  Depending on how they want to
 5     spend their money, they want two lawyers,
 6     that's their right, but one lawyer talks.
 7     Only one lawyer talks.
 8          MR. MOROKNEK:  That's the way it's been,
 9     Judge.
10          MR. McELFISH:  But Barmen is doing other
11     things that he doesn't need to do, and it
12     just gets old after a while.  It really is
13     childish.
14          THE COURT:  Look, what are the other
15     things?  He is staring at you.  I can't -- I
16     mean --
17          MR. McELFISH:  It is ridiculous.  I
18     agree.  I agree, and we shouldn't go down
19     this path.  I called about the termination
20     because they -- I asked them four times if
21     we could continue, and they said no and left
22     the room with the doctor.
23          MR. MOROKNEK:  You made the doctor feel
24     uncomfortable.  You made the doctor feel
25     uncomfortable.  You physically threatened --

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 65

```
 1            MR. McELFISH:  Hold on a second.
 2            MR. MOROKNEK:  You physically threatened
 3       an attorney.
 4            MR. McELFISH:  No, I did not.
 5            MR. MOROKNEK:  Yes, you did.
 6            MR. McELFISH:  Can you knock it off?
 7            MR. MOROKNEK:  You want to get the
 8       witnesses from the hallway?
 9            THE COURT:  Stop.  Stop.
10            MR. McELFISH:  What I wanted to say --
11       what I wanted to say is --
12            THE COURT:  No, no, no, no.  Stop.
13            MR. McELFISH:  Okay.
14            THE COURT:  Stop.  Stop.  Continue with
15       the deposition.  Get it done.  And let the
16       doctor get back to treating patients.
17            MR. MOROKNEK:  Thank you, sir.
18            MR. McELFISH:  Okay.  Thank you for your
19       time.
20            THE COURT:  Bye.
21            (Telephonic hearing concludes.)
22            MR. MOROKNEK:  Let's see what happens.
23            MR. McELFISH:  You're doing it again.
24            MR. BARMEN:  I'm not looking.
25            MR. MOROKNEK:  Don't look at him.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 66

1          MR. BARMEN:  I'm not looking.

2          MR. McELFISH:  Honestly.

3          MR. BARMEN:  Honestly.

4          MR. McELFISH:  I will take care of it.

5          MR. BARMEN:  I am sure you will.  I

6     can't wait.

7          MR. McELFISH:  You are doing it now.

8          MR. BARMEN:  Are you going to continue

9     this, yes or no?

10         MR. McELFISH:  You lied for him.  Okay.

11    So at least you can now see what he is

12    doing.  I know you have to lie for him.

13         MR. BARMEN:  Are you going to continue?

14         MR. MOROKNEK:  Raymond, we are going to

15    be here for another five minutes.  If you

16    don't start the deposition, we are leaving.

17    Okay?

18         MR. McELFISH:  Leave.

19         MR. MOROKNEK:  You decide.

20         MR. McELFISH:  You heard what the Court

21    said.

22         MR. MOROKNEK:  You decide.  I will call

23    the Court, and I will tell the Court.

24         MR. McELFISH:  You won't do anything.

25    You're all talk.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 67

```
1            MR. MOROKNEK:  Okay.

2            MR. McELFISH:  You didn't believe me

3       when said I called.

4            MR. MOROKNEK:  Okay.

5   BY MR. McELFISH:

6       Q.  Okay.  Let's try this again.  I don't

7   remember where we were, but let's just go back, I

8   guess, for general sake to the 2013 lumbar films.

9   I think I was -- it's so far back now -- I think

10  I was asking you about anything else you had seen

11  on the films that were traumatic or degenerative

12  in nature other than what we already spoke about?

13      A.  No.

14      Q.  Okay.  And I think I asked you this, but

15  did you observe in the film the increased signal

16  or the decreased signal in the L5-S1 compared to

17  the other levels?

18      A.  Yes.

19      Q.  Okay.  All right.  Now, with respect to

20  the cervical film --

21           MR. McELFISH:  Stop it, Mr. Barmen.

22      Seriously.

23           MR. BARMEN:  Stop what, Ray?

24           MR. McELFISH:  Stop it, man.

25           MR. BARMEN:  I honestly don't understand
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 68

```
 1        what your issue is.
 2   BY MR. McELFISH:
 3        Q.   Going back to the cervical films at that
 4   time, did you see any pathology just generally on
 5   the cervical films in 2013?
 6        A.   Yes.
 7        Q.   What did you see?
 8        A.   They showed central disc herniations in
 9   the left at C4, C5, C5, C6 central at C6-7.  They
10   were noted to be of normal height, no fractured
11   dislocations.  They were bulges at C2, C3 and
12   C3-4.  There was no evidence of any acute injury
13   to the cervical spine.
14        Q.   Okay.  And in the Everly case you
15   offered an opinion that there were no neck
16   fractures in that case initially, correct?
17             MR. MOROKNEK:  Objection to form.
18             THE WITNESS:  Correct.
19   BY MR. McELFISH:
20        Q.   And then at trial when you were shown
21   the radiographs and you were shown the reports,
22   you conceded that Ms. Everly had a number of
23   compression fractures at the various cervical
24   levels?
25             A.   Oh, oh, Everly.  Oh.  There were clearly
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 69

1    fractures in that case.  I didn't recall

2    initially.  There was a C7 and T1 compression

3    fractures.

4         Q.  Right.  But even though you had the

5    radiographs and the films in that case, you had

6    the initial opinion in your report that there was

7    no fracture?

8         A.  That was --

9              MR. MOROKNEK:  Form.

10             THE WITNESS:  That was from the CT scan,

11        which was read by the neuroradiologist as

12        normal with no evidence of fracture.

13             The reason the fractures became apparent

14        were from the MRI scan, which showed signal

15        changes on the T1 and T2 weighted studies,

16        but the CT scan in itself was read as normal

17        by everybody.

18   BY MR. McELFISH:

19        Q.  But once you had the MRI results in that

20   case, you did not update your report to reflect

21   that change?

22             MR. MOROKNEK:  Objection to form.

23             THE WITNESS:  I don't recall.

24   BY MR. McELFISH:

25        Q.  Now, back to this case, with respect to

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 70

1    the cervical spine, you did not see any of it --

2    any of the findings or any of the pathology as

3    traumatic in nature?

4         A.  Correct.

5         Q.  Okay.  Was there any compression

6    centrally or laterally in the cervical spine that

7    you were able to see?

8         A.  There was no compression of the spinal

9    cord itself.

10        Q.  Okay.  What about laterally?

11        A.  Somewhat to the left at C4-C5 and C5-C6,

12   according to my report.

13        Q.  Okay.  And again, just so I have it in

14   my head correctly, on the lumbar spine there was

15   no compression laterally as well other than the

16   L5-S1 level?

17            MR. MOROKNEK:  Objection to form.  Asked

18        and answered.

19            THE WITNESS:  Correct.

20            MR. McELFISH:  Okay.

21            MR. MOROKNEK:  Can you read that

22        question and answer back for me?

23            THE REPORTER:  Sure.

24            MR. MOROKNEK:  Thank you.

25            (Record read.)

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 71

1   BY MR. McELFISH:

2        Q.   Okay.  And so now that I have heard the

3   question back, let me just try to be a little

4   clearer.

5             In the lumbar spine there was no

6   foraminal compression or lateral compression at

7   any of the levels in the lumbar spine other than

8   the L5-S1 -- L5-S1 in 2013?

9        A.   Correct.

10       Q.   Okay.  Now was there any -- to your

11  recollection, was there any lateral compression

12  in the foramina on the left side in that 2013

13  film?

14       A.   Of the cervical or lumbar?

15       Q.   I am sorry.  Lumbar.

16       A.   There was the disc herniation on the

17  left side.

18       Q.   That's more of a central herniation.  I

19  am asking you more about the foramina.

20       A.   I think there was bilateral foraminal

21  stenosis.

22       Q.   What levels?

23       A.   L5-S1.

24       Q.   Okay.  But no other levels on the left

25  side?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 72

```
 1        A.   No.
 2        Q.   Okay.  Now going to the 2015 films, did
 3   you generally make a comparison between the '15
 4   and the '13 films?
 5            MR. MOROKNEK:  Objection.
 6            THE WITNESS:  Yes.
 7   BY MR. McELFISH:
 8        Q.   And did you see any injury or change or
 9   pathology on the 2015 films that were not present
10   on the '13 films there?
11        A.   I think there was a little more of a
12   right-sided focal disc at L4-L5.
13        Q.   Okay.  How much more?  Were you able to
14   quantify?
15        A.   Small, very small and focal.
16        Q.   In terms of millimeters, any idea?
17        A.   I don't recall.
18        Q.   Okay.  Did you take any note of the
19   L5-S1 herniation and whether or not it had
20   changed?
21        A.   I said it looked as seen as previous on
22   the MRI of November 8, 2013.
23        Q.   Okay.  And I take that to mean that you
24   saw it generally to be the same.  I just want to
25   ask you a little more specifically, did you
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 73

```
 1    notice whether or not it had shrunk at all --
 2            MR. MOROKNEK:  Objection to form.
 3            MR. McELFISH:  -- from the 2015 films to
 4        the --
 5            What's funny, Mr. Barmen?
 6            MR. BARMEN:  Huh?
 7            MR. McELFISH:  You are doing it again,
 8        man.
 9            MR. BARMEN:  What am I doing, Ray?
10            MR. McELFISH:  You are laughing at every
11        question.
12            MR. BARMEN:  Did I laugh?
13            MR. McELFISH:  I am trying to examine
14        the doctor.
15            MR. BARMEN:  No, no.  You are not.  I
16        don't know what you are doing.
17            MR. McELFISH:  Exactly.  You don't know.
18            MR. BARMEN:  I don't know --
19            MR. McELFISH:  Like a lot of things.
20    BY MR. McELFISH:
21        Q.  So did you notice any shrinkage of the
22    L5-S1 herniation on the 2015 film versus the '13
23    film?
24            MR. MOROKNEK:  Objection.
25            THE WITNESS:  It's not in my report, no.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 74

```
 1              MR. McELFISH:  I'm sorry.  I didn't hear
 2         you.
 3              THE WITNESS:  It's not in my report, no.
 4    BY MR. McELFISH:
 5         Q.  Okay.  Are you familiar with the term
 6    "resorption"?
 7         A.  Yes.
 8         Q.  Tell me what that is.
 9         A.  It's when a disc gets smaller as time
10    goes by, a herniation.
11         Q.  Did you note in any of Dr. Mobin's
12    reports or any of his follow-up, supplemental or
13    rebuttal reports or his deposition, where he had
14    noted his review of the 2015 film, and that he
15    believes that the L5-S1 herniation had resorbed
16    and shrunk?
17         A.  I don't recall it completely, but I know
18    there was some reference to it.  I actually wrote
19    a paper on that.
20         Q.  On resorption?
21         A.  Uh-huh.
22         Q.  Were you able to observe the hydration,
23    if you will, generally, of the L5-S1 versus the
24    other levels in the '15 film?
25         A.  I believe it was degenerated compared to
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 75

1   the other levels, yes.

2          Q.   Okay.  Had it acquired any hydration or

3   had it resorbed any -- had it undergone any

4   resorption since the 2013 films comparatively?

5              MR. MOROKNEK:  Objection to form.

6              THE WITNESS:  I don't recall.

7   BY MR. McELFISH:

8          Q.   So you don't know one way or the other?

9          A.   I don't recall.

10         Q.   Okay.  Assuming that -- and I will try

11  to get this right -- assuming that there was

12  resorption of the L5-S1 disc in the 2015 films,

13  would that be an indication to you that there was

14  a traumatic event to the L5-S1 herniation in '13?

15         A.   No.

16         Q.   What paper did you write on resorption?

17         A.   "Spontaneous regression of a large disc

18  herniation."  It was published, I believe, in

19  Clinical Orthopedics and Related Research, and it

20  involved resorption of a previously very large

21  lumbar disc herniation.

22         Q.   I am sorry.  Where did you published it

23  at?

24         A.   I believe it was -- I believe it's in

25  Clinical Orthopedics and Related Research.  It's

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 76

1    in my C.V.

2          Q.   Okay.  Did you have any co-authors?

3          A.   Suzanne Miller, I believe.

4          Q.   Who is she?

5          A.   She was a medical student at the time.

6          Q.   Okay.  Any other changes that we have

7    not talked about that you observed on the 2015

8    film versus the '13 film?

9          A.   Not in my report, no.

10         Q.   Do you believe that the L4-L5 -- well,

11   let me ask it this way:  Did you see any trauma

12   related to the L4-L5 change?

13         A.   No.

14         Q.   So there was no edema or there was no

15   other indications of trauma at that level?

16         A.   No.

17         Q.   Okay.  And did you see whether or not

18   the L4-L5, the increased size of that disc on the

19   '15 film, could you tell whether or not it was

20   compressing centrally or laterally?

21             MR. MOROKNEK:  Objection to form.

22             THE WITNESS:  I don't believe it was,

23         no.

24   BY MR. McELFISH:

25         Q.   Okay.  That was not a great question for

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 77

1    what I wanted.  What I was trying to find out is:

2    Were you able to tell the -- whether or not the

3    increased L4-L5 disc on the '15 film, whether or

4    not it was doing anything that would cause pain?

5         A.  I don't believe so.

6              MR. MOROKNEK:  Objection to form.

7    BY MR. McELFISH:

8         Q.  Do you still have the '13 films

9    somewhere?

10        A.  No.

11        Q.  What did you do with those?

12        A.  The disks I just destroyed.

13        Q.  Okay.  If you recall, then, with regard

14   to the 2013 films, do you recall, did you write

15   down or document what window or frame you were

16   looking at and whether it was sagittal or axial

17   as to where you saw the central protrusion?

18        A.  I usually -- I usually look at both.

19   It's not just one or the other.  I look at the

20   axials and the sagittals, and the T1 and T2

21   weighted studies.

22        Q.  Do you remember the plane?  Did you mark

23   it down?

24        A.  No.

25        Q.  Okay.  You said in your report that the

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 78

1   neurological findings did not correlate.  What

2   did you mean?

3       A.  Well, initially he had no complaints of

4   back pain is one thing.  So if, in fact, that --

5   I mean, excuse me.  No complaints of leg pain in

6   the emergency room.  So if this was a large acute

7   disc herniation, one would have expected him to

8   have left leg pain at the time of the injury.

9       Q.  Okay.  But based on the film that you

10  saw and that we have been discussing, the pain he

11  did complain of on the right side could have come

12  from the foramina and the compression?

13          MR. MOROKNEK:  Objection to form.

14          THE WITNESS:  I don't think that his

15      foraminal complaints would be accounted for

16      for back pain, no.

17  BY MR. McELFISH:

18      Q.  Okay.  But for the leg pain and the leg

19  weakness it could be true?

20          MR. MOROKNEK:  Objection to form.

21          THE WITNESS:  It can.  Degenerative

22      changes like that can cause pain in the leg.

23  BY MR. McELFISH:

24      Q.  Okay.  What about delayed onset?  Do you

25  believe in the idea that someone can have an

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 79

1   injury and there is a delayed onset to the

2   symptoms?

3        A.   What symptoms?

4        Q.   Low back or leg symptoms.

5        A.   Not in the leg.  Not if you have an

6   acute herniated disc, I don't think there is a

7   delayed onset.

8        Q.   What about in the back?

9        A.   I think that the back, if it's hurt, it

10  hurts right then and there.  I don't think it

11  comes on later.

12       Q.   Have you ever seen a case where someone

13  developed back pain within a couple of days or a

14  week after the accident?

15       A.   I have seen it, but it's usually just

16  muscular mechanical pain.

17       Q.   Not herniated disc or a disc injury?

18       A.   No.

19       Q.   Have you seen any of the articles or any

20  of the science that's been developed on delayed

21  onset?

22       A.   Not that I can think of, no.

23       Q.   Assuming that Mr. Bauta had a

24  degenerative condition in his lower spine at the

25  time of this accident, do you believe this

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 80

```
 1    accident exacerbated that condition?
 2              MR. MOROKNEK:  Objection to form.
 3              THE WITNESS:  No.
 4    BY MR. McELFISH:
 5         Q.  Do you believe it made -- the accident
 6    made the condition symptomatic?
 7         A.  It could have made it symptomatic, but
 8    it was preexisting degenerative disease.
 9         Q.  Right.  I want you to make that
10    assumption, Doctor, that it was preexisting
11    degenerative disease.
12         A.  Uh-huh.
13         Q.  Do you believe that the accident caused
14    it to be symptomatic?
15              MR. MOROKNEK:  Objection to form.
16              THE WITNESS:  It can cause pain to --
17         something to become symptomatic, yes.
18    BY MR. McELFISH:
19         Q.  What I am asking you, though, is a
20    slightly different question.  In this case -- I
21    understand it can -- in this case do you believe
22    it did?
23         A.  Did what?  I am not following.
24         Q.  Let me rephrase.
25              Because you just testified that an
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 81

1  accident can make an underlying degenerative

2  condition symptomatic, I am asking you now, is

3  it -- do you believe in this case, this accident

4  caused Mr. Bauta's underlying degenerative

5  condition to become symptomatic?

6      A.  No, I don't.

7      Q.  Why?  What do you base that belief on?

8      A.  The fact that his symptoms do not

9  correlate with the MRI finding.  I think this MRI

10  of the herniated disc on the left side was

11  preexisting.  I think his foraminal stenosis was

12  preexisting, and I don't think they were of

13  sufficient magnitude to be injured by the -- in

14  this type of an accident.

15      Q.  I want you to assume that the herniated

16  disc that we are talking about -- can we call it

17  an extruded disc?

18      A.  I think it was a herniated disc.  I

19  don't think the fragment was necessarily

20  extruded.  That has to have migrated, and I don't

21  think this migrated.

22      Q.  You didn't see any extrusion on the

23  film?

24      A.  It's hard to call an extrusion until you

25  are in surgery.  Sometimes you can.  I take that

Page 82

1    back.

2        Q.   Back to my question, though.   Did you

3    see any extrusion on the film?

4        A.   I think this was a herniation, not an

5    extrusion.

6        Q.   But you didn't see any extrusion on the

7    film?

8        A.   I just said, I don't think it was

9    extruded.

10       Q.   That would be no?   In other words, you

11   did not?

12       A.   No.

13       Q.   All right.   Now, I want you to assume

14   that -- well, I guess the MRI reports called it a

15   large herniation.   I believe you called it a

16   large herniation when you testified about what

17   you saw in the film in 2013.

18             Assume it's an 11-millimeter extrusion

19   on the left side.   Would that have been

20   symptomatic prior to this accident?

21             MR. McELFISH:   Objection to form.

22             THE WITNESS:   Sometimes yes, and a lot

23       of times no.

24   BY MR. McELFISH:

25       Q.   You can have an 11-millimeter extruded

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 83

1    disc or herniated disc with no pain?

2         A.   Absolutely.

3         Q.   Do you know how many hours you have

4    spent on this case?

5         A.   A lot.  I don't know.  I have reviewed

6    the records several times and then more records

7    came.  I don't know.  I would say 10 hours to

8    15 hours, somewhere around there.

9         Q.   Do you have a record of that?

10        A.   No, I don't.

11        Q.   Did you bill the defendants for your

12   time?

13        A.   I bill by set fees.  I don't bill by the

14   hour.

15        Q.   You bill $10,000 for a review and

16   report?

17        A.   Correct.

18        Q.   $15,000 for testimony?

19        A.   Only in court, not in the office.

20        Q.   Correct.  And when you are in

21   depositions, how do you bill that?

22        A.   I bill out at 7,500 for the deposition.

23        Q.   Okay.  Regardless of how long it takes?

24        A.   Regardless.

25        Q.   Okay.

JE50-0084

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 84

1        A.  I had to leave the operating room today

2    to come here and do this.

3        Q.  Okay.  Did you see in any of the

4    treating doctors' records that they noted that

5    Mr. Bauta's complains did not match up with his

6    neurological findings?

7        A.  Not in the treating doctors' records, I

8    don't believe.

9        Q.  He treated with how many?  Five, ten

10   providers at least?

11       A.  I didn't add them up.

12            MR. MOROKNEK:  Objection to form.

13            You can answer.

14            THE WITNESS:  Five to ten.

15            MR. McELFISH:  Sorry.  Go ahead.

16            THE WITNESS:  Five to ten, I would say.

17   BY MR. McELFISH:

18       Q.  Okay.  Did you note from reviewing --

19   you said you reviewed the records a couple of

20   times.  Did you note in your report after having

21   those reviews, anywhere where any one of his

22   treating doctors made the comment or a notation

23   or the intimation even, I suppose, that the

24   complaints did not match the neurological

25   findings?

Page 85

1           MR. MOROKNEK:  Objection to form.  Asked
2      and answered.
3           THE WITNESS:  No.
4           MR. McELFISH:  Different question.
5      Thank you.  If you need a break, just let me
6      know.
7           THE WITNESS:  No, I am fine.
8  BY MR. McELFISH:
9      Q.  Would you agree with me that in looking
10 at the cervical films, that, you know, absent a
11 fracture of the bone, bony structure, you
12 wouldn't necessarily see edema?  So if you have
13 an injury or you have an accident or an event,
14 someone has neck pain, absent a fracture or an
15 injury to the bony structure, you wouldn't
16 necessarily see edema?
17           MR. MOROKNEK:  Objection to form.
18           THE WITNESS:  Correct.
19 BY MR. McELFISH:
20     Q.  Okay.  Said another way, if you just had
21 an injury where someone has a musculoligamentous
22 injury or just a -- potentially even a disc
23 protrusion, you wouldn't necessarily see edema?
24     A.  You could have a ligament injury and see
25 edema, but generally, it's in the bone.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 86

1        Q.  Do you have an opinion about whether or

2   not an April 15, 2014, fall on ice had any impact

3   on his injury?

4        A.  No.

5        Q.  So you don't believe the fall on the ice

6   that was indicated at Brookdale Hospital in April

7   of 2014 made his injury worse or had any, I

8   guess, contributing effect to it?

9        A.  I don't have any opinion on that.

10       Q.  All right.  Did you see the record from

11  Brookdale from April of 2014 about the fall?

12       A.  No, I did not.

13       Q.  Okay.  Thank you.

14           With respect to Dr. Alladin's records --

15  and I am asking it this way, Doctor, because I

16  think you know your report probably better than I

17  do.  I don't know your report very well, but did

18  you have an opportunity to note whether or not

19  Dr. Alladin diagnosed weakness in the lower

20  extremity early on in his care?

21       A.  He did document some weakness.

22       Q.  And motor weakness, right?

23       A.  Correct.

24       Q.  On the right side?

25       A.  Correct.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 87

1      Q.  And how did he do that?

2          MR. MOROKNEK:  Objection to form.

3          THE WITNESS:  I wasn't there.  I assume

4      he tested him.

5  BY MR. McELFISH:

6      Q.  Well, that's what I am getting at.  I am

7  not asking you to speculate, obviously, but as an

8  expert, if you have reviewed his record, I was

9  trying to ascertain whether or not you could tell

10  from his record how he did that?

11     A.  I cannot.

12     Q.  And can you tell me what the

13  quantitative -- what the quantitative measurement

14  was in the weakness of the motor on the right

15  side?

16     A.  He recorded what, in retrospect, does

17  not make a lot of sense because he recorded

18  weakness of his biceps, triceps, interosseous,

19  and handgrip.  Those are -- I mean, that's almost

20  the complete arm, which is -- anatomically makes

21  no sense.

22     Q.  Okay.  But with respect to the right,

23  lower extremity, he documented a 3 out of 5 motor

24  weakness, correct?

25     A.  Correct.  And he said due to pain.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 88

1      Q.  He did not document such a motor

2  weakness on the left side?

3      A.  Not in my report, no.

4      Q.  And not any of his other reports?

5      A.  Not that I know of.

6      Q.  Thank you.

7           Now, with respect to your practice here

8  at Mount Sinai Hospital, how much of your

9  practice is defense -- is expert work versus

10  clinical work?

11     A.  In my daily routine here at the

12  hospital, it's five percent of the time.

13     Q.  Let's say in a given year, how much of

14  your time is devoted to forensic work?

15     A.  I spend some time on weekends, but my

16  main focus is my clinical practice, so at least

17  80 percent of my time.

18     Q.  All right.  How many cases do you have

19  right now as an expert?

20     A.  Right now?

21     Q.  Uh-huh.

22     A.  I don't know what you mean by "have

23  right now."  How many are pending to be done

24  or --

25     Q.  Fine.  I will withdraw -- and fine.

Page 89

```
 1          How many cases do you currently have
 2    pending where you have been retained as an
 3    expert?
 4          A.  Well, I have done reports.  I do
 5    reports.  I don't know if that keeps me retained
 6    or not.  I mean, you know, I finish the report,
 7    and I am done as far as I concerned.
 8          Q.  Assume it does.
 9          A.  Assume it does.
10          Q.  Yes.
11          A.  I still don't know.  Is that within a
12    year or within two years or every report I have
13    ever done?
14          Q.  What's currently open.
15          A.  I really don't know the answer to that
16    question --
17          Q.  Okay.
18          A.  -- from my point of view.
19          Q.  Okay.  Well, how many reports have you
20    written this year so far?
21          A.  This year?
22          Q.  Uh-huh.
23          A.  Not that many.  Maybe -- it's January,
24    maybe ten.
25          Q.  Okay.  How many IMEs have you done this
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 90

1   year?

2         A.   Maybe ten.

3         Q.   Is that typical for year to year?  I

4   mean, we are only in -- we just got through

5   February basically.

6         A.   It depends.  It varies.  If I am on

7   vacation, if I am around.  I do -- on average,

8   it's -- if I am around, it's one to two a week.

9         Q.   Okay.  If you are around?

10        A.   Right.  If I am in the office.

11        Q.   Okay.  Out of the ones that you do have,

12   how many are defense and how many are plaintiff?

13        A.   They are all defense work.

14        Q.   Do you have any cases in your office

15   right now where you are an expert for the

16   plaintiff?

17        A.   No.

18        Q.   And when is the last time you had any --

19   when is the last time you were retained by a

20   lawyer or by the plaintiff in a case?

21        A.   As an expert witness?

22        Q.   As an expert for the plaintiff.

23        A.   As a treating physician or as an expert?

24        Q.   As an expert, retained expert.

25        A.   Not as a treating physician?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 91

1       Q.   Correct.

2       A.   I don't think I did.

3       Q.   Ever?

4       A.   No.

5       Q.   Okay.  How many times have you been

6    retained as a non -- how many times have you

7    acted as a non-retained expert, meaning a

8    treating doctor --

9       A.   Once.

10      Q.   -- in a case?  When was that?

11      A.   Oh, years ago.

12      Q.   Is that the one in Connecticut,

13   Papadakis?

14      A.   Yes.

15      Q.   I believe in that case you testified

16   that pain is evidence of trauma, didn't you?

17      A.   I don't recall that.  No.

18      Q.   You were just asked about it in the

19   Everly case, and you said, "Pain is evidence of

20   trauma."  Do you recall that testimony?

21      A.   I don't recall saying those words, no.

22      Q.   Do you agree with that as a concept?

23      A.   Pain can be a sign of trauma, yes.

24      Q.   Okay.  With respect to Mr. Bauta's back

25   pain, do you have an opinion -- I want to ask it

Case 1:14-cv-03725-RER   Document 874   Filed 09/01/20   Page 93 of 151 PageID #: 36932

Page 92

```
 1   this way for a reason -- do you have an opinion
 2   as to whether or not Mr. Bauta was faking his
 3   complaints?
 4            MR. MOROKNEK:  Objection to the form of
 5        the question.
 6            THE WITNESS:  I don't have an opinion
 7        other than I didn't think he participated
 8        completely when I tested his muscle
 9        strength.
10   BY MR. McELFISH:
11        Q.  But other than that, you don't have an
12   opinion?
13        A.  No.
14        Q.  Did you note from the hospital records
15   in Brooklyn that he complained of whole body
16   pain?
17        A.  Yes.
18        Q.  And he had head injuries in the
19   Evangelical Hospital?
20        A.  I don't recall that part, no.
21        Q.  What did he complain about at
22   Evangelical?
23        A.  He had a headache.  They did a CT scan
24   of his head, which was negative.  He complained
25   of pain in the neck, dizziness, neck stiffness,
```

Page 93

1    chest pain.  He denied chest pain, rather.  He

2    complained of lower back pain, pain in his legs,

3    right worse than left.

4         Q.  Do you know whether or not he had any

5    abrasions or cuts or visible injuries to his

6    head?

7         A.  I believe he had an abrasion on his head

8    if I am not mistaken.

9         Q.  Have you ever seen a photo?

10        A.  I can't remember.

11        Q.  Were you asked to evaluate mechanism of

12   injury in this case?

13        A.  No, I was not.

14        Q.  So you have no opinion one way or

15   another whether or not there was a mechanism of

16   injury which caused Mr. Bauta's injuries?

17        A.  Oh, I thought you mean looking at the

18   car.  No.  I know what happened in the accident,

19   how the accident happened.

20        Q.  Okay.  Let's back up, then.  Let's back

21   up.

22             So do you have an opinion as to whether

23   or not this bus accident caused these injuries

24   Mr. Bauta complains of in terms of his back?

25        A.  I think he is complaining of injuries

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 94

```
 1    because of it.  I don't think -- I think his
 2    changes were all preexisting degenerative
 3    changes.
 4         Q.  But he has symptoms from it?
 5         A.  Correct.
 6              MR. MOROKNEK:  Objection to the form of
 7         the question.
 8    BY MR. McELFISH:
 9         Q.  In terms of the mechanism, the specific
10    mechanism, not biomechanics, not Delta-v, not
11    change in speed, I am asking you about medical
12    mechanism of being in a rear-end accident as a
13    passenger on a bus, is that consistent with the
14    injuries or complaints he is making?
15              MR. MOROKNEK:  Objection to the form of
16         the question.
17              THE WITNESS:  It could be.
18    BY MR. McELFISH:
19         Q.  Do you believe it is or is not?
20              MR. MOROKNEK:  Objection to form.
21              THE WITNESS:  I believe it could be.
22              MR. McELFISH:  Okay.  Sorry, guys.  I
23         have to see what this is.
24              (Discussion off the record.)
25    BY MR. McELFISH:
```

Page 95

1       Q.   In terms of mechanism, Doctor, do you

2    have any understanding as to how the accident

3    happened?

4            MR. MOROKNEK:   Objection to form.   Asked

5        and answered.

6            THE WITNESS:   I believe it was a rear-

7        end collision.

8    BY MR. McELFISH:

9       Q.   Do you know the body mechanics in terms

10   of the mechanism, how the body was moving and

11   things like that that might have caused this

12   injury?

13      A.   No.

14      Q.   Okay.  Did you read plaintiff's

15   deposition as an expert in the case?

16      A.   I did.  I looked at it.  Yes.  I don't

17   recall much of it, but I did look at it.

18      Q.   Did you make any comments about any of

19   it in your report?

20      A.   No, I did not.

21      Q.   Do you recall which deposition you read?

22   Because he was deposed twice.

23      A.   I think both I saw.

24      Q.   Okay.  You didn't make any comments one

25   way or the other?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 96

```
 1        A.   No.
 2        Q.   Now, with respect to the treatment
 3   records that we discussed that you outlined in
 4   your report and your testimony here today, do you
 5   have an opinion, Doctor, as to whether or not
 6   the -- whether or not the surgeries that Mr.
 7   Bauta had in this case were reasonable and
 8   necessary for the conditions he was complaining
 9   of at that time?
10             (Mr. Barmen left the room.)
11             THE WITNESS:   Necessary is not a way of
12        looking at it.   This was elective surgery
13        based upon complaints.   It's not necessary
14        surgery.
15   BY MR. McELFISH:
16        Q.   Was it reasonable?
17        A.   I would not have done what this doctor
18   did.   I don't think he needed surgery at the
19   L4-L5 level.   I am not sure why that was done.   I
20   probably would not have -- would have not fused
21   his spine in general, but I don't think it's
22   unreasonable what was done.
23        Q.   So if I understand you correctly, you
24   are saying you wouldn't have done it, but in
25   terms of the medical community, you don't believe
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 97

1  that what he did was unreasonable?

2          MR. MOROKNEK:  Objection to form.

3          THE WITNESS:  I don't think -- I don't

4      think most people would have done this, no.

5  BY MR. McELFISH:

6      Q.  Then how can you say it's not

7  unreasonable?

8      A.  Because I don't think it was grossly

9  negligent.  I just would not have done it, and I

10  don't think it's what should have been done.

11      Q.  Going back to your testimony about why

12  you would not have done it, you said you did not

13  understand why there was surgery at the L4-L5

14  level, right?

15      A.  Correct.

16      Q.  But earlier you said you noticed on the

17  films that there was nerve root compression on

18  the foramina?

19      A.  I did not say at L4-L5.

20          MR. MOROKNEK:  Objection to form.

21          THE WITNESS:  You said that.

22  BY MR. McELFISH:

23      Q.  Let me withdraw that.  Was there --

24  would it be reasonable to operate at the L5-S1?

25          MR. MOROKNEK:  Objection to form.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 98

```
 1              THE WITNESS:  That could be reasonable,
 2       yes.
 3  BY MR. McELFISH:
 4       Q.  All right.  So let's break it down,
 5  then.  With respect to a surgery at L4-L5, was
 6  there surgery done?
 7       A.  I believe there was.
 8       Q.  What was done?
 9       A.  I believe a laminectomy and a fusion and
10  instrumentation.
11              (Mr. Barmen returned.)
12  BY MR. McELFISH:
13       Q.  Okay.  And did that address -- what did
14  that address, to your knowledge?
15       A.  I don't know.  The disc was not
16  degenerative.  I don't know why they fused that
17  level, and the herniation was so small that I
18  don't think it was a sign of problems for him.
19       Q.  Can you state any basis for why you
20  believe that L4-L5 surgery was done?
21       A.  I cannot.
22       Q.  Now with respect to the L5-S1, what do
23  you understand was done?
24       A.  A laminectomy, a fusion and a
25  decompression.
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 99

1      Q.   Okay.   And was that reasonable?

2            MR. MOROKNEK:   Objection to form.

3            THE WITNESS:   Again, it depends.   I put

4      together the patient's symptoms, their

5      complaints, how I think they are going to do

6      postoperatively, and then make a decision

7      about whether surgery should be done or not.

8  BY MR. McELFISH:

9      Q.   In this case, do you believe what was

10  done was reasonable?

11           MR. MOROKNEK:   Objection to form.

12           THE WITNESS:   I don't think it was

13      unreasonable, no.

14  BY MR. McELFISH:

15      Q.   Okay.   Do you agree that fusion should

16  be done if a patient has unretractable discogenic

17  back pain?

18           MR. MOROKNEK:   Objection to form.

19           THE WITNESS:   In certain situations,

20      yes.

21  BY MR. McELFISH:

22      Q.   What about in this situation?

23      A.   I think it's not unreasonable.

24      Q.   Okay.   And can you say why there was

25  another surgery?   Are you able to tell?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 100

1      A.   Apparently some of the screws were

2   misplaced, so they had to go back in and take

3   them out.

4      Q.   Okay.  But as of now, he is living with

5   the hardware in his spine?

6      A.   As I understand it, yes.

7      Q.   Let me see if I can just ask it one

8   other way.  Do you believe that there was any

9   alternative for the surgeons -- just, Doctor, I

10  understand your opinion about L4-L5 -- but with

11  respect to L5-S1, was there any alternative for

12  the doctors other than the fusion that they did?

13     A.   Yes.

14     Q.   What was it?

15     A.   Not to operate.

16     Q.   And do what?

17     A.   Just treat him nonoperatively, and he is

18  no better off now than he was before.  So he

19  could have avoided surgery and have the same

20  problems.

21     Q.   You agree with me that he was treated

22  conservatively with multifaceted modalities for

23  two to three years before the surgery?

24     A.   Correct.

25     Q.   And they did not work?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 101

1     A.  Correct.

2     Q.  Including facet blocks and epidurals?

3     A.  Correct.

4     Q.  So we can take the facet blocks and

5  epidurals out of play, true?

6     A.  True.

7         MR. MOROKNEK:  Objection to form.  I am

8         not sure what that means.

9  BY MR. McELFISH:

10     Q.  Okay.  Have you reviewed Dr. Winn's

11  deposition?

12     A.  I probably saw it.  I don't recall

13  reviewing it, per se, but I did see it.

14     Q.  Did you note it in your report?

15     A.  I said before earlier that I talked

16  about Dr. Winn's treatment or I don't know; I

17  don't remember if it was Dr. Winn's note or Dr.

18  Alladin's notes that had Dr. Winn's notes in it.

19     Q.  I was asking a different question.  I

20  was asking if you made a note in your report of

21  whether or not you saw Dr. Winn's deposition?

22     A.  No.  It's not in my report.

23     Q.  Other than sending Mr. Bauta back to

24  conservative care -- hold on.  Other than to

25  sending --

Page 102

1          MR. MOROKNEK:  Just note my objection to

2      the last question insofar as Dr. Winn was

3      just deposed.  He was deposed after the

4      doctor, this doctor, Dr. Casden, prepared

5      his report.

6  BY MR. McELFISH:

7      Q.  In terms of when you say he should

8  have -- they should have not operated and done

9  conservative care, what would you have

10  recommended?

11      A.  Sometimes it's better not to operate,

12  that's all.

13      Q.  But do you have -- I am trying to -- I

14  understand your opinion in that regard, but,

15  Doctor, what I am trying to find out is:  What do

16  you believe should have been done for him?

17      A.  Maybe just pain medication and no

18  surgery.

19      Q.  Okay.  What about returning him for

20  injections and epidurals?

21      A.  I think --

22          MR. MOROKNEK:  Objection.

23          THE WITNESS:  If you failed them at some

24      point, it's enough.  You have done enough,

25      and it's not worth trying again.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 103

1    BY MR. McELFISH:

2        Q.  And do you believe he had sufficient

3    physical therapy to exhaust that avenue?

4        A.  Yes, I do.

5            MR. MOROKNEK:  Form.

6    BY MR. McELFISH:

7        Q.  And do you find that the reasonable --

8    do you find that the physical therapy that he had

9    in this case was reasonable?

10       A.  Yes, I believe so.

11       Q.  And what about, I think based on your

12   last answer before that, you said that if someone

13   fails the injections and the epidurals, that it's

14   over, basically?

15       A.  At some point, yes.

16       Q.  At some point.  Do you believe that the

17   conservative care he received in that regard with

18   respect to the injections and the epidurals were

19   reasonable for the complaints he was making?

20           MR. MOROKNEK:  Objection to form.

21           THE WITNESS:  I don't believe in all the

22       things that were done to him, but I use --

23       but I do have people who do these injections

24       for me.

25   BY MR. McELFISH:

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 104

1       Q.   Okay.  So what was it you believe -- you
2    don't believe should have been done to him?
3       A.   I am just not a big believer,
4    personally, in medial branch blocks.  I don't
5    find they really have an effect.
6       Q.   Why not?
7       A.   I can't tell you why.  I just don't
8    think from my 20 years of doing this that they
9    were, but I think that epidurals do work.
10      Q.   And what about facet blocks?
11      A.   Maybe.
12      Q.   What about rhizotomies?
13      A.   No.
14      Q.   You don't do those?
15      A.   No.
16      Q.   So, so far in this case, if you billed
17   7,500 for today and 10,000 for the report, you
18   are up $17,500?
19          MR. MOROKNEK:   Objection to form.
20          THE WITNESS:   Correct.
21   BY MR. McELFISH:
22      Q.   When you -- you said earlier that
23   Mr. Fabiani was your friend or a lawyer that you
24   knew that you first started doing expert work
25   with?

Page 105

1     A.  Correct.

2     Q.  When you testified on trial in Everly

3 that he gave you discounts, what did you mean by

4 that?

5     A.  When I -- I don't want say in front of

6 these guys, but I do --

7     Q.  We are here.

8     A.  I do it for him for $7,500.

9     Q.  To do what?

10     A.  Because that's what we started for.  The

11 IMEs.

12     Q.  Okay.  And does he get a discount on

13 anything else?

14     A.  No.

15     Q.  And why do you do a discount for Mr.

16 Fabiani?

17     A.  He has called me and said he can't get

18 more from his clients.

19     Q.  So because these defendants can pay

20 more, there is no problem billing more?

21         MR. MOROKNEK:  Objection to form.

22     Argumentative.

23         THE WITNESS:  I don't --

24         MR. MOROKNEK:  Foundation.

25         THE WITNESS:  I don't see any problem

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 106

1      with it.

2           MR. McELFISH:  Okay.

3           MR. BARMEN:  I don't, either.  Get what

4      you can get.

5           THE WITNESS:  I get paid different

6      amounts for surgery when I do surgery.  It's

7      the same thing.

8  BY MR. McELFISH:

9      Q.  What do you charge for a fusion?

10     A.  What do I charge?

11     Q.  What's the charges?

12     A.  That comes out of the computer.  My

13  billing department does that.

14     Q.  Do you have any idea?

15     A.  It depends the type of fusion, how many

16  levels you are doing, and the insurance payments.

17     Q.  What about a double level fusion?

18     A.  The computer would --

19     Q.  Lumbar.

20     A.  -- probably put out a bill in the range

21  of 45 to 50,000, but we don't get paid that.

22     Q.  Is that just your surgical bill?

23     A.  That's -- would be just my surgical

24  bill.

25     Q.  What would the facility bill be?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 107

1        A.   I don't know.

2        Q.   Do you have some ballpark?

3        A.   No.

4        Q.   Over six figures?

5        A.   I have no idea.

6        Q.   Would a double level fusion require an

7     overnight stay?

8        A.   Yes.

9        Q.   How much is an overnight stay in a

10    hospital?

11       A.   I don't know.

12       Q.   Here at Mount Sinai?

13       A.   I don't know.

14       Q.   Okay.  Okay.  Do you have any opinions

15    in this case as to whether or not the bills, the

16    medical bills of Mr. Bauta, the treatment bills,

17    and the surgical bills, and the facility bills,

18    and the conservative care bills, do you have any

19    opinion as to whether or not they are reasonable

20    and customary?

21            MR. MOROKNEK:  Objection to form.

22            THE WITNESS:  I have no clue.  I have no

23         idea what was charged for anything.

24    BY MR. McELFISH:

25       Q.   Okay.  Okay.  Some experts have

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 108

1    opinions, particularly out West, it's a little

2    different where the surgeons will testify as to

3    the reasonableness and customariness of the

4    bills, so that's why I am asking.

5         A.   Yes.

6         Q.   You were not asked to do that?

7         A.   No.

8         Q.   Okay.  Now, with respect to -- let's go

9    back to your opinion that you believe that the --

10   at least the L5-S1 portion of the fusion was not

11   unreasonable.

12             MR. MOROKNEK:  Objection to form.

13   BY MR. McELFISH:

14        Q.   Okay?

15        A.   Correct.

16        Q.   Okay.  Based upon that, and then the

17   condition of Mr. Bauta post fusion, do you have

18   any opinion as to whether or not he would need

19   future medical care?

20        A.   I believe he will require future medical

21   care, yes.

22        Q.   What do you believe he needs?

23        A.   Pain management is all I would ever do

24   for him.

25        Q.   Okay.  Sir, what about adjacent segment

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 109

1    disease or adjacent level disease or adjacent

2    segment breakdown; you know what I am referring

3    to?

4         A.   Yes.

5         Q.   In a 39- or a 40-year-old gentleman,

6    what are the likelihoods that he will develop

7    adjacent segment disease or breakdown in the next

8    ten years?

9         A.   Percentage-wise?

10        Q.   Anything you can -- any way we can do

11   it.

12        A.   Five percent maybe.

13        Q.   That's it?

14        A.   That's it.

15        Q.   Is there any -- is it more likely -- let

16   me ask it this way:  As an expert, is it more

17   likely than not that Mr. Bauta will in his

18   lifetime or within his life expectancy need

19   additional fusions at the adjacent levels?

20        A.   Less likely.

21        Q.   Not more likely than not?

22        A.   Correct.

23        Q.   Okay.  And what do you base that on?

24        A.   Personal experience.  I have many

25   patients that have 20-plus years from a fusion

Case 1:14-cv-03725-RER   Document 874   Filed 09/01/20   Page 111 of 151 PageID #: 36950

Page 110

1      and have never had any more surgery.

2          Q.   And how many of those patients are we

3      talking about?

4          A.   I don't know.  I have operated on

5      thousands of patients.

6          Q.   Okay.  And have you had them all back to

7      see if they have had additional fusions based on

8      adjacent segment disease?

9              MR. MOROKNEK:  Objection to form.

10              THE WITNESS:  Not all, no.

11     BY MR. McELFISH:

12         Q.   Are you familiar with the literature in

13     the field about the percentages and probabilities

14     of additional fusions based on adjacent segment

15     disease after a fusion?

16         A.   I am familiar with the some of the

17     literature, not the specific numbers.  The

18     numbers are probably all over the place in terms

19     of what percentages.

20         Q.   Can you cite any of the literature?

21         A.   No, I can't.

22         Q.   How much -- going back to your opinion

23     on future medical care, how much conservative

24     care do you believe he will need or pain

25     management do you believe he will need?

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 111

1          A.   If it were me, I would just give him

2     pain pills, and that's it.

3          Q.   And just let him go?

4          A.   Yeah.

5          Q.   Okay.  What kind of pain pills would you

6     prescribe?

7          A.   I am not a pain management doctor,

8     but --

9          Q.   Well, if you are -- if it's your

10    opinion -- and just correct me if I am wrong --

11    if it's your opinion that all you would do in

12    terms of future medical care is give him pain

13    pills, I am just curious as to what pills you

14    would --

15         A.   I would have a pain management doctor

16    manage his pain medication requirements, but I

17    think that is what this patient needs is just

18    pain medication for now.

19         Q.   Are you aware of whether or not Mr.

20    Bauta took any pain medications prior to his

21    surgery?

22         A.   I am not.

23         Q.   Are you --

24         A.   I assume no.

25         Q.   You would assume did he not?

Case 1:14-cv-03725-RER   Document 874   Filed 09/01/20   Page 113 of 151 PageID #: 36952

Page 112

1      A.   Correct.

2      Q.   Okay.  Are you aware of whether or not

3  Mr. Bauta took pain medications since his

4  surgery?

5      A.   He takes -- he was taking Tizanidine,

6  but that's all, I believe.

7      Q.   What is that?

8      A.   I don't believe he was taking any

9  narcotics as far as I know.

10      Q.   Did you ask him?

11      A.   I usually do ask, yes.

12      Q.   Is it in your report that you asked him,

13  and is his answer there?

14      A.   The question is not there, but I only

15  mentioned Tizanidine, so I don't have any other

16  answers.

17      Q.   Okay.  I would assume if you asked him

18  about narcotics, you would have noted that.

19  Well, let me rephrase it.

20           Considering that you believe that's the

21  type of future medical care you think he needs,

22  if you had asked him whether or not he is taking

23  any medication, that would be noted?

24      A.   Correct.

25           MR. MOROKNEK:  Objection to form.

Page 113

1    BY MR. McELFISH:

2         Q.   And it's not?

3         A.   Correct.

4              MR. MOROKNEK:   Objection to form.

5    BY MR. McELFISH:

6         Q.   I do note from the Papadakis transcript

7    you were asked whether or not it is reasonable to

8    do a fusion to alleviate pain, and your answer

9    was yes.

10             MR. MOROKNEK:   Objection to form.

11             THE WITNESS:   Correct.

12   BY MR. McELFISH:

13        Q.   I believe you have been asked that

14   question in five or six other cases at least and

15   you gave the same answer.

16        A.   Correct.

17        Q.   Was there a situation where you made

18   $30,000 in one day testifying?

19        A.   Yes.

20        Q.   You testified in Queens in the morning

21   and Kings in the afternoon?

22        A.   Correct.

23        Q.   And then in New York the same week?

24        A.   I believe so.

25        Q.   That was Papadakis v Fahan, I believe,

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 114

1  in 2003?

2        A.  I don't recall.

3        Q.  Okay.  Now, in that case I believe you

4  were asked about whether or not someone could

5  have pain after a collision without any

6  structural change at all on their MRI, and you

7  said yes?

8        A.  Correct.

9        Q.  And you believe that's true?

10       A.  Yes.

11       Q.  And assuming Mr. Bauta's pathology on

12  his films were preexisting, that's what would

13  happen here, right?

14              MR. MOROKNEK:  Objection to form.

15              THE WITNESS:  Could.

16  BY MR. McELFISH:

17       Q.  I am getting there, Doctor, I am working

18  my way to the end.

19       A.  Sounds good to me.

20       Q.  Do you remember the Lopez case, Lopez

21  versus the City, 2011, a couple of years ago?

22       A.  Not really.  A little bit, I think,

23  because he had a bad injury.  Rectal injury if I

24  am not mistaken.

25       Q.  Right.  Wasn't that an impalement case?

Page 115

1       A.   I believe so.

2       Q.   And your opinion in that case was he had

3    no injury from the accident?

4           MR. MOROKNEK:   Objection to form.

5           THE WITNESS:   He was impaled in the

6       rectum by a rebar if I am not mistaken.

7    BY MR. McELFISH:

8       Q.   Okay.   How did the jury come out in that

9    case?

10          MR. MOROKNEK:   Objection to form.

11          THE WITNESS:   I don't know.

12   BY MR. McELFISH:

13      Q.   Certainly you don't believe that a

14   surgeon such as yourself as an expert is in a

15   better position to evaluate Mr. Bauta's injuries

16   than his own treating doctors, do you?

17          MR. MOROKNEK:   Objection to form.

18          THE WITNESS:   Rephrase it?   Say it

19      again?

20   BY MR. BARMEN:

21      Q.   Sure.   You don't believe as an expert in

22   this case that you are in a better position to

23   evaluate Mr. Bauta's injuries and the causation

24   thereof than his treating doctors, are you?

25          MR. MOROKNEK:   Objection.

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 116

```
 1           THE WITNESS:  I can't answer how well
 2       they treated him or not.
 3   BY MR. McELFISH:
 4       Q.  Are you in a better position than they
 5   are?
 6       A.  No.
 7           MR. MOROKNEK:  Objection to form.
 8   BY MR. McELFISH:
 9       Q.  Are you in a worse position?
10       A.  I think I make a pretty good assessment
11   from seeing him and evaluating the records.
12       Q.  Comparatively speaking, are you in a
13   better or worse position than they are?
14           MR. MOROKNEK:  Objection to form.
15           THE WITNESS:  I think similar.
16   BY MR. McELFISH:
17       Q.  Now in the Papadakis case, which I know
18   you are -- you have been asked about recently, I
19   guess, and the Everly case and in other cases you
20   were the expert for the plaintiffs in that case?
21       A.  Correct.
22       Q.  And in that case, Papadakis had a
23   fusion, I believe?
24       A.  Correct.
25       Q.  Okay.  And you offered an opinion in
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 117

```
 1    that case that, based upon the fusion that was
 2    done, that that -- which I believe you did that
 3    fusion, didn't you?
 4         A.   Correct.
 5         Q.   That she would need future care,
 6    including future surgery, didn't you?
 7         A.   I don't recall it was so long ago.
 8         Q.   I think in that case -- if you know you
 9    know, if you don't, you don't.  We will get the
10    transcripts I guess later.  I didn't want to
11    waste time with the transcripts today, but I just
12    wanted to ask you:  In that case, you actually
13    indicated that she needed future surgery,
14    including adjacent level -- including adjacent
15    level work based on the adjacent segment disease?
16              MR. MOROKNEK:  Objection to the form of
17         the question.  Do you have the transcript?
18         You don't have the transcript to show him?
19              MR. McELFISH:  I am not answering your
20         questions.  I have a pending question for
21         the doctor.
22              MR. MOROKNEK:  My -- if you have --
23              MR. McELFISH:  You can make an
24         objection, Mr. Moroknek.  Go ahead.
25              MR. MOROKNEK:  I am in the process of
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 118

```
 1        trying to do that.  Objection to the form of
 2        the question.  If you have the transcript,
 3        it would be nice to be able to show him.
 4             MR. McELFISH:  I know what would be
 5        nice, but there is a question pending.
 6             THE WITNESS:  There is a big difference
 7        between cervical spine adjacent disease and
 8        lumbar spine adjacent disease.
 9   BY MR. McELFISH:
10        Q.  Understood.  You testified, though, in
11   that case that based on the fusion you did for
12   Papadakis, that they would need future surgery
13   based on adjacent segment.
14        A.  I may have.
15        Q.  And some of these questions are out of
16   my curiosity.  Some of them are just -- need to
17   be nailed down if you will.  This is one that I
18   think needs to be nailed down, is:  Were you
19   asked to have an opinion or do you have an
20   opinion on any cost of future care for Mr. Bauta?
21        A.  I was not asked that, no.
22        Q.  Okay.  And have you seen the life care
23   plan in this case prepared by either -- there
24   were two -- either the one from Mr. Provder, the
25   plaintiff's life care expert, or the one from
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 119

1    Wendy Cummings, the defendant's life care expert?

2         A.   I saw both of them.

3         Q.   You did.  Do you have any opinion on

4    them?

5         A.   I think the one from the plaintiff was

6    grossly overestimating the amount of studies and

7    injections and treatments that would be

8    necessary.

9         Q.   Was there a life care plan in the

10   Papadakis case?

11        A.   I don't recall.

12        Q.   Are you able to say, as you sit here --

13   and if you don't remember, it's fine -- but are

14   you able to say what -- what recommendations made

15   by Mr. Provder were overexaggerated?

16        A.   I don't recall.  It would have to do

17   with how many MRIs of the cervical spine, how

18   often, how many visits to the doctor, how often,

19   MRIs every year of the cervical and lumbar spine,

20   that kind of thing.

21        Q.   Earlier when I was asking you about

22   future care, you indicated that you would refer

23   to pain management, and they would deal with the

24   pills or whatever.

25        A.   Correct.

**Andrew M. Casden, M.D.**
**2/23/2017**

```
                                         Page 120
 1        Q.  As a foundation for the question, my
 2   question is:  Given the fusion that Mr. Bauta had
 3   in this case, would you recommend any future MRIs
 4   to see where we stand in terms of its progression
 5   or prognosis?
 6        A.  Only if his symptoms change.
 7        Q.  His symptoms are bad enough right now,
 8   right?
 9             MR. MOROKNEK:  Objection to form.
10             MR. McELFISH:  Let me rephrase.  Let me
11        rephrase.
12   BY MR. McELFISH:
13        Q.  When you saw him just a few months ago
14   or, sorry, a year ago, he had severe pain, right?
15             MR. MOROKNEK:  Objection to form.
16             THE WITNESS:  He had pain.  I am not
17        going to comment on the severity of it.
18   BY MR. McELFISH:
19        Q.  Were you able to find out from him or
20   make a determination from him on a scale of 1 to
21   10 what his lower back pain level was at that
22   time?
23        A.  His subjective complaints, I believe,
24   was a 10 -- a 6 to a 10 out of 10.
25        Q.  And on that basis, do you believe that
```

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 121

 1    he would -- because he was post surgical at that

 2    point in time --

 3         A.  Correct.

 4         Q.  -- over eight months, seven months -- do

 5    you believe he would need future MRIs to check

 6    the progression or prognosis of that surgery?

 7         A.  No.

 8         Q.  Okay.  Give me a second to look at my

 9    papers.  Have you had a chance to review the

10    reports or the deposition of defense expert

11    Rabin -- Rabin or whatever it is?

12         A.  Yes.

13         Q.  And do you agree or disagree with

14    anything he says?

15         A.  Again, I didn't go over it in -- I don't

16    recall it in detail, but for the most part I

17    agreed with him, yes.

18         Q.  Did you make any notes in your report

19    about what you agreed with or what you disagreed

20    with?

21         A.  No, I did not.

22         Q.  Do you know him personally?

23         A.  No.

24              MR. MOROKNEK:  Just note my objection to

25         the form of the question as far as the

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 122

1       availability of the documents counsel is

2       talking about as related to when this report

3       was done.

4   BY MR. McELFISH:

5       Q.  What about with respect to Mr. Bauta's

6   neck pain?  Did he exhibit any neck pain when you

7   saw him at the IME?

8       A.  He complained of neck pain.

9       Q.  What recommendations would you make for

10  that?

11      A.  Would I make for that?

12      Q.  Yeah, if he were your patient.

13      A.  I would have him just continue with pain

14  management and physical therapy as such, but I

15  would not recommend surgery.

16      Q.  Would you recommend injections?

17      A.  I usually try one or two cervical

18  epidurals.  I am not a big fan of them.

19      Q.  But you would try them in this case?

20      A.  I would try one or two.

21      Q.  Why did you say you do not think he

22  would need surgery?  Where did that come from?

23      A.  Because I don't think he's got -- I

24  don't know where I would operate.  He's got

25  levels all over the place of little bulges of his

**Andrew M. Casden, M.D.**
**2/23/2017**

Page 123

```
 1    disc, so I don't know how you pick and choose
 2    what level to operate on.
 3          Q.  Right.  Well, you understand in this
 4    case that he has not had an operation on his
 5    neck?
 6          A.  Correct.
 7          Q.  And you understand that plaintiff's main
 8    neurosurgeon expert has opined he does not need
 9    neck surgery?
10          A.  Correct.
11          Q.  So I was wondering where the comment
12    about he did not need a neck surgery come from?
13          A.  From me.
14          Q.  All right.  So you agree with everybody?
15          A.  Yeah.
16          Q.  Okay.  Do you have any other opinions in
17    this case other than what's in your report and
18    other than what you testified to here today?
19          A.  No, I do not.
20              MR. McELFISH:  I have no further
21          questions of this witness.
22              Dr. Casden, thank you.
23              THE WITNESS:  My pleasure.
24              MR. MOROKNEK:  Thanks, Doc.
25              THE WITNESS:  That's it?
```

**Andrew M. Casden, M.D.**
**2/23/2017**

                                                        Page 124

1           MR. McELFISH:  Wait.  Wait.  One thing,

2        before you go, I didn't bring a printed-out

3        version of your report, so if we can just

4        give the court reporter your report as an

5        exhibit to your deposition, at least we will

6        have it marked there.

7           (Casden Exhibit 1, Report of Dr. Casden

8        dated September 28, 2016 marked for

9        Identification.)

10          (Time noted:  3:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 125

1                    A C K N O W L E D G M E N T

2

3    STATE OF            )

4                        ) ss.:

5    COUNTY OF           )

6

7        I, ANDREW M. CASDEN, M.D., hereby certify

8    that I have read the transcript of my testimony

9    taken under oath in my deposition; that the

10   transcript is a true, complete and correct record

11   of my testimony, and that the answers on the

12   record as given by me are true and correct.

13

14

15                    _____

16                        ANDREW M. CASDEN, M.D.

17

18

19   Signed and subscribed to before me, this _____

20   day of _____, _____.

21

22

23   Notary Public, State of _____

24

25

Page 126

1          C E R T I F I C A T E

2

3     STATE OF NEW YORK      )

4                           )ss.:

5     COUNTY OF NEW YORK     )

6

7          I, DARBY GINSBERG, a Notary Public

8     within and for the State of New York, do hereby

9     certify:

10         That ANDREW M. CASDEN, M.D., the

11    witness whose deposition is herein before set

12    forth, was duly sworn by me and that such

13    deposition is a true record of the testimony

14    given by such witness.

15         I further certify that I am not related

16    to any of the parties to this action by blood or

17    marriage; and that I am in no way interested in

18    the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto set

20    my hand this 6th day of March, 2017.

21

22

23    _____

24    DARBY GINSBERG
      Commission Number: 01GI6230654
25    Expires:  11-1-2018

Andrew M. Casden, M.D.
2/23/2017

**A**

**able** 11:7 30:23 30:24 32:4 33:23 50:2 70:7 72:13 74:22 77:2 99:25 118:3 119:12,14 120:19
**abnormalities** 35:15
**abrasion** 93:7
**abrasions** 93:5
**absent** 85:10,14
**absolute** 16:3
**absolutely** 60:13 83:2
**accident** 8:23 12:24 13:11,23 14:6,11 15:10 29:24 45:19,23 47:16 79:14,25 80:1,5,13 81:1 81:3,14 82:20 85:13 93:18,19 93:23 94:12 95:2 115:3
**accidents** 13:7 14:3
**accounted** 78:15
**acquired** 75:2
**acted** 91:7
**action** 126:16
**active** 59:4
**actual** 25:19
**acute** 68:12 78:6 79:6
**add** 22:4 84:11
**addition** 24:12
**additional** 22:17 109:19 110:7 110:14
**address** 98:13,14
**adjacent** 108:25 109:1,1,7,19

110:8,14 117:14,14,15 118:7,8,13
**admonitions** 11:19,24 23:11
**advise** 63:19
**afternoon** 5:7 56:16 113:21
**age** 15:6,9
**aggressive** 60:2
**ago** 32:17,20 91:11 114:21 117:7 120:13 120:14
**agree** 34:11,17 64:18,18 85:9 91:22 99:15 100:21 121:13 123:14
**agreed** 35:10 121:17,19
**ahead** 18:1 52:6 84:15 117:24
**AKOS** 1:6
**al** 56:2
**Alladin** 25:2 86:19
**Alladin's** 24:9 24:17 26:12 86:14 101:18
**alleviate** 113:8
**alternative** 100:9,11
**amazed** 59:7
**amazing** 58:22 59:5
**AMERICA** 1:7
**amount** 119:6
**amounts** 106:6
**aside** 14:3 37:24
**anatomically** 87:20
**ANDERSON** 1:6
**ANDREW** 1:16 4:3 125:7,16

126:10
**ankles** 20:11
**answer** 12:4 19:3 43:25 45:1 70:22 84:13 89:15 103:12 112:13 113:8,15 116:1
**answered** 70:18 85:2 95:5
**answering** 117:19
**answers** 112:16 125:11
**anteriorly** 36:24 36:25 37:2
**anymore** 7:6 53:13
**apologize** 41:16 52:21 56:19 58:7
**apparent** 69:13
**Apparently** 100:1
**Appearing** 3:15
**application** 49:3
**appreciate** 49:20
**appropriate** 59:16
**April** 86:2,6,11
**area** 11:10
**areas** 5:17 18:3
**Argumentative** 105:22
**arm** 87:20
**arrested** 55:7
**arrived** 12:21
**articles** 79:19
**ascertain** 87:9
**asked** 6:1 8:17 8:21 9:1,6,9,11 9:14 15:18 16:11 45:12,25 49:14,18 57:8

64:20 67:14 70:17 85:1 91:18 93:11 95:4 108:6 112:12,17,22 113:7,13 114:4 116:18 118:19 118:21
**asking** 10:20 11:6 12:1,2 34:24 58:11 67:10 71:19 80:19 81:2 86:15 87:7 94:11 101:19 101:20 108:4 119:21
**asks** 58:17
**assault** 55:12,14
**assessment** 116:10
**assignment** 8:13 8:14
**assume** 81:15 82:13,18 87:3 89:8,9 111:24 111:25 112:17
**assuming** 42:5 44:1 75:10,11 79:23 114:11
**assumption** 80:10
**attention** 15:16
**attorney** 56:6 65:3
**Attorneys** 2:4,14 3:4
**attribute** 18:7
**availability** 122:1
**available** 22:3 54:19
**avenue** 3:5 103:3
**average** 90:7

**avoid** 60:23
**avoided** 100:19
**aware** 11:16 13:21 14:2,3,8 17:16,17 26:4 26:6,8,10 111:19 112:2
**axial** 35:2 77:16
**axials** 77:20

**B**

**B** 4:6 55:14
**back** 6:16 13:6 14:10 18:2 20:24 21:2 25:15 30:8,9 33:14 36:18,22 43:2 45:13,14 47:15 50:17 52:17 53:18 54:12 57:22 59:9 60:24 61:19 65:16 67:7,9 68:3 69:25 70:22 71:3 78:4,16 79:4,8,9,13 82:1,2 91:24 93:2,20,20,24 97:11 99:17 100:2 101:23 108:9 110:6,22 120:21
**background** 5:11
**backward** 19:1 19:21
**backwards** 15:20 29:3
**bad** 114:23 120:7
**ballpark** 107:2
**Barmen** 2:17 25:9,12 28:13 46:15,20 47:2

Andrew M. Casden, M.D.
2/23/2017

47:7,9,11,23
47:25 48:2,19
50:23 51:8,10
51:17,20,24
52:3,6,24 53:4
53:9,11,25
54:25 55:11,18
55:20,23 56:11
56:12,23 57:8
58:2,24 59:3
59:14,18,22,23
62:11,15 63:1
63:6,12,21
64:10 65:24
66:1,3,5,8,13
67:21,23,25
73:5,6,9,12,15
73:18 96:10
98:11 106:3
115:20
**Barmen's** 48:7
**base** 81:7 109:23
**based** 14:13 17:2
17:3 78:9
96:13 103:11
108:16 110:7
110:14 117:1
117:15 118:11
118:13
**basically** 90:5
103:14
**basis** 98:19
120:25
**Bauta** 1:3 8:23
9:15 12:16
13:4,22 14:5
32:16 40:7
45:19 56:1,6
79:23 92:2
93:24 96:7
101:23 107:16
108:17 109:17
111:20 112:3
118:20 120:2
**Bauta's** 15:6

39:13 46:4
47:14 81:4
84:5 91:24
93:16 114:11
115:15,23
122:5
**beginning** 11:14
11:22
**behave** 50:4
59:20
**behavior** 61:20
**belief** 81:7
**believe** 8:1 24:11
26:17 67:2
74:25 75:18,24
75:24 76:3,10
76:22 77:5
78:25 79:25
80:5,13,21
81:3 82:15
84:8 86:5
91:15 93:7
94:19,21 95:6
96:25 98:7,9
98:20 99:9
100:8 102:16
103:2,10,16,21
104:1,2 108:9
108:20,22
110:24,25
112:6,8,20
113:13,24,25
114:3,9 115:1
115:13,21
116:23 117:2
120:23,25
121:5
**believer** 104:3
**believes** 74:15
**bend** 15:19
16:13 18:6,20
19:1,21,22
**bending** 15:20
18:11
**best** 58:8 63:18

**better** 14:9
41:17 86:16
100:18 102:11
115:15,22
116:4,13
**biceps** 20:10
87:18
**big** 7:9 104:3
118:6 122:18
**bilateral** 71:20
**bill** 83:11,13,13
83:15,21,22
106:20,22,24
106:25
**billed** 104:16
**billing** 105:20
106:13
**bills** 7:2 107:15
107:16,16,17
107:17,18
108:4
**biomechanics**
94:10
**BISGAARD**
2:13
**bit** 5:10 29:1,3
59:18 114:22
**blocks** 101:2,4
104:4,10
**blood** 126:16
**board** 5:16
27:24
**body** 11:4,8
92:15 95:9,10
**bone** 85:11,25
**bony** 29:23,25
30:3 85:11,15
**bottom** 20:19
**box** 27:25 28:2,8
28:13
**brachioradialis**
20:11
**Brad** 2:17 47:22
**brad.barmen...**
2:20

**Bradley** 54:25
56:11
**branch** 104:4
**break** 85:5 98:4
**breakdown**
109:2,7
**brief** 60:16
**bring** 7:1 124:2
**Brisbois** 2:13 8:2
**bro** 50:14
**Brook** 3:6
**Brookdale** 24:9
86:6,11
**Brooklyn** 92:15
**brought** 6:23
**buddy** 55:22
**building** 9:24
**bulges** 43:9,13
68:11 122:25
**bulging** 43:8
**bully** 58:20
**bus** 13:23 14:6
14:11 93:23
94:13
**buttocks** 39:3,6
**Bye** 65:20
**bypass** 12:3

**C**

**C** 2:1 3:1 5:1
125:1 126:1,1
**C.V** 76:1
**C2** 68:11
**C3** 68:11
**C3-4** 68:12
**C4** 68:9
**C4-C5** 70:11
**C5** 68:9,9
**C5-C6** 70:11
**C6** 68:9
**C6-7** 68:9
**C7** 69:2
**California** 2:6
**call** 20:6 22:3
40:4 51:18

52:5 54:1,11
54:13 56:18
58:7 60:9
66:22 81:16,24
**called** 5:1 11:24
16:16 20:18
28:21 52:14
53:17,22 54:3
54:6 57:21
60:20 64:19
67:3 82:14,15
105:17
**calling** 52:16
53:18 56:17
57:12
**canal** 35:20 38:1
**Capiola** 25:22
**car** 93:18
**care** 9:3,12
53:11 61:4
66:4 86:20
101:24 102:9
103:17 107:18
108:19,21
110:23,24
111:12 112:21
117:5 118:20
118:22,25
119:1,9,22
**Casden** 1:16 4:3
4:7,8 13:15
56:13,22 102:4
123:22 124:7,7
125:7,16
126:10
**case** 1:9 6:7,12
6:15 7:14 8:13
8:22 9:9,12
12:13 24:6,22
26:21 29:19
40:12 52:1
58:21 62:13
68:14,16 69:1
69:5,20,25
79:12 80:20,21

81:3 83:4
90:20 91:10,15
91:19 93:12
95:15 96:7
99:9 103:9
104:16 107:15
114:3,20,25
115:2,9,22
116:17,19,20
116:22 117:1,8
117:12 118:11
118:23 119:10
120:3 122:19
123:4,17
**cases** 7:24 10:6
12:8 88:18
89:1 90:14
113:14 116:19
**caught** 15:15
**causally** 8:23
45:22
**causation**
115:23
**cause** 37:16 38:1
38:19 40:9
77:4 78:22
80:16
**caused** 80:13
81:4 93:16,23
95:11
**causes** 38:24
**causing** 40:15,16
41:2,4 60:7
62:16
**CAV** 1:7
**central** 35:16,18
37:12,13,15
38:1 68:8,9
71:18 77:17
**centrally** 37:8,14
40:24 70:6
76:20
**certain** 31:22
99:19
**certainly** 14:13

18:8 31:7
61:17 115:13
**certified** 5:16
**certify** 125:7
126:9,15
**cervical** 15:21
27:6,9,11,15
67:20 68:3,5
68:13,23 70:1
70:6 71:14
85:10 118:7
119:17,19
122:17
**chair** 10:16
**chambers** 57:21
**chance** 17:25
35:7 59:20
61:21 121:9
**change** 32:1,1
69:21 72:8
76:12 94:11
114:6 120:6
**changed** 72:20
**changes** 23:24
28:23 32:13
33:4,6,10,11
69:15 76:6
78:22 94:2,3
**characteristics**
31:23,24
**charge** 106:9,10
**charged** 107:23
**charges** 106:11
**check** 121:5
**checked** 20:1,13
**Chen** 26:2
**Chen's** 26:3
**chest** 93:1,1
**Chicago** 5:15
**childish** 62:25
64:13
**choose** 123:1
**chose** 46:21
**Chuck** 21:12
**cite** 110:20

**cities** 60:24
**City** 114:21
**claim** 60:21
**claimed** 30:3
**clean** 43:3
**clearer** 71:4
**clearly** 68:25
**clerk** 54:2,5
**Cleveland** 2:16
**client** 63:7
**clients** 105:18
**clinical** 75:19,25
88:10,16
**clonus** 20:18
**clue** 107:22
**co-authors** 76:2
**Coleman** 3:3
6:22
**collision** 95:7
114:5
**come** 9:13 39:3
50:17,18 57:22
58:21 59:9
78:11 84:2
115:8 122:22
123:12
**comes** 79:11
106:12
**coming** 51:3
60:24
**command** 16:12
**comment** 31:3
84:22 120:17
123:11
**commented**
12:12
**comments** 95:18
95:24
**Commission**
126:24
**communication**
58:24
**community** 24:8
96:25
**comparatively**

75:4 116:12
**compare** 38:9
**compared** 43:22
67:16 74:25
**comparison**
34:16 72:3
**comparisons**
32:4 33:23
**complain** 78:11
92:21
**complained**
92:15,24 93:2
122:8
**complaining**
93:25 96:8
**complains** 84:5
93:24
**complaints**
14:10 47:14
78:3,5,15
84:24 92:3
94:14 96:13
99:5 103:19
120:23
**complete** 87:20
125:10
**completely**
74:17 92:8
**compressed**
44:23
**compressing**
76:20
**compression**
37:13,15,25
38:12,14,18
39:19,21,23
40:8,11,25
41:4 44:13
68:23 69:2
70:5,8,15 71:6
71:6,11 78:12
97:17
**computer**
106:12,18
**conceded** 68:22

**concept** 91:22
**concerned** 89:7
**conclude** 61:9
**concluded** 61:7
**concludes** 65:21
**condition** 79:24
80:1,6 81:2,5
108:17
**conditions** 14:4
96:8
**conference** 56:1
57:22
**Connecticut**
91:12
**conservative**
101:24 102:9
103:17 107:18
110:23
**conservatively**
100:22
**Considering**
112:20
**consistent** 46:6
47:14,16 94:13
**Cont'd** 3:1
**contacted** 6:15
6:20 7:22 37:9
**contain** 23:18
**contained** 23:3
**continue** 47:12
49:24 50:2
61:11 62:1
64:21 65:14
66:8,13 122:13
**continued** 63:18
**continuing** 62:8
**contrary** 13:14
**contributing**
86:8
**cooperating**
10:19,19
**cord** 20:16 70:9
**Cordiale** 24:24
25:2
**Cordiale's** 24:11

Andrew M. Casden, M.D.
2/23/2017

Page 4

**Cordially** 21:14
**Cornell** 5:12
**corner** 9:22,23
**correct** 6:11,25
9:25 10:24
12:14 13:25
14:23,25 15:2
17:7 19:16
20:25 22:13
23:6,9,22 24:1
24:25 27:2
28:10 30:10
32:21 33:5,22
34:4,7 35:22
39:25 41:25
42:15,18,21,23
68:16,18 70:4
70:19 71:9
83:17,20 85:18
86:23,25 87:24
87:25 91:1
94:5 97:15
100:24 101:1,3
104:20 105:1
108:15 109:22
111:10 112:1
112:24 113:3
113:11,16,22
114:8 116:21
116:24 117:4
119:25 121:3
123:6,10
125:10,12
**correctly** 70:14
96:23
**correlate** 78:1
81:9
**cost** 118:20
**counsel** 56:3,7
56:22 62:2
122:1
**country** 22:7
**COUNTY** 125:5
126:5
**couple** 18:16,18

79:13 84:19
114:21
**course** 6:17 46:5
**court** 1:1 49:3
51:2 54:1,4,6
56:14,15 61:8
61:15,25 62:6
63:10,19 64:3
64:14 65:9,12
65:14,20 66:20
66:23,23 83:19
124:4
**covered** 19:18
**crazy** 55:4,5
**CT** 27:6 69:10
69:16 92:23
**Cummings**
119:1
**curiosity** 118:16
**curious** 111:13
**current** 23:25
**currently** 89:1
89:14
**customariness**
108:3
**customary**
107:20
**cuts** 93:5

────────
**D**
**D** 2:7 4:1 5:1,1
125:1
**daily** 88:11
**Darby** 1:17
126:7,24
**date** 22:9,10,16
**dated** 4:8 27:7,8
27:9,10,12,15
124:8
**dates** 27:17
**daughters** 58:19
**day** 12:18,19
21:15 113:18
125:20 126:20
**days** 79:13

**deal** 51:7 119:23
**dealing** 11:4
**decades** 18:16
18:18
**decide** 66:19,22
**decided** 59:19
**decision** 99:6
**decompression**
98:25
**decreased** 67:16
**defendant** 56:22
**defendant's**
119:1
**defendants** 1:8
2:14 3:4 56:8
83:11 105:19
**defending** 62:10
**defense** 6:15
88:9 90:12,13
121:10
**deficit** 16:3
**degenerated**
74:25
**Degeneration**
33:10
**degenerative**
28:23 29:4,7,9
29:10 32:13
33:4,6,9,11
43:6 67:11
78:21 79:24
80:8,11 81:1,4
94:2 98:16
**degrees** 15:19,20
15:21,22,23
18:7,20 19:1,8
**dehydrated** 31:4
31:19,24
**dehydration**
33:2
**delayed** 78:24
79:1,7,20
**Delta-v** 94:10
**Demetrios** 24:10
**demonstrated**

16:10
**denied** 93:1
**Dennehey** 3:3
6:22 7:21
**department**
106:13
**depending** 10:18
64:4
**depends** 90:6
99:3 106:15
**depose** 49:13
**deposed** 95:22
102:3,3
**deposition** 1:16
11:21,24 12:7
13:18 32:22
34:19 48:22
49:2,4,6 50:17
50:21 52:11
53:13,14 56:21
57:3,11,17
59:9 60:19
61:7,9 62:1,24
65:15 66:16
74:13 83:22
95:15,21
101:11,21
121:10 124:5
125:9 126:11
126:13
**depositions**
62:11,15 83:21
**describe** 11:3
36:10
**described** 19:24
40:6
**DESCRIPTION**
4:7
**destroy** 7:8
**destroyed** 77:12
**detail** 121:16
**detected** 16:1
**determination**
120:20
**develop** 109:6

**developed** 79:13
79:20
**devoted** 88:14
**diagnosed** 86:19
**dictate** 21:22
**dictation** 21:20
**difference** 62:22
118:6
**different** 13:19
14:22 16:15
80:20 85:4
101:19 106:5
108:2
**difficulty** 10:16
**diminished** 20:6
**direct** 61:21
**direction** 36:10
57:23
**disagree** 121:13
**disagreed** 35:10
121:19
**disc** 30:25 31:1
31:19,19,22,24
31:25 32:1
33:3,10,16,24
34:14 35:16
36:8,21,23
37:1 43:8 68:8
71:16 72:12
74:9 75:12,17
75:21 76:18
77:3 78:7 79:6
79:17,17 81:10
81:16,17,18
83:1,1 85:22
98:15 123:1
**discogenic** 99:16
**discount** 105:12
105:15
**discounts** 105:3
**discuss** 51:13,15
**discussed** 96:3
**discussing** 44:13
78:10
**Discussion** 94:24

Andrew M. Casden, M.D.
2/23/2017

Page 5

disease 5:14 80:8
80:11 109:1,1
109:7 110:8,15
117:15 118:7,8
disk 30:15
disks 77:12
dislocations 30:2
68:11
dispense 11:18
12:2
distracting
46:10,18
DISTRICT 1:1
1:2
dizziness 92:25
Doc 123:24
Docket 56:2
doctor 5:7 48:23
48:25 49:2,20
52:19,25 57:5
57:7,15 59:10
59:17 60:3,6
62:7 64:22,23
64:24 65:16
73:14 80:10
86:15 91:8
95:1 96:5,17
100:9 102:4,4
102:15 111:7
111:15 114:17
117:21 119:18
doctor's 59:3
60:8
doctors 84:22
100:12 115:16
115:24
doctors' 84:4,7
document 77:15
86:21 88:1
documentation
14:9 15:1
23:20
documented
87:23
documents 24:4

24:5 122:1
doing 5:15,19,25
6:4 11:15
16:21 18:14,18
50:9 51:6 52:8
56:19 57:17
61:4 64:10
65:23 66:7,12
73:7,9,16 77:4
104:8,24
106:16
double 106:17
107:6
Dr 4:8 13:15
24:9,10,10,11
24:17,20,24
25:2,22,25
26:2,3,5,7,9,14
26:16 34:9,20
35:1 39:10,10
41:19 42:1,16
42:19 56:13,22
74:11 86:14,19
101:10,16,17
101:17,18,21
102:2,4 123:22
124:7
draft 23:17
drafts 22:18
Drive 2:5
dude 48:1 49:11
51:19 53:8
due 16:2 18:8,9
58:14 87:25
duly 5:2 126:12

E
E 2:1,1 3:1,1,14
4:1,6 5:1,1
125:1,1 126:1
126:1
earlier 15:12,12
40:6 45:12
97:16 101:15
104:22 119:21

early 39:12
86:20
East 1:12 2:15
EASTERN 1:2
edema 76:14
85:12,16,23,25
effect 86:8 104:5
effort 16:2,19
17:1 18:21
EHL 40:4
eight 121:4
either 8:11 22:6
40:3 43:5
106:3 118:23
118:24
elective 96:12
emergency 24:7
78:6
EMG 17:6
encroached 37:8
ENTERPRISE
1:7
entire 59:8
epidurals 101:2
101:5 102:20
103:13,18
104:9 122:18
equal 17:11 20:6
ESQ 2:7,17 3:7
established
39:21
estimate 30:20
estimates 19:8
19:13,15
et 56:2
evaluate 93:11
115:15,23
evaluating
116:11
Evangelical 24:8
92:19,22
event 44:21
75:14 85:13
events 14:4
Everly 6:10

68:14,22,25
91:19 105:2
116:19
everybody 57:3
69:17 123:14
evidence 28:22
29:22 68:12
69:12 91:16,19
ex 53:25
exacerbated
80:1
exact 9:21
Exactly 73:17
exaggerating
17:15
exam 12:17,17
12:19 17:9
18:2 19:17,20
20:12 21:13
22:12,15
examination 4:2
5:5 8:14 10:2
10:22 13:2
examinations
10:7
examine 9:15
10:4 73:13
examined 5:3
13:1 32:16
examining 16:21
excuse 29:6 78:5
exhaust 103:3
exhibit 4:8,12
122:6 124:5,7
exhibits 34:22
34:23
exists 59:4
expect 49:13
expectancy
109:18
expected 78:7
experience 31:15
109:24
experienced
59:24

expert 5:20,25
11:15,21 18:15
60:20 87:8
88:9,19 89:3
90:15,21,22,23
90:24,24 91:7
95:15 104:24
109:16 115:14
115:21 116:20
118:25 119:1
121:10 123:8
experts 107:25
Expires 126:25
explain 39:20
expressions 12:5
Extended 15:22
extent 35:23
extremities
15:25 19:22,23
extremity 86:20
87:23
extrude 36:21
extruded 36:11
81:17,20 82:9
82:25
extruding 40:23
extrusion 36:15
37:25 40:17
41:2 81:22,24
82:3,5,6,18

F
F 48:13 126:1
Fabiani 6:6
104:23 105:16
face 48:7
facet 101:2,4
104:10
facility 106:25
107:17
fact 52:23 78:4
81:8
facts 58:8
Fahan 113:25
failed 102:23

Andrew M. Casden, M.D.
2/23/2017

**fails** 103:13
**Fair** 11:13 35:12
  37:4
**faking** 92:2
**fall** 86:2,5,11
**familiar** 74:5
  110:12,16
**fan** 122:18
**far** 13:17 14:14
  67:9 89:7,20
  104:16 112:9
  121:25
**FAX** 2:9,19 3:9
**FB** 1:9
**February** 1:13
  27:10 90:5
**feel** 12:25 16:18
  16:20 59:12,15
  64:23,24
**feeling** 16:25
  17:3
**feels** 59:11 62:7
**fees** 83:13
**field** 110:13
**Fifth** 25:12
**fight** 53:3
**figures** 107:4
**file** 6:16 7:1
**film** 35:5,14,15
  36:8 37:5 43:5
  67:15,20 71:13
  73:22,23 74:14
  74:24 76:8,8
  76:19 77:3
  78:9 81:23
  82:3,7,17
**films** 30:24
  31:11,16 32:3
  43:2,3 67:8,11
  68:3,5 69:5
  72:2,4,9,10
  73:3 75:4,12
  77:8,14 85:10
  97:17 114:12
**final** 22:19 32:23

59:20 61:21
**find** 24:5 42:13
  61:23 77:1
  102:15 103:7,8
  104:5 120:19
**finding** 16:24
  20:7 37:3
  39:13 81:9
**findings** 17:10
  20:13,21 21:16
  23:4 70:2 78:1
  84:6,25
**fine** 20:5 85:7
  88:25,25
  119:13
**fingers** 20:22,23
**finish** 49:5 50:16
  50:20 89:6
**firm** 2:3 6:21
  7:25 8:3
**first** 1:7 5:2 6:14
  51:4,5 53:16
  58:3,4 104:24
**FIRSTGROUP**
  1:7
**five** 10:7 66:15
  84:9,14,16
  88:12 109:12
  113:14
**flexed** 15:21
**focal** 72:12,15
**focus** 88:16
**follow** 36:20
**follow-up** 45:15
  74:12
**following** 54:13
  80:23
**follows** 5:3
**foot** 20:19,20
**foramen** 38:24
  39:19,19 40:13
  40:25
**foramina** 38:13
  38:19 40:9
  44:14 71:12,19

78:12 97:18
**foraminal** 38:6
  71:6,20 78:15
  81:11
**forensic** 88:14
**forgot** 19:9
**form** 10:9 13:24
  14:17 25:3,4
  30:13 36:1
  37:17,21 38:20
  39:3,15 40:18
  41:5 42:8,25
  43:11,15,24
  44:9,25 46:7
  58:12 68:17
  69:9,22 70:17
  73:2 75:5
  76:21 77:6
  78:13,20 80:2
  80:15 82:21
  84:12 85:1,17
  87:2 92:4 94:6
  94:15,20 95:4
  97:2,20,25
  99:2,11,18
  101:7 103:5,20
  104:19 105:21
  107:21 108:12
  110:9 112:25
  113:4,10
  114:14 115:4
  115:10,17
  116:7,14
  117:16 118:1
  120:9,15
  121:25
**forth** 126:12
**forward** 15:19
  18:6,20 19:21
  19:21 61:16
**found** 58:11
**foundation**
  105:24 120:1
**four** 64:20
**fracture** 69:7,12

85:11,14
**fractured** 68:10
**fractures** 28:22
  30:2,4 68:16
  68:23 69:1,3
  69:13
**fragment** 81:19
**frame** 77:15
**Franklin** 24:12
**frankly** 59:13,23
**friend** 6:1
  104:23
**front** 36:19,21
  36:24 60:3
  105:5
**fuck** 53:5
**full** 15:24,25
  17:14 18:21
**funny** 73:5
**further** 48:23
  123:20 126:15
**fused** 96:20
  98:16
**fusion** 17:22
  98:9,24 99:15
  100:12 106:9
  106:15,17
  107:6 108:10
  108:17 109:25
  110:15 113:8
  116:23 117:1,3
  118:11 120:2
**fusions** 109:19
  110:7,14
**future** 9:11
  108:19,20
  110:23 111:12
  112:21 117:5,6
  117:13 118:12
  118:20 119:22
  120:3 121:5

––––––––––––
       **G**
––––––––––––
**G** 125:1
**games** 51:6

**gang** 56:25
**gastroc** 40:3
**general** 24:13
  29:4 67:8
  96:21
**generally** 11:23
  29:8 36:2 68:4
  72:3,24 74:23
  85:25
**generated** 24:21
**gentleman** 57:15
  57:16 60:25
  109:5
**getting** 10:16
  87:6 114:17
**Ginsberg** 1:17
  126:7,24
**give** 8:8 58:8
  59:19 61:20
  111:1,12 121:8
  124:4
**given** 11:17 46:2
  88:13 120:2
  125:12 126:14
**giving** 16:25
  18:21
**go** 13:1 28:4
  33:14 48:3,12
  49:9 50:15,23
  51:12 52:6
  53:3,23 58:3,4
  59:1 60:7 61:2
  61:16 63:6
  64:18 67:7
  84:15 100:2
  108:8 111:3
  117:24 121:15
  124:2
**God** 55:20
**goes** 29:2 74:10
**Goggin** 3:3 6:22
**going** 15:4 18:2
  24:2 34:12
  35:9 41:15
  43:2 45:13

48:13,21,22
49:11 50:6
51:10,15,17,25
53:5 55:6
57:24 58:7,23
61:8,11,15,18
62:1 63:16,17
66:8,13,14
68:3 72:2
97:11 99:5
110:22 120:17
**goniometer**
19:11,12,14
**good** 5:7,9 6:3
17:1 52:3,18
56:16 114:19
116:10
**great** 55:9 76:25
**Greyhound** 1:6
56:1
**groin** 39:4,5
**grossly** 97:8
119:6
**GROUP** 1:7
**grown** 61:5
**GUBICA** 1:6,6
**guess** 12:5 15:13
49:7 67:8
82:14 86:8
116:19 117:10
**Gutstein's** 39:10
41:19 42:2,16
42:19
**guys** 6:7 49:9
50:3 51:6 55:1
57:17 94:22
105:6

—————————
**H**
—————————
**H** 4:6
**hallway** 48:6
65:8
**hammer** 20:2,3
**hand** 126:20
**handgrip** 87:19

**Hang** 55:1
**happen** 12:11
114:13
**happened** 6:12
22:1 59:25
93:18,19 95:3
**happening** 45:5
49:8
**happens** 65:22
**harassed** 57:13
**harassing** 60:11
**harassment** 53:1
55:14
**hard** 81:24
**hardware** 100:5
**harm** 49:12
**Harold** 3:7
50:20 54:24
55:17 56:10
58:6
**head** 26:22
45:13 70:14
92:18,24 93:6
93:7
**headache** 92:23
**hear** 41:19 74:1
**heard** 29:13 45:5
48:17 52:24,25
53:1 66:20
71:2
**hearing** 3:16
65:21
**height** 31:25
68:10
**Hello** 54:14
**help** 34:25
**hereunto** 126:19
**herniated** 33:3
79:6,17 81:10
81:15,18 83:1
**herniation** 30:12
30:14,15 31:3
35:17,19,23,25
36:9 37:12
43:10,14,21

71:16,18 72:19
73:22 74:10,15
75:14,18,21
78:7 82:4,15
82:16 98:17
**herniations**
36:23 37:1,2
68:8
**Hi** 54:15,17
**history** 12:24
13:1,6,10
**hlmoroknek@...**
3:10
**hold** 16:12 55:2
65:1 101:24
**Hollywood** 2:6
**honestly** 46:10
47:22 50:13
63:22 66:2,3
67:25
**Honor** 57:13
58:2,6,15 62:4
62:9 63:2,16
**HONORABLE**
3:14
**hospital** 5:14
9:24 24:8,9,13
28:6 86:6 88:8
88:12 92:14,19
107:10
**hour** 83:14
**hours** 83:3,7,8
**Huh** 73:6
**hurt** 79:9
**hurts** 79:10
**hydrated** 31:4
31:19,22 33:17
34:3,16
**hydration** 30:25
31:1,2,3 32:6
33:2,21 34:15
74:22 75:2

—————————
**I**
—————————
**I.D** 4:7

**ice** 86:2,5
**idea** 51:19 72:16
78:25 106:14
107:5,23
**Identification**
124:9
**identify** 56:4,8
**IME** 122:7
**IMEs** 89:25
105:11
**immediately**
58:5
**impact** 86:2
**impaled** 115:5
**impalement**
114:25
**impingement**
44:15
**importance**
22:25
**important** 7:16
7:18 14:24
24:5 28:19
42:7,10
**impression** 37:5
**inappropriate**
60:14
**include** 9:7,8
**including** 9:3
57:5,7 60:6
101:2 117:6,14
117:14
**increase** 44:22
**increased** 67:15
76:18 77:3
**indicated** 86:6
117:13 119:22
**indication** 75:13
**indications**
76:15
**information**
13:14
**initial** 69:6
**initially** 68:16
69:2 78:3

**injections**
102:20 103:13
103:18,23
119:7 122:16
**injured** 40:15
81:13
**injuries** 8:22
13:7,22 26:22
26:22,23 92:18
93:5,16,23,25
94:14 115:15
115:23
**injury** 29:23
39:18 45:19,22
68:12 72:8
78:8 79:1,17
85:13,15,21,22
85:24 86:3,7
93:12,16 95:12
114:23,23
115:3
**inside** 40:25
**insofar** 102:2
**instance** 8:21
9:1 16:13 17:4
40:12
**instrumentation**
17:22 98:10
**insurance**
106:16
**intensity** 34:6
**interested** 26:24
126:17
**interosseous**
87:18
**interrupt** 16:5
23:13
**interrupts** 49:17
**intimation** 84:23
**intimidating**
56:23
**involved** 75:20
**issue** 13:20 68:1
**issues** 13:7 63:19

Andrew M. Casden, M.D.
2/23/2017

**J**

**J** 2:17
**January** 6:19
9:18 22:12
89:23
**job** 46:20
**John** 6:6
**Joint** 5:14
**JOSE** 1:3
**JR** 3:14
**judge** 50:10 52:1
52:13,15 53:16
53:17 54:18
55:3 56:16
57:6 58:20
59:7,22 61:12
61:17 62:17
63:9,16,25
64:2,9
**jury** 115:8
**Justice** 63:10

**K**

**K** 125:1
**KAROLY** 1:6
**keep** 7:10 22:5
**keeps** 89:5
**kept** 14:16
**kidding** 49:10
49:11
**kind** 8:9 46:20
111:5 119:20
**kinds** 14:4
**Kings** 113:21
**knee** 16:13 45:19
45:22
**knees** 20:9,10,11
**knew** 104:24
**knock** 48:1
50:12 65:6
**know** 6:12 9:5
10:13 11:7,12
11:20 12:4,20
17:23 18:14
23:23 25:8

26:11 30:5
32:16 34:5
40:6 42:6,9
46:23 57:19
59:18 60:9
61:10 62:8
63:9 66:12
73:16,17,18
74:17 75:8
83:3,5,7 85:6
85:10 86:16,17
88:5,22 89:5,6
89:11,15 93:4
93:18 95:9
98:15,16
101:16 107:1
107:11,13
109:2 110:4
112:9 115:11
116:17 117:8,9
118:4 121:22
122:24 123:1
**knowing** 18:13
**knowledge** 98:14
**Kolb** 26:7

**L**

**L** 3:7 125:1
**L2** 43:23
**L3** 43:23
**L4** 39:1,8,22
43:23
**L4-5** 29:16
39:18
**L4-L5** 17:22
39:22 44:14
72:12 76:10,12
76:18 77:3
96:19 97:13,19
98:5,20 100:10
**L5** 28:21 39:1
44:14
**L5-S1** 17:22
28:23 29:17
30:16 32:5,13

33:3,16,24
34:14 36:9
38:3,8 39:24
40:1,8,12
43:10,14,21
44:5,14 67:16
70:16 71:8,8
71:23 72:19
73:22 74:15,23
75:12,14 97:24
98:22 100:11
108:10
**lack** 14:9
**laminectomy**
17:21 98:9,24
**large** 30:12,15
30:20 75:17,20
78:6 82:15,16
**larger** 43:18
44:1,4,5,8,10
**lateral** 35:19
38:5 71:6,11
**laterally** 40:8
70:6,10,15
76:20
**laugh** 73:12
**laughing** 57:3
73:10
**law** 2:3 7:25 8:3
**lawyer** 6:1 64:6
64:7 90:20
104:23
**lawyers** 12:12
63:23 64:2,3,5
**lay** 7:12,17
**lays** 7:15
**LC** 2:3
**leave** 66:18 84:1
**leaving** 66:16
**left** 15:22 16:1,4
16:6,7,8 21:14
30:15,16 36:14
36:22 37:11,25
38:17 40:17,24
64:21 68:9

70:11 71:12,17
71:24 78:8
81:10 82:19
88:2 93:3
96:10
**left-sided** 35:16
37:16 41:2
**leg** 16:6,7,8,12
16:14 17:13,14
17:15 38:25
40:5 78:5,8,18
78:18,22 79:4
79:5
**legs** 93:2
**let's** 32:3 49:9
50:10,15,16,20
50:23 52:4,7
60:7 65:22
67:6,7 88:13
93:20,20 98:4
108:8
**level** 29:16 32:5
35:3 38:7,24
70:16 76:15
96:19 97:14
98:17 106:17
107:6 109:1
117:14,15
120:21 123:2
**levels** 32:5 33:24
34:2,15 38:10
67:17 68:24
71:7,22,24
74:24 75:1
106:16 109:19
122:25
**Lewis** 2:13 8:2
**Lichy's** 26:5
**lie** 55:20,20,21
66:12
**lied** 66:10
**lies** 57:24
**life** 63:11 109:18
118:22,25
119:1,9

**lifetime** 109:18
**lifting** 40:4
**ligament** 85:24
**light** 28:2,8
**likelihoods**
109:6
**limp** 10:17 11:11
15:14 40:7
**limping** 11:1,3,4
11:8
**line** 51:3 54:23
**Lines** 1:6 56:1
**list** 41:20
**listen** 50:19
**listening** 10:19
**literature** 110:12
110:17,20
**little** 5:10 6:4 8:7
10:11,13 20:2
20:3,5 29:1,3
54:11 59:18
71:3 72:11,25
108:1 114:22
122:25
**living** 100:4
**LLC** 1:7
**LLP** 2:13
**logical** 41:12
**long** 5:19,22
10:1,4 16:22
17:10 20:13,21
22:14 83:23
117:7
**longer** 10:11,14
10:18
**look** 28:2 30:23
30:24 31:1,11
32:1 36:3 37:1
41:1 46:3
64:14 65:25
77:18,19 95:17
121:8
**looked** 24:8
30:24 31:2
34:21 72:21

95:16
**looking** 28:8
  31:16 33:12
  34:2,5 65:24
  66:1 77:16
  85:9 93:17
  96:12
**Lopez** 114:20,20
**lost** 33:21
**lot** 11:16 23:2
  73:19 82:22
  83:5 87:17
**loudly** 60:2
**low** 14:10 20:24
  21:2 47:15
  79:4
**lower** 14:5 19:23
  79:24 86:19
  87:23 93:2
  120:21
**luck** 52:3
**lumbar** 15:18
  17:21 19:1
  27:8,10,11,15
  32:3 33:25
  35:2,14 43:3
  67:8 70:14
  71:5,7,14,15
  75:21 106:19
  118:8 119:19
**lying** 60:18

_____

**M**

**M** 1:16 4:3 5:1
  125:1,7,16
  126:10
**M.D** 1:16 5:1
  125:7,16
  126:10
**machine** 21:23
**mad** 23:16
**magnitude**
  81:13
**main** 88:16
  123:7

**making** 49:16
  94:14 103:19
**man** 47:3 67:24
  73:8
**manage** 111:16
**management**
  108:23 110:25
  111:7,15
  119:23 122:14
**manner** 60:2
**March** 126:20
**mark** 77:22
**marked** 124:6,8
**marriage** 126:17
**Marshall** 3:3
  6:21 7:21
**match** 84:5,24
**material** 7:2
  36:11 40:23
**materials** 7:2,5
**matter** 11:22
  126:18
**McELFISH** 2:3
  2:7 4:3 5:6
  10:12 14:1,18
  14:19 25:6,10
  25:14,21 28:1
  28:16 30:17
  36:4 37:19,23
  38:22 39:17
  40:20 41:8
  42:12 43:1,12
  44:3,11 45:2
  46:8,13,18,23
  47:5,8,13,19
  47:22,24 48:1
  48:3,6,9,11,15
  48:18,24 49:1
  49:5,9,14,18
  49:23 50:1,6
  50:10,13,16,20
  50:24 51:2,9
  51:12,15,19,22
  51:25 52:4,8
  52:12,16,19

53:2,7,10,15
53:19,22 54:2
54:5,8,10,14
54:15,16,20
55:5,9,16,19
55:22 56:5,5
56:16,17 57:7
58:9,10,15
59:2,12,20
60:1,16 61:10
61:13,19 62:9
62:19,21 63:4
63:21 64:1,10
64:17 65:1,4,6
65:10,13,18,23
66:2,4,7,10,18
66:20,24 67:2
67:5,21,24
68:2,19 69:18
69:24 70:20
71:1 72:7 73:3
73:7,10,13,17
73:19,20 74:1
74:4 75:7
76:24 77:7
78:17,23 80:4
80:18 82:21,24
84:15,17 85:4
85:8,19 87:5
92:10 94:8,18
94:22,25 95:8
96:15 97:5,22
98:3,12 99:8
99:14,21 101:9
102:6 103:1,6
103:25 104:21
106:2,8 107:24
108:13 110:11
113:1,5,12
114:16 115:7
115:12 116:3,8
116:16 117:19
117:23 118:4,9
120:10,12,18
122:4 123:20

124:1
**mean** 9:24 11:20
  12:4,20 18:8
  29:25 31:18
  36:24 43:16,18
  44:1 57:1
  61:11 62:4,5
  64:16 72:23
  78:2,5 87:19
  88:22 89:6
  90:4 93:17
  105:3
**meaning** 91:7
**means** 15:24
  101:8
**meant** 44:6
**measure** 30:18
**measured** 19:9
**measurement**
  35:5 87:13
**measurements**
  19:7
**mechanical**
  79:16
**mechanics** 95:9
**mechanism**
  93:11,15 94:9
  94:10,12 95:1
  95:10
**med** 5:12
**medial** 104:4
**medical** 8:15
  12:25 13:5
  14:4 17:24
  41:11,16 59:4
  76:5 94:11
  96:25 107:16
  108:19,20
  110:23 111:12
  112:21
**medication**
  102:17 111:16
  111:18 112:23
**medications**
  111:20 112:3

**medicine** 5:23
**mentioned** 30:6
  112:15
**middle** 35:20
**migrated** 81:20
  81:21
**Mikelis** 24:20
  25:2
**Mikelis's** 24:11
**Miller** 76:3
**millimeters**
  72:16
**mind** 52:20
**mine** 6:1
**minute** 37:24
  43:3
**minutes** 10:3,5,7
  10:17 52:10,21
  66:15
**misdemeanor**
  55:15
**misplaced** 100:2
**mistaken** 93:8
  114:24 115:6
**Mobin** 34:20
  35:1
**Mobin's** 34:9
  74:11
**modalities**
  100:22
**modifications**
  22:4
**modify** 22:2
**money** 64:5
**month** 6:18
**months** 32:19
  120:13 121:4,4
**morning** 113:20
**Moroknek** 3:7
  10:9 13:24
  14:17 25:3,8
  25:13 27:25
  30:13 36:1
  37:17,21 38:20
  39:15 40:18

Andrew M. Casden, M.D.
2/23/2017

41:5 42:8,25
43:11,15,24
44:9,25 46:7
46:11,16,19,22
47:1,10,18,21
48:5,10,13,17
48:20 49:1,7
49:10,15,19
50:4,8,12,15
50:18 51:1,14
52:7,9,14,18
52:22,25 53:6
53:12,17,20
54:3,6,9,24,24
55:4,7,10,13
56:10,10,25
57:5,10 58:1,3
58:6,10 61:12
61:15,17 62:3
62:10,14,17,20
63:2,5,14,24
64:8,23 65:2,5
65:7,17,22,25
66:14,19,22
67:1,4 68:17
69:9,22 70:17
70:21,24 72:5
73:2,24 75:5
76:21 77:6
78:13,20 80:2
80:15 84:12
85:1,17 87:2
92:4 94:6,15
94:20 95:4
97:2,20,25
99:2,11,18
101:7 102:1,22
103:5,20
104:19 105:21
105:24 107:21
108:12 110:9
112:25 113:4
113:10 114:14
115:4,10,17,25
116:7,14

117:16,22,24
117:25 120:9
120:15 121:24
123:24
**motion** 15:18
**motor** 16:23
  86:22 87:14,23
  88:1
**Mount** 88:8
  107:12
**moving** 95:10
**MRI** 27:7,8,9
  30:11 31:16,23
  69:14,19 72:22
  81:9,9 82:14
  114:6
**MRIs** 8:16 30:9
  31:8 119:17,19
  120:3 121:5
**multifaceted**
  100:22
**Multiple** 48:19
**muscle** 16:17
  19:23 92:8
**muscular** 79:16
**musculoligam...**
  85:21

_____
**N**
**N** 2:1 3:1 4:1 5:1
  5:1 125:1,1
**Nadia** 7:23
**nail** 13:19
**nailed** 118:17,18
**name** 6:5
**narcotics** 112:9
  112:18
**nature** 43:5,6,7
  67:12 70:3
**necessarily**
  81:19 85:12,16
  85:23
**necessary** 9:4,10
  96:8,11,13
  119:8

**neck** 15:20 30:8
  68:15 85:14
  92:25,25 122:6
  122:6,8 123:5
  123:9,12
**need** 47:3 62:23
  63:22,23 64:1
  64:11 85:5
  108:18 109:18
  110:24,25
  117:5 118:12
  118:16 121:5
  122:22 123:8
  123:12
**needed** 9:12
  96:18 117:13
**needs** 58:5
  108:22 111:17
  112:21 118:18
**negative** 92:24
**negligent** 97:9
**nerve** 37:9 39:22
  44:15,22 97:17
**neuroforamen**
  38:15
**neurologic** 16:3
  16:22
**neurological**
  78:1 84:6,24
**neuropsycholo...**
  26:25
**neuroradiolog...**
  69:11
**neurosurgeon**
  123:8
**never** 29:11,12
  31:2 41:15
  59:23 63:9,10
  110:1
**new** 1:2,12,12,18
  3:6 23:1
  113:23 126:3,5
  126:8
**Niazi** 7:23
**nice** 28:13,14

118:3,5
**non** 91:6
**non-retained**
  91:7
**nonoperatively**
  100:17
**normal** 20:7
  34:16 68:10
  69:12,16
**normal-** 34:1
**North** 2:5
**not-** 61:19
**Notary** 1:18
  125:23 126:7
**notation** 84:22
**notations** 10:22
**note** 10:21 15:3
  15:6,9,11 17:8
  18:2,23,24
  19:5,17 26:18
  39:9,12 42:1
  44:15 72:18
  74:11 84:18,20
  86:18 92:14
  101:14,17,20
  102:1 113:6
  121:24
**noted** 14:21,24
  15:1 28:17
  30:12 33:4
  43:4 68:10
  74:14 84:4
  112:18,23
  124:10
**notes** 7:2 21:17
  21:22 24:10,10
  24:11,11,12,17
  24:19,23 25:20
  26:13 27:1
  101:18,18
  121:18
**notice** 1:17 73:1
  73:21
**noticed** 97:16
**November** 27:8

27:9 72:22
**number** 46:2
  56:2 68:22
  126:24
**numbers** 110:17
  110:18
**numbness** 38:25

_____
**O**
**O** 125:1
**oath** 12:8 125:9
**object** 46:9
  58:19 61:22,22
**objecting** 46:19
**objection** 10:9
  13:24 14:17
  25:3,4,11,14
  30:13 37:17,21
  38:20 39:15
  40:18 42:8,25
  43:11,15,24
  44:9,25 46:7
  47:18 49:16
  58:13,18,25
  68:17 69:22
  70:17 72:5
  73:2,24 75:5
  76:21 77:6
  78:13,20 80:2
  80:15 82:21
  84:12 85:1,17
  87:2 92:4 94:6
  94:15,20 95:4
  97:2,20,25
  99:2,11,18
  101:7 102:1,22
  103:20 104:19
  105:21 107:21
  108:12 110:9
  112:25 113:4
  113:10 114:14
  115:4,10,17,25
  116:7,14
  117:16,24
  118:1 120:9,15

121:24
**objectionable**
46:12 58:12
61:23
**objections** 46:24
62:2
**objective** 16:24
**objects** 58:16
**observation**
12:16
**observations**
23:5,19
**observe** 15:15
33:16 37:4
67:15 74:22
**observed** 10:23
11:9 15:14
33:2 76:7
**obstructionist**
61:13,14
**obviously** 87:7
**October** 14:11
27:7,12,16
28:18,20
**offense** 58:16,18
**offered** 68:15
116:25
**offhand** 42:4
**office** 9:20,23
24:19,23 60:8
83:19 90:10,14
**oh** 5:21 6:17
11:25 51:20
62:20 68:25,25
68:25 91:11
93:17
**Ohio** 2:16
**okay** 5:7,16,19
6:14,20,23 7:1
7:11,24 9:1,14
10:21,25 11:6
11:13 12:6
13:13 14:2
16:18 17:2,8
18:25 20:12,23

21:18,22,25
23:17 24:2,16
24:20 25:22
27:3 29:16
31:4,18 35:13
37:15 38:4
42:24 43:9
44:8,20 45:12
47:1,1 48:7
55:1,22 56:15
63:3 65:13,18
66:10,17 67:1
67:4,6,14,19
68:14 70:5,10
70:13,20 71:2
71:10,24 72:2
72:13,18,23
74:5 75:2,10
76:2,6,17,25
77:13,25 78:9
78:18,24 83:23
83:25 84:3,18
85:20 86:13
87:22 89:17,19
89:25 90:9,11
91:5,24 93:20
94:22 95:14,24
98:13 99:1,15
99:24 100:4
101:10 102:19
104:1 105:12
106:2 107:14
107:14,25,25
108:8,14,16,25
109:23 110:6
111:5 112:2,17
114:3 115:8
116:25 118:22
121:8 123:16
**old** 15:8 23:25
64:12
**once** 69:19 91:9
**ones** 7:15,17
12:7 33:12
34:1 46:11

90:11
**onset** 78:24 79:1
79:7,21
**open** 89:14
**operate** 97:24
100:15 102:11
122:24 123:2
**operated** 102:8
110:4
**operating** 31:12
84:1
**operation** 123:4
**operations** 31:13
**operative** 26:15
**opine** 8:17 9:6
45:13
**opined** 8:19
123:8
**opinion** 9:2
32:23 45:21,24
62:16 68:15
69:6 86:1,9
91:25 92:1,6
92:12 93:14,22
96:5 100:10
102:14 107:19
108:9,18
110:22 111:10
111:11 115:2
116:25 118:19
118:20 119:3
**opinions** 7:13
23:4,19 29:18
107:14 108:1
123:16
**opportunity** 6:3
33:15 86:18
**original** 23:3
**orthopedic** 5:13
5:18 31:7
**Orthopedics**
75:19,25
**outcome** 126:18
**outlined** 96:3
**outside** 48:12

51:12 53:3
57:8,9 59:1,3
60:7
**overestimating**
119:6
**overexaggerated**
119:15
**overnight** 107:7
107:9

**P**

**P** 2:1,1 3:1,1
**p.m** 1:14 124:10
**PAGE** 4:2
**paid** 106:5,21
**pain** 14:10 18:9
77:4 78:4,5,8
78:10,16,18,22
79:13,16 80:16
83:1 85:14
87:25 91:16,19
91:23,25 92:16
92:25 93:1,1,2
93:2 99:17
102:17 108:23
110:24 111:2,5
111:7,12,15,16
111:18,20
112:3 113:8
114:5 119:23
120:14,16,21
122:6,6,8,13
**Papadakis** 91:13
113:6,25
116:17,22
118:12 119:10
**paper** 74:19
75:16
**papers** 44:21
45:4 121:9
**paperwork** 23:2
**parcel** 60:11
**part** 8:24 60:11
92:20 121:16
**parte** 54:1

**participated**
92:7
**particular** 8:18
8:20 9:6,9 24:4
**particularly**
108:1
**parties** 126:16
**passenger** 94:13
**patch** 54:22 55:3
**patched** 54:18
**path** 64:19
**pathological**
58:4
**pathology** 68:4
70:2 72:9
114:11
**patient** 99:16
111:17 122:12
**patient's** 99:4
**patients** 65:16
109:25 110:2,5
**pay** 105:19
**payments**
106:16
**pending** 88:23
89:2 117:20
118:5
**people** 23:14
31:12 97:4
103:23
**percent** 88:12,17
109:12
**Percentage-wise**
109:9
**percentages**
110:13,19
**perform** 16:9
**period** 22:14
**person** 7:21
**Personal** 109:24
**personally** 104:4
121:22
**pertinent** 7:16
**Philly** 62:13
**phone** 2:8,18 3:8

21:24 50:11 54:13 58:7,9 59:6
**photo** 93:9
**phrase** 14:18
**physical** 48:8 49:12 103:3,8 122:14
**physically** 10:4 19:25 52:23 59:2,13 64:25 65:2
**physician** 90:23 90:25
**pick** 123:1
**picture** 35:1
**piles** 7:10
**pills** 111:2,5,13 111:13 119:24
**place** 15:3 110:18 122:25
**plaintiff** 1:4 2:4 8:15 56:3 90:12,16,20,22 119:5
**plaintiff's** 95:14 118:25 123:7
**plaintiffs** 116:20
**plan** 118:23 119:9
**plane** 77:22
**play** 101:5
**PLC** 1:7
**please** 25:16 54:12 56:3
**pleasure** 123:23
**plus** 17:11
**point** 18:12 48:21 58:22 62:6 89:18 102:24 103:15 103:16 121:2
**poor** 16:2,19
**portion** 108:10
**position** 115:15

115:22 116:4,9 116:13
**post** 108:17 121:1
**posterior** 36:18
**postoperatively** 99:6
**potentially** 85:22
**practice** 59:5 88:7,9,16
**practicing** 5:22
**preexisting** 80:8 80:10 81:11,12 94:2 114:12
**preparation** 7:13
**prepared** 21:19 23:7,20 102:4 118:23
**prescribe** 111:6
**present** 3:13 62:14 72:9
**presented** 13:13
**pressure** 20:15
**pretty** 25:10 116:10
**previous** 18:9 72:21
**previously** 75:20
**primarily** 33:13
**printed** 35:1
**printed-out** 124:2
**prior** 13:7,10,22 13:23 14:5,10 22:19 82:20 111:20
**probabilities** 110:13
**probably** 5:21 7:23 8:6 10:3,5 21:7 45:20 86:16 96:20 101:12 106:20

110:18
**problem** 54:11 55:23 56:15 105:20,25
**problems** 62:16 98:18 100:20
**proceed** 25:9 59:16 63:17,17 63:24
**process** 117:25
**PRODUCED** 4:12
**professional** 59:24 63:8
**professionals** 50:5
**prognosis** 120:5 121:6
**progression** 120:4 121:6
**proportion** 43:10,13,17,19 43:20,22
**protrude** 35:25
**protruding** 36:11
**protrusion** 35:24 77:17 85:23
**protrusions** 43:23
**Provder** 118:24 119:15
**providers** 84:10
**psychology** 26:25 27:1
**Public** 1:18 125:23 126:7
**published** 75:18 75:22
**pursuant** 1:17
**push** 20:19
**put** 10:22 12:23 35:5 55:2 99:3 106:20
**putting** 14:2

37:24

───────────
**Q**
**quad** 39:7,8,14 39:20
**qualities** 32:6
**quantify** 44:17 72:14
**quantitative** 87:13,13
**Queens** 113:20
**question** 11:9,17 18:25 25:11,15 33:1,14 36:7 45:15 46:9,15 47:20 70:22 71:3 73:11 76:25 80:20 82:2 85:4 89:16 92:5 94:7,16 101:19 102:2 112:14 113:14 117:17 117:20 118:2,5 120:1,2 121:25
**questioning** 58:25
**questions** 12:24 46:16,21 58:11 58:17 61:23 117:20 118:15 123:21
**quintessential** 63:7
**quite** 8:6 59:13
**quote** 48:10

───────────
**R**
**R** 2:1 3:1 5:1 126:1
**Rabin** 121:11,11
**radiation** 39:3
**radicular** 40:2
**radiographs** 27:11,13 28:18

68:21 69:5
**radiologic** 24:14
**radiological** 27:4
**radiologists** 31:8
**raise** 16:14
**RAMON** 3:14
**range** 15:17 106:20
**Ray** 46:11 49:16 53:9 54:10 56:17 67:23 73:9
**Raymond** 2:7 51:17 56:5 66:14
**read** 12:7 25:15 25:17 29:13 41:20,21 69:11 69:16 70:21,25 95:14,21 125:8
**reading** 7:2
**ready** 54:21
**real** 11:11 57:12 60:20
**realize** 55:10
**really** 46:10 52:14 57:2,20 60:25 61:6 63:8 64:12 89:15 104:5 114:22
**rear-** 95:6
**rear-end** 94:12
**reason** 11:6 24:3 34:24 57:12 60:20 69:13 92:1
**reasonable** 9:4 96:7,16 97:24 98:1 99:1,10 103:7,9,19 107:19 113:7
**reasonableness** 108:3
**rebar** 115:6

Andrew M. Casden, M.D.
2/23/2017

Page 13

**rebuttal** 74:13
**recall** 7:20 8:11
  9:8 11:5,12
  18:22 19:4,5
  25:18,19,24
  26:11 31:5
  32:8 34:23
  39:16 42:4
  45:11,11 69:1
  69:23 72:17
  74:17 75:6,9
  77:13,14 91:17
  91:20,21 92:20
  95:17,21
  101:11 114:2
  117:7 119:11
  119:16 121:16
**receive** 31:8
**received** 9:3
  14:14,20
  103:17
**Recess** 48:4
  50:22
**recognized** 37:2
**recollect** 42:3
**recollection** 8:12
  34:25 71:11
**recommend**
  120:3 122:15
  122:16
**recommendati...**
  119:14 122:9
**recommended**
  102:10
**record** 14:15,20
  21:16 25:17
  48:3,5 50:23
  53:21,23 56:4
  56:9,13 58:15
  70:25 83:9
  86:10 87:8,10
  94:24 125:10
  125:12 126:13
**recorded** 11:8
  87:16,17

**recordings** 22:5
  22:6
**records** 7:3,12
  8:15 17:24
  22:3,17 24:7,9
  25:20,23,25
  26:3,5,11 27:1
  39:10,12 41:19
  42:2,17,20
  45:9,18 46:2
  83:6,6 84:4,7
  84:19 86:14
  92:14 96:3
  116:11
**Rectal** 114:23
**rectum** 115:6
**refer** 119:22
**reference** 26:12
  74:18
**references** 26:14
**referring** 20:8
  23:18 24:17,21
  35:19 109:2
**reflect** 48:5
  69:20
**reflexes** 17:11
  20:1,20
**refresh** 34:25
**regard** 34:11
  45:15 47:15
  77:13 102:14
  103:17
**Regardless**
  83:23,24
**registered** 18:19
**regression** 75:17
**relate** 20:23
  29:18
**related** 8:23 14:5
  16:19 26:21
  45:22 75:19,25
  76:12 122:2
  126:15
**relates** 21:2
**relating** 13:6

**reluctant** 56:18
**remember** 11:7
  67:7 77:22
  93:10 101:17
  114:20 119:13
**remind** 34:12
**removed** 63:22
**rephrase** 36:5
  40:21 46:8
  80:24 112:19
  115:18 120:10
  120:11
**report** 4:8 6:24
  7:11 8:12,16
  8:25 9:2,7
  10:23 14:21
  15:4 21:18
  22:2,8,15,16
  22:18,19 24:21
  26:18 31:6
  32:7,9,12,19
  34:9 41:23
  42:3,6,10,14
  42:22 69:6,20
  70:12 73:25
  74:3 76:9
  77:25 83:16
  84:20 86:16,17
  88:3 89:6,12
  95:19 96:4
  101:14,20,22
  102:5 104:17
  112:12 121:18
  122:2 123:17
  124:3,4,7
**reporter** 56:14
  70:23 124:4
**reports** 7:10
  23:3,17,25,25
  24:18 25:1,19
  26:15 27:18
  31:8 68:21
  74:12,13 82:14
  88:4 89:4,5,19
  121:10

**represents** 63:6
**require** 107:6
  108:20
**requirements**
  111:16
**RER** 1:9
**reschedule** 60:25
**Research** 75:19
  75:25
**resist** 16:11
**resistance** 19:23
**resorbed** 74:15
  75:3
**resorption** 74:6
  74:20 75:4,12
  75:16,20
**respect** 10:25
  13:4 18:6,25
  22:8 24:16,20
  34:8 35:14
  36:8 38:4,5
  44:12 58:14
  67:19 69:25
  86:14 87:22
  88:7 91:24
  96:2 98:5,22
  100:11 103:18
  108:8 122:5
**response** 60:16
**result** 17:4
**results** 69:19
**retained** 89:2,5
  90:19,24 91:6
**retrolisthesis**
  28:21,24 33:9
**retrospect** 87:16
**returned** 98:11
**returning**
  102:19
**reveal** 40:1
**review** 8:15,21
  22:17 45:25
  74:14 83:15
  121:9
**reviewed** 7:13

  24:14 83:5
  84:19 87:8
  101:10
**reviewing** 17:24
  84:18 101:13
**reviews** 84:21
**REYES** 3:14
**rhizotomies**
  104:12
**rid** 51:22
**ridiculous** 46:22
  52:2 64:17
**right** 7:20 8:8
  9:20,25 10:1
  12:10,15 14:8
  14:13 15:23,25
  17:13,14,15
  19:6 21:1
  23:16 28:11
  30:4,6,11
  31:15 32:2,18
  36:16,22 37:16
  38:16,17,25
  39:2,7,9,14,23
  40:12,25 54:7
  57:4 59:21
  61:8,16 64:6
  67:19 69:4
  75:11 78:11
  79:10 80:9
  82:13 86:10,22
  86:24 87:14,22
  88:18,19,20,23
  90:10,15 93:3
  97:14 98:4
  114:13,25
  120:7,8,14
  123:3,14
**right-sided** 38:1
  38:18,19 41:3
  41:3 44:12
  72:12
**rmcelfish@mc...**
  2:10
**room** 9:21 12:23

JE50-0140

Andrew M. Casden, M.D.
2/23/2017

Page 14

24:7 28:4
56:13,24 57:23
64:22 78:6
84:1 96:10
**root** 37:9 44:15
44:22 97:17
**Rosenberg's**
24:10 25:25
**Rotated** 15:22
**routine** 88:11
**RPR** 1:18
**rule** 23:12
**rules** 11:23
**Rye** 3:6

---

**S**

**S** 2:1 3:1 4:6 5:1
**S1** 28:21 37:9
39:1
**SABRINA** 1:6
**sac** 37:4,5,9
**sagittal** 35:2
77:16
**sagittals** 77:20
**sake** 67:8
**save** 21:25 22:20
22:24
**saw** 24:7 26:11
27:5,6,20
28:21 30:14
42:11 72:24
77:17 78:10
82:17 95:23
101:12,21
119:2 120:13
122:7
**saying** 32:11
51:14 91:21
96:24
**says** 59:6 121:14
**scale** 120:20
**scan** 27:6 69:10
69:14,16 92:23
**scarring** 18:3
**scene** 60:8

**school** 5:12
41:16
**science** 79:20
**scope** 8:13,24
26:20 45:16
46:5
**scratch** 20:19
**screws** 100:1
**se** 101:13
**second** 8:8,10
26:10 55:2
65:1 121:8
**see** 9:19 11:10
15:5,7 19:19
22:8 25:1,23
25:25 26:2,5
26:15 27:18,19
30:11 34:19,22
35:7,11,14
58:14 62:20
65:22 66:11
68:4,7 70:1,7
72:8 76:11,17
81:22 82:3,6
84:3 85:12,16
85:23,24 86:10
94:23 100:7
101:13 105:25
110:7 120:4
**seeing** 23:24
25:18,19 28:14
116:11
**seen** 12:11 29:12
34:8 41:21
44:20 45:18
60:15 63:11
67:10 72:21
79:12,15,19
93:9 118:22
**segment** 108:25
109:2,7 110:8
110:14 117:15
118:13
**self** 18:1
**sending** 101:23

101:25
**sense** 18:19
41:12,14 46:14
46:17,24,25
87:17,21
**September** 4:9
22:10 124:8
**Seriously** 47:8
67:22
**service** 21:20
**set** 30:8 83:13
126:11,19
**sets** 30:7
**setting** 59:25
**seven** 5:21 11:16
121:4
**severe** 120:14
**severity** 120:17
**shenanigans**
47:4,7,9,25
48:2 51:11
**Sherbourne** 2:5
**show** 28:15 30:1
117:18 118:3
**showed** 68:8
69:14
**shown** 68:20,21
**shred** 7:8
**shredded** 14:16
14:22 42:19
**shrinkage** 73:21
**shrunk** 73:1
74:16
**side** 11:4,8,10
15:25 16:1,4
30:15,16 37:10
37:11 38:16,17
40:13 71:12,17
71:25 78:11
81:10 82:19
86:24 87:15
88:2
**sign** 33:9,11
91:23 98:18
**signal** 31:23,24

34:6,6 67:15
67:16 69:14
**Signed** 125:19
**significant** 38:11
**signs** 20:15,21
44:20
**similar** 21:2
116:15
**simple** 25:10
58:21
**simply** 60:4
**Sinai** 88:8
107:12
**single** 57:2
**sir** 36:9 65:17
108:25
**sit** 13:21 119:12
**sits** 59:4
**situation** 99:22
113:17
**situations** 99:19
**six** 32:19 107:4
113:14
**size** 31:25 43:22
76:18
**slightly** 13:19
80:20
**slipped** 29:2
**slowly** 15:17
**small** 72:15,15
98:17
**smaller** 43:20
74:9
**SMITH** 2:13
**socks** 21:7,9
**somebody** 6:21
16:21,25 18:11
**Somewhat** 70:11
**sorry** 16:4 23:10
27:13 36:7
40:23 60:18
71:15 74:1
75:22 84:15
94:22 120:14
**sort** 12:17 32:23

**sorts** 62:25
**sound** 21:12
57:1
**sounded** 6:3
**sounds** 51:20,24
114:19
**speak** 59:17
**SPEAKER**
54:15,17,22
55:1,25 56:7
**speaking** 116:12
**specific** 27:4
33:7 94:9
110:17
**specifically**
15:11 20:8
32:12 38:23
72:25
**speculate** 87:7
**speed** 94:11
**spend** 64:5
88:15
**spent** 5:14 83:4
**spinal** 5:15 13:2
20:16 26:21,22
26:23 35:20
70:8
**spine** 13:23 14:5
15:18,21 19:2
27:7,8,9,10,11
27:15 29:23
30:2,4 33:25
35:3 36:24
68:13 70:1,6
70:14 71:5,7
79:24 96:21
100:5 118:7,8
119:17,19
**spoke** 67:12
**Spontaneous**
75:17
**ss** 125:4 126:4
**staff** 53:1 59:3
**stand** 120:4
**stare** 62:24

staring 51:5
  56:24 64:15
start 32:3 47:2,4
  52:10,13 66:16
started 6:3 12:21
  104:24 105:10
starting 25:6
state 1:18 98:19
  125:3,23 126:3
  126:8
statement 50:25
STATES 1:1
stay 107:7,9
stenosis 38:5,6
  71:21 81:11
step 52:20
stiffness 92:25
stop 18:11 47:22
  47:23,23,24,25
  48:21 49:14,18
  50:14 65:9,9
  65:12,14,14
  67:21,23,24
stopped 58:5
straight 16:12
  16:14
Street 1:12 2:15
strength 15:23
  15:24,25 16:23
  17:14 92:9
structural 114:6
structure 29:23
  29:25 85:11,15
student 76:5
studies 24:14
  27:4,5,18,19
  27:20 28:3,5,9
  30:6 69:15
  77:21 119:6
subject 35:13
  48:22
subjecting 48:24
subjective 16:22
  18:10 120:23
subscribed

125:19
subsequently
  41:22
suffered 13:22
sufficient 81:13
  103:2
suggest 62:5
Suite 2:15
supplemental
  74:12
suppose 11:18
  84:23
supposed 62:12
  62:12
sure 10:21 23:16
  27:6 32:25
  36:6 43:16
  61:6 66:5
  70:23 96:19
  101:8 115:21
surgeon 31:7
  115:14
surgeons 100:9
  108:2
surgeries 96:6
surgery 5:13,15
  5:18 9:4,10
  17:18,20 18:3
  18:9 24:13
  81:25 96:12,14
  96:18 97:13
  98:5,6,20 99:7
  99:25 100:19
  100:23 102:18
  106:6,6 110:1
  111:21 112:4
  117:6,13
  118:12 121:6
  122:15,22
  123:9,12
surgical 18:3
  106:22,23
  107:17 121:1
Suzanne 76:3
sworn 5:2

126:12
symmetric 17:11
  20:6
symptomatic
  80:6,7,14,17
  81:2,5 82:20
symptoms 44:22
  79:2,3,4 81:8
  94:4 99:4
  120:6,7

─────────
T

T 4:6 125:1
  126:1,1
T1 69:2,15 77:20
T2 69:15 77:20
take 10:2,13
  12:23 21:9,17
  25:12 56:21
  57:9 66:4
  72:18,23 81:25
  100:2 101:4
taken 10:11,17
  28:20 48:4
  50:22 125:9
takes 58:16
  83:23 112:5
talk 47:5 53:15
  62:24 66:25
talked 46:3 76:7
  101:15
talking 27:3,17
  33:8 81:16
  110:3 122:2
talks 64:6,7
tape 21:25
teaming 60:17
technically
  55:11,13
telephone 3:15
  3:15 55:25
Telephonic
  65:21
tell 5:10 12:16
  13:5 18:12

28:24 31:21
  38:23 51:18
  52:4 56:18
  57:24 58:19
  66:23 74:8
  76:19 77:2
  87:9,12 99:25
  104:7
telling 50:14
  52:2
ten 15:19 84:9
  84:14,16 89:24
  90:2 109:8
term 14:9 19:9
  74:5
terminated
  57:11
termination
  57:20 60:23
  64:19
terms 11:3 13:6
  19:7 40:2
  43:22 45:15
  46:4 72:16
  93:24 94:9
  95:1,9 96:25
  102:7 110:18
  111:12 120:4
terrible 36:7
test 11:10 16:9
  16:14,22 17:4
  18:11 19:21,21
  19:22,24
tested 19:22
  87:4 92:8
testified 5:3 10:6
  25:5 80:25
  82:16 91:15
  105:2 113:20
  118:10 123:18
testify 108:2
testifying 113:18
testimony 11:17
  14:14 26:21
  83:18 91:20

96:4 97:11
  125:8,11
  126:13
testing 16:17,23
thank 34:18
  49:20,22 54:12
  65:17,18 70:24
  85:5 86:13
  88:6 123:22
thanks 5:9
  123:24
thecal 37:4,5,8
therapy 103:3,8
  122:14
thereof 115:24
thing 10:15
  20:18 55:16
  59:8 78:4
  106:7 119:20
  124:1
things 15:5
  57:10 59:6
  60:22 61:3
  62:25 63:5
  64:11,15 73:19
  95:11 103:22
think 7:18 12:4
  19:18 21:5
  22:22,25 29:22
  32:13 36:23
  39:21,23 48:21
  49:10 63:12
  67:9,9,14
  71:20 72:11
  78:14 79:6,9
  79:10,22 81:9
  81:11,12,18,19
  81:21 82:4,8
  86:16 91:2
  92:7 93:25
  94:1,1 95:23
  96:18,21 97:3
  97:4,8,10
  98:18 99:5,12
  99:23 102:21

103:11 104:8,9
111:17 112:21
114:22 116:10
116:15 117:8
118:18 119:5
122:21,23
**thought** 7:15
16:2 47:21
93:17
**thousands** 110:5
**threat** 50:8
51:21,24
**threaten** 49:12
50:5,7 51:10
**threatened** 48:7
52:23 59:2,13
60:1 64:25
65:2
**three** 15:12
22:23 53:6
100:23
**time** 12:20 15:6
15:9 21:8
22:14 23:7,20
29:24 47:16
49:21 51:18
65:19 68:4
74:9 76:5 78:8
79:25 83:12
88:12,14,15,17
90:18,19 96:9
117:11 120:22
121:2 124:10
**times** 8:5 48:19
53:6 64:20
82:23 83:6
84:20 91:5,6
**tired** 57:13,14
**Tizanidine**
112:5,15
**today** 5:8 6:24
7:12 13:18,21
14:14 22:9
23:15 27:21
32:22 49:21

84:1 96:4
104:17 117:11
123:18
**toe** 40:4
**toes** 21:1
**told** 58:18 59:11
60:4 61:19
**Tom** 52:5 54:10
**Town** 63:10
**track** 17:10
20:13,21
**trained** 5:13
**transcript** 113:6
117:17,18
118:2 125:8,10
**transcripts**
117:10,11
**trauma** 76:11,15
91:16,20,23
**traumatic** 29:5,6
29:11 43:5,7
44:21 67:11
70:3 75:14
**treat** 100:17
**treated** 50:19
84:9 100:21
116:2
**treating** 65:16
84:4,7,22
90:23,25 91:8
115:16,24
**treatment** 9:3
46:5 96:2
101:16 107:16
**treatments**
119:7
**trial** 12:12 68:20
105:2
**triceps** 20:10
87:18
**true** 10:8 14:16
31:9,10,14,17
35:25 36:22,25
39:4 57:25
60:22 63:3

78:19 101:5,6
114:9 125:10
125:12 126:13
**try** 15:4 16:13
23:11,11,12,13
23:15 24:3
63:16,17 67:6
71:3 75:10
122:17,19,20
**trying** 32:15
42:13 56:21
57:14,16 60:19
60:23 73:13
77:1 87:9
102:13,15,25
118:1
**Twenty-eight**
5:24
**twice** 95:22
**two** 6:18 15:12
22:23 23:14
30:7 52:10
59:1 63:13,23
64:1,3,5 89:12
90:8 100:23
118:24 122:17
122:20
**two-year-old**
49:15
**type** 13:5 14:10
17:3 21:19
23:14 29:15
40:9 81:14
106:15 112:21
**types** 13:7
**typical** 13:2 90:3

**U**

**uh-huh** 20:3
35:4,6 40:14
45:8,17 74:21
80:12 88:21
89:22
**unbelievable**
58:1 63:1

**uncomfortable**
59:11,12 62:7
64:24,25
**undergone** 75:3
**underlying** 81:1
81:4
**understand** 12:6
13:17 31:18
50:1 67:25
80:21 96:23
97:13 98:23
100:6,10
102:14 123:3,7
**understanding**
10:20 95:2
**Understood**
118:10
**underwent**
17:21
**UNIDENTIFI...**
54:15,17,22
55:1,25 56:7
**UNITED** 1:1
**University** 5:12
**unprofessional**
60:14
**unreasonable**
96:22 97:1,7
99:13,23
108:11
**unretractable**
99:16
**untrue** 60:5
**update** 22:16
42:5,10,22
69:20
**updated** 23:1
**upper** 15:24
19:22
**use** 19:13 103:22
**usually** 8:25 9:5
11:21 13:3
24:23 40:3
77:18,18 79:15
112:11 122:17

**V**

**v** 113:25
**vacation** 90:7
**valid** 7:16
**varies** 90:6
**various** 68:23
**Vasile** 45:9
**version** 23:1
124:3
**versus** 56:1
73:22 74:23
76:8 88:9
114:21
**vertebra** 29:1,2
**view** 89:18
**views** 35:2
**Vincent** 45:9
**violate** 23:12
**violated** 23:14
**violence** 48:8
**visible** 93:5
**visits** 119:18
**voiced** 58:12
**vs-** 1:5

**W**

**W** 5:1 125:1
**wait** 26:10 66:6
124:1,1
**waiting** 52:12
**waive** 12:2
**walk** 11:23
12:17
**walked** 8:9
10:16 15:17
**walking** 40:7,7
**want** 13:18
21:12 24:4
32:2 33:14
48:11 52:10,19
53:2,12,14,15
56:18 58:4
61:2,6 64:4,4,5
65:7 72:24
80:9 81:15

82:13 91:25
105:5 117:10
**wanted** 6:2
32:22 57:9
65:10,11 77:1
117:12
**wants** 49:1
**Warner** 3:3 6:22
**Warwick** 63:10
**wasn't** 17:15
41:13 42:7
87:3 114:25
**waste** 117:11
**way** 13:19 18:13
27:23 28:15
29:19 36:9,13
44:17 50:19
55:6 57:1
59:16 62:3
64:8 75:8
76:11 85:20
86:15 92:1
93:14 95:25
96:11 100:8
109:10,16
114:18 126:17
**We'll** 28:14
**we're** 23:18
50:11
**weakness** 16:1
16:10 37:16
38:2,19,25
39:13,20 40:3
40:4,5,9,16
41:3 78:19
86:19,21,22
87:14,18,24
88:2
**week** 62:11
79:14 90:8
113:23
**weekends** 88:15
**weighted** 69:15
77:21
**Wendy** 119:1

**went** 5:12 48:6
57:8
**weren't** 53:23
**West** 2:6 108:1
**Westchester** 3:5
**WHEREOF**
126:19
**white** 28:13
**window** 77:15
**Winn** 26:9,14,16
102:2
**Winn's** 26:13
101:10,16,17
101:18,21
**withdraw** 88:25
97:23
**withstanding**
61:20
**witness** 4:2 5:2
5:20 10:10
11:16,22 13:25
18:15 25:18
30:14 36:2
37:18,22 38:21
39:16 40:19
41:6 42:9
43:18 44:1,10
49:13,22,24
68:18 69:10,23
70:19 72:6
73:25 74:3
75:6 76:22
78:14,21 80:3
80:16 82:22
84:14,16 85:3
85:7,18 87:3
90:21 92:6
94:17,21 95:6
96:11 97:3,21
98:1 99:3,12
99:19 102:23
103:21 104:20
105:23,25
106:5 107:22
110:10 113:11

114:15 115:5
115:11,18
116:1,15 118:6
120:16 123:21
123:23,25
126:11,14,19
**witnesses** 55:24
60:4,5 65:8
**wondering**
123:11
**Woolery** 21:12
**word** 47:10,11
**words** 12:5
41:11 43:21
63:13 82:10
91:21
**work** 5:20,25 6:2
6:4 11:16
18:15 88:9,10
88:14 90:13
100:25 104:9
104:24 117:15
**worked** 8:3
**working** 12:21
21:17 114:17
**world** 53:9 62:22
**worse** 86:7 93:3
116:9,13
**worth** 28:14
102:25
**wouldn't** 20:23
85:12,15,23
96:24
**write** 9:7 75:16
77:14
**written** 44:21
89:20
**wrong** 111:10
**wrote** 32:19
74:18

---

**X**

**x** 1:2,10 4:1,6
**X-rays** 28:20
30:1

---

**Y**

**Yeah** 6:13 12:5
41:13 111:4
122:12 123:15
**year** 5:14 32:16
88:13 89:12,20
89:21 90:1,3,3
119:19 120:14
**years** 5:21,24
11:16 15:8,12
15:12 18:17
89:12 91:11
100:23 104:8
109:8,25
114:21
**yesterday** 23:15
**York** 1:2,12,12
1:18 3:6
113:23 126:3,5
126:8
**Yup** 53:19

---

**Z**

---

**0**

**0** 15:20 19:1
**01GI6230654**
126:24

---

**1**

**1** 4:8 120:20
124:7
**1:57** 1:14
**10** 10:5 18:7,19
83:7 120:21,24
120:24,24
**10,000** 83:15
104:17
**10573** 3:6
**11** 27:10
**11-1-2018**
126:25
**11-millimeter**
82:18,25
**1112** 2:5

**124** 4:8
**13** 28:18 30:8
72:4,10 73:22
75:14 76:8
77:8
**1375** 2:15
**14-3725** 1:9
**14-cv-3725** 56:2
**15** 30:9 72:3
74:24 76:19
77:3 83:8 86:2
**15,000** 83:18
**16** 6:19
**1600** 2:15
**17,500** 104:18
**19th** 9:18

---

**2**

**2-3** 43:8
**20** 15:22,23
18:17 104:8
**20-plus** 109:25
**2003** 114:1
**2011** 114:21
**2013** 14:6,11
15:10 27:7,8,9
27:12,16 28:20
30:11 32:4
35:14 43:4
67:8 68:5 71:8
71:12 72:22
75:4 77:14
82:17
**2014** 86:2,7,11
**2015** 27:10 72:2
72:9 73:3,22
74:14 75:12
76:7
**2016** 4:9 9:18
22:11 124:8
**2017** 1:13
126:20
**215.586.8810**
2:18
**216.344.9421**

Andrew M. Casden, M.D.
2/23/2017

Page 18

| | |
|---|---|
| 2:19 | **8th** 27:9 |
| **23** 1:13 | |
| **25** 8:6 | **9** |
| **25th** 27:12,16 | **9** 27:7 |
| 28:20 | **90069** 2:6 |
| **28** 4:9 22:10 | **914.977.7300** 3:8 |
| 124:8 | **914.977.7301** 3:9 |
| **28th** 27:8 | **98th** 1:12 |
| | **9th** 2:15 |
| **3** | |
| **3** 87:23 | |
| **3-4** 43:8 | |
| **3:50** 124:10 | |
| **30** 10:3 | |
| **30,000** 113:18 | |
| **310.659.4900** 2:8 | |
| **310.659.4926** 2:9 | |
| **37** 15:13 | |
| **39-** 109:5 | |
| | |
| **4** | |
| **4-5** 43:8 | |
| **40** 15:8,21 | |
| **40-year-old** | |
| 109:5 | |
| **44114** 2:16 | |
| **45** 10:3 106:21 | |
| | |
| **5** | |
| **5** 1:12 4:3 15:23 | |
| 15:23 87:23 | |
| **50,000** 106:21 | |
| | |
| **6** | |
| **6** 120:24 | |
| **6th** 126:20 | |
| | |
| **7** | |
| **7,500** 83:22 | |
| 104:17 105:8 | |
| | |
| **8** | |
| **8** 72:22 | |
| **80** 88:17 | |
| **800** 3:5 | |
| **87** 63:9 | |



Andrew M. Casden, M.D.
*Associate Professor*
*Orthopaedic Spine Surgery*
*Leni & Peter W. May*
*Department of Orthopaedic Surgery*
*The Mount Sinai Medical Center*

Mailing Address:
5 East 98th Street, 9th Floor, Box 1188
New York, NY 10029

Office Address:
17 East 102nd Street, 5th Floor
New York, NY 10029

T 212-241-1073
F 646-537-9446

**Mount Sinai Doctors**

September 28, 2016

Ms. Nadia E. Niazi
Marshall, Dennehey, Warner, Coleman & Goggin
800 Westchester Avenue, Suite C-700
Rye Brook, New York 10573

Re: **Jose Bauta**
Date of Accident: 08/09/2013

Dear Ms. Niazi:

I had the opportunity to perform an independent medical evaluation and review of medical records regarding Mr. Jose Bauta, Mr. Bauta presented a driver's license for identification purposes. His date of birth was noted to be December 23, 1975, and he was 40 years old. The examination was carried out in my office on January 19, 2016 located at 5 East 98th Street.

Mr. Bauta reported to me he was involved in a motor vehicle accident on October 9, 2013. At that time he was a passenger on a bus which "crashed". The bus hit the back of a tractor trailer, but he does not remember many details of the accident. He is not sure if the bus drove away from the accident or if it was towed. He was unrestrained at that time. He is not sure if he was taken by ambulance, but he remembers awakening that night in a hospital. According to Mr. Bauta he was treated and released. No fractures were identified, and no surgery was done immediately after the accident. Mr. Bauta reports that the accident is "a blur".

Mr. Bauta reports prior to the accident of October 9, 2013 he had no history of neck or lower back problems. He did not see a physician, and he had no previous MRI or x-rays.

Mr. Bauta reported prior to the accident he was working "side jobs" including yard work and little jobs. He has not worked since the accident.

Mr. Bauta reported that he continued to have pain following the accident with lower back pain radiating down into the lower extremities. He also had a stiff neck after the accident and headache. He tried physical therapy and epidural injections without significant improvement. The pain persisted and seemed to increase.



Casden

2/23/17 RG
JE50 0146

Re: **Jose Bauta**
September 28, 2016
Page 2

Mr. Bauta reported that in May of 2015 he underwent lumbar spinal surgery by Dr. Cordiale. Dr. Cordiale performed a fusion with screws in his back. Mr. Bauta reports that following surgery it "took some pain away", and that he has a "different type of pain now".

Currently Mr. Bauta complains of lower back pain up and down his entire back. He says the pain varies from a 6 to a 10/10. Most days he is about an 8/10. He has pain in the buttock but no leg pain. He does complain of a feeling of weakness in the legs with numbness and tingling. He says the left side is worse than the right side. He says the numbness of the left leg is worse post operatively. He takes Tizanidine at the present time. The pain is quite daily and limiting for him.

Mr. Bauta notes that he also has continued cervical pain when he turns his head to the left or the right along with stiffness. His arms do not feel as strong as before the accident, although he says he does not get tingling. He does not exercise at all because it hurts. He currently is undergoing physical therapy.

Mr. Bauta reports that he walks with a cane. He says he can sit, stand and walk for less than 15 minutes. He notes physical therapy gives him some temporary improvement and then the pain gets worse again. He has headaches on a regular basis also, and he uses the cane all the time.

On examination in my office Mr. Bauta moved around slowly with difficulty getting up from the chair. He had a limp when he walked. His gait was slow. Range of motion of the lumbar spine was 10 degrees of flexion with pain, 0 degrees of extension with pain. Flexion of the cervical spine was 40 degrees, extension 20 degrees, left and right rotation 20 degrees. He had a well healed midline posterior scar. His neurological evaluation revealed 5/5 motor strength in the upper extremities. Lower extremities were 5/5 on the right side, but 4/5 for knee extension and dorsiflexion on the left side but this was felt to be secondary to poor effort rather than a neurologic deficit. Long track findings were absent. Reflexes were 1 plus equal, and symmetric.

I had the opportunity to review various medical records.

Mr. Bauta was seen on the day of the accident, October 9, 2013 at Evangelical Community Hospital. The emergency room note reveals that he was brought to the emergency room via EMS complaining of having struck his head with a headache. He reported some dizziness as well with neck stiffness. He denied chest pain, shortness of breath or back pain at the time of the accident. He did complain of pain in both lower legs, right worse than left. His review of systems was noted to be positive for headaches, meaning that he had a history of headaches. His examination reported some stiffness in the cervical spine, abrasion to the head and face, otherwise a normal neurological evaluation. During this hospital emergency room visit he had a CT scan of the cervical spine which was normal with no evidence of trauma. He had a CT scan of the head done without evidence of any acute findings. He had a CT scan of the facial

Re: **Jose Bauta**
September 28, 2016
Page 3

OCT —> MARCH?

bones with no facial fractures noted. He was discharged in good condition with facial and scalp contusions. He was told to follow-up with a physician.

Mr. Bauta was seen at Brookdale Hospital Medical Center on October 10, 2013. At that time he complained of whole body pain having been involved in a motor vehicle accident the day prior. He was noted to be complaining of "entire body pain". He denied nausea, vomiting, blurred vision, and difficulty walking. He was seen in the emergency room at Brookdale where he was felt to have soft tissue contusions of the scalp, but no further diagnostic tests were done. He was treated and released.

Mr. Bauta was seen in consultation by Dr. Ifran A. Allidin on March 13, 2014. Dr. Allidin notes that Mr. Bauta complained of neck pain and low back pain at the time. He noted that he was taken by ambulance to the hospital in Pennsylvania where the evaluation was negative for fractures. He then notes that he presented to New York Rehab Center for physical therapy and chiropractic care. He was now presenting for follow-up with continued complains of lower back pain radiating into his waist and buttock, but denies radiation into his legs. He said the pain comes and goes from 8 to 10. Mr. Bauta noted that his pain was increased with standing, and difficulty standing from the seated position. He noted occasional numbness and tingling into his left leg. He also complained of neck pain radiating into the trapezius. He denied upper extremity pain. It was also noted he complained of headaches on a regular basis. He said his neck pain can vary from a 2 to a 10/10. The note reports that he had difficulty sleeping at night due to his headaches. His physical evaluation at that time revealed spasms throughout the spine. He was noted to have decreased range of motion also. He was noted to have weakness in the left upper extremity of the biceps, triceps, interossei, and hand grip of 4/5, right upper extremity 4/5, right lower extremity 3/5 due to pain, left lower extremity 4/5 in hamstrings, hip flexors, knee extensor and EHL. There are no reports of any diagnostic studies in Dr. Allidin's report. He was recommended to continue physical therapy and chiropractic care, and to start Lidocaine patches. He was seen on a regular basis by Dr. Allidin and underwent a series of various injection treatments. On March 17, 2014 he underwent bilateral lumbar medial branch blocks at L3-L4, L4-L5 and L5-S1 by Dr. Terrance Winn. This was done at Accelerated Surgical Center of North Jersey. He had another set of injections on April 5, 2014, and on June 14, 2014. On October 18, 2014 he underwent transforaminal nerve blocks at L2-L3 and L3-L4 also by Dr. Winn. Another set of epidurals was done on October 18, 2014. He continued to be followed by Dr. Allidin on August 27, 2014 where his note reads essentially as the earlier notes did.

Mr. Bauta was seen by Glenn Rosenberg, DC on April 15, 2014. He noted that Mr. Buata was complaining of "generalized back pain" that arose 1 week ago as a result of a fall. The note does not mention detail about the fall but does refer to weakness as a result of the fall one week prior to the visit on April 15, 2014.

Mr. Bauta came under the care of Dr. Demetrios Mikelis on November 17, 2014. At that time Dr. Mikelis was part of New York Spine Specialists. Dr. Mikelis noted that Mr.

JE50-0148

Re: **Jose Bauta**
September 28, 2016
Page 4

Bauta sustained an injury on October 9, 2013. He was complaining of lower back pain, neck pain with radiation into bilateral shoulders and right lower extremity with radiation, numbness and tingling. He was also noted to be complaining of headaches. Dr. Mikelis noted that his motor examination revealed weakness of the deltoid on the right side with upper extremity normal reflexes. He noted weakness of 4/5 tibialis anterior on the right, motor strength 4/5 EHL on the right, and altered sensation in the right L4-L5 and L5-S1 dermatome. Dr. Mikelis reviewed MRI scans from November 7, 2013. He briefly reports in his note herniated nucleus at C4, C5, C6 and C7, and herniated nucleus at L5-S1. This is a very scant report without detail.

Mr. Bauta was seen on January 22, 2015 by Dr. Cordiale. Dr. Cordiale noted essentially the same report as Dr. Mikelis. Further evaluation was done by Dr. Cordiale on March 10, 2015. At that time he reports MRI finding dated February 22, 2015 revealing "HNP L4-S1". He noted L5-S1 axial collapse on lumbar spine x-rays dated March 10, 2015. He recommended surgical intervention at that time. On May 27, 2015 Mr. Bauta underwent spinal surgery at Franklin General Hospital by Dr. Cordiale. He underwent a lumbar laminectomy at L4, L5, S1, facetectomies, discectomies, posterior spinal fusion with pedicle screw fixation L4, L5 and S1. BMP was also used. On June 1, 2015 he underwent a second lumbar spinal surgery where he had revision of the re exploration of the disc space at L5-S1, irrigation and debridement of the posterior spine wound, partial removal of hardware and complex wound closure. Post operatively he was followed by Dr. Cordiale. Post operative notes from June 16, 2015 reveals that he is doing well but continued to complain of pain and symptoms consistent with preoperative symptoms. He continued to be followed by Dr. Cordiale on July 28, 2015 and also on October 6, 2015. At both of those visits he notes to be complaining of continued preoperative pain.

A review of radiologic reports and studies was performed.

CT scan of the cervical spine dated October 9, 2013 was reviewed and demonstrated no evidence of acute injury or trauma to the cervical spine. Degenerative changes were noted.

MRI scan of the lumbar spine dated November 8, 2013 was reviewed and revealed bulging discs at L2-L3, L3-L4, L4-L5; rather large central and left sided herniation L5-S1. This was felt to be central with bilateral posterolateral extension. It was noted to encroach on the thecal sac centrally. No definitive evidence of trauma to the lumbar spine was identified. Degenerative changes are clearly noted.

MRI scan of the cervical spine was reviewed dated November 8, 2013 and revealed disc herniations central and to the left at C4-C5, C5-C6, central at C6-C7. The discs were noted to be of normal height. There was no evidence of any fracture, dislocations or spinal cord injury. There were noted to be disc bulges at C2-C3 and C3-C4. No evidence of any acute injury to the cervical spine.

JE50-0149

Re: **Jose Bauta**
September 28, 2016
Page 5

MRI of the lumbar spine dated February 11, 2015 was reviewed and demonstrated small focal and right lateral disc at L4-L5 and the central and left sided herniation at L5-S1 seen on the previous MRI scan of November 8, 2013. No evidence of a traumatic injury to the lumbar spine is identified.

I reviewed plain radiographs of the cervical and lumbar spine that were taken on October 25, 2013 was reviewed. Radiographs of the lumbar spine reveal grade I retrospondylolisthesis of L5 on S1, vertebral heights normal, no evidence of fractures. Degenerative changes at L5-S1. Cervical spine x-rays reveal degenerative lipping and calcification at C5-C6. The disc heights were well maintained. Uncinate joints and facet joints intact. No evidence of any fractures noted.

EMG studies of the cervical spine were done on January 10, 2014. These were normal.

In summary, Mr. Bauta was involved in a motor vehicle accident on October 9, 2013. At that time evaluation in the emergency room revealed no evidence of fractures or dislocations to the cervical spine. No imaging studies were done at that time of the lumbar spine indicating that there was no suspicion of injury to the lumbar area. Mr. Bauta was discharged from the hospital and was seen again the next day at Brookdale Hospital Medical Center. During the second emergency room visit no further diagnostic studies are documented. Clearly there was little suspicion of injury to the cervical or lumbar spine at the time of the accident and the day following the accident. Mr. Bauta was complaining of entire body pain on the day following the accident, and he denied lower extremity weakness. He did not complain of lower back pain at that time or the next day when he visited Brookdale Emergency Room.

During my encounter with Dr. Bauta his subjective complaints of pain were out of proportion to his neurologic findings. I felt that Mr. Bauta exhibited poor effort in his neurological evaluation during my examination. I felt that Mr. Bauta although complaining of severe pain certainly did not appear to be in the amount of pain that he subjectively complained of. His objective neurologic findings did not correlate with his continued subjective complaints.

The radiologic studies reviewed did not demonstrate any evidence of trauma to the cervical spine. The MRI scan of the cervical spine dated November 8, 2013 does not show any edema, fractures or dislocations. There are no findings on this MRI scan consistent with trauma to the cervical spine. The MRI study of the lumbar spine dated November 8, 2013 does not demonstrate any fractures or dislocations. There was noted to be a bulge at the level of L4-L5 and a large central and posterolateral disc herniation at L5-S1. There was clearly preexisting degenerative disc disease. No evidence of trauma was identified. I believe the disc herniation was preexisting as there is no other evidence of trauma. In addition Mr. Bauta did not complain to a medical professional of lower back pain until October 17, 2013. I believe within a reasonable degree of medical certainty had he in fact sustained a large acute herniation he should have had immediate onset of severe lower back and leg pain but he did not.

JE50-0150

Re: **Jose Bauta**
September 28, 2016
Page 6

The second surgical procedure performed was clearly a result of complications from the first operative procedure. Normally the patient would not undergo a second operative procedure for evacuation of hematoma and removal of screws.

The cervical radiologic studies including the xray, MRI and CT scan are consistent with preoperative degenerative disease with no evidence of any acute injury. There was clearly preexisting degenerative disease of the lumbar spine also. I believe the herniation noted at L5-S1 was preexisting and not a result of the accident since he did not complain of lower back pain until October 17, 2013. If Mr. Bauta had sustained a large disc herniation at the time of the accident I would have expected the immediate onset of back and leg pain at the time of the accident.

The office note of Glenn Rosenberg dated April 15, 2014 refers to a "fall" a week before the office visit. The details of this fall are not discussed but led to "weakness" as a result of the fall. The office note reports that the "fall" contributed to his lower back complaints. The details of this fall should be investigated further. This fall may have exacerbated his condition at the time of the fall. If the fall was significant enough to cause "weakness of the legs" then it certainly may have contributed to his underlying spinal issues.

I do not think Mr. Bauta will require surgery of his cervical spine. All of the radiologic findings are preexisting degenerative disease and surgery would not be expected to result in improvement of his complaints of cervical pain. I do not think he will require additional surgery on his lumbar spine. He did not improve following the first surgery and I see no additional indication for more surgery on his lumbar spine.

I Andrew M. Casden, M.D. being a physician, duly licensed to practice in the state of New York, pursuant to CPLR section 2106, hereby certify and affirm that the above is true and with a reasonable degree of medical certainty under penalties of perjury.

If you have any further questions please do not hesitate to contact me.

Sincerely yours,

Andrew M. Casden, M.D.

AMC/rh

JE50-0151